```
 1                    UNITED STATES BANKRUPTCY COURT
                           DISTRICT OF DELAWARE
 2

 3   IN RE:                       .  Chapter 11
                                  .  Case No. 25-10475 (TMH)
 4   VILLAGE ROADSHOW             .
     ENTERTAINMENT GROUP          .  (Joint Administration Requested)
 5   USA, INC., et al.,           .
                                  .  Courtroom No. 7
 6                                .  824 Market Street
                Debtors.          .  Wilmington, Delaware 19801
 7                                .
                                  .  Tuesday, March 18, 2025
 8   . . . . . . . . . . . . . .  10:00 a.m.

 9
                          TRANSCRIPT OF HEARING
10            BEFORE THE HONORABLE THOMAS M. HORAN
                    UNITED STATES BANKRUPTCY JUDGE
11

12   APPEARANCES:

13   For the Debtors:           Joseph M. Mulvihill, Esquire
                                YOUNG CONAWAY STARGATT & TAYLOR, LLP
14                              Rodney Square
                                1000 North King Street
15                              Wilmington, Delaware 19801

16

17

18

19   (APPEARANCES CONTINUED)

20   Audio Operator:           Ian Willoughby, ECRO

21   Transcription Company:    Reliable
                                The Nemours Building
22                              1007 N. Orange Street, Suite 110
                                Wilmington, Delaware 19801
23                              Telephone: (302)654-8080
                                Email:  gmatthews@reliable-co.com
24
     Proceedings recorded by electronic sound recording,
25   transcript produced by transcription service.
```

1 | APPEARANCES (CONTINUED):

2 | For the Debtors:           Justin R. Bernbrock, Esquire
                               Matthew T. Benz, Esquire
3 |                           SHEPPARD, MULLIN, RICHTER
                                 & HAMPTON, LLP
4 |                           321 North Clark Street
                               32nd Floor
5 |                           Chicago, Illinois 60654

6 |                           Alyssa Paddock, Esquire
                               30 Rockefeller Plaza
7 |                           39th Floor
                               New York, New York 10112

8 |
    For Warner Bros.
9 | Entertainment, Inc.
    and its Affiliates:       Matthew B. Harvey, Esquire
10 |                          MORRIS NICHOLS ARSHT & TUNNELL, LLP
                              1201 North Market Street
11 |                          #1600
                              Wilmington, Delaware 19801
12 |
                              -and-
13 |
                              Stephen H. Warren, Esquire
14 |                          O'MELVENY & MYERS, LLP
                              400 South Hope Street
15 |                          Suite 1900
                              Los Angeles, California 90071
16 |
    For Alcon Media
17 | Group:                   Vadim J. Rubinstein, Esquire
                              LOEB & LOEB, LLP
18 |                          345 Park Avenue
                              New York, New York 10154
19 |

20 | For the U.S. Trustee:    Rosa Sierra-Fox, Esquire
                              OFFICE OF THE UNITED STATES TRUSTEE
21 |                          J. Caleb Boggs Federal Building
                              844 North King Street
22 |                          Suite 2207, Lockbox 35
                              Wilmington, Delaware 19801
23 |

24 |

25 |

1    APPEARANCES (CONTINUED):

2    For U.S. Bank
     National Association:    Aaron Gavant, Esquire
3                             BARNES & THORNBURG, LLP
                              One North Wacker Drive
4                             Suite 4400
                              Chicago, Illinois 60606
5

6    For SAG-AFTRA, DGA,
     WGA-West, and MPIPHP:    David E. Ahdoot, Esquire
7                             BUSH GOTTLIEB
                              801 North Brand Boulevard
8                             Suite 950
                              Glendale, California 91203
9

10   For 1397225 Ontario
     Limited and Falcon
11   Strategic Partners IV:   Christopher M. Samis, Esquire
                              POTTER ANDERSON & CORROON, LLP
12                            1313 North Market Street
                              6th Floor
13                            Wilmington, Delaware 19801

14                            -and-

15                            James A. Newton, Esquire
                              MORRISON & FOERSTER, LLP
16                            250 West 55th Street
                              New York, New York 10019

17

18

19

20

21

22

23

24

25

1                                INDEX

2    MOTIONS:                                                     PAGE

3    Agenda
     Item 3:    Debtors' Motion for Entry of an Order (I)          20
4               Directing Joint Administration of Chapter 11
                Cases and (II) Granting Related Relief
5               [Docket No. 3, 3/17/25]

6               Court's Ruling:                                    21

7    Agenda
     Item 4:    Debtors' Motion for Entry of an Order (I)          21
8               Approving the Retention and Appointment of
                Kurtzman Carson Consultants LLC, dba Verita
9               Global, as the Claims and Noticing Agent to
                the Debtors, Effective as Petition Date and
10              (II) Granting Related Relief
                [Docket No. 4, 3/17/25]
11
                Court's Ruling:                                    23
12
     Agenda
13   Item 5:    Debtors' Motion for Entry Interim and Final        23
                Orders (I) Authorizing the Redaction of
14              Certain Personally Identifiable Information of
                Individuals from the Consolidated List of
15              Creditors and Certain Other Filings and (II)
                Granting Related Relief [Docket No. 5, 3/1725]
16
                Court's Ruling:                                    24
17
     Agenda
18   Item 6:    Debtors' Motion for Entry of Interim and Final     24
                Orders (I) Authorizing the Payment of Certain
19              Prepetition Taxes and Fees and Related
                Obligations, (II) Authorizing Banks to Honor
20              Process Check and Electronic Transfer Requests
                Related Thereto, and (III) Granting Related
21              Relief [Docket No. 6, 3/17/25]

22              Court's Ruling:                                    25

23

24

25

1                                INDEX

2    MOTIONS:                                                    PAGE

3    Agenda
     Item 7:     Debtors' Motion for Entry of Interim and Final    26
4                Orders (I) Authorizing the Debtors to (A)
                 Continue to Operate Their Cash Management
5                System, (B) Honor Certain Prepetition
                 Obligations Related Thereto, (C) Maintain
6                Existing Business Forms, (D) Continue
                 Intercompany Transactions; (II) Confirming
7                Administrative Expense Priority for
                 Postpetition Intercompany Claims; and (III)
8                Granting Related Relief
                 [Docket No. 7, 3/17/25]
9
                 Court's Ruling:                                   34
10
     Agenda
11   Item 8:     Debtors' Motion for Entry of Interim and Final    34
                 Orders (I) Authorizing the Debtors to (A) Pay
12               Prepetition Employee Wages, Salaries, Other
                 Compensation, and Reimbursable Employee
13               Expenses and (B) Continue Employee Benefits
                 Programs; and (II) Granting Related Relief
14               [Docket No. 8, 3/17/25]

15               Court's Ruling:                                   37

16   Agenda
     Item 9:     Debtors' Motion for Entry of Interim and Final    38
17               Orders (I) Authorizing the Debtors to (A)
                 Obtain Postpetition Financing and (B) Utilize
18               Cash Collateral, (II) Granting Liens and
                 Superpriority Administrative Expense Claims,
19               (III) Granting Adequate Protection, (IV)
                 Modifying the Automatic Stay, (V) Scheduling a
20               Final Hearing, and (VI) Granting Related
                 Relief [Docket No. 9, 3/17/25]
21
                 Court's Ruling:                                   71
22

23

24

25

EXHIBITS

DECLARATIONS:                                                PAGE

1) Declaration of Keith Maib                                    9

2) Declaration of George N. Koutsonicolis                      10

3) Declaration of Evan Gershbein                               21


Transcriptionists' Certificate                                 77

1          (Proceedings commenced at 10:00 a.m.)

2               THE CLERK:  All rise.

3               THE COURT:  Good morning.  Please be seated.

4               Good morning, Mr. Mulvihill.

5               MR. MULVIHILL:  Good morning, Your Honor.

6               For the record, Joseph Mulvihill, Young Conaway

7    Stargatt & Taylor, proposed counsel to Village Roadshow

8    Entertainment Group USA, Inc. and its affiliated debtors.

9               At the outset of today's hearing, Your Honor, we'd

10   like to thank you for making time to hear us for our first

11   day pleadings.  I'd like to introduce with me in court today

12   is my colleague Christopher Lambe, but I'm also joined by the

13   Sheppard Mullin team.

14               After I make a few introductory remarks, Your

15   Honor, I'll turn it over to Mr. Bernbrock, who will introduce

16   the rest of the team and give Your Honor a brief presentation

17   on the company.

18               THE COURT:  Great.

19               MR. MULVIHILL:  Your Honor, just as a housekeeping

20   matter, we were able to schedule a second hearing with your

21   chambers prior today; I'd like to put that on the record.

22   It'll be April 11th at 1:30 p.m.

23               THE COURT:  Yes.

24               MR. MULVIHILL:  And that will be for our second

25   day hearing and also our bid procedures will be scheduled for

1   that.

2          We filed our agenda today, Your Honor, at

3   Docket 21.  There have been a few updates since then, as Your

4   Honor might expect.  Most importantly, a revised budget was

5   filed at Docket 47, with respect to the DIP.  I wanted to

6   make sure Your Honor had that; if not, I can hand up a copy

7   at the appropriate time when we get to the DIP motion.

8          THE COURT:  Okay.

9          MR. MULVIHILL:  We'd also like to thank Ms. Sierra

10  Fox for working cooperatively with us in advance of the

11  hearing.  We've been able to resolve, I believe, almost

12  everything for the routine first days, Your Honor.  I will

13  say we're completely resolved.  There'll be a couple of

14  revisions that we're going to put on the record as we move

15  through, I believe, it's with respect to cash management --

16         THE COURT:  Okay.

17         MR. MULVIHILL:  -- and we are 95 percent of the

18  way there on the DIP, Your Honor; still incorporating

19  comments from various parties, which we will get to.  I

20  believe there's one open issue with the U.S. Trustee and

21  those will be addressed in due course as we move through the

22  hearing.

23         Finally, Your Honor, we have two declarations in

24  support of our hearing today.  The first is from Keith Maib;

25  he's our chief restructuring officer.  That is our first day

1   declaration filed at Docket 2.

2           At this time, Your Honor, I would move that into

3   evidence.

4           THE COURT:  Does anybody object to the admission

5   of Mr. Maib's declaration, purely for the purposes of today's

6   hearing?

7       (No verbal response)

8           THE COURT:  Okay.  I hear no response.

9           Mr. Maib's declaration is admitted.

10      (Maib Declaration received in evidence)

11          THE COURT:  Is there anybody who would like to

12  cross-examine Mr. Maib?

13      (No verbal response)

14          THE COURT:  I hear no response.

15          MR. MULVIHILL:  Thank you, Your Honor.

16          The second declaration is from Mr. Koutsonicolis,

17  who is our investment banker; that's in support of the DIP,

18  filed at Docket 10.

19          At this time, Your Honor, we would also like to

20  move that into evidence.

21          THE COURT:  Okay.  Does anybody object to the

22  admission of Mr. Koutsonicolis, but it's Koutsonicolis.

23          MR. MULVIHILL:  Your Honor, I spent a lot of time

24  this morning practicing that, as well --

25          THE COURT:  Well, I appreciate that.

1      MR. MULVIHILL:  -- and I think I still might have

2  gotten it wrong -- I got it right for the first time, thank

3  you.

4      THE COURT:  It's important to get it right.

5      Is there anybody who objects to the admission of

6  Mr. Koutsonicolis' declaration for the purposes of today's

7  hearing?

