# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | )  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC., *et al.*,[1] | ) Case No. 25 – 10475 (TMH) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |
| | ) Ref. Docket No. 11 |
| | ) |

**DECLARATION OF REID SNELLENBARGER
IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF ORDERS (I)(A) APPROVING BID PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS, (B) AUTHORIZING THE DEBTORS' ENTRY INTO THE STALKING HORSE APA AND APPROVING BID PROTECTIONS THEREUNDER, (C) SCHEDULING AN AUCTION FOR, AND HEARING TO APPROVE, SALE OF THE DEBTORS' ASSETS, (D) APPROVING FORM AND MANNER OF NOTICES OF SALE, AUCTION, AND SALE HEARING, AND (E) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES; (II)(A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, AND (B) APPROVING ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

I, Reid Snellenbarger, declare under penalty of perjury as follows:

1.  I am the Co-Head and Managing Partner of SOLIC Capital Advisors, LLC and SOLIC Capital, LLC (collectively, "<u>SOLIC</u>"), which is a financial advisory and investment banking firm whose headquarters are located at 425 West New England Avenue, Suite 300, Winter Park, Florida 32789.  SOLIC is the Debtors' proposed investment banker in these chapter 11 cases, and have filed application to employ and retain SOLIC [Docket No. 135].

---

[1] The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343. The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

2. I submit this Declaration (the "Declaration") in support of the *Debtors' Motion for Entry of Orders (I)(A) Approving Bid Procedures for the Sale of the Debtors' Assets, (B) Authorizing the Debtors' Entry into the Stalking Horse APA and Approving Bid Protections Thereunder, (C) Scheduling an Auction for , and Hearing to Approve, Sale of the Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (E) Approving Assumption and Assignment Procedures; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of all Liens, Claims, Interests, and Encumbrances, and (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 11] (the "Motion"), as well as the *Debtors' Supplemental Motion for Entry of an Order (A) Approving (I) the Debtors' Designation of the New Stalking Horse Bidder for the Library Assets as set forth in the Stalking Horse Agreement, (II) the Debtors' Entry into the Stalking Horse Agreement, and (III) the Bid Protections and (B) Granting Related Relief* (the "Stalking Horse Supplement"), filed contemporaneously herewith.[2] Through the Motion and the Stalking Horse Supplement, the Debtors seek, among other things, entry of an order (a) approving the Bid Procedures, (b) authorizing the Debtors' entry into the Alcon Stalking Horse APA with Alcon and approving the Alcon Bid Protections, (c) approving certain notices related to the Sale(s), and (d) scheduling certain dates and deadlines with respect to the Bid Procedures, Auction, and Sale(s).

3. I am authorized by the Debtors to submit this Declaration and, unless otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the SOLIC team, the Debtors' management team, and the Debtors' other advisors, my review of relevant documents and information concerning the

---

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion or the Stalking Horse Supplement, as applicable.

Debtors' operations and financial affairs, or my opinions based upon my experience and knowledge. If called as a witness, I could and would testify competently to the facts set forth in this Declaration on that basis.

## Qualifications

4. During my over 27-year professional career, I have gained significant experience in mergers and acquisitions, raising various forms of capital, and negotiations relating to the restructuring of private and public securities as an advisor. Prior to SOLIC, I spent most of my career as a Managing Director and shareholder at Houlihan Lokey Capital, Inc. I have a bachelor's of science degree in finance from Purdue University. I have been involved in restructuring of private and public securities in chapter 11 and out-of-court distressed M&A transactions and recapitalizations since 1998. My experience includes representing debtors, creditors and investors in both large and middle-market domestic and cross-border companies.

## Background

5. The Debtors formally engaged SOLIC as their investment banker on February 3, 2025. Prior to SOLIC's engagement, the Debtors had engaged Goldman Sachs ("Goldman") to market their assets to prospective purchasers over the course of 2024. When it became clear that the Company would be unable to consummate a sale transaction out of court, the Company engaged SOLIC to replace Goldman and continue the pre-petition marketing process of all of the Debtors' Assets leading up to and through the course of these chapter 11 cases. As part of the transition from Goldman to SOLIC as investment banker, I met with Goldman's team and reviewed their marketing efforts to date.

