## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC., *et al.*,[1] | ) Case No. 25-10475 (TMH) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Ref. Docket No. 9** |
| | ) |

### DECLARATION OF KEITH MAIB IN SUPPORT OF THE DEBTORS' REQUEST FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO ENTER INTO TRANSACTION SUPPORT AGREEMENT

I, Keith Maib, hereby state and declare the following under penalty of perjury:

1.     I am a Senior Managing Director in the Turnaround & Restructuring practice at Accordion Partners, LLC ("Accordion"), which has served as a restructuring advisor for Village Roadshow Entertainment Group USA Inc. and each of its affiliated debtors and debtors in possession (collectively, the "Debtors") since February 20, 2024.  Effective January 3, 2025, the Debtors appointed me as the Chief Restructuring Officer.  I have led Accordion's engagement for the Debtors.  The Debtors have filed a motion [Docket No. 121] seeking to retain Accordion as its restructuring adviser and me as their Chief Restructuring Officer in these chapter 11 cases.

2.     I submit this declaration (this "Declaration") in support of the Debtors' request for entry of an order authorizing, among other things, the Debtors to enter into the Transaction Support Agreement (as defined below), which request is set forth in the *Debtors' Motion for Entry of*

---

[1]  The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343.  The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd, Ste. 800 West, West Hollywood, CA 90069.  Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

*Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* [Docket No. 9] (the "<u>DIP Motion</u>").[2]

3.    Except as otherwise noted, I have personal knowledge of the matters set forth herein.  All facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management and Accordion's team, my review of relevant documents, and/or my opinion based on my experience and knowledge of the Debtors' operations and financial condition.  In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing the Declaration.  If I were called to testify as a witness in this matter, I could and would testify competently to the facts set forth herein.

4.    On several occasions prior to the Petition Date, counsel to the Debtors and counsel to the ABS Trustee met and conferred in good faith to discuss the terms under which the ABS Trustee might agree not to object to certain transactions contemplated in these chapter 11 cases, including the DIP Facility and a sale of the ABS Collateral (the "<u>Sale</u>," and together with the DIP Facility, the "<u>Transactions</u>").  Prior to the Petition Date, the Debtors and the ABS Trustee agreed upon an original form of agreement in that regard, a copy of which was attached to the DIP Motion as Exhibit B (the "<u>Original Transaction Support Agreement</u>").  At that time, the ABS Trustee informed the Debtors that it would not enter in the Original Transaction Support Agreement without first receiving affirmative direction by a required majority of the ABS Noteholders

---

[2]    Capitalized terms used but not defined herein have the meanings ascribed to such terms in the DIP Motion.

pursuant to the terms of the Prepetition ABS Agreement.  Accordingly, the Debtors sought authority to enter into the Original Transaction Support Agreement in connection with interim approval of the DIP Motion so that they could be in a position to do so if and when the ABS Trustee received the requisite direction from the ABS Noteholders.  In response to comments raised by the United States Trustee at the first day hearing held on March 18, 2025 (the "First Day Hearing"), the Debtors agreed to seek this authority in connection with approval of the DIP Motion on a final basis.

5.      In the weeks since the First Day Hearing, counsel to the Debtors have further engaged with counsel to the ABS Trustee and counsel to certain of the ABS Noteholders (the "Ad Hoc Group of ABS Noteholders," and together with the ABS Trustee, the "ABS Parties") with respect to the Transactions and these chapter 11 cases.  Pursuant to those discussions, the Debtors and the ABS Parties have agreed to a revised form of agreement, substantially in the form attached hereto as **Exhibit A** (the "Transaction Support Agreement"),[3] which sets forth the terms and conditions under which the ABS Trustee will agree not to object to the Transactions and further agrees to abstain from taking certain actions in connection with the Transactions and these chapter 11 cases.  Upon information and belief, the Ad Hoc Group of ABS Noteholders will direct the ABS Trustee to enter into the Transaction Support Agreement, subject to the Court entering an order authorizing the Debtors to also enter into the Transaction Support Agreement.

6.      I believe that the Debtors' entry into the Transaction Support Agreement provides a clear benefit to the Debtors and their estates.  Consummation of the Transactions contemplated in the Transaction Support Agreement is critical to the Debtors' efforts to maximize the value of

---

[3]    A redline of the Transaction Support Agreement as marked against the Original Transaction Support Agreement is attached hereto as **Exhibit B**.

their estates.  The Transaction Support Agreement ensures that the ABS Trustee will not object to the Transactions and will abstain from taking other actions in connection with the Transactions and the Debtors' chapter 11 cases for so long as the agreement is in effect.  That, in turn, allows the Debtors to pursue the Transactions with the knowledge that a key stakeholder will not raise objections as the Transactions proceed.

7.      In addition, the Transaction Support Agreement contemplates that the ABS Trustee will not terminate or replace Debtor Village Roadshow Entertainment Group USA Inc. ("VREG-USA") as the servicer under the Prepetition ABS Credit Documents (the "Servicer") based solely on the Debtors' initiation of these chapter 11 cases.  In its capacity as Servicer, VREG-USA conducts various functions related to the servicing, administration, and collection of proceeds from the ABS Collateral in accordance with the terms of the Prepetition ABS Credit Documents.  In exchange for providing such services, VREG-USA is entitled to receive a fee equal to 5% of the proceeds from the ABS Collateral collected during each quarterly collection period (the "Servicing Fee").  Thus, by providing for VREG-USA to continue acting as Servicer, the Transaction Support Agreement will allow the Debtors to continue receiving the Servicing Fee and will avoid disruptions to the Debtors' operations that would result if VREG-USA were terminated or replaced as Servicer.

