## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) )  Chapter 11 |
| | ) |
| VILLAGE ROADSHOW ENTERTAINMENT | )  Case No. 25-10475 (TMH) |
| GROUP USA INC., *et al.*,[1] | ) |
| | )  (Jointly Administered) |
| | ) |
| Debtors. | ) |
| | ) |
| | )  **Re: Docket No. 197** |
| | ) |

## NOTICE OF FILING OF REVISED ALCON STALKING HORSE APA

**PLEASE TAKE NOTICE** that on April 16, 2025, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Debtors' Supplemental Motion for Entry of an Order (A) Approving (I) the Debtors' Designation of the New Stalking Horse Bidder for the Library Assets as Set Forth in the Stalking Horse Agreement, (II) the Debtors' Entry into the Stalking Horse Agreement, and (III) the Bid Protections and (B) Granting Related Relief* [Docket No. 197] (the "Motion").[2]

**PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit A** is a revised version of the Alcon Stalking Horse APA (the "Revised Alcon Stalking Horse APA"). Attached hereto as **Exhibit B** is a blackline of the Revised Alcon Stalking Horse APA, showing changes from the CP Stalking Horse APA.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion, the Revised Alcon Stalking Horse APA, and other information regarding these chapter 11 cases are available for inspection free of charge on the case website at https://www.veritaglobal.net/vreg.

**PLEASE TAKE FURTHER NOTICE** THAT A HEARING TO CONSIDER THE MOTION WILL BE HELD ON **April 22, 2025, AT 2:00 P.M. (ET)** BEFORE THE HONORABLE THOMAS M. HORAN, UNITED STATES BANKRUPTCY COURT JUDGE FOR THE DISTRICT OF DELAWARE, 824 N. MARKET STREET, 3RD FLOOR, COURTROOM NO. 7, WILMINGTON, DELAWARE 19801.

---

[1]   The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343. The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

[2]   Capitalized terms used but not defined herein shall have the meanings given in the Motion.

Dated: April 18, 2025
Wilmington, Delaware

/s/ Joseph M. Mulvihill

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Joseph M. Mulvihill (Del. Bar No. 6061)
Carol E. Thompson (Del. Bar No. 6936)
Benjamin C. Carver (Del. Bar No. 7176)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:     (302) 571-6600
Facsimile:     (302) 571-1253
Email:          jmulvihill@ycst.com
                cthompson@ycst.com
                bcarver@ycst.com

*Co-Counsel for the Debtors and*
*Debtors in Possession*

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**

Justin R. Bernbrock (admitted *pro hac vice*)
Matthew T. Benz (admitted *pro hac vice*)
321 North Clark Street, 32nd Floor
Chicago, IL 60654
Telephone:     (312) 499-6300
Facsimile:     (312) 499-6301
Email:          jbernbrock@sheppardmullin.com
                mbenz@sheppardmullin.com

-and-

Jennifer L. Nassiri (admitted *pro hac vice*)
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
Telephone:     (310) 228-3700
Facsimile:     (310) 228-3701
Email:          jnassiri@sheppardmullin.com

-and-

Alyssa Paddock (admitted *pro hac vice*)
30 Rockefeller Plaza, 39th Floor
New York, NY 10112
Telephone:     (212) 653-8700
Facsimile:     (212) 653-8701
Email:          apaddock@sheppardmullin.com

*Co-Counsel for the Debtors and*
*Debtors in Possession*

# EXHIBIT A

**Revised Alcon Stalking Horse APA**

*Execution Version*

# PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (as amended, restated, supplemented, or otherwise modified pursuant to the terms hereof from time to time, this "**Agreement**"), is made and entered into as of April [   ], 2025 (the "**Effective Date**"), by and among the Persons identified on Schedule I hereto (each, a "**Seller**", and collectively, the "**Sellers**"), Alcon Media Group, LLC ("**Buyer**"), and Kevin Berg in his capacity as the representative of the Sellers pursuant to Section 10.15 (the "**Seller Representative**").

## RECITALS

A.      The Parties desire to set forth the terms pursuant to which Buyer will, subject to the entry of a Sale Order (as defined below), purchase from the Sellers, the Purchased Assets (as defined herein), including, without limitation, (i) (a) an undivided interest equal to the Relevant Percentage in the Designated Foreign Receipts in respect of the Motion Pictures set forth in Part A of Schedule II hereto (the "**Foreign Pictures**") and in Part B of Schedule II hereto (the "**F/D Pictures**"), subject to the rights of the Foreign Distributors under the Foreign Licenses and/or the applicable Foreign Distribution Agreements, and (without duplication) the Proceeds thereof, (b) an undivided interest equal to the Relevant Percentage in the Foreign Distribution Rights in perpetuity in respect of the Foreign Pictures and the F/D Pictures and (without duplication) the Proceeds thereof, and (c) the right to receive the Relevant Percentage in the Designated Foreign Receipts in perpetuity in respect of the Foreign Pictures and the F/D Pictures and the Proceeds thereof; (ii) (a) an undivided interest equal to the Relevant Percentage in the Designated Domestic Receipts in respect of the F/D Pictures, subject to the rights of the Domestic Distributor under the Domestic Licenses and the Domestic Distribution Agreement, and (without duplication) the Proceeds thereof, (b) an undivided interest equal to the Relevant Percentage in the Domestic Distribution Rights in perpetuity in respect of the F/D Pictures and (without duplication) the Proceeds thereof, and (c) the right to receive the Relevant Percentage in the Designated Domestic Receipts in perpetuity in respect of the F/D Pictures and the Proceeds thereof; (iii) (a) an undivided interest equal to the Relevant Percentage in the Designated Global Receipts in respect of the Motion Pictures set forth in Part C of Schedule II hereto (the "**Global Pictures**"), subject to the rights of the Global Distributor under the Global Licenses and the Global Distribution Agreement, and (without duplication) the Proceeds thereof, (b) an undivided interest equal to the Relevant Percentage in the Global Distribution Rights in perpetuity in respect of the Global Pictures and (without duplication) the Proceeds thereof, and (c) the right to receive the Relevant Percentage in the Designated Global Receipts in perpetuity in respect of the Global Pictures and the Proceeds thereof; and (iv) (a) an undivided interest equal to the Relevant Percentage in the Designated Virtual Receipts in respect of the Motion Pictures set forth in Part D of Schedule II hereto (the "**Virtual Pictures**" and, together with the Foreign Pictures, the F/D Pictures and the Global Pictures, the "**Pictures**"), subject to the rights of the Virtual Distributor under the Virtual Co-Financing Agreement, and (without duplication) the Proceeds thereof, (b) an undivided interest equal to the Relevant Percentage in the Virtual Distribution Rights in perpetuity in respect of the Virtual Pictures and (without duplication) the Proceeds thereof, and (c) the right to receive the Relevant Percentage in the Designated Virtual Receipts in perpetuity in respect of the Virtual Pictures and the Proceeds thereof.

B.      The Sellers and certain of their Affiliates have commenced voluntary petitions for relief under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "**Bankruptcy Code**") (the date of the filing of such petitions, the "**Petition Date**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") (such cases, collectively, the "**Bankruptcy Cases**").

C.      On the terms and subject to the conditions hereof, the Sellers desire to sell, transfer and assign to Buyer or a Buyer Designee, and Buyer desires to purchase, acquire and assume from the Sellers through a Buyer Designee, the Purchased Assets, subject to the terms and conditions set forth in this Agreement, the Bid Procedures (as defined below) and Bid Procedures Order (as defined below), and in accordance with sections 105, 363, 365, 1123, as applicable, and other applicable provisions of the Bankruptcy Code. The Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the receipt and sufficiency of which is hereby acknowledged, it is hereby agreed among the Parties as follows:

## ARTICLE I.  DEFINITIONS

Section 1.01    <u>**Defined Terms**</u>. Except as otherwise specified in this Agreement or as the context may otherwise require, the following terms shall have the respective meanings set forth below for all purposes of this Agreement:

"**ABS Obligations**" means all Liabilities of the Sellers and their Affiliates under the ABS Transaction Documents, including, without limitation, all fees, costs, expenses and indemnity obligations, and, in each case, any interest accrued thereon.

"**ABS Transaction Documents**" means all "Transaction Documents" under (and as defined in) the Indenture.

"**Accountant**" has the meaning set forth in <u>Section 2.13(b)</u>.

"**Adverse Claim**" means a lien, security interest, attachment, Claim, Liability, offset, deduction, restriction, mortgage, pledge or other charge or Encumbrance, or other type of preferential arrangement having the practical effect of any of the foregoing, or other claim in, of or on any Person's assets or properties in favor of any other Person.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such Person. The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and/or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Alternative Transaction**" means any direct or indirect acquisition, financing or purchase of all or any portion of the Purchased Assets or any other similar transaction involving all or any portion of the Purchased Assets, whether effected by sale of assets, sale of equity, merger, joint venture, recapitalization, loan, financing arrangement or otherwise, but excluding any financing provided by any holder of Parent's existing notes and any debtor-in-possession financing.

"**Ancillary Rights**" means any and all ancillary, subsidiary or allied rights now known and unknown, including, without limitation, publishing, novelization, music publishing, soundtrack recording, screenplay, publication, sponsorship, commercial tie-up, character, live stage, radio, interactive, Internet, theme park and merchandising rights of every kind and nature whatsoever derived from, appurtenant to or related to a Picture, the underlying material relating thereto, the title or titles of such Picture, the characters appearing in such Picture or said underlying material and/or the names or characteristics of said characters.

"**Anti-Terrorism Order**" means Executive Order No. 13,244 of September 24, 2001, Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism, 66 U.S. Fed. Reg. 49, 079 (2001), as amended.

"**Applicable Copyright Law**" means (a) the 1976 Copyright Act, 17. U.S.C. §101 et seq., as amended; (b) as applicable, the U.S. Copyright Act of 1909, as amended; and (c) for Pictures being Exploited as of the Effective Date in any territory party to the Universal Copyright Convention or the Berne Convention, the Copyright laws of such territory.

"**Applicable Percentage**" means (a) in the case of the Foreign Pictures and the F/D Pictures, the percentage of Foreign Gross Receipts that Sellers are entitled to receive with respect to such Pictures under the applicable QCSA or MPRPA and related Picture Agreements, (b) in the case of the F/D Pictures, the percentage of Domestic Gross Receipts that Sellers are entitled to receive with respect to such Pictures under the applicable MPRPA and related Picture Agreements, (c) in the case of the Global Pictures, the percentage of Global Gross Receipts that Sellers are entitled to receive with respect to such Pictures under the applicable MPRPA and related Picture Agreements, and (d) in the case of the Virtual Pictures, the percentage of Designated Virtual Receipts that Sellers are entitled to receive pursuant to the Virtual Documents. The Applicable Percentage for each Picture is set forth on Schedule II hereto.

"**Assumed Contract**" has the meaning set forth in Section 2.05(a).

"**Assumed Liabilities**" has the meaning set forth in Section 2.02.

"**Assumption and Assignment Agreement**" means an Assignment and Assumption Agreement effecting the assignment of the Assumed Liabilities from Sellers to Buyer, in form and substance satisfactory to the Parties.

"**Auction**" means an auction or auctions, if any, for the sale of the Sellers' assets conducted pursuant to the terms and conditions of the Bid Procedures Order.

"**Avoidance Actions**" means all rights, lawsuits, claims, rights of recovery, objections, causes of action, avoidance actions and other similar rights of any Seller or other appropriate party

in interest arising under Chapter 5 of the Bankruptcy Code or applicable state law (whether or not asserted as of the Closing Effective Date) and all proceeds thereof.

"**Backup Bidder**" means, if an Auction is conducted, the party that is the next highest or otherwise best bidder at the Auction after the Successful Bidder.

"**Bankruptcy Cases**" has the meaning set forth in the recitals.

"**Bankruptcy Code**" has the meaning set forth in the recitals.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bid Deadline**" has the meaning set forth in Section 7.02.

"**Bid Procedures**" means the bid procedures approved by the Bankruptcy Court pursuant to the Bid Procedures Order.

"**Bid Procedures and Sale Motion**" means the motion filed in the Bankruptcy Cases, which motion shall be in form and substance satisfactory to Sellers and Buyer (together with all exhibits and ancillary documents thereto), (i) seeking approval of (A) this Agreement and the transactions contemplated hereby and (B) the Bid Procedures and scheduling certain dates, deadlines and forms of notice in connection therewith, (ii) authorizing the payment of the Expense Reimbursement, and (iii) granting other related relief, in each case, as set forth in this Agreement.

"**Bid Procedures Order**" means the order of the Bankruptcy Court approving the Bid Procedures and Sale Motion and the Bid Procedures, and granting the relief requested therein, in form and substance satisfactory to the Sellers and Buyer, which shall include, without limitation, (i) approval of Buyer as the stalking horse purchaser and (ii) approval of the Expense Reimbursement to Buyer, in each case, as set forth in this Agreement.

"**Books and Records**" means all principal and/or material business records, tangible data, documents, management information systems (including related computer software), files, participant lists, vendor lists, statements, invoices, all work papers, notes, files or documents related thereto, and all other principal and/or material books and records received and/or maintained by Sellers or their Affiliates (excluding personnel records) related to the Pictures. For the avoidance of doubt, "Books and Records" shall in any event include all underlying documentation supporting the calculations in the Financial Information provided to Magnum.

"**business day**" means any day other than a Saturday, Sunday, legal holiday in the United States or any day on which banks in the City of New York, New York are authorized or required by law to close.

"**Buyer**" has the meaning set forth in the preamble. References herein to Buyer shall also refer to the Buyer Designee interchangeably.

"**Buyer Closing Deliverables**" has the meaning set forth in Section 2.11.

"**Buyer Deposit**" has the meaning set forth in <u>Section 2.06(b)</u>.

"**Buyer Designee**" has the meaning set forth in <u>Section 10.01</u>.

"**Claim**" means all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"**Closing**" means the consummation of the purchase by Buyer from Sellers of the Purchased Assets.

"**Closing Effective Date**" means the date on which the Closing occurs.

"**Closing Statement**" has the meaning set forth in <u>Section 2.09</u>.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

"**Collective Bargaining Agreement**" means any agreement, contract or arrangement with any union or guild or similarly constituted or substitute organization regarding any rights and/or services and/or personnel utilized in connection with the production and/or distribution and/or Exploitation of a Picture.

"**Consolidated Intercreditor Agreement**" means that certain Second Amended and Restated Consolidated Intercreditor Agreement dated as of September 5, 2024, among WBPL, VRD, VRF, WAV, VRD-USA, VRFNA, VREG-USA, Magnum, Bank of America, N.A. and U.S. Bank National Association, as amended, restated, supplemented or otherwise modified from time to time prior to the Closing Effective Date.

"**Constitutive Documents**" means, as to any Person, such Person's certificate of incorporation or registration (including, if relevant, certificates of change of name), memorandum of association, articles of association or incorporation, charter, by-laws, trust deed, partnership, limited liability company, joint venture or shareholders' agreement or equivalent documents constituting the organization or forming of such Person, in each case as the same may from time to time be amended, restated, supplemented or otherwise modified from time to time.

"**Contract**" means any contract, agreement, lease, license, or other legally binding commitment, agreement or instrument, whether or not in writing, including all amendments and modifications thereto.

"**Contract Rights**" means, with respect to a Picture, all rights, interest, entitlements and remedies (including, without limitation, the benefits of all representations, warranties, covenants and indemnifications) under any Contract relating to such Picture, including, for clarity, all rights, interest, entitlements and remedies arising from any letter of credit, instrument or other agreement relating to a Picture which designates a Seller as a beneficiary, even if such Seller is not a party to that letter of credit, instrument or other agreement.

"**Copyright**" means, with respect to a Picture, all common law and statutory copyrights, rights in copyrights (including the right to make publication thereof for copyright purposes, to register claims under copyright, the right to renew and extend such copyrights and the right to sue for past, present and future infringements of copyright), interests in copyrights, all applications for copyrights, registrations of copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained upon such project, the underlying material relating thereto or any part thereof.

"**Copyright Termination**" means any right of termination of transfer or license of a Copyright, or termination or reversion of any right under a Copyright, under any Applicable Copyright Law, including 17 U.S.C. § 203 or § 304 or any similar law, rule or regulation of any Governmental Authority.

"**CPII**" means Columbia Pictures Industries, Inc.

"**Cure Amounts**" means all amounts, costs and expenses to cure defaults, if any, under the Assumed Contracts so that they may be assumed and assigned to Buyer pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code.

"**Cutoff Date**" means July 31, 2024 (as reflected in the Quarterly Compliance Certificate Quarterly Report of June 2024 Quarter with Key Date of Quarterly Collection Period Ending July 31, 2024).

"**Dataroom**" means that certain virtual data room hosted by Ansarada titled "Project Ventura".

"**Debtor Relief Laws**" means the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, suspension of payments or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

"**Defined Proceeds**" has the meaning set forth in the Virtual Co-Financing Agreement.

"**Derivative Rights**" means, with respect to a Picture, all rights throughout the world to produce remakes, sequels and prequels of a Picture and other derivative works based thereon and to distribute and otherwise Exploit such remakes, sequels or prequels for viewing in any medium or media now known or hereafter devised, whether in theatres or home video or on television, and to produce, distribute and otherwise Exploit as a television program, movie of the week, television series or a television spinoff any audiovisual work based on a Picture, its story line, or any one or more of its characters.

"**Designated Domestic Receipts**" with respect to the F/D Pictures means (i) the Applicable Percentage of the Domestic Gross Receipts and/or amounts accountable and/or accounted as such or in respect thereof under the Domestic Distribution Agreement, subject to the rights of the Domestic Distributor under the Domestic Distribution Agreement in its capacity as such (including, without limitation, the right to retain Domestic Gross Receipts to pay and/or reimburse Domestic Distributor Fees, Domestic Participations, Domestic Residuals and Domestic

Recoupable Distribution Expenses, in each case as and to the extent set forth therein), (ii) the Applicable Percentage of any Domestic Subsidies payable to Sellers or any of their Affiliates with respect to any F/D Picture, and (iii) the Applicable Percentage of any other amounts received from any source on or in respect of the Exploitation of the F/D Pictures in the Domestic Territory, in each case under the foregoing clauses (i), (ii) and (iii), arising, received or payable from and after the Cutoff Date.

"**Designated Domestic Rights**" means, with respect to any F/D Picture, (a) an undivided interest equal to Sellers' Applicable Percentage in the Domestic Rights (as defined in the Domestic Distribution Agreement) in such F/D Picture and (b) Sellers' right to receive the Applicable Percentage of the Domestic Gross Receipts with respect to such F/D Picture, in each case, except to the extent that WBEI and VRPNA otherwise agreed in the Rights Purchase Agreement (as defined in the applicable MPRPA) applicable to such F/D Picture.

"**Designated Foreign Receipts**" with respect to the Foreign Pictures and the F/D Pictures, means (i) the Applicable Percentage of the Foreign Gross Receipts and/or amounts accountable and/or accounted as such or in respect thereof under the applicable Foreign Distribution Agreement, subject to the rights of the Foreign Distributor under the applicable Foreign Distribution Agreement in its capacity as such (including, without limitation, the right to retain Foreign Gross Receipts to pay and/or reimburse Foreign Distributor Fees, Foreign Participations, Foreign Residuals and Foreign Recoupable Distribution Expenses, in each case as and to the extent set forth therein), (ii) the Applicable Percentage of any Foreign Subsidies payable to Sellers or any of their Affiliates with respect to any Foreign Picture or F/D Picture, and (iii) the Applicable Percentage of any other amounts received from any source on or in respect of the Exploitation of the Foreign Pictures and the F/D Pictures in the Foreign Territory, in each case under the foregoing clauses (i), (ii) and (iii), arising, received or payable from and after the Cutoff Date.

"**Designated Foreign Rights**" means, with respect to any Foreign Picture and any F/D Picture, (a) an undivided interest equal to Sellers' Applicable Percentage in the Foreign Rights or International Rights, as the case may be (as such terms are defined in the applicable Foreign Distribution Agreement), in such Picture and (b) Sellers' right to receive the Applicable Percentage of the Foreign Gross Receipts with respect to such Picture, in each case, except to the extent that WBEI and VRPNA otherwise agreed in the Rights Purchase Agreement (as defined in the applicable MPRPA), if any, applicable to such Picture.

"**Designated Global Receipts**" with respect to the Global Pictures means (i) the Applicable Percentage of the Global Gross Receipts and/or amounts accountable and/or accounted as such or in respect thereof under the Global Distribution Agreement, subject to the rights of the Global Distributor under the Global Distribution Agreement in its capacity as such (including, without limitation, the right to retain Global Gross Receipts to pay and/or reimburse Global Distributor Fees, Global Participations, Global Residuals and Global Recoupable Distribution Expenses, in each case as and to the extent set forth therein), (ii) the Applicable Percentage of any Global Subsidies payable to Sellers or any of their Affiliates with respect to any Global Picture, and (iii) the Applicable Percentage of any other amounts received from any source on or in respect of the Exploitation of the Global Pictures in the Global Territory, in each case under the foregoing clauses (i), (ii) and (iii), arising, received or payable from and after the Cutoff Date.

"**Designated Global Rights**" means, with respect to any Global Picture, (a) an undivided interest equal to Sellers' Applicable Percentage in the Global Rights (as defined in the Global Distribution Agreement) in such Global Picture and (b) Sellers' right to receive the Applicable Percentage of the Global Gross Receipts with respect to such Global Picture, in each case, except to the extent that Sony, CPII, and VRPNA otherwise agreed in the Rights Purchase Agreement (as defined in the applicable MPRPA) applicable to such Global Picture.

"**Designated Virtual Receipts**" with respect to the Virtual Pictures means (i) the Applicable Percentage of the Defined Proceeds and/or amounts accountable and/or accounted as such or in respect thereof under the Virtual Documents, subject to the rights of the Virtual Distributor under the Virtual Co-Financing Agreement in its capacity as such, and (ii) the Applicable Percentage of any other amounts received from any source on or in respect of the Exploitation of the Virtual Pictures in the Virtual Territory, in each case under the foregoing clauses (i) and (ii), arising, received or payable from and after the Cutoff Date.

"**Disclosure Schedules**" has the meaning set forth in <u>Section 4.01</u>.

"**Distribution Agreements**" means the Domestic Distribution Agreement, the Foreign Distribution Agreements, the Global Distribution Agreement and the Virtual Co-Financing Agreement.

"**Domestic Distribution Agreement**" means that certain Second Amended and Restated Output Distribution Agreement (Domestic) dated as of November 10, 2020, between the Domestic Distributor and VRD-USA, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Domestic Distribution Rights**" means the rights to distribute or otherwise Exploit the F/D Pictures in any media throughout the Domestic Territory, which rights are subject to the prior grant of distribution rights to the Domestic Distributor under the Domestic Licenses and the Domestic Distribution Agreement.

"**Domestic Distributor**" means WAV.

"**Domestic Distributor Fees**" means the distribution fees payable to the Domestic Distributor under the Domestic Distribution Agreement.

"**Domestic Gross Receipts**" means "Defined Gross" as defined in the Domestic Distribution Agreement.

"**Domestic Licenses**" means each Domestic License (as defined in the applicable MPRPA) executed by WBEI in favor of WAV pursuant to the applicable MPRPA.

"**Domestic Participations**" means Participations that are paid by the Domestic Distributor in accordance with the Domestic Distribution Agreement.

"**Domestic Recoupable Distribution Expenses**" means "Recoupable Distribution Expenses" (as defined in the Domestic Distribution Agreement).

"**Domestic Residuals**" means Residuals that are paid by the Domestic Distributor in accordance with the Domestic Distribution Agreement.

"**Domestic Subsidies**" means Production Subsidies/Sale Proceeds with respect to the F/D Pictures.

"**Domestic Territory**" means (a) in the case of the Foreign Pictures (other than *Saving Silverman*, *Down to Earth*, *Zoolander* and *Don't Say A Word*) and the F/D Pictures, the "Domestic Territory" as defined in the applicable Foreign Distribution Agreement; (b) in the case of the Motion Picture titled *Saving Silverman*, the "Domestic Territory" as defined in that certain Distribution Agreement (Domestic) dated as of May 5, 2000, between Columbia Pictures and Evil Woman Films LLC, as amended, restated, supplemented or otherwise modified from time to time; (c) in the case of the Motion Picture titled *Down to Earth*, the "Domestic Territory" as defined in that certain Distribution Agreement (Domestic) dated as of August 11, 2000, between Paramount Pictures Corporation and DTE Films LLC, as amended, restated, supplemented or otherwise modified from time to time; (d) in the case of the Motion Picture titled *Zoolander*, the "Domestic Territory" as defined in that certain Distribution Agreement (Domestic) dated as of August 11, 2000, by and between Paramount Pictures Corporation and Zoo Films LLC; and (e) in the case of the Motion Picture titled *Don't Say A Word*, the "Domestic Territory" as defined in that certain Distribution Agreement (Domestic) dated as of October 2, 2000, by and between Regency Entertainment (USA), Inc. and DSAW Films LLC.

"**DTE Film LLC Agreement**" means that certain Operating Agreement of DTE Films LLC, dated as of August 11, 2000, by and between Paramount Pictures Corporation and VR DTE Distribution USA Inc., as amended, restated, supplemented or otherwise modified from time to time.

"**DTE Film Partnership Agreement**" means that certain Limited Partnership Agreement of DTE Film Partners L.P., dated as of August 11, 2000, by and among VRD, VRDTE, and MTV S.A. (f/k/a MTV S.A. LDC), as amended, restated, supplemented or otherwise modified from time to time.

"**DTE Notice of Assignment and Amendment**" means an irrevocable notice of assignment and amendment entered into among Buyer and each of the parties to the DTE Agreement, DTE QCSA, DTE Film Partnership Agreement and DTE Film LLC Agreement (each of the foregoing, together with any other agreements between or among the parties thereto in connection with *Down to Earth*, the "**Specified DTE Agreements**"), pursuant to which the parties thereto shall agree that, notwithstanding anything to the contrary in the Specified DTE Agreements: (i) "International Net Proceeds" and "Domestic Net Proceeds" (each as described and calculated in the Financial Information prepared by Paramount Pictures Corporation ("**Paramount**") in respect of *Down to Earth*) shall be shared by Paramount and Buyer 50 / 50 in perpetuity; provided, that if International Net Proceeds are cumulatively negative, Paramount shall pay Buyer one hundred percent (100%) of the International Net Proceeds and Domestic Net Proceeds until such shortfall has been recouped, consistent with past practice, and (ii) the parties to the Specified DTE Agreements shall agree not to amend any Specified DTE Agreement following the date of such notice of assignment and amendment in any manner that would modify

or otherwise affect the calculation or timing of amounts payable to Buyer pursuant to such notice of assignment and amendment.

"**Effective Date**" has the meaning set forth in the preamble.

"**Encumbrance**" means any defect or imperfection in title, charge, deed of trust, security interest, pledge, hypothecation, mortgage, encumbrance, Lien (as such term is defined in the Bankruptcy Code), lease, license grant by any Seller, sublease, option, right of first refusal, easement, right of way, servitude, covenant, condition, proxy, voting trust or agreement or transfer restriction under any equity holder or similar Contract.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**Escrow Account**" has the meaning set forth in Section 2.06(b).

"**Escrow Agreement**" has the meaning set forth in Section 2.06(b). For the avoidance of doubt, the Escrow Agreement shall be in form and substance acceptable to Buyer and the Sellers.

"**Escrow Holder**" has the meaning set forth in Section 2.06(b).

"**Estimated Purchase Price**" has the meaning set forth in Section 2.09.

"**Excluded Assets**" has the meaning set forth in Section 2.03.

"**Excluded Liabilities**" has the meaning set forth in Section 2.04.

"**Excluded Taxes**" means any liabilities of any Seller for any period, or otherwise imposed on the Purchased Assets with respect to any Pre-Closing Tax Period, in respect of any Tax, including without limitation (a) any Liability of any Seller for the Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law), as a transferee or successor, or by Contract, (b) any Taxes that will arise as a result of the purchase and sale of the Purchased Assets and (c) fifty percent (50%) of any Transfer Taxes, but excluding any Property Taxes to the extent specifically allocated to Buyer pursuant to Section 6.06.

"**Expense Reimbursement**" means all reasonable and documented costs, fees and expenses actually incurred by Buyer and/or its Affiliates (including legal, financial advisory, accounting and other similar costs of professionals retained by Buyer and/or its Affiliates), related to the Transactions contemplated by this Agreement and the Bankruptcy Cases, including, without limitation, in connection with the evaluation, diligence, negotiation, documentation, and performance of the Transactions, which amount shall constitute a superpriority administrative expense of the Sellers with priority over any and all administrative expenses of any kind; provided however, that the aggregate amount of the Expense Reimbursement shall not exceed $2,000,000.

"**Exploit**" means the manufacture, distribution, licensing, exhibition, marketing, promotion, reissuance, and other exploitation of a motion picture or applicable rights thereto, in any and all languages, by any and all means and devices now known or hereafter devised, and

howsoever accessed by the viewer, and to otherwise exploit the foregoing in any and all media, whether now known or hereafter existing and howsoever accessed, including, without limitation, theatrical, home video, pay, cable and free television, computers, hand held devices, cell phones and other accessing devices.  The meaning of the term "**Exploitation**" shall be correlative to the foregoing.

"**Exploitation Agreement**" means any Contract (including any co-production and/or co-financing agreement) to which a Seller is a party or is otherwise bound with respect to the Exploitation by any Person of a Picture or any rights therein or thereto, whether on a single-picture, multi-picture or output basis (but, in each case, solely to the extent relating to a Picture or any rights therein or thereto), as amended, modified, supplemented or restated from time to time.

"**F/D Pictures**" has the meaning set forth in the recitals.

"**Final Order**" means a judgment or order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to in writing by Buyer) and as to which (a) the time to appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such proceeding or order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order, shall not cause an order not to be a Final Order.

"**Financial Information**" means (a) the accounting, participation and/or ultimates statements received by the Sellers from the applicable counterparties under the Distribution Agreements in respect of the Pictures or any other Person with respect to any consideration payable to Sellers in connection with the Pictures, and (b) the accounting, participation and/or ultimates statements prepared by the Sellers and delivered to Magnum under the Magnum Agreements in respect of the Pictures.

"**Foreign Distribution Agreement**" means (a) in the case of the Foreign Pictures other than *Saving Silverman*, *Down to Earth*, *Zoolander* and *Don't Say A Word*, that certain Amended and Restated Consolidated Output Distribution Agreement (Foreign) dated as of November 10, 2020, between WBPL and VRD, as amended, restated, supplemented or otherwise modified from time to time (the "**Warner Foreign Agreement**"); (b) in the case of the Motion Picture titled *Saving Silverman*, that certain Distribution Agreement (Foreign) dated as of May 5, 2000, between Columbia Pictures Corporation Limited and VRP (as successor-in-interest to Evil Woman Film Partners LP), as amended, restated, supplemented or otherwise modified from time to time (the "**Saving Silverman Agreement**"); (c) in the case of the Motion Picture titled *Down to Earth*, that

certain Distribution Agreement (Foreign) License and Sublicense dated as of August 11, 2000, between Paramount Pictures International, MTV S.A. LDC, DTE Film Partners LP and VRD, as amended, restated, supplemented or otherwise modified from time to time (the "**DTE Agreement**"); (d) in the case of the Motion Picture titled *Zoolander*, that certain Distribution Agreement (Foreign) Distribution Agreement (Foreign) License and Sublicense dated as of August 11, 2000, between Paramount Pictures International, MTV S.A. LDC, Zoo Film Partners LP and VRD, as amended, restated, supplemented or otherwise modified from time to time (the "**Zoolander Agreement**"); (e) in the case of the Motion Picture titled *Don't Say A Word*, that certain Distribution Agreement (Foreign) dated as of October 2, 2000, between Monarchy Enterprises S.a.r.l. and VRP (as successor-in-interest to DSAW Film Partners L.P.), as amended, restated, supplemented or otherwise modified from time to time (the "**Don't Say a Word Agreement**"); (f) in the case of the F/D Pictures, that certain Second Amended and Restated Output Distribution Agreement (Foreign) dated as of November 10, 2020, between WBPL and VRD, as amended, restated, supplemented or otherwise modified from time to time (the "**Warner F/D Agreement**"); and (g) in the case of the Foreign Pictures and the Motion Picture titled *Into the Storm*, the Greek Territory Distribution Agreements.

"**Foreign Distribution Rights**" means the rights to distribute or otherwise Exploit the Foreign Pictures and the F/D Pictures in any media throughout the Foreign Territory, which rights are subject to the prior grant of distribution rights to the Foreign Distributor under the Foreign Licenses and the applicable Foreign Distribution Agreement.

"**Foreign Distributor**" means (a) in the case of the Foreign Pictures (other than *Saving Silverman*, *Down to Earth*, *Zoolander* and *Don't Say A Word*) and the F/D Pictures, WBPL; (b) in the case of the Motion Picture titled *Saving Silverman*, Columbia Pictures Corporation Limited; (c) in the case of the Motion Pictures titled *Down to Earth* and *Zoolander*, Paramount Pictures International and MTV S.A. LDC; (d) in the case of the Motion Picture titled *Don't Say A Word*, Monarchy Enterprises S.a.r.l.; and (e) in the case of the Foreign Pictures and the Motion Picture titled *Into the Storm*, Village Roadshow Films Distributors S.A. (solely with respect to the Greek Territory).

"**Foreign Distributor Fees**" means the distribution fees payable to the applicable Foreign Distributor under the applicable Foreign Distribution Agreement.

"**Foreign Gross Receipts**" means "Defined Gross" or "Gross Receipts" or "International Gross Receipts", as the case may be, as defined in the applicable Foreign Distribution Agreement.

"**Foreign Licenses**" means each Foreign License (as defined in the applicable MPRPA) executed by WBEI in favor of WBPL pursuant to the applicable MPRPA.

"**Foreign Participations**" means Participations that are paid by the applicable Foreign Distributor in accordance with the applicable Foreign Distribution Agreement.

"**Foreign Pictures**" has the meaning set forth in the recitals.

"**Foreign Recoupable Distribution Expenses**" means "Recoupable Distribution Expenses", "Recoupable Expenses" (in the case of the Motion Picture titled *Don't Say a Word*), "Foreign Distribution Expenses", "Home Video Distribution Expenses" (in the case of the Motion Picture titled *Saving Silverman*), "Video Costs" (in the case of the Motion Pictures titled *Down to Earth* and *Zoolander*) and "Allowable Distribution Expenses" (each as defined in the applicable Foreign Distribution Agreement).

"**Foreign Residuals**" means Residuals that are paid by the applicable Foreign Distributor in accordance with the applicable Foreign Distribution Agreement.

"**Foreign Subsidies**" means Production Subsidies/Sale Proceeds with respect to the Foreign Pictures or F/D Pictures, as applicable.

"**Foreign Territory**" means in the case of each Picture, the "Foreign Territory" as defined in the applicable Foreign Distribution Agreement.

"**Fundamental Contracts**" means each of (a) the Warner F/D Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise necessary to comply with the terms thereof); (b) the Domestic Distribution Agreement (together with all right, title and interest in and to the Pictures licensed to the Domestic Distributor pursuant thereto or otherwise necessary to comply with the terms thereof); (c) the Warner Foreign Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise necessary to comply with the terms thereof); and (d) the Virtual Co-Financing Agreement (together with all right, title and interest in and to the Pictures licensed to the Virtual Distributor pursuant thereto or otherwise necessary to comply with the terms thereof).

"**Global Distribution Agreement**" means that certain Amended and Restated Output Distribution Agreement dated as of October 30, 2015, between VRD-USA and CPII with respect to the Global Pictures, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Global Distribution Rights**" means the rights to distribute or otherwise Exploit the Global Pictures in any media throughout the Global Territory, which rights are subject to the prior grant of distribution rights to the Global Distributor under the Global Licenses and the Global Distribution Agreement.

"**Global Distributor**" means CPII.

"**Global Distributor Fees**" means the distribution fees payable to the Global Distributor under the Global Distribution Agreement.

"**Global Gross Receipts**" means "Defined Gross Receipts" as defined in the Global Distribution Agreement.

"**Global Intercreditor Agreement**" means the Second Amended and Restated Intercreditor Agreement dated as of November 10, 2020, among CPII, for itself and for the benefit

of Sony, VRFG, VRD-USA, VREG-USA, Magnum and U.S. Bank National Association, as amended, restated, supplemented or otherwise modified from time to time prior to the Closing Effective Date.

"**Global Licenses**" means each Global License (as defined in the applicable MPRPA) executed by Sony in favor of CPII pursuant to the applicable MPRPA.

"**Global Participations**" means Participations that are paid by the Global Distributor in accordance with the Global Distribution Agreement.

"**Global Pictures**" has the meaning set forth in the recitals.

"**Global Recoupable Distribution Expenses**" means "Recoupable Distribution Expenses" (as defined in the Global Distribution Agreement).

"**Global Residuals**" means Residuals that are paid by the applicable Global Distributor in accordance with the Global Distribution Agreement.

"**Global Subsidies**" means Production Subsidies/Sale Proceeds with respect to the Global Pictures.

"**Global Territory**" means the entire universe.

"**Government Approval**" means any (a) necessary filings, notifications, registrations, applications, declarations, waiting period expiration or termination, and submissions in connection with the Transactions, as required under any applicable Law and (b) consents, certifications, grants, confirmation, permits or Orders from a Governmental Authority required to be obtained or made by any Seller or Buyer or any of their respective Affiliates to execute, deliver and perform their respective obligations under this Agreement or the other Transaction Documents and consummate the Transactions.

"**Governmental Authority**" means any court, tribunal, arbitrator, authority, agency, commission, bureau, board, department, legislature, official, body or other instrumentality of the United States (whether federal, state, municipal or local), any foreign country, or any domestic or foreign state, province, county, city, other political subdivision or any other similar body or organization exercising governmental or quasi-governmental power or authority.

"**Greek Territory**" means the "Greek Territory" as defined in the Greek Territory Distribution Agreements.

"**Greek Territory Distribution Agreements**" means (a) that certain Amended & Restated Output Distribution Agreement dated as of October 2, 2009, between Village Roadshow Distribution UK Limited and Village Roadshow Films Distributors S.A., as amended, restated, replaced, supplemented or otherwise modified from time to time, and (b) that certain Deed of Novation and Variation dated as of February 28, 2019 among Village Roadshow Distribution UK Limited, VRD and Village Roadshow Films Distributors S.A., as amended, restated, replaced, supplemented or otherwise modified from time to time.

"**IFRS**" means the International Financial Reporting Standards issued from time to time by the International Financial Reporting Standards Foundation and the International Accounting Standards Board.

"**Indebtedness**" of any Person as of any date of determination means, without duplication, (a) the principal amount of all indebtedness of such Person for borrowed money and any accrued and unpaid interest thereon, (b) the principal amount of any other indebtedness of such Person which is evidenced by a note, bond, debenture or similar instrument or debt security and any accrued and unpaid interest thereon, including, without limitation, the obligations of the Sellers under all notes issued pursuant to the Indenture, in each case determined in accordance with IFRS, (c) all capital lease obligations of such Person as of such date, in each case determined in accordance with IFRS, (d) indebtedness secured by an Adverse Claim on assets of any Seller, (e) obligations under any drawn letters of credit (excluding reimbursement obligations in respect of undrawn letters of credit), (f) all interest rate or non-U.S. currency swaps, caps, collars, hedges or insurance agreements, or options or forwards on such agreements, or other similar agreements for the purpose of managing the interest rate or non-U.S. exchange risk, (g) all financing fees and costs related to the indebtedness described in foregoing clauses (a) through (f), and (h) all guaranties of such Person in respect of any of the foregoing.

"**Indenture**" means (a) that certain Base Indenture dated as of November 10, 2020 among VR Funding and VRF Holdings, as issuers, and U.S. Bank National Association, as trustee, as supplemented by (b) that certain Group A Supplement dated as of November 10, 2020 among VR Funding, VRF Holdings, VRF, VRFNA, VRFG and VRVS, as Group A Co-Issuers, and U.S. Bank National Association, as trustee, as supplemented by (c) that certain Series 2020-1 Supplement dated as of November 10, 2020 among the Group A Co-Issuers and U.S. Bank National Association, as trustee in each case, as supplemented, amended, restated, extended or otherwise modified from time to time.

"**Insider**" shall have the meaning set forth in section 101(31) of the Bankruptcy Code.

"**Insider Causes of Action**" means any Claims or causes of action against any Insider of the Debtors.

"**Intercreditor Agreements**" means the Consolidated Intercreditor Agreement, the Global Intercreditor Agreement and the Virtual Intercreditor Agreement.

"**IP Assignment Agreement**" means the assignment agreement to assign and transfer the Sellers' rights in the Transferred Copyrights to Buyer, to be entered into at Closing, in form and substance mutually acceptable to each of the Parties.

"**Knowledge**" means, when referring to the "knowledge" of the Sellers, or any similar phrase or qualification based on knowledge of any Seller, (a) the actual knowledge of James Moore, Louis Santor, Kevin Berg, Keith Maib, and/or Glenn Taylor and (b) the knowledge that any such person referenced in clause (a) above, as a prudent business person, would have obtained after making due inquiry with respect to the particular matter in question.

"**Law**" or "**law**" means and includes any provision or requirement of any present or future statute, rule, regulation, code, code of practice, ordinance, standard, statutory guidance, decree, rule of common law or principle of equity, or other decision of any court, tribunal or Governmental Authority or by-law of any foreign, multinational, regional, federal, state, county, municipal or local jurisdiction.

"**Liability**" means, with respect to any Person, any liability or obligation (including with respect to Taxes) of such Person of any kind, character or description, whether known or unknown, disclosed or undisclosed, absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, direct or indirect, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person or is discharged, stayed or otherwise affected by any proceeding under any Debtor Relief Laws.

"**Loss**" or "**Losses**" means any Liability, loss, damage, claim, demand, obligation, charge, deficiency, settlement payment, Tax, expense, interest, award, judgment, penalty, assessment, disbursement, fine, fee or amount paid in settlement or cost or expense related to any of the foregoing (including reasonable and documented out-of-pocket legal fees and expenses), but shall not include any exemplary or punitive damages.

"**Magnum**" means Magnum Films SPC, a segregated portfolio company incorporated under the laws of the Cayman Islands.

"**Magnum Agreements**" means (a) that certain Sale Agreement dated as of December 20, 2013, by and among VRF, VRD and Magnum (as amended, restated, supplemented or otherwise modified from time to time), (b) that certain Fourth Amended and Restated Co-Investment Agreement dated as of November 10, 2020, by and among VRF, VRD, VRFNA, VRD-USA, VRPNA and Magnum (as amended, restated, supplemented or otherwise modified from time to time) and (c) that certain Second Amended and Restated Co-Investment Agreement (Global) dated as of November 10, 2020, by and among VRFG, VRD-USA and Magnum (as amended, restated, supplemented or otherwise modified from time to time), in each case, together with all ancillary documents entered into in connection therewith.

"**Magnum Domestic Percentage**" means the percentage of Designated Domestic Rights, Designated Domestic Receipts and Proceeds of the foregoing purchased by Magnum with respect to certain Pictures pursuant to the Magnum Agreements.

"**Magnum Foreign Percentage**" means the percentage of Designated Foreign Rights, Designated Foreign Receipts and Proceeds of the foregoing purchased by Magnum with respect to certain Pictures pursuant to the Magnum Agreements.

"**Magnum Global Percentage**" means the percentage of Designated Global Rights, Designated Global Receipts and Proceeds of the foregoing purchased by Magnum with respect to certain Pictures pursuant to the Magnum Agreements.

"**Material Adverse Effect**" means any change, event, circumstance, effect, state of facts, occurrence, development or other matter (any such item, an "**Effect**") that, individually or in combination with all other such similar or related Effects that have occurred prior to the date of determination of the occurrence of such Effect (a) prevents or would reasonably be expected to prevent or impair the ability of any Seller to consummate the Transactions under the Transaction Documents or (b) is or would reasonably be expected to be materially adverse to (i) the benefits, interests, rights or remedies of Buyer under any of the Transaction Documents or the rights to, timing of, or the amount of, payments thereunder, (ii) the business, assets, liabilities, condition (financial or otherwise), operations, performance, or properties of any Seller, (iii) the ability of any Seller to timely perform or comply with its covenants, agreements or obligations under any Transaction Document, or (iv) the legality, validity or enforceability of any Transaction Document; but, with respect to clauses (a) and (b), excluding any change or effect to the extent that it results from or arises out of the commencement of the Bankruptcy Cases.

"**Motion Picture**" means a feature-length theatrical motion picture.

"**MPRPA**" means (a) with respect to the Motion Pictures titled *Where the Wild Things Are*, *Sherlock Holmes*, *Sex and the City 2*, *Cats & Dogs: The Revenge of Kitty Galore*, *Legend of the Guardians*, *Life As We Know It*, *Happy Feet Two*, *Sherlock Holmes: A Game of Shadows*, *The Lucky One*, *Dark Shadows*, *Gangster Squad*, *the Great Gatsby*, *The LEGO Movie*, *Winter's Tale* and *Edge of Tomorrow*, that certain Amended and Restated Motion Picture Rights Purchase Agreement dated as of November 21, 2012, between WV Films IV LLC and WV Film Partners IV L.P., as amended, restated, supplemented or otherwise modified from time to time; (b) with respect to the F/D Pictures, that certain Amended and Restated Motion Picture Rights Purchase Agreement dated as of November 10, 2020, between VRPNA and WBEI, as amended, restated, supplemented or otherwise modified from time to time; and (c) with respect to the Global Pictures, that certain Amended and Restated Motion Picture Rights Purchase Agreement dated as of October 30, 2015, between VRPNA and Sony, as amended, restated, supplemented or otherwise modified from time to time.

"**Notices of Assignment and Amendment**" means the Zoolander Notice of Assignment and Amendment and the DTE Notice of Assignment and Amendment.

"**Objection Notice**" has the meaning set forth in <u>Section 2.13(b)</u>.

"**Order**" means any order, judgment, ruling, injunction, award, stipulation, assessment, decree or writ, whether preliminary or final, issued, promulgated or entered by or with any Governmental Authority.

"**Outside Date**" has the meaning set forth in <u>Section 8.01(c)</u>.

"**Parent**" has the meaning set forth in <u>Schedule I</u>.

"**Participations**" means amounts (excluding Residuals) payable to any Person (other than any Seller or any of its Affiliates) who rendered services or granted rights in respect of or co-financed a Picture, and which are contingent on amounts derived from the Exploitation of such

Picture or payable upon the occurrence of specified events in relation to the Exploitation of such Picture, by whatever name called or however calculated or characterized, whether as a fixed sum or as a percentage of the receipts (however denominated) of the applicable Picture remaining after giving effect to specified exclusions and deductions, if any.

"**Party**" or "**Parties**" means any party or parties to this Agreement.

"**Permitted Liens**" means security interests in favor of the Domestic Distributor, the Foreign Distributors, the Global Distributor or the Virtual Distributor (including any Uniform Commercial Code financing statement in favor of the Domestic Distributor, any of the Foreign Distributors, the Global Distributor or the Virtual Distributor with respect to the Pictures) as and to the extent set forth in the Intercreditor Agreements in effect as of the Effective Date (the "**Distributor Liens**").

"**Person**" means any individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company, Governmental Authority, or other entity.

"**Picture Agreements**" means the QCSAs, the MPRPAs, the Virtual Documents, the Distribution Agreements, the Magnum Agreements, the Intercreditor Agreements, the Indenture, all other instruments, exhibits, documents and agreements executed or delivered by Sellers from time to time prior to the Closing Effective Date pursuant to the foregoing, including, without limitation, rights purchase agreements, intercompany licenses and assignments and security perfection documents, and all other Contracts to which a Seller is a party in connection with the financing, development, production, exhibition or other Exploitation of the Pictures.

"**Pictures**" has the meaning set forth in the recitals.

"**Post-Closing Statement**" has the meaning set forth in Section 2.13(a).

"**Post-Closing Tax Period**" means (x) any Tax period beginning after the Closing Effective Date and (y) with respect to a Straddle Period, that portion of such Straddle Period beginning after the Closing Effective Date and continuing for the remainder of such Straddle Period.

"**Post-Cutoff Income**" has the meaning set forth in Section 2.06.

"**Post-Cutoff Paid Liabilities**" has the meaning set forth in Section 2.06.

"**Pre-Closing Period**" has the meaning set forth in Section 6.01(a).

"**Pre-Closing Tax Period**" means (a) any Tax period ending on or before the Closing Effective Date and (b) with respect to a Straddle Period, that portion of such Straddle Period ending on (and including) the Closing Effective Date.

"**Proceeding**" means any suit, action, cause of action, litigation, hearing, inquiry, examination, demand, proceeding, controversy, complaint, appeal, notice of violation, citation,

summons, subpoena, arbitration, mediation, dispute, claim, allegation, investigation or audit of any nature whether civil, criminal, quasi criminal, indictment, administrative, regulatory or otherwise and whether at Law or in equity.

"**Proceeds**" means, with respect to any property, (a) whatever is acquired upon the sale, lease, license, exchange, or other disposition of such property; (b) whatever is collected on, or distributed on account of, such property; (c) rights arising out of such property; (d) to the extent of the value of such property, claims arising out of the Loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, such property; or (e) to the extent of the value of such property and to the extent payable to the owner of such property, insurance payable by reason of the Loss or nonconformity of, defects or infringement of rights in, or damage to, such property.  For purposes of this Agreement, all references to "Proceeds" in the definition of Purchased Assets or any definition referred to therein shall be deemed to mean Proceeds arising, received or payable from and after the Cutoff Date.

"**Production Subsidies/Sale Proceeds**" means Motion Picture subsidies, rebates or refunds (including in respect of Taxes) granted by a governmental or other entity for use in connection with or with respect to the production of the applicable Picture and any proceeds from sales or leasebacks or similar transactions in connection with the production of such Picture that are in the nature of, or have a similar effect to, a subsidy, rebate or refund.

"**Property Taxes**" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"**Purchase Price**" has the meaning set forth in Section 2.06.

"**Purchase Price Schedule**" has the meaning set forth in Section 2.12(a).

"**Purchased Assets**" means all of the Sellers' right, title and interest in and to the Pictures and all of the assets, properties and rights of any kind, whether tangible or intangible, used in, held for use in, relating to or arising from the financing, development, production and/or Exploitation of the Pictures, including, without limitation, all of the right, title and interest of each Seller in and to the following to the extent such assets or rights exist (except to the extent constituting the Excluded Assets):

(a)    the Pictures and any and all versions existing thereof, and all elements thereof (including the screenplay and story) and all trailers, "bloopers," footage, trims and outtakes thereof (including, without limitation, the director's cut and the final cut and any and all versions of each of the foregoing (in any and all languages), all versions rated by the Motion Picture Association of America and unrated versions thereof, "behind the scenes," "making of," and any and all other documentary or short form content relating thereto and all footage, "bloopers," trims and outtakes of each of the foregoing);

(b)    the Copyrights for each Picture and the underlying material for such Picture, in all territories of the world in which Copyright protection for such Picture is available, and any and all

Copyright registrations and applications for such registrations for such Picture in such materials in all territories of the world (if any) (the "**Transferred Copyrights**");

(c)     all trademarks (if any) relating to the Pictures or any of the elements thereof, including, without limitation, rights protected pursuant to trademark, service mark, unfair competition and/or other laws, rules or principles of law or equity, and the right to register, renew, enforce and defend the foregoing (collectively, "**Trademarks**");

(d)     the license to use, in connection with the Exploitation thereof, all original or licensed music included in the soundtrack of such Picture and all musical material synchronized therewith, in whole or in part, all rights to perform, copy, record, rerecord, produce, publish, reproduce or synchronize any or all of said music and musical compositions, as well as all other rights to Exploit such music, including record, soundtrack recording and music publishing rights and all Copyrights in and to said musical material;

(e)     all Exploitation rights with respect to the Pictures (including all Ancillary Rights);

(f)     all inventory and work-in-process used in, held for use in, relating to, or arising from the ownership and Exploitation of the Pictures or any rights therein;

(g)     all Exploitation Agreements and all Contract Rights, including, without limitation, the right to cause the Pictures or any rights thereto to be distributed and/or Exploited under the Exploitation Agreements;

(h)     all accounts and accounts receivable (whether current or noncurrent) and the full benefit of all security for such receivables arising, received or payable from and after the Cutoff Date, including any claims, remedies and other rights to the extent related to any of the foregoing, including, without limitation, all right to receive or retain, whether as an owner, a participant or otherwise, any and all receivables, royalties, cash flows and other incomes and revenues of whatever kind or nature from the Exploitation of the Pictures or any elements thereof in any and all media arising, received or payable from and after the Cutoff Date (the "**Post-Cutoff Cash Flows**");

(i)     all Books and Records;

(j)     all Tangible Assets;

(k)     all rights to receive Financial Information from a distributor or any other Person with respect to the monies and any other consideration payable in connection with the Pictures for all accounting periods;

(l)     all rights to (A) exercise, control, settle, compromise and/or direct any noticed, pending or future audit and/or inspection (an "**Audit Right**") of or relating to amounts reflected in any Financial Information with respect to any Picture, and (B) receive the economic benefit and/or any payments resulting from any audit set forth in clause (A) above; and

(m)     other than with respect to the Warner Dispute, the Insider Causes of Action and the Avoidance Actions, all of the Sellers' claims or causes of action, choses in action, rights of recovery and rights of set-off of any kind and indemnities against other Persons (regardless of whether or not such claims and causes of action have been asserted) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery (regardless of whether such rights are currently exercisable) relating to the Pictures or the Exploitation of the Pictures; provided, that, for the avoidance of doubt, Sellers agree that Buyer is not acquiring the rights, obligations or Liabilities relating to any claim (A) asserted against any Seller (or its Affiliates) in the Warner Dispute or (B) asserted by any Seller (or its Affiliates) in the Warner Dispute.  However, nothing herein shall affect Buyer's (or any of its Affiliate's) rights with respect to any all claims or causes of action, choses in action, rights of recovery and rights of set-off of any kind and indemnities made on its own behalf against other Persons (regardless of whether or not such claims and causes of action have been asserted) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery (regardless of whether such rights are currently exercisable) to which Buyer (or its Affiliates) may be entitled in the Warner Dispute;

provided, for clarity, that the Purchased Assets shall include the following:

(i)     the Assumed Contracts;

(ii)     with respect to each Foreign Picture and each F/D Picture, (i) an undivided interest equal to the Relevant Percentage in the Foreign Distribution Rights with respect to such Picture, (ii) an undivided interest equal to the Relevant Percentage in the Designated Foreign Receipts with respect to such Picture, and (iii) all Proceeds of the foregoing;

(iii)     with respect to each F/D Picture, (i) an undivided interest equal to the Relevant Percentage in the Domestic Distribution Rights with respect to such Picture, (ii) an undivided interest equal to the Relevant Percentage in the Designated Domestic Receipts with respect to such Picture, and (iii) all Proceeds of the foregoing;

(iv)     with respect to each Global Picture, (i) an undivided interest equal to the Relevant Percentage in the Global Distribution Rights with respect to such Picture, (ii) an undivided interest equal to the Relevant Percentage in the Designated Global Receipts with respect to such Picture, and (iii) all Proceeds of the foregoing;

(v)     with respect to each Virtual Picture, (i) an undivided interest equal to the Relevant Percentage in the Virtual Distribution Rights with respect to such Picture, (ii) an undivided interest equal to the Relevant Percentage in the Designated Virtual Receipts with respect to such Picture, and (iii) all Proceeds of the foregoing; and

(vi)     without duplication of the foregoing, all amounts to which Sellers are entitled to receive pursuant to the Specified Zoolander Agreements and Specified DTE Agreements.

"**QCSA**" means (a) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of February 22, 2006, between WV Films LLC and WV Film Partners L.P., as amended, restated, supplemented or otherwise modified from time to time; (b) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of February 22, 2006, between WV Films II LLC and WV Film Partners II L.P., as amended, restated, supplemented or otherwise modified from time to time; (c) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of April 10, 2008, between WV Films III LLC and WV Film Partners III L.P., as amended, restated, supplemented or otherwise modified from time to time; (d) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of December 15, 2017, between WV Films IV LLC and WV Film Partners IV L.P., as amended, restated, supplemented or otherwise modified from time to time; (e) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of December 14, 2021, between Evil Woman Films LLC and Evil Woman Film Partners LP, as amended, restated, supplemented or otherwise modified from time to time; (f) that certain Qualified Cost Sharing Agreement dated as of August 11, 2000, between Zoo Films LLC and Zoo Film Partners LP, as amended, restated, supplemented or otherwise modified from time to time (the "**Zoolander QCSA**"); (g) that certain Qualified Cost Sharing Agreement dated as of August 11, 2000, between DTE Films LLC and DTE Film Partners LP, as amended, restated, supplemented or otherwise modified from time to time (the "**DTE QCSA**"); and (h) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of December 19, 2019, between DSAW Films LLC and DSAW Film Partners L.P., as amended, restated, supplemented or otherwise modified from time to time.

"**Quarterly Reporting**" means the accounting statements, earnings statements or other similar statements or reporting delivered by the counterparties under the Distribution Agreements for the immediately preceding fiscal quarter.

"**Reductions**" has the meaning set forth in Section 4.01(j)(ix).

"**Relevant Percentage**" means the percentage of the Applicable Percentage of each Picture owned by the Sellers after giving effect to the purchases by Magnum pursuant to the Magnum Agreements.

"**Required Consent**" has the meaning set forth in Section 2.05(a).

"**Residuals**" means all residuals and other Liabilities (including employer fringe benefits, supplemental market payments, pension, health and welfare payments and Taxes payable with respect thereto) owing or payable to any Person (other than any Seller or any of its Affiliates) under applicable Collective Bargaining Agreements by reason of, in connection with, as a condition to or arising from the Exploitation of the Pictures, or any part thereof, from time to time, or any use or reuse thereof for any purpose or in any media whatsoever.

"**Rights Purchase Agreement**" has the meaning set forth in the applicable MPRPA.

"**Sale Order**" means an order entered by the Bankruptcy Court, in form and substance acceptable to Buyer and the Sellers, approving this Agreement and all of the terms and conditions hereof and approving and authorizing the Sellers to consummate the transactions contemplated

hereby. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, (i) the execution, delivery and performance by the Sellers of this Agreement, (ii) the sale of the Purchased Assets to Buyer on the terms set forth herein and free and clear of all Adverse Claims (other than those included in the Assumed Liabilities and the Permitted Liens) to the full extent permitted pursuant to section 363(f) of the Bankruptcy Code and find that Buyer is not a successor of any of the Sellers, and (iii) the performance by the Sellers of their respective obligations under this Agreement, including the full satisfaction of Cure Amounts for all Assumed Contracts, (b) authorize and empower the Sellers to assume and assign to Buyer the Assumed Contracts as set forth in this Agreement pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, and (c) find that Buyer is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code and grant Buyer the protections of section 363(m) of the Bankruptcy Code.

"**Seller Closing Deliverables**" has the meaning set forth in Section 2.10.

"**Seller Transaction Expenses**" means the aggregate amount of any and all costs, fees and expenses incurred by or on behalf of, or paid or to be paid directly by, the Sellers or any Person that the Sellers pay or reimburse or are otherwise legally obligated to pay or reimburse in connection with, in anticipation of or incident to the negotiation, preparation, execution and delivery of this Agreement and the other Transaction Documents or the performance or consummation of the Transactions, including: (i) all costs, fees and expenses payable to counsel, advisors, consultants, investment bankers, accountants, auditors and any other experts, and all obligations under any engagement letter or other agreement or understanding with any investment banker or broker in connection with the Transactions; (ii) any costs, fees and expenses associated with obtaining necessary or appropriate waivers, consents, or approvals of any Governmental Authority or other third parties on behalf of the Sellers in connection with the Transactions; (iii) any costs, fees or expenses associated with obtaining the release and termination of any Adverse Claims in connection with the Transactions; (iv) all brokers', finders' or similar fees in connection with the Transactions; and (v) all amounts owed to any Service Provider that arise in whole or in part as a result of the consummation of the Transactions including all change of control payments, bonuses, severance, termination, or retention obligations or similar amounts payable in the future or due by the Sellers in connection with the Transactions contemplated hereby, including any Taxes payable in connection therewith.

"**Seller Transaction Expenses Schedule**" means a written schedule of the Seller Transaction Expenses that remain unpaid as of the Closing Effective Date, in form and substance reasonably satisfactory to Buyer, setting forth (a) the name of each such Seller Transaction Expense payee, (b) the amount due to such payee as set forth in the applicable invoice and (c) such payee's bank account information as set forth in the applicable invoice, delivered to Buyer in accordance with Section 2.10(d) together with a copy of each such invoice and an IRS Form W-9 or applicable IRS Form W-8 for each such payee, duly executed by such payee.

"**Sellers**" has the meaning set forth in the preamble.

"**Separateness**" means the requirement of each Seller to maintain an existence separate from its Affiliates, as more particularly set forth in each Seller's Constitutive Documents.

"**Service Provider**" means, with respect to any Person, each director, officer, employee, manager, independent contractor, consultant, leased employee or other service provider of such Person.

"**Sony**" means Sony Pictures Entertainment Inc., a Delaware corporation.

"**Source**" has the meaning set forth in Section 4.02(e).

"**Specified Audit Proceeds**" means an amount equal to fifty percent (50%) of (a) all payments received by Buyer from the applicable counterparty to the applicable Distribution Agreement resulting from any audit of amounts reflected in any Financial Information with respect to the applicable Picture for any period commencing prior to the Cutoff Date and ending prior to the Cutoff Date (the "**Pre-Cutoff Period**"), less (b) all documented out of pocket costs (including legal fees) incurred by Buyer or its Affiliates in connection with the negotiation, litigation and/or settlement of such audit; provided, that to the extent that any such audit is in respect of both the Pre-Cutoff Period and any audit period commencing on or after the Cutoff Date (the "**Post-Cutoff Period**"), then Buyer shall allocate the amounts described in the foregoing (a) and (b) between the Pre-Cutoff Period and the Post-Cutoff Period reasonably and in good faith based on the number of days in the applicable period subject to such audit occurring during the Pre-Cutoff Period relative to the total number of days in the applicable period subject to such audit.

"**Specified Contracts**" means each of (a) the Global Distribution Agreement (together with all right, title and interest in and to the Pictures licensed to the Global Distributor pursuant thereto or otherwise necessary to comply with the terms thereof), (b) the Saving Silverman Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise necessary to comply with the terms thereof), (c) the DTE Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise necessary to comply with the terms thereof), (d) the Zoolander Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise necessary to comply with the terms thereof), and (e) the Don't Say a Word Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise necessary to comply with the terms thereof).

"**Specified Event**" means, (i) with respect to a Specified Contract, the Sellers' failure to obtain and deliver to Buyer the Sale Order approving the transfer to Buyer of such Specified Contract on or prior to the Closing Effective Date, (ii) with respect to *Zoolander*, the Sellers' failure to obtain and deliver to Buyer on or prior to the Closing Effective Date the Zoolander Notice of Assignment and Amendment, in form and substance reasonably satisfactory to Buyer and duly executed by the parties thereto, and/or (iii) with respect to *Down to Earth*, the Sellers' failure to obtain and deliver to Buyer on or prior to the Closing Effective Date the DTE Notice of Assignment and Amendment, in form and substance reasonably satisfactory to Buyer and duly executed by the parties thereto.

"**Specified Event Purchase Price Reduction**" means an amount equal to the sum of (a) in the event of a Specified Event with respect to the Global Distribution Agreement, an amount

equal to $13,882,000, *plus* (b) in the event of a Specified Event with respect to the Saving Silverman Agreement, an amount equal to $76,000, *plus* (c) in the event of a Specified Event with respect to the DTE Agreement or *Down to Earth*, an amount equal to $1,384,000, *plus* (d) in the event of a Specified Event in connection with the Zoolander Agreement or *Zoolander*, an amount equal to $7,564,000, *plus* (e) in the event of a Specified Event with respect to the Don't Say a Word Agreement, an amount equal to $756,000.

"**Straddle Period**" means any Tax period beginning before or on, and ending after, the Closing Effective Date.

"**Successful Bidder**" means, if an Auction is conducted, the prevailing party with respect to the Purchased Assets at the conclusion of such Auction.

"**Tangible Assets**" means all physical properties of, or relating to, any Picture, including prints, negatives, duplicating negatives, fine grains, music and sound effects tracks, master tapes and other duplicating materials of any kind, all various language dubbed and titled versions, prints and negatives of stills, trailers and television spots, all promos and other advertising and publicity materials, stock footage, trims, tabs, out-takes, cells, drawings, storyboards, models, sculptures, puppets, sketches and continuities, including, without limitation, those elements which are stored by the relevant distributor (or the applicable rights therein).

"**Tax**" or "**Taxes**" means any U.S. federal, state, local or non-U.S. income, gross receipts, branch profits, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, escheat, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, ad valorem, value added, alternative or add-on minimum or estimated tax or other tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or not.

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Transaction Documents**" means this Agreement, the Assumption and Assignment Agreement, the IP Assignment Agreement, any pleadings related to this Agreement filed with the Bankruptcy Court, the Notices of Assignment and Amendment, and all other instruments, exhibits, documents and agreements executed or delivered from time to time in connection with the foregoing.

"**Transactions**" means the transactions contemplated by the Transaction Documents.

"**Transfer Taxes**" means all transfer, stamp, documentary, sales, use, registration, value-added and other similar Taxes (including all applicable real estate transfer Taxes) incurred in connection with any Transaction Document and the Transactions.

"**V Squared Assignment and Assumption Agreement**" means that certain Assignment and Assumption Agreement dated as of November 10, 2020, by and among V Squared, LLC,

VRVS, Vine Investment Advisors, LP, Vine Film Finance Fund II AIV, L.P., Vine WestCon SPV, LP, Warner Bros. Pictures, a division of WB Studio Enterprises Inc. and VREG-USA, as amended, restated, supplemented or otherwise modified from time to time.

"**VFFF Assignment and Assumption Agreement**" means that certain Assignment and Assumption Agreement dated as of November 10, 2020, by and among Vine Film Finance Fund II AIV, L.P., VRVS, V Squared LLC, and VREG-USA, as amended, restated, supplemented or otherwise modified from time to time.

"**Virtual Assignment and Assumption Agreements**" means the V Squared Assignment and Assumption Agreement, the VFFF Assignment and Assumption Agreement and the WestCon Assignment and Assumption Agreement**.**

"**Virtual Co-Financing Agreement**" means that certain Co-Financing Agreement dated as of September 28, 2005, between Warner Bros. Pictures Inc. and Virtual Studios LLC, as amended, restated, supplemented or otherwise modified from time to time.

"**Virtual Distribution Rights**" means the right to market, distribute, subdistribute and otherwise Exploit the Virtual Pictures in any media throughout the Virtual Territory, which rights are subject to the prior grant of distribution rights to the Virtual Distributor under that certain Assignment dated as of April 1, 2003, between Warner Bros. Pictures Inc. and WBEI.

"**Virtual Distributor**" means WBEI.

"**Virtual Documents**" means the Virtual Assignment and Assumption Agreements, the Virtual Co-Financing Agreement and the Virtual Letter of Direction.

"**Virtual Intercreditor Agreement**" means that certain Intercreditor Agreement dated as of November 10, 2020, among Warner Bros. Pictures, a division of WB Studio Enterprises Inc., VRVS and U.S. Bank National Association, as amended, restated, supplemented or otherwise modified from time to time prior to the Closing Effective Date.

"**Virtual Letter of Direction**" means that certain Second Amended and Restated Letter of Direction re: Co-Financing Agreement dated September 28, 2005, as amended by that certain letter agreement dated November 10, 2020, by and among VRVS, VRH-USA, Warner Bros. Pictures, a division of WB Studio Enterprises, Inc., Vine Investment Advisors, LP, V Squared, LLC, Vine Film Finance Fund II AIV, L.P., and Vine WestCon SPV, LP, as amended, restated, supplemented or otherwise modified from time to time.

"**Virtual Pictures**" has the meaning set forth in the recitals.

"**Virtual Territory**" means the entire universe.

"**VR Funding**" has the meaning set forth in Schedule I.

"**VRD**" has the meaning set forth in Schedule I.

"**VRDTE**" means VR DTE Productions Ltd., a company formed under the laws of the British Virgin Islands.

"**VRD-USA**" has the meaning set forth in Schedule I.

"**VREG-USA**" means Village Roadshow Entertainment Group USA Inc., a Delaware corporation.

"**VRF**" has the meaning set forth in Schedule I.

"**VRF Holdings**" has the meaning set forth in Schedule I.

"**VRFG**" has the meaning set forth in Schedule I.

"**VRFNA**" has the meaning set forth in Schedule I.

"**VRH-USA**" means Village Roadshow Holdings USA Inc., a Delaware corporation.

"**VRP**" has the meaning set forth in Schedule I.

"**VRPNA**" has the meaning set forth in Schedule I.

"**VRVS**" has the meaning set forth in Schedule I.

"**Warner Dispute**" means any and all claims brought or asserted at any time by WBEI and/or its Affiliates against any Seller and/or any of its Affiliates, and any and all claims brought or asserted at any time by any Seller and/or any of its Affiliates against WBEI and/or its Affiliates, including, but not limited to, each of the Proceedings set forth on Section 4.01(e) of the Disclosure Schedules, and any other related or similar Proceedings, in each case involving any Seller and/or its Affiliates, on the one hand, and WBEI and/or its Affiliates, on the other hand.

"**WAV**" means WAV Distribution LLC, a Delaware limited liability company.

"**WBEI**" means Warner Bros. Entertainment Inc., a Delaware corporation.

"**WBPL**" means Warner Bros. Productions Limited, a company formed under the laws of England.

"**WestCon Assignment and Assumption Agreement**" means that certain Assignment and Assumption Agreement dated as of November 10, 2020, by and among Vine WestCon SPV, LP, VRVS, V Squared LLC, and VREG-USA, as amended, restated, supplemented or otherwise modified from time to time.

"**Zoo Films LLC Agreement**" means that certain Operating Agreement of Zoo Films LLC, dated as of August 11, 2000 by and among Paramount Pictures Corporation and VR Zoo Distribution USA Inc., as amended, restated, supplemented or otherwise modified from time to time.

"**Zoo Films Partnership Agreement**" means that certain Articles of Limited Partnership of Zoo Film Partners L.P., dated as of August 11, 2000, by and among VRD, VR Zoo Productions Ltd, and MTV S.A. (f/k/a MTV S.A. LDC), as amended, restated, supplemented or otherwise modified from time to time.

"**Zoolander Notice of Assignment and Amendment**" means an irrevocable notice of assignment and amendment entered into among Buyer and each of the parties to the Zoolander Agreement, Zoolander QCSA, Zoo Films Partnership Agreement and Zoo Films LLC Agreement (each of the foregoing, together with any other agreements between or among the parties thereto in connection with *Zoolander*, the "**Specified Zoolander Agreements**"), pursuant to which the parties thereto shall agree that, notwithstanding anything to the contrary in the Specified Zoolander Agreements: (i) "International Net Proceeds" and "Domestic Net Proceeds" (each as described and calculated in the Financial Information prepared by Paramount in respect of *Zoolander*) shall be shared by Paramount and Buyer 50 / 50 in perpetuity; provided, that if International Net Proceeds are cumulatively negative, Paramount shall pay Buyer one hundred percent (100%) of the International Net Proceeds and Domestic Net Proceeds until such shortfall has been recouped, consistent with past practice, and (ii) the parties to the Specified Zoolander Agreements shall agree not to amend any Specified Zoolander Agreement following the date of such notice of assignment and amendment in any manner that would modify or otherwise affect the calculation or timing of amounts payable to Buyer pursuant to such notice of assignment and amendment.

Section 1.02   **References to Agreements**.   References to an agreement or document shall include all schedules, annexes, exhibits, appendices and other attachments to such agreement or document, and unless otherwise stated, are to such agreement or document (including all such attachments) as amended, restated, replaced, supplemented or otherwise modified from time to time in a manner not inconsistent with the terms hereof and thereof.

## ARTICLE II.  SALE AND PURCHASE; CLOSING

Section 2.01   **Sale and Purchase of Purchased Assets**.   Pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, and provided that in all events that Buyer is the Successful Bidder, at the Closing, Buyer shall purchase, acquire and accept from the Sellers, and the Sellers shall irrevocably sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, all of the Sellers' right, title and interest, in, to and under the Purchased Assets, on an "as is" and "where is" basis (except as otherwise provided herein), but free and clear of Adverse Claims (except for the Assumed Liabilities and the Permitted Liens) or other interests in such Purchased Assets to the full extent provided by section 363(f) of the Bankruptcy Code.

Section 2.02   **Assumed Liabilities**.   Upon the terms and subject to the conditions of this Agreement, and explicitly excluding the Excluded Liabilities described below in Section 2.04, Buyer agrees, effective as of the time of the Closing, that it shall assume the sole responsibility for paying, performing and discharging when due, (a) all Liabilities arising from the ownership and Exploitation of the Purchased Assets by or on behalf of Buyer after the Closing Effective Date,

and (b) all Liabilities for Property Taxes allocated to Buyer under and in accordance with Section 6.06 (the "**Assumed Liabilities**").

Section 2.03   **Excluded Assets**.  Notwithstanding any provision in this Agreement to the contrary, the Sellers shall not be deemed to sell, transfer, assign, convey or deliver, and the Sellers will retain, all right, title and interest to, in and under, (a) the Derivative Rights, (b) any Contract that is not an Assumed Contract, (c) the Specified Audit Proceeds, (d) Avoidance Actions and Insider Causes of Action and (e) the rights, obligations, or Liabilities relating to any claim asserted against any Seller (or its Affiliates) in the Warner Dispute or asserted by any Seller (or its Affiliates) in the Warner Dispute, in each case (collectively, the "**Excluded Assets**").

Section 2.04   **Excluded Liabilities**. Notwithstanding any provision in this Agreement to the contrary, (i) Buyer is assuming only the Assumed Liabilities, and (ii) the Excluded Liabilities shall remain the sole obligation and responsibility of the Sellers.  As used in this Agreement, "**Excluded Liabilities**" includes, without limitation:

(a)      all Liabilities of the Sellers not arising out of, in respect of or relating to the Purchased Assets;

(b)      all Liabilities of the Sellers arising out of, in respect of or relating to the Purchased Assets accruing prior to the Cutoff Date;

(c)      all Liabilities arising out of, in respect of or relating to the Purchased Assets to the extent resulting from or relating to actions, omissions or circumstances taking place prior to the Closing Effective Date, including all Liabilities arising out of, in respect of or relating to (1) any actual or threatened Proceedings or legal claims (including but not limited to the Warner Dispute) arising from or relating to Sellers' production, financing, ownership or Exploitation of the Pictures or the Purchased Assets or any other aspect of Sellers' business prior to the Closing Effective Date, (2) any Seller at any time in its capacity as a producer, financier, owner, licensor, distributor or in any other capacity at or prior to the Closing Effective Date, (3) the failure of Sellers to comply with any Laws or any of their obligations prior to the Closing Effective Date (whether contractual or otherwise, including, without limitation, any Participation or Residual obligations that are contractually required to be paid on or prior to the Closing Effective Date), and (4) the obligation to indemnify, reimburse or advance amounts to any present or former officer, director, employee, owner, manager, Affiliate or agent of Sellers or their Affiliates or any participant, producer, financier, owner, distributor, talent or other Person in connection with any Picture or otherwise prior to the Closing Effective Date;

(d)      all Liabilities of the Sellers pursuant to any QCSA or MPRPA;

(e)      all Liabilities arising out of, in respect of, or relating to the Excluded Assets;

(f)      Excluded Taxes;

(g)      all Indebtedness of the Sellers and all Indebtedness arising before the Closing Effective Date that is otherwise secured by any of the Purchased Assets which in either case remains outstanding following the Closing Effective Date;

(h)    the ABS Obligations;

(i)    all Liabilities assumed by, retained by or agreed to be performed by Sellers pursuant to the Transaction Documents; and

(j)    all Liabilities arising out of, in respect of, or relating to Cure Amounts under the Assumed Contracts.

Section 2.05    **Assumption and Assignment of Contracts.**

(a)    Assignment of Contracts. To the maximum extent permitted by law, at the Closing, and pursuant to the Sale Order, the Sellers shall assign to Buyer those assignable contracts that are set forth on Schedule III, including, but not limited to, certain of the Picture Agreements pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code (the "**Assumed Contracts**"), which schedule Buyer may update at any time prior to the Closing Effective Date.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party, would not be permissible under section 365 of the Bankruptcy Code. Except with respect to the Fundamental Contracts as provided in Section 3.01(f), if such consent is not obtained or such assignment is not attainable pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, then such Purchased Asset shall not be transferred hereunder and the Closing shall proceed with respect to the remaining Purchased Assets without any reduction in the Purchase Price other than with respect to the Specified Contracts as provided in Section 2.06(a)(iii); provided, however, that (i) the Sellers shall use, whether before or after the Closing, their commercially reasonable efforts to obtain all necessary consents (each, a "**Required Consent**") to the assignment and transfer thereof, and (ii) in the event that any Assumed Contract is deemed not to be assigned pursuant to clause (i) of this Section 2.05(a), the Sellers shall (A) use commercially reasonable efforts to obtain such Required Consents as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful arrangement reasonably proposed by Buyer, including subcontracting, licensing or sublicensing to Buyer any or all of any Seller's rights and obligations with respect to any such Assumed Contract, under which Buyer shall obtain (without infringing upon the legal rights of such third party or violating any law) the economic rights and benefits under such Assumed Contract with respect to which such Required Consent has not been obtained.

(b)    Sellers Commitment to Cure Payments. The Sellers will pay all Cure Amounts in connection with the assumption and assignment of Assumed Contracts for which all Required Consents and Bankruptcy Court approval to transfer have been obtained. The Sellers have provided to Buyer a schedule set forth on Schedule III setting forth a good faith estimate of all Cure Amounts for all Assumed Contracts ("**Cure Schedule**"), which schedule the Sellers may update from time to time prior to the date that is three (3) business days prior to the Closing Effective Date.

(c)    Adequate Assurance. Buyer shall use commercially reasonable efforts to provide the Bankruptcy Court and non-debtor contract counterparties any evidence reasonably necessary

to prove adequate assurance of future performance necessary to effect the assumption and assignment of the Assumed Contracts.

Section 2.06   **Purchase Price and Buyer Deposit**.

(a)   On the terms and subject to the conditions contained herein, the aggregate purchase price to be paid by Buyer for the Purchased Assets (the "**Purchase Price**") shall consist of an amount of cash equal to the sum of (i) Four Hundred Seventeen Million Five Hundred Thousand Dollars ($417,500,000); *minus* (ii) an amount equal to the sum of all gross amounts received by or credited to the Sellers that constitute amounts included in the Purchased Assets (including, without limitation, all gross amounts received by or credited to the Sellers prior to the Closing Effective Date in respect of the Pictures from and after the Cutoff Date) (the "**Post-Cutoff Income**"); *minus* (iii) in the event of the occurrence of one or more Specified Events, an amount equal to the Specified Event Purchase Price Reduction with respect to such Specified Events; *plus* (iv) an amount equal to the sum of any actual, direct, verifiable, third party out-of-pocket costs (including Participations to Magnum) attributable to the Post-Cutoff Income that are actually paid by the Sellers or their Affiliates to third parties on or prior to the Closing Effective Date (the amount so paid, the "**Post-Cutoff Paid Liabilities**").

(b)   No later than seven (7) days after entry of the Bid Procedures Order, Buyer and Sellers will enter into the escrow agreement in form and substance acceptable to Buyer and the Sellers (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**Escrow Agreement**"), with an escrow agent acceptable to Buyer and the Sellers (the "**Escrow Holder**").   On the date of execution of the Escrow Agreement, Buyer shall deposit $41,750,000 (together with any interest accrued thereon in accordance with the terms of the Escrow Agreement, the "**Buyer Deposit**") with the Escrow Holder by wire transfer of immediately available funds.   The Escrow Holder will hold the Buyer Deposit until the Closing Effective Date or earlier termination of this Agreement pursuant to Article VIII in a segregated account (the "**Escrow Account**") pursuant to the terms below and otherwise in accordance with the terms of the Escrow Agreement.   Buyer, on the one hand, and Sellers, on the other hand, shall share equally all costs under the Escrow Agreement, including any fee of the Escrow Holder.   The Buyer Deposit shall become payable, and shall be paid, to the Sellers at the Closing.   At the Closing, Buyer and Sellers shall instruct the Escrow Holder to deliver the Buyer Deposit to Sellers by wire transfer of immediately available funds into an account designated by the Sellers pursuant to the terms and conditions of the Escrow Agreement.   If this Agreement is validly terminated prior to the Closing pursuant to Article VIII, the Buyer Deposit shall be released and distributed to Buyer or Sellers, as applicable, in accordance with the terms of the Escrow Agreement. Without limiting the foregoing, the Parties acknowledge and agree that, per the terms of the Escrow Agreement, in the event that this Agreement is terminated by the Sellers in accordance with Section 8.01(c), the Sellers shall be entitled to retain the Buyer Deposit.   If there is a dispute concerning the reason for termination of this Agreement, the disputing Party shall provide notice of same to Escrow Holder and the Buyer's Deposit shall be handled and distributed in accordance with the provisions of the Escrow Agreement pertaining to such dispute. In the event of any termination of this Agreement then each Party covenants and agrees that such Party shall promptly provide Escrow Holder with such instructions as may be reasonable and necessary to cause Escrow Holder to release the Buyer's Deposit to the Party entitled thereto.   In the event of any termination of this Agreement

(i) due to an uncured default of a Party pursuant to <u>Section 8.01(b)</u> or <u>Section 8.01(c)</u>, then the defaulting Party shall pay all cancellation costs imposed by the Escrow Holder, (ii) pursuant to <u>Section 8.01(d)</u>, <u>Section 8.01(f)</u>, <u>Section 8.01(g)</u> and/or <u>Section 8.01(h)</u>, then Sellers shall pay all cancellation costs imposed by the Escrow Holder, and (iii) for any other reason pursuant to <u>Section 8.01</u>, the cancellation costs imposed by Escrow Holder shall be split equally by Buyer and Sellers. If there is a conflict between the Escrow Agreement and this Agreement, the terms of this Agreement shall prevail.

Section 2.07    **Closing**.  The Closing shall be effected by exchanging true, complete and accurate copies of executed originals via electronic mail at a time and on a date specified by the Sellers and Buyer that is no later than the fifteenth (15th) business day following the date on which the last of the conditions set forth in <u>Article III</u> has been satisfied or expressly waived (other than those conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of any such condition), or at such other time and place as the Sellers and Buyer may agree in writing.

Section 2.08    **Post-Closing Assumption and Assignment of Contracts to Buyer**. At any time after the Closing Effective Date, the Sellers and Buyer may (but shall have no obligation to) mutually agree to seek authorization from the Bankruptcy Court, pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, to assume and assign a contract that was not identified as an Assumed Contract as of Closing (which contract shall become an Assumed Contract upon such assumption and assignment); provided that the Sellers will be solely responsible for paying the Cure Amount required to assume such contract (if applicable).

Section 2.09    **Delivery of Closing Statement**.  At least three (3) business days before the Closing Effective Date, Seller Representative, on behalf of the Sellers, shall prepare and deliver to Buyer a reasonably detailed written statement (the "**Closing Statement**") setting forth a good faith calculation of (a) the Seller Transaction Expenses that remain unpaid as of the Closing Effective Date (which shall include all amounts set forth in the corresponding invoices from the respective payees) and (b) a good faith calculation of the estimated Purchase Price (the "**Estimated Purchase Price**") using (and setting forth) good faith estimates of each of (A) the Post-Cutoff Income and (B) the Post-Cutoff Paid Liabilities, in each case under the foregoing (a) and (b), with reasonable supporting or underlying documentation used in the preparation thereof.  The Sellers shall provide Buyer and its representatives full access to the Books and Records and direct all appropriate personnel of Sellers and/or their Affiliates to reasonably cooperate with Buyer and its representatives in each case as are reasonably necessary to assist Buyer in its review of such calculations.  In the event that Buyer disagrees with any of the items set forth on the Closing Statement, Buyer and Seller Representative, on behalf of the Sellers, shall work together in good faith to resolve any such disagreement.

Section 2.10   **Seller Closing Deliverables**.  In addition to the other requirements set forth in this Agreement, as of the Closing, the Sellers shall deliver or cause to be delivered to Buyer each of the following documents and instruments (the "**Seller Closing Deliverables**"):

(a)      a counterpart of each Transaction Document to which any Seller or the Seller Representative is a party, duly executed by each applicable Seller and/or the Seller Representative, as applicable;

(b)      an IRS Form W-9 or applicable IRS Form W-8 for each of the Sellers, duly executed by such Seller;

(c)      a certificate in form and substance reasonably acceptable to Buyer dated as of the Closing Effective Date and duly executed by the secretary, director or other authorized officer of each Seller, certifying (i) that attached thereto are copies of each such Person's certificate of formation or certificate of incorporation, as the case may be (and any amendments thereto), certified as of a recent date by the Secretary of State of the State of Delaware or the Registrar of Corporate Affairs in the British Virgin Islands, and limited liability company agreement, bylaws or memorandum and articles of association, as the case may be (and any amendments thereto), (ii) that attached thereto are resolutions adopted by the Board of Directors (or equivalent body) and/or equity holders or members of such Person (as applicable) authorizing the execution, delivery and performance in accordance with their respective terms of the Transaction Documents to which each of such Persons is a party, (iii) attached thereto are incumbency and specimen signatures of each authorized signatory of such Person executing the Transaction Documents, and (iv) as to the Sellers' satisfaction of the conditions set forth in Sections 3.01(a) and 3.01(b);

(d)      the Seller Transaction Expenses Schedule;

(e)      a copy of all Books and Records in the Dataroom on a USB drive or other data storage device;

(f)      the Closing Statement; and

(g)      all other instruments and documents reasonably requested by Buyer.

Section 2.11   **Buyer Closing Deliverables**.  In addition to the other requirements set forth in this Agreement, as of the Closing, Buyer shall deliver or cause to be delivered to the Seller Representative each of the following documents and instruments (the "**Buyer Closing Deliverables**"):

(a)      a counterpart of each Transaction Document to which Buyer is a party, duly executed by Buyer; and

(b)      a certificate in form and substance reasonably acceptable to the Sellers dated as of the Closing Effective Date and duly executed by the secretary or other authorized officer of Buyer, certifying (i) that attached thereto is a copy of Buyer's certificate of formation (and any amendments thereto), certified as of a recent date by the Secretary of State of the State of Delaware, and limited liability company agreement (and any amendments thereto), (ii) that attached thereto

are resolutions adopted by the sole member of Buyer authorizing the execution, delivery and performance in accordance with their respective terms of the Transaction Documents to which Buyer is a party, (iii) attached thereto are incumbency and specimen signatures of each authorized signatory of Buyer executing the Transaction Documents, and (iv) as to Buyer's satisfaction of the conditions set forth in Sections 3.02(a), and 3.02(b).

Section 2.12  **Payments at Closing**.  At the Closing, Buyer shall:

(a)     pay or cause to be paid to each Seller, by wire transfer of immediately available funds to the account or accounts designated in writing by the Sellers not less than two (2) days prior to the Closing Effective Date, its share as designated on Schedule IV hereto (the "**Purchase Price Schedule**") of an amount of cash equal to the sum of (i) the Estimated Purchase Price, *minus* (ii) the Buyer Deposit, *minus* (ii) the Seller Transaction Expenses that remain unpaid as of the Closing Effective Date; and

(b)     pay or cause to be paid, on behalf and for the account of the Sellers, the Seller Transaction Expenses that remain unpaid as of the Closing Effective Date by wire transfer of immediately available funds to the applicable recipients thereof as set forth on the Seller Transaction Expenses Schedule.

Section 2.13  **Post-Closing Adjustment**.

(a)     Within one hundred and eighty (180) days following the Closing Effective Date, Buyer shall deliver to Seller Representative a reasonably detailed statement (the "**Post-Closing Statement**") setting forth calculations of the Purchase Price, along with reasonable supporting documentation.  In connection therewith, the Sellers shall provide Buyer and its representatives full access to the Books and Records to the extent reasonably related to Buyer's preparation of the Post-Closing Statement and shall direct personnel of the Sellers to reasonably cooperate with Buyer and its representatives in connection with its preparation of the Post-Closing Statement.

(b)     The Sellers and their accountants, counsel or financial advisers shall have a period of thirty (30) days after delivery of the Post-Closing Statement to review such Post-Closing Statement, and Seller Representative shall be entitled during such period to notify Buyer in writing of any objections Sellers may have to the calculations set forth therein (the "**Objection Notice**"). Any such Objection Notice shall state in reasonable detail each item or amount that Sellers dispute, the amount in dispute for each such disputed item and the reasons supporting Sellers' positions. In the event that Seller Representative does not provide an Objection Notice within the thirty (30)-day period after delivery of the Post-Closing Statement, Sellers and Buyer shall be deemed to have agreed to the Post-Closing Statement and the calculations of the Purchase Price delivered by Buyer, which shall be final, binding and conclusive for all purposes hereunder.  If an Objection Notice is delivered to Buyer within the thirty (30) day period referred to above, then the Purchase Price (as revised in accordance with this sentence) shall become final and binding upon the Parties on the earlier of (i) the date on which Seller Representative and Buyer resolve in writing any differences they have with respect to the matters specified in the Objection Notice and (ii) the date on which all such disputed matters are finally resolved in writing by the Accountant (as defined below) pursuant to the procedures set forth in this Section 2.13(b).  Following the delivery of an

Objection Notice, the Seller Representative and Buyer shall negotiate in good faith and use commercially reasonable efforts to resolve any such dispute. If Seller Representative and Buyer fail to resolve such dispute within fifteen (15) days of delivery of the Objection Notice, then Seller Representative, on behalf of the Sellers, and Buyer shall jointly engage a nationally recognized independent public accounting firm with specialized knowledge in the media and entertainment industry (the "**Accountant**") to resolve any and all matters that remain in dispute and were included in the Objection Notice; provided, (A) if, within fifteen (15) days after the end of such resolution period, such Parties are unable to agree on an Accountant, then Seller Representative, on the one hand, and Buyer, on the other hand, shall each select an Accountant, and such firms together shall select a nationally recognized independent public accounting firm with specialized knowledge in the media and entertainment industry to act as the Accountant, and (B) if Seller Representative, on the one hand, and Buyer, on the other hand, fail to select an Accountant within ten (10) days of written demand therefor by the other Party, then the Accountant selected by the Seller Representative or Buyer, as the case may be, shall act as the Accountant for purposes of this Section 2.13(b). Seller Representative and Buyer shall instruct the Accountant to render its decision as to the disputed matters and the effect of its decision on the Objection Notice as promptly as practicable but in no event later than sixty (60) calendar days after its selection. Neither Seller Representative nor Buyer shall (and each shall cause the Sellers, as applicable, and their respective Affiliates and any attorney, accountant or other advisor, agent or other representative not to) have any *ex parte* meetings, teleconference, presentations or other correspondence with the Accountant but shall ensure that the other party participate in all such teleconferences, meetings, presentations and receive copies of all such correspondence.

(c) The scope of the disputes to be resolved by the Accountant shall be limited to (i) whether there were mathematical errors in the Post-Closing Statement and (ii) whether the Post-Cutoff Income, the Post-Cutoff Paid Liabilities and the Purchase Price were calculated in accordance with the terms of this Agreement with respect to the disputed matters that were submitted to the Accountant for resolution. In resolving any such disputed matter, the Accountant (w) shall act in the capacity of an expert and not as an arbitrator, (x) shall limit its review to matters specifically set forth in the Objection Notice as a disputed matter (other than matters thereafter resolved by mutual written agreement of the Parties), (y) shall not assign a value to any disputed matter greater than the greatest value for such matter claimed by either Party or less than the smallest value for such matter claimed by either Party in the Post-Closing Statement or in the Objection Notice and (z) shall make its determinations in accordance with this Agreement.

(d) The final determination by the Accountant of the matters submitted to it pursuant to Section 2.13(b) shall (i) be in writing, (ii) include the Accountant's calculation of the Purchase Price, (iii) include the Accountant's determination of each matter submitted to it pursuant to Section 2.13(b) and (iv) include a brief summary of the Accountant's reasons for its determination of each matter. Absent manifest error, the resolution of disputed matters by the Accountant shall be final and binding, and the determination of the Accountant shall constitute an arbitral award that is final, binding and non-appealable (absent fraud, bad faith or manifest error) and upon which a judgment may be entered by a court having jurisdiction over the party against which such determination is to be enforced.

(e)     The costs, fees and expenses of the Accountant shall be borne by the Sellers, on the one hand, and Buyer, on the other hand, in proportion to the amounts by which their calculations of the Purchase Price differed from the Accountant's determination, which proportionate allocations shall also be determined by the Accountant at the time its determination is rendered on the merits of the matters submitted.

(f)     If the Purchase Price is greater than the Estimated Purchase Price, then Buyer shall pay to the Sellers the difference, by electronic funds transfer within five (5) business days of final determination, in immediately available funds to an account designated by the Seller Representative to receive payment; provided, that if Buyer is obligated to pay any amount to one or more Sellers pursuant to the foregoing, Buyer shall have the right to first offset any amounts that one or more Sellers owe to Buyer.  If the Purchase Price is less than the Estimated Purchase Price, then within five (5) business days of final determination, Buyer shall be entitled to recover from a debtor reserve established by the Sale Order, an amount equal to the lesser of (A) such difference and (B) the balance of such debtor reserve.

Section 2.14   **Withholding**.  Notwithstanding anything to the contrary in this Agreement, Buyer, the Sellers, and their designees will be entitled to deduct and withhold from any amounts payable pursuant to this Agreement any amounts required to be deducted or withheld under applicable Law.  To the extent that any such amounts are so deducted or withheld, such amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction or withholding was made.  Upon Closing (and thereafter as required by applicable Law or as requested by Buyer), each person entitled to payment under this Agreement shall provide a duly executed IRS Form W-9 or applicable IRS Form W-8.

## ARTICLE III.  CONDITIONS PRECEDENT TO CLOSING

Section 3.01   **Conditions Precedent to Purchase by Buyer**.  The obligations of Buyer to consummate the Transactions at Closing are subject to the fulfillment or written waiver by Buyer, as of the Closing Effective Date, of each of the following conditions:

(a)     Representations and Warranties.  Each of the representations and warranties of the Sellers contained in this Agreement or any other Transaction Document (i) that are qualified as to Material Adverse Effect, shall be true and correct in all respects as of the Effective Date and as of the Closing Effective Date as though made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects on and as of such date) and (ii) that are not qualified as to Material Adverse Effect, shall be true and correct in all respects as of the Effective Date and as of the Closing Effective Date as if made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects as of such date), except for breaches and inaccuracies the effect of which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)    Performance of Covenants.  Each Seller shall have performed in all material respects all of the covenants and obligations required to be performed by it under this Agreement or any other Transaction Document prior to or at the Closing.

(c)    Government Approvals.  All Government Approvals required in connection with the Sellers' execution, delivery and performance of this Agreement or any other Transaction Document or consummation of the Transactions shall have been obtained or made and shall be in full force and effect.

(d)    Seller Closing Deliverables.    Buyer shall have received each Seller Closing Deliverable.

(e)    [Reserved]

(f)    Fundamental Contracts.  Sellers shall have obtained and delivered to Buyer the Sale Order approving the transfer to Buyer of each of the Fundamental Contracts.

(g)    Notices of Assignment and Amendment. Sellers shall have obtained and delivered to Buyer the Notices of Assignment and Amendment, in form and substance reasonably satisfactory to Buyer and duly executed by the parties thereto.

Section 3.02    **Conditions Precedent to Sale by Sellers**.  The obligations of the Sellers to consummate the Transactions at Closing are subject to the fulfillment or written waiver by the Sellers, as of the Closing Effective Date, of each of the following conditions:

(a)    Representations and Warranties.  Each of the representations and warranties of Buyer contained in this Agreement or any other Transaction Document (i) that are qualified as to Material Adverse Effect, shall be true and correct in all respects as of the Effective Date and as of the Closing Effective Date as though made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects on and as of such date) and (ii) that are not qualified as to Material Adverse Effect shall be true and correct in all respects as of the Effective Date and as of the Closing Effective Date as if made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects as of such date), except for breaches and inaccuracies the effect of which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)    Performance of Covenants.  Buyer shall have performed in all material respects all of the covenants and obligations required to be performed by it under this Agreement or any other Transaction Document prior to or at the Closing.

(c)    Government Approvals.  All Government Approvals required in connection with execution, delivery and performance of this Agreement or any other Transaction Document or consummation of the Transactions shall have been obtained or made and shall be in full force and effect.

Section 3.03   **Conditions Precedent to Obligations of Buyer and the Sellers**.   The obligations of the Buyer and the Sellers to consummate the Transactions at Closing are subject to the fulfillment or written waiver by each of the Buyer and the Sellers, as of the Closing Effective Date, of each of the following conditions:

(a)   Bankruptcy Court Order. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be unstayed and in full force and effect.

## ARTICLE IV.  REPRESENTATIONS AND WARRANTIES

Section 4.01   **Representations and Warranties of Sellers**.   Except as set forth in the corresponding sections or subsections of the Disclosure Schedules attached hereto (collectively, the "**Disclosure Schedules**"), each Seller hereby jointly and severally represents and warrants to Buyer, unless another date is expressly noted below, as of the Effective Date and as of the Closing Effective Date as follows:

(a)   Organization and Qualification.   Such Seller is a limited liability company or corporation duly incorporated, formed, validly existing and in good standing under the laws of (x) the State of Delaware or, in the case of the Sellers incorporated in the British Virgin Islands, the laws of the British Virgin Islands and (y) all other jurisdictions where the business conducted by such Seller requires it be qualified to do business. None of the Sellers incorporated in the British Virgin Islands conducts business outside of the British Virgin Islands.  No Seller other than the Sellers incorporated in the British Virgin Islands conducts business outside of the United States.

(b)   Authorization; No Violation.

(i)   The execution and delivery by such Seller of, and the performance by such Seller of its obligations under, the Transaction Documents to which it is or is to be a party, and the Transactions, are within such Person's powers and have been duly authorized by all necessary action.

(ii)   The execution and delivery by such Seller of, and the performance by such Seller of its obligations under, the Transaction Documents to which it is or is to be a party, and the Transactions, do not (w) contravene, conflict with or violate its Constitutive Documents, (x) contravene, conflict with or violate any applicable Law or Order, including, in the case of the Sellers incorporated in the British Virgin Islands, the Economic Substance (Companies and Limited Partnerships) Act (As Revised) of the British Virgin Islands, (y) require any consent, approval or notice under, conflict with or result in the material breach of, or constitute a material default (or an event that, with the giving of notice or lapse of time, or both, would become a material default) under, or give rise to any rights of termination, amendment, modification, acceleration, creation or increase in any material payment obligation or forfeiture, suspension, limitation, cancellation, impairment or Loss of any right or benefit of the Sellers (and, after the Closing, Buyer) to own or Exploit or otherwise exercise any rights that the Sellers currently have with respect to the Pictures under, any loan agreement, indenture, mortgage, deed of trust, lease or other instrument or Contract binding on or affecting such Person or any of its assets or properties,

including the Purchased Assets, or (z) result in or require the creation or imposition of any Adverse Claim upon or with respect to any of the assets or properties of such Person, including the Purchased Assets, other than a Permitted Lien.

(iii)    Except as set forth in <u>Section 4.01(b)(iii)</u> of the Disclosure Schedules, no Seller is in violation of any Law, writ, injunction, determination or award or in breach of any distribution agreement, loan agreement, indenture, mortgage, deed of trust, lease or other instrument or Contract, the violation or breach of which would be reasonably likely to have a Material Adverse Effect.

(c)    <u>Consents and Approvals</u>.  All authorizations or approvals of and other actions by, and all notices to and filings with, any Governmental Authority or regulatory body or any other Person that are required to be obtained, taken, given or made by any Seller (i) for the due execution and delivery by such Person of, and the performance by such Person of its obligations under, any of the Transaction Documents to which it is or is to be a party, or (ii) for the exercise by Buyer of its rights under such Transaction Documents, as applicable, have been (or, in the case of the purchase and sale of the Purchased Assets hereunder, shall have been as of the Closing Effective Date) duly obtained, taken, given or made and are (or, in the case of the purchase and sale of the Purchased Assets hereunder, shall have been as of the Closing Effective Date) in full force and effect.

(d)    <u>Enforceability</u>.  This Agreement has been, and each other Transaction Document to which any Seller is or is to be a party is, or when delivered will have been, duly executed by such Person, and is, or when delivered will be, the legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium and other similar laws affecting the rights of creditors and to general principles of equity (whether considered in a suit at law or in equity or pursuant to arbitration).

(e)    <u>Litigation</u>.  Except as set forth on <u>Section 4.01(e)</u> of the Disclosure Schedules, there is no pending or, to the Sellers' Knowledge, threatened Proceeding (i) that questions the legality or propriety of the Transactions or that if adversely determined could reasonably be expected to adversely impact any Seller's ability to comply with the terms of the Transaction Documents and/or adversely impact Buyer's rights under the Transaction Documents, (ii) against or affecting any Seller or its Affiliates, or any of its or their current or former officers, directors, members, employees or representatives in their capacities as such, in each case relating to or arising out of the Purchased Assets or any Picture, or (iii) that requires any future payment by any Seller or its Affiliates to any Person in connection with any Picture.  None of the Purchased Assets is subject to any Order.  In connection with the Warner Dispute, there have been no, nor does any Seller have Knowledge of any, threatened, adverse interim or final Orders by a court or arbitrator against any Seller or any of its Affiliates that could reasonably be expected to adversely impact such Seller's ability to comply with the terms of the Transaction Documents and/or Buyer's rights under the Transaction Documents.

(f)    [Reserved]

(g)    [Reserved]

(h)    [Reserved]

(i)    <u>Absence of Certain Changes or Events</u>.

(i)    Since June 30, 2024, and except as set forth on <u>Section 4.01(i)(i)</u> of the Disclosure Schedules, (A) no Seller has experienced any change, event or circumstance that, individually or in the aggregate, has had or would be reasonably likely to have a Material Adverse Effect and (B) there has been no material damage, destruction, Loss or claim, whether or not covered by insurance, adversely affecting any of the Purchased Assets, on a Picture by Picture basis.

(ii)    Without limiting the generality of clause (i) of this <u>Section 4.01(i)</u>, and except as set forth on <u>Section 4.01(i)(ii)</u> of the Disclosure Schedules, since June 30, 2024, none of the Sellers has:

(A)    sold, transferred, leased, subleased, licensed or otherwise disposed of, or imposed or suffered to be imposed any Adverse Claim (other than Permitted Liens) on, any Purchased Assets;

(B)    accelerated or delayed collection of any material notes or material accounts receivable, advances, cash flows or other income or revenues of whatever kind or nature arising out of or related to the Purchased Assets;

(C)    delayed or accelerated payment of any material account payable or other material Liability arising out of or related to the Purchased Assets;

(D)    paid any material amount in respect of the Purchased Assets as a result of awards or settlements in connection with any Proceeding (including any audit);

(E)    (1) cancelled, compromised, waived or released any material right in Sellers' favor or claim of such Seller with respect to any Purchased Assets or (2) settled or compromised any Proceeding (including any audit) with respect to any Purchased Assets;

(F)    entered into, amended, modified or terminated any Picture Agreement, or cancelled, modified or waived any debts or claims or waived any rights held by it thereunder;

(G)    entered into any contract or transaction with any Affiliate pertaining to or affecting the Purchased Assets;

(H)    (1) made, changed or revoked any Tax election, (2) changed an annual accounting period, (3) adopted or changed any accounting method with respect to Taxes, (4) filed any amended Tax Return, (5) entered into any closing

agreement, (6) settled or compromised any Tax claim or assessment, or (7) consented to any extension or waiver of the limitation period applicable to any claim or assessment with respect to Taxes; in each case, to the extent such action would adversely affect the Purchased Assets in a Post-Closing Tax Period; or

(I)     agreed, whether in writing or otherwise, to take any of the actions specified in this Section 4.01(i).

(j)     Pictures.

(i)     Picture Ownership.   Schedule II hereto sets forth a true, correct and complete list of each Picture, including, for each Picture, (A) the Applicable Percentage, (B) the applicable distributor(s), (C) the Magnum Foreign Percentage (if applicable), (D) the Magnum Domestic Percentage (if applicable), (E) the Magnum Global Percentage (if applicable) and (F) the Relevant Percentage.   Neither Magnum nor its Affiliates has any right to purchase or otherwise increase the Magnum Foreign Percentage, Magnum Domestic Percentage or the Magnum Global Percentage set forth on Schedule II hereto pursuant to the Magnum Agreements or otherwise.

(ii)     [Reserved]

(iii)     No Litigation.   There is no pending or threatened in writing or, to any Seller's Knowledge, otherwise threatened Proceeding in any jurisdiction contesting or challenging the Exploitation, use, ownership, rights or entitlements, validity, enforceability, or registrability, as applicable, by any Seller of any of its right, title or interest in or to any Picture.   No Seller is party to any settlement, covenant not to sue, tolling agreement or Order resulting from any Proceeding which (x) requires any future payment by any Seller to any Person in connection with any Picture, (y) permits any Persons other than Sellers to Exploit any Purchased Assets; or (z) restricts the rights of any Seller to Exploit any Purchased Assets.

(iv)     Audits.   Section 4.01(j)(iv) of the Disclosure Schedules: (A) sets forth a true, correct and complete list of all audits and claims (including current status and outside tolling date of any such audit or claim) with respect to each Picture (whether brought by or on behalf of any Seller or any third Person) that have been noticed or that are ongoing; (B) describes in detail, on an audit-by-audit basis, whether such audit or claim is an out-bound audit (i.e., audits of, or other Proceedings with respect to, the books and records of third parties in progress or demanded by or on behalf of any Seller as of the date hereof, with respect to any of the Purchased Assets) or an in-bound audit (i.e., audits of, or other Proceedings with respect to, the books and records of any Seller in progress or demanded by or on behalf of a third party as of the date hereof, with respect to any of the Purchased Assets); and (C) sets forth a true, correct and complete list of all past and ongoing settlements and other resolutions relating to any of the foregoing audits.   The Sellers have provided Buyer with true, correct and complete copies of all documentation described in or related to the foregoing subclause (C).   All costs that are due and payable by or on behalf of the Sellers in connection with any of the audits described on Section 4.01(j)(iv) of the

Disclosure Schedules have been paid. To the Knowledge of Sellers, no Person party to any Contract pursuant to which a Participation in connection with any Picture has been granted has given notice of an intention to commence, or otherwise indicated an intention to commence, any audit in connection therewith. Except as set forth in Section 4.01(j)(iv) of the Disclosure Schedules, no Seller has waived or modified any of the Audit Rights provided for in the Exploitation Agreements or other Contracts giving rise to proceeds payable to such Seller with respect to audit periods that remain contestable as of the Closing Effective Date. Except as set forth in Section 4.01(j)(iv) of the Disclosure Schedules, to the Sellers' Knowledge, there are no facts or circumstances existing that provide a right of any distributor or other payor to adjust the proceeds payable to such Seller or claim a refund of any amount previously paid, except to the extent the period to assert a claim therefor has expired.

(v)     [Reserved]

(vi)    Picture Agreements. Section 4.01(j)(vi)(A) of the Disclosure Schedules sets forth a true, correct and complete list of all the Picture Agreements. True, complete and accurate copies of each Picture Agreement, together with all modifications and amendments thereto, have previously been made available to Buyer. Each Picture Agreement is valid, binding, and in full force and effect and is enforceable by the applicable Seller party thereto (or to whom the rights therein were assigned) in accordance with its terms and is not subject to any material claims, charges, set-offs or defenses. Each Seller has performed the material obligations required to be performed by it to date under the Picture Agreements and no Seller is (with or without the lapse of time or the giving of notice, or both) in material breach or default thereunder, nor has any event occurred that would give rise to any right of notice, modification, acceleration, payment, cancellation or termination of or by another party under, or in any manner release any party thereto from any material obligation under, any such Picture Agreement and, to the Knowledge of the Sellers, no other party to the Picture Agreements is (with or without the lapse of time or the giving of notice, or both) in material breach or default thereunder and no event has occurred that with the giving of notice or the passage of time or both would constitute a material breach or default by any other party, or that would give rise to any right of notice, modification, acceleration, payment, cancellation or termination of or by any Seller under, or in any manner release any party thereto from any material obligation under, any such Picture Agreement. No Seller has received any notice of the intention of any third party to terminate, cancel or rescind any Picture Agreement. As of immediately prior to the Closing, (I) the Distribution Agreements are all of the Exploitation Agreements to which any Seller or any of their Affiliates is a party, (II) the Intercreditor Agreements are all of the intercreditor agreements to which any Seller or any of their Affiliates is a party and (III) the QCSAs and MPRPAs are all of the multi-Picture co-financing or cost-sharing agreements or rights purchase agreements pursuant to which any Seller or any of their Affiliates is a party. Except as set forth in Section 4.01(j)(vi)(B) of the Disclosure Schedules, no Seller or its Affiliates has any remaining or ongoing co-financing or cost-sharing obligations, obligations to reimburse or refund or pass through any amounts, obligations to submit for potential co-financing any Motion Pictures pursuant to any output or similar terms, or reporting obligations, in each case under the QCSAs or MPRPAs or

pursuant to any of the individual or ancillary Picture documents entered into in connection therewith, all of which obligations have expired or been terminated. Except as set forth in Section 4.01(j)(vi)(C) of the Disclosure Schedules, there are no amounts owed, accrued or due or payable by any Seller pursuant to any Picture Agreement, including any shortfall payments, advances or similar payments. No Motion Pictures are or may be subject to the Picture Agreements other than the Pictures, and the Pictures constitute all of the Motion Pictures that are or may be subject to the Picture Agreements. No Picture Agreement has been altered, amended or modified in any manner by any Seller (or to such Seller's Knowledge by any other party to such agreements) since the date of execution except (y) as specified in the applicable document or (z) as such documentation has been previously provided to Buyer.

(vii)    [Reserved]

(viii)    <u>Sufficiency of the Purchased Assets</u>. The Purchased Assets, together with the Transaction Documents, include all of the assets and rights necessary and sufficient in all material respects (x) for the Exploitation of the Pictures as Exploited by the Sellers through each of the Effective Date and the Closing Effective Date and (y) to permit Buyer to continue to Exploit the Pictures in substantially the same manner as the Pictures have been Exploited through each of the Effective Date and the Closing Effective Date.

(ix)    <u>Picture Reporting and Receipts</u>. The Sellers have provided Buyer true, correct and complete copies of all Financial Information provided to the Sellers in respect of the Pictures for the last three (3) years. The Financial Information is true and correct in all material respects and has been recorded consistently across the periods presented. All material statements and Financial Information received by the Sellers in connection with any Pictures are consistent in all material respects with the entitlements of the Sellers set forth in the applicable Contracts related to such Pictures. Except as set forth in Section 4.01(j)(ix) of the Disclosure Schedule, Sellers have, in all material respects, (A) not been paid amounts in excess of those amounts to which they are entitled thereunder, and (B) actually received such amounts reflected as payable to the Sellers. The Sellers have not accelerated, deferred or delayed the payment by any Person of any compensation or other amount payable to the Sellers or to which the Sellers are otherwise entitled. To the Knowledge of the Sellers, there are no judgments, debts, deductions, offsets, claims, overpayments or other basis (collectively, "**Reductions**") for reducing any of such payments or other compensation. The Sellers and their Affiliates have not received any written notice from any Person (including, without limitation, any distributor, sub-distributor, licensee, sales agent or collection agent) asserting the existence of any Reductions that have not been resolved as of the Closing Effective Date. None of the Picture Agreements grants to any Person a right of cross-collateralization, offset, recoupment or similar right with respect to any material rights or obligations among any of the Purchased Assets or Assumed Liabilities, on the one hand, and the Excluded Assets or Excluded Liabilities, on the other hand.

(x)    <u>Copyrights and Copyright Registrations</u>. Section 4.01(j)(x) of the Disclosure Schedules sets forth a true, correct and complete list of all registered

Copyrights, and all pending applications therefor, that are owned by or currently licensed to, or purported to be owned by or currently licensed to, a Seller, which schedule shall include, with respect to all such Copyrights, (1) the name of the applicant/registrant (as applicable) and each Seller that currently owns any portion of such Copyright (including the ownership share of each such Seller), (2) the application or registration number (as applicable), (3) the status of the application or registration (as applicable), (4) the jurisdiction where the application/registration is located and (5) the Picture with respect to which the Copyright relates.  Each Picture has, as of the date hereof, been registered in the U.S. Copyright Office, and except as set forth on Section 4.01(j)(x) of the Disclosure Schedules, Sellers are the sole owners of such registered Copyrights. No Seller owns or is currently licensed any Trademarks with respect to the Pictures.

(xi)    [Reserved]

(xii)    Participations and Residuals.  With respect to the Pictures, (x) Sellers are not currently paying to any Person, (y) Sellers have not paid or had any obligation to pay to any Person at any time prior to the Closing Effective Date and (z) Sellers will not be required to pay to any third Person in the future, any Participations or Residuals, in each case other than amounts payable to Magnum pursuant to the Magnum Agreements.  With respect to each Picture, each Seller has complied with all requirements applicable to it under any applicable Collective Bargaining Agreement.

(xiii)    [Reserved]

(xiv)    [Reserved]

(xv)    Tangible Assets.  Sellers do not own, control or have access to any Tangible Assets relating to the Pictures.

(k)    Magnum Agreements.  As of immediately prior to the Closing, the Magnum Agreements, the Consolidated Intercreditor Agreement and the Global Intercreditor Agreement are all of the agreements with Magnum or any of its Affiliates to which any Seller or any of their Affiliates is a party.  Sellers have delivered to Buyer true, correct and complete copies of all Financial Information that have been provided by Sellers to Magnum for the last three (3) years. As of the Closing, there are no amounts due and payable by any Seller pursuant to any Magnum Agreement.  Sellers and their Affiliates have performed or caused to be performed all material non-monetary obligations required to be performed or fulfilled by them pursuant to the Magnum Agreements.

(l)    Title to Purchased Assets.  Sellers have and will convey to Buyer, and upon consummation of the Transactions, Buyer will acquire, good, valid and marketable title to, and legal and beneficial ownership of, the Purchased Assets, free and clear of any Adverse Claim (other than the Assumed Liabilities and the Permitted Liens), subject to the rights of (i) the Domestic Distributor under the Domestic Licenses and the Domestic Distribution Agreement, (ii) the Foreign Distributors under the Foreign Licenses and/or the Foreign Distribution Agreements, (iii) the Global Distributor under the Global Licenses and the Global Distribution Agreement, and (iv)

-44-

the Virtual Distributor under the Virtual Co-Financing Agreement.  Immediately after the Closing, Buyer shall (x) have the same title or interest in the Purchased Assets as Sellers had immediately prior to the Closing, free and clear of any Adverse Claims (other than the Assumed Liabilities and the Permitted Liens) and (y) be able to Exploit or otherwise enjoy the Purchased Assets to the same extent, and in the same manner, that Sellers Exploited or otherwise enjoyed the Purchased Assets immediately before the Closing.  After the Closing, neither Sellers nor any of their Affiliates shall have any right, title or interest in any of the Purchased Assets, whether at law or in equity, and no Seller or Affiliate of Seller shall have any right, title or interest in or to the Pictures other than the Excluded Assets.   Other than pursuant to the Distribution Agreements and the Magnum Agreements, no Seller has sold, assigned, conveyed or hypothecated (whether or not for cash or other consideration) the entirety or any portion of the Purchased Assets, or any part thereof, or granted to any third party any present or future right to acquire any such rights (whether by option or otherwise).  No third Person has notified Sellers of, and, to the Knowledge of the Sellers, no circumstances warrant the assertion by any third Person of, any right to receive all or any portion of the Purchased Assets. Immediately following the Closing, VRF, VRFNA, VRFG and Parent will be the only Sellers holding any material assets.

(m)    <u>Financing Statements</u>.  No effective financing statement naming any Seller or its Affiliates as "debtor" or other instrument similar in effect (including any Copyright mortgage) covering the Purchased Assets is on file or recorded in any filing or recording office in the United States or elsewhere in the Domestic Territory, the Foreign Territory, the Global Territory or the Virtual Territory, except (i) those to be discharged in the Bankruptcy Cases, and (ii) those filed with respect to Permitted Liens.

(n)    <u>BVI Security Registration</u>.  No effective security registration pursuant to section 163 of the BVI Business Companies Act (As Revised) naming any Seller incorporated in the British Virgin Islands as "debtor" or "charger" or other instrument similar in effect (including any Copyright mortgage) covering the Purchased Assets is registered with the BVI Registry of Corporate Affairs except (i) those being terminated and discharged in the Bankruptcy Cases, and (ii) those filed with respect to Permitted Liens.

(o)    <u>No Brokers or Finders</u>.  Except as set forth on <u>Section 4.01(o)</u> of the Disclosure Schedules, none of the Sellers nor any Affiliate thereof has retained any broker or finder, agreed to pay or made any statement or representation to any Person that would entitle such Person to, any broker's, finder's or similar fees or commissions in connection with the Transactions.

(p)    [Reserved]

Section 4.02   **Representations and Warranties of Buyer.**  Buyer hereby represents and warrants to the Sellers as of the Effective Date and the Closing Effective Date as follows:

(a)    <u>Organization</u>.  Buyer is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of Delaware.

(b)    <u>Authorization</u>.  Buyer has full power and authority to enter into this Agreement.

(c)     Enforceability.  Upon entry of the Sale Order, this Agreement, and each other Transaction Document to which Buyer is or is to be a party is, or when delivered will have been, duly executed and delivered by Buyer and is, or when delivered will be, the valid and binding agreement of Buyer, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium and other similar laws affecting the rights of creditors and to general principles of equity (whether considered in a suit at law or in equity or pursuant to arbitration).

(d)     No Violation.  The execution and delivery by Buyer, and the performance by Buyer of its obligations under, the Transaction Documents to which it is or is to be a party, and the Transactions, do not (i) contravene, conflict with or violate its Constitutive Documents or (ii) contravene, conflict with or violate any material applicable Law or Order.

(e)     Source of Funds.  Buyer represents that the following statement is an accurate representation as to each source of funds (a "**Source**") to be used by Buyer to pay the Purchase Price for the Purchased Assets:  The Source does not include assets of any employee benefit plan, other than a plan exempt from the coverage of ERISA. As used in this Section 4.02(e), the term "**employee benefit plan**" shall have the meaning assigned to such term in Section 3 of ERISA.

(f)     Investment Representations.  Buyer is sophisticated with respect to decisions to acquire assets of the type represented by the Purchased Assets and either it, or the Person exercising discretion in making its decision to acquire the Purchased Assets, is experienced in acquiring assets of such type.

(g)     Acknowledgement.  Except for the representations and warranties made by the Sellers in Section 4.01 of this Agreement, Buyer hereby acknowledges that (i) none of the Sellers nor any of their Affiliates has made, or has agreed to make, any express or implied representation, warranty, guarantee or agreement (A) that the aesthetic or artistic quality of the Pictures will exceed any minimum standard or quality, (B) that the Pictures will generate any minimum amount of Domestic Gross Receipts, Foreign Gross Receipts, Global Gross Receipts or Defined Proceeds, or (C) with respect to the film industry as a whole or the business and financial risks associated with the film industry as a whole, (ii) it has made its own inquiry and investigation into, and based thereon has formed an independent judgment concerning, the film industry as a whole and the business and financial risks associated with the film industry as a whole, and (iii) there are uncertainties inherent in making any estimates, projections, forecasts or opinions with respect to future events and that any such estimates, projections, forecasts or opinions delivered by the Sellers or any of their Affiliates pursuant to the Transaction Documents shall be subject to such uncertainties.

(h)     No Brokers or Finders.  None of Buyer nor any Affiliate thereof has retained any broker or finder, agreed to pay or made any statement or representation to any Person that would entitle such Person to, any broker's, finder's or similar fees or commissions in connection with the Transactions.

## ARTICLE V.  PAYMENT OF DESIGNATED DOMESTIC RECEIPTS, DESIGNATED FOREIGN RECEIPTS, DESIGNATED GLOBAL RECEIPTS AND DESIGNATED VIRTUAL RECEIPTS

Section 5.01   **Deposits to Buyer's Account**.   In the event that any amounts that are required under any Transaction Document to be paid directly to Buyer or otherwise constitute Purchased Assets are received by any Seller or any of their respective Affiliates, such Person shall, and each Seller shall cause such Person to, as applicable, hold such amounts in trust, and deposit such amounts in the form received, immediately, but in any event not later than two (2) business days of its receipt thereof, in an account designated in writing by Buyer.

Section 5.02   **No Setoff**.  Each payment of any amounts included in the Purchased Assets (including the Relevant Percentage of the Designated Domestic Receipts, the Designated Foreign Receipts, the Designated Global Receipts or the Designated Virtual Receipts with respect to the Pictures) required under Section 5.01 shall not be reduced by any setoff or deduction on account of any claim or other charge other than with respect to any tax withholding or similar governmental charge or as expressly permitted or required under this Agreement.

Section 5.03   **No Survival**. The respective representations and warranties of the Parties hereto hereunder shall not survive the Closing. The respective covenants of the Parties hereto required to be performed on or prior to the Closing Effective Date shall not survive the Closing.

## ARTICLE VI.  COVENANTS

Section 6.01   **Conduct of the Sellers Prior to Closing**.

(a)   During the period from the Effective Date until the earlier of (i) the Closing Effective Date, or (ii) the date this Agreement is validly terminated in accordance with its terms (such period, the "**Pre-Closing Period**"), unless otherwise consented to in writing by Buyer, the Sellers shall (A) operate their businesses and the Purchased Assets only in the ordinary course of business as debtors in possession, (B) preserve and maintain their business organization and assets (including the Purchased Assets), and (C) keep available the services of the current Service Providers of the Sellers or any of their Affiliates.

(b)   Without limiting the generality of the foregoing, except as consented to in writing by Buyer or as required by Law or directed by the Bankruptcy Court, during the Pre-Closing Period, the Sellers shall not, except as set forth in Section 6.01(b) of the Disclosure Schedules:

(i)   issue, sell, transfer, lease, license, convey, assign, abandon, cancel, pledge, dispose of, or otherwise subject to any Adverse Claim, any Purchased Assets;

(ii)   incur any Indebtedness or issue any debt securities or assume, guarantee or endorse, or otherwise become responsible for, the obligations of any Person, or make any loans or advances, in each case affecting the Purchased Assets;

(iii)   amend, waive, modify, terminate or give any consent or approval under the Picture Agreements, or amend, waive, modify, terminate or give any consent or approval

regarding any Seller's rights thereunder, or enter into any Contract in connection with the Purchased Assets;

(iv)     pay, discharge or satisfy any Liability relating to the Purchased Assets;

(v)     cancel, compromise, waive or release any right or claim or Proceeding (including any audit) relating to the Purchased Assets;

(vi)     permit the lapse of any existing policy of insurance relating to the Purchased Assets;

(vii)     commence or settle any Proceeding relating to the Purchased Assets or the Pictures (including any audit or the Warner Dispute) if such commencement or settlement could reasonably be expected to adversely affect, in any material respect, the Purchased Assets (including, without limitation, the Post-Cutoff Cash Flows) or the Pictures, unless otherwise authorized by a finding of the Bankruptcy Court;

(viii)     fail to comply in all material respects with all applicable Laws in any manner that could reasonably be expected to adversely affect, in any material respect, the Purchased Assets or the rights or remedies of Buyer under the Transaction Documents;

(ix)     fail to maintain their existence as a limited liability company or corporation, as the case may be, validly existing and in good standing under the laws of its jurisdiction of organization and obtain and preserve its qualification to do business in each jurisdiction in which the failure to so could reasonably be expected to adversely affect, in any material respect, the Purchased Assets or the rights or remedies of Buyer under the Transaction Documents;

(x)     (A) fail to maintain all organizational formalities, (B) fail to comply with the provisions of its Constitutive Documents (including with respect to Separateness or independent directors) in all material respects at all times, (C) amend any provisions of their Constitutive Documents in any manner that could reasonably be expected to adversely affect, in any material respect, the Purchased Assets or the rights or remedies of Buyer under the Transaction Documents, (D) permit any Affiliate to assume or guarantee any of the Liabilities of any Seller other than as required by this Agreement or documents governing any Seller's Indebtedness or ABS Obligations that are in effect as of the Effective Date, (E) fail to make all decisions regarding any Seller's organization and operation independently, or allow such decisions to be dictated by any other Person, (F) fail to take such other actions as are necessary on a Seller's part to ensure that all corporate procedures required by their Constitutive Documents are duly and validly taken, and (G) act in any manner that would foreseeably mislead others with respect to its separate identity from any Affiliate;

(xi)     fail to pay and discharge and fully perform, at or before maturity, all of their respective material obligations and Liabilities, including, without limitation, Tax liabilities and other governmental claims levied or imposed upon such Seller or upon the income,

-48-

properties or operations of such Seller, judgments, settlement agreements and all obligations of such Seller under the Transaction Documents, except where the same may be contested in good faith by appropriate proceedings, and will maintain, in accordance with IFRS, reserves as appropriate for the accrual of any of the same;

(xii)     engage in any dealings or transactions with any Person described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or in Section 1 of the Anti-Terrorism Order;

(xiii)    take any action, or intentionally fail to take any action, that would cause any representation or warranty made by the Sellers in this Agreement or any other Transaction Document to be untrue or result in a breach of any covenant made by the Sellers in this Agreement or any other Transaction Document, or that has or would reasonably be expected to have a Material Adverse Effect;

(xiv)    make any material change to their internal controls over financial reporting or the methodology used to prepare and provide Financial Information;

(xv)     enter into any transaction or Contract between any Seller, on the one hand, and any Affiliate of such Seller, on the other hand, with respect to the Purchased Assets;

(xvi)    (A) make, change or revoke any Tax election, (B) change an annual accounting period, (C) adopt or change any accounting method with respect to Taxes, (D) file any amended Tax Return, (E) enter into any closing agreement, (F) settle or compromise any Tax claim or assessment, or (G) consent to any extension or waiver of the limitation period applicable to any claim or assessment with respect to Taxes; in each case, to the extent such action would adversely affect the Purchased Assets in a Post-Closing Tax Period; or

(xvii)   announce an intention, enter into any formal or informal agreement, or otherwise make a commitment to do any of the foregoing.

(c)      During the Pre-Closing Period, the Sellers shall promptly, and in any event within three (3) business days of receipt by any Seller, provide copies to Buyer of all Quarterly Reporting and other Financial Information received or provided by any Seller.

Section 6.02   **Access**.  During the Pre-Closing Period, except to the extent prohibited by applicable Law, the Sellers shall provide, and cause their Service Providers, attorneys, accountants, advisors, consultants and other agents to provide, to Buyer and its accounting, legal and other representatives, as well as their respective Service Providers, affiliates and other agents, access at all reasonable times and during normal business hours, upon reasonable notice, to the Sellers' personnel and to business, financial, legal, tax, compensation and other data and information concerning the Purchased Assets as Buyer deems reasonably necessary or advisable.

Section 6.03   **Notification of Certain Matters**.

(a)    During the Pre-Closing Period, Sellers shall give prompt written notice to Buyer of (i) the occurrence or non-occurrence of any event, the occurrence or non-occurrence of which would render any representation or warranty of the Sellers contained in this Agreement or any other Transaction Document, if made on or immediately following the date of such event, untrue, inaccurate or misleading, (ii) the occurrence of any event that, individually or in combination with any other events, has had or could reasonably be expected to have a Material Adverse Effect, (iii) any failure of the Sellers, or any Affiliate of the Sellers to comply with or satisfy any covenant or agreement to be complied with or satisfied by it under the Transaction Documents or any event that would otherwise result in the nonfulfillment of any of the conditions to Buyer's obligations hereunder, (iv) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions, (v) any notice or other communication from any Governmental Authority in connection with the Transactions, (vi) any material and adverse change to the Purchased Assets, (vii) any notice of any material breach, default or termination of any Picture Agreement, (viii) the occurrence of any event which would or would reasonably be likely to (A) prevent or materially delay the consummation of the Transactions or (B) result in the failure of any condition to Closing set forth in this Agreement to be satisfied, or (ix) any Proceeding pending or, to the Knowledge of the Sellers, threatened against a Party or the Parties relating to the Transactions or otherwise affecting the Purchased Assets.

(b)    Without limiting anything set forth in Section 6.03(a), during the Pre-Closing Period, to the fullest extent permitted or consistent with any applicable Order of any court, tribunal or arbitrator in the Warner Dispute, Sellers and their Affiliates will (and will cause their litigation counsel to) furnish Buyer with the material details respecting any offer of settlement or other resolution either proposed by Sellers or its Affiliates or by WBEI or its Affiliates that could reasonably be expected to adversely affect the Purchased Assets (including, without limitation, the Post-Cutoff Cash Flows) or the Pictures (and at Buyer's request, Sellers shall take all reasonable steps to obtain any necessary consent Sellers reasonably believe is required in order to furnish Buyer with such offer of settlement or other resolution or any information related thereto); provided, nothing in this Section 6.03(b) shall restrict Sellers or their Affiliates from entering into any settlement or other resolution of the Warner Dispute in its sole discretion, subject to Buyer's consent rights pursuant to Section 6.01(b)(vii).  To the extent that any Order of any Governmental Authority does not permit Sellers or their Affiliates from furnishing information as described in this Section 6.03(b), upon reasonable request from Buyer, Sellers and/or their Affiliates shall seek modification or relief from such Order such that Buyer shall be permitted to receive such information. Sellers shall be solely responsible for the payment of all arbitration fees, attorneys' fees, costs, experts, or any other fees and costs in connection with the Warner Dispute.

(c)    From and after the Closing Effective Date through a period that is the earlier of (a) the closing of the Bankruptcy Cases; or (b) the third (3rd) anniversary thereof, subject to any confidentiality obligations applicable to the Sellers or their Affiliates, if any Seller or its Affiliates receives notice of a pending or threatened Proceeding against, relating to or affecting the Purchased Assets (including, without limitation, any claimed breach by any Seller or its Affiliates under any Picture Agreement), then such Person will (i) promptly notify Buyer of same; and (ii) give Buyer copies of all notices and other writings relating to it received by such Person promptly after their receipt.

Section 6.04   **Specified Audit Proceeds**.   From and after the Closing Effective Date, Buyer shall solely own and control all Audit Rights included within the Purchased Assets and may in its sole discretion, conduct, settle and/or litigate any future audit(s) in connection therewith in such manner as Buyer shall determine; provided, that to the extent any such audit results in any Specified Audit Proceeds, Buyer shall pay to the Sellers one hundred percent (100%) of such Specified Audit Proceeds, by wire transfer of immediately available funds, to an account or account designated in writing by the Sellers, no later than five (5) business days following receipt thereof. For clarity, (i) Sellers shall not be required to pay any costs or expenses incurred in connection with its exercise of the Audit Rights from and after the Closing Effective Date, but shall bear its respective portion thereof as and to the extent deducted in calculating Specified Audit Proceeds and (ii) Buyer shall retain one hundred percent (100%) of all payments received by Buyer in connection with the exercise of any Audit Rights that do not constitute Specified Audit Proceeds.

Section 6.05   **Efforts to Close**.   Each Party shall, and Sellers shall cause their Affiliates to, use commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the Transactions as promptly as practicable.  In furtherance and not in limitation of the foregoing, the Sellers shall permit Buyer reasonably to participate in the defense and settlement of any claim, suit or cause of action relating to this Agreement or the Transactions, and the Sellers shall not settle or compromise any such claim, suit or cause of action without Buyer's written consent.

Section 6.06   **Tax Matters**.

(a)      Buyer and the Sellers agree to furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets, including, without limitation, access to Books and Records, as is reasonably necessary for the filing of all Tax Returns by Buyer or the Sellers, the making of any election relating to Taxes, the preparation for any audit with respect to Taxes by any Governmental Authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax.  Buyer and the Sellers shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least seven (7) years following the Closing Effective Date.  Buyer and the Sellers shall cooperate fully with each other in the conduct of any audit, litigation or other proceeding relating to Taxes involving the Purchased Assets.

(b)      To the extent not otherwise provided in this Agreement, the Sellers shall be responsible for and shall promptly pay when due all Property Taxes levied with respect to the Purchased Assets attributable to the Pre-Closing Tax Period.  All Property Taxes levied with respect to the Purchased Assets for the Straddle Period shall be apportioned between Buyer and the Sellers based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period. The Sellers shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period.  Upon receipt of any bill for such Property Taxes by Buyer or any Seller, Buyer or the Sellers as applicable, shall present a statement to the other setting forth the amount of reimbursement to which Buyer or the Sellers, as applicable, are entitled under this Section 6.06(b) together with such supporting evidence as is

reasonably necessary to calculate the proration amount. The proration amount shall be paid by the Party or Parties owing it to the other(s) within ten (10) days after delivery of such statement. In the event that Buyer or any Seller makes any payment for which it is entitled to reimbursement under this Section 6.06, Buyer or the Sellers shall make such reimbursement promptly but in no event later than ten (10) days after the presentation of a statement setting forth the amount of reimbursement to which the presenting Party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement.

(c)    All Transfer Taxes will be borne fifty percent (50%) by the Sellers, jointly and severally, and fifty percent (50%) by Buyer. The Sellers shall duly prepare any Tax Return or other document with respect to such Transfer Taxes (and Buyer shall cooperate with respect thereto as necessary) and the Sellers shall pay such Transfer Taxes when due.

(d)    The Sellers shall promptly notify Buyer in writing upon receipt by any Seller of written notice of any pending or threatened Tax audits or assessments relating to the income, properties or operations of such Seller that may reasonably be expected to relate to or give rise to an Excluded Tax or an Adverse Claim on the Purchased Assets.

Section 6.07    **Intentionally Deleted**.

Section 6.08    **Further Assurances**. Subject to the terms of this Agreement, from and after the date hereof, each Party hereto agrees to, and to cause their Affiliates to, as applicable, to use commercially reasonable efforts to (a) furnish upon request to each other Party such further information in connection with the Transaction, (b) execute and deliver to each other Party such other documents consistent herewith (after a reasonable period to review and discuss such documents) and (c) do such other acts and things consistent herewith, in each case as another Party may reasonably request for the purpose of carrying out the intent of this Agreement, the other Transaction Documents to which it is a party and the Transactions. To the extent any Purchased Assets are in the name of an Affiliate of a Seller, the Sellers shall cause such Affiliate to sell, assign, transfer, convey and deliver to Buyer the applicable Purchased Assets and further cause their respective Affiliates to comply with the terms of this Agreement and the other Transaction Documents to the extent such terms purport to bind such Affiliate. Following the Closing, each Seller shall take any actions and execute any documents as reasonably requested by Buyer in furtherance of this Section 6.08 relating to the Purchased Assets. In the event that such Seller does not take such actions or deliver such executed documents to Buyer within five (5) business days following Buyer's request therefor, Buyer shall have the authority as such Seller's true and lawful attorney-in-fact to take any such actions and execute any such documents on behalf of such Seller relating to the Purchased Assets. In such event, Buyer shall provide such Seller with a copy of any document so executed; provided, that the inadvertent failure to do so shall not be deemed a breach hereof.

Section 6.09    **[Reserved]**.

Section 6.10    **Books and Records**. Promptly following the Closing Effective Date, and in no event later than ten (10) business days thereafter (with respect to any Books and Records provided to Buyer in the Dataroom as of the Closing Effective Date) or sixty (60) days thereafter

(with respect to all other Books and Records), Sellers shall use commercially reasonable efforts to deliver to Buyer, via a cloud-based server or another electronic format reasonably acceptable to Buyer, copies of all Books and Records, including, without limitation, all Financial Information, in the Sellers' possession in an electronic format. No later than sixty (60) days following the Closing Effective Date, Sellers shall use commercially reasonable efforts to deliver to Buyer, or otherwise make accessible to Buyer via a cloud-based server or another electronic format reasonably acceptable to Buyer, copies of all Books and Records, including, without limitation, all Financial Information, in the Sellers' possession in a physical format. From and after the Closing Effective Date through the third (3rd) anniversary thereof, each Seller will hold, and will cause its Affiliates and Representatives to hold, in confidence from any other Person, all confidential information, documents, materials and other information related to the Books and Records.

Section 6.11  **Zoolander and Down to Earth**. From and after the Effective Date, no Seller or any Affiliate thereof shall amend any Specified Zoolander Agreement or Specified DTE Agreement in any manner that would modify or otherwise affect, or take any other action the effect of which would be to adversely affect, the calculation or timing of amounts payable to Buyer pursuant to the Notices of Assignment and Amendment.

## ARTICLE VII.  BANKRUPTCY COURT MATTERS

Section 7.01  **Sale Motion, Bankruptcy Procedures Hearing, Bid Procedures and Sale Order**. The Sellers shall use their reasonable best efforts to seek entry of (i) the Bid Procedures Order on or before April 22, 2025, and (ii) the Sale Order, in each case, in form and substance acceptable to the Sellers and Buyer and which identifies Buyer as the "stalking horse" for the Purchased Assets and (b) appropriate supporting declarations. The Sellers shall use their reasonable best efforts to seek entry of the Sale Order on or prior to the date that is sixty (60) days after entry of the Bid Procedures Order; provided, in no event shall the Sellers be deemed in breach of this Section 7.01 if the Bankruptcy Court sets a later Sale Order hearing date in the Bid Procedures Order. The Sellers shall comply with all notice requirements (x) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedures and/or (y) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith. The Bankruptcy Court shall have entered the Sale Order. In the event the entry of the Sale Order is appealed, the Sellers shall use commercially reasonable efforts to defend such appeal.

Section 7.02  **Auction.** Pursuant to the Bid Procedures Order, any and all qualified bids shall have been submitted at least two (2) business days prior to the commencement of the auction contemplated by the Bid Procedures (the "**Bid Deadline**"). If any qualified bid is submitted prior to the Bid Deadline, the Sellers shall use reasonable best efforts to commence the auction contemplated by the Bid Procedures on or prior to the date that is seventy (70) days after the Petition Date; provided, in no event shall the Sellers be deemed in breach of this Section 7.02 if the Bid Procedures mandate a different auction commencement date.

Section 7.03  **Bankruptcy Filings**. From and after the Effective Date and until the Closing Effective Date, to the extent reasonably practicable, the Sellers shall deliver to Buyer drafts of any material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement and the operation of the

Sellers for Buyer's prior review and comment at least two (2) business days prior to the filing or submission thereof, and such filings shall be acceptable to Buyer to the extent they relate to the Purchased Assets, the Assumed Liabilities, or any of Buyer's obligations hereunder. Each of the Sellers and Buyer shall appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other Party with copies of notices or other communications received by such Party from the Bankruptcy Court or any third party or any Governmental Authority with respect to the transactions contemplated by this Agreement. Buyer agrees that it will use its commercially reasonable efforts to assist the Sellers in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, and (y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

Section 7.04    **Sale Free and Clear**. The Sellers acknowledge and agree, and the Sale Order shall provide that, on the Closing Effective Date and concurrently with the Closing, all then existing or thereafter arising obligations, Adverse Claims (other than the Assumed Liabilities and the Permitted Liens) of, against or created by the Sellers or their bankruptcy estate, to the fullest extent permitted by section 363(f) of the Bankruptcy Code, shall be fully released from, and with respect to, the Purchased Assets. On the Closing Effective Date, the Purchased Assets shall be transferred to Buyer free and clear of all Adverse Claims (other than the Assumed Liabilities and the Permitted Liens), to the fullest extent permitted by section 363 of the Bankruptcy Code.

Section 7.05    **Excluded Assets**. For the avoidance of doubt, nothing in this Agreement will restrict Sellers or their Affiliates from selling, disposing of or otherwise transferring any Excluded Assets, or from settling, delegating or otherwise transferring any Excluded Liabilities, in each case, with the approval of the Bankruptcy Court, or from entering into discussions or agreements with respect to the foregoing.

## ARTICLE VIII.  TERMINATION

Section 8.01    **Termination**.  This Agreement and the obligations of the Parties to consummate the Transactions may, by written notice given on or prior to the Closing Effective Date, in the manner provided in this <u>Section 8.01</u>, be terminated at any time prior to the Closing only as follows:

(a)    by mutual written consent of Buyer and the Seller Representative;

(b)    by Buyer if at any time (i) any of the representations or warranties of any Seller in <u>Section 4.01</u> is or becomes untrue or inaccurate such that the condition set forth in <u>Section 3.01(a)</u> would not be satisfied (treating such time as if it were the Closing for purposes of this Section 8.01(b)), (ii) the condition set forth in <u>Section 3.01(f)</u> would not be satisfied (treating such time as if it were the Closing for purposes of this <u>Section 8.01(b)</u>), or (iii) there has been a breach on the part of any Seller or Parent of any of its covenants or agreements contained in this Agreement such

that the condition set forth in <u>Section 3.01(b)</u> would not be satisfied (treating such time as if it were the Closing for purposes of this <u>Section 8.01(b)</u>), and in the case of (i) through (iii) above, such breach or failure to satisfy such condition cannot be cured by the Sellers or Parent or, if capable of being cured, has not been cured by the applicable Sellers or Parent by the date that is three (3) business days prior to the Outside Date, <u>provided</u> that Buyer shall not be entitled to terminate pursuant to this <u>Section 8.01(b)</u> if the consummation of the Transactions is then being prevented by the willful and material breach by Buyer of any of its representations, warranties or covenants contained in the Agreement;

(c)     by the Sellers if at any time (i) any of the representations or warranties of Buyer in <u>Section 4.02</u> is or becomes untrue or inaccurate such that the condition set forth in <u>Section 3.02(a)</u> would not be satisfied (treating such time as if it were the Closing for purposes of this <u>Section 8.01(c)</u>), or (ii) there has been a breach on the part of Buyer of any of its covenants or agreements contained in this Agreement such that the condition set forth in <u>Section 3.02(b)</u> would not be satisfied (treating such time as if it were the Closing for purposes of this <u>Section 8.01(c)</u>), and in the case of both (i) and (ii) above, such breach cannot be cured by Buyer or, if capable of being cured, has not been cured by Buyer by the date that is three (3) business days prior to the Outside Date, <u>provided</u> that the Sellers shall not be entitled to terminate pursuant to this <u>Section 8.01(c)</u> if the consummation of the Transactions is then being prevented by the willful and material breach by Sellers or Parent of any of their representations, warranties or covenants contained in the Agreement;

(d)     by Buyer if the Closing has not occurred on or before July 5, 2025 or such later date, if any, as both Buyer and the Seller Representative may agree upon in writing (as such date may be extended pursuant to the terms of this Agreement or by the mutual written consent of the Seller Representative and Buyer, the "**Outside Date**"), <u>provided</u> that Buyer shall not be entitled to terminate pursuant to this <u>Section 8.01(d)</u> if the failure to consummate the Transactions by the Outside Date was primarily caused by the willful and material breach by Buyer of any of Buyer's representations, warranties or covenants contained in the Agreement;

(e)     by either Buyer or the Sellers if consummation of the Transactions is enjoined or prohibited by the terms of any Law or a final, non-appealable Order of any Governmental Authority having competent jurisdiction; <u>provided</u>, <u>however</u>, that the party seeking to terminate shall not be entitled to terminate pursuant to this <u>Section 8.01(e)</u> if the imposition of such Order or the failure of such Order to be resisted, resolved or lifted, as applicable, was proximately caused by a breach of a representation, warranty, covenant or agreement on the part of Buyer (if it is seeking to terminate) or any Seller (if the Sellers are seeking to terminate);

(f)     by Buyer if any of the Bankruptcy Cases of a Seller are dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of the Sellers is appointed in the Bankruptcy Case of a Seller;

(g)     Buyer, if (i) the Bid Procedures Order shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York Time) on April 22, 2025, (ii) the Sale Order shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York Time) on the date that is

sixty (60) days after entry of the Bid Procedures Order, or (iii) following the entry of the Sale Order, the Sale Order shall (A) fail to be in full force and effect, (B) have been reversed, (C) have been stayed and such stay shall continue to be in effect for more than fourteen (14) days or (D) have been modified or amended in any manner adverse to Buyer without the prior written consent of Buyer; or

(h)    by Buyer or Sellers upon (i) any announcement by the Sellers at the Auction held in accordance with the Bid Procedures Order that Buyer is not the Successful Bidder or the Backup Bidder or (ii) the consummation of an Alternative Transaction.

The Party seeking to terminate this Agreement pursuant to this <u>Section 8.01</u> (other than pursuant to <u>Section 8.01(a)</u>) shall give prompt written notice of such termination to the other Parties hereto.

Section 8.02    **Effect of Termination**.  In the event of termination of this Agreement as provided above, this Agreement shall immediately terminate and have no further force and effect and there shall be no Liability on the part of any Party to any other Party under this Agreement, except that (a) the covenants and agreements set forth in this <u>Section 8.02</u>, <u>Section 8.03</u>, and <u>Article IX</u> and all definitions herein necessary to interpret any of the foregoing provisions shall remain in full force and effect and survive such termination indefinitely, (b) the Sellers may have Liability as provided in <u>Section 8.03</u>; and (c) nothing in this <u>Section 8.02</u> shall release any Party from any Liability for any breach by such Party of this Agreement before the effective date of such termination, or otherwise affect any of the rights or remedies (whether under this Agreement, or at Law, in equity or otherwise) available to any Party with respect to the breach of this Agreement by any Party before the effective date of such termination.

Section 8.03    **Expense Reimbursement**.

(a)    Notwithstanding anything in this Agreement to the contrary, the Sellers agree to pay Buyer the Expense Reimbursement in the event this Agreement is terminated (other than a termination pursuant to <u>Section 8.01(c)</u>).  The Sellers shall pay to Buyer the Expense Reimbursement by wire transfer of immediately available funds promptly (and in any event no later than one (1) business day after the closing of an Alternative Transaction) directly from and only from and out of proceeds of any Alternative Transaction (and the consummation of any Alternative Transaction shall be conditioned on the payment thereof).  In the event that, notwithstanding the foregoing, the Expense Reimbursement is not timely paid,  the obligations of the Sellers to pay the Expense Reimbursement (i) shall be entitled to super-priority administrative expense claim status under sections 503 and 507 of the Bankruptcy Code, (ii) shall not be subordinate to any other administrative expense claim against the Sellers, and (iii) shall survive the termination of this Agreement.

(b)    If the Sellers fail to take any action necessary to cause the delivery of the Expense Reimbursement and, in order to obtain such Expense Reimbursement, Buyer commences a Proceeding which results in an order for relief in favor of Buyer, Sellers shall pay to Buyer, in addition to the Expense Reimbursement, an amount of cash equal to the costs and expenses (including attorneys' fees) incurred by Buyer in connection with such Proceeding.

(c)    The parties acknowledge and agree that any payment of the Expense Reimbursement described in this Section 8.03 shall be the sole and exclusive remedy of Buyer and any other Person against the Sellers for any and all losses or damages suffered or incurred in connection with this Agreement and the Transactions contemplated hereby. The parties acknowledge and agree that the agreements contained in this Section 8.03 are an integral part of this Agreement and the Transactions contemplated hereby.

## ARTICLE IX.  REMEDIES

Section 9.01    **Remedies**.  Except as contemplated by Section 2.06(b) or as otherwise provided in Section 9.02 or the Escrow Agreement, the parties agree that the remedies and/or the termination of this Agreement in accordance with the provisions of Article VIII shall be the sole and exclusive remedy of the Sellers (if the breaching party is Buyer) or Buyer (if the breaching party is a Seller) under this Agreement for any breach of representation and warranty made or any covenant or agreement to be performed on or prior to Closing.

Section 9.02    **Specific Performance**.  The parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that any party does not perform the provisions of this Agreement (including failing to take such actions as are required of it hereunder to consummate the Transaction) in accordance with its specified terms or otherwise breaches such provisions. It is accordingly agreed that Buyer shall be entitled to an injunction or other equitable relief to prevent breaches of this Agreement by the Sellers and to enforce specifically the terms and provisions hereof, and the Sellers shall be entitled to an injunction or other equitable relief to prevent breaches of this Agreement by Buyer and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which a non-breaching party is entitled at Law or in equity.

## ARTICLE X.  MISCELLANEOUS

Section 10.01    **Assignments**.  This Agreement shall be binding upon the Parties and their respective successors and permitted assigns except to the extent that it is hereafter superseded or modified by subsequent written agreements between the Parties.  This Agreement may not be assigned or otherwise transferred (including by operation of Law) by Buyer, without the prior written consent of the Seller Representative, or by any Seller or Seller Representative, without the prior written consent of Buyer; provided, however, that nothing in this Agreement or any other Transaction Document shall or is intended to limit the ability of Buyer to assign (a) its right, title and interest in and to this Agreement and/or the Purchased Assets (i) prior to the Closing Effective Date, to one or more Affiliates of Buyer, if and to the extent designated by Buyer in writing to Seller (a "**Buyer Designee**"), (ii) after the Closing Effective Date, to one or more Affiliates of Buyer, or (iii) to any entity acquiring or succeeding to all or substantially all of the assets of Buyer or into which Buyer is merged; (b) this Agreement and Buyer's rights hereunder to one or more financiers (or a collateral agent or security trustee for and on behalf of any such financiers) for security purposes; and (c) all or any portion of the Purchased Assets to any Person after the Closing Effective Date; provided, further, no assignment or delegation shall relieve the assigning or delegating party of any of its obligations hereunder without the prior written consent of the other Parties.  Any attempted assignment in violation of this Section 10.01 is void *ab initio*.

Section 10.02  **Notices**.  All notices and other communications provided for or required hereunder shall be in writing (including e-mail communication) and e-mailed or delivered at each party's address set forth below, or at such other address as shall be designated by such party in a written notice to the other parties.  All such notices and communications shall be effective two (2) business days after delivery to a recognized overnight courier service, or when delivered, if sent by other means.

<u>If to Buyer</u>:

Alcon Media Group, LLC
10390 Santa Monica Boulevard Suite 250
Los Angeles, CA 90025
Attention: Scott Parish
E-mail:  sparish@alconent.com

<u>With a copy (which shall not constitute notice) to</u>:

Loeb & Loeb LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Attention: Scott Edel
E-mail:  sedel@loeb.com

Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
Attention: Vadim J. Rubinstein
E-mail:  vrubinstein@loeb.com

<u>If to Sellers</u>:

c/o Village Roadshow Entertainment Group USA Inc.
10100 Santa Monica Boulevard, Suite 200
Los Angeles, California 90067
Attention: Louis Santor and Kevin Berg
E-mail:  louis.santor@vreg.com and kevin.berg@vreg.com

<u>With copies (which shall not constitute notice) to</u>:

Sheppard Mullin Richter & Hampton LLP
350 South Grand Ave., 40th Floor
Los Angeles, California 90071-3460
Attention:  Stacey Rosenberg, Esq.
E-mail:  srosenberg@sheppardmullin.com

321 North Clark Street, 32nd Floor

Chicago, IL 60654
Attention: Justin R. Bernbrock
E-mail: jbernbrock@sheppardmullin.com

Section 10.03 **Confidentiality**.  Following the Closing, the Parties shall, and shall cause their respective Affiliates and representatives to, treat all non-public information and trade secrets relating to the other Parties, their respective Affiliates, the terms of this Agreement and the other Transaction Documents, as confidential, preserve the confidentiality thereof, and not use such information and trade secrets for any reason or purpose whatsoever (other than any purposes permitted under this Agreement) or disclose to any Person such information or trade secrets unless such information or trade secret is (a) now or hereafter disclosed, through no act or omission of the applicable Party or its Affiliates or their respective representatives in breach of this Agreement, in a manner making it available to the general public, (b) required by Law to be disclosed, (c) received by any Party or its representatives after the Closing Effective Date from a third party who is not, to the knowledge of such Party, its Affiliates or their respective representatives, known to be under an obligation of nondisclosure or in breach of an obligation of confidentiality, in each case, to the other Party, (d) independently developed by any Party or its representatives after the Closing Effective Date without the use of or reference to any such information or trade secret, (e) reasonably necessary to defend or prosecute a Proceeding, or (f) approved in advance for use or disclosure via written authorization of the applicable Party.  If the disclosure of such information or trade secrets is required by Law or is reasonably necessary to defend or prosecute a Proceeding, the Parties, their Affiliates and their respective representatives shall (i) cooperate with and provide the other Party an opportunity to object to the disclosure and shall, to the extent legally permissible, give the other Party as much prior written notice as is practicable under the circumstances, (ii) only disclose such information or trade secrets to the minimum extent required by Law to be disclosed or reasonably necessary to defend or prosecute such Proceeding, and (iii) use reasonable efforts to procure that confidential treatment will be accorded to any such information or trade secrets so disclosed.  Notwithstanding the foregoing, (x) each Party shall have the right to communicate and discuss with, and provide to, its Affiliates and its and their legal advisors, financial or accounting advisors, representatives, officers or employees, directors, consultants and agents, any information regarding the terms and status of this Agreement and the other Transaction Documents and the Transactions who are under professional duty or contractual obligation to maintain the confidentiality of such information, and (y) Buyer and its Affiliates may make customary disclosures (which are made subject to customary confidentiality obligations), including the key economic terms of the Transactions and the return realized as a result thereof, to its current or prospective investors or lenders in connection with its fundraising and reporting activities.

Section 10.04 **Amendment; Waiver**.  This Agreement shall not be amended, modified or waived in any manner except by an agreement in writing duly executed and delivered by each of Buyer and the Sellers.  No failure or delay of any Party to exercise any right or remedy given to such Party under this Agreement or any other Transaction Document or otherwise available to such Party, or to insist upon strict compliance by any other Party with its or his obligations hereunder, no single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, and no custom or practice of the Parties in variance with the terms hereof, shall constitute a waiver of any Party's right to demand exact compliance with the terms hereof.  Any written waiver shall be limited to those items specifically

waived therein and shall not be deemed to waive any future breaches or violations or other non-specified breaches or violations unless, and to the extent, expressly set forth therein.

Section 10.05 **Binding Effect; No Third-Party Beneficiaries**.   Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors, transferees and assigns.  Nothing in this Agreement, express or implied, is intended to confer on any Person (other than the Parties or their respective successors and permitted assigns) any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 10.06 **Rules of Construction**.  The following rules of construction shall govern the interpretation of this Agreement:

(a)     all references to Articles, Sections, Exhibits or Schedules are to Articles, Sections, Exhibits or Schedules in this Agreement;

(b)     unless the context otherwise requires, words in the singular or plural include the singular and plural, and pronouns stated in either the masculine, the feminine or neuter gender shall include the masculine, feminine and neuter;

(c)     whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "but not limited to";

(d)     the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not simply mean "if";

(e)     references to a Person herein are also to its permitted successors and permitted assigns;

(f)     references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(g)     in computing any period of time pursuant to this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included, but the time shall begin to run on the next succeeding day.  The last day of the period so computed shall be included, unless it is not a business day, in which event the period shall run until the end of the next business day;

(h)     time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement;

(i)     Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof;

(j)      (i) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits hereto, (ii) the term "any" means "any and all," and (iii) the term "or" shall not be exclusive and shall mean "and/or";

(k)      the phrases "provided" or "made available to Buyer" mean that the information referred to has been made available in the Dataroom at least two (2) business days prior to the Effective Date;

(l)      (i) references to "days" means calendar days unless business days are expressly specified and (ii) references to "$" mean U.S. dollars, provided that if there is a need to convert U.S. dollars into any foreign currency, or vice versa, the exchange rate shall be that published by The Wall Street Journal three (3) business days before the date on which the obligation is paid (or if The Wall Street Journal is not published on such date, the first date thereafter on which The Wall Street Journal is published), except as otherwise required by applicable Law (in which case, the exchange rate shall be determined in accordance with such Law);

(m)      the Parties intend that each representation, warranty, covenant and agreement contained herein shall have independent significance, and if any Party has breached any representation, warranty, covenant or agreement contained herein in any respect, the fact that there exists another representation, warranty, covenant or agreement relating to the same or similar subject matter that the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, covenant or agreement;

(n)      any drafts of this Agreement or any other Transaction Document circulated by or among the Parties prior to the final fully executed drafts shall not be used for purposes of interpreting any provision of this Agreement or any other Transaction Document, and each of the Parties agrees that no Party shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any dispute or Proceeding among any of the foregoing or for any other purpose; and

(o)      the Parties have participated jointly in the negotiation and drafting of this Agreement and the other Transaction Documents; in the event an ambiguity or question of intent or interpretation arises, this Agreement and the other Transaction Documents shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement or any other Transaction Document and the language used in it will be deemed to be the language chosen by the Parties to express their mutual intent.

Section 10.07 **Severability**.  Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.  The preceding sentence of this Section shall be of no force or effect if the consequence of enforcing the remainder of this

Agreement without such illegal or invalid term or provision would be to cause any Party to lose the material benefit of its economic bargain.

Section 10.08 **Incorporation by Reference**. Every Exhibit, annex and schedule (including the Disclosure Schedules) attached to this Agreement and referred to herein is incorporated fully into this Agreement by reference.

Section 10.09 **Governing Law; Submission to Jurisdiction**.

(a) THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

(b) THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY ANCILLARY AGREEMENT; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN NEW YORK WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

Section 10.10 **Waiver of Jury Trial**. EACH OF THE PARTIES IRREVOCABLY WAIVES TO THE EXTENT PERMITTED BY LAW ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT, STATUTE OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF. EACH PARTY FURTHER WAIVES ANY RIGHT TO SEEK TO CONSOLIDATE ANY PROCEEDING IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER PROCEEDING IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (a) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED OR WARRANTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (c) EACH PARTY MAKES THIS WAIVER VOLUNTARILY AND (d) EACH

PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.10</u>.

Section 10.11 **Expenses**.  Except as otherwise expressly stated herein, each Party shall be responsible for the payment of its own fees and expenses (including legal, accounting and investment banking fees and expenses) incurred in connection with the Transaction Documents and in the negotiation and preparation for and consummation of the Transactions.

Section 10.12 **Counterpart Execution**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and when taken together shall constitute one and the same instrument.  The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.13 **Entire Agreement**.  This Agreement (including all annexes, schedules (including the Disclosure Schedules) and the Exhibits attached hereto) and the other Transaction Documents constitute the entire agreement and understanding between the Parties in respect of the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

Section 10.14 **Relationship of the Parties**.  Nothing in this Agreement creates any partnership, employment, joint venture, franchise or agency relationship between the parties; rather, the parties acknowledge that their relationship under this Agreement is one of independent contracting parties.

Section 10.15 **Seller Representative**.

(a)    For purposes of this Agreement, each Seller hereby irrevocably appoints and designates Seller Representative to serve as such Seller's true and lawful representative, agent, attorney-in-fact, with full power of substitution and re-substitution, to act for and on behalf of such Seller for the purpose of taking any and all actions by such Seller specified in or contemplated by this Agreement or the other Transaction Documents; <u>provided</u>, that if Kevin Berg at any time is unable, due to incapacity or otherwise, to serve as Seller Representative or resigns as Seller Representative, then the Sellers shall designate a successor Seller Representative in writing.  Each successor Seller Representative, if required to serve, shall sign an acknowledgment in writing agreeing to perform and be bound by all of the provisions of this Agreement and the other Transaction Documents applicable to Seller Representative.  Each successor Seller Representative shall have all of the power, authority, rights and privileges conferred by this Agreement upon the original Seller Representative, and the term "Seller Representative" as used herein shall be deemed to include any successor Seller Representative.

(b)     Seller Representative is hereby constituted and appointed as agent and attorney-in-fact for and on behalf of each Seller with respect to the performance of its duties as Seller Representative as set forth herein.  This power of attorney and all authority hereby conferred is coupled with an interest and is irrevocable and shall not terminate or otherwise be affected by the death, disability, incompetence, bankruptcy or insolvency of any Seller and shall be binding upon the successors, assigns, heirs, executors, administrators, legal representatives, and beneficiaries, as applicable, of each Seller.  Seller Representative shall promptly deliver to each Seller any notice received by Seller Representative concerning this Agreement that Seller Representative deems is material.

(c)     Without limiting the generality of the foregoing, Seller Representative has full power and authority, on behalf of each Seller and such Seller's successors and assigns, to:  (i) interpret the terms and provisions of this Agreement and the other Transaction Documents to be executed and delivered by the Sellers in connection herewith, including the Escrow Agreement, (ii) execute and deliver and receive deliveries of all agreements, certificates, statements, notices, approvals, extensions, waivers, undertakings, amendments, and other documents required or permitted to be given in connection with the consummation of the Transactions, (iii) receive service of process in connection with any claims under this Agreement or the other Transaction Documents, (iv) agree to, negotiate, enter into settlements and compromises of, assume the defense of claims, and demand arbitration and comply with orders of courts and awards of arbitrators with respect to such claims, and to take all actions necessary or appropriate in the judgment of Seller Representative for the accomplishment of the foregoing, (v) give and receive notices and communications, (vi) authorize delivery to Buyer of the Buyer Deposit, (vii) object to such delivery, (viii) distribute the Buyer Deposit to which Sellers are entitled, and any earnings and proceeds thereon, (ix) to assert the attorney-client privilege on behalf of the Sellers with respect to any communications that relate in any way to the transactions contemplated hereby, (x) deliver to Buyer any and all Transaction Documents to which any Seller is a party executed by such Seller and deposited with Seller Representative, upon Seller Representative's determination that the conditions to Closing have been satisfied or waived, (xi) grant any consent, approval or waiver under this Agreement or any other Transaction Document and (xii) take all actions necessary or appropriate in the sole judgment of Seller Representative on behalf of the Sellers for the accomplishment of the foregoing or otherwise specifically required or in connection with this Agreement or the other Transaction Documents.  Notwithstanding anything to the contrary herein, in the event of a claim hereunder against a single Seller, and not any other Seller, such affected Seller shall be entitled to control the defense of such claim.

(d)     Service by Seller Representative shall be without compensation except for the reimbursement by the Sellers of out-of-pocket expenses and indemnification specifically provided herein.

(e)     Seller Representative shall have no duties or responsibilities except those expressly set forth herein, and no implied covenants, functions, responsibilities, duties, obligations or liabilities on behalf of any Seller shall otherwise exist against Seller Representative.  Seller Representative shall not be liable to any Seller relating to the performance of Seller Representative's duties or exercise of any rights under this Agreement for any errors in judgment, negligence, oversight, breach of duty or otherwise except to the extent it is finally determined in a

court of competent jurisdiction by clear and convincing evidence that the actions taken or not taken by Seller Representative constituted actual fraud or were taken or not taken, as applicable, in bad faith.  Seller Representative shall be protected in acting upon any notice, statement or certificate believed by Seller Representative to be genuine and to have been furnished by the appropriate Person and in acting or refusing to act in good faith on any matter.  Seller Representative shall not be liable to Buyer or any Affiliate of Buyer by reason of this Agreement or the performance of Seller Representative's duties hereunder or otherwise.

(f)      The Sellers shall indemnify and hold harmless Seller Representative against all losses, including costs of defense, paid or incurred in connection with any action, suit, proceeding or claim to which Seller Representative is made a party by reason of the fact that Seller Representative was acting as Seller Representative pursuant to this Agreement; provided, that Seller Representative shall not be entitled to indemnification hereunder to the extent it is finally determined in a court of competent jurisdiction by clear and convincing evidence that the actions taken or not taken by Seller Representative constituted actual fraud or were taken or not taken, as applicable, in bad faith.

(g)      Buyer shall be entitled to rely conclusively without inquiry upon any decision, action, consent or instruction of Seller Representative as the duly authorized decision, action, consent or instruction of Seller Representative on behalf of each Seller with respect to any matters set forth in this Agreement or any other Transaction Document and Buyer is hereby relieved from any liability to any Person for any acts done by it in accordance with any such decision, action, consent or instruction.

(h)      The provisions of this Section 10.15 will survive the Closing, the resignation or removal of Seller Representative or the termination of this Agreement.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties have executed and entered into this Purchase Agreement on the date first set forth above.

**SELLERS:**

VILLAGE ROADSHOW FILMS (BVI) LIMITED

By: _____
Name:
Title:

VILLAGE ROADSHOW FILMS NORTH AMERICA INC.

By: _____
Name: Kevin P. Berg
Title:   General Counsel and Secretary

VILLAGE ROADSHOW FILMS GLOBAL INC.

By: _____
Name: Kevin P. Berg
Title:   General Counsel and Secretary

VILLAGE ROADSHOW VS FILMS LLC

By: _____
Name: Kevin P. Berg
Title:   General Counsel and Secretary

VILLAGE ROADSHOW DISTRIBUTION (BVI) LIMITED


By: _____
Name:
Title:


VILLAGE ROADSHOW DISTRIBUTION USA INC.


By: _____
Name:
Title:

VILLAGE ROADSHOW PICTURES NORTH AMERICA INC.


By: _____
Name:
Title:

VR FUNDING LLC

By: _____
Name:
Title:


VR FILMS HOLDINGS (BVI) LIMITED


By: _____
Name:
Title:

VILLAGE ROADSHOW PRODUCTIONS (BVI) LIMITED

By: _____
Name:
Title:


VILLAGE ROADSHOW ENTERTAINMENT GROUP (BVI) LIMITED

By: _____
Name:
Title:


**BUYER:**

ALCON MEDIA GROUP, LLC

By: _____
Name:
Title:


**SELLER REPRESENTATIVE:**


_____
Kevin  Berg

## Schedule I

## Sellers

1. Village Roadshow Films (BVI) Limited, a BVI business company incorporated in the British Virgin Islands ("**VRF**")

2. Village Roadshow Films North America Inc., a Delaware corporation ("**VRFNA**")

3. Village Roadshow Films Global Inc., a Delaware corporation ("**VRFG**")

4. Village Roadshow VS Films LLC, a Delaware limited liability company ("**VRVS**")

5. Village Roadshow Distribution (BVI) Limited, a BVI business company incorporated under the laws of the British Virgin Islands ("**VRD**")

6. Village Roadshow Distribution USA Inc., a Delaware corporation ("**VRD-USA**")

7. Village Roadshow Pictures North America Inc., a Delaware corporation ("**VRPNA**")

8. VR Funding LLC, a Delaware limited liability company ("**VR Funding**")

9. VR Films Holdings (BVI) Limited, a BVI business company incorporated under the laws of the British Virgin Islands ("**VRF Holdings**")

10. Village Roadshow Productions (BVI) Limited, a BVI business company incorporated under the laws of the British Virgin Islands ("**VRP**")

11. Village Roadshow Entertainment Group (BVI) Limited, a BVI business company incorporated under the laws of the British Virgin Islands ("**Parent**")

**Schedule II**

**Pictures**

**Part A – Foreign Pictures**

| Title | Applicable Percentage | Distributor | Magnum Foreign Percentage | Relevant Percentage |
|---|---|---|---|---|
| Practical Magic | 100% | WBPL and Village Roadshow Films Distributors S.A. ("VR Greece") | 50% | 50% |
| Analyze This | 100% | WBPL and VR Greece | 50% | 50% |
| The Matrix | 100% | WBPL and VR Greece | 50% | 50% |
| Deep Blue Sea | 100% | WBPL and VR Greece | 50% | 50% |
| Three Kings | 100% | WBPL and VR Greece | 50% | 50% |
| Three to Tango | 100% | WBPL and VR Greece | 50% | 50% |
| Gossip | 100% | WBPL and VR Greece | 50% | 50% |
| Space Cowboys | 100% | WBPL and VR Greece | 50% | 50% |
| Red Planet | 100% | WBPL and VR Greece | 50% | 50% |
| Miss Congeniality | 100% | WBPL and VR Greece | 50% | 50% |
| Valentine | 100% | WBPL and VR Greece | 50% | 50% |
| Saving Silverman | 100% | Columbia Pictures Corporation Limited and VR Greece | 50% | 50% |

| Title | Applicable Percentage | Distributor | Magnum Foreign Percentage | Relevant Percentage |
|---|---|---|---|---|
| Down to Earth | 100% | Paramount Pictures International, MTV S.A. LDC and VR Greece | 50% | 50% |
| See Spot Run | 100% | WBPL and VR Greece | 50% | 50% |
| Exit Wounds | 100% | WBPL and VR Greece | 50% | 50% |
| Swordfish | 100% | WBPL and VR Greece | 50% | 50% |
| Cats & Dogs | 100% | WBPL and VR Greece | 50% | 50% |
| Don't Say A Word | 100% | Monarchy Enterprises S.a.r.l. and VR Greece | 50% | 50% |
| Hearts in Atlantis | 100% | WBPL and VR Greece | 50% | 50% |
| Zoolander | 100% | Paramount Pictures International, MTV S.A. LDC and VR Greece | 50% | 50% |
| Training Day | 100% | WBPL and VR Greece | 50% | 50% |
| Ocean's Eleven | 100% | WBPL and VR Greece | 50% | 50% |
| The Majestic | 100% | WBPL and VR Greece | 50% | 50% |
| Queen of the Damned | 100% | WBPL and VR Greece | 50% | 50% |
| Showtime | 100% | WBPL and VR Greece | 50% | 50% |

| Title | Applicable Percentage | Distributor | Magnum Foreign Percentage | Relevant Percentage |
|---|---|---|---|---|
| Eight Legged Freaks | 100% | WBPL and VR Greece | 50% | 50% |
| Pluto Nash | 100% | WBPL and VR Greece | 50% | 50% |
| Ghost Ship | 100% | WBPL and VR Greece | 50% | 50% |
| Analyze That | 100% | WBPL and VR Greece | 50% | 50% |
| Two Weeks Notice | 100% | WBPL and VR Greece | 50% | 50% |
| Dreamcatcher | 100% | WBPL and VR Greece | 50% | 50% |
| Matrix Reloaded (together with The Animatrix) | 100% | WBPL and VR Greece | 50% | 50% |
| Mystic River | 100% | WBPL and VR Greece | 50% | 50% |
| Matrix Revolutions | 100% | WBPL and VR Greece | 50% | 50% |
| Torque | 100% | WBPL and VR Greece | 50% | 50% |
| Taking Lives | 100% | WBPL and VR Greece | 50% | 50% |
| Catwoman | 100% | WBPL and VR Greece | 50% | 50% |
| Ocean's Twelve | 100% | WBPL and VR Greece | 50% | 50% |
| Constantine | 100% | WBPL and VR Greece | 50% | 50% |
| Miss Congeniality 2: Armed & Fabulous | 100% | WBPL and VR Greece | 50% | 50% |
| House of Wax | 100% | WBPL and VR Greece | 50% | 50% |

| Title | Applicable Percentage | Distributor | Magnum Foreign Percentage | Relevant Percentage |
|---|---|---|---|---|
| Charlie and the Chocolate Factory | 100% | WBPL and VR Greece | 50% | 50% |
| Dukes of Hazzard | 100% | WBPL and VR Greece | 50% | 50% |
| Rumor Has It… | 100% | WBPL and VR Greece | 50% | 50% |
| Firewall | 100% | WBPL and VR Greece | 50% | 50% |
| The Lake House | 100% | WBPL and VR Greece | 50% | 50% |
| Happy Feet | 100% | WBPL and VR Greece | 50% | 50% |
| Unaccompanied Minors | 100% | WBPL and VR Greece | 50% | 50% |
| Music and Lyrics | 100% | WBPL and VR Greece | 50% | 50% |
| The Reaping | 100% | WBPL and VR Greece | 50% | 50% |
| Lucky You | 100% | WBPL and VR Greece | 50% | 50% |
| Ocean's Thirteen | 100% | WBPL and VR Greece | 50% | 50% |
| License to Wed | 100% | WBPL and VR Greece | 50% | 50% |
| No Reservations | 100% | WBPL and VR Greece | 50% | 50% |
| The Invasion | 100% | WBPL and VR Greece | 50% | 50% |
| The Brave One | 100% | WBPL and VR Greece | 50% | 50% |
| I Am Legend | 100% | WBPL and VR Greece | 50% | 50% |

| Title | Applicable Percentage | Distributor | Magnum Foreign Percentage | Relevant Percentage |
|---|---|---|---|---|
| Speed Racer | 100% | WBPL and VR Greece | 50% | 50% |
| Get Smart | 100% | WBPL and VR Greece | 50% | 50% |
| Nights in Rodanthe | 100% | WBPL and VR Greece | 50% | 50% |
| Yes Man | 100% | WBPL and VR Greece | 50% | 50% |
| Gran Torino | 100% | WBPL and VR Greece | 50% | 50% |
| Where the Wild Things Are | 100% | WBPL and VR Greece | 50% | 50% |
| Sherlock Holmes | 100% | WBPL and VR Greece | 50% | 50% |
| Sex and the City 2 | 100% | WBPL and VR Greece | 50% | 50% |
| Cats & Dogs: The Revenge of Kitty Galore | 100% | WBPL and VR Greece | 50% | 50% |
| Legend of the Guardians | 100% | WBPL and VR Greece | 50% | 50% |
| Life As We Know It | 100% | WBPL and VR Greece | 50% | 50% |
| Happy Feet Two | 100% | WBPL and VR Greece | 50% | 50% |
| Sherlock Holmes: A Game of Shadows | 100% | WBPL and VR Greece | 50% | 50% |
| The Lucky One | 100% | WBPL and VR Greece | 50% | 50% |
| Dark Shadows | 100% | WBPL and VR Greece | 50% | 50% |
| Gangster Squad | 100% | WBPL and VR Greece | 50% | 50% |

| Title | Applicable Percentage | Distributor | Magnum Foreign Percentage | Relevant Percentage |
|---|---|---|---|---|
| The Great Gatsby | 100% | WBPL and VR Greece | 50% | 50% |
| The LEGO Movie | 100% | WBPL and VR Greece | 50% | 50% |
| Winter's Tale | 50% | WBPL and VR Greece | 50% | 50% |
| Edge of Tomorrow | 66.7% | WBPL and VR Greece | 50% | 50% |

**Part B – F/D Pictures**

| Title | Applicable Percentage (VRF) | Applicable Percentage (VRFNA) | Distributors (Foreign/Domestic) | Magnum Foreign Percentage / Magnum Domestic Percentage | Relevant Percentage |
|---|---|---|---|---|---|
| Into the Storm | 37.5% | 37.5% | WBPL and VR Greece/WAV | 50%/50% | 50% |
| The Judge | 25% | 25% | WBPL/WAV | 50%/50% | 50% |
| American Sniper | 33.3% | 33.3% | WBPL/WAV | 50%/50% | 50% |
| Jupiter Ascending | 33.3% | 33.3% | WBPL/WAV | 10%/10% | 90% |
| Mad Max: Fury Road | 50% | 50% | WBPL/WAV | 10%/10% | 90% |
| San Andreas | 25% | 25% | WBPL/WAV | 10%/10% | 90% |
| In the Heart of the Sea | 25% | 25% | WBPL/WAV | 10%/10% | 90% |
| The Legend of Tarzan | 33.3% | 33.3% | WBPL/WAV | 10%/10% | 90% |
| Sully | 25% | 25% | WBPL/WAV | 10%/10% | 90% |
| Collateral Beauty | 25% | 25% | WBPL/WAV | 10%/10% | 90% |

| Title | Applicable Percentage (VRF) | Applicable Percentage (VRFNA) | Distributors (Foreign/Domestic) | Magnum Foreign Percentage / Magnum Domestic Percentage | Relevant Percentage |
|---|---|---|---|---|---|
| Fist Fight | 25% | 25% | WBPL/WAV | 10%/10% | 90% |
| Going in Style | 25% | 25% | WBPL/WAV | 10%/10% | 90% |
| King Arthur | 15% | 15% | WBPL/WAV | 10%/10% | 90% |
| The House | 25% | 25% | WBPL/WAV | 10%/10% | 90% |
| The 15:17 to Paris | 33.3% | 33.3% | WBPL/WAV | 10%/10% | 90% |
| Ready Player One | 33.3% | 33.3% | WBPL/WAV | 10%/10% | 90% |
| Ocean's 8 | 50% | 50% | WBPL/WAV | 10%/10% | 90% |
| Joker | 25% | 25% | WBPL/WAV | 10%/10% | 90% |

**Part C – Global Pictures**

| Title | Applicable Percentage | Distributor | Magnum Global Percentage | Relevant Percentage |
|---|---|---|---|---|
| The Equalizer | 25% | CPII | 50% | 50% |
| Annie | 25% | CPII | 50% | 50% |
| Goosebumps | 25% | CPII | 10% | 90% |
| Concussion | 25% | CPII | 10% | 90% |
| The Brothers Grimsby | 25% | CPII | 10% | 90% |
| The Magnificent Seven | 25% | CPII | 10% | 90% |

**Part D – Virtual Pictures**

| Title | Applicable Percentage | Distributor | Magnum Global Percentage | Relevant Percentage |
|---|---|---|---|---|
| V for Vendetta | 50% | WBEI | 0% | 100% |
| Poseidon | 50% | WBEI | 0% | 100% |
| Blood Diamond | 50% | WBEI | 0% | 100% |
| The Good German | 50% | WBEI | 0% | 100% |
| 300 | 32.5% | WBEI | 0% | 100% |
| Nancy Drew: The Mystery in Hollywood Hills | 50% | WBEI | 0% | 100% |
| The Assassination of Jesse James by the Coward Robert Ford | 30.414% | WBEI | 0% | 100% |

**<u>Schedule III</u>**

**Assumed Contracts & Cure Amounts**

[See Attached]

**<u>Schedule IV</u>**

**Purchase Price Schedule[1]**

| Entity | Valuation % |
|--------|-------------|
| Village Roadshow Films (BVI) Limited | 72.77% |
| Village Roadshow Films North America Inc. | 13.28% |
| Village Roadshow Films Global Inc. | 4.07% |
| Village Roadshow VS Films LLC | 8.03% |
| Village Roadshow Distribution (BVI) Limited | 1.86% |
| **TOTAL** | **100%** |

---

[1] The Valuation Percentages contained in this Section 2.11(a) will be further adjusted at Closing, as mutually agreed by Seller Representative and Buyer, to reflect the change in relative value of the Purchased Assets owned by each Seller as a result of any collections generated by the Purchased Assets between the Effective Date and the Closing Effective Date.

241154324.2
212160-10346
241111631.8
212160-10346

# EXHIBIT B

**Blackline**

*Execution Version*

# PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (as amended, restated, supplemented, or otherwise modified pursuant to the terms hereof from time to time, this "**Agreement**"), is made and entered into as of ~~March 14~~April [  ], 2025 (the "**Effective Date**"), by and among the Persons identified on Schedule I hereto (each, a "**Seller**", and collectively, the "**Sellers**"), ~~CP Ventura~~Alcon Media Group, LLC ("**Buyer**"), and Kevin Berg in his capacity as the representative of the Sellers pursuant to Section 10.15 (the "**Seller Representative**").

## RECITALS

A.      The Parties desire to set forth the terms pursuant to which Buyer will, subject to the entry of a Sale Order (as defined below), purchase from the Sellers, the Purchased Assets (as defined herein), including, without limitation, (i) (a) an undivided interest equal to the Relevant Percentage in the Designated Foreign Receipts in respect of the Motion Pictures set forth in Part A of Schedule II hereto (the "**Foreign Pictures**") and in Part B of Schedule II hereto (the "**F/D Pictures**"), subject to the rights of the Foreign Distributors under the Foreign Licenses and/or the applicable Foreign Distribution Agreements, and (without duplication) the Proceeds thereof, (b) an undivided interest equal to the Relevant Percentage in the Foreign Distribution Rights in perpetuity in respect of the Foreign Pictures and the F/D Pictures and (without duplication) the Proceeds thereof, and (c) the right to receive the Relevant Percentage in the Designated Foreign Receipts in perpetuity in respect of the Foreign Pictures and the F/D Pictures and the Proceeds thereof; (ii) (a) an undivided interest equal to the Relevant Percentage in the Designated Domestic Receipts in respect of the F/D Pictures, subject to the rights of the Domestic Distributor under the Domestic Licenses and the Domestic Distribution Agreement, and (without duplication) the Proceeds thereof, (b) an undivided interest equal to the Relevant Percentage in the Domestic Distribution Rights in perpetuity in respect of the F/D Pictures and (without duplication) the Proceeds thereof, and (c) the right to receive the Relevant Percentage in the Designated Domestic Receipts in perpetuity in respect of the F/D Pictures and the Proceeds thereof; (iii) (a) an undivided interest equal to the Relevant Percentage in the Designated Global Receipts in respect of the Motion Pictures set forth in Part C of Schedule II hereto (the "**Global Pictures**"), subject to the rights of the Global Distributor under the Global Licenses and the Global Distribution Agreement, and (without duplication) the Proceeds thereof, (b) an undivided interest equal to the Relevant Percentage in the Global Distribution Rights in perpetuity in respect of the Global Pictures and (without duplication) the Proceeds thereof, and (c) the right to receive the Relevant Percentage in the Designated Global Receipts in perpetuity in respect of the Global Pictures and the Proceeds thereof; and (iv) (a) an undivided interest equal to the Relevant Percentage in the Designated Virtual Receipts in respect of the Motion Pictures set forth in Part D of Schedule II hereto (the "**Virtual Pictures**" and, together with the Foreign Pictures, the F/D Pictures and the Global Pictures, the "**Pictures**"), subject to the rights of the Virtual Distributor under the Virtual Co-Financing Agreement, and (without duplication) the Proceeds thereof, (b) an undivided interest equal to the Relevant Percentage in the Virtual Distribution Rights in perpetuity in respect of the Virtual Pictures and (without duplication) the Proceeds thereof, and (c) the right to receive the Relevant Percentage in the Designated Virtual Receipts in perpetuity in respect of the Virtual Pictures and the Proceeds thereof.

B.    The Sellers and certain of their Affiliates ~~will commence~~have commenced voluntary petitions for relief under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "**Bankruptcy Code**") (the date of the filing of such petitions, the "**Petition Date**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") (such cases, collectively, the "**Bankruptcy Cases**").

C.    On the terms and subject to the conditions hereof, the Sellers desire to sell, transfer and assign to Buyer or a Buyer Designee, and Buyer desires to purchase, acquire and assume from the Sellers through a Buyer Designee, the Purchased Assets, subject to the terms and conditions set forth in this Agreement, the Bid Procedures (as defined below) and Bid Procedures Order (as defined below), and in accordance with sections 105, 363, 365, 1123, as applicable, and other applicable provisions of the Bankruptcy Code.  The Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the receipt and sufficiency of which is hereby acknowledged, it is hereby agreed among the Parties as follows:

## ARTICLE IDEFINITIONS

Section 1.01    **Defined Terms**.  Except as otherwise specified in this Agreement or as the context may otherwise require, the following terms shall have the respective meanings set forth below for all purposes of this Agreement:

"**ABS Obligations**" means all Liabilities of the Sellers and their Affiliates under the ABS Transaction Documents, including, without limitation, all fees, costs, expenses and indemnity obligations, and, in each case, any interest accrued thereon.

"**ABS Transaction Documents**" means all "Transaction Documents" under (and as defined in) the Indenture.

"**Accountant**" has the meaning set forth in Section 2.13(b).

"**Adverse Claim**" means a lien, security interest, attachment, Claim, Liability, offset, deduction, restriction, mortgage, pledge or other charge or Encumbrance, or other type of preferential arrangement having the practical effect of any of the foregoing, or other claim in, of or on any Person's assets or properties in favor of any other Person.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such Person.  The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and/or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Alternative Transaction**" ~~has the meaning set forth in Section 6.07.~~ means any direct or indirect acquisition, financing or purchase of all or any portion of the Purchased Assets or any other similar transaction involving all or any portion of the Purchased Assets, whether effected by sale of assets, sale of equity, merger, joint venture, recapitalization, loan, financing arrangement or otherwise, but excluding any financing provided by any holder of Parent's existing notes and any debtor-in-possession financing.

"**Ancillary Rights**" means any and all ancillary, subsidiary or allied rights now known and unknown, including, without limitation, publishing, novelization, music publishing, soundtrack recording, screenplay, publication, sponsorship, commercial tie-up, character, live stage, radio, interactive, Internet, theme park and merchandising rights of every kind and nature whatsoever derived from, appurtenant to or related to a Picture, the underlying material relating thereto, the title or titles of such Picture, the characters appearing in such Picture or said underlying material and/or the names or characteristics of said characters.

"**Anti-Terrorism Order**" means Executive Order No. 13,244 of September 24, 2001, Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism, 66 U.S. Fed. Reg. 49, 079 (2001), as amended.

"**Applicable Copyright Law**" means (a) the 1976 Copyright Act, 17.  U.S.C. §101 et seq., as amended; (b) as applicable, the U.S. Copyright Act of 1909, as amended; and (c) for Pictures being Exploited as of the Effective Date in any territory party to the Universal Copyright Convention or the Berne Convention, the Copyright laws of such territory.

"**Applicable Percentage**" means (a) in the case of the Foreign Pictures and the F/D Pictures, the percentage of Foreign Gross Receipts that Sellers are entitled to receive with respect to such Pictures under the applicable QCSA or MPRPA and related Picture Agreements, (b) in the case of the F/D Pictures, the percentage of Domestic Gross Receipts that Sellers are entitled to receive with respect to such Pictures under the applicable MPRPA and related Picture Agreements, (c) in the case of the Global Pictures, the percentage of Global Gross Receipts that Sellers are entitled to receive with respect to such Pictures under the applicable MPRPA and related Picture Agreements, and (d) in the case of the Virtual Pictures, the percentage of Designated Virtual Receipts that Sellers are entitled to receive pursuant to the Virtual Documents.  The Applicable Percentage for each Picture is set forth on Schedule II hereto.

"**Assumed Contract**" has the meaning set forth in Section 2.05(a).

"**Assumed Liabilities**" has the meaning set forth in Section 2.02.

"**Assumption and Assignment Agreement**" means an Assignment and Assumption Agreement effecting the assignment of the Assumed Liabilities from Sellers to Buyer, in form and substance satisfactory to the Parties.

"**Auction**" means an auction or auctions, if any, for the sale of the Sellers' assets conducted pursuant to the terms and conditions of the Bid Procedures Order.

"**Avoidance Actions**" means all rights, lawsuits, claims, rights of recovery, objections, causes of action, avoidance actions and other similar rights of any Seller or other appropriate party in interest arising under Chapter 5 of the Bankruptcy Code or applicable state law (whether or not asserted as of the Closing Effective Date) and all proceeds thereof.

"**Backup Bidder**" means, if an Auction is conducted, the party that is the next highest or otherwise best bidder at the Auction after the Successful Bidder.

"**Bankruptcy Cases**" has the meaning set forth in the recitals.

"**Bankruptcy Code**" has the meaning set forth in the recitals.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bid Deadline**" has the meaning set forth in Section 7.02.

"**Bid Procedures**" means the bid procedures approved by the Bankruptcy Court pursuant to the Bid Procedures Order.

"**Bid Procedures and Sale Motion**" means the motion filed in the Bankruptcy Cases, which motion shall be in form and substance satisfactory to Sellers and Buyer (together with all exhibits and ancillary documents thereto), (i) seeking approval of (A) this Agreement and the transactions contemplated hereby and (B) the Bid Procedures and scheduling certain dates, deadlines and forms of notice in connection therewith, (ii) authorizing the payment of the ~~Break Up Fee and~~ Expense Reimbursement ~~to Buyer~~, and (iii) granting other related relief, in each case, as set forth in this Agreement.

"**Bid Procedures Order**" means the order of the Bankruptcy Court approving the Bid Procedures and Sale Motion and the Bid Procedures, and granting the relief requested therein, in form and substance satisfactory to the Sellers and Buyer, which shall include, without limitation, (i) approval of Buyer as the stalking horse purchaser and (ii) approval of the ~~Break Up Fee and~~ Expense Reimbursement to Buyer, in each case, as set forth in this Agreement.

"**Books and Records**" means all principal and/or material business records, tangible data, documents, management information systems (including related computer software), files, participant lists, vendor lists, statements, invoices, all work papers, notes, files or documents related thereto, and all other principal and/or material books and records received and/or maintained by Sellers or their Affiliates (excluding personnel records) related to the Pictures. For the avoidance of doubt, "Books and Records" shall in any event include all underlying documentation supporting the calculations in the Financial Information provided to Magnum.

~~"**Break Up Fee**" means $10,000,000.~~

"**business day**" means any day other than a Saturday, Sunday, legal holiday in the United States or any day on which banks in the City of New York, New York are authorized or required by law to close.

"**Buyer**" has the meaning set forth in the preamble.  References herein to Buyer shall also refer to the Buyer Designee interchangeably.

"**Buyer Closing Deliverables**" has the meaning set forth in Section 2.11.

"**Buyer Deposit**" has the meaning set forth in Section 2.06(b).

"**Buyer Designee**" has the meaning set forth in Section 10.01.

"**Claim**" means all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"**Closing**" means the consummation of the purchase by Buyer from Sellers of the Purchased Assets.

"**Closing Effective Date**" means the date on which the Closing occurs.

"**Closing Statement**" has the meaning set forth in Section 2.09.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

"**Collective Bargaining Agreement**" means any agreement, contract or arrangement with any union or guild or similarly constituted or substitute organization regarding any rights and/or services and/or personnel utilized in connection with the production and/or distribution and/or Exploitation of a Picture.

"**Consolidated Intercreditor Agreement**" means that certain Second Amended and Restated Consolidated Intercreditor Agreement dated as of September 5, 2024, among WBPL, VRD, VRF, WAV, VRD-USA, VRFNA, VREG-USA, Magnum, Bank of America, N.A. and U.S. Bank National Association, as amended, restated, supplemented or otherwise modified from time to time prior to the Closing Effective Date.

"**Constitutive Documents**" means, as to any Person, such Person's certificate of incorporation or registration (including, if relevant, certificates of change of name), memorandum of association, articles of association or incorporation, charter, by-laws, trust deed, partnership, limited liability company, joint venture or shareholders' agreement or equivalent documents constituting the organization or forming of such Person, in each case as the same may from time to time be amended, restated, supplemented or otherwise modified from time to time.

"**Contract**" means any contract, agreement, lease, license, or other legally binding commitment, agreement or instrument, whether or not in writing, including all amendments and modifications thereto.

"**Contract Rights**" means, with respect to a Picture, all rights, interest, entitlements and remedies (including, without limitation, the benefits of all representations, warranties, covenants and indemnifications) under any Contract relating to such Picture, including, for clarity, all rights, interest, entitlements and remedies arising from any letter of credit, instrument or other agreement relating to a Picture which designates a Seller as a beneficiary, even if such Seller is not a party to that letter of credit, instrument or other agreement.

"**Copyright**" means, with respect to a Picture, all common law and statutory copyrights, rights in copyrights (including the right to make publication thereof for copyright purposes, to register claims under copyright, the right to renew and extend such copyrights and the right to sue for past, present and future infringements of copyright), interests in copyrights, all applications for copyrights, registrations of copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained upon such project, the underlying material relating thereto or any part thereof.

"**Copyright Termination**" means any right of termination of transfer or license of a Copyright, or termination or reversion of any right under a Copyright, under any Applicable Copyright Law, including 17 U.S.C. § 203 or § 304 or any similar law, rule or regulation of any Governmental Authority.

"**CPII**" means Columbia Pictures Industries, Inc.

"**Cure Amounts**" means all amounts, costs and expenses to cure defaults, if any, under the Assumed Contracts so that they may be assumed and assigned to Buyer pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code.

"**Cutoff Date**" means July 31, 2024 (as reflected in the Quarterly Compliance Certificate Quarterly Report of June 2024 Quarter with Key Date of Quarterly Collection Period Ending July 31, 2024).

"**Dataroom**" means that certain virtual data room hosted by Ansarada titled "Project Ventura".

"**Debtor Relief Laws**" means the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, suspension of payments or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

"**Defined Proceeds**" has the meaning set forth in the Virtual Co-Financing Agreement.

"**Derivative Rights**" means, with respect to a Picture, all rights throughout the world to produce remakes, sequels and prequels of a Picture and other derivative works based thereon and to distribute and otherwise Exploit such remakes, sequels or prequels for viewing in any medium

or media now known or hereafter devised, whether in theatres or home video or on television, and to produce, distribute and otherwise Exploit as a television program, movie of the week, television series or a television spinoff any audiovisual work based on a Picture, its story line, or any one or more of its characters.

"**Designated Domestic Receipts**" with respect to the F/D Pictures means (i) the Applicable Percentage of the Domestic Gross Receipts and/or amounts accountable and/or accounted as such or in respect thereof under the Domestic Distribution Agreement, subject to the rights of the Domestic Distributor under the Domestic Distribution Agreement in its capacity as such (including, without limitation, the right to retain Domestic Gross Receipts to pay and/or reimburse Domestic Distributor Fees, Domestic Participations, Domestic Residuals and Domestic Recoupable Distribution Expenses, in each case as and to the extent set forth therein), (ii) the Applicable Percentage of any Domestic Subsidies payable to Sellers or any of their Affiliates with respect to any F/D Picture, and (iii) the Applicable Percentage of any other amounts received from any source on or in respect of the Exploitation of the F/D Pictures in the Domestic Territory, in each case under the foregoing clauses (i), (ii) and (iii), arising, received or payable from and after the Cutoff Date.

"**Designated Domestic Rights**" means, with respect to any F/D Picture, (a) an undivided interest equal to Sellers' Applicable Percentage in the Domestic Rights (as defined in the Domestic Distribution Agreement) in such F/D Picture and (b) Sellers' right to receive the Applicable Percentage of the Domestic Gross Receipts with respect to such F/D Picture, in each case, except to the extent that WBEI and VRPNA otherwise agreed in the Rights Purchase Agreement (as defined in the applicable MPRPA) applicable to such F/D Picture.

"**Designated Foreign Receipts**" with respect to the Foreign Pictures and the F/D Pictures, means (i) the Applicable Percentage of the Foreign Gross Receipts and/or amounts accountable and/or accounted as such or in respect thereof under the applicable Foreign Distribution Agreement, subject to the rights of the Foreign Distributor under the applicable Foreign Distribution Agreement in its capacity as such (including, without limitation, the right to retain Foreign Gross Receipts to pay and/or reimburse Foreign Distributor Fees, Foreign Participations, Foreign Residuals and Foreign Recoupable Distribution Expenses, in each case as and to the extent set forth therein), (ii) the Applicable Percentage of any Foreign Subsidies payable to Sellers or any of their Affiliates with respect to any Foreign Picture or F/D Picture, and (iii) the Applicable Percentage of any other amounts received from any source on or in respect of the Exploitation of the Foreign Pictures and the F/D Pictures in the Foreign Territory, in each case under the foregoing clauses (i), (ii) and (iii), arising, received or payable from and after the Cutoff Date.

"**Designated Foreign Rights**" means, with respect to any Foreign Picture and any F/D Picture, (a) an undivided interest equal to Sellers' Applicable Percentage in the Foreign Rights or International Rights, as the case may be (as such terms are defined in the applicable Foreign Distribution Agreement), in such Picture and (b) Sellers' right to receive the Applicable Percentage of the Foreign Gross Receipts with respect to such Picture, in each case, except to the

extent that WBEI and VRPNA otherwise agreed in the Rights Purchase Agreement (as defined in the applicable MPRPA), if any, applicable to such Picture.

"**Designated Global Receipts**" with respect to the Global Pictures means (i) the Applicable Percentage of the Global Gross Receipts and/or amounts accountable and/or accounted as such or in respect thereof under the Global Distribution Agreement, subject to the rights of the Global Distributor under the Global Distribution Agreement in its capacity as such (including, without limitation, the right to retain Global Gross Receipts to pay and/or reimburse Global Distributor Fees, Global Participations, Global Residuals and Global Recoupable Distribution Expenses, in each case as and to the extent set forth therein), (ii) the Applicable Percentage of any Global Subsidies payable to Sellers or any of their Affiliates with respect to any Global Picture, and (iii) the Applicable Percentage of any other amounts received from any source on or in respect of the Exploitation of the Global Pictures in the Global Territory, in each case under the foregoing clauses (i), (ii) and (iii), arising, received or payable from and after the Cutoff Date.

"**Designated Global Rights**" means, with respect to any Global Picture, (a) an undivided interest equal to Sellers' Applicable Percentage in the Global Rights (as defined in the Global Distribution Agreement) in such Global Picture and (b) Sellers' right to receive the Applicable Percentage of the Global Gross Receipts with respect to such Global Picture, in each case, except to the extent that Sony, CPII, and VRPNA otherwise agreed in the Rights Purchase Agreement (as defined in the applicable MPRPA) applicable to such Global Picture.

"**Designated Virtual Receipts**" with respect to the Virtual Pictures means (i) the Applicable Percentage of the Defined Proceeds and/or amounts accountable and/or accounted as such or in respect thereof under the Virtual Documents, subject to the rights of the Virtual Distributor under the Virtual Co-Financing Agreement in its capacity as such, and (ii) the Applicable Percentage of any other amounts received from any source on or in respect of the Exploitation of the Virtual Pictures in the Virtual Territory, in each case under the foregoing clauses (i) and (ii), arising, received or payable from and after the Cutoff Date.

"**Disclosure Schedules**" has the meaning set forth in Section 4.01.

"**Distribution Agreements**" means the Domestic Distribution Agreement, the Foreign Distribution Agreements, the Global Distribution Agreement and the Virtual Co-Financing Agreement.

"**Domestic Distribution Agreement**" means that certain Second Amended and Restated Output Distribution Agreement (Domestic) dated as of November 10, 2020, between the Domestic Distributor and VRD-USA, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Domestic Distribution Rights**" means the rights to distribute or otherwise Exploit the F/D Pictures in any media throughout the Domestic Territory, which rights are subject to the

prior grant of distribution rights to the Domestic Distributor under the Domestic Licenses and the Domestic Distribution Agreement.

"**Domestic Distributor**" means WAV.

"**Domestic Distributor Fees**" means the distribution fees payable to the Domestic Distributor under the Domestic Distribution Agreement.

"**Domestic Gross Receipts**" means "Defined Gross" as defined in the Domestic Distribution Agreement.

"**Domestic Licenses**" means each Domestic License (as defined in the applicable MPRPA) executed by WBEI in favor of WAV pursuant to the applicable MPRPA.

"**Domestic Participations**" means Participations that are paid by the Domestic Distributor in accordance with the Domestic Distribution Agreement.

"**Domestic Recoupable Distribution Expenses**" means "Recoupable Distribution Expenses" (as defined in the Domestic Distribution Agreement).

"**Domestic Residuals**" means Residuals that are paid by the Domestic Distributor in accordance with the Domestic Distribution Agreement.

"**Domestic Subsidies**" means Production Subsidies/Sale Proceeds with respect to the F/D Pictures.

"**Domestic Territory**" means (a) in the case of the Foreign Pictures (other than *Saving Silverman*, *Down to Earth*, *Zoolander* and *Don't Say A Word*) and the F/D Pictures, the "Domestic Territory" as defined in the applicable Foreign Distribution Agreement; (b) in the case of the Motion Picture titled *Saving Silverman*, the "Domestic Territory" as defined in that certain Distribution Agreement (Domestic) dated as of May 5, 2000, between Columbia Pictures and Evil Woman Films LLC, as amended, restated, supplemented or otherwise modified from time to time; (c) in the case of the Motion Picture titled *Down to Earth*, the "Domestic Territory" as defined in that certain Distribution Agreement (Domestic) dated as of August 11, 2000, between Paramount Pictures Corporation and DTE Films LLC, as amended, restated, supplemented or otherwise modified from time to time; (d) in the case of the Motion Picture titled *Zoolander*, the "Domestic Territory" as defined in that certain Distribution Agreement (Domestic) dated as of August 11, 2000, by and between Paramount Pictures Corporation and Zoo Films LLC; and (e) in the case of the Motion Picture titled *Don't Say A Word*, the "Domestic Territory" as defined in that certain Distribution Agreement (Domestic) dated as of October 2, 2000, by and between Regency Entertainment (USA), Inc. and DSAW Films LLC.

"**DTE Film LLC Agreement**" means that certain Operating Agreement of DTE Films LLC, dated as of August 11, 2000, by and between Paramount Pictures Corporation and VR DTE Distribution USA Inc., as amended, restated, supplemented or otherwise modified from time to time.

"**DTE Film Partnership Agreement**" means that certain Limited Partnership Agreement of DTE Film Partners L.P., dated as of August 11, 2000, by and among VRD, VRDTE, and MTV S.A. (f/k/a MTV S.A. LDC), as amended, restated, supplemented or otherwise modified from time to time.

"**DTE Notice of Assignment and Amendment**" means an irrevocable notice of assignment and amendment entered into among Buyer and each of the parties to the DTE Agreement, DTE QCSA, DTE Film Partnership Agreement and DTE Film LLC Agreement (each of the foregoing, together with any other agreements between or among the parties thereto in connection with *Down to Earth*, the "**Specified DTE Agreements**"), pursuant to which the parties thereto shall agree that, notwithstanding anything to the contrary in the Specified DTE Agreements: (i) "International Net Proceeds" and "Domestic Net Proceeds" (each as described and calculated in the Financial Information prepared by Paramount Pictures Corporation ("**Paramount**") in respect of *Down to Earth*) shall be shared by Paramount and Buyer 50 / 50 in perpetuity; provided, that if International Net Proceeds are cumulatively negative, Paramount shall pay Buyer one hundred percent (100%) of the International Net Proceeds and Domestic Net Proceeds until such shortfall has been recouped, consistent with past practice, and (ii) the parties to the Specified DTE Agreements shall agree not to amend any Specified DTE Agreement following the date of such notice of assignment and amendment in any manner that would modify or otherwise affect the calculation or timing of amounts payable to Buyer pursuant to such notice of assignment and amendment.

"**Effective Date**" has the meaning set forth in the preamble.

"**Encumbrance**" means any defect or imperfection in title, charge, deed of trust, security interest, pledge, hypothecation, mortgage, encumbrance, Lien (as such term is defined in the Bankruptcy Code), lease, license grant by any Seller, sublease, option, right of first refusal, easement, right of way, servitude, covenant, condition, proxy, voting trust or agreement or transfer restriction under any equity holder or similar Contract.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**Escrow Account**" has the meaning set forth in <u>Section 2.06(b)</u>.

"**Escrow Agreement**" has the meaning set forth in <u>Section 2.06(b)</u>.  For the avoidance of doubt, the Escrow Agreement shall be in form and substance acceptable to Buyer and the Sellers.

"**Escrow Holder**" has the meaning set forth in <u>Section 2.06(b)</u>.

"**Estimated Purchase Price**" has the meaning set forth in <u>Section 2.09</u>.

"**Excluded Assets**" has the meaning set forth in <u>Section 2.03</u>.

"**Excluded Liabilities**" has the meaning set forth in <u>Section 2.04</u>.

241154324.2
212160-10346

"**Excluded Taxes**" means any liabilities of any Seller for any period, or otherwise imposed on the Purchased Assets with respect to any Pre-Closing Tax Period, in respect of any Tax, including without limitation (a) any Liability of any Seller for the Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law), as a transferee or successor, or by Contract, (b) any Taxes that will arise as a result of the purchase and sale of the Purchased Assets and (c) fifty percent (50%) of any Transfer Taxes, but excluding any Property Taxes to the extent specifically allocated to Buyer pursuant to Section 6.06.

"**Expense Reimbursement**" means all reasonable and documented costs, fees and expenses actually incurred by Buyer and/or its Affiliates (including legal, financial advisory, accounting and other similar costs of professionals retained by Buyer and/or its Affiliates), related to the Transactions contemplated by this Agreement and the Bankruptcy Cases, including, without limitation, in connection with the evaluation, diligence, negotiation, documentation, and performance of the Transactions, which amount shall constitute a superpriority administrative expense of the Sellers with priority over any and all administrative expenses of any kind; provided however, that the aggregate amount of the Expense Reimbursement shall not exceed $2,000,000.

"**Exploit**" means the manufacture, distribution, licensing, exhibition, marketing, promotion, reissuance, and other exploitation of a motion picture or applicable rights thereto, in any and all languages, by any and all means and devices now known or hereafter devised, and howsoever accessed by the viewer, and to otherwise exploit the foregoing in any and all media, whether now known or hereafter existing and howsoever accessed, including, without limitation, theatrical, home video, pay, cable and free television, computers, hand held devices, cell phones and other accessing devices. The meaning of the term "**Exploitation**" shall be correlative to the foregoing.

"**Exploitation Agreement**" means any Contract (including any co-production and/or co-financing agreement) to which a Seller is a party or is otherwise bound with respect to the Exploitation by any Person of a Picture or any rights therein or thereto, whether on a single-picture, multi-picture or output basis (but, in each case, solely to the extent relating to a Picture or any rights therein or thereto), as amended, modified, supplemented or restated from time to time.

"**F/D Pictures**" has the meaning set forth in the recitals.

"**Final Order**" means a judgment or order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to in writing by Buyer) and as to which (a) the time to appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent

jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such proceeding or order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order, shall not cause an order not to be a Final Order.

"**Financial Information**" means (a) the accounting, participation and/or ultimates statements received by the Sellers from the applicable counterparties under the Distribution Agreements in respect of the Pictures or any other Person with respect to any consideration payable to Sellers in connection with the Pictures, and (b) the accounting, participation and/or ultimates statements prepared by the Sellers and delivered to Magnum under the Magnum Agreements in respect of the Pictures.

"**Foreign Distribution Agreement**" means (a) in the case of the Foreign Pictures other than *Saving Silverman*, *Down to Earth*, *Zoolander* and *Don't Say A Word*, that certain Amended and Restated Consolidated Output Distribution Agreement (Foreign) dated as of November 10, 2020, between WBPL and VRD, as amended, restated, supplemented or otherwise modified from time to time (the "**Warner Foreign Agreement**"); (b) in the case of the Motion Picture titled *Saving Silverman*, that certain Distribution Agreement (Foreign) dated as of May 5, 2000, between Columbia Pictures Corporation Limited and VRP (as successor-in-interest to Evil Woman Film Partners LP), as amended, restated, supplemented or otherwise modified from time to time (the "**Saving Silverman Agreement**"); (c) in the case of the Motion Picture titled *Down to Earth*, that certain Distribution Agreement (Foreign) License and Sublicense dated as of August 11, 2000, between Paramount Pictures International, MTV S.A. LDC, DTE Film Partners LP and VRD, as amended, restated, supplemented or otherwise modified from time to time (the "**DTE Agreement**"); (d) in the case of the Motion Picture titled *Zoolander*, that certain Distribution Agreement (Foreign) Distribution Agreement (Foreign) License and Sublicense dated as of August 11, 2000, between Paramount Pictures International, MTV S.A. LDC, Zoo Film Partners LP and VRD, as amended, restated, supplemented or otherwise modified from time to time (the "**Zoolander Agreement**"); (e) in the case of the Motion Picture titled *Don't Say A Word*, that certain Distribution Agreement (Foreign) dated as of October 2, 2000, between Monarchy Enterprises S.a.r.l. and VRP (as successor-in-interest to DSAW Film Partners L.P.), as amended, restated, supplemented or otherwise modified from time to time (the "**Don't Say a Word Agreement**"); (f) in the case of the F/D Pictures, that certain Second Amended and Restated Output Distribution Agreement (Foreign) dated as of November 10, 2020, between WBPL and VRD, as amended, restated, supplemented or otherwise modified from time to time (the "**Warner F/D Agreement**"); and (g) in the case of the Foreign Pictures and the Motion Picture titled *Into the Storm*, the Greek Territory Distribution Agreements.

"**Foreign Distribution Rights**" means the rights to distribute or otherwise Exploit the Foreign Pictures and the F/D Pictures in any media throughout the Foreign Territory, which rights are subject to the prior grant of distribution rights to the Foreign Distributor under the Foreign Licenses and the applicable Foreign Distribution Agreement.

"**Foreign Distributor**" means (a) in the case of the Foreign Pictures (other than *Saving Silverman*, *Down to Earth*, *Zoolander* and *Don't Say A Word*) and the F/D Pictures, WBPL; (b) in the case of the Motion Picture titled *Saving Silverman*, Columbia Pictures Corporation Limited; (c) in the case of the Motion Pictures titled *Down to Earth* and *Zoolander*, Paramount Pictures International and MTV S.A. LDC; (d) in the case of the Motion Picture titled *Don't Say A Word*, Monarchy Enterprises S.a.r.l.; and (e) in the case of the Foreign Pictures and the Motion Picture titled *Into the Storm*, Village Roadshow Films Distributors S.A. (solely with respect to the Greek Territory).

"**Foreign Distributor Fees**" means the distribution fees payable to the applicable Foreign Distributor under the applicable Foreign Distribution Agreement.

"**Foreign Gross Receipts**" means "Defined Gross" or "Gross Receipts" or "International Gross Receipts", as the case may be, as defined in the applicable Foreign Distribution Agreement.

"**Foreign Licenses**" means each Foreign License (as defined in the applicable MPRPA) executed by WBEI in favor of WBPL pursuant to the applicable MPRPA.

"**Foreign Participations**" means Participations that are paid by the applicable Foreign Distributor in accordance with the applicable Foreign Distribution Agreement.

"**Foreign Pictures**" has the meaning set forth in the recitals.

"**Foreign Recoupable Distribution Expenses**" means "Recoupable Distribution Expenses", "Recoupable Expenses" (in the case of the Motion Picture titled *Don't say a Word*), "Foreign Distribution Expenses", "Home Video Distribution Expenses" (in the case of the Motion Picture titled *Saving Silverman*), "Video Costs" (in the case of the Motion Pictures titled *Down to Earth* and *Zoolander*) and "Allowable Distribution Expenses" (each as defined in the applicable Foreign Distribution Agreement).

"**Foreign Residuals**" means Residuals that are paid by the applicable Foreign Distributor in accordance with the applicable Foreign Distribution Agreement.

"**Foreign Subsidies**" means Production Subsidies/Sale Proceeds with respect to the Foreign Pictures or F/D Pictures, as applicable.

"**Foreign Territory**" means in the case of each Picture, the "Foreign Territory" as defined in the applicable Foreign Distribution Agreement.

"**Fundamental Contracts**" means each of (a) the Warner F/D Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise necessary to comply with the terms thereof); (b) the Domestic Distribution Agreement (together with all right, title and interest in and to the Pictures licensed to the Domestic Distributor pursuant thereto or otherwise necessary to comply with the terms thereof); (c) the Warner Foreign Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise

necessary to comply with the terms thereof); and (d) the Virtual Co-Financing Agreement (together with all right, title and interest in and to the Pictures licensed to the Virtual Distributor pursuant thereto or otherwise necessary to comply with the terms thereof).

"**Global Distribution Agreement**" means that certain Amended and Restated Output Distribution Agreement dated as of October 30, 2015, between VRD-USA and CPII with respect to the Global Pictures, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Global Distribution Rights**" means the rights to distribute or otherwise Exploit the Global Pictures in any media throughout the Global Territory, which rights are subject to the prior grant of distribution rights to the Global Distributor under the Global Licenses and the Global Distribution Agreement.

"**Global Distributor**" means CPII.

"**Global Distributor Fees**" means the distribution fees payable to the Global Distributor under the Global Distribution Agreement.

"**Global Gross Receipts**" means "Defined Gross Receipts" as defined in the Global Distribution Agreement.

"**Global Intercreditor Agreement**" means the Second Amended and Restated Intercreditor Agreement dated as of November 10, 2020, among CPII, for itself and for the benefit of Sony, VRFG, VRD-USA, VREG-USA, Magnum and U.S. Bank National Association, as amended, restated, supplemented or otherwise modified from time to time prior to the Closing Effective Date.

"**Global Licenses**" means each Global License (as defined in the applicable MPRPA) executed by Sony in favor of CPII pursuant to the applicable MPRPA.

"**Global Participations**" means Participations that are paid by the Global Distributor in accordance with the Global Distribution Agreement.

"**Global Pictures**" has the meaning set forth in the recitals.

"**Global Recoupable Distribution Expenses**" means "Recoupable Distribution Expenses" (as defined in the Global Distribution Agreement).

"**Global Residuals**" means Residuals that are paid by the applicable Global Distributor in accordance with the Global Distribution Agreement.

"**Global Subsidies**" means Production Subsidies/Sale Proceeds with respect to the Global Pictures.

"**Global Territory**" means the entire universe.

"**Government Approval**" means any (a) necessary filings, notifications, registrations, applications, declarations, waiting period expiration or termination, and submissions in connection with the Transactions, as required under any applicable Law and (b) consents, certifications, grants, confirmation, permits or Orders from a Governmental Authority required to be obtained or made by any Seller or Buyer or any of their respective Affiliates to execute, deliver and perform their respective obligations under this Agreement or the other Transaction Documents and consummate the Transactions.

"**Governmental Authority**" means any court, tribunal, arbitrator, authority, agency, commission, bureau, board, department, legislature, official, body or other instrumentality of the United States (whether federal, state, municipal or local), any foreign country, or any domestic or foreign state, province, county, city, other political subdivision or any other similar body or organization exercising governmental or quasi-governmental power or authority.

"**Greek Territory**" means the "Greek Territory" as defined in the Greek Territory Distribution Agreements.

"**Greek Territory Distribution Agreements**" means (a) that certain Amended & Restated Output Distribution Agreement dated as of October 2, 2009, between Village Roadshow Distribution UK Limited and Village Roadshow Films Distributors S.A., as amended, restated, replaced, supplemented or otherwise modified from time to time, and (b) that certain Deed of Novation and Variation dated as of February 28, 2019 among Village Roadshow Distribution UK Limited, VRD and Village Roadshow Films Distributors S.A., as amended, restated, replaced, supplemented or otherwise modified from time to time.

"**IFRS**" means the International Financial Reporting Standards issued from time to time by the International Financial Reporting Standards Foundation and the International Accounting Standards Board.

"**Indebtedness**" of any Person as of any date of determination means, without duplication, (a) the principal amount of all indebtedness of such Person for borrowed money and any accrued and unpaid interest thereon, (b) the principal amount of any other indebtedness of such Person which is evidenced by a note, bond, debenture or similar instrument or debt security and any accrued and unpaid interest thereon, including, without limitation, the obligations of the Sellers under all notes issued pursuant to the Indenture, in each case determined in accordance with IFRS, (c) all capital lease obligations of such Person as of such date, in each case determined in accordance with IFRS, (d) indebtedness secured by an Adverse Claim on assets of any Seller, (e) obligations under any drawn letters of credit (excluding reimbursement obligations in respect of undrawn letters of credit), (f) all interest rate or non-U.S. currency swaps, caps, collars, hedges or insurance agreements, or options or forwards on such agreements, or other similar agreements for the purpose of managing the interest rate or non-U.S. exchange risk, (g) all financing fees and costs related to the indebtedness described in foregoing clauses (a) through (f), and (h) all guaranties of such Person in respect of any of the foregoing.

"**Indenture**" means (a) that certain Base Indenture dated as of November 10, 2020 among VR Funding and VRF Holdings, as issuers, and U.S. Bank National Association, as

-15-

trustee, as supplemented by (b) that certain Group A Supplement dated as of November 10, 2020 among VR Funding, VRF Holdings, VRF, VRFNA, VRFG and VRVS, as Group A Co-Issuers, and U.S. Bank National Association, as trustee, as supplemented by (c) that certain Series 2020-1 Supplement dated as of November 10, 2020 among the Group A Co-Issuers and U.S. Bank National Association, as trustee in each case, as supplemented, amended, restated, extended or otherwise modified from time to time.

"**Insider**" shall have the meaning set forth in section 101(31) of the Bankruptcy Code.

"**Insider Causes of Action**" means any Claims or causes of action against any Insider of the Debtors.

"**Intercreditor Agreements**" means the Consolidated Intercreditor Agreement, the Global Intercreditor Agreement and the Virtual Intercreditor Agreement.

"**IP Assignment Agreement**" means the assignment agreement to assign and transfer the Sellers' rights in the Transferred Copyrights to Buyer, to be entered into at Closing, in form and substance mutually acceptable to each of the Parties.

"**Knowledge**" means, when referring to the "knowledge" of the Sellers, or any similar phrase or qualification based on knowledge of any Seller, (a) the actual knowledge of James Moore, Louis Santor, Kevin Berg, Keith Maib, and/or Glenn Taylor and (b) the knowledge that any such person referenced in clause (a) above, as a prudent business person, would have obtained after making due inquiry with respect to the particular matter in question.

"**Law**" or "**law**" means and includes any provision or requirement of any present or future statute, rule, regulation, code, code of practice, ordinance, standard, statutory guidance, decree, rule of common law or principle of equity, or other decision of any court, tribunal or Governmental Authority or by-law of any foreign, multinational, regional, federal, state, county, municipal or local jurisdiction.

"**Liability**" means, with respect to any Person, any liability or obligation (including with respect to Taxes) of such Person of any kind, character or description, whether known or unknown, disclosed or undisclosed, absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, direct or indirect, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person or is discharged, stayed or otherwise affected by any proceeding under any Debtor Relief Laws.

"**Loss**" or "**Losses**" means any Liability, loss, damage, claim, demand, obligation, charge, deficiency, settlement payment, Tax, expense, interest, award, judgment, penalty, assessment, disbursement, fine, fee or amount paid in settlement or cost or expense related to any of the foregoing (including reasonable and documented out-of-pocket legal fees and expenses), but shall not include any exemplary or punitive damages.

"**Magnum**" means Magnum Films SPC, a segregated portfolio company incorporated under the laws of the Cayman Islands.

"**Magnum Agreements**" means (a) that certain Sale Agreement dated as of December 20, 2013, by and among VRF, VRD and Magnum (as amended, restated, supplemented or otherwise modified from time to time), (b) that certain Fourth Amended and Restated Co-Investment Agreement dated as of November 10, 2020, by and among VRF, VRD, VRFNA, VRD-USA, VRPNA and Magnum (as amended, restated, supplemented or otherwise modified from time to time) and (c) that certain Second Amended and Restated Co-Investment Agreement (Global) dated as of November 10, 2020, by and among VRFG, VRD-USA and Magnum (as amended, restated, supplemented or otherwise modified from time to time), in each case, together with all ancillary documents entered into in connection therewith.

"**Magnum Domestic Percentage**" means the percentage of Designated Domestic Rights, Designated Domestic Receipts and Proceeds of the foregoing purchased by Magnum with respect to certain Pictures pursuant to the Magnum Agreements.

"**Magnum Foreign Percentage**" means the percentage of Designated Foreign Rights, Designated Foreign Receipts and Proceeds of the foregoing purchased by Magnum with respect to certain Pictures pursuant to the Magnum Agreements.

"**Magnum Global Percentage**" means the percentage of Designated Global Rights, Designated Global Receipts and Proceeds of the foregoing purchased by Magnum with respect to certain Pictures pursuant to the Magnum Agreements.

"**Material Adverse Effect**" means any change, event, circumstance, effect, state of facts, occurrence, development or other matter (any such item, an "**Effect**") that, individually or in combination with all other such similar or related Effects that have occurred prior to the date of determination of the occurrence of such Effect (a) prevents or would reasonably be expected to prevent or impair the ability of any Seller to consummate the Transactions under the Transaction Documents or (b) is or would reasonably be expected to be materially adverse to (i) the benefits, interests, rights or remedies of Buyer under any of the Transaction Documents or the rights to, timing of, or the amount of, payments thereunder, (ii) the business, assets, liabilities, condition (financial or otherwise), operations, performance, or properties of any Seller, (iii) the ability of any Seller to timely perform or comply with its covenants, agreements or obligations under any Transaction Document, or (iv) the legality, validity or enforceability of any Transaction Document; but, with respect to clauses (a) and (b), excluding any change or effect to the extent that it results from or arises out of the commencement of the Bankruptcy Cases.

"**Motion Picture**" means a feature-length theatrical motion picture.

"**MPRPA**" means (a) with respect to the Motion Pictures titled *Where the Wild Things Are*, *Sherlock Holmes*, *Sex and the City 2*, *Cats & Dogs: The Revenge of Kitty Galore*, *Legend of the Guardians*, *Life As We Know It*, *Happy Feet Two*, *Sherlock Holmes: A Game of Shadows*, *The Lucky One*, *Dark Shadows*, *Gangster Squad*, *the Great Gatsby*, *The LEGO Movie*, *Winter's Tale* and *Edge of Tomorrow*, that certain Amended and Restated Motion Picture Rights Purchase

Agreement dated as of November 21, 2012, between WV Films IV LLC and WV Film Partners IV L.P., as amended, restated, supplemented or otherwise modified from time to time; (b) with respect to the F/D Pictures, that certain Amended and Restated Motion Picture Rights Purchase Agreement dated as of November 10, 2020, between VRPNA and WBEI, as amended, restated, supplemented or otherwise modified from time to time; and (c) with respect to the Global Pictures, that certain Amended and Restated Motion Picture Rights Purchase Agreement dated as of October 30, 2015, between VRPNA and Sony, as amended, restated, supplemented or otherwise modified from time to time.

"**Notices of Assignment and Amendment**" means the Zoolander Notice of Assignment and Amendment and the DTE Notice of Assignment and Amendment.

"**Objection Notice**" has the meaning set forth in Section 2.13(b).

"**Order**" means any order, judgment, ruling, injunction, award, stipulation, assessment, decree or writ, whether preliminary or final, issued, promulgated or entered by or with any Governmental Authority.

"**Outside Date**" has the meaning set forth in Section 8.01(c).

"**Parent**" has the meaning set forth in Schedule I.

"**Participations**" means amounts (excluding Residuals) payable to any Person (other than any Seller or any of its Affiliates) who rendered services or granted rights in respect of or co-financed a Picture, and which are contingent on amounts derived from the Exploitation of such Picture or payable upon the occurrence of specified events in relation to the Exploitation of such Picture, by whatever name called or however calculated or characterized, whether as a fixed sum or as a percentage of the receipts (however denominated) of the applicable Picture remaining after giving effect to specified exclusions and deductions, if any.

"**Party**" or "**Parties**" means any party or parties to this Agreement.

"**Permitted Liens**" means security interests in favor of the Domestic Distributor, the Foreign Distributors, the Global Distributor or the Virtual Distributor (including any Uniform Commercial Code financing statement in favor of the Domestic Distributor, any of the Foreign Distributors, the Global Distributor or the Virtual Distributor with respect to the Pictures) as and to the extent set forth in the Intercreditor Agreements in effect as of the Effective Date (the "**Distributor Liens**").

"**Person**" means any individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company, Governmental Authority, or other entity.

"**Picture Agreements**" means the QCSAs, the MPRPAs, the Virtual Documents, the Distribution Agreements, the Magnum Agreements, the Intercreditor Agreements, the Indenture, all other instruments, exhibits, documents and agreements executed or delivered by Sellers from time to time prior to the Closing Effective Date pursuant to the foregoing, including, without

limitation, rights purchase agreements, intercompany licenses and assignments and security perfection documents, and all other Contracts to which a Seller is a party in connection with the financing, development, production, exhibition or other Exploitation of the Pictures.

"**Pictures**" has the meaning set forth in the recitals.

"**Post-Closing Statement**" has the meaning set forth in Section 2.13(a).

"**Post-Closing Tax Period**" means (x) any Tax period beginning after the Closing Effective Date and (y) with respect to a Straddle Period, that portion of such Straddle Period beginning after the Closing Effective Date and continuing for the remainder of such Straddle Period.

"**Post-Cutoff Income**" has the meaning set forth in Section 2.06.

"**Post-Cutoff Paid Liabilities**" has the meaning set forth in Section 2.06.

"**Pre-Closing Period**" has the meaning set forth in Section 6.01(a).

"**Pre-Closing Tax Period**" means (a) any Tax period ending on or before the Closing Effective Date and (b) with respect to a Straddle Period, that portion of such Straddle Period ending on (and including) the Closing Effective Date.

"**Proceeding**" means any suit, action, cause of action, litigation, hearing, inquiry, examination, demand, proceeding, controversy, complaint, appeal, notice of violation, citation, summons, subpoena, arbitration, mediation, dispute, claim, allegation, investigation or audit of any nature whether civil, criminal, quasi criminal, indictment, administrative, regulatory or otherwise and whether at Law or in equity.

"**Proceeds**" means, with respect to any property, (a) whatever is acquired upon the sale, lease, license, exchange, or other disposition of such property; (b) whatever is collected on, or distributed on account of, such property; (c) rights arising out of such property; (d) to the extent of the value of such property, claims arising out of the Loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, such property; or (e) to the extent of the value of such property and to the extent payable to the owner of such property, insurance payable by reason of the Loss or nonconformity of, defects or infringement of rights in, or damage to, such property. For purposes of this Agreement, all references to "Proceeds" in the definition of Purchased Assets or any definition referred to therein shall be deemed to mean Proceeds arising, received or payable from and after the Cutoff Date.

"**Production Subsidies/Sale Proceeds**" means Motion Picture subsidies, rebates or refunds (including in respect of Taxes) granted by a governmental or other entity for use in connection with or with respect to the production of the applicable Picture and any proceeds from sales or leasebacks or similar transactions in connection with the production of such Picture that are in the nature of, or have a similar effect to, a subsidy, rebate or refund.

"**Property Taxes**" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"**Purchase Price**" has the meaning set forth in Section 2.06.

"**Purchase Price Schedule**" has the meaning set forth in Section 2.12(a).

"**Purchased Assets**" means all of the Sellers' right, title and interest in and to the Pictures and all of the assets, properties and rights of any kind, whether tangible or intangible, used in, held for use in, relating to or arising from the financing, development, production and/or Exploitation of the Pictures, including, without limitation, all of the right, title and interest of each Seller in and to the following to the extent such assets or rights exist (except to the extent constituting the Excluded Assets):

(a)    the Pictures and any and all versions existing thereof, and all elements thereof (including the screenplay and story) and all trailers, "bloopers," footage, trims and outtakes thereof (including, without limitation, the director's cut and the final cut and any and all versions of each of the foregoing (in any and all languages), all versions rated by the Motion Picture Association of America and unrated versions thereof, "behind the scenes," "making of," and any and all other documentary or short form content relating thereto and all footage, "bloopers," trims and outtakes of each of the foregoing);

(b)    the Copyrights for each Picture and the underlying material for such Picture, in all territories of the world in which Copyright protection for such Picture is available, and any and all Copyright registrations and applications for such registrations for such Picture in such materials in all territories of the world (if any) (the "**Transferred Copyrights**");

(c)    all trademarks (if any) relating to the Pictures or any of the elements thereof, including, without limitation, rights protected pursuant to trademark, service mark, unfair competition and/or other laws, rules or principles of law or equity, and the right to register, renew, enforce and defend the foregoing (collectively, "**Trademarks**");

(d)    the license to use, in connection with the Exploitation thereof, all original or licensed music included in the soundtrack of such Picture and all musical material synchronized therewith, in whole or in part, all rights to perform, copy, record, rerecord, produce, publish, reproduce or synchronize any or all of said music and musical compositions, as well as all other rights to Exploit such music, including record, soundtrack recording and music publishing rights and all Copyrights in and to said musical material;

(e)    all Exploitation rights with respect to the Pictures (including all Ancillary Rights);

(f)    all inventory and work-in-process used in, held for use in, relating to, or arising from the ownership and Exploitation of the Pictures or any rights therein;

(g)    all Exploitation Agreements and all Contract Rights, including, without limitation, the right to cause the Pictures or any rights thereto to be distributed and/or Exploited under the Exploitation Agreements;

(h)    all accounts and accounts receivable (whether current or noncurrent) and the full benefit of all security for such receivables arising, received or payable from and after the Cutoff Date, including any claims, remedies and other rights to the extent related to any of the foregoing, including, without limitation, all right to receive or retain, whether as an owner, a participant or otherwise, any and all receivables, royalties, cash flows and other incomes and revenues of whatever kind or nature from the Exploitation of the Pictures or any elements thereof in any and all media arising, received or payable from and after the Cutoff Date (the "**Post-Cutoff Cash Flows**");

(i)    all Books and Records;

(j)    all Tangible Assets;

(k)    all rights to receive Financial Information from a distributor or any other Person with respect to the monies and any other consideration payable in connection with the Pictures for all accounting periods;

(l)    all rights to (A) exercise, control, settle, compromise and/or direct any noticed, pending or future audit and/or inspection (an "**Audit Right**") of or relating to amounts reflected in any Financial Information with respect to any Picture, and (B) receive the economic benefit and/or any payments resulting from any audit set forth in clause (A) above; and

(m)    other than with respect to the Warner Dispute, ~~all~~the Insider Causes of Action and the Avoidance Actions, all of the Sellers' claims or causes of action, choses in action~~, Avoidance Actions~~, rights of recovery and rights of set-off of any kind and indemnities against other Persons (regardless of whether or not such claims and causes of action have been asserted) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery (regardless of whether such rights are currently exercisable) relating to the Pictures or the Exploitation of the Pictures; provided, that, for the avoidance of doubt, Sellers agree that Buyer is not acquiring the rights, obligations or Liabilities relating to any claim (A) asserted against any Seller (or its Affiliates) in the Warner Dispute or (B) asserted by any Seller (or its Affiliates) in the Warner Dispute.  However, nothing herein shall affect Buyer's (or any of its Affiliate's) rights with respect to any all claims or causes of action, choses in action, rights of recovery and rights of set-off of any kind and indemnities made on its own behalf against other Persons (regardless of whether or not such claims and causes of action have been asserted) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery (regardless of whether such rights are currently exercisable) to which Buyer (or its Affiliates) may be entitled in the Warner Dispute;

provided, for clarity, that the Purchased Assets shall include the following:

(i)  the Assumed Contracts;

(ii)  with respect to each Foreign Picture and each F/D Picture, (i) an undivided interest equal to the Relevant Percentage in the Foreign Distribution Rights with respect to such Picture, (ii) an undivided interest equal to the Relevant Percentage in the Designated Foreign Receipts with respect to such Picture, and (iii) all Proceeds of the foregoing;

(iii)  with respect to each F/D Picture, (i) an undivided interest equal to the Relevant Percentage in the Domestic Distribution Rights with respect to such Picture, (ii) an undivided interest equal to the Relevant Percentage in the Designated Domestic Receipts with respect to such Picture, and (iii) all Proceeds of the foregoing;

(iv)  with respect to each Global Picture, (i) an undivided interest equal to the Relevant Percentage in the Global Distribution Rights with respect to such Picture, (ii) an undivided interest equal to the Relevant Percentage in the Designated Global Receipts with respect to such Picture, and (iii) all Proceeds of the foregoing;

(v)  with respect to each Virtual Picture, (i) an undivided interest equal to the Relevant Percentage in the Virtual Distribution Rights with respect to such Picture, (ii) an undivided interest equal to the Relevant Percentage in the Designated Virtual Receipts with respect to such Picture, and (iii) all Proceeds of the foregoing; and

(vi)  without duplication of the foregoing, all amounts to which Sellers are entitled to receive pursuant to the Specified Zoolander Agreements and Specified DTE Agreements.

"**QCSA**" means (a) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of February 22, 2006, between WV Films LLC and WV Film Partners L.P., as amended, restated, supplemented or otherwise modified from time to time; (b) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of February 22, 2006, between WV Films II LLC and WV Film Partners II L.P., as amended, restated, supplemented or otherwise modified from time to time; (c) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of April 10, 2008, between WV Films III LLC and WV Film Partners III L.P., as amended, restated, supplemented or otherwise modified from time to time; (d) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of December 15, 2017, between WV Films IV LLC and WV Film Partners IV L.P., as amended, restated, supplemented or otherwise modified from time to time; (e) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of December 14, 2021, between Evil Woman Films LLC and Evil Woman Film Partners LP, as amended, restated, supplemented or otherwise modified from time to time; (f) that certain Qualified Cost Sharing Agreement dated as of August 11, 2000, between Zoo Films LLC and Zoo Film Partners LP, as amended, restated, supplemented or otherwise modified from time to time (the "**Zoolander QCSA**"); (g) that certain Qualified Cost Sharing Agreement dated as of August 11, 2000, between DTE Films

-22-

LLC and DTE Film Partners LP, as amended, restated, supplemented or otherwise modified from time to time (the "**DTE QCSA**"); and (h) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of December 19, 2019, between DSAW Films LLC and DSAW Film Partners L.P., as amended, restated, supplemented or otherwise modified from time to time.

"**Quarterly Reporting**" means the accounting statements, earnings statements or other similar statements or reporting delivered by the counterparties under the Distribution Agreements for the immediately preceding fiscal quarter.

"**Reductions**" has the meaning set forth in Section 4.01(j)(ix).

"**Relevant Percentage**" means the percentage of the Applicable Percentage of each Picture owned by the Sellers after giving effect to the purchases by Magnum pursuant to the Magnum Agreements.

"**Required Consent**" has the meaning set forth in Section 2.05(a).

"**Residuals**" means all residuals and other Liabilities (including employer fringe benefits, supplemental market payments, pension, health and welfare payments and Taxes payable with respect thereto) owing or payable to any Person (other than any Seller or any of its Affiliates) under applicable Collective Bargaining Agreements by reason of, in connection with, as a condition to or arising from the Exploitation of the Pictures, or any part thereof, from time to time, or any use or reuse thereof for any purpose or in any media whatsoever.

"**Rights Purchase Agreement**" has the meaning set forth in the applicable MPRPA.

"**Sale Order**" means an order entered by the Bankruptcy Court, in form and substance acceptable to Buyer and the Sellers, approving this Agreement and all of the terms and conditions hereof and approving and authorizing the Sellers to consummate the transactions contemplated hereby.  The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, (i) the execution, delivery and performance by the Sellers of this Agreement, (ii) the sale of the Purchased Assets to Buyer on the terms set forth herein and free and clear of all Adverse Claims (other than those included in the Assumed Liabilities and the Permitted Liens) to the full extent permitted pursuant to section 363(f) of the Bankruptcy Code and find that Buyer is not a successor of any of the Sellers, and (iii) the performance by the Sellers of their respective obligations under this Agreement, including the full satisfaction of Cure Amounts for all Assumed Contracts, (b) authorize and empower the Sellers to assume and assign to Buyer the Assumed Contracts as set forth in this Agreement pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, and (c) find that Buyer is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code and grant Buyer the protections of section 363(m) of the Bankruptcy Code.

"**Seller Closing Deliverables**" has the meaning set forth in Section 2.10.

"**Seller Transaction Expenses**" means the aggregate amount of any and all costs, fees and expenses incurred by or on behalf of, or paid or to be paid directly by, the Sellers or any Person that the Sellers pay or reimburse or are otherwise legally obligated to pay or reimburse in

connection with, in anticipation of or incident to the negotiation, preparation, execution and delivery of this Agreement and the other Transaction Documents or the performance or consummation of the Transactions, including: (i) all costs, fees and expenses payable to counsel, advisors, consultants, investment bankers, accountants, auditors and any other experts, and all obligations under any engagement letter or other agreement or understanding with any investment banker or broker in connection with the Transactions; (ii) any costs, fees and expenses associated with obtaining necessary or appropriate waivers, consents, or approvals of any Governmental Authority or other third parties on behalf of the Sellers in connection with the Transactions; (iii) any costs, fees or expenses associated with obtaining the release and termination of any Adverse Claims in connection with the Transactions; (iv) all brokers', finders' or similar fees in connection with the Transactions; and (v) all amounts owed to any Service Provider that arise in whole or in part as a result of the consummation of the Transactions including all change of control payments, bonuses, severance, termination, or retention obligations or similar amounts payable in the future or due by the Sellers in connection with the Transactions contemplated hereby, including any Taxes payable in connection therewith.

"**Seller Transaction Expenses Schedule**" means a written schedule of the Seller Transaction Expenses that remain unpaid as of the Closing Effective Date, in form and substance reasonably satisfactory to Buyer, setting forth (a) the name of each such Seller Transaction Expense payee, (b) the amount due to such payee as set forth in the applicable invoice and (c) such payee's bank account information as set forth in the applicable invoice, delivered to Buyer in accordance with Section 2.10(d) together with a copy of each such invoice and an IRS Form W-9 or applicable IRS Form W-8 for each such payee, duly executed by such payee.

"**Sellers**" has the meaning set forth in the preamble.

"**Separateness**" means the requirement of each Seller to maintain an existence separate from its Affiliates, as more particularly set forth in each Seller's Constitutive Documents.

"**Service Provider**" means, with respect to any Person, each director, officer, employee, manager, independent contractor, consultant, leased employee or other service provider of such Person.

"**Sony**" means Sony Pictures Entertainment Inc., a Delaware corporation.

"**Source**" has the meaning set forth in Section 4.02(e).

"**Specified Audit Proceeds**" means an amount equal to fifty percent (50%) of (a) all payments received by Buyer from the applicable counterparty to the applicable Distribution Agreement resulting from any audit of amounts reflected in any Financial Information with respect to the applicable Picture for any period commencing prior to the Cutoff Date and ending prior to the Cutoff Date (the "**Pre-Cutoff Period**"), less (b) all documented out of pocket costs (including legal fees) incurred by Buyer or its Affiliates in connection with the negotiation, litigation and/or settlement of such audit; provided, that to the extent that any such audit is in respect of both the Pre-Cutoff Period and any audit period commencing on or after the Cutoff Date (the "**Post-Cutoff Period**"), then Buyer shall allocate the amounts described in the

foregoing (a) and (b) between the Pre-Cutoff Period and the Post-Cutoff Period reasonably and in good faith based on the number of days in the applicable period subject to such audit occurring during the Pre-Cutoff Period relative to the total number of days in the applicable period subject to such audit.

"**Specified Contracts**" means each of (a) the Global Distribution Agreement (together with all right, title and interest in and to the Pictures licensed to the Global Distributor pursuant thereto or otherwise necessary to comply with the terms thereof), (b) the Saving Silverman Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise necessary to comply with the terms thereof), (c) the DTE Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise necessary to comply with the terms thereof), (d) the Zoolander Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise necessary to comply with the terms thereof), and (e) the Don't Say a Word Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise necessary to comply with the terms thereof).

"**Specified Event**" means, (i) with respect to a Specified Contract, the Sellers' failure to obtain and deliver to Buyer the Sale Order approving the transfer to Buyer of such Specified Contract on or prior to the Closing Effective Date, (ii) with respect to *Zoolander*, the Sellers' failure to obtain and deliver to Buyer on or prior to the Closing Effective Date the Zoolander Notice of Assignment and Amendment, in form and substance reasonably satisfactory to Buyer and duly executed by the parties thereto, and/or (iii) with respect to *Down to Earth*, the Sellers' failure to obtain and deliver to Buyer on or prior to the Closing Effective Date the DTE Notice of Assignment and Amendment, in form and substance reasonably satisfactory to Buyer and duly executed by the parties thereto.

"**Specified Event Purchase Price Reduction**" means an amount equal to the sum of (a) in the event of a Specified Event with respect to the Global Distribution Agreement, an amount equal to $13,882,000, *plus* (b) in the event of a Specified Event with respect to the Saving Silverman Agreement, an amount equal to $76,000, *plus* (c) in the event of a Specified Event with respect to the DTE Agreement or *Down to Earth*, an amount equal to $1,384,000, *plus* (d) in the event of a Specified Event in connection with the Zoolander Agreement or *Zoolander*, an amount equal to $7,564,000, *plus* (e) in the event of a Specified Event with respect to the Don't Say a Word Agreement, an amount equal to $756,000.

"**Straddle Period**" means any Tax period beginning before or on, and ending after, the Closing Effective Date.

"**Successful Bidder**" means, if an Auction is conducted, the prevailing party with respect to the Purchased Assets at the conclusion of such Auction.

"**Tangible Assets**" means all physical properties of, or relating to, any Picture, including prints, negatives, duplicating negatives, fine grains, music and sound effects tracks, master tapes and other duplicating materials of any kind, all various language dubbed and titled versions,

prints and negatives of stills, trailers and television spots, all promos and other advertising and publicity materials, stock footage, trims, tabs, out-takes, cells, drawings, storyboards, models, sculptures, puppets, sketches and continuities, including, without limitation, those elements which are stored by the relevant distributor (or the applicable rights therein).

"**Tax**" or "**Taxes**" means any U.S. federal, state, local or non-U.S. income, gross receipts, branch profits, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, escheat, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, ad valorem, value added, alternative or add-on minimum or estimated tax or other tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or not.

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Transaction Documents**" means this Agreement, the Assumption and Assignment Agreement, the IP Assignment Agreement, any pleadings related to this Agreement filed with the Bankruptcy Court, the Notices of Assignment and Amendment, and all other instruments, exhibits, documents and agreements executed or delivered from time to time in connection with the foregoing.

"**Transactions**" means the transactions contemplated by the Transaction Documents.

"**Transfer Taxes**" means all transfer, stamp, documentary, sales, use, registration, value-added and other similar Taxes (including all applicable real estate transfer Taxes) incurred in connection with any Transaction Document and the Transactions.

"**V Squared Assignment and Assumption Agreement**" means that certain Assignment and Assumption Agreement dated as of November 10, 2020, by and among V Squared, LLC, VRVS, Vine Investment Advisors, LP, Vine Film Finance Fund II AIV, L.P., Vine WestCon SPV, LP, Warner Bros. Pictures, a division of WB Studio Enterprises Inc. and VREG-USA, as amended, restated, supplemented or otherwise modified from time to time.

"**VFFF Assignment and Assumption Agreement**" means that certain Assignment and Assumption Agreement dated as of November 10, 2020, by and among Vine Film Finance Fund II AIV, L.P., VRVS, V Squared LLC, and VREG-USA, as amended, restated, supplemented or otherwise modified from time to time.

"**Virtual Assignment and Assumption Agreements**" means the V Squared Assignment and Assumption Agreement, the VFFF Assignment and Assumption Agreement and the WestCon Assignment and Assumption Agreement**.**

"**Virtual Co-Financing Agreement**" means that certain Co-Financing Agreement dated as of September 28, 2005, between Warner Bros. Pictures Inc. and Virtual Studios LLC, as amended, restated, supplemented or otherwise modified from time to time.

"**Virtual Distribution Rights**" means the right to market, distribute, subdistribute and otherwise Exploit the Virtual Pictures in any media throughout the Virtual Territory, which rights are subject to the prior grant of distribution rights to the Virtual Distributor under that certain Assignment dated as of April 1, 2003, between Warner Bros. Pictures Inc. and WBEI.

"**Virtual Distributor**" means WBEI.

"**Virtual Documents**" means the Virtual Assignment and Assumption Agreements, the Virtual Co-Financing Agreement and the Virtual Letter of Direction.

"**Virtual Intercreditor Agreement**" means that certain Intercreditor Agreement dated as of November 10, 2020, among Warner Bros. Pictures, a division of WB Studio Enterprises Inc., VRVS and U.S. Bank National Association, as amended, restated, supplemented or otherwise modified from time to time prior to the Closing Effective Date.

"**Virtual Letter of Direction**" means that certain Second Amended and Restated Letter of Direction re: Co-Financing Agreement dated September 28, 2005, as amended by that certain letter agreement dated November 10, 2020, by and among VRVS, VRH-USA, Warner Bros. Pictures, a division of WB Studio Enterprises, Inc., Vine Investment Advisors, LP, V Squared, LLC, Vine Film Finance Fund II AIV, L.P., and Vine WestCon SPV, LP, as amended, restated, supplemented or otherwise modified from time to time.

"**Virtual Pictures**" has the meaning set forth in the recitals.

"**Virtual Territory**" means the entire universe.

"**VR Funding**" has the meaning set forth in Schedule I.

"**VRD**" has the meaning set forth in Schedule I.

"**VRDTE**" means VR DTE Productions Ltd., a company formed under the laws of the British Virgin Islands.

"**VRD-USA**" has the meaning set forth in Schedule I.

"**VREG-USA**" means Village Roadshow Entertainment Group USA Inc., a Delaware corporation.

"**VRF**" has the meaning set forth in Schedule I.

"**VRF Holdings**" has the meaning set forth in Schedule I.

241154324.2
212160-10346

"**VRFG**" has the meaning set forth in <u>Schedule I</u>.

"**VRFNA**" has the meaning set forth in Schedule I.

"**VRH-USA**" means Village Roadshow Holdings USA Inc., a Delaware corporation.

"**VRP**" has the meaning set forth in <u>Schedule I</u>.

"**VRPNA**" has the meaning set forth in <u>Schedule I</u>.

"**VRVS**" has the meaning set forth in <u>Schedule I</u>.

"**Warner Dispute**" means any and all claims brought or asserted at any time by WBEI and/or its Affiliates against any Seller and/or any of its Affiliates, and any and all claims brought or asserted at any time by any Seller and/or any of its Affiliates against WBEI and/or its Affiliates, including, but not limited to, each of the Proceedings set forth on <u>Section 4.01(e)</u> of the Disclosure Schedules, and any other related or similar Proceedings, in each case involving any Seller and/or its Affiliates, on the one hand, and WBEI and/or its Affiliates, on the other hand.

"**WAV**" means WAV Distribution LLC, a Delaware limited liability company.

"**WBEI**" means Warner Bros. Entertainment Inc., a Delaware corporation.

"**WBPL**" means Warner Bros. Productions Limited, a company formed under the laws of England.

"**WestCon Assignment and Assumption Agreement**" means that certain Assignment and Assumption Agreement dated as of November 10, 2020, by and among Vine WestCon SPV, LP, VRVS, V Squared LLC, and VREG-USA, as amended, restated, supplemented or otherwise modified from time to time.

"**Zoo Films LLC Agreement**" means that certain Operating Agreement of Zoo Films LLC, dated as of August 11, 2000 by and among Paramount Pictures Corporation and VR Zoo Distribution USA Inc., as amended, restated, supplemented or otherwise modified from time to time.

"**Zoo Films Partnership Agreement**" means that certain Articles of Limited Partnership of Zoo Film Partners L.P., dated as of August 11, 2000, by and among VRD, VR Zoo Productions Ltd, and MTV S.A. (f/k/a MTV S.A. LDC), as amended, restated, supplemented or otherwise modified from time to time.

"**Zoolander Notice of Assignment and Amendment**" means an irrevocable notice of assignment and amendment entered into among Buyer and each of the parties to the Zoolander Agreement, Zoolander QCSA, Zoo Films Partnership Agreement and Zoo Films LLC Agreement (each of the foregoing, together with any other agreements between or among the parties thereto in connection with *Zoolander*, the "**Specified Zoolander Agreements**"), pursuant to which the

parties thereto shall agree that, notwithstanding anything to the contrary in the Specified Zoolander Agreements: (i) "International Net Proceeds" and "Domestic Net Proceeds" (each as described and calculated in the Financial Information prepared by Paramount in respect of *Zoolander*) shall be shared by Paramount and Buyer 50 / 50 in perpetuity; provided, that if International Net Proceeds are cumulatively negative, Paramount shall pay Buyer one hundred percent (100%) of the International Net Proceeds and Domestic Net Proceeds until such shortfall has been recouped, consistent with past practice, and (ii) the parties to the Specified Zoolander Agreements shall agree not to amend any Specified Zoolander Agreement following the date of such notice of assignment and amendment in any manner that would modify or otherwise affect the calculation or timing of amounts payable to Buyer pursuant to such notice of assignment and amendment.

Section 1.02   **References to Agreements**.  References to an agreement or document shall include all schedules, annexes, exhibits, appendices and other attachments to such agreement or document, and unless otherwise stated, are to such agreement or document (including all such attachments) as amended, restated, replaced, supplemented or otherwise modified from time to time in a manner not inconsistent with the terms hereof and thereof.

## ARTICLE IISALE AND PURCHASE; CLOSING

Section 2.01   **Sale and Purchase of Purchased Assets**.  Pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, and provided that in all events that Buyer is the Successful Bidder, at the Closing, Buyer shall purchase, acquire and accept from the Sellers, and the Sellers shall irrevocably sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, all of the Sellers' right, title and interest, in, to and under the Purchased Assets, on an "as is" and "where is" basis (except as otherwise provided herein), but free and clear of Adverse Claims (except for the Assumed Liabilities and the Permitted Liens) or other interests in such Purchased Assets to the full extent provided by section 363(f) of the Bankruptcy Code.

Section 2.02   **Assumed Liabilities**.  Upon the terms and subject to the conditions of this Agreement, and explicitly excluding the Excluded Liabilities described below in Section 2.04, Buyer agrees, effective as of the time of the Closing, that it shall assume the sole responsibility for paying, performing and discharging when due, (a) all Liabilities arising from the ownership and Exploitation of the Purchased Assets by or on behalf of Buyer after the Closing Effective Date, and (b) all Liabilities for Property Taxes allocated to Buyer under and in accordance with Section 6.06 (the "**Assumed Liabilities**").

Section 2.03   **Excluded Assets**.  Notwithstanding any provision in this Agreement to the contrary, the Sellers shall not be deemed to sell, transfer, assign, convey or deliver, and the Sellers will retain, all right, title and interest to, in and under, (a) the Derivative Rights, (b) any Contract that is not an Assumed Contract, ~~and~~ (c) the Specified Audit Proceeds, (d) Avoidance Actions and Insider Causes of Action and (e) the rights, obligations, or Liabilities relating to any claim asserted against any Seller (or its Affiliates) in the Warner Dispute or asserted by any

Seller (or its Affiliates) in the Warner Dispute, in each case (collectively, the "**Excluded Assets**").

Section 2.04    **Excluded Liabilities**. Notwithstanding any provision in this Agreement to the contrary, (i) Buyer is assuming only the Assumed Liabilities, and (ii) the Excluded Liabilities shall remain the sole obligation and responsibility of the Sellers.  As used in this Agreement, "**Excluded Liabilities**" includes, without limitation:

(a)    all Liabilities of the Sellers not arising out of, in respect of or relating to the Purchased Assets;

(b)    all Liabilities of the Sellers arising out of, in respect of or relating to the Purchased Assets accruing prior to the Cutoff Date;

(c)    all Liabilities arising out of, in respect of or relating to the Purchased Assets to the extent resulting from or relating to actions, omissions or circumstances taking place prior to the Closing Effective Date, including all Liabilities arising out of, in respect of or relating to (1) any actual or threatened Proceedings or legal claims (including but not limited to the Warner Dispute) arising from or relating to Sellers' production, financing, ownership or Exploitation of the Pictures or the Purchased Assets or any other aspect of Sellers' business prior to the Closing Effective Date, (2) any Seller at any time in its capacity as a producer, financier, owner, licensor, distributor or in any other capacity at or prior to the Closing Effective Date, (3) the failure of Sellers to comply with any Laws or any of their obligations prior to the Closing Effective Date (whether contractual or otherwise, including, without limitation, any Participation or Residual obligations that are contractually required to be paid on or prior to the Closing Effective Date), and (4) the obligation to indemnify, reimburse or advance amounts to any present or former officer, director, employee, owner, manager, Affiliate or agent of Sellers or their Affiliates or any participant, producer, financier, owner, distributor, talent or other Person in connection with any Picture or otherwise prior to the Closing Effective Date;

(d)    all Liabilities of the Sellers pursuant to any QCSA or MPRPA;

(e)    all Liabilities arising out of, in respect of, or relating to the Excluded Assets;

(f)    Excluded Taxes;

(g)    all Indebtedness of the Sellers and all Indebtedness arising before the Closing Effective Date that is otherwise secured by any of the Purchased Assets which in either case remains outstanding following the Closing Effective Date;

(h)    the ABS Obligations;

(i)    all Liabilities assumed by, retained by or agreed to be performed by Sellers pursuant to the Transaction Documents; and

(j)      all Liabilities arising out of, in respect of, or relating to Cure Amounts under the Assumed Contracts.

Section 2.05    **Assumption and Assignment of Contracts.**

(a)      <u>Assignment of Contracts</u>. To the maximum extent permitted by law, at the Closing, and pursuant to the Sale Order, the Sellers shall assign to Buyer those assignable contracts that are set forth on ~~Schedule III~~Schedule III, including, but not limited to, certain of the Picture Agreements pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code (the "**Assumed Contracts**"), which schedule Buyer may update at any time prior to the Closing Effective Date.   Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party, would not be permissible under section 365 of the Bankruptcy Code. Except with respect to the Fundamental Contracts as provided in ~~Section 3.01(g)~~Section 3.01(f), if such consent is not obtained or such assignment is not attainable pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, then such Purchased Asset shall not be transferred hereunder and the Closing shall proceed with respect to the remaining Purchased Assets without any reduction in the Purchase Price other than with respect to the Specified Contracts as provided in <u>Section 2.06(a)(iii)</u>; provided, however, that (i) the Sellers shall use, whether before or after the Closing, their commercially reasonable efforts to obtain all necessary consents (each, a "**Required Consent**") to the assignment and transfer thereof, and (ii) in the event that any Assumed Contract is deemed not to be assigned pursuant to clause (i) of this <u>Section 2.05(a)</u>, the Sellers shall (A) use commercially reasonable efforts to obtain such Required Consents as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful arrangement reasonably proposed by Buyer, including subcontracting, licensing or sublicensing to Buyer any or all of any Seller's rights and obligations with respect to any such Assumed Contract, under which Buyer shall obtain (without infringing upon the legal rights of such third party or violating any law) the economic rights and benefits under such Assumed Contract with respect to which such Required Consent has not been obtained.

(b)      <u>Sellers Commitment to Cure Payments</u>. The Sellers will pay all Cure Amounts in connection with the assumption and assignment of Assumed Contracts for which all Required Consents and Bankruptcy Court approval to transfer have been obtained. The Sellers have provided to Buyer a schedule set forth on ~~Schedule III~~Schedule III setting forth a good faith estimate of all Cure Amounts for all Assumed Contracts ("**Cure Schedule**"), which schedule the Sellers may update from time to time prior to the date that is three (3) business days prior to the Closing Effective Date.

(c)      <u>Adequate Assurance</u>. Buyer shall use commercially reasonable efforts to provide the Bankruptcy Court and non-debtor contract counterparties any evidence reasonably necessary to prove adequate assurance of future performance necessary to effect the assumption and assignment of the Assumed Contracts.

Section 2.06    **Purchase Price and Buyer Deposit.**

(a)      On the terms and subject to the conditions contained herein, the aggregate purchase price to be paid by Buyer for the Purchased Assets (the "**Purchase Price**") shall consist of an amount of cash equal to the sum of (i) ~~Three~~Four Hundred ~~Sixty-Five~~Seventeen Million Five Hundred Thousand Dollars ($~~365,000,000~~417,500,000); *minus* (ii) an amount equal to the sum of all gross amounts received by or credited to the Sellers that constitute amounts included in the Purchased Assets (including, without limitation, all gross amounts received by or credited to the Sellers prior to the Closing Effective Date in respect of the Pictures from and after the Cutoff Date) (the "**Post-Cutoff Income**"); *minus* (iii) in the event of the occurrence of one or more Specified Events, an amount equal to the Specified Event Purchase Price Reduction with respect to such Specified Events; *plus* (iv) an amount equal to the sum of any actual, direct, verifiable, third party out-of-pocket costs (including Participations to Magnum) attributable to the Post-Cutoff Income that are actually paid by the Sellers or their Affiliates to third parties on or prior to the Closing Effective Date (the amount so paid, the "**Post-Cutoff Paid Liabilities**").

(b)      No later than seven (7) days after entry of the Petition DateBid Procedures Order, Buyer and Sellers will enter into the escrow agreement in form and substance acceptable to Buyer and the Sellers (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**Escrow Agreement**"), with an escrow agent acceptable to Buyer and the Sellers (the "**Escrow Holder**").  Within one (1) business day of the entry of the Bid Procedures OrderOn the date of execution of the Escrow Agreement, Buyer shall deposit $36,500,000 (the41,750,000 (together with any interest accrued thereon in accordance with the terms of the Escrow Agreement, the "**Buyer Deposit**") with the Escrow Holder by wire transfer of immediately available funds.  The Escrow Holder will hold the Buyer Deposit until the Closing Effective Date or earlier termination of this Agreement pursuant to Article VIII in a segregated account (the "**Escrow Account**") pursuant to the terms below and otherwise in accordance with the terms of the Escrow Agreement.  Buyer, on the one hand, and Sellers, on the other hand, shall share equally all costs under the Escrow Agreement, including any fee of the Escrow Holder. The Buyer Deposit shall become payable, and shall be paid, to the Sellers at the Closing.  At the Closing, Buyer and Sellers shall instruct the Escrow Holder to deliver the Buyer Deposit to Sellers by wire transfer of immediately available funds into an account designated by the Sellers pursuant to the terms and conditions of the Escrow Agreement.  If this Agreement is validly terminated prior to the Closing pursuant to Article VIII, the Buyer Deposit shall be released and distributed to Buyer or Sellers, as applicable, in accordance with the terms of the Escrow Agreement. Without limiting the foregoing, the Parties acknowledge and agree that, per the terms of the Escrow Agreement, in the event that this Agreement is terminated by the Sellers in accordance with Section 8.01(c), the Sellers shall be entitled to retain the Buyer Deposit.  If there is a dispute concerning the reason for termination of this Agreement, the disputing Party shall provide notice of same to Escrow Holder and the Buyer's Deposit shall be handled and distributed in accordance with the provisions of the Escrow Agreement pertaining to such dispute. In the event of any termination of this Agreement then each Party covenants and agrees that such Party shall promptly provide Escrow Holder with such instructions as may be reasonable and necessary to cause Escrow Holder to release the Buyer's Deposit to the Party entitled thereto.  In the event of any termination of this Agreement (i) due to an uncured default of a Party pursuant to Section 8.01(b) or Section 8.01(c), then the defaulting Party shall pay all cancellation costs imposed by the Escrow Holder, (ii) pursuant to Section 8.01(d), Section 8.01(f), Section 8.01(g) and/or Section 8.01(h), then Sellers shall pay all cancellation costs imposed by the Escrow Holder, and (iii) for any other reason pursuant to Section 8.01, the cancellation costs imposed by Escrow Holder shall be split equally by Buyer and Sellers. If there is a conflict between the Escrow Agreement and this Agreement, the terms of this Agreement shall prevail.

Section 2.07    **Closing**.  The Closing shall be effected by exchanging true, complete and accurate copies of executed originals via electronic mail at a time and on a date specified by the Sellers and Buyer that is no later than the fifteenth (15th) business day following the date on which the last of the conditions set forth in Article III has been satisfied or expressly waived (other than those conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of any such condition), or at such other time and place as the Sellers and Buyer may agree in writing.

Section 2.08   **Post-Closing Assumption and Assignment of Contracts to Buyer**. At any time after the Closing Effective Date, the Sellers and Buyer may (but shall have no obligation to) mutually agree to seek authorization from the Bankruptcy Court, pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, to assume and assign a contract that was not identified as an Assumed Contract as of Closing (which contract shall become an Assumed Contract upon such assumption and assignment); provided that the Sellers will be solely responsible for paying the Cure Amount required to assume such contract (if applicable).

Section 2.09   **Delivery of Closing Statement**.  At least three (3) business days before the Closing Effective Date, Seller Representative, on behalf of the Sellers, shall prepare and deliver to Buyer a reasonably detailed written statement (the "**Closing Statement**") setting forth a good faith calculation of (a) the Seller Transaction Expenses that remain unpaid as of the Closing Effective Date (which shall include all amounts set forth in the corresponding invoices from the respective payees) and (b) a good faith calculation of the estimated Purchase Price (the "**Estimated Purchase Price**") using (and setting forth) good faith estimates of each of (A) the Post-Cutoff Income and (B) the Post-Cutoff Paid Liabilities, in each case under the foregoing (a) and (b), with reasonable supporting or underlying documentation used in the preparation thereof. The Sellers shall provide Buyer and its representatives full access to the Books and Records and direct all appropriate personnel of Sellers and/or their Affiliates to reasonably cooperate with Buyer and its representatives in each case as are reasonably necessary to assist Buyer in its review of such calculations.  In the event that Buyer disagrees with any of the items set forth on the Closing Statement, Buyer and Seller Representative, on behalf of the Sellers, shall work together in good faith to resolve any such disagreement.

Section 2.10   **Seller Closing Deliverables**.  In addition to the other requirements set forth in this Agreement, as of the Closing, the Sellers shall deliver or cause to be delivered to Buyer each of the following documents and instruments (the "**Seller Closing Deliverables**"):

(a)      a counterpart of each Transaction Document to which any Seller or the Seller Representative is a party, duly executed by each applicable Seller and/or the Seller Representative, as applicable;

(b)      an IRS Form W-9 or applicable IRS Form W-8 for each of the Sellers, duly executed by such Seller;

(c)      a certificate in form and substance reasonably acceptable to Buyer dated as of the Closing Effective Date and duly executed by the secretary, director or other authorized officer of each Seller, certifying (i) that attached thereto are copies of each such Person's certificate of formation or certificate of incorporation, as the case may be (and any amendments thereto), certified as of a recent date by the Secretary of State of the State of Delaware or the Registrar of Corporate Affairs in the British Virgin Islands, and limited liability company agreement, bylaws or memorandum and articles of association, as the case may be (and any amendments thereto), (ii) that attached thereto are resolutions adopted by the Board of Directors (or equivalent body) and/or equity holders or members of such Person (as applicable) authorizing the execution, delivery and performance in accordance with their respective terms of the Transaction Documents to which each of such Persons is a party, (iii) attached thereto are incumbency and specimen signatures of each authorized signatory of such Person executing the Transaction Documents, and (iv) as to the Sellers' satisfaction of the conditions set forth in Sections 3.01(a), and 3.01(b), and 3.01(d);

(d)      the Seller Transaction Expenses Schedule;

(e)      a copy of all Books and Records in the Dataroom on a USB drive or other data storage device;

(f)      the Closing Statement; and

(g)      all other instruments and documents reasonably requested by Buyer.

Section 2.11   **Buyer Closing Deliverables**.  In addition to the other requirements set forth in this Agreement, as of the Closing, Buyer shall deliver or cause to be delivered to the Seller Representative each of the following documents and instruments (the "**Buyer Closing Deliverables**"):

(a)      a counterpart of each Transaction Document to which Buyer is a party, duly executed by Buyer; and

(b)     a certificate in form and substance reasonably acceptable to the Sellers dated as of the Closing Effective Date and duly executed by the secretary or other authorized officer of Buyer, certifying (i) that attached thereto is a copy of Buyer's certificate of formation (and any amendments thereto), certified as of a recent date by the Secretary of State of the State of Delaware, and limited liability company agreement (and any amendments thereto), (ii) that attached thereto are resolutions adopted by the sole member of Buyer authorizing the execution, delivery and performance in accordance with their respective terms of the Transaction Documents to which Buyer is a party, (iii) attached thereto are incumbency and specimen signatures of each authorized signatory of Buyer executing the Transaction Documents, and (iv) as to Buyer's satisfaction of the conditions set forth in <u>Sections 3.02(a)</u>, and <u>3.02(b)</u>.

Section 2.12    **Payments at Closing**.  At the Closing, Buyer shall:

(a)     pay or cause to be paid to each Seller, by wire transfer of immediately available funds to the account or accounts designated in writing by the Sellers not less than two (2) days prior to the Closing Effective Date, its share as designated on <u>Schedule IV</u> hereto (the "**Purchase Price Schedule**") of an amount of cash equal to the sum of (i) the Estimated Purchase Price, *minus* (ii) the Buyer Deposit, *minus* (ii) the Seller Transaction Expenses that remain unpaid as of the Closing Effective Date; and

(b)     pay or cause to be paid, on behalf and for the account of the Sellers, the Seller Transaction Expenses that remain unpaid as of the Closing Effective Date by wire transfer of immediately available funds to the applicable recipients thereof as set forth on the Seller Transaction Expenses Schedule.

Section 2.13    **Post-Closing Adjustment**.

(a)     Within one hundred and eighty (180) days following the Closing Effective Date, Buyer shall deliver to Seller Representative a reasonably detailed statement (the "**Post-Closing Statement**") setting forth calculations of the Purchase Price, along with reasonable supporting documentation.  In connection therewith, the Sellers shall provide Buyer and its representatives full access to the Books and Records to the extent reasonably related to Buyer's preparation of the Post-Closing Statement and shall direct personnel of the Sellers to reasonably cooperate with Buyer and its representatives in connection with its preparation of the Post-Closing Statement.

(b)     The Sellers and their accountants, counsel or financial advisers shall have a period of thirty (30) days after delivery of the Post-Closing Statement to review such Post-Closing Statement, and Seller Representative shall be entitled during such period to notify Buyer in writing of any objections Sellers may have to the calculations set forth therein (the "**Objection Notice**").  Any such Objection Notice shall state in reasonable detail each item or amount that Sellers dispute, the amount in dispute for each such disputed item and the reasons supporting Sellers' positions.  In the event that Seller Representative does not provide an Objection Notice within the thirty (30)-day period after delivery of the Post-Closing Statement, Sellers and Buyer shall be deemed to have agreed to the Post-Closing Statement and the calculations of the Purchase Price delivered by Buyer, which shall be final, binding and conclusive for all purposes hereunder.  If an Objection Notice is delivered to Buyer within the thirty (30) day period referred

to above, then the Purchase Price (as revised in accordance with this sentence) shall become final and binding upon the Parties on the earlier of (i) the date on which Seller Representative and Buyer resolve in writing any differences they have with respect to the matters specified in the Objection Notice and (ii) the date on which all such disputed matters are finally resolved in writing by the Accountant (as defined below) pursuant to the procedures set forth in this Section 2.13(b). Following the delivery of an Objection Notice, the Seller Representative and Buyer shall negotiate in good faith and use commercially reasonable efforts to resolve any such dispute. If Seller Representative and Buyer fail to resolve such dispute within fifteen (15) days of delivery of the Objection Notice, then Seller Representative, on behalf of the Sellers, and Buyer shall jointly engage a nationally recognized independent public accounting firm with specialized knowledge in the media and entertainment industry (the "**Accountant**") to resolve any and all matters that remain in dispute and were included in the Objection Notice; provided, (A) if, within fifteen (15) days after the end of such resolution period, such Parties are unable to agree on an Accountant, then Seller Representative, on the one hand, and Buyer, on the other hand, shall each select an Accountant, and such firms together shall select a nationally recognized independent public accounting firm with specialized knowledge in the media and entertainment industry to act as the Accountant, and (B) if Seller Representative, on the one hand, and Buyer, on the other hand, fail to select an Accountant within ten (10) days of written demand therefor by the other Party, then the Accountant selected by the Seller Representative or Buyer, as the case may be, shall act as the Accountant for purposes of this Section 2.13(b). Seller Representative and Buyer shall instruct the Accountant to render its decision as to the disputed matters and the effect of its decision on the Objection Notice as promptly as practicable but in no event later than sixty (60) calendar days after its selection. Neither Seller Representative nor Buyer shall (and each shall cause the Sellers, as applicable, and their respective Affiliates and any attorney, accountant or other advisor, agent or other representative not to) have any *ex parte* meetings, teleconference, presentations or other correspondence with the Accountant but shall ensure that the other party participate in all such teleconferences, meetings, presentations and receive copies of all such correspondence.

(c)     The scope of the disputes to be resolved by the Accountant shall be limited to (i) whether there were mathematical errors in the Post-Closing Statement and (ii) whether the Post-Cutoff Income, the Post-Cutoff Paid Liabilities and the Purchase Price were calculated in accordance with the terms of this Agreement with respect to the disputed matters that were submitted to the Accountant for resolution. In resolving any such disputed matter, the Accountant (w) shall act in the capacity of an expert and not as an arbitrator, (x) shall limit its review to matters specifically set forth in the Objection Notice as a disputed matter (other than matters thereafter resolved by mutual written agreement of the Parties), (y) shall not assign a value to any disputed matter greater than the greatest value for such matter claimed by either Party or less than the smallest value for such matter claimed by either Party in the Post-Closing Statement or in the Objection Notice and (z) shall make its determinations in accordance with this Agreement.

(d)     The final determination by the Accountant of the matters submitted to it pursuant to Section 2.13(b) shall (i) be in writing, (ii) include the Accountant's calculation of the Purchase Price, (iii) include the Accountant's determination of each matter submitted to it pursuant to Section 2.13(b) and (iv) include a brief summary of the Accountant's reasons for its

determination of each matter.  Absent manifest error, the resolution of disputed matters by the Accountant shall be final and binding, and the determination of the Accountant shall constitute an arbitral award that is final, binding and non-appealable (absent fraud, bad faith or manifest error) and upon which a judgment may be entered by a court having jurisdiction over the party against which such determination is to be enforced.

(e)      The costs, fees and expenses of the Accountant shall be borne by the Sellers, on the one hand, and Buyer, on the other hand, in proportion to the amounts by which their calculations of the Purchase Price differed from the Accountant's determination, which proportionate allocations shall also be determined by the Accountant at the time its determination is rendered on the merits of the matters submitted.

(f)      If the Purchase Price is greater than the Estimated Purchase Price, then Buyer shall pay to the Sellers the difference, by electronic funds transfer within five (5) business days of final determination, in immediately available funds an account designated by the Seller Representative to receive payment; provided, that if Buyer is obligated to pay any amount to one or more Sellers pursuant to the foregoing, Buyer shall have the right to first offset any amounts that one or more Sellers owe to Buyer.  If the Purchase Price is less than the Estimated Purchase Price, then within five (5) business days of final determination, Buyer shall be entitled to recover from a debtor reserve established by the Sale Order, an amount equal to the lesser of (A) such difference and (B) the balance of such debtor reserve.

Section 2.14   **Withholding**.    Notwithstanding anything to the contrary in this Agreement, Buyer, the Sellers, and their designees will be entitled to deduct and withhold from any amounts payable pursuant to this Agreement any amounts required to be deducted or withheld under applicable Law.  To the extent that any such amounts are so deducted or withheld, such amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction or withholding was made.  Upon Closing (and thereafter as required by applicable Law or as requested by Buyer), each person entitled to payment under this Agreement shall provide a duly executed IRS Form W-9 or applicable IRS Form W-8.

## ARTICLE IIICONDITIONS PRECEDENT TO CLOSING

Section 3.01   **Conditions Precedent to Purchase by Buyer**.  The obligations of Buyer to consummate the Transactions at Closing are subject to the fulfillment or written waiver by Buyer, as of the Closing Effective Date, of each of the following conditions:

(a)      Representations and Warranties.  Each of the representations and warranties of the Sellers contained in this Agreement or any other Transaction Document (i) that are qualified as to ~~materiality or~~ Material Adverse Effect, shall be true and correct in all respects as of the Effective Date and as of the Closing Effective Date as though made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects on and as of such date) and (ii) that are not qualified as to ~~materiality or~~ Material Adverse Effect, shall be true and correct in all ~~material~~ respects as of the Effective Date and as of

the Closing Effective Date as if made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects as of such date), except for breaches and inaccuracies the effect of which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)     Performance of Covenants.  Each Seller shall have performed in all material respects all of the covenants and obligations required to be performed by it under this Agreement or any other Transaction Document prior to or at the Closing.

(c)     Government Approvals.  All Government Approvals required in connection with the Sellers' execution, delivery and performance of this Agreement or any other Transaction Document or consummation of the Transactions shall have been obtained or made and shall be in full force and effect.

(d) No Material Adverse Effect.  Since the effectiveness of this Agreement, no event shall have occurred or arisen that, individually or in combination with any other events, has had or could reasonably be expected to have a Material Adverse Effect.

(d)     (e) Seller Closing Deliverables.  Buyer shall have received each Seller Closing Deliverable.

(f) Required Consents.  Sellers shall have obtained and delivered to Buyer all Required Consents in form and substance reasonably satisfactory to Buyer and duly executed by the parties thereto.

(e)     [Reserved]

(f)     (g) Fundamental Contracts.  Sellers shall have obtained and delivered to Buyer the Sale Order approving the transfer to Buyer of each of the Fundamental Contracts.

(g)     (h) Notices of Assignment and Amendment.  Sellers shall have obtained and delivered to Buyer the Notices of Assignment and Amendment, in form and substance reasonably satisfactory to Buyer and duly executed by the parties thereto.

Section 3.02  **Conditions Precedent to Sale by Sellers**.  The obligations of the Sellers to consummate the Transactions at Closing are subject to the fulfillment or written waiver by the Sellers, as of the Closing Effective Date, of each of the following conditions:

(a)     Representations and Warranties.  Each of the representations and warranties of Buyer contained in this Agreement or any other Transaction Document (i) that are qualified as to materiality or Material Adverse Effect, shall be true and correct in all respects as of the Effective Date and as of the Closing Effective Date as though made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects on and as of such date) and (ii) that are not qualified as to materiality or Material Adverse Effect, shall be true and correct in all material respects as of the Effective Date and as of the Closing

Effective Date as if made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects as of such date), except for breaches and inaccuracies the effect of which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)     Performance of Covenants.  Buyer shall have performed in all material respects all of the covenants and obligations required to be performed by it under this Agreement or any other Transaction Document prior to or at the Closing.

(c)     Government Approvals.  All Government Approvals required in connection with execution, delivery and performance of this Agreement or any other Transaction Document or consummation of the Transactions shall have been obtained or made and shall be in full force and effect.

Section 3.03    **Conditions Precedent to Obligations of Buyer and the Sellers**.  The obligations of the Buyer and the Sellers to consummate the Transactions at Closing are subject to the fulfillment or written waiver by each of the Buyer and the Sellers, as of the Closing Effective Date, of each of the following conditions:

(a)     Bankruptcy Court Order. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall ~~have become a Final Order~~be unstayed and in full force and effect.

## ARTICLE IV REPRESENTATIONS AND WARRANTIES

Section 4.01    **Representations and Warranties of Sellers**.  Except as set forth in the corresponding sections or subsections of the Disclosure Schedules attached hereto (collectively, the "**Disclosure Schedules**"), each Seller hereby jointly and severally represents and warrants to Buyer, unless another date is expressly noted below, as of the Effective Date and as of the Closing Effective Date as follows:

(a)     Organization and Qualification.  Such Seller is a limited liability company or corporation duly incorporated, formed, validly existing and in good standing under the laws of (x) the State of Delaware or, in the case of the Sellers incorporated in the British Virgin Islands, the laws of the British Virgin Islands and (y) all other jurisdictions where the business conducted by such Seller requires it be qualified to do business.  None of the Sellers incorporated in the British Virgin Islands conducts business outside of the British Virgin Islands.  No Seller other than the Sellers incorporated in the British Virgin Islands conducts business outside of the United States.

(b)     Authorization; No Violation.

(i)     The execution and delivery by such Seller of, and the performance by such Seller of its obligations under, the Transaction Documents to which it is or is to be a party, and the Transactions, are within such Person's powers and have been duly authorized by all necessary action.

(ii)     The execution and delivery by such Seller of, and the performance by such Seller of its obligations under, the Transaction Documents to which it is or is to be a party, and the Transactions, do not (w) contravene, conflict with or violate its Constitutive Documents, (x) contravene, conflict with or violate any applicable Law or Order, including, in the case of the Sellers incorporated in the British Virgin Islands, the Economic Substance (Companies and Limited Partnerships) Act (As Revised) of the British Virgin Islands, (y) require any consent, approval or notice under, conflict with or result in the material breach of, or constitute a material default (or an event that, with the giving of notice or lapse of time, or both, would become a material default) under, or give rise to any rights of termination, amendment, modification, acceleration, creation or increase in any material payment obligation or forfeiture, suspension, limitation, cancellation, impairment or Loss of any right or benefit of the Sellers (and, after the Closing, Buyer) to own or Exploit or otherwise exercise any rights that the Sellers currently have with respect to the Pictures under, any loan agreement, indenture, mortgage, deed of trust, lease or other instrument or Contract binding on or affecting such Person or any of its assets or properties, including the Purchased Assets, or (z) result in or require the creation or imposition of any Adverse Claim upon or with respect to any of the assets or properties of such Person, including the Purchased Assets, other than a Permitted Lien.

(iii)     Except as set forth in Section 4.01(b)(iii) of the Disclosure Schedules, no Seller is in violation of any Law, writ, injunction, determination or award or in breach of any distribution agreement, loan agreement, indenture, mortgage, deed of trust, lease or other instrument or Contract, the violation or breach of which would be reasonably likely to have a Material Adverse Effect.

(c)     Consents and Approvals.  All authorizations or approvals of and other actions by, and all notices to and filings with, any Governmental Authority or regulatory body or any other Person that are required to be obtained, taken, given or made by any Seller (i) for the due execution and delivery by such Person of, and the performance by such Person of its obligations under, any of the Transaction Documents to which it is or is to be a party, or (ii) for the exercise by Buyer of its rights under such Transaction Documents, as applicable, have been (or, in the case of the purchase and sale of the Purchased Assets hereunder, shall have been as of the Closing Effective Date) duly obtained, taken, given or made and are (or, in the case of the purchase and sale of the Purchased Assets hereunder, shall have been as of the Closing Effective Date) in full force and effect.

(d)     Enforceability.  This Agreement has been, and each other Transaction Document to which any Seller is or is to be a party is, or when delivered will have been, duly executed by such Person, and is, or when delivered will be, the legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium and other similar laws affecting the rights of creditors and to general principles of equity (whether considered in a suit at law or in equity or pursuant to arbitration).

(e)      Litigation.  Except as set forth on Section 4.01(e) of the Disclosure Schedules, there is no pending or, to the Sellers' Knowledge, threatened Proceeding (i) that questions the legality or propriety of the Transactions or that if adversely determined could reasonably be expected to adversely impact any Seller's ability to comply with the terms of the Transaction Documents and/or adversely impact Buyer's rights under the Transaction Documents, (ii) against or affecting any Seller or its Affiliates, or any of its or their current or former officers, directors, members, employees or representatives in their capacities as such, in each case relating to or arising out of the Purchased Assets or any Picture, or (iii) that requires any future payment by any Seller or its Affiliates to any Person in connection with any Picture.  None of the Purchased Assets is subject to any Order.  In connection with the Warner Dispute, there have been no, nor does any Seller have Knowledge of any, threatened, adverse interim or final Orders by a court or arbitrator against any Seller or any of its Affiliates that could reasonably be expected to adversely impact such Seller's ability to comply with the terms of the Transaction Documents and/or Buyer's rights under the Transaction Documents.

(f)      [Reserved]

(g)      [Reserved]

(f)  Compliance with Laws.   Except as set forth on Section 4.01(f) of the Disclosure Schedules, each Seller complies, and has at all times complied, in all material respects with all applicable Laws in connection with the financing, production, ownership and Exploitation of the Purchased Assets, and no Seller or its Affiliates has received during the past five years, nor is there any basis for, any written or other notice or other communication from any Governmental Authority or any other Person that any Seller or its Affiliates is not in compliance in any material respect with any Law or Order applicable to it or any of its respective properties or assets (including the Purchased Assets).

(g)  Employees.   No Seller has any employees or maintains or contributes to any "employee benefit plan" within the meaning of Section 3 of ERISA.

(h)      Taxes. [Reserved]

(i) There is no Tax, levy, impost, deduction, charge or withholding (excluding any documentary, stamp or similar Tax) imposed by the British Virgin Islands or the United States of America on or by virtue of the execution or delivery of this Agreement or any other Transaction Document.

(ii) There are no pending or threatened audits, investigations, disputes, notices of deficiency, claims or other actions for or relating to any Liability for material Taxes of such Seller relating to the Purchased Assets.

(iii) Such Seller has filed all material Tax Returns that were required to be filed with respect to the Purchased Assets.  All such Tax Returns are complete and accurate in all material respects.  All material Taxes owed by such Seller (whether or not shown on any Tax Return) with respect to the Purchased Assets have been paid.  There are no

-42-

~~Adverse Claims on any of the Purchased Assets for Taxes (other than for current Taxes not yet due and payable).~~

~~(iv)   None of the transactions contemplated by this Agreement are subject to withholding under Section 1445 of the Code or otherwise.~~

(i)     <u>Absence of Certain Changes or Events</u>.

(i)     Since June 30, 2024, and except as set forth on <u>Section 4.01(i)(i)</u> of the Disclosure Schedules, (A) no Seller has experienced any change, event or circumstance that, individually or in the aggregate, has had or would be reasonably likely to have a Material Adverse Effect and (B) there has been no material damage, destruction, Loss or claim, whether or not covered by insurance, adversely affecting any of the Purchased Assets, on a Picture by Picture basis.

(ii)    Without limiting the generality of clause (i) of this <u>Section 4.01(i)</u>, and except as set forth on <u>Section 4.01(i)(ii)</u> of the Disclosure Schedules, since June 30, 2024, none of the Sellers has:

(A)    sold, transferred, leased, subleased, licensed or otherwise disposed of, or imposed or suffered to be imposed any Adverse Claim (other than Permitted Liens) on, any Purchased Assets;

(B)    accelerated or delayed collection of any material notes or material accounts receivable, advances, cash flows or other income or revenues of whatever kind or nature arising out of or related to the Purchased Assets;

(C)    delayed or accelerated payment of any material account payable or other material Liability arising out of or related to the Purchased Assets;

(D)    paid any material amount in respect of the Purchased Assets as a result of awards or settlements in connection with any Proceeding (including any audit);

(E)    (1) cancelled, compromised, waived or released any material right in Sellers' favor or claim of such Seller with respect to any Purchased Assets or (2) settled or compromised any Proceeding (including any audit) with respect to any Purchased Assets;

(F)    entered into, amended, modified or terminated any Picture Agreement, or cancelled, modified or waived any debts or claims or waived any rights held by it thereunder;

(G)    entered into any contract or transaction with any Affiliate pertaining to or affecting the Purchased Assets;

(H)     (1) made, changed or revoked any Tax election, (2) changed an annual accounting period, (3) adopted or changed any accounting method with respect to Taxes, (4) filed any amended Tax Return, (5) entered into any closing agreement, (6) settled or compromised any Tax claim or assessment, or (7) consented to any extension or waiver of the limitation period applicable to any claim or assessment with respect to Taxes; in each case, to the extent such action would adversely affect the Purchased Assets in a Post-Closing Tax Period; or

(I)     agreed, whether in writing or otherwise, to take any of the actions specified in this Section 4.01(i).

(j)     Pictures.

(i)     Picture Ownership.   Schedule II hereto sets forth a true, correct and complete list of each Picture, including, for each Picture, (A) the Applicable Percentage, (B) the applicable distributor(s), (C) the Magnum Foreign Percentage (if applicable), (D) the Magnum Domestic Percentage (if applicable), (E) the Magnum Global Percentage (if applicable) and (F) the Relevant Percentage.  Neither Magnum nor its Affiliates has any right to purchase or otherwise increase the Magnum Foreign Percentage, Magnum Domestic Percentage or the Magnum Global Percentage set forth on Schedule II hereto pursuant to the Magnum Agreements or otherwise.

~~(ii)   No Infringement.   Except (A) as set forth on Section 4.01(j)(ii) of the Disclosure Schedules, (B) as, individually, has not been and would not reasonably be expected to be material, or (C) for infringement arising from unauthorized copying as is commonly of concern to the motion picture and entertainment industry (e.g., piracy and "bootlegging", peer-to-peer file sharing over the Internet and the like), (1) no Picture nor any underlying materials upon which any Picture is based, nor any literary, dramatic or musical works or any other materials contained therein or synchronized therewith, nor the exercise of any right, license or privilege herein granted, violates or will violate, or infringes or will infringe, any trademark, trade name, Contract, Copyright (whether common law or statutory), patent, literary, artistic, dramatic, personal, private, civil, or property right or right of privacy or "moral right of author," or any Law or regulation applicable to the Pictures or other right whatsoever of, or slanders or libels, any Person, (2) there are no pending or threatened in writing Proceedings against any Seller or its Affiliates and, to the Knowledge of the Sellers, there have been no otherwise threatened Proceedings in any jurisdiction, asserting anything to the contrary from the representations and warranties set forth in the foregoing clause (1), including the invalidity, misuse or unenforceability of any Picture or challenging any Seller's ownership or registrability of any Picture, and there is no basis for any such claim, and (3) to the Knowledge of the Sellers, no Picture has been infringed, misappropriated or violated by any other Person.~~

(ii)     [Reserved]

(iii)    No Litigation.  There is no pending or threatened in writing or, to any Seller's Knowledge, otherwise threatened Proceeding in any jurisdiction contesting or challenging the Exploitation, use, ownership, rights or entitlements, validity, enforceability, or ~~registerability~~registrability, as applicable, by any Seller of any of its right, title or interest in or to any Picture.  No Seller is party to any settlement, covenant not to sue, tolling agreement or Order resulting from any Proceeding which (x) requires any future payment by any Seller to any Person in connection with any Picture, (y) permits any Persons other than Sellers to Exploit any Purchased Assets; or (z) restricts the rights of any Seller to Exploit any Purchased Assets.

(iv)    Audits.  Section 4.01(j)(iv) of the Disclosure Schedules: (A) sets forth a true, correct and complete list of all audits and claims (including current status and outside tolling date of any such audit or claim) with respect to each Picture (whether brought by or on behalf of any Seller or any third Person) that have been noticed or that are ongoing; (B) describes in detail, on an audit-by-audit basis, whether such audit or claim is an out-bound audit (*i.e.*, audits of, or other Proceedings with respect to, the books and records of third parties in progress or demanded by or on behalf of any Seller as of the date hereof, with respect to any of the Purchased Assets) or an in-bound audit (*i.e.*, audits of, or other Proceedings with respect to, the books and records of any Seller in progress or demanded by or on behalf of a third party as of the date hereof, with respect to any of the Purchased Assets); and (C) sets forth a true, correct and complete list of all past and ongoing settlements and other resolutions relating to any of the foregoing audits.  The Sellers have provided Buyer with true, correct and complete copies of all documentation described in or related to the foregoing subclause (C).  All costs that are due and payable by or on behalf of the Sellers in connection with any of the audits described on Section 4.01(j)(iv) of the Disclosure Schedules have been paid.  To the Knowledge of Sellers, no Person party to any Contract pursuant to which a Participation in connection with any Picture has been granted has given notice of an intention to commence, or otherwise indicated an intention to commence, any audit in connection therewith.  Except as set forth in Section 4.01(j)(iv) of the Disclosure Schedules, no Seller has waived or modified any of the Audit Rights provided for in the Exploitation Agreements or other Contracts giving rise to proceeds payable to such Seller with respect to audit periods that remain contestable as of the Closing Effective Date.  Except as set forth in Section 4.01(j)(iv) of the Disclosure Schedules, to the Sellers' Knowledge, there are no facts or circumstances existing that provide a right of any distributor or other payor to adjust the proceeds payable to such Seller or claim a refund of any amount previously paid, except to the extent the period to assert a claim therefor has expired.

~~(v)    Picture Information.  All written information (excluding any estimates, projections, forecasts, opinions with respect to future events or library valuations prepared by third-party non-affiliated appraisers, as to which the Sellers make no representation other than that none of them altered the contents thereof) heretofore furnished by any Seller or any of their Affiliates in writing to Buyer for purposes of or in connection with this Agreement or the Transactions is, and all such written information hereafter furnished by or on behalf of the Sellers or any of their Affiliates to Buyer will be, true, complete and accurate in all material respects, on the date such information is~~

-45-

~~furnished, stated or certified, and all expressions of expectation, intention, belief and opinion contained in that information were given (or when hereafter given, shall be given) honestly and on reasonable grounds after due and careful inquiry.~~

(v)    [Reserved]

(vi)    Picture Agreements.  Section 4.01(j)(vi)(A) of the Disclosure Schedules sets forth a true, correct and complete list of all the Picture Agreements.  True, complete and accurate copies of each Picture Agreement, together with all modifications and amendments thereto, have previously been made available to Buyer.  Each Picture Agreement is valid, binding, and in full force and effect and is enforceable by the applicable Seller party thereto (or to whom the rights therein were assigned) in accordance with its terms and is not subject to any material claims, charges, set-offs or defenses.  Each Seller has performed the material obligations required to be performed by it to date under the Picture Agreements and no Seller is (with or without the lapse of time or the giving of notice, or both) in material breach or default thereunder, nor has any event occurred that would give rise to any right of notice, modification, acceleration, payment, cancellation or termination of or by another party under, or in any manner release any party thereto from any material obligation under, any such Picture Agreement and, to the Knowledge of the Sellers, no other party to the Picture Agreements is (with or without the lapse of time or the giving of notice, or both) in material breach or default thereunder and no event has occurred that with the giving of notice or the passage of time or both would constitute a material breach or default by any other party, or that would give rise to any right of notice, modification, acceleration, payment, cancellation or termination of or by any Seller under, or in any manner release any party thereto from any material obligation under, any such Picture Agreement.  No Seller has received any notice of the intention of any third party to terminate, cancel or rescind any Picture Agreement.  As of immediately prior to the Closing, (I) the Distribution Agreements are all of the Exploitation Agreements to which any Seller or any of their Affiliates is a party, (II) the Intercreditor Agreements are all of the intercreditor agreements to which any Seller or any of their Affiliates is a party and (III) the QCSAs and MPRPAs are all of the multi-Picture co-financing or cost-sharing agreements or rights purchase agreements pursuant to which any Seller or any of their Affiliates is a party.  Except as set forth in Section 4.01(j)(vi)(B) of the Disclosure Schedules, no Seller or its Affiliates has any remaining or ongoing co-financing or cost-sharing obligations, obligations to reimburse or refund or pass through any amounts, obligations to submit for potential co-financing any Motion Pictures pursuant to any output or similar terms, or reporting obligations, in each case under the QCSAs or MPRPAs or pursuant to any of the individual or ancillary Picture documents entered into in connection therewith, all of which obligations have expired or been terminated.   Except as set forth in Section 4.01(j)(vi)(C) of the Disclosure Schedules, there are no amounts owed, accrued or due or payable by any Seller pursuant to any Picture Agreement, including any shortfall payments, advances or similar payments.  No Motion Pictures are or may be subject to the Picture Agreements other than the Pictures, and the Pictures constitute all of the Motion Pictures that are or may be subject to the Picture Agreements.  No Picture Agreement has been altered, amended or modified in any manner by any Seller (or to such Seller's Knowledge by any

other party to such agreements) since the date of execution except (y) as specified in the applicable document or (z) as such documentation has been previously provided to Buyer.

(vii)   ~~Insurance and Indemnity Claims.   No insurance or indemnity claim has been made by any Seller during the last five (5) years with respect to the Pictures.~~[Reserved]

(viii)   Sufficiency of the Purchased Assets.  The Purchased Assets, together with the Transaction Documents, include all of the assets and rights necessary and sufficient in all material respects (x) for the ~~conduct of the Sellers' business in the manner conducted through each of the Effective Date and the Closing Effective Date, (y) for the~~ Exploitation of the Pictures as Exploited by the Sellers through each of the Effective Date and the Closing Effective Date and (~~z~~y) to permit Buyer to continue to Exploit the Pictures in substantially the same manner as the Pictures have been Exploited through each of the Effective Date and the Closing Effective Date.

(ix)   Picture Reporting and Receipts.  The Sellers have provided Buyer true, correct and complete copies of all Financial Information provided to the Sellers in respect of the Pictures for the last three (3) years.  The Financial Information is true and correct in all material respects and has been recorded consistently across the periods presented. All material statements and Financial Information received by the Sellers in connection with any Pictures are consistent in all material respects with the entitlements of the Sellers set forth in the applicable Contracts related to such Pictures.  Except as set forth in Section 4.01(j)(ix)~~-~~ of the Disclosure Schedule, Sellers have, in all material respects, (A) not been paid amounts in excess of those amounts to which they are entitled thereunder, and (B) actually received such amounts reflected as payable to the Sellers. The Sellers have not accelerated, deferred or delayed the payment by any Person of any compensation or other amount payable to the Sellers or to which the Sellers are otherwise entitled.  To the Knowledge of the Sellers, there are no judgments, debts, deductions, offsets, claims, overpayments or other basis (collectively, "**Reductions**") for reducing any of such payments or other compensation.  The Sellers and their Affiliates have not received any written notice from any Person (including, without limitation, any distributor, sub-distributor, licensee, sales agent or collection agent) asserting the existence of any Reductions that have not been resolved as of the Closing Effective Date. None of the Picture Agreements grants to any Person a right of cross-collateralization, offset, recoupment or similar right with respect to any material rights or obligations among any of the Purchased Assets or Assumed Liabilities, on the one hand, and the Excluded Assets or Excluded Liabilities, on the other hand.

(x)   Copyrights and Copyright Registrations.   Section 4.01(j)(x) of the Disclosure Schedules sets forth a true, correct and complete list of all registered Copyrights, and all pending applications therefor, that are owned by or currently licensed to, or purported to be owned by or currently licensed to, a Seller, which schedule shall include, with respect to all such Copyrights, (1) the name of the applicant/registrant (as applicable) and each Seller that currently owns any portion of such Copyright (including

the ownership share of each such Seller), (2) the application or registration number (as applicable), (3) the status of the application or registration (as applicable), (4) the jurisdiction where the application/registration is located and (5) the Picture with respect to which the Copyright relates.  Each Picture has, as of the date hereof, been registered in the U.S. Copyright Office, and except as set forth on Section 4.01(j)(x) of the Disclosure Schedules, Sellers are the sole owners of such registered Copyrights. No Seller owns or is currently licensed any Trademarks with respect to the Pictures.

~~(xi)  Intellectual Property Protection.  The Exploitation rights included in the Purchased Assets that are protectable under Applicable Copyright Law are registered, recorded, applied for or otherwise protected and validly subsisting under all Applicable Copyright Laws, and, to the Knowledge of the Sellers, no material protectable portion of any of the foregoing is in the public domain in the United States.  Each Seller uses and has used commercially reasonable efforts to protect, confirm, register (to the extent such registration is or was, as the case may be, customary industry practice at the time the rights were created), maintain, police and enforce all Exploitation rights included in the Purchased Assets, including making all filings, paying all fees and executing all appropriate written agreements in connection therewith, in each case to the extent any of the Sellers has the right to protect, confirm, register, maintain, police or enforce its rights in the applicable Picture.  No Seller or any of its Affiliates (nor, to the Knowledge of the Sellers, any other Person) has received any written notice from a third Person that such third Person has exercised or intends to exercise any Copyright Termination with respect to any of the Pictures.~~

(xi)    [Reserved]

(xii)    Participations and Residuals.  With respect to the Pictures, (x) Sellers are not currently paying to any Person, (y) Sellers have not paid or had any obligation to pay to any Person at any time prior to the Closing Effective Date and (z) Sellers will not be required to pay to any third Person in the future, any Participations or Residuals, in each case other than amounts payable to Magnum pursuant to the Magnum Agreements.  With respect to each Picture, each Seller has complied with all requirements applicable to it under any applicable Collective Bargaining Agreement.

(xiii)    [Reserved]

(xiv)    [Reserved]

~~(xiii)  Derivative Rights.  Except as set forth on Section 4.01(j)(xiii) of the Disclosure Schedules, no Seller owns, controls or otherwise holds any Derivative Rights.~~

~~(xiv)  First/Last Opportunity Rights.  No Person has any first/last opportunity rights (including, without limitation, rights of first refusal, rights of first negotiation, rights of last refusal, rights of first offer, or other rights of similar nature) or any "call" or "put" right with respect to any Purchased Assets that have not expired or terminated.~~

(xv)    Tangible Assets.  Sellers do not own, control or have access to any Tangible Assets relating to the Pictures.

(k)    Magnum Agreements.  As of immediately prior to the Closing, the Magnum Agreements, the Consolidated Intercreditor Agreement and the Global Intercreditor Agreement are all of the agreements with Magnum or any of its Affiliates to which any Seller or any of their Affiliates is a party.  Sellers have delivered to Buyer true, correct and complete copies of all Financial Information that have been provided by Sellers to Magnum for the last three (3) years.  As of the Closing, there are no amounts due and payable by any Seller pursuant to any Magnum Agreement.  Sellers and ~~its~~their Affiliates have performed or caused to be performed all material non-monetary obligations required to be performed or fulfilled by ~~it~~them pursuant to the Magnum Agreements.

(l)    Title to Purchased Assets.  Sellers have and will convey to Buyer, and upon consummation of the Transactions, Buyer will acquire, good, valid and marketable title to, and legal and beneficial ownership of, the Purchased Assets, free and clear of any Adverse Claim (other than the Assumed Liabilities and the Permitted Liens), subject to the rights of (i) the Domestic Distributor under the Domestic Licenses and the Domestic Distribution Agreement, (ii) the Foreign Distributors under the Foreign Licenses and/or the Foreign Distribution Agreements, (iii) the Global Distributor under the Global Licenses and the Global Distribution Agreement, and (iv) the Virtual Distributor under the Virtual Co-Financing Agreement. Immediately after the Closing, Buyer shall (x) have the same title or interest in the Purchased Assets as Sellers had immediately prior to the Closing, free and clear of any Adverse Claims (other than the Assumed Liabilities and the Permitted Liens) and (y) be able to Exploit or otherwise enjoy the Purchased Assets to the same extent, and in the same manner, that Sellers Exploited or otherwise enjoyed the Purchased Assets immediately before the Closing.  After the Closing, neither Sellers nor any of their Affiliates shall have any right, title or interest in any of the Purchased Assets, whether at law or in equity, and no Seller or Affiliate of Seller shall have any right, title or interest in or to the Pictures other than the Excluded Assets.  Other than pursuant to the Distribution Agreements and the Magnum Agreements, no Seller has sold, assigned, conveyed or hypothecated (whether or not for cash or other consideration) the entirety or any portion of the Purchased Assets, or any part thereof, or granted to any third party any present or future right to acquire any such rights (whether by option or otherwise).  No third Person has notified Sellers of, and, to the Knowledge of the Sellers, no circumstances warrant the assertion by any third Person of, any right to receive all or any portion of the Purchased Assets. Immediately following the Closing, VRF, VRFNA, VRFG and Parent will be the only Sellers holding any material assets.

(m)    Financing Statements.  No effective financing statement naming any Seller or its Affiliates as "debtor" or other instrument similar in effect (including any Copyright mortgage) covering the Purchased Assets is on file or recorded in any filing or recording office in the United States or elsewhere in the Domestic Territory, the Foreign Territory, the Global Territory or the Virtual Territory, except (i) those to be discharged in the Bankruptcy Cases, and (ii) those filed with respect to Permitted Liens.

(n)     BVI Security Registration.  No effective security registration pursuant to section 163 of the BVI Business Companies Act (As Revised) naming any Seller incorporated in the British Virgin Islands as "debtor" or "charger" or other instrument similar in effect (including any Copyright mortgage) covering the Purchased Assets is registered with the BVI Registry of Corporate Affairs except (i) those being terminated and discharged in the Bankruptcy Cases, and (ii) those filed with respect to Permitted Liens.

(o)     No Brokers or Finders.  Except as set forth on Section 4.01(o) of the Disclosure Schedules, none of the Sellers nor any Affiliate thereof has retained any broker or finder, agreed to pay or made any statement or representation to any Person that would entitle such Person to, any broker's, finder's or similar fees or commissions in connection with the Transactions.

(p)     [Reserved]

~~(p)     No Reliance.   Each of the Sellers understands the terms and provisions of this Agreement and the other Transaction Documents, and has received independent tax and accounting advice and legal representation in the negotiation and execution of this Agreement and the other Transaction Documents.   Neither Sellers nor any of their Affiliates, lenders or advisors are relying upon any valuation of the Purchased Assets (including with respect to future receipts of each Picture) made by Buyer or any Person affiliated with Buyer, and Sellers acknowledge and agree that the Sellers must make and rely solely upon their own valuation (or the valuation of their advisers) of the Purchased Assets in connection with the sale of such Purchased Assets to Buyer.~~

~~(q)     No Further Consent.   No consent by such Seller or any of its or their direct or indirect equityholders or Affiliates shall be required to be provided as a condition to the exercise of any right of Buyer with respect to the Purchased Assets.~~

Section 4.02   **Representations and Warranties of Buyer.**  Buyer hereby represents and warrants to the Sellers as of the Effective Date and the Closing Effective Date as follows:

(a)     Organization.  Buyer is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of Delaware.

(b)     Authorization.  Buyer has full power and authority to enter into this Agreement.

(c)     Enforceability.  Upon entry of the Sale Order, this Agreement, and each other Transaction Document to which Buyer is or is to be a party is, or when delivered will have been, duly executed and delivered by Buyer and is, or when delivered will be, the valid and binding agreement of Buyer, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium and other similar laws affecting the rights of creditors and to general principles of equity (whether considered in a suit at law or in equity or pursuant to arbitration).

(d)     No Violation.  The execution and delivery by Buyer, and the performance by Buyer of its obligations under, the Transaction Documents to which it is or is to be a party, and

the Transactions, do not (i) contravene, conflict with or violate its Constitutive Documents or (ii) contravene, conflict with or violate any material applicable Law or Order.

(e)    <u>Source of Funds</u>.  Buyer represents that the following statement is an accurate representation as to each source of funds (a "**Source**") to be used by Buyer to pay the Purchase Price for the Purchased Assets:  The Source does not include assets of any employee benefit plan, other than a plan exempt from the coverage of ERISA. As used in this <u>Section 4.02(e)</u>, the term "**employee benefit plan**" shall have the meaning assigned to such term in Section 3 of ERISA.

(f)    <u>Investment Representations</u>.  Buyer is sophisticated with respect to decisions to acquire assets of the type represented by the Purchased Assets and either it, or the Person exercising discretion in making its decision to acquire the Purchased Assets, is experienced in acquiring assets of such type.

(g)    <u>Acknowledgement</u>.  Except for the representations and warranties made by the Sellers in <u>Section 4.01</u> of this Agreement, Buyer hereby acknowledges that (i) none of the Sellers nor any of their Affiliates has made, or has agreed to make, any express or implied representation, warranty, guarantee or agreement (A) that the aesthetic or artistic quality of the Pictures will exceed any minimum standard or quality, (B) that the Pictures will generate any minimum amount of Domestic Gross Receipts, Foreign Gross Receipts, Global Gross Receipts or Defined Proceeds, or (C) with respect to the film industry as a whole or the business and financial risks associated with the film industry as a whole, (ii) it has made its own inquiry and investigation into, and based thereon has formed an independent judgment concerning, the film industry as a whole and the business and financial risks associated with the film industry as a whole, and (iii) there are uncertainties inherent in making any estimates, projections, forecasts or opinions with respect to future events and that any such estimates, projections, forecasts or opinions delivered by the Sellers or any of their Affiliates pursuant to the Transaction Documents shall be subject to such uncertainties.

(h)    <u>No Brokers or Finders</u>.  None of Buyer nor any Affiliate thereof has retained any broker or finder, agreed to pay or made any statement or representation to any Person that would entitle such Person to, any broker's, finder's or similar fees or commissions in connection with the Transactions.

## ARTICLE VPAYMENT OF DESIGNATED DOMESTIC RECEIPTS, DESIGNATED FOREIGN RECEIPTS, DESIGNATED GLOBAL RECEIPTS AND DESIGNATED VIRTUAL RECEIPTS

Section 5.01   **Deposits to Buyer's Account**.  In the event that any amounts that are required under any Transaction Document to be paid directly to Buyer or otherwise constitute Purchased Assets are received by any Seller or any of their respective Affiliates, such Person shall, and each Seller shall cause such Person to, as applicable, hold such amounts in trust, and deposit such amounts in the form received, immediately, but in any event not later than two (2) business days of its receipt thereof, in an account designated in writing by Buyer.

Section 5.02    **No Setoff**.    Each payment of any amounts included in the Purchased Assets (including the Relevant Percentage of the Designated Domestic Receipts, the Designated Foreign Receipts, the Designated Global Receipts or the Designated Virtual Receipts with respect to the Pictures) required under Section 5.01 shall not be reduced by any setoff or deduction on account of any claim or other charge other than with respect to any tax withholding or similar governmental charge or as expressly permitted or required under this Agreement.

Section 5.03    **No Survival**. The respective representations and warranties of the Parties hereto hereunder shall not survive the Closing. The respective covenants of the Parties hereto required to be performed on or prior to the Closing Effective Date shall not survive the Closing.

## ARTICLE VICOVENANTS

Section 6.01    **Conduct of the Sellers Prior to Closing**.

(a)    During the period from the Effective Date until the earlier of (i) the Closing Effective Date, or (ii) the date this Agreement is validly terminated in accordance with its terms (such period, the "**Pre-Closing Period**"), unless otherwise consented to in writing by Buyer, the Sellers shall (A) operate their businesses and the Purchased Assets only in the ordinary course of business as debtors in possession, (B) preserve and maintain their business organization and assets (including the Purchased Assets), and (C) keep available the services of the current Service Providers of the Sellers or any of their Affiliates.

(b)    Without limiting the generality of the foregoing, except as consented to in writing by Buyer or as required by Law or directed by the Bankruptcy Court, during the Pre-Closing Period, the Sellers shall not, except as set forth in Section 6.01(b) of the Disclosure Schedules:

(i)    issue, sell, transfer, lease, license, convey, assign, abandon, cancel, pledge, dispose of, or otherwise subject to any Adverse Claim, any Purchased Assets;

(ii)    incur any Indebtedness or issue any debt securities or assume, guarantee or endorse, or otherwise become responsible for, the obligations of any Person, or make any loans or advances, in each case affecting the Purchased Assets;

(iii)    amend, waive, modify, terminate or give any consent or approval under the Picture Agreements, or amend, waive, modify, terminate or give any consent or approval regarding any Seller's rights thereunder, or enter into any Contract in connection with the Purchased Assets;

(iv)    pay, discharge or satisfy any Liability relating to the Purchased Assets;

(v)    cancel, compromise, waive or release any right or claim or Proceeding (including any audit) relating to the Purchased Assets;

(vi)    permit the lapse of any existing policy of insurance relating to the Purchased Assets;

(vii)   commence or settle any Proceeding relating to the Purchased Assets or the Pictures (including any audit or the Warner Dispute) if such commencement or settlement could reasonably be expected to adversely affect, in any material respect, the Purchased Assets (including, without limitation, the Post-Cutoff Cash Flows) or the Pictures, unless otherwise authorized by a finding of the Bankruptcy Court;

(viii)   fail to comply in all material respects with all applicable Laws in any manner that could reasonably be expected to adversely affect, in any material respect, the Purchased Assets or the rights or remedies of Buyer under the Transaction Documents;

(ix)   fail to maintain their existence as a limited liability company or corporation, as the case may be, validly existing and in good standing under the laws of its jurisdiction of organization and obtain and preserve its qualification to do business in each jurisdiction in which the failure to so could reasonably be expected to adversely affect, in any material respect, the Purchased Assets or the rights or remedies of Buyer under the Transaction Documents;

(x)   (A) fail to maintain all organizational formalities, (B) fail to comply with the provisions of its Constitutive Documents (including with respect to Separateness or independent directors) in all material respects at all times, (C) amend any provisions of their Constitutive Documents in any manner that could reasonably be expected to adversely affect, in any material respect, the Purchased Assets or the rights or remedies of Buyer under the Transaction Documents, (D) permit any Affiliate to assume or guarantee any of the Liabilities of any Seller other than as required by this Agreement or documents governing any Seller's Indebtedness or ABS Obligations that are in effect as of the Effective Date, (E) fail to make all decisions regarding any Seller's organization and operation independently, or allow such decisions to be dictated by any other Person, (F) fail to take such other actions as are necessary on a Seller's part to ensure that all corporate procedures required by their Constitutive Documents are duly and validly taken, and (G) act in any manner that would foreseeably mislead others with respect to its separate identity from any Affiliate;

(xi)   fail to pay and discharge and fully perform, at or before maturity, all of their respective material obligations and Liabilities, including, without limitation, Tax liabilities and other governmental claims levied or imposed upon such Seller or upon the income, properties or operations of such Seller, judgments, settlement agreements and all obligations of such Seller under the Transaction Documents, except where the same may be contested in good faith by appropriate proceedings, and will maintain, in accordance with IFRS, reserves as appropriate for the accrual of any of the same;

(xii)   engage in any dealings or transactions with any Person described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or in Section 1 of the Anti-Terrorism Order;

(xiii)   take any action, or intentionally fail to take any action, that would cause any representation or warranty made by the Sellers in this Agreement or any other

-53-

Transaction Document to be untrue or result in a breach of any covenant made by the Sellers in this Agreement or any other Transaction Document, or that has or would reasonably be expected to have a Material Adverse Effect;

(xiv)   make any material change to their internal controls over financial reporting or the methodology used to prepare and provide Financial Information;

(xv)   enter into any transaction or Contract between any Seller, on the one hand, and any Affiliate of such Seller, on the other hand, with respect to the Purchased Assets;

(xvi)   (A) make, change or revoke any Tax election, (B) change an annual accounting period, (C) adopt or change any accounting method with respect to Taxes, (D) file any amended Tax Return, (E) enter into any closing agreement, (F) settle or compromise any Tax claim or assessment, or (G) consent to any extension or waiver of the limitation period applicable to any claim or assessment with respect to Taxes; in each case, to the extent such action would adversely affect the Purchased Assets in a Post-Closing Tax Period; or

(xvii)   announce an intention, enter into any formal or informal agreement, or otherwise make a commitment to do any of the foregoing.

(c)   During the Pre-Closing Period, the Sellers shall promptly, and in any event within three (3) business days of receipt by any Seller, provide copies to Buyer of all Quarterly Reporting and other Financial Information received or provided by any Seller.

Section 6.02   **Access**.  During the Pre-Closing Period, except to the extent prohibited by applicable Law, the Sellers shall provide, and cause their Service Providers, attorneys, accountants, advisors, consultants and other agents to provide, to Buyer and its accounting, legal and other representatives, as well as their respective Service Providers, affiliates and other agents, access at all reasonable times and during normal business hours, upon reasonable notice, to the Sellers' personnel and to business, financial, legal, tax, compensation and other data and information concerning the Purchased Assets as Buyer deems reasonably necessary or advisable.

Section 6.03   **Notification of Certain Matters**.

(a)   During the Pre-Closing Period, Sellers shall give prompt written notice to Buyer of (i) the occurrence or non-occurrence of any event, the occurrence or non-occurrence of which would render any representation or warranty of the Sellers contained in this Agreement or any other Transaction Document, if made on or immediately following the date of such event, untrue, inaccurate or misleading, (ii) the occurrence of any event that, individually or in combination with any other events, has had or could reasonably be expected to have a Material Adverse Effect, (iii) any failure of the Sellers, or any Affiliate of the Sellers to comply with or satisfy any covenant or agreement to be complied with or satisfied by it under the Transaction Documents or any event that would otherwise result in the nonfulfillment of any of the conditions to Buyer's obligations hereunder, (iv) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the

Transactions, (v) any notice or other communication from any Governmental Authority in connection with the Transactions, (vi) any material and adverse change to the Purchased Assets, (vii) any notice of any material breach, default or termination of any Picture Agreement, (viii) the occurrence of any event which would or would reasonably be likely to (A) prevent or materially delay the consummation of the Transactions or (B) result in the failure of any condition to Closing set forth in this Agreement to be satisfied, or (ix) any Proceeding pending or, to the Knowledge of the Sellers, threatened against a Party or the Parties relating to the Transactions or otherwise affecting the Purchased Assets.

(b)      Without limiting anything set forth in Section 6.03(a), during the Pre-Closing Period, to the fullest extent permitted or consistent with any applicable Order of any court, tribunal or arbitrator in the Warner Dispute, Sellers and their Affiliates will (and will cause their litigation counsel to) furnish Buyer with the material details respecting any offer of settlement or other resolution either proposed by Sellers or its Affiliates or by WBEI or its Affiliates that could reasonably be expected to adversely affect the Purchased Assets (including, without limitation, the Post-Cutoff Cash Flows) or the Pictures (and at Buyer's request, Sellers shall take all reasonable steps to obtain any necessary consent Sellers reasonably believe is required in order to furnish Buyer with such offer of settlement or other resolution or any information related thereto); provided, nothing in this Section 6.03(b) shall restrict Sellers or their Affiliates from entering into any settlement or other resolution of the Warner Dispute in its sole discretion, subject to Buyer's consent rights pursuant to Section 6.01(b)(vii).  To the extent that any Order of any Governmental Authority does not permit Sellers or their Affiliates from furnishing information as described in this Section 6.03(b), upon reasonable request from Buyer, Sellers and/or their Affiliates shall seek modification or relief from such Order such that Buyer shall be permitted to receive such information. Sellers shall be solely responsible for the payment of all arbitration fees, attorneys' fees, costs, experts, or any other fees and costs in connection with the Warner Dispute.

(c)      From and after the Closing Effective Date through a period that is the earlier of (a) the closing of the Bankruptcy Cases; or (b) the third (3rd) anniversary thereof, subject to any confidentiality obligations applicable to the Sellers or their Affiliates, if any Seller or its Affiliates receives notice of a pending or threatened Proceeding against, relating to or affecting the Purchased Assets (including, without limitation, any claimed breach by any Seller or its Affiliates under any Picture Agreement), then such Person will (i) promptly notify Buyer of same; and (ii) give Buyer copies of all notices and other writings relating to it received by such Person promptly after their receipt.

Section 6.04   **Specified Audit Proceeds**.  From and after the Closing Effective Date, Buyer shall solely own and control all Audit Rights included within the Purchased Assets and may in its sole discretion, conduct, settle and/or litigate any future audit(s) in connection therewith in such manner as Buyer shall determine; provided, that to the extent any such audit results in any Specified Audit Proceeds, Buyer shall pay to the Sellers one hundred percent (100%) of such Specified Audit Proceeds, by wire transfer of immediately available funds, to an account or account designated in writing by the Sellers, no later than five (5) business days following receipt thereof; provided, further, that Buyer shall have the right to first offset any amounts that one or more Sellers owe to Buyer. For clarity, (i) Sellers shall not be required to

pay any costs or expenses incurred in connection with its exercise of the Audit Rights from and after the Closing Effective Date, but shall bear its respective portion thereof as and to the extent deducted in calculating Specified Audit Proceeds and (ii) Buyer shall retain one hundred percent (100%) of all payments received by Buyer in connection with the exercise of any Audit Rights that do not constitute Specified Audit Proceeds.

Section 6.05    **Efforts to Close**.  Each Party shall, and Sellers shall cause their Affiliates to, use commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the Transactions as promptly as practicable.  In furtherance and not in limitation of the foregoing, the Sellers shall permit Buyer reasonably to participate in the defense and settlement of any claim, suit or cause of action relating to this Agreement or the Transactions, and the Sellers shall not settle or compromise any such claim, suit or cause of action without Buyer's written consent.

Section 6.06    **Tax Matters**.

(a)      Buyer and the Sellers agree to furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets, including, without limitation, access to Books and Records, as is reasonably necessary for the filing of all Tax Returns by Buyer or the Sellers, the making of any election relating to Taxes, the preparation for any audit with respect to Taxes by any Governmental Authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax.  Buyer and the Sellers shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least seven (7) years following the Closing Effective Date.  Buyer and the Sellers shall cooperate fully with each other in the conduct of any audit, litigation or other proceeding relating to Taxes involving the Purchased Assets.

(b)      To the extent not otherwise provided in this Agreement, the Sellers shall be responsible for and shall promptly pay when due all Property Taxes levied with respect to the Purchased Assets attributable to the Pre-Closing Tax Period.  All Property Taxes levied with respect to the Purchased Assets for the Straddle Period shall be apportioned between Buyer and the Sellers based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period.  The Sellers shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period.  Upon receipt of any bill for such Property Taxes by Buyer or any Seller, Buyer or the Sellers as applicable, shall present a statement to the other setting forth the amount of reimbursement to which Buyer or the Sellers, as applicable, are entitled under this Section 6.06(b) together with such supporting evidence as is reasonably necessary to calculate the proration amount.  The proration amount shall be paid by the Party or Parties owing it to the other(s) within ten (10) days after delivery of such statement.  In the event that Buyer or any Seller makes any payment for which it is entitled to reimbursement under this Section 6.06, Buyer or the Sellers shall make such reimbursement promptly but in no event later than ten (10) days after the presentation of a statement setting forth

the amount of reimbursement to which the presenting Party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement.

(c)    All Transfer Taxes will be borne fifty percent (50%) by the Sellers, jointly and severally, and fifty percent (50%) by Buyer.  The Sellers shall duly prepare any Tax Return or other document with respect to such Transfer Taxes (and Buyer shall cooperate with respect thereto as necessary) and the Sellers shall pay such Transfer Taxes when due.

(d)    The Sellers shall promptly notify Buyer in writing upon receipt by any Seller of written notice of any pending or threatened Tax audits or assessments relating to the income, properties or operations of such Seller that may reasonably be expected to relate to or give rise to an Excluded Tax or an Adverse Claim on the Purchased Assets.

~~Section 6.07 **Exclusivity**.   During the period commencing on the Effective Date and ending on the Petition Date, no Seller shall (and the Sellers shall cause their respective Affiliates and its and their respective officers, directors, managers, partners, equity holders, employees, bankers, attorneys, accountants, consultants, financial advisors, and other agents not to), directly or indirectly: (i) solicit, initiate, consider, encourage or accept any other proposals or offers from any Person, or enter into any agreement (binding or nonbinding), relating to~~ any direct or indirect acquisition, financing or purchase of all or any portion of the Purchased Assets or any other similar transaction involving all or any portion of the Purchased Assets, whether effected by sale of assets, sale of equity, merger, joint venture, recapitalization, loan, financing arrangement or otherwise, but excluding any financing provided by any holder of Parent's existing notes and any ~~debtor-in-possession financing (an "**Alternative Transaction**"); or (ii) participate in any discussions, conversations, negotiations or other communications regarding, or furnish to any other Person any information with respect to, or otherwise cooperate in any way, assist or participate in, facilitate or encourage any effort or attempt by any other Person to seek to do any of the foregoing.   The Sellers shall (and shall cause their respective Affiliates and their respective officers, directors, managers, partners, equity holders, employees, bankers, attorneys, accountants, consultants, financial advisors, and other agents to) immediately cease and cause to be terminated all existing discussions, conversations, negotiations and other communications with, and access to any information by, any Persons conducted or provided heretofore with respect to any of the foregoing.   The Sellers shall notify Buyer promptly, but in any event within twenty-four (24) hours, orally and in writing if any such proposal or offer, or any inquiry or other contact with any Person with respect thereto, is made.   Any such notice to Buyer shall indicate in reasonable detail the identity of the Person making such proposal, offer, inquiry or other contact and the terms and conditions of such proposal, offer, inquiry or other contact.   No Seller shall release any Person from, or waive any provision of, any confidentiality or standstill agreement to which any Seller is a party, without the prior written consent of Buyer.   Notwithstanding anything set forth in this Section 6.07, the Sellers shall be entitled to take any action duly authorized by the governing authorit(ies) of the Sellers if per the written advice of the Sellers' legal counsel, failure to take such action could reasonably constitute a breach of such governing authorities' fiduciary duties pursuant to applicable Law.~~

Section 6.07   **Intentionally Deleted**.

Section 6.08   **Further Assurances**.  Subject to the terms of this Agreement, from and after the date hereof, each Party hereto agrees to, and to cause their Affiliates to, as applicable, to use commercially reasonable efforts to (a) furnish upon request to each other Party such further information in connection with the Transaction, (b) execute and deliver to each other Party such other documents consistent herewith (after a reasonable period to review and discuss such documents) and (c) do such other acts and things consistent herewith, in each case as another Party may reasonably request for the purpose of carrying out the intent of this Agreement, the other Transaction Documents to which it is a party and the Transactions.  To the extent any Purchased Assets are in the name of an Affiliate of a Seller, the Sellers shall cause such Affiliate to sell, assign, transfer, convey and deliver to Buyer the applicable Purchased Assets and further cause their respective Affiliates to comply with the terms of this Agreement and the other Transaction Documents to the extent such terms purport to bind such Affiliate.  Following the Closing, each Seller shall take any actions and execute any documents as reasonably requested by Buyer in furtherance of this Section 6.08 relating to the Purchased Assets.  In the event that such Seller does not take such actions or deliver such executed documents to Buyer within five (5) business days following Buyer's request therefor, Buyer shall have the authority as such Seller's true and lawful attorney-in-fact to take any such actions and execute any such documents on behalf of such Seller relating to the Purchased Assets.  In such event, Buyer shall provide such Seller with a copy of any document so executed; provided, that the inadvertent failure to do so shall not be deemed a breach hereof.

~~Section 6.09 **Public Announcements**.  The Parties shall consult with each other before issuing any press release or otherwise making any public statements or announcements with respect to this Agreement or the Transactions, and no Party shall issue any press release or make any public statement or announcement prior to obtaining the prior written approval of both Buyer and the Seller Representative, except that no such approval shall be necessary to the extent disclosure may be required by applicable Law, in which case the Party proposing to make such disclosure shall use its commercially reasonable efforts to consult in good faith with the other Parties and give such other Parties a reasonable opportunity, to the extent reasonably practicable, to review and comment upon such disclosure before making such disclosure.~~

Section 6.09   **[Reserved]**.

Section 6.10   **Books and Records**. Promptly following the Closing Effective Date, and in no event later than ten (10) business days thereafter (with respect to any Books and Records provided to Buyer in the Dataroom as of the Closing Effective Date) or sixty (60) days thereafter (with respect to all other Books and Records), Sellers shall use commercially reasonable efforts to deliver to Buyer, via a cloud-based server or another electronic format reasonably acceptable to Buyer, copies of all Books and Records, including, without limitation, all Financial Information, in the Sellers' possession in an electronic format.  No later than sixty (60) days following the Closing Effective Date, Sellers shall use commercially reasonable efforts to deliver to Buyer, or otherwise make accessible to Buyer via a cloud-based server or another electronic format reasonably acceptable to Buyer, copies of all Books and Records, including, without limitation, all Financial Information, in the Sellers' possession in a physical format.  From and after the Closing Effective Date through the third (3rd) anniversary thereof, each Seller will hold, and will cause its Affiliates and Representatives to hold, in confidence from any other Person, all

confidential information, documents, materials and other information related to the Books and Records.

Section 6.11    **Zoolander and Down to Earth**. From and after the Effective Date, no Seller or any Affiliate thereof shall amend any Specified Zoolander Agreement or Specified DTE Agreement in any manner that would modify or otherwise affect, or take any other action the effect of which would be to adversely affect, the calculation or timing of amounts payable to Buyer pursuant to the Notices of Assignment and Amendment.

## ARTICLE VII BANKRUPTCY COURT MATTERS

Section 7.01    **Sale Motion, Bankruptcy Procedures Hearing, Bid Procedures and Sale Order**. ~~On or prior to the date that is one (1) day after the Petition Date, the~~The Sellers ~~shall file with the Bankruptcy Court (a) the Bid Procedures and Sale Motion and~~ shall use their reasonable best efforts to seek entry of (i) the Bid Procedures Order on or ~~prior to the date that is twenty-one (21) days after the Petition Date~~before April 22, 2025, and (ii) the Sale Order, in each case, in form and substance acceptable to the Sellers and Buyer and which identifies Buyer as the "stalking horse" for the Purchased Assets and (b) appropriate supporting declarations. The Sellers shall use their reasonable best efforts to seek entry of the Sale Order on or prior to the date that is sixty (60) days after entry of the Bid Procedures Order~~. The Sellers shall affix a true and complete copy of this Agreement to the Bid Procedures and Sale Motion filed with~~; provided, in no event shall the Sellers be deemed in breach of this Section 7.01 if the Bankruptcy Court sets a later Sale Order hearing date in the Bid Procedures Order. The Sellers shall comply with all notice requirements (x) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedures and/or (y) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith. The Bankruptcy Court shall have entered the Sale Order.   In the event the entry of the Sale Order is appealed, the Sellers shall use commercially reasonable efforts to defend such appeal.

Section 7.02    **Auction.** Pursuant to the Bid Procedures Order, any and all qualified bids shall have been submitted at least two (2) business days prior to the commencement of the auction contemplated by the Bid Procedures (the "**Bid Deadline**").   If any qualified bid is submitted prior to the Bid Deadline, the Sellers shall ~~have commenced the Auction~~use reasonable best efforts to commence the auction contemplated by the Bid Procedures on or prior to the date that is seventy (70) days after the Petition Date; provided, in no event shall the Sellers be deemed in breach of this Section 7.02 if the Bid Procedures mandate a different auction commencement date.

Section 7.03    **Bankruptcy Filings**. From and after the Effective Date and until the Closing Effective Date, to the extent reasonably practicable, the Sellers shall deliver to Buyer drafts of any material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement and the operation of the Sellers for Buyer's prior review and comment at least two (2) business days prior to the filing or submission thereof, and such filings shall be acceptable to Buyer to the extent they relate to the Purchased Assets, the Assumed Liabilities, or any of Buyer's obligations hereunder. Each of the Sellers and Buyer shall appear formally or informally in the Bankruptcy Court if reasonably

requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other Party with copies of notices or other communications received by such Party from the Bankruptcy Court or any third party or any Governmental Authority with respect to the transactions contemplated by this Agreement. Buyer agrees that it will use its commercially reasonable efforts to assist the Sellers in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, and (y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

Section 7.04   **Sale Free and Clear**. The Sellers acknowledge and agree, and the Sale Order shall provide that, on the Closing Effective Date and concurrently with the Closing, all then existing or thereafter arising obligations, Adverse Claims (other than the Assumed Liabilities and the Permitted Liens) of, against or created by the Sellers or their bankruptcy estate, to the fullest extent permitted by section 363(f) of the Bankruptcy Code, shall be fully released from, and with respect to, the Purchased Assets. On the Closing Effective Date, the Purchased Assets shall be transferred to Buyer free and clear of all Adverse Claims (other than the Assumed Liabilities and the Permitted Liens), to the fullest extent permitted by section 363 of the Bankruptcy Code.

Section 7.05   **Excluded Assets**. For the avoidance of doubt, nothing in this Agreement will restrict Sellers or their Affiliates from selling, disposing of or otherwise transferring any Excluded Assets, or from settling, delegating or otherwise transferring any Excluded Liabilities, in each case, with the approval of the Bankruptcy Court, or from entering into discussions or agreements with respect to the foregoing.

## ARTICLE VIIITERMINATION

Section 8.01   **Termination**.   This Agreement and the obligations of the Parties to consummate the Transactions may, by written notice given on or prior to the Closing Effective Date, in the manner provided in this Section 8.01, be terminated at any time prior to the Closing only as follows:

(a)        by mutual written consent of Buyer and the Seller Representative;

(b)        by Buyer if at any time (i) any of the representations or warranties of any Seller in Section 4.01 is or becomes untrue or inaccurate such that the condition set forth in Section 3.01(a) would not be satisfied (treating such time as if it were the Closing for purposes of this Section 8.01(b)), (ii) the condition set forth in ~~Section 3.01(g)~~Section 3.01(f) would not be satisfied (treating such time as if it were the Closing for purposes of this Section 8.01(b)), or (iii) there has been a breach on the part of any Seller or Parent of any of its covenants or agreements contained in this Agreement such that the condition set forth in Section 3.01(b) would not be satisfied (treating such time as if it were the Closing for purposes of this Section 8.01(b)), and in the case of (i) through (iii) above, such breach or failure to satisfy such condition cannot be cured

by the Sellers or Parent or, if capable of being cured, has not been cured by the applicable Sellers or Parent by the date that is three (3) business days prior to the Outside Date, <u>provided</u> that Buyer shall not be entitled to terminate pursuant to this <u>Section 8.01(b)</u> if the consummation of the Transactions is then being prevented by the willful and material breach by Buyer of any of its representations, warranties or covenants contained in the Agreement;

(c)     by the Sellers if at any time (i) any of the representations or warranties of Buyer in <u>Section 4.02</u> is or becomes untrue or inaccurate such that the condition set forth in <u>Section 3.02(a)</u> would not be satisfied (treating such time as if it were the Closing for purposes of this <u>Section 8.01(c)</u>), or (ii) there has been a breach on the part of Buyer of any of its covenants or agreements contained in this Agreement such that the condition set forth in <u>Section 3.02(b)</u> would not be satisfied (treating such time as if it were the Closing for purposes of this <u>Section 8.01(c)</u>), and in the case of both (i) and (ii) above, such breach cannot be cured by Buyer or, if capable of being cured, has not been cured by Buyer by the date that is three (3) business days prior to the Outside Date, <u>provided</u> that the Sellers shall not be entitled to terminate pursuant to this <u>Section 8.01(c)</u> if the consummation of the Transactions is then being prevented by the willful and material breach by Sellers or Parent of any of their representations, warranties or covenants contained in the Agreement;

(d)     by Buyer if the Closing has not occurred on or before July 5, 2025 or such later date, if any, as both Buyer and the Seller Representative may agree upon in writing (as such date may be extended pursuant to the terms of this Agreement or by the mutual written consent of the Seller Representative and Buyer, the "**Outside Date**"), <u>provided</u> that Buyer shall not be entitled to terminate pursuant to this <u>Section 8.01(d)</u> if the failure to consummate the Transactions by the Outside Date was primarily caused by the willful and material breach by Buyer of any of Buyer's representations, warranties or covenants contained in the Agreement;

(e)     by either Buyer or the Sellers if consummation of the Transactions is enjoined or prohibited by the terms of any Law or a final, non-appealable Order of any Governmental Authority having competent jurisdiction; <u>provided</u>, <u>however</u>, that the party seeking to terminate shall not be entitled to terminate pursuant to this <u>Section 8.01(e)</u> if the imposition of such Order or the failure of such Order to be resisted, resolved or lifted, as applicable, was proximately caused by a breach of a representation, warranty, covenant or agreement on the part of Buyer (if it is seeking to terminate) or any Seller (if the Sellers are seeking to terminate);

(f)     by Buyer if any of the Bankruptcy Cases of a Seller are dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of the Sellers is appointed in the Bankruptcy Case of a Seller;

(g)     Buyer, if (i) the Bid Procedures Order shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York Time) on ~~the date that is twenty-one (21) days after the Petition Date~~<u>April 22, 2025</u>, (ii) the Sale Order shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York Time) on the date that is sixty (60) days after entry of the Bid Procedures Order, or (iii) following the entry of the Sale Order, the Sale Order shall (A) fail to be in full force and effect, (B) have been reversed, (C) have been stayed and such stay

shall continue to be in effect for more than fourteen (14) days or (D) have been modified or amended in any manner adverse to Buyer without the prior written consent of Buyer; or

(h)    by Buyer or Sellers upon (i) any announcement by the Sellers at the Auction held in accordance with the Bid Procedures Order that Buyer is not the Successful Bidder or the Backup Bidder or (ii) the consummation of an Alternative Transaction~~;~~.

The Party seeking to terminate this Agreement pursuant to this Section 8.01 (other than pursuant to Section 8.01(a)) shall give prompt written notice of such termination to the other Parties hereto.

Section 8.02    **Effect of Termination**.  In the event of termination of this Agreement as provided above, this Agreement shall immediately terminate and have no further force and effect and there shall be no Liability on the part of any Party to any other Party under this Agreement, except that (a) the covenants and agreements set forth in this Section 8.02, Section 8.03, and Article IX and all definitions herein necessary to interpret any of the foregoing provisions shall remain in full force and effect and survive such termination indefinitely, (b) the Sellers may have Liability as provided in Section 8.03; and (c) nothing in this Section 8.02 shall release any Party from any Liability for any breach by such Party of this Agreement before the effective date of such termination, or otherwise affect any of the rights or remedies (whether under this Agreement, or at Law, in equity or otherwise) available to any Party with respect to the breach of this Agreement by any Party before the effective date of such termination.

Section 8.03    ~~**Break Up Fee and**~~ **Expense Reimbursement**.

~~(a) In the event that Buyer has complied, in all material respects, with all agreements, obligations and covenants to be performed by or on its behalf through the date of termination of this Agreement, the Bid Procedures Order has been entered and this Agreement is terminated pursuant to Section 8.01(b), Section 8.01(d), or Section 8.01(h), then the Sellers shall pay to Buyer, to a bank account designated in writing by Buyer on at least two (2) business days' prior written notice, the Break Up Fee. The obligations of the Sellers to pay the Break Up Fee (i) shall be entitled to super-priority administrative expense claim status under sections 503 and 507 of the Bankruptcy Code, (ii) shall not be subordinate to any other administrative expense claim against the Sellers, (iii) shall be paid directly from proceeds of any Alternative Transaction (and the consummation of any Alternative Transaction shall be conditioned on the payment thereof), and (iv) shall survive the termination of this Agreement. Each Seller acknowledges and agrees that such Seller shall be jointly and severally liable for the entire Break Up Fee payable pursuant to this Agreement.~~

(a)    ~~(b)~~ Notwithstanding anything in this Agreement to the contrary, the Sellers agree to pay Buyer the Expense Reimbursement in the event this Agreement is terminated (other than a termination pursuant to Section 8.01(c)). The Sellers shall pay to Buyer the Expense Reimbursement by wire transfer of immediately available funds promptly (and in any event no later than one (1) business day ~~following notice from Buyer to the Sellers of such event) upon the termination of this Agreement. The~~ after the closing of an Alternative Transaction) directly from and only from and out of proceeds of any Alternative Transaction (and the consummation of any

Alternative Transaction shall be conditioned on the payment thereof). In the event that, notwithstanding the foregoing, the Expense Reimbursement is not timely paid, the obligations of the Sellers to pay the Expense Reimbursement (i) shall be entitled to super-priority administrative expense claim status under sections 503 and 507 of the Bankruptcy Code, (ii) shall not be subordinate to any other administrative expense claim against the Sellers, and (iii) shall be paid directly from proceeds of any Alternative Transaction (and the consummation of any Alternative Transaction shall be conditioned on the payment thereof), and (iv) shall survive the termination of this Agreement. Each Seller acknowledges and agrees that such Seller shall be jointly and severally liable for the entire amount of the Expense Reimbursement payable pursuant to this Agreement.

(b)    (c) If the Sellers fail to take any action necessary to cause the delivery of the Break Up Fee or the Expense Reimbursement and, in order to obtain such Break Up Fee and Expense Reimbursement, Buyer commences a Proceeding which results in an order for relief in favor of Buyer, Sellers shall pay to Buyer, in addition to the Break Up Fee and the Expense Reimbursement, an amount of cash equal to the costs and expenses (including attorneys' fees) incurred by Buyer in connection with such Proceeding.

(c)    (d) The parties acknowledge and agree that any payment of the Break Up Fee and the Expense Reimbursement described in this Section 8.03 shall be the sole and exclusive remedy of Buyer and any other Person against the Sellers for any and all losses or damages suffered or incurred in connection with this Agreement and the Transactions contemplated hereby. The parties acknowledge and agree that the agreements contained in this Section 8.03 are an integral part of this Agreement and the Transactions contemplated hereby.

## ARTICLE IXREMEDIES

Section 9.01    **Remedies**.  Except as contemplated by Section 2.06(b) or as otherwise provided in Section 9.02 or the Escrow Agreement, the parties agree that the remedies and/or the termination of this Agreement in accordance with the provisions of Article VIII shall be the sole and exclusive remedy of the Sellers (if the breaching party is Buyer) or Buyer (if the breaching party is a Seller) under this Agreement for any breach of representation and warranty made or any covenant or agreement to be performed on or prior to Closing.

Section 9.02    **Specific Performance**.  The parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that any party does not perform the provisions of this Agreement (including failing to take such actions as are required of it hereunder to consummate the Transaction) in accordance with its specified terms or otherwise breaches such provisions. It is accordingly agreed that Buyer shall be entitled to an injunction or other equitable relief to prevent breaches of this Agreement by the Sellers and to enforce specifically the terms and provisions hereof, and the Sellers shall be entitled to an injunction or other equitable relief to prevent breaches of this Agreement by Buyer and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which a non-breaching party is entitled at Law or in equity.

## ARTICLE XMISCELLANEOUS

Section 10.01 **Assignments**.  This Agreement shall be binding upon the Parties and their respective successors and permitted assigns except to the extent that it is hereafter superseded or modified by subsequent written agreements between the Parties.  This Agreement may not be assigned or otherwise transferred (including by operation of Law) by Buyer, without the prior written consent of the Seller Representative, or by any Seller or Seller Representative, without the prior written consent of Buyer; provided, however, that nothing in this Agreement or any other Transaction Document shall or is intended to limit the ability of Buyer to assign (a) its right, title and interest in and to this Agreement and/or the Purchased Assets to any Affiliate of Buyer or to(i) prior to the Closing Effective Date, to one or more Affiliates of Buyer, if and to the extent designated by Buyer in writing to Seller (a "**Buyer Designee**"), (ii) after the Closing Effective Date, to one or more Affiliates of Buyer, or (iii) to any entity acquiring or succeeding to all or substantially all of the assets of Buyer or into which Buyer is merged; (b) this Agreement and Buyer's rights hereunder to one or more financiers (or a collateral agent or security trustee for and on behalf of any such financiers) for security purposes; and (c) all or any portion of the Purchased Assets to any Person after the Closing Effective Date; provided, further, no assignment or delegation shall relieve the assigning or delegating party of any of its obligations hereunder without the prior written consent of the other Parties.  Any attempted assignment in violation of this Section 10.01 is void *ab initio*.

Section 10.02  **Notices**.  All notices and other communications provided for or required hereunder shall be in writing (including e-mail communication) and e-mailed or delivered at each party's address set forth below, or at such other address as shall be designated by such party in a written notice to the other parties.  All such notices and communications shall be effective two (2) business days after delivery to a recognized overnight courier service, or when delivered, if sent by other means.

If to Buyer:

~~CP Ventura~~Alcon Media Group, LLC
~~10877 Wilshire Boulevard, Suite 1404~~

~~Los Angeles, CA 90024~~

~~Attention:  Steven H. Kram and Steven E. Blume~~

10390 Santa Monica Boulevard Suite 250
Los Angeles, CA 90025
Attention: Scott Parish
E-mail:  ~~kram@contentllc.com and blume@contentllc~~sparish@alconent.com

With a copy (which shall not constitute notice) to:

~~Latham & Watkins LLP~~

~~10250 Constellation~~ Loeb & Loeb LLP
10100 Santa Monica Blvd., Suite ~~1100~~2200
Los Angeles, CA 90067
Attention: ~~Liliana Ranger~~Scott Edel
E-mail:  ~~liliana.ranger@lw~~sedel@loeb.com

~~1271 Avenue of the Americas~~

Loeb & Loeb LLP
345 Park Avenue
New York, NY ~~10020~~ 10154
Attention: ~~David Hammerman~~ Vadim J. Rubinstein
~~E-mail:  david.hammerman@lw~~E-mail:  vrubinstein@loeb.com

<u>If to Sellers</u>:

c/o Village Roadshow Entertainment Group USA Inc.
10100 Santa Monica Boulevard, Suite 200
Los Angeles, California 90067
Attention: Louis Santor and Kevin Berg
E-mail:  louis.santor@vreg.com and kevin.berg@vreg.com

<u>With copies (which shall not constitute notice) to</u>:

Sheppard Mullin Richter & Hampton LLP
350 South Grand Ave., 40th Floor
Los Angeles, California 90071-3460
Attention:  Stacey Rosenberg, Esq.
E-mail:  srosenberg@sheppardmullin.com

321 North Clark Street, 32nd Floor
Chicago, IL 60654
Attention: Justin R. Bernbrock
E-mail: jbernbrock@sheppardmullin.com

Section 10.03 **Confidentiality**.  Following the Closing, the Parties shall, and shall cause their respective Affiliates and representatives to, treat all non-public information and trade secrets relating to the other Parties, their respective Affiliates, the terms of this Agreement and the other Transaction Documents, as confidential, preserve the confidentiality thereof, and not use such information and trade secrets for any reason or purpose whatsoever (other than any purposes permitted under this Agreement) or disclose to any Person such information or trade secrets unless such information or trade secret is (a) now or hereafter disclosed, through no act or omission of the applicable Party or its Affiliates or their respective representatives in breach of this Agreement, in a manner making it available to the general public, (b) required by Law to be disclosed, (c) received by any Party or its representatives after the Closing Effective Date from a third party who is not, to the knowledge of such Party, its Affiliates or their respective representatives, known to be under an obligation of nondisclosure or in breach of an obligation of confidentiality, in each case, to the other Party, (d) independently developed by any Party or its representatives after the Closing Effective Date without the use of or reference to any such information or trade secret, (e) reasonably necessary to defend or prosecute a Proceeding, or (f) approved in advance for use or disclosure via written authorization of the applicable Party.  If the disclosure of such information or trade secrets is required by Law or is reasonably necessary to defend or prosecute a Proceeding, the Parties, their Affiliates and their respective representatives shall (i) cooperate with and provide the other Party an opportunity to object to the disclosure and shall, to the extent legally permissible, give the other Party as much prior written notice as is practicable under the circumstances, (ii) only disclose such information or trade secrets to the minimum extent required by Law to be disclosed or reasonably necessary to defend or prosecute such Proceeding, and (iii) use reasonable efforts to procure that confidential treatment will be accorded to any such information or trade secrets so disclosed.  Notwithstanding the foregoing, (x) each Party shall have the right to communicate and discuss with, and provide to, its Affiliates and its and their legal advisors, financial or accounting advisors, representatives, officers or employees, directors, consultants and agents, any information regarding the terms and status of this Agreement and the other Transaction Documents and the Transactions who are under professional duty or contractual obligation to maintain the confidentiality of such information, and (y) Buyer and its Affiliates may make customary disclosures (which are made subject to customary confidentiality obligations), including the key economic terms of the Transactions and the return realized as a result thereof, to its current or prospective investors or lenders in connection with its fundraising and reporting activities.

Section 10.04 **Amendment; Waiver**.  This Agreement shall not be amended, modified or waived in any manner except by an agreement in writing duly executed and delivered by each of Buyer and the Sellers.  No failure or delay of any Party to exercise any right or remedy given to such Party under this Agreement or any other Transaction Document or otherwise available to such Party, or to insist upon strict compliance by any other Party with its or his obligations hereunder, no single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, and no custom or practice of the Parties in variance with the terms hereof, shall constitute a waiver of any Party's right to demand exact compliance with the terms hereof.  Any written waiver shall be limited to those items specifically waived therein and shall not be deemed to waive any future breaches or violations or other non-specified breaches or violations unless, and to the extent, expressly set forth therein.

Section 10.05 **Binding Effect; No Third-Party Beneficiaries**.  Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors, transferees and assigns.  Nothing in this Agreement, express or implied, is intended to confer on any Person (other than the Parties or their respective successors and permitted assigns) any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 10.06 **Rules of Construction**.  The following rules of construction shall govern the interpretation of this Agreement:

(a)      all references to Articles, Sections, Exhibits or Schedules are to Articles, Sections, Exhibits or Schedules in this Agreement;

(b)      unless the context otherwise requires, words in the singular or plural include the singular and plural, and pronouns stated in either the masculine, the feminine or neuter gender shall include the masculine, feminine and neuter;

(c)      whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "but not limited to";

(d)      the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not simply mean "if";

(e)      references to a Person herein are also to its permitted successors and permitted assigns;

(f)      references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(g)      in computing any period of time pursuant to this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included, but the time shall begin to run on the next succeeding day.  The last day of the period so computed shall be included, unless it is not a business day, in which event the period shall run until the end of the next business day;

(h)      time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement;

(i)      Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof;

(j)        (i) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits hereto, (ii) the term "any" means "any and all," and (iii) the term "or" shall not be exclusive and shall mean "and/or";

(k)        the phrases "provided" or "made available to Buyer" mean that the information referred to has been made available in the Dataroom at least two (2) business days prior to the Effective Date;

(l)        (i) references to "days" means calendar days unless business days are expressly specified and (ii) references to "$" mean U.S. dollars, provided that if there is a need to convert U.S. dollars into any foreign currency, or vice versa, the exchange rate shall be that published by The Wall Street Journal three (3) business days before the date on which the obligation is paid (or if The Wall Street Journal is not published on such date, the first date thereafter on which The Wall Street Journal is published), except as otherwise required by applicable Law (in which case, the exchange rate shall be determined in accordance with such Law);

(m)        the Parties intend that each representation, warranty, covenant and agreement contained herein shall have independent significance, and if any Party has breached any representation, warranty, covenant or agreement contained herein in any respect, the fact that there exists another representation, warranty, covenant or agreement relating to the same or similar subject matter that the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, covenant or agreement;

(n)        any drafts of this Agreement or any other Transaction Document circulated by or among the Parties prior to the final fully executed drafts shall not be used for purposes of interpreting any provision of this Agreement or any other Transaction Document, and each of the Parties agrees that no Party shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any dispute or Proceeding among any of the foregoing or for any other purpose; and

(o)        the Parties have participated jointly in the negotiation and drafting of this Agreement and the other Transaction Documents; in the event an ambiguity or question of intent or interpretation arises, this Agreement and the other Transaction Documents shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement or any other Transaction Document and the language used in it will be deemed to be the language chosen by the Parties to express their mutual intent.

Section 10.07 **Severability**.  Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.  The preceding sentence of this Section shall be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause any Party to lose the material benefit of its economic bargain.

Section 10.08 **Incorporation by Reference**.  Every Exhibit, annex and schedule (including the Disclosure Schedules) attached to this Agreement and referred to herein is incorporated fully into this Agreement by reference.

Section 10.09 **Governing Law; Submission to Jurisdiction**.

(a)    THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

(b)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY ANCILLARY AGREEMENT; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN NEW YORK WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

Section 10.10 **Waiver of Jury Trial**.  EACH OF THE PARTIES IRREVOCABLY WAIVES TO THE EXTENT PERMITTED BY LAW ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT, STATUTE OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF. EACH PARTY FURTHER WAIVES ANY RIGHT TO SEEK TO CONSOLIDATE ANY PROCEEDING IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER PROCEEDING IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (a) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED OR WARRANTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (c) EACH PARTY MAKES THIS WAIVER VOLUNTARILY AND (d) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.10.

Section 10.11 **Expenses**.  Except as otherwise expressly stated herein, each Party shall be responsible for the payment of its own fees and expenses (including legal, accounting and investment banking fees and expenses) incurred in connection with the Transaction Documents and in the negotiation and preparation for and consummation of the Transactions.

Section 10.12 **Counterpart Execution**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and when taken together shall constitute one and the same instrument.  The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.13 **Entire Agreement**.  This Agreement (including all annexes, schedules (including the Disclosure Schedules) and the Exhibits attached hereto) and the other Transaction Documents constitute the entire agreement and understanding between the Parties in respect of the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

Section 10.14 **Relationship of the Parties**.  Nothing in this Agreement creates any partnership, employment, joint venture, franchise or agency relationship between the parties; rather, the parties acknowledge that their relationship under this Agreement is one of independent contracting parties.

Section 10.15 **Seller Representative**.

(a)    For purposes of this Agreement, each Seller hereby irrevocably appoints and designates Seller Representative to serve as such Seller's true and lawful representative, agent, and attorney-in-fact, with full power of substitution and re-substitution, to act for and on behalf of such Seller for the purpose of taking any and all actions by such Seller specified in or contemplated by this Agreement or the other Transaction Documents; provided, that if Kevin Berg at any time is unable, due to incapacity or otherwise, to serve as Seller Representative or resigns as Seller Representative, then the Sellers shall designate a successor Seller Representative in writing. Each successor Seller Representative, if required to serve, shall sign an acknowledgment in writing agreeing to perform and be bound by all of the provisions of this Agreement and the other Transaction Documents applicable to Seller Representative. Each successor Seller Representative shall have all of the power, authority, rights and privileges conferred by this Agreement upon the original Seller Representative, and the term "Seller Representative" as used herein shall be deemed to include any successor Seller Representative.

(b)    Seller Representative is hereby constituted and appointed as agent and attorney-in-fact for and on behalf of each Seller with respect to the performance of its duties as Seller Representative as set forth herein. This power of attorney and all authority hereby conferred is coupled with an interest and is irrevocable and shall not terminate or otherwise be affected by the death, disability, incompetence, bankruptcy or insolvency of any Seller and shall be binding upon the successors, assigns, heirs, executors, administrators, legal representatives, and beneficiaries, as applicable, of each Seller. Seller Representative shall promptly deliver to each Seller any notice received by Seller Representative concerning this Agreement that Seller Representative deems is material.

(c)    Without limiting the generality of the foregoing, Seller Representative has full power and authority, on behalf of each Seller and such Seller's successors and assigns, to: (i) interpret the terms and provisions of this Agreement and the other Transaction Documents to be executed and delivered by the Sellers in connection herewith, including the Escrow Agreement, (ii) execute and deliver and receive deliveries of all agreements, certificates, statements, notices, approvals, extensions, waivers, undertakings, amendments, and other documents required or permitted to be given in connection with the consummation of the Transactions, (iii) receive service of process in connection with any claims under this Agreement or the other Transaction Documents, (iv) agree to, negotiate, enter into settlements and compromises of, assume the defense of claims, and demand arbitration and comply with orders of courts and awards of arbitrators with respect to such claims, and to take all actions necessary or appropriate in the judgment of Seller Representative for the accomplishment of the foregoing, (v) give and receive notices and communications, (vi) authorize delivery to Buyer of the Buyer Deposit, (vii) object to such delivery, (viii) distribute the Buyer Deposit to which Sellers are entitled, and any earnings and proceeds thereon, (ix) to assert the attorney-client privilege on behalf of the Sellers with respect to any communications that relate in any way to the transactions contemplated hereby, (x) deliver to Buyer any and all Transaction Documents to which any Seller is a party executed by such Seller and deposited with Seller Representative, upon Seller Representative's determination that the conditions to Closing have been satisfied or waived, (xi) grant any consent, approval or waiver under this Agreement or any other Transaction Document and (xii)

take all actions necessary or appropriate in the sole judgment of Seller Representative on behalf of the Sellers for the accomplishment of the foregoing or otherwise specifically required or in connection with this Agreement or the other Transaction Documents.  Notwithstanding anything to the contrary herein, in the event of a claim hereunder against a single Seller, and not any other Seller, such affected Seller shall be entitled to control the defense of such claim.

(d)     Service by Seller Representative shall be without compensation except for the reimbursement by the Sellers of out-of-pocket expenses and indemnification specifically provided herein.

(e)     Seller Representative shall have no duties or responsibilities except those expressly set forth herein, and no implied covenants, functions, responsibilities, duties, obligations or liabilities on behalf of any Seller shall otherwise exist against Seller Representative.  Seller Representative shall not be liable to any Seller relating to the performance of Seller Representative's duties or exercise of any rights under this Agreement for any errors in judgment, negligence, oversight, breach of duty or otherwise except to the extent it is finally determined in a court of competent jurisdiction by clear and convincing evidence that the actions taken or not taken by Seller Representative constituted actual fraud or were taken or not taken, as applicable, in bad faith.  Seller Representative shall be protected in acting upon any notice, statement or certificate believed by Seller Representative to be genuine and to have been furnished by the appropriate Person and in acting or refusing to act in good faith on any matter.  Seller Representative shall not be liable to Buyer or any Affiliate of Buyer by reason of this Agreement or the performance of Seller Representative's duties hereunder or otherwise.

(f)     The Sellers shall indemnify and hold harmless Seller Representative against all losses, including costs of defense, paid or incurred in connection with any action, suit, proceeding or claim to which Seller Representative is made a party by reason of the fact that Seller Representative was acting as Seller Representative pursuant to this Agreement; provided, that Seller Representative shall not be entitled to indemnification hereunder to the extent it is finally determined in a court of competent jurisdiction by clear and convincing evidence that the actions taken or not taken by Seller Representative constituted actual fraud or were taken or not taken, as applicable, in bad faith.

(g)     Buyer shall be entitled to rely conclusively without inquiry upon any decision, action, consent or instruction of Seller Representative as the duly authorized decision, action, consent or instruction of Seller Representative on behalf of each Seller with respect to any matters set forth in this Agreement or any other Transaction Document and Buyer is hereby relieved from any liability to any Person for any acts done by it in accordance with any such decision, action, consent or instruction.

(h)     The provisions of this Section 10.15 will survive the Closing, the resignation or removal of Seller Representative or the termination of this Agreement.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties have executed and entered into this Purchase Agreement on the date first set forth above.

**SELLERS:**

VILLAGE ROADSHOW FILMS (BVI) LIMITED


By: _____
Name:
Title:


VILLAGE ROADSHOW FILMS NORTH AMERICA INC.


By: _____
Name: Kevin P. Berg
Title:   General Counsel and Secretary


VILLAGE ROADSHOW FILMS GLOBAL INC.


By: _____
Name: Kevin P. Berg
Title:   General Counsel and Secretary


VILLAGE ROADSHOW VS FILMS LLC


By: _____
Name: Kevin P. Berg
Title:   General Counsel and Secretary

VILLAGE ROADSHOW DISTRIBUTION (BVI) LIMITED

By: _____
Name:
Title:


VILLAGE ROADSHOW DISTRIBUTION USA INC.

By: _____
Name:
Title:

VILLAGE ROADSHOW PICTURES NORTH AMERICA INC.

By: _____
Name:
Title:

VR FUNDING LLC

By: _____
Name:
Title:

VR FILMS HOLDINGS (BVI) LIMITED

By: _____
Name:
Title:

241154324.2
212160-10346

VILLAGE ROADSHOW PRODUCTIONS (BVI) LIMITED


By: _____
Name:
Title:


VILLAGE ROADSHOW ENTERTAINMENT GROUP (BVI) LIMITED


By: _____
Name:
Title:


**BUYER:**

~~CP VENTURA~~ALCON MEDIA GROUP, LLC

By: _____
Name:
Title:


**SELLER REPRESENTATIVE:**


_____
Kevin Berg

## Schedule I

## Sellers

1.  Village Roadshow Films (BVI) Limited, a BVI business company incorporated in the British Virgin Islands ("**VRF**")

2.  Village Roadshow Films North America Inc., a Delaware corporation ("**VRFNA**")

3.  Village Roadshow Films Global Inc., a Delaware corporation ("**VRFG**")

4.  Village Roadshow VS Films LLC, a Delaware limited liability company ("**VRVS**")

5.  Village Roadshow Distribution (BVI) Limited, a BVI business company incorporated under the laws of the British Virgin Islands ("**VRD**")

6.  Village Roadshow Distribution USA Inc., a Delaware corporation ("**VRD-USA**")

7.  Village Roadshow Pictures North America Inc., a Delaware corporation ("**VRPNA**")

8.  VR Funding LLC, a Delaware limited liability company ("**VR Funding**")

9.  VR Films Holdings (BVI) Limited, a BVI business company incorporated under the laws of the British Virgin Islands ("**VRF Holdings**")

10. Village Roadshow Productions (BVI) Limited, a BVI business company incorporated under the laws of the British Virgin Islands ("**VRP**")

11. Village Roadshow Entertainment Group (BVI) Limited, a BVI business company incorporated under the laws of the British Virgin Islands ("**Parent**")

**Schedule II**

**Pictures**

**Part A – Foreign Pictures**

| Title | Applicable Percentage | Distributor | Magnum Foreign Percentage | Relevant Percentage |
|---|---|---|---|---|
| Practical Magic | 100% | WBPL and Village Roadshow Films Distributors S.A. ("VR Greece") | 50% | 50% |
| Analyze This | 100% | WBPL and VR Greece | 50% | 50% |
| The Matrix | 100% | WBPL and VR Greece | 50% | 50% |
| Deep Blue Sea | 100% | WBPL and VR Greece | 50% | 50% |
| Three Kings | 100% | WBPL and VR Greece | 50% | 50% |
| Three to Tango | 100% | WBPL and VR Greece | 50% | 50% |
| Gossip | 100% | WBPL and VR Greece | 50% | 50% |
| Space Cowboys | 100% | WBPL and VR Greece | 50% | 50% |
| Red Planet | 100% | WBPL and VR Greece | 50% | 50% |
| Miss Congeniality | 100% | WBPL and VR Greece | 50% | 50% |
| Valentine | 100% | WBPL and VR Greece | 50% | 50% |
| Saving Silverman | 100% | Columbia Pictures Corporation Limited and VR Greece | 50% | 50% |

| Title | Applicable Percentage | Distributor | Magnum Foreign Percentage | Relevant Percentage |
|---|---|---|---|---|
| Down to Earth | 100% | Paramount Pictures International, MTV S.A. LDC and VR Greece | 50% | 50% |
| See Spot Run | 100% | WBPL and VR Greece | 50% | 50% |
| Exit Wounds | 100% | WBPL and VR Greece | 50% | 50% |
| Swordfish | 100% | WBPL and VR Greece | 50% | 50% |
| Cats & Dogs | 100% | WBPL and VR Greece | 50% | 50% |
| Don't Say A Word | 100% | Monarchy Enterprises S.a.r.l. and VR Greece | 50% | 50% |
| Hearts in Atlantis | 100% | WBPL and VR Greece | 50% | 50% |
| Zoolander | 100% | Paramount Pictures International, MTV S.A. LDC and VR Greece | 50% | 50% |
| Training Day | 100% | WBPL and VR Greece | 50% | 50% |
| Ocean's Eleven | 100% | WBPL and VR Greece | 50% | 50% |
| The Majestic | 100% | WBPL and VR Greece | 50% | 50% |
| Queen of the Damned | 100% | WBPL and VR Greece | 50% | 50% |
| Showtime | 100% | WBPL and VR Greece | 50% | 50% |
| Eight Legged Freaks | 100% | WBPL and VR | 50% | 50% |

| Title | Applicable Percentage | Distributor | Magnum Foreign Percentage | Relevant Percentage |
|---|---|---|---|---|
| | | Greece | | |
| Pluto Nash | 100% | WBPL and VR Greece | 50% | 50% |
| Ghost Ship | 100% | WBPL and VR Greece | 50% | 50% |
| Analyze That | 100% | WBPL and VR Greece | 50% | 50% |
| Two Weeks Notice | 100% | WBPL and VR Greece | 50% | 50% |
| Dreamcatcher | 100% | WBPL and VR Greece | 50% | 50% |
| Matrix Reloaded (together with The Animatrix) | 100% | WBPL and VR Greece | 50% | 50% |
| Mystic River | 100% | WBPL and VR Greece | 50% | 50% |
| Matrix Revolutions | 100% | WBPL and VR Greece | 50% | 50% |
| Torque | 100% | WBPL and VR Greece | 50% | 50% |
| Taking Lives | 100% | WBPL and VR Greece | 50% | 50% |
| Catwoman | 100% | WBPL and VR Greece | 50% | 50% |
| Ocean's Twelve | 100% | WBPL and VR Greece | 50% | 50% |
| Constantine | 100% | WBPL and VR Greece | 50% | 50% |
| Miss Congeniality 2: Armed & Fabulous | 100% | WBPL and VR Greece | 50% | 50% |
| House of Wax | 100% | WBPL and VR Greece | 50% | 50% |
| Charlie and the | 100% | WBPL and VR | 50% | 50% |

| Title | Applicable Percentage | Distributor | Magnum Foreign Percentage | Relevant Percentage |
|---|---|---|---|---|
| Chocolate Factory | | Greece | | |
| Dukes of Hazzard | 100% | WBPL and VR Greece | 50% | 50% |
| Rumor Has It… | 100% | WBPL and VR Greece | 50% | 50% |
| Firewall | 100% | WBPL and VR Greece | 50% | 50% |
| The Lake House | 100% | WBPL and VR Greece | 50% | 50% |
| Happy Feet | 100% | WBPL and VR Greece | 50% | 50% |
| Unaccompanied Minors | 100% | WBPL and VR Greece | 50% | 50% |
| Music and Lyrics | 100% | WBPL and VR Greece | 50% | 50% |
| The Reaping | 100% | WBPL and VR Greece | 50% | 50% |
| Lucky You | 100% | WBPL and VR Greece | 50% | 50% |
| Ocean's Thirteen | 100% | WBPL and VR Greece | 50% | 50% |
| License to Wed | 100% | WBPL and VR Greece | 50% | 50% |
| No Reservations | 100% | WBPL and VR Greece | 50% | 50% |
| The Invasion | 100% | WBPL and VR Greece | 50% | 50% |
| The Brave One | 100% | WBPL and VR Greece | 50% | 50% |
| I Am Legend | 100% | WBPL and VR Greece | 50% | 50% |
| Speed Racer | 100% | WBPL and VR Greece | 50% | 50% |

| Title | Applicable Percentage | Distributor | Magnum Foreign Percentage | Relevant Percentage |
|---|---|---|---|---|
| Get Smart | 100% | WBPL and VR Greece | 50% | 50% |
| Nights in Rodanthe | 100% | WBPL and VR Greece | 50% | 50% |
| Yes Man | 100% | WBPL and VR Greece | 50% | 50% |
| Gran Torino | 100% | WBPL and VR Greece | 50% | 50% |
| Where the Wild Things Are | 100% | WBPL and VR Greece | 50% | 50% |
| Sherlock Holmes | 100% | WBPL and VR Greece | 50% | 50% |
| Sex and the City 2 | 100% | WBPL and VR Greece | 50% | 50% |
| Cats & Dogs: The Revenge of Kitty Galore | 100% | WBPL and VR Greece | 50% | 50% |
| Legend of the Guardians | 100% | WBPL and VR Greece | 50% | 50% |
| Life As We Know It | 100% | WBPL and VR Greece | 50% | 50% |
| Happy Feet Two | 100% | WBPL and VR Greece | 50% | 50% |
| Sherlock Holmes: A Game of Shadows | 100% | WBPL and VR Greece | 50% | 50% |
| The Lucky One | 100% | WBPL and VR Greece | 50% | 50% |
| Dark Shadows | 100% | WBPL and VR Greece | 50% | 50% |
| Gangster Squad | 100% | WBPL and VR Greece | 50% | 50% |
| The Great Gatsby | 100% | WBPL and VR Greece | 50% | 50% |

| Title | Applicable Percentage | Distributor | Magnum Foreign Percentage | Relevant Percentage |
|---|---|---|---|---|
| The LEGO Movie | 100% | WBPL and VR Greece | 50% | 50% |
| Winter's Tale | 50% | WBPL and VR Greece | 50% | 50% |
| Edge of Tomorrow | 66.7% | WBPL and VR Greece | 50% | 50% |

**Part B – F/D Pictures**

| Title | Applicable Percentage (VRF) | Applicable Percentage (VRFNA) | Distributors (Foreign/Domestic) | Magnum Foreign Percentage / Magnum Domestic Percentage | Relevant Percentage |
|---|---|---|---|---|---|
| Into the Storm | 37.5% | 37.5% | WBPL and VR Greece/WAV | 50%/50% | 50% |
| The Judge | 25% | 25% | WBPL/WAV | 50%/50% | 50% |
| American Sniper | 33.3% | 33.3% | WBPL/WAV | 50%/50% | 50% |
| Jupiter Ascending | 33.3% | 33.3% | WBPL/WAV | 10%/10% | 90% |
| Mad Max: Fury Road | 50% | 50% | WBPL/WAV | 10%/10% | 90% |
| San Andreas | 25% | 25% | WBPL/WAV | 10%/10% | 90% |
| In the Heart of the Sea | 25% | 25% | WBPL/WAV | 10%/10% | 90% |
| The Legend of Tarzan | 33.3% | 33.3% | WBPL/WAV | 10%/10% | 90% |
| Sully | 25% | 25% | WBPL/WAV | 10%/10% | 90% |
| Collateral Beauty | 25% | 25% | WBPL/WAV | 10%/10% | 90% |
| Fist Fight | 25% | 25% | WBPL/WAV | 10%/10% | 90% |

| Title | Applicable Percentage (VRF) | Applicable Percentage (VRFNA) | Distributors (Foreign/Domestic) | Magnum Foreign Percentage / Magnum Domestic Percentage | Relevant Percentage |
|---|---|---|---|---|---|
| Going in Style | 25% | 25% | WBPL/WAV | 10%/10% | 90% |
| King Arthur | 15% | 15% | WBPL/WAV | 10%/10% | 90% |
| The House | 25% | 25% | WBPL/WAV | 10%/10% | 90% |
| The 15:17 to Paris | 33.3% | 33.3% | WBPL/WAV | 10%/10% | 90% |
| Ready Player One | 33.3% | 33.3% | WBPL/WAV | 10%/10% | 90% |
| Ocean's 8 | 50% | 50% | WBPL/WAV | 10%/10% | 90% |
| Joker | 25% | 25% | WBPL/WAV | 10%/10% | 90% |

## Part C – Global Pictures

| Title | Applicable Percentage | Distributor | Magnum Global Percentage | Relevant Percentage |
|---|---|---|---|---|
| The Equalizer | 25% | CPII | 50% | 50% |
| Annie | 25% | CPII | ~~10~~50% | ~~90~~50% |
| Goosebumps | 25% | CPII | 10% | 90% |
| Concussion | 25% | CPII | ~~50~~10% | ~~50~~90% |
| The Brothers Grimsby | 25% | CPII | 10% | 90% |
| The Magnificent Seven | 25% | CPII | 10% | 90% |

## Part D – Virtual Pictures

| Title | Applicable Percentage | Distributor | Magnum Global Percentage | Relevant Percentage |
|---|---|---|---|---|
| V for Vendetta | 50% | WBEI | 0% | 100% |

| Title | Applicable Percentage | Distributor | Magnum Global Percentage | Relevant Percentage |
|---|---|---|---|---|
| Poseidon | 50% | WBEI | 0% | 100% |
| Blood Diamond | 50% | WBEI | 0% | 100% |
| The Good German | 50% | WBEI | 0% | 100% |
| 300 | 32.5% | WBEI | 0% | 100% |
| Nancy Drew: The Mystery in Hollywood Hills | 50% | WBEI | 0% | 100% |
| The Assassination of Jesse James by the Coward Robert Ford | 30.414% | WBEI | 0% | 100% |

**Schedule III**

**Assumed Contracts & Cure Amounts**

[See Attached]

## Schedule IV

### Purchase Price Schedule[1]

| Entity | Valuation % |
|---|---|
| Village Roadshow Films (BVI) Limited | 72.77% |
| Village Roadshow Films North America Inc. | 13.28% |
| Village Roadshow Films Global Inc. | 4.07% |
| Village Roadshow VS Films LLC | 8.03% |
| Village Roadshow Distribution (BVI) Limited | 1.86% |
| **TOTAL** | **100%** |

---

[1] The Valuation Percentages contained in this Section 2.11(a) will be further adjusted at Closing, as mutually agreed by Seller Representative and Buyer, to reflect the change in relative value of the Purchased Assets owned by each Seller as a result of any collections generated by the Purchased Assets between the Effective Date and the Closing Effective Date.

241154324.2
212160-10346
241111631.8
212160-10346

| Summary report: Litera Compare for Word 11.8.0.56 Document comparison done on 4/18/2025 2:25:33 PM | |
|---|---|
| **Style name:** SMRH Standard | |
| **Intelligent Table Comparison:** Active | |
| **Original DMS:** nd://4923-9832-9144/1/VREG - Content Partners APA (363 Sale) EXECUTED VERSION.docx | |
| **Modified DMS:** nd://4898-1996-9843/14/VREG - Alcon APA (363 Sale).docx | |
| **Changes:** | |
| Add | 188 |
| Delete | 140 |
| Move From | 4 |
| Move To | 4 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 336 |