**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
|  | ) |
| VILLAGE ROADSHOW ENTERTAINMENT | ) Case No. 25-10475 (TMH) |
| GROUP USA INC., *et al.*,[1] | ) |
|  | ) (Jointly Administered) |
| Debtors. | ) |
|  | ) |

**AFFIDAVIT OF PUBLICATION OF THE NOTICE OF SALE,
BID PROCEDURES, POTENTIAL AUCTION, AND SALE HEARING
IN THE WALL STREET JOURNAL AND LOS ANGELES TIMES**

This Affidavit of Publication includes the sworn statements verifying that the *Notice of Sale, Bid Procedures, Potential Auction, and Sale Hearing* was published and incorporated by reference herein as follows:

1. In *The Wall Street Journal* on April 28, 2025, attached hereto as **Exhibit A**.

2. In *Los Angeles Times* on April 28, 2025, attached hereto as **Exhibit B**.

---

[1]  The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343. The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

# Exhibit A

# AFFIDAVIT

**STATE OF NEW JERSEY )**
**) ss:**
**CITY OF MONMOUTH JUNCTION, in the COUNTY OF MIDDLESEX )**

I, Keith Oechsner, being duly sworn, depose and say that I am the Advertising Clerk of the Publisher of THE WALL STREET JOURNAL, a daily national newspaper of general circulation throughout the United States, and that the notice attached to this Affidavit has been regularly published in THE WALL STREET JOURNAL for National distribution for

1 insertion(s) on the following date(s):

APR-28-2025;

ADVERTISER: VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC.;

and that the foregoing statements are true and correct to the best of my knowledge.

Keith Oechsner

Sworn to before me this
28 day of April 2025

Notary Public

IAN C. MARTIN
NOTARY PUBLIC
ID # 50086494
COMMISSION EXPIRES 07/18/2028
STATE OF NEW JERSEY



# TECHNOLOGY

WSJ.com/Tech

# As AI Races Ahead, Companies Still Struggle to Drive Returns

More capabilities haven't yet led to a corresponding surge in productivity

By Steven Rosenbush

AI adoption among companies is stunningly high, but most of them are struggling to put it to good use. They intuit that AI is essential to their future. Yet intuition alone won't unlock the promise of AI, and it isn't clear to them which key will do the trick.

As of last year, 78% of companies said they used artificial intelligence in at least one function, up from 55% in 2023, according to global management consulting firm McKinsey's State of AI survey, released in March. From these efforts, companies claimed to typically find cost savings of less than 10% and revenue increases of less than 5%.

While the measurable financial return is limited, business is nonetheless all-in on AI, according to the 2025 AI Index report released in April by the Stanford Institute for Human-Centered Artificial Intelligence. Last year, private generative AI investment alone hit $33.9 billion globally, up 18.7% from 2023.

The numbers reflect a "productivity paradox," in which improvements in AI capabilities haven't led to a corresponding surge in national-level productivity, according to Stanford University economist and professor Erik Brynjolfsson, who worked on the AI Index. While some specific projects have been enormously productive, "many companies are disappointed with their AI projects."

## 'Units of work'

For companies to get the most out of AI efforts, Brynjolfsson advocates for a task-based analysis, in which a company is broken down into fine-grained tasks or "atomic units of work" that are evaluated for potential AI assistance. As AI is applied, the results are measured against key performance indicators, or KPIs. Brynjolfsson co-founded a startup, **Workhelix**, that applies those principles.

Companies should target an outcome first, and then find the model that helps them achieve it, says Scott Hallworth, chief data and analytics officer and head of digital solutions at **HP**.

A report from McKinsey issued in January helps explain why AI adoption is racing ahead of associated productivity gains, according to Lareina Yee, senior partner and director at the McKinsey Global Institute. Only 1% of U.S. companies that have invested in AI report they have scaled their investment, while 43% report they are still in the pilot stage. "One cannot expect significant productivity gains at the pilot level or even at the company unit level. Significant productivity improvements require achieving scale," she said.

The critical question is how companies can best scale their AI efforts.

Ryan Teeples, chief technology officer of 1-800Accountant, agrees that "breaking work into AI-enabled tasks and aligning them to KPIs not only drives measurable ROI, it also creates a better customer experience by surfacing critical information faster than a human ever could."

The privately held company based in New York provides tax, booking and payroll services to 50,000 active clients, with a focus on small businesses. The company isn't a Workhelix customer.

Additionally, Teeples says, companies should look beyond individualized AI use, in which employees use GenAI chatbots or AI-equipped productivity tools to enhance their work. "True enterprise adoption...involves orchestration and scaling across the organization. Very few organizations have truly reached this level, and even those are only scratching the surface," he said.

## Early assessment

The use of AI at 1-800Accountant begins with an assessment of whether the technology improves the client experience. If the AI provides customers with answers that are as good, better or faster than a human, it is a good use case, Teeples said. In the past, the company scheduled hourlong appointments with advisers who answered simple client questions, such as the status of their tax return.

Now, the company uses an AI agent connected to curated data sources to address 65% of customer inquiries, with 30% arranging a call with a human.


Last year, private gen-AI investment hit $33.9 billion globally.

(The remaining 5% drop out of the process for various reasons.) The company uses **Salesforce**'s Agentforce to handle customer inquiries and its Einstein platform for orchestration across the back end.

Teeples said the company is saving money on the cost of human advisers. "The ROI in this case was abundantly clear," he said.

Orchestrating AI across the enterprise requires the right infrastructure, especially when it comes to data, said Gabrielle Tao, senior vice president for data cloud at Salesforce. It is important to harmonize data, for example, by creating a consistent way to refer to business concepts such as "orders" and "transactions," regardless of the underlying data source.

AI deployments should target tasks that are both frequent and generalizable, said Walter Sun, global head of artificial intelligence at **SAP**. Infrequent, highly specific tasks such as a marketing campaign for a single event might benefit from AI, but applying AI to regularly occurring tasks will achieve a more consistent ROI, he said.

Historically, it has taken years for the world to figure out what to do with revolutionary general-purpose technologies, including the steam engine and electricity, according to Brynjolfsson. It isn't unusual for general-purpose models to follow a "J-curve," with a dip in initial productivity, as businesses figure things out, followed by a ramp-up in productivity. He says companies are beginning to turn the corner of the AI J-curve.

The transformation may occur faster than in the past, because businesses—under pressure from investors—are working to justify the amount of capital pouring into AI.

---

# Huawei Challenges Nvidia

Continued from page B1

retary Gina Raimondo.

This month, Washington added Nvidia's H20 chip—the most-advanced processor the company could sell in China without a license—to a growing list of semiconductors whose sales are restricted there. Nvidia said it would take a $5.5 billion charge as a result.

The restrictions offer an opportunity to Nvidia's Chinese rivals such as Huawei and Beijing-based **Cambricon Technologies**, which developed similar chips.

This year, Huawei is poised to ship more than 800,000 Ascend 910B and 910C chips to customers including state-owned telecommunications carriers and private AI developers such as TikTok parent **ByteDance**, people familiar with the matter said.

