**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-10475 (TMH)<br><br>(Jointly Administered) |

**WARNER BROS. ENTERTAINMENT INC.'S OMNIBUS OBJECTION TO
(I) THE DEBTORS' MOTION FOR AN ORDER APPROVING THE SALE
OF THE DEBTORS' ASSETS, (II) THE DEBTORS' SALE SUPPLEMENT
WITH RESPECT THERETO AND (III) THE DEBTORS' ASSUMPTION
AND ASSIGNMENT OF CERTAIN WARNER BROS. AGREEMENTS**

Curtis S. Miller (No. 4583)
Matthew B. Harvey (No. 5186)
**MORRIS, NICHOLS, ARSHT
& TUNNELL LLP**
1201 North Market Street, 16th Floor
Wilmington, DE 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: cmiller@morrisnichols.com
mharvey@morrisnichols.com

Steve Warren (*Admitted pro hac vice*)
**O'MELVENY & MYERS LLP**
400 South Hope Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 430-6000
Email: swarren@omm.com

Matt Kline (*Admitted pro hac vice*)
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Telephone: (310) 553-6700
Email: mkline@omm.com

Scott Drake (*Admitted pro hac vice*)
Emma Jones (*Admitted pro hac vice*)
**O'MELVENY & MYERS LLP**
2801 North Hardwood Street, Suite 1600
Dallas, Texas 75201
Telephone: (972) 360-1900
Email: sdrake@omm.com
Email: eljones@omm.com

*Counsel to Warner Bros. Entertainment Inc., and its Affiliates*

---

[1]  The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343. The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

**TABLE OF CONTENTS**

Page

I.  PRELIMINARY STATEMENT ................................................................. 3
    A.  Derivative Rights ............................................................................ 3
    B.  Library Assets ................................................................................ 6

II. FACTUAL BACKGROUND ................................................................... 8
    A.  Village Co-Finances Certain Warner Bros. Films Under Specific
        Contractual Terms ......................................................................... 8
    B.  Village Breached Its Contract with Warner Bros. By Refusing to Pay Its
        Co-Financing Share of *Matrix IV* ............................................... 12
    C.  The Arbitrator Finds Village Breached and Owes ██████████ ...... 13
    D.  The Arbitration Appeal Panel Affirms the Arbitrator's Liability Finding
        and Orders Further Proceedings on Damages .................................. 14
    E.  Village Fraudulently Transfers Derivative Rights to ████████
        ████████████ .............................................................. 14
    F.  Warner Bros.' Selection of Any Co-Financing Partner is Inherently
        Personal ........................................................................................ 15
    G.  Village Commences These Chapter 11 Cases With the Aim of Selling All
        (or Substantially All) of Its Assets ................................................. 16

III. ARGUMENT ........................................................................................ 19
    A.  The Debtors Are Barred from Assuming and Assigning Any of Their
        Derivative Rights Agreements with Warner Bros. to Any Third Party in
        Connection with a Sale of the Derivative Rights ............................. 19
        a.  The Derivative Rights Agreements are financial accommodations
            that cannot be assumed and assigned under section 365(c)(2) of
            the Bankruptcy Code ........................................................... 20
        b.  The Derivative Rights Agreements separately cannot be assumed
            and assigned without Warner Bros.' consent under section
            365(c)(1) of the Code .......................................................... 29
            i.   The Derivative Rights Agreements pertain to Warner Bros.'
                 exclusive intellectual property rights ........................... 30
            ii.  The Derivative Rights Agreements are personal to Village
                 and its prior ownership structure ................................. 32
            iii. Alcon cannot provide adequate assurance of future
                 performance in light of the personal nature of the
                 Derivative Rights Agreements ...................................... 34
        c.  The Debtors' rights under many of the Derivative Rights
            Agreements are restricted, and the Debtors lack Derivative Rights
            in certain pictures altogether ............................................... 36

**TABLE OF CONTENTS**
(continued)

B. The Debtors' Proposed Library Asset Sale to Alcon Raises Numerous Objectionable Issues and Concerns That Must be Addressed Prior to any Sale Being Approved ........................................................................................ 37

    a. The Debtors cannot assume and assign their Library Agreements with Warner Bros. to Alcon over Warner Bros.' objection pursuant to section 365(c)(1) .................................................................. 39

        i. The Library Agreements also contain intellectual property rights ................................................................................ 39

        ii. The Debtors cannot sell the Audit Rights absent Warner Bros.' consent, nor can they do so while excluding the Audit Proceeds ............................................................ 42

    b. The Debtors must cure their obligations from the Matrix and Wonka Arbitrations in connection with any sale ..................................... 45

    c. Alcon must provide adequate assurance of future performance ............. 48

    d. The Alcon APA contains additional objectionable provisions that must be rectified ................................................................... 49

        i. Warner Bros.' property rights and rights of deduction, setoff and recoupment cannot be extinguished ........................... 49

        ii. Warner Bros.' property rights and existing liens on the Debtors' assets must be unimpaired in connection with the Debtors' sale ................................................................ 51

        iii. The Alcon APA does not appropriately address the Debtors' pre-existing relationship with Magnum post-closing ................................................................... 53

        iv. The Alcon APA improperly modifies Warner Bros.' copyright interests ...................................................... 53

C. Warner Bros.' Rights under Its Studio Business-Related Agreements with the Debtors Cannot Be Impaired in Any Studio Business Sale .......................... 54

IV. RESERVATION OF RIGHTS ...................................................................... 56

V. CONCLUSION .......................................................................................... 57

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allegheny Enters. v. J-W Operating Co.*,
No. 10-02539, 2014 U.S. Dist. LEXIS 27998 (M.D. Pa. Mar. 5, 2014) .................................. 43

*In re ANC Rental Corp., Inc.*,
277 B.R. 226 (Bankr. D. Del. 2002) ....................................................................... 42

*In re Boscov's, Inc.*,
No. 08-11637 (KG), 2008 WL 4975882 (Bankr. D. Del. Nov. 21, 2008) .............................. 22

*Chase Manhattan Bank v. Iridium Afr. Corp.*,
No. CIV.A. 00-564 JJF, 2004 WL 323178 (D. Del. Feb. 13, 2004) ................................. 23, 29

*Citizens & S. Nat'l Bank v. Thomas B. Hamilton Co. (In re Thomas B. Hamilton Co.)*,
969 F.2d 1013 (11th Cir. 1992) .......................................................................... 20, 22

*In re Coupon Clearing Serv., Inc.*,
113 F.3d 1091 (9th Cir. 1997) ................................................................................. 51

*Creative Data Forms, Inc. v. Pa. Minority Bus. Dev. Auth.*,
72 B.R. 619 (E.D. Pa. 1985) .................................................................................. 37

*Davis v. Blige*,
505 F.3d 90 (2d Cir. 2007) .................................................................................... 41

*In re Dynamic Tooling Sys., Inc.*,
349 B.R. 847 (Bankr. D. Kan. 2006) ......................................................................... 55

*Edgar Rice Burroughs, Inc. v. Commodore Prods. & Artists, Inc.*,
167 Cal. App. 2d 463 (1959) .................................................................................. 33

*In re Ernie Haire Ford, Inc.*,
403 B.R. 750 (Bankr. M.D. Fla. 2009) ...................................................................... 20

*In re Exide Techs.*,
607 F.3d 957 (3d Cir. 2010) .................................................................................. 55

*Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.*,
661 F.2d 479 (5th Cir. 1981) ................................................................................. 30

*Farmland Irr. Co. v. Dopplmaier*,
48 Cal. 2d 208 (1957) ........................................................................................ 32

*In re Fleming Cos.*,
499 F.3d 300 (3d Cir. 2007) .................................................................................. 43

*In re Fleming Cos.*,
No. 03-10945 (MFW), 2004 Bankr. LEXIS 198 (Bankr. D. Del. Feb. 27, 2004) ............. 46, 47

*Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J.V.*,
209 F.3d 252 (3d Cir. 2000) .................................................................................. 51

*In re Furniture Brands Int'l, Inc.*,
Nos. 13-12329(CSS), 191, 349, 442, 2013 Bankr. LEXIS 5162 (Bankr. D. Del. Nov. 7,
2013)........................................................................................................... 55

**TABLE OF AUTHORITIES**

(continued)

Page(s)

*Gardner v. Nike, Inc.*,
   279 F.3d 774 (9th Cir. 2002) ..................................................................... 40

*In re Golden Books Family Entm't*,
   269 B.R. 300 (Bankr. D. Del. 2001) .......................................................... 40

*Gribling v. Bohan*,
   26 Cal. App. 771 (1915) ............................................................................ 32

*Hispanic Indep. TV Sales, LLC v. Kaza Azteca Am. Inc.*,
   2012 U.S. Dist. LEXIS 46239 (S.D.N.Y. Mar. 30, 2012) .......................... 51

*Huron Consulting Servs., LLC v. Physiotherapy Hldgs., Inc. (In re Physiotherapy Hldgs., Inc.)*,
   538 B.R. 225 (D. Del. 2015) ...................................................................... 43

*In re Italian Cook Oil Corp.*,
   190 F.2d 994 (3d Cir. 1951) ....................................................................... 42

*Kirkeby v. Super. Ct.*,
   33 Cal. 4th 642 (2004) ............................................................................... 15

*In re Lafayette Radio Elecs. Corp.*,
   12 B.R. 302 (Bankr. E.D.N.Y. 1991) .......................................................... 35

*Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*,
   716 F.3d (3d Cir. 2013) ....................................................................... 36, 52

*Manela v. Stone*,
   66 Cal. App. 5th 90 (2021) ........................................................................ 33

*Matter of Midway Airlines Inc.*,
   6 F.3d 492 (7th Cir. 1993) .......................................................................... 44

*In re Neuhoff Farms, Inc.*,
   258 B.R. 343 (Bankr. E.D. N.C. 2000) ....................................................... 22

*In re Open Road Films, LLC, et al.*,
   No. 18-12012 (Bankr. D. Del. Dec. 19, 2018) ........................................... 52

*In re Patient Educ. Media, Inc.*,
   210 B.R. 237 (Bankr. S.D.N.Y. 1997) ................................................... 30, 40

*In re Placid Oil Co.*,
   72 B.R. 135 (Bankr. N.D. Tex. 1987) .................................................... 22, 26

*In re Planet Hollywood Int'l, Inc.*,
   No. 99-3612 (JJF), 2000 WL 36118317 (D. Del. Nov. 21, 2000) ........... 33, 34, 45

*In re R.B.B., Inc.*,
   211 F.3d 475 (9th Cir. 2000) ...................................................................... 35

*In re Rupari Holding Corp.*,
   573 B.R. 111 (Bankr. D. Del. 2017) ........................................................... 31

*In re Sapolin Paints, Inc.*,
   5 B.R. 412 (E.D.N.Y. 1980) ........................................................................ 34

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*In re Sportsman's Warehouse, Inc.*,
    457 B.R. 372 (Bankr. D. Del. 2011) ............................................................ 20, 23

*In re Sun Runner Marine, Inc.*,
    945 F.2d 1089 (9th Cir. 1991)................................................................ 20, 21, 23

*Superbrace, Inc. v. Tidwell*,
    124 Cal. App. 4th 388 (2004)........................................................................... 32

*In re Taggatz*,
    106 B.R. 983 (Bankr. W.D. Wis. 1989) .......................................................... 21

*Tresóna Multimedia, Ltd. Liab. Co. v. Burbank High Sch. Vocal Music Ass'n*,
    953 F.3d 638 (9th Cir. 2020)........................................................................... 41

*In re Trump Entm't Resorts, Inc.*,
    526 B.R. 116 (Bankr. D. Del. 2015) ................................................................ 39

*Trustmark Ins. Co. v. Transamerica Occidental Life Ins. Co.*,
    484 F. Supp. 2d 850 (N.D. Ill. 2007) .............................................................. 42

*In re Vice Group Holding Inc.*,
    No. 23-10738 (Bankr. S.D.N.Y. June 23, 2023) ............................................ 52

*In re Vice Group Holdings*,
    652 B.R. 423 (S.D.N.Y. 2023) ........................................................................ 34

*Village Roadshow Films (BVI) Ltd. v. Warner Bros. Entm't Inc.*,
    No. 22STCV04606 (L.A. Cnty. Super. Ct.) ................................................... 13

*In re W. Elecs., Inc.*,
    852 F.2d 79 (3d Cir. 1988) ....................................................................... 30, 39

*Watts v. Pa. Hous. Fin. Co.*,
    876 F.2d 1090 (3d Cir. 1989) .................................................................... 21, 29

*In re Wegner Farms*,
    49 B.R. 440 (Bankr. Iowa 1985) ..................................................................... 21

*In re Whiteprize, LLC*,
    275 B.R. 868 (Bankr. D. Ariz. 2002) .............................................................. 22

**Statutes**

11 U.S.C. § 363(e) ................................................................................................. 55

11 U.S.C. § 365(b)(1) ....................................................................................... 34, 48

11 U.S.C. § 365(b)(1)(A) .................................................................................. 45, 46

11 U.S.C. § 365(c)(1) ............................................................................................ 29

11 U.S.C. § 365(c)(2) ............................................................................................ 20

11 U.S.C. § 365(e)(2) ............................................................................................ 23

11 U.S.C. § 365(n)(2)(A) ....................................................................................... 55

Cal. Civ. Code § 1642 ........................................................................................... 43

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

Cal. Civ. Proc. Code § 3439.04(a)(2) ........................................................................................ 15

**Other Authorities**

3 Collier on Bankruptcy (16th 2025) .................................................................................. 23, 32

1.      Warner Bros. Entertainment Inc. and its affiliates (collectively, "Warner Bros.")
files this omnibus objection (the "Objection") to the *Debtors' Motion for Entry of Orders (I)(A)
Approving Bid Procedures for the Sale of the Debtors' Assets, (B) Authorizing the Debtors' Entry
Into the Stalking Horse APA and Approving Bid Protections Thereunder, (C) Scheduling an
Auction for, and Hearing to Approve, Sale of the Debtors' Assets, (D) Approving Form and
Manner of Notices of Sale, Auction, and Sale Hearing, and (E) Approving Assumption and
Assignment Procedures; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of all
Liens, Claims, Interests, and Encumbrances, and (B) Approving Assumption and Assignment of
Executory Contracts and Unexpired Leases; and (III) Granted Related Relief* [Dkt. No. 11] (the
"Sale Motion"); the *Debtors' Supplemental Motion for Entry of an Order (A) Approving (I) the
Debtors' Designation of the New Stalking Horse Bidder for the Library Assets as set Forth in the
Stalking Horse Agreement, (II) the Debtors' Entry Into the Stalking Horse Agreement and (III) the
Bid Protections and (B) Granting Related Relief* [Dkt. No. 197] (the "Supplement");[2] the *Notice
of Possible Assumption and Assignment of Certain Executory Contracts With Warner Bros.* [Dkt.
No. 284] (the "Warner Bros. Contract Notice"); the *Second Supplemental Notice of Possible
Assumption and Assignment of Certain Executory Contracts* [Dkt. No. 345] (the "Second
Supplemental Contract Notice"); the *Notice of Successful Bidder for Library Assets* [Dkt. No. 396]
(the "Library Notice"); and the *Notice of (I) Successful Bidder for Derivative Rights and Studio
Business and (II) Back-Up Bidder for Derivative Rights* [Dkt. No. 446] (the "DR Notice"), all filed
by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors").

