### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC., *et al.*,[1] | Case No. 25-10475 (TMH) |
| Debtors. | (Jointly Administered) |

### DECLARATION OF WAYNE M. SMITH IN SUPPORT OF WARNER BROS. ENTERTAINMENT INC.'S OMNIBUS OBJECTION TO (I) THE DEBTORS' MOTION FOR AN ORDER APPROVING THE SALE OF THE DEBTORS' ASSETS, (II) THE DEBTORS' SALE SUPPLEMENT WITH RESPECT THERETO AND (III) THE DEBTORS' ASSUMPTION AND ASSIGNMENT OF CERTAIN WARNER BROS. AGREEMENTS

I, Wayne M. Smith, declare the following pursuant to 28 U.S.C. § 1746:

1.      I am an attorney at law, licensed to practice in the State of California. I am employed by WarnerMedia Services LLC, a subsidiary of Warner Bros. Discovery, Inc., as Executive Vice President, Legal, Warner Bros. Studios, where I act as the head of legal with oversight over various business units including HBO, Warner Bros. Television, DC Studios and the Warner Bros. Motion Picture Group (together with Warner Bros. Entertainment Inc. and its affiliates, "Warner Bros."). I have been employed by Warner Bros. or its predecessors and affiliates in various legal capacities for over 25 years, since January 2000. Prior to my current role, from 2020 through May 2025, I was Head of Legal Affairs for Warner Bros. Motion Picture Group, adding DC Studios in 2022. In that role, I supervised a group of attorneys and other legal

---

[1] The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343. The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

professionals who were responsible for negotiating agreements relating to the development, production, and financing of feature-length motion pictures developed, financed, produced and distributed by Warner Bros.  Since 2020, I have been the attorney at Warner Bros. who has been chiefly responsible for all legal issues regarding Village.[2]  Prior to my role as Head of Legal Affairs, from 2000 to 2020, I held various roles in the Corporate Legal department of Warner Bros., including supervising the handling of litigation and claims in which Warner Bros. was involved.

2.    I submit this declaration in support of *Warner Bros. Entertainment Inc.'s Omnibus Objection to (I) the  Debtors' Motion For an Order Approving the Sale Of the Debtors' Assets, (II) the Debtors' Sale Supplement With Respect Thereto and (III) the Debtors' Assumption and Assignment of Certain Warner Bros. Agreements* (the "Sale Objection"), filed contemporaneously herewith.[3]  Except as otherwise indicated, all facts set forth in this declaration are based on my personal knowledge, my review of the relevant documents, my discussions with the Warner Bros. team and its advisors, and my views based on personal experience and knowledge.  I am above 18 years of age, am competent to testify, and, if called as a witness, could and would testify competently to the facts set forth in this declaration on that basis.

## I.    OVERVIEW OF WARNER BROS.' CO-FINANCING DEALS

3.    Warner Bros. finances many of its own pictures by itself, but also co-finances a number of pictures with other studios and specialized film financing investors, the latter of which

---

[2] "Village" refers to Village Roadshow Pictures North America Inc. ("VRPNA"), Village Roadshow Films North America Inc. ("VRFNA"), Village Roadshow Films (BVI) Limited ("VRF-BVI"), Village Roadshow Distribution USA Inc. ("VRD-USA"), Village Roadshow Distribution (BVI) Ltd. ("VRD-BVI") and/or VREG Wonka IP Global, LLC, as applicable.

[3] Capitalized terms used but not otherwise defined or described in this Declaration shall have the meanings ascribed to them in the Sale Objection.

will sometimes invest in a "slate" of films. Over the past 25 years, those third parties have included Village; Legendary Entertainment; Ratpac Entertainment, LLC/Dune Entertainment; Domain Capital; and Bron Creative. As discussed in more detail below, co-financing a film requires a high degree of trust and cooperation.  Among other things, and as later described in connection with Warner Bros.' agreements with Village, Warner Bros. shares with its co-financier confidential information about its coming film projects and plans. Those parties share credits on the resulting films and participate in media events and communications.

## II.    WARNER BROS.' CONTRACTUAL RELATIONSHIP WITH VILLAGE

### A.    Overview of Relationship

4.    Since 1998, back when Village was a family-owned business, Warner Bros. and Village have entered into numerous agreements setting forth their respective rights and obligations with regard to the co-financing and co-ownership of motion-picture properties.  Warner Bros. and Village have co-financed over 90 theatrical motion pictures under those arrangements, beginning with the 1998 film *Practical Magic.*  Pursuant to the parties' agreements, Village is entitled to a contractually defined share of the proceeds from Warner Bros.' exploitation of the co-financed films.  After a film is released, Warner Bros. continues to pay Village its contractually defined share of proceeds in accordance with the terms of Warner Bros.' film rights and distribution agreements with Village.

5.    The nature of Warner Bros.' and Village's co-financing relationship, and their respective rights as contracting parties, has evolved over the years.  Since December 31, 2020, which was just several years after Village was acquired by a hedge fund (*e.g.*, Vine Alternative Investments Group, LLC), Warner Bros. elected to not extend its prior deal with Village and as a result, the parties are no longer engaged in co-financing any projects other than those that are

derivative works (*e.g.*, remakes, sequels, prequels) of the motion pictures co-financed prior to 2021.  That is, since December 31, 2020, Village's only co-financing rights are in certain derivative works based on motion pictures that the parties co-own and previously co-financed; there is no existing agreement that contemplates Village co-financing new motion picture projects—*i.e.*, other than derivative works of prior projects.  Further, and as set forth below, Village's right to co-finance derivative works is limited by contract to those derivative works that meet certain requirements.

6.      There is nothing in any of the Warner Bros. agreements with Village that requires Warner Bros. to develop and produce any derivative works.  Rather, and as set forth further below, the agreements expressly provide Warner Bros. with the "unilateral right" and "sole discretion" over the development of such projects, and contain specific requirements on when Warner Bros. is required to offer Village a co-financing opportunity, should Warner Bros. elect to produce derivative works.  For any derivative works that Warner Bros. does develop and plans to exploit, and that Warner Bros. and Village agree to co-finance, the agreements make clear that Warner Bros. has broad and exclusive control over the distribution of such projects, and that Warner Bros. fronts all production costs if Village commits to co-finance a derivative work.

7.      Separately, in connection with Village's Studio Business, Warner Bros. was licensed by Village to exploit certain rights for the motion picture *December Boys*.  Attached hereto as **Exhibit 1** is a true and correct copy of the *December Boys Purchase and Distribution Agreement (US/Canada)* dated February 9, 2007, by and between Warner Independent Pictures, Inc. and VRPG-DB Pty. Ltd. (as set forth therein).

**B.      The Motion Picture Rights Purchase Agreements and Related Security Interests**

8.      The last agreement that contemplated that Village might co-finance new, non-

4

derivative motion picture projects was the 2014 *Motion Picture Rights Purchase Agreement* ("2014 MPRPA"), which was amended and restated in 2020 (the "2020 MPRPA") shortly prior to its expiration on December 31, 2020.  Attached hereto as **Exhibits 2 and 3** are true and correct copies of the 2014 MPRPA and 2020 MPRPA, respectively.

9.      The 2014 MPRPA and 2020 MPRPA, among other things, set out the terms on which Village could co-finance new projects, and they also grant Warner Bros. certain exclusive rights, including consent rights and intellectual property protections. The 2014 MPRPA and the 2020 MPRPA provide that, for each co-financed picture, Warner Bros. and Village would enter into a Rights Purchase Agreement specific to that picture, which specified each party's rights and payment obligations in connection with such co-financed picture, among other things.

10.      The 2014 MPRPA and 2020 MPRPA also provide for the execution of security agreements and copyright mortgages and assignments in favor of Warner Bros. with respect to certain picture rights.  Warner Bros.' liens and security interests maintain their priority over Village's interests in any co-financed pictures, as set forth in the agreements.  For example, Section 2.1 of the 2014 and 2020 MPRPAs provide that ███████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████████████████ (emphasis added).
Further, Section 3.5(a) provides that ███████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████ (emphasis added).  Finally, Section 6.1 provides that ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████ (emphasis added).

      11.      Additionally, and as relevant here, Section 13.5 of the 2014 MPRPA and 2020

MPRPA (entitled "Assignments") provides that, ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ (emphasis added).

      12.      While Section 13.5 later provides that Village ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ it also notes that

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████ (Emphasis added.)

      13.      Also relevant here, the 2014 and 2020 MPRPAs show how the relationship between

Warner Bros. and Village is public facing.  Sections 9.1 and 9.2, for example, provides that ████

████████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

In addition, Section 9.4 of the 2014 and 2020 MPRPAs provide that ██████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

14.     Prior to the 2014 MPRPA, Warner Bros. and Village had entered into a similar Motion Picture Rights Purchase Agreement dated as of October 14, 2009 ("2009 MPRPA"), which was amended and restated on November 12, 2012 ("2012 MPRPA").  Prior to the 2009 MPRPA, Warner Bros. and Village entered into a series of four Qualified Cost Sharing Agreements, which similarly defined the terms on which Village might co-finance certain motion pictures and the parties' rights and obligations with respect to such pictures.

**C.     Co-Ownership Agreements and Amendments Thereto**

15.     For nearly all co-financed pictures, Warner Bros. and Village also entered into a Co-Ownership Agreement.  The Co-Ownership Agreements set forth the parties' rights to produce, distribute, and otherwise exploit remakes, sequels, prequels, and other derivative works that Warner Bros. may create for the 91 films in the Film Library[4] that Warner Bros. co-financed with Village (the "Derivative Rights").  For example, Warner Bros. and Village entered into a *Co-Ownership Agreement with Respect to Remakes and Sequels of the Matrix* (the "Matrix Co-Ownership Agreement") dated as of October 30, 2003, which, among other things, sets forth Warner Bros.' and Village's rights with respect to future derivative works based on the first three

---

[4] I understand that Village claims to have certain derivative rights with respect to up to 108 feature films (the "Film Library").  As set forth above, 91 of these 108 films are films that Village co-financed with Warner Bros.

7

*Matrix* films.  Attached hereto as **Exhibit 4** is a true and correct copy of the Matrix Co-Ownership Agreement.

16.     Over the years, Warner Bros. and Village have amended the Co-Ownership Agreements through certain Omnibus Amendments.  For instance, Warner Bros. and Village entered into an *Omnibus Amendment to Co-Ownership Agreements* as of August 29, 2017 (the "2017 Omnibus Amendment").  As set forth in Recital K thereto, Warner Bros.' and Village's mutually stated intent in entering the 2017 Omnibus Amendment was to "restructure the arrangements for exploiting the Derivative Rights under the various Co-Ownership Agreements so that the treatment of the ownership and exploitation of the Derivative Rights will be the same for all Pictures."  This included the Matrix Co-Ownership Agreement.  Attached hereto as **Exhibit 5** is a true and correct copy of the 2017 Omnibus Amendment.

17.     Pursuant to Attachment 1 to the 2017 Omnibus Amendment, Warner Bros. and Village agreed to amend paragraph 4 in the Co-Ownership Agreements to confirm, among other things, that Warner Bros. has the "unilateral right" and "sole discretion" over whether to initiate any exploitation of Derivative Rights: "[Village] shall have the right to **propose** Sequel or Remake Projects or Television Projects for consideration by [Warner Bros.], provided that [Warner Bros.] ***shall have <u>no</u> obligation to agree*** *to any such proposal* and [Warner Bros.]' decision to agree or not to agree to a proposal *is within its **sole discretion***, and *neither VRF nor VRFNA [i.e., Village] shall have any right*, as a consequence, to exploit any of the Derivative Rights, nor shall VRF or VRFNA have any right to produce, license or exploit any of the Derivative Rights without [Warner Bros.]' written consent, it being understood that *only [Warner Bros.] shall have the **unilateral right** in its **sole discretion** to initiate any exploitation of the Derivative Rights*." (Emphases added.)

18.     Warner Bros. and Village also amended paragraph 4 in the Co-Ownership

Agreements to confirm the derivative works for which Warner Bros. was required to offer Village a co-financing opportunity should Warner Bros. elect to produce such projects, and the process for doing so.  Specifically, Attachment 1 to the 2017 Omnibus Amendment amended paragraph 4 in the Co-Ownership Agreements to state that if a proposed "Sequel or Remake Project" or "Television Project" is based on a "Non-Library Film" or is a "Qualifying Derivative Work" (as those terms are defined in the agreements), Warner Bros. is required to provide Village with a "Project Notice" or "Television Project Notice," as applicable. Such "Project Notice" includes ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████ This information, particularly

the ███████████████████████████ and ██████████████████████

████████, is extremely sensitive. And this sensitive information is provided to Village, subject to the terms of, and as set forth in, the 2017 Omnibus Amendment and applicable Warner Bros.' agreements, regardless of whether Village elects to co-finance a project. Based on my experience, the disclosure of (i) the contents of the screenplay of a film in advance of its release can seriously damage the film's commercial prospects, such as by revealing "spoilers";  and (ii) a film's Projected Budget (as defined in the 2017 Omnibus Amendment) would release extremely sensitive and private information to the public, including compensation paid to a number of individuals who can be identified by their unique roles (such as the film's director).  In recognition of these highly sensitive matters, the Co-Ownership Agreements contain confidentially clauses, as found in the Matrix Co-Ownership Agreement, for example, which expressly provides that a party shall not

disclose ██████████████████████████████████████████████ subject only to

certain narrow exceptions.

19.     The amended paragraph 4 of the 2017 Omnibus Amendment also states that the

"Project Notice" or "Television Project Notice" constitutes an offer to Village to acquire an interest

in the project and participate in the financing and co-ownership of the project.  Village has 15

business days to accept the offer, otherwise Warner Bros. may proceed with the production and

exploitation of the "Sequel or Remake Project" or "Television Project" free and clear of any right

or interest of Village.  However, if a "Sequel or Remake Project" or "Television Project" is based

on a "Library Film"[5] and is not a "Qualifying Derivative Work," Village's derivative rights with

respect to such Sequel or Remake Project or Television Project shall automatically revert, be

reassigned, and be fully transferred to Warner Bros. at such time as such Sequel or Remake Project

or Television Project is determined not to be a Qualifying Derivative Work.  In other words,

Village has no right to co-finance such projects.

20.     In the event Village timely accepts the offer to co-finance a derivative work,

Warner Bros. produces the derivative work and fronts all production costs.  Paragraph 4(b) of

Attachment 1 to the 2017 Omnibus Amendment provides that ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[5] The Library Films include, without limitation, (i) *Ocean's Eleven*, (ii) *Catwoman,* (iii) *Constantine,* (iv) *Charlie & the Chocolate Factory*, (v) *The Dukes of Hazzard*, (vi) *Ocean's Twelve,* (vii) *House of Wax*, (viii) *The Invasion,* (ix) *I Am Legend*, (x) *Get Smart*, (xi) *Ocean's 13*, (xii) *Speed Racer*, (xiii) *Sherlock Holmes,* (xiv) *Sherlock Holmes 2*, (xv) *Dark Shadows,* (xvi) *The Great Gatsby*, (xvii) *The Legend of Tarzan*, (xviii) *King Arthur: Legend of the Sword*, (xix) *Going In Style*, (xx) *Ocean's 8, and* (xxi) *Wonka*.  For clarity, Village has no co-ownership rights in derivative productions of *The Lego Movie* and *Sex and the City 2*, and very limited co-ownership rights in *Joker* (only in productions where Joaquin Phoenix plays the role "Joker").  In addition, Warner Bros.' underlying rights in the property on which the film *Edge of Tomorrow* was based have lapsed and, accordingly, any Derivative Rights have similarly lapsed.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████ (Emphasis added).

21.    Paragraph 4(d) of Attachment 1 to the 2017 Omnibus Amendment further provides

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ (Emphasis added).

22.    Warner Bros. and Village also entered into an *Omnibus Amendment No. 2 to Co-Ownership Agreements* as of November 10, 2020 ("Omnibus Amendment No. 2"), which, among other things, also amended the language of paragraph 2 of the Co-Ownership Agreements to confirm that, ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████    (Emphases added).  Attached hereto as **Exhibit 6** is a true and correct copy of Omnibus Amendment No. 2.

23.    In the event that Village does not timely accept the offer to co-finance a derivative work as set forth in the 2017 Omnibus Amendment, or to the extent a "Sequel or Remake Project" or "Television Project" is based on a "Library Film" and is not a "Qualifying Derivative Work," and Warner Bros. chooses, in its discretion, to seek other co-financiers for future films, it is Warner Bros.' desire to only partner with parties with which it anticipates have a positive working relationship with.  These protections safeguarding with whom Warner Bros. must conduct business are important to Warner Bros., and hence one sees them across various agreements with Village.

D.    **The Distribution Agreements and Related Security Interests**

24.    In November 2020, Village and Warner Bros. also entered into a *Second Amended and Restated Output Distribution Agreement (Domestic)* (the "2020 Domestic Distribution Agreement"), which amended and followed the *Amended and Restated Output Distribution Agreement (Domestic)*, dated October 30, 2015 between Warner Bros. and Village (the "2015 Domestic Distribution Agreement"); a *Second Amended and Restated Output Distribution Agreement (Foreign)* (the "2020 Warner Foreign Distribution (F-D) Agreement"), which amended and followed the *Amended and Restated Output Distribution Agreement (Foreign)* dated as of

12

October 30, 2015 between WBPL and Village (the "2015 Warner Foreign Distribution (F-D) Agreement"); and an *Amended and Restated Consolidated Output Distribution Agreement (Foreign)* (the "2020 Warner Foreign Agreement" and collectively with the 2020 and 2015 Domestic Distribution Agreements and the 2020 and 2015 Warner Foreign Distribution (F-D) Agreements, the "Distribution Agreements").  The Distribution Agreements, among other things, yet again confirm Warner Bros.' broad discretion and control over distribution of any co-financed motion pictures and set forth terms pursuant to which Warner Bros. must account to Village for receipts received from Warner Bros.' exploitation of the motion pictures distributed thereunder. Attached hereto as **Exhibits 7, 8, 9, 10, and 11** are true and correct copies of the 2020 Domestic Distribution Agreement, 2015 Domestic Distribution Agreement, 2020 Warner Foreign Distribution (F-D) Agreement, 2015 Warner Foreign Distribution (F-D) Agreement, and the 2020 Warner Foreign Agreement, respectively.

25.     Under the 2015 and 2020 Domestic Distribution Agreements, Warner Bros. and Village agreed that Warner Bros. would have the right to "exploit or distribute directly, or license to, or subdistribute through, a third party (whether or not affiliated with [Warner Bros.]) any of the Exploitation Rights determined by [Warner Bros.] in its sole discretion, without any consultation with [Village]."   The 2015 and 2020 Domestic Distribution Agreements also contain other provisions setting forth Warner Bros.' broad control and discretion over distribution decisions. For example, Paragraph 6(e) provides that Warner Bros. "shall have the broadest possible latitude in exercising its rights under this Agreement and in exploiting its distribution rights in the Pictures" and that Warner Bros.' "judgment and decision in all matters pertaining to the distribution of any Picture shall be binding and conclusive upon [Village]."

26.     Paragraph 17 of the 2015 and 2020 Domestic Distribution Agreements further

provide that, other than certain agreed upon exceptions, ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ (Emphases

added).

27.     In addition, in the event that Village elects to co-finance a Derivative Rights work

subject to the terms of the 2017 Omnibus Amendment as described above, Warner Bros.'

relationship of trust with Village expands significantly. This is because Warner Bros.' agreements

with Village provide for the parties to work closely together on a wide range of extremely sensitive

and confidential matters. For example, paragraph 2 of Exhibit G to the 2020 Domestic Distribution

Agreement and 2020 Warner Foreign Distribution (F-D) Agreement each provide that Warner

Bros. █████████████████████████████████████████████

████████████ Further, paragraph 3 of Exhibit G to those agreements provide that

Warner Bros. ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████ and in connection with that obligation, ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ And as set forth in paragraph

4 of Exhibit G to those agreements, Warner Bros. is also required to ███████████████

██████████████████████████

28.     The Distribution Agreements also provide for the creation of certain security

interests by Village in favor of Warner Bros. for picture rights, among other things.  For example,

the 2020 and 2015 Domestic Distribution Agreements require Village to execute certain security

agreements, copyright mortgages, and assignments of copyrights in favor of WAV Distribution LLC ("WAV," a Warner Bros. affiliate), to secure WAV's security interests in each picture. Similarly, the 2020 and 2015 Warner Foreign (F-D) Agreements require Village to execute certain security interests, copyright mortgages, and assignments in favor of Warner Bros. Productions Ltd. ("WBPL"). Examples of such agreements that Warner Bros. executed in connection with the motion picture *Joker*, pursuant to the 2015 Domestic Distribution Agreement and 2015 Warner Foreign Distribution (F-D) Agreement, are attached hereto as **Exhibits 12, 13, 14, and 15**. These examples include true and correct copies of the November 22, 2019 versions of: (i) the *Security Agreement, Mortgage and Assignment of Copyright (Domestic)*, (ii) *Copyright Mortgage and Assignment (Domestic)*, (iii) *Security Agreement, Mortgage and Assignment of Copyright (Foreign)*, and (iv) *Copyright Mortgage and Assignment (Foreign)*. Warner Bros. has also filed UCC-1 financing statements to perfect its security interests for its rights in its film library. Examples of such UCC-1 financing statements made in connection with *Joker* are attached hereto as **Exhibits 16 and 17.**

### E. The Intercreditor Agreements

29.     The priority of Warner Bros.' security interests in its film library and under its film rights and distribution agreements with Village is also memorialized in that certain *Second Amended and Restated Consolidated Intercreditor Agreement* dated September 5, 2024, by and among Warner Bros., Village and other Village affiliates, Magnum, Bank of America, N.A. (as Magnum Lender Agent, as defined therein) and U.S. Bank National Association ("U.S. Bank"), as Permanent Financing Trustee pursuant to the Indenture (as defined therein) (the "Consolidated Intercreditor Agreement"); that certain *Intercreditor Agreement* dated November 10, 2020, by and among Warner Bros., Village Roadshow VS Films LLC ("VRVS"), and U.S. Bank, as trustee (the

"<u>Virtual Intercreditor Agreement</u>"); and that certain *Intercreditor Agreement* dated December 6, 2023, by and among Village, Warner Bros., and Loompala Pictures, LLC (*e.g.*, an Alcon affiliate) (the "<u>Wonka Intercreditor Agreement</u>"). Attached hereto as **<u>Exhibits 18, 19, and 20</u>** are true and correct copies of the Consolidated Intercreditor Agreement, the Virtual Intercreditor Agreement, and the Wonka Intercreditor Agreement, respectively.

30.     For example, Section 1(a) of the Consolidated Intercreditor Agreement provides, in relevant part, that ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

31.     In addition, Section 1(a) of the Virtual Intercreditor Agreement provides, in relevant part, that ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

32.     Further, Section 1(a) of the Wonka Intercreditor Agreement provides that ████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████

### III.    ARBITRATION DISPUTES CONCERNING *MATRIX IV* AND *WONKA*

33.    Given the extreme sensitivity of the information Warner Bros. provides Village pursuant to the terms of the Co-Ownership Agreements, the 2017 Omnibus Amendment, and Omnibus Amendment No. 2 (collectively, the "Derivative Rights Agreements"), Warner Bros.' relationship with Village or any other co-financier must necessarily be characterized by a high degree of trust.  For many years, Warner Bros. enjoyed such a relationship with Village.  However, after the following disputes between Village and Warner Bros. arose, that relationship quickly deteriorated.

34.    On August 13, 2019, Warner Bros. sent Village a Project Notice in connection with the fourth Matrix film, *The Matrix Resurrections* ("*Matrix IV*"), pursuant to the Matrix Co-Ownership Agreement, as amended by the 2017 Omnibus Amendment.  Village sent Warner Bros. an acceptance of the Project Notice on August 21, 2019, and agreed to participate in the financing and co-ownership of *Matrix IV*.  In reliance on Village's agreement to co-finance the picture, Warner Bros. thereafter spent more than $200 million to produce *Matrix IV* and committed another $100 million more to market it.

17

35.    On December 3, 2020, in the heart of the Covid-19 crisis, Warner Bros. announced its decision to release each of its 2021 theatrical motion pictures, including *Matrix IV*, simultaneously in theaters and on HBO Max (currently "Max")—*i.e.*, a *"day-and-date"* release.

36.    On December 10, 2021—over a year after Warner Bros. announced its release plans for *Matrix IV*, and less than a week before the film was to be initially released on December 16, 2021—I received a letter from Village's counsel, which asserted that Warner Bros.' day-and-date release plan for *Matrix IV* breached the 2020 Domestic Distribution Agreement and that Village was invoking the dispute-resolution provisions under the parties' agreements, which required a period of time for the parties to attempt informal resolution before either party could initiate an arbitration.  Not until the eve of the movie's release (when publicly available tracking indicated that it would not perform as hoped) did Village refuse to pay its co-financing share.

37.    In February 2022, two months after *Matrix IV* was released and all informal attempts at resolution with Village had failed, Warner Bros. initiated arbitration proceedings against Village, asserting that Village had breached its agreement to co-finance *Matrix IV* and seeking to collect Village's more than $100 million co-financing share (the "Matrix Arbitration").

38.    At the same time, and in connection with a separate dispute that had arisen with Village during 2021, Warner Bros. filed a separate arbitration demand seeking a declaratory judgment that Warner Bros. was not required to offer Village the opportunity to participate in co-financing a separate film project, *Wonka*, because it was based on a "Library Film" (*Charlie and the Chocolate Factory*) and is not a "Qualifying Derivative Work," and that Village's right to participate in derivative works of a number of other co-financed pictures based on "Library Films" was subject to the same limitations (the "Wonka Arbitration").

39.    After Warner Bros. filed its confidential *Matrix IV* and *Wonka* arbitration demands,

and in violation of its agreements to arbitrate all disputes, Village filed a public complaint and motion for an injunction in California state court in connection with both the *Matrix* and *Wonka* disputes, as well as a separate issue related to another potential derivative television project based on the motion picture *Edge of Tomorrow*.  Village also shared pre-filing versions of its complaint with the press, leaked confidential plot information about the forthcoming *Wonka* film, and its agents disparaged Warner Bros. and its executive team. Warner Bros. moved to compel arbitration of Village's lawsuit.  On May 27, 2022, the court denied Village's request for a preliminary injunction and granted Warner Bros.' motion to compel arbitration.  Attached hereto as **Exhibit 21** is a true and correct copy of the Superior Court's May 27, 2022 Minute Order, and subsequent Nunc Pro Tunc Order entered that same day.

40.    In July 2023, following more than a year of discovery and motion practice and a , the Hon. Terry Friedman (Ret.) of JAMS (the "Arbitrator") issued an award in the Matrix Arbitration (the "Final Award"), finding that Village breached its contractual obligations to Warner Bros. by failing to pay its co-financing share for *Matrix IV*

Judge Friedman

Judge Friedman

Judge Friedman

Attached hereto as **Exhibits 22 and 23** are true and correct copies of the Arbitrator's July 21, 2023 Final Award and Order Granting Post-Hearing Relief.

41.    On November 28, 2023, four months after Judge Friedman issued his Final Award in the Matrix Arbitration, I received an email from counsel for Village notifying Warner Bros. that Village had assigned the Derivative Rights to 90 films it had previously co-financed with Warner Bros. to other Village entities not named as respondents in the Matrix Arbitration for a consideration of $1 per transfer.   Attached as **Exhibit 24** are true and correct copies of the Assignments of Derivative Rights.  In March and April 2024, Warner Bros. objected that Village's transfers of these Derivative Rights to entities that were not respondents in the Matrix Arbitration for a total of $9 in consideration, was improper.

42.    Village appealed Judge Friedman's Final Award in the Matrix Arbitration. Following lengthy appellate proceedings, the arbitration appeal panel (the "Appeal Panel") issued an Interim Decision and Award on September 19, 2024, affirming Judge Friedman's liability ruling, finding that the ███████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████ Judge Friedman ███████████████████████████████████████ t Judge Friedman ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████ In its Interim Decision and Award, the Appeal Panel also noted, ████████████████████ ████████████████████████████████████████████████████ ████ The Appeal Panel ██████████████████████████████████████ ████████████████ Attached hereto as **Exhibit 25** is a true and correct copy of the September

19, 2024 Appeal Panel Interim Decision and Award.

## IV.   THE DEBTORS' PROPOSED SALE OF ASSETS AND PROPOSED ASSUMPTION AND ASSIGNMENT OF WARNER BROS.' AGREEMENTS THREATENS AND IMPAIRS WARNER BROS.' RIGHTS

### A.   The Derivative Rights as set Forth in the Derivative Rights Agreements

43.     The Debtors' proposed sale of Derivative Rights to Alcon Media Group, LLC ("Alcon") as the Successful Bidder for those assets involves the Debtors' proposed assumption and assignment of the Derivative Rights Agreements with Warner Bros. to Alcon. Those Derivative Rights Agreements contain certain financial accommodations that Warner Bros. extended to Village and certain exclusive rights, including consent requirements, anti-assignment provisions, and intellectual property protections, all for Warner Bros.' benefit. The Debtors have neither sought nor obtained Warner Bros.' consent to any assumption or assignment of the Derivative Rights Agreements in connection with a sale of the Derivative Rights to Alcon or any other third party.

44.     Moreover, Warner Bros.' pre-existing relationship with Village was (and still is) a primary consideration for Warner Bros. entering into the Derivative Rights Agreements that Village now seeks to assume and assign to Alcon. Permitting Village to assume and assign the Derivative Rights Agreements to a third party without Warner Bros.' consent would force Warner Bros. into a commercial relationship with an entity that Warner Bros. never agreed to partner with. That is something that Warner Bros. specifically wanted to prevent when it negotiated and entered into the Derivative Rights Agreements.

45.     Indeed, for the reasons described above, Warner Bros.' co-financing relationship with Village is more than just a publicly-facing collaboration, it provides that the parties are to work closely together in a relationship of partnership and trust. That arrangement was a special

21

negotiated deal between Warner Bros. and Village. Because of this close working relationship, the highly confidential matters involved, and the necessity of a high degree of trust, the Derivative Rights Agreements cannot be transferred to just anyone. In view of the foregoing, these rights of consent are of vital importance with Warner Bros. as they dictate who Warner Bros. will be working closely with on future derivative works.

46.     Despite everything that has transpired, Warner Bros. attempted to compromise its dispute with the Debtors over the Derivative Rights.  To that end, Warner Bros. submitted an initial $6 million bid for the Derivative Rights.   In response, the Debtors deemed Warner Bros. a "Qualified Bidder" for purposes of the May 28, 2025 auction for a proposed sale of the Derivative Rights.  Despite that Warner Bros. even increased its bid to $17.5 million, which Warner Bros. was willing to pay to avoid a contested sale hearing over the Debtors' proposed sale of the Derivative Rights. The Debtors rejected Warner Bros.' offer and declared Alcon as the Successful Bidder for the Derivative Rights.

### B.  The Library Assets as set Forth in the Library Agreements

47.     The agreements between Warner Bros. and Village that the Debtors propose to assume and assign to Alcon in connection with the Library Asset sale (the "Library Agreements") also contain certain exclusive rights, including consent requirements, anti-assignment provisions (including with respect to the Audit Rights, as that term is defined in the Alcon APA), and intellectual property protections, all for Warner Bros.' benefit. As with the proposed sale of Derivative Rights, the Debtors have neither sought nor obtained Warner Bros.' consent to the Debtors' assumption and assignment of the Library Agreements to Alcon or any other Back-Up Bidder in connection with the Library Asset sale.

48.     In addition, after July 31, 2024 (which I understand to be the "Cutoff Date," as such

22

term is used and defined in the Alcon APA), Warner Bros. has continued to pay the Debtors Village's share of participation revenues for Village's co-financed pictures with Warner Bros. in accordance with the terms of the applicable Library Agreements, in the total amount of $67,703,375.

49.    As set forth above, Warner Bros.' claims in connection with the *Matrix* and *Wonka* Arbitrations remain outstanding and, as to the *Matrix* matter, have not been paid.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: June 13, 2025          By: _____
Burbank, California                  Wayne M. Smith

                                     Executive Vice President, Legal
                                     Warner Bros. Studios

23