## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC., *et al.*,[1] | ) Case No. 25-10475 (TMH) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) **Ref. Docket Nos. 276, 438, & 530** |
| | ) |

## NOTICE OF FILING OF FURTHER REVISED SALE
## ORDER FOR THE LIBRARY ASSETS

**PLEASE TAKE NOTICE** that, on April 24, 2025, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Amended Order (I) Approving Bid Procedures for the Sale of the Debtors' Assets, (II) Authorizing the Debtors' Entry Into the Stalking Horse APA and Approving Bid Protections There under, (III) Scheduling an Auction for, and Hearing to Approve, Sale of the Debtors' Assets, (IV) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (V) Approving Assumption and Assignment Procedures, and (VI) Granting Related Relief* [D.I. 276] (the "Bid Procedures Order").[2] The Bidding Procedures Order established Bidding Procedures to govern the Sale and Auction of all or substantially all of the Debtors' assets.

**PLEASE TAKE FURTHER NOTICE** that, on May 27, 2025, the Debtors filed a proposed form order (the "Proposed Sale Order") approving the Sale of the Debtors' Assets to the Successful Bidder [Docket No. 438], a copy of which was attached thereto as Exhibit A.

**PLEASE TAKE FURTHER NOTICE** that, on June 16, 2025, the Debtors filed a revised proposed form order (the "Revised Proposed Sale Order") approving the Sale of the Debtors' Assets to the Successful Bidder [Docket No. 530], a copy of which was attached thereto as Exhibit A.

---

[1] The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343. The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bid Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that, the Debtors have further revised the Proposed Sale Order (the "Further Revised Proposed Sale Order") for the sale of the Library Assets, a copy of which is attached hereto as **Exhibit A**.  For the convenience of the Court and other interested parties, a blackline comparing the Further Revised Proposed Sale Order against the Revised Proposed Sale Order is attached hereto as **Exhibit B**

**PLEASE TAKE FURTHER NOTICE** that a hearing (the "Sale Hearing") to consider the sale of the Library Assets and Studio Assets is scheduled to be held on **June 18, 2025, at 11:00 a.m. (ET)** before the Honorable Thomas M. Horan, United States Bankruptcy Judge.[3]

**PLEASE TAKE FURTHER NOTICE** that the Further Revised Proposed Sale Order remains subject to ongoing review and revision in all respects. The Debtors intend to seek entry of the Further Revised Proposed Sale Order at the Sale Hearing and reserve all rights to revise the Further Revised Proposed Sale Order at or prior to the Sale Hearing.

*[Remainder of Page Intentionally Left Blank]*

---

[3]   The Sale Hearing was originally scheduled for 2:00 p.m. (ET). The time of Sale Hearing has been rescheduled to start at 11:00 a.m. (ET).

Dated: June 18, 2025
Wilmington, Delaware

/s/ Benjamin C. Carver

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Joseph M. Mulvihill (Del. Bar No. 6061)
Benjamin C. Carver (Del. Bar No. 7176)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:    jmulvihill@ycst.com
         bcarver@ycst.com

*Co-Counsel for the Debtors and Debtors in Possession*

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**

Justin R. Bernbrock (admitted *pro hac vice*)
Matthew T. Benz (admitted *pro hac vice*)
321 North Clark Street, 32nd Floor
Chicago, Illinois 60654
Telephone:    (312) 499-6300
Facsimile:    (312) 499-6301
Email:    jbernbrock@sheppardmullin.com
         mbenz@sheppardmullin.com

-and-

Jennifer L. Nassiri (admitted *pro hac vice*)
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
Telephone:    (310) 228-3700
Facsimile:    (310) 228-3701
Email:    jnassiri@sheppardmullin.com

-and-

Alyssa Paddock (admitted *pro hac vice*)
30 Rockefeller Plaza, 39th Floor
New York, NY 10112
Telephone:    (212) 653-8700
Facsimile:    (212) 653-8701
Email:    apaddock@sheppardmullin.com

*Co-Counsel for the Debtors and Debtors in Possession*

**<u>EXHIBIT A</u>**

**Further Revised Proposed Sale Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC., *et al.*,[1] | ) Case No. 25 – 10475 (TMH) |
|  | ) |
|  | ) (Jointly Administered) |
| Debtors. | ) |
|  | ) **Ref. Docket Nos. 11, 197** |
|  | ) |

## ORDER (I) APPROVING THE SALE OF LIBRARY ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES, (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF

Upon the motion [Docket No. 11] (the "Bid Procedures and Sale Motion"),[2] and the

*Debtors' Supplemental Motion for Entry of an Order (A) Approving (I) the Debtors' Designation*

*of the New Stalking Horse Bidder for the Library Assets as set forth in the Stalking Horse*

*Agreement, (II) the Debtors' Entry into the Stalking Horse Agreement, and (III) the Bid*

*Protections and (B) Granting Related Relief* [Docket No. 197] (the "Stalking Horse Supplement")

filed by the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively,

the "Debtors"); and the Court having previously entered the *Amended Order (I) Approving Bid*

*Procedures for the Sale of the Debtors' Assets, (II) Authorizing the Debtors' Entry Into the*

*Stalking Horse APA and Approving Bid Protections Thereunder, (III) Scheduling an Auction for,*

---

[1]    The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343.  The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069.  Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

[2]    Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Bid Procedures and Sale Motion, the Stalking Horse Supplement, the APA, the Bid Procedures, the Bid Procedures Order, and the DIP Order (each, as defined herein), as applicable.

*and Hearing to Approve, Sale of the Debtors' Assets, (IV) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (V) Approving Assumption and Assignment Procedures, and (VI) Granting Related Relief* [Docket No. 276] (the "Bid Procedures Order" and the bidding procedures attached as Exhibit 1 to the Bid Procedures Order, the "Bid Procedures") following the hearing on April 22, 2025 (the "Bid Procedures Hearing"); and Alcon Media Group, LLC (the "Buyer")[3] having submitted the highest and best bid for the Library Assets (defined as the "Purchased Assets" in that certain *Asset Purchase Agreement*, dated as of April 14, 2025, by and among the Buyer and certain of the Debtors as sellers (together, the "Sellers")[4] (as amended, supplemented or otherwise modified from time to time, the "APA")), a copy of which is attached hereto as **Exhibit 1**); and there being no higher or better bids submitted for the Library Assets; and the Buyer having been chosen as the Successful Bidder for the Library Assets; and the Court having conducted a hearing to consider certain relief requested in the Bid Procedures and Sale Motion on June 18, 2025 (the "Sale Hearing"), at which time all objecting and interested parties were offered an opportunity to be heard with respect to the Bid Procedures and Sale Motion and the Stalking Horse Supplement; and the Court having reviewed and considered: (i) the Bid Procedures and Sale Motion; (ii) the Stalking Horse Supplement; (iii) the *Declaration of Reid Snellenbarger in Support of the Debtors' Motion for Entry of Orders (I)(A) Approving Bid Procedures for the Sale of the Debtors' Assets, (B) Authorizing the Debtors' Entry Into the Stalking Horse APA and Approving Bid Protections Thereunder, (C) Scheduling an Auction for, and*

---

[3]   References herein to Buyer shall also refer to one or more Affiliates designated by Buyer prior to the Closing to purchase any portion of the Library Assets.

[4]   The Sellers are set forth in Schedule I appended to the APA.

*Hearing to Approve, Sale of the Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (E) Approving Assumption and Assignment Procedures; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, and (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 198] (the "Sale Declaration"); (iv) the APA; (v) the Bid Procedures; (vi) the Bid Procedures Order; (vii) the record of the Bid Procedures Hearing; (viii) objections, if any, filed with the Court to the sale of the Library Assets to the Buyer, including without limitation any Assumption and Assignment Objection, the *Limited Objection and Reservation of Rights of Magnum Films SPC to Bidding Procedures Motion* [Docket No. 175], the *Limited Objection and Reservation of Rights of Magnum Films SPC to Sale of Debtors' Assets* [Docket No. 331], the *Limited Objection and Reservation of Rights by the Directors Guild of America, Inc., Screen Actors Guild-American Federation of Television and Radio Artists, the Writers Guild of America, West, Inc., Their Respective Pension and Health Plans, and the Motion Picture Industry Pension and Health Plans to Sale of Debtors' Assets* [Docket No. 323], the *Objection and Reservation of Rights to the Debtors' Proposed Sale and Assumption and Assignment of Certain Executory Contracts* [Docket No. 340] (the "Paramount Assumption Objection"), and *Warner Bros. Entertainment Inc.'s Omnibus Objection to (I) the Debtors' Motion for an Order Approving the Sale of the Debtors' Assets, (II) the Debtors' Sale Supplement with Respect Thereto and (III) the Debtors' Assumption and Assignment of Certain Warner Bros. Agreements* [Docket No. 518] (each, an "Objection" and, collectively with any informal objections received by the Debtors, the "Objections"); and (ix) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and after due deliberation the

Court having determined that the legal and factual bases set forth in the Bid Procedures and Sale Motion as it relates to the Library Assets and the Stalking Horse Supplement establish just cause for the relief granted herein; and it appearing that the relief requested in the Bid Procedures and Sale Motion and Stalking Horse Supplement and approval of the APA are in the best interest of the Debtors, their estates and their creditors, and the Debtors having demonstrated good, sufficient and sound business justifications for the relief granted herein;

**IT IS HEREBY FOUND AND DETERMINED THAT:[5]**

A.    <u>Jurisdiction and Venue</u>.    This Court has jurisdiction to consider the Bid Procedures and Sale Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    <u>Final Order</u>.  This order (this "<u>Order</u>") constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, expressly directs that this Order be

---

[5] The findings and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  The Court's findings also shall include any oral findings of fact and conclusions of law made by the Court during the Sale Hearing.

effective immediately upon entry, and waives any stay of execution or implementation of this Order, and expressly directs entry of judgment as set forth herein.

C.      Statutory Predicates.  The statutory and other legal predicates for the relief sought in the Bid Procedures and Sale Motion and granted herein are sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Bankruptcy Rules 2002, 4001, 6004, 6006, 9007 and 9014, and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

D.      Notice and Opportunity to Be Heard.  The Debtors have provided proper, timely, adequate and sufficient notice of, and a fair and reasonable opportunity to object and be heard with respect to, the Bid Procedures and Sale Motion, the Stalking Horse Supplement, the Bid Procedures, the Bid Procedures Order, the Sale Hearing, and the sale of the Library Assets pursuant to the APA (the "Transaction") free and clear of any Interests (as defined below) (other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order, and all "Guild Motion Picture Interests," if any, which are defined as security agreements, assumption agreements, intercreditor agreements, interparty agreements, trust agreements, collection account management agreements and guaranty agreements entered into by the Debtors, the affiliated-Debtor entities, and/or various third parties, as applicable, with respect to the Purchased Assets and in favor of each or all of the "Union Entities"[6]) within the

---

[6]   The Directors Guild of America, Inc., Screen Actors Guild-American Federation of Television and Radio Artists, the Writers Guild of America, West, Inc., their respective pension and health plans, and the Motion Picture Industry Pension and Health Plans, as applicable.

meaning of section 363(f) of the Bankruptcy Code, the *Notice of Successful Bidder for Library Assets* [Docket No. 396], and the assumption and assignment of the executory contracts and unexpired leases to be assumed and assigned to the Buyer at Closing pursuant to this Order and the terms of the APA (collectively, the "Assumed Contracts"), in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 6006, 9007 and 9014, Local Rules 2002-1, 6004-1 and 9006-1 and the Bid Procedures Order, to all persons and entities entitled to such notice, including the Notice Parties and all other persons and entities as directed by the Court.   Such notice was good, sufficient and appropriate under the circumstances, including but not limited to providing each counterparty a full and fair opportunity to object to the assumption and assignment of its Assumed Contract and its proposed Cure Amounts; and no other or further notice of any of the foregoing is required.   The Debtors published the Bid Procedures and Sale Motion, the Stalking Horse Supplement, the Bid Procedures Order, the Bid Procedures, the APA (and all exhibits and schedules thereto), the Sale Notice, the Assumption and Assignment Notice, and certain other documents relevant to the Sale on the case website.

E.     Sound Business Purpose.   The Debtors have demonstrated good, sufficient and sound business purposes and justifications for approval of the Bid Procedures and Sale Motion. The approval of and entry into the APA and any ancillary agreements thereto (i) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties; (ii) provide value and are beneficial to the Debtors' estates, and are in the best interests of the Debtors, their estates and their stakeholders; and (iii) are reasonable and appropriate under the circumstances.   Business

justifications for entry into the Transaction and the APA include, without limitation, the following: (i) the APA constitutes the highest or best offer received for the Library Assets; (ii) the APA presents the best opportunity to maximize the value of the Library Assets; (iii) failure to consummate the Transaction expeditiously could materially diminish creditor recoveries; and (iv) the immediate consummation of the Transaction is necessary to maximize the value of the Debtors' estates.

F.    <u>Marketing Process</u>.  As demonstrated by the Sale Declaration and testimony adduced at the Bid Procedures Hearing and the Sale Hearing, the Debtors and their advisors thoroughly marketed the Library Assets and conducted the marketing and sale process as set forth in and in accordance with the Bid Procedures and Sale Motion, the Stalking Horse Supplement, and the Bid Procedures Order.  Based upon the record of these proceedings, all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Library Assets.

G.    <u>Compliance with Bid Procedures</u>.  The Debtors conducted an open and fair sale process.  The sale process was non-collusive in all respects, and the Debtors (a) afforded all interested parties a full, fair, and reasonable opportunity to qualify as a Qualified Bidder and make an offer to purchase the Library Assets, (b) provided Potential Bidders, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Library Assets, and (c) appropriately considered all Bids that were duly submitted in accordance with the Bid Procedures.  The Debtors, the Buyer, and their respective counsel and other advisors have complied with the Bid Procedures and the Bid Procedures Order. The Buyer is the designated Successful Bidder, and the APA is designated the Successful Bid for the Purchased

Assets enumerated therein, in each case, in accordance with the Bid Procedures Order. The Buyer and its professionals have complied in all material respects with the Bid Procedures Order, the Bid Procedures, the Assumption and Assignment Procedures, the Warner Bros. Assumption and Assignment Procedures, and all other applicable orders of this Court in negotiating and entering into the APA, and the Transaction and the APA likewise comply with the Bid Procedures Order and all other applicable orders of this Court.

H.    <u>Highest or Best Value</u>.  Consistent with their fiduciary duties, and in consultation with the Consultation Parties, the Debtors have demonstrated good, sufficient and sound business reasons and justifications for entering into the Transaction and the performance of their obligations under the APA, including, but not limited to, the fact that (a) the total consideration provided by the Buyer for the Library Assets as reflected in the APA is the highest or otherwise best offer for the Library Assets; (b) the consideration provided by the Buyer under the APA will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative, including a separate liquidation of the Library Assets; (c) the Transaction contemplated by the APA presents the best opportunity to maximize the value of the Library Assets; and (d) unless the Transaction is concluded expeditiously as provided for in the Bid Procedures and Sale Motion and pursuant to the APA, creditor recoveries will be diminished.

I.    <u>Fair Consideration</u>.  The consideration the Buyer will pay under the APA constitutes (i) fair and reasonable consideration for the Library Assets; and (ii) reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act

and other laws of the United States, any state, territory, possession thereof or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.

J.      <u>Free and Clear Sale</u>.  The Debtors may sell the Library Assets free and clear of all Interests (other than any Assumed Liabilities expressly assumed under the APA or this Order, and all Guild Motion Picture Interests, if any, as applicable), and no such Interests may be asserted against the Buyer or any Buyer Related Party (as defined below) after the Closing Effective Date, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Any holder of Interests that objected to the Transaction or the Stalking Horse Motion and the Bid Procedures and Sale Motion as it relates to the Library Assets and that has an Interest in the Library Assets could be compelled in a legal or equitable proceeding to accept money in satisfaction of such Interest pursuant to section 363(f)(5) or fall within one or more of the other subsections of section 363(f), including section 363(f)(4) because such Interest is in a bona fide dispute, and, therefore, are adequately protected by having their Interests on the Library Assets attach solely to the proceeds of the Transaction ultimately attributable to the sale of the property on which such holders have an Interest, in the same order of priority, and with the same validity, force and effect that such Interests had prior to the consummation of the Transaction, subject to any rights, claims or defenses of the Debtors and their estates.  Any Interest holders that did not object, or that withdrew their objections, to the Bid Procedures and Sale Motion, the Stalking Horse Supplement or the Transaction, are deemed to have consented to the sale of the Library Assets free and clear of their respective Interests on the Library Assets pursuant to section 363(f)(2) of the Bankruptcy Code.  For avoidance of doubt, the term Library Assets and Purchased Assets, as used herein and/or in the

APA, shall not be deemed to include the Magnum Assets (as defined below) because between 2013 and 2020, Debtors Village Roadshow Films (BVI) Limited ("VRF"), Village Roadshow Distribution (BVI) Limited ("VRD"), Village Roadshow Films North America Inc. ("VRFNA"), Village Roadshow Pictures North America Inc. ("VRPNA"), and Magnum Films SPC ("Magnum") entered into (a) that certain *Sale Agreement*, dated December 20, 2013, as amended by that certain *Amendment No. 4 to Sale Agreement* dated November 10, 2020, by and among VRF, VRD and Magnum (as amended, restated, supplemented or otherwise modified from time to time) (the "Sale Agreement"), (b) that certain *Fourth Amended and Restated Co-Investment Agreement*, dated as of November 10, 2020, by and among VRF, VRD, VRFNA, Village Roadshow Distribution USA Inc. ("VRD-USA"), VRPNA, and Magnum (as amended, restated, supplemented or otherwise modified from time to time) (the "Co-Investment Agreement (Foreign & Domestic)," (c) that certain Sec*ond Amended and Restated Co-Investment Agreement (Global)* dated as of November 10, 2020, by and among VRFG, VRD-USA and Magnum (as amended, restated, supplemented or otherwise modified from time to time) (the "Co-Investment Agreement (Global)"), (d) that certain *Second Amended and Restated Consolidated Intercreditor Agreement* dated as of September 5, 2024, by and among Warner Bros. Production Limited, VRD, VRF, WAV Distribution LLC ("WAV"), VRD-USA, VRFNA, Village Roadshow Entertainment Group USA Inc. ("VREG-USA"), Magnum and U.S. Bank National Association ("Permanent Financing Trustee") (as amended, restated, supplemented or otherwise modified from time to time); and (e) that certain *Second Amended and Restated Intercreditor Agreement* dated as of November 10, 2020, by and among Columbia Pictures Industries, Inc., VRFG, VRD-US, VREG-USA, Magnum and the Permanent Financing Trustee (as amended, restated, supplemented or

otherwise modified from time to time) (subparagraphs (a) through (e) collectively, the "<u>Magnum Sale, Co-Investment and Intercreditor Agreement</u>") with respect to the sale of the Mangum Assets to Mangum. The Magnum Sale, Co-Investment and Intercreditor Agreements resulted in Magnum, after exercising various rights and options thereunder, purchasing and acquiring a percentage of certain of the Debtors' rights (including certain intellectual property rights) in and to certain Pictures ("<u>Distribution Rights</u>") and the proceeds of such Distribution Rights (such proceeds, the "<u>Magnum Distributable Amount</u>**" and the "<u>Magnum Payments</u>**" and together with the Distribution Rights, the "<u>Magnum Assets</u>"), with all such Magnum Distributable Amounts and Magnum Payments being paid to Magnum in accordance with the Magnum Sale, Co-Investment and Intercreditor Agreements or as otherwise agreed between the Buyer and Magnum prior to Closing. The Library Assets are not being sold free and clear of Magnum's interest in the Magnum Assets (the "<u>Magnum Ownership Interest</u>"). Notwithstanding anything contained herein to the contrary, the Transaction shall not in any way prevent, impede, interfere with, or adversely affect the Magnum Assets, the Magnum Ownership Interest and/or the payment of the Mangum Distributable Amount and Mangum Payments to Mangum. Notwithstanding any other provision in this Order or the APA, nothing contained in this Order or the APA, including the free and clear or 363(f) findings or provisions, shall extinguish, impair, or otherwise affect any right of recoupment, to the extent any such rights exist, of Paramount Global and its affiliates, including Paramount Pictures Corporation, Paramount Pictures International, and Paramount Pictures International Limited (collectively, "<u>Paramount</u>").

K.     <u>Buyer Reliance on Free and Clear Sale</u>. The Buyer would not have entered into the APA and would not consummate the Transaction if the sale of the Library Assets were not

free and clear of all Interests (other than any Assumed Liabilities expressly assumed under the APA or this Order, all Guild Motion Picture Interests, if any, and the Magnum Ownership Interest, as applicable), if the Buyer or any Buyer Related Party would, or in the future could, be liable for any such Interests, or if any such Interests would or could be asserted against the Buyer or any Buyer Related Party after the Closing Effective Date.  A sale of the Library Assets other than one free and clear of all Interests would adversely impact the Debtors, their estates and their creditors, and would yield substantially less value for the Library Assets and the Debtors' estates, with less certainty than that which is provided by the Transaction.  The total consideration to be provided under the APA reflects the Buyer's reliance on this Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to, and possession of, the Library Assets free and clear of all Interests (other than any Assumed Liabilities expressly assumed under the APA or this Order, and all Guild Motion Picture Interests, if any, as applicable), including, without limitation, to the greatest extent permitted by applicable law, and any potential derivative, vicarious, transferee or successor liability Interests.

L.      "Interests".  As used in this Order, the term "Interest" includes, in each case to the extent against or with respect to any of the Debtors or in, on, or against or with respect to any of the Library Assets: Adverse Claims (as defined in the APA), liens (as defined in section 101(37) of the Bankruptcy Code), claims (as defined in section 101(5) of the Bankruptcy Code), debts (as defined in section 101(12) of the Bankruptcy Code), encumbrances, obligations, Liabilities, any defect or imperfection in title, demands, guarantees, actions, suits, defenses, license grant by any Seller, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, rights, or interests of any kind or nature whatsoever, whether known or unknown,

inchoate or not, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to, (i) mortgages, deeds of trust, pledges, charges, security interests, hypothecations, encumbrances, easements, servitudes, leases, subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, rights of use or possession, leases, conditional sale arrangements, or any similar rights, (ii) all claims, including, without limitation, all rights or causes of action under contract, tort, declaratory relief, intellectual property rights or otherwise (and whether in law or equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other person, consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity or otherwise; (iii) all debts, liabilities, obligations, contractual or tort rights and claims, and labor, employment, and pension claims; (iv) any rights that purport to give any party a right or option impose any liability or effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Debtors', the Buyer's or any Buyer Related Party's interest in the Library

Assets, or any similar rights; (v) any rights under labor or employment agreements; (vi) any rights under pension, multiemployer plan (as such term is defined in section 3(37) or section 4001(a)(3) of the Employment Retirement Income Security Act of 1974 (as amended, "ERISA"), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (vii) any other employee, worker's compensation, occupation disease, or unemployment or temporary disability claims, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, each as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code of any similar state law, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (l) the WARN Act (29 U.S.C. §§ 2101, et seq.) or any state or other laws of similar effect; (viii) any bulk sales or similar law; (ix) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the assets or businesses of the Debtors prior to the Closing; (x) any unexpired and executory or non-

executory contract or unexpired lease to which a Debtor is a party that is not an Assumed Contract; (xi) any environmental liabilities, debts, claims, fines, penalties, or obligations arising from conditions, facts, or circumstances first existing or occurring prior to Closing (including, without limitation, the presence of or exposure to chemical, hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis and at any time, including, without limitation, any liabilities, debts, claims, fines, penalties, or obligations arising under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), or any other environmental, health, and safety laws; and (xii) Interests arising under or in connection with any acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors, Affiliates, or Subsidiaries, including, but not limited to, Interests arising under any theory, law, or doctrines of successor, transferee, or vicarious liability, violation of the Securities Act, the Exchange Act, or other applicable securities laws or regulations, breach of fiduciary duty, or aiding or abetting breach of fiduciary duty, or any similar theories under applicable Law or otherwise; provided that, in each case, the term Interests shall not mean or include any of the foregoing pursuant to the Magnum Sale, Co-Investment and Intercreditor Agreements or the Magnum Ownership Interest.

M.     No Successor or Other Derivative Liability.  By consummating the Transaction pursuant to the APA, the Buyer is not a mere continuation of any of the Debtors or any Debtor's estate, and there is no continuity of enterprise or otherwise or common identity between the Buyer, on the one hand, and any Debtor, on the other.  The Buyer is not holding itself out as a continuation of any Debtor.  The Buyer is not a successor to any Debtor or any Debtor's estate by reason of any theory of law or equity, and the Transaction does not amount to a consolidation,

merger or *de facto* merger of the Buyer and the Debtors or any of the Debtors' estates. Neither the Buyer, nor its Affiliates or their respective predecessors, designees, successors, assigns, members, partners, principals, officers, directors, or direct or indirect shareholders (or the equivalent thereof), in their capacities as such (collectively, the "Buyer Related Persons") shall assume or in any way be responsible for any obligation or liability of any Debtor (or any affiliate of any Debtor) or any Debtor's estate, except as expressly provided in the APA and pursuant to the Magnum Sale, Co-Investment and Intercreditor Agreements. The sale and transfer of the Library Assets to the Buyer, including the assumption by the Debtors and assignment, transfer and/or sale to the Buyer of any of the Assumed Contracts, will not subject the Buyer or any Buyer Related Persons to any Interests or any liability with respect to the operation of the Debtors' businesses prior to the Closing or by reason of such transfer, except that, upon the Closing, the Buyer shall remain liable for the applicable Assumed Liabilities.

N.     Arm's-Length Sale. The sale process engaged in by the Debtors and the Buyer was conducted in accordance with the Bid Procedures and the Bid Procedures Order. The APA was negotiated, proposed, and entered into by the Sellers and the Buyer in good faith, without collusion of any kind, and from arm's-length bargaining positions, and is substantively and procedurally fair to all parties in interest. The Debtors and the Buyer and their respective advisors have complied, in good faith, in all material respects with the Bid Procedures Order and the Bid Procedures. The Debtors and their management, board of directors, employees, agents, advisors, and representatives, and the Buyer and its employees, agents, advisors and representatives, each acted in good faith and without collusion or fraud of any kind. The Buyer subjected its bid to competitive bidding in accordance with the Bid Procedures and was designated the Successful

Bidder for the Library Assets in accordance with the Bid Procedures and the Bid Procedures Order. All payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Transaction have been disclosed.  The form and total consideration to be realized by the Debtors under the APA constitutes fair and reasonably equivalent value, full and adequate consideration, and reasonable market value for the Library Assets.

O.    Good Faith.  The Debtors, the Buyer and their respective counsel and other advisors have negotiated and entered into the APA and each of the transactions contemplated thereby in good faith, without collusion, from arm's-length bargaining position, and substantively and procedurally fair to all entities.  The Buyer is a good faith purchaser and is acting in good faith within the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to all of the protections afforded thereby.  The Debtors were free to deal with any other party interested in acquiring some or all of the Library Assets.  Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the Transaction, the APA, or any of the transactions contemplated thereby to be avoided or subject to monetary damages under section 363(n) of the Bankruptcy Code, or that would prevent the application of sections 363(m) of the Bankruptcy Code.  The Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction.  The Buyer has not acted in a collusive manner with any person or entity. The Buyer has complied with the Bid Procedures and all provisions of the Bid Procedures Order. All payments to be made or caused to be made by the Buyer and all agreements entered into by the Buyer and the Debtors under the APA in connection with the Transaction have been disclosed and are appropriate.  The APA was not entered into, and the Transaction is not being

consummated, for the purpose of hindering, delaying or defrauding creditors under laws of the United States, any state, territory, possession thereof or the District of Columbia, or any other applicable law.   Neither the Debtors nor the Buyer have entered into the APA or are consummating the Transaction with any fraudulent or otherwise improper purpose.

P.   <u>No Collusion</u>.  The APA was not controlled by an agreement between potential bidders within the meaning of section 363(n) of the Bankruptcy Code.  The Debtors and the Buyer have not engaged in any conduct that would cause or permit the APA or the consummation of the Sale to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.  Neither the Debtors nor the Buyer has entered into the APA or is consummating the Sale with any fraudulent or otherwise improper purpose.

Q.   <u>Assumption and Assignment of Assumed Contracts</u>.   The assumption and assignment of the Assumed Contracts is an integral part of the Transaction, is in the best interests of the Debtors and their estates, and represents the valid and reasonable exercise of the Debtors' sound business judgment.   Specifically, the assumption and assignment of the Assumed Contracts (i) is necessary to sell the Library Assets to the Buyer as contemplated by the APA, (ii) limits the losses suffered by counterparties to the Assumed Contracts, and (iii) maximizes the recoveries of other creditors of the Debtors by eliminating claims against the Debtors' estates that would arise from the Debtors' rejection of the Assumed Contracts.  Any counterparty to any Assumed Contract that has not actually filed with the Court and served on the Notice Parties (as defined in the Bid Procedures Order) an Assumption and Assignment Objection, as of the date specified in: (i) the Bid Procedures Order; (ii) the *Supplemental Notice of Possible Assumption and Assignment of Certain Executory Contracts* [Docket No. 297] (the "<u>First Supplemental</u>

Assumption Notice"); (iii) the *Second Supplemental Notice of Possible Assumption and Assignment of Certain Executory Contracts* [Docket No. 345] (the "Second Supplemental Assumption Notice"); and (iv) the *Third Supplemental Notice of Possible Assumption and Assignment of Certain Executory Contracts* [Docket No. 510] (the "Third Supplemental Assumption Notice"), as applicable, is deemed to have consented to the assumption and assignment of the Assumed Contract, and to the applicable Cure Amounts. Such counterparty shall forever be barred and estopped from objecting to the assumption, assignment and transfer of such Assumed Contract to Buyer and to the Cure Amount as the amount to cure all defaults to satisfy section 365 of the Bankruptcy Code and from asserting that any additional amounts are due or defaults exist. For the avoidance of doubt, the executory obligations owing to Magnum with respect to the Magnum Assets pursuant to the Magnum Sale, Co-Investment and Intercreditor Agreements (including without limitation the payment of the Magnum Distributable Amount and Magnum Payments to Magnum as well as all audit and inspection rights of Magnum thereunder), are obligations arising under Assumed Contracts and shall, unless otherwise agreed between the Buyer and Magnum be deemed assumed and assigned to the Buyer upon Closing.

R.     Compliance with Section 365 of the Bankruptcy Code. The Debtors have met all requirements of section 365(b) of the Bankruptcy Code with respect to the assumption and assignment of each of the Assumed Contracts. The Debtors and Buyer have provided adequate assurance of future performance (within the meaning of section 365(b)(1) of the Bankruptcy Code) of cure of any default existing under any of the Assumed Contracts on or before the Closing Effective Date. The Buyer has demonstrated adequate assurance of future performance

of and under the Assumed Contracts within the meaning of sections 365(b) and 365(f)(2) of the Bankruptcy Code.  Pursuant to section 365(f) of the Bankruptcy Code, the Assumed Contracts shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in the Assumed Contracts or other restrictions prohibiting their assignment or transfer.

S.     <u>Property of the Estates</u>.  The Library Assets constitute property of the Sellers' estates within the meaning of section 541(a) of the Bankruptcy Code.  The Sellers are the sole and lawful owners of the Sellers' right, title and interest in the Library Assets, and no other person has any ownership right, title, or interest therein.

T.     <u>Validity of the Transaction</u>.  The consummation of the Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in all respects in connection with the Transaction.  As of the Closing, the sale and assignment of the Library Assets and the Assumed Contracts to the Buyer will be a legal, valid and effective transfer of the Library Assets and the Assumed Contracts, and will vest the Buyer with all right, title and interest of the Debtors in and to the Library Assets and the Assumed Contracts free and clear of all Interests (other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order, and all Guild Motion Picture Interests, if any, as applicable).  The Debtors have full corporate or other applicable authority to execute the APA and all other documents contemplated thereby, and the Transaction has been duly and validly authorized by all necessary corporate action of the Debtors.

Upon entry of this Order, other than any consents identified in the APA, no consent or approval from any other person, entity or legal authority is required to consummate the Transaction.

U.   <u>No Sub Rosa Plan</u>.   Neither the Transaction nor the APA impermissibly restructures the rights of any of the Debtors' creditors or impermissibly dictates the terms of a liquidating plan of reorganization of the Debtors.   Neither the Transaction nor the APA constitutes a *sub rosa* or *de facto* plan of reorganization or liquidation.

V.   <u>No Stay of Order</u>.   Time is of the essence to implement the APA and consummate the Transaction.   The Transaction must be approved and consummated promptly in order to preserve the value of the Library Assets and to maximize the value to the Debtors, their estates, their creditors and all other parties in interest and to ensure the Debtors' compliance with their obligations under their post-petition financing agreements.   The Debtors have demonstrated compelling circumstances and sound business justifications for the immediate approval and consummation of the Transaction as contemplated by the APA.   Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d), 7062 or any applicable provisions of the Local Rules, this Order shall not be stayed and shall be effective and enforceable immediately upon entry.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.   <u>Sale Motion Granted</u>.   The Bid Procedures and Sale Motion as it relates to the Library Assets and the Stalking Horse Supplement, and the relief requested therein (to the extent not previously granted by the Court pursuant to the Bid Procedures Order or otherwise), is GRANTED and approved as set forth herein.   The Buyer is hereby approved as the Successful Bidder for the Library Assets in accordance with the Bid Procedures Order and this Order.

2.     <u>Objections Overruled</u>.   Unless otherwise provided for herein or in the Bid Procedures Order, any Objections to or reservation of rights against the Bid Procedures and Sale Motion as it relates to the Library Assets, the Stalking Horse Supplement or the relief requested therein that have not been withdrawn, waived, or settled are hereby OVERRULED on the merits with prejudice.   All persons and entities that failed to timely object thereto and to the consummation of the Transaction are deemed to consent to the relief sought therein and to the sale of the Library Assets, including assumption, assignment and transfer of Assumed Contracts, to the Buyer.   All objections to the entry of this Order or to the relief granted herein that were not timely filed are hereby forever barred.

3.     <u>Transaction Approved</u>.   The APA and all transactions contemplated thereby, including the Transaction, are hereby APPROVED.   The Debtors are authorized to enter into the APA (and all ancillary documents), and all of the terms and conditions thereof, and all of the Transactions contemplated therein are approved in all respects, including, without limitation, any amendment to the APA that the Debtors and the Buyer determines is necessary or desirable in connection with the Transaction.   The consummation of the Transaction is hereby approved and authorized under sections 363(b) and 365 of the Bankruptcy Code.

4.     <u>Prior Findings of Fact and Conclusions of Law</u>.   The Court's findings of fact and conclusions of law in the Bid Procedures Order, including the record of the Bid Procedures Hearing, and the findings of fact recited above are incorporated herein by reference.   In the event that the terms of this Order and the Bid Procedures Order are in conflict, this Order will control.

5.     <u>Adequate and Reasonable Notice.</u>   Notice of the Bid Procedures, the Transaction, the assumption and assignment of the Assumed Contracts pursuant to the APA, the Cure Amounts,

the Sale Hearing, and all deadlines related thereto was good, sufficient, and appropriate under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

6.    _Debtors' Performance Authorized_.  The Debtors are hereby authorized and directed to enter into and perform their obligations under the APA, and to take such other actions as may be necessary or desirable to effectuate the terms of the APA, including providing transition services, if needed, and other instruments or documents that may be reasonably necessary or desirable to implement and effectuate the terms of the APA, the Transaction, or this Order, including, without limitation, deeds, assignments, stock powers, transfers of membership interests and any other instruments of transfer, without further order of the Court.  The Debtors are hereby further authorized to take all other actions as may reasonably be requested by the Buyer or otherwise for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, possession of any or all of the Library Assets and the Assumed Contracts, as may be necessary or appropriate for the Debtors to perform their obligations under the APA and consummate the Transaction, including, without limitation, providing transition services, assisting in the transfer of bank accounts and similar services without further order of the Court.

7.    The Debtors are hereby authorized and empowered to cause to be executed and filed such statements, instruments, releases and other documents with respect to the Library Assets that are necessary or appropriate to effectuate the APA, the Transaction, or this Order, including, as applicable, directions to banks, amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings or recordings as may be required under appropriate provisions of the applicable laws of all applicable

governmental units or as any of the officers of the Debtors may determine are necessary or appropriate.

8.     <u>Valid Transfer and Assignment</u>.  Effective as of the Closing Effective Date, the sale and assignment of the Assumed Contracts and the Library Assets by the Debtors to the Buyer shall constitute a legal, valid and effective transfer and assignment of the Assumed Contracts and the Library Assets, notwithstanding any requirement for approval or consent by any person, and will vest in the Buyer with all right, title and interest of the Debtors and their respective estates in and to the Assumed Contracts and the Library Assets, free and clear of all Interests (other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order, and all Guild Motion Picture Interests, if any, as applicable), pursuant to section 363(f) of the Bankruptcy Code.

9.     <u>Free and Clear Sale</u>.  Except to the extent specifically provided in the APA, upon the Closing Effective Date, the Debtors shall be, and hereby are, authorized and empowered, pursuant to sections 105, 363(b) and 363(f) of the Bankruptcy Code, to sell and transfer to the Buyer the Library Assets.  The sale and transfer of the Library Assets to the Buyer shall vest in the Buyer with all right, title, and interest of the Debtors in and to the Library Assets free and clear of any and all Interests of any person or entity to the fullest extent permitted by applicable law (other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order, or pursuant to the Magnum Sale, Co-Investment and Intercreditor Agreements, including the Magnum Ownership Interest, and all Guild Motion Picture Interests, if any, as applicable), with all such Interests to attach to the net proceeds of the Transaction ultimately attributable to the sale of the property on which such holders have an Interest, in the same order of priority, and with

-24-

the same validity, force and effect that such Interests had prior to the consummation of the Transaction, subject to any rights, claims or defenses of the Debtors or their estates. Following the Closing, no holder of any Interest on any of the Library Assets shall interfere with the Buyer's or any Buyer Related Party's use or enjoyment of any of the Library Assets based on or related to such Interest or any actions that the Debtors have taken or may take in their chapter 11 cases and no interested party may take any action to prevent or interfere with consummation of the Transaction. Moreover, with respect to motion pictures rights transferred to the Buyer and produced subject to the Guild Motion Picture Interests, if any, Buyer shall execute standard Guild assumption agreements within a reasonable period after entry of this Order.

10. The provisions of this Order authorizing the sale and transfer of the Library Assets free and clear of Interests (other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order, or pursuant to the Magnum Sale, Co-Investment and Intercreditor Agreements, including the Magnum Ownership Interest, and all Guild Motion Picture Interests, if any, as applicable) shall be self-executing, and neither the Debtors, on one hand, nor the Buyer, on the other, shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate, or implement the provisions of this Order. For the avoidance of doubt, on or after the Closing Effective Date, the Debtors and the Buyer shall be authorized, but not directed, to file any such releases, termination statements, assignments, consents or other instruments in any jurisdiction to record the release, discharge and termination of Interests on the Library Assets pursuant to the terms of this Order.

11.   <u>Interest Release Documentation</u>.   This Order shall be (a) effective as a determination that, as of the Closing Effective Date, all Interests on the Library Assets (except as otherwise expressly assumed under, or expressly permitted by, the APA, or pursuant to the Magnum Sale, Co-Investment and Intercreditor Agreements, including as to the Magnum Ownership Interest) shall be unconditionally released, discharged and terminated as to the Buyer and the Library Assets; and (b) binding upon all persons and entities, including all the Debtors' creditors and any holder of an Interest on any of the Library Assets, and all such persons and entities are hereby authorized to execute such documents and take all other actions they determine in their sole discretion may be reasonably necessary to release their respective Interests on the Library Assets, if any, as requested by, and at the expense of, the Debtors.  If any person or entity that has filed a financing statement, mortgage, mechanics lien, *lis pendens* or other document, instrument, notice or agreement evidencing any Interest on the Library Assets has not, at the Debtors' request and expense and in forms provided by the Debtors (subject to approval by such person or entity in their sole discretion), delivered to the Debtors on or before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, releases or instruments of satisfaction that the person or entity has with respect to the Library Assets, the Debtors and the Buyer are authorized to (x) execute and file such termination statements, releases, instruments of satisfaction or other documents with respect to the Library Assets on behalf of the applicable person or entity, and (y) file, register or otherwise record a certified copy of this Order which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests on the Library Assets.  This Order is deemed to be in recordable form

sufficient to be placed in the filing or recording system of each and every federal, state, local, tribal or foreign government agency, department or office.

12.     <u>Authorization of Recording Officers</u>.  This Order shall be binding upon all persons and entities, including filing agents or officers, title agents or companies, recorders of mortgages or deeds, registrars, administrative agencies, governmental units or departments, secretaries of state, governmental officials and all other persons or entities that may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments regarding the Library Assets or who may be required to report or insure any title or state of title in or to the Library Assets, (collectively, the "<u>Recording Officers</u>").  All Recording Officers are hereby authorized to (a) accept any and all documents or instruments necessary and appropriate to consummate the Transaction or to record and reflect that the Buyer is the owner of the Library Assets free and clear of all Interests (other than Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order, and all Guild Motion Picture Interests, if any, as applicable) and (b) strike all recorded Interests on the Library Assets from their records.

13.     <u>Direction to Surrender the Library Assets</u>.  All persons or entities in possession or control of any of the Library Assets, either presently or on or before the Closing Effective Date, are authorized to surrender possession or control of the Library Assets to the Buyer on the Closing Effective Date.

14.     <u>Direction to Make Payments to Buyer</u>.  Upon occurrence of the Closing Effective Date, any Contract counterparty or other party that is required, by agreement, contract or applicable law to make royalty or similar payments to Sellers on account of the Library Assets shall instead

make any such payments to the Buyer directly to the account or accounts designated by the Buyer; *provided* that, unless otherwise agreed in writing between the Buyer and Mangum, any royalty or similar payments which constitute the Magnum Distributable Amount and Magnum Payments to Magnum as required pursuant to the terms of the Magnum Sale, Co-Investment and Intercreditor Agreements must continue to be paid to Magnum in a manner to be agreed to by the Buyer and Magnum prior to the Closing, including, without limitation, by (i) the establishment by Buyer of one or more segregated accounts at an established financial institution in the United States of America in the name of Buyer into which all Mangum Distributable Amounts and Magnum Payments shall be made and over which Magnum will be granted security pursuant to one or more account control agreements; (ii) the filing by Magnum of financing statement, copyright mortgages and/or amendments thereto in any relevant jurisdiction to continue the perfection of the recharacterization liens granted to Magnum in the Magnum Assets; and (iii) the execution of amended intercreditor agreements revised to reflect the changes in relevant parties, rights and entitlements resulting from the sale transaction and the chapter 11 cases.

15.    No Successor Liability.  The Buyer and the Buyer Related Persons are not and shall not be (a) deemed a "successor" in any respect to any of the Debtors or any of their estates as a result of the consummation of the Transaction or any other event occurring in the Debtors' chapter 11 cases under any theory of law or equity; (b) deemed to have, *de facto* or otherwise, merged or consolidated with or into any of the Debtors or any of their estates; (c) deemed to be an alter ego of or have a common identity with any of the Debtors; (d) deemed to have a continuity of enterprise with any of the Debtors; (e) deemed to be a continuation or substantial continuation of any of the Debtors or any enterprise of any of the Debtors, including (with respect to clause (a) through (e)

of this paragraph) within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, health, products liability, safety laws, or other law, doctrine rule or regulation (including any filing requirements under any such laws, rules or regulations) with respect to the Debtors' liability under such law, doctrine, rule or regulation including, without limitation, under COBRA, CERCLA, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, each as amended, the Americans with Disabilities Act of 1990 (as amended), the Federal Rehabilitation Act of 1973 (as amended), and the National Labor Relations Act, 29 U.S.C. § 151, et seq.; or (f) other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order, be liable for (i) any environmental liabilities, debts, claims, fines, penalties, or obligations arising from conditions, facts, or circumstances first existing or occurring prior to Closing (including, without limitation, the presence of or exposure to chemical, hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis and at any time, including, without limitation, any liabilities, debts, claims, fines, penalties, or obligations arising under CERCLA, or any other environmental, health, and safety laws, or (ii) any liabilities, debts, claims, fines, penalties, or obligations of or required to be paid by the Debtors (A) for any taxes of any kind for any period, (B) under any labor, employment, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules, or regulations), or (C) under any products liability or intellectual property law or doctrine, or any other law or doctrine, with respect to the Debtors' liability under any law, rule, regulation, or doctrine.

16.     Except as expressly provided in the APA or this Order with respect to the Assumed Liabilities, and all Guild Motion Picture Interests, if any, as applicable, the Buyer and the Buyer Related Persons, in such capacities, shall not (a) assume, nor be deemed to have assumed or in any way be responsible for (i) any liability, Interest or obligation (of any kind, character, or description, whether known or unknown, asserted or unasserted, matured or unmatured, liquidated or unliquidated, disputed or undisputed, accrued or unaccrued, due or to become due, fixed, absolute, contingent or otherwise) of any of the Debtors or any of their estates or related to the Library Assets including, but not limited to, any Excluded Liabilities, any bulk sales law, successor or vicarious liability, liability or responsibility for any claim against any of the Debtors or against any related person of the Debtors, or any similar liability or obligation, (ii) any remaining claims (as defined in section 101(5) of the Bankruptcy Code) or liens against the Debtors or any of their predecessors or affiliates, (iii) liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to, the operation of the Library Assets prior to Closing, or (b) have any liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or product lines or any of the Debtors' (or their predecessors' or affiliates') obligations based, in whole or part, directly or indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon any theory of antitrust, environmental, successor, or transferee liability, *de facto* merger or substantial continuity, labor and employment, infringement or products liability, whether known or unknown as of such Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated, including, without limitation, (i) liabilities or obligations under the CERCLA or any other environmental, health, and safety laws, (ii) liabilities or

obligations under ERISA, COBRA, or other similar state or local laws with respect to any pension plan, welfare plan, or other employee benefit plan, (iii) liabilities or obligations under any collective bargaining agreement or employment agreement, or (iv) any liabilities or obligations or any foreign, federal, state, or local labor, employment, or environmental law whether of similar import or otherwise by virtue of such Buyer's purchase of any Library Assets or assumption of the Assumed Liabilities.  The Bid Procedures and Sale Motion, the Stalking Horse Supplement, and notices provided in accordance with the Bid Procedures contain sufficient notice of such limitation in accordance with applicable law.  Except for the Buyer's assumption of the Assumed Liabilities pursuant to the APA and this Order, Guild Motion Picture Interests, if any, as applicable, and claims brought by the Debtors to enforce the express terms of the APA and this Order, the transfer of the Library Assets and the Assumed Contracts to the Buyer under the APA will not result in (a) the Buyer or the Buyer Related Persons having any liability or obligation for any Interest made or asserted against any of the Debtors (or their respective affiliates, together with their respective predecessors, successors, assigns, members, partners, officers, directors, principals or direct or indirect equityholders), including without limitation in respect of the Excluded Liabilities, nor in any such liability or obligation attaching to the Library Assets; (b) the Buyer or any Buyer Related Person having any liability or obligation with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, recoupment or otherwise, directly or indirectly, any Interests or Excluded Liabilities, nor in any such liability or obligation attaching to the Library Assets; or (c) the Buyer or any Buyer Related Person having any liability or obligation to any of the Debtors.

17.     Effective upon the Closing Effective Date, all persons and entities are forever prohibited from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, the Buyer Related Persons, or their assets (including the Library Assets) with respect to any (a) Interest in or with respect to the Library Assets or (b) successor, transferee, vicarious or other similar liability or theory of liability, including (i) commencing or continuing any action or other proceeding pending or threatened with respect to the Library Assets, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Order or other orders of the Court or the agreements or actions contemplated or taken in respect hereof or thereof; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Interest; (iv) asserting any setoff, right of subrogation or recoupment of any kind; or (v) revoking, terminating or failing or refusing to renew any license, permit or authorization to utilize any of the Library Assets.  Following the Closing Effective Date, no holder of any Interest shall interfere with the Buyer's title to or use and enjoyment of the Library Assets based on or related to any such Interest, or based on any action the Debtors may take in their chapter 11 cases.

18.     <u>Assumption and Assignment of the Assumed Contracts</u>.  Under sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Transaction, the Debtors' assumption and assignment of the Assumed Contracts to the Buyer free and clear of all Interests (other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order, or pursuant to the Magnum Sale, Co-Investment and Intercreditor Agreements, including as to the Magnum Ownership Interest, and all Guild Motion

Picture Interests, if any, as applicable) pursuant to the terms of the APA, as modified by the terms

of any amendments reached by the Buyer and the respective counterparty, is hereby approved, and

the Debtors are hereby authorized and directed to assume and assign the Assumed Contracts to the

Buyer in accordance with the APA and this Order, and the requirements of sections 365(b) and

365(f)(2) of the Bankruptcy Code with respect thereto are hereby deemed satisfied.  Any

counterparty to an Assumed Contract that has not filed with the Court an objection to the

assumption or assignment of such Assumed Contract as of the date specified in the Bid Procedures

Order is deemed to have consented to such assumption and assignment.

19.     Upon the Debtors' assumption and assignment of the Assumed Contracts to the

Buyer, each applicable counterparty shall be forever barred, estopped, and permanently enjoined

from (i) raising or asserting against the Debtors, the Buyer or any Buyer Related Person, or their

respective property, any assignment fee, default, breach, claim, pecuniary loss, liability or

obligation (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or

non-contingent, known or unknown, liquidated or unliquidated senior or subordinate),

counterclaim, defense, setoff or any other matter arising under or out of, in connection with or in

any way related to, the Assumed Contracts existing prior to or as of the Closing Effective Date or

arising by reason of the Closing, or (ii) taking any other action against the Buyer or any Buyer

Related Person as a result of any Debtor's financial condition, bankruptcy, or failure to perform

any of its obligations under the Assumed Contracts based on acts or occurrences existing prior to

or as of the Closing Effective Date or arising by reason of the Closing.  Each Counterparty hereby

is also forever barred, estopped, and permanently enjoined from (A) asserting against the Debtors,

the Buyer or any Buyer Related Person, or the property of any of them, any default or claim arising

out of any indemnity or other obligation or warranties for acts or occurrences arising prior to or existing as of the Closing Effective Date and (B) imposing or charging against the Buyer or the Buyer Related Persons any assignment fees, increases, or any other fees as a result of the Debtors' assumption and assignment of the Assumed Contracts.

20.     Upon the Debtors' assumption and assignment of the Assumed Contracts to the Buyer, the Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors in and to the Assumed Contracts and the Assumed Contracts shall be deemed to be valid and binding and in full force and effect and enforceable in accordance with their terms for the benefit of the Buyer, as applicable, notwithstanding any provision in any of the Assumed Contracts that prohibits, restricts, or conditions such assignment or transfer.   The Debtors' assumption and assignment of the Assumed Contracts to the Buyer shall not constitute a default under or a termination of any Assumed Contract.   In accordance with the APA, the Buyer may determine to assume or reject any Assumed Contract through and including the Closing Effective Date.

21.     Cure Amounts.   Any defaults or other obligations under the Assumed Contracts shall be deemed cured by the payment or other satisfaction of the Cure Amounts, if any, associated with the Assumed Contracts.

22.     Assumption and Assignment Objections.   Except as provided herein, all Assumption and Assignment Objections to the Debtors' calculation of Cure Amounts with respect to any of the Assumed Contracts have been overruled, withdrawn, waived, settled or otherwise resolved.   Any Assumption and Assignment Objections as to applicable Cure Amounts that have not been resolved by the parties may be heard at a later date as set by the Court.   The pendency of a dispute relating to a particular Assumed Contract shall not prevent or delay the assumption or

assignment of any other Assumed Contract or the closing of the Transaction. To the extent a counterparty to any of the Assumed Contracts fails to timely object to the Cure Amounts for any Assumed Contract in accordance with the Bid Procedures Order, such Cure Amounts shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Amounts at any time.

23. <u>Paramount Assumption Objection.</u> Notwithstanding anything to the contrary in this Order or the Bid Procedures Order, the Paramount Assumption Objection is not overruled and shall be adjourned to the hearing scheduled for June 30, 2025, at 10:00 a.m. (ET). The Debtors and Paramount shall work in good faith following entry of this Order and prior to Closing to consensually resolve any disputed issues raised in the Paramount Assumption Objection. Except as set forth herein, the Debtors' and Paramount's rights are fully reserved with respect to paragraphs 12 through 14 of the Paramount Assumption Objection.

24. <u>Adequate Assurance.</u> The Buyer has provided adequate assurance of future performance under the Assumed Contracts within the meaning of sections 365(b) and 365(f)(2)(B) of the Bankruptcy Code. Any Assumption and Assignment Objections related to the adequate assurance of future performance by the Buyer that have not been withdrawn, waived or settled and all reservations of rights included in such objections are hereby overruled on the merits with prejudice. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the Debtors' assumption and assignment of the Assumed Contracts to the Buyer have been satisfied.

25. <u>Anti-Assignment Provisions Unenforceable.</u> No section or provision of any Assumed Contract that purports to (a) prohibit, restrict or condition the assignment of an Assumed

Contract, including, but not limited to, the conditioning of such assignment on the consent of any counterparty to such Contract; (b) authorize the termination, cancellation or modification of an Assumed Contract based on the filing of a bankruptcy case, the financial condition of the Debtors or similar circumstances; (c) declare a breach or default as a result of a change in control in respect of the Debtors; or (d) provide for additional payments, profit sharing, penalties, conditions, renewals, extensions, charges or other financial accommodations in favor of the counterparty to an Assumed Contract, or modification of any term or condition upon the assignment of a contract or the occurrence of the conditions set forth in subsection (b) above, shall have any force or effect, and any such section or provision constitutes an unenforceable anti-assignment provision under section 365(f) or 363(l), as applicable, of the Bankruptcy Code or is otherwise unenforceable under section 365(e) of the Bankruptcy Code.

26.    No Fees for Assumption and Assignment.  There shall be no assignment fees, increases or any other fees charged to the Buyer, or any of their respective successors or assigns, or the Debtors as a result of the transfer or assumption and assignment of the Assumed Contracts.

27.    Direction to Assumed Contract Counterparties.  All counterparties to Assumed Contracts assigned or otherwise transferred to the Buyer in accordance with the terms of this Order and the APA shall cooperate with, and expeditiously execute and deliver upon, any reasonable request of the Buyer, and shall not charge the Buyer for any instruments, applications, consents or other documents that may be required or requested by any governmental unit or other public or quasi-public authority or other party to effectuate the applicable transfers in connection with the Debtors' assumption and assignment of the Assumed Contracts to the Buyer.

28.     <u>Licenses and Permits</u>.  To the extent provided in the APA and available under applicable law, the Buyer shall be authorized, as of the Closing Effective Date, to operate under any license, permit, registration and any other governmental authorization or approval of the Debtors with respect to the Library Assets and the Assumed Contracts, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Effective Date.  To the extent any license or permit necessary for the operation of the Library Assets is determined not to be an executory contract that may be assumed and assigned under section 365 of the Bankruptcy Code, the Buyer shall apply for and obtain any necessary license or permit promptly after the Closing Effective Date, and such license or permit of the Debtors shall remain in place for the Buyer's benefit until a new license or permit is obtained (or, in the case of licenses or permits of Debtors of which the assignment to Buyer is pending as of the Closing Effective Date (whether pursuant to a notice period that has not expired as of the Closing Effective Date or a required consent from an applicable governmental authority that has not been received as of the Closing Effective Date), shall transfer to Buyer upon the expiration of such notice period or the receipt of such consent).

29.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the utilization of the Library Assets that are sold, transferred or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Transaction.

30.     <u>Fair Consideration</u>.  The consideration provided by the Buyer for the Library Assets under the APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy

Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, and any other applicable laws of the United States, any state, territory, possession, or the District of Columbia.  The APA was not entered into, and the Transaction is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Sellers nor the Buyer have entered into the APA, any Transaction Document, or any agreement contemplated thereby or are consummating the Transaction with any fraudulent or otherwise improper purpose.  No other person or entity or group of persons or entities has offered to purchase the Purchase Assets for an amount that would provide greater value to the Debtors and their estates than the value provided by the Buyer. This Court's approval of the Bid Procedures and Sale Motion, the Stalking Horse Supplement and the APA are in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

31.    <u>Good-Faith Buyer</u>.  The Buyer is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is entitled to all of the protections afforded thereby. The Transaction and the APA are undertaken and entered into by the Debtors and the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code.  As such, the reversal or modification on appeal of this Order shall not affect the validity of the Transaction or any term of the APA, and shall not permit the unwinding of the Transaction, whether or not the Buyer knew of the pendency of the appeal, unless this Order and the Transaction were duly and properly stayed pending appeal.

32.   <u>Section 363(n) of the Bankruptcy Code</u>.  The Transaction approved by this Order is not subject to avoidance and no party is entitled to any recovery of damages pursuant to section 363(n) of the Bankruptcy Code or otherwise.

33.   Notwithstanding any other provision in this Order or the APA, the sale of any intellectual property and/or intellectual property rights in the Library Assets is not free and clear of the rights pursuant to section 365(n) of the Bankruptcy Code, if any rights exist, of Paramount Global and its affiliates, including Paramount Pictures Corporation, Paramount Pictures International, and Paramount Pictures International Limited, under an agreement that is not an Assumed Contract.  The Debtors and Buyer reserve all rights with respect to any party's assertion of rights as an intellectual property license and any arguments with respect to section 363(n) of the Bankruptcy Code.

34.   <u>Bulk Sales</u>.  No bulk sales law, bulk transfer law or similar law of any state or other jurisdiction shall apply in any way to the Transaction.

35.   <u>Amendments</u>.  Except in the case of a material amendment, the APA and any related agreements may be amended, supplemented, or otherwise modified by the parties thereto and in accordance with the terms thereof, without further action or order of the Court; *provided* that any such amendment, supplement, or modification shall require the prior written consent of the Buyer and shall not have a material adverse effect on the Debtors' estates.  Any material amendments shall require approval of this Court.

36.   <u>Sale Proceeds</u>.  In accordance with the *Final Order (I) Authorizing the Debtors to Obtain Post-Petition Secured Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Status, (IV) Granting Adequate*

-39-

*Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 280] (the "DIP Order"),[7] notwithstanding anything to the contrary in this Order or in the APA (or in any document contemplated thereby), upon the Closing Effective Date, the Debtors shall and are directed to apply the proceeds of the Transaction as follows, net of any actual costs reasonably necessary to close the Library Sale: (a) first to the ABS Trustee for the indefeasible payment in full of the outstanding Prepetition ABS Obligations in accordance with the Prepetition ABS Agreements; (b) second, to each of the DIP Secured Parties, amounts necessary to indefeasibly satisfy all of the Debtors' obligations owed to such DIP Secured Party in full in accordance with the DIP Documents and the Final DIP Order; (c) third, to fund the Warner Bros. Reserve; (d) fourth, to fund the Library Reserve; and (e) fifth, to the Sellers.

37.    Warner Bros. Provision.  Notwithstanding the terms of the Sale Motion, the APA, this Sale Order and any of the transactions authorized hereby,

(a)    nothing herein or therein shall:

(i)    alter the terms of any contract Warner Bros. Entertainment Inc. (together with its affiliates, "Warner Bros.") has with any of the Debtors, including any Assumed Contracts, provided that the Cure Amounts (including such claims, "Cure Claims") asserted by Warner Bros. shall be paid by the Sellers as provided herein and are not Assumed Liabilities;

(ii)    limit Warner Bros.' rights to enforce contractual terms against the Buyer, including all rights of recoupment, defense and deduction, but with respect

---

[7]    Capitalized terms used in this paragraph 33 but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Order.

to offset, only to the extent such right of offset arises after the Closing Effective Date; provided that Warner Bros. will provide Buyer with written notice thereof prior to such rights being exercised; provided further that the Cure Claims asserted by Warner Bros. shall be paid by the Sellers as provided herein and are not Assumed Liabilities. For the avoidance of doubt, Warner Bros. will not be permitted to enforce a right of offset that could have been asserted prior to the Closing Effective Date and its Cure Claims shall be paid by Sellers as provided herein and are not Assumed Liabilities;

(iii) limit (beyond any limitations set forth in the agreements between Warner Bros. and the Debtors) or convey to Buyer any intellectual property or other property rights of Warner Bros.;

(iv) limit or impair any security interests held by Warner Bros., including copyright mortgages related to the distribution of motion pictures, productions, or otherwise, which shall be deemed to be Permitted Liens and shall remain effective as against any applicable Purchased Assets;

(v) require Warner Bros. to pay to Buyer any amounts related to any Post-Cutoff Cashflows, Proceeds, Receipts and Rights (including any Designated Domestic, Foreign, Global or Virtual Rights and Receipts) or any other claims or obligations of any kind (including Proceeds thereof) that have already been paid or otherwise satisfied by Warner Bros. as of the Closing Effective Date, including any of the foregoing paid or satisfied by Warner Bros. between the Cutoff Date and the Closing Effective Date;

(vi)    Reserved;

(vii)    convey or alter in any way any Derivative Rights (as defined in the APA) related to any Warner Bros. Motion Picture, or authorize the assumption of any contract with Warner Bros. to the extent that such contract conveys any Derivative Rights (the "Derivative Rights Agreements");

(viii)    determine whether any amounts arising under or related to any Derivative Rights Agreements are Cure Amounts, it being understood that this limitation does not apply to the Cured Obligations set forth in Section (e) hereof; or

(ix)    constitute a finding in any way with respect to any sale of the Derivative Rights (as defined in the APA) (including any findings with respect to adequate assurance of future performance or assignability of intellectual property rights) or Studio Business, and Warner Bros.' objections to any such sales are fully preserved.

(b)    Reserved;

(c)    for the avoidance of doubt, this Sale Order authorizes only the sale of the Debtors' rights, title, and interest presently held by the Debtors in the Purchased Assets, including without limitation,  the Fundamental Contracts and any other Contracts or Purchased Assets;

(d)    Warner Bros. does not object to the transfer of Sellers' interests in the Audit Rights to Buyer, subject to certain modifications thereto as agreed to and separately documented by Buyer and Warner Bros.;

(e)     the assumption and assignment of any contracts with Warner Bros. in connection with the sale of the Library Assets shall be conditioned on the cure of all defaults under such contracts, including without limitation, the Warner Dispute (as defined in the APA) and all amounts owing under any contract with Warner Bros. assumed by the Buyer, including with respect to the arbitration proceeding by and between Warner Bros. and certain of the Debtors over the motion picture *Matrix IV* (the "Matrix Arbitration") (the foregoing, the "Cured Obligations") as hereinafter provided: the Sellers shall promptly establish the Warner Bros. Reserve out of the proceeds of the Sale in the amount of $110 million as a condition to the Closing Effective Date for the Warner Bros.' claims, including the Cured Obligations and those related to the Warner Dispute (which, for the avoidance of doubt, includes claims related to the Matrix Arbitration); and the Cured Obligations shall for all purposes be treated and satisfied by payment in full in cash from the Warner Bros. Reserve as Cure Claims upon the liquidation of such Claims, without the need for further motion, order of the Court, or plan confirmation.  For the avoidance of doubt, upon establishment and funding of the Warner Bros. Reserve, the Cured Obligations may only be asserted against the Warner Bros. Reserve, or to the extent inadequate, the Sellers and other Debtors;

(f)     for all purposes, the Buyer shall be Alcon Media Group LLC ("Alcon") or a wholly-owned subsidiary of Alcon, provided that Alcon shall furnish a guarantee in favor of the applicable Warner Bros. entity(ies) with respect to obligations owing to Warner Bros. under the Fundamental Contracts or other Assumed Contracts of Warner Bros. accruing after the Closing Effective Date;

(g)     Buyer shall be responsible for dividing and remitting any portion of the Applicable Percentage it may receive from Warner Bros. that belongs to any third party including Magnum under the Magnum Agreements and Warner Bros. shall have no responsibility or liability for such division or remittance; for the avoidance of doubt, Warner Bros. is authorized to make any payment of the Applicable Percentage after the Closing Effective Date to the Buyer to an account or accounts designated by the Buyer on or before the Closing Effective Date;

(h)     the Buyer and Sellers shall execute such additional executory contracts, licenses, security instruments, or assignments with Warner Bros. as required under the terms of the Library Agreements in connection with the sale of the Purchased Assets to the Buyer;

(i)     this Sale Order shall not waive or impair Warner Bros.' rights to seek arbitration of its claims, including any Cure Claim under an Assumed Contract;

Warner Bros. reserves all rights concerning (i) the appropriate allocation of any asset sales proceeds as among the Debtors' estates, (ii) the appropriate source of payment for any obligation satisfied with proceeds of assets, including the source of payment of the Prepetition ABS Obligations permitted hereby, (iii) marshalling of assets as among the estates for payment of claims; provided that the foregoing shall not prevent the payment of the Prepetition ABS Obligations or the DIP Loans as otherwise set forth in this Final Order; (iv) the Warner Bros. Assumption and Assignment Procedures as set forth in the Bid Procedures Order and (v) the Final DIP Order.

38.    <u>APA Provisions</u>.   Section 6.04 of the APA is hereby modified by adding the following sentence after the last sentence thereof: "Notwithstanding the foregoing, if and to the extent Buyer has actually incurred any Liability, loss, deficiency or expense arising from any reduction or offset in any amounts to which Buyer is entitled to be paid by WBEI (or any Affiliate thereof) by virtue of its ownership of the Purchased Assets (including the Relevant Percentage of the Designated Domestic Receipts, the Designated Foreign Receipts, the Designated Global Receipts or the Designated Virtual Receipts with respect to the Pictures), and which reduction or offset arose from an overpayment to Sellers by WBEI which overpayment occurred prior to the Cutoff Date, Buyer shall be entitled to reduce and offset against any amounts to which Sellers are or will be entitled pursuant to this Section 6.04 the lesser of the amount of such reduction or offset and the amount it is obligated to pay to Sellers hereunder."

39.    <u>Binding Order</u>.   This Order and the APA shall be binding upon and govern the acts of all persons and entities, including without limitation, the Debtors, the Buyer, any of their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in a chapter 7 case of any of the Debtors if any of these chapter 11 cases is converted from a case under chapter 11 to a case under chapter 7, all creditors of any and all of the Debtors (whether known or unknown), all counterparties to any Assumed Contracts.   Neither the Transaction nor the APA shall be subject to rejection or avoidance under any circumstances.   This Order and the APA shall inure to the benefit of the Debtors, their estates, their creditors, the Buyer, or any Buyer Related Person and their respective successors and assigns.   Nothing contained in any chapter 11 plan confirmed in the chapter 11 cases, any order confirming any such chapter 11 plan, or any order approving wind-

down or dismissal of the chapter 11 cases or any subsequent chapter 7 cases shall conflict with or derogate from the provisions of APA (including any related agreements), or this Order, and to the extent of any conflict or derogation between this Order or the APA and such future plan or order, the terms of this Order and the APA, including any related agreements, shall control.

40.  Failure to Specify Provisions; Conflicts.  The failure to specifically include or mention any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtors and the Buyer that the APA be authorized and approved in its entirety, including any amendments thereto as may be made by the parties thereto in accordance with the terms thereof and this Order.  Likewise, all of the provisions of this Order are non-severable and mutually dependent.

41.  Further Assurances.  From time to time, as and when requested, and subject to the terms of the APA, all parties to the Transaction shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as the requesting party may reasonably deem necessary or desirable to consummate the Transaction, including such actions as may be necessary to perfect, confirm, record or otherwise vest in the Buyer its right, title and interest in and to the Library Assets and the Assumed Contracts.

42.  Automatic Stay.  The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified to the extent necessary, without further order of the Court, to allow the Buyer to deliver any notice provided for in the APA and to take any and all actions permitted, required under, or reasonably necessary to effectuate the APA in accordance with the terms and conditions thereof.

43.     <u>No Stay of Order</u>.  Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062 and any applicable Local Rules, the Court expressly finds there is no reason for delay in the implementation of this Order and this Order shall not be stayed and shall be effective and enforceable immediately upon entry.  The provisions of this Order shall be self-executing.  Time is of the essence in implementing the APA and closing the Transaction.

44.     <u>Governing Terms</u>.  To the extent there is any inconsistency between the terms of this Order and the terms of the APA or the Bid Procedures Order, the terms of this Order shall govern.

45.     <u>Retention of Jurisdiction</u>.  This Court shall retain exclusive jurisdiction to (a) interpret, implement and enforce the terms and provisions of this Order and the APA, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith; and (b) decide any issues or disputes concerning or related to this Order, the APA, or the rights and duties of the parties hereunder or thereunder, including the interpretation of the terms, conditions and provisions hereof and thereof, and the status, nature and extent of the Library Assets and the Assumed Contracts and any disputes with any counterparty to any Assumed Contract.  This Court retains jurisdiction to compel delivery of the Debtors' right, title and interest in the Assets, to protect the Buyer and its assets, including the Debtors' right, title and interest in the Library Assets, against any Interests and successor and transferee liability and to enter orders, as appropriate, pursuant to Bankruptcy Code sections 105(a) or 363 (or other applicable provisions) necessary to transfer the Debtors' right, title and interest in the Library Assets to the Buyer.

46.    <u>Other Provisions</u>.  The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Order.

47.    <u>Non-Severability</u>.  The provisions of this Order are non-severable and mutually dependent.

48.    The requirements set forth in Bankruptcy Rules 6003(b), 6004, and 6006 and Local Rule 9013-1 have been satisfied or otherwise deemed waived.

**<u>Exhibit 1</u>**

**APA**

*Execution Version*

# PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (as amended, restated, supplemented, or otherwise modified pursuant to the terms hereof from time to time, this "**Agreement**"), is made and entered into as of April [   ], 2025 (the "**Effective Date**"), by and among the Persons identified on Schedule I hereto (each, a "**Seller**", and collectively, the "**Sellers**"), Alcon Media Group, LLC ("**Buyer**"), and Kevin Berg in his capacity as the representative of the Sellers pursuant to Section 10.15 (the "**Seller Representative**").

## RECITALS

A.     The Parties desire to set forth the terms pursuant to which Buyer will, subject to the entry of a Sale Order (as defined below), purchase from the Sellers, the Purchased Assets (as defined herein), including, without limitation, (i) (a) an undivided interest equal to the Relevant Percentage in the Designated Foreign Receipts in respect of the Motion Pictures set forth in Part A of Schedule II hereto (the "**Foreign Pictures**") and in Part B of Schedule II hereto (the "**F/D Pictures**"), subject to the rights of the Foreign Distributors under the Foreign Licenses and/or the applicable Foreign Distribution Agreements, and (without duplication) the Proceeds thereof, (b) an undivided interest equal to the Relevant Percentage in the Foreign Distribution Rights in perpetuity in respect of the Foreign Pictures and the F/D Pictures and (without duplication) the Proceeds thereof, and (c) the right to receive the Relevant Percentage in the Designated Foreign Receipts in perpetuity in respect of the Foreign Pictures and the F/D Pictures and the Proceeds thereof; (ii) (a) an undivided interest equal to the Relevant Percentage in the Designated Domestic Receipts in respect of the F/D Pictures, subject to the rights of the Domestic Distributor under the Domestic Licenses and the Domestic Distribution Agreement, and (without duplication) the Proceeds thereof, (b) an undivided interest equal to the Relevant Percentage in the Domestic Distribution Rights in perpetuity in respect of the F/D Pictures and (without duplication) the Proceeds thereof, and (c) the right to receive the Relevant Percentage in the Designated Domestic Receipts in perpetuity in respect of the F/D Pictures and the Proceeds thereof; (iii) (a) an undivided interest equal to the Relevant Percentage in the Designated Global Receipts in respect of the Motion Pictures set forth in Part C of Schedule II hereto (the "**Global Pictures**"), subject to the rights of the Global Distributor under the Global Licenses and the Global Distribution Agreement, and (without duplication) the Proceeds thereof, (b) an undivided interest equal to the Relevant Percentage in the Global Distribution Rights in perpetuity in respect of the Global Pictures and (without duplication) the Proceeds thereof, and (c) the right to receive the Relevant Percentage in the Designated Global Receipts in perpetuity in respect of the Global Pictures and the Proceeds thereof; and (iv) (a) an undivided interest equal to the Relevant Percentage in the Designated Virtual Receipts in respect of the Motion Pictures set forth in Part D of Schedule II hereto (the "**Virtual Pictures**" and, together with the Foreign Pictures, the F/D Pictures and the Global Pictures, the "**Pictures**"), subject to the rights of the Virtual Distributor under the Virtual Co-Financing Agreement, and (without duplication) the Proceeds thereof, (b) an undivided interest equal to the Relevant Percentage in the Virtual Distribution Rights in perpetuity in respect of the Virtual Pictures and (without duplication) the Proceeds thereof, and (c) the right to receive the Relevant Percentage in the Designated Virtual Receipts in perpetuity in respect of the Virtual Pictures and the Proceeds thereof.

B.     The Sellers and certain of their Affiliates have commenced voluntary petitions for relief under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "**Bankruptcy Code**") (the date of the filing of such petitions, the "**Petition Date**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") (such cases, collectively, the "**Bankruptcy Cases**").

C.     On the terms and subject to the conditions hereof, the Sellers desire to sell, transfer and assign to Buyer or a Buyer Designee, and Buyer desires to purchase, acquire and assume from the Sellers through a Buyer Designee, the Purchased Assets, subject to the terms and conditions set forth in this Agreement, the Bid Procedures (as defined below) and Bid Procedures Order (as defined below), and in accordance with sections 105, 363, 365, 1123, as applicable, and other applicable provisions of the Bankruptcy Code.  The Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the receipt and sufficiency of which is hereby acknowledged, it is hereby agreed among the Parties as follows:

## ARTICLE I.  DEFINITIONS

Section 1.01    **Defined Terms**.  Except as otherwise specified in this Agreement or as the context may otherwise require, the following terms shall have the respective meanings set forth below for all purposes of this Agreement:

"**ABS Obligations**" means all Liabilities of the Sellers and their Affiliates under the ABS Transaction Documents, including, without limitation, all fees, costs, expenses and indemnity obligations, and, in each case, any interest accrued thereon.

"**ABS Transaction Documents**" means all "Transaction Documents" under (and as defined in) the Indenture.

"**Accountant**" has the meaning set forth in Section 2.13(b).

"**Adverse Claim**" means a lien, security interest, attachment, Claim, Liability, offset, deduction, restriction, mortgage, pledge or other charge or Encumbrance, or other type of preferential arrangement having the practical effect of any of the foregoing, or other claim in, of or on any Person's assets or properties in favor of any other Person.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such Person.  The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and/or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

"**Agreement**" has the meaning set forth in the preamble.

"**Alternative Transaction**" means any direct or indirect acquisition, financing or purchase of all or any portion of the Purchased Assets or any other similar transaction involving all or any portion of the Purchased Assets, whether effected by sale of assets, sale of equity, merger, joint venture, recapitalization, loan, financing arrangement or otherwise, but excluding any financing provided by any holder of Parent's existing notes and any debtor-in-possession financing.

"**Ancillary Rights**" means any and all ancillary, subsidiary or allied rights now known and unknown, including, without limitation, publishing, novelization, music publishing, soundtrack recording, screenplay, publication, sponsorship, commercial tie-up, character, live stage, radio, interactive, Internet, theme park and merchandising rights of every kind and nature whatsoever derived from, appurtenant to or related to a Picture, the underlying material relating thereto, the title or titles of such Picture, the characters appearing in such Picture or said underlying material and/or the names or characteristics of said characters.

"**Anti-Terrorism Order**" means Executive Order No. 13,244 of September 24, 2001, Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism, 66 U.S. Fed. Reg. 49, 079 (2001), as amended.

"**Applicable Copyright Law**" means (a) the 1976 Copyright Act, 17. U.S.C. §101 et seq., as amended; (b) as applicable, the U.S. Copyright Act of 1909, as amended; and (c) for Pictures being Exploited as of the Effective Date in any territory party to the Universal Copyright Convention or the Berne Convention, the Copyright laws of such territory.

"**Applicable Percentage**" means (a) in the case of the Foreign Pictures and the F/D Pictures, the percentage of Foreign Gross Receipts that Sellers are entitled to receive with respect to such Pictures under the applicable QCSA or MPRPA and related Picture Agreements, (b) in the case of the F/D Pictures, the percentage of Domestic Gross Receipts that Sellers are entitled to receive with respect to such Pictures under the applicable MPRPA and related Picture Agreements, (c) in the case of the Global Pictures, the percentage of Global Gross Receipts that Sellers are entitled to receive with respect to such Pictures under the applicable MPRPA and related Picture Agreements, and (d) in the case of the Virtual Pictures, the percentage of Designated Virtual Receipts that Sellers are entitled to receive pursuant to the Virtual Documents. The Applicable Percentage for each Picture is set forth on Schedule II hereto.

"**Assumed Contract**" has the meaning set forth in Section 2.05(a).

"**Assumed Liabilities**" has the meaning set forth in Section 2.02.

"**Assumption and Assignment Agreement**" means an Assignment and Assumption Agreement effecting the assignment of the Assumed Liabilities from Sellers to Buyer, in form and substance satisfactory to the Parties.

"**Auction**" means an auction or auctions, if any, for the sale of the Sellers' assets conducted pursuant to the terms and conditions of the Bid Procedures Order.

"**Avoidance Actions**" means all rights, lawsuits, claims, rights of recovery, objections, causes of action, avoidance actions and other similar rights of any Seller or other appropriate party

in interest arising under Chapter 5 of the Bankruptcy Code or applicable state law (whether or not asserted as of the Closing Effective Date) and all proceeds thereof.

"**Backup Bidder**" means, if an Auction is conducted, the party that is the next highest or otherwise best bidder at the Auction after the Successful Bidder.

"**Bankruptcy Cases**" has the meaning set forth in the recitals.

"**Bankruptcy Code**" has the meaning set forth in the recitals.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bid Deadline**" has the meaning set forth in <u>Section 7.02</u>.

"**Bid Procedures**" means the bid procedures approved by the Bankruptcy Court pursuant to the Bid Procedures Order.

"**Bid Procedures and Sale Motion**" means the motion filed in the Bankruptcy Cases, which motion shall be in form and substance satisfactory to Sellers and Buyer (together with all exhibits and ancillary documents thereto), (i) seeking approval of (A) this Agreement and the transactions contemplated hereby and (B) the Bid Procedures and scheduling certain dates, deadlines and forms of notice in connection therewith, (ii) authorizing the payment of the Expense Reimbursement, and (iii) granting other related relief, in each case, as set forth in this Agreement.

"**Bid Procedures Order**" means the order of the Bankruptcy Court approving the Bid Procedures and Sale Motion and the Bid Procedures, and granting the relief requested therein, in form and substance satisfactory to the Sellers and Buyer, which shall include, without limitation, (i) approval of Buyer as the stalking horse purchaser and (ii) approval of the Expense Reimbursement to Buyer, in each case, as set forth in this Agreement.

"**Books and Records**" means all principal and/or material business records, tangible data, documents, management information systems (including related computer software), files, participant lists, vendor lists, statements, invoices, all work papers, notes, files or documents related thereto, and all other principal and/or material books and records received and/or maintained by Sellers or their Affiliates (excluding personnel records) related to the Pictures. For the avoidance of doubt, "Books and Records" shall in any event include all underlying documentation supporting the calculations in the Financial Information provided to Magnum.

"**business day**" means any day other than a Saturday, Sunday, legal holiday in the United States or any day on which banks in the City of New York, New York are authorized or required by law to close.

"**Buyer**" has the meaning set forth in the preamble. References herein to Buyer shall also refer to the Buyer Designee interchangeably.

"**Buyer Closing Deliverables**" has the meaning set forth in <u>Section 2.11</u>.

"**Buyer Deposit**" has the meaning set forth in <u>Section 2.06(b)</u>.

"**Buyer Designee**" has the meaning set forth in <u>Section 10.01</u>.

"**Claim**" means all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"**Closing**" means the consummation of the purchase by Buyer from Sellers of the Purchased Assets.

"**Closing Effective Date**" means the date on which the Closing occurs.

"**Closing Statement**" has the meaning set forth in <u>Section 2.09</u>.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

"**Collective Bargaining Agreement**" means any agreement, contract or arrangement with any union or guild or similarly constituted or substitute organization regarding any rights and/or services and/or personnel utilized in connection with the production and/or distribution and/or Exploitation of a Picture.

"**Consolidated Intercreditor Agreement**" means that certain Second Amended and Restated Consolidated Intercreditor Agreement dated as of September 5, 2024, among WBPL, VRD, VRF, WAV, VRD-USA, VRFNA, VREG-USA, Magnum, Bank of America, N.A. and U.S. Bank National Association, as amended, restated, supplemented or otherwise modified from time to time prior to the Closing Effective Date.

"**Constitutive Documents**" means, as to any Person, such Person's certificate of incorporation or registration (including, if relevant, certificates of change of name), memorandum of association, articles of association or incorporation, charter, by-laws, trust deed, partnership, limited liability company, joint venture or shareholders' agreement or equivalent documents constituting the organization or forming of such Person, in each case as the same may from time to time be amended, restated, supplemented or otherwise modified from time to time.

"**Contract**" means any contract, agreement, lease, license, or other legally binding commitment, agreement or instrument, whether or not in writing, including all amendments and modifications thereto.

"**Contract Rights**" means, with respect to a Picture, all rights, interest, entitlements and remedies (including, without limitation, the benefits of all representations, warranties, covenants and indemnifications) under any Contract relating to such Picture, including, for clarity, all rights, interest, entitlements and remedies arising from any letter of credit, instrument or other agreement relating to a Picture which designates a Seller as a beneficiary, even if such Seller is not a party to that letter of credit, instrument or other agreement.

"**Copyright**" means, with respect to a Picture, all common law and statutory copyrights, rights in copyrights (including the right to make publication thereof for copyright purposes, to register claims under copyright, the right to renew and extend such copyrights and the right to sue for past, present and future infringements of copyright), interests in copyrights, all applications for copyrights, registrations of copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained upon such project, the underlying material relating thereto or any part thereof.

"**Copyright Termination**" means any right of termination of transfer or license of a Copyright, or termination or reversion of any right under a Copyright, under any Applicable Copyright Law, including 17 U.S.C. § 203 or § 304 or any similar law, rule or regulation of any Governmental Authority.

"**CPII**" means Columbia Pictures Industries, Inc.

"**Cure Amounts**" means all amounts, costs and expenses to cure defaults, if any, under the Assumed Contracts so that they may be assumed and assigned to Buyer pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code.

"**Cutoff Date**" means July 31, 2024 (as reflected in the Quarterly Compliance Certificate Quarterly Report of June 2024 Quarter with Key Date of Quarterly Collection Period Ending July 31, 2024).

"**Dataroom**" means that certain virtual data room hosted by Ansarada titled "Project Ventura".

"**Debtor Relief Laws**" means the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, suspension of payments or similar debtor relief laws from time to time in effect affecting the rights of creditors generally.

"**Defined Proceeds**" has the meaning set forth in the Virtual Co-Financing Agreement.

"**Derivative Rights**" means, with respect to a Picture, all rights throughout the world to produce remakes, sequels and prequels of a Picture and other derivative works based thereon and to distribute and otherwise Exploit such remakes, sequels or prequels for viewing in any medium or media now known or hereafter devised, whether in theatres or home video or on television, and to produce, distribute and otherwise Exploit as a television program, movie of the week, television series or a television spinoff any audiovisual work based on a Picture, its story line, or any one or more of its characters.

"**Designated Domestic Receipts**" with respect to the F/D Pictures means (i) the Applicable Percentage of the Domestic Gross Receipts and/or amounts accountable and/or accounted as such or in respect thereof under the Domestic Distribution Agreement, subject to the rights of the Domestic Distributor under the Domestic Distribution Agreement in its capacity as such (including, without limitation, the right to retain Domestic Gross Receipts to pay and/or reimburse Domestic Distributor Fees, Domestic Participations, Domestic Residuals and Domestic

Recoupable Distribution Expenses, in each case as and to the extent set forth therein), (ii) the Applicable Percentage of any Domestic Subsidies payable to Sellers or any of their Affiliates with respect to any F/D Picture, and (iii) the Applicable Percentage of any other amounts received from any source on or in respect of the Exploitation of the F/D Pictures in the Domestic Territory, in each case under the foregoing clauses (i), (ii) and (iii), arising, received or payable from and after the Cutoff Date.

"**Designated Domestic Rights**" means, with respect to any F/D Picture, (a) an undivided interest equal to Sellers' Applicable Percentage in the Domestic Rights (as defined in the Domestic Distribution Agreement) in such F/D Picture and (b) Sellers' right to receive the Applicable Percentage of the Domestic Gross Receipts with respect to such F/D Picture, in each case, except to the extent that WBEI and VRPNA otherwise agreed in the Rights Purchase Agreement (as defined in the applicable MPRPA) applicable to such F/D Picture.

"**Designated Foreign Receipts**" with respect to the Foreign Pictures and the F/D Pictures, means (i) the Applicable Percentage of the Foreign Gross Receipts and/or amounts accountable and/or accounted as such or in respect thereof under the applicable Foreign Distribution Agreement, subject to the rights of the Foreign Distributor under the applicable Foreign Distribution Agreement in its capacity as such (including, without limitation, the right to retain Foreign Gross Receipts to pay and/or reimburse Foreign Distributor Fees, Foreign Participations, Foreign Residuals and Foreign Recoupable Distribution Expenses, in each case as and to the extent set forth therein), (ii) the Applicable Percentage of any Foreign Subsidies payable to Sellers or any of their Affiliates with respect to any Foreign Picture or F/D Picture, and (iii) the Applicable Percentage of any other amounts received from any source on or in respect of the Exploitation of the Foreign Pictures and the F/D Pictures in the Foreign Territory, in each case under the foregoing clauses (i), (ii) and (iii), arising, received or payable from and after the Cutoff Date.

"**Designated Foreign Rights**" means, with respect to any Foreign Picture and any F/D Picture, (a) an undivided interest equal to Sellers' Applicable Percentage in the Foreign Rights or International Rights, as the case may be (as such terms are defined in the applicable Foreign Distribution Agreement), in such Picture and (b) Sellers' right to receive the Applicable Percentage of the Foreign Gross Receipts with respect to such Picture, in each case, except to the extent that WBEI and VRPNA otherwise agreed in the Rights Purchase Agreement (as defined in the applicable MPRPA), if any, applicable to such Picture.

"**Designated Global Receipts**" with respect to the Global Pictures means (i) the Applicable Percentage of the Global Gross Receipts and/or amounts accountable and/or accounted as such or in respect thereof under the Global Distribution Agreement, subject to the rights of the Global Distributor under the Global Distribution Agreement in its capacity as such (including, without limitation, the right to retain Global Gross Receipts to pay and/or reimburse Global Distributor Fees, Global Participations, Global Residuals and Global Recoupable Distribution Expenses, in each case as and to the extent set forth therein), (ii) the Applicable Percentage of any Global Subsidies payable to Sellers or any of their Affiliates with respect to any Global Picture, and (iii) the Applicable Percentage of any other amounts received from any source on or in respect of the Exploitation of the Global Pictures in the Global Territory, in each case under the foregoing clauses (i), (ii) and (iii), arising, received or payable from and after the Cutoff Date.

"**Designated Global Rights**" means, with respect to any Global Picture, (a) an undivided interest equal to Sellers' Applicable Percentage in the Global Rights (as defined in the Global Distribution Agreement) in such Global Picture and (b) Sellers' right to receive the Applicable Percentage of the Global Gross Receipts with respect to such Global Picture, in each case, except to the extent that Sony, CPII, and VRPNA otherwise agreed in the Rights Purchase Agreement (as defined in the applicable MPRPA) applicable to such Global Picture.

"**Designated Virtual Receipts**" with respect to the Virtual Pictures means (i) the Applicable Percentage of the Defined Proceeds and/or amounts accountable and/or accounted as such or in respect thereof under the Virtual Documents, subject to the rights of the Virtual Distributor under the Virtual Co-Financing Agreement in its capacity as such, and (ii) the Applicable Percentage of any other amounts received from any source on or in respect of the Exploitation of the Virtual Pictures in the Virtual Territory, in each case under the foregoing clauses (i) and (ii), arising, received or payable from and after the Cutoff Date.

"**Disclosure Schedules**" has the meaning set forth in <u>Section 4.01</u>.

"**Distribution Agreements**" means the Domestic Distribution Agreement, the Foreign Distribution Agreements, the Global Distribution Agreement and the Virtual Co-Financing Agreement.

"**Domestic Distribution Agreement**" means that certain Second Amended and Restated Output Distribution Agreement (Domestic) dated as of November 10, 2020, between the Domestic Distributor and VRD-USA, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Domestic Distribution Rights**" means the rights to distribute or otherwise Exploit the F/D Pictures in any media throughout the Domestic Territory, which rights are subject to the prior grant of distribution rights to the Domestic Distributor under the Domestic Licenses and the Domestic Distribution Agreement.

"**Domestic Distributor**" means WAV.

"**Domestic Distributor Fees**" means the distribution fees payable to the Domestic Distributor under the Domestic Distribution Agreement.

"**Domestic Gross Receipts**" means "Defined Gross" as defined in the Domestic Distribution Agreement.

"**Domestic Licenses**" means each Domestic License (as defined in the applicable MPRPA) executed by WBEI in favor of WAV pursuant to the applicable MPRPA.

"**Domestic Participations**" means Participations that are paid by the Domestic Distributor in accordance with the Domestic Distribution Agreement.

"**Domestic Recoupable Distribution Expenses**" means "Recoupable Distribution Expenses" (as defined in the Domestic Distribution Agreement).

"**Domestic Residuals**" means Residuals that are paid by the Domestic Distributor in accordance with the Domestic Distribution Agreement.

"**Domestic Subsidies**" means Production Subsidies/Sale Proceeds with respect to the F/D Pictures.

"**Domestic Territory**" means (a) in the case of the Foreign Pictures (other than *Saving Silverman*, *Down to Earth*, *Zoolander* and *Don't Say A Word*) and the F/D Pictures, the "Domestic Territory" as defined in the applicable Foreign Distribution Agreement; (b) in the case of the Motion Picture titled *Saving Silverman*, the "Domestic Territory" as defined in that certain Distribution Agreement (Domestic) dated as of May 5, 2000, between Columbia Pictures and Evil Woman Films LLC, as amended, restated, supplemented or otherwise modified from time to time; (c) in the case of the Motion Picture titled *Down to Earth*, the "Domestic Territory" as defined in that certain Distribution Agreement (Domestic) dated as of August 11, 2000, between Paramount Pictures Corporation and DTE Films LLC, as amended, restated, supplemented or otherwise modified from time to time; (d) in the case of the Motion Picture titled *Zoolander*, the "Domestic Territory" as defined in that certain Distribution Agreement (Domestic) dated as of August 11, 2000, by and between Paramount Pictures Corporation and Zoo Films LLC; and (e) in the case of the Motion Picture titled *Don't Say A Word*, the "Domestic Territory" as defined in that certain Distribution Agreement (Domestic) dated as of October 2, 2000, by and between Regency Entertainment (USA), Inc. and DSAW Films LLC.

"**DTE Film LLC Agreement**" means that certain Operating Agreement of DTE Films LLC, dated as of August 11, 2000, by and between Paramount Pictures Corporation and VR DTE Distribution USA Inc., as amended, restated, supplemented or otherwise modified from time to time.

"**DTE Film Partnership Agreement**" means that certain Limited Partnership Agreement of DTE Film Partners L.P., dated as of August 11, 2000, by and among VRD, VRDTE, and MTV S.A. (f/k/a MTV S.A. LDC), as amended, restated, supplemented or otherwise modified from time to time.

"**DTE Notice of Assignment and Amendment**" means an irrevocable notice of assignment and amendment entered into among Buyer and each of the parties to the DTE Agreement, DTE QCSA, DTE Film Partnership Agreement and DTE Film LLC Agreement (each of the foregoing, together with any other agreements between or among the parties thereto in connection with *Down to Earth*, the "**Specified DTE Agreements**"), pursuant to which the parties thereto shall agree that, notwithstanding anything to the contrary in the Specified DTE Agreements: (i) "International Net Proceeds" and "Domestic Net Proceeds" (each as described and calculated in the Financial Information prepared by Paramount Pictures Corporation ("**Paramount**") in respect of *Down to Earth*) shall be shared by Paramount and Buyer 50 / 50 in perpetuity; provided, that if International Net Proceeds are cumulatively negative, Paramount shall pay Buyer one hundred percent (100%) of the International Net Proceeds and Domestic Net Proceeds until such shortfall has been recouped, consistent with past practice, and (ii) the parties to the Specified DTE Agreements shall agree not to amend any Specified DTE Agreement following the date of such notice of assignment and amendment in any manner that would modify

or otherwise affect the calculation or timing of amounts payable to Buyer pursuant to such notice of assignment and amendment.

"**Effective Date**" has the meaning set forth in the preamble.

"**Encumbrance**" means any defect or imperfection in title, charge, deed of trust, security interest, pledge, hypothecation, mortgage, encumbrance, Lien (as such term is defined in the Bankruptcy Code), lease, license grant by any Seller, sublease, option, right of first refusal, easement, right of way, servitude, covenant, condition, proxy, voting trust or agreement or transfer restriction under any equity holder or similar Contract.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**Escrow Account**" has the meaning set forth in Section 2.06(b).

"**Escrow Agreement**" has the meaning set forth in Section 2.06(b). For the avoidance of doubt, the Escrow Agreement shall be in form and substance acceptable to Buyer and the Sellers.

"**Escrow Holder**" has the meaning set forth in Section 2.06(b).

"**Estimated Purchase Price**" has the meaning set forth in Section 2.09.

"**Excluded Assets**" has the meaning set forth in Section 2.03.

"**Excluded Liabilities**" has the meaning set forth in Section 2.04.

"**Excluded Taxes**" means any liabilities of any Seller for any period, or otherwise imposed on the Purchased Assets with respect to any Pre-Closing Tax Period, in respect of any Tax, including without limitation (a) any Liability of any Seller for the Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law), as a transferee or successor, or by Contract, (b) any Taxes that will arise as a result of the purchase and sale of the Purchased Assets and (c) fifty percent (50%) of any Transfer Taxes, but excluding any Property Taxes to the extent specifically allocated to Buyer pursuant to Section 6.06.

"**Expense Reimbursement**" means all reasonable and documented costs, fees and expenses actually incurred by Buyer and/or its Affiliates (including legal, financial advisory, accounting and other similar costs of professionals retained by Buyer and/or its Affiliates), related to the Transactions contemplated by this Agreement and the Bankruptcy Cases, including, without limitation, in connection with the evaluation, diligence, negotiation, documentation, and performance of the Transactions, which amount shall constitute a superpriority administrative expense of the Sellers with priority over any and all administrative expenses of any kind; provided however, that the aggregate amount of the Expense Reimbursement shall not exceed $2,000,000.

"**Exploit**" means the manufacture, distribution, licensing, exhibition, marketing, promotion, reissuance, and other exploitation of a motion picture or applicable rights thereto, in any and all languages, by any and all means and devices now known or hereafter devised, and

howsoever accessed by the viewer, and to otherwise exploit the foregoing in any and all media, whether now known or hereafter existing and howsoever accessed, including, without limitation, theatrical, home video, pay, cable and free television, computers, hand held devices, cell phones and other accessing devices.  The meaning of the term "**Exploitation**" shall be correlative to the foregoing.

"**Exploitation Agreement**" means any Contract (including any co-production and/or co-financing agreement) to which a Seller is a party or is otherwise bound with respect to the Exploitation by any Person of a Picture or any rights therein or thereto, whether on a single-picture, multi-picture or output basis (but, in each case, solely to the extent relating to a Picture or any rights therein or thereto), as amended, modified, supplemented or restated from time to time.

"**F/D Pictures**" has the meaning set forth in the recitals.

"**Final Order**" means a judgment or order of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed (other than such modifications or amendments that are consented to in writing by Buyer) and as to which (a) the time to appeal, petition for certiorari or move for a new trial, stay, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, stay, reargument or rehearing shall then be pending or (b) if an appeal, writ of certiorari, new trial, stay, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, stay, reargument or rehearing shall have expired, as a result of which such proceeding or order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Bankruptcy Procedure, may be filed relating to such order, shall not cause an order not to be a Final Order.

"**Financial Information**" means (a) the accounting, participation and/or ultimates statements received by the Sellers from the applicable counterparties under the Distribution Agreements in respect of the Pictures or any other Person with respect to any consideration payable to Sellers in connection with the Pictures, and (b) the accounting, participation and/or ultimates statements prepared by the Sellers and delivered to Magnum under the Magnum Agreements in respect of the Pictures.

"**Foreign Distribution Agreement**" means (a) in the case of the Foreign Pictures other than *Saving Silverman*, *Down to Earth*, *Zoolander* and *Don't Say A Word*, that certain Amended and Restated Consolidated Output Distribution Agreement (Foreign) dated as of November 10, 2020, between WBPL and VRD, as amended, restated, supplemented or otherwise modified from time to time (the "**Warner Foreign Agreement**"); (b) in the case of the Motion Picture titled *Saving Silverman*, that certain Distribution Agreement (Foreign) dated as of May 5, 2000, between Columbia Pictures Corporation Limited and VRP (as successor-in-interest to Evil Woman Film Partners LP), as amended, restated, supplemented or otherwise modified from time to time (the "**Saving Silverman Agreement**"); (c) in the case of the Motion Picture titled *Down to Earth*, that

certain Distribution Agreement (Foreign) License and Sublicense dated as of August 11, 2000, between Paramount Pictures International, MTV S.A. LDC, DTE Film Partners LP and VRD, as amended, restated, supplemented or otherwise modified from time to time (the "**DTE Agreement**"); (d) in the case of the Motion Picture titled *Zoolander*, that certain Distribution Agreement (Foreign) Distribution Agreement (Foreign) License and Sublicense dated as of August 11, 2000, between Paramount Pictures International, MTV S.A. LDC, Zoo Film Partners LP and VRD, as amended, restated, supplemented or otherwise modified from time to time (the "**Zoolander Agreement**"); (e) in the case of the Motion Picture titled *Don't Say A Word*, that certain Distribution Agreement (Foreign) dated as of October 2, 2000, between Monarchy Enterprises S.a.r.l. and VRP (as successor-in-interest to DSAW Film Partners L.P.), as amended, restated, supplemented or otherwise modified from time to time (the "**Don't Say a Word Agreement**"); (f) in the case of the F/D Pictures, that certain Second Amended and Restated Output Distribution Agreement (Foreign) dated as of November 10, 2020, between WBPL and VRD, as amended, restated, supplemented or otherwise modified from time to time (the "**Warner F/D Agreement**"); and (g) in the case of the Foreign Pictures and the Motion Picture titled *Into the Storm*, the Greek Territory Distribution Agreements.

"**Foreign Distribution Rights**" means the rights to distribute or otherwise Exploit the Foreign Pictures and the F/D Pictures in any media throughout the Foreign Territory, which rights are subject to the prior grant of distribution rights to the Foreign Distributor under the Foreign Licenses and the applicable Foreign Distribution Agreement.

"**Foreign Distributor**" means (a) in the case of the Foreign Pictures (other than *Saving Silverman*, *Down to Earth*, *Zoolander* and *Don't Say A Word*) and the F/D Pictures, WBPL; (b) in the case of the Motion Picture titled *Saving Silverman*, Columbia Pictures Corporation Limited; (c) in the case of the Motion Pictures titled *Down to Earth* and *Zoolander*, Paramount Pictures International and MTV S.A. LDC; (d) in the case of the Motion Picture titled *Don't Say A Word*, Monarchy Enterprises S.a.r.l.; and (e) in the case of the Foreign Pictures and the Motion Picture titled *Into the Storm*, Village Roadshow Films Distributors S.A. (solely with respect to the Greek Territory).

"**Foreign Distributor Fees**" means the distribution fees payable to the applicable Foreign Distributor under the applicable Foreign Distribution Agreement.

"**Foreign Gross Receipts**" means "Defined Gross" or "Gross Receipts" or "International Gross Receipts", as the case may be, as defined in the applicable Foreign Distribution Agreement.

"**Foreign Licenses**" means each Foreign License (as defined in the applicable MPRPA) executed by WBEI in favor of WBPL pursuant to the applicable MPRPA.

"**Foreign Participations**" means Participations that are paid by the applicable Foreign Distributor in accordance with the applicable Foreign Distribution Agreement.

"**Foreign Pictures**" has the meaning set forth in the recitals.

"**Foreign Recoupable Distribution Expenses**" means "Recoupable Distribution Expenses", "Recoupable Expenses" (in the case of the Motion Picture titled *Don't Say a Word*), "Foreign Distribution Expenses", "Home Video Distribution Expenses" (in the case of the Motion Picture titled *Saving Silverman*), "Video Costs" (in the case of the Motion Pictures titled *Down to Earth* and *Zoolander*) and "Allowable Distribution Expenses" (each as defined in the applicable Foreign Distribution Agreement).

"**Foreign Residuals**" means Residuals that are paid by the applicable Foreign Distributor in accordance with the applicable Foreign Distribution Agreement.

"**Foreign Subsidies**" means Production Subsidies/Sale Proceeds with respect to the Foreign Pictures or F/D Pictures, as applicable.

"**Foreign Territory**" means in the case of each Picture, the "Foreign Territory" as defined in the applicable Foreign Distribution Agreement.

"**Fundamental Contracts**" means each of (a) the Warner F/D Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise necessary to comply with the terms thereof); (b) the Domestic Distribution Agreement (together with all right, title and interest in and to the Pictures licensed to the Domestic Distributor pursuant thereto or otherwise necessary to comply with the terms thereof); (c) the Warner Foreign Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise necessary to comply with the terms thereof); and (d) the Virtual Co-Financing Agreement (together with all right, title and interest in and to the Pictures licensed to the Virtual Distributor pursuant thereto or otherwise necessary to comply with the terms thereof).

"**Global Distribution Agreement**" means that certain Amended and Restated Output Distribution Agreement dated as of October 30, 2015, between VRD-USA and CPII with respect to the Global Pictures, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Global Distribution Rights**" means the rights to distribute or otherwise Exploit the Global Pictures in any media throughout the Global Territory, which rights are subject to the prior grant of distribution rights to the Global Distributor under the Global Licenses and the Global Distribution Agreement.

"**Global Distributor**" means CPII.

"**Global Distributor Fees**" means the distribution fees payable to the Global Distributor under the Global Distribution Agreement.

"**Global Gross Receipts**" means "Defined Gross Receipts" as defined in the Global Distribution Agreement.

"**Global Intercreditor Agreement**" means the Second Amended and Restated Intercreditor Agreement dated as of November 10, 2020, among CPII, for itself and for the benefit

of Sony, VRFG, VRD-USA, VREG-USA, Magnum and U.S. Bank National Association, as amended, restated, supplemented or otherwise modified from time to time prior to the Closing Effective Date.

"**Global Licenses**" means each Global License (as defined in the applicable MPRPA) executed by Sony in favor of CPII pursuant to the applicable MPRPA.

"**Global Participations**" means Participations that are paid by the Global Distributor in accordance with the Global Distribution Agreement.

"**Global Pictures**" has the meaning set forth in the recitals.

"**Global Recoupable Distribution Expenses**" means "Recoupable Distribution Expenses" (as defined in the Global Distribution Agreement).

"**Global Residuals**" means Residuals that are paid by the applicable Global Distributor in accordance with the Global Distribution Agreement.

"**Global Subsidies**" means Production Subsidies/Sale Proceeds with respect to the Global Pictures.

"**Global Territory**" means the entire universe.

"**Government Approval**" means any (a) necessary filings, notifications, registrations, applications, declarations, waiting period expiration or termination, and submissions in connection with the Transactions, as required under any applicable Law and (b) consents, certifications, grants, confirmation, permits or Orders from a Governmental Authority required to be obtained or made by any Seller or Buyer or any of their respective Affiliates to execute, deliver and perform their respective obligations under this Agreement or the other Transaction Documents and consummate the Transactions.

"**Governmental Authority**" means any court, tribunal, arbitrator, authority, agency, commission, bureau, board, department, legislature, official, body or other instrumentality of the United States (whether federal, state, municipal or local), any foreign country, or any domestic or foreign state, province, county, city, other political subdivision or any other similar body or organization exercising governmental or quasi-governmental power or authority.

"**Greek Territory**" means the "Greek Territory" as defined in the Greek Territory Distribution Agreements.

"**Greek Territory Distribution Agreements**" means (a) that certain Amended & Restated Output Distribution Agreement dated as of October 2, 2009, between Village Roadshow Distribution UK Limited and Village Roadshow Films Distributors S.A., as amended, restated, replaced, supplemented or otherwise modified from time to time, and (b) that certain Deed of Novation and Variation dated as of February 28, 2019 among Village Roadshow Distribution UK Limited, VRD and Village Roadshow Films Distributors S.A., as amended, restated, replaced, supplemented or otherwise modified from time to time.

"**IFRS**" means the International Financial Reporting Standards issued from time to time by the International Financial Reporting Standards Foundation and the International Accounting Standards Board.

"**Indebtedness**" of any Person as of any date of determination means, without duplication, (a) the principal amount of all indebtedness of such Person for borrowed money and any accrued and unpaid interest thereon, (b) the principal amount of any other indebtedness of such Person which is evidenced by a note, bond, debenture or similar instrument or debt security and any accrued and unpaid interest thereon, including, without limitation, the obligations of the Sellers under all notes issued pursuant to the Indenture, in each case determined in accordance with IFRS, (c) all capital lease obligations of such Person as of such date, in each case determined in accordance with IFRS, (d) indebtedness secured by an Adverse Claim on assets of any Seller, (e) obligations under any drawn letters of credit (excluding reimbursement obligations in respect of undrawn letters of credit), (f) all interest rate or non-U.S. currency swaps, caps, collars, hedges or insurance agreements, or options or forwards on such agreements, or other similar agreements for the purpose of managing the interest rate or non-U.S. exchange risk, (g) all financing fees and costs related to the indebtedness described in foregoing clauses (a) through (f), and (h) all guaranties of such Person in respect of any of the foregoing.

"**Indenture**" means (a) that certain Base Indenture dated as of November 10, 2020 among VR Funding and VRF Holdings, as issuers, and U.S. Bank National Association, as trustee, as supplemented by (b) that certain Group A Supplement dated as of November 10, 2020 among VR Funding, VRF Holdings, VRF, VRFNA, VRFG and VRVS, as Group A Co-Issuers, and U.S. Bank National Association, as trustee, as supplemented by (c) that certain Series 2020-1 Supplement dated as of November 10, 2020 among the Group A Co-Issuers and U.S. Bank National Association, as trustee in each case, as supplemented, amended, restated, extended or otherwise modified from time to time.

"**Insider**" shall have the meaning set forth in section 101(31) of the Bankruptcy Code.

"**Insider Causes of Action**" means any Claims or causes of action against any Insider of the Debtors.

"**Intercreditor Agreements**" means the Consolidated Intercreditor Agreement, the Global Intercreditor Agreement and the Virtual Intercreditor Agreement.

"**IP Assignment Agreement**" means the assignment agreement to assign and transfer the Sellers' rights in the Transferred Copyrights to Buyer, to be entered into at Closing, in form and substance mutually acceptable to each of the Parties.

"**Knowledge**" means, when referring to the "knowledge" of the Sellers, or any similar phrase or qualification based on knowledge of any Seller, (a) the actual knowledge of James Moore, Louis Santor, Kevin Berg, Keith Maib, and/or Glenn Taylor and (b) the knowledge that any such person referenced in clause (a) above, as a prudent business person, would have obtained after making due inquiry with respect to the particular matter in question.

"**Law**" or "**law**" means and includes any provision or requirement of any present or future statute, rule, regulation, code, code of practice, ordinance, standard, statutory guidance, decree, rule of common law or principle of equity, or other decision of any court, tribunal or Governmental Authority or by-law of any foreign, multinational, regional, federal, state, county, municipal or local jurisdiction.

"**Liability**" means, with respect to any Person, any liability or obligation (including with respect to Taxes) of such Person of any kind, character or description, whether known or unknown, disclosed or undisclosed, absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, direct or indirect, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person or is discharged, stayed or otherwise affected by any proceeding under any Debtor Relief Laws.

"**Loss**" or "**Losses**" means any Liability, loss, damage, claim, demand, obligation, charge, deficiency, settlement payment, Tax, expense, interest, award, judgment, penalty, assessment, disbursement, fine, fee or amount paid in settlement or cost or expense related to any of the foregoing (including reasonable and documented out-of-pocket legal fees and expenses), but shall not include any exemplary or punitive damages.

"**Magnum**" means Magnum Films SPC, a segregated portfolio company incorporated under the laws of the Cayman Islands.

"**Magnum Agreements**" means (a) that certain Sale Agreement dated as of December 20, 2013, by and among VRF, VRD and Magnum (as amended, restated, supplemented or otherwise modified from time to time), (b) that certain Fourth Amended and Restated Co-Investment Agreement dated as of November 10, 2020, by and among VRF, VRD, VRFNA, VRD-USA, VRPNA and Magnum (as amended, restated, supplemented or otherwise modified from time to time) and (c) that certain Second Amended and Restated Co-Investment Agreement (Global) dated as of November 10, 2020, by and among VRFG, VRD-USA and Magnum (as amended, restated, supplemented or otherwise modified from time to time), in each case, together with all ancillary documents entered into in connection therewith.

"**Magnum Domestic Percentage**" means the percentage of Designated Domestic Rights, Designated Domestic Receipts and Proceeds of the foregoing purchased by Magnum with respect to certain Pictures pursuant to the Magnum Agreements.

"**Magnum Foreign Percentage**" means the percentage of Designated Foreign Rights, Designated Foreign Receipts and Proceeds of the foregoing purchased by Magnum with respect to certain Pictures pursuant to the Magnum Agreements.

"**Magnum Global Percentage**" means the percentage of Designated Global Rights, Designated Global Receipts and Proceeds of the foregoing purchased by Magnum with respect to certain Pictures pursuant to the Magnum Agreements.

"**Material Adverse Effect**" means any change, event, circumstance, effect, state of facts, occurrence, development or other matter (any such item, an "**Effect**") that, individually or in combination with all other such similar or related Effects that have occurred prior to the date of determination of the occurrence of such Effect (a) prevents or would reasonably be expected to prevent or impair the ability of any Seller to consummate the Transactions under the Transaction Documents or (b) is or would reasonably be expected to be materially adverse to (i) the benefits, interests, rights or remedies of Buyer under any of the Transaction Documents or the rights to, timing of, or the amount of, payments thereunder, (ii) the business, assets, liabilities, condition (financial or otherwise), operations, performance, or properties of any Seller, (iii) the ability of any Seller to timely perform or comply with its covenants, agreements or obligations under any Transaction Document, or (iv) the legality, validity or enforceability of any Transaction Document; but, with respect to clauses (a) and (b), excluding any change or effect to the extent that it results from or arises out of the commencement of the Bankruptcy Cases.

"**Motion Picture**" means a feature-length theatrical motion picture.

"**MPRPA**" means (a) with respect to the Motion Pictures titled *Where the Wild Things Are*, *Sherlock Holmes*, *Sex and the City 2*, *Cats & Dogs: The Revenge of Kitty Galore*, *Legend of the Guardians*, *Life As We Know It*, *Happy Feet Two*, *Sherlock Holmes: A Game of Shadows*, *The Lucky One*, *Dark Shadows*, *Gangster Squad*, *the Great Gatsby*, *The LEGO Movie*, *Winter's Tale* and *Edge of Tomorrow*, that certain Amended and Restated Motion Picture Rights Purchase Agreement dated as of November 21, 2012, between WV Films IV LLC and WV Film Partners IV L.P., as amended, restated, supplemented or otherwise modified from time to time; (b) with respect to the F/D Pictures, that certain Amended and Restated Motion Picture Rights Purchase Agreement dated as of November 10, 2020, between VRPNA and WBEI, as amended, restated, supplemented or otherwise modified from time to time; and (c) with respect to the Global Pictures, that certain Amended and Restated Motion Picture Rights Purchase Agreement dated as of October 30, 2015, between VRPNA and Sony, as amended, restated, supplemented or otherwise modified from time to time.

"**Notices of Assignment and Amendment**" means the Zoolander Notice of Assignment and Amendment and the DTE Notice of Assignment and Amendment.

"**Objection Notice**" has the meaning set forth in Section 2.13(b).

"**Order**" means any order, judgment, ruling, injunction, award, stipulation, assessment, decree or writ, whether preliminary or final, issued, promulgated or entered by or with any Governmental Authority.

"**Outside Date**" has the meaning set forth in Section 8.01(c).

"**Parent**" has the meaning set forth in Schedule I.

"**Participations**" means amounts (excluding Residuals) payable to any Person (other than any Seller or any of its Affiliates) who rendered services or granted rights in respect of or co-financed a Picture, and which are contingent on amounts derived from the Exploitation of such

Picture or payable upon the occurrence of specified events in relation to the Exploitation of such Picture, by whatever name called or however calculated or characterized, whether as a fixed sum or as a percentage of the receipts (however denominated) of the applicable Picture remaining after giving effect to specified exclusions and deductions, if any.

"**Party**" or "**Parties**" means any party or parties to this Agreement.

"**Permitted Liens**" means security interests in favor of the Domestic Distributor, the Foreign Distributors, the Global Distributor or the Virtual Distributor (including any Uniform Commercial Code financing statement in favor of the Domestic Distributor, any of the Foreign Distributors, the Global Distributor or the Virtual Distributor with respect to the Pictures) as and to the extent set forth in the Intercreditor Agreements in effect as of the Effective Date (the "**Distributor Liens**").

"**Person**" means any individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company, Governmental Authority, or other entity.

"**Picture Agreements**" means the QCSAs, the MPRPAs, the Virtual Documents, the Distribution Agreements, the Magnum Agreements, the Intercreditor Agreements, the Indenture, all other instruments, exhibits, documents and agreements executed or delivered by Sellers from time to time prior to the Closing Effective Date pursuant to the foregoing, including, without limitation, rights purchase agreements, intercompany licenses and assignments and security perfection documents, and all other Contracts to which a Seller is a party in connection with the financing, development, production, exhibition or other Exploitation of the Pictures.

"**Pictures**" has the meaning set forth in the recitals.

"**Post-Closing Statement**" has the meaning set forth in Section 2.13(a).

"**Post-Closing Tax Period**" means (x) any Tax period beginning after the Closing Effective Date and (y) with respect to a Straddle Period, that portion of such Straddle Period beginning after the Closing Effective Date and continuing for the remainder of such Straddle Period.

"**Post-Cutoff Income**" has the meaning set forth in Section 2.06.

"**Post-Cutoff Paid Liabilities**" has the meaning set forth in Section 2.06.

"**Pre-Closing Period**" has the meaning set forth in Section 6.01(a).

"**Pre-Closing Tax Period**" means (a) any Tax period ending on or before the Closing Effective Date and (b) with respect to a Straddle Period, that portion of such Straddle Period ending on (and including) the Closing Effective Date.

"**Proceeding**" means any suit, action, cause of action, litigation, hearing, inquiry, examination, demand, proceeding, controversy, complaint, appeal, notice of violation, citation,

summons, subpoena, arbitration, mediation, dispute, claim, allegation, investigation or audit of any nature whether civil, criminal, quasi criminal, indictment, administrative, regulatory or otherwise and whether at Law or in equity.

"**Proceeds**" means, with respect to any property, (a) whatever is acquired upon the sale, lease, license, exchange, or other disposition of such property; (b) whatever is collected on, or distributed on account of, such property; (c) rights arising out of such property; (d) to the extent of the value of such property, claims arising out of the Loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, such property; or (e) to the extent of the value of such property and to the extent payable to the owner of such property, insurance payable by reason of the Loss or nonconformity of, defects or infringement of rights in, or damage to, such property.  For purposes of this Agreement, all references to "Proceeds" in the definition of Purchased Assets or any definition referred to therein shall be deemed to mean Proceeds arising, received or payable from and after the Cutoff Date.

"**Production Subsidies/Sale Proceeds**" means Motion Picture subsidies, rebates or refunds (including in respect of Taxes) granted by a governmental or other entity for use in connection with or with respect to the production of the applicable Picture and any proceeds from sales or leasebacks or similar transactions in connection with the production of such Picture that are in the nature of, or have a similar effect to, a subsidy, rebate or refund.

"**Property Taxes**" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"**Purchase Price**" has the meaning set forth in Section 2.06.

"**Purchase Price Schedule**" has the meaning set forth in Section 2.12(a).

"**Purchased Assets**" means all of the Sellers' right, title and interest in and to the Pictures and all of the assets, properties and rights of any kind, whether tangible or intangible, used in, held for use in, relating to or arising from the financing, development, production and/or Exploitation of the Pictures, including, without limitation, all of the right, title and interest of each Seller in and to the following to the extent such assets or rights exist (except to the extent constituting the Excluded Assets):

(a)    the Pictures and any and all versions existing thereof, and all elements thereof (including the screenplay and story) and all trailers, "bloopers," footage, trims and outtakes thereof (including, without limitation, the director's cut and the final cut and any and all versions of each of the foregoing (in any and all languages), all versions rated by the Motion Picture Association of America and unrated versions thereof, "behind the scenes," "making of," and any and all other documentary or short form content relating thereto and all footage, "bloopers," trims and outtakes of each of the foregoing);

(b)    the Copyrights for each Picture and the underlying material for such Picture, in all territories of the world in which Copyright protection for such Picture is available, and any and all

Copyright registrations and applications for such registrations for such Picture in such materials in all territories of the world (if any) (the "**Transferred Copyrights**");

(c)     all trademarks (if any) relating to the Pictures or any of the elements thereof, including, without limitation, rights protected pursuant to trademark, service mark, unfair competition and/or other laws, rules or principles of law or equity, and the right to register, renew, enforce and defend the foregoing (collectively, "**Trademarks**");

(d)     the license to use, in connection with the Exploitation thereof, all original or licensed music included in the soundtrack of such Picture and all musical material synchronized therewith, in whole or in part, all rights to perform, copy, record, rerecord, produce, publish, reproduce or synchronize any or all of said music and musical compositions, as well as all other rights to Exploit such music, including record, soundtrack recording and music publishing rights and all Copyrights in and to said musical material;

(e)     all Exploitation rights with respect to the Pictures (including all Ancillary Rights);

(f)     all inventory and work-in-process used in, held for use in, relating to, or arising from the ownership and Exploitation of the Pictures or any rights therein;

(g)     all Exploitation Agreements and all Contract Rights, including, without limitation, the right to cause the Pictures or any rights thereto to be distributed and/or Exploited under the Exploitation Agreements;

(h)     all accounts and accounts receivable (whether current or noncurrent) and the full benefit of all security for such receivables arising, received or payable from and after the Cutoff Date, including any claims, remedies and other rights to the extent related to any of the foregoing, including, without limitation, all right to receive or retain, whether as an owner, a participant or otherwise, any and all receivables, royalties, cash flows and other incomes and revenues of whatever kind or nature from the Exploitation of the Pictures or any elements thereof in any and all media arising, received or payable from and after the Cutoff Date (the "**Post-Cutoff Cash Flows**");

(i)     all Books and Records;

(j)     all Tangible Assets;

(k)     all rights to receive Financial Information from a distributor or any other Person with respect to the monies and any other consideration payable in connection with the Pictures for all accounting periods;

(l)     all rights to (A) exercise, control, settle, compromise and/or direct any noticed, pending or future audit and/or inspection (an "**Audit Right**") of or relating to amounts reflected in any Financial Information with respect to any Picture, and (B) receive the economic benefit and/or any payments resulting from any audit set forth in clause (A) above; and

(m)     other than with respect to the Warner Dispute, the Insider Causes of Action and the Avoidance Actions, all of the Sellers' claims or causes of action, choses in action, rights of recovery and rights of set-off of any kind and indemnities against other Persons (regardless of whether or not such claims and causes of action have been asserted) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery (regardless of whether such rights are currently exercisable) relating to the Pictures or the Exploitation of the Pictures; provided, that, for the avoidance of doubt, Sellers agree that Buyer is not acquiring the rights, obligations or Liabilities relating to any claim (A) asserted against any Seller (or its Affiliates) in the Warner Dispute or (B) asserted by any Seller (or its Affiliates) in the Warner Dispute.  However, nothing herein shall affect Buyer's (or any of its Affiliate's) rights with respect to any all claims or causes of action, choses in action, rights of recovery and rights of set-off of any kind and indemnities made on its own behalf against other Persons (regardless of whether or not such claims and causes of action have been asserted) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery (regardless of whether such rights are currently exercisable) to which Buyer (or its Affiliates) may be entitled in the Warner Dispute;

provided, for clarity, that the Purchased Assets shall include the following:

(i)     the Assumed Contracts;

(ii)     with respect to each Foreign Picture and each F/D Picture, (i) an undivided interest equal to the Relevant Percentage in the Foreign Distribution Rights with respect to such Picture, (ii) an undivided interest equal to the Relevant Percentage in the Designated Foreign Receipts with respect to such Picture, and (iii) all Proceeds of the foregoing;

(iii)     with respect to each F/D Picture, (i) an undivided interest equal to the Relevant Percentage in the Domestic Distribution Rights with respect to such Picture, (ii) an undivided interest equal to the Relevant Percentage in the Designated Domestic Receipts with respect to such Picture, and (iii) all Proceeds of the foregoing;

(iv)     with respect to each Global Picture, (i) an undivided interest equal to the Relevant Percentage in the Global Distribution Rights with respect to such Picture, (ii) an undivided interest equal to the Relevant Percentage in the Designated Global Receipts with respect to such Picture, and (iii) all Proceeds of the foregoing;

(v)     with respect to each Virtual Picture, (i) an undivided interest equal to the Relevant Percentage in the Virtual Distribution Rights with respect to such Picture, (ii) an undivided interest equal to the Relevant Percentage in the Designated Virtual Receipts with respect to such Picture, and (iii) all Proceeds of the foregoing; and

(vi)     without duplication of the foregoing, all amounts to which Sellers are entitled to receive pursuant to the Specified Zoolander Agreements and Specified DTE Agreements.

"**QCSA**" means (a) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of February 22, 2006, between WV Films LLC and WV Film Partners L.P., as amended, restated, supplemented or otherwise modified from time to time; (b) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of February 22, 2006, between WV Films II LLC and WV Film Partners II L.P., as amended, restated, supplemented or otherwise modified from time to time; (c) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of April 10, 2008, between WV Films III LLC and WV Film Partners III L.P., as amended, restated, supplemented or otherwise modified from time to time; (d) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of December 15, 2017, between WV Films IV LLC and WV Film Partners IV L.P., as amended, restated, supplemented or otherwise modified from time to time; (e) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of December 14, 2021, between Evil Woman Films LLC and Evil Woman Film Partners LP, as amended, restated, supplemented or otherwise modified from time to time; (f) that certain Qualified Cost Sharing Agreement dated as of August 11, 2000, between Zoo Films LLC and Zoo Film Partners LP, as amended, restated, supplemented or otherwise modified from time to time (the "**Zoolander QCSA**"); (g) that certain Qualified Cost Sharing Agreement dated as of August 11, 2000, between DTE Films LLC and DTE Film Partners LP, as amended, restated, supplemented or otherwise modified from time to time (the "**DTE QCSA**"); and (h) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of December 19, 2019, between DSAW Films LLC and DSAW Film Partners L.P., as amended, restated, supplemented or otherwise modified from time to time.

"**Quarterly Reporting**" means the accounting statements, earnings statements or other similar statements or reporting delivered by the counterparties under the Distribution Agreements for the immediately preceding fiscal quarter.

"**Reductions**" has the meaning set forth in Section 4.01(j)(ix).

"**Relevant Percentage**" means the percentage of the Applicable Percentage of each Picture owned by the Sellers after giving effect to the purchases by Magnum pursuant to the Magnum Agreements.

"**Required Consent**" has the meaning set forth in Section 2.05(a).

"**Residuals**" means all residuals and other Liabilities (including employer fringe benefits, supplemental market payments, pension, health and welfare payments and Taxes payable with respect thereto) owing or payable to any Person (other than any Seller or any of its Affiliates) under applicable Collective Bargaining Agreements by reason of, in connection with, as a condition to or arising from the Exploitation of the Pictures, or any part thereof, from time to time, or any use or reuse thereof for any purpose or in any media whatsoever.

"**Rights Purchase Agreement**" has the meaning set forth in the applicable MPRPA.

"**Sale Order**" means an order entered by the Bankruptcy Court, in form and substance acceptable to Buyer and the Sellers, approving this Agreement and all of the terms and conditions hereof and approving and authorizing the Sellers to consummate the transactions contemplated

hereby. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, (i) the execution, delivery and performance by the Sellers of this Agreement, (ii) the sale of the Purchased Assets to Buyer on the terms set forth herein and free and clear of all Adverse Claims (other than those included in the Assumed Liabilities and the Permitted Liens) to the full extent permitted pursuant to section 363(f) of the Bankruptcy Code and find that Buyer is not a successor of any of the Sellers, and (iii) the performance by the Sellers of their respective obligations under this Agreement, including the full satisfaction of Cure Amounts for all Assumed Contracts, (b) authorize and empower the Sellers to assume and assign to Buyer the Assumed Contracts as set forth in this Agreement pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, and (c) find that Buyer is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code and grant Buyer the protections of section 363(m) of the Bankruptcy Code.

"**Seller Closing Deliverables**" has the meaning set forth in <u>Section 2.10</u>.

"**Seller Transaction Expenses**" means the aggregate amount of any and all costs, fees and expenses incurred by or on behalf of, or paid or to be paid directly by, the Sellers or any Person that the Sellers pay or reimburse or are otherwise legally obligated to pay or reimburse in connection with, in anticipation of or incident to the negotiation, preparation, execution and delivery of this Agreement and the other Transaction Documents or the performance or consummation of the Transactions, including: (i) all costs, fees and expenses payable to counsel, advisors, consultants, investment bankers, accountants, auditors and any other experts, and all obligations under any engagement letter or other agreement or understanding with any investment banker or broker in connection with the Transactions; (ii) any costs, fees and expenses associated with obtaining necessary or appropriate waivers, consents, or approvals of any Governmental Authority or other third parties on behalf of the Sellers in connection with the Transactions; (iii) any costs, fees or expenses associated with obtaining the release and termination of any Adverse Claims in connection with the Transactions; (iv) all brokers', finders' or similar fees in connection with the Transactions; and (v) all amounts owed to any Service Provider that arise in whole or in part as a result of the consummation of the Transactions including all change of control payments, bonuses, severance, termination, or retention obligations or similar amounts payable in the future or due by the Sellers in connection with the Transactions contemplated hereby, including any Taxes payable in connection therewith.

"**Seller Transaction Expenses Schedule**" means a written schedule of the Seller Transaction Expenses that remain unpaid as of the Closing Effective Date, in form and substance reasonably satisfactory to Buyer, setting forth (a) the name of each such Seller Transaction Expense payee, (b) the amount due to such payee as set forth in the applicable invoice and (c) such payee's bank account information as set forth in the applicable invoice, delivered to Buyer in accordance with <u>Section 2.10(d)</u> together with a copy of each such invoice and an IRS Form W-9 or applicable IRS Form W-8 for each such payee, duly executed by such payee.

"**Sellers**" has the meaning set forth in the preamble.

"**Separateness**" means the requirement of each Seller to maintain an existence separate from its Affiliates, as more particularly set forth in each Seller's Constitutive Documents.

"**Service Provider**" means, with respect to any Person, each director, officer, employee, manager, independent contractor, consultant, leased employee or other service provider of such Person.

"**Sony**" means Sony Pictures Entertainment Inc., a Delaware corporation.

"**Source**" has the meaning set forth in Section 4.02(e).

"**Specified Audit Proceeds**" means an amount equal to fifty percent (50%) of (a) all payments received by Buyer from the applicable counterparty to the applicable Distribution Agreement resulting from any audit of amounts reflected in any Financial Information with respect to the applicable Picture for any period commencing prior to the Cutoff Date and ending prior to the Cutoff Date (the "**Pre-Cutoff Period**"), less (b) all documented out of pocket costs (including legal fees) incurred by Buyer or its Affiliates in connection with the negotiation, litigation and/or settlement of such audit; provided, that to the extent that any such audit is in respect of both the Pre-Cutoff Period and any audit period commencing on or after the Cutoff Date (the "**Post-Cutoff Period**"), then Buyer shall allocate the amounts described in the foregoing (a) and (b) between the Pre-Cutoff Period and the Post-Cutoff Period reasonably and in good faith based on the number of days in the applicable period subject to such audit occurring during the Pre-Cutoff Period relative to the total number of days in the applicable period subject to such audit.

"**Specified Contracts**" means each of (a) the Global Distribution Agreement (together with all right, title and interest in and to the Pictures licensed to the Global Distributor pursuant thereto or otherwise necessary to comply with the terms thereof), (b) the Saving Silverman Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise necessary to comply with the terms thereof), (c) the DTE Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise necessary to comply with the terms thereof), (d) the Zoolander Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise necessary to comply with the terms thereof), and (e) the Don't Say a Word Agreement (together with all right, title and interest in and to the Pictures licensed to the applicable Foreign Distributor pursuant thereto or otherwise necessary to comply with the terms thereof).

"**Specified Event**" means, (i) with respect to a Specified Contract, the Sellers' failure to obtain and deliver to Buyer the Sale Order approving the transfer to Buyer of such Specified Contract on or prior to the Closing Effective Date, (ii) with respect to *Zoolander*, the Sellers' failure to obtain and deliver to Buyer on or prior to the Closing Effective Date the Zoolander Notice of Assignment and Amendment, in form and substance reasonably satisfactory to Buyer and duly executed by the parties thereto, and/or (iii) with respect to *Down to Earth*, the Sellers' failure to obtain and deliver to Buyer on or prior to the Closing Effective Date the DTE Notice of Assignment and Amendment, in form and substance reasonably satisfactory to Buyer and duly executed by the parties thereto.

"**Specified Event Purchase Price Reduction**" means an amount equal to the sum of (a) in the event of a Specified Event with respect to the Global Distribution Agreement, an amount

equal to $13,882,000, *plus* (b) in the event of a Specified Event with respect to the Saving Silverman Agreement, an amount equal to $76,000, *plus* (c) in the event of a Specified Event with respect to the DTE Agreement or *Down to Earth*, an amount equal to $1,384,000, *plus* (d) in the event of a Specified Event in connection with the Zoolander Agreement or *Zoolander*, an amount equal to $7,564,000, *plus* (e) in the event of a Specified Event with respect to the Don't Say a Word Agreement, an amount equal to $756,000.

"**Straddle Period**" means any Tax period beginning before or on, and ending after, the Closing Effective Date.

"**Successful Bidder**" means, if an Auction is conducted, the prevailing party with respect to the Purchased Assets at the conclusion of such Auction.

"**Tangible Assets**" means all physical properties of, or relating to, any Picture, including prints, negatives, duplicating negatives, fine grains, music and sound effects tracks, master tapes and other duplicating materials of any kind, all various language dubbed and titled versions, prints and negatives of stills, trailers and television spots, all promos and other advertising and publicity materials, stock footage, trims, tabs, out-takes, cells, drawings, storyboards, models, sculptures, puppets, sketches and continuities, including, without limitation, those elements which are stored by the relevant distributor (or the applicable rights therein).

"**Tax**" or "**Taxes**" means any U.S. federal, state, local or non-U.S. income, gross receipts, branch profits, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, escheat, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, ad valorem, value added, alternative or add-on minimum or estimated tax or other tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or not.

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Transaction Documents**" means this Agreement, the Assumption and Assignment Agreement, the IP Assignment Agreement, any pleadings related to this Agreement filed with the Bankruptcy Court, the Notices of Assignment and Amendment, and all other instruments, exhibits, documents and agreements executed or delivered from time to time in connection with the foregoing.

"**Transactions**" means the transactions contemplated by the Transaction Documents.

"**Transfer Taxes**" means all transfer, stamp, documentary, sales, use, registration, value-added and other similar Taxes (including all applicable real estate transfer Taxes) incurred in connection with any Transaction Document and the Transactions.

"**V Squared Assignment and Assumption Agreement**" means that certain Assignment and Assumption Agreement dated as of November 10, 2020, by and among V Squared, LLC,

VRVS, Vine Investment Advisors, LP, Vine Film Finance Fund II AIV, L.P., Vine WestCon SPV, LP, Warner Bros. Pictures, a division of WB Studio Enterprises Inc. and VREG-USA, as amended, restated, supplemented or otherwise modified from time to time.

"**VFFF Assignment and Assumption Agreement**" means that certain Assignment and Assumption Agreement dated as of November 10, 2020, by and among Vine Film Finance Fund II AIV, L.P., VRVS, V Squared LLC, and VREG-USA, as amended, restated, supplemented or otherwise modified from time to time.

"**Virtual Assignment and Assumption Agreements**" means the V Squared Assignment and Assumption Agreement, the VFFF Assignment and Assumption Agreement and the WestCon Assignment and Assumption Agreement**.**

"**Virtual Co-Financing Agreement**" means that certain Co-Financing Agreement dated as of September 28, 2005, between Warner Bros. Pictures Inc. and Virtual Studios LLC, as amended, restated, supplemented or otherwise modified from time to time.

"**Virtual Distribution Rights**" means the right to market, distribute, subdistribute and otherwise Exploit the Virtual Pictures in any media throughout the Virtual Territory, which rights are subject to the prior grant of distribution rights to the Virtual Distributor under that certain Assignment dated as of April 1, 2003, between Warner Bros. Pictures Inc. and WBEI.

"**Virtual Distributor**" means WBEI.

"**Virtual Documents**" means the Virtual Assignment and Assumption Agreements, the Virtual Co-Financing Agreement and the Virtual Letter of Direction.

"**Virtual Intercreditor Agreement**" means that certain Intercreditor Agreement dated as of November 10, 2020, among Warner Bros. Pictures, a division of WB Studio Enterprises Inc., VRVS and U.S. Bank National Association, as amended, restated, supplemented or otherwise modified from time to time prior to the Closing Effective Date.

"**Virtual Letter of Direction**" means that certain Second Amended and Restated Letter of Direction re: Co-Financing Agreement dated September 28, 2005, as amended by that certain letter agreement dated November 10, 2020, by and among VRVS, VRH-USA, Warner Bros. Pictures, a division of WB Studio Enterprises, Inc., Vine Investment Advisors, LP, V Squared, LLC, Vine Film Finance Fund II AIV, L.P., and Vine WestCon SPV, LP, as amended, restated, supplemented or otherwise modified from time to time.

"**Virtual Pictures**" has the meaning set forth in the recitals.

"**Virtual Territory**" means the entire universe.

"**VR Funding**" has the meaning set forth in Schedule I.

"**VRD**" has the meaning set forth in Schedule I.

"**VRDTE**" means VR DTE Productions Ltd., a company formed under the laws of the British Virgin Islands.

"**VRD-USA**" has the meaning set forth in Schedule I.

"**VREG-USA**" means Village Roadshow Entertainment Group USA Inc., a Delaware corporation.

"**VRF**" has the meaning set forth in Schedule I.

"**VRF Holdings**" has the meaning set forth in Schedule I.

"**VRFG**" has the meaning set forth in Schedule I.

"**VRFNA**" has the meaning set forth in Schedule I.

"**VRH-USA**" means Village Roadshow Holdings USA Inc., a Delaware corporation.

"**VRP**" has the meaning set forth in Schedule I.

"**VRPNA**" has the meaning set forth in Schedule I.

"**VRVS**" has the meaning set forth in Schedule I.

"**Warner Dispute**" means any and all claims brought or asserted at any time by WBEI and/or its Affiliates against any Seller and/or any of its Affiliates, and any and all claims brought or asserted at any time by any Seller and/or any of its Affiliates against WBEI and/or its Affiliates, including, but not limited to, each of the Proceedings set forth on Section 4.01(e) of the Disclosure Schedules, and any other related or similar Proceedings, in each case involving any Seller and/or its Affiliates, on the one hand, and WBEI and/or its Affiliates, on the other hand.

"**WAV**" means WAV Distribution LLC, a Delaware limited liability company.

"**WBEI**" means Warner Bros. Entertainment Inc., a Delaware corporation.

"**WBPL**" means Warner Bros. Productions Limited, a company formed under the laws of England.

"**WestCon Assignment and Assumption Agreement**" means that certain Assignment and Assumption Agreement dated as of November 10, 2020, by and among Vine WestCon SPV, LP, VRVS, V Squared LLC, and VREG-USA, as amended, restated, supplemented or otherwise modified from time to time.

"**Zoo Films LLC Agreement**" means that certain Operating Agreement of Zoo Films LLC, dated as of August 11, 2000 by and among Paramount Pictures Corporation and VR Zoo Distribution USA Inc., as amended, restated, supplemented or otherwise modified from time to time.

"**Zoo Films Partnership Agreement**" means that certain Articles of Limited Partnership of Zoo Film Partners L.P., dated as of August 11, 2000, by and among VRD, VR Zoo Productions Ltd, and MTV S.A. (f/k/a MTV S.A. LDC), as amended, restated, supplemented or otherwise modified from time to time.

"**Zoolander Notice of Assignment and Amendment**" means an irrevocable notice of assignment and amendment entered into among Buyer and each of the parties to the Zoolander Agreement, Zoolander QCSA, Zoo Films Partnership Agreement and Zoo Films LLC Agreement (each of the foregoing, together with any other agreements between or among the parties thereto in connection with *Zoolander*, the "**Specified Zoolander Agreements**"), pursuant to which the parties thereto shall agree that, notwithstanding anything to the contrary in the Specified Zoolander Agreements: (i) "International Net Proceeds" and "Domestic Net Proceeds" (each as described and calculated in the Financial Information prepared by Paramount in respect of *Zoolander*) shall be shared by Paramount and Buyer 50 / 50 in perpetuity; provided, that if International Net Proceeds are cumulatively negative, Paramount shall pay Buyer one hundred percent (100%) of the International Net Proceeds and Domestic Net Proceeds until such shortfall has been recouped, consistent with past practice, and (ii) the parties to the Specified Zoolander Agreements shall agree not to amend any Specified Zoolander Agreement following the date of such notice of assignment and amendment in any manner that would modify or otherwise affect the calculation or timing of amounts payable to Buyer pursuant to such notice of assignment and amendment.

Section 1.02    **References to Agreements**.  References to an agreement or document shall include all schedules, annexes, exhibits, appendices and other attachments to such agreement or document, and unless otherwise stated, are to such agreement or document (including all such attachments) as amended, restated, replaced, supplemented or otherwise modified from time to time in a manner not inconsistent with the terms hereof and thereof.

## ARTICLE II.  SALE AND PURCHASE; CLOSING

Section 2.01    **Sale and Purchase of Purchased Assets**.  Pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, and provided that in all events that Buyer is the Successful Bidder, at the Closing, Buyer shall purchase, acquire and accept from the Sellers, and the Sellers shall irrevocably sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, all of the Sellers' right, title and interest, in, to and under the Purchased Assets, on an "as is" and "where is" basis (except as otherwise provided herein), but free and clear of Adverse Claims (except for the Assumed Liabilities and the Permitted Liens) or other interests in such Purchased Assets to the full extent provided by section 363(f) of the Bankruptcy Code.

Section 2.02    **Assumed Liabilities**.  Upon the terms and subject to the conditions of this Agreement, and explicitly excluding the Excluded Liabilities described below in <u>Section 2.04</u>, Buyer agrees, effective as of the time of the Closing, that it shall assume the sole responsibility for paying, performing and discharging when due, (a) all Liabilities arising from the ownership and Exploitation of the Purchased Assets by or on behalf of Buyer after the Closing Effective Date,

and (b) all Liabilities for Property Taxes allocated to Buyer under and in accordance with Section 6.06 (the "**Assumed Liabilities**").

Section 2.03    **Excluded Assets**.  Notwithstanding any provision in this Agreement to the contrary, the Sellers shall not be deemed to sell, transfer, assign, convey or deliver, and the Sellers will retain, all right, title and interest to, in and under, (a) the Derivative Rights, (b) any Contract that is not an Assumed Contract, (c) the Specified Audit Proceeds, (d) Avoidance Actions and Insider Causes of Action and (e) the rights, obligations, or Liabilities relating to any claim asserted against any Seller (or its Affiliates) in the Warner Dispute or asserted by any Seller (or its Affiliates) in the Warner Dispute, in each case (collectively, the "**Excluded Assets**").

Section 2.04    **Excluded Liabilities**. Notwithstanding any provision in this Agreement to the contrary, (i) Buyer is assuming only the Assumed Liabilities, and (ii) the Excluded Liabilities shall remain the sole obligation and responsibility of the Sellers.  As used in this Agreement, "**Excluded Liabilities**" includes, without limitation:

(a)    all Liabilities of the Sellers not arising out of, in respect of or relating to the Purchased Assets;

(b)    all Liabilities of the Sellers arising out of, in respect of or relating to the Purchased Assets accruing prior to the Cutoff Date;

(c)    all Liabilities arising out of, in respect of or relating to the Purchased Assets to the extent resulting from or relating to actions, omissions or circumstances taking place prior to the Closing Effective Date, including all Liabilities arising out of, in respect of or relating to (1) any actual or threatened Proceedings or legal claims (including but not limited to the Warner Dispute) arising from or relating to Sellers' production, financing, ownership or Exploitation of the Pictures or the Purchased Assets or any other aspect of Sellers' business prior to the Closing Effective Date, (2) any Seller at any time in its capacity as a producer, financier, owner, licensor, distributor or in any other capacity at or prior to the Closing Effective Date, (3) the failure of Sellers to comply with any Laws or any of their obligations prior to the Closing Effective Date (whether contractual or otherwise, including, without limitation, any Participation or Residual obligations that are contractually required to be paid on or prior to the Closing Effective Date), and (4) the obligation to indemnify, reimburse or advance amounts to any present or former officer, director, employee, owner, manager, Affiliate or agent of Sellers or their Affiliates or any participant, producer, financier, owner, distributor, talent or other Person in connection with any Picture or otherwise prior to the Closing Effective Date;

(d)    all Liabilities of the Sellers pursuant to any QCSA or MPRPA;

(e)    all Liabilities arising out of, in respect of, or relating to the Excluded Assets;

(f)    Excluded Taxes;

(g)    all Indebtedness of the Sellers and all Indebtedness arising before the Closing Effective Date that is otherwise secured by any of the Purchased Assets which in either case remains outstanding following the Closing Effective Date;

(h)    the ABS Obligations;

(i)    all Liabilities assumed by, retained by or agreed to be performed by Sellers pursuant to the Transaction Documents; and

(j)    all Liabilities arising out of, in respect of, or relating to Cure Amounts under the Assumed Contracts.

Section 2.05    **Assumption and Assignment of Contracts.**

(a)    Assignment of Contracts. To the maximum extent permitted by law, at the Closing, and pursuant to the Sale Order, the Sellers shall assign to Buyer those assignable contracts that are set forth on Schedule III, including, but not limited to, certain of the Picture Agreements pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code (the "**Assumed Contracts**"), which schedule Buyer may update at any time prior to the Closing Effective Date.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party, would not be permissible under section 365 of the Bankruptcy Code. Except with respect to the Fundamental Contracts as provided in Section 3.01(f), if such consent is not obtained or such assignment is not attainable pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, then such Purchased Asset shall not be transferred hereunder and the Closing shall proceed with respect to the remaining Purchased Assets without any reduction in the Purchase Price other than with respect to the Specified Contracts as provided in Section 2.06(a)(iii); provided, however, that (i) the Sellers shall use, whether before or after the Closing, their commercially reasonable efforts to obtain all necessary consents (each, a "**Required Consent**") to the assignment and transfer thereof, and (ii) in the event that any Assumed Contract is deemed not to be assigned pursuant to clause (i) of this Section 2.05(a), the Sellers shall (A) use commercially reasonable efforts to obtain such Required Consents as promptly as practicable after the Closing and (B) cooperate in good faith in any lawful arrangement reasonably proposed by Buyer, including subcontracting, licensing or sublicensing to Buyer any or all of any Seller's rights and obligations with respect to any such Assumed Contract, under which Buyer shall obtain (without infringing upon the legal rights of such third party or violating any law) the economic rights and benefits under such Assumed Contract with respect to which such Required Consent has not been obtained.

(b)    Sellers Commitment to Cure Payments. The Sellers will pay all Cure Amounts in connection with the assumption and assignment of Assumed Contracts for which all Required Consents and Bankruptcy Court approval to transfer have been obtained. The Sellers have provided to Buyer a schedule set forth on Schedule III setting forth a good faith estimate of all Cure Amounts for all Assumed Contracts ("**Cure Schedule**"), which schedule the Sellers may update from time to time prior to the date that is three (3) business days prior to the Closing Effective Date.

(c)    Adequate Assurance. Buyer shall use commercially reasonable efforts to provide the Bankruptcy Court and non-debtor contract counterparties any evidence reasonably necessary

to prove adequate assurance of future performance necessary to effect the assumption and assignment of the Assumed Contracts.

Section 2.06   **Purchase Price and Buyer Deposit**.

(a)     On the terms and subject to the conditions contained herein, the aggregate purchase price to be paid by Buyer for the Purchased Assets (the "**Purchase Price**") shall consist of an amount of cash equal to the sum of (i) Four Hundred Seventeen Million Five Hundred Thousand Dollars ($417,500,000); *minus* (ii) an amount equal to the sum of all gross amounts received by or credited to the Sellers that constitute amounts included in the Purchased Assets (including, without limitation, all gross amounts received by or credited to the Sellers prior to the Closing Effective Date in respect of the Pictures from and after the Cutoff Date) (the "**Post-Cutoff Income**"); *minus* (iii) in the event of the occurrence of one or more Specified Events, an amount equal to the Specified Event Purchase Price Reduction with respect to such Specified Events; *plus* (iv) an amount equal to the sum of any actual, direct, verifiable, third party out-of-pocket costs (including Participations to Magnum) attributable to the Post-Cutoff Income that are actually paid by the Sellers or their Affiliates to third parties on or prior to the Closing Effective Date (the amount so paid, the "**Post-Cutoff Paid Liabilities**").

(b)     No later than seven (7) days after entry of the Bid Procedures Order, Buyer and Sellers will enter into the escrow agreement in form and substance acceptable to Buyer and the Sellers (as amended, supplemented, amended and restated or otherwise modified from time to time, the "**Escrow Agreement**"), with an escrow agent acceptable to Buyer and the Sellers (the "**Escrow Holder**").  On the date of execution of the Escrow Agreement, Buyer shall deposit $41,750,000 (together with any interest accrued thereon in accordance with the terms of the Escrow Agreement, the "**Buyer Deposit**") with the Escrow Holder by wire transfer of immediately available funds.  The Escrow Holder will hold the Buyer Deposit until the Closing Effective Date or earlier termination of this Agreement pursuant to Article VIII in a segregated account (the "**Escrow Account**") pursuant to the terms below and otherwise in accordance with the terms of the Escrow Agreement.  Buyer, on the one hand, and Sellers, on the other hand, shall share equally all costs under the Escrow Agreement, including any fee of the Escrow Holder.  The Buyer Deposit shall become payable, and shall be paid, to the Sellers at the Closing.  At the Closing, Buyer and Sellers shall instruct the Escrow Holder to deliver the Buyer Deposit to Sellers by wire transfer of immediately available funds into an account designated by the Sellers pursuant to the terms and conditions of the Escrow Agreement.  If this Agreement is validly terminated prior to the Closing pursuant to Article VIII, the Buyer Deposit shall be released and distributed to Buyer or Sellers, as applicable, in accordance with the terms of the Escrow Agreement. Without limiting the foregoing, the Parties acknowledge and agree that, per the terms of the Escrow Agreement, in the event that this Agreement is terminated by the Sellers in accordance with Section 8.01(c), the Sellers shall be entitled to retain the Buyer Deposit.  If there is a dispute concerning the reason for termination of this Agreement, the disputing Party shall provide notice of same to Escrow Holder and the Buyer's Deposit shall be handled and distributed in accordance with the provisions of the Escrow Agreement pertaining to such dispute. In the event of any termination of this Agreement then each Party covenants and agrees that such Party shall promptly provide Escrow Holder with such instructions as may be reasonable and necessary to cause Escrow Holder to release the Buyer's Deposit to the Party entitled thereto.  In the event of any termination of this Agreement

(i) due to an uncured default of a Party pursuant to <u>Section 8.01(b)</u> or <u>Section 8.01(c)</u>, then the defaulting Party shall pay all cancellation costs imposed by the Escrow Holder, (ii) pursuant to <u>Section 8.01(d)</u>, <u>Section 8.01(f)</u>, <u>Section 8.01(g)</u> and/or <u>Section 8.01(h)</u>, then Sellers shall pay all cancellation costs imposed by the Escrow Holder, and (iii) for any other reason pursuant to <u>Section 8.01</u>, the cancellation costs imposed by Escrow Holder shall be split equally by Buyer and Sellers. If there is a conflict between the Escrow Agreement and this Agreement, the terms of this Agreement shall prevail.

Section 2.07    **Closing**.  The Closing shall be effected by exchanging true, complete and accurate copies of executed originals via electronic mail at a time and on a date specified by the Sellers and Buyer that is no later than the fifteenth (15th) business day following the date on which the last of the conditions set forth in <u>Article III</u> has been satisfied or expressly waived (other than those conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of any such condition), or at such other time and place as the Sellers and Buyer may agree in writing.

Section 2.08    **Post-Closing Assumption and Assignment of Contracts to Buyer**. At any time after the Closing Effective Date, the Sellers and Buyer may (but shall have no obligation to) mutually agree to seek authorization from the Bankruptcy Court, pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, to assume and assign a contract that was not identified as an Assumed Contract as of Closing (which contract shall become an Assumed Contract upon such assumption and assignment); provided that the Sellers will be solely responsible for paying the Cure Amount required to assume such contract (if applicable).

Section 2.09    **Delivery of Closing Statement**.  At least three (3) business days before the Closing Effective Date, Seller Representative, on behalf of the Sellers, shall prepare and deliver to Buyer a reasonably detailed written statement (the "**Closing Statement**") setting forth a good faith calculation of (a) the Seller Transaction Expenses that remain unpaid as of the Closing Effective Date (which shall include all amounts set forth in the corresponding invoices from the respective payees) and (b) a good faith calculation of the estimated Purchase Price (the "**Estimated Purchase Price**") using (and setting forth) good faith estimates of each of (A) the Post-Cutoff Income and (B) the Post-Cutoff Paid Liabilities, in each case under the foregoing (a) and (b), with reasonable supporting or underlying documentation used in the preparation thereof.  The Sellers shall provide Buyer and its representatives full access to the Books and Records and direct all appropriate personnel of Sellers and/or their Affiliates to reasonably cooperate with Buyer and its representatives in each case as are reasonably necessary to assist Buyer in its review of such calculations.  In the event that Buyer disagrees with any of the items set forth on the Closing Statement, Buyer and Seller Representative, on behalf of the Sellers, shall work together in good faith to resolve any such disagreement.

Section 2.10    **Seller Closing Deliverables**.  In addition to the other requirements set forth in this Agreement, as of the Closing, the Sellers shall deliver or cause to be delivered to Buyer each of the following documents and instruments (the "**Seller Closing Deliverables**"):

(a)    a counterpart of each Transaction Document to which any Seller or the Seller Representative is a party, duly executed by each applicable Seller and/or the Seller Representative, as applicable;

(b)    an IRS Form W-9 or applicable IRS Form W-8 for each of the Sellers, duly executed by such Seller;

(c)    a certificate in form and substance reasonably acceptable to Buyer dated as of the Closing Effective Date and duly executed by the secretary, director or other authorized officer of each Seller, certifying (i) that attached thereto are copies of each such Person's certificate of formation or certificate of incorporation, as the case may be (and any amendments thereto), certified as of a recent date by the Secretary of State of the State of Delaware or the Registrar of Corporate Affairs in the British Virgin Islands, and limited liability company agreement, bylaws or memorandum and articles of association, as the case may be (and any amendments thereto), (ii) that attached thereto are resolutions adopted by the Board of Directors (or equivalent body) and/or equity holders or members of such Person (as applicable) authorizing the execution, delivery and performance in accordance with their respective terms of the Transaction Documents to which each of such Persons is a party, (iii) attached thereto are incumbency and specimen signatures of each authorized signatory of such Person executing the Transaction Documents, and (iv) as to the Sellers' satisfaction of the conditions set forth in Sections 3.01(a) and 3.01(b);

(d)    the Seller Transaction Expenses Schedule;

(e)    a copy of all Books and Records in the Dataroom on a USB drive or other data storage device;

(f)    the Closing Statement; and

(g)    all other instruments and documents reasonably requested by Buyer.

Section 2.11    **Buyer Closing Deliverables**.  In addition to the other requirements set forth in this Agreement, as of the Closing, Buyer shall deliver or cause to be delivered to the Seller Representative each of the following documents and instruments (the "**Buyer Closing Deliverables**"):

(a)    a counterpart of each Transaction Document to which Buyer is a party, duly executed by Buyer; and

(b)    a certificate in form and substance reasonably acceptable to the Sellers dated as of the Closing Effective Date and duly executed by the secretary or other authorized officer of Buyer, certifying (i) that attached thereto is a copy of Buyer's certificate of formation (and any amendments thereto), certified as of a recent date by the Secretary of State of the State of Delaware, and limited liability company agreement (and any amendments thereto), (ii) that attached thereto

are resolutions adopted by the sole member of Buyer authorizing the execution, delivery and performance in accordance with their respective terms of the Transaction Documents to which Buyer is a party, (iii) attached thereto are incumbency and specimen signatures of each authorized signatory of Buyer executing the Transaction Documents, and (iv) as to Buyer's satisfaction of the conditions set forth in Sections 3.02(a), and 3.02(b).

Section 2.12   **Payments at Closing**.  At the Closing, Buyer shall:

(a)      pay or cause to be paid to each Seller, by wire transfer of immediately available funds to the account or accounts designated in writing by the Sellers not less than two (2) days prior to the Closing Effective Date, its share as designated on Schedule IV hereto (the "**Purchase Price Schedule**") of an amount of cash equal to the sum of (i) the Estimated Purchase Price, *minus* (ii) the Buyer Deposit, *minus* (ii) the Seller Transaction Expenses that remain unpaid as of the Closing Effective Date; and

(b)      pay or cause to be paid, on behalf and for the account of the Sellers, the Seller Transaction Expenses that remain unpaid as of the Closing Effective Date by wire transfer of immediately available funds to the applicable recipients thereof as set forth on the Seller Transaction Expenses Schedule.

Section 2.13   **Post-Closing Adjustment**.

(a)      Within one hundred and eighty (180) days following the Closing Effective Date, Buyer shall deliver to Seller Representative a reasonably detailed statement (the "**Post-Closing Statement**") setting forth calculations of the Purchase Price, along with reasonable supporting documentation.  In connection therewith, the Sellers shall provide Buyer and its representatives full access to the Books and Records to the extent reasonably related to Buyer's preparation of the Post-Closing Statement and shall direct personnel of the Sellers to reasonably cooperate with Buyer and its representatives in connection with its preparation of the Post-Closing Statement.

(b)      The Sellers and their accountants, counsel or financial advisers shall have a period of thirty (30) days after delivery of the Post-Closing Statement to review such Post-Closing Statement, and Seller Representative shall be entitled during such period to notify Buyer in writing of any objections Sellers may have to the calculations set forth therein (the "**Objection Notice**"). Any such Objection Notice shall state in reasonable detail each item or amount that Sellers dispute, the amount in dispute for each such disputed item and the reasons supporting Sellers' positions. In the event that Seller Representative does not provide an Objection Notice within the thirty (30)-day period after delivery of the Post-Closing Statement, Sellers and Buyer shall be deemed to have agreed to the Post-Closing Statement and the calculations of the Purchase Price delivered by Buyer, which shall be final, binding and conclusive for all purposes hereunder.  If an Objection Notice is delivered to Buyer within the thirty (30) day period referred to above, then the Purchase Price (as revised in accordance with this sentence) shall become final and binding upon the Parties on the earlier of (i) the date on which Seller Representative and Buyer resolve in writing any differences they have with respect to the matters specified in the Objection Notice and (ii) the date on which all such disputed matters are finally resolved in writing by the Accountant (as defined below) pursuant to the procedures set forth in this Section 2.13(b).  Following the delivery of an

Objection Notice, the Seller Representative and Buyer shall negotiate in good faith and use commercially reasonable efforts to resolve any such dispute.  If Seller Representative and Buyer fail to resolve such dispute within fifteen (15) days of delivery of the Objection Notice, then Seller Representative, on behalf of the Sellers, and Buyer shall jointly engage a nationally recognized independent public accounting firm with specialized knowledge in the media and entertainment industry (the "**Accountant**") to resolve any and all matters that remain in dispute and were included in the Objection Notice; provided, (A) if, within fifteen (15) days after the end of such resolution period, such Parties are unable to agree on an Accountant, then Seller Representative, on the one hand, and Buyer, on the other hand, shall each select an Accountant, and such firms together shall select a nationally recognized independent public accounting firm with specialized knowledge in the media and entertainment industry to act as the Accountant, and (B) if Seller Representative, on the one hand, and Buyer, on the other hand, fail to select an Accountant within ten (10) days of written demand therefor by the other Party, then the Accountant selected by the Seller Representative or Buyer, as the case may be, shall act as the Accountant for purposes of this Section 2.13(b).  Seller Representative and Buyer shall instruct the Accountant to render its decision as to the disputed matters and the effect of its decision on the Objection Notice as promptly as practicable but in no event later than sixty (60) calendar days after its selection. Neither Seller Representative nor Buyer shall (and each shall cause the Sellers, as applicable, and their respective Affiliates and any attorney, accountant or other advisor, agent or other representative not to) have any *ex parte* meetings, teleconference, presentations or other correspondence with the Accountant but shall ensure that the other party participate in all such teleconferences, meetings, presentations and receive copies of all such correspondence.

(c)     The scope of the disputes to be resolved by the Accountant shall be limited to (i) whether there were mathematical errors in the Post-Closing Statement and (ii) whether the Post-Cutoff Income, the Post-Cutoff Paid Liabilities and the Purchase Price were calculated in accordance with the terms of this Agreement with respect to the disputed matters that were submitted to the Accountant for resolution.  In resolving any such disputed matter, the Accountant (w) shall act in the capacity of an expert and not as an arbitrator, (x) shall limit its review to matters specifically set forth in the Objection Notice as a disputed matter (other than matters thereafter resolved by mutual written agreement of the Parties), (y) shall not assign a value to any disputed matter greater than the greatest value for such matter claimed by either Party or less than the smallest value for such matter claimed by either Party in the Post-Closing Statement or in the Objection Notice and (z) shall make its determinations in accordance with this Agreement.

(d)     The final determination by the Accountant of the matters submitted to it pursuant to Section 2.13(b) shall (i) be in writing, (ii) include the Accountant's calculation of the Purchase Price, (iii) include the Accountant's determination of each matter submitted to it pursuant to Section 2.13(b) and (iv) include a brief summary of the Accountant's reasons for its determination of each matter.  Absent manifest error, the resolution of disputed matters by the Accountant shall be final and binding, and the determination of the Accountant shall constitute an arbitral award that is final, binding and non-appealable (absent fraud, bad faith or manifest error) and upon which a judgment may be entered by a court having jurisdiction over the party against which such determination is to be enforced.

(e)      The costs, fees and expenses of the Accountant shall be borne by the Sellers, on the one hand, and Buyer, on the other hand, in proportion to the amounts by which their calculations of the Purchase Price differed from the Accountant's determination, which proportionate allocations shall also be determined by the Accountant at the time its determination is rendered on the merits of the matters submitted.

(f)      If the Purchase Price is greater than the Estimated Purchase Price, then Buyer shall pay to the Sellers the difference, by electronic funds transfer within five (5) business days of final determination, in immediately available funds to an account designated by the Seller Representative to receive payment; provided, that if Buyer is obligated to pay any amount to one or more Sellers pursuant to the foregoing, Buyer shall have the right to first offset any amounts that one or more Sellers owe to Buyer.  If the Purchase Price is less than the Estimated Purchase Price, then within five (5) business days of final determination, Buyer shall be entitled to recover from a debtor reserve established by the Sale Order, an amount equal to the lesser of (A) such difference and (B) the balance of such debtor reserve.

Section 2.14   **Withholding**.  Notwithstanding anything to the contrary in this Agreement, Buyer, the Sellers, and their designees will be entitled to deduct and withhold from any amounts payable pursuant to this Agreement any amounts required to be deducted or withheld under applicable Law.  To the extent that any such amounts are so deducted or withheld, such amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction or withholding was made.  Upon Closing (and thereafter as required by applicable Law or as requested by Buyer), each person entitled to payment under this Agreement shall provide a duly executed IRS Form W-9 or applicable IRS Form W-8.

## ARTICLE III.  CONDITIONS PRECEDENT TO CLOSING

Section 3.01   **Conditions Precedent to Purchase by Buyer**.  The obligations of Buyer to consummate the Transactions at Closing are subject to the fulfillment or written waiver by Buyer, as of the Closing Effective Date, of each of the following conditions:

(a)      Representations and Warranties.  Each of the representations and warranties of the Sellers contained in this Agreement or any other Transaction Document (i) that are qualified as to Material Adverse Effect, shall be true and correct in all respects as of the Effective Date and as of the Closing Effective Date as though made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects on and as of such date) and (ii) that are not qualified as to Material Adverse Effect, shall be true and correct in all respects as of the Effective Date and as of the Closing Effective Date as if made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects as of such date), except for breaches and inaccuracies the effect of which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b) <u>Performance of Covenants</u>. Each Seller shall have performed in all material respects all of the covenants and obligations required to be performed by it under this Agreement or any other Transaction Document prior to or at the Closing.

(c) <u>Government Approvals</u>. All Government Approvals required in connection with the Sellers' execution, delivery and performance of this Agreement or any other Transaction Document or consummation of the Transactions shall have been obtained or made and shall be in full force and effect.

(d) <u>Seller Closing Deliverables</u>. Buyer shall have received each Seller Closing Deliverable.

(e) [Reserved]

(f) <u>Fundamental Contracts</u>. Sellers shall have obtained and delivered to Buyer the Sale Order approving the transfer to Buyer of each of the Fundamental Contracts.

(g) <u>Notices of Assignment and Amendment</u>. Sellers shall have obtained and delivered to Buyer the Notices of Assignment and Amendment, in form and substance reasonably satisfactory to Buyer and duly executed by the parties thereto.

Section 3.02 **Conditions Precedent to Sale by Sellers**. The obligations of the Sellers to consummate the Transactions at Closing are subject to the fulfillment or written waiver by the Sellers, as of the Closing Effective Date, of each of the following conditions:

(a) <u>Representations and Warranties</u>. Each of the representations and warranties of Buyer contained in this Agreement or any other Transaction Document (i) that are qualified as to Material Adverse Effect, shall be true and correct in all respects as of the Effective Date and as of the Closing Effective Date as though made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects on and as of such date) and (ii) that are not qualified as to Material Adverse Effect shall be true and correct in all respects as of the Effective Date and as of the Closing Effective Date as if made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects as of such date), except for breaches and inaccuracies the effect of which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b) <u>Performance of Covenants</u>. Buyer shall have performed in all material respects all of the covenants and obligations required to be performed by it under this Agreement or any other Transaction Document prior to or at the Closing.

(c) <u>Government Approvals</u>. All Government Approvals required in connection with execution, delivery and performance of this Agreement or any other Transaction Document or consummation of the Transactions shall have been obtained or made and shall be in full force and effect.

Section 3.03   **Conditions Precedent to Obligations of Buyer and the Sellers**.   The obligations of the Buyer and the Sellers to consummate the Transactions at Closing are subject to the fulfillment or written waiver by each of the Buyer and the Sellers, as of the Closing Effective Date, of each of the following conditions:

(a)   Bankruptcy Court Order. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be unstayed and in full force and effect.

## ARTICLE IV.  REPRESENTATIONS AND WARRANTIES

Section 4.01   **Representations and Warranties of Sellers**.   Except as set forth in the corresponding sections or subsections of the Disclosure Schedules attached hereto (collectively, the "**Disclosure Schedules**"), each Seller hereby jointly and severally represents and warrants to Buyer, unless another date is expressly noted below, as of the Effective Date and as of the Closing Effective Date as follows:

(a)   Organization and Qualification.   Such Seller is a limited liability company or corporation duly incorporated, formed, validly existing and in good standing under the laws of (x) the State of Delaware or, in the case of the Sellers incorporated in the British Virgin Islands, the laws of the British Virgin Islands and (y) all other jurisdictions where the business conducted by such Seller requires it be qualified to do business.  None of the Sellers incorporated in the British Virgin Islands conducts business outside of the British Virgin Islands.  No Seller other than the Sellers incorporated in the British Virgin Islands conducts business outside of the United States.

(b)   Authorization; No Violation.

(i)   The execution and delivery by such Seller of, and the performance by such Seller of its obligations under, the Transaction Documents to which it is or is to be a party, and the Transactions, are within such Person's powers and have been duly authorized by all necessary action.

(ii)   The execution and delivery by such Seller of, and the performance by such Seller of its obligations under, the Transaction Documents to which it is or is to be a party, and the Transactions, do not (w) contravene, conflict with or violate its Constitutive Documents, (x) contravene, conflict with or violate any applicable Law or Order, including, in the case of the Sellers incorporated in the British Virgin Islands, the Economic Substance (Companies and Limited Partnerships) Act (As Revised) of the British Virgin Islands, (y) require any consent, approval or notice under, conflict with or result in the material breach of, or constitute a material default (or an event that, with the giving of notice or lapse of time, or both, would become a material default) under, or give rise to any rights of termination, amendment, modification, acceleration, creation or increase in any material payment obligation or forfeiture, suspension, limitation, cancellation, impairment or Loss of any right or benefit of the Sellers (and, after the Closing, Buyer) to own or Exploit or otherwise exercise any rights that the Sellers currently have with respect to the Pictures under, any loan agreement, indenture, mortgage, deed of trust, lease or other instrument or Contract binding on or affecting such Person or any of its assets or properties,

including the Purchased Assets, or (z) result in or require the creation or imposition of any Adverse Claim upon or with respect to any of the assets or properties of such Person, including the Purchased Assets, other than a Permitted Lien.

(iii)   Except as set forth in Section 4.01(b)(iii) of the Disclosure Schedules, no Seller is in violation of any Law, writ, injunction, determination or award or in breach of any distribution agreement, loan agreement, indenture, mortgage, deed of trust, lease or other instrument or Contract, the violation or breach of which would be reasonably likely to have a Material Adverse Effect.

(c)   <u>Consents and Approvals</u>.  All authorizations or approvals of and other actions by, and all notices to and filings with, any Governmental Authority or regulatory body or any other Person that are required to be obtained, taken, given or made by any Seller (i) for the due execution and delivery by such Person of, and the performance by such Person of its obligations under, any of the Transaction Documents to which it is or is to be a party, or (ii) for the exercise by Buyer of its rights under such Transaction Documents, as applicable, have been (or, in the case of the purchase and sale of the Purchased Assets hereunder, shall have been as of the Closing Effective Date) duly obtained, taken, given or made and are (or, in the case of the purchase and sale of the Purchased Assets hereunder, shall have been as of the Closing Effective Date) in full force and effect.

(d)   <u>Enforceability</u>.  This Agreement has been, and each other Transaction Document to which any Seller is or is to be a party is, or when delivered will have been, duly executed by such Person, and is, or when delivered will be, the legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium and other similar laws affecting the rights of creditors and to general principles of equity (whether considered in a suit at law or in equity or pursuant to arbitration).

(e)   <u>Litigation</u>.  Except as set forth on Section 4.01(e) of the Disclosure Schedules, there is no pending or, to the Sellers' Knowledge, threatened Proceeding (i) that questions the legality or propriety of the Transactions or that if adversely determined could reasonably be expected to adversely impact any Seller's ability to comply with the terms of the Transaction Documents and/or adversely impact Buyer's rights under the Transaction Documents, (ii) against or affecting any Seller or its Affiliates, or any of its or their current or former officers, directors, members, employees or representatives in their capacities as such, in each case relating to or arising out of the Purchased Assets or any Picture, or (iii) that requires any future payment by any Seller or its Affiliates to any Person in connection with any Picture.  None of the Purchased Assets is subject to any Order.  In connection with the Warner Dispute, there have been no, nor does any Seller have Knowledge of any, threatened, adverse interim or final Orders by a court or arbitrator against any Seller or any of its Affiliates that could reasonably be expected to adversely impact such Seller's ability to comply with the terms of the Transaction Documents and/or Buyer's rights under the Transaction Documents.

(f)   [Reserved]

(g)     [Reserved]

(h)     [Reserved]

(i)     <u>Absence of Certain Changes or Events</u>.

(i)     Since June 30, 2024, and except as set forth on <u>Section 4.01(i)(i)</u> of the Disclosure Schedules, (A) no Seller has experienced any change, event or circumstance that, individually or in the aggregate, has had or would be reasonably likely to have a Material Adverse Effect and (B) there has been no material damage, destruction, Loss or claim, whether or not covered by insurance, adversely affecting any of the Purchased Assets, on a Picture by Picture basis.

(ii)     Without limiting the generality of clause (i) of this <u>Section 4.01(i)</u>, and except as set forth on <u>Section 4.01(i)(ii)</u> of the Disclosure Schedules, since June 30, 2024, none of the Sellers has:

(A)     sold, transferred, leased, subleased, licensed or otherwise disposed of, or imposed or suffered to be imposed any Adverse Claim (other than Permitted Liens) on, any Purchased Assets;

(B)     accelerated or delayed collection of any material notes or material accounts receivable, advances, cash flows or other income or revenues of whatever kind or nature arising out of or related to the Purchased Assets;

(C)     delayed or accelerated payment of any material account payable or other material Liability arising out of or related to the Purchased Assets;

(D)     paid any material amount in respect of the Purchased Assets as a result of awards or settlements in connection with any Proceeding (including any audit);

(E)     (1) cancelled, compromised, waived or released any material right in Sellers' favor or claim of such Seller with respect to any Purchased Assets or (2) settled or compromised any Proceeding (including any audit) with respect to any Purchased Assets;

(F)     entered into, amended, modified or terminated any Picture Agreement, or cancelled, modified or waived any debts or claims or waived any rights held by it thereunder;

(G)     entered into any contract or transaction with any Affiliate pertaining to or affecting the Purchased Assets;

(H)     (1) made, changed or revoked any Tax election, (2) changed an annual accounting period, (3) adopted or changed any accounting method with respect to Taxes, (4) filed any amended Tax Return, (5) entered into any closing

agreement, (6) settled or compromised any Tax claim or assessment, or (7) consented to any extension or waiver of the limitation period applicable to any claim or assessment with respect to Taxes; in each case, to the extent such action would adversely affect the Purchased Assets in a Post-Closing Tax Period; or

(I)     agreed, whether in writing or otherwise, to take any of the actions specified in this Section 4.01(i).

(j)     Pictures.

(i)     Picture Ownership.   Schedule II hereto sets forth a true, correct and complete list of each Picture, including, for each Picture, (A) the Applicable Percentage, (B) the applicable distributor(s), (C) the Magnum Foreign Percentage (if applicable), (D) the Magnum Domestic Percentage (if applicable), (E) the Magnum Global Percentage (if applicable) and (F) the Relevant Percentage.   Neither Magnum nor its Affiliates has any right to purchase or otherwise increase the Magnum Foreign Percentage, Magnum Domestic Percentage or the Magnum Global Percentage set forth on Schedule II hereto pursuant to the Magnum Agreements or otherwise.

(ii)     [Reserved]

(iii)     No Litigation.   There is no pending or threatened in writing or, to any Seller's Knowledge, otherwise threatened Proceeding in any jurisdiction contesting or challenging the Exploitation, use, ownership, rights or entitlements, validity, enforceability, or registrability, as applicable, by any Seller of any of its right, title or interest in or to any Picture.   No Seller is party to any settlement, covenant not to sue, tolling agreement or Order resulting from any Proceeding which (x) requires any future payment by any Seller to any Person in connection with any Picture, (y) permits any Persons other than Sellers to Exploit any Purchased Assets; or (z) restricts the rights of any Seller to Exploit any Purchased Assets.

(iv)     Audits.   Section 4.01(j)(iv) of the Disclosure Schedules: (A) sets forth a true, correct and complete list of all audits and claims (including current status and outside tolling date of any such audit or claim) with respect to each Picture (whether brought by or on behalf of any Seller or any third Person) that have been noticed or that are ongoing; (B) describes in detail, on an audit-by-audit basis, whether such audit or claim is an out-bound audit (*i.e.*, audits of, or other Proceedings with respect to, the books and records of third parties in progress or demanded by or on behalf of any Seller as of the date hereof, with respect to any of the Purchased Assets) or an in-bound audit (*i.e.*, audits of, or other Proceedings with respect to, the books and records of any Seller in progress or demanded by or on behalf of a third party as of the date hereof, with respect to any of the Purchased Assets); and (C) sets forth a true, correct and complete list of all past and ongoing settlements and other resolutions relating to any of the foregoing audits.   The Sellers have provided Buyer with true, correct and complete copies of all documentation described in or related to the foregoing subclause (C).   All costs that are due and payable by or on behalf of the Sellers in connection with any of the audits described on Section 4.01(j)(iv) of the

Disclosure Schedules have been paid.  To the Knowledge of Sellers, no Person party to any Contract pursuant to which a Participation in connection with any Picture has been granted has given notice of an intention to commence, or otherwise indicated an intention to commence, any audit in connection therewith.  Except as set forth in <u>Section 4.01(j)(iv)</u> of the Disclosure Schedules, no Seller has waived or modified any of the Audit Rights provided for in the Exploitation Agreements or other Contracts giving rise to proceeds payable to such Seller with respect to audit periods that remain contestable as of the Closing Effective Date.  Except as set forth in <u>Section 4.01(j)(iv)</u> of the Disclosure Schedules, to the Sellers' Knowledge, there are no facts or circumstances existing that provide a right of any distributor or other payor to adjust the proceeds payable to such Seller or claim a refund of any amount previously paid, except to the extent the period to assert a claim therefor has expired.

(v)     [Reserved]

(vi)     <u>Picture Agreements</u>.  <u>Section 4.01(j)(vi)(A)</u> of the Disclosure Schedules sets forth a true, correct and complete list of all the Picture Agreements.  True, complete and accurate copies of each Picture Agreement, together with all modifications and amendments thereto, have previously been made available to Buyer.  Each Picture Agreement is valid, binding, and in full force and effect and is enforceable by the applicable Seller party thereto (or to whom the rights therein were assigned) in accordance with its terms and is not subject to any material claims, charges, set-offs or defenses.  Each Seller has performed the material obligations required to be performed by it to date under the Picture Agreements and no Seller is (with or without the lapse of time or the giving of notice, or both) in material breach or default thereunder, nor has any event occurred that would give rise to any right of notice, modification, acceleration, payment, cancellation or termination of or by another party under, or in any manner release any party thereto from any material obligation under, any such Picture Agreement and, to the Knowledge of the Sellers, no other party to the Picture Agreements is (with or without the lapse of time or the giving of notice, or both) in material breach or default thereunder and no event has occurred that with the giving of notice or the passage of time or both would constitute a material breach or default by any other party, or that would give rise to any right of notice, modification, acceleration, payment, cancellation or termination of or by any Seller under, or in any manner release any party thereto from any material obligation under, any such Picture Agreement.  No Seller has received any notice of the intention of any third party to terminate, cancel or rescind any Picture Agreement.  As of immediately prior to the Closing, (I) the Distribution Agreements are all of the Exploitation Agreements to which any Seller or any of their Affiliates is a party, (II) the Intercreditor Agreements are all of the intercreditor agreements to which any Seller or any of their Affiliates is a party and (III) the QCSAs and MPRPAs are all of the multi-Picture co-financing or cost-sharing agreements or rights purchase agreements pursuant to which any Seller or any of their Affiliates is a party.  Except as set forth in <u>Section 4.01(j)(vi)(B)</u> of the Disclosure Schedules, no Seller or its Affiliates has any remaining or ongoing co-financing or cost-sharing obligations, obligations to reimburse or refund or pass through any amounts, obligations to submit for potential co-financing any Motion Pictures pursuant to any output or similar terms, or reporting obligations, in each case under the QCSAs or MPRPAs or

pursuant to any of the individual or ancillary Picture documents entered into in connection therewith, all of which obligations have expired or been terminated.  Except as set forth in Section 4.01(j)(vi)(C) of the Disclosure Schedules, there are no amounts owed, accrued or due or payable by any Seller pursuant to any Picture Agreement, including any shortfall payments, advances or similar payments.  No Motion Pictures are or may be subject to the Picture Agreements other than the Pictures, and the Pictures constitute all of the Motion Pictures that are or may be subject to the Picture Agreements.  No Picture Agreement has been altered, amended or modified in any manner by any Seller (or to such Seller's Knowledge by any other party to such agreements) since the date of execution except (y) as specified in the applicable document or (z) as such documentation has been previously provided to Buyer.

(vii)    [Reserved]

(viii)    Sufficiency of the Purchased Assets.  The Purchased Assets, together with the Transaction Documents, include all of the assets and rights necessary and sufficient in all material respects (x) for the Exploitation of the Pictures as Exploited by the Sellers through each of the Effective Date and the Closing Effective Date and (y) to permit Buyer to continue to Exploit the Pictures in substantially the same manner as the Pictures have been Exploited through each of the Effective Date and the Closing Effective Date.

(ix)    Picture Reporting and Receipts.  The Sellers have provided Buyer true, correct and complete copies of all Financial Information provided to the Sellers in respect of the Pictures for the last three (3) years.  The Financial Information is true and correct in all material respects and has been recorded consistently across the periods presented.  All material statements and Financial Information received by the Sellers in connection with any Pictures are consistent in all material respects with the entitlements of the Sellers set forth in the applicable Contracts related to such Pictures.  Except as set forth in Section 4.01(j)(ix) of the Disclosure Schedule, Sellers have, in all material respects, (A) not been paid amounts in excess of those amounts to which they are entitled thereunder, and (B) actually received such amounts reflected as payable to the Sellers.  The Sellers have not accelerated, deferred or delayed the payment by any Person of any compensation or other amount payable to the Sellers or to which the Sellers are otherwise entitled.  To the Knowledge of the Sellers, there are no judgments, debts, deductions, offsets, claims, overpayments or other basis (collectively, "**Reductions**") for reducing any of such payments or other compensation.  The Sellers and their Affiliates have not received any written notice from any Person (including, without limitation, any distributor, sub-distributor, licensee, sales agent or collection agent) asserting the existence of any Reductions that have not been resolved as of the Closing Effective Date.  None of the Picture Agreements grants to any Person a right of cross-collateralization, offset, recoupment or similar right with respect to any material rights or obligations among any of the Purchased Assets or Assumed Liabilities, on the one hand, and the Excluded Assets or Excluded Liabilities, on the other hand.

(x)    Copyrights and Copyright Registrations.    Section 4.01(j)(x) of the Disclosure Schedules sets forth a true, correct and complete list of all registered

Copyrights, and all pending applications therefor, that are owned by or currently licensed to, or purported to be owned by or currently licensed to, a Seller, which schedule shall include, with respect to all such Copyrights, (1) the name of the applicant/registrant (as applicable) and each Seller that currently owns any portion of such Copyright (including the ownership share of each such Seller), (2) the application or registration number (as applicable), (3) the status of the application or registration (as applicable), (4) the jurisdiction where the application/registration is located and (5) the Picture with respect to which the Copyright relates.  Each Picture has, as of the date hereof, been registered in the U.S. Copyright Office, and except as set forth on Section 4.01(j)(x) of the Disclosure Schedules, Sellers are the sole owners of such registered Copyrights. No Seller owns or is currently licensed any Trademarks with respect to the Pictures.

(xi)     [Reserved]

(xii)    Participations and Residuals.  With respect to the Pictures, (x) Sellers are not currently paying to any Person, (y) Sellers have not paid or had any obligation to pay to any Person at any time prior to the Closing Effective Date and (z) Sellers will not be required to pay to any third Person in the future, any Participations or Residuals, in each case other than amounts payable to Magnum pursuant to the Magnum Agreements.  With respect to each Picture, each Seller has complied with all requirements applicable to it under any applicable Collective Bargaining Agreement.

(xiii)   [Reserved]

(xiv)    [Reserved]

(xv)     Tangible Assets.  Sellers do not own, control or have access to any Tangible Assets relating to the Pictures.

(k)      Magnum Agreements.  As of immediately prior to the Closing, the Magnum Agreements, the Consolidated Intercreditor Agreement and the Global Intercreditor Agreement are all of the agreements with Magnum or any of its Affiliates to which any Seller or any of their Affiliates is a party.  Sellers have delivered to Buyer true, correct and complete copies of all Financial Information that have been provided by Sellers to Magnum for the last three (3) years.  As of the Closing, there are no amounts due and payable by any Seller pursuant to any Magnum Agreement.  Sellers and their Affiliates have performed or caused to be performed all material non-monetary obligations required to be performed or fulfilled by them pursuant to the Magnum Agreements.

(l)      Title to Purchased Assets.  Sellers have and will convey to Buyer, and upon consummation of the Transactions, Buyer will acquire, good, valid and marketable title to, and legal and beneficial ownership of, the Purchased Assets, free and clear of any Adverse Claim (other than the Assumed Liabilities and the Permitted Liens), subject to the rights of (i) the Domestic Distributor under the Domestic Licenses and the Domestic Distribution Agreement, (ii) the Foreign Distributors under the Foreign Licenses and/or the Foreign Distribution Agreements, (iii) the Global Distributor under the Global Licenses and the Global Distribution Agreement, and (iv)

the Virtual Distributor under the Virtual Co-Financing Agreement.  Immediately after the Closing, Buyer shall (x) have the same title or interest in the Purchased Assets as Sellers had immediately prior to the Closing, free and clear of any Adverse Claims (other than the Assumed Liabilities and the Permitted Liens) and (y) be able to Exploit or otherwise enjoy the Purchased Assets to the same extent, and in the same manner, that Sellers Exploited or otherwise enjoyed the Purchased Assets immediately before the Closing.  After the Closing, neither Sellers nor any of their Affiliates shall have any right, title or interest in any of the Purchased Assets, whether at law or in equity, and no Seller or Affiliate of Seller shall have any right, title or interest in or to the Pictures other than the Excluded Assets.   Other than pursuant to the Distribution Agreements and the Magnum Agreements, no Seller has sold, assigned, conveyed or hypothecated (whether or not for cash or other consideration) the entirety or any portion of the Purchased Assets, or any part thereof, or granted to any third party any present or future right to acquire any such rights (whether by option or otherwise).  No third Person has notified Sellers of, and, to the Knowledge of the Sellers, no circumstances warrant the assertion by any third Person of, any right to receive all or any portion of the Purchased Assets. Immediately following the Closing, VRF, VRFNA, VRFG and Parent will be the only Sellers holding any material assets.

(m)     Financing Statements.  No effective financing statement naming any Seller or its Affiliates as "debtor" or other instrument similar in effect (including any Copyright mortgage) covering the Purchased Assets is on file or recorded in any filing or recording office in the United States or elsewhere in the Domestic Territory, the Foreign Territory, the Global Territory or the Virtual Territory, except (i) those to be discharged in the Bankruptcy Cases, and (ii) those filed with respect to Permitted Liens.

(n)     BVI Security Registration.  No effective security registration pursuant to section 163 of the BVI Business Companies Act (As Revised) naming any Seller incorporated in the British Virgin Islands as "debtor" or "charger" or other instrument similar in effect (including any Copyright mortgage) covering the Purchased Assets is registered with the BVI Registry of Corporate Affairs except (i) those being terminated and discharged in the Bankruptcy Cases, and (ii) those filed with respect to Permitted Liens.

(o)     No Brokers or Finders.  Except as set forth on Section 4.01(o) of the Disclosure Schedules, none of the Sellers nor any Affiliate thereof has retained any broker or finder, agreed to pay or made any statement or representation to any Person that would entitle such Person to, any broker's, finder's or similar fees or commissions in connection with the Transactions.

(p)     [Reserved]

Section 4.02   **Representations and Warranties of Buyer.**  Buyer hereby represents and warrants to the Sellers as of the Effective Date and the Closing Effective Date as follows:

(a)     Organization.  Buyer is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of Delaware.

(b)     Authorization.  Buyer has full power and authority to enter into this Agreement.

(c)    Enforceability.  Upon entry of the Sale Order, this Agreement, and each other Transaction Document to which Buyer is or is to be a party is, or when delivered will have been, duly executed and delivered by Buyer and is, or when delivered will be, the valid and binding agreement of Buyer, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium and other similar laws affecting the rights of creditors and to general principles of equity (whether considered in a suit at law or in equity or pursuant to arbitration).

(d)    No Violation.  The execution and delivery by Buyer, and the performance by Buyer of its obligations under, the Transaction Documents to which it is or is to be a party, and the Transactions, do not (i) contravene, conflict with or violate its Constitutive Documents or (ii) contravene, conflict with or violate any material applicable Law or Order.

(e)    Source of Funds.  Buyer represents that the following statement is an accurate representation as to each source of funds (a "**Source**") to be used by Buyer to pay the Purchase Price for the Purchased Assets:  The Source does not include assets of any employee benefit plan, other than a plan exempt from the coverage of ERISA. As used in this Section 4.02(e), the term "**employee benefit plan**" shall have the meaning assigned to such term in Section 3 of ERISA.

(f)    Investment Representations.  Buyer is sophisticated with respect to decisions to acquire assets of the type represented by the Purchased Assets and either it, or the Person exercising discretion in making its decision to acquire the Purchased Assets, is experienced in acquiring assets of such type.

(g)    Acknowledgement.  Except for the representations and warranties made by the Sellers in Section 4.01 of this Agreement, Buyer hereby acknowledges that (i) none of the Sellers nor any of their Affiliates has made, or has agreed to make, any express or implied representation, warranty, guarantee or agreement (A) that the aesthetic or artistic quality of the Pictures will exceed any minimum standard or quality, (B) that the Pictures will generate any minimum amount of Domestic Gross Receipts, Foreign Gross Receipts, Global Gross Receipts or Defined Proceeds, or (C) with respect to the film industry as a whole or the business and financial risks associated with the film industry as a whole, (ii) it has made its own inquiry and investigation into, and based thereon has formed an independent judgment concerning, the film industry as a whole and the business and financial risks associated with the film industry as a whole, and (iii) there are uncertainties inherent in making any estimates, projections, forecasts or opinions with respect to future events and that any such estimates, projections, forecasts or opinions delivered by the Sellers or any of their Affiliates pursuant to the Transaction Documents shall be subject to such uncertainties.

(h)    No Brokers or Finders.  None of Buyer nor any Affiliate thereof has retained any broker or finder, agreed to pay or made any statement or representation to any Person that would entitle such Person to, any broker's, finder's or similar fees or commissions in connection with the Transactions.

**ARTICLE V.  PAYMENT OF DESIGNATED DOMESTIC RECEIPTS, DESIGNATED FOREIGN RECEIPTS, DESIGNATED GLOBAL RECEIPTS AND DESIGNATED VIRTUAL RECEIPTS**

Section 5.01    **Deposits to Buyer's Account**.   In the event that any amounts that are required under any Transaction Document to be paid directly to Buyer or otherwise constitute Purchased Assets are received by any Seller or any of their respective Affiliates, such Person shall, and each Seller shall cause such Person to, as applicable, hold such amounts in trust, and deposit such amounts in the form received, immediately, but in any event not later than two (2) business days of its receipt thereof, in an account designated in writing by Buyer.

Section 5.02    **No Setoff**.  Each payment of any amounts included in the Purchased Assets (including the Relevant Percentage of the Designated Domestic Receipts, the Designated Foreign Receipts, the Designated Global Receipts or the Designated Virtual Receipts with respect to the Pictures) required under Section 5.01 shall not be reduced by any setoff or deduction on account of any claim or other charge other than with respect to any tax withholding or similar governmental charge or as expressly permitted or required under this Agreement.

Section 5.03    **No Survival**. The respective representations and warranties of the Parties hereto hereunder shall not survive the Closing. The respective covenants of the Parties hereto required to be performed on or prior to the Closing Effective Date shall not survive the Closing.

**ARTICLE VI.  COVENANTS**

Section 6.01    **Conduct of the Sellers Prior to Closing**.

(a)    During the period from the Effective Date until the earlier of (i) the Closing Effective Date, or (ii) the date this Agreement is validly terminated in accordance with its terms (such period, the "**Pre-Closing Period**"), unless otherwise consented to in writing by Buyer, the Sellers shall (A) operate their businesses and the Purchased Assets only in the ordinary course of business as debtors in possession, (B) preserve and maintain their business organization and assets (including the Purchased Assets), and (C) keep available the services of the current Service Providers of the Sellers or any of their Affiliates.

(b)    Without limiting the generality of the foregoing, except as consented to in writing by Buyer or as required by Law or directed by the Bankruptcy Court, during the Pre-Closing Period, the Sellers shall not, except as set forth in Section 6.01(b) of the Disclosure Schedules:

(i)    issue, sell, transfer, lease, license, convey, assign, abandon, cancel, pledge, dispose of, or otherwise subject to any Adverse Claim, any Purchased Assets;

(ii)    incur any Indebtedness or issue any debt securities or assume, guarantee or endorse, or otherwise become responsible for, the obligations of any Person, or make any loans or advances, in each case affecting the Purchased Assets;

(iii)    amend, waive, modify, terminate or give any consent or approval under the Picture Agreements, or amend, waive, modify, terminate or give any consent or approval

regarding any Seller's rights thereunder, or enter into any Contract in connection with the Purchased Assets;

     (iv)    pay, discharge or satisfy any Liability relating to the Purchased Assets;

     (v)    cancel, compromise, waive or release any right or claim or Proceeding (including any audit) relating to the Purchased Assets;

     (vi)    permit the lapse of any existing policy of insurance relating to the Purchased Assets;

     (vii)    commence or settle any Proceeding relating to the Purchased Assets or the Pictures (including any audit or the Warner Dispute) if such commencement or settlement could reasonably be expected to adversely affect, in any material respect, the Purchased Assets (including, without limitation, the Post-Cutoff Cash Flows) or the Pictures, unless otherwise authorized by a finding of the Bankruptcy Court;

     (viii)    fail to comply in all material respects with all applicable Laws in any manner that could reasonably be expected to adversely affect, in any material respect, the Purchased Assets or the rights or remedies of Buyer under the Transaction Documents;

     (ix)    fail to maintain their existence as a limited liability company or corporation, as the case may be, validly existing and in good standing under the laws of its jurisdiction of organization and obtain and preserve its qualification to do business in each jurisdiction in which the failure to so could reasonably be expected to adversely affect, in any material respect, the Purchased Assets or the rights or remedies of Buyer under the Transaction Documents;

     (x)    (A) fail to maintain all organizational formalities, (B) fail to comply with the provisions of its Constitutive Documents (including with respect to Separateness or independent directors) in all material respects at all times, (C) amend any provisions of their Constitutive Documents in any manner that could reasonably be expected to adversely affect, in any material respect, the Purchased Assets or the rights or remedies of Buyer under the Transaction Documents, (D) permit any Affiliate to assume or guarantee any of the Liabilities of any Seller other than as required by this Agreement or documents governing any Seller's Indebtedness or ABS Obligations that are in effect as of the Effective Date, (E) fail to make all decisions regarding any Seller's organization and operation independently, or allow such decisions to be dictated by any other Person, (F) fail to take such other actions as are necessary on a Seller's part to ensure that all corporate procedures required by their Constitutive Documents are duly and validly taken, and (G) act in any manner that would foreseeably mislead others with respect to its separate identity from any Affiliate;

     (xi)    fail to pay and discharge and fully perform, at or before maturity, all of their respective material obligations and Liabilities, including, without limitation, Tax liabilities and other governmental claims levied or imposed upon such Seller or upon the income,

properties or operations of such Seller, judgments, settlement agreements and all obligations of such Seller under the Transaction Documents, except where the same may be contested in good faith by appropriate proceedings, and will maintain, in accordance with IFRS, reserves as appropriate for the accrual of any of the same;

(xii)    engage in any dealings or transactions with any Person described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or in Section 1 of the Anti-Terrorism Order;

(xiii)    take any action, or intentionally fail to take any action, that would cause any representation or warranty made by the Sellers in this Agreement or any other Transaction Document to be untrue or result in a breach of any covenant made by the Sellers in this Agreement or any other Transaction Document, or that has or would reasonably be expected to have a Material Adverse Effect;

(xiv)    make any material change to their internal controls over financial reporting or the methodology used to prepare and provide Financial Information;

(xv)    enter into any transaction or Contract between any Seller, on the one hand, and any Affiliate of such Seller, on the other hand, with respect to the Purchased Assets;

(xvi)    (A) make, change or revoke any Tax election, (B) change an annual accounting period, (C) adopt or change any accounting method with respect to Taxes, (D) file any amended Tax Return, (E) enter into any closing agreement, (F) settle or compromise any Tax claim or assessment, or (G) consent to any extension or waiver of the limitation period applicable to any claim or assessment with respect to Taxes; in each case, to the extent such action would adversely affect the Purchased Assets in a Post-Closing Tax Period; or

(xvii)    announce an intention, enter into any formal or informal agreement, or otherwise make a commitment to do any of the foregoing.

(c)    During the Pre-Closing Period, the Sellers shall promptly, and in any event within three (3) business days of receipt by any Seller, provide copies to Buyer of all Quarterly Reporting and other Financial Information received or provided by any Seller.

Section 6.02    **Access**.  During the Pre-Closing Period, except to the extent prohibited by applicable Law, the Sellers shall provide, and cause their Service Providers, attorneys, accountants, advisors, consultants and other agents to provide, to Buyer and its accounting, legal and other representatives, as well as their respective Service Providers, affiliates and other agents, access at all reasonable times and during normal business hours, upon reasonable notice, to the Sellers' personnel and to business, financial, legal, tax, compensation and other data and information concerning the Purchased Assets as Buyer deems reasonably necessary or advisable.

Section 6.03    **Notification of Certain Matters**.

(a)     During the Pre-Closing Period, Sellers shall give prompt written notice to Buyer of (i) the occurrence or non-occurrence of any event, the occurrence or non-occurrence of which would render any representation or warranty of the Sellers contained in this Agreement or any other Transaction Document, if made on or immediately following the date of such event, untrue, inaccurate or misleading, (ii) the occurrence of any event that, individually or in combination with any other events, has had or could reasonably be expected to have a Material Adverse Effect, (iii) any failure of the Sellers, or any Affiliate of the Sellers to comply with or satisfy any covenant or agreement to be complied with or satisfied by it under the Transaction Documents or any event that would otherwise result in the nonfulfillment of any of the conditions to Buyer's obligations hereunder, (iv) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions, (v) any notice or other communication from any Governmental Authority in connection with the Transactions, (vi) any material and adverse change to the Purchased Assets, (vii) any notice of any material breach, default or termination of any Picture Agreement, (viii) the occurrence of any event which would or would reasonably be likely to (A) prevent or materially delay the consummation of the Transactions or (B) result in the failure of any condition to Closing set forth in this Agreement to be satisfied, or (ix) any Proceeding pending or, to the Knowledge of the Sellers, threatened against a Party or the Parties relating to the Transactions or otherwise affecting the Purchased Assets.

(b)     Without limiting anything set forth in Section 6.03(a), during the Pre-Closing Period, to the fullest extent permitted or consistent with any applicable Order of any court, tribunal or arbitrator in the Warner Dispute, Sellers and their Affiliates will (and will cause their litigation counsel to) furnish Buyer with the material details respecting any offer of settlement or other resolution either proposed by Sellers or its Affiliates or by WBEI or its Affiliates that could reasonably be expected to adversely affect the Purchased Assets (including, without limitation, the Post-Cutoff Cash Flows) or the Pictures (and at Buyer's request, Sellers shall take all reasonable steps to obtain any necessary consent Sellers reasonably believe is required in order to furnish Buyer with such offer of settlement or other resolution or any information related thereto); provided, nothing in this Section 6.03(b) shall restrict Sellers or their Affiliates from entering into any settlement or other resolution of the Warner Dispute in its sole discretion, subject to Buyer's consent rights pursuant to Section 6.01(b)(vii).  To the extent that any Order of any Governmental Authority does not permit Sellers or their Affiliates from furnishing information as described in this Section 6.03(b), upon reasonable request from Buyer, Sellers and/or their Affiliates shall seek modification or relief from such Order such that Buyer shall be permitted to receive such information. Sellers shall be solely responsible for the payment of all arbitration fees, attorneys' fees, costs, experts, or any other fees and costs in connection with the Warner Dispute.

(c)     From and after the Closing Effective Date through a period that is the earlier of (a) the closing of the Bankruptcy Cases; or (b) the third (3rd) anniversary thereof, subject to any confidentiality obligations applicable to the Sellers or their Affiliates, if any Seller or its Affiliates receives notice of a pending or threatened Proceeding against, relating to or affecting the Purchased Assets (including, without limitation, any claimed breach by any Seller or its Affiliates under any Picture Agreement), then such Person will (i) promptly notify Buyer of same; and (ii) give Buyer copies of all notices and other writings relating to it received by such Person promptly after their receipt.

Section 6.04   **Specified Audit Proceeds**.   From and after the Closing Effective Date, Buyer shall solely own and control all Audit Rights included within the Purchased Assets and may in its sole discretion, conduct, settle and/or litigate any future audit(s) in connection therewith in such manner as Buyer shall determine; provided, that to the extent any such audit results in any Specified Audit Proceeds, Buyer shall pay to the Sellers one hundred percent (100%) of such Specified Audit Proceeds, by wire transfer of immediately available funds, to an account or account designated in writing by the Sellers, no later than five (5) business days following receipt thereof. For clarity, (i) Sellers shall not be required to pay any costs or expenses incurred in connection with its exercise of the Audit Rights from and after the Closing Effective Date, but shall bear its respective portion thereof as and to the extent deducted in calculating Specified Audit Proceeds and (ii) Buyer shall retain one hundred percent (100%) of all payments received by Buyer in connection with the exercise of any Audit Rights that do not constitute Specified Audit Proceeds.

Section 6.05   **Efforts to Close**.   Each Party shall, and Sellers shall cause their Affiliates to, use commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the Transactions as promptly as practicable.  In furtherance and not in limitation of the foregoing, the Sellers shall permit Buyer reasonably to participate in the defense and settlement of any claim, suit or cause of action relating to this Agreement or the Transactions, and the Sellers shall not settle or compromise any such claim, suit or cause of action without Buyer's written consent.

Section 6.06   **Tax Matters**.

(a)      Buyer and the Sellers agree to furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets, including, without limitation, access to Books and Records, as is reasonably necessary for the filing of all Tax Returns by Buyer or the Sellers, the making of any election relating to Taxes, the preparation for any audit with respect to Taxes by any Governmental Authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax.  Buyer and the Sellers shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least seven (7) years following the Closing Effective Date.  Buyer and the Sellers shall cooperate fully with each other in the conduct of any audit, litigation or other proceeding relating to Taxes involving the Purchased Assets.

(b)      To the extent not otherwise provided in this Agreement, the Sellers shall be responsible for and shall promptly pay when due all Property Taxes levied with respect to the Purchased Assets attributable to the Pre-Closing Tax Period.  All Property Taxes levied with respect to the Purchased Assets for the Straddle Period shall be apportioned between Buyer and the Sellers based on the number of days of such Straddle Period included in the Pre-Closing Tax Period and the number of days of such Straddle Period included in the Post-Closing Tax Period. The Sellers shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period.  Upon receipt of any bill for such Property Taxes by Buyer or any Seller, Buyer or the Sellers as applicable, shall present a statement to the other setting forth the amount of reimbursement to which Buyer or the Sellers, as applicable, are entitled under this Section 6.06(b) together with such supporting evidence as is

reasonably necessary to calculate the proration amount. The proration amount shall be paid by the Party or Parties owing it to the other(s) within ten (10) days after delivery of such statement. In the event that Buyer or any Seller makes any payment for which it is entitled to reimbursement under this Section 6.06, Buyer or the Sellers shall make such reimbursement promptly but in no event later than ten (10) days after the presentation of a statement setting forth the amount of reimbursement to which the presenting Party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement.

(c)     All Transfer Taxes will be borne fifty percent (50%) by the Sellers, jointly and severally, and fifty percent (50%) by Buyer. The Sellers shall duly prepare any Tax Return or other document with respect to such Transfer Taxes (and Buyer shall cooperate with respect thereto as necessary) and the Sellers shall pay such Transfer Taxes when due.

(d)     The Sellers shall promptly notify Buyer in writing upon receipt by any Seller of written notice of any pending or threatened Tax audits or assessments relating to the income, properties or operations of such Seller that may reasonably be expected to relate to or give rise to an Excluded Tax or an Adverse Claim on the Purchased Assets.

Section 6.07   **Intentionally Deleted**.

Section 6.08   **Further Assurances**. Subject to the terms of this Agreement, from and after the date hereof, each Party hereto agrees to, and to cause their Affiliates to, as applicable, to use commercially reasonable efforts to (a) furnish upon request to each other Party such further information in connection with the Transaction, (b) execute and deliver to each other Party such other documents consistent herewith (after a reasonable period to review and discuss such documents) and (c) do such other acts and things consistent herewith, in each case as another Party may reasonably request for the purpose of carrying out the intent of this Agreement, the other Transaction Documents to which it is a party and the Transactions. To the extent any Purchased Assets are in the name of an Affiliate of a Seller, the Sellers shall cause such Affiliate to sell, assign, transfer, convey and deliver to Buyer the applicable Purchased Assets and further cause their respective Affiliates to comply with the terms of this Agreement and the other Transaction Documents to the extent such terms purport to bind such Affiliate. Following the Closing, each Seller shall take any actions and execute any documents as reasonably requested by Buyer in furtherance of this Section 6.08 relating to the Purchased Assets. In the event that such Seller does not take such actions or deliver such executed documents to Buyer within five (5) business days following Buyer's request therefor, Buyer shall have the authority as such Seller's true and lawful attorney-in-fact to take any such actions and execute any such documents on behalf of such Seller relating to the Purchased Assets. In such event, Buyer shall provide such Seller with a copy of any document so executed; provided, that the inadvertent failure to do so shall not be deemed a breach hereof.

Section 6.09   **[Reserved]**.

Section 6.10   **Books and Records**. Promptly following the Closing Effective Date, and in no event later than ten (10) business days thereafter (with respect to any Books and Records provided to Buyer in the Dataroom as of the Closing Effective Date) or sixty (60) days thereafter

(with respect to all other Books and Records), Sellers shall use commercially reasonable efforts to deliver to Buyer, via a cloud-based server or another electronic format reasonably acceptable to Buyer, copies of all Books and Records, including, without limitation, all Financial Information, in the Sellers' possession in an electronic format. No later than sixty (60) days following the Closing Effective Date, Sellers shall use commercially reasonable efforts to deliver to Buyer, or otherwise make accessible to Buyer via a cloud-based server or another electronic format reasonably acceptable to Buyer, copies of all Books and Records, including, without limitation, all Financial Information, in the Sellers' possession in a physical format. From and after the Closing Effective Date through the third (3rd) anniversary thereof, each Seller will hold, and will cause its Affiliates and Representatives to hold, in confidence from any other Person, all confidential information, documents, materials and other information related to the Books and Records.

Section 6.11    **Zoolander and Down to Earth**. From and after the Effective Date, no Seller or any Affiliate thereof shall amend any Specified Zoolander Agreement or Specified DTE Agreement in any manner that would modify or otherwise affect, or take any other action the effect of which would be to adversely affect, the calculation or timing of amounts payable to Buyer pursuant to the Notices of Assignment and Amendment.

## ARTICLE VII.  BANKRUPTCY COURT MATTERS

Section 7.01    **Sale Motion, Bankruptcy Procedures Hearing, Bid Procedures and Sale Order**. The Sellers shall use their reasonable best efforts to seek entry of (i) the Bid Procedures Order on or before April 22, 2025, and (ii) the Sale Order, in each case, in form and substance acceptable to the Sellers and Buyer and which identifies Buyer as the "stalking horse" for the Purchased Assets and (b) appropriate supporting declarations. The Sellers shall use their reasonable best efforts to seek entry of the Sale Order on or prior to the date that is sixty (60) days after entry of the Bid Procedures Order; provided, in no event shall the Sellers be deemed in breach of this Section 7.01 if the Bankruptcy Court sets a later Sale Order hearing date in the Bid Procedures Order. The Sellers shall comply with all notice requirements (x) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedures and/or (y) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith. The Bankruptcy Court shall have entered the Sale Order. In the event the entry of the Sale Order is appealed, the Sellers shall use commercially reasonable efforts to defend such appeal.

Section 7.02    **Auction.** Pursuant to the Bid Procedures Order, any and all qualified bids shall have been submitted at least two (2) business days prior to the commencement of the auction contemplated by the Bid Procedures (the "**Bid Deadline**"). If any qualified bid is submitted prior to the Bid Deadline, the Sellers shall use reasonable best efforts to commence the auction contemplated by the Bid Procedures on or prior to the date that is seventy (70) days after the Petition Date; provided, in no event shall the Sellers be deemed in breach of this Section 7.02 if the Bid Procedures mandate a different auction commencement date.

Section 7.03    **Bankruptcy Filings**. From and after the Effective Date and until the Closing Effective Date, to the extent reasonably practicable, the Sellers shall deliver to Buyer drafts of any material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement and the operation of the

Sellers for Buyer's prior review and comment at least two (2) business days prior to the filing or submission thereof, and such filings shall be acceptable to Buyer to the extent they relate to the Purchased Assets, the Assumed Liabilities, or any of Buyer's obligations hereunder. Each of the Sellers and Buyer shall appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other Party with copies of notices or other communications received by such Party from the Bankruptcy Court or any third party or any Governmental Authority with respect to the transactions contemplated by this Agreement. Buyer agrees that it will use its commercially reasonable efforts to assist the Sellers in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, and (y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

Section 7.04   **Sale Free and Clear**. The Sellers acknowledge and agree, and the Sale Order shall provide that, on the Closing Effective Date and concurrently with the Closing, all then existing or thereafter arising obligations, Adverse Claims (other than the Assumed Liabilities and the Permitted Liens) of, against or created by the Sellers or their bankruptcy estate, to the fullest extent permitted by section 363(f) of the Bankruptcy Code, shall be fully released from, and with respect to, the Purchased Assets. On the Closing Effective Date, the Purchased Assets shall be transferred to Buyer free and clear of all Adverse Claims (other than the Assumed Liabilities and the Permitted Liens), to the fullest extent permitted by section 363 of the Bankruptcy Code.

Section 7.05   **Excluded Assets**. For the avoidance of doubt, nothing in this Agreement will restrict Sellers or their Affiliates from selling, disposing of or otherwise transferring any Excluded Assets, or from settling, delegating or otherwise transferring any Excluded Liabilities, in each case, with the approval of the Bankruptcy Court, or from entering into discussions or agreements with respect to the foregoing.

## ARTICLE VIII.  TERMINATION

Section 8.01   **Termination**.  This Agreement and the obligations of the Parties to consummate the Transactions may, by written notice given on or prior to the Closing Effective Date, in the manner provided in this Section 8.01, be terminated at any time prior to the Closing only as follows:

(a)      by mutual written consent of Buyer and the Seller Representative;

(b)      by Buyer if at any time (i) any of the representations or warranties of any Seller in Section 4.01 is or becomes untrue or inaccurate such that the condition set forth in Section 3.01(a) would not be satisfied (treating such time as if it were the Closing for purposes of this Section 8.01(b)), (ii) the condition set forth in Section 3.01(f) would not be satisfied (treating such time as if it were the Closing for purposes of this Section 8.01(b)), or (iii) there has been a breach on the part of any Seller or Parent of any of its covenants or agreements contained in this Agreement such

that the condition set forth in <u>Section 3.01(b)</u> would not be satisfied (treating such time as if it were the Closing for purposes of this <u>Section 8.01(b)</u>), and in the case of (i) through (iii) above, such breach or failure to satisfy such condition cannot be cured by the Sellers or Parent or, if capable of being cured, has not been cured by the applicable Sellers or Parent by the date that is three (3) business days prior to the Outside Date, <u>provided</u> that Buyer shall not be entitled to terminate pursuant to this <u>Section 8.01(b)</u> if the consummation of the Transactions is then being prevented by the willful and material breach by Buyer of any of its representations, warranties or covenants contained in the Agreement;

(c)     by the Sellers if at any time (i) any of the representations or warranties of Buyer in <u>Section 4.02</u> is or becomes untrue or inaccurate such that the condition set forth in <u>Section 3.02(a)</u> would not be satisfied (treating such time as if it were the Closing for purposes of this <u>Section 8.01(c)</u>), or (ii) there has been a breach on the part of Buyer of any of its covenants or agreements contained in this Agreement such that the condition set forth in <u>Section 3.02(b)</u> would not be satisfied (treating such time as if it were the Closing for purposes of this <u>Section 8.01(c)</u>), and in the case of both (i) and (ii) above, such breach cannot be cured by Buyer or, if capable of being cured, has not been cured by Buyer by the date that is three (3) business days prior to the Outside Date, <u>provided</u> that the Sellers shall not be entitled to terminate pursuant to this <u>Section 8.01(c)</u> if the consummation of the Transactions is then being prevented by the willful and material breach by Sellers or Parent of any of their representations, warranties or covenants contained in the Agreement;

(d)     by Buyer if the Closing has not occurred on or before July 5, 2025 or such later date, if any, as both Buyer and the Seller Representative may agree upon in writing (as such date may be extended pursuant to the terms of this Agreement or by the mutual written consent of the Seller Representative and Buyer, the "**Outside Date**"), <u>provided</u> that Buyer shall not be entitled to terminate pursuant to this <u>Section 8.01(d)</u> if the failure to consummate the Transactions by the Outside Date was primarily caused by the willful and material breach by Buyer of any of Buyer's representations, warranties or covenants contained in the Agreement;

(e)     by either Buyer or the Sellers if consummation of the Transactions is enjoined or prohibited by the terms of any Law or a final, non-appealable Order of any Governmental Authority having competent jurisdiction; <u>provided</u>, <u>however</u>, that the party seeking to terminate shall not be entitled to terminate pursuant to this <u>Section 8.01(e)</u> if the imposition of such Order or the failure of such Order to be resisted, resolved or lifted, as applicable, was proximately caused by a breach of a representation, warranty, covenant or agreement on the part of Buyer (if it is seeking to terminate) or any Seller (if the Sellers are seeking to terminate);

(f)     by Buyer if any of the Bankruptcy Cases of a Seller are dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of the Sellers is appointed in the Bankruptcy Case of a Seller;

(g)     Buyer, if (i) the Bid Procedures Order shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York Time) on April 22, 2025, (ii) the Sale Order shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York Time) on the date that is

sixty (60) days after entry of the Bid Procedures Order, or (iii) following the entry of the Sale Order, the Sale Order shall (A) fail to be in full force and effect, (B) have been reversed, (C) have been stayed and such stay shall continue to be in effect for more than fourteen (14) days or (D) have been modified or amended in any manner adverse to Buyer without the prior written consent of Buyer; or

(h)    by Buyer or Sellers upon (i) any announcement by the Sellers at the Auction held in accordance with the Bid Procedures Order that Buyer is not the Successful Bidder or the Backup Bidder or (ii) the consummation of an Alternative Transaction.

The Party seeking to terminate this Agreement pursuant to this <u>Section 8.01</u> (other than pursuant to <u>Section 8.01(a)</u>) shall give prompt written notice of such termination to the other Parties hereto.

Section 8.02    **Effect of Termination**.  In the event of termination of this Agreement as provided above, this Agreement shall immediately terminate and have no further force and effect and there shall be no Liability on the part of any Party to any other Party under this Agreement, except that (a) the covenants and agreements set forth in this <u>Section 8.02</u>, <u>Section 8.03</u>, and <u>Article IX</u> and all definitions herein necessary to interpret any of the foregoing provisions shall remain in full force and effect and survive such termination indefinitely, (b) the Sellers may have Liability as provided in <u>Section 8.03</u>; and (c) nothing in this <u>Section 8.02</u> shall release any Party from any Liability for any breach by such Party of this Agreement before the effective date of such termination, or otherwise affect any of the rights or remedies (whether under this Agreement, or at Law, in equity or otherwise) available to any Party with respect to the breach of this Agreement by any Party before the effective date of such termination.

Section 8.03    **Expense Reimbursement**.

(a)    Notwithstanding anything in this Agreement to the contrary, the Sellers agree to pay Buyer the Expense Reimbursement in the event this Agreement is terminated (other than a termination pursuant to <u>Section 8.01(c)</u>).  The Sellers shall pay to Buyer the Expense Reimbursement by wire transfer of immediately available funds promptly (and in any event no later than one (1) business day after the closing of an Alternative Transaction) directly from and only from and out of proceeds of any Alternative Transaction (and the consummation of any Alternative Transaction shall be conditioned on the payment thereof).  In the event that, notwithstanding the foregoing, the Expense Reimbursement is not timely paid,  the obligations of the Sellers to pay the Expense Reimbursement (i) shall be entitled to super-priority administrative expense claim status under sections 503 and 507 of the Bankruptcy Code, (ii) shall not be subordinate to any other administrative expense claim against the Sellers, and (iii) shall survive the termination of this Agreement.

(b)    If the Sellers fail to take any action necessary to cause the delivery of the Expense Reimbursement and, in order to obtain such Expense Reimbursement, Buyer commences a Proceeding which results in an order for relief in favor of Buyer, Sellers shall pay to Buyer, in addition to the Expense Reimbursement, an amount of cash equal to the costs and expenses (including attorneys' fees) incurred by Buyer in connection with such Proceeding.

(c)     The parties acknowledge and agree that any payment of the Expense Reimbursement described in this Section 8.03 shall be the sole and exclusive remedy of Buyer and any other Person against the Sellers for any and all losses or damages suffered or incurred in connection with this Agreement and the Transactions contemplated hereby. The parties acknowledge and agree that the agreements contained in this Section 8.03 are an integral part of this Agreement and the Transactions contemplated hereby.

## ARTICLE IX.  REMEDIES

Section 9.01    **Remedies**.  Except as contemplated by Section 2.06(b) or as otherwise provided in Section 9.02 or the Escrow Agreement, the parties agree that the remedies and/or the termination of this Agreement in accordance with the provisions of Article VIII shall be the sole and exclusive remedy of the Sellers (if the breaching party is Buyer) or Buyer (if the breaching party is a Seller) under this Agreement for any breach of representation and warranty made or any covenant or agreement to be performed on or prior to Closing.

Section 9.02    **Specific Performance**.  The parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that any party does not perform the provisions of this Agreement (including failing to take such actions as are required of it hereunder to consummate the Transaction) in accordance with its specified terms or otherwise breaches such provisions. It is accordingly agreed that Buyer shall be entitled to an injunction or other equitable relief to prevent breaches of this Agreement by the Sellers and to enforce specifically the terms and provisions hereof, and the Sellers shall be entitled to an injunction or other equitable relief to prevent breaches of this Agreement by Buyer and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which a non-breaching party is entitled at Law or in equity.

## ARTICLE X.  MISCELLANEOUS

Section 10.01    **Assignments**.  This Agreement shall be binding upon the Parties and their respective successors and permitted assigns except to the extent that it is hereafter superseded or modified by subsequent written agreements between the Parties.  This Agreement may not be assigned or otherwise transferred (including by operation of Law) by Buyer, without the prior written consent of the Seller Representative, or by any Seller or Seller Representative, without the prior written consent of Buyer; provided, however, that nothing in this Agreement or any other Transaction Document shall or is intended to limit the ability of Buyer to assign (a) its right, title and interest in and to this Agreement and/or the Purchased Assets (i) prior to the Closing Effective Date, to one or more Affiliates of Buyer, if and to the extent designated by Buyer in writing to Seller (a "**Buyer Designee**"), (ii) after the Closing Effective Date, to one or more Affiliates of Buyer, or (iii) to any entity acquiring or succeeding to all or substantially all of the assets of Buyer or into which Buyer is merged; (b) this Agreement and Buyer's rights hereunder to one or more financiers (or a collateral agent or security trustee for and on behalf of any such financiers) for security purposes; and (c) all or any portion of the Purchased Assets to any Person after the Closing Effective Date; provided, further, no assignment or delegation shall relieve the assigning or delegating party of any of its obligations hereunder without the prior written consent of the other Parties.  Any attempted assignment in violation of this Section 10.01 is void *ab initio*.

Section 10.02 **<u>Notices</u>**.  All notices and other communications provided for or required hereunder shall be in writing (including e-mail communication) and e-mailed or delivered at each party's address set forth below, or at such other address as shall be designated by such party in a written notice to the other parties.  All such notices and communications shall be effective two (2) business days after delivery to a recognized overnight courier service, or when delivered, if sent by other means.

<u>If to Buyer</u>:

Alcon Media Group, LLC
10390 Santa Monica Boulevard Suite 250
Los Angeles, CA 90025
Attention: Scott Parish
E-mail:  sparish@alconent.com

<u>With a copy (which shall not constitute notice) to</u>:

Loeb & Loeb LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Attention: Scott Edel
E-mail:  sedel@loeb.com

Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
Attention: Vadim J. Rubinstein
E-mail:  vrubinstein@loeb.com


<u>If to Sellers</u>:

c/o Village Roadshow Entertainment Group USA Inc.
10100 Santa Monica Boulevard, Suite 200
Los Angeles, California 90067
Attention: Louis Santor and Kevin Berg
E-mail:  louis.santor@vreg.com and kevin.berg@vreg.com

<u>With copies (which shall not constitute notice) to</u>:

Sheppard Mullin Richter & Hampton LLP
350 South Grand Ave., 40th Floor
Los Angeles, California 90071-3460
Attention:  Stacey Rosenberg, Esq.
E-mail:  srosenberg@sheppardmullin.com

321 North Clark Street, 32nd Floor

Chicago, IL 60654
Attention: Justin R. Bernbrock
E-mail: jbernbrock@sheppardmullin.com

Section 10.03 **Confidentiality**.  Following the Closing, the Parties shall, and shall cause their respective Affiliates and representatives to, treat all non-public information and trade secrets relating to the other Parties, their respective Affiliates, the terms of this Agreement and the other Transaction Documents, as confidential, preserve the confidentiality thereof, and not use such information and trade secrets for any reason or purpose whatsoever (other than any purposes permitted under this Agreement) or disclose to any Person such information or trade secrets unless such information or trade secret is (a) now or hereafter disclosed, through no act or omission of the applicable Party or its Affiliates or their respective representatives in breach of this Agreement, in a manner making it available to the general public, (b) required by Law to be disclosed, (c) received by any Party or its representatives after the Closing Effective Date from a third party who is not, to the knowledge of such Party, its Affiliates or their respective representatives, known to be under an obligation of nondisclosure or in breach of an obligation of confidentiality, in each case, to the other Party, (d) independently developed by any Party or its representatives after the Closing Effective Date without the use of or reference to any such information or trade secret, (e) reasonably necessary to defend or prosecute a Proceeding, or (f) approved in advance for use or disclosure via written authorization of the applicable Party.  If the disclosure of such information or trade secrets is required by Law or is reasonably necessary to defend or prosecute a Proceeding, the Parties, their Affiliates and their respective representatives shall (i) cooperate with and provide the other Party an opportunity to object to the disclosure and shall, to the extent legally permissible, give the other Party as much prior written notice as is practicable under the circumstances, (ii) only disclose such information or trade secrets to the minimum extent required by Law to be disclosed or reasonably necessary to defend or prosecute such Proceeding, and (iii) use reasonable efforts to procure that confidential treatment will be accorded to any such information or trade secrets so disclosed.  Notwithstanding the foregoing, (x) each Party shall have the right to communicate and discuss with, and provide to, its Affiliates and its and their legal advisors, financial or accounting advisors, representatives, officers or employees, directors, consultants and agents, any information regarding the terms and status of this Agreement and the other Transaction Documents and the Transactions who are under professional duty or contractual obligation to maintain the confidentiality of such information, and (y) Buyer and its Affiliates may make customary disclosures (which are made subject to customary confidentiality obligations), including the key economic terms of the Transactions and the return realized as a result thereof, to its current or prospective investors or lenders in connection with its fundraising and reporting activities.

Section 10.04 **Amendment; Waiver**.  This Agreement shall not be amended, modified or waived in any manner except by an agreement in writing duly executed and delivered by each of Buyer and the Sellers.  No failure or delay of any Party to exercise any right or remedy given to such Party under this Agreement or any other Transaction Document or otherwise available to such Party, or to insist upon strict compliance by any other Party with its or his obligations hereunder, no single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, and no custom or practice of the Parties in variance with the terms hereof, shall constitute a waiver of any Party's right to demand exact compliance with the terms hereof.  Any written waiver shall be limited to those items specifically

waived therein and shall not be deemed to waive any future breaches or violations or other non-specified breaches or violations unless, and to the extent, expressly set forth therein.

Section 10.05 **Binding Effect; No Third-Party Beneficiaries**.  Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors, transferees and assigns.  Nothing in this Agreement, express or implied, is intended to confer on any Person (other than the Parties or their respective successors and permitted assigns) any rights, remedies, obligations or liabilities under or by reason of this Agreement.

Section 10.06 **Rules of Construction**.  The following rules of construction shall govern the interpretation of this Agreement:

(a)      all references to Articles, Sections, Exhibits or Schedules are to Articles, Sections, Exhibits or Schedules in this Agreement;

(b)      unless the context otherwise requires, words in the singular or plural include the singular and plural, and pronouns stated in either the masculine, the feminine or neuter gender shall include the masculine, feminine and neuter;

(c)      whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "but not limited to";

(d)      the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not simply mean "if";

(e)      references to a Person herein are also to its permitted successors and permitted assigns;

(f)      references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(g)      in computing any period of time pursuant to this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included, but the time shall begin to run on the next succeeding day.  The last day of the period so computed shall be included, unless it is not a business day, in which event the period shall run until the end of the next business day;

(h)      time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement;

(i)      Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof;

(j)      (i) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits hereto, (ii) the term "any" means "any and all," and (iii) the term "or" shall not be exclusive and shall mean "and/or";

(k)      the phrases "provided" or "made available to Buyer" mean that the information referred to has been made available in the Dataroom at least two (2) business days prior to the Effective Date;

(l)      (i) references to "days" means calendar days unless business days are expressly specified and (ii) references to "$" mean U.S. dollars, provided that if there is a need to convert U.S. dollars into any foreign currency, or vice versa, the exchange rate shall be that published by The Wall Street Journal three (3) business days before the date on which the obligation is paid (or if The Wall Street Journal is not published on such date, the first date thereafter on which The Wall Street Journal is published), except as otherwise required by applicable Law (in which case, the exchange rate shall be determined in accordance with such Law);

(m)      the Parties intend that each representation, warranty, covenant and agreement contained herein shall have independent significance, and if any Party has breached any representation, warranty, covenant or agreement contained herein in any respect, the fact that there exists another representation, warranty, covenant or agreement relating to the same or similar subject matter that the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, covenant or agreement;

(n)      any drafts of this Agreement or any other Transaction Document circulated by or among the Parties prior to the final fully executed drafts shall not be used for purposes of interpreting any provision of this Agreement or any other Transaction Document, and each of the Parties agrees that no Party shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any dispute or Proceeding among any of the foregoing or for any other purpose; and

(o)      the Parties have participated jointly in the negotiation and drafting of this Agreement and the other Transaction Documents; in the event an ambiguity or question of intent or interpretation arises, this Agreement and the other Transaction Documents shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement or any other Transaction Document and the language used in it will be deemed to be the language chosen by the Parties to express their mutual intent.

Section 10.07  **Severability**.  Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.  The preceding sentence of this Section shall be of no force or effect if the consequence of enforcing the remainder of this

Agreement without such illegal or invalid term or provision would be to cause any Party to lose the material benefit of its economic bargain.

Section 10.08 **Incorporation by Reference**.    Every Exhibit, annex and schedule (including the Disclosure Schedules) attached to this Agreement and referred to herein is incorporated fully into this Agreement by reference.

Section 10.09 **Governing Law; Submission to Jurisdiction**.

(a)    THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

(b)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY ANCILLARY AGREEMENT; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN NEW YORK WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

Section 10.10 **Waiver of Jury Trial**.    EACH OF THE PARTIES IRREVOCABLY WAIVES TO THE EXTENT PERMITTED BY LAW ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT, STATUTE OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF. EACH PARTY FURTHER WAIVES ANY RIGHT TO SEEK TO CONSOLIDATE ANY PROCEEDING IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER PROCEEDING IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (a) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED OR WARRANTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (c) EACH PARTY MAKES THIS WAIVER VOLUNTARILY AND (d) EACH

PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 10.10</u>.

Section 10.11 **Expenses**.  Except as otherwise expressly stated herein, each Party shall be responsible for the payment of its own fees and expenses (including legal, accounting and investment banking fees and expenses) incurred in connection with the Transaction Documents and in the negotiation and preparation for and consummation of the Transactions.

Section 10.12 **Counterpart Execution**.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and when taken together shall constitute one and the same instrument.  The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.13 **Entire Agreement**.  This Agreement (including all annexes, schedules (including the Disclosure Schedules) and the Exhibits attached hereto) and the other Transaction Documents constitute the entire agreement and understanding between the Parties in respect of the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

Section 10.14 **Relationship of the Parties**.  Nothing in this Agreement creates any partnership, employment, joint venture, franchise or agency relationship between the parties; rather, the parties acknowledge that their relationship under this Agreement is one of independent contracting parties.

Section 10.15 **Seller Representative**.

(a)    For purposes of this Agreement, each Seller hereby irrevocably appoints and designates Seller Representative to serve as such Seller's true and lawful representative, agent, attorney-in-fact, with full power of substitution and re-substitution, to act for and on behalf of such Seller for the purpose of taking any and all actions by such Seller specified in or contemplated by this Agreement or the other Transaction Documents; <u>provided</u>, that if Kevin Berg at any time is unable, due to incapacity or otherwise, to serve as Seller Representative or resigns as Seller Representative, then the Sellers shall designate a successor Seller Representative in writing.  Each successor Seller Representative, if required to serve, shall sign an acknowledgment in writing agreeing to perform and be bound by all of the provisions of this Agreement and the other Transaction Documents applicable to Seller Representative.  Each successor Seller Representative shall have all of the power, authority, rights and privileges conferred by this Agreement upon the original Seller Representative, and the term "Seller Representative" as used herein shall be deemed to include any successor Seller Representative.

(b)     Seller Representative is hereby constituted and appointed as agent and attorney-in-fact for and on behalf of each Seller with respect to the performance of its duties as Seller Representative as set forth herein.  This power of attorney and all authority hereby conferred is coupled with an interest and is irrevocable and shall not terminate or otherwise be affected by the death, disability, incompetence, bankruptcy or insolvency of any Seller and shall be binding upon the successors, assigns, heirs, executors, administrators, legal representatives, and beneficiaries, as applicable, of each Seller.  Seller Representative shall promptly deliver to each Seller any notice received by Seller Representative concerning this Agreement that Seller Representative deems is material.

(c)     Without limiting the generality of the foregoing, Seller Representative has full power and authority, on behalf of each Seller and such Seller's successors and assigns, to:  (i) interpret the terms and provisions of this Agreement and the other Transaction Documents to be executed and delivered by the Sellers in connection herewith, including the Escrow Agreement, (ii) execute and deliver and receive deliveries of all agreements, certificates, statements, notices, approvals, extensions, waivers, undertakings, amendments, and other documents required or permitted to be given in connection with the consummation of the Transactions, (iii) receive service of process in connection with any claims under this Agreement or the other Transaction Documents, (iv) agree to, negotiate, enter into settlements and compromises of, assume the defense of claims, and demand arbitration and comply with orders of courts and awards of arbitrators with respect to such claims, and to take all actions necessary or appropriate in the judgment of Seller Representative for the accomplishment of the foregoing, (v) give and receive notices and communications, (vi) authorize delivery to Buyer of the Buyer Deposit, (vii) object to such delivery, (viii) distribute the Buyer Deposit to which Sellers are entitled, and any earnings and proceeds thereon, (ix) to assert the attorney-client privilege on behalf of the Sellers with respect to any communications that relate in any way to the transactions contemplated hereby, (x) deliver to Buyer any and all Transaction Documents to which any Seller is a party executed by such Seller and deposited with Seller Representative, upon Seller Representative's determination that the conditions to Closing have been satisfied or waived, (xi) grant any consent, approval or waiver under this Agreement or any other Transaction Document and (xii) take all actions necessary or appropriate in the sole judgment of Seller Representative on behalf of the Sellers for the accomplishment of the foregoing or otherwise specifically required or in connection with this Agreement or the other Transaction Documents.  Notwithstanding anything to the contrary herein, in the event of a claim hereunder against a single Seller, and not any other Seller, such affected Seller shall be entitled to control the defense of such claim.

(d)     Service by Seller Representative shall be without compensation except for the reimbursement by the Sellers of out-of-pocket expenses and indemnification specifically provided herein.

(e)     Seller Representative shall have no duties or responsibilities except those expressly set forth herein, and no implied covenants, functions, responsibilities, duties, obligations or liabilities on behalf of any Seller shall otherwise exist against Seller Representative.  Seller Representative shall not be liable to any Seller relating to the performance of Seller Representative's duties or exercise of any rights under this Agreement for any errors in judgment, negligence, oversight, breach of duty or otherwise except to the extent it is finally determined in a

court of competent jurisdiction by clear and convincing evidence that the actions taken or not taken by Seller Representative constituted actual fraud or were taken or not taken, as applicable, in bad faith.  Seller Representative shall be protected in acting upon any notice, statement or certificate believed by Seller Representative to be genuine and to have been furnished by the appropriate Person and in acting or refusing to act in good faith on any matter.  Seller Representative shall not be liable to Buyer or any Affiliate of Buyer by reason of this Agreement or the performance of Seller Representative's duties hereunder or otherwise.

(f)     The Sellers shall indemnify and hold harmless Seller Representative against all losses, including costs of defense, paid or incurred in connection with any action, suit, proceeding or claim to which Seller Representative is made a party by reason of the fact that Seller Representative was acting as Seller Representative pursuant to this Agreement; provided, that Seller Representative shall not be entitled to indemnification hereunder to the extent it is finally determined in a court of competent jurisdiction by clear and convincing evidence that the actions taken or not taken by Seller Representative constituted actual fraud or were taken or not taken, as applicable, in bad faith.

(g)     Buyer shall be entitled to rely conclusively without inquiry upon any decision, action, consent or instruction of Seller Representative as the duly authorized decision, action, consent or instruction of Seller Representative on behalf of each Seller with respect to any matters set forth in this Agreement or any other Transaction Document and Buyer is hereby relieved from any liability to any Person for any acts done by it in accordance with any such decision, action, consent or instruction.

(h)     The provisions of this Section 10.15 will survive the Closing, the resignation or removal of Seller Representative or the termination of this Agreement.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties have executed and entered into this Purchase Agreement on the date first set forth above.

**SELLERS:**

VILLAGE ROADSHOW FILMS (BVI) LIMITED

By: _____
Name:
Title:

VILLAGE ROADSHOW FILMS NORTH AMERICA INC.

By: _____
Name: Kevin P. Berg
Title:   General Counsel and Secretary

VILLAGE ROADSHOW FILMS GLOBAL INC.

By: _____
Name: Kevin P. Berg
Title:   General Counsel and Secretary

VILLAGE ROADSHOW VS FILMS LLC

By: _____
Name: Kevin P. Berg
Title:   General Counsel and Secretary

VILLAGE ROADSHOW DISTRIBUTION (BVI) LIMITED

By: _____
Name:
Title:


VILLAGE ROADSHOW DISTRIBUTION USA INC.

By: _____
Name:
Title:


VILLAGE ROADSHOW PICTURES NORTH AMERICA INC.

By: _____
Name:
Title:


VR FUNDING LLC

By: _____
Name:
Title:


VR FILMS HOLDINGS (BVI) LIMITED

By: _____
Name:
Title:

VILLAGE ROADSHOW PRODUCTIONS (BVI) LIMITED

By: _____
Name:
Title:


VILLAGE ROADSHOW ENTERTAINMENT GROUP (BVI) LIMITED


By: _____
Name:
Title:


**BUYER:**

ALCON MEDIA GROUP, LLC

By: _____
Name:
Title:


**SELLER REPRESENTATIVE:**


_____

Kevin Berg

## Schedule I

## Sellers

1.    Village Roadshow Films (BVI) Limited, a BVI business company incorporated in the British Virgin Islands ("**VRF**")

2.    Village Roadshow Films North America Inc., a Delaware corporation ("**VRFNA**")

3.    Village Roadshow Films Global Inc., a Delaware corporation ("**VRFG**")

4.    Village Roadshow VS Films LLC, a Delaware limited liability company ("**VRVS**")

5.    Village Roadshow Distribution (BVI) Limited, a BVI business company incorporated under the laws of the British Virgin Islands ("**VRD**")

6.    Village Roadshow Distribution USA Inc., a Delaware corporation ("**VRD-USA**")

7.    Village Roadshow Pictures North America Inc., a Delaware corporation ("**VRPNA**")

8.    VR Funding LLC, a Delaware limited liability company ("**VR Funding**")

9.    VR Films Holdings (BVI) Limited, a BVI business company incorporated under the laws of the British Virgin Islands ("**VRF Holdings**")

10.   Village Roadshow Productions (BVI) Limited, a BVI business company incorporated under the laws of the British Virgin Islands ("**VRP**")

11.   Village Roadshow Entertainment Group (BVI) Limited, a BVI business company incorporated under the laws of the British Virgin Islands ("**Parent**")

**Schedule II**

**Pictures**

**Part A – Foreign Pictures**

| Title | Applicable Percentage | Distributor | Magnum Foreign Percentage | Relevant Percentage |
|---|---|---|---|---|
| Practical Magic | 100% | WBPL and Village Roadshow Films Distributors S.A. ("VR Greece") | 50% | 50% |
| Analyze This | 100% | WBPL and VR Greece | 50% | 50% |
| The Matrix | 100% | WBPL and VR Greece | 50% | 50% |
| Deep Blue Sea | 100% | WBPL and VR Greece | 50% | 50% |
| Three Kings | 100% | WBPL and VR Greece | 50% | 50% |
| Three to Tango | 100% | WBPL and VR Greece | 50% | 50% |
| Gossip | 100% | WBPL and VR Greece | 50% | 50% |
| Space Cowboys | 100% | WBPL and VR Greece | 50% | 50% |
| Red Planet | 100% | WBPL and VR Greece | 50% | 50% |
| Miss Congeniality | 100% | WBPL and VR Greece | 50% | 50% |
| Valentine | 100% | WBPL and VR Greece | 50% | 50% |
| Saving Silverman | 100% | Columbia Pictures Corporation Limited and VR Greece | 50% | 50% |

| Title | Applicable Percentage | Distributor | Magnum Foreign Percentage | Relevant Percentage |
|---|---|---|---|---|
| Down to Earth | 100% | Paramount Pictures International, MTV S.A. LDC and VR Greece | 50% | 50% |
| See Spot Run | 100% | WBPL and VR Greece | 50% | 50% |
| Exit Wounds | 100% | WBPL and VR Greece | 50% | 50% |
| Swordfish | 100% | WBPL and VR Greece | 50% | 50% |
| Cats & Dogs | 100% | WBPL and VR Greece | 50% | 50% |
| Don't Say A Word | 100% | Monarchy Enterprises S.a.r.l. and VR Greece | 50% | 50% |
| Hearts in Atlantis | 100% | WBPL and VR Greece | 50% | 50% |
| Zoolander | 100% | Paramount Pictures International, MTV S.A. LDC and VR Greece | 50% | 50% |
| Training Day | 100% | WBPL and VR Greece | 50% | 50% |
| Ocean's Eleven | 100% | WBPL and VR Greece | 50% | 50% |
| The Majestic | 100% | WBPL and VR Greece | 50% | 50% |
| Queen of the Damned | 100% | WBPL and VR Greece | 50% | 50% |
| Showtime | 100% | WBPL and VR Greece | 50% | 50% |

| Title | Applicable Percentage | Distributor | Magnum Foreign Percentage | Relevant Percentage |
|---|---|---|---|---|
| Eight Legged Freaks | 100% | WBPL and VR Greece | 50% | 50% |
| Pluto Nash | 100% | WBPL and VR Greece | 50% | 50% |
| Ghost Ship | 100% | WBPL and VR Greece | 50% | 50% |
| Analyze That | 100% | WBPL and VR Greece | 50% | 50% |
| Two Weeks Notice | 100% | WBPL and VR Greece | 50% | 50% |
| Dreamcatcher | 100% | WBPL and VR Greece | 50% | 50% |
| Matrix Reloaded (together with The Animatrix) | 100% | WBPL and VR Greece | 50% | 50% |
| Mystic River | 100% | WBPL and VR Greece | 50% | 50% |
| Matrix Revolutions | 100% | WBPL and VR Greece | 50% | 50% |
| Torque | 100% | WBPL and VR Greece | 50% | 50% |
| Taking Lives | 100% | WBPL and VR Greece | 50% | 50% |
| Catwoman | 100% | WBPL and VR Greece | 50% | 50% |
| Ocean's Twelve | 100% | WBPL and VR Greece | 50% | 50% |
| Constantine | 100% | WBPL and VR Greece | 50% | 50% |
| Miss Congeniality 2: Armed & Fabulous | 100% | WBPL and VR Greece | 50% | 50% |
| House of Wax | 100% | WBPL and VR Greece | 50% | 50% |

| Title | Applicable Percentage | Distributor | Magnum Foreign Percentage | Relevant Percentage |
|---|---|---|---|---|
| Charlie and the Chocolate Factory | 100% | WBPL and VR Greece | 50% | 50% |
| Dukes of Hazzard | 100% | WBPL and VR Greece | 50% | 50% |
| Rumor Has It… | 100% | WBPL and VR Greece | 50% | 50% |
| Firewall | 100% | WBPL and VR Greece | 50% | 50% |
| The Lake House | 100% | WBPL and VR Greece | 50% | 50% |
| Happy Feet | 100% | WBPL and VR Greece | 50% | 50% |
| Unaccompanied Minors | 100% | WBPL and VR Greece | 50% | 50% |
| Music and Lyrics | 100% | WBPL and VR Greece | 50% | 50% |
| The Reaping | 100% | WBPL and VR Greece | 50% | 50% |
| Lucky You | 100% | WBPL and VR Greece | 50% | 50% |
| Ocean's Thirteen | 100% | WBPL and VR Greece | 50% | 50% |
| License to Wed | 100% | WBPL and VR Greece | 50% | 50% |
| No Reservations | 100% | WBPL and VR Greece | 50% | 50% |
| The Invasion | 100% | WBPL and VR Greece | 50% | 50% |
| The Brave One | 100% | WBPL and VR Greece | 50% | 50% |
| I Am Legend | 100% | WBPL and VR Greece | 50% | 50% |

| Title | Applicable Percentage | Distributor | Magnum Foreign Percentage | Relevant Percentage |
|-------|----------------------|-------------|---------------------------|---------------------|
| Speed Racer | 100% | WBPL and VR Greece | 50% | 50% |
| Get Smart | 100% | WBPL and VR Greece | 50% | 50% |
| Nights in Rodanthe | 100% | WBPL and VR Greece | 50% | 50% |
| Yes Man | 100% | WBPL and VR Greece | 50% | 50% |
| Gran Torino | 100% | WBPL and VR Greece | 50% | 50% |
| Where the Wild Things Are | 100% | WBPL and VR Greece | 50% | 50% |
| Sherlock Holmes | 100% | WBPL and VR Greece | 50% | 50% |
| Sex and the City 2 | 100% | WBPL and VR Greece | 50% | 50% |
| Cats & Dogs: The Revenge of Kitty Galore | 100% | WBPL and VR Greece | 50% | 50% |
| Legend of the Guardians | 100% | WBPL and VR Greece | 50% | 50% |
| Life As We Know It | 100% | WBPL and VR Greece | 50% | 50% |
| Happy Feet Two | 100% | WBPL and VR Greece | 50% | 50% |
| Sherlock Holmes: A Game of Shadows | 100% | WBPL and VR Greece | 50% | 50% |
| The Lucky One | 100% | WBPL and VR Greece | 50% | 50% |
| Dark Shadows | 100% | WBPL and VR Greece | 50% | 50% |
| Gangster Squad | 100% | WBPL and VR Greece | 50% | 50% |

| Title | Applicable Percentage | Distributor | Magnum Foreign Percentage | Relevant Percentage |
|---|---|---|---|---|
| The Great Gatsby | 100% | WBPL and VR Greece | 50% | 50% |
| The LEGO Movie | 100% | WBPL and VR Greece | 50% | 50% |
| Winter's Tale | 50% | WBPL and VR Greece | 50% | 50% |
| Edge of Tomorrow | 66.7% | WBPL and VR Greece | 50% | 50% |

**Part B – F/D Pictures**

| Title | Applicable Percentage (VRF) | Applicable Percentage (VRFNA) | Distributors (Foreign/Domestic) | Magnum Foreign Percentage / Magnum Domestic Percentage | Relevant Percentage |
|---|---|---|---|---|---|
| Into the Storm | 37.5% | 37.5% | WBPL and VR Greece/WAV | 50%/50% | 50% |
| The Judge | 25% | 25% | WBPL/WAV | 50%/50% | 50% |
| American Sniper | 33.3% | 33.3% | WBPL/WAV | 50%/50% | 50% |
| Jupiter Ascending | 33.3% | 33.3% | WBPL/WAV | 10%/10% | 90% |
| Mad Max: Fury Road | 50% | 50% | WBPL/WAV | 10%/10% | 90% |
| San Andreas | 25% | 25% | WBPL/WAV | 10%/10% | 90% |
| In the Heart of the Sea | 25% | 25% | WBPL/WAV | 10%/10% | 90% |
| The Legend of Tarzan | 33.3% | 33.3% | WBPL/WAV | 10%/10% | 90% |
| Sully | 25% | 25% | WBPL/WAV | 10%/10% | 90% |
| Collateral Beauty | 25% | 25% | WBPL/WAV | 10%/10% | 90% |

| Title | Applicable Percentage (VRF) | Applicable Percentage (VRFNA) | Distributors (Foreign/Domestic) | Magnum Foreign Percentage / Magnum Domestic Percentage | Relevant Percentage |
|---|---|---|---|---|---|
| Fist Fight | 25% | 25% | WBPL/WAV | 10%/10% | 90% |
| Going in Style | 25% | 25% | WBPL/WAV | 10%/10% | 90% |
| King Arthur | 15% | 15% | WBPL/WAV | 10%/10% | 90% |
| The House | 25% | 25% | WBPL/WAV | 10%/10% | 90% |
| The 15:17 to Paris | 33.3% | 33.3% | WBPL/WAV | 10%/10% | 90% |
| Ready Player One | 33.3% | 33.3% | WBPL/WAV | 10%/10% | 90% |
| Ocean's 8 | 50% | 50% | WBPL/WAV | 10%/10% | 90% |
| Joker | 25% | 25% | WBPL/WAV | 10%/10% | 90% |

**Part C – Global Pictures**

| Title | Applicable Percentage | Distributor | Magnum Global Percentage | Relevant Percentage |
|---|---|---|---|---|
| The Equalizer | 25% | CPII | 50% | 50% |
| Annie | 25% | CPII | 50% | 50% |
| Goosebumps | 25% | CPII | 10% | 90% |
| Concussion | 25% | CPII | 10% | 90% |
| The Brothers Grimsby | 25% | CPII | 10% | 90% |
| The Magnificent Seven | 25% | CPII | 10% | 90% |

**Part D – Virtual Pictures**

| Title | Applicable Percentage | Distributor | Magnum Global Percentage | Relevant Percentage |
|---|---|---|---|---|
| V for Vendetta | 50% | WBEI | 0% | 100% |
| Poseidon | 50% | WBEI | 0% | 100% |
| Blood Diamond | 50% | WBEI | 0% | 100% |
| The Good German | 50% | WBEI | 0% | 100% |
| 300 | 32.5% | WBEI | 0% | 100% |
| Nancy Drew: The Mystery in Hollywood Hills | 50% | WBEI | 0% | 100% |
| The Assassination of Jesse James by the Coward Robert Ford | 30.414% | WBEI | 0% | 100% |

## Schedule III

**Assumed Contracts & Cure Amounts**

[See Attached]

**<u>Schedule IV</u>**

**Purchase Price Schedule[1]**

| Entity | Valuation % |
|---|---|
| Village Roadshow Films (BVI) Limited | 72.77% |
| Village Roadshow Films North America Inc. | 13.28% |
| Village Roadshow Films Global Inc. | 4.07% |
| Village Roadshow VS Films LLC | 8.03% |
| Village Roadshow Distribution (BVI) Limited | 1.86% |
| **TOTAL** | **100%** |

---

[1] The Valuation Percentages contained in this Section 2.11(a) will be further adjusted at Closing, as mutually agreed by Seller Representative and Buyer, to reflect the change in relative value of the Purchased Assets owned by each Seller as a result of any collections generated by the Purchased Assets between the Effective Date and the Closing Effective Date.

241154324.2
212160-10346
241111631.8
212160-10346

**EXHIBIT B**

**Blackline**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VILLAGE ROADSHOW ENTERTAINMENT | ) Case No. 25 – 10475 (TMH) |
| GROUP USA INC., *et al.*,[1] | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) **Ref. Docket Nos. 11, 197** |
| | ) |

## ORDER (I) APPROVING THE SALE OF
## LIBRARY ASSETS FREE AND CLEAR OF LIENS, CLAIMS,
## INTERESTS, AND ENCUMBRANCES, (II) APPROVING THE ASSUMPTION
## AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
## LEASES IN CONNECTION THEREWITH, AND (III) GRANTING RELATED RELIEF

Upon the motion [Docket No. 11] (the "<u>Bid Procedures and Sale Motion</u>"),[2] and the

*Debtors' Supplemental Motion for Entry of an Order (A) Approving (I) the Debtors' Designation*

*of the New Stalking Horse Bidder for the Library Assets as set forth in the Stalking Horse*

*Agreement, (II) the Debtors' Entry into the Stalking Horse Agreement, and (III) the Bid*

*Protections and (B) Granting Related Relief* [Docket No. 197] (the "<u>Stalking Horse Supplement</u>")

filed by the debtors and debtors in possession in the above-captioned chapter 11 cases (collectively,

the "<u>Debtors</u>"); and the Court having previously entered the *Amended Order (I) Approving Bid*

*Procedures for the Sale of the Debtors' Assets, (II) Authorizing the Debtors' Entry Into the*

*Stalking Horse APA and Approving Bid Protections Thereunder, (III) Scheduling an Auction for,*

---

[1]    The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343.  The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069.  Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

[2]    Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Bid Procedures and Sale Motion, the Stalking Horse Supplement, the APA, the Bid Procedures, the Bid Procedures Order, and the DIP Order (each, as defined herein), as applicable.

-1-

*and Hearing to Approve, Sale of the Debtors' Assets, (IV) Approving Form and Manner of Notices*

*of Sale, Auction, and Sale Hearing, (V) Approving Assumption and Assignment Procedures, and*

*(VI) Granting Related Relief* [Docket No. 276] (the "Bid Procedures Order" and the bidding

procedures attached as Exhibit 1 to the Bid Procedures Order, the "Bid Procedures") following the

hearing on April 22, 2025 (the "Bid Procedures Hearing"); and Alcon Media Group, LLC

(the "Buyer")[3] having submitted the highest and best bid for the Library Assets (defined as

the "Purchased Assets" in that certain *Asset Purchase Agreement*, dated as of April 14, 2025, by

and among the Buyer and certain of the Debtors as sellers (together, the "Sellers")[4] (as amended,

supplemented or otherwise modified from time to time, the "APA")), a copy of which is attached

hereto as **Exhibit 1**); and there being no higher or better bids submitted for the Library Assets; and

the Buyer having been chosen as the Successful Bidder for the Library Assets; and the Court

having conducted a hearing to consider certain relief requested in the Bid Procedures and Sale

Motion on June 18, 2025 (the "Sale Hearing"), at which time all objecting and interested parties

were offered an opportunity to be heard with respect to the Bid Procedures and Sale Motion and

the Stalking Horse Supplement; and the Court having reviewed and considered: (i) the Bid

Procedures and Sale Motion; (ii) the Stalking Horse Supplement; (iii) the *Declaration of Reid*

*Snellenbarger in Support of the Debtors' Motion for Entry of Orders (I)(A) Approving Bid*

*Procedures for the Sale of the Debtors' Assets, (B) Authorizing the Debtors' Entry Into the Stalking*

*Horse APA and Approving Bid Protections Thereunder, (C) Scheduling an Auction for, and*

---

[3]    References herein to Buyer shall also refer to one or more Affiliates designated by Buyer prior to the Closing to purchase any portion of the Library Assets.

[4]    The Sellers are set forth in Schedule I appended to the APA.

*Hearing to Approve, Sale of the Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (E) Approving Assumption and Assignment Procedures; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, and (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 198] (the "Sale Declaration"); (iv) the APA; (v) the Bid Procedures; (vi) the Bid Procedures Order; (vii) the record of the Bid Procedures Hearing; (viii) objections, if any, filed with the Court to the sale of the Library Assets to the Buyer, including without limitation any Assumption and Assignment Objection, the *Limited Objection and Reservation of Rights of Magnum Films SPC to Bidding Procedures Motion* [Docket No. 175], the *Limited Objection and Reservation of Rights of Magnum Films SPC to Sale of Debtors' Assets* [Docket No. 331], the *Limited Objection and Reservation of Rights by the Directors Guild of America, Inc., Screen Actors Guild-American Federation of Television and Radio Artists, the Writers Guild of America, West, Inc., Their Respective Pension and Health Plans, and the Motion Picture Industry Pension and Health Plans to Sale of Debtors' Assets* [Docket No. 323], the *Objection and Reservation of Rights to the Debtors' Proposed Sale and Assumption and Assignment of Certain Executory Contracts* [Docket No. 340] ~~filed by~~ (the "Paramount ~~as defined below),~~Assumption Objection"), and *Warner Bros. Entertainment Inc.'s Omnibus Objection to (I) the Debtors' Motion for an Order Approving the Sale of the Debtors' Assets, (II) the Debtors' Sale Supplement with Respect Thereto and (III) the Debtors' Assumption and Assignment of Certain Warner Bros. Agreements* [Docket No. 518] (each, an "Objection" and, collectively with any informal objections received by the Debtors, the "Objections"); and (ix) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and after

due deliberation the Court having determined that the legal and factual bases set forth in the Bid Procedures and Sale Motion as it relates to the Library Assets and the Stalking Horse Supplement establish just cause for the relief granted herein; and it appearing that the relief requested in the Bid Procedures and Sale Motion and Stalking Horse Supplement and approval of the APA are in the best interest of the Debtors, their estates and their creditors, and the Debtors having demonstrated good, sufficient and sound business justifications for the relief granted herein;

**IT IS HEREBY FOUND AND DETERMINED THAT:**[5]

A.    <u>Jurisdiction and Venue</u>.   This Court has jurisdiction to consider the Bid Procedures and Sale Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    <u>Final Order</u>.  This order (this "<u>Order</u>") constitutes a final order within the meaning of 28 U.S.C. § 158(a).   Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order, expressly directs that this Order be

---

[5]    The findings and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.  The Court's findings also shall include any oral findings of fact and conclusions of law made by the Court during the Sale Hearing.

effective immediately upon entry, and waives any stay of execution or implementation of this Order, and expressly directs entry of judgment as set forth herein.

C.     <u>Statutory Predicates</u>.  The statutory and other legal predicates for the relief sought in the Bid Procedures and Sale Motion and granted herein are sections 105, 363 and 365 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Bankruptcy Rules 2002, 4001, 6004, 6006, 9007 and 9014, and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>").

D.     <u>Notice and Opportunity to Be Heard</u>.  The Debtors have provided proper, timely, adequate and sufficient notice of, and a fair and reasonable opportunity to object and be heard with respect to, the Bid Procedures and Sale Motion, the Stalking Horse Supplement, the Bid Procedures, the Bid Procedures Order, the Sale Hearing, and the sale of the Library Assets pursuant to the APA (the "<u>Transaction</u>") free and clear of any Interests (as defined below) (other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order<u>, and all "Guild Motion Picture Interests," if any, which are defined as security agreements, assumption agreements, intercreditor agreements, interparty agreements, trust agreements, collection account management agreements and guaranty agreements entered into by the Debtors, the affiliated-Debtor entities, and/or various third parties, as applicable, with respect to the Purchased Assets and in favor of each or all of the "Union Entities"[6]</u>) within the

---

[6]   The Directors Guild of America, Inc., Screen Actors Guild-American Federation of Television and Radio Artists, the Writers Guild of America, West, Inc., their respective pension and health plans, and the Motion Picture Industry Pension and Health Plans, as applicable.

meaning of section 363(f) of the Bankruptcy Code, the *Notice of Successful Bidder for Library Assets* [Docket No. 396], and the assumption and assignment of the executory contracts and unexpired leases to be assumed and assigned to the Buyer at Closing pursuant to this Order and the terms of the APA (collectively, the "Assumed Contracts"), in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 6006, 9007 and 9014, Local Rules 2002-1, 6004-1 and 9006-1 and the Bid Procedures Order, to all persons and entities entitled to such notice, including the Notice Parties and all other persons and entities as directed by the Court. Such notice was good, sufficient and appropriate under the circumstances, including but not limited to providing each counterparty a full and fair opportunity to object to the assumption and assignment of its Assumed Contract and its proposed Cure Amounts; and no other or further notice of any of the foregoing is required. The Debtors published the Bid Procedures and Sale Motion, the Stalking Horse Supplement, the Bid Procedures Order, the Bid Procedures, the APA (and all exhibits and schedules thereto), the Sale Notice, the Assumption and Assignment Notice, and certain other documents relevant to the Sale on the case website.

E.     Sound Business Purpose. The Debtors have demonstrated good, sufficient and sound business purposes and justifications for approval of the Bid Procedures and Sale Motion. The approval of and entry into the APA and any ancillary agreements thereto (i) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties; (ii) provide value and are beneficial to the Debtors' estates, and are in the best interests of the Debtors, their estates and their stakeholders; and (iii) are reasonable and appropriate under the circumstances. Business

justifications for entry into the Transaction and the APA include, without limitation, the following: (i) the APA constitutes the highest or best offer received for the Library Assets; (ii) the APA presents the best opportunity to maximize the value of the Library Assets; (iii) failure to consummate the Transaction expeditiously could materially diminish creditor recoveries; and (iv) the immediate consummation of the Transaction is necessary to maximize the value of the Debtors' estates.

F.      <u>Marketing Process</u>.  As demonstrated by the Sale Declaration and testimony adduced at the Bid Procedures Hearing [and the Sale Hearing],. the Debtors and their advisors thoroughly marketed the Library Assets and conducted the marketing and sale process as set forth in and in accordance with the Bid Procedures and Sale Motion, the Stalking Horse Supplement, and the Bid Procedures Order.  Based upon the record of these proceedings, all prospective purchasers have been afforded a reasonable and fair opportunity to bid for the Library Assets.

G.      <u>Compliance with Bid Procedures</u>.  The Debtors conducted an open and fair sale process.  The sale process was non-collusive in all respects, and the Debtors (a) afforded all interested parties a full, fair, and reasonable opportunity to qualify as a Qualified Bidder and make an offer to purchase the Library Assets, (b) provided Potential Bidders, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Library Assets, and (c) appropriately considered all Bids that were duly submitted in accordance with the Bid Procedures.  The Debtors, the Buyer, and their respective counsel and other advisors have complied with the Bid Procedures and the Bid Procedures Order. The Buyer is the designated Successful Bidder, and the APA is designated the Successful Bid for the Purchased

Assets enumerated therein, in each case, in accordance with the Bid Procedures Order. The Buyer and its professionals have complied in all material respects with the Bid Procedures Order, the Bid Procedures, the Assumption and Assignment Procedures, the Warner Bros. Assumption and Assignment Procedures, and all other applicable orders of this Court in negotiating and entering into the APA, and the Transaction and the APA likewise comply with the Bid Procedures Order and all other applicable orders of this Court.

H.      Highest or Best Value.  Consistent with their fiduciary duties, and in consultation with the Consultation Parties, the Debtors have demonstrated good, sufficient and sound business reasons and justifications for entering into the Transaction and the performance of their obligations under the APA, including, but not limited to, the fact that (a) the total consideration provided by the Buyer for the Library Assets as reflected in the APA is the highest or otherwise best offer for the Library Assets; (b) the consideration provided by the Buyer under the APA will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative, including a separate liquidation of the Library Assets; (c) the Transaction contemplated by the APA presents the best opportunity to maximize the value of the Library Assets; and (d) unless the Transaction is concluded expeditiously as provided for in the Bid Procedures and Sale Motion and pursuant to the APA, creditor recoveries will be diminished.

I.      Fair Consideration.  The consideration the Buyer will pay under the APA constitutes (i) fair and reasonable consideration for the Library Assets; and (ii) reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act

and other laws of the United States, any state, territory, possession thereof or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.

J.      <u>Free and Clear Sale</u>.  The Debtors may sell the Library Assets free and clear of all Interests (other than any Assumed Liabilities expressly assumed under the APA or this Order, and all Guild Motion Picture Interests, if any, as applicable), and no such Interests may be asserted against the Buyer or any Buyer Related Party (as defined below) after the Closing Effective Date, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Any holder of Interests that objected to the Transaction or the Stalking Horse Motion and the Bid Procedures and Sale Motion as it relates to the Library Assets and that has an Interest in the Library Assets could be compelled in a legal or equitable proceeding to accept money in satisfaction of such Interest pursuant to section 363(f)(5) or fall within one or more of the other subsections of section 363(f), including section 363(f)(4) because such Interest is in a bona fide dispute, and, therefore, are adequately protected by having their Interests on the Library Assets attach solely to the proceeds of the Transaction ultimately attributable to the sale of the property on which such holders have an Interest, in the same order of priority, and with the same validity, force and effect that such Interests had prior to the consummation of the Transaction, subject to any rights, claims or defenses of the Debtors and their estates.  Any Interest holders that did not object, or that withdrew their objections, to the Bid Procedures and Sale Motion, the Stalking Horse Supplement or the Transaction, are deemed to have consented to the sale of the Library Assets free and clear of their respective Interests on the Library Assets pursuant to section 363(f)(2) of the Bankruptcy Code.  For avoidance of doubt, the term Library Assets and Purchased Assets, as used herein and/or in the

APA, shall not be deemed to include the Magnum Assets (as defined below) because between 2013 and 2020, Debtors Village Roadshow Films (BVI) Limited ("VRF"), Village Roadshow Distribution (BVI) Limited ("VRD"), Village Roadshow Films North America Inc. ("VRFNA"), Village Roadshow Pictures North America Inc. ("VRPNA"), and Magnum Films SPC ("Magnum") entered into (a) that certain *Sale Agreement*, dated December 20, 2013, as amended by that certain *Amendment No. 4 to Sale Agreement* dated November 10, 2020, by and among VRF, VRD and Magnum (as amended, restated, supplemented or otherwise modified from time to time) (the "Sale Agreement"), (b) that certain *Fourth Amended and Restated Co-Investment Agreement*, dated as of November 10, 2020, by and among VRF, VRD, VRFNA, Village Roadshow Distribution USA Inc. ("VRD-USA"), VRPNA, and Magnum (as amended, restated, supplemented or otherwise modified from time to time) (the "Co-Investment Agreement (Foreign & Domestic)," (c) that certain Sec*ond Amended and Restated Co-Investment Agreement (Global)* dated as of November 10, 2020, by and among VRFG, VRD-USA and Magnum (as amended, restated, supplemented or otherwise modified from time to time) (the "Co-Investment Agreement (Global)"), (d) that certain *Second Amended and Restated Consolidated Intercreditor Agreement* dated as of September 5, 2024, by and among Warner Bros. Production Limited, VRD, VRF, WAV Distribution LLC ("WAV"), VRD-USA, VRFNA, Village Roadshow Entertainment Group USA Inc. ("VREG-USA"), Magnum and U.S. Bank National Association ("Permanent Financing Trustee") (as amended, restated, supplemented or otherwise modified from time to time); and (e) that certain *Second Amended and Restated Intercreditor Agreement* dated as of November 10, 2020, by and among Columbia Pictures Industries, Inc., VRFG, VRD-US, VREG-USA, Magnum and the Permanent Financing Trustee (as amended, restated, supplemented or

otherwise modified from time to time)  (subparagraphs (a) through (e) collectively, the "Magnum Sale, Co-Investment and Intercreditor Agreement") with respect to the sale of the Mangum Assets to Mangum.   The Magnum Sale, Co-Investment and Intercreditor Agreements resulted in Magnum, after exercising various rights and options thereunder, purchasing and acquiring a percentage of certain of the Debtors' rights (including certain intellectual property rights) in and to certain Pictures ("Distribution Rights") and the proceeds of such Distribution Rights (such proceeds, the "Magnum Distributable Amount" and the "Magnum Payments" and together with the Distribution Rights, the "Magnum Assets")."), with all such Magnum Distributable Amounts and Magnum Payments being paid to Magnum in accordance with the Magnum Sale, Co-Investment and Intercreditor Agreements or as otherwise agreed between the Buyer and Magnum prior to Closing.  The Library Assets are not  being sold free and clear of Magnum's interest in the Magnum Assets (the "Magnum Ownership Interest").  Notwithstanding anything contained herein to the contrary, the Transaction shall not in any way prevent, impede, interfere with, or adversely affect the Magnum Assets, the Magnum Ownership Interest and/or the payment of the Mangum Distributable Amount and Mangum Payments to Mangum.  Notwithstanding any other provision in this Order or the APA, nothing contained in this Order or the APA, including the free and clear or 363(f) findings or provisions, shall extinguish, impair, or otherwise affect any right of recoupment, to the extent any such rights exist, of Paramount Global and its affiliates, including Paramount Pictures Corporation, Paramount Pictures International, and Paramount Pictures International Limited (collectively, "Paramount").

K.       Buyer Reliance on Free and Clear Sale.  The Buyer would not have entered into the APA and would not consummate the Transaction if the sale of the Library Assets were not

free and clear of all Interests (other than any Assumed Liabilities expressly assumed under the APA or this Order, all Guild Motion Picture Interests, if any, and the Magnum Ownership Interest, as applicable), if the Buyer or any Buyer Related Party would, or in the future could, be liable for any such Interests, or if any such Interests would or could be asserted against the Buyer or any Buyer Related Party after the Closing Effective Date.  A sale of the Library Assets other than one free and clear of all Interests would adversely impact the Debtors, their estates and their creditors, and would yield substantially less value for the Library Assets and the Debtors' estates, with less certainty than that which is provided by the Transaction.  The total consideration to be provided under the APA reflects the Buyer's reliance on this Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to, and possession of, the Library Assets free and clear of all Interests (other than any Assumed Liabilities expressly assumed under the APA or this Order, and all Guild Motion Picture Interests, if any, as applicable), including, without limitation, to the greatest extent permitted by applicable law, and any potential derivative, vicarious, transferee or successor liability Interests.

L.      "Interests".  As used in this Order, the term "Interest" includes, in each case to the extent against or with respect to any of the Debtors or in, on, or against or with respect to any of the Library Assets: Adverse Claims (as defined in the APA), liens (as defined in section 101(37) of the Bankruptcy Code), claims (as defined in section 101(5) of the Bankruptcy Code), debts (as defined in section 101(12) of the Bankruptcy Code), encumbrances, obligations, Liabilities, any defect or imperfection in title, demands, guarantees, actions, suits, defenses, license grant by any Seller, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, rights, or interests of any kind or nature whatsoever, whether known or unknown,

inchoate or not, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to, (i) mortgages, deeds of trust, pledges, charges, security interests, hypothecations, encumbrances, easements, servitudes, leases, subleases, rights-of-way, encroachments, restrictive covenants, restrictions on transferability or other similar restrictions, rights of offset or recoupment, rights of use or possession, leases, conditional sale arrangements, or any similar rights, (ii) all claims, including, without limitation, all rights or causes of action under contract, tort, declaratory relief, intellectual property rights or otherwise (and whether in law or equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff, recoupment, indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other person, consent rights, options, contract rights, covenants, and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity or otherwise; (iii) all debts, liabilities, obligations, contractual or tort rights and claims, and labor, employment, and pension claims; (iv) any rights that purport to give any party a right or option impose any liability or effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Debtors', the Buyer's or any Buyer Related Party's interest in the Library

Assets, or any similar rights; (v) any rights under labor or employment agreements; (vi) any rights under pension, multiemployer plan (as such term is defined in section 3(37) or section 4001(a)(3) of the Employment Retirement Income Security Act of 1974 (as amended, "ERISA"), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (vii) any other employee, worker's compensation, occupation disease, or unemployment or temporary disability claims, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, each as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code of any similar state law, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (l) the WARN Act (29 U.S.C. §§ 2101, et seq.) or any state or other laws of similar effect; (viii) any bulk sales or similar law; (ix) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the assets or businesses of the Debtors prior to the Closing; (x) any unexpired and executory or non-

executory contract or unexpired lease to which a Debtor is a party that is not an Assumed Contract; (xi) any environmental liabilities, debts, claims, fines, penalties, or obligations arising from conditions, facts, or circumstances first existing or occurring prior to Closing (including, without limitation, the presence of or exposure to chemical, hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis and at any time, including, without limitation, any liabilities, debts, claims, fines, penalties, or obligations arising under the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), or any other environmental, health, and safety laws; and (xii) Interests arising under or in connection with any acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors, Affiliates, or Subsidiaries, including, but not limited to, Interests arising under any theory, law, or doctrines of successor, transferee, or vicarious liability, violation of the Securities Act, the Exchange Act, or other applicable securities laws or regulations, breach of fiduciary duty, or aiding or abetting breach of fiduciary duty, or any similar theories under applicable Law or otherwise; provided that, in each case, the term Interests shall not mean or include any of the foregoing pursuant to the Magnum Sale, Co-Investment and Intercreditor Agreements or the Magnum Ownership Interest.

M.   No Successor or Other Derivative Liability.  By consummating the Transaction pursuant to the APA, the Buyer is not a mere continuation of any of the Debtors or any Debtor's estate, and there is no continuity of enterprise or otherwise or common identity between the Buyer, on the one hand, and any Debtor, on the other.  The Buyer is not holding itself out as a continuation of any Debtor.  The Buyer is not a successor to any Debtor or any Debtor's estate by reason of any theory of law or equity, and the Transaction does not amount to a consolidation,

merger or *de facto* merger of the Buyer and the Debtors or any of the Debtors' estates. Neither the Buyer, nor its Affiliates or their respective predecessors, designees, successors, assigns, members, partners, principals, officers, directors, or direct or indirect shareholders (or the equivalent thereof), in their capacities as such (collectively, the "Buyer Related Persons") shall assume or in any way be responsible for any obligation or liability of any Debtor (or any affiliate of any Debtor) or any Debtor's estate, except as expressly provided in the APA and pursuant to the Magnum Sale, Co-Investment and Intercreditor Agreements. The sale and transfer of the Library Assets to the Buyer, including the assumption by the Debtors and assignment, transfer and/or sale to the Buyer of any of the Assumed Contracts, will not subject the Buyer or any Buyer Related Persons to any Interests or any liability with respect to the operation of the Debtors' businesses prior to the Closing or by reason of such transfer, except that, upon the Closing, the Buyer shall remain liable for the applicable Assumed Liabilities.

N.    Arm's-Length Sale. The sale process engaged in by the Debtors and the Buyer was conducted in accordance with the Bid Procedures and the Bid Procedures Order. The APA was negotiated, proposed, and entered into by the Sellers and the Buyer in good faith, without collusion of any kind, and from arm's-length bargaining positions, and is substantively and procedurally fair to all parties in interest. The Debtors and the Buyer and their respective advisors have complied, in good faith, in all material respects with the Bid Procedures Order and the Bid Procedures. The Debtors and their management, board of directors, employees, agents, advisors, and representatives, and the Buyer and its employees, agents, advisors and representatives, each acted in good faith and without collusion or fraud of any kind. The Buyer subjected its bid to competitive bidding in accordance with the Bid Procedures and was designated the Successful

Bidder for the Library Assets in accordance with the Bid Procedures and the Bid Procedures Order. All payments to be made by the Buyer and other agreements or arrangements entered into by the Buyer in connection with the Transaction have been disclosed. The form and total consideration to be realized by the Debtors under the APA constitutes fair and reasonably equivalent value, full and adequate consideration, and reasonable market value for the Library Assets.

O.    <u>Good Faith</u>.    The Debtors, the Buyer and their respective counsel and other advisors have negotiated and entered into the APA and each of the transactions contemplated thereby in good faith, without collusion, from arm's-length bargaining position, and substantively and procedurally fair to all entities. The Buyer is a good faith purchaser and is acting in good faith within the meaning of section 363(m) of the Bankruptcy Code, and, as such, is entitled to all of the protections afforded thereby. The Debtors were free to deal with any other party interested in acquiring some or all of the Library Assets. Neither the Debtors nor the Buyer have engaged in any conduct that would cause or permit the Transaction, the APA, or any of the transactions contemplated thereby to be avoided or subject to monetary damages under section 363(n) of the Bankruptcy Code, or that would prevent the application of sections 363(m) of the Bankruptcy Code. The Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction. The Buyer has not acted in a collusive manner with any person or entity. The Buyer has complied with the Bid Procedures and all provisions of the Bid Procedures Order. All payments to be made or caused to be made by the Buyer and all agreements entered into by the Buyer and the Debtors under the APA in connection with the Transaction have been disclosed and are appropriate. The APA was not entered into, and the Transaction is not being

consummated, for the purpose of hindering, delaying or defrauding creditors under laws of the United States, any state, territory, possession thereof or the District of Columbia, or any other applicable law.   Neither the Debtors nor the Buyer have entered into the APA or are consummating the Transaction with any fraudulent or otherwise improper purpose.

P.   <u>No Collusion</u>.   The APA was not controlled by an agreement between potential bidders within the meaning of section 363(n) of the Bankruptcy Code.   The Debtors and the Buyer have not engaged in any conduct that would cause or permit the APA or the consummation of the Sale to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.   Neither the Debtors nor the Buyer has entered into the APA or is consummating the Sale with any fraudulent or otherwise improper purpose.

Q.   <u>Assumption and Assignment of Assumed Contracts</u>.   The assumption and assignment of the Assumed Contracts is an integral part of the Transaction, is in the best interests of the Debtors and their estates, and represents the valid and reasonable exercise of the Debtors' sound business judgment.   Specifically, the assumption and assignment of the Assumed Contracts (i) is necessary to sell the Library Assets to the Buyer as contemplated by the APA, (ii) limits the losses suffered by counterparties to the Assumed Contracts, and (iii) maximizes the recoveries of other creditors of the Debtors by eliminating claims against the Debtors' estates that would arise from the Debtors' rejection of the Assumed Contracts.   Any counterparty to any Assumed Contract that has not actually filed with the Court and served on the Notice Parties (as defined in the Bid Procedures Order) an Assumption and Assignment Objection, as of the date specified in: (i) the Bid Procedures Order; (ii) the *Supplemental Notice of Possible Assumption and Assignment of Certain Executory Contracts* [Docket No. 297] (the "<u>First Supplemental</u>

Assumption Notice"); (iii) the *Second Supplemental Notice of Possible Assumption and Assignment of Certain Executory Contracts* [Docket No. 345] (the "Second Supplemental Assumption Notice"); and (iv) the *Third Supplemental Notice of Possible Assumption and Assignment of Certain Executory Contracts* [Docket No. 510] (the "Third Supplemental Assumption Notice"), as applicable, is deemed to have consented to the assumption and assignment of the Assumed Contract, and to the applicable Cure Amounts.  Such counterparty shall forever be barred and estopped from objecting to the assumption, assignment and transfer of such Assumed Contract to Buyer and to the Cure Amount as the amount to cure all defaults to satisfy section 365 of the Bankruptcy Code and from asserting that any additional amounts are due or defaults exist.  For the avoidance of doubt, the executory obligations owing to Magnum with respect to the Magnum Assets pursuant to the Magnum Sale, Co-Investment and Intercreditor Agreements (including without limitation the payment of the Magnum Distributable Amount and Magnum Payments to Magnum as well as all audit and inspection rights of Magnum thereunder), are obligations arising under Assumed Contracts and shall, unless otherwise agreed between the Buyer and Magnum be deemed assumed and assigned to the Buyer upon Closing.

R.    Compliance with Section 365 of the Bankruptcy Code.  The Debtors have met all requirements of section 365(b) of the Bankruptcy Code with respect to the assumption and assignment of each of the Assumed Contracts.  The Debtors and Buyer have provided adequate assurance of future performance (within the meaning of section 365(b)(1) of the Bankruptcy Code) of cure of any default existing under any of the Assumed Contracts on or before the Closing Effective Date.  The Buyer has demonstrated adequate assurance of future performance

of and under the Assumed Contracts within the meaning of sections 365(b) and 365(f)(2) of the Bankruptcy Code. Pursuant to section 365(f) of the Bankruptcy Code, the Assumed Contracts shall be assigned and transferred to, and remain in full force and effect for the benefit of, the Buyer, notwithstanding any provision in the Assumed Contracts or other restrictions prohibiting their assignment or transfer.

S.      _Property of the Estates_. The Library Assets constitute property of the Sellers' estates within the meaning of section 541(a) of the Bankruptcy Code. The Sellers are the sole and lawful owners of the Sellers' right, title and interest in the Library Assets, and no other person has any ownership right, title, or interest therein.

T.      _Validity of the Transaction_. The consummation of the Transaction is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in all respects in connection with the Transaction. As of the Closing, the sale and assignment of the Library Assets and the Assumed Contracts to the Buyer will be a legal, valid and effective transfer of the Library Assets and the Assumed Contracts, and will vest the Buyer with all right, title and interest of the Debtors in and to the Library Assets and the Assumed Contracts free and clear of all Interests (other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order), and all Guild Motion Picture Interests, if any, as applicable). The Debtors have full corporate or other applicable authority to execute the APA and all other documents contemplated thereby, and the Transaction has been duly and validly authorized by all necessary corporate action of the Debtors.

Upon entry of this Order, other than any consents identified in the APA, no consent or approval from any other person, entity or legal authority is required to consummate the Transaction.

U.    <u>No Sub Rosa Plan</u>.    Neither the Transaction nor the APA impermissibly restructures the rights of any of the Debtors' creditors or impermissibly dictates the terms of a liquidating plan of reorganization of the Debtors.    Neither the Transaction nor the APA constitutes a *sub rosa* or *de facto* plan of reorganization or liquidation.

V.    <u>No Stay of Order</u>.    Time is of the essence to implement the APA and consummate the Transaction.    The Transaction must be approved and consummated promptly in order to preserve the value of the Library Assets and to maximize the value to the Debtors, their estates, their creditors and all other parties in interest and to ensure the Debtors' compliance with their obligations under their post-petition financing agreements.    The Debtors have demonstrated compelling circumstances and sound business justifications for the immediate approval and consummation of the Transaction as contemplated by the APA.    Notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d), 7062 or any applicable provisions of the Local Rules, this Order shall not be stayed and shall be effective and enforceable immediately upon entry.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.    <u>Sale Motion Granted</u>.    The Bid Procedures and Sale Motion as it relates to the Library Assets and the Stalking Horse Supplement, and the relief requested therein (to the extent not previously granted by the Court pursuant to the Bid Procedures Order or otherwise), is GRANTED and approved as set forth herein.    The Buyer is hereby approved as the Successful Bidder for the Library Assets in accordance with the Bid Procedures Order and this Order.

2.      <u>Objections Overruled</u>.    Unless otherwise provided for herein or in the Bid Procedures Order, any Objections to or reservation of rights against the Bid Procedures and Sale Motion as it relates to the Library Assets, the Stalking Horse Supplement or the relief requested therein that have not been withdrawn, waived, or settled are hereby OVERRULED on the merits with prejudice.    All persons and entities that failed to timely object thereto and to the consummation of the Transaction are deemed to consent to the relief sought therein and to the sale of the Library Assets, including assumption, assignment and transfer of Assumed Contracts, to the Buyer.    All objections to the entry of this Order or to the relief granted herein that were not timely filed are hereby forever barred.

3.      <u>Transaction Approved</u>.    The APA and all transactions contemplated thereby, including the Transaction, are hereby APPROVED.    The Debtors are authorized to enter into the APA (and all ancillary documents), and all of the terms and conditions thereof, and all of the Transactions contemplated therein are approved in all respects, including, without limitation, any amendment to the APA that the Debtors and the Buyer determines is necessary or desirable in connection with the Transaction.    The consummation of the Transaction is hereby approved and authorized under sections 363(b) and 365 of the Bankruptcy Code.

4.      <u>Prior Findings of Fact and Conclusions of Law</u>.    The Court's findings of fact and conclusions of law in the Bid Procedures Order, including the record of the Bid Procedures Hearing, and the findings of fact recited above are incorporated herein by reference.    In the event that the terms of this Order and the Bid Procedures Order are in conflict, this Order will control.

5.      <u>Adequate and Reasonable Notice.</u>    Notice of the Bid Procedures, the Transaction, the assumption and assignment of the Assumed Contracts pursuant to the APA, the Cure Amounts,

the Sale Hearing, and all deadlines related thereto was good, sufficient, and appropriate under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

6.      <u>Debtors' Performance Authorized</u>.  The Debtors are hereby authorized and directed to enter into and perform their obligations under the APA, and to take such other actions as may be necessary or desirable to effectuate the terms of the APA, including providing transition services, if needed, and other instruments or documents that may be reasonably necessary or desirable to implement and effectuate the terms of the APA, the Transaction, or this Order, including, without limitation, deeds, assignments, stock powers, transfers of membership interests and any other instruments of transfer, without further order of the Court.  The Debtors are hereby further authorized to take all other actions as may reasonably be requested by the Buyer or otherwise for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, possession of any or all of the Library Assets and the Assumed Contracts, as may be necessary or appropriate for the Debtors to perform their obligations under the APA and consummate the Transaction, including, without limitation, providing transition services, assisting in the transfer of bank accounts and similar services without further order of the Court.

7.      The Debtors are hereby authorized and empowered to cause to be executed and filed such statements, instruments, releases and other documents with respect to the Library Assets that are necessary or appropriate to effectuate the APA, the Transaction, or this Order, including, as applicable, directions to banks, amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings or recordings as may be required under appropriate provisions of the applicable laws of all applicable

governmental units or as any of the officers of the Debtors may determine are necessary or appropriate.

8.    Valid Transfer and Assignment.  Effective as of the Closing Effective Date, the sale and assignment of the Assumed Contracts and the Library Assets by the Debtors to the Buyer shall constitute a legal, valid and effective transfer and assignment of the Assumed Contracts and the Library Assets, notwithstanding any requirement for approval or consent by any person, and will vest in the Buyer with all right, title and interest of the Debtors and their respective estates in and to the Assumed Contracts and the Library Assets, free and clear of all Interests (other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order, and all Guild Motion Picture Interests, if any, as applicable), pursuant to section 363(f) of the Bankruptcy Code.

9.    Free and Clear Sale.  Except to the extent specifically provided in the APA, upon the Closing Effective Date, the Debtors shall be, and hereby are, authorized and empowered, pursuant to sections 105, 363(b) and 363(f) of the Bankruptcy Code, to sell and transfer to the Buyer the Library Assets.  The sale and transfer of the Library Assets to the Buyer shall vest in the Buyer with all right, title, and interest of the Debtors in and to the Library Assets free and clear of any and all Interests of any person or entity to the fullest extent permitted by applicable law (other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order, or pursuant to the Magnum Sale, Co-Investment and Intercreditor Agreements, including the Magnum Ownership Interest, and all Guild Motion Picture Interests, if any, as applicable), with all such Interests to attach to the net proceeds of the Transaction ultimately attributable to the sale of the property on which such holders have an Interest, in the same order of priority, and with

the same validity, force and effect that such Interests had prior to the consummation of the Transaction, subject to any rights, claims or defenses of the Debtors or their estates. Following the Closing, no holder of any Interest on any of the Library Assets shall interfere with the Buyer's or any Buyer Related Party's use or enjoyment of any of the Library Assets based on or related to such Interest or any actions that the Debtors have taken or may take in their chapter 11 cases and no interested party may take any action to prevent or interfere with consummation of the Transaction. Moreover, with respect to motion pictures rights transferred to the Buyer and produced subject to the Guild Motion Picture Interests, if any, Buyer shall execute standard Guild assumption agreements within a reasonable period after entry of this Order.

10.     The provisions of this Order authorizing the sale and transfer of the Library Assets free and clear of Interests (other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order, or pursuant to the Magnum Sale, Co-Investment and Intercreditor Agreements, including the Magnum Ownership Interest, and all Guild Motion Picture Interests, if any, as applicable) shall be self-executing, and neither the Debtors, on one hand, nor the Buyer, on the other, shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate, or implement the provisions of this Order. For the avoidance of doubt, on or after the Closing Effective Date, the Debtors and the Buyer shall be authorized, but not directed, to file any such releases, termination statements, assignments, consents or other instruments in any jurisdiction to record the release, discharge and termination of Interests on the Library Assets pursuant to the terms of this Order.

11.   <u>Interest Release Documentation</u>.    This Order shall be (a) effective as a determination that, as of the Closing Effective Date, all Interests on the Library Assets (except as otherwise expressly assumed under, or expressly permitted by, the APA, or pursuant to the Magnum Sale, Co-Investment and Intercreditor Agreements, including as to the Magnum Ownership Interest) shall be unconditionally released, discharged and terminated as to the Buyer and the Library Assets; and (b) binding upon all persons and entities, including all the Debtors' creditors and any holder of an Interest on any of the Library Assets, and all such persons and entities are hereby authorized to execute such documents and take all other actions they determine in their sole discretion may be reasonably necessary to release their respective Interests on the Library Assets, if any, as requested by, and at the expense of, the Debtors.  If any person or entity that has filed a financing statement, mortgage, mechanics lien, *lis pendens* or other document, instrument, notice or agreement evidencing any Interest on the Library Assets has not, at the Debtors' request and expense and in forms provided by the Debtors (subject to approval by such person or entity in their sole discretion), delivered to the Debtors on or before the Closing, in proper form for filing and executed by the appropriate parties, termination statements, releases or instruments of satisfaction that the person or entity has with respect to the Library Assets, the Debtors and the Buyer are authorized to (x) execute and file such termination statements, releases, instruments of satisfaction or other documents with respect to the Library Assets on behalf of the applicable person or entity, and (y) file, register or otherwise record a certified copy of this Order which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Interests on the Library Assets.  This Order is deemed to be in recordable form

sufficient to be placed in the filing or recording system of each and every federal, state, local, tribal or foreign government agency, department or office.

12.    <u>Authorization of Recording Officers</u>.  This Order shall be binding upon all persons and entities, including filing agents or officers, title agents or companies, recorders of mortgages or deeds, registrars, administrative agencies, governmental units or departments, secretaries of state, governmental officials and all other persons or entities that may be required by operation of law, the duties of their office or contract to accept, file, register or otherwise record or release any documents or instruments regarding the Library Assets or who may be required to report or insure any title or state of title in or to the Library Assets, (collectively, the "<u>Recording Officers</u>").  All Recording Officers are hereby authorized to (a) accept any and all documents or instruments necessary and appropriate to consummate the Transaction or to record and reflect that the Buyer is the owner of the Library Assets free and clear of all Interests (other than Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order, and all Guild Motion Picture Interests, if any, as applicable) and (b) strike all recorded Interests on the Library Assets from their records.

13.    <u>Direction to Surrender the Library Assets</u>.  All persons or entities in possession or control of any of the Library Assets, either presently or on or before the Closing Effective Date, are authorized to surrender possession or control of the Library Assets to the Buyer on the Closing Effective Date.

14.    <u>Direction to Make Payments to Buyer</u>.  Upon occurrence of the Closing Effective Date, any Contract counterparty or other party that is required, by agreement, contract or applicable law to make royalty or similar payments to Sellers on account of the Library Assets shall instead

make any such payments to the Buyer directly to the account or accounts designated by the Buyer; *provided* that, unless otherwise agreed in writing between the Buyer and Mangum, any royalty or similar payments which constitute the Magnum Distributable Amount and Magnum Payments to Magnum as required pursuant to the terms of the Magnum Sale, Co-Investment and Intercreditor Agreements must continue to be paid to Magnum in a manner to be agreed to by the Buyer and Magnum prior to the Closing, including, without limitation, by (i) the establishment by Buyer of one or more segregated accounts at an established financial institution in the United States of America in the name of Buyer into which all Mangum Distributable Amounts and Magnum Payments shall be made and over which Magnum will be granted security pursuant to one or more account control agreements; (ii) the filing by Magnum of financing statement, copyright mortgages and/or amendments thereto in any relevant jurisdiction to continue the perfection of the recharacterization liens granted to Magnum in the Magnum Assets; and (iii) the execution of amended intercreditor agreements revised to reflect the changes in relevant parties, rights and entitlements resulting from the sale transaction and the chapter 11 cases.

15.     No Successor Liability.  The Buyer and the Buyer Related Persons are not and shall not be (a) deemed a "successor" in any respect to any of the Debtors or any of their estates as a result of the consummation of the Transaction or any other event occurring in the Debtors' chapter 11 cases under any theory of law or equity; (b) deemed to have, *de facto* or otherwise, merged or consolidated with or into any of the Debtors or any of their estates; (c) deemed to be an alter ego of or have a common identity with any of the Debtors; (d) deemed to have a continuity of enterprise with any of the Debtors; (e) deemed to be a continuation or substantial continuation of any of the Debtors or any enterprise of any of the Debtors, including (with respect to clause (a) through (e)

of this paragraph) within the meaning of any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, environmental, health, products liability, safety laws, or other law, doctrine rule or regulation (including any filing requirements under any such laws, rules or regulations) with respect to the Debtors' liability under such law, doctrine, rule or regulation including, without limitation, under COBRA, CERCLA, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964 (as amended), the Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act, each as amended, the Americans with Disabilities Act of 1990 (as amended), the Federal Rehabilitation Act of 1973 (as amended), and the National Labor Relations Act, 29 U.S.C. § 151, et seq.; or (f) other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order, be liable for (i) any environmental liabilities, debts, claims, fines, penalties, or obligations arising from conditions, facts, or circumstances first existing or occurring prior to Closing (including, without limitation, the presence of or exposure to chemical, hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis and at any time, including, without limitation, any liabilities, debts, claims, fines, penalties, or obligations arising under CERCLA, or any other environmental, health, and safety laws, or (ii) any liabilities, debts, claims, fines, penalties, or obligations of or required to be paid by the Debtors (A) for any taxes of any kind for any period, (B) under any labor, employment, or other law, rule, or regulation (including, without limitation, filing requirements under any such laws, rules, or regulations), or (C) under any products liability or intellectual property law or doctrine, or any other law or doctrine, with respect to the Debtors' liability under any law, rule, regulation, or doctrine.

16.     Except as expressly provided in the APA or this Order with respect to the Assumed

Liabilities, and all Guild Motion Picture Interests, if any, as applicable, the Buyer and the Buyer

Related Persons, in such capacities, shall not (a) assume, nor be deemed to have assumed or in any

way be responsible for (i) any liability, Interest or obligation (of any kind, character, or description,

whether known or unknown, asserted or unasserted, matured or unmatured, liquidated or

unliquidated, disputed or undisputed, accrued or unaccrued, due or to become due, fixed, absolute,

contingent or otherwise) of any of the Debtors or any of their estates or related to the Library

Assets including, but not limited to, any Excluded Liabilities, any bulk sales law, successor or

vicarious liability, liability or responsibility for any claim against any of the Debtors or against

any related person of the Debtors, or any similar liability or obligation, (ii) any remaining claims

(as defined in section 101(5) of the Bankruptcy Code) or liens against the Debtors or any of their

predecessors or affiliates, (iii) liabilities on account of any taxes arising, accruing, or payable

under, out of, in connection with, or in any way relating to, the operation of the Library Assets

prior to Closing, or (b) have any liability whatsoever with respect to the Debtors' (or their

predecessors' or affiliates') respective businesses or operations or product lines or any of the

Debtors' (or their predecessors' or affiliates') obligations based, in whole or part, directly or

indirectly, on any theory of successor or vicarious liability of any kind or character, or based upon

any theory of antitrust, environmental, successor, or transferee liability, *de facto* merger or

substantial continuity, labor and employment, infringement or products liability, whether known

or unknown as of such Closing, now existing or hereafter arising, asserted or unasserted, fixed or

contingent, liquidated or unliquidated, including, without limitation, (i) liabilities or obligations

under the CERCLA or any other environmental, health, and safety laws, (ii) liabilities or

obligations under ERISA, COBRA, or other similar state or local laws with respect to any pension plan, welfare plan, or other employee benefit plan, (iii) liabilities or obligations under any collective bargaining agreement or employment agreement, or (iv) any liabilities or obligations or any foreign, federal, state, or local labor, employment, or environmental law whether of similar import or otherwise by virtue of such Buyer's purchase of any Library Assets or assumption of the Assumed Liabilities. The Bid Procedures and Sale Motion, the Stalking Horse Supplement, and notices provided in accordance with the Bid Procedures contain sufficient notice of such limitation in accordance with applicable law. Except for the Buyer's assumption of the Assumed Liabilities pursuant to the APA and this Order, Guild Motion Picture Interests, if any, as applicable, and claims brought by the Debtors to enforce the express terms of the APA and this Order, the transfer of the Library Assets and the Assumed Contracts to the Buyer under the APA will not result in (a) the Buyer or the Buyer Related Persons having any liability or obligation for any Interest made or asserted against any of the Debtors (or their respective affiliates, together with their respective predecessors, successors, assigns, members, partners, officers, directors, principals or direct or indirect equityholders), including without limitation in respect of the Excluded Liabilities, nor in any such liability or obligation attaching to the Library Assets; (b) the Buyer or any Buyer Related Person having any liability or obligation with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, recoupment or otherwise, directly or indirectly, any Interests or Excluded Liabilities, nor in any such liability or obligation attaching to the Library Assets; or (c) the Buyer or any Buyer Related Person having any liability or obligation to any of the Debtors.

17.     Effective upon the Closing Effective Date, all persons and entities are forever prohibited from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, the Buyer Related Persons, or their assets (including the Library Assets) with respect to any (a) Interest in or with respect to the Library Assets or (b) successor, transferee, vicarious or other similar liability or theory of liability, including (i) commencing or continuing any action or other proceeding pending or threatened with respect to the Library Assets, in any manner or place, that does not comply with, or is inconsistent with, the provisions of this Order or other orders of the Court or the agreements or actions contemplated or taken in respect hereof or thereof; (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any Interest; (iv) asserting any setoff, right of subrogation or recoupment of any kind; or (v) revoking, terminating or failing or refusing to renew any license, permit or authorization to utilize any of the Library Assets.  Following the Closing Effective Date, no holder of any Interest shall interfere with the Buyer's title to or use and enjoyment of the Library Assets based on or related to any such Interest, or based on any action the Debtors may take in their chapter 11 cases.

18.     <u>Assumption and Assignment of the Assumed Contracts</u>.  Under sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the closing of the Transaction, the Debtors' assumption and assignment of the Assumed Contracts to the Buyer free and clear of all Interests (other than any Assumed Liabilities expressly assumed under, or expressly permitted by, the APA or this Order, or pursuant to the Magnum Sale, Co-Investment and Intercreditor Agreements, including <u>as to </u>the Magnum Ownership Interest<u>, and all Guild Motion</u>

Picture Interests, if any, as applicable) pursuant to the terms of the APA, as modified by the terms of any amendments reached by the Buyer and the respective counterparty, is hereby approved, and the Debtors are hereby authorized and directed to assume and assign the Assumed Contracts to the Buyer in accordance with the APA and this Order, and the requirements of sections 365(b) and 365(f)(2) of the Bankruptcy Code with respect thereto are hereby deemed satisfied. Any counterparty to an Assumed Contract that has not filed with the Court an objection to the assumption or assignment of such Assumed Contract as of the date specified in the Bid Procedures Order is deemed to have consented to such assumption and assignment.

19.    Upon the Debtors' assumption and assignment of the Assumed Contracts to the Buyer, each applicable counterparty shall be forever barred, estopped, and permanently enjoined from (i) raising or asserting against the Debtors, the Buyer or any Buyer Related Person, or their respective property, any assignment fee, default, breach, claim, pecuniary loss, liability or obligation (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, known or unknown, liquidated or unliquidated senior or subordinate), counterclaim, defense, setoff or any other matter arising under or out of, in connection with or in any way related to, the Assumed Contracts existing prior to or as of the Closing Effective Date or arising by reason of the Closing, or (ii) taking any other action against the Buyer or any Buyer Related Person as a result of any Debtor's financial condition, bankruptcy, or failure to perform any of its obligations under the Assumed Contracts based on acts or occurrences existing prior to or as of the Closing Effective Date or arising by reason of the Closing. Each Counterparty hereby is also forever barred, estopped, and permanently enjoined from (A) asserting against the Debtors, the Buyer or any Buyer Related Person, or the property of any of them, any default or claim arising

out of any indemnity or other obligation or warranties for acts or occurrences arising prior to or existing as of the Closing Effective Date and (B) imposing or charging against the Buyer or the Buyer Related Persons any assignment fees, increases, or any other fees as a result of the Debtors' assumption and assignment of the Assumed Contracts.

20.     Upon the Debtors' assumption and assignment of the Assumed Contracts to the Buyer, the Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtors in and to the Assumed Contracts and the Assumed Contracts shall be deemed to be valid and binding and in full force and effect and enforceable in accordance with their terms for the benefit of the Buyer, as applicable, notwithstanding any provision in any of the Assumed Contracts that prohibits, restricts, or conditions such assignment or transfer.  The Debtors' assumption and assignment of the Assumed Contracts to the Buyer shall not constitute a default under or a termination of any Assumed Contract.  In accordance with the APA, the Buyer may determine to assume or reject any Assumed Contract through and including the Closing Effective Date.

21.     <u>Cure Amounts</u>.  Any defaults or other obligations under the Assumed Contracts shall be deemed cured by the payment or other satisfaction of the Cure Amounts, if any, associated with the Assumed Contracts.

22.     <u>Assumption and Assignment Objections</u>.    Except as provided herein, all Assumption and Assignment Objections to the Debtors' calculation of Cure Amounts with respect to any of the Assumed Contracts have been overruled, withdrawn, waived, settled or otherwise resolved.  Any Assumption and Assignment Objections as to applicable Cure Amounts that have not been resolved by the parties may be heard at a later date as set by the Court.  The pendency of a dispute relating to a particular Assumed Contract shall not prevent or delay the assumption or

assignment of any other Assumed Contract or the closing of the Transaction. To the extent a counterparty to any of the Assumed Contracts fails to timely object to the Cure Amounts for any Assumed Contract in accordance with the Bid Procedures Order, such Cure Amounts shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Amounts at any time.

23.     Paramount Assumption Objection. Notwithstanding anything to the contrary in this Order or the Bid Procedures Order, the Paramount Assumption Objection is not overruled and shall be adjourned to the hearing scheduled for June 30, 2025, at 10:00 a.m. (ET). The Debtors and Paramount shall work in good faith following entry of this Order and prior to Closing to consensually resolve any disputed issues raised in the Paramount Assumption Objection. Except as set forth herein, the Debtors' and Paramount's rights are fully reserved with respect to paragraphs 12 through 14 of the Paramount Assumption Objection.

23.24. Adequate Assurance. The Buyer has provided adequate assurance of future performance under the Assumed Contracts within the meaning of sections 365(b) and 365(f)(2)(B) of the Bankruptcy Code. Any Assumption and Assignment Objections related to the adequate assurance of future performance by the Buyer that have not been withdrawn, waived or settled and all reservations of rights included in such objections are hereby overruled on the merits with prejudice. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the Debtors' assumption and assignment of the Assumed Contracts to the Buyer have been satisfied.

24.25. Anti-Assignment Provisions Unenforceable. No section or provision of any Assumed Contract that purports to (a) prohibit, restrict or condition the assignment of an Assumed

Contract, including, but not limited to, the conditioning of such assignment on the consent of any counterparty to such Contract; (b) authorize the termination, cancellation or modification of an Assumed Contract based on the filing of a bankruptcy case, the financial condition of the Debtors or similar circumstances; (c) declare a breach or default as a result of a change in control in respect of the Debtors; or (d) provide for additional payments, profit sharing, penalties, conditions, renewals, extensions, charges or other financial accommodations in favor of the counterparty to an Assumed Contract, or modification of any term or condition upon the assignment of a contract or the occurrence of the conditions set forth in subsection (b) above, shall have any force or effect, and any such section or provision constitutes an unenforceable anti-assignment provision under section 365(f) or 363(l), as applicable, of the Bankruptcy Code or is otherwise unenforceable under section 365(e) of the Bankruptcy Code.

25.26.  No Fees for Assumption and Assignment.  There shall be no assignment fees, increases or any other fees charged to the Buyer, or any of their respective successors or assigns, or the Debtors as a result of the transfer or assumption and assignment of the Assumed Contracts.

26.27.  Direction to Assumed Contract Counterparties.  All counterparties to Assumed Contracts assigned or otherwise transferred to the Buyer in accordance with the terms of this Order and the APA shall cooperate with, and expeditiously execute and deliver upon, any reasonable request of the Buyer, and shall not charge the Buyer for any instruments, applications, consents or other documents that may be required or requested by any governmental unit or other public or quasi-public authority or other party to effectuate the applicable transfers in connection with the Debtors' assumption and assignment of the Assumed Contracts to the Buyer.

27.28.  Licenses and Permits.  To the extent provided in the APA and available under applicable law, the Buyer shall be authorized, as of the Closing Effective Date, to operate under any license, permit, registration and any other governmental authorization or approval of the Debtors with respect to the Library Assets and the Assumed Contracts, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Effective Date.  To the extent any license or permit necessary for the operation of the Library Assets is determined not to be an executory contract that may be assumed and assigned under section 365 of the Bankruptcy Code, the Buyer shall apply for and obtain any necessary license or permit promptly after the Closing Effective Date, and such license or permit of the Debtors shall remain in place for the Buyer's benefit until a new license or permit is obtained (or, in the case of licenses or permits of Debtors of which the assignment to Buyer is pending as of the Closing Effective Date (whether pursuant to a notice period that has not expired as of the Closing Effective Date or a required consent from an applicable governmental authority that has not been received as of the Closing Effective Date), shall transfer to Buyer upon the expiration of such notice period or the receipt of such consent).

28.29.  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the utilization of the Library Assets that are sold, transferred or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Transaction.

29.30.  Fair Consideration.  The consideration provided by the Buyer for the Library Assets under the APA constitutes reasonably equivalent value and fair consideration under the Bankruptcy

Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the Uniform Voidable Transactions Act, and any other applicable laws of the United States, any state, territory, possession, or the District of Columbia.  The APA was not entered into, and the Transaction is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Sellers nor the Buyer have entered into the APA, any Transaction Document, or any agreement contemplated thereby or are consummating the Transaction with any fraudulent or otherwise improper purpose.  No other person or entity or group of persons or entities has offered to purchase the Purchase Assets for an amount that would provide greater value to the Debtors and their estates than the value provided by the Buyer. This Court's approval of the Bid Procedures and Sale Motion, the Stalking Horse Supplement and the APA are in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

30.31.  Good-Faith Buyer.  The Buyer is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and is entitled to all of the protections afforded thereby. The Transaction and the APA are undertaken and entered into by the Debtors and the Buyer without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code.  As such, the reversal or modification on appeal of this Order shall not affect the validity of the Transaction or any term of the APA, and shall not permit the unwinding of the Transaction, whether or not the Buyer knew of the pendency of the appeal, unless this Order and the Transaction were duly and properly stayed pending appeal.

31.32.  Section 363(n) of the Bankruptcy Code.  The Transaction approved by this Order is not subject to avoidance and no party is entitled to any recovery of damages pursuant to section 363(n) of the Bankruptcy Code or otherwise.

32.33.  Notwithstanding any other provision in this Order or the APA, the sale of any intellectual property and/or intellectual property rights in the Library Assets is not free and clear of the rights pursuant to section 365(n) of the Bankruptcy Code, if any rights exist, of Paramount Global and its affiliates, including Paramount Pictures Corporation, Paramount Pictures International, and Paramount Pictures International Limited, under an agreement that is not an Assumed Contract.  The Debtors and Buyer reserve all rights with respect to any party's assertion of rights as an intellectual property license and any arguments with respect to section 363(n) of the Bankruptcy Code.

33.34.  Bulk Sales.  No bulk sales law, bulk transfer law or similar law of any state or other jurisdiction shall apply in any way to the Transaction.

34.35.  Amendments.  Except in the case of a material amendment, the APA and any related agreements may be amended, supplemented, or otherwise modified by the parties thereto and in accordance with the terms thereof, without further action or order of the Court; *provided* that any such amendment, supplement, or modification shall require the prior written consent of the Buyer and shall not have a material adverse effect on the Debtors' estates.  Any material amendments shall require approval of this Court.

35.36.  Sale Proceeds.  In accordance with the *Final Order (I) Authorizing the Debtors to Obtain Post-Petition Secured Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Status, (IV) Granting Adequate*

*Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 280] (the "DIP Order"),[7] notwithstanding anything to the contrary in this Order or in the APA (or in any document contemplated thereby), upon the Closing Effective Date, the Debtors shall and are directed to apply the proceeds of the Transaction as follows, net of any actual costs reasonably necessary to close the Library Sale: (a) first to the ABS Trustee for the indefeasible payment in full of the outstanding Prepetition ABS Obligations in accordance with the Prepetition ABS Agreements; (b) second, to each of the DIP Secured Parties, amounts necessary to indefeasibly satisfy all of the Debtors' obligations owed to such DIP Secured Party in full in accordance with the DIP Documents and the Final DIP Order; (c) third, to fund the Warner Bros. Reserve; (d) fourth, to fund the Library Reserve; and (e) fifth, to the Sellers.

37.     Warner Bros. Provision.  Notwithstanding the terms of the Sale Motion, the APA, this Sale Order and any of the transactions authorized hereby,

(a)     nothing herein or therein shall:

(i)     alter the terms of any contract Warner Bros. Entertainment Inc. (together with its affiliates, "Warner Bros.") has with any of the Debtors, including any Assumed Contracts, provided that the Cure Amounts (including such claims, "Cure Claims") asserted by Warner Bros. shall be paid by the Sellers as provided herein and are not Assumed Liabilities;

(ii)     limit Warner Bros.' rights to enforce contractual terms against the Buyer, including all rights of recoupment, defense and deduction, but with respect

---

[7]     Capitalized terms used in this paragraph 33 but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Order.

to offset, only to the extent such right of offset arises after the Closing Effective Date; provided that Warner Bros. will provide Buyer with written notice thereof prior to such rights being exercised; provided further that the Cure Claims asserted by Warner Bros. shall be paid by the Sellers as provided herein and are not Assumed Liabilities.  For the avoidance of doubt, Warner Bros. will not be permitted to enforce a right of offset that could have been asserted prior to the Closing Effective Date and its Cure Claims shall be paid by Sellers as provided herein and are not Assumed Liabilities;

(iii)    limit (beyond any limitations set forth in the agreements between Warner Bros. and the Debtors) or convey to Buyer any intellectual property or other property rights of Warner Bros.;

(iv)    limit or impair any security interests held by Warner Bros., including copyright mortgages related to the distribution of motion pictures, productions, or otherwise, which shall be deemed to be Permitted Liens and shall remain effective as against any applicable Purchased Assets;

(v)    require Warner Bros. to pay to Buyer any amounts related to any Post-Cutoff Cashflows, Proceeds, Receipts and Rights (including any Designated Domestic, Foreign, Global or Virtual Rights and Receipts) or any other claims or obligations of any kind (including Proceeds thereof) that have already been paid or otherwise satisfied by Warner Bros. as of the Closing Effective Date, including any of the foregoing paid or satisfied by Warner Bros. between the Cutoff Date and the Closing Effective Date;

(vi)     Reserved;

(vii)    convey or alter in any way any Derivative Rights (as defined in the APA) related to any Warner Bros. Motion Picture, or authorize the assumption of any contract with Warner Bros. to the extent that such contract conveys any Derivative Rights (the "Derivative Rights Agreements");

(viii)    determine whether any amounts arising under or related to any Derivative Rights Agreements are Cure Amounts, it being understood that this limitation does not apply to the Cured Obligations set forth in Section (e) hereof; or

(ix)     constitute a finding in any way with respect to any sale of the Derivative Rights (as defined in the APA) (including any findings with respect to adequate assurance of future performance or assignability of intellectual property rights) or Studio Business, and Warner Bros.' objections to any such sales are fully preserved.

(b)     Reserved;

(c)     for the avoidance of doubt, this Sale Order authorizes only the sale of the Debtors' rights, title, and interest presently held by the Debtors in the Purchased Assets, including without limitation,  the Fundamental Contracts and any other Contracts or Purchased Assets;

(d)     Warner Bros. does not object to the transfer of Sellers' interests in the Audit Rights to Buyer, subject to certain modifications thereto as agreed to and separately documented by Buyer and Warner Bros.;

(e)    the assumption and assignment of any contracts with Warner Bros. in connection with the sale of the Library Assets shall be conditioned on the cure of all defaults under such contracts, including without limitation, the Warner Dispute (as defined in the APA) and all amounts owing under any contract with Warner Bros. assumed by the Buyer, including with respect to the arbitration proceeding by and between Warner Bros. and certain of the Debtors over the motion picture *Matrix IV* (the "Matrix Arbitration") (the foregoing, the "Cured Obligations") as hereinafter provided: the Sellers shall promptly establish the Warner Bros. Reserve out of the proceeds of the Sale in the amount of $110 million as a condition to the Closing Effective Date for the Warner Bros.' claims, including the Cured Obligations and those related to the Warner Dispute (which, for the avoidance of doubt, includes claims related to the Matrix Arbitration); and the Cured Obligations shall for all purposes be treated and satisfied by payment in full in cash from the Warner Bros. Reserve as Cure Claims upon the liquidation of such Claims, without the need for further motion, order of the Court, or plan confirmation.  For the avoidance of doubt, upon establishment and funding of the Warner Bros. Reserve, the Cured Obligations may only be asserted against the Warner Bros. Reserve, or to the extent inadequate, the Sellers and other Debtors;

(f)    for all purposes, the Buyer shall be Alcon Media Group LLC ("Alcon") or a wholly-owned subsidiary of Alcon, provided that Alcon shall furnish a guarantee in favor of the applicable Warner Bros. entity(ies) with respect to obligations owing to Warner Bros. under the Fundamental Contracts or other Assumed Contracts of Warner Bros. accruing after the Closing Effective Date;

(g)    Buyer shall be responsible for dividing and remitting any portion of the Applicable Percentage it may receive from Warner Bros. that belongs to any third party including Magnum under the Magnum Agreements and Warner Bros. shall have no responsibility or liability for such division or remittance; for the avoidance of doubt, Warner Bros. is authorized to make any payment of the Applicable Percentage after the Closing Effective Date to the Buyer to an account or accounts designated by the Buyer on or before the Closing Effective Date;

(h)    the Buyer and Sellers shall execute such additional executory contracts, licenses, security instruments, or assignments with Warner Bros. as required under the terms of the Library Agreements in connection with the sale of the Purchased Assets to the Buyer;

(i)    this Sale Order shall not waive or impair Warner Bros.' rights to seek arbitration of its claims, including any Cure Claim under an Assumed Contract;

Warner Bros. reserves all rights concerning (i) the appropriate allocation of any asset sales proceeds as among the Debtors' estates, (ii) the appropriate source of payment for any obligation satisfied with proceeds of assets, including the source of payment of the Prepetition ABS Obligations permitted hereby, (iii) marshalling of assets as among the estates for payment of claims; provided that the foregoing shall not prevent the payment of the Prepetition ABS Obligations or the DIP Loans as otherwise set forth in this Final Order; (iv) the Warner Bros. Assumption and Assignment Procedures as set forth in the Bid Procedures Order and (v) the Final DIP Order.

38.     APA Provisions.   Section 6.04 of the APA is hereby modified by adding the following sentence after the last sentence thereof: "Notwithstanding the foregoing, if and to the extent Buyer has actually incurred any Liability, loss, deficiency or expense arising from any reduction or offset in any amounts to which Buyer is entitled to be paid by WBEI (or any Affiliate thereof) by virtue of its ownership of the Purchased Assets (including the Relevant Percentage of the Designated Domestic Receipts, the Designated Foreign Receipts, the Designated Global Receipts or the Designated Virtual Receipts with respect to the Pictures), and which reduction or offset arose from an overpayment to Sellers by WBEI which overpayment occurred prior to the Cutoff Date, Buyer shall be entitled to reduce and offset against any amounts to which Sellers are or will be entitled pursuant to this Section 6.04 the lesser of the amount of such reduction or offset and the amount it is obligated to pay to Sellers hereunder."

36.39.   Binding Order.  This Order and the APA shall be binding upon and govern the acts of all persons and entities, including without limitation, the Debtors, the Buyer, any of their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in a chapter 7 case of any of the Debtors if any of these chapter 11 cases is converted from a case under chapter 11 to a case under chapter 7, all creditors of any and all of the Debtors (whether known or unknown), all counterparties to any Assumed Contracts.  Neither the Transaction nor the APA shall be subject to rejection or avoidance under any circumstances.  This Order and the APA shall inure to the benefit of the Debtors, their estates, their creditors, the Buyer, or any Buyer Related Person and their respective successors and assigns.  Nothing contained in any chapter 11 plan confirmed in the chapter 11 cases, any order confirming any such chapter 11 plan, or any order approving wind-

down or dismissal of the chapter 11 cases or any subsequent chapter 7 cases shall conflict with or derogate from the provisions of APA (including any related agreements), or this Order, and to the extent of any conflict or derogation between this Order or the APA and such future plan or order, the terms of this Order and the APA, including any related agreements, shall control.

37.40.  Failure to Specify Provisions; Conflicts.  The failure to specifically include or mention any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court, the Debtors and the Buyer that the APA be authorized and approved in its entirety, including any amendments thereto as may be made by the parties thereto in accordance with the terms thereof and this Order.  Likewise, all of the provisions of this Order are non-severable and mutually dependent.

38.41.  Further Assurances.  From time to time, as and when requested, and subject to the terms of the APA, all parties to the Transaction shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as the requesting party may reasonably deem necessary or desirable to consummate the Transaction, including such actions as may be necessary to perfect, confirm, record or otherwise vest in the Buyer its right, title and interest in and to the Library Assets and the Assumed Contracts.

39.42.  Automatic Stay.  The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified to the extent necessary, without further order of the Court, to allow the Buyer to deliver any notice provided for in the APA and to take any and all actions permitted, required under, or reasonably necessary to effectuate the APA in accordance with the terms and conditions thereof.

40.43.  No Stay of Order.  Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062 and any applicable Local Rules, the Court expressly finds there is no reason for delay in the implementation of this Order and this Order shall not be stayed and shall be effective and enforceable immediately upon entry.  The provisions of this Order shall be self-executing.  Time is of the essence in implementing the APA and closing the Transaction.

41.44.  Governing Terms.  To the extent there is any inconsistency between the terms of this Order and the terms of the APA or the Bid Procedures Order, the terms of this Order shall govern.

42.45. Retention of Jurisdiction.  This Court shall retain exclusive jurisdiction to (a) interpret, implement and enforce the terms and provisions of this Order and the APA, including all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith; and (b) decide any issues or disputes concerning or related to this Order, the APA, or the rights and duties of the parties hereunder or thereunder, including the interpretation of the terms, conditions and provisions hereof and thereof, and the status, nature and extent of the Library Assets and the Assumed Contracts and any disputes with any counterparty to any Assumed Contract.  This Court retains jurisdiction to compel delivery of the Debtors' right, title and interest in the Assets, to protect the Buyer and its assets, including the Debtors' right, title and interest in the Library Assets, against any Interests and successor and transferee liability and to enter orders, as appropriate, pursuant to Bankruptcy Code sections 105(a) or 363 (or other applicable provisions) necessary to transfer the Debtors' right, title and interest in the Library Assets to the Buyer.

~~43.~~46.  Other Provisions.  The Debtors are authorized and empowered to take all actions necessary or appropriate to implement the relief granted in this Order.

~~44.~~47.  Non-Severability.  The provisions of this Order are non-severable and mutually dependent.

~~45.~~48.  The requirements set forth in Bankruptcy Rules 6003(b), 6004, and 6006 and Local Rule 9013-1 have been satisfied or otherwise deemed waived.

**<u>Exhibit 1</u>**

**APA**