8      (No verbal response)

9      THE COURT:  I hear no response.

10      It is admitted.

11      (Koutsonicolis Declaration received in evidence)

12      THE COURT:  Is there anybody here who would like

13  to cross-examine Mr. Koutsonicolis?

14      (No verbal response)

15      THE COURT:  I hear no response.

16      MR. MULVIHILL:  Thank you, Your Honor.

17      Unless you have any questions for me at this time,

18  I'll cede the podium to my co-counsel, Justin Bernbrock.

19      THE COURT:  I have no questions.

20      Mr. Bernbrock, good morning.  Welcome.

21      MR. BERNBROCK:  Thank you.

22      Good morning, Your Honor.  Justin Bernbrock of

23  Sheppard, Mullin, Richter & Hampton, proposed counsel to the

24  debtors and debtors-in-possession.

25      Your Honor, I'd like to echo Mr. Mulvihill's

1   thanks to Your Honor and Your Honor's staff for accommodating

2   the hearing today.  Also, to Ms. Sierra Fox for working with

3   us over the weekend late, late hours and we're very

4   appreciative for those efforts.

5          On the walk over to the courtroom this morning, it

6   occurred to me with three first day hearings in this

7   courthouse that the great obsession of every debtor lawyer at

8   the first day hearing is to make a splash and given that

9   these debtors are in the entertainment business, I thought

10  that I might try to reenact the great scene from Willy Wonka

11  & the Chocolate Factory where Gene Wilder appears frail and

12  fragile while he's leaving the chocolate factory, only to

13  plant his cane and do a somersault and I thought that might

14  work; although, I'm no Gene Wilder and the last time I did a

15  somersault, I had a broken leg on account of it.

16      (Laughter)

17          MR. BERNBROCK:  Your Honor, I do want to make some

18  additional introductions.  My partner Jennifer Nassiri is

19  with us in the courtroom; our colleague Alyssa Paddock and

20  Matthew Benz.  We've also got, as Mr. Mulvihill said, Mr.

21  Keith Maib, who's the chief restructuring officer of the

22  debtors; Mr. George Koutsonicolis, proposed investment banker

23  to the debtors.  We also got a number of folks on the Zoom

24  line; notably, the company's chief operating officer, Mr.

25  Louis Santor, and the company's general counsel and

1  secretary, Mr. Kevin Berg.  There are also members of the

2  Board on the Zoom, as well.

3        Also in the courtroom -- the other great aspect of

4  being a debtor lawyer is that when you have a new case, you

5  make all sorts of new friends, and some folks who we hope

6  will become friends.  We've got counsel to the DIP lenders,

7  Mr. Newton, and his Delaware counsel in the courtroom.  Back

8  of the courtroom is Mr. Hammerman from the Latham firm; they

9  represent the buyer of the assets or proposed buyer.

10 Mr. Gavant from Barnes & Thornburg, to my left, is ABS

11 trustee counsel.  We've got Ms. Kaufman here who represents

12 the various guilds and her co-counsel, a very dear friend,

13 Mr. Ahdoot is on the Zoom.  And then, of course, the folks

14 from Morris Nichols, Mr. Harvey is here, and I believe his

15 co-counsel from the O'Melveny firm, and they represent Warner

16 Bros.

17        THE COURT:  Uh-huh.

18        MR. BERNBROCK:  All that said, Your Honor, I would

19 like to briefly go through a presentation, if I may, and just

20 to give Your Honor a sense of the company, how we got here,

21 what we anticipate or hope to do in the context of

22 Chapter 11, and what that timeline might look like, and then

23 we'll talk a little bit about the proposed financing.

24        So, go ahead and share that screen, please.

25        Now, as Your Honor may have seen in the filings,

1  Village Roadshow Entertainment Group is an independent motion

2  picture and TV financier and production house and has been

3  operating since the late '90s, 1997, in fact.  They have

4  released and been involved with over a hundred motion

5  pictures, some really interesting and critically acclaimed

6  pictures, indeed, and the overall box office receipts, on

7  account of the projects is a little over $19 billion.

8  Thirty-four, number-one, box office openings.  In connection

9  with the projects, 19 Academy Awards were issued and 6 Golden

10 Globes.  Some of the projects include The Joker, The Great

11 Gatsby, the Ocean series, that movie Sully, the LEGO Movie,

12 and The Matrix trilogy.  I want to put a marker here, The

13 Matrix, or at least one of The Matrix movies, in connection

14 or that the company has been involved with, is the subject of

15 some disputes with Warner Bros.

16           Next slide.

17           So, when Village was created, back in 1997, the

18 idea was that it would be an independent house that would

19 partner with major studios to co-finance projects and also

20 share in the upside of those.  And you see here, the various

21 dates when movies and other projects were released.

22           In 2017, the company was acquired by Vine

23 Alternative Investments and several of its affiliated funds

24 and then the company continued thereafter.  And after that

25 acquisition, and we'll talk a little more later, the company

1  did explore some ventures, most notably, an independent

2  studio venture, and that's -- if you see at the top, the

3  motion picture Cinnamon was one of the projects to emerge

4  from that process.

5          Next slide.

6          So, it's a complicated company.  There's a

7  multinational components to the company.  There's entities in

8  Australia, and BVI, and the United States and those are

9  really the main jurisdictions for the company's entities.

10         There are two principal funded debt silos, what we

11 would commonly call the "senior secured notes" and the ABS or

12 "asset-backed securities" facility.

13         When you think about the business and the company,

14 on an asset basis, you know, there's only three categories.

15 There's the film library, certain derivative rights, and the

16 independent studio business.

17         Next slide.

18         So, this is the broad overview of the debtors'

19 enterprise structure.  The -- and we'll get more granular in

20 the next slide.  We will get more granular in the next

21 slide -- ah, perfect.

22         So, Your Honor, what we are attempting to do here

23 is show the entities in the structure that make up the film

24 library.  These are the owners of the library assets.  These

25 entities are also sellers under the proposed stalking horse

1  purchase agreement.  They are also entities that are obligors

2  under the ABS facility.

3         And I do want to be very candid and clear, as

4  you'll see, the boxes that are outlined in the red, those are

5  entities that are involved in the Warner Bros. arbitration.

6  So, there are claims by Warner Bros. at entities that own

7  library assets.  Beyond those claims, and I should say in

8  related claims to that proceeding, our broad understanding is

9  that these special purpose vehicles own the library and,

10 otherwise, don't owe funded or unfunded debt, aside from the

11 ABS, of course.

12        So the next category, you know, of value across

13 the enterprise, are what we globally call the derivative

14 rights and these are independent intellectual property rights

15 to make derivative works from the underlying copyright or the

16 underlying project in which we own an interest.  These rights

17 were removed out of other entities in the structure,

18 particularly, the library entities, as a product of a

19 transaction within the last, I believe, 18 months, if memory

20 serves.

21        Again, I'll flag that questions about that

22 transaction have been, and likely, will be raised.  We

23 believe that there are justifications for it, but I certainly

24 don't want to hide-the-ball on anything and that transaction

25 of these rights to these assets is something, I suspect,

1   we're going to hear about in the case.

2              Next slide.

3              So, finally, is the independent studio business

4   and this was a venture that the company pursued to create and

5   produce independent works.  Everything up until the creation

6   of this studio business always depended on a partnership with

7   a major studio, most notably, Warner Bros., but there are

8   others:  Sony, Paramount, et cetera.  But this -- these

9   entities represent the independent studio venture.  The

10  claims, the fair number of claims set forth in the debtors'

11  top-20 list of unsecured creditors arise from this business

12  activity.

13             Next slide.

14             So, there are, you know, there are a host of

15  factors, despite the media's focus on the dispute with Warner

16  Bros., which is a factor, but it is one among many.  The

17  company has suffered financial distress on account of

18  disruptions from the COVID pandemic, the 2023 writers and

19  directors strike, the, I should say growing prevalence of

20  streaming companies in the entertainment industry, generally,

21  and other general, macroeconomic headwinds.  So, despite what

22  may have been reported, this is not we are here solely

23  because we have a dispute with Warner Bros.

24             The liquidity crisis, you know, really, at the end

25  of the, in the final analysis arises from the independent

1  studio business' failure to really, you know, catch any

2  altitude on the projects that it produced and made and the

3  loss of our largest studio partner.  The relationship with

4  the largest studio partner, coupled with the inability to, or

5  I shouldn't say, "inability," I should say that the projects

6  just did not take off, as it were.  So, ultimately, that's

7  what set the company on a collision course with the

8  Chapter 11.

9          The good news about the company's entrance into

10 Chapter 11, and to be clear, I don't minimize at all the fact

11 that there are hundreds of millions of dollars, you know,

12 that have been invested in this enterprise, that there have

13 been trade claims and other investments, some of which may

14 not be repaid.  We do enter Chapter 11 with a stalking horse

15 purchase agreement with content partners, which I'm not --

16 certainly, not a show business expert, but as we understand,

17 and our firm certainly has entertained lawyers, this is a

18 very, very highly regarded, well-capitalized, well-financed

19 entertainment company that owns several libraries.  The

20 headline purchase price for that library asset sale is 365

21 million, less some deduction and calculations.  So it is a

22 significant sum of money.

23          Next slide.

24          Here is our, just at a very high level, our

25 proposed or projected case timeline.  Of course, yesterday,

1   March 17th, was the petition date.  We, as Mr. Mulvihill

2   said, established April 11th for the second day hearing and

3   entry of the bid procedures order.  I will note, April 11th

4   is the day before Passover and if Your Honor doesn't mind, I

5   would ask on behalf of our friends in the Jewish community,

6   that anyone can appear via Zoom, as there's not going to be

7   meaningful argument.

8            THE COURT:  Absolutely, yes.

9            MR. BERNBROCK:  Thank you, Your Honor.

10           We do have a milestone deadline to have the final

11  DIP order entered on or before April 21st.  We've got a bid

12  deadline of May 16th; a proposed auction, if necessary, of

13  May 21st; a sale hearing on May 29th; and hopefully, a sale

14  closing on or about June 17th.

15           Next slide.

16           To accomplish that, the company does require

17  debtor-in-possession financing.  The headline amount on that

18  facility is just shy of $13 million.  Of that, there's a $7

19  million new-money component, the balance of which is proposed

20  to be a roll-up from certain bridge notes that were issued in

21  the last several weeks.

22           We're not seeking to roll-up anything today;

23  indeed, the only thing that we're seeking to do today is to

24  draw $500,000 on an interim basis and subject to the interim

25  order.  We -- the company simply does not have adequate cash

1  flow, as is shown in the budget, to fund the cases, absent

2  this facility.

3          Your Honor, that really winds up my presentation

4  and I'm going to turn it over to Mr. Benz next to walk

5  through some of the motions.  I'll call back up and talk with

6  you about the DIP facility itself when we get to that motion

7  in the agenda.

8          I will say that -- and thanks is due to the

9  parties that I introduced and those that are on Zoom.  I

10  believe that we have a substantially consensual first day

11  hearing and I really do want to thank the parties because, I

12  guess, the final obsession of debtor lawyers is to get past

13  the first day hearing.  And so I think we can present Your

14  Honor with a consensual first day calendar.  Thank you, Your

15  Honor.

16          Any questions?

17          THE COURT:  With the films in which the debtors

18  own rights, do they have any merchandising rights that go

19  along with that?

20          MR. BERNBROCK:  I do not know that answer, Your

21  Honor.  I'm going to look to see if we -- they do not.  No,

22  Your Honor, they do not.

23          THE COURT:  Okay.  Thank you.

24          MR. BERNBROCK:  Thank you, Your Honor.

25          I'll cede the podium to Mr. Benz.

1          THE COURT:  Good morning, Mr. Benz.

2          MR. BENZ:  Good morning, Your Honor.

3          Matthew Benz of Sheppard, Mullin, Richter &

4 Hampton, proposed counsel to the debtors and debtors-in-

5 possession.

6          Your Honor, I will start with the debtors' joint

7 administration motion, which is filed at Docket 3.

8          There are 34 entities that have filed petitions,

9 all of whom are affiliates within the meaning of Section 101

10 of the Bankruptcy Code.  Pursuant to the motion, the debtors

11 seek joint administration of these cases for procedural

12 purposes only under Case Number 25-10475, which is the

13 proposed lead debtor case of Village Roadshow Entertainment

14 Group USA, Inc.  The debtors view this request for relief as

15 routine and submit that it will facilitate the Court's

16 administration of these cases.  We have shared drafts of the

17 motion with the United States Trustee prior to the petition

18 date and have incorporated any comments received.

19          Unless Your Honor has any questions, the debtors

20 request entry of the order, as attached to the motion as

21 Exhibit A.

22          THE COURT:  Okay.  Is there anybody who would like

23 to be heard regarding joint administration?

24     (No verbal response)

25          THE COURT:  Okay.  I hear no response.

1          It's, of course, typical first day relief that's

2   warranted in a multi-debtor case like this one, so I'm happy

3   to grant the motion.

4          MR. BENZ:  Thank you, Your Honor.

5          Next up on the agenda is the debtors' application

6   to retain Kurtzman Carson Consultants, LLC, d/b/a Verita

7   Global, as the claims and noticing agent in these Chapter 11

8   cases, and that application is filed at Docket 4.

9          The application is supported by the declaration of

10  Evan Gershbein, which is attached as Exhibit B to the

11  application.  At this time, we would request that the

12  Gershbein declaration in support of the Verita application be

13  moved into evidence.

14         THE COURT:  Does anybody object to the admission

15  of Mr. Gershbein's declaration?

16      (No verbal response)

17         THE COURT:  Okay.  I hear no response, and it is

18  admitted.

19      (Gershbein Declaration received in evidence)

20         THE COURT:  Is there anybody who would like to

21  cross-examine Mr. Gershbein?

22      (No verbal response)

23         THE COURT:  Okay.  I hear no response.

24         MR. BENZ:  Thank you, Your Honor.

25         The appointment of Verita, as claims and noticing

1  agent, in these Chapter 11 cases will expedite the

2  distribution of notices, the processing of claims, facilitate

3  other administrative aspects of these Chapter 11 cases and

4  will relieve the Clerk of the Court of the administrative

5  burden of processing what may be an overwhelming number of

6  claims.

7         The debtors submit that Verita has the necessary

8  qualifications and more than enough experience to serve as

9  the claims and noticing agent in these cases and, indeed,

10 Verita has served as claims and noticing agent in numerous

11 large Chapter 11 cases.

12        The debtors have shared drafts of the application

13 with the United States Trustee prior to the petition date and

14 incorporated any comments received; specifically, the debtors

15 have filed at Docket 49, an engagement agreement with Verita,

16 which attaches a rate sheet in response to one of the United

17 States Trustee's requests.  We believe that that has resolved

18 all outstanding concerns.

19        Unless Your Honor has any questions, the debtors

20 request that Your Honor enter the order attached as Exhibit A

21 to the application.

22        THE COURT:  Does anybody wish to be heard

23 regarding Verita's engagement here?

24    (No verbal response)

25        THE COURT:  Okay.  I hear no response.

1       Based upon the record before me, I do find that

2   the relief is warranted and will grant the motion.

3       MR. BENZ:  Thank you, Your Honor.

4       Next on the agenda is the debtors' PII redaction

5   motion, which is filed at Docket 5.

6       Pursuant to the motion, the debtors seek authority

7   for entry of interim and final orders authorizing the

8   redaction of certain personally identifiable information of

9   individuals contained within the debtors' consolidated list

10  of creditors and certain of the filings within these

11  Chapter 11 cases that may contain similarly personally

12  identifiable information or otherwise sensitive information

13  of individuals.

14      The debtors submit that cause exists to redact PII

15  from the debtors' filings, due to concerns of identity theft,

16  harassment, stalking, phishing scams, and other similar

17  concerns.

18      The debtors propose to provide unredacted or to

19  file -- excuse me -- unredacted copies of all redacted

20  filings under seal and to provide the Court and the United

21  States Trustee and other parties in interest, upon request,

22  with copies of those unredacted filings.  We have shared

23  copies of the motion, drafts and motion with the United

24  States Trustee prior to the petition dates and incorporated

25  any comments received.

1      Unless Your Honor has any questions, the debtors

2  respectfully request that Your Honor enter the interim order,

3  attached as Exhibit A to the motion.

4      THE COURT:  Does anybody wish to be heard

5  regarding the PII motion?

6      (No verbal response)

7      THE COURT:  Okay.  I hear no response.

8      Based upon the evidence before me in the form of

9  Mr. Maib's declaration, I do find that the relief requested

10  is necessary to avoid the immediate and irreparable harm to

11  the debtors and, therefore, I'll grant the motion on an

12  interim basis.

13      MR. BENZ:  Thank you, Your Honor.

14      Next on the agenda is the debtors' taxes motion,

15  which appears at Docket 6.

16      Pursuant to the taxes motion, the debtors request

17  entry of interim and final orders, authorizing the debtors to

18  pay certain prepetition taxes and fees, due and owing to

19  taxing authorities, and these taxes arise in the ordinary

20  course.  The debtors remit the taxes and fees to various

21  foreign, federal, and state, and local government taxing

22  authorities and these taxes and fees relate to certain

23  property, income, sales and use, GST; i.e., goods and

24  services taxes, that are incurred in these jurisdictions in

25  the ordinary course of business.

1          The debtors believe that the relief requested is

2    appropriate because the failure to pay such taxes and fees

3    could subject the debtors to penalties and fees imposed by

4    the various taxing authorities and incurring these penalties

5    and fees could jeopardize the debtors' operations in a

6    material manner and also jeopardize the debtors'

7    restructuring efforts more broadly.

8          Pursuant to the motion, the debtors are requesting

9    authority, but not direction, to pay $2,700 in taxes and fees

10   on an interim basis and $16,700 on a final basis.

11         We have shared drafts of the motion with the

12   United States Trustee prior to the petition date and

13   incorporated any comments received.  And unless Your Honor

14   has any questions, we would respectfully request that Your

15   Honor enter the order, the interim order attached to the

16   taxes motion as Exhibit A.

17         THE COURT:  Does anybody wish to be heard

18   regarding the taxes motion?

19     (No verbal response)

20         THE COURT:  Okay.  I hear no response.

21         Based upon the evidence before me in the form of

22   Mr. Maib's declaration, I do find that any irreparable harm

23   would come to the debtors if I did not grant this relief on

24   an interim basis.  The debtor simply needs to pay its taxes

25   and avoid the sorts of consequences that you described.  I'd

1   also note that the amounts at stake here are minimal, but the

2   consequences of not paying those amounts could be quite

3   upsized.  So, I'm certainly satisfied that the debtors have

4   shown why it's appropriate and I would grant the motion on an

5   interim basis.

6          MR. BENZ:  Thank you, Your Honor.

7          I will now cede the podium to my colleague,

8   Ms. Paddock.

9          THE COURT:  Okay.

10         Welcome, Ms. Paddock.

11         MS. PADDOCK:  Thank you.  Good morning, Your

12  Honor.

13         For the record, Alyssa Paddock, Sheppard, Mullin,

14  Richter & Hampton, proposed counsel to Village Roadshow

15  Entertainment Group USA and its affiliated debtors.

16         Your Honor, first, I will turn to the debtors'

17  cash management motion, which is Agenda 7 and filed at

18  Docket 7.

19         This motion has been previewed with the U.S.

20  Trustee and last night we received a couple comments to add

21  clarifying language to the proposed interim order from Alcon

22  and Warner Bros.; both of those comments have been

23  incorporated and, again, shown to the U.S. Trustee.

24         We actually have a new redline that's fresher than

25  the one we sent to the Court this morning, if I could bring

1  it up to you.

2           THE COURT:  Yes, please.

3           MS. PADDOCK:  May I approach?

4           THE COURT:  Yes, you may.

5           Thank you, Ms. Paddock.

6           MS. PADDOCK:  Your Honor, this motion seeks

7  authority for the debtors to continue operating their

8  existing cash management system in the ordinary course, honor

9  prepetition obligations relating to bank fees, and to

10 continue to honor intercompany transactions in an ordinary

11 course, as well as seek administrative expense priority for

12 post-petition intercompany claims.

13          The debtors' cash management system, like most, is

14 designed to collect, transfer, and disburse funds through the

15 debtors' operations and to accurately record such

16 collections, transfers, and disbursements.  Continued use of

17 this cash management system is critical to support the

18 debtors' current operations, and I can provide Your Honor

19 with a quick overview of the schematic attached to the motion

20 as Exhibit D.

21          THE COURT:  Certainly.

22          MS. PADDOCK:  Your Honor, as you will see here,

23 while the debtors technically have 21 bank accounts, they

24 only operate and control 6.  The bottom 14 accounts are all

25 restricted and operate at the direction of the ABS trustee

1 and pursuant to various transaction agreements.

2        Historically, the debtors only receive money from

3 those accounts on a quarterly basis for a servicing fee

4 that's calculated every quarter and differs from quarter to

5 quarter.  The debtors do not have direct control of those

6 accounts and, similarly, the siloed accounts to the left of

7 the page, is more of a pass-through account due to a cash

8 flow arrangement based on a transaction for the sale of

9 distribution proceeds with Alcon.  That relates to one of the

10 comments to the order.  So the debtors do not operate that

11 account; it's controlled by Alcon employees and they also do

12 not have a right to any of the proceeds within that account.

13        So, the main accounts, and the only accounts they

14 operate, are the six in the middle; the four, the U.S.

15 operating accounts, the top one being the main operating

16 account where they disburse checks and issue payments

17 appeared receive payments, generally.  Right below it is

18 payroll, which is swept daily.  And over on the right side

19 are the two Australian accounts; those cover the processing

20 fees and operation expenses for the Australian employees.  We

21 have six there, which I'll get to next.  Generally, those

22 amounts are covered by intercompany transactions from the

23 main U.S. operating account to Australia and then converting

24 that middle one and then paid out of the second one.  Those

25 accounts can, at times, bring in cash.  It's much more rare,

1   but they are connected to various payables, based on all

2   transactions.

3          Your Honor, the debtors submit that all these

4   accounts in the U.S. are authorized depositories in

5   accordance with the UST Guidelines.  The Australian accounts

6   are international or not [sic], but the debtors submit that

7   they are in substantial compliance with 345(b).  They are

8   maintained at banks that are well-capitalized and insured, in

9   accordance with Australian law.

10          However, though, the debtors -- with those two

11   accounts (indiscernible), the debtors are -- are seeking

12   interim suspension of the requirements of Section 345(b) for

13   an initial period of 45 days, as set forth in the motion, and

14   will continue to work with the U.S. Trustee going forward.

15          So, with all that background, as set forth in the

16   motion, the debtors are seeking authority to continue to

17   engage in routine intercompany transactions and honor

18   intercompany claims in the ordinary course.  The debtors

19   maintain all of their records of their transactions and

20   record them as receivables and payables.  And, importantly,

21   the debtors will not be transferring any amounts to non-

22   debtor affiliates during these cases.

23          The debtors are also seeking administrative

24   expense priority for intercompany claims post-petition.

25   There's a bit of clarifying language regarding that in the

1  proposed order, which I can walk through at the end, that has

2  also been agreed to with the U.S. Trustee.

3          Next, the debtors are seeking to pay prepetition

4  bank fees, which are, of course, necessary in order to

5  maintain these bank accounts.  They accrue about a thousand

6  dollars in bank fees per month, which is paid quarterly.

7  Just since January 1st through the petition date, there's

8  about $2,670 outstanding on account of prepetition bank fees

9  that need paid and will become due on March 31st.

10          Finally, from a substantive standpoint, the

11  debtors are seeking to utilize their current business forms,

12  as changing forms would be unnecessarily and dutily

13  burdensome and expensive for the estate.  All of the requests

14  for relief in this motion, Your Honor, is standard with

15  (indiscernible) in this court and the debtors submit that any

16  disruption to the current cash management system would

17  substantially diminish and impair the debtors' efforts in

18  these Chapter 11 cases.

19          As set forth in the motion, Bankruptcy Rule 6003

20  is implied and the relief requested, the debtors believe is

21  integral to the operations and without it, the debtors would

22  suffer immediate and irreparable harm to their estates.

23          If Your Honor would like, I can walk through the

24  changes in the order.

25          THE COURT:  Right.  It looks like paragraph 8, you

 1 │ have the language that you just mentioned about the ordinary

 2 │ course, intercompany claims.

 3 │         MS. PADDOCK:  Yep, and that was agreed to with

 4 │ Warner Bros. and the U.S. Trustee.

 5 │         And then paragraph 9 just adds the clarifying

 6 │ language from Alcon, with respect to those accounts that the

 7 │ debtors have, but do not operate.

 8 │         THE COURT:  Okay.

 9 │         MS. PADDOCK:  So, unless there's any other

10 │ questions, I would request entry of the interim order, as

11 │ previewed in the redline, Your Honor.

12 │         THE COURT:  Okay.  Let me first ask if there's

13 │ anyone in the courtroom who would like to be heard regarding

14 │ the cash management motion?

15 │         Mr. Harvey, good morning.

16 │         MR. HARVEY:  Good morning, Your Honor.

17 │         And for the record, Matthew Harvey from Morris,

18 │ Nichols, Arsht & Tunnell.

19 │         I rise to simply thank the debtors for resolving

20 │ this comment with us and also to introduce my co-counsel, Mr.

21 │ Stephen Warren from O'Melveny & Myers; we represent,

22 │ together, Warner Bros. Entertainment, Inc. and certain of its

23 │ affiliates.

24 │         And I know Mr. Warren wanted -- had a few comments

25 │ he wanted to provide the Court and whether it's appropriate

1  to do that now or in connection with the DIP, I just wanted

2  to introduce him and offer that to Your Honor now.

3           THE COURT:  Okay.  I'm happy to hear from

4  Mr. Warren now.

5           MR. HARVEY:  Okay.  Thank you, Your Honor.

6           THE COURT:  Thank you, Mr. Harvey.

7           Mr. Warren, good morning.

8           MR. WARREN:  Good morning, Your Honor.  Thank you

9  very much.

10          Stephen Warren of O'Melveny & Myers, appearing on

11  behalf of Warner Bros. Entertainment, Inc. and its

12  affiliates.  I'll refer to those as "Warner."  Also appearing

13  remotely with me are Scott Drake and Emma Jones of

14  O'Melveny & Myers.

15          I want to thank the Court, initially, for allowing

16  us to appear remotely.  I'm in California and my colleagues

17  are in Texas.  We'd be there if we physically could have, so

18  I appreciate the kindness that Your Honor has shown us in

19  allowing us to appear remotely.

20          I will probably save most of my comments, perhaps,

21  for when we get to the DIP.  That's probably the meatier

22  section, so, perhaps, we can talk again, then.

23          I do want to thanks the debtors for adding

24  language here and clarifying that the intercompany transfers

25  will only be ordinary course and will be subject to Rules in

1 terms of value being received to the estate.

2           So, thank you very much for that clarification and

3 we'll be back at the DIP.  Thank you, Your Honor.

4           THE COURT:  Okay.  Thank you, Mr. Warren.

5           Is there anybody else who would like to be heard

6 regarding the cash management motion?

7      (No verbal response)

8           THE COURT:  Okay.  I hear nobody in the courtroom.

9           Mr. Rubinstein, good morning.

10           MR. RUBINSTEIN:  Good morning, Your Honor.

11           Vadim Rubinstein of Loeb & Loeb, counsel to Alcon

12 Entertainment and its affiliated companies, including

13 (indiscernible) Pictures.

14           First, Your Honor, thank you, again, for allowing

15 me to appear remotely at the hearing on short notice; it's

16 greatly appreciated.

17           THE COURT:  Certainly.

18           MR. RUBINSTEIN:  I want to introduce my co-

19 counsel, Ms. Kimberly Brown from Landis Rath & Cobb, who is

20 in the courtroom this morning, and she's been directing with

21 the debtors in my stead.

22           I will also save some comments for the DIP order.

23 For purposes of this particular motion, I will say, first, as

24 it relates to the debtors, we do question whether the entity

25 VREG Wonka IP Global LLC is before Your Honor and should be

1  before Your Honor as a debtor under the Bankruptcy Code.  We

2  are considering that issue.

3          But the debtors have been gracious in their

4  negotiations regarding the cash management order and they

5  certainly have relieved some of our concerns and we thank the

6  debtors for that and for including the language in the first

7  day order and we appreciate that.

8          With respect to the other matters in the case, I

9  will just leave it for now and I'll pick it up at the DIP.

10          THE COURT:  Okay.

11          MR. RUBINSTEIN:  And Your Honor (indiscernible)

12  the DIP.

13          THE COURT:  Thank you, Mr. Rubinstein.

14          Is there anybody else who would like to be heard

15  regarding cash management?

16      (No verbal response)

17          THE COURT:  Okay.  I hear no response.

18          Based on the evidence before me in the form of

19  Mr. Maib's declaration and finding the routine, that this is

20  relief that's routinely requested in a first day and if I did

21  not enter this order, immediate and irreparable harm would

22  come to the debtors and, therefore, I'm happy to grant the

23  motion on an interim basis.

24          MS. PADDOCK:  Thank you, Your Honor.

25          Next up, we will turn to the wages motion, which

1  is Agenda 8 and filed at Docket 8.

2          This motion, too, has been previewed with the U.S.

3  Trustee and, thankfully, no comments were received, so we are

4  seeking relief of Your Honor to enter the interim order, as

5  filed.

6          Your Honor, as you've likely seen in the first day

7  declaration and in this motion, the debtors have really

8  tapered their workforce significantly over the last several

9  months as part of cost-cutting measures and the result of

10 that is the employees that the debtors do have remaining are

11 an absolutely critical workforce.  And each employee is vital

12 to the company's operations to continue through these

13 Chapter 11 cases.

14         The debtors workforce consists of five U.S.

15 employees, two executives and three administrative

16 professionals, and six employees in Australia, all of which

17 who are members of the debtors' accounting team.

18         Like almost every other Chapter 11 case and even

19 more so here, the debtors' employees are essential to their

20 operation.  In this particular case, these employees have a

21 history with the company, have been integral to its business

22 for many years, and like all employees, rely on this

23 employment for, themselves, and their families.  During these

24 cases, it is imperative that the debtors retain these

25 employees in order to continue uninterrupted operations

1 through these cases and through the proposed sale of the

2 debtors' assets.

3      I can walk Your Honor through a few of the main

4 points, as set forth in the motion.  The debtors offer a

5 standard suite of employee benefits and as you'll see in the

6 motion, the amount that the debtors are seeking to pay for

7 outstanding prepetition amounts is actually quite low.  This

8 is on account of a payroll that went out on Friday the 14th,

9 so the only amount of wages that have accrued since are over

10 the weekend.

11      I do want to bring Your Honor's attention to one

12 thing in the chart that is in the motion.  The chart

13 conflicts with the body of the motion a little bit and does

14 not request amounts for reimbursable expenses, which are

15 things like business expenses, credit card payments.

16      As you'll see in the motion, Your Honor, we are

17 seeking a thousand dollars in that bucket on an interim and

18 final basis to pay any possible outstanding prepetition

19 reimbursable expenses that are owed to the employees.  As

20 Your Honor will see, the kind of main buckets that have

21 outstanding amounts are the employee leave benefits which are

22 generally comprised of accruing PTO in accordance with

23 company policy, both in the U.S. and Australia.

24      And the really large amount, comparatively,

25 requested through this motion is what is called the

1  "Australian employee termination pay" bucket.  This is an

2  account of two different concepts that are required under

3  statutory law in Australia, which is the Australia employee

4  termination pay and then the redundancy pay.  Those are both

5  required under Australian law.

6           And I think it is important to note here that

7  while we are seeking authority, but not direction, to pay

8  this on an interim basis, we do not currently anticipate a

9  cash payment will go out.  This is an amount that has accrued

10 prepetition and it could become due at any time and that is

11 why we are seeking Your Honor's authority to pay it at any

12 time when it becomes due in accordance with Australian law.

13          I would, again, note that Rule 6003 is implicated

14 and for the reasons set forth in the motion and stated here,

15 the ability to pay the employees that we do have and maintain

16 their benefit programs through these Chapter 11 cases is

17 absolutely critical to prevent irreparable harm.

18          Unless Your Honor has any questions, I would

19 request Your Honor enter the interim order, as attached to

20 the motion.

21          THE COURT:  Is there anybody who would like to be

22 heard regarding the wage motion?

23     (No verbal response)

24          THE COURT:  Okay.  I hear no response.

25          Based upon the evidence before me in the form of

1  Mr. Maib's declaration, I do find that immediate and

2  irreparable harm would come to the debtors if I did not grant

3  this relief.  It's unthinkable that the employees should have

4  to continue to work while there's uncertainty about whether

5  they can even be paid timely for the work that they've

6  performed for the debtors prepetition and receive the

7  benefits that they count on and they bargained for in

8  connection with their employment.  So, I'm happy to grant

9  this motion on an interim basis.

10           MS. PADDOCK:  Thank you very much, Your Honor.

11           And I will now cede the podium back to Justin

12  Bernbrock.

13           THE COURT:  Okay.  Thank you.

14           Mr. Bernbrock?

15           MR. BERNBROCK:  Thank you, Your Honor.

16           Bear with me one moment, please.

17       (Pause)

18           MR. BERNBROCK:  Again, for the record, Your Honor,

19  Justin Bernbrock of Sheppard, Mullin, Richter & Hampton,

20  proposed counsel to the debtors and debtors-in-possession.

21           Your Honor, the final item on today's agenda is

22  Item 9, Docket 9, the debtors' motion for authorization to

23  enter into and borrow under the proposed debtor-in-possession

24  financing facility.  Your Honor, as is common in cases of

25  this type, the pleadings set forth the basis for the relief

1  requested.  We also have the evidentiary support of the

2  declarations provided by Mr. Maib and Mr. Koutsonicolis from

3  SOLIC Capital.

4          I want to highlight a couple of headlined

5  components, just to reiterate from the overview presentation

6  that I gave.  The facility size is just shy of $13 million,

7  of which $7 million is proposed to be new-money financing.

8  And then there's a proposed roll-up component of $5,786,105

9  and we are proposing to roll that up *pari passu* with the DIP

10  liens.

11          There's a standard carve-out in the proposed DIP

12  order.  In other packages, or I'd say an are broader package

13  of components, afforded for the benefit of the DIP lenders

14  and certain other parties, most notably, adequate protection

15  for certain prepetition secured parties, the ABS trustee and

16  their counsel, as well as the senior, secured noteholders, as

17  well.

18          I want to flag what I think is probably one of the

19  more controversial components of the proposed financing,

20  which is the prepetition financing is in separate silos and

21  the chief reason for that is that the ABS silo, where

22  substantially all of the library asset value sits, has highly

23  restrictive covenants and components in both, the base

24  indenture and amendments and supplements thereto, as well as

25  any organizational documents restrict the incurrence of debt

1  at those entities.

2      The proposed debtor-in-possession financing would

3  be at all entities throughout the debtors' structure.  The

4  exception or the limitation is that at the ABS entities, the

5  DIP would go and subordinate to the ABS collateral and liens

6  and so on.  Everywhere else in the structure is proposed to

7  be superseding or first priority, but it is different than

8  what is prepetition.

9      We have done some research on this point.  I think

10  that the leading case is, In re Vanguard Diversified, 31 B.R.

11  364, which comes from the Eastern District of New York; I

12  think a Judge Duberstein decision, if I have my facts right.

13  There was a four-factor test established by that Court and

14  those factors are that the Court should consider whether,

15  absent the proposed financing, the debtors' business

16  operations will not survive; two, the debtor is unable to

17  obtain alternative financing on acceptable terms; three, the

18  proposed lender will not accede to less-preferential terms;

19  and, four, the proposed financing is in the best interests of

20  the general creditor body.

21      We believe that we satisfy, and we set out more

22  fully in the papers how we satisfy those factors.  It's plain

23  from the evidence in Mr. Maib's declaration that the debtors

24  do have a cash need to operate and, ultimately, get to a

25  consummation of the library sale.

1          You know, what is at least interesting to note is
2 the proposed library sale, if we just take the three-hundred-
3 and-sixty-five-million-dollar number and we less the ABS
4 obligation, which are approximately $223 million, we have a
5 net result of $142 million.  And then the DIP would be
6 immediately junior to that ABS obligation.

7          So, as those ABS entities, where we believe the
8 only material, potential creditor is Warner Bros., we have
9 excess proceeds of approximately $140 million or $130 million
10 if you were to assume that the DIP were to be fully funded
11 and repaid.  The Warner Bros. claim, we believe, at present,
12 is unliquidated and there are certain confidentiality
13 provisions that govern what we can say about that particular
14 arbitration proceeding, but there are significant excess
15 proceeds and, I'm sorry, and certainly not representing that
16 Warner Bros. believes that those are sufficient to satisfy
17 its claim or that they're insufficient or that the debtors
18 assert otherwise.  The point is, that is a significant sum of
19 money that creates a cushion at those ABS entities, again,
20 where no other material unsecured creditors sit.

21          The Vanguard decision, Your Honor, just to button
22 that up, was recognized by Judge Stickles in this court, in
23 the In re Blink Holdings case, as well as the In re Mondee
24 Holdings case, and I believe those are cited in our papers;
25 if not, we have the case numbers that we can provide.

1          THE COURT:  Uh-huh.

2          MR. BERNBROCK:  So, I do want to talk about a

3    couple of other components here.  With respect to our friend,

4    Mr. Rubinstein and our friends at Alcon, the broader

5    arrangement or business deal and transaction between the

6    parties is that we, on a prepetition basis, sold to Alcon,

7    the stream of payments in connection with the Wonka film --

8          THE COURT:  Uh-huh.

9          MR. BERNBROCK:  -- not with Mr. Wilder.  This is

10   the new one with the Chalamet fella.

11          The way that that operates or at least the way

12   that the stream of cash operates is that the money comes into

13   a debtor, effectively, a lockbox account.  It is then

14   automatically, and without any action by the debtors, swept

15   and paid to Alcon.

16          Some of the language that we have put into the

17   proposed DIP order addresses that any liens granted in

18   connection with the DIP order and the superpriority

19   administrative claims, et cetera, do not and shall not

20   encumber that which the debtors don't own.  And I think it's

21   fair to say that's a very reasonable ask by Mr. Rubinstein

22   and we're happy to incorporate it, and it accords with our

23   understanding of the law.

24          And in a moment I'll hand up a proposed order.  We

25   did receive a proposed paragraph from the Warner Bros.

1  entities and claimants.  And let me just say to each of Mr.

2  Rubinstein and Mr. Warren, we're very, very grateful for your

3  reasonableness, your willingness to work with us, and we hope

4  that it spells good vibes, I guess, for the future, and --

5  because we may have to call upon those.

6          The point, I think, of the Warner Bros. language,

7  and it will and it shall speak for itself, and of course

8  Mr. Warren will speak to it as well, it is to preserve the

9  status quo as between the parties.  There is permission to

10  make the initial funding; however, to the extent that it is

11  subsequently determined by this Court or other court of

12  competent jurisdiction that there are infirmities or other

13  limitations with respect to what's proposed in connection

14  with this facility, there will be another opportunity,

15  particularly in connection with the final order, to revisit

16  that.  And certainly our sincere hope and my commitment to

17  Mr. Warren, and his colleagues and his client, is that the

18  debtors are prepared to do whatever possible to resolve that

19  in advance of that final order hearing.

20          Mr. Ahdoot, my dear, dear friend, it warms my

21  heart to see him on the Zoom screen, he represents several of

22  the Guilds.  So this is the Screen Actors Guild of American,

23  the Writers Guild of America, as well as the Directors Guild

24  of America, and I'll say other because I know that there are

25  other related union types in connection with the companies.

1    So these creative people and members of these

2 Guilds, as part of their agreements to participate in motion

3 pictures and television and other entertainment projects,

4 have very robust and quite notable rights and claims, some of

5 which become secured claims at various entities, and they

6 attach to certain projects.  We, you know, in the very short

7 time between the petition date and this hearing have not had,

8 and it would be unfair to Mr. Ahdoot to say that we have had

9 nearly enough time to go through and make sure in each and

10 every instance whether there's a valid lien claim or whether

11 amounts are due and owing.  My representation to Mr. Ahdoot

12 when we spoke yesterday was that we will work between now and

13 the final order to determine what those claims are, if any,

14 and treat them as the Bankruptcy Code requires, whether

15 that's adequate protection payments, whether that's through

16 additional lien -- whatever the law provides, they will get.

17    I think, as I understand some email traffic that's

18 been going on during the hearing, the best way that we might

19 address this is to have a paragraph that mirrors, at least in

20 many respects, the paragraph supplied by Warner Bros. for

21 Mr. Ahdoot's clients as well.

22    Lastly, we are doing something or at least

23 proposing to do something novel with respect to this motion.

24 We have a proposed transaction support agreement that was

25 affixed to the motion.  And this is -- I will claim credit if

1   it goes badly; if it goes well, it was my partner's idea --

2   the idea here is we have a facility -- we have a

3   securitization facility where, while we know the holders and

4   we know who the trustee is, were we to have had substantive

5   engagement with those holders in a very limited prepetition

6   window, we would have infected them with material nonpublic

7   information, restricting their ability to trade.  And so,

8   after having many discussions with my new friend Mr. Galvan

9   at the Barnes & Thornburg firm, we ultimately concluded that

10  it would be best to wait until the petition date, the cases

11  had been filed, to engage with the holders under that ABS

12  facility.

13          That of course puts Mr. Gavant and his client,

14  U.S. Bank, in an uncomfortable position as an indenture

15  trustee who knows something and is not able to engage with

16  its holders, while at the same time, very graciously, seeking

17  to help the debtors in what we're trying to accomplish with

18  respect to these bankruptcy cases generally.  The farthest --

19  and to his credit, the farthest that I could push Mr. Gavant

20  was that we would agree to a form of a transaction support

21  agreement, very similar to a restructuring support agreement,

22  whereby we have made various commitments to the ABS trustee

23  and the holders thereunder, they have made -- are proposing

24  to make commitments to the debtors.  The trustee cannot,

25  shall not, will not sign that document unless and until 50.1

1  percent of the holders under that facility give the direction

2  for the trustee to do so.

3         And, again, I really wanted to thank Mr. Gavant

4  because there could have been many other reactions to this

5  idea of attaching a proposed, agreed-as-to-form agreement,

6  but this is -- it's unique here and critical, and I would say

7  that the relief we're requesting could, if denied, give rise

8  to immediate and irreparable harm because -- and I'll give a

9  specific example in a second -- there are components of the

10 indenture that prefer to operate automatically without any

11 further action by the trustee, the most notable example is

12 the debtors act as servicer under the ABS facility, and this

13 is largely the operations conducted in Australia.  So, in a

14 world where we don't have the benefits and protections of

15 this proposed transaction support agreement, we may have to

16 scramble to find a replacement servicer to step in and do the

17 collection of money in connection with that facility.

18        There are a number of components, I won't go into

19 all of them, but the overarching theme of what we're trying

20 to accomplish with that transaction support agreement is

21 that, so long as we hold good on our end of the bargain,

22 which is the first $223 million and then some that come from

23 our sale of their collateral we're going to pay to them,

24 retire that facility in full indefeasibly, and in the

25 meantime we ask them to sort of ride along with us and not

1  oppose that which we are trying to do.

2          So that's the transaction support agreement.  I

3  will note for -- because I don't want it to be not noted that

4  the United States Trustee's Office I think does have some

5  concern with that document and our request that it be -- the

6  debtors be authorized, but not directed, to enter into that

7  if, and only if, the ABS noteholders give the direction to

8  U.S. Bank.  What we want to have the ability to do is then

9  countersign that document immediately.  It's a post-petition

10 agreement outside the ordinary course of business; we have

11 cited Section 363 to seek that relief.

12         I've got a -- at least whatever the current draft

13 of the order was that -- when we clicked print, but before I

14 tick through that, perhaps, Your Honor -- well, first let me

15 ask, does Your Honor have any questions about the debtors'

16 motion and the relief requested?

17         THE COURT:  No, I think I understand what you're

18 trying to do.

19         MR. BERNBROCK:  Thank you, Your Honor.

20         THE COURT:  Yes.

21         MR. BERNBROCK:  And then I would propose, subject

22 to Your Honor's concurrence, perhaps Mr. Warren, Mr.

23 Rubinstein, Mr. Ahdoot, if they want to speak now, and then I

24 can go into the order itself.

25         THE COURT:  Yeah, let me first ask if there's

 1  anyone in the courtroom who would like to be heard regarding

 2  the DIP motion.

 3          Ms. Sierra-Fox.  Good morning.

 4          MS. SIERRA-FOX:  Good morning, Your Honor, Rosa

 5  Sierra-Fox on behalf of the U.S. Trustee.

 6          Your Honor, I think our objection is simple.  I

 7  think, generally, we don't believe -- the U.S. Trustee does

 8  not believe that entry into the transaction support agreement

 9  is necessary under Rule 6003 to avoid immediate and

10  irreparable harm, and I can explain why we believe that.

11  But, Your Honor, in the alternative, I think another

12  potentially satisfactory way to resolve this, if Your Honor

13  is inclined to allow the debtors that authority on a first

14  day basis, is to supplement the record as to the necessity

15  for this relief.

16          I think Mr. Bernbrock's introduction and argument

17  was certainly helpful, but I do think that as far as evidence

18  on the record on this point, the best I think that's been

19  addressed here is the chief restructuring officer's

20  declaration at about paragraph 21.  Perhaps there's more of a

21  proffer that the debtors can offer so this Court and the

22  public can be rest assured that it is -- you know, there is a

23  potential here for immediate and irreparable harm if the

24  transaction support agreement, the debtors are not authorized

25  to enter into that once the trustee has the authority from

1  the requisite noteholders.

2         But, Your Honor, looking at the substance of the

3  transaction agreement, I think -- and I discussed this with

4  debtors' counsel -- I see it as an agreement that agrees to

5  preserve the status quo in a certain sense, the parties

6  continue to act how they were acting under the respective

7  agreements; however, I do see potential implications for Rule

8  6003.  The debtors are incurring a post-petition

9  indemnification obligation, that's Section 6-4 of the

10 transaction support agreement.  The issue about the servicer

11 also implicates a potential assumption or of an executory

12 contract and, like I said, Your Honor, Rule -- and as I

13 referenced, Rule 6003 does not allow the debtor to incur

14 those types of obligations within the first 21 days of the

15 case unless it's immediate -- necessary to avoid immediate

16 and irreparable harm.

17        And, Your Honor, if the parties have agreed, and

18 here meaning the ABS trustee and the debtors have agreed to

19 abide by a certain set of conduct up through the interim

20 hearing, I think the parties are certainly going to be well

21 served by proceeding in that way, and they can certainly

22 continue to act in that way up until the final hearing when,

23 hopefully, this agreement and -- notice of this motion and

24 this agreement has gone out on notice as required by the

25 rules.

1          Simply put, Your Honor, I don't know -- I guess

2    what I don't know, and parties don't know what they don't

3    know, so I'm not sure if this implicates the rights of other

4    parties that have yet to appear, and, even if those parties

5    have appeared, whether they've had enough time to fully

6    understand the implications of entering -- the debtor having

7    authority to enter into this transaction support agreement.

8          So for those reasons, Your Honor, we don't

9    believe -- the U.S. Trustee does not believe that the debtors

10   should be authorized to do that, at least on an interim

11   basis, and that's addressed -- the relevant part of the order

12   that addresses this, Your Honor, is paragraph 24.  So, to the

13   extent there are -- Your Honor is inclined to agree with the

14   U.S. Trustee in any way, I believe that's where we'd need to

15   make changes to the order.

16         And, Your Honor, like I previewed at the outset,

17   alternatively perhaps, if Your Honor is inclined to allow the

18   debtors to enter into this agreement on an interim basis,

19   perhaps the parties and the debtors can do -- offer some

20   further, more robust evidentiary support as to what harm

21   would result if they don't have this support agreement.

22         Thank you.

23         THE COURT:  Okay.  Thank you so much, Ms. Sierra-

24   Fox.

25         Yes, Mr. Gavant, welcome.

1    MR. GAVANT:  Thank you, Your Honor.  Aaron Gavant

2  from Barnes & Thornburg on behalf of the ABS trustee, and I'm

3  here with my colleague Amy Tryon also --

4    THE COURT:  Good morning.

5    MR. GAVANT:  -- from the Delaware office.

6    I was going to take the opportunity to introduce

7  who my client is, Mr. Bernbrock did a phenomenal job, but

8  obviously we are a primary stakeholder in this case and

9  certainly in one of the silos that we've been discussing.  We

10  are just the trustee -- I don't put just -- I know we have an

11  important role, but as has been explained we are the legal

12  title holder of the interests here and we want to make sure

13  we're acting for the beneficial interest holders, who we have

14  not yet had the opportunity to speak to.

15    We do think the proposed sale, which is not up

16  before Your Honor today, of the library assets, is sort of

17  the key component of the case, and so we have tried to work

18  cooperatively with the debtors.  To repeat what was said in

19  the papers and what has been said from the podium today, the

20  debtors have been forthright with us.  We believe we have

21  been engaged in good faith negotiations.  We understand what

22  they're trying to do with the DIP, we understand what they're

23  trying to do with the sale, and it's really just due to

24  timing that we have not yet been able to sign the transaction

25  support agreement that is before Your Honor today.  We've

1  worked on a structure that we think could get there.  Would

2  we in other circumstances potentially have been able to sign

3  that prepetition?  Yes.  May we be -- will we potentially be

4  in a situation to sign that shortly?  Also potentially yes,

5  also potentially no, we don't know yet.  Subject to all, we

6  filed a reservation of rights on these points.  We don't know

7  what our holders will say, but all of that is to say that we

8  think there's real value for the debtors, obviously -- and

9  it's their case to make, but in keeping this case moving, and

10  we're trying to be a helpful partner in that.

11         And so, again, we have to speak to our holders,

12  but we do think there is value in giving the debtors the

13  authority to enter that agreement today, even if not the

14  direction.  But I also wanted to answer any questions Your

15  Honor might have on that structure.

16         THE COURT:  I think it creates an interesting

17  issue, right?  If you're not yet authorized to enter into the

18  agreement, the debtor is asking me to approve something

19  without it actually being, I guess for want of a better term,

20  ripe to be adjudicated.  You may get there, you may not; you

21  may get there on different terms.

22         So, if there is no actual agreement among the

23  parties to enter into this transaction, then should I be

24  approving it at all right now?

25         MR. GAVANT:  So, I understand what Your Honor is

1  saying.  I might take some issue with saying that we're not

2  willing to enter into the agreement.  There is one -- there

3  are two parties --

4          THE COURT:  No, not that you're not willing, it's

5  just that you're not there.

6          MR. GAVANT:  Correct.

7          THE COURT:  I think the point that you made, and I

8  read your written submission as well, is that you need to

9  talk to the holders.  So you're kind of in an in-between

10  position right now.  You know what you're recommending to

11  them, I suppose, but you don't know yet if you have the

12  consent of the client to do it.

13          MR. GAVANT:  And that's right.  To speak really

14  just in practical terms, rather than legal terms, this is

15  probably the most efficient way to do it.  If holders do

16  support this agreement, we will be in a position to move

17  quickly.  And I know there's time pressures here and so,

18  again, we're trying to be good partners.

19          THE COURT:  Yeah.

20          MR. GAVANT:  And so, yes, to your point, Your

21  Honor, if we get approval on this form, which the trustee is

22  willing to sign, this is the best way to move quickly, but I

23  confirm that we do not yet know how holders will react.

24          THE COURT:  Understood.  Okay.  Thank you, Mr.

25  Gavant --

1          MR. GAVANT:  Thank you.

2          THE COURT:  -- I appreciate it.

3          Is there anybody else in the courtroom who would

4     like to be heard?

5          (No verbal response)

6          THE COURT:  Okay.  Let me start with Mr. Warren,

7     please.

8          MR. WARREN:  Thank you very much, Your Honor.

9     Again, Steven Warren, O'Melveny & Myers, on behalf of Warner

10    Bros.

11         I always like to start with good news, and the

12    good news is I can confirm what Mr. Bernbrock said, we've

13    made tremendous progress in terms of the language that would

14    reserve Warner's rights with respect to the DIP, the adequate

15    protection, the liens, the whole suite of rights that are

16    covered in that motion.  I think we may be down to a word or

17    two, and we understand there will be some discussion after

18    the hearing just to resolve those last little cleanup items.

19    But the gist of it is that all of Warner's objections that it

20    would otherwise be presenting today can be heard at the final

21    and all preserved with respect to the liens and the adequate

22    protection.

23         We do consent to the $500,000 going out, no point

24    battling over that sum of money given the numbers here

25    otherwise in terms of claims, but there are protections for

1  our rights under contract and (indiscernible) granted, and

2  rights with contracts with us are subject to those contract

3  rights, and the rights with respect to IP are subject to --

4  they don't alter, they don't supersede any of our IP rights.

5  And so we've (indiscernible) ourselves I think to another

6  day.

7          And, in some circumstances, I'd like now just to

8  sit down -- or, I guess, turn my mic off, but with the

9  Court's indulgence, I'd like to spend a little bit of time

10  addressing points that Mr. Bernbrock raised in his initial

11  presentation, in part, table setting.  And I always think

12  it's odd when parties reserve rights and then don't explain

13  at all what it is that they're preserving and why it's

14  relevant, and I'd like to, with the Court's indulgence, spend

15  a couple of minutes doing that.

16          Your Honor, the parties' relationship, covered to

17  some extent by the Maib declaration, but it really goes back

18  to 1998 and it covers a huge suite, I think it's over 90

19  theatrical films that you would recognize:  The Matrix,

20  Oceans 11, Sherlock Holmes.  Warner is the creative spark in

21  all of these franchises, it has the exclusive right to create

22  the content, decide whether a film will be produced, and what

23  the film will be and what its contents will be, that's

24  exclusively Warner, but Village has -- as had under the

25  parties' agreement, has a financial interest.  It can

1  finance, co-finance the pictures and, if it does, it gets a

2  participation, it shares the revenue stream.

3         And so when we hear about the library assets,

4  we're talking about those films, they've already been

5  produced, there's money coming in, and it's getting split,

6  that's the language.  But there's also a right in certain

7  circumstances for derivative assets or new motion pictures.

8  If Warner, with respect to these existing franchises, decides

9  to create a new film, in that event, then Village can

10  (indiscernible) finance.

11         At the beginning of our relationship, Your Honor,

12  Village was a failing (indiscernible) company, it's since,

13  you know, owned by a high-powered private equity firm, and

14  you heard a decision was made to fundamentally alter their

15  business model.  They went from financing motion pictures

16  created by others to creating their own content, and they've

17  candidly admitted that that effort resulted in failure.

18  Unfortunately, from our perspective, Your Honor, when that

19  failed, Village failed to live up to its contractual

20  obligations with respect to co-financing.

21         The dispute between the parties grows out of the

22  Matrix franchise, Matrix Resurrections.  That was a co-

23  financing arrangement and understood that Village had

24  committed to co-finance.  Based on that reliance on that

25  commitment, Warner spent $200 million to produce the film,

1 $100 million to market it, and then Village did not step

2 forward and provide co-financing.  That's led to a years-long

3 arbitration that has gone on for quite a bit.

4        I know there were some redacted sections, it is a

5 confidential arbitration, and so some items can only be

6 shared with the Court through redactions *in camera* and

7 clearing the court, or however one might do that, but there's

8 some things I can share with you.  The first thing is we very

9 much contest, and you won't be surprised to hear, some of the

10 characterizations in the redacted section regarding what

11 happened during the arbitration.

12        Now, I can share some other facts with you because

13 they're not confidential, they've either been disclosed or we

14 have the right to do so.  Liability has already been

15 determined, the arbitrators have already decided that Village

16 breached its obligations with respect to the Matrix

17 preliminary injunction, that's done, all that's left is to

18 determine the damages.  And, again, with respect to the

19 public record I can tell you Warner took the position at the

20 inception of the dispute that it was owed approximately $100

21 million, maybe even a bit more, and that number hasn't gone

22 down.  So that, I think, sets kind of the goal posts of the

23 dispute.

24        I really did appreciate the presentation and the

25 candor to the Court that there's some real concerns about

1 transactions that took place here.  After Warner Bros.

2 succeeded in establishing liability in the arbitration, the

3 derivative assets were moved out of the entities that were

4 obligors -- are obligors of Warner Bros. and the newly-

5 created special purpose entities for a dollar, for a dollar

6 apiece.  These are rights that Village had taken the position

7 are worth quite a lot of money and, for a dollar, they

8 transferred them out, and then we subsequently found out that

9 those new entities guaranteed and pledged those derivative

10 rights which could not have been pledged under the agreements

11 with Warner up to the parent's debt.  And we've taken the

12 position that the transactions were a fraudulent transfer,

13 we've taken the position that the pledges were fraudulent,

14 intentional or constructively fraudulent transfers, and Mr.

15 Bernbrock has flagged that for you.

16           With respect to the assets, Your Honor, if I could

17 just spend a moment.  The schematic that was provided was

18 really very helpful to us, I'm sure it was to the Court too.

19 The last page of the Maib declaration is that schematic

20 showing kind of broad outline of the debtors, it's also I

21 think at paragraph 17 of that declaration.  If you look at

22 the library assets, that's what's being sold here, over $300

23 million, if you look over on the right lower section of the

24 schematic, you see those entities, there are four entities

25 that have red boxes around them, those are the ones that

1   Warner has sued or is pursuing in the arbitration that they

2   own the library rights, the income stream that comes in from

3   the films.  And you'll see there's -- you know, there's no --

4   that the silo, I think as Mr. Bernbrock called it, of the

5   notes, senior notes, they're not there, there's no green.

6   They don't have claims, they don't have blues there.

7          But it's important because under the DIP motion

8   (indiscernible) with financing that would invade those assets

9   that are not subject to the (indiscernible) claims, there

10  would be a rollup of their prepetition debt for which those

11  parties are obligated, and there would be adequate protection

12  for what is, in our view, an equity interest, right, because

13  ultimately what those noteholders have is a claim on the

14  equity of the equity of the equity of those, and we don't

15  think you can bootstrap equity into a superpriority claim by

16  adequate protection and going ahead of the creditors.

17         And the derivative rights we already talked about,

18  you see that in the schematic, those green entities down at

19  (indiscernible) those were the beneficiaries of the

20  (indiscernible) transfers.  Warner has rights under its

21  agreements.  Again, we think they prevented those

22  transactions, we think applicable law prevented those

23  transactions.  And there are a handful of things -- you know,

24  I'm kind of winding up here, Your Honor -- that concern us a

25  lot.  It's the validation of the liens and transfers that

1   took place with those shell entities of the derivative

2   rights, there's a challenge period, but we're the only

3   parties who were really hurt by this, we would say we were

4   the target.  There may be no other creditor that was as

5   potentially injured as we were because value has escaped from

6   entities that are obligated to us, but they're also -- they

7   are also rights related to our content, so we may be the ones

8   who are really most concerned about that.

9           Also, the grant of the rights with respect to the

10  library assets, again, we're talking about the grants being

11  given by the rollup and protection of entities that aren't

12  claimants presently (indiscernible) that's a concern

13  (indiscernible).  It also grants the noteholders proceeds --

14  or I should say the DIP lenders, but sort of noteholders

15  proceeds of avoidance actions that, as we said, our concern

16  is they may be the target of those avoidance actions, that

17  doesn't seem to favor it.

18          There are many other concerns, those are the most

19  pressing I wanted to raise with the Court and, hopefully,

20  we'll be able to make progress, I don't know whether we'll be

21  able to get all the way there.  These are serious concerns

22  and they go to a number of different parts of this proposal,

23  but we're open to having those conversations.  We're cheered

24  by the fact that we got through today.  This may be the first

25  consensual thing amongst the parties that's happened, you

1  know, since -- with respect to the arbitration and these

2  disputes for some time, and we're open to having further

3  conversations.

4       The last little footnote, Your Honor -- and I know

5  this is more of a second day issue, but we do want to make

6  sure with respect to the sale process there's sufficient time

7  to really analyze this and think about it.  We don't think

8  this is a melting ice cube.  The debtor is a holding company,

9  it has 11 employees.  We're going to want to think about the

10 timing to make sure that we understand all the transactions,

11 where the money is going, is it going to be protected and

12 preserved for the creditors who have claims directly at the

13 level where the assets are.

14      With that, Your Honor, I'll hold myself open to

15 questions, and thank you very much for your patience.

16      THE COURT:  Thank you very much for the comments,

17 Mr. Warren, I appreciate that helpful background.

18      Let me hear from Mr. Rubinstein, please.

19      MR. RUBINSTEIN:  Good morning again, Your Honor,

20 Vadim Rubinstein of Loeb & Loeb, counsel to Alcon

21 Entertainment and its affiliates.

22      First, I wanted to echo what Mr. Warren has

23 indicated regarding the debtors' cooperation with the DIP

24 order, they have been quite cooperative and we thank the

25 debtors in that regard, but in terms of -- I only rise for

1   the one issue of setting the stage and issues that Alcon may

2   be bring to Your Honor's attention down the road, one of

3   which does relate to the sale process that Mr. Warren has

4   just discussed with you, in that Alcon has always viewed

5   itself as one of the likely parties that would be interested

6   in the purchase of the debtors' assets.  And while the

7   debtors may have a different view of things, it is certainly

8   Alcon's belief that it was not afforded the opportunity to

9   make a bid in this process despite its efforts leading up to

10  this filing.

11          And so you will be hearing about this, I suspect,

12  down the road, but I just wanted the Court to be aware of the

13  fact that this shouldn't be a surprise, Alcon is an

14  interested party here and Alcon expects to be heard with

15  respect to the bid procedures motion down the road.

16          THE COURT:  Thank you, Mr. Rubinstein.

17          Mr. Ahdoot, good morning.  Welcome.

18          MR. AHDOOT:  Good morning, Your Honor.  It's nice

19  to see you again.

20          THE COURT:  Nice to see you.

21          MR. AHDOOT:  David Ahdoot, Bush Gottlieb, on

22  behalf of the entertainment guilds.

23          Your Honor, I rise very briefly, primarily to give

24  thanks first to the Court for allowing us to appear by Zoom

25  today, as well as on April 11th.  I am in Los Angeles and it

1  was very much appreciated.  My colleague Susan Kaufman is in

2  the courtroom today as well.

3           THE COURT:  Yes, she is.

4           MR. AHDOOT:  Mr. Bernbrock accurately presented

5  the situation with the Guilds.  We want to sort of endorse

6  his commentary with respect to the fact that our interests in

7  cash collateral as they relate to the DIP have not really

8  been fully vetted.  We proposed some language just this

9  morning via email during this hearing which we presume will

10 be accepted, but we still need to sort of finalize that, and

11 assuming that it is accepted or something similar is

12 accepted, the Guilds are comfortable with moving forward.

13          I guess the only other point I have is that I'm

14 also pleased to be able to reaffirm my friendship with Mr.

15 Bernbrock on the record.  Since he opened that door, I

16 thought I might as well as validate his comments.

17          Other than that, Your Honor, again, thank you for

18 taking the time and it's much appreciated.

19          THE COURT:  Thank you, Mr. Ahdoot.

20          Is there anybody else who would like to be heard

21 concerning the DIP?

22          Mr. Samis.

23          MR. SAMIS:  Good morning, Your Honor, Chris Samis

24 here, Potter Anderson, today on behalf of the noteholders,

25 along with my co-counsel Mr. Newton from MoFo, Mr. Newton

1  would like to make a couple of comments surrounding the DIP.

2          THE COURT:  Certainly.

3          MR. SAMIS:  Thank you, Your Honor.

4          THE COURT:  Mr. Newton, great to have you here.  I

5  had the pleasure --

6          MR. NEWTON:  Thank you.

7          THE COURT:  -- of admitting you to practice *pro*

8  *hac vice* this morning.

9          MR. NEWTON:  Yes, thank you very much, and thanks

10  for the time.  I rise similarly, you know, with just a short

11  set of comments, having heard Mr. Warren comment on his

12  concerns about the DIP, and to briefly state, you know, the

13  DIP lenders, also prepetition lenders to the enterprise have

14  been working with the company to provide some bridge

15  financing over the course of the first quarter to allow the

16  debtors to enter this process with a sale in place, which was

17  signed up in February, and to allow for a smooth transition

18  into the bankruptcy case, and to allow for a sale down the

19  road.

20          In connection with providing that prepetition

21  funding, they did not obtain liens on the ABS collateral, in

22  part because that would have been a default under the ABS

23  facilities.  But, you know, we'll work with Warner Bros.

24  during the course of the next few weeks here to address their

25  concerns, as I mentioned, they included some reservation of

1  rights language in the order, and we'll continue to work with

2  them ahead of the final hearing.  And, as Mr. Warren said,

3  hopefully, we can resolve a number of those issues, but I

4  just wanted to comment on that aspect of the presentation

5  and, you know, given that Mr. Warren was commenting on the

6  lack of liens there.  There's a reason for it, it's not a

7  massive amount, there's a lot more prepetition debt, and the

8  DIP lenders are not looking to roll up a lot of the

9  prepetition debt, but we wanted to make this process as

10 smooth and, hopefully, as efficient and economical as

11 possible, and hence the reason for the rollup.

12         I will -- I'll defer on some of the other issues

13 that Mr. Warren mentioned.  You know, the transfer of

14 derivative rights is certainly before my time, and I'm sure

15 we'll have time to discuss that in due course and address it,

16 but I just wanted to stand up for that purpose.

17         THE COURT:  Okay.  Thank you, Mr. Newton.

18         MR. NEWTON:  Thank you.

19         THE COURT:  Okay.  Mr. Bernbrock.

20         Well, before you make your comments, I'm going to

21 ask you to think about one thing.  I do have an 11:30 hearing

22 and I have people waiting for it.  Before you begin your

23 comments, would it be productive at all for you to have --

24 or, well, I guess discussions with some of your colleagues or

25 perhaps with Ms. Sierra-Fox about how you'd like to proceed

1  to address the objections that Ms. Sierra-Fox raised?  Or

2  where do you see yourself with all that at the moment, I

3  guess?

4          MR. BERNBROCK:  Thank you, Your Honor, Justin

5  Bernbrock of Sheppard, Mullin, Richter & Hampton, proposed

6  counsel for the debtors.  For a minute there, I was worried

7  you were going to ask me to tap dance, which is -- I'm unable

8  to do with Ms. Sierra-Fox.  I'm certainly happy to meet and

9  confer and discuss a potential workaround.

10         Your Honor raised a couple of questions in

11  connection with the transaction support agreement that I do

12  want to try to address.  In the event that this document

13  changes, my understanding, or at least how we built this, the

14  authority then falls away.  We're only seeking the authority

15  for this proposed document.  And so while we did think about

16  if there were, you know, scrivener's errors or minor

17  modifications, but where we sort of landed was, if it changes

18  at all, we have to come back to the Court.

19         With respect to the exculpation set forth that Ms.

20  Sierra-Fox raised, we bear the same obligations under the

21  indenture, those are secured, you know, capital ABS, capital

22  O obligations.  And so this isn't doing anything new that

23  isn't already in existence.

24         THE COURT:  And by that do you mean the

25  indemnification at paragraph 6.04?

1          MR. BERNBROCK:  Yes, indemnification --

2          THE COURT:  Yeah, okay.

3          MR. BERNBROCK:  -- and exculpation.

4          THE COURT:  Okay, thanks.

5          MR. BERNBROCK:  And, Your Honor, it's not with

6   respect to the servicing, it's not an assumption or proposed

7   assumption because this is a funded debt facility that we

8   cannot under the Bankruptcy Code assume or seek to assume,

9   these are our obligations under the transaction documents.

10          At the risk of putting Ms. Sierra-Fox on the spot,

11   what the debtors could be comfortable with might be adding

12   some incremental language into the order that gives parties

13   the right to -- that grants the authority, but preserves the

14   rights of parties to object in connection with the final

15   hearing.

16          And really what I'm trying to do here, so that

17   it's very, very clear, because we are speaking to noteholders

18   quite soon, is if we get the authority and we execute the

19   document and the trustee countersigns, then I know at least

20   that we have done as much as we can to ensure that our

21   ongoing operations, our proposed sale process, et cetera, can

22   remain on track.  There could still be, because the indenture

23   only requires a simple majority of 50.1 percent of the

24   holders to give the direction, a holder who says I'm going to

25   pursue my own rights, and what I'm -- the language I am

1   proposing would preserve the right of that non-consenting

2   holder, non-directing holder to come in and raise whatever

3   issues they might have.

4           Is that acceptable -- I mean, if we want to go

5   talk about it, I don't want to --

6           THE COURT:  Yeah, Ms. Sierra-Fox.

7           MS. SIERRA-FOX:  Your Honor -- and I'm also going

8   to be monitoring the 11:30 hearing -- I appreciate the

9   proposal.  I don't have authority for that at this time, I'd

10  have to take a break and call my client.  Your Honor, I

11  think, not to seem like I don't want to resolve what -- the

12  U.S. Trustee doesn't want to resolve the issue, I think we

13  view this to be sufficiently out of the ordinary where -- I

14  mean, it would be our preference for precedential purposes

15  and just for the reasons I reiterated on the record that Your

16  Honor rule on this and we get -- it end up my client be

17  directed in that way.

18          So, if Your Honor does want -- believes that

19  debtors' counsel's proposal is what -- the preferred route,

20  then that -- my client will have to live with that, but at

21  this point I think I just don't have authority to go that

22  route.

23          THE COURT:  I understand.  Okay.

24          Mr. Bernbrock.

25          MR. BERNBROCK:  Your Honor, in light of Your

1  Honor's hearing at 11:30, I'm happy to briefly conclude or if

2  Your Honor -- if we need to step away, I'm looking to take

3  direction from you.  I wanted to make a couple of overarching

4  comments in response to some of what we heard, but let me

5  pause.

6          THE COURT:  On the record before as it stands,

7  okay, I'm not certain that I have enough evidence to support

8  a finding that entry into the transaction support agreement

9  is necessary to avoid immediate and irreparable harm.  So to

10  Ms. Sierra-Fox's comment that it may require of an

11  evidentiary record, I think I agree with that.  So it may

12  make sense to come back at about -- my day is rough -- I

13  would anticipate my next hearing is approximately an hour --

14  maybe if we came back at 1 o'clock and I could -- I have time

15  until 2:00.  I think that would be enough to probably handle

16  the issues, but it might give you an opportunity to think

17  further about what sort of record you need to build and what

18  testimony you might require.

19          But it is an unusual transaction and there is

20  nothing wrong with unusual transactions, frankly, it's one of

21  the things that make being a Judge in Delaware a lot of fun

22  is that we get unusual transactions and it's great to see

23  them develop.  So I have no problem conceptually with the

24  idea that this is new, but I do think that there is an

25  evidentiary record that has to be built to support the

1  request for relief before I can rule on it.

2          Does that make sense?

3          MR. BERNBROCK:  Absolutely.  And, to Ms. Sierra-

4  Fox's point, it is the right one, she is correct, and of

5  course as is Your Honor.

6          Perhaps we could work with Ms. Sierra-Fox -- I

7  know this isn't her evidence, but that which would satisfy

8  her concern as to the threshold, understanding that doesn't

9  satisfy Your Honor, but we could prepare a proffer, a

10  submission that we may tender to the Court perhaps by filing

11  that and -- because there are a number of other, I think,

12  components in the order that we want to work through with a

13  number of parties.

14          So what I'm suggesting then is we'll work with Ms.

15  Sierra-Fox as to that form of proffer, we'll tender it to --

16  we'll file it with the Court, and then, after we have

17  resolved the language with the parties, perhaps submit two

18  versions of the order, one which authorizes that, if Your

19  Honor were to find that that additional proffer was

20  sufficient for the record, and then one order that does not

21  have that authorization in the order.  I'm trying to preserve

22  your calendar and trying to -- I know some folks have flights

23  out as well, but --

24          THE COURT:  Yeah.

25          MR. BERNBROCK:  -- just an idea.

1          THE COURT:  I understand.  Now, Ms. Sierra-Fox is

2    going to be with me for the next hour or more, but,

3    conceptually, it's fine.

4          Look, I'm certainly satisfied that upon the record

5    that the debtors presented in the form of the two

6    declarations that there is a need for the financing.  We are

7    not going to be here on April 11th if we don't get financing

8    in place.  So I think that the issue is about the transaction

9    support agreement and whether that's appropriate,

10   appropriately supported by the evidence so as to be approved

11   on an interim basis, and I view that as the sole issue.  And

12   I'll make clear, in every other respect, I do find that the

13   debtor has sustained its burden of showing why it's an

14   appropriate exercise of their business judgment to enter into

15   the lending facility, putting a parentheses around the

16   restructuring support -- or transaction support agreement for

17   the moment.

18         MR. BERNBROCK:  I should have thought of this

19   initially and I apologize, Your Honor, perhaps we could just

20   make this a final order issue on normal notice, we'll

21   supplement the record appropriately.  If the trustee gets

22   direction, then I've got a signature page from U.S. Bank that

23   says they're not going to do anything.  And Mr. Gavant has

24   been eminently reasonable in all respects, I would be shocked

25   to see that he would take action without at least first

1  calling me, and so I feel reasonably comfortable just --

2  we'll just make this a final hearing issue, normal notice,

3  and we can then supplement the record.

4          THE COURT:  I think that makes a lot of sense.

5  You know, with first day hearings, one of the things that I

6  think a Judge always has to think about is who is not in the

7  room simply because they don't know yet.  They're pretty

8  close to being *ex parte* hearings, right?  And so I certainly

9  appreciate that considered approach to dealing with this and

10 it would make a great deal of sense to me.

11         MR. BERNBROCK:  Well, then, Your Honor, what I

12 would propose is we will -- we'll make that modification to

13 the order, we've got a number of comments to work through

14 with the parties, and I would propose that we would then

15 tender the revised order under certification of counsel and I

16 will -- with respect to Mr. Warren, I'll only say, I'll

17 reiterate something that I said to him over email at the very

18 early hours, that I, as a younger lawyer than Mr. Warren,

19 look forward to actually learning quite a bit because I think

20 that this is going to be an interesting experience.  There's

21 no question that there are disputes among these parties, I

22 think that that is quite clear.

23         And I should have mentioned, my law firm, our

24 partners are not counsel to the debtors with respect to that

25 ongoing arbitration, this is Kirkland & Ellis that is

1  representing them in that proceeding.  I should have

2  mentioned, my former partners and friends there may be

3  frustrated, but they are -- they've been on the line as well,

4  but I say all of that to say, thus far, in very limited

5  interaction with Mr. Warren, I have a lot of hope that we're

6  going to collectively be able to come to a good resolution

7  for the benefit of all parties.

8           Mr. Rubinstein, the marketing period is open, we

9  look forward to your bid and any bid of any party, including

10 Mr. Warren and the Warner Bros. studio, we're certainly happy

11 to entertain any and all competing bids to the proposed

12 transaction.

13          With that, Your Honor, that does conclude the

14 presentation.  As I said, we would --

15          THE COURT:  Let me just ask one thing.  I didn't

16 ask Ms. Sierra-Fox if that proposed resolution addresses her

17 comments.

18          MS. SIERRA-FOX:  Yes, Your Honor --

19          THE COURT:  Okay.

20          MS. SIERRA-FOX:  -- Rosa Sierra-Fox on behalf of

21 the U.S. Trustee, that addresses our comments.

22          THE COURT:  I just wanted to make sure.

23          MS. SIERRA-FOX:  Yes.

24          THE COURT:  Okay.  Well, look, thank you for --

25 I'm sorry, Mr. Mulvihill.

1          MR. MULVIHILL:  Your Honor, I'm sorry, before you

2   make your final comment, just one housekeeping matter on the

3   orders.  All of the orders have been uploaded except,

4   obviously, for the DIP and cash management order.  I just

5   wanted to ask Your Honor, would you like the cash management

6   order with those changes under certification of counsel on

7   the docket?

8          THE COURT:  Yes, please.

9          MR. MULVIHILL:  Okay.  So we will upload that and,

10  once we have it signed off from all the parties, we will

11  upload the DIP after the hearing.

12          THE COURT:  Okay.  And to be clear then, April

13  11th is the -- will be the final hearing on the motions for

14  which interim relief is sought today.

15          MR. MULVIHILL:  That's correct, Your Honor.

16          THE COURT:  Okay.  Okay, very good.

17          Okay.  I appreciate the presentations very much,

18  this was really well done, and look forward to seeing you

19  back on the 11th.  If anything comes up in the course of

20  getting all the final comments in on the DIP order and you

21  need anything, certainly tomorrow I can -- I can hear you,

22  and certainly any party that would want to appear by Zoom, it

23  would be just fine, but otherwise I'll look out for your

24  certification of counsel on the final DIP order -- or, I'm

25  sorry, the interim DIP order.

1          MR. BERNBROCK:  Thank you, Your Honor.

2          THE COURT:  Okay?

3          MR. BERNBROCK:  If I may indulge --

4          THE COURT:  Yes.

5          MR. BERNBROCK:  -- one final piece?  I raise this

6    only to the extent that we have to come back to Your Honor on

7    an emergency basis and I want to make very clear that there

8    is a separate and distinct -- although we share a common

9    ancestry, a separate and distinct enterprise that operates

10   under the Village Roadshow name in Australia, and they

11   operate theaters, they operate theme parks.  While the two at

12   one time were related and connected, and there's a very

13   small, *de minimis* equity holding in the Topco by some of

14   those legacy entities, this is a different -- this case is

15   not that case.  We have not filed bankruptcy for those

16   companies and operations; it is a separate and distinct

17   enterprise.  However, somewhat unfortunately, we were served

18   a notice dated today that on its face, Your Honor, is a

19   violation of the automatic stay.

20          I tell you that that's our read, our

21   interpretation of the action that's been taken.  We are going

22   to apprise that entity or those entities of the obligations

23   under the automatic stay, and I'm very, very hopeful that we

24   will be able to make clear what the automatic stay requires.

25   If those conversations are unsuccessful, we may bring a

1 motion to enforce the automatic stay before Your Honor on an

2 expedited basis.

3          THE COURT:  Understood.

4          MR. BERNBROCK:  I just want to flag that.

5          THE COURT:  Okay.

6          MR. BERNBROCK:  Otherwise, Your Honor, thank you.

7          THE COURT:  Thank you very much.  We are

8 adjourned.

9      (Proceedings concluded at 11:43 a.m.)

1                         CERTIFICATION

2          We certify that the foregoing is a correct

3   transcript from the electronic sound recording of the

4   proceedings in the above-entitled matter to the best of our

5   knowledge and ability.

6

7   /s/ William J. Garling                  March 19, 2025

8   William J. Garling, CET-543

9   Certified Court Transcriptionist

10  For Reliable

11

12  /s/ Tracey J. Williams                  March 19, 2025

13  Tracey J. Williams, CET-914

14  Certified Court Transcriptionist

15  For Reliable

16

17

18

19

20

21

22

23

24

25