6. Since being engaged, SOLIC has worked closely with the Debtors and their advisors to: (a) review and analyze the Debtors' businesses and financial projections, and (b) continue the marketing of the Debtors' assets that Goldman previously commenced, including

developing marketing materials and identifying potential purchasers. It is my understanding that when Goldman was engaged, they were in communication with 30 parties who executed confidentiality agreements. Since the Debtors commenced these chapter 11 cases, SOLIC has contacted 137 parties, and as of the date hereof, 40 parties have executed confidentiality agreements, and 15 parties are currently engaged in discussions or negotiating confidentiality agreements.

7. Concurrently with the marketing process, and immediately upon being engaged, SOLIC, alongside the Debtors' other advisors, negotiated extensively with CP Ventura, LLC ("CP"), the original stalking horse bidder (as used herein, the "CP Stalking Horse Bidder") regarding the terms of a chapter 11 process, including a sale process that would continue under and with the benefits of section 363 of the Bankruptcy Code. The CP Stalking Horse Bidder ultimately agreed to provide the initial CP Stalking Horse Bid for the Library Assets on the terms set forth in the initial CP Stalking Horse APA as proposed and filed in connection with the Bid Procedures and Sale Motion.

8. However, following the Petition Date, on April 3, 2025, the Debtors received a letter proposal from Alcon Media Group, LLC ("Alcon") setting forth a bid for the Library Assets, contingent upon being the new stalking horse bidder. While the Debtors were not previously soliciting bids for a replacement stalking horse bidder for the Library Assets, the Debtors and Alcon engaged in good-faith, arms-length negotiations, which resulted in Alcon submitting the Alcon Stalking Horse APA to the Debtors on April 7, 2025, on terms very similar to the initial CP Stalking Horse APA, but with an increased purchase price (the "Alcon Stalking Horse Bid"), no break-up fee, and an identical expense reimbursement of $2 million.

9. The Debtors, prepared to accept the bid from Alcon in the exercise of their business judgment and following Board approval, notified CP of the new stalking horse bid. On April 11, 2025, CP raised their bid for the Library Assets, topping Alcon's bid. The Debtors sought further approval from the Board to accept CP's revised stalking horse bid on April 12, 2025, and notified Alcon of the same. On April 13, 2025, Alcon submitted a further stalking horse bid for the Library Assets, topping CP's bid received on April 11, 2025. Following this development, the Debtors brought both bids to the Board, and the Board directed the Debtors to request best and final bids from both Alcon and CP by 5:00p.m. ET on April 14, 2025. After the deadline passed, the highest and best bid for the Library Assets was offered by Alcon, with a purchase price of $417.5 million dollars (the "Alcon Stalking Horse Bid").

10. As a result of the extensive good-faith negotiations, and in consultation with their other advisors, the Debtors determined that the Alcon Stalking Horse Bid for the Library Assets was the highest and best proposal received, and the Debtors filed the Stalking Horse Supplement to seek approval of the Alcon Stalking Horse Bidder to replace the CP Stalking Horse Bidder for the Library Assets.

11. Subject to the Court's approval, the Alcon Stalking Horse Bid will now serve as the floor for potential additional bids for the Library Assets. Importantly, the Alcon Stalking Horse APA and the Bid Procedures contemplate a public, fair, and open sale process whereby interested parties may submit higher or better bids for the Library Assets, or alternatively, the Debtors' full suite of Assets, or other portions of the Assets.

12. Additionally, SOLIC has worked with the Debtors and their advisors to develop the proposed Bid Procedures to maximize the value of the Debtors' estates in these chapter 11 cases. The Bid Procedures were developed in good faith through discussions with the Debtors'

management team, advisors, and key stakeholders. The timeline set forth in the Bid Procedures is reasonable, customary in this jurisdiction, and will provide interested parties with sufficient time and information to formulate bids to purchase all of the Debtors' Assets or a subset thereof. Given the Debtors' extensive pre-petition marketing efforts, which I understand to have spanned a year, the proposed timeline is more than sufficient to complete a fair and open sale process that will maximize the value received for the Assets. Many of the potential bidders may be among those who previously executed confidentiality agreements or had access to the data room during the pre-petition process. Thus, these parties likely need minimal time to complete their diligence and submit competing bids. And for new bidders, the proposed timeline will provide them with sufficient time to perform due diligence given that the process is well understood at this juncture.

**The Alcon Stalking Horse Bidder and the Alcon Stalking Horse APA**

13. The Alcon Stalking Horse APA was negotiated at arm's length and is the product of good faith negotiations between the Debtors and the Alcon Stalking Horse Bidder. I am not aware of any indication of fraud, collusion, or any similar conduct between the Alcon Stalking Horse Bidder and other bidders that would taint the sale process. The Alcon Stalking Horse Bidder is not an "insider" or "affiliate" of any of the Debtors, and no common identity of incorporators, directors, or controlling stakeholders exist between the Alcon Stalking Horse Bidder and the Debtors.

14. I believe that the Alcon Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the best possible price for the Library Assets. While the Debtors commenced these cases with the CP Stalking Horse Bidder in place, the Alcon Stalking Horse Bid sets a new floor bid price for the Library Assets $52.5 million dollars higher than that provided by the initial CP Stalking Horse Bid as proposed and filed in connection with Bid Procedures and Sale Motion.

15. The Alcon Stalking Horse APA does not contain special treatment for the Debtors' affiliates or insiders. The Alcon Stalking Horse Bidder's offer will be subject to higher or otherwise better bids, and thus, ultimately, the Successful Bidder(s) will have submitted the highest or otherwise best bid.

**The Alcon Stalking Horse Bid Protections**

16. The only proposed bid protections provided to the Alcon Stalking Horse Bidder are reimbursement of reasonable and documented out-of-pocket costs, fees and expenses of the Alcon Stalking Horse Bidder in an amount up to $2 million related to the transaction contemplated by the Alcon Stalking Horse APA (the "Alcon Bid Protections"). The Alcon Stalking Horse APA does not contain any break-up fees. The Debtors believe that the amount of the Alcon Bid Protections are reasonable, given the benefit to the Debtors' estates of having a "stalking horse" bidder setting a higher floor for the purchase price. Ultimately, the Debtors, consistent with their business judgment, determined that approval of the Alcon Bid Protections under the terms of the Alcon Stalking Horse APA is necessary to preserve and enhance the value of the Debtors' estates. The Debtors believe that the agreement to pay the Alcon Bid Protections on the terms of the Alcon Stalking Horse APA was necessary to induce the Alcon Stalking Horse Bidder to enter into the transactions encompassed by the Alcon Stalking Horse APA which sets a floor price for the Library Assets that materially exceeds the initial one provided by the CP Stalking Horse Bidder as filed in connection with the Bid Procedures and Sale Motion. Finally, the Debtors believe that the Alcon Bid Protections are an integral element of the holistic negotiated deal with the Alcon Stalking Horse Bidder and are fair and reasonable under the circumstances of these cases.

17. In light of these circumstances, the Alcon Bid Protections are (a) reasonable and appropriate in light of the size and nature of the Sale proposed under the Alcon Stalking Horse Bid and comparable transactions, the commitments that have been made, and the efforts that have been

and will be expended by the Alcon Stalking Horse Bidder, and (b) necessary to induce the Alcon Stalking Horse Bidder to pursue the Sale and to continue to be bound by the Alcon Stalking Horse APA.

### The Bid Procedures

18. SOLIC worked collaboratively with the Debtors in the formulation of the Bid Procedures. As set forth in the Motion, the Debtors are seeking approval of the Bid Procedures to establish a clear and transparent process for the solicitation, receipt, evaluation, and selection of Bids on a Court-approved timeline that allows the Debtors to timely consummate one or more Sales involving their Assets. The Bid Procedures provide for an orderly, uniform and appropriately competitive process through which interested parties may submit offers in connection with the Sale of the Assets. The Debtors, with the assistance of their advisors, have structured the Bid Procedures to promote active bidding by interested parties and to confirm the highest or otherwise best offer reasonably available for the Assets. The Bid Procedures will allow the Debtors to conduct any Auction in a fair and transparent manner that will encourage participation by financially capable bidders with demonstrated ability to timely consummate a Sale.

19. I have reviewed the Bid Procedures and, generally speaking, the Bid Procedures establish, among other things:[3]

- The opportunity for Potential Bidders to conduct due diligence with respect to the Assets;

- The deadlines and requirements for submitting Bids and the method and criteria by which such Bids may be deemed to be "Qualified Bids" sufficient to trigger the Auction, including the terms and conditions that must be

---

[3] This summary is qualified in its entirety by the Bid Procedures. To the extent there are any conflicts between this summary and the Bid Procedures, the terms of the Bid Procedures shall govern.

> satisfied and the deadline that must be met by any Potential Bidder to be considered a "Qualified Bidder" and to participate in the Auction;

- The procedures for conducting the Auction, if one is held, and for selecting the Successful Bid(s);

- The requirements of an Initial Library Assets Overbid;

- Various other matters relating to the Debtors' sale process generally, including the designation of Back-up Bids, return of any Deposits, and certain reservations of rights; and

- The procedures concerning the potential assumption and assignment of executory contracts and unexpired leases in connection with a Sale.

20. The Bid Procedures propose the following key dates and deadlines with respect to the sale of the Debtors' Assets:

| Event or Deadline | Date and Time |
|---|---|
| **Entry of Bid Procedures Order** | April 22, 2025 |
| **Deadline to Serve and Publish the Sale Notice** | April 28, 2025 |
| **Deadline to File and Serve the Cure Notice** | April 28, 2025 |
| **Sale Objection Deadline** | May 12, 2025, at 4:00 p.m. (ET) |
| **Contract Objection Deadline** | May 12, 2025, at 4:00 p.m. (ET) |
| **Bid Deadline** | May 16, 2025, at 4:00 p.m. (ET) |
| **Auction (if necessary)** | May 21, 2025 |
| **Deadline to File Notice of Successful Bidder and Serve Counterparties to Potential Assumed Contracts with Notice and Process for Obtaining Adequate Assurance Information** | 1 business day after conclusion of the Auction |
| **Post-Auction Objection Deadline** | 2 business days after conclusion of the Auction |
| **Deadline to File Proposed Sale Order** | May 27, 2025 |
| **Sale Hearing (subject to Court availability)** | June 11, 2025 |

21.     Based on my experience, I believe that the Bid Procedures are designed to maximize the value received for all of the Debtors' Assets by facilitating a fair and competitive bidding process where potential bidders are encouraged to participate and submit competing Bids within the specified time frame for the applicable Assets, with the backdrop of the Debtors having executed the Alcon Stalking Horse APA for the Library Assets.  As described in the Motion, the proposed Bid Deadline requires Bids for the purchase of the Debtors' Assets to be submitted no later than **May 16, 2025, at 4:00p.m. (ET).**  This Bid Deadline thus provides parties who were not part of the pre-petition marketing process with approximately two months from the filing of the Motion and the proposed Bid Procedures to obtain information, execute confidentiality agreements and enter the data room, and formulate and submit a timely Bid to purchase all of the Debtors' Assets, individual Business Segments, or a subset thereof.  I believe that this period is more than sufficient for potential bidders to formulate competitive bids.  As set forth above, SOLIC has reached out to a multitude of parties following the commencement of these chapter 11 cases and has seen vast and immediate engagement.  In the context of this business and this sale process, I fully expect that competitive market participants will be able to meet the deadline to submit Qualified Bids.

22.     For these reasons, I am confident that the Bid Procedures and the other relief requested in the Motion, including setting a schedule for the Auction (if held), represent the best opportunity for the Debtors to realize the maximum value for their Assets.

23.     Given the Debtors' agreement with the Alcon Stalking Horse Bidder, and the timeline proposed by the Debtors pursuant to the Bid Procedures, it is my view, based on my experience and in light of the circumstances, that the proposed post-petition sale process set forth in the Bid Procedures is reasonable and appropriate under the circumstances.  The Bid Procedures

seek to strike a balance between the Debtors' interests in consummating the Sale(s) on a reasonable timeline and preserving the opportunity to attract the highest or otherwise best offers for the Assets. I believe that the proposed Bid Procedures provide for substantial flexibility with respect to the structure of one or more Sales, and the Bid Procedures provide the optimal path to garner interest in the Assets and maximize value for all stakeholders. At the Auction (if held), as set forth in the proposed Bid Procedures, the Debtors will have an opportunity to consider all competing offers and select the offers (including combinations thereof) that they deem to be the highest or otherwise best offer(s) for all of the Debtors' Assets.

## Conclusion

24. For all of the reasons set forth herein, in the Motion, and in the Stalking Horse Supplement, I believe that the Bid Procedures will encourage competitive bidding for the Assets, are consistent with other bidding procedures previously approved in chapter 11 cases of similar size and complexity, and are appropriate under the circumstances. In addition, I believe that the Alcon Bid Protections are reasonable and necessary under the facts and circumstances of these chapter 11 cases. In light of the foregoing, and based on my professional experience and involvement in the marketing process to date, I believe that the Bid Procedures are appropriate and should be approved.

*[Remainder of page intentionally blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: April 16, 2025

By: */s/ Reid Snellenbarger*
Name: Reid Snellenbarger