8.      Securing the ABS Trustee's non-objection to the Transactions on the terms and conditions set forth in the Transaction Support Agreement will aid in the Debtors' efficient prosecution of these chapter 11 cases and inure to the benefit of all stakeholders in the Debtors' estates.  Accordingly, entry into the Transaction Support Agreement represents a sound exercise of the Debtors' business judgment.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Dated: April 17, 2025

By:    _/s/ Keith Maib_____
       Keith Maib
       Senior Managing Director
       Accordion Partners, LLC

## EXHIBIT A

**Transaction Support Agreement**

*Agreed As To Form*

## <u>TRANSACTION SUPPORT AGREEMENT</u>

This TRANSACTION SUPPORT AGREEMENT (this "**Agreement**") is made and entered into as of [●], 2025 by and among the following parties (each, a "**Party**," and collectively, the "**Parties**"):

a.      VR Funding LLC, a Delaware limited liability company, and each of its affiliated entities listed on <u>**Exhibit A**</u> attached hereto (collectively, the "**Company**"); and

b.      U.S. Bank National Association, a national banking association, in its capacity as trustee and in certain other related roles under the ABS Agreements (the "**ABS Trustee**"), acting at the direction of Group A Noteholders representing beneficial ownership of more than 50% of the outstanding principal amount of the Group A Notes (as defined in the ABS Agreements (as defined herein) the "**Group A Majority**").

## <u>RECITALS</u>

**WHEREAS**, certain of the Company entities (the "**Issuers and Guarantors**")[1] and the ABS Trustee are party to that certain *Base Indenture*, dated as of November 10, 2020 (the "**Base Indenture**"), as supplemented by that certain *Group A Supplement*, dated as of November 10, 2020 (the "**Group A Supplement**"), and that certain *Series 2020-1 Supplement*, dated as of November 10, 2020 (together with the Base Indenture, the Group A Supplement, and the other agreements related thereto (including the Servicing Agreement (as defined herein) as supplemented and amended from time to time, the "**ABS Agreements**");

**WHEREAS**, the Issuers' and Guarantors' obligations under the ABS Agreements (the "**ABS Obligations**") are secured by a first-priority security interest in favor of the ABS Trustee (the "**ABS Liens**") in substantially all of the assets of the Issuers and certain specified assets of the Guarantors (the "**ABS Collateral**");

**WHEREAS**, the Issuers are party to that certain Servicing Agreement, dated as of November 10, 2020, among the Issuers, Village Roadshow Entertainment Group USA Inc., as Servicer (the "**Servicer**"), Vine Investment Advisors, LP, as Back-up Servicer, and the ABS Trustee (the "**Servicing Agreement**");

**WHEREAS**, the Issuers and Guarantors have informed the ABS Trustee that they intend to pursue certain transactions in connection with the Company commencing cases before the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**," and such cases, the "**Chapter 11 Cases**"), including a sale of the ABS Collateral (the "**Sale Transaction**") to be implemented pursuant to section 363 of the Bankruptcy Code and conducted

---

[1]     The Issuers under the ABS Agreements are:  VR Funding LLC, VR Films Holdings (BVI) Limited, Village Roadshow Films (BVI) Limited, Village Roadshow Films North America Inc., Village Roadshow Films Global Inc., and Village Roadshow VS Films LLC; the Guarantors under the ABS Agreements are:  Village Roadshow Distribution (BVI) Limited, Village Roadshow Pictures North America Inc., Village Roadshow Pictures (BVI) Limited and Village Roadshow Distribution USA Inc.

pursuant to certain bid procedures substantially in the form attached hereto as **Exhibit B** (the "**Bid Procedures**"), in connection with which certain of the Company entities, as sellers, have executed a form of asset purchase agreement attached hereto as **Exhibit C** (the "**CP Stalking Horse Agreement**") with CP Ventura LLC, as purchaser;

**WHEREAS**, in accordance with the terms and conditions set forth in this Agreement, the ABS Trustee has agreed not to object to the Sale Transaction on (i) the condition that the net purchase price for the ABS Collateral is comprised of a cash component sufficient to indefeasibly satisfy all Claims (as defined in section 101(5) of the Bankruptcy Code) on account of the ABS Obligations (the "**ABS Claims**"), as reflected in the CP Stalking Horse Agreement or such other purchase agreement reflecting a higher or otherwise better bid pursuant to the Bid Procedures (the CP Stalking Horse Agreement or such other purchase agreement, as applicable, the "**Stalking Horse APA**"), and (ii) the other conditions set forth herein;

**WHEREAS**, Falcon Strategic Partners IV, LP, and 1397225 Ontario Limited (collectively, the "**DIP Lenders**") have agreed to provide the Company with debtor-in-possession financing (the "**DIP Financing**" and, collectively with the Sale Transaction, the "**Transactions**"), on the terms set forth in that certain debtor-in-possession term sheet attached hereto as **Exhibit D** (the "**DIP Term Sheet**"), which contemplates the grant of security interests in favor of the DIP Lenders on substantially all of the Company's assets, including liens on the ABS Collateral that are subordinate to the ABS Liens in all respects (the "**DIP Liens**"), subject to and in accordance with an order of the Bankruptcy Court in the form attached hereto as **Exhibit E** (the "**DIP Order**");

**WHEREAS**, in accordance with the terms and conditions set forth in this Agreement, the ABS Trustee has agreed not to object to the DIP Financing on (i) the condition that the DIP Liens are subordinate to the ABS Liens in all respects, (ii) the DIP Order is entered by the Bankruptcy Court and remains in full force and effect in the form attached hereto, except as shall not be material and adverse to the interests of the ABS Trustee or the holders of the ABS Obligations, and (iii) the other conditions set forth herein;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

<u>**AGREEMENT**</u>

**Section 1.**    *Recitals.*  The Recitals set forth above are true and correct and are incorporated herein by reference and made a part hereof.

**Section 2.**    *Conditions Precedent to the Effectiveness of this Agreement.*  This Agreement shall become effective and binding upon each of the Parties on the date on which all of the following conditions have been satisfied (the "**Agreement Effective Date**"):

(a)    the ABS Trustee shall have been directed by the Group A Majority to enter into this Agreement, which direction shall be confirmed by the ABS Trustee to the Company in writing (for which an e-mail to Company counsel shall be sufficient);

(b)      the Company shall have executed and delivered counterpart signature pages of this Agreement to counsel to the ABS Trustee;

(c)      the ABS Trustee shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company; and

(d)      the Company shall have obtained authority from the Bankruptcy Court to enter into this Agreement.

**Section 3.**      *Definitive Documents.*

3.01.    The documents governing the Transactions shall be comprised of the following, to the extent applicable, each in the forms provided to the ABS Trustee and counsel to the Group A Majority pursuant to Section 5.01(h) below (collectively, the "**Definitive Documents**"):

(a)      the DIP Term Sheet and the DIP Order; and

(b)      the Bid Procedures, the Stalking Horse APA or any other purchase agreement pursuant to which the Company seeks to effectuate the Sale Transaction in accordance with the Bid Procedures and any order of the Bankruptcy Court authorizing the Company to enter into the Stalking Horse APA or any other such purchase agreement.

**Section 4.**      *Commitments of the ABS Trustee.*

4.01.    General Commitments.

(a)      During the period from the Agreement Effective Date to the date on which this Agreement is terminated in accordance with <u>Section 6</u> (the "**Agreement Effective Period**"), the ABS Trustee agrees, in respect of all ABS Claims, to:

(i)      not object to the Transactions so long (1) with respect to the Sale Transaction, the net purchase price for the ABS Collateral is comprised of a cash component sufficient to indefeasibly satisfy all ABS Claims as reflected in the Stalking Horse APA or a higher or otherwise better bid pursuant to the Bid Procedures and, at closing of the Sale Transaction thereunder the ABS Claims are indefeasibly repaid in full; (2) with respect to the DIP Financing, the DIP Liens are subordinate to the ABS Liens in all respects and the DIP Order remains in effect in the form attached hereto, except as shall not be material and adverse to the interests of the ABS Trustee or the holders of the ABS Obligations; (3) they are otherwise on the terms and subject to the conditions of this Agreement, and (4) they are otherwise on the terms and conditions set forth in the Definitive Documents, it being understood that notwithstanding such agreement not to object to the Transactions and any other provision of this Agreement, the ABS Trustee has not agreed to, and will not, vote in favor of or in any manner support a sale which would adversely impact the Specified WB Liens (as defined in the DIP Order) or any other similar lien or interest in a way that would violate the ABS Agreements; and

(ii)      [reserved].

(b)      During the Agreement Effective Period, the ABS Trustee agrees, in respect of all ABS Claims, that it shall not directly or indirectly:

(i)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Transactions (so long as they are on the terms noted in Section 4.01(a)(i) above);

(ii)      file any motion, pleading, or other document with the Bankruptcy Court or any other court that, in whole or in part, is materially inconsistent with this Agreement;

(iii)      exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any ABS Claims other than in accordance with this Agreement and the Definitive Documents; or

(iv)      terminate or replace Servicer in its capacity as such based solely on the initiation of the Chapter 11 Cases otherwise constituting an Event of Bankruptcy and Servicer Termination Event (each as defined in the Servicing Agreement) under Section 5.1(a)(v) of the Servicing Agreement, provided the Servicer continues to perform all services required under the Servicing Agreement and the other ABS Agreements in the ordinary course to at least the standard of performance that obtained prior to the commencement of the Chapter 11 Cases.

### Section 5.      *Commitments of the Company*.

5.01.      <u>Affirmative Covenants</u>.      During the Agreement Effective Period, the Company agrees to:

(a)      pay all amounts due and owing under the ABS Agreements, as such amounts come due including, without limitation all amounts payable in respect of the Group A Notes, any and all Group A Trustee Expenses and any and all Group A Quarterly Trustee Fees (each as defined in the ABS Agreements), which shall include any amounts incurred pursuant to Section 6.04 hereof;

(b)      with respect to the Company entity that serves as Servicer, continue to serve as Servicer in all respects under and in connection with the ABS Agreements in the ordinary course to at least the standard of performance that obtained prior to the commencement of the Chapter 11 Cases and not attempt to reject the Servicing Agreement under Section 365 of the Bankruptcy Code;

(c)      support and take all steps reasonably necessary and desirable to consummate the Transactions in accordance with this Agreement;

(d)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(e)      use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Transactions;

(f)      negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Transactions as contemplated by this Agreement;

(g)      use commercially reasonable efforts to seek additional support for the Transactions from other material stakeholders (if any) to the extent reasonably prudent;

(h)      provide counsel for the ABS Trustee and counsel for the Group A Majority a reasonable opportunity to review copies of all Definitive Documents (which reasonable opportunity shall be at least three calendar days prior to any such Definitive Documents being filed with the Bankruptcy Court for approval);

(i)      oppose and if necessary object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the implementation or consummation of the Transactions (including, if applicable, the Company's timely filing of objections or written responses in the Chapter 11 Cases) to the extent such opposition or objection is reasonably necessary to facilitate implementation of the Transactions or the Company's performance of its obligations under this Agreement.

5.02.   <u>Representation and Warranties; Negative Covenants</u>.

(a)      The Company represents and warrants that, while certain affiliates of the Company had contemplated issuing Residual Notes under the Residual Indenture (each as defined by the ABS Agreements), and the ABS Agreements were amended in 2023 to permit that issuance, such Residual Notes were never issued.

(b)      During the Agreement Effective Period, the Company shall not directly or indirectly:

(i)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Transactions;

(ii)      take any action, or encourage any other person or entity to take any action, that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Transactions described in this Agreement or any Definitive Document; or

(iii)      seek to modify the Definitive Documents or the terms of the Transactions, in whole or part, in a manner that is not consistent with this Agreement.

(c)      From and after the Agreement Effective Date, the Company shall not, nor shall it permit any of the Company's affiliates to: (i) commence any proceeding or other action that challenges (A) the amount, validity, allowance, character, enforceability, or priority of any ABS Claims, or (B) the validity, enforceability, or perfection of the ABS Liens; (ii) otherwise seek to restrict any rights of the ABS Trustee or the holders of ABS Obligations; or (iii) support any person in connection with any of the acts described in the foregoing clauses.

5.03.   Application of Sale Proceeds.   At closing of any Sale Transaction, the Company shall fully and indefeasibly repay in cash the ABS Obligations and terminate the ABS Agreements.

**Section 6.**      *Termination Events*.

6.01.   ABS Trustee Termination Events.   Upon the occurrence of any of the following events, the ABS Trustee may, or at the direction of the Group A Majority shall, by delivery to the Company of a written notice, terminate this Agreement:

(a)      the breach in any material respect by the Company of any representation, warranty, covenant or commitment of the Company that (i) is adverse to the ABS Trustee or any holder of ABS Claims and (ii) remains uncured for five (5) business days after the ABS Trustee transmits a written notice detailing any such breach;

(b)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that enjoins the consummation of a material portion of the Transactions;

(c)      the Company pursues consummation of a Sale Transaction that:  (i) does not provide for a net purchase price for the ABS Collateral comprised of a cash component sufficient to indefeasibly satisfy all ABS Claims; or (ii) is otherwise inconsistent with the terms of the Definitive Documents or the terms of this Agreement;

(d)      the Company pursues a DIP Financing which contemplates the grant of DIP Liens that are not subordinate to the ABS Liens in all respects or which is otherwise inconsistent with the terms of this Agreement or the DIP Order;

(e)      the Stalking Horse APA is terminated by any party thereto and the Company has not entered into a binding agreement in respect of an alternative transaction that would, if consummated, satisfy in full, in cash the ABS Obligations; or

(f)      the Company and/or its affiliated debtors in the Chapter 11 Cases fail to comply with the DIP Order, including the payment of adequate protection payments as set forth therein.

6.02.   Company Termination Events.   This Agreement may be terminated by the Company by the delivery to the ABS Trustee of a written notice upon the occurrence of the following events:

(a)      the breach in any material respect by the ABS Trustee of any commitments of the ABS Trustee set forth in Section 4 that (i) is adverse to the Company and (ii) remains uncured for five (5) business days after the Company transmit a written notice detailing any such breach;

(b)      the board of directors, board of managers, or similar governing body of the Company determines, after consulting with counsel, that proceeding with any of the Transactions would be inconsistent with the exercise of its fiduciary duties or applicable law and notifies the ABS Trustee of such determination; and

(c)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that enjoins the consummation of a material portion of the Transactions.

6.03.   <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all Parties.

6.04.   <u>Automatic Termination</u>.   This Agreement, and the obligations of the Parties hereunder, shall automatically terminate without any action by any Party hereto, on July 5, 2025 (unless such date is extended by all the Parties hereunder prior to such date).

6.05.   <u>Indemnification</u>.   The Company agrees that any loss, liability, claim, cost, disbursement, expense, legal fees and expenses (including reasonable attorney's fees and expenses), damage or injury incurred by any Indenture Indemnified Parties (as defined by the ABS Agreements) in connection with, arising out of or resulting from the ABS Trustee's entry into this Agreement shall constitute indemnifiable amounts for which the Company will be jointly and severally liable in accordance with the terms of the ABS Agreements including, without limitation, Section 7.4(b) of the Base Indenture.

6.06.   <u>Effect of Termination</u>.  Upon the occurrence of a termination in accordance with this <u>Section 6</u>, this Agreement shall be of no further force and effect as to the Parties and each Party shall be released from its commitments, undertakings, and agreements under or related to this Agreement, shall have the rights and remedies that it would have had had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims (as defined in section 101(5) of the Bankruptcy Code); provided, however, that Sections 5.02(c) and 6.05 of this Agreement shall survive termination of this Agreement and shall be enforceable by the Parties notwithstanding its termination.

**Section 7.**     *Miscellaneous*.

7.01.   <u>Capacity of the ABS Trustee</u>.  Notwithstanding anything contained herein to the contrary, this Agreement has been entered into by U.S. Bank National Association, not in its individual capacity but solely in its capacity as ABS Trustee and in no event shall U.S. Bank National Association have any individual or personal liability for the representations, warranties, covenants, agreements or other obligations of the ABS Trustee hereunder.

7.02.   <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)      if to the Company, to:

Village Roadshow Entertainment Group USA Inc.
750 N. San Vincente Blvd., Suite 800 West
West Hollywood, CA 90069
Attention:  Kevin Berg and Louis Santor
Email:  kevin.berg@vreg.com and louis.santor@vreg.com

with a copy (which shall not constitute notice) to:

Sheppard Mullin Richter & Hampton LLP
321 North Clark Street, 32nd Floor
Chicago, IL  60654
Attention:  Justin Bernbrock
E-mail:  jbernbrock@sheppardmullin.com

(b)    if to the ABS Trustee, to:

U.S. Bank National Association
190 S LaSalle St
Chicago, IL 60603
Attention: Nick Valaperta
Email: nicolas.valaperta@usbank.com

with a copy (which shall not constitute notice) to:

Barnes & Thornburg LLP
One North Wacker Drive, Suite 4400
Chicago, IL  60606
Attention:  Aaron Gavant
E-mail:  agavant@btlaw.com

Any notice given by delivery, mail, or courier shall be effective when received.

7.03.  Enforceability of Agreement.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

7.04.  Waiver.  If the Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

7.05.  No Third Party Beneficiaries. This Agreement is solely for the benefit of, and shall only be binding upon, the Parties and their respective successors and permitted assigns. This Agreement is not intended to, and does not, confer upon any other person any benefits, rights or remedies, except that, notwithstanding anything to the contrary in this Agreement, the Group A Noteholders representing the Group A Majority may rely upon and enforce this Agreement as express third party beneficiaries and shall have the right to seek specific performance of the Company's obligation hereunder (including, without limitation, Section 5.03 hereof).

IN WITNESS WHEREOF, the Parties hereto have executed and entered into this Agreement on the date first set forth above.

**COMPANY:**

VR FUNDING LLC AND EACH OF ITS AFFILIATED ENTITIES LISTED ON EXHIBIT A

By: _____

Name:    Kevin P. Berg

Title:     General Counsel and Secretary

**ABS TRUSTEE:**

U.S. BANK NATIONAL ASSOCIATION


By: _____
Name:
Title:

## <u>EXHIBIT A</u>

**Company Parties**

VR Funding LLC and VR Films Holdings (BVI) Limited
(the "**Parent Co-Issuers**")

Village  Roadshow Films (BVI) Limited, Village Roadshow Films North America Inc., Village
Roadshow VS Films LLC, and Village Roadshow Films Global Inc.
(the "**Subsidiary Co-Issuers**" and, together with the Parent Co-Issuers, the "**Issuers**")

Village Roadshow Distribution (BVI) Limited, Village Roadshow Pictures North America Inc.,
Village Roadshow Pictures (BVI) Limited, and Village Roadshow Distribution USA Inc.
(the "**Guarantors**")

Village Roadshow Entertainment Group USA Inc.
(the "**Servicer**")

# **EXHIBIT B**

## **Bid Procedures**

(Intentionally Omitted)

## **EXHIBIT C**

**CP Stalking Horse Agreement**

(Intentionally Omitted)

## **EXHIBIT D**

**DIP Term Sheet**

(Intentionally Omitted)

**<u>EXHIBIT B</u>**

**Redline**

*Agreed As To Form*

## **TRANSACTION SUPPORT AGREEMENT**

This TRANSACTION SUPPORT AGREEMENT (this "**Agreement**") is made and entered into as of [————], [●], 2025 by and among the following parties (each, a "**Party**," and collectively, the "**Parties**"):

a.  VR Funding LLC, a Delaware limited liability company, and each of its affiliated entities listed on **Exhibit A** attached hereto (collectively, the "**Company**"); and

b.  U.S. Bank National Association, a national banking association, in its capacity as trustee and in certain other related roles under the ABS Agreements (the "**ABS Trustee**"), acting at the direction of Group A Noteholders representing beneficial ownership of more than 50% of the outstanding principal amount of the Group A Notes (as defined in the ABS Agreements (as defined herein) the "**Group A Majority**").

## **RECITALS**

**WHEREAS**, certain of the Company entities (the "**Issuers and Guarantors**")[1] and the ABS Trustee are party to that certain *Base Indenture*, dated as of November 10, 2020 (the "**Base Indenture**"), as supplemented by that certain *Group A Supplement*, dated as of November 10, 2020 (the "**Group A Supplement**"), and that certain *Series 2020-1 Supplement*, dated as of November 10, 2020 (together with the Base Indenture, the Group A Supplement, and the other agreements related thereto (including the Servicing Agreement (as defined herein) as supplemented and amended from time to time, the "**ABS Agreements**");

**WHEREAS**, certain affiliates of the Company had contemplated issuing Residual Notes under the Residual Indenture (each as defined by the ABS Agreements), and the ABS Agreements were amended in 2023 to permit that issuance, but such Residual Notes were never issued;

**WHEREAS**, the Issuers' and Guarantors' obligations under the ABS Agreements (the "**ABS Obligations**") are secured by a first-priority security interest in favor of the ABS Trustee (the "**ABS Liens**") in substantially all of the assets of the Issuers and certain specified assets of the Guarantors (the "**ABS Collateral**");

**WHEREAS**, the Issuers are party to that certain Servicing Agreement, dated as of November 10, 2020, among the Issuers, Village Roadshow Entertainment Group USA Inc., as Servicer (the "**Servicer**"), Vine Investment Advisors, LP, as Back-up Servicer, and the ABS Trustee (the "**Servicing Agreement**");

**WHEREAS**, the Issuers and Guarantors have informed the ABS Trustee that they intend to pursue certain transactions in connection with the Company commencing cases before the

---

[1]  The Issuers under the ABS Agreements are: VR Funding LLC, VR Films Holdings (BVI) Limited, Village Roadshow Films (BVI) Limited, Village Roadshow Films North America Inc., Village Roadshow Films Global Inc., and Village Roadshow VS Films LLC; the Guarantors under the ABS Agreements are: Village Roadshow Distribution (BVI) Limited, Village Roadshow Pictures North America Inc., Village Roadshow Pictures (BVI) Limited and Village Roadshow Distribution USA Inc.

United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**," and such cases, the "**Chapter 11 Cases**"), including a sale of the ABS Collateral (the "**Sale Transaction**") to be implemented pursuant to section 363 of the Bankruptcy Code and conducted pursuant to certain bid procedures substantially in the form attached hereto as **Exhibit B** (the "**Bid Procedures**"), in connection with which certain of the Company entities, as sellers, have executed a form of asset purchase agreement attached hereto as **Exhibit C** (the "**CP Stalking Horse APAAgreement**") with CP Ventura LLC, as purchaser;

**WHEREAS**, in accordance with the terms and conditions set forth in this Agreement, the ABS Trustee has agreed not to object to the Sale Transaction on (i) the condition that the net purchase price for the ABS Collateral is comprised of a cash component sufficient to indefeasibly satisfy all Claims (as defined in section 101(5) of the Bankruptcy Code) on account of the ABS Obligations (the "**ABS Claims**"), as reflected in the CP Stalking Horse APAAgreement or such other purchase agreement reflecting a higher or otherwise better bid pursuant to the Bid Procedures, (the CP Stalking Horse Agreement or such other purchase agreement, as applicable, the "**Stalking Horse APA**"), and (ii) the other conditions set forth herein;

**WHEREAS**, Falcon Strategic Partners IV, LP, and 1397225 Ontario Limited (collectively, the "**DIP Lenders**") have agreed to provide the Company with debtor-in-possession financing (the "**DIP Financing**" and, collectively with the Sale Transaction, the "**Transactions**"), on the terms set forth in that certain debtor-in-possession term sheet attached hereto as **Exhibit D** (the "**DIP Term Sheet**"), which contemplates the grant of security interests in favor of the DIP Lenders on substantially all of the Company's assets, including liens on the ABS Collateral that are subordinate to the ABS Liens in all respects (the "**DIP Liens** "**DIP Liens**"), subject to and in accordance with an order of the Bankruptcy Court in the form attached hereto as **Exhibit E** (the "**DIP Order**");

**WHEREAS**, in accordance with the terms and conditions set forth in this Agreement, the ABS Trustee has agreed not to object to the DIP Financing on (i) the condition that the DIP Liens are subordinate to the ABS Liens in all respects, and (ii)(ii) the DIP Order is entered by the Bankruptcy Court and remains in full force and effect in the form attached hereto, except as shall not be material and adverse to the interests of the ABS Trustee or the holders of the ABS Obligations, and (iii) the other conditions set forth herein;

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## <u>AGREEMENT</u>

**Section 1.**    *Recitals*.  The Recitals set forth above are true and correct and are incorporated herein by reference and made a part hereof.

**Section 2.**    *Conditions Precedent to the Effectiveness of this Agreement*.  This Agreement shall become effective and binding upon each of the Parties on the date on which all of the following conditions have been satisfied (the "**Agreement Effective Date**"):

(a)      the ABS Trustee shall have been directed by the Group A Majority to enter into this Agreement, which direction shall be confirmed by the ABS Trustee to the Company in writing (for which an e-mail to Company counsel shall be sufficient);

(b)      the Company shall have executed and delivered counterpart signature pages of this Agreement to counsel to the ABS Trustee;

(c)      the ABS Trustee shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company; and

(d)      the Company shall have obtained authority from the Bankruptcy Court to enter into this Agreement.

**Section 3.**      *Definitive Documents*.

3.01.    The documents governing the Transactions shall be comprised of the following, to the extent applicable, each in the forms provided to the ABS Trustee and counsel to the Group A Majority pursuant to Section 5.01(~~g~~h) below (collectively, the "**Definitive Documents**"):

(a)      the DIP Term Sheet and the ~~orders entered by the Bankruptcy Court approving the~~ DIP ~~Financing on interim~~Order; and ~~final bases; and~~

(b)      the Bid Procedures, the Stalking Horse APA or any other purchase agreement pursuant to which the Company seeks to effectuate the Sale Transaction in accordance with the Bid Procedures and any order of the Bankruptcy Court authorizing the Company to enter into the Stalking Horse APA or any other such purchase agreement.

**Section 4.**      *Commitments of the ABS Trustee*.

4.01.    General Commitments.

(a)      During the period from the Agreement Effective Date to the date on which ~~termination of~~ this Agreement is ~~effective~~terminated in accordance with Section ~~5~~6 (the "**Agreement Effective Period**"), the ABS Trustee agrees, in respect of all ABS Claims, to:

(i)      not object to the Transactions so long (1) with respect to the Sale Transaction, the net purchase price for the ABS Collateral is comprised of a cash component sufficient to indefeasibly satisfy all ABS Claims as reflected in the Stalking Horse APA or a higher or otherwise better bid pursuant to the Bid Procedures and, at closing of the Sale Transaction thereunder the ABS Claims are indefeasibly repaid in full; (2) with respect to the DIP Financing, the DIP Liens are subordinate to the ABS Liens in all respects and the DIP Order remains in effect in the form attached hereto, except as shall not be material and adverse to the interests of the ABS Trustee or the holders of the ABS Obligations; (3) they are otherwise on the terms and subject to the conditions of this Agreement, and (4) they are otherwise on the terms and conditions set forth in the Definitive Documents, it being understood that notwithstanding such agreement not to object to the Transactions and any other provision of this Agreement, the ABS Trustee has not agreed to, and will not, vote in favor of or in any manner support a sale which would adversely impact the

Specified WB Liens (as defined in the DIP Order) or any other similar lien or interest in a way that would violate the ABS Agreements; and

(ii)    to the extent commercially reasonable and as the Company so requests, to cooperate with the Company (subject to the terms hereof) in respect of all material matters concerning the implementation and consummation of the Transactions (so long as they are on the terms noted in Section 4.01(a)(i) above) including, without limitation, coordinating with and seeking direction from the Group A Majority, to the extent necessary.

(ii)    [reserved].

(b)    During the Agreement Effective Period, the ABS Trustee agrees, in respect of all ABS Claims, that it shall not directly or indirectly:

(i)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Transactions (so long as they are on the terms noted in Section 4.01(a)(i) above);

(ii)    file any motion, pleading, or other document with the Bankruptcy Court or any other court that, in whole or in part, is not materially consistentinconsistent with this Agreement or the Definitive Documents;

(iii)    initiate any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the Transactions contemplated herein against the Company other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(iv)(iii)exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any ABS Claims other than in accordance with this Agreement and the Definitive Documents; or

(v)    object to, delay, impede, or take any other action to interfere with the Company's ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code; or

(vi)(iv)terminate or replace Servicer in its capacity as such based solely on the initiation of the Chapter 11 Cases otherwise constituting an Event of Bankruptcy and Servicer Termination Event (each as defined in the Servicing Agreement) under Section 5.1(a)(v) of the Servicing Agreement, provided the Servicer continues to perform all services required under the Servicing Agreement and the other ABS Agreements in the ordinary course to at least the standard of performance that obtained prior to the commencement of the Chapter 11 Cases.

**Section 5.    *Commitments of the Company*.**

5.01.    <u>Affirmative Covenants</u>.    During the Agreement Effective Period, the Company agrees to:

-4-

(a)     pay all amounts due and owing under the ABS Agreements, as such amounts come due including, without limitation all amounts payable in respect of the Group A Notes, any and all Group A Trustee Expenses and any and all Group A Quarterly Trustee Fees (each as defined in the ABS Agreements), which shall include any amounts incurred pursuant to Section 6.04 hereof;

(b)     with respect to the Company entity that serves as Servicer, continue to serve as Servicer in all respects under and in connection with the ABS Agreements in the ordinary course to at least the standard of performance that obtained prior to the commencement of the Chapter 11 Cases and not attempt to reject the Servicing Agreement under Section 365 of the Bankruptcy Code;

(c)     support and take all steps reasonably necessary and desirable to consummate the Transactions in accordance with this Agreement;

(d)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Transactions contemplated herein, take all steps reasonably necessary and desirable to address any such impediment;

(e)     use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Transactions;

(f)     negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Transactions as contemplated by this Agreement;

(g)     use commercially reasonable efforts to seek additional support for the Transactions from other material stakeholders (if any) to the extent reasonably prudent;

(h)     provide counsel for the ABS Trustee and counsel for the Group A Majority a reasonable opportunity to review copies of all Definitive Documents (which reasonable opportunity shall be at least three calendar days prior to any such Definitive Documents being filed with the Bankruptcy Court for approval);

(i)     oppose and if necessary object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the implementation or consummation of the Transactions (including, if applicable, the Company's timely filing of objections or written responses in the Chapter 11 Cases) to the extent such opposition or objection is reasonably necessary to facilitate implementation of the Transactions or the Company's performance of its obligations under this Agreement.

5.02.   Representation and Warranties; Negative Covenants.

(a)     The Company represents and warrants that, while certain affiliates of the Company had contemplated issuing Residual Notes under the Residual Indenture (each as defined by the ABS Agreements), and the ABS Agreements were amended in 2023 to permit that issuance, such Residual Notes were never issued.

(b)     During the Agreement Effective Period, the Company shall not directly or indirectly:

(i)     object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Transactions;

(ii)     take any action, or encourage any other person or entity to take any action, that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the Transactions described in this Agreement or any Definitive Document; or

(iii)     seek to modify the Definitive Documents or the terms of the Transactions, in whole or part, in a manner that is not consistent with this Agreement.

(c)     From and after the Agreement Effective Date, the Company shall not: (i), nor shall it permit any of the Company's affiliates to:  (i) commence any proceeding or other action that challenges (A) the amount, validity, allowance, character, enforceability, or priority of any ABS Claims, or (B) the validity, enforceability, or perfection of the ABS Liens; (ii)  otherwise seek to restrict any rights of the ABS Trustee or the holders of ABS Obligations; or (iii)  support any person in connection with any of the acts described in the foregoing clauses.

~~5.03.    *Fiduciary Out.  Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Company or its board of directors, board of managers, or similar governing body, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Transactions to the extent taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law, and any such action or inaction shall not be deemed to constitute a breach of this Agreement.*~~

5.03.    Application of Sale Proceeds.  At closing of any Sale Transaction, the Company shall fully and indefeasibly repay in cash the ABS Obligations and terminate the ABS Agreements.

**Section 6.    *Termination Events*.**

6.01.    ABS Trustee Termination Events.  ~~This Agreement may be terminated by~~Upon the occurrence of any of the following events, the ABS Trustee ~~by the~~may, or at the direction of the Group A Majority shall, by delivery to the Company of a written notice ~~upon the occurrence of the following events~~, terminate this Agreement:

(a)     the breach in any material respect by the Company of any representation, warranty, covenant or commitment of the Company that (i) is adverse to the ABS Trustee or any holder of ABS Claims and (ii) remains uncured for five (5) business days after the ABS Trustee transmits a written notice detailing any such breach;

(b)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that enjoins the consummation of a material portion of the Transactions;

(c)     the Company pursues consummation of a Sale Transaction that:  (i) does not provide for a net purchase price for the ABS Collateral comprised of a cash component sufficient to indefeasibly satisfy all ABS Claims; or (ii) is otherwise inconsistent with the terms of the Definitive Documents or the terms of this Agreement;

(d)     the Company pursues a DIP Financing which contemplates the grant of DIP Liens that are not subordinate to the ABS Liens in all respects or which is otherwise inconsistent with the terms of this Agreement; or the DIP Order;

(e)     the ~~Group A Majority directs~~Stalking Horse APA is terminated by any party thereto and the Company has not entered into a binding agreement in respect of an alternative transaction that would, if consummated, satisfy in full, in cash the ABS ~~Trustee, in accordance~~Obligations; or

~~(e)~~(f)     the Company and/or its affiliated debtors in the Chapter 11 Cases fail to comply with the ~~requirements~~DIP Order, including the payment of adequate protection payments as set forth ~~in the ABS Agreements and any other related or applicable documents, to terminate this Agreement~~therein.

6.02.   <u>Company Termination Events</u>.   This Agreement may be terminated by the Company by the delivery to the ABS Trustee of a written notice upon the occurrence of the following events:

(a)     the breach in any material respect by the ABS Trustee of any commitments of the ABS Trustee set forth in <u>Section 4</u> that (i) is adverse to the Company and (ii) remains uncured for five (5) business days after the Company transmit a written notice detailing any such breach;

(b)     the board of directors, board of managers, or ~~such~~ similar governing body of the Company determines, after consulting with counsel, ~~(i)~~ that proceeding with any of the Transactions would be inconsistent with the exercise of its fiduciary duties or applicable law and notifies the ABS Trustee of such determination; and

(c)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that enjoins the consummation of a material portion of the Transactions.

6.03.   <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among all Parties.

6.04.   Automatic Termination.   This Agreement, and the obligations of the Parties hereunder, shall automatically terminate without any action by any Party hereto, on July 5, 2025 (unless such date is extended by all the Parties hereunder prior to such date).

~~6.04.~~6.05.     Indemnification.  The Company agrees that any loss, liability, claim, cost, disbursement, expense, legal fees and expenses (including reasonable attorney's fees and expenses), damage or injury incurred by any Indenture Indemnified Parties (as defined by the ABS Agreements) in connection with, arising out of or resulting from the ABS Trustee's entry into this Agreement shall constitute indemnifiable amounts for which the Company will be jointly and

severally liable in accordance with the terms of the ABS Agreements including, without limitation, Section 7.4(b) of the Base Indenture.

~~6.05.~~6.06.    Effect of Termination.  Upon the occurrence of a termination in accordance with this Section 6, this Agreement shall be of no further force and effect as to the Parties and each Party shall be released from its commitments, undertakings, and agreements under or related to this Agreement, shall have the rights and remedies that it would have had had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims (as defined in section 101(5) of the Bankruptcy Code); provided, however, that Sections 5.02(c) and 6.~~04~~05 of this Agreement shall survive termination of this Agreement and shall be enforceable by the Parties notwithstanding its termination.

**Section 7.    _Miscellaneous_.**

7.01.    Capacity of the ABS Trustee.  Notwithstanding anything contained herein to the contrary, this Agreement has been entered into by U.S. Bank National Association, not in its individual capacity but solely in its capacity as ABS Trustee and in no event shall U.S. Bank National Association have any individual or personal liability for the representations, warranties, covenants, agreements or other obligations of the ABS Trustee hereunder.

7.02.    Notices.  All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    if to the Company, to:

~~[to come]~~

Village Roadshow Entertainment Group USA Inc.
750 N. San Vincente Blvd., Suite 800 West
West Hollywood, CA 90069
Attention:  Kevin Berg and Louis Santor
Email:  kevin.berg@vreg.com and louis.santor@vreg.com

with a copy (which shall not constitute notice) to:

Sheppard Mullin Richter & Hampton LLP

321 North Clark Street, 32nd Floor

Chicago, IL  60654

Attention:  Justin Bernbrock

E-mail:  jbernbrock@sheppardmullin.com

(b)    if to the ABS Trustee, to:

-8-

[to come]

U.S. Bank National Association
190 S LaSalle St
Chicago, IL 60603
Attention: Nick Valaperta
Email: nicolas.valaperta@usbank.com

with a copy (which shall not constitute notice) to:

Barnes & Thornburg LLP

One North Wacker Drive, Suite 4400

Chicago, IL 60606

Attention: Aaron Gavant

E-mail: agavant@btlaw.com

Any notice given by delivery, mail, or courier shall be effective when received.

7.03.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

7.04.  <u>Waiver</u>.  If the Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

*[Remainder of Page Intentionally Left Blank]*

7.05.    No Third Party Beneficiaries. This Agreement is solely for the benefit of, and shall only be binding upon, the Parties and their respective successors and permitted assigns. This Agreement is not intended to, and does not, confer upon any other person any benefits, rights or remedies, except that, notwithstanding anything to the contrary in this Agreement, the Group A Noteholders representing the Group A Majority may rely upon and enforce this Agreement as express third party beneficiaries and shall have the right to seek specific performance of the Company's obligation hereunder (including, without limitation, Section 5.03 hereof).

IN WITNESS WHEREOF, the Parties hereto have executed and entered into this Agreement on the date first set forth above.

[To come]

**COMPANY:**

VR FUNDING LLC AND EACH OF ITS AFFILIATED ENTITIES LISTED ON EXHIBIT A

By: _____
Name:    Kevin P. Berg
Title:    General Counsel and Secretary

**ABS TRUSTEE:**

U.S. BANK NATIONAL ASSOCIATION


By: _____
Name:
Title:

## **EXHIBIT A**

**Company Parties**

VR Funding LLC and VR Films Holdings (BVI) Limited, as the Parent Co-Issuers
(the "**Parent Co-Issuers**")


Village  Roadshow Films (BVI) Limited, Village Roadshow Films North America Inc., Village
Roadshow VS Films LLC, and Village Roadshow Films Global Inc.
(the "**Subsidiary Co-Issuers**" and, together with the Parent Co-Issuers, the "**Issuers**")


Village Roadshow Distribution (BVI) Limited, Village Roadshow Pictures North America Inc.,
Village Roadshow Pictures (BVI) Limited, and Village Roadshow Distribution USA Inc.
(the "**Guarantors**")


Village Roadshow Entertainment Group USA Inc.
(the "**Servicer**")

**<u>EXHIBIT B</u>**

**Bid Procedures**

(Intentionally Omitted)

## EXHIBIT C

**CP Stalking Horse ~~APA~~Agreement**

(Intentionally Omitted)

# **EXHIBIT D**

## **DIP Term Sheet**

(Intentionally Omitted)