Some buyers have been in talks with Huawei to increase orders of the 910C after the Trump administration restricted the exports of Nvidia's H20s, the people said.

Despite manufacturing bottlenecks, Huawei and several Chinese chip companies have already been able to deliver some products comparable to Nvidia chips, albeit with a lag of a few years. Chip makers have been turning to technologies that can pack several chips together to create more powerful processors, as it gets harder and more expensive to make the circuitry inside chips smaller.

Beijing also has encouraged Chinese AI developers to increase purchases of domestic chips. State data centers have said most chips they used were from Chinese suppliers.

Still, previous Huawei chips have struggled to live up to their hype.

The 910C was marketed to clients as comparable to Nvidia's H100, but engineers who have used the two chips said Huawei's performance fell short of its rival.

Huawei faces challenges in producing such chips at a significant scale. It has been cut off from the world's largest chip foundry, **Taiwan Semiconductor Manufacturing**. China's closest alternative, **Semiconductor Manufacturing International**, is blocked from purchasing the most-advanced chip-making equipment.

 *(note: this ref is actually the Huawei booth photo)*

Huawei's booth at an AI conference in Shanghai last year.

---

# Rare Earths Stir Concern In EV Sector

Continued from page B1

said Neha Mukherjee, industry analyst at Benchmark Mineral Intelligence.

"Rare earths are used in almost everything that turns on," said Gracelin Baskaran, a director at the Center for Strategic and International Studies, a Washington, D.C., think tank. "The primary use of rare earths is permanent magnets."

The minerals are abundant in nature but difficult to refine into their pure form. They are the essential building blocks of much of modern technology, forming parts of everything from satellites and jet fighters to CT scanners and iPhone speakers. Automakers said they are currently combing through their catalogs to find affected parts. They are finding them in dashboard screens, brakes, gear shifters, windshield wipers and even some headlights.

"We have one particular supplier who uses a magnet in a particular component in the vehicle, a seat-belt buckle," an automotive supply chain manager said. "Another supplier does not."

China is the source of over 90% of the world's supply of rare-earth minerals, and thus far no other country has been able to produce them at the same scale and cost, according to experts.

Baskaran has worked to draw attention to the national-security risk posed by China's near monopoly on rare-earth minerals for years, and now finds herself in the spotlight as companies and policymakers scramble to find a response. "I never thought I would be cool," said Baskaran, who holds a doctorate from the University of Cambridge.

The potential chaos related to the slowing of one link in the automotive supply chain illustrates how dependent the modern car industry is on global trade. It also shows how the efforts by the Trump administration to reverse decades of globalization are exposing holes in America's manufacturing industry that can't easily be filled.

In many cases, carmakers have been able to find parts that don't employ rare-earth materials, but there are few good alternatives for use in electric-motor magnets.

One option would be to revert to an older technology that uses electromagnets, which once powered early versions of Tesla's Model S luxury sedan. The company ditched those motors because rare-earth magnets were more efficient, allowing EVs to squeeze more miles out of a charge.

America's disadvantage is twofold: There is currently only one large-scale dysprosium mine in the U.S., and processing facilities are only now coming online. The mine, in California, wouldn't be able to meet the needs of American manufacturers. Many more such operations would be required to wean the car sector from China's supply.

The development of a new mine takes an average of 29 years in the U.S., according to a report by S&P Global Market Intelligence. The bigger problem is that the U.S. can't currently separate dysprosium from surrounding rock.

China's head start on mining and extracting the precious elements makes it difficult to build alternative sources. "A mine in China, to produce from an ore to oxide, costs around $11 to $15 a kilogram," said Mukherjee, of Benchmark Mineral Intelligence. "For a mine in Brazil, it's approximately $35 to $40 a kilogram. It would be even higher in the U.S. or Australia."

There also are key parts of the refining process known only to Chinese companies, said Baskaran. "It's a permitting problem, a know-how problem and a technical problem," she said.

Most expertise for refining dysprosium is concentrated in China.

---

ADVERTISEMENT

# The Marketplace

To advertise: 800-366-3975 or WSJ.com/classifieds

## NOTICE OF SALE

**NOTICE OF DISPOSITION OF COLLATERAL BY PUBLIC SALE UNDER GEORGIA UNIFORM COMMERCIAL CODE**

PLEASE TAKE NOTICE that pursuant to Section 9-610 of the Georgia Uniform Commercial Code and that certain Pledge Agreement dated as of January 26, 2023 (as amended, restated, supplemented, or otherwise modified from time to time, the "Pledge Agreement") provided by Americus Fresh Real Estate Holdings LLC ("Grantor") in favor of X-Caliber Rural Lending LLC ("Lender"), Lender will sell sale or all of Grantor's following assets that are subject to Lender's lien thereon: 100% of the shares of capital stock, partnership interests, ownership or membership interests in Americus Fresh LLC (as further defined and described in the Pledge Agreement as Collateral and hereinafter referred to as the "Assets"). The Assets secure the repayment of the indebtedness of Americus Fresh LLC ("Borrower") to Lender under that certain Promissory Note dated as of January 26, 2023 (as amended, restated, supplemented, or otherwise modified from time to time, the "Note") and that certain Loan Agreement dated as of January 26, 2023 by and among Borrower and Lender (as amended, restated, supplemented, or otherwise modified from time to time, the "Loan Agreement").

Subject to all the terms of this notice, the Assets will be sold pursuant to public auction (the "Sale") to the highest bidder at the offices of Lender's Counsel, Blank Rome LLP, 444 West Lake Street, Suite 1650, Chicago, Illinois 60606 on May 13, 2025 at 9:00 a.m. CST.

Each prospective bidder may be required to demonstrate to Lender's satisfaction, in advance of bidding, its financial ability to close the sale transaction and tender payment for the Assets no later than the next business day after the Sale.

The Assets will be sold to the highest bidder pursuant to the following terms and conditions: the Assets will be offered for sale, piecemeal or in bulk and sold to the highest bidder at the conclusion of the Sale, as determined by Lender in its sole and absolute discretion, on an "AS IS, WHERE IS" basis, with all faults, without recourse, and without any express or implied representations or warranties whatsoever, including, without limitation, condition of title, value or quality of the Assets, or with regard to assets, liabilities, financial condition or earnings of Borrower or any of its affiliates. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, ALL WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, POSSESSION, QUIET ENJOYMENT, OR THE LIKE IN THIS DISPOSITION ARE EXPRESSLY DISCLAIMED. Upon acceptance of a bid (the "Accepted Bid"), the successful bidder (other than Lender) shall pay Lender the full amount of the Accepted Bid, no later than the next business day after the Sale. If the successful bidder fails to pay the Accepted Bid within such time, Lender may (but shall not be obligated to) offer the Assets to the next highest bidder. Lender reserves its right, on or prior to the Sale, to withdraw all or a portion of the Assets from the Sale for any reason whatsoever, modify, waive or amend any terms or conditions of the Sale or impose any other terms or conditions on the Sale and, if Lender deems appropriate, to reject any or all bids or to continue the Sale to such time and place as Lender, in its sole and absolute discretion, may deem fit, or to cancel such Sale.

Additional or amended terms and conditions of the Sale may be announced at the Sale. Lender reserves its right to credit or otherwise bid at the Sale and to apply the expenses of the Sale and all or any part of the total amount of the indebtedness owed to Lender under the Note, Loan Agreement or any other Loan Documents, in satisfaction of the purchase price. Lender reserves all of the rights accruing to it under the Note, the Loan Agreement, and the other Loan Documents, including the right to seek a judgment for any deficiency remaining on account of its indebtedness after the conclusion of the Sale.

Persons interested in bidding on the Assets at the Sale shall contact counsel for Lender, Paige Tinkham (paige.tinkham@blankrome.com or 312.776.2514), during normal business hours, no later than two (2) business days prior to the auction date set forth above to obtain the necessary information to participate in the auction.

## NOTICE OF SALE

IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

In re: VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC., et al.,[1] Debtors.

Chapter 11
Case No. 25-10475 (TMH)
(Jointly Administered)

**NOTICE OF SALE, BID PROCEDURES, POTENTIAL AUCTION, AND SALE HEARING**

PLEASE TAKE NOTICE that, on March 17, 2025 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

PLEASE TAKE NOTICE that, on March 17, 2025, the Debtors filed a motion [Docket No. 11] (the "Bid Procedures and Sale Motion") seeking entry of (a) an order, (the "Bid Procedures Order"), (i) authorizing and approving bid procedures (the "Bid Procedures"), in connection with one or more sales or dispositions (collectively, the "Sale") of the Debtors' Assets, (ii) authorizing and approving the Debtors' entry into and performance under an asset purchase agreement (the "CP Stalking Horse APA"), in connection with a potential sale of the Debtors' Library Assets to CP Ventura LLC (the "CP"), subject to higher or otherwise better bids submitted in accordance with the Bid Procedures, (iii) authorizing and approving certain stalking horse bid protections provided to CP in accordance with the terms and conditions set forth in the CP Stalking Horse APA and the Bid Procedures, (iv) establishing certain dates and deadlines in connection with the sale process for the Assets, including scheduling an auction (the "Auction"), if necessary, in accordance with the Bid Procedures, and the hearing with respect to the approval of the Sale (the "Sale Hearing"), (v) approving the form and manner of notice of the Auction, if any, the Sale, and the Sale Hearing, (vi) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (the "Assumption and Assignment Procedures") and solely with respect to Warner Bros. Entertainment Inc. and its affiliates (collectively, "Warner Bros."), the Warner Bros. Assumption and Assignment Procedures, and approving the form and manner of notice thereof, and (vii) granting related relief; and (b) one or more orders (each, a "Sale Order"), (i) authorizing and approving the Sale of the Debtors' Assets to the Stalking Horse Bidder or otherwise Successful Bidder(s), as applicable, free and clear of all liens, claims, interests, and encumbrances to the extent set forth in the Stalking Horse APA or the asset purchase agreement with the otherwise Successful Bidder, as applicable (the "APA"), (ii) approving the assumption and assignment of the Assumed Contracts as set forth in the applicable APA, and (iii) granting related relief.

PLEASE TAKE FURTHER NOTICE that, on April 16, 2025, the Debtors filed a motion [Docket No. 197] (the "Stalking Horse Supplement") seeking entry of an order (a) modifying the relief requested in the Bid Procedures and Sale Motion, (b) approving (i) the designation of Alcon Media Group, LLC ("Alcon") as the new stalking horse bidder for the Debtors' Library Assets (the "Alcon Stalking Horse Bidder"), (ii) the Debtors' entry into an asset purchase agreement with Alcon (acting by its indirect subsidiary) with respect to the Debtors' Library Assets ("Alcon Stalking Horse APA"), and (iii) an expense reimbursement provided to the Alcon Stalking Horse Bidder pursuant to the terms of the Alcon Stalking Horse APA, and (c) granting related relief.

PLEASE TAKE FURTHER NOTICE that, on April 22, 2025, the Court entered the Bid Procedures Order, approving, among other things, the Bid Procedures, which establish key dates and times relating to the Sale and the Auction, and granting the relief requested in the Stalking Horse Supplement. All interested bidders should carefully read the Bid Procedures Order and the Bid Procedures in their entirety.[1]

**Parties Interested in Submitting a Bid.** The Bid Procedures set forth the requirements for becoming a Qualified Bidder and submitting a Qualified Bid, and any party interested in making a bid to purchase all of the Debtors' Assets, or certain of the Business Segments must comply with the Bid Procedures. Only Qualified Bids will be considered by the Debtors, in accordance with the Bid Procedures.

Any persons interested in submitting a Bid to purchase all or certain of the Debtors' Assets should contact Solic Capital Advisors, LLC, 150 North Wacker Drive, Suite 3000, Chicago, IL 60606, Attn.: Neal Snellenberger (nneals@soliccapital.com) and George R. Koutsonicolis (georgek@soliccapital.com).

**Key Dates and Deadlines[4]**

• **Bid Deadline.** Any Bid for the Debtors' Assets must be submitted to the Debtors and their advisors, in accordance with the Bid Procedures, so as to be **actually received** by such parties on or before **May 16, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline").

• **Auction.** If the Debtors receive two or more Qualified Bids by the Bid Deadline, the Auction may take place on or after **May 21, 2025**, at a time to be announced by the Debtors, via remote video and/or in person at the offices of Sheppard, Mullin, Richter & Hampton LLP 1901 Avenue of the Stars, Suite 1600, Los Angeles, CA 90067, and shall be conducted in a timely fashion according to the procedures set forth in the Bid Procedures.

• **Sale Hearing.** The Sale Hearing to consider the proposed Sale will be held on or before **June 10, 2025, at 10:00 a.m.** (ET), or such other date and time as determined by the Court, at 824 Market ST N, 3rd Floor, Wilmington, Delaware 19801.

**Filing Objections.** Any and all objections to a Sale of the Debtors' Assets and entry of a Sale Order (each objection, a "Sale Objection") must: (i) be in writing and specify the nature of such objection, (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and all orders of the Court entered in these chapter 11 cases, (iii) except with respect to Warner Bros., who instead shall be subject to the Warner Bros. Sale Objection Deadline and Warner Bros. Post-Auction Objection Deadline as described and set forth in the Bid Procedures Order, be filed with the Court by (a) **May 12, 2025 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline"), or (b) with respect to objections solely related to the identity of the Successful Bidder(s) (other than the Stalking Horse Bidder), or adequate assurance of future performance by the Successful Bidder(s) (other than the Stalking Horse Bidder), by 4:00 p.m. (prevailing Eastern Time) on the date that is two business days following the filing of the Notice of Successful Bidder (the "Post-Auction Objection Deadline"), and (iv) be served upon the following parties (collectively, the "Notice Parties"): (1) proposed co-counsel to the Debtors, (i) Sheppard, Mullin, Richter & Hampton LLP, 321 North Clark Street, 32nd Floor, Chicago, IL 60654, Attn.: Justin R. Bernbrock (jbernbrock@sheppardmullin.com), and (ii) Young Conaway Stargatt & Taylor, LLP,Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn.: Joseph M. Mulvihill (jmulvihill@ycst.com); (2) counsel to the ABL Trustee, Barnes & Thornburg LLP, One North Wacker Drive Suite 4400, Chicago, IL 60606, Attn.: Aaron Gavant (agavant@btlaw.com) (3) counsel to the DIP Lenders, Morrison Foerster, 250 West 55th Street, New York, NY 10019, Attn.: James Newton (jnewton@mofo.com); (4) counsel to Vine Alternative Investments Group, LLC, Cooley LLP, 55 Hudson Yards, New York, NY 10001 Attn.: Daniel Shamah (dshamah@cooley.com); (5) Magnum Films SPC, DLA Piper LLP 121 Avenue of the Americas, New York, New York, 10020, Attn: Dennis C. O'Donnell (dennis.odonnell@dlapiper.com); (6) counsel to the ad hoc group of ABS Noteholders, Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York 10019, Attn: Joel Simwinga (jmsimwinga@wlrk.com); (7) proposed counsel to the Official Committee of Unsecured Creditors, Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue 34th Floor, New York, NY 10017, Attn: Robert Feinstein (rfeinstein@pszjlaw.com) and Bradford Sandler (bsandler@pszjlaw.com); (8) counsel to Warner Bros., (i) O'Melveny & Myers LLP, 400 South Hope Street, Suite 1900, Los Angeles, CA 90071, Attn.: Steve Warren (swarren@omm.com), and (ii) Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, 16th Floor, Wilmington, DE 19801, Attn.: Curtis S. Miller (cmiller@morrisnichols.com), (9) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), 844 N. King Street, Room 2207, Wilmington, DE 19801, Attn.: Rosa Sierra-Fox (rosa.sierra-fox@usdoj.gov); and (10) any Successful Bidders.

**Consequences of Failing to Timely File an Objection.** Except with respect to Warner Bros., if any party fails to timely file with the Court and serve a Sale Objection by the Sale Objection Deadline or Post-Auction Objection Deadline, as applicable, or otherwise abide by the procedures set forth in the Bid Procedures regarding an objection to the Sale, such party shall be barred from asserting, at the Sale Hearing or otherwise, any objection to the relief requested in the Motion or to the consummation and performance of the Sale, including (i) assumption and assignment of Assumed Contracts as set forth in the applicable APA and (ii) the transfer of the applicable Asset(s) to the applicable Successful Bidder(s) free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code, and shall be deemed to "consent" to the Sale pursuant to section 363(f) of the Bankruptcy Code.

**Obtaining Additional Information.** Copies of the Bid Procedures Motion, the Stalking Horse Supplement, the Bid Procedures Order, the Alcon Stalking Horse APA, and all other documents filed with the Court, are available free of charge on the Debtors' case information website, located at https://www.veritaglobal.net/vreg.

The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343. The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification number is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bid Procedures or the Bid Procedures Order, as applicable.

To the extent of any inconsistencies between the Bid Procedures and the summary descriptions of the Bid Procedures in this notice, the terms of the Bid Procedures shall control in all respects.

The following dates and deadlines may be extended by the Debtors or the Court pursuant to the terms of the Bid Procedures and the Bid Procedures Order.

# THE WALL STREET JOURNAL.
## THE MARKETPLACE
ADVERTISE TODAY
(800) 366-3975 | wsj.com/classifieds

© 2025 Dow Jones & Company, Inc. All Rights Reserved.

DJ | DOW JONES

# Exhibit B



**PROOF OF PUBLICATION**
**(2015.5 C.C.P.)**

**STATE OF CALIFORNIA**
**County of Los Angeles**

I am a citizen of the United States and a resident of the County aforesaid; I
am over the age of eighteen years, and not a party to or interested in the
action for which the attached notice was published.

I am a principal clerk of the Los Angeles Times, which was adjudged a
newspaper of general circulation on May 21, 1952, Cases 598599 for the
City of Los Angeles, County of Los Angeles, and State of California.
Attached to this Affidavit is a true and complete copy as was printed and
published on the following date(s):

Apr 28, 2025

I certify (or declare) under penalty of perjury under the laws of the State of
California that the foregoing is true and correct.

Dated at El Segundo, California on this 28th day of April, 2025.


*Wendy Cooper*
_____
                **[signature]**


**2300 E. Imperial Highway**
**El Segundo, CA 90245**

8000245 – Los Angeles Times

1 of 2

**Los Angeles Times**
MEDIA GROUP

---

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

In re: VILLAGE ROADSHOW ENTERTAINMENT ) Chapter 11
GROUP USA INC., *et al.*,[1]                ) Case No. 25-10475 (TMH)
Debtors.                                    ) (Jointly Administered)

**NOTICE OF SALE, BID PROCEDURES, POTENTIAL AUCTION,**
**AND SALE HEARING**

**PLEASE TAKE NOTICE** that, on March 17, 2025 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that, on March 17, 2025, the Debtors filed a motion [Docket No. 11] (the "Bid Procedures and Sale Motion") seeking entry of (a) an order, (the "Bid Procedures Order"), (i) authorizing and approving bid procedures (the "Bid Procedures"),[2] in connection with one or more sales or dispositions (collectively, the "Sale") of the Debtors' Assets, (ii) authorizing and approving the Debtors' entry into and performance under an asset purchase agreement (the "CP Stalking Horse APA"), in connection with a potential sale of the Debtors' Library Assets to CP Ventura LLC (the "CP"), subject to higher or otherwise better bids submitted in accordance with the Bid Procedures, (iii) authorizing and approving certain stalking horse bid protections provided to CP in accordance with the terms and conditions set forth in the CP Stalking Horse APA and the Bid Procedures, (iv) establishing certain dates and deadlines in connection with the sale process for the Assets, including scheduling an auction (the "Auction"), if necessary, in accordance with the Bid Procedures, and the hearing with respect to the approval of the Sale (the "Sale Hearing"), (v) approving the form and manner of notice of the Auction, if any, the Sale, and the Sale Hearing, (vi) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (the "Assumption and Assignment Procedures") and solely with respect to Warner Bros. Entertainment Inc. and its affiliates (collectively, "Warner Bros."), the Warner Bros. Assumption and Assignment Procedures, and approving the form and manner of notice thereof, and (vii) granting related relief; and (b) one or more orders (each, a "Sale Order"), (i) authorizing and approving the Sale of the Debtors' Assets to the Stalking Horse Bidder or otherwise Successful Bidder(s), as applicable, free and clear of all liens, claims, interests, and encumbrances to the extent set forth in the Stalking Horse APA or the asset purchase agreement with the otherwise Successful Bidder, as applicable (the "APA"), (ii) the assumption and assignment of the Assumed Contracts as set forth in the applicable APA, and (iii) granting related relief.

**PLEASE TAKE FURTHER NOTICE** that, on April 16, 2025, the Debtors filed a motion [Docket No. 197] (the "Stalking Horse Supplement") seeking entry of an order (a) modifying the relief requested in the Bid Procedures and Sale Motion, (b) approving (i) the designation of Alcon Media Group, LLC ("Alcon") as the new stalking horse bidder for the Debtors' Library Assets (the "Alcon Stalking Horse Bidder"), (ii) the Debtors' entry into an asset purchase agreement with Alcon setting forth the terms of Alcon's bid for the Library Assets ("Alcon Stalking Horse APA"), and (iii) an expense reimbursement provided to the Alcon Stalking Horse Bidder pursuant to the terms of the Alcon Stalking Horse APA, and (c) granting related relief.

**PLEASE TAKE FURTHER NOTICE** that, on April 22, 2025, the Court entered the Bid Procedures Order, approving, among other things, the Bid Procedures, which establish key dates and times relating to the Sale and the Auction, and granting the relief requested in the Stalking Horse Supplement. All interested bidders should carefully read the Bid Procedures Order and the Bid Procedures in their entirety.[3]

**Parties Interested in Submitting a Bid.** The Bid Procedures set forth the requirements for becoming a Qualified Bidder and submitting a Qualified Bid, and any party interested in making a bid to purchase all of the Debtors' Assets, or certain of the Business Segments must comply with the Bid Procedures. Only Qualified Bids will be considered by the Debtors, in accordance with the Bid Procedures.

Any persons interested in submitting a Bid to purchase all or certain of the Debtors' Assets should contact Solic Capital Advisors, LLC, 150 North Wacker Drive, Suite 3000, Chicago, IL 60606, Attn.: Reid Snellenbarger (reids@soliccapital.com) and George N. Koutsonicolis (georgek@soliccapital.com).

**Key Dates and Deadlines**[4]

•   **Bid Deadline.** Any Bid for the Debtors' Assets must be submitted to the Debtors and their advisors, in accordance with the Bid Procedures, so as to be **actually received** by such parties on or before **May 16, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline").

•   **Auction.** If the Debtors receive two or more Qualified Bids for the Debtors' Assets, the Auction may take place on or after **May 21, 2025**, at a time to be announced by the Debtors, via remote video and/or in person at the offices of Sheppard, Mullin, Richter & Hampton LLP, 1901 Avenue of the Stars, Suite 1600, Los Angeles, CA 90067, and shall be conducted in a timely fashion according to the procedures set forth in the Bid Procedures.

•   **Sale Hearing.** The Sale Hearing to consider the proposed Sale will be held on or before **June 10, 2025, at 10:00 a.m.** (ET), or such other date and time as determined by the Court, at 824 Market ST N, 3rd Floor, Wilmington, Delaware 19801.

**Filing Objections.** Any and all objections to a Sale of the Debtors' Assets and entry of a Sale Order (such objection, a "Sale Objection") must: (i) be in writing and specify the nature of such objection, (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and all orders of the Court entered in these chapter 11 cases, (iii) except with respect to Warner Bros., who instead shall be subject to the Warner Bros. Sale Objection Deadline and Warner Bros. Post-Auction Objection Deadline as described and set forth in the Bid Procedures Order, be filed with the Court by (a) **May 12, 2025 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline"), or (b) with respect to objections solely related to the identity of the Successful Bidder(s) (other than the Stalking Horse Bidder), or adequate assurance of future performance by the Successful Bidder(s) (other than the Stalking Horse Bidder), by 4:00 p.m. (prevailing Eastern Time) on the date that is two business days following the filing of the Notice of Successful Bidder (the "Post-Auction Objection Deadline"), and (iv) be served upon the following parties (collectively, the "Notice Parties"): (1) proposed co-counsel to the Debtors, (i) Sheppard, Mullin, Richter & Hampton LLP, 321 North Clark Street, 32nd Floor, Chicago, IL 60654, Attn.: Justin R. Bernbrock (jbernbrock@sheppardmullin.com), and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn.: Joseph M. Mulvihill (jmulvihill@ycst.com); (2) counsel to the ABS Trustee, Barnes & Thornburg LLP, One North Wacker Drive Suite 4400, Chicago, IL 60606, Attn.: Aaron Gavant (agavant@btlaw.com) (3) counsel to the DIP Lenders, Morrison Foerster, 250 West 55th Street, New York, NY 10019, Attn.: James Newton (jnewton@mofo.com); (4) counsel to Vine Alternative Investments Group, LLC, Cooley LLP, 55 Hudson Yards, New York, NY 10001 Attn.: Daniel Shamah (dshamah@cooley.com); (5) Magnum Films SPC, DLA Piper LLP, 121 Avenue of the Americas, New York, New York, 10020, Attn: Dennis C. O'Donnell (dennis.odonnell@dlapiper.com); (6) counsel to the ad hoc group of ABS Noteholders, Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York 10019, Attn: Joel Simwinga (jmsimwinga@wlrk.com); (7) proposed counsel to the Official Committee of Unsecured Creditors, Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue 34th Floor, New York, NY 10017, Attn: Robert Feinstein (rfeinstein@pszjlaw.com) and Bradford Sandler (bsandler@pszjlaw.com); (8) counsel to Warner Bros., (i) O'Melveny & Myers LLP, 400 South Hope Street, Suite 1900, Los Angeles, CA 90071, Attn.: Steve Warren (swarren@omm.com), and (ii) Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, 16th Floor, Wilmington, DE 19801, Attn.: Curtis S. Miller (cmiller@morrisnichols.com), (9) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), 844 N. King Street, Room 2207, Wilmington, DE 19801, Attn.: Rosa Sierra-Fox (rosa.sierra-fox@usdoj.gov); and (10) any Successful Bidders.

**Consequences of Failing to Timely File an Objection. Except with respect to Warner Bros., if any party fails to timely file with the Court and serve a Sale Objection by the Sale Objection Deadline or Post-Auction Objection Deadline, as applicable, or otherwise abide by the procedures set forth in the Bid Procedures regarding an objection to the Sale, such party shall be barred from asserting, at the Sale Hearing or otherwise, any objection to the relief requested in the Motion or to the consummation and performance of the Sale, including (i) assumption and assignment of Assumed Contracts as set forth in the applicable APA and (ii) the transfer of the applicable Asset(s) to the applicable Successful Bidder(s) free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code, and shall be deemed to "consent" to the Sale for purposes of section 363(f) of the Bankruptcy Code.**

**Obtaining Additional Information.** Copies of the Bid Procedures Motion, the Stalking Horse Supplement, the Bid Procedures, the Bid Procedures Order, the Alcon Stalking Horse APA, and all other documents filed with the Court, are available free of charge on the Debtors' case information website, located at https://www.veritaglobal.net/vreg.

[1]   The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343.   The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bid Procedures or the Bid Procedures Order, as applicable.

[3]   To the extent of any inconsistencies between the Bid Procedures and the summary descriptions of the Bid Procedures in this notice, the terms of the Bid Procedures shall control in all respects.

[4]   The following dates and deadlines may be extended by the Debtors or the Court pursuant to the terms of the Bid Procedures and the Bid Procedures Order.

---

8000245– Los Angeles Times

Case 25-10475-TMH    Doc 295    Filed 04/30/25    Page 8 of 8

# Los Angeles Times

## BUSINESS

# 'Golden handcuffs' come off for some workers

[**Tech,** from A1]

pany Square, was eliminating his role as a development and operations engineer because of a reorganization.

Square's parent company, Oakland-based Block, planned to shed 931 jobs, or 8% of its workforce, citing performance issues and the need to create a more streamlined operation.

In California, the cuts will begin next month and affect 240 employees, including engineers, designers and writers, according to a notice sent to the state's Employment Development Department.

Block is among major San Francisco Bay Area tech companies slashing their payrolls this year. Meta, Google, Autodesk, Workday and others also announced job cuts. Intel is planning to cut more than 20% of its workforce, Bloomberg reported. On Thursday, the Santa Clara-based chipmaker confirmed it would be laying off workers to "drive better, more efficient execution across the business."

"I'm a big believer in the philosophy that the best leaders get the most done with the fewest people," Intel Chief Executive Lip-Bu Tan told employees in an email. The company lost $821 million in the first quarter.

In a region known for boom and bust cycles, these tech industry layoffs are delivering a blow to a sector that is vital to California's economy, recently ranked as the world's fourth-largest.

In addition to supporting high salary jobs, tech companies offer employees stock options, so the state benefits from taxing capital gains, the profit earned when the shareholder sells their stock for a higher price.

"When cuts are happening in Silicon Valley, traditionally it's affected everything from wages and taxes to even state revenues," said Kevin Klowden, executive director at the Milken Institute, an economic think tank in Santa Monica.

The numbers are bleak, though not as bad as in 2023, when layoffs surged. U.S. tech companies announced 37,097 job cuts from January to March, down 13% from the same period last year, according to a report from Challenger, Gray & Christmas, a firm that offers job search and career transition coaching. In 2023, tech companies announced 102,391 cuts during the first three months of that year.

In California, companies in the first quarter of this year announced 17,874 cuts in technology, which includes businesses mainly engaged in the development of software or manufacturing of computer hardware, according to Challenger, Gray & Christmas. The firm



**EVAN RICHARDSON,** 43, was caught off guard when his employer, payment company Square, eliminated his job as a development and operations engineer.

PAUL KURODA For The Times

gathers data from news reports, company filings, annual reports, news releases and layoff notices.

Overhiring during the pandemic, when more people turned to online shopping, videoconferencing and social media, fueled much of the layoffs in recent years, experts say.

"A lot of these tech companies that hired to the moon are falling back down to Earth," said Andy Challenger, senior vice president at Challenger, Gray & Christmas.

But other factors are driving the latest round of layoffs, economists say. They say that companies are measuring people's productivity and performance more closely, and that they are shifting resources toward artificial intelligence investments.

Economic uncertainty prompted by regulatory changes such as tariffs and shifts in immigration policies are also driving businesses to rein in costs.

"There's just a general unease about the economy, particularly over the last several months. We've seen a slowdown in hiring really across the board," said Dante DeAntonio, senior director of economic research at Moody's Analytics.

For tech workers reeling from all the job losses, the industry feels far less stable.

Technology evolves rapidly, and so can a company's priorities. One day you're in, the next day you're out.

Though some are weighing whether they want to stay in tech, others find it tough to let go of the high salaries, benefits and perks.

Maria Jose Calero was laid off from Autodesk after

> 'A lot of these tech companies that hired to the moon are falling back down to Earth.'
>
> —ANDY CHALLENGER, senior vice president at Challenger, Gray & Christmas

six years at the San Francisco company, where she worked as a program manager and business partner.

Autodesk, which makes software used by architects, designers and engineers, announced in February it will cut 1,350 positions, or roughly 9% of its workforce. It cited geopolitical and macroeconomic factors along with its efforts to invest more heavily in AI, a regulatory filing said.

Those reasons were little consolation for Calero. The 36-year-old San Francisco resident said the tech industry offered stability and opportunities to grow her career.

She is considering jobs in other industries, including healthcare and hospitality, but isn't sure they will pay enough to cover her bills, a mortgage and for her daughter's day care.

"Tech is hard to walk away from," she said. "It's like golden handcuffs because where do you find a salary that matches what you had?"

With major companies such as Meta saying they're targeting low performers, unemployed workers have pushed back against the claims on social media.

Among them is Adam Espinoza, who recently lost his job as a software engineer at Meta. In February the social network started cutting about 5% of its workforce, or roughly 3,600 employees, the latest in a series of job reductions in recent years.

Espinoza said he met all expectations and was even talking to his manager about a promotion when he was told he would be let go.

"That also indicates to me that I shouldn't have been on the chopping block, but here I was," the 28-year-old said.

Like other workers, Espinoza said, he's seen a culture shift within tech companies, which have moved away from efforts to promote diversity.

At Meta, he said it felt like if you didn't consistently exceed expectations as an engineer, you could get replaced by artificial intelligence or the company could hire someone new for lower pay or less compensation.

Still, Espinoza has no intention of leaving the industry. He grew up in Rosemead in the era of dial-up internet and AOL and was drawn to how engineers solved problems. His career in tech eventually brought him to San Francisco.

"I'm planning on staying in the tech industry for now. It is definitely something that I love doing," he said.

Chase Foti-Landis, who was laid off from his job at software company Zendesk, is still processing what happened.

The San Francisco-based company said in February that it was laying off 51 employees in California, according to a notice filed with the state. The cuts included senior managers, the vice president of product and principal managers.

Though layoffs had happened in the company before, Foti-Landis said his team was already lean, so losing his security analyst job came as a "total surprise." Zendesk had slashed 8% of its workforce in 2023.

"I was made to think that it could never happen to me," he said.

Foti-Landis, 31, who worked at Zendesk for more than four years, pivoted into tech after working as a sales associate and a teacher.

Pondering his next career move, he's thought about whether he should work outdoors as a park ranger.

"So many times you'd just be working at a desk or working on the computer," he said, "and you look outside, and you're just like, 'God, it's gorgeous outside.'"

---

# Trump's push for rate cuts might not help consumers

Even if Powell gave in to political pressure, economists say, it will not necessarily lead to lower borrowing costs.

By Christopher Rugaber

President Trump is badgering the Federal Reserve to cut interest rates, but even if the Fed gave in to the pressure, it wouldn't necessarily lead to lower borrowing costs for consumers.

In fact, economists say, Trump's tariff policies and his attacks on Fed Chair Jerome H. Powell could keep the longer-term interest rates that matter for consumers and businesses higher than they otherwise would be. A less-independent Fed can lead, over time, to higher borrowing costs, as investors worry that inflation may jump in the future. As a result, they demand higher yields to own Treasury securities.

Trump has repeatedly urged Powell to cut the short-term interest rate that the central bank controls. The Fed typically reduces its rate during an economic downturn to encourage more borrowing and spending, and raises it to cool the economy and fight inflation when prices rise.

But long-term rates on things such as mortgages, auto loans and credit cards are largely set by market forces. And in recent weeks, fears that Trump's sweeping tariffs could raise inflation, along with the administration's threats to the Fed's independence, have led markets to push those longer-term rates higher. It's unclear that the Fed can fully reverse those trends by itself.

"It's not automatically true that even if the Fed were to cut rates, that you would see a measured decline in long-term interest rates," Francesco Bianchi, an economist at Johns Hopkins University, said. "This kind of pressure on the Fed might backfire ... if markets don't believe the Fed has inflation under control."

Trump renewed calls last week for Powell to reduce the Fed's short-term rate, telling reporters that the chair is "making a mistake" by not doing so.

And this month, Trump suggested he could fire Powell, while a top aide said that the White House was studying whether it could do so.

Stock markets plunged in response, the yield on the 10-year Treasury bond rose, and the dollar fell, an unusual combination that suggested investors were selling most American assets. Markets recovered those losses after Trump said last week that he had "no intention" of firing the Fed chair.

Still, the threats to the Fed's independence unnerved Wall Street investors, because they see a Fed free from political pressure as crucial to keeping inflation in check. An independent Fed can take unpopular steps, such as raising rates, to fight inflation.

"Threatening the Fed doesn't soothe markets — it spooks them," said Lauren Goodwin, chief market strategist at New York Life Investments. "And the result is often the opposite of what any administration wants to see: higher rates, weaker confidence and more market turmoil."

Since Trump began imposing tariffs in early March, when he slapped duties on Canada and Mexico, the 10-year Treasury yield has risen from 4.15% to about 4.3%. The yield is a benchmark for mortgage rates and other borrowing. Mortgage rates, in turn, have increased during that time, from 6.6% to 6.8%.

While Trump says he is negotiating over tariffs with many countries, most economists expect some level of duties to remain in place for at least this year, including his 10% duties on nearly all imports.

The 10-year yield did fall last week when two Federal Reserve officials said that rate cuts are possible as soon as this summer, should the economy falter and unemployment rise.

Yet last fall, longer-term interest rates also fell in anticipation of rate cuts, but then rose once the Fed cut in September and then continued to rise as the central bank reduced its rate again in November — two days after the election — and in December. Mortgage rates are now higher than they were when the Fed cut.

A range of factors can affect longer-term Treasury rates, including expectations for growth and inflation, as well as the supply and demand for government bonds. Bianchi worries that stubbornly high government budget deficits could also lift long-term rates.

Should the Fed cut rates now, longer-term borrowing costs "would move in the opposite direction, absolutely," Goodwin said, "because the threat of inflation is so palpable — that move would call their credibility into question."

Trump said in a social media post last week that there is "virtually No Inflation" and as a result, the Fed should lower its key rate, from its current level of about 4.3%. Many economists expect the central bank will do so this year. But Powell has underscored that the central bank wants to evaluate the impact of Trump's policies before making any moves.

Inflation has fallen in recent months, dropping to 2.4% in March, the lowest level since last September. Yet excluding the volatile food and energy categories, core inflation was 2.8%. Core prices often provide a better signal of where inflation is headed.

A key issue for the Fed is that the economy is very different now than it was during Trump's first term. Back then inflation was actually below the Fed's target. At that time, it was a no-brainer to cut rates, Bianchi said, if there was a threat of a recession, because inflation wasn't an issue.

But now, tariffs will almost certainly lift prices in the coming months, at least temporarily. That raises the bar much higher for a Fed rate cut, Bianchi said.

Still, once there are clear signs the economy is deteriorating, such as a rising unemployment rate, the Fed will cut rates, regardless of what Trump does, economists said.

Trump last week accused Powell of often being "too late" with his rate decisions, but ironically the Fed may move more slowly this time because of the threat of higher prices from tariffs. Without clear evidence of a downturn, Fed officials would worry about being seen as giving in to political pressure from Trump if they cut.

"Powell knows the irreparable damage that would occur if it was perceived that he cut because he was forced to by Trump," said Tom Porcelli, chief U.S. economist at PGIM Fixed Income.

The Fed now "will be even more delayed because I think you're going to get more of an inflation lift initially, before you get the more pronounced slowing in growth," Porcelli said.

Either way it may take more than a Fed cut or two to bring down longer-term borrowing costs, Bianchi said.

"To really lower long-term rates you need to provide a stable macroeconomic environment, and right now we are not there yet," he added.

*Rugaber writes for the Associated Press.*

---

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

In re: VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC., *et al.,* )  Chapter 11
Debtors.  )  Case No. 25-10475 (TMH)
)  (Jointly Administered)

**NOTICE OF SALE, BID PROCEDURES, POTENTIAL AUCTION, AND SALE HEARING**

**PLEASE TAKE NOTICE** that, on March 17, 2025 the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

**PLEASE TAKE FURTHER NOTICE** that, on March 17, 2025, the Debtors filed a motion (Docket No. 11) (the "Bid Procedures and Sale Motion") seeking entry of (a) an order, (the "Bid Procedures Order"), (i) authorizing and approving the Debtors' entry into performance under an asset purchase agreement (the "CP Stalking Horse APA") in connection with a potential sale of the Debtors' Library Assets to CP Ventura LLC (the "CP"), subject to higher or otherwise better bids submitted in accordance with the Bid Procedures, (iii) authorizing and approving certain stalking horse bid protections provided to CP in accordance with the terms and conditions set forth in the CP Stalking Horse APA and the Bid Procedures, (iv) establishing certain dates and deadlines in connection with the sale process for the Assets, including scheduling an auction (the "Auction"), if necessary, in accordance with the Bid Procedures, and the hearing with respect to the approval of the Sale (the "Sale Hearing"), (v) approving the form and manner of notice of the Auction, if any, the Sale, and the Sale Hearing, (vi) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (the "Assumption and Assignment Procedures") and solely with respect to Warner Bros. Entertainment Inc. and its affiliates (collectively, "Warner Bros."), the Warner Bros. Assumption and Assignment Procedures, and approving the form and manner of notice thereof, and (vii) granting related relief; and (b) one or more orders (each, a "Sale Order"), (i) authorizing and approving the Sale of the Debtors' Assets to the Stalking Horse Bidder or otherwise Successful Bidder(s), as applicable, free and clear of all liens, claims, interests, and encumbrances to the extent set forth in the Stalking Horse APA or the asset purchase agreement with the otherwise Successful Bidder, as applicable (the "APA"), (ii) the assumption and assignment of the Assumed Contracts as set forth in the terms and conditions set forth in the Bid Procedures.

**PLEASE TAKE FURTHER NOTICE** that, on April 16, 2025, the Debtors filed a motion (Docket No. 197) (the "Stalking Horse Supplement") seeking entry of an order (a) modifying the relief requested in the Bid Motion by approving (i) the designation of Alcon Media Group, LLC ("Alcon") as the new stalking horse bidder for the Debtors' Library Assets (the "Alcon Stalking Horse Bidder"), (ii) the Debtors' entry into an asset purchase agreement with Alcon setting forth the terms of Alcon's bid for the Library Assets ("Alcon Stalking Horse APA"), and (iii) an expense reimbursement provided to the Alcon Stalking Horse Bidder pursuant to the terms of the Alcon Stalking Horse APA, and (c) granting related relief.

**PLEASE TAKE FURTHER NOTICE** that, on April 22, 2025, the Court entered the Bid Procedures Order, approving, among other things, the Bid Procedures, which establish key dates and times relating to the Sale and the Auction, and granting the relief requested in the Stalking Horse Supplement. All interested bidders should carefully read the Bid Procedures Order and the Bid Procedures in their entirety.[1]

**Parties Interested in Submitting a Bid.** The Bid Procedures set forth the requirements for becoming a Qualified Bidder and submitting a Qualified Bid, and any party interested in making a bid to purchase all of the Debtors' Assets, or certain of the Business Segments must comply with the Bid Procedures. Only Qualified Bids will be considered by the Debtors, in accordance with the Bid Procedures.

Any parties interested in submitting a bid or certain of the Debtors' Assets should contact Solic Capital Advisors, LLC, 150 North Wacker Drive, Suite 3000, Chicago, IL 60606, Attn.: Reid Snellenbarger (reids@soliccapital.com) and George N. Koutsonicolis (georgek@soliccapital.com).

**Key Dates and Deadlines[4]**

• **Bid Deadline.** Any Bid for the Debtors' Assets must be submitted to the Debtors and their advisors, in accordance with the Bid Procedures, so as to be **actually received** by such parties on or before **May 16, 2025, at 4:00 p.m. (prevailing Eastern Time)** (the "Bid Deadline").

• **Auction.** If the Debtors receive two or more Qualified Bids for the Debtors' Assets, the Auction may take place on or after **May 21, 2025**, at a time to be announced by the Debtors, via remote video and/or in person at the offices of Sheppard, Mullin, Richter & Hampton LLP, 1901 Avenue of the Stars, Suite 1600, Los Angeles, CA 90067, and shall be conducted in a timely fashion according to the procedures set forth in the Bid Procedures Order.

• **Sale Hearing.** The Sale Hearing to consider the proposed Sale will be held on or

before **June 10, 2025, at 10:00 a.m.**, (ET), or such other date and time as determined by the Court, at 824 Market St N, 3rd Floor, Wilmington, Delaware 19801.

**Filing Objections.** Any and all objections to a Sale of the Debtors' Assets and entry of a Sale Order (such objection, a "Sale Objection") must: (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and all orders of the Court entered in these chapter 11 cases, (iii) except with respect to Warner Bros., who instead shall be subject to the Warner Bros. Sale Objection Deadline and Warner Bros. Post-Auction Objection Deadline as described and set forth in the Bid Procedures Order, be filed with the Court by (a) **May 12, 2025 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection Deadline"), or (b) with respect to objections solely related to the identity of the Successful Bidder(s) (other than the Stalking Horse Bidder), or adequate assurance of future performance by the Successful Bidder(s) (other than the Stalking Horse Bidder), by 4:00 p.m. (prevailing Eastern Time) on the date that is two business days following the filing of the Notice of Successful Bidder (the "Post-Auction Objection Deadline"), and (iv) be served upon the following parties (collectively, the "Notice Parties"): (1) proposed co-counsel to the Debtors, (i) Sheppard, Mullin, Richter & Hampton LLP, 321 North Clark Street, 32nd Floor, Chicago, IL 60654, Attn.: Justin R. Bernbrock (jbernbrock@sheppardmullin.com), and (ii) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801, Attn.: Joseph M. Mulvihill (jmulvihill@ycst.com); (2) counsel to the ABS Trustee, Barnes & Thornburg LLP, One North Wacker Drive Suite 4400, Chicago, IL 60606, Attn.: Aaron Gavant (agavant@btlaw.com) (3) counsel to the DIP Lenders, Morrison Foerster, 250 West 55th Street, New York, NY 10019, Attn.: James Newton (jnewton@mofo.com); (4) counsel to Vine Alternative Investments Group, LLC, Cooley LLP, 55 Hudson Yards, New York, NY 10001 Attn.: Daniel Shamah (dshamah@cooley.com); (5) Magnum Films SPC, DLA Piper LLP, 1251 Avenue of the Americas, New York, New York 10020, Attn: Dennis C. O'Donnell (dennis.odonnell@dlapiper.com); (6) counsel to the ad hoc group of ABS Noteholders, Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, New York 10019, Attn: Joel Simwinga (jmsimwinga@wlrk.com); (7) proposed counsel to the Official Committee of Unsecured Creditors, Pachulski Stang Ziehl & Jones LLP, 780 Third Avenue 34th Floor, New York, NY 10017, Attn: Robert Feinstein (rfeinstein@pszjlaw.com) and Bradford Sandler (bsandler@pszjlaw.com); (8) counsel to Warner Bros., (i) O'Melveny & Myers LLP, 400 South Hope Street, Suite 1900, Los Angeles, CA 90071, Attn.: Steve Warren (swarren@omm.com), and (ii) Morris, Nichols, Arsht & Tunnell LLP, 1201 N. Market Street, 16th Floor, Wilmington, DE 19801, Attn.: Curtis S. Miller (cmiller@morrisnichols.com), (9) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), 844 N. King Street, Room 2207, Wilmington, DE 19801, Attn.: Rosa Sierra-Fox (rosa.sierra-fox@usdoj.gov); and (10) any Successful Bidders.

**Consequences of Failing to Timely File an Objection. Except with respect to Warner Bros., if any party fails to timely file with the Court and serve a Sale Objection by the Sale Objection Deadline or Post-Auction Objection Deadline, as applicable, or otherwise abide by the procedures set forth in the Bid Procedures regarding an objection to the Sale, such party shall be barred from asserting, at the Sale Hearing or otherwise, any objection to the relief requested in the Motion or to the consummation and performance of the Sale, including (i) assumption and assignment of Assumed Contracts as set forth in the applicable APA and (ii) the transfer of the applicable Asset(s) to the applicable Successful Bidder(s) free and clear of all liens, claims, interests, and encumbrances pursuant to section 363(f) of the Bankruptcy Code, and shall be deemed to "consent" to the Sale for purposes of section 363(f) of the Bankruptcy Code.**

**Obtaining Additional Information.** Copies of the Bid Procedures Motion, the Stalking Horse Supplement, the Bid Procedures, the Bid Procedures Order, the Alcon Stalking Horse APA, and all other documents filed with the Court, and additional notes free of charge on the Debtors' case information website, located at https://www.veritaglobal.net/vreg.

1 The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343. The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

2 Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bid Procedures or the Bid Procedures Order, as applicable.

3 To the extent of any inconsistencies between the Bid Procedures and the summary descriptions of the Bid Procedures in this notice, the terms of the Bid Procedures shall control in all respects.

4 The following dates and deadlines may be extended by the Debtors or the Court pursuant to the terms of the Bid Procedures and the Bid Procedures Order.



**BATHTUB KING** OF CALIFORNIA

$50 COUPON

**REFINISHING OF:** TUBS • TILES • SINKS • FIBERGLASS

Valid 5/1/25 - 5/15/25

$339

Promo Code: LATPD Tub Only Reg. $389

**1-800-882-5464**
www.bathtubkingcalifornia.com
Lic. #775121

**DO BUSINESS WITH A LICENSED CONTRACTOR**