---

[2] Capitalized terms used but not otherwise defined in this Objection shall have the meanings ascribed to them in the
Sale Motion, Supplement, or Alcon APA (as later defined herein), as applicable.  Nothing herein shall constitute a
waiver of Warner Bros.' rights under the Bid Procedures Order, or in connection with the Warner Bros. procedures as
set forth herein.

2.     The Debtors seek to sell to Alcon Media Group, LLC ("Alcon"): (i) their contractual rights to receive participation proceeds in 91 copyrighted films that Warner Bros. created and distributed (the "Library Assets") for $417.5 million (minus approximately $67,703,375 in payments already received by Village from Warner Bros. for the Library Asset films after the Cutoff Date) as set forth in the Debtors' library asset purchase agreement with Alcon (the "Alcon APA"), and (ii) their potential right to co-finance certain derivative works from certain of those films (the "Derivative Rights") for $18.5 million.  While both proposed sales are objectionable, the defects as to the Derivative Rights are incurable and that sale to Alcon must be rejected.[3]  In lieu of the Alcon Derivative Rights transaction, the Court should approve Warner Bros. Backup Bid at $17.5 million for the Derivative Rights, which does not suffer from the infirmities and risks of the Alcon Derivative Rights Bid.  In contrast, the more lucrative sale of the Library Assets (and Studio Business) can proceed if the Debtors and Alcon are willing to make certain modifications to protect Warner Bros.' contractual and property rights.[4]

3.     In support of this Objection, Warner Bros. respectfully states as follows:

---

[3] Shortly before the deadline for Warner Bros. to file its objections to the Library Assets, Studio Business, and Derivative Rights sales, the Debtors advised that they were not ready to proceed with the Derivative Rights sale to Alcon on June 18, 2025, but reserved the right to reset that for a later hearing.  Accordingly, Warner Bros.' time to object to the Derivative Rights sale has been extended.  Warner Bros. nevertheless is filing its general objection to the sale of the Derivative Rights (excluding objections related to the identity of the Buyer).  Warner Bros. will supplement its response to include, *inter alia*, its objections related to the identity of the Buyer (*i.e.*, Alcon) and concerns about adequate assurances in connection therewith, should the Debtors attempt to proceed with the proposed sale of the Derivative Rights to Alcon.

[4] "Village" refers to Village Roadshow Pictures North America Inc. ("VRPNA"), Village Roadshow Films North America Inc. ("VRFNA"), Village Roadshow Films (BVI) Limited ("VRF-BVI"), Village Roadshow Distribution USA Inc. ("VRD-USA"), and/or Village Roadshow Distribution (BVI) Ltd. ("VRD-BVI"), as applicable. In addition, the "WB Arbitration Debtors" as used later in this Objection specifically refer to VRPNA, VRFNA, VRF-BVI, and VRD-USA.  The "Studio Business" refers to the Debtors' studio business centered around the development and production of independent films (for clarity, excluding the Debtors' Film Library) and scripted and unscripted television series.

# I.   PRELIMINARY STATEMENT[5]

4.      Warner Bros. previewed a number of its concerns in connection with the Debtors' proposed sales in its Bid Procedures Objection.  Many of the same infirmities remain, as the Debtors continue to overlook their limited rights in the Derivative Rights and their interests in the Library Assets.  The Debtors' only interest in the Derivative Rights is the limited option to co-finance certain derivative works based on pictures the parties' previously co-financed (the "Derivative Rights Agreements").[6]  The Derivative Rights Agreements include and otherwise constitute financial accommodations that cannot be assumed and assigned under the Bankruptcy Code, and that are otherwise unassignable absent Warner Bros.' consent because they relate to Warner Bros.' exclusive copyrighted material and the terms of the related agreements were personal to Village as it was previously constituted.

5.      Similarly, the Library Assets' underlying agreements (the "Library Agreements") afford Warner Bros. certain exclusive rights, including consent rights and intellectual property protections, that are equally unassignable over Warner Bros.' objection.  As a result, changes must be made to protect Warner Bros.' rights related to the sale of Library Assets as identified below.

## A.   Derivative Rights

6.      The proposed Derivative Rights sale to Alcon cannot proceed without Warner Bros.' consent for four separate and independent reasons:

- Financial Accommodations: Under the Derivative Rights Agreements, Warner

---

[5] Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to them as set forth later in this Objection, subject to *supra*, n. 2.

[6] The Derivative Rights Agreements include all of Warner Bros.' Co-Ownership Agreements with Village for prequels, remakes, and sequels of films, the 2017 Omnibus Amendment (as later defined) and the Omnibus Amendment No. 2 (as later defined).  For the avoidance of doubt, references to "Derivative Rights" in this Objection are in specific reference to the Derivative Rights stemming from Warner Bros. and Village agreements—the Derivative Rights Agreements.

Bros. has the exclusive right to create a derivative work and the sole discretion and control over the production and distribution of such works. Village has an option to co-finance in arears certain derivative works, which Village must exercise at or around the time Warner Bros. greenlights the film for production. Pursuant to the Derivative Rights Agreements, Warner Bros. then advances all of the costs of production (as well as all marketing and distribution expenses) based on Village's commitment to later reimburse Warner Bros. for its share of the production costs, generally days before the film is released. That is, Warner Bros. pre-finances Village's share of the financing based on Village's agreement to make payment in the future. This is the essence of a financial accommodation, as best evidenced by the consequences of Village's failure to honor its financial repayment obligations related to *Matrix IV*. Indeed, both Village and Warner Bros. enter into security agreements that are part of the ancillary agreements that must be executed in connection with any new film that is co-financed under the Derivative Rights Agreements, yet another immutable characteristic of a financial accommodation.

- Copyright Interests: Only Warner Bros. can decide to produce and distribute a derivative work of the prior co-financed films, and Warner Bros. controls all elements of the content, production, and distribution thereafter. As such, Village's contractual co-financing interests are merely a byproduct of Warner Bros.' exclusive copyright interests, which may not be assigned without Warner Bros.' consent under the Copyright Act, the Bankruptcy Code, and the parties' agreements.

- Personal Rights and Adequate Assurance: The Derivative Rights Agreements'

financial structure is a relic from a time when Village was a family-owned business that had a multi-decade relationship with Warner Bros. The terms of those agreements are personal to that former relationship, including the advances made by Warner Bros. to create and distribute the films, while Village defers any financial obligation. These agreements are not suitable to be assigned to a financial actor that takes a purely transactional approach to the parties' relationship—as confirmed by the past four years of litigation, and cannot be assigned absent Warner Bros.' consent under the Bankruptcy Code.

7.      Unfortunately, the Debtors have rebuffed Warner Bros.' efforts to compromise the dispute over the Derivative Rights for $17.5 million, which Warner Bros. was willing to pay to avoid a repeat of recent, excruciating history. That is, Warner Bros. offered $17.5 million in "ransom" at the Auction for the privilege of repurchasing the right to finance its own films, without having to make financial accommodations for the benefit of another fund selected by Village. As Warner Bros. stated at the Auction, and repeats now, its $17.5 million bid is the highest and best that the estate received, because its offer for the Derivative Rights can actually close while the current proposal cannot. Warner Bros. wants to be reasonable but its willingness to pay more to get the rights it already has under its agreements with Village is not limitless. The current proposal to sell the Derivative Rights is contrary to Warner Bros.' contractual and property rights and, to the extent that the Sale Motion covers the Derivative Rights, it should be rejected. Warner Bros. remains ready to close on its $17.5 million offer. The Debtors should have accepted this olive branch; instead, they have yet again chosen to stay on their course of futile, expensive confrontation in derogation of Warner Bros.' rights.[7]

---

[7] Warner Bros. reserves all of its claims against the Debtors' estates arising prior to the Closing of any sale, including without limitation all damages claims related to the *Matrix IV*, none of which are limited or waived by virtue of its

B.    **Library Assets**

8.    As currently proposed, the sale of the Library Assets infringes upon Warner Bros.'

rights as well.  Among other things, the Alcon APA seeks to (i) assume and assign the Library

Agreements to Alcon notwithstanding Warner Bros.' consent rights, which section 365(c)(1)

protects; (ii) impermissibly modify the Library Agreements' Audit Rights, which otherwise

remain subject to Warner Bros.' consent and the principles of *cum onere*; (iii) assume and assign

the Library Agreements without curing the Debtors' $100+ million obligation thereunder arising

from Village's breach of its obligation to co-finance the *Matrix IV* motion picture (the "Matrix

Arrangement");[8] and (iv) cut off Warner Bros.' prospective rights including recoupments, setoffs,

and perhaps even deductions for amounts it has already paid to Village.

9.    Warner Bros. believes that the Library Asset transaction may move forward with

certain modifications to any final order approving the Sale Motion and Supplement for a sale of

the Library Assets (the "Final Sale Order").  As with other unsecured creditors of the estate, and

particularly so given the size of its pre-petition claim (upwards of $100 million), Warner Bros.

wants to be paid on its outstanding *Matrix IV* claim—and wants to be paid in full.  But before

Warner Bros. will withdraw its objection to the Debtors' proposed Library Asset sale to Alcon,

the Alcon APA will need to be modified and any Final Sale Order will need to, *inter alia*, (i)

correct the definition of Purchased Assets, which seemingly provides for the sale to Alcon of over

$67.7 million in participation payments that Warner Bros. has already made to the Debtors after

---

offer on the Derivative Rights.

[8] Warner Bros. acknowledges that its concerns related to its Cure Claims may be satisfied if the Debtors establish the Warner Bros. Reserve as set forth in the Final DIP Order.  Final DIP Order ¶ 32.  The Warner Bros. Reserve would provide sufficient cash to satisfy the claims related to the Matrix Arbitration once they are liquidated.  Because Warner Bros.' claims constitute Cure Claims, they must be paid out of the Warner Bros. Reserve in full once they are liquidated.

July 31, 2024 the ("Cutoff Date"); (ii) preserve Warner Bros.' property, recoupment, deduction, lien, and prospective offset rights; (iii) address Warner Bros.' concerns with respect to treatment of the Audit Rights; (iv) provide the appropriate mechanisms to ensure Warner Bros.' rights are not impaired in connection with the transfer of the Debtors' agreements with Magnum to Alcon; (v) reserve and not otherwise transfer the copyright interests in 91 Warner Bros.' motion pictures to Alcon, which should be coupled with the Derivative Rights and revert to Warner Bros. since neither the Derivative Rights nor their associated copyrights can be assumed or assigned to any non-Warner Bros. third party; (vi) provide for the funding of the $110 million Warner Bros. Reserve and treatment of the resulting Warner Bros. Claims as a cure claims to be paid in full in cash promptly upon the liquidation of such claim;  (vii) clarify that the assumption of the Fundamental Contracts with Warner Bros. and other Warner Bros. contracts only conveys the Debtors' existing interest therein; and (viii) provide adequate assurance of future performance, including the identity of any entity to which any Warner Bros. contract is assigned and its financial and other ability to perform.

10.     And to be clear, the *inter alia*, qualification above is quite important.  Weeks have passed now since the Auction, and the Debtors have still failed to provide Warner Bros. with Alcon's executed actual asset purchase agreement in connection with the Derivative Rights and Studio Business.  If and when Warner Bros. receives a copy of those APAs, it might need to supplement this filing for the Court.  Warner Bros. has been asking for the Derivative Rights APA for well over a week.

## II.   FACTUAL BACKGROUND[9]

**A.   Village Co-Finances Certain Warner Bros. Films Under Specific Contractual Terms.**

11.     Warner Bros. and Village's contractual relationship dates back to 1998, when Village was a family-owned business.  *See Declaration of Wayne Smith in Support of Warner Bros.' Objection* ("Smith Decl.") ¶ 4.  The terms of the parties' agreements reflect their prior close relationship as it existed for decades before Village was acquired by a hedge fund (Vine).  *See id.* ¶¶ 4-5.  Warner Bros. and Village have co-financed more than 90 theatrical films through a series of agreements.  *See id.* ¶ 4.  At a high level, and as detailed below, Warner Bros. and Village agreed (1) to share in certain revenues of the co-financed films (which Village has referred to as comprising part of the Library Assets), (2) that Village will have some rights to participate in co-financing of certain derivative works of certain of the co-financed films (the Derivative Rights), and (3) that Warner Bros. has the exclusive right to produce and exploit the co-financed films and any future derivative works of those co-financed films.  *See generally id.* ¶¶ 4-6.  Since December 31, 2020, the parties are no longer engaged in co-financing any projects other than derivative works of the prior co-financed films.  *See id.* ¶ 5.

12.     The basic structure of Warner Bros. and Village's contractual arrangement is as follows.[10]  Warner Bros. and Village entered into a series of agreements—first, the Qualified Cost Sharing Agreements and later, the Motion Picture Rights Purchase Agreements ("MPRPA")—setting out certain terms for co-financing new projects, including executing security agreements

---

[9] Given the importance of these issues, and Warner Bros.' unique contractual rights *vis-à-vis* its contracts with Village, Warner Bros. restates and recites portions of this fact background from its prior pleadings in these cases for the benefit of the Court and parties-in-interest.

[10] This description is purposefully simplified for background purposes only.  Certain terms capitalized in this section are used as defined in the applicable agreement(s).

and copyright mortgages and assignments in favor of WAV Distribution LLC ("WAV"—a Warner Bros. affiliate) with respect to, among other things, picture rights.  *See generally id.* ¶¶ 8-14; *see also id.,* Exs. 2 and 3 (2014 and 2020 MPRPA).  For each co-financed motion-picture, Warner Bros. and Village also entered into a Rights Purchase Agreement ("RPA"), which specified each party's rights and payment obligations in connection with a co-financed picture, and a Co-Ownership Agreement setting forth the parties' rights with respect to remakes, sequels, prequels and other derivative works based on the co-financed film, including the terms on which Village may co-finance such derivative works and the financial accommodations Warner Bros. provides to Village in such case.  *See id.* ¶¶ 9, 15.  Over the years, the Co-Ownership Agreements have been amended through two Omnibus Amendments, including to ensure that they contain certain identical terms.  *See e.g. id.,* Ex. 5 (2017 Omnibus Amendment); *see also id.*, Ex. 6 (Omnibus Amendment No. 2).

13.     Under the Co-Ownership Agreements, Warner Bros. has the exclusive right to determine whether to produce derivative projects.  *See id.,* Ex. 5 (2017 Omnibus Amendment), attach. 1 ¶ 4(f).[11]  Under certain circumstances and for certain qualifying derivative projects, Warner Bros. must offer Village a co-financing opportunity.  *See id.* attach. 1 ¶ 4(a), (c), (g); *see also id.,* Exs. 2 and 3 (2014 and 2020 MPRPA) § 6.4.  The Co-Ownership Agreement, as amended by the 2017 Omnibus Amendment, dictates the terms of that process:  Warner Bros. sends Village a Project Notice, which Village must accept within 15 business days.  *See id.,* Ex. 5 (2017 Omnibus Amendment), attach. 1 ¶ 4(a), (c); *see also id.,* Exs. 2 and 3 (2014 and 2020 MPRPA), § 6.4 & Ex.

---

[11] "Each of VRF and VRFNA shall have the right to propose Sequel or Remake Projects or Television Projects for consideration by WB, provided that WB shall have no obligation to agree to any such proposal and WB's decision to agree or not to agree to a proposal is within its sole discretion, and neither VRF nor VRFNA shall have any right, as a consequence, to exploit any of the Derivative Rights, nor shall VRF or VRFNA have any right to produce, license or exploit any of the Derivative Rights without WB's written consent, it being understood that only WB shall have the unilateral right in its sole discretion to initiate any exploitation of the Derivative Rights."

G (form Co-Ownership Agreement).  If Village accepts, Warner Bros. will then produce the project and front all production and marketing costs.  *See id.,* Ex. 5 (2017 Omnibus Amendment), attach. 1 ¶ 4(b), (d).  Village, which along the way is entitled to serve as an executive producer and to certain consulting rights, among other things, is not required to pay its co-financing share (which is specifically defined in the agreements, but approximately equal to the relevant percentage of the film's production costs, less any applicable anticipated offsets and rebates) until the "Pick-Up Date," which will occur by the time the film is released.  *See id.,* Exs. 2 and 3 (2014 and 2020 MPRPA) § 5.1 & Ex. F (form RPA) § 2(b).  Village is then entitled to participate in future revenues from that derivative work.

14.    The domestic and foreign Output Distribution Agreements then set forth the economic and other terms pursuant to which Warner Bros. retains the exclusive rights to exploit each picture, and how the proceeds from such exploitation are divided among the parties.[12]  *See id.* ¶¶ 24-27.  The Distribution Agreements grant Warner Bros. full and exclusive control over distribution decisions with "the broadest possible latitude," subject to certain obligations (for instance, Warner Bros. must release each film in a minimum number of theaters).  *See e.g.*, Exs. 7 and 8 (2020 and 2015 Domestic Distribution Agreements) §§ 6, 14.  Warner Bros. also advances all distribution expenses and is entitled to collect a distribution fee.  *Id.* § 6(a).  The Distribution Agreements further provide specific terms governing Village's participations in receipts received

---

[12] These agreements, dated as of November 10, 2020, are identified as the "Warner F/D Agreement," the "Domestic Distribution Agreement," and the "Warner Foreign Agreement" in the Alcon APA, which are otherwise defined herein as 2020 Warner Foreign Distribution (F-D) Agreement, 2020 Domestic Distribution Agreement, and the 2020 Warner Foreign Agreement, respectively. "Distribution Agreements" as used herein include the Warner F/D Agreement, the Domestic Distribution Agreement, the *Amended and Restated Output Distribution Agreement (Domestic)*, dated October 30, 2015 between WAV and Village (the "2015 Domestic Distribution Agreement"), and the *Amended and Restated Output Distribution Agreement (Foreign)* dated as of October 30, 20215 between WBPL and Village (the "2015 Warner Foreign Distribution (F-D) Agreement").

from Warner Bros.' exploitation.  *See id.* § 7.

15.    In addition, the Distribution Agreements provide for the creation of certain security interests by Village in favor of Warner Bros. for, *inter alia*, picture rights.  For example, the 2020 and 2015 Domestic Distribution Agreements require Village to execute certain security agreements, copyright mortgages, and assignments of copyrights in favor of WAV, to secure WAV's security interests in each picture in the Domestic Territory (as defined and otherwise set forth therein).  Similarly, the 2020 and 2015 Warner F/D Agreements require Village to execute certain security agreements, copyright mortgages, and assignments of copyrights in favor of Warner Bros. Productions Ltd. ("WBPL").  *See id.* ¶ 28; *see also id.,* Exs. 12, 13, 14, and 15 (Security Agreements, Mortgages and Assignments of Copyright and Copyright Mortgage Assignments dated November 22, 2019).  Warner Bros. also files UCC-1 financing statements to perfect its security interests for its rights in its film library.  *See, e.g., id.,* Exs. 16 and 17 (UCC-1 Financing Statements).

16.    The priority of Warner Bros.' security interests in its pictures and under its film rights and distribution agreements with Village is set forth in further detail in the Consolidated Intercreditor Agreement by and among Warner Bros., Village and other Village affiliates, Magnum Magnum Films SPC ("Magnum"), Bank of America, N.A. and U.S. Bank National Association ("U.S. Bank"); the Virtual Intercreditor Agreement by and among Warner Bros., Village Roadshow VS Films LLC ("VRVS"), and U.S. Bank; and that certain *Intercreditor Agreement* dated December 6, 2023, by and among Village, Warner Bros., and Loompala Pictures, LLC (the "Wonka Intercreditor Agreement").  *See id.* ¶ 29; *see also id.,* Exs. 18, 19 and 20 (Consolidated, Virtual, and Wonka Intercreditor Agreements).  Those intercreditor agreements generally provide that Warner Bros.' security interests in picture rights (among other things) are superior to Village's

security interests.  *See id.* ¶¶ 30-33; *see also id.*, Exs. 18, 19 and 20.

**B.      Village Breached Its Contract with Warner Bros. By Refusing to Pay Its Co-Financing Share of *Matrix IV*.**

17.      Among the many films co-financed by Warner Bros. and Village is the *Matrix* trilogy.  In 2003, the parties entered into the *Matrix* Co-Ownership Agreement, which set forth Warner Bros.' and Village's rights with respect to future derivative works based on the first three *Matrix* films.  *See* Smith Decl., ¶ 15; *see also id.,* Ex. 4 (Matrix Co-Ownership Agreement).  That agreement was amended in 2017 by the 2017 Omnibus Amendment.  *See* Smith Decl. ¶ 16; *see also id.,* Ex. 25 (Appeal Panel's Interim Decision and Award) at 3.

18.      In 2019, 

As required by the parties' contracts, Warner Bros. offered Village the opportunity to co-finance the film, which Village accepted.  *Id.* at 8-9.  Village agreed to pay half the film's production costs, and Warner Bros., in turn, spent approximately $200 million to produce *Matrix IV* and $100 million more to market it.  *Id.* at 4-5. Village subsequently refused to pay its co-financing share, arguing that Warner Bros.' distribution plan for the film violated the parties' agreements.  ▮▮▮▮▮▮▮▮▮▮▮▮ Warner Bros. initiated the Matrix Arbitration to affirm its contractual rights and collect the money Village owed. At the same time, Warner Bros. filed a separate arbitration demand, seeking, among other things, a declaratory judgment that Warner Bros. was not required to permit Village to participate in co-financing the film *Wonka* and that Village likewise did not have the right to participate in derivative works based on other "Library Films,"[13] and including a request for certain damages (the "<u>Wonka</u>

---

[13] The Library Films include, without limitation, (i) *Ocean's Eleven*, (ii) *Catwoman*, (iii) *Constantine,* (iv) *Charlie & the Chocolate Factory*, (v) *The Dukes of Hazzard,* (vi) *Ocean's Twelve*, (vii) *House of Wax*, (viii) *The Invasion,* (ix) *I Am Legend*, (x) *Get Smart*, (xi) *Ocean's 13*, (xii) *Speed Racer*, (xiii) *Sherlock Holmes,* (xiv) *Sherlock Holmes 2*, (xv) *Dark Shadows,* (xvi) *The Great Gatsby*, (xvii) *The Legend of Tarzan*, (xviii) *King Arthur: Legend of the Sword*, (xix) *Going In Style*, (xx) *Ocean's 8, and* (xxi) *Wonka*. For clarity, Village has no co-ownership rights in derivative

Arbitration"). *See id.* ¶ 38. The parties agreed to stay the Wonka Arbitration pending resolution of the Matrix Arbitration.

19.    After Warner Bros. filed its arbitration demands, Village filed a complaint and motion for a preliminary injunction in California state court ("California Superior Court")—a complaint it also shared widely with the press. *See Village Roadshow Films (BVI) Ltd. v. Warner Bros. Entm't Inc.*, No. 22STCV04606 (L.A. Cnty. Super. Ct.). The complaint addressed both the *Matrix* and *Wonka* disputes as well as a separate issue related to another potential derivative television project based on the motion picture *Edge of Tomorrow*. *See id.* ¶ 39. The California Superior Court denied Village's preliminary injunction motion, finding that Village was not irreparably harmed and was not likely to prevail on its claims, and ordered Village's claims to arbitration. *See id.*, Ex. 21 (Superior Court's May 27, 2022 Minute Order).

**C.    The Arbitrator Finds Village Breached and Owes ██████████████**

20.    In July 2023, ████████████████████████████████████

████████████████████ Hon. Terry Friedman (Ret.) of JAMS issued an award in the Matrix Arbitration, finding that: ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████ Judge Friedman ████████████████████████████

████████████████████████████████████████████████

██████████████████ *Id.,* Ex. 22 at 51 (Arbitrator's Final Award); *see also id.,* Ex. 23

---

productions of *The Lego Movie* and *Sex and the City* 2, and very limited co-ownership rights in *Joker* (only in productions where Joaquin Phoenix plays the role "Joker"). In addition, Warner Bros.' underlying rights in the property on which the film Edge of Tomorrow was based have lapsed and, accordingly, any Derivative Rights have similarly lapsed. *See* Smith Decl. ¶ 19, n. 5.

(Order Granting Post-Hearing Relief).

**D.     The Arbitration Appeal Panel Affirms the Arbitrator's Liability Finding and Orders Further Proceedings on Damages.**

21.     Village appealed Judge Friedman's Final Award in the Matrix Arbitration.  After multiple briefs, the JAMS Arbitration Panel (the "<u>Appeal Panel</u>") issued an Interim Decision and Award, affirming Judge Friedman's liability ruling and finding that the ███████████████

████████████████████████████████████████████████████████████████

███████████████████████ ███████████████████████████

Judge Friedman ████████████████████████████████████████████

██ Judge Friedman ██████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████     *See* Smith Decl. ¶ 42.

**E.     Village Fraudulently Transfers Derivative Rights to** ███████████████████
██████████████████

22.     Village began almost immediately to impede Warner Bros.' ability to collect the amounts it is owed.  On November 28, 2023, just four months after Judge Friedman issued his Final Award, Village entered into nine separate transfers and assignment of the Derivative Rights to 90 films that it had previously co-financed with Warner Bros. to other Village entities not named in the Matrix Arbitration.  *See* Smith Decl. ¶ 41; *see also id*., Ex. 24 (Derivative Rights Assignments).  Village's assignment of these rights, without Warner Bros.' permission and for consideration of a ***mere $1 per transfer***, reflected Village's intent to move assets to entities outside of the Village respondents named in the Matrix Arbitration (here, the Library Asset Debtors) in an

effort to potentially shield them from being used to satisfy Warner Bros.' damages. Such fraudulent conveyances of material assets are plainly improper and strictly prohibited under California law. *See Kirkeby v. Super. Ct.*, 33 Cal. 4th 642, 648 (2004) (A fraudulent conveyance "is a transfer by the debtor of property to a third person undertaken with the intent to prevent a creditor from reaching that interest to satisfy its claim.") (citation omitted); *see also* Cal. Civ. Proc. Code § 3439.04(a)(2) (constructive fraud demonstrated when debtor makes transfer "without receiving a reasonably equivalent value in exchange for the transfer or obligation, and . . . intended to incur, or believed or reasonably should have believed that [he] would incur, debts beyond [his] ability to pay as they became due"). In March and April 2024, Warner Bros. objected that Village's transfer of these Derivative Rights to entities that were not respondents in the Matrix Arbitration, for a total of $9 in consideration, was fraudulent. *See id.* ¶ 41.

**F.     Warner Bros.' Selection of Any Co-Financing Partner is Inherently Personal.**

23.     Warner Bros. finances many of its own pictures by itself, but also co-finances a number of pictures with other studios and specialized film financing investors (such as Legendary Entertainment; Ratpac Entertainment, LLC/Dune Entertainment; Domain Capital; and Bron Creative). *See* Smith Decl. ¶ 3. Co-financing a film requires a high degree of trust and cooperation. *See id.* ¶¶ 3, 33, 45. Among other things, Warner Bros. must share with its co-financer confidential information about its coming film projects and plans. *See id.* ¶ 3. Those parties share credits on the resulting films and participate in media events and communications. *See id.* In addition, because of the high degree of trust and cooperation involved, it is Warner Bros.' desire to only partner with parties with which it anticipates have a positive working relationship. *See id.* ¶ 23.

24.     As noted above, Warner Bros. had a decades' long relationship with Village before it was acquired by a hedge fund (Vine). *See id.* ¶¶ 3-4. The structure of the agreements with Village reflected the prior relationship of the parties when Village was a family-owned business,

including Warner Bros.' agreement to front and pay the production costs of the films in advance based on Village's commitment to repay its share. *See generally id*. ¶¶ 4-6. That type of agreement is obviously unsuitable for any counter-party with whom Warner Bros. may be forced into such an arrangement absent Warner Bros.' consent. *See generally id*. ¶ 23. Warner Bros. terminated Village's right to co-finance new original motion pictures several years ago after Village was acquired by Vine. *See id*. ¶ 5. Village only has the vestigial ability to finance sequels of those pictures that it co-financed years ago. *See id*.

**G.    Village Commences These Chapter 11 Cases With the Aim of Selling All (or Substantially All) of Its Assets.**

25.    On March 18, 2025 (the "Petition Date"), Village and a number of its affiliates (collectively, the Debtors) each filed a voluntary petition for relief under title 11 of the United States Code, 11 U.S.C. §§ 101-1552 (the "Bankruptcy Code"). The Debtors are continuing in possession of their property and are operating and managing their businesses as debtors in possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

26.    No trustee or examiner has been appointed in the Debtors' bankruptcy cases. On March 27, 2025, the Office of the United States Trustee for the District of Delaware (Region 3) appointed an Official Committee of Unsecured Creditors in these bankruptcy cases (the "Committee"), but did not include Warner Bros. on the Committee.

27.    On April 7, 2025, Warner Bros. filed an objection (the "Bid Procedures Objection") to the bid procedures set forth in the Sale Motion [Dkt. No. 11] (the "Bid Procedures Motion"). In its Bid Procedures Objection, Warner Bros. raised a number of issues in connection with the Debtors' proposed sale of Library Assets to the Stalking Horse Bidder, and any contemplated sale of the Derivative Rights. *See* Bid Procedures Objection, ¶¶ 15-23. Following extensive negotiations with the Debtors and other parties-in-interest, Warner Bros. resolved its objections to

the Bid Procedures Motion and Supplement, preserving any and all of Warner Bros.' objections to the Debtors' proposed sale of Library Assets or Derivative Rights or assumption or assignment of any Warner Bros. agreements in connection with the sale.

28.     On April 25, 2025, the Court entered the *Amended Order (I) Approving Bid Procedures for the Sale of the Debtors' Asses, (II) Authorizing the Debtors' Entry Into the Stalking Horse APA and Approving Bid Protections Thereunder, (III) Scheduling an Auction for and Hearing to Approve, Sale of the Debtors' Assets, (IV) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (V) Approving Assumption and Assignment Procedures, and (VI) Granting Related Relief* [Dkt. No. 276] (the "<u>Bid Procedures Order</u>").  The Bid Procedures Order sets forth certain assumption and assignment procedures specific to Warner Bros.  Such terms ensure Warner Bros.' intellectual property and contract rights in 91 motion pictures Warner Bros. created, and Village co-financed, remain protected and preserved in connection with this Objection.  *See, e.g.*, Bid Procedures Order ¶¶ 17-18.  The Bid Procedures Order also provides Warner Bros. with additional optionality in connection with liquidating its Cure Costs and other claims against the Debtors' estates.  *Id.* ¶¶ 32-33.

29.     On April 25, 2025, the Court entered the *Final Order (I) Authorizing the Debtors to Obtain Post-Petition Secured Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Superiority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Dkt. No. 280] (the "<u>Final DIP Order</u>").  Among other protections and reservations of rights in favor of Warner Bros., the Final DIP Order establishes a Warner Bros. Reserve in the amount of $110,000,000 from the proceeds of any sale by the WB Arbitration Debtors of the Library Assets and/or Derivative Rights.  Final DIP Order ¶ 32.  The Final DIP Order also preserves Warner Bros.' rights

to seek to have its claims (including the Matrix Arbitration claim) determined through arbitration. *Id.* ¶ 32.  Warner Bros.' claims are to be paid out of the Warner Bros. Reserve after they are liquidated. *Id.*

30.    On April 25, 2025, the Debtors filed the Warner Bros. Contract Notice, identifying a number of agreements between Warner Bros. and the Debtors, including the 2020 Domestic Distribution Agreement, certain co-ownership agreements for Matrix films, and the 2017 Omnibus Amendment.[14] ██████████████████████████████████ (a liability determination upheld on appeal) and further rejected Village's cross-claims under those same contracts and various other theories (also determinations that were either not challenged or not successfully challenged on appeal).  *See* Smith Decl., Ex. 25 (Appeal Panel's Interim Decision and Award) at 51, 14-15, 34-36.  Warner Bros. has since filed a motion seeking to lift the automatic stay and enforce those agreements' arbitration provisions to liquidate its claim against the WB Arbitration Debtors; that motion remains pending.  *See* Dkt. No. 324.

31.    On May 16, 2025, the Debtors filed a Second Supplemental Contract Notice. Although not specifically designated as a "Warner Bros." notice pursuant to the Bid Procedures Order,[15] that notice identifies three Warner Bros. agreements in connection with the Debtors' Studio Business for the film "December Boys."  Second Suppl. Contract Notice Nos. 48-50 (which, along with any and all other such agreements, the "Warner Bros. Studio Agreements").

32.    The Debtors on May 22, 2025 filed the Library Notice, designating Alcon as the

---

[14] The Warner Bros. Contract Notice identifies "Omnibus Amendment No. 1 to Co-Ownership Agreements," which Warner Bros. assumes is in reference to the 2017 Omnibus Amendment.  The Warner Bros. Contract Notice also identifies a number of Matrix co-ownership agreements, which were later merged into a single agreement that constitutes the Matrix Co-Ownership Agreement (including with respect to *Matrix IV*), ██████████████████████

[15] Warner Bros. conferred with the Debtors regarding this issue and the Debtors agreed that such agreements fall under the Warner Bros. Assumption and Assignment Procedures pursuant to the Bid Procedures Order and Warner Bros. reserves all rights in connection therewith.

Successful Bidder for the Library Assets. *See* Library Notice. Following an auction on May 28, 2025 (the "<u>Auction</u>"), in which Warner Bros. submitted a bid for the Derivative Rights for $17.5 million, the Debtors designated Alcon as the Successful Bidder for the Derivative Rights for $18.5 million and the Studio Business for $4.25 million (plus assumption of certain liabilities). *See* DR Notice at 1-2. The Debtors also designated Warner Bros. as the Back-Up Bidder for the Derivative Rights for $17.5 million. *See id.* As noted above, the Debtors have not provided Warner Bros. with a copy of the Derivative Rights APA nor Studio Business APA that they contend documents those asserted sales with Alcon following the Auction.

## III.    ARGUMENT

**A.    The Debtors Are Barred from Assuming and Assigning Any of Their Derivative Rights Agreements with Warner Bros. to Any Third Party in Connection with a Sale of the Derivative Rights.**

33.    The proposed sale of the Derivative Rights to Alcon must be rejected altogether. There are two primary reasons for this. First, the Derivative Rights Agreements contain financial accommodations extended by Warner Bros. to the Debtors, which are executory in nature and expose Warner Bros. to obvious credit risk; the Debtors are prohibited from assuming and assigning those agreements under section 365(c)(2) of the Bankruptcy Code. This ground alone is reason enough to reject the Debtors' proposed sale to Alcon of the Derivative Rights.

34.    Second, the Derivative Rights Agreements grant Warner Bros. important contractual and intellectual property rights that the Debtors cannot assume and assign in connection with any sale under Bankruptcy Code section 365(c)(1) and applicable federal copyright and California law, absent Warner Bros.' consent.

35.    The Debtors cannot overcome these objections with adequate assurances or otherwise, and thus, as shown below, the Sale Motion with respect to the Debtors' proposed sale of Derivative Rights must be denied.

### a.    The Derivative Rights Agreements are financial accommodations that cannot be assumed and assigned under section 365(c)(2) of the Bankruptcy Code.

36.    The Debtors' proposed sale of the Derivative Rights fails first and foremost because the Derivative Rights Agreements are financial accommodations, which cannot be assumed or assigned. Section 365(c)(2) of the Bankruptcy Code provides that a debtor "may not assume or assign any executory contract or unexpired lease" if the contract "is a contract to make a loan, extend other debt financing or financial accommodations, or issue a security of the debtor." 11 U.S.C. § 365(c)(2). The Code does not provide a definition for "financial accommodation," but courts, including courts in the Third Circuit, agree that section 365(c)(2), though strictly construed, applies to contracts relating to "the extension of money or credit to accommodate another." *In re Sportsman's Warehouse, Inc.*, 457 B.R. 372, 392-93 (Bankr. D. Del. 2011); *see also Citizens & S. Nat'l Bank v. Thomas B. Hamilton Co. (In re Thomas B. Hamilton Co.)*, 969 F.2d 1013, 1018-20 (11th Cir. 1992) (finding that section 365(c)(2) applies to "contracts to make loans and other traditional kinds of debt financing arrangements"); *see also In re Sun Runner Marine, Inc*., 945 F.2d 1089, 1092 (9th Cir. 1991) ("The agreement clearly contemplates Transamerica's extension of money or credit in the form of loans to the dealers . . . . These loans are admittedly made to accommodate the debtor" and "are an indispensable means of financing the debtor's business. Thus the agreement is a contract for financial accommodations for the benefit of the debtor, and is within the purview of § 365(c)(2)."). This exception also encompasses "the extension of money or credit to accommodate another" that is not "incidental to the overall agreement between the parties." *See In re Thomas B. Hamilton Co.*, 969 F.2d at 1020; *see also In re Ernie Haire Ford, Inc.*, 403 B.R. 750, 756 (Bankr. M.D. Fla. 2009) ("The Eleventh and Seventh Circuits agree that the court must examine the 'true legal nature' of the agreement" in determining whether the financial accommodation exception applies.).

37.     The financial accommodation exception to assumption and assignment is also essential because it protects both parties who have made a yet-unperformed lending commitment (like Warner Bros.) and the estate as a whole.  As the court explained in *In re Sun Runner Marine, Inc.,* the rule is "consistent with the Code's overall approach to post-petition financing.  Section 364 provides certain incentives that a debtor may offer, with court approval, to induce a potential lender to extend credit post-petition"; such "benefit to the lender would be at the expense of the other unsecured creditors . . . because it would diminish the estate assets available to satisfy their claims.  Thus the § 365(c)(2) prohibition against the assumption of financial accommodation contracts protects all unsecured creditors . . . ."  945 F.2d at 1092-93; *see also Watts v. Pa. Hous. Fin. Co.*, 876 F.2d 1090, 1095 (3d Cir. 1989) (citation omitted) ("[T]he Code provides explicitly that there is no way that a debtor can assume [a financing] agreement and thus compel its lender to continue to advance funds during reorganization.").

38.     When a contract's primary purpose is to extend credit, including loan commitments, guaranties, or surety agreements, courts have held that it constitutes a financial accommodation that cannot be assumed or assigned.  *See In re Sun Runner Marine, Inc.*, 945 F.2d at 1091 (floor financing agreement between debtor boat manufacturer and bank was a contract to extend financial accommodations because the bank made loans to the debtor's boat dealers, with proceeds provided directly to the debtor); *In re Taggatz*, 106 B.R. 983, 993 (Bankr. W.D. Wis. 1989) (agreement obligating bank to fund unfunded portion of promissory note was a contract to extend financial accommodations); *In re Wegner Farms*, 49 B.R. 440, 444 (Bankr. Iowa 1985) (although surety bond did not "fit neatly within the framework of traditional debt financing," the court still held that because the bond was "intimately connected with the debtor's financial integrity" and required the bonding company to make good on certain liabilities of the debtor, the surety bond was a

financial accommodation); *In re Whiteprize, LLC*, 275 B.R. 868, 874 (Bankr. D. Ariz. 2002) (where agreement provided that the debtor would acquire an interest in real property, and the seller would provide financing that the debtor would repay over a number of years, financing was essential, so the agreement was a financial accommodation notwithstanding that it was not reliant on the debtor's ability to repay); *see also In re Placid Oil Co*., 72 B.R. 135, 139 (Bankr. N.D. Tex. 1987) (an insurance premium agreement evidenced an extension of credit by the insurer for the benefit of the debtor, and accordingly, the financial accommodation exception applied).

39.     Conversely, if the extension of credit is merely incidental to a broader agreement involving the debtor, or the debtor is not directly or secondarily liable for the underlying debt, the contract is not treated as a financial accommodation agreement.  *See In re Thomas B. Hamilton Co.*, 969 F.2d at 1020-21 (rejecting merchant bank's position that funds credited were an advancement of its own funds and holding the credit card merchant agreement was not a contract to extend financial accommodations: "We find it compelling that . . . it is the card-issuing bank, *not* the merchant bank, that carries the primary contractual obligation to extend credit; it is the card-issuing bank that bears the risk of a cardholder who cannot, or will not, pay for a valid credit card transaction") (emphasis in original); *In re Neuhoff Farms, Inc.*, 258 B.R. 343, 348 (Bankr. E.D. N.C. 2000) (contract to supply hogs that contained a price stabilization mechanism was not a financial accommodation contract); *see also In re Boscov's, Inc.*, No. 08-11637 (KG), 2008 WL 4975882, at *2 (Bankr. D. Del. Nov. 21, 2008) (holding that section 365(c)(2) did not apply because the creditor had extended credit to Boscov's customers (and not directly to the Debtors) leaving the Debtors with no liability for the debt).

40.     Moreover, "[t]he purpose of [section 365(c)(2)] is to make it clear that a party to a transaction which is based upon the financial strength of a debtor should not be required to extend

new credit to the debtor." *Chase Manhattan Bank v. Iridium Afr. Corp.*, No. CIV.A. 00-564 JJF, 2004 WL 323178, at *4 (D. Del. Feb. 13, 2004) (internal citations omitted).  In *Chase*, the Delaware District Court held that the capital exchange commitment at issue was more analogous to an old "equity investment" already made and therefore section 365(c)(2) of the Bankruptcy Code was not applicable; however, the decision indicates that if the credit extension obligations were newly incurred and remained executory in the event of assumption, section 365(c)(2) would apply, thereby triggering the financial accommodations exception. *See id.*; *see also In re Sportsman's Warehouse, Inc.*, 457 B.R. 372, 392-94 (Bankr. D. Del. 2011) (concluding that the factual allegations in the complaint were sufficient to support a finding that the lease agreement, in the event that it was deemed to include a mandatory purchase obligation, actually provides debt financing or financial accommodations, within the scope of § 365(c)(2), and would therefore not be a lease capable of being assumed).

41.     Overall, section 365(c)(2) "unambiguously prohibits the assumption of financial accommodation contracts . . . ." *In re Sun Runner Marine, Inc.*, 945 F.2d at 1093.  The result is that not only are such agreements unassignable, they are terminable pursuant to section 365(e)(2). *See* 11 U.S.C. § 365(e)(2); *see also* 3 Collier on Bankruptcy ¶ 365.08 (16th 2025) ("[N]ot only may a non-assumable contract or a commitment to lend money not be assumed or assigned," but section 365(e)(2) provides "that the obligations of the other party may be terminated and, in the case of loans, the obligation to pay may be accelerated.").

42.     Here, the Derivative Rights Agreements contain numerous provisions that render them unassignable executory, financial-accommodation agreements. As discussed above, the process pursuant to which Warner Bros. offers Village the opportunity to co-finance certain derivative works is as follows: Warner Bros. sends Village a project notice, which Village must

accept within 15 business days. Smith Decl. ¶ 19; *see also id.,* Ex. 5 (2017 Omnibus Amendment), attach. 1 ¶ 4(a), (c); *see also id.* Exs. 2 and 3 (2014 and 2020 MPRPA), § 6.4, Ex. G (form Co-Ownership Agreement). If Village accepts, Warner Bros. will then produce the project ***and front all production and marketing costs*** for the picture, including Village's share of such costs. *See id.,* Ex. 5 (2017 Omnibus Amendment), attach. 1 ¶ 4(b), (d).[16] Village must then repay Warner Bros. for its co-financing share (which is roughly its share of the film's production costs) by the time the film is released—which is generally years after Village accepted the project notice. *See id.* Exs. 2 and 3 (2014 and 2020 MPRPA) § 5.1 & Ex. F (form RPA) § 2(b). As a concrete example of this, the Arbitrator in the Matrix Arbitration determined that Village obligated itself to co-finance *Matrix IV* ███████████████████████████████ Smith Decl., Ex. 22

---

[16] Attach. 1 ¶ 4(b), (d) of the 2017 Omnibus Amendment provides, in relevant part:



*Id.* (emphasis added).

(Arbitrator's Final Award) at 13, 42 (" ███████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████."); *see also id.*, Ex. 25

(Appeal Panel's Interim Decision and Award) at 15-17. ████████████████

██████████████████████████████████████████████ *See id.,* Ex. 22

(Arbitrator's Final Award) at 50 (████████████████████). Village of course failed to

make this payment and breached. *Id.* (Arbitrator's Final Award) at 5; *see also id.*, Ex. 25 (Appeal

Panel's Interim Decision and Award) at 15-17.

43.    Once Village pays its co-financing share, Village is then entitled to participate in

future revenues from that derivative work, and Warner Bros. recoups Village's share of the

marketing and distribution expenses from such proceeds. *See* Smith Decl., Ex. 3 (2020 MPRPA)

at § 5.1 (" ████████████████████████████████████████████████

████████████████████████████████████; *Id.*, Ex. 7 (2020 Domestic

Distribution Agreement) at § 10(a) ████████████████████████████████

██████████). But during the several-year gap in time between Village accepting a project notice

and paying its co-financing share, Warner Bros. takes on Village as a credit risk, and unsurprisingly

charges it a rate of interest for doing so. *See id.,* Exs. 2 and 3 (2014 and 2020 MPRPA) §§ 8.1-

8.2.

44.    Under this structure, when Village agrees to co-finance a project, it becomes liable

to Warner Bros. for Warner Bros.' fronting of production costs associated with the derivative work.

Smith Decl. ¶ 6; *see also id.*, Ex. 22 (Arbitrator's Final Award) at 51 (" ██████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████.") (emphasis added).   Specifically, Attachment 1 ¶ 4(b) to the 2017 Omnibus Amendment

obligates Village to execute a Rights Purchase Agreement ***requiring*** Village to pay its share of the

cost in proportion to its economic interest in the picture.  *See* Smith Decl. ¶ 20, Ex. 5 (2017

Omnibus Amendment), attach. 1 ¶ 4(b)(i), (ii).  Ultimately, however, the project notice offer and

acceptance process creates an obligation on the part of Village to co-finance a picture.  *See id.,* Ex.

25 (Appeal Panel's Interim Decision and Award) at 17 (" ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ (emphasis

added).

45.    This process necessarily creates a creditor-debtor relationship between Warner

Bros. and Village under the Derivative Rights Agreements that remain executory.  *See, e.g.*, *In re

Placid Oil Co.*, 72 B.R. at 139 ("The entire structure of the retrospective premium arrangement

evidences an extension of credit by AIU for the benefit of the Debtor. . . . There are no collateral

obligations here to obscure the essentially debtor/creditor nature of the arrangement").  Indeed, the

Derivative Rights Agreements are built entirely around Warner Bros' extension of credit to

Village: once Village accepts a Project Notice, Warner Bros. finances the derivative work on

behalf of itself and Village, and Village is later required to repay its co-financing share to Warner

Bros.  *See* Smith Decl. ¶¶ 6, 20; *see also id.*, Ex. 5 (2017 Omnibus Amendment), attach. 1 ¶ 4(b)(i),

(ii).

46.    As noted above, Warner' Bros.' disputes with Village over the financing of *Matrix

IV* irrefutably illustrate that the Derivative Rights Agreements are financial accommodations.

Smith Decl., Ex. 25 (Appeal Panel's Interim Decision and Award) ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████") and at 4-

5 ("███████████████████████████████████████████████████████████

████████████████████████████ (emphases added); *see also id.,* Ex. 22

(Arbitrator's Final Award) at 51.  They further confirm that Village's executory obligation to co-

finance certain derivative works is rooted in the Derivative Rights Agreements themselves.  *See*

*id.,* Ex. 25 (Appeal Panel's Interim Decision and Award) at 17 ("██████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

(emphasis added).

     47.    The ancillary agreements that Warner Bros. and Village are required to execute in

connection with any future derivative work that Village agrees to co-finance under the Derivative

Rights Agreements only further confirm the executory and financial-accommodation nature of

those agreements.  Article 8 of the MPRPA, titled "████████████ for example, generally provides

that ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ all for Village's benefit.

*See id.* Exs. 2 and 3 (2014 and 2020 MPRPA) §§ 8.1-8.2.  The MPRPA also includes the form

domestic and foreign security agreements and domestic and foreign copyright mortgages, among

other things, that Warner Bros. and Village execute for derivative projects.  *See e.g. id.,* Ex 3 (2020 MPRPA) Exs. C-1, C-2, D-1, D-2.  The security agreements include a grant of a security interest in picture rights to Warner Bros. to secure its distribution rights.  *See id.* Exs. 2 and 3 (2014 and 2020 MPRPA) Recitals, B & C; *id.* § 2.1.  Warner Bros. maintains these liens and security interests in the pictures produced as derivative works with Village, which are senior secured claims and interests as acknowledged by the Final DIP Order and the parties' agreements.  *Id.* § 2.1 ███

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████") (emphasis added); *id.* § 3.5(a) ████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████) (emphasis added); *id.* § 6.1 ("███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████") (emphasis added).[17]  *See also* Final DIP Order ¶ 30

---

[17] The form Co-Ownership Agreement affixed to the MPRPA also acknowledges Village's interests in the Derivative Rights remain subject to Warner Bros.' security interests.  *See* Smith Decl., Exs. 2 and 3 (2014 and 2020 MPRPA), § 6.4 and Ex. G (form Co-Ownership Agreement) Recitals, C ("███████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████

(providing Warner Bros.' liens, as set forth in Schedule 1 thereto, "shall retain their validity and priority notwithstanding anything in [the] Final [DIP] Order.").

48.     Finally, it is essential to underscore that the very nature of the financing obligations arising from the Project Notice (as defined in the 2017 Omnibus Amendment) and corresponding acceptance process (as outlined and subject to the terms in the Derivative Rights Agreements) demonstrates that *new* obligations are created each time Village agrees to a new project and Warner Bros. advances all associated production costs for the benefit of Village.  *Cf. Chase Manhattan Bank*, No. CIV.A. 00-564 JJF, 2004 WL 323178, at *4.  Accordingly, the financing obligations in the Derivative Rights Agreements remain executory.

49.     Because the Derivative Rights Agreements contain financial accommodations that remain executory, the agreements cannot be assumed or assigned in connection with any sale.  *See Watts.*, 876 F.2d at 1095 (internal quotation omitted) ("Section 365(c)(2) of the Code precludes the assumption or assignment of an executory contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor.").  This can and should be the starting and ending point of the Court's analysis.

> ### b.     *The Derivative Rights Agreements separately cannot be assumed and assigned without Warner Bros.' consent under section 365(c)(1) of the Code.*

50.     In addition to the infirmities identified above, the Bankruptcy Code places limitations on a debtor's ability to assume and assign certain intellectual property agreements absent consent.  Section 365(c)(1) of the Bankruptcy Code provides that "[the debtor] may not assume or assign . . . any executory contract . . . if . . . (1)(A) applicable law excuses a party, other

---

████████████████████████████████████████████████
████████████████████████████████████
████████████████████    (emphasis added).

than the debtor, to such contract . . . from accepting performance from . . . an entity other than the debtor or the debtor in possession . . . and (B) such party does not consent to such assumption." 11 U.S.C. § 365(c)(1); *see also In re W. Elecs., Inc.*, 852 F.2d 79, 83 (3d Cir. 1988) (recognizing that section 365(c)(1) "limiting assumption of contracts is applicable to any contract subject to a legal prohibition against assignment") (citations omitted).

> i.   The Derivative Rights Agreements pertain to Warner Bros.' exclusive intellectual property rights.

51.     Federal copyright law provides holders of intellectual property with powerful rights in bankruptcy under section 365(c)(1) to prevent assumption and assignment of such agreements absent consent. *In re Patient Educ. Media, Inc.*, 210 B.R. 237, 242 (Bankr. S.D.N.Y. 1997) (citing *Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.*, 661 F.2d 479, 483 (5th Cir. 1981) (Copyright Act constitutes applicable non-bankruptcy law when evaluating the assignability of copyright licenses). This limitation applies here because the Derivative Rights Agreements contain anti-assignment restrictions, and Warner Bros.' intellectual property rights under those agreements are superior to, and not co-equal with, Village's rights thereunder.

52.     For example, Omnibus Amendment No. 2 to the Co-Ownership Agreements ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ *See* Smith Decl., Ex. 5 (Omnibus Amendment No. 2 § 2(f)(i) (amending ¶ 2(c) of the Co-Ownership Agreement)).[18] ███████████████████████████████████████

---

[18] Section 2(f)(i) provides:

███████████████████████████████████████ ██████ ████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████

*Id.*



""). *Id.* (emphasis added).[19]  These contractual exceptions plainly do not apply where the Debtors seek to assume and assign the Derivative Rights Agreements to Alcon, a non-Village third party, in connection with the Debtors' proposed sale.

53.     Despite these unambiguous contractual restrictions, the Debtors suggest—without supporting authority—that they jointly own the intellectual property interests that comprise the Derivative Rights as well as the underlying copyrights to the films that comprise the Library Assets, and thus, are free to assume and assign them without Warner Bros.' consent.  *See Debtors' Reply in Support of the DIP Motion* [Dkt. No. 220] (the "DIP Reply") ¶ 21.  That is incorrect.  The Debtors do not share co-equal rights with Warner Bros. for either the Derivative Rights or Library Assets.  Warner Bros. is the primary owner of all rights under copyright, as it is the distributor, and licensor with exclusive rights to create and control its property interests under the Derivative Rights and Library Agreements.  *See generally In re Rupari Holding Corp.*, 573 B.R. 111, 119 (Bankr. D. Del. 2017) (holding that the debtor could not assume and assign a trademark license

_____

[19] The Debtors violated this contractual exception when they engaged in the intentional and constructive fraudulent prepetition transfers of Derivative Rights.  The non-Library Asset Debtors who now hold the Debtors' interests in Derivative Rights ▮▮▮▮▮▮▮▮▮▮▮▮  In any event, this contractual exception from the non-assignment limitation does not permit the Debtors to engage in intentional fraudulent transfers to avoid Warner Bros.' arbitration judgment without consideration to the transferors.

without the consent of the non-debtor licensor).[20]   As a result, the Debtors' interests in the Derivative Rights are ultimately derivative of Warner Bros.' exclusive rights.   Hence, Warner Bros.' intellectual property rights must be preserved, including its rights under Bankruptcy Code section 365(c)(1) limiting the Debtors' assignment of the Derivative Rights Agreements.

> ii.   The Derivative Rights Agreements are personal to Village and its prior ownership structure.

54.   In addition to ground identified above, the Derivative Rights Agreements are also unassignable under section 365(c)(1) because Village's obligations under the agreements are of such a personal nature that Warner Bros. would otherwise be deprived of the benefit of its bargain if they were assigned over Warner Bros.' objection.   *See* 3 Collier on Bankruptcy ¶ 365.07 (16th ed. 2025) ("[S]ection 365(c) is intended to distinguish those contracts that, generically under applicable nonbankruptcy law, would be of a type for which the nondebtor party would be entitled to insist on the debtor's performance.").

55.   Under applicable California law, which governs many if not all Derivative Rights Agreements, a court cannot assign contractual rights over the contract counterparty's objection if such assignment would materially impair the non-assigning party's ability to receive the performance it reasonably expected.   *See generally Farmland Irr. Co. v. Dopplmaier*, 48 Cal. 2d 208, 222 (1957).   As one court succinctly summarized, "[t]here are contracts for personal service or other personal performance which cannot be assigned so as to transfer the concurrent obligation without the consent of the person entitled to such performance."   *Superbrace, Inc. v. Tidwell*, 124 Cal. App. 4th 388, 416 (2004) (citing *Gribling v. Bohan*, 26 Cal. App. 771, 772 (1915)).   Duties

---

[20] The Debtors Schedules to do not affirmatively provide that the Debtors own any interests in copyrights.  *See, e.g.*, *Schedules of Assets and Liabilities for VREG OP Global LLC (Case No. 25-10483)* [Dkt. No. 411] Part 10 (disclosing no asserted property interests in intangibles or intellectual property); *Schedules of Assets and Liabilities for Village Roadshow Films (BVI) Limited (Case No. 25-10506)* [Dkt. No. 434] Part 10, ¶ 62 (disclosing only asserted property interests in licenses and royalties under intangibles and intellectual property).

are personal and not delegable: "(1) where in the nature or circumstances of the case[,] the skill, credit or other personal quality of the party was a distinctive characteristic of the thing stipulated for, namely, the personal nature of the contract itself, or (2) the personal quality of the party was a material inducement to the other party entering into the contract." *Manela v. Stone*, 66 Cal. App. 5th 90, 107 (2021) (citing *Edgar Rice Burroughs, Inc. v. Commodore Prods. & Artists, Inc*., 167 Cal. App. 2d 463, 469 (1959)) (finding contract at issue was a personal services contract because, among other things, the counter-party's engagement was material inducement for the other contracting party to enter into such contract).

56.      In *In re Planet Hollywood Int'l, Inc.*, the U.S. District Court for the District of Delaware sustained the objection of athletes and their servicing companies to the debtors' proposed assumption and assignment of their agreements under section 365(c)(1). *See* No. 99-3612 (JJF), 2000 WL 36118317, at *1 (D. Del. Nov. 21, 2000) (unpublished).[21] Applying both California and Florida law, which "provide that contracts involving relationships of personal confidence and trust or personal services are not assignable by either party without the consent of the other party," the court concluded the agreements at issue were one for personal services and unassignable absent consent. *Id.* at *5.  The debtors objected, claiming the agreements were not ones for personal services because they were entered into by corporations and not individuals; however, the court noted: "While many personal service contracts are contracts with individuals, there is no per se rule precluding a contract from being characterized as a personal service contract merely because it is entered into by a corporation." *Id.* at *9.  Instead, "based on unique relationships involving the reputation and character of the contracting parties," the agreements were ones for personal

---

[21] A copy of the *Planet Hollywood* decision is submitted herewith as **Exhibit A**.

services and unassignable under section 365(c)(1).  *Id.* at *10.[22]

57.    At the core of Village's limited rights under the Derivative Rights Agreements is ***Village's*** right of first refusal to co-finance certain derivative works with Warner Bros., pursuant to the terms therein.  That right is inherently a personal one; Warner Bros. agreed to provide Village specifically with the opportunity to co-finance certain films at a time when it was managed by team with which Warner Bros. had a decades-long relationship.  Here, an entirely independent, outside third-party—Alcon—proposes to acquire the Derivative Rights Agreements.  This matters because Warner Bros. only agreed to enter into the Derivative Rights Agreements **with Village** (well before Village breached its contractual obligation to Warner Bros. in connection with *Matrix IV*, *Wonka*, and others) based on the parties' preexisting relationship with prior management. Smith Decl, ¶¶ 4, 44. That arrangement was a special negotiated deal between Warner Bros. and Village.  *See generally id.* ¶¶ 4, 33, 44-45. Accordingly, Warner Bros. should not be forced into a similar relationship with any other third party.  Avoiding such risks is the reason Warner Bros. included specific terms in those contracts prohibiting Village from assigning them.

### iii.    Alcon cannot provide adequate assurance of future performance in light of the personal nature of the Derivative Rights Agreements.

58.    Because the Derivative Rights Agreements are unassignable under sections 365(c) and were structured in a way that was personal to Village as it was previously constituted, neither the Debtors nor Alcon can provide Warner Bros. with adequate assurance of future performance. *See* 11 U.S.C. § 365(b)(1).  What constitutes "adequate assurance" for assignment purposes is determined on a case-by-case basis.  *See In re Sapolin Paints, Inc.*, 5 B.R. 412, 421 (E.D.N.Y.

---

[22] One New York court recently suggested that corporations somehow have less of a right to protect relationships that are personal to them.  *See generally In re Vice Group Holdings*, 652 B.R. 423 (S.D.N.Y. 2023).  That decision is not based on any California precedent that would restrict the rights of corporations in this area and is inconsistent with the Delaware District Court's decision in *Planet Hollywood*.  *Cf.* No. 99-3612 (JJF), 2000 WL 36118317, at *1.

1980) (interpreting California law) ("What constitutes "adequate assurance" is to be determined by factual conditions; the seller must exercise good faith and observe commercial standards; his satisfaction must be based upon reason and must not be arbitrary or capricious.").  Whether there is "adequate assurance of future performance" by a potential purchaser usually depends on the purchaser's financial condition and its ability to comply with the debtor's financial obligations under the agreement.  *In re R.B.B., Inc.*, 211 F.3d 475, 477-80 (9th Cir. 2000) (assignment of automobile dealer franchise denied where identity of proposed dealer/buyer not clearly disclosed and financial information unreliable).  The burden of proof on adequate assurance issues is with the Debtors.  *See In re Lafayette Radio Elecs. Corp*., 12 B.R. 302, 312 (Bankr. E.D.N.Y. 1991).

59.     The unique nature of Warner Bros.' relationship with Village was a material factor in the formation of the Derivative Rights Agreements and Warner Bros.' willingness to be bound by their terms and grant Village the financial accommodations thereunder. The latter is particularly sensitive because allowing Village to assume and assign the Derivative Rights Agreements to a third-party effectively places Warner Bros. in an ongoing, close commercial relationship with an entity other than Village.  This means Warner Bros. would be required to coordinate closely with that third party (*i.e.*, Alcon) and, among other things, share highly confidential details about its forthcoming motion pictures, including scripts, casting, budget, etc. with Alcon; permit someone at Alcon to serve as an executive producer with respect to any such derivative works, which will necessarily involve Alcon working closely with Warner Bros. throughout production of the film; consult with Alcon regarding certain marketing and distribution decisions; and incur reliance in ways that could have significant impact on Warner Bros.' operations and strategic decision-making.  *See* Smith Dec., ¶ 27; *see also e.g id.*, Ex. 9 (2020 Warner Foreign Distribution (F-D) Agreement), Ex. G ¶ 1(iii) ("███████████████████████████████████



60.     The consents for transferring the Derivative Rights were put in place precisely to avoid the situation presented here: requiring Warner Bros. to be forced into an ongoing third-party relationship with an entity other than Village to produce a motion picture in which Warner Bros. is investing and fronting tens if not hundreds of millions of dollars.

c.     *The Debtors' rights under many of the Derivative Rights Agreements are restricted, and the Debtors lack Derivative Rights in certain pictures altogether.*

61.     Finally, Warner Bros. was the creative spark for the 91 motion pictures the Debtors identify in their Film Library.  The Debtors have restricted co-financing rights with respect to *Wonka*, *Joker*, and more than 20 other Warner Bros. films, and no Derivative Rights in connection with *The Lego Movie*, *Sex and the City 2*, and *Edge of Tomorrow*.  *See id.* ¶ 19, n. 5.

62.     Litigation is pending between Warner Bros. and Village regarding the extent of the derivative rights in this latter group of films.  The Debtors cannot sell more than they own.  *See generally Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d at 748 (3d Cir. 2013) (noting "§ 541" of the Bankruptcy Code "provides that a bankruptcy estate succeeds only to legal or equitable interests of the debtor . . . as of the commencement of the case," and accordingly, "[i]t is a given that the trustee [or debtor-in-possession] can assert no greater rights than the debtor himself had on the date the [bankruptcy] case was commenced.")

(internal quotations and citations omitted).  To the extent that the Derivative Rights were limited in Village's hands, they will likewise be so in any putative assignee.  *See id; see also Creative Data Forms, Inc. v. Pa. Minority Bus. Dev. Auth.*, 72 B.R. 619, 623 (E.D. Pa. 1985) ("Section 541(a) is not intended to expand a debtor's rights against others beyond the bounds in existence at the commencement of the case.").  Village cannot pass any putative rights to these pictures to Alcon free and clear of Warner Bros.' property interests.  While no Alcon Asset Purchase Agreement ("APA") for the Derivative Rights or Studio Business is yet on file, the Debtors seek to sell the Derivative Rights on a free and clear basis and will likely purport to cleave off Warner Bros.' disputes with the Debtors.  That they cannot do.  At a minimum, any putative sale must be subject to all of Warner Bros.' property rights, including the limitations on the Derivative Rights associated with these 20 films.  If and to the extent that Alcon acquires Village's putative rights, Alcon must be subject to Warner Bros.' rights in the pending litigation with Village concerning the scope of those interests.[23]

63.     It is unfortunate that despite repeated requests, the Debtors have not provided Warner Bros. or the other parties a final copy of the Derivative Rights APA before the completion of this brief, such that the issues could be fully aired before the Court.  Warner Bros. must reserve all rights to supplement its objections in this regard to address the final actual terms of the Alcon Derivative Rights APA.

**B.     The Debtors' Proposed Library Asset Sale to Alcon Raises Numerous Objectionable Issues and Concerns That Must be Addressed Prior to any Sale Being Approved.**

64.     As Warner Bros. previewed for this Court in its Bid Procedures Objection, the

---

[23] Without waiving any of these arguments, Warner Bros.' claims in connection with the Matrix Arbitration for breach of various Derivative Rights Agreements (in addition to the 2020 Domestic Distribution Agreement) would also need to be cured.  *See infra*, Part B(b).

Alcon Library Asset APA seeks to, among other things, sell the Debtors' interests in the Library Assets to Alcon, including Copyrights and Trademarks for each Picture, Contract Rights, and Assumed Contracts for a purchase price of $417.5 million less certain post-cutoff income and liabilities. *See* Ex. 2 to Bid Procedures Order [Dkt. No. 276-1] (the "Alcon APA") § 2.06. As discussed, 91 of the 108 feature films that comprise the Debtors' Film Library are subject to Warner Bros.' prepetition rights. *See* Sale Mot., ¶ 7; *see also Declaration of Keith Maib in Support of First Day Relief* [Dkt. No. 14] ("First Day Decl."), ¶ 12 (noting the "majority of motion pictures—91" of the Library Assets "were developed through co-financing and co-production agreements between the [Debtors] and Warner Bros.").

65.     The Library Agreements for these feature films grant Warner Bros. important contractual and intellectual property rights that the Debtors should not be permitted to assume or assign to Alcon over Warner Bros.' objection, as highlighted below. Nevertheless, Warner Bros. is willing to consent to the proposed Library Asset sale to Alcon, subject to Debtors and Alcon making certain modifications to the Final Sale Order and Alcon APA. This includes, *inter alia*, (i) curing Warner Bros.' claims in connection with the Matrix and Wonka Arbitrations; (ii) clarifying that the Debtors only seek to assume their interests in (and thus not all interests in) the Fundamental Contracts as set forth in the Alcon APA; (iii) rectifying the definition of Purchased Assets, which presently provides for the sale to Alcon of over $67.7 million in participation payments that Warner Bros. has already made to the Debtors after the Cutoff Date; (iv) preserving Warner Bros.' property rights and all recoupment, lien and prospective offset rights; (v) addressing Warner Bros.' concerns with respect to treatment of the Audit Rights; (vi) providing the appropriate mechanisms to ensure Warner Bros.' rights are not impaired in connection with the transfer of the Debtors' agreements with Magnum to Alcon; and (vii) reserving and not otherwise

transferring the copyright interests in 91 Warner Bros.' motion pictures to Alcon, which should instead be reserved for Warner Bros. in connection with the Derivative Rights.

>  **a.  The Debtors cannot assume and assign their Library Agreements with Warner Bros. to Alcon over Warner Bros.' objection pursuant to section 365(c)(1).**

66.    As with the Derivative Rights Agreements, the Debtors cannot assume and assign the Library Agreements unless Warner Bros. agrees under section 365(c)(1).  *See In re West Elecs. Inc.*, 852 F.2d 79, 83 (3d Cir. 1988) (Under section 365(c)(1), "if non-bankruptcy law provides that the [counterparty] would have to consent to an assignment of the [executory] contract to a third party, *i.e.*, someone 'other than the debtor or the debtor in possession,' then [the Debtor] . . . cannot assume that contract  and, by extension, assign it.'"); *see also In re Trump Entm't Resorts, Inc.*, 526 B.R. 116, 122 (Bankr. D. Del. 2015) ("The Section 365(c)(1) limitation on the assumption of executory contracts applies whenever the contract is 'subject to a legal prohibition against assignment' to a third party and the non-debtor party to the contract does not consent to assignment.").[24]

>  i.    The Library Agreements also contain intellectual property rights.

67.    The Library Agreements' provisions concerning Warner Bros.' intellectual property limit the Debtors' assignment of the Library Assets.  For example, the MPRPA and 2020 Domestic Distribution Agreement both clarify that the Debtors cannot in certain instances assign any rights in any Picture without Warner Bros.' express consent.[25]  While there are also exceptions

---

[24] For the motion pictures that have already been produced *vis-à-vis* Warner Bros. and Village (the revenue streams of which constitute the Library Assets), Warner Bros. submits that any financial accommodations no longer exist because they have been performed (or breached, as in the case of the Matrix and Wonka Arbitrations).

[25] *See* Smith Decl., Ex. 3 (2020 MPRPA § 13.5) ("████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████. *See also id.,* Ex. 7, (2020 Domestic Dist. Agrmt.) ¶ 17 ("████████████████ ████████████████████████████████████████████████████████████████████████████████"). The Debtors also identify the MPRPA as a contract included in the Alcon APA. *See* Alcon APA at 17; *see also id*. at § 2.05(a) ("Assumed Contracts" to include "certain of the Picture Agreements"). The 2020 Domestic Distribution Agreement is also identified as a "Fundamental

to the non-assignment of intellectual property rights—for instance, the Debtors can assign the limited right to receive revenue from the Pictures subject to certain restrictions—those exceptions do not apply in the context of the Debtors' requested Library Asset sale to Alcon, when the sale otherwise impairs Warner Bros.' property and contract rights.[26]

68.    The Bankruptcy Code limits a debtor's ability to assume and assign executory agreements involving intellectual property. *See generally In re Golden Books Family Entm't*, 269 B.R. 300, 309 (Bankr. D. Del. 2001) ([A] nonexclusive licensee . . . has only a personal and not a property interest in the [intellectual property], which cannot be assigned unless the [intellectual property] owner authorizes the assignment . . . .") (internal quotations omitted); *In re Patient Educ. Media, Inc.*, 210 B.R. 237, 243 (Bankr. S.D.N.Y. 1997) (holding debtor licensee could not assign its nonexclusive license without the licensor's consent: "The nonexclusive license does not transfer any rights of ownership; ownership remains in the licensor."); *see also Gardner v. Nike, Inc.*, 279 F.3d 774, 781 (9th Cir. 2002) (holding that under the Copyright Act, licensees cannot freely transfer rights even under an exclusive license without consent of the licensor). Warner Bros. is the primary copyright owner and licensor with exclusive rights to create and control the Library Assets under the agreements.[27] As a result, the Debtors' interests in the Library Assets are

Contract," the Debtors' delivery of which is a condition precedent to closing. *See id.* at 13, § 3.01(g).

[26] Specifically, the 2020 Domestic Distribution Agreement ██████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████." Smith Decl., Ex. 7, (2020 Domestic Dist. Agrmt., ¶ 17). Section 13.5 of the MPRPA, in turn, provides that ████████████████████████ ████████████████████████████████████████████████." *Id.*, Ex. 3, (2020 MPRPA) § 13.5.  That said, ██████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████. *See id.*

[27] *See* Smith Decl. ¶ 24 ("The Distribution Agreements, among other things, . . . confirm Warner Bros.' broad discretion and control over distribution of any co-financed motion pictures . . . ."); *see also, e.g., id.*, Ex. 7, (2020

ultimately derivative of Warner Bros.' exclusive rights, and thus, more analogous to those of a nonexclusive licensee than those of a true, joint copyright owner.

69.     Even assuming that the Debtors jointly own the film library copyrights at issue, it is black letter law that the Debtors can only convey through a sale whatever rights the Debtors own.  *See Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007) ("Early in the twentieth century, we stated in the copyright context the venerable principle of the law of property that, while an owner may convey any of his rights to others permanently or temporarily, he may not convey more than he owns.");  *see also Tresóna Multimedia, Ltd. Liab. Co. v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 645 (9th Cir. 2020) (". . . . [A] joint-owner cannot transfer more than he himself holds; thus, an assignment or exclusive license from one joint-owner to a third party cannot bind the other joint-owners or limit their rights in the copyright without their consent.").

70.     The Alcon APA identifies the 2020 Domestic Distribution Agreement among certain "Fundamental Contracts," that the Debtors intend to assume and assign.  *See* Alcon APA § 2.05.  The Debtors' delivery of the Fundamental Contracts is also a closing condition of the Alcon sale.  *See id.* § 3.01(g).  The "Fundamental Contracts" provision of the Alcon APA broadly defines Warner Bros.' domestic and foreign distribution agreements with the Debtors, including the 2020 Domestic Distribution Agreement, Warner F/D Agreement, Warner Foreign Agreement, and Virtual Co-Financing Agreement, "together with **all** right, title and interest in and to the Pictures licensed to the [applicable Domestic/Foreign/Virtual] Distributor pursuant thereto or

---

Domestic Distribution Agreement) § 6(e) ("█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████");  *see also id.*, Ex. 3 (2020 MPRPA) § 7.1 ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.").

otherwise necessary to comply with the terms thereof."  Alcon APA at 13 (emphasis added).[28] This broad language exceeds the Debtors' interests in the Pictures under the governing agreements because, as set forth above, the Debtors do not share co-equal rights with Warner Bros. under such agreements, nor do they have "all" such rights, titles and interests.  Because, at a minimum, the Debtors can only seek to convey *the Debtors'* rights, title, and interest in these assets, the Debtors' proposed sale of Library Assets must be denied absent Warner Bros.' consent and language appropriately clarifying the scope of the Debtors' interests in the Film Library.

ii.    <u>The Debtors cannot sell the Audit Rights absent Warner Bros.' consent,<br>nor can they do so while excluding the Audit Proceeds.</u>

71.    While the Debtors cannot assume and assign the Library Agreements over Warner Bros.' objection, the Debtors' proposed sale to Alcon also raises other issues of concern to Warner Bros.  When assuming and assigning a contract under section 365(b) of the Code, a debtor may not pick and choose the portions of a specific contract that it prefers.  *In re ANC Rental Corp., Inc.*, 277 B.R. 226, 238 (Bankr. D. Del. 2002) (citing *In re Italian Cook Oil Corp.*, 190 F.2d 994, 997 (3d Cir. 1951) ("The [debtor], however, may not blow hot and cold.  If he accepts the contract he accepts it *cum onere*.  If he receives the benefits he must adopt the burdens.  He cannot accept one and reject the other.")).  Rather, courts must enforce a contract's terms as written.  *Trustmark Ins. Co. v. Transamerica Occidental Life Ins. Co.*, 484 F. Supp. 2d 850, 853 (N.D. Ill. 2007)

---

[28] "Fundamental Contracts" means:

> [E]ach of (a) the Warner F/D Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise necessary to comply with the terms thereof); (b) the Domestic Distribution Agreement (together with all right, title and interest in and to the Pictures licensed to the Domestic Distributor pursuant thereto or otherwise necessary to comply with the terms thereof); (c) the Warner Foreign Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise necessary to comply with the terms thereof); and (d) the Virtual Co-Financing Agreement (together with all right, title and interest in and to the Pictures licensed to the Virtual Distributor pursuant thereto or otherwise necessary to comply with the terms thereof).

*Id.*

(stating a "court cannot alter, change or modify the existing terms of a contract or add new terms or conditions to which the parties do not appear to have assented, write into the contract something which the parties have omitted or take away something which the parties have included") (citation omitted). It follows that a bankruptcy assignment cannot modify the terms of a contract. *See In re Fleming Cos.*, 499 F.3d 300, 308 (3d Cir. 2007) ("[A]n assignment is intended to change only who performs an obligation, not the obligation to be performed.") (quotation omitted).

72.     As is the case with respect to the Derivative Rights under the Derivative Rights Agreements, the Library Assets are part of, and constitute, a series of integrated Library Agreements that must be read, interpreted, and enforced together. *See Allegheny Enters. v. J-W Operating Co.*, No. 10-02539, 2014 U.S. Dist. LEXIS 27998, at *18-19 (M.D. Pa. Mar. 5, 2014) (finding an integrated agreement where several contracts between the same parties governed the parties' relationship as to a particular subject). Thus, an executory contract must be assumed in its entirety and all of the contracts that comprise an integrated agreement must either be assumed or rejected, since they all make up one contract. *See Huron Consulting Servs., LLC v. Physiotherapy Hldgs., Inc. (In re Physiotherapy Hldgs., Inc.)*, 538 B.R. 225 (D. Del. 2015) (reversing bankruptcy court decision that permitted debtor to assume one agreement between itself and another party, and not the related agreements; holding that all agreements must be assumed or rejected together). Under California law, made applicable by many, if not all, of Warner Bros.' agreements with the Debtors (including the MPRPA), "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." Cal. Civ. Code § 1642.

73.     The Debtors, however, seek to sell their Audit Rights to Alcon while excluding a percentage of revenues derived from the Audit Rights. *See* Supplement at 10-11; Alcon APA

§§ 2.01, 2.03.  But the Debtors cannot bifurcate out the Specified Audit Proceeds from the sale to Alcon.  Specifically, the Alcon APA specifies that "Audit Rights"—*i.e.*, "rights to (A) exercise, control, settle, compromise and/or direct any noticed, pending or future audit and/or inspection . . . of or relating to amounts reflected in any Financial Information with respect to any Picture, and (B) receive the economic benefit and/or any payments resulting from any audit set forth in clause (A) above," are included as Purchased Assets.  Alcon APA at 20.  "Specified Audit Proceeds," however, are Excluded Assets.  *Id.* § 2.03.[29]  The Debtors' attempt to rewrite the terms of the Library Agreements in this way must be rejected.

74.     Equally problematic is the MPRPA's prohibition on a Village assignee's right to an accounting or audit in the context of an assignment, absent Warner Bros.' consent.  *See supra*, n. 26.  As discussed above, the Library Agreements prohibit Village from assigning its accounting or audit rights.  *See id.*  These anti-assignment restrictions should be protected under section 365(c)(1) where, as here, these Audit Rights are also personal to Village against the backdrop of the parties' prior relationship.  *See Matter of Midway Airlines Inc.*, 6 F.3d 492, 495 (7th Cir. 1993) (stating that section 365(c)(1) contemplates personal services contracts and any other applicable law prohibiting assignment).

---

[29]  The Alcon APA defines "Specified Audit Proceeds," as:

> [A]n amount equal to fifty percent (50%) of (a) all payments received by Buyer from the applicable counterparty to the applicable Distribution Agreement resulting from any audit of amounts reflected in any Financial Information with respect to the applicable Picture for any period commencing prior to the Cutoff Date and ending prior to the Cutoff Date (the "Pre-Cutoff Period"), less (b) all documented out of pocket costs (including legal fees) incurred by Buyer or its Affiliates in connection with the negotiation, litigation and/or settlement of such audit; provided, that to the extent that any such audit is in respect of both the Pre-Cutoff Period and any audit period commencing on or after the Cutoff Date (the "Post-Cutoff Period"), then Buyer shall allocate the amounts described in the foregoing (a) and (b) between the Pre-Cutoff Period and the Post-Cutoff Period reasonably and in good faith based on the number of days in the applicable period subject to such audit occurring during the Pre-Cutoff Period relative to the total number of days in the applicable period subject to such audit.

Alcon APA at 24.

75.     Indeed, the right to audit was specifically negotiated by and among Warner Bros. and Village under the MPRPA.  It provides that "███████████████████████████████ ███████████████," and that any assignee of Village's rights has "███████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████ . . . ."  Smith Decl., Ex. 3 (2020 MPRPA) §§ 12.4, 13.5.  Although the MPRPA is a contract by and among two corporate entities, and not individuals, that alone should not be dispositive where, as here, the contemplated purchaser is an entirely new, third-party entity.  *Cf. Planet Hollywood Int'l, Inc*., No. 99-3612 (JJF), 2000 WL 36118317, at *1.  For these reasons, the Alcon APA and Final Sale Order must be modified to address Warner Bros.' requests.

**b.     *The Debtors must cure their obligations from the Matrix and Wonka Arbitrations in connection with any sale.***

76.     In addition to the Specified Audit Proceeds, the Alcon APA identifies "the rights, obligations, or Liabilities relating to any claims asserted against any Seller (or its Affiliates) in the Warner Dispute or asserted by any Seller (or its Affiliates) in the Warner Dispute" as Excluded Assets.  Alcon APA § 2.03.  The "Warner Dispute" is defined to include (but is not limited to) the Matrix and Wonka Arbitrations.  *Id*. at 27.  The Alcon APA also broadly excludes various liabilities, including "all Liabilities  . . . relating to Cure Amounts under the Assumed Contracts." *See id*. § 2.04(j).  Notwithstanding the foregoing, section 365(b)(1) of the Bankruptcy Code provides, in relevant part, that the Debtors may not assume or assign any executory contract if there has been a default of such contract, unless the Debtors "cure[], or provide[] adequate assurance that the [Debtors] will promptly cure, such default . . . ."  11 U.S.C. § 365(b)(1)(A).

77.     Although the terms of the Library Asset sale purports to leave the claims related to the "Warner Dispute" behind, the Alcon APA also provides for the mandatory assumption and

assignment of the "Fundamental Contracts." *See* Alcon APA § 2.05(a), 3.01(f). The Fundamental Contracts consists of multiple Warner Bros. Agreements, including the 2020 Domestic Distribution Agreement. Not only does this assigned Fundamental Contract include the 2020 Domestic Distribution Agreement itself, but any and all other rights and agreements related to any of the many Warner Bros. Pictures covered by that agreement. *Id.* § 1.01 ("Fundamental Contracts" means . . . (b) the [2020] Domestic Distribution Agreement (together with all right, title and interest in and to the Pictures licensed to the Domestic Distributor pursuant thereto or otherwise necessary to comply with the terms thereof). . .")

78.     Third Circuit law requires that the Debtors "cure[] or provides adequate assurance that [they] will promptly cure [any] such default" under any executory agreements that the Debtors intend to assume or assign. *See In re Fleming Cos*., No. 03-10945 (MFW), 2004 Bankr. LEXIS 198, at *13 (Bankr. D. Del. Feb. 27, 2004) (citing 11 U.S.C. § 365(b)(1)(A)). This is true with respect to either a sale of the Debtors' interests in the Library Assets or Derivative Rights.[30] Thus, the Library Asset sale must provide for the cure and payment in full of all obligations owed to Warner Bros. related to the 2020 Domestic Distribution Agreements and all the ancillary related agreements that fall into the definition of Fundamental Contracts.

79.     As the Debtors are well aware, the Arbitrator has already determined, and the Appeal Panel has affirmed, the WB Arbitration Debtors are liable to Warner Bros. for breach of various agreements in connection with the Matrix Arbitration. Those agreements (the "<u>Matrix Agreements</u>") include ███████████████████████████████

---

[30] Warner Bros. submits that, for reasons already discussed herein, the Derivative Rights Agreements are unassignable to any non-Village or non-Warner Bros. third-party. Solely to the extent the Court disagrees with Warner Bros.' arguments in connection with the assignability of the Derivative Rights Agreements, the Debtors must otherwise cure all amounts owed to Warner Bros. based on the claims asserted in the Matrix or Wonka Arbitrations in connection with a Library Asset sale or sale of the Derivative Rights.

██████████████████████████████████████. *See* Smith Decl. ¶ 40; *see also id*., Ex. 22, (Final Award at 51) ("██████████████████████████████████████████████████████████████████████████████████████████████"); *see also supra*, ¶ 23, citing Smith Decl., Ex. 25 (Appeal Panel's Interim Decision and Award) (affirming the liability determination in favor of Warner Bros. and also rejecting the WB Arbitration Debtors' claim that ██████████████████████████████████████).

80.     This liability finding is not confined to the Derivative Rights because the Arbitrator expressly found that ████████████████████████████████████████████ ██████████████, which is a "Fundamental Contract" the Debtors intend to assume and assign to Alcon in connection with the Library Asset sale and accordingly, any damages from the resulting breach must be cured in connection therewith. *See In re Fleming Cos*., 2004 Bankr. LEXIS 198, at *13 (court determined that where debtor sought to assume and assign certain agreements, the alleged damages resulting from breach of those agreements, which could be quantified, must be cured by prompt payment). Thus, the Debtors must cure the WB Arbitration Debtors' (who are sellers under the Alcon APA) breach of ████████████████████████████ in connection with any Library Asset sale.

81.     Importantly, Warner Bros.' Cure claim will not, in and of itself (and separate and apart from the other issues Warner Bros. raises with respect to the Alcon APA), impact the closing of the Debtors' proposed sale to Alcon (or any other sale of assets in these cases). *See* Bid Procedures Order ¶ 32(d). The Warner Bros. Reserve already provides a mechanism through which such funds are to be segregated in favor of Warner Bros. pending liquidation of its claims and without impacting the closing of any sale. *See* Final DIP Order ¶ 31. This is true irrespective of whether Warner Bros.' Matrix Arbitration claim is a Cure claim (which, for the reasons set forth

47

above, Warner Bros. submits that it is).  *Id.* ¶ 32.  Accordingly, nothing in the Debtors' proposed sale of Library Assets to Alcon (or any other bidder), or in the Debtors' proposed sale of Derivative Rights, can alter Warner Bros.' rights in connection with the damages it is owed pursuant to the Matrix Arbitration.  Moreover, absent the Debtors' curing of all damages in connection with the Matrix Arbitration, any purported buyer of the Derivative Rights is barred from exercising their right to co-finance derivative works.

82.     The Final DIP Order provides for the creation of the Warner Bros. Reserve to satisfy the claims asserted by Warner Bros. against Village.  *See id.* ¶¶ 31-32.  In light of the fact that the Warner Bros. claims constitute Cure claims, the Sale Order must provide that Warner Bros. be paid in full from the reserve, plus interest, immediately upon the liquidation of its claims.  The Debtors cannot defer payment until some later date, such as the effective date of any plan of liquidation.

### c.     *Alcon must provide adequate assurance of future performance.*

83.     In addition to securing Warner Bros.' consent to assignment of Warner Bros.' agreements in connection with the Debtors' proposed sale of assets to Alcon for the Library Assets, the Debtors must also provide adequate assurance of future performance.  11 U.S.C. § 365(b)(1). At a minimum, the Debtors must provide the following additional information or assurances to satisfy Bankruptcy Code section 365(b): (i) that Alcon will assume the Debtors' prior role in allocating the original Village Applicable Percentage to Magnum in a manner that does not prejudice Warner Bros.' rights and responsibilities; (ii) that the Final Sale Order will provide that all of Warner Bros.' rights (including property rights) are preserved and Alcon is bound *cum onere* to the terms of the Library Agreements with respect to the Library Assets prospectively; (iii) that the Buyer specifically identify the entity responsible for the proposed assumption of Library Agreements to the extent a Buyer Designee seeks to acquire the Library Assets upon Closing; (iv)

that the Buyer entity that is seeking to assume the Library Agreements has assets, net worth and access to funds sufficient to pay any obligations that may arise including any damage awards for breaches; and (v) Alcon's assurances that, subject to Warner Bros.' consent, Alcon would execute any additional executory contract(s), licenses, security instruments, or assignments with Warner Bros. solely in connection with the Library Asset sale, as needed.[31]   Absent these assurances, Warner Bros. cannot determine Alcon's suitability as a Warner Bros. business partner in connection with the Library Assets, or its ability to adequately perform under the terms of any of the Library Agreements.

84.     Until Warner Bros.' objections are addressed and the information described above is provided, the Debtors have not complied with the requirements of section 365(b)(1)(C). Accordingly, Warner Bros. respectfully requests that the Court condition approval of the Sale Motion and Supplement in connection with the Library Asset sale on the Debtors' providing Warner Bros. with adequate assurance of future performance as set forth herein.

>      ***d.     The Alcon APA contains additional objectionable provisions that must be rectified.***

85.     The Alcon APA contains additional objectionable provisions that improperly impair Warner Bros.' rights, which must be rectified (i) before Warner Bros. considers consenting to such sale and (ii) in the Final Sale Order approving the sale of Library Assets to Alcon.

>      i.      <u>Warner Bros.' property rights and rights of deduction, setoff and recoupment cannot be extinguished.</u>

86.     The Sale Order must preserve all of Warner Bros. property rights, including all of its rights of recoupment, setoff and deduction.  As presently constituted, the Alcon Library APA

---

[31] Solely to the extent Warner Bros.' objections to the proposed sale of Derivative Rights to Alcon are overruled, Warner Bros. would request the foregoing in connection with the Derivative Rights as well.

fails to satisfy this requirement.

87.    Inexplicably, the structure of the Alcon APA appears to sell to Alcon the right to receive payments from Warner Bros. that have already been made over the last year.  Alcon APA at 19 ("Purchased Assets" includes "Proceeds arising, received or payable from and after the Cutoff Date.").  Curiously, the Alcon APA provides that Alcon is acquiring all proceeds due on account of the Library Assets as of the "Cutoff Date, " which is *July 31, 2024—**almost a full year ago**. Id.* at 6.  Over the last year, Warner Bros. has paid Village over $67.7 million in participation payments on the Library Assets and it has continued to make payment to Village since the bankruptcy filing.  The Purchase Price is reduced for any amounts that Warner Bros. has paid Village over the last year; so, the actual headline number of $417.5 million is overstated by the amount of the payments that have been made to Village since the Cutoff Date. *Id*. § 2.06(a).  It is unclear why the headline sale price is being calculated using 2024 figures (and then subtracting the payments over the last year).  But even more inexplicable is the fact that there does not appear to be any corresponding reduction in the proceeds being sold to Alcon under the Alcon APA for the amounts Warner Bros. has already paid to Village since July 31, 2024 of last year, exceeding $67.7 million.  Quite the opposite: the Alcon APA may purport to cut off any pre-closing deduction, even though Warner Bros. has been consistently paying Village. *See id.* § 5.02; Smith Decl., ¶ 4.

88.    Obviously, Warner Bros. cannot be forced to pay the same participation amount twice: first to Village and then to Alcon.  That said, Warner Bros. has had to fend off other unexpected attacks by Alcon over the last year concerning the parties' current, limited relationship. Warner Bros. has repeatedly asked for clarification that the Debtors are not purporting to transfer to Alcon any right to the proceeds of participation payments made by Warner Bros. since the

Cutoff Date. But Village has been unable to answer why the Cutoff Date is set as of end of July 2024 instead of the Closing Date, nor has it clarified that the Alcon APA does not allow such double-dipping. Hopefully, this is just imprecise drafting rather than an intentional attempt to obtain more than is actually due. *See In re Coupon Clearing Serv., Inc.*, 113 F.3d 1091, 1099 (9th Cir. 1997) (noting that a debtor's estate has "no greater rights in property than those held by the debtor prior to the bankruptcy") (citation omitted).

89.     But even if this defect is corrected, neither the Debtors nor Alcon may impair Warner Bros.' other rights of offset, recoupment, and deduction. The Alcon APA contains a broad "no setoff" provision, without regard to when the offsets accrue. *See* Alcon APA § 5.02. Consistent with Warner Bros.' reservation of rights set forth in the Final DIP Order and the additional protections afforded to Warner Bros. under the various Intercreditor Agreements, Warner Bros.' rights of setoff and recoupment must be preserved. *See* Final DIP Order ¶ 30; Smith Decl., Exs. 18, 19, 20 (Consolidated, Virtual, and Wonka Intercreditor Agreements); *see also* Alcon APA at 18 ("Picture Agreements" includes "Intercreditor Agreements" certain of which are proposed to be assumed and assigned under § 2.05); *see Folger Adam Sec., Inc. v. DeMatteis/MacGregor, J.V.*, 209 F.3d 252, 254, 261 (3d Cir. 2000) ("[A]ffirmative defenses do not constitute an 'interest' for purposes of section 363(f) and, therefore, were not extinguished by the Bankruptcy sale."); *Hispanic Indep. TV Sales, LLC v. Kaza Azteca Am. Inc.*, 2012 U.S. Dist. LEXIS 46239, at *14 (S.D.N.Y. Mar. 30, 2012) ("[S]ales pursuant to section 363(f) do not extinguish affirmative defenses. As recoupment is a defense, it is not extinguished by a section 363(f) sale.") (citations omitted).

      ii.    <u>Warner Bros.' property rights and existing liens on the Debtors' assets must be unimpaired in connection with the Debtors' sale.</u>

90.     The Debtors also cannot sell any of the Library Assets free and clear of Warner

Bros.' existing liens or its property rights. Courts in this district have approved free and clear sales involving motion picture interests only when such interests were not disturbed in any of the sale titles. *See, e.g., In re Vice Group Holding Inc*., No. 23-10738 (Bankr. S.D.N.Y. June 23, 2023), ECF No. 214 (preserving full force and effect of Guild security agreements without modification or prejudice); *see also In re Open Road Films, LLC, et al.*, No. 18-12012 (Bankr. D. Del. Dec. 19, 2018), [Dkt. No. 483] (approving the sale of motion picture assets free and clear of all liens, claims, interests, and encumbrances, except for the "Permitted Liens," including, among other things, "with respect to Participations arising under Assumed Contracts the payment of which were secured by properly perfected Liens on the related Purchased Title(s) not otherwise avoided or avoidable in connection with the Chapter 11 Cases," pursuant to the Asset Purchase Agreement at issue). A debtor can only convey or sell its own rights, nothing more. *See generally Majestic Star Casino, LLC v. Barden Dev., Inc. (In re Majestic Star Casino, LLC)*, 716 F.3d 736, 748 (3d Cir. 2013) ("[T]he trustee [or debtor-in-possession] can assert no greater rights than the debtor himself had on the date the [bankruptcy] case was commenced.") (internal quotations omitted)

91.     The Alcon APA provides that the Debtors' proposed sale of Library Assets will be "free and clear" and on an "as is" and "where is" basis, except for "Assumed Liabilities and the Permitted Liens." Alcon APA § 2.01. While "Permitted Liens" is defined to include certain Warner Bros. security interests to the extent set forth in certain Intercreditor Agreements,[32] Warner

---

[32] "Permitted Liens" means:

> [S]ecurity interests in favor of the Domestic Distributor [WAV], the Foreign Distributors [which includes WBPL for certain pictures], the Global Distributor or the Virtual Distributor [WBEI] (including any Uniform Commercial Code financing statement in favor of the Domestic Distributor, any of the Foreign Distributors, the Global Distributor or the Virtual Distributor with respect to the Pictures) as and to the extent set forth in the Intercreditor Agreements in effect as of the Effective Date (the 'Distributor Liens').

Alcon APA at 18.

Bros. reserves all rights in an abundance of caution to ensure that no Final Sale Order impairs, alters, or supersedes any and all of Warner Bros.' perfected liens, including with respect to picture rights or copyright registrations. Moreover, there must be a full reservation of all of Warner Bros. property interests, none of which can be disturbed by the proposed sale.

      iii.   <u>The Alcon APA does not appropriately address the Debtors' pre-existing relationship with Magnum post-closing.</u>

92.     The Debtors assert they sold a share of their original percentage of the revenue streams in the Library Assets to Magnum prepetition. *See* Alcon APA at 22 ("Relevant Percentage" means "the percentage of the Applicable Percentage of the Applicable Percentage of each Picture owned by the Sellers after giving effect to the purchases by Magnum pursuant to the Magnum Agreements."). But the Alcon APA does not provide that Alcon will assume the Debtors' prior role in allocating the original Village Applicable Percentage to Magnum. Warner Bros. is not in a position to assume that role if and to the extent that the Sale Motion and Supplement for the Debtors' proposed Library Asset sale to Alcon is approved upon addressing Warner Bros.' objections. Nor can Warner Bros. be required to do so: Village's pre-existing relationship and contracts with Magnum must be dealt with in a way that does not prejudice Warner Bros.' rights or responsibilities. *See also generally Limited Objection and Reservation of Rights of Magnum Films SPC to Sale of Debtors' Assets* [Dkt. No. 331] (raising similar issues as those set forth herein).

      iv.   <u>The Alcon APA improperly modifies Warner Bros.' copyright interests.</u>

93.     The Alcon APA improperly includes all "Copyrights for each Picture" as "Purchased Assets," when Village's copyrights share in its films should be preserved in connection with the Derivative Rights, which rights fundamentally derive from copyright. Alcon APA at 19. In contrast, the underlying copyrights in the films have no direct connection to the Library Assets,

which consist of financial obligations under the Output Distribution Agreements. Because no party

other than Warner Bros. can ultimately acquire the Derivative Rights due to section 365(c)(2)'s

prohibition on the assumption and assignment of the Derivative Rights Agreements to any third-

party, any copyrights in those films must be preserved for the benefit of Warner Bros.

### C.    Warner Bros.' Rights under Its Studio Business-Related Agreements with the Debtors Cannot Be Impaired in Any Studio Business Sale.

94.    Following the Auction, the Debtors announced Alcon as the Successful Bidder in

connection with a sale of the Studio Business for $4.25 million.  *See* DR Notice at 1-2.  The Second

Supplemental Contract Notice contemplates the Debtors' assumption and assignment of the

Warner Bros. Studio Agreements in connection with the Debtors' proposed sale of the Studio

Business under the Sale Motion.  *See* Second Suppl. Contract Notice Nos. 48-50.  Under those

agreements, Warner Bros. has, among other things, the right to exploit certain rights for

"December Boys" as a licensee.  *See* Smith Decl., ¶ 7; *see also e.g. id.,* Ex. 1 (Purchase and

Distribution Agreement Re: December Boys) ¶ 3 █████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████").  In the event the Debtors propose to assume

and assign the Warner Bros. Studio Agreements to Alcon (which Warner Bros. would consent to

provided its concerns are addressed), Warner Bros.' rights should be protected.

95.    In the event that (i) Alcon acquires the Studio Business assets but does not assume

the Warner Bros. Studio Agreements or (ii) the Debtors later move to reject the Warner Bros.

Studio Agreements should the Court not approve the sale or Alcon not consummate it, Warner

Bros. reserves its rights to invoke section 365(n) to exploit and retain its rights under its

agreements.  *See* 11 U.S.C. § 365(n)(2)(A) ("If the licensee elects to retain its rights," following a

trustee's rejection of an executory contract under which the debtor is a licensor of a right to

intellectual property, "the trustee shall allow the licensee to exercise such rights . . . ."); *id.* § 363(e)

("[O]n request of an entity that has an interest in property used, sold, . . . or proposed to be used,

sold, . . . by the trustee, the court . . . shall prohibit or condition such use, sale, or lease as is

necessary to provide adequate protection of such interest.").  Accordingly, any final sale order in

connection with a sale of the Studio Business would need to provide that any transferred copyright

rights remain subject to the rights afforded to intellectual property licensees, including Warner

Bros., under section 365(n).  *See, e.g., In re Dynamic Tooling Sys., Inc*., 349 B.R. 847, 854–56

(Bankr. D. Kan. 2006) (holding that in a section 363 sale, a licensee's section 365(n) rights must

be adequately protected pursuant to section 363(e) of the Bankruptcy Code such that the sale

cannot be effectuated free and clear of a licensee's section 365(n) rights).

96.     That said, Warner Bros. does not concede that the Warner Bros. Studio Agreements

are executory such that the Debtors could otherwise seek to reject those agreements or discharge

any of their obligations thereunder.  *See In re Exide Techs*., 607 F.3d 957, 962 (3d Cir. 2010) (an

executory contract is "a contract under which the obligation of both the bankrupt and the other

party to the contract are so far underperformed that the failure of either to complete performance

would constitute a material breach excusing the performance of the other."); *see also In re*

*Furniture Brands Int'l, Inc*., Nos. 13-12329(CSS), 191, 349, 442, 2013 Bankr. LEXIS 5162, at \*8

(Bankr. D. Del. Nov. 7, 2013) ("The general rule is that a contract is not executory where the only

obligation of a party to a contract is the payment of money.") (internal quotations omitted).  Nor

does Warner Bros. concede that the Debtors maintain any property rights under the Warner Bros.

Studio Agreements.   Instead, the Warner Bros. Studio Agreements provide that Village (as

"seller") and Warner Bros., as purchaser, entered into the Warner Bros. Studio Agreements in order to grant Warner Bros. certain distribution and other rights thereunder, subject to Village's prior license agreement with another third party (*i.e.*, Becker Group Limited and certain affiliates). Smith Decl., Ex. 1 (Purchase and Distribution Agreement Re: December Boys). Warner Bros.' property rights (including intellectual property rights) cannot be extinguished or impaired to the extent Village has no remaining property interests under those agreements. For all these reasons, and the reasons set forth above, the Final Sale Order must address Warner Bros.' objections and concerns in connection with the Library Asset and Studio Business sale before such sales may be approved.

## IV.   <u>RESERVATION OF RIGHTS</u>

97.    Warner Bros. expressly reserves all rights to amend and/or supplement this Objection, and any arguments advanced herein, at any time prior to, or during, the Court's hearing to consider final approval of the Debtors' proposed sale of Library Assets to Alcon or any other Back-Up Bidder, or in connection with any other sale of the Debtors' assets (including with respect to the Derivative Rights) to Alcon or any other third party.

98.    In addition, nothing contained herein is intended to be or shall be deemed as a waiver of Warner Bros.' rights under the Bankruptcy Code or any other applicable non-bankruptcy law, including its rights to (a) move to withdraw the reference from this Court; (b) contest the jurisdiction of this Court; (c) contest whether any matter constitutes a core proceeding; (d) contest the entry of final orders or judgments by this Court; or (e) demand arbitration or a trial by jury.

## V.     <u>CONCLUSION</u>

**WHEREFORE**, Warner Bros. respectfully requests that this Court (i) deny the Sale Motion as to the Debtors' proposed sale of the Derivative Rights to Alcon a final basis, (ii) modify the terms of the Debtors' proposed Library Asset sale to Alcon as set forth in the Alcon APA and the Final Sale Order, in a manner consistent with the relief requested herein, (iii) modify the terms of the Debtors' proposed sale of the Studio Business to ensure Warner Bros.' rights are not impaired in connection therewith, and (iv) grant such other and further relief as the Court deems just and proper.

*[Remainder of page intentionally left blank.]*

Dated: June 13, 2025
   Wilmington, Delaware       **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Curtis S. Miller*
Curtis S. Miller (No. 4583)
Matthew B. Harvey (No. 5186)
1201 North Market Street, 16th Floor
Wilmington, DE 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: cmiller@morrisnichols.com
        mharvey@morrisnichols.com

*- and –*

**O'MELVENY & MYERS LLP**
Steve Warren (*Admitted pro hac vice*)
400 South Hope Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 430-6000
Email: swarren@omm.com

Matt Kline (*Admitted pro hac vice*)
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Telephone: (310) 553-6700
Email: mkline@omm.com

Scott Drake (*Admitted pro hac vice*)
Emma Jones (*Admitted pro hac vice*)
2801 North Hardwood Street, Suite 1600
Dallas, Texas 75201
Telephone: (972) 360-1900
Email: sdrake@omm.com
Email: eljones@omm.com

*Counsel to Warner Bros. Entertainment Inc., and its Affiliate*