# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC., *et al.*,[1] | Case No. 25-10475 (TMH) |
| Debtors. | (Jointly Administered) |

## WARNER BROS. ENTERTAINMENT INC.'S SUPPLEMENTAL OBJECTION TO (I) THE DEBTORS' MOTION FOR AN ORDER APPROVING THE SALE OF THE DEBTORS' ASSETS, AND (II) THE DEBTORS' ASSUMPTION AND ASSIGNMENT OF CERTAIN WARNER BROS. AGREEMENTS

Curtis S. Miller (No. 4583)
Matthew B. Harvey (No. 5186)
**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
1201 North Market Street, 16th Floor
Wilmington, DE 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: cmiller@morrisnichols.com
mharvey@morrisnichols.com

Steve Warren (*Admitted pro hac vice*)
**O'MELVENY & MYERS LLP**
400 South Hope Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 430-6000
Email: swarren@omm.com

Dan Petrocelli (*Admitted pro hac vice*)
Matt Kline (*Admitted pro hac vice*)
**O'MELVENY & MYERS LLP**
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Telephone: (310) 553-6700
Email: dpetrocelli@omm.com
Email: mkline@omm.com

Scott Drake (*Admitted pro hac vice*)
Emma Jones (*Admitted pro hac vice*)
**O'MELVENY & MYERS LLP**
2801 North Hardwood Street, Suite 1600
Dallas, Texas 75201
Telephone: (972) 360-1900
Email: sdrake@omm.com
Email: eljones@omm.com

*Counsel to Warner Bros. Entertainment Inc., and its Affiliates*

---

[1] The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343. The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

## TABLE OF CONTENTS

Page

I.    PRELIMINARY STATEMENT ..................................................................... 2

II.   FACTUAL BACKGROUND........................................................................ 10

    A.    Village Co-Finances Certain Warner Bros. Films Under Specific
Contractual Terms, Village's Subsequent Breach of Contract, and Warner
Bros.' Matrix Arbitration Liability Determination Against Village.................. 10

    B.    Alcon and Warner Bros. Have a Limited Existing Relationship for Film
Distribution ............................................................................................. 10

    C.    Alcon Commences a Lawsuit Against Warner Bros. and Third Parties in
an Unrelated Matter ................................................................................. 12

    D.    Village Seeks to Sell the Derivative Rights to Alcon Notwithstanding
Warner Bros.' Initial Back-up Bid and the Debtors' Inability to Assume
and Assign the Derivative Rights Agreements to a Non-Warner Bros.
Third Party ............................................................................................... 16

    E.    The Court Declines to Bifurcate the Derivative Rights Sale Hearing, and
the Parties Stipulate to an Agreed Scheduling Order............................................ 18

    F.    Warner Bros. Submits a Higher and Better Offer to the Debtors for the
Derivative Rights ..................................................................................... 19

    G.    The Debtors Purport to Accept an Opportunity to Co-Finance *Practical
Magic 2* Without Seeking Court Approval ........................................................ 20

    H.    The Debtors File A Supplemental Notice of Possible Assumption and
Assignment of Certain Executory Contracts With Warner Bros ........................ 21

III.  ARGUMENT ............................................................................................. 22

    A.    Warner Bros.' Revised $18.5 Million Bid (Plus $10 Million Warner Bros.
Reserve Release) for the Derivative Rights Is the Higher and Better Offer
and Should be Approved Over the Debtors' Proposed Sale to Alcon ................ 22

    B.    Because the Debtors Are Prohibited from Assuming and Assigning the
Derivative Rights Agreements to Alcon, the Alcon Sale Cannot Close.............. 25

        a.    The financial accommodation provisions of the Derivative Rights
Agreements render them unassignable. ................................................... 26

        b.    Warner Bros.' exclusive intellectual property interests must be
respected, and the sale to Alcon must be denied absent Warner
Bros.' consent. ....................................................................................... 30

        c.    The Derivative Rights Agreements are personal in nature and
cannot be assigned absent Warner Bros.' consent. ................................. 36

    C.    The Debtors and Alcon Cannot Provide Adequate Assurance of Future
Performance ............................................................................................ 38

    D.    The Debtors' Proposed Derivative Rights APA With Alcon Suffers From
Additional Infirmities That Bar Approval of That Sale....................................... 41

## TABLE OF CONTENTS
### (continued)

|  |  |  | **Page** |
|---|---|---|---|
| | a. | The Debtors cannot sell any purported rights in *Furiosa* or *Joker 2*. | 43 |
| | b. | The Debtors' Purported Project Notice Acceptance for *Practical Magic 2* is Invalid, and Cannot be Approved. | 44 |
| | c. | Additional issues prevent approval of the Sale Motion to Alcon. | 47 |
| E. | | The Value of the Derivative Rights Should be Allocated to the Applicable Library Debtors as the Rightful Owners of the Derivative Rights | 48 |
| IV. | RESERVATION OF RIGHTS | | 50 |
| V. | CONCLUSION | | 50 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ajir v. Exxon Corp.*,
　855 F. Supp. 294 (N.D. Cal. 1994) ........................................................... 45

*Alcon Entertainment, LLC v. Tesla, Inc., Elon Musk, and Warner Bros. Discovery*,
　Case No. 2:24-cv-09033 (U.S. Dist. C.D. Cal.) ............................................ 6

*AstroPower Liquidating Tr. v. Xantrex Tech., Inc. (In re AstroPower Liquidating Tr.)*,
　335 B.R. 309 (Bankr. D. Del. 2005) ......................................................... 49

*Chase Manhattan Bank v. Iridium Afr. Corp.*,
　No. CIV.A. 00-564 JJF, 2004 WL 323178 (D. Del. Feb. 13, 2004) ................... 27, 28

*DiMarco v. Flannery (In re Flannery)*,
　11 B.R. 974 (Bankr. E.D. Pa. 1981) ......................................................... 24

*EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*,
　380 B.R. 348 (Bankr. D. Del. 2008) *aff'd*, 382 F. App'x 135 (3d Cir. 2010) ........... 37, 38

*In re Adams Res. Expl. Corp.*,
　No. 17-10866 (KG), 2017 Bankr. LEXIS 4017 (Bankr. D. Del. Aug. 10, 2017) ......... 24, 25

*In re After Six*,
　154 B.R. 876 (Bankr. E.D. Pa. 1993) ........................................................ 24

*In re Bakalis*,
　220 B.R. 525 (Bankr. E.D.N.Y. 1998) ....................................................... 23

*In re Boscov's, Inc.*,
　No. 08-11637 (KG), 2008 WL 4975882 (Bankr. D. Del. Nov. 21, 2008) ................ 27

*In re Boy Scouts of America and Delaware BSA, LLC*,
　No. 20-10343 (LSS) (Bankr. D. Del. Sep. 9, 2022) ....................................... 21

*In re Carlisle Homes, Inc.*,
　103 B.R. 524 (Bankr. D.N.J. 1988) .......................................................... 39

*In re Dura Auto. Sys.*,
　No. 06-11202 (KJC) (Bankr. D. Del. Aug. 15, 2007) ..................................... 24

*In re Golden Books Family Entm't*,
　269 B.R. 300 (Bankr. D. Del. 2001) ......................................................... 35

*In re GPX Int'l Tire Corp.*,
　No. 09-20170-JNF, 2009 Bankr. LEXIS 5410 (Bankr. D. Mass. Dec. 15, 2009) ......... 23

*In re Mondie Forge, Inc.*,
　148 B.R. 499 (Bankr. N.D. Ohio 1992) ...................................................... 24

*In re Mt. States Rosen, LLC*,
　619 B.R. 750 (Bankr. D. Wyo. 2020) ........................................................ 23

*In re Planet Hollywood Int'l, Inc.*,
　2000 WL 36118317 (D. Del. Nov. 21, 2000) .......................................... 36, 37, 38

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re Sportsman's Warehouse, Inc.*,
  457 B.R. 372 (Bankr. D. Del. 2011) ................................................................ 27

*In re Texas Health Enters., Inc.*,
  246 B.R. 832 (Bankr. E.D. Tex. 2000) .............................................................. 39

*Kambiz Ajir v. Exxon Corp.*,
  Nos. 97-17032, 97-17134, 1999 U.S. App. LEXIS 11046 (9th Cir. May 26, 1999) ............... 45

*Miller v. Fallas (In re J & M Sales, Inc.)*,
  Nos. 18-11801 (JTD), 20-50775, 2021 Bankr. LEXIS 2268 (Bankr. D. Del. Aug. 20, 2021) .......................................................................................................... 49

*Moody v. Amoco Oil Co.*,
  734 F.2d 1200 (7th Cir. 1984) ......................................................................... 45

*Reading Co. v. Brown*,
  391 U.S. 471 (1968) ....................................................................................... 21

*Stanley Jacobs Prod., Ltd. v. 9472541 Can. Inc. (In re Thane Int'l, Inc.)*,
  586 B.R. 540 (Bankr. D. Del. 2018) ................................................................ 44

*Svenhard's Swedish Bakery v. Bakery (In re Svenhard's Swedish Bakery)*,
  No. 23-60045, 2025 LX 328143 (9th Cir. Sep. 12, 2025) ................................. 26, 28

*Watts v. Pa. Hous. Fin. Co.*,
  876 F.2d 1090 (3d Cir. 1989) .......................................................................... 27

**Statutes**

11 U.S.C. § 363(b) ............................................................................................ 44

11 U.S.C. § 365(b)(1) ....................................................................................... 38

11 U.S.C. § 503(b)(1)(A) .................................................................................. 21

11 U.S.C. § 507(a)(2) ........................................................................................ 21

11 U.S.C. § 550 ................................................................................................. 49

California Civil Code § 1585 ............................................................................ 45

1.      Warner Bros. Entertainment Inc. and its affiliates (collectively, "Warner Bros.") file this supplemental objection (the "Supplemental Objection") to the *Debtors' Motion for Entry of Orders (I)(A) Approving Bid Procedures for the Sale of the Debtors' Assets, (B) Authorizing the Debtors' Entry Into the Stalking Horse APA and Approving Bid Protections Thereunder, (C) Scheduling an Auction for, and Hearing to Approve, Sale of the Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (E) Approving Assumption and Assignment Procedures; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of all Liens, Claims, Interests, and Encumbrances, and (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granted Related Relief* [Dkt. No. 11] (the "Sale Motion"); the *Notice of Possible Assumption and Assignment of Certain Executory Contracts With Warner Bros.*, as recently supplemented [Dkt. Nos. 284, 904] (the first, the "Warner Bros. Contract Notice"); and the *Notice of (I) Successful Bidder for Derivative Rights and Studio Business and (II) Back-Up Bidder for Derivative Rights* [Dkt. No. 446] (the "DR Notice"), all filed by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors").

2.      As Warner Bros.' previewed in its Omnibus Objection to the Debtors' proposed sale of assets in these cases,[2] the Debtors seek to sell to Alcon Media Group, LLC ("Alcon") their potential right to co-finance certain derivative works from certain Library Asset films (the "Derivative Rights") for $18.5 million.  For the reasons set forth in the Omnibus Objection and

---

[2] *See Warner Bros. Entertainment Inc.'s Omnibus Objection to (I) the Debtors' Motion for an Order Approving the Sale of the Debtors' Assets, (II) the Debtors' Sale Supplement With Respect Thereto and (III) the Debtors' Assumption and Assignment of Warner Bros. Agreements* [Dkt. No. 518] (Filed Under Seal) and [Dkt. No. 521] (Redacted Version) (the "Omnibus Objection"). Capitalized terms used but not otherwise defined in this Objection shall have the meanings ascribed to them in the Omnibus Objection, Sale Motion, or Final DIP Order, as applicable.  Nothing herein shall constitute a waiver of Warner Bros.' rights under the Bid Procedures Order, or in connection with the Warner Bros. procedures as set forth therein.

the additional reasons below, the Debtors cannot overcome the legal obstacles to sell the Derivative Rights to Alcon over Warner Bros.' objections and, accordingly, the proposed sale to Alcon must be rejected. In support of this Supplemental Objection, Warner Bros. respectfully states as follows:

## I.   PRELIMINARY STATEMENT[3]

3.     The Debtors' proposed sale of the Derivative Rights fails for a simple reason: the Debtors are not entitled to sell the Derivative Rights without Warner Bros.' consent as a matter of law.[4] The Debtors have stipulated that assumption of the Derivative Rights Agreements with Warner Bros. is a precondition to the proposed sale to Alcon.  As Warner Bros. previously stated and reiterates here, the Derivative Rights Agreements constitute unassignable financial accommodations, contain Warner Bros.' exclusive copyright material, and given their highly personal nature, cannot be assigned absent Warner Bros.' consent.[5]  These issues, coupled with the proper understanding of the universe of the Derivative Rights Agreements themselves, demonstrate that these agreements cannot be assigned in connection with the present sale over Warner Bros.' objections.

4.     Separate and apart from those fatal defects, the Alcon bid is not the highest and best offer for the Derivative Rights.  Warner Bros. recently increased its bid for the Debtors' interests

---

[3] Capitalized terms used but not otherwise defined in this Preliminary Statement shall have the meanings ascribed to them as set forth later in this Supplemental Objection, subject to *supra*, n. 2.

[4] As discussed in the Omnibus Objection and for the avoidance of doubt, the Derivative Rights Agreements include all of Warner Bros.' Co-Ownership Agreements with Village for prequels, remakes, and sequels of films, the 2017 Omnibus Amendment and the Omnibus Amendment No. 2.  For the avoidance of doubt, references to "Derivative Rights" in this Supplemental Objection are in specific reference to the Derivative Rights stemming from Warner Bros. and Village agreements—the Derivative Rights Agreements.

[5] As stated in its Omnibus Objection, Warner Bros.' deadline to object to the Derivative Rights sale was extended by agreement of the parties. Warner Bros. nevertheless filed its general objection to the sale of the Derivative Rights (excluding objections related to the identity of the Buyer, *i.e.*, Alcon).  Warner Bros. now supplements that response, which it fully incorporates herein along with the initial Smith Declaration, to reiterate those objections, and to include, *inter alia*, its objections related to the identity of the Buyer (Alcon) and its concerns about adequate assurances in connection therewith.

in the Derivative Rights.  The Revised Warner Bros. Bid amounts to ***upward of $28.5 million in aggregate additional value*** to the Debtors' estates ($18.5 million cash purchase price plus release of $10 million from the Warner Bros. Reserve being held for Warner Bros.' benefit).[6]  Warner Bros.' offer provides that if it is approved, Warner Bros. will consent to the $10 million released from the Warner Bros. Reserve being used to pay the other general unsecured creditors in the case. Many (if not all) of these unsecured claims sit at the holding company level above the Library Debtors who own the relevant assets and are obligated directly to Warner Bros.  Thus, Warner Bros.' consent provides additional value to the estates and their unsecured creditors.  The Alcon sale cannot be approved when Warner Bros.' bid is the facially better offer, particularly accounting for the defects and closing risks the Alcon bid poses.  Warner Bros. reiterates each of those defects and closing risks, which it previously addressed in the Omnibus Objection.

5.      The Derivative Rights Agreements define the parties' interests in the Derivative Rights and provide for Warner Bros. to advance the full amount to produce each Picture for the Debtors' benefit, which in some cases is more than $100,000,000 on a single Picture. It may be years between the date the Picture is greenlit (when the Debtors become obligated if they accept the Project Notice) and the date the reimbursement is due from the Debtors—even assuming they timely pay.  If the Debtors do not timely pay, it may take years more for Warner Bros. to collect (as has been the case with *Matrix IV*).  All the while, interest accrues under the parties' agreements, reflecting that Warner Bros. is acting as the "bank" for the production of these Pictures.[7] Warner Bros. extends other significant financial accommodations as well, including ███████████ ████████████████████████

---

[6] *See* Aug. 22, 2025 Hr'g Trans. [12:3-4], *infra*, ¶ 34.

[7] As used herein, "Pictures," refers to the Warner Bros. motion pictures in the Film Library, the Debtors' asserted interests in the Derivative Rights for which the Debtors seek to sell through the Sale Motion.

6.     These contracts clearly constitute financial accommodations, if not outright loan commitments. This structure also explains why the identity of Warner Bros.' counterparty is necessarily "personal"—based upon a deep and broad historical relationship founded on trust. Indeed, many commercial motion-picture-production agreements require co-financiers like the Debtors to pay as costs are incurred, not years later.  Likewise, the relationship at stake involves access to Warner Bros.' exclusive intellectual property, which it alone develops and has the rights to exploit, as well its confidential trade secrets.  This relationship cannot be transferred over Warner Bros.' objection as a matter of law.

7.     Hoping to sidestep these barriers to finalize the Debtors' unacceptable proposal to sell to Alcon their interests in the Derivative Rights, the Debtors mischaracterize their limited interests in the Derivative Rights in an apparent attempt to downplay their limited interests in the Derivative Rights by virtue of the Derivative Rights Agreements.[8]  But such framing rests on a fundamental misunderstanding of the Derivative Rights assets.  Again, the Debtors' *only* interest in the Derivative Rights is the limited option to co-finance certain derivative works based on pictures the parties' previously co-financed as set forth in the Derivative Rights Agreements. Even if the Debtors assert they "co-own" the Derivative Rights, those asserted ownership rights are creatures of and limited by, the contracts that created them—the Derivative Rights Agreements. Those agreements define the actual scope of the Debtors' rights.  The only interests the Debtors now have (or ever had) in Warner Bros.' Pictures are those limited rights expressly provided in the Derivative Rights Agreements themselves.  The Derivative Rights Agreements, the underlying

---

[8] *See* Reply and Rosenberg Decl. (both as later defined), at Dkt. Nos. 526-27 (Filed Under Seal), 533 (Redacted). As later discussed, *infra*, the Debtors stipulated that their Derivative Rights sale to Alcon includes their proposed assumption and assignment of the Derivative Rights Agreements subject to all of Warner Bros.' objections thereto; accordingly, Warner Bros. reserves all rights, including its right to later object, to any of the Debtors' future efforts to alter or reject the Derivative Rights Agreements, and such arguments are preserved in connection therewith.

assignment documents (the "Assignments"), ███████████████████ make this all the more clear.[9]  The Debtors' interests in the Derivative Rights are not (and never were) coequal to those of Warner Bros.

8.      That said, the potential disagreement over the relationship between the Derivative Rights and the Derivative Rights Agreements has been resolved for the purposes of the Sale Motion and the Derivative Rights sale hearing.  For those matters now before the Court, the Debtors concede that they cannot reject the Derivative Rights Agreements; rather, they must be able to assume and assign the Derivative Rights Agreements to Alcon for Alcon to acquire the Debtors' interests in the Derivative Rights.[10]  Because the Debtors are unable to assume and assign the Derivative Rights Agreements, the sale to Alcon must be rejected.

9.      Equally fatal to the proposed sale to Alcon, neither the Debtors nor Alcon can provide Warner Bros. with the required "adequate assurance of future performance" given Alcon's litigious past and pending disputes with Warner Bros. Alcon is particularly ill-suited to serve as the Debtors' proposed purchaser for this trust-based relationship, through which Warner Bros. provides up-front financing and shares its intellectual property and creative works.  Warner Bros. has never invited Alcon to co-finance a film it produced.  The parties' relationship has been primarily limited to Warner Bros.' distribution of films produced or acquired by Alcon on an arm's-length basis.[11]  Even that limited relationship is in the process of winding down, which has

---

[9] The "Assignments" include Warner Bros.' assignments of picture rights (including Village's respective share of the Derivative Rights) to Warner Bros./Village joint entities and to Village, as later described below. *See* App'x, Ex. 58 (Sept. 30, 2025 Deposition of K. Berg) ████████████████████████████████████████████████████ ███████████████████████████████████████████

[10] Scheduling Order ¶ 4.

[11] Conversely, Warner Bros. has co-financed one Alcon produced film (*Sisterhood of the Traveling Pants 2*).

corresponded with Alcon becoming increasingly adversarial.

10.    Indeed, Alcon has taken hostile positions on numerous transactions with Warner Bros., culminating in Alcon's filing of frivolous litigation against Warner Bros. in October 2024. That suit was filed with no prior notice to Warner Bros, which first learned of the litigation via a leaked trade press article.[12]  Alcon's complaints in that case asserted claims over the alleged misuse by Tesla of an image purportedly invoking *Blade Runner 2049* at an event Tesla hosted on the Warner Bros. studio lot.  Alcon has accused Warner Bros. of acting with "malic[e]" and in "bad faith" and of somehow conspiring with Elon Musk to purposefully damage Alcon, despite the plain and obvious facts, well known to Alcon and documented in writing, showing nothing of the sort. Alcon further insulted Warner Bros. and its individual personnel, accusing them of being "disingenuous" and somehow "controversial" in the industry. App'x, Ex. 33   (Alcon Amended Compl.) ¶¶ 34, 89.

11.    The U.S. District Court for the Central District of California dismissed many of the claims in the Alcon Amended Complaint (initially with leave to amend), finding that (i) Alcon had pleaded no facts suggesting Warner Bros. had any responsibility for the alleged claims and (ii) even the inadequate allegations it included were based solely on information and belief.[13] Although the Alcon Amended Complaint and related pleadings leveled many false accusations against Warner Bros., what most concerns Warner Bros. is not the magnitude of Alcon's claims; it is that such an insignificant underlying dispute has mushroomed into such needless and

---

[12] *See Alcon Entertainment, LLC v. Tesla, Inc., Elon Musk, and Warner Bros. Discovery*, Case No. 2:24-cv-09033 (U.S. Dist. C.D. Cal.) (the "Alcon Lawsuit"). A true and correct copy of the initial amended complaint in the Alcon Lawsuit (the "Alcon Amended Complaint"), and second amended complaint (the "Alcon Second Amended Complaint") are attached to the Appendix in support of this Supplemental Objection and the corresponding Supplemental Smith Declaration (as later defined) ("App'x") as Exs. 33, 36. The Alcon Amended Complaint was dismissed, with leave to amend, on April 7, 2025 and the Second Amended Complaint was dismissed, with leave to amend, on September 11, 2025.

[13] *See* App'x, Ex. 33.

6

unwarranted aggression and a public litigation strategy aimed at harming Warner Bros.  Alcon next filed a Second Amended Complaint that lodged many of the same baseless accusations against Warner Bros., despite acknowledging evidence that refutes its own theories against Warner Bros. On September 11, 2025, the California District Court once again dismissed the majority of Alcon's claims, finding Alcon's attempts to "muddy[] the waters" based on its "information and belief" allegations, "unhelpful." Suppl. Smith Decl. ¶ 26, App'x, Ex. 40 (Alcon Lawsuit Second Tentative Dismissal Ruling).[14] Undeterred, on October 2, 2025, Alcon filed a Third Amended Complaint laded with false theories against Warner Bros.

12.     Despite its open hostility to Warner Bros. and its apparent zeal to publicly accuse Warner Bros. of various imagined wrongdoings in litigation filed over token matters, Alcon now seeks to force Warner Bros. to greatly expand their relationship into an area of trust (film financing) to which Alcon has never been voluntarily invited even when the parties' relationship was less strained.  Warner Bros. should not be compelled to partner with Alcon on the production and financing of future Warner Bros. motion pictures (including advancing potentially hundreds of millions of dollars on Alcon's behalf based on Alcon's commitment to pay its share *after* a new film has been completed).  Warner Bros. does not want to subject itself to the prospect of being unpaid as it was by Village for *Matrix IV*, or baselessly attacked in the press and in frivolous litigation, any time it makes a film subject to the Derivative Rights with a business partner hostile toward Warner Bros. and its management team. Nor should Warner Bros. be forced to provide Alcon with highly confidential and proprietary information about derivative works in development or their eventual distribution and promotion, which Warner Bros. controls, but which are all

---

[14] As discussed, *infra*, on October 2, 2024, Alcon filed its *Third Amended Complaint* in the Alcon Lawsuit, App'x, Ex. 42, asserting a direct copyright infringement claim against Tesla and Elon Musk, and a contributory copyright infringement claim against Warner Bros.

information-sharing aspects of a co-financing relationship.[15]

13.     Warner Bros. is particularly sensitive to the potential transfer of the Derivative

Rights to any party that is not a trusted partner because the Derivative Rights were the genesis of

over three years of litigation related to the financing of *Matrix IV* that collectively cost the parties

over $25 million in litigation expenses and resulted in the arbitral determination that Village

breached its obligations to Warner Bros.  Over Warner Bros' higher and better bid, the Debtors

now propose to leave Warner Bros. to deal with yet another aggressive fund, with which Warner

Bros. already has a strained working relationship, on these same putative co-financing rights.

14.     And while Alcon claims



Given the magnitude of the advances and accommodations to be made by Warner

Bros. under the parties' agreements for even a single Picture,

Indeed, each Picture may cost over $100,000,000 to produce over a period of years—

as was the case for *Matrix IV*.  Thus, Alcon cannot give adequate assurance of future

performance for the much larger relationship with Warner Bros. contemplated by the assignment

---

[15] Indeed, following the "souring of a significant business relationship" between Village and Warner Bros. (*see* Maib Declaration [D.I. 2] ¶ 25) after *Matrix IV*, Village

[16] *See* App', Ex. 59 ALCON000029

App'x, Ex. 60 ALCON000028

of the Derivative Rights.

15.     The problems with the Debtors' proposed sale are magnified by the terms of their proposed Asset Purchase Agreement with Alcon (the "Alcon Derivative Rights APA"). These defective provisions include, among other things, the Debtors' failed attempt to co-finance or assign the ability to co-finance the upcoming film, *Practical Magic 2*, and the Debtors' proposed transfer of rights associated with *Furiosa* and *Joker 2*.   The Debtors are entitled to no greater rights in bankruptcy than outside of bankruptcy. Nor may the Debtors transfer any interest in property that they do not own.   The Debtors' putative interests in these Derivative Rights is limited by the parties' agreements, including the Assignments of these rights themselves, and the QCSAs, MPRPAs, RPAs, and Co-Ownership Agreements, as amended.   The Debtors did not properly accept the PM2 Project Notice for *Practical Magic* 2.   Nor did they have the right to finance *Furiosa* or *Joker 2,* and even if they did, they have paid none of the large sums of monies Warner Bros. invested to produce those pictures.   Warner Bros. must retain its challenges to any alleged interest by the Debtors (or Alcon) in those pictures, which can only be transferred if the Debtors and Alcon also pay in full for the "Purchased 'Unfunded' Pictures" as part of their cure and adequate assurance obligations (which they have yet to do).[17]

16.     In sum, the Debtors' current proposal to sell the Derivative Rights to Alcon would trample Warner Bros.' contractual and property rights and the Sale Motion regarding the proposed sale of Derivative Rights to Alcon should be rejected.   Warner Bros. is ready to close on its revised $18.5 million offer, including a reduction of $10 million in the Warner Bros. Reserve and the other considerations set forth in the Revised Warner Bros. Bid.[18]   By contrast, the Debtors propose to

---

[17] The Debtors also failed to follow the Bid Procedures Order as applicable to Warner Bros. for these pictures.

[18] As noted in its Omnibus Objection, Warner Bros. reserves all of its claims against the Debtors' estates arising prior to the Closing of any sale, including without limitation all damages claims related to the *Matrix IV*, none of which are

move forward with a lesser offer from Alcon that cannot be consummated for numerous independent reasons under the Bankruptcy Code. For all those reasons, and the additional reasons set forth below, the proposed sale of Derivative Rights to Alcon should be denied.

## II.    FACTUAL BACKGROUND

A.    **Village Co-Finances Certain Warner Bros. Films Under Specific Contractual Terms, Village's Subsequent Breach of Contract, and Warner Bros.' Matrix Arbitration Liability Determination Against Village.**

17.    Warner Bros. adopts and incorporates by reference the facts and arguments set forth in its Omnibus Objection, including the initial Smith Declaration, all of which are restated herein and as supplemented below.

B.    **Alcon and Warner Bros. Have a Limited Existing Relationship for Film Distribution.**

18.    Warner Bros. finances most of its own pictures by itself or with a small group of other studios and film financing specialists (including Legendary Entertainment; Ratpac Entertainment, LLC/Dune Entertainment; Domain Capital; and Bron Creative). *See Declaration of Wayne M. Smith in Support of Warner Bros.' Omnibus Objection* [Dkt. No. 519] (Filed Under Seal) ("Smith Decl.") ¶ 3. Co-financing a film requires a high degree of trust and cooperation. *See id.* ¶¶ 3, 33, 63. Among other things, Warner Bros. must share with its co-financer confidential information about its coming film projects and plans, including the script. *See id.* ¶¶ 4-5. Those parties also generally share credits on the resulting films, participate in media events and communications, and consult regarding the marketing and distribution of the pictures. *See id.* ¶ 3. In addition, because of the high degree of trust and cooperation involved, it is Warner Bros.' desire to partner only with parties with which it anticipates having a positive working relationship. *See id.* ¶¶ 3, 23.

---

limited or waived by virtue of its offer on the Derivative Rights.

19.    Warner Bros. had a decades' long relationship with Village before Village's acquisition by a hedge fund (Vine). *See id*. ¶¶ 3-5. The structure of the parties' agreements reflected their prior relationship, which originated when Village was a family-owned business, including Warner Bros.' agreement to front and pay the production costs of the films in advance based on Village's commitment to repay its share. *See id*. ¶¶ 4-6, 45. That type of agreement is untenable with a counter-party that views the relationship as entirely transactional—an opportunity to leverage any advantage it has in the underlying agreements. *See generally id*. ¶ 44. Warner Bros. terminated Village's right to co-finance new original motion pictures several years ago after Village was acquired by Vine. *See* Smith Decl. ¶ 5. Village now has only the vestigial ability to co-finance certain sequels of those pictures that it co-financed years ago. *See id*.

20.    Warner Bros. has never directly invited Alcon to co-finance a picture it has produced and has no intention to do so. *See Declaration of Wayne M. Smith in Support of Supplemental Objection*, filed contemporaneously herewith ("Suppl. Smith Decl.") ¶ 7. While Warner Bros. has previously distributed films produced or acquired by Alcon, it has been winding down its relationship with Alcon over the last several years. *See id*. ¶ 6. The parties' relationship was strictly based on an arm's-length distribution contract. *See id*. ¶¶ 6-7. The limited exception with respect to this disengagement is Alcon's acquisition of the Debtors' interests in the Library Assets in these cases, which Warner Bros. objected to but which such objection was ultimately resolved. *See id.* ¶ 9. But that type of relationship is almost entirely transactional, and generally limited to Warner Bros.' collection and remitting of Alcon's share of participation revenues in connection with the Pictures, including audit rights. *See id.* That type of a relationship is also fundamentally different than film co-financing, which requires a high degree of trust and cooperation. *See id*. In the process of the parties' disengagement before these bankruptcy cases

were even filed, Alcon has taken a series of increasingly aggressive positions, attempting to assert

rights it does not have under the parties' agreements.  *See id.* ¶ 8.  Among other things, Alcon has

███████████████████████████████████████████████████████████

██████████     *See id.* ¶ 30.  At the end of last year, the parties' relationship reached the breaking

point.

**C.    Alcon Commences a Lawsuit Against Warner Bros. and Third Parties in an Unrelated Matter as the Parties' Relationship Deteriorated, and Other Disputes Emerge.**

21.    On October 21, 2024, Alcon filed a complaint against Tesla, Inc. ("Tesla"), Elon

Musk ("Musk"), and Warner Bros. Discovery, alleging claims for direct, vicarious, and

contributory copyright infringement and false endorsement under the Lanham Act, later amended

the complaint on February 13, 2025.  *See id.* ¶¶ 12, 14; *see also* App'x, Exs. 30, 33  (Alcon

Amended Complaint).  The Alcon Lawsuit is premised on an October 10, 2024, Tesla event to

promote the carmaker's new fully autonomous cybercab and, took place on Warner Bros.'

Burbank, California studio lot.  *See id.*, Ex. 33  (Alcon Amended Complaint), ¶ 3.  The Alcon

Amended Complaint alleged that when Alcon denied permission to use an image from Alcon's

*Blade Runner 2049* motion picture for the event, Tesla and Musk "used an admittedly AI-generated

image to do it all anyway" and "[Warner Bros.] facilitated or ratified the bad conduct."  *Id.*

22.    The Alcon Amended Complaint made a number of inflammatory allegations

against Warner Bros.  Among other things, it  (i) wrongly accused Warner Bros. of bad faith and

malice, *see, e.g.*, *id.* ¶ 7, (ii) falsely represented that Warner Bros. knew of Alcon's concerns over

Musk and Tesla's use of the *Blade Runner 2049* image and did nothing to stop it, *see id.* ¶ 96, (iii)

asserted Warner Bros.' actions were disingenuous, *see, e.g.*, *id.* ¶ 89, (iv) averred that Warner

Bros.' management was somehow "controversial" in the industry, *see id.* ¶¶ 3, 89, and (v) alleged

that Warner Bros. had an incentive to permit the alleged infringement and that it encouraged or

knowingly allowed Tesla and Musk's actions, *see, e.g.*, *id.* ¶¶ 147-148.  Alcon also asserted that Warner Bros. supposed misconduct was orchestrated at the highest levels by its senior executives.  *See* Alcon Lawsuit, Dkt. No. 37,  ¶ 34.

23.    On March 6, 2025, Warner Bros. filed a motion to dismiss the Alcon Amended Complaint as against it.  *See* Alcon Lawsuit, Dkt. Nos. 48-49.  On April 7, 2025, the District Court granted that motion, with leave to amend.  *See* Suppl. Smith Decl. ¶¶ 18, 21; *see also* App'x, Ex. 35 (Alcon Lawsuit Minute Order on MTDs).  In its dismissal ruling, the District Court found that Alcon had been unable to allege any fact suggesting that Warner Bros. engaged in any conduct that would justify a claim against it.  *See id.,* Ex. 34 (Alcon Lawsuit Tentative Ruling), p. 20 ("There is nothing ***factual*** (or that the Court must credit as true) that Warner [Bros.] played any selection-role beyond that failure. . ." and "[a]s a result, unless it indicates it has something more to add that, for some good reason, it has not already notified the Court about by way of its Opposition brief, the Court is inclined to conclude that Plaintiff's claim for direct copyright infringement against Warner [Bros.] must be dismissed . . . ."); *see also id.*, p. 25 ("Plaintiff simply asserts – without citation to any facts supporting the assertion, making it an improper/insufficient information-and-belief allegation – that Warner [Bros.] 'blessed Musk and Tesla to incorporate BR2049 in the event anyway, and/or failed to take meaningful action to stop them, although such action was available,' leaving Musk to feel 'empowered' to use BR2049 anyway.").  Even the Alcon Amended Complaint's inadequate allegations were made merely on information and belief.  *See* App'x, Ex. 33 (Alcon Amended Complaint), ¶¶ 85, 91, 93, 105.

24.    Alcon knew better than to file that lawsuit.  Indeed, it was Warner Bros. that alerted Alcon, before the Tesla event, to the salient issues and documented for Alcon which permissions were being granted and which were not.  *See* Suppl. Smith Decl. ¶¶ 10-11, 13; *see also id.,* App'x,

Exs. 28-29 (October 10 Emails).  These plain writings show that its legal claims were baseless, and its information-and-belief allegations were untrue, salacious, and irresponsible—did not stop Alcon from either filing the Alcon Lawsuit or publicly promoting it.

25.    What is more, on June 16, 2025 (which was also two days before the Library Asset sale hearing in these cases), Alcon filed a *Second Amended Complaint* asserting the same three claims for copyright infringement that it raised in its prior complaints against Tesla, Musk, and Warner Bros. (asserting a fourth Lanham Act claim, this time only as against Musk and Tesla). *See* Suppl. Smith Decl. ¶ 22. Through its Second Amended Complaint, Alcon continued to assert a false narrative that Warner Bros. wrongly "spen[t] time on the 'clip license' plan rather than immediately informing Alcon of Musk and Tesla's specific expression of interest in using protected elements of BR2049 for  the Event," even though Warner Bros. had no obligation to do so.  *Id*., App'x, Ex. 36 (Alcon Second Amended Complaint) ¶ 66. Alcon made this assertion despite ***now admitting*** that Warner Bros.' "shared services licensing department told Tesla that Warner Bros. was now—very close to the scheduled start of the Event—not going to be able to license the Exhibit A image to Tesla for Musk's keynote speech as planned." *Id*. ¶ 72. Alcon also went on to contend that Warner Bros. "intentionally or negligently failed actively to police Musk and Tesla's conduct during the Event," again without providing a basis that Warner Bros. had the legal obligation to do so, and also acknowledging that, whether Warner Bros. did so, "is still not entirely clear to Alcon." *Id.* ¶¶ 90, 97.  On July 30, 2025, Warner Bros., alongside Tesla and Musk, moved to dismiss the Second Amended Complaint. Suppl. Smith Decl. ¶ 23.  On September 11, 2025, the District Court once again granted the motions to dismiss the Second Amended Complaint. *Id.* ¶ 27.  In its tentative ruling on the second motions to dismiss, the District Court emphasized that Alcon's pure "information and belief" allegations against Warner Bros. were "unhelpful," and later

directed Alcon to limit its next amended complaint to 20 pages. *Id.* ¶¶ 26; *see also* App'x, Ex. 40 n.5, p. 7. On October 2, 2025, Alcon filed a *Third Amended Complaint* against Warner Bros., asserting a contributory copyright claim against it, and against Musk and Tesla for direct copyright infringement. Suppl. Smith Decl. ¶ 28; *see also* App'x, Ex. 42. Like its three prior complaints, Alcon once again showed little regard for the actual facts, much less any consideration for the relationship it claims to desire with Warner Bros. as a film production partner, proceeding to plead all manner of false theories against Warner Bros. and its parent company "on information and belief" or under various "alternative theor[ies]." App'x, Ex. 42 (Alcon Third Amended Compl.) ¶ 32.

26.     Under these circumstances, Warner Bros. does not want to be required to share sensitive materials like the contents of a movie script (which, if leaked, could harm and undermine the movie's performance), sensitive casting information (including compensation of directors and actors), or distribution and marketing plans (which constitute sensitive commercial information, given the intense competition in the industry for release dates and access to audiences). *See* Suppl. Smith Decl. ¶ 51; *see also* Smith Decl. ¶¶ 18, 27, 45. Warner Bros. also does not want to be forced to place Alcon's logo in proximity to the Warner Bros. logo, suggesting to the public a close partnership in the opening credits of its films and on advertising materials. Suppl. Smith Decl. ¶ 9. Nor does Waner Bros. want to be compelled to appear jointly at events like premieres and other promotions given the accusations and insults in the baseless Alcon Lawsuit. *See id.* ¶¶ 15, 19, 26. Even Alcon concedes that "significant friction ha[s] developed in the [Warner Bros.]-Alcon relationship." App'x, Ex. 42 (Alcon Third Amended Compl.) ¶ 32.

27.     Alcon's conduct raises many other concerns, which are noted in the accompanying Supplemental Smith Declaration. These include two other recent disputes between Warner Bros.

and Alcon regarding ███████ and ████████████████████ Suppl. Smith Decl. ¶¶ 29-30.   Suffice it to say, this is not a business relationship that should be forced, and Warner Bros. long ago and repeatedly negotiated for protections against such a compelled relationship (with anti-assignment provisions), as permitted by law.  *See*, e.g., Smith Decl., ¶¶ 16-22.

**D.**    **Village Seeks to Sell the Derivative Rights to Alcon Notwithstanding Warner Bros.' Initial Back-up Bid and the Debtors' Inability to Assume and Assign the Derivative Rights Agreements to a Non-Warner Bros. Third Party.**

28.    On May 22, 2025, the Debtors filed the Library Notice, designating Alcon as the Successful Bidder for the Library Assets.  *See* Library Notice.  Following an auction on May 28, 2025 (the "Auction"), in which Warner Bros. submitted an initial bid $17.5 million bid for the Derivative Rights, the Debtors designated Alcon as the Successful Bidder for the Derivative Rights for $18.5 million and the Studio Business for $4.25 million (plus assumption of certain liabilities).  *See* DR Notice at 1-2.  The Debtors also designated Warner Bros. as the Back-Up Bidder for the Derivative Rights for $17.5 million.  *See id.*

29.    On June 5, 2025, Regency Entertainment (USA), Inc. ("Regency") filed an objection to the Sale Motion in connection with the Debtors' proposed sale of the Derivative Rights to the motion picture *Don't Say a Word*, as governed by the Co-Ownership Agreement by and among Regency and Village for such picture (the "Regency Objection").  *See* Dkt. Nos. 481-83. For its part, Regency objects to the Sale Motion on the bases that the Regency Co-Ownership Agreement is an unassignable personal service contract, and accordingly, any assignment of it requires the assignee to be bound by the terms of the Regency Co-Ownership Agreement, and that such sale without Regency's express written consent would result in a breach of the Regency Co-Ownership Agreement entitling Regency to injunctive relief and specific enforcement. *See* Regency Objection pp. 3-4.

30.    On June 13, 2025, Warner Bros. filed its Omnibus Objection to the Debtors'

proposed sales of the Library Assets, Studio Business, and the Derivative Rights. Among other things, the Omnibus Objection explains why the Derivative Rights Agreements cannot be assumed and assigned to Alcon in connection with the Derivative Rights sale. This includes, *inter alia*, that (1) the Derivative Rights Agreements are financial accommodations that cannot be assumed and assigned to Alcon under section 365(c)(2) of the Bankruptcy Code, (2) the Derivative Rights Agreements contain Warner Bros.' exclusive intellectual property rights and otherwise constitute personal service-type agreements that cannot be assumed and assigned absent Warner Bros.' consent, and (3) Alcon cannot provide adequate assurance of future performance in light of the personal nature of those agreements. *See* Omnibus Obj. ¶¶ 6-7, 33-63.

31.    On June 16, 2025, the Debtors filed the *Debtors' Reply in Support of the Sale of the Library Assets to the Successful Bidder and in Response to Warner Bros.' Objection* [Dkt. No. 525] (Filed Under Seal), [Dkt. No. 533] (Redacted Version) (the "Reply") and declaration in support thereof [Dkt. No. 527] (Filed Under Seal) ("Rosenberg Decl."). Through their Reply, the Debtors addressed Warner Bros.' objections to the proposed Library Asset sale, but also raised certain arguments in support of their proposed sale of Derivative Rights while reserving the balance of their arguments for a later reply. *See* Reply ¶¶ 2-7; *see id.* n. 6.

32.    That same day, Alcon filed *Alcon Media Group, LLC's (I) Joinder to the Debtors' Response to Warner Bros. Entertainment Inc.'s Objection to Entry of the Derivative Rights Sale Order and (II) Limited Response to Warner Bros. Entertainment Inc.'s Objection* [Dkt. No. 528] (the "Alcon Joinder") without leave from the Court to file its late-filed reply and response. The Alcon Joinder, including its arguments on adequate assurance of future performance, appears cabined to Warner Bros.' objections to the Library Asset sale.

33.    On June 20, 2025, following Warner Bros.' negotiations with the Debtors and

Alcon to resolve its objections to the Library Asset sale, the Court entered the *Order (I) Approving the Sale of Library Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith and (III) Granting Related Relief* [Dkt. No. 562] (the "<u>Library Sale Order</u>").  Among other things, the Library Sale Order unambiguously provides that the Order does not "convey or alter in any way any Derivative Rights (as defined in the APA) related to any Warner Bros. Motion Picture, or authorize the assumption of any contract with Warner Bros. to the extent that such contract conveys any Derivative Rights." *Id.* ¶ 37(a)(vii).

**E.     The Court Declines to Bifurcate the Derivative Rights Sale Hearing, and the Parties Stipulate to an Agreed Scheduling Order.**

34.     On August 22, 2025, the Court held a status conference following Warner Bros.' request that the Court bifurcate the sale hearing on the Derivative Rights to first determine whether Warner Bros.—instead of Alcon—submitted the highest and best bid for the Derivative Rights. *See* Dkt Nos. 729-30. Though the Court ultimately denied Warner Bros.' request for bifurcation, Debtors' counsel stated during that hearing that the Debtors would "be more than happy" to welcome a higher bid. *See* Aug. 22, 2025 Hr'g Trans. [12:3-4], App'x, Ex. 6. Debtors' counsel further stated that the Debtors "would have an obligation to consider such bid." *Id.* at [12:4-5].

35.     On September 2, 2025, the Court entered the *Agreed Scheduling Order For the Pending Contested Matter Regarding the Sale of the Debtors' Derivative Rights Assets* [Dkt. No. 800] (the "<u>Scheduling Order</u>").

36.     Importantly, paragraph 4 of the Scheduling Order provides, that the Debtors' proposed sale of Derivative Rights to Alcon "includes and is subject to the Debtors' proposed assumption and assignment of . . . the Derivative Rights Agreements," and that "[t]he Debtors shall not seek rejection of any Derivative Rights Agreements in connection with the Sale Hearing on

the Derivative Rights." Scheduling Order ¶ 4. Accordingly, Warner Bros. reserves all rights in connection therewith.

37.    On September 15, 2025, the Debtors filed their form of proposed order in connection with their proposed sale of their interests in the Derivative Rights to Alcon, alongside an unexecuted version of their Derivative Rights APA with Alcon. The Debtors' purported Derivative Rights APA with Alcon is unsigned notwithstanding the requirement that such agreement be executed as set forth in the Scheduling Order. *See* Scheduling Order ¶ 10.

**F.    Warner Bros. Submits a Higher and Better Offer to the Debtors for the Derivative Rights.**

38.    On September 8, 2025, Warner Bros. sent an offer to Debtors' counsel increasing its initial $17.5 million bid (the "Revised Warner Bros. Bid").  Suppl. Smith Decl. ¶ 3; *see also* App'x , Ex. 26. The Revised Warner Bros. Bid offers, among other consideration and subject to Court approval, $18.5 million for the Derivative Rights ***plus*** an additional $10 million reduction to the Warner Bros. Reserve, among other consideration. Suppl. Smith Decl. ¶ 3. Moreover, the Warner Bros. offer would permit the $10 million released from the Warner Bros. Reserve to be used to pay other general unsecured claims. *See id*., App'x, Ex. 26. Most (if not all of these claims) are asserted against the Village holding companies above the Village operating entities that are obligated on the Warner Bros. claims. Warner Bros.' consent, thus, paves the way for distributions to be made to these creditors. Though that Revised Warner Bros. Bid initially expired by its terms on September 16, Warner Bros. informed the Debtors on September 26, 2025, that it renewed the Revised Warner Bros. Bid through the October 20, 2025 Derivative Rights sale hearing, and desired that the Warner Bros. Settlement terms be made public. Suppl. Smith Decl. ¶ 4.

39.    Notwithstanding that the Revised Warner Bros. Bid is the higher and better offer, and Debtors' counsel recently stated that he would "welcome" such an offer, the Debtors have not

accepted the Revised Warner Bros. Bid as the highest and best bid for the Derivative Rights.

**G.    The Debtors Purport to Accept an Opportunity to Co-Finance *Practical Magic 2* Without Seeking Court Approval.**

40.    Even as the Debtors' sale process unfolds, Warner Bros.' operations remain ongoing. Warner Bros. continues to create and produce content, and recently began production for the theatrical motion picture *Practical Magic 2*. Suppl. Smith Decl. ¶ 46. Though Warner Bros. disputes that Village is even entitled to co-finance any Sequel or Remake Project of the 1998 Warner Bros. film, *Practical Magic*, ███████████████████████████████████████ ████████████████████████████████████████████████ (the "PM2 Project Notice"), subject to a full reservation of rights. *Id.* ¶ 46. These reservation of rights include, among other things, that ████████████████████████████████████████████ ████████████████████████████ including its pre-petition fraudulent transfers of the Derivative Rights. App'x, Ex. 55.

41.    Under the terms of the 2017 Omnibus Amendment to the Practical Magic Co-Ownership Agreement, Village had 15 business days to seek to accept the PM2 Project Notice. *See* Smith Decl., Ex. 5. ███████████████ Village purported to accept the PM2 Project Notice ████████████████████████████████████████████████ ████████████████████████████████████ Suppl. Smith Decl. ¶ 47. In doing so, the Debtors ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ Warner Bros. has since learned, through discovery, that ████████████████████████████ ████████████████████████████[19]████████████████████

███████████████████████████████████
[19] *See* App'x, Ex. 62 ALCON000030 ████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████

42.    On September 8, 2025, Warner Bros. sent Debtors' counsel a letter response to Village's purported PM2 Project Notice Acceptance. *Id.* ¶ 48. That response, *inter alia*, ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████   App'x, Ex. 57 (citing 11 U.S.C. §§ 503(b)(1)(A), 507(a)(2); *Reading Co. v. Brown*, 391 U.S. 471 (1968); *see also In re Boy Scouts of America and Delaware BSA, LLC*, No. 20-10343 (LSS) (Bankr. D. Del. Sep. 9, 2022) [ECF No. 10316] at p. 17 (allowing administrative expense under section 503(b) of the Bankruptcy Code, where the movant's underlying briefing asserted the administrative expense claim should be allowed based on the debtors' failure to perform required conditions they agreed to post-petition).  To date, the Debtors have failed to file a motion seeking approval of Village's PM2 Project Notice Acceptance with the Court.

**H.    The Debtors File A Supplemental Notice of Possible Assumption and Assignment of Certain Executory Contracts With Warner Bros.**

43.    On October 3, 2025, the Debtors filed a *Supplemental Notice of Possible Assumption and Assignment of Certain Executory Contracts With Warner Bros.* [Dkt. No. 904] (the "Suppl. Warner Contract Notice"). That notice identifies five additional agreements between

---

*See also* App'x, Ex. 63
████████████████████████████████████████
VREG-WB_004778-80.
████████████████████████ for all of the reasons Warner Bros. stated in
its Omnibus Objection and the additional reasons set forth later herein. Alcon is not a suitable counterparty to acquire
the Debtors' interests in the Derivative Rights.

certain of the Debtors and Warner Bros. in connection with the Debtors' proposed sale process.[20]

None of those agreements were previously identified ████████████████████████████

████████████████

44.    Warner Bros. now files this Supplemental Objection to address the additional

reasons why Alcon is uniquely ill-suited to be the purported buyer of the Derivative Rights and to

raise additional objections to and arguments against the Debtors' proposed sale of Derivative

Rights to Alcon.  *See* Omnibus Obj. n. 3.  As detailed below, the Debtors' proposed sale must be

rejected because (1) Warner Bros.' revised bid is now the higher and better offer; (2) the Debtors,

in any event, are prohibited from assuming and assigning the Derivative Rights Agreements to

Alcon; (3) neither the Debtors nor Alcon can provide Warner Bros. with adequate assurance of

future performance; and (4) the Alcon Derivative Rights APA purports to sell rights in certain

pictures the Debtors do not possess and are not the subject of the Sale Motion, and any obligations

owed in connection with must otherwise be cured.

## III.    ARGUMENT

**A.    Warner Bros.' Revised $18.5 Million Bid (Plus $10 Million Warner Bros. Reserve Release) for the Derivative Rights Is the Higher and Better Offer and Should be Approved Over the Debtors' Proposed Sale to Alcon.**

45.    As an initial matter, the Court need not adjudicate the merits of Warner Bros.'

objections to the Debtors' proposed sale of their interests in the Derivative Rights to Alcon.

Instead, the Court need only review the current competing bids to conclude that the Revised

---

[20] These include agreements referenced as (i) Amendment to QCSA / Co-Ownership Agreements "Training Day Prequel," dated as of February 23, 2021, with respect to a feature length motion picture prequel to "Training Day," (ii) Option and Assignment Agreement, dated as of April 17, 2017, with respect to the project entitled "Deep Blue Sea 2 DTV," (iii) Short Form Option/Purchase Agreement, dated as of March 20, 2023, with respect to the Chinese language motion picture tentatively called "Undercover Netcaster" based on "Miss Congeniality, (iv) Acknowledgement and Consent, dated as of June 19, 2019, with respect to the project entitled "Happy Feet Chi Distribution Agreement, dated as of November 17, 2015, with respect to the film entitled "Zhong Kui: Snow Girl and the Dark Crystal."

Warner Bros. Bid is in the best interests of the Debtors' estates while the Alcon bid is not.  Among these considerations are the sale objections that **only** Warner Bros.—as the Debtors' primary contract-counterparty in connection with this sale—has the ability to raise, which bar closing of any sale absent Warner Bros.' consent.[21]   Ultimately, however, the Court need only evaluate whether the **_Revised_** Warner Bros. Bid of upward of **_$28.5 million_** in additional consideration is plainly superior to Alcon's **_$18.5 million_** bid to determine that the Debtors' have not exercised their reasonable business judgment in selecting and standing by Alcon as the Successful Bidder. *See* App'x, Ex. 26; *see also* DR Notice. Given this overwhelming disparity in Warner Bros.' favor, the Sale Motion to Alcon should be denied, and the Revised Warner Bros. Bid should be approved.

46.    While it is well-established in bankruptcy that a trustee's business judgment enjoys "great judicial deference," that deference is not without limits.  *In re Bakalis*, 220 B.R. 525, 532 (Bankr. E.D.N.Y. 1998); *see also In re Mt. States Rosen, LLC*, 619 B.R. 750, 754 (Bankr. D. Wyo. 2020) ("Regardless of a debtor's discretion, debtors, in conducting the sale process, have a fiduciary duty to maximize the value of their estates."). Courts often consider whether a debtor's proposed purchaser has offered the highest and best price for the assets in determining whether the business judgment standard has been satisfied, and whether to approve a section 363(b) sale.  *See, e.g.*, *In re GPX Int'l Tire Corp.*, No. 09-20170-JNF, 2009 Bankr. LEXIS 5410, at *1 (Bankr. D. Mass. Dec. 15, 2009) (debtor had articulated good, sufficient, and sound business justification for the sale pursuant to 11 U.S.C. § 363(b) prior to, and outside of, a plan in that, among other things, the debtor had made a diligent and good-faith effort to market the facilities and solicit alternative

---

[21] Warner Bros. lodged these initial arguments at the bifurcation status conference, which the Court declined to determine until the Derivative Rights Sale hearing. Warner Bros. submits this issue is now ripe for the Court's determination in connection with the Derivative Rights Sale hearing, particularly given the change in facts and circumstances since that time as Warner Bros. subsequently highlights.

offers in accordance with the Bidding Procedures Orders, **and no other party had offered better terms**); *see also In re Adams Res. Expl. Corp.*, No. 17-10866 (KG), 2017 Bankr. LEXIS 4017, at *7 (Bankr. D. Del. Aug. 10, 2017) ("The bid submitted by the Purchaser is the highest and best offer received by the Debtor for the [assets] . . . .").

47.     Where, as here, a chapter 11 case has all the hallmarks of a liquidating chapter 11, the "principle [*sic*] underlying rationale, *i.e.*, that a DIP is entitled to some free reign [*sic*] in fulfilling its perceived mission of aiding the economy (and, ironically, the job market) by keeping an ongoing business afloat, is lacking . . . ." *In re After Six*, 154 B.R. 876, 882-83 (Bankr. E.D. Pa. 1993). Rather, as is true in chapter 7 liquidations, which should be the standard imposed here, a debtor maintains a duty to maximize the value obtained from a sale. *See In re Mondie Forge, Inc.*, 148 B.R. 499, 502 (Bankr. N.D. Ohio 1992) ("The trustee has a duty to realize the maximum return for the estate for further distribution to the Debtor's creditors."); *DiMarco v. Flannery (In re Flannery)*, 11 B.R. 974, 977 (Bankr. E.D. Pa. 1981) ("In a liquidation case,  the sale to the highest bidder is legally essential . . . .").[22]

48.     Here, however, the Debtors continue to champion Alcon as the Successful Bidder

---

[22] Courts otherwise consider:

> A non-exhaustive list of list of factors to consider in determining if there is a sound business purpose for the sale include: the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the likelihood that a plan of reorganization will be proposed and confirmed in the near future; the effect of the proposed disposition of the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value.

*In re Dura Auto. Sys.*, No. 06-11202 (KJC),, at *258-59 (Bankr. D. Del. Aug. 15, 2007).

> Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, **that the sale price is fair and reasonable and that the proposed purchaser is proceeding in good faith**.

*Id*. (emphasis added). Here, the Debtors' proposed sale to Alcon for $18.5 million is not a fair and reasonable price in light of Warner Bros.' higher and better Revised Warner Bros. Bid.

despite the mandates of the Bid Procedures Order, the Debtors' obligations under the Bankruptcy Code, and their recent averments to the Court that they would "welcome" a higher bid. *See supra* ¶ 34. To be clear, Alcon's "Successful Bid[]" is not (and never was—but most certainly is not now) the highest and best offer for the Debtors' interests in the Derivative Rights. *Cf. In re Adams Res. Expl. Corp.*, at *7. Nor have the Debtors' satisfied their burden of showing that their acceptance of Alcon's bid is in the best interest of the Debtors' estates. *See id.* ("[t]he bid submitted by the Purchaser constitutes the highest or otherwise best offer for the [assets]," and "the APA and the closing of the transactions contemplated thereby will present the best, opportunity for the Debtor to realize the highest value for the [assets]").

49.     The $18.5 million in cash consideration Alcon offered for the Debtors' interests in the Derivative Rights pales in comparison to the collective $28.5 million in additional cash consideration that the Revised Warner Bros.' Bid provides to the estates, along with, *inter alia*, Warner Bros.' release of various valuable claims, including Warner Bros.' Challenge rights of estate claims, and the consensual resolution of the objection by the only other party that is a current Village contract-counterparty to the proposed sale—Regency. The Revised Warner Bros. Bid also includes Warner Bros.' consent to use the released funds from the Warner Bros. Reserve to pay other general unsecured claims, which are asserted at holding companies above the Library Debtors. For these reasons, and the reasons discussed in greater detail in the Omnibus Objection and below, the Revised Warner Bros. Bid is the highest and best bid in connection with the Sale Motion and the sale to Alcon should be rejected.

**B.    Because the Debtors Are Prohibited from Assuming and Assigning the Derivative Rights Agreements to Alcon, the Alcon Sale Cannot Close.**

50.     Regardless of how the Court evaluates the parties' competing bids, the Debtors' proposed sale cannot proceed because the Debtors are not entitled to assume and assign the

Derivative Rights Agreements. As Warner Bros. stated in its Omnibus Objection and repeats here, the Debtors' proposed sale of the Derivative Rights to Alcon fails out the gate because the Derivative Rights Agreements constitute unassignable financial accommodations, and otherwise contain Warner Bros. exclusive intellectual property rights and personal contract rights that cannot be assigned absent Warner Bros.' consent.

> **a.**    ***The financial accommodation provisions of the Derivative Rights Agreements render them unassignable.***

51.    Warner Bros. incorporates by reference all of the arguments in its Omnibus Objection for why the Derivative Rights Agreements constitute financial accommodations that cannot be assigned. Because, the Debtors now agree that any sale to Alcon includes the assumption and assignment (and not rejection) of the Derivative Rights Agreements, the Debtors' inability to assign these contracts for this reason bars approval of that sale. *See* Scheduling Order ¶ 4.

52.    In addition to the cases previously cited in the Omnibus Objection (certain of which Warner Bros. reiterates below), on September 12, 2025, the Ninth Circuit Court of Appeals issued a decision regarding the financial accommodation exception of section 365(c)(2) of the Code. *See Svenhard's Swedish Bakery v. Bakery (In re Svenhard's Swedish Bakery)*, No. 23-60045, 2025 LX 328143, at *1 (9th Cir. Sep. 12, 2025), App'x, Ex. 65. In affirming the bankruptcy court's denial of the debtor's motion to assume and assign a settlement agreement under this exception, the Court determined that the ordinary meaning of "financial accommodations" includes "***more*** than just loans and other debt financing." *Id.* at *14 (emphasis added). Rather, the Court relied on a plain reading of that term to include arrangements for a "***financial favor***" that is something "***supplied for convenience or to satisfy a need***." *Id.* at *10 (emphasis added). Finding the settlement agreement at issue was not a contract where the financial accommodations were merely incidental to it, and because the agreement accepted a schedule of payments and involved the forbearance

and reduction of the amount to which the counterparty would otherwise be entitled to aid the debtor's poor financial condition, the Court ruled it was an unassignable financial accommodation. *Id.* at *11, 13.

53.     The *Svenhard's* decision is consistent with Delaware law and the law of this Circuit. *See e.g. Watts v. Pa. Hous. Fin. Co.*, 876 F.2d 1090, 1095 (3d Cir. 1989) (citation omitted) ("the Code provides explicitly that there is no way that a debtor can assume [a financing] agreement and thus compel its lender to continue to advance funds during reorganization.") (citation omitted); *In re Sportsman's Warehouse, Inc.*, 457 B.R. 372, 392-93 (Bankr. D. Del. 2011) (section 365(c)(2) applies to contracts relating to "the extension of money or credit to accommodate another."); *In re Boscov's, Inc.*, No. 08-11637 (KG), 2008 WL 4975882, at *2 (Bankr. D. Del. Nov. 21, 2008) (holding that section 365(c)(2) did not apply because the creditor had extended credit to Boscov's customers (and not directly to the Debtors) leaving the Debtors with no liability for the debt.); *Chase Manhattan Bank v. Iridium Afr. Corp.*, No. CIV.A. 00-564 JJF, 2004 WL 323178, at *4 (D. Del. Feb. 13, 2004) (internal citations omitted) ("[t]he purpose of [section 365(c)(2)] is to make it clear that a party to a transaction which is based upon the financial strength of a debtor should not be required to extend new credit to the debtor").

54.     Indeed, the Derivative Rights Agreements satisfy any definition of "financial accommodation" under section 365(c)(2).  Under the Derivative Rights Agreements Warner Bros. effectively acts as Village's bank for purposes of financing the Pictures. Warner Bros. covers production and marketing costs for each Warner Bros. theatrical motion picture that Village agreed to co-finance and Warner Bros. produced. That Village is obligated to co-finance its share of the production costs once it accepts a Project Notice in connection with an applicable Warner Bros. motion picture is confirmed by ████████████████████████

██████████████████████ [23] That obligation (and Warner Bros.' financial accommodation to make advances on account of that obligation) is not merely "incidental" to the parties' rights and obligations with respect to derivative works. They instead are the fulcrum of the parties' relationship in connection with the Derivative Rights, Village's failure to abide by which has resulted in fractious yearslong litigation.

55.      What is more, Warner Bros. executed the 2017 Omnibus Amendment at a time when ████████████████████████. That agreement contemplates ongoing obligations for future derivative works pursuant to the terms of the parties' agreements. *Cf. Chase Manhattan Bank*, No. CIV.A. 00-564 JJF, 2004 WL 323178, at *4. As the Ninth Circuit in *Svenhard's* recently highlighted, "the ordinary and common meaning of 'financial accommodations' at the time of enactment included contracts to forebear or reduce payments to which one was otherwise entitled, if those contracts were agreed upon to aid a debtor's poor financial condition." *Svenhard's Swedish Bakery*, No. 23-60045, 2025 LX 328143, at *10. Because the Derivative Rights Agreements commit Warner Bros. to front all production costs in connection with its motion pictures that Village agrees to co-finance under their terms, which aided Village's financial condition, the agreements cannot be assigned.

56.      Also relevant is that Warner Bros. previously defined the Derivative Rights Agreements in these cases to ***include*** the Co-Ownership Agreements, 2017 Omnibus Amendment, and Omnibus Amendment No. 2, related to each picture.[24] But this language is not limiting. The

---

[23] *See* App'x, Ex. 58 (Sept. 30, 2025 Deposition of K. Berg) ████████████████████████████
████████████████████████

[24] *See* Omnibus Obj. n. 6 ("The Derivative Rights Agreements ***include*** all of Warner Bros.' Co-Ownership Agreements with Village for prequels, remakes, and sequels of films, the 2017 Omnibus Amendment (as later defined) and the Omnibus Amendment No. 2 (as later defined). For the avoidance of doubt, references to "Derivative Rights" in this Objection are in specific reference to the Derivative Rights stemming from Warner Bros. and Village agreements— the Derivative Rights Agreements).") (emphasis added). *See id.* ¶ 72 ("As is the case with respect to the Derivative

QCSAs, picture and purchase agreements for films associated therewith, MPRPAs, RPAs, and promissory notes and loan agreements Village executed for certain Pictures (the "<u>Promissory Notes</u>") are integrated with these agreements.

57. The Promissory Notes, in turn, further evidence Village's commitment to repay ███████████████████████████████████████████████████████████████ other payment obligations in connection with certain co-financed pictures. *See* Suppl. Smith Dec. ¶ 44; *see also*, *e.g.,* App'x, Ex. 52 (████████████ Promissory Note) ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████ *see* App'x, Ex. 53 (2010 Loan Agreement). These include Promissory Notes that Village, or entities associated with Village, executed in favor of Warner Bros. that ██████████ ██████████████████████████████████ in connection with the Warner Bros. motion pictures: ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████ Suppl. Smith Decl. ¶ 44.

58. The same financial accommodations are present in all of the other Pictures, whether or not the parties documented them through separate notes. In all cases, Warner Bros. commits to fronting all production costs in connection with the projects Village accepts from the time the picture is "greenlighted" until shortly before the Picture is released, and oftentimes for an even

Rights under the Derivative Rights Agreements, the Library Assets are part of, and constitute, a series of integrated Library Agreements that must be read, interpreted, and enforced together.").

longer period of time. Moreover, Warner Bros. extends other significant financial accommodations

to Village as well, including ████████████████████████████████████████████████████

██████████████ *Id.* ¶ 45.  These are "financial favor[s]" offered "to satisfy [Village's] need,"

for immediate financing once Village takes on the obligation to co-finance a derivative work. And

in all cases, Warner Bros. charges Village interest for this extended financial accommodation, in

recognition of the nature of the financial accommodations. This financing extends *for the years*

while the Pictures are being produced, each one of which may implicate $100,000,000 or more in

total costs. *See id.* ¶ 35.

> **b.  Warner Bros.' exclusive intellectual property interests must be respected, and the sale to Alcon must be denied absent Warner Bros.' consent.**

59.  Warner Bros. once again reiterates that, in the alternative, the Debtors' proposed

sale of their interests in the Derivative Rights to Alcon must be denied in light of Warner Bros.'

consent rights under section 365(c)(1) of the Bankruptcy Code. *See* Omnibus Obj. ¶¶ 50-57. The

Debtors' interests in the Derivative Rights are limited by the Derivative Rights Agreements, which

provide Warner Bros. with exclusive rights, including consent rights.

60.  The Debtors have recently suggested that, notwithstanding that the Derivative

Rights are embodied in, and inextricably intertwined with, the Derivative Rights Agreements that

limit their rights thereunder, the Derivative Rights are distinct assets from the Derivative Rights

Agreements. Reply ¶¶ 2-7. The Debtors do so in order to argue that they may freely transfer their

asserted joint ownership interest in the Derivative Rights notwithstanding Warner Bros.' exclusive

rights under the Derivative Rights Agreements, including Warner Bros.' consent rights. *See, e.g.*,

¶ 5.  But where, as here, the Debtors' interests in the Derivative Rights are a byproduct of the

overarching Assignments of the parties' respective interests in picture rights, including copyright

interests, as limited by their terms, the Derivative Rights are inherently tied to the Derivative

Rights Agreements, and Warner Bros.' consent must be obtained.[25]

61.    The specific language of the Assignments has varied slightly over the years from the Warner Bros.' earlier Qualified Cost Sharing Agreements ("QCSAs") with Village to the parties' Motion Rights Pictures Agreements ("MPRPAs") that were first executed in 2009, and amended and restated over time in 2012, 2014, and 2020.  Suppl. Smith Decl. ¶ 38; *see also* App'x, Exs. 46-47.  Despite this, all of the Assignments include language substantially similar in form to each other insofar as each overarching Assignment of rights in each picture (including the Derivative Rights) from Warner Bros. to either Village (or, in the case of pre-2014 MPRPA pictures that Village co-financed with Warner Bros., to a Warner Bros./Village joint member entity)[26] explicitly provide that such Assignment of rights is made pursuant to the terms of the applicable QCSA or MPRPA, as the case may be.  *See, e.g.*, Suppl. Smith Decl. ¶¶ 37-38, App'x, Ex. 45 (Practical Magic Assignment of Rights from Warner Bros. to WV Films LLC) ¶ 2 ███

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██ (2009 and 2012 MPRPAs) Ex. B, ¶ 2 ████████████████████████████████

████████████████████████████████████████████████████████████████████

█████████████████ *see* Smith Decl., Exs. 2-3 (2014 and 2020 MPRPA) Ex. F ¶ 2.1 ███

████████████████████████████████████████████████████████████████████

██████████████████████

---

[25] *See* App'x, Ex. 58 (Sept. 30, 2025 Deposition of K. Berg) ████████████████████████████████████████
████████████████████

[26] This includes, for example, assignments made by and between (i) Warner Bros. and WV Films IV LLC (a Delaware limited liability company whose members included Warner Bros. and Village), (ii) Warner Bros. and WV Films LLC (a Delaware liability company whose members included Warner Bros. and Village), and assignments made by and between (iii) WV Films IV LLC to WV Film Partners IV L.P., and (iv) WV Films LLC to WV Film Partners L.P.

62.     Each of the QCSAs, and, in turn, MPRPAs (and as later amended), generally provide that the respective Warner Bros. and Village entities are required to execute a Co-Ownership Agreement, substantially in the form affixed to each QCSA or MPRPA, and are otherwise bound by their terms. Suppl. Smith Decl. ¶ 39, App'x, Ex. 48 (1998 QCSA) § 6.4 ██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████ (2009 MPRPA) § 6.4 ██████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████ App'x, Ex. 47 (2012 MPRPA) (same); Smith Decl. Exs. 2, 3 (2014 and 2020 MPRPA) (same as 2009 and 2012 MPRPAs).

63.     The Co-Ownership Agreements themselves cabin and restrict Village's right to exploit or produce derivative works. This was true before the Co-Ownership Agreements were uniformly amended pursuant to the 2017 Omnibus Amendment. *See, e.g.*, Suppl. Smith Decl. ¶ 40, App'x, Ex. 48 (1998 QCSA) Exh. D ¶ 2(a) ██████████████████████████

██████████████████████████████████████████████████████ ¶ 3 █████

██████████████████████████████████████████████████████████████

████████████████████████, ¶ 4(a)-(d) (providing for Warner Bros.' unilateral right to exploit the Derivative Rights, subject to certain co-financing rights provided to Village as set forth therein), ¶ 4(e) ████████████████████████████████████████████

███████████████████████████████████ (emphases added); *see also* Smith Decl., Ex. 4 (Matrix Co-Ownership Agmt.) ¶ 3 ██████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████ (emphasis added). The same was equally true after the parties entered into the 2017 Omnibus Amendment and Omnibus Amendment No. 2, which amended all preceding Co-Ownership Agreements,[27] and once again solidified that only Warner Bros. maintains the unilateral right to exploit the Derivative Rights and that Village's rights in the Derivative Rights are not coequal to Warner Bros.' Smith Decl. Ex. 6 (Omnibus Amendment No. 2) Attach. 1, ¶ 4(f) ██████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████ Ex. 6 at ¶ 2(f)(ii) ███████████████████

████████████████████████████████████████

█████████████████████, Ex. 5 (2017 Omnibus Amendment) attach. 1 ¶ 4(e)

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████ (emphases added).

64.    Moreover, the Assignments to Village of its share of Derivative Rights for pre-2014 MPRPA pictures specifically acknowledge that Village's asserted one-half interest in the Derivative Rights remains subject to contractual restrictions as set forth in the Co-Ownership Agreements. *See, e.g.*, Suppl. Smith Decl. ¶ 41, App'x, Ex. 49 (Practical Magic Assignment of

---

[27] Smith Decl., Ex. 6 (Omnibus Amendment No. 2) at pp. 1-2; *see id*., Ex. 5 (2017 Omnibus Amendment) at K ██████████████████████████████████████████

    *see id.* at Ex. 5 ¶ 4 ████████████████████████████████████████
████████████████████████████████████████
█████

Rights from WV Film Partners L.P. to VRP (BVI) Ltd.) ¶¶ 3.1 ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

3.2 ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ Ex.

50 (The Great Gatsby Assignment of Rights from WV Film Partners IV L.P. to VRP (BVI) Ltd.)

¶¶ 3.1 ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ 3.2 ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ Many (if not all) of the Assignments related to the 2014

MPRPA and later pictures also provide specific language that Warner Bros.' assignment to Village

of its joint share of the Derivative Rights are limited by the Co-Ownership Agreement. *See id*. Ex.

51 (Joker Assignment from Warner Bros. to VRPNA) ¶ 2.2 ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

    65.    All of these terms make clear that (i) the original purported "property" grant, *e.g.*,

the Assignments of the parties' respective rights in each picture, including the Derivative Rights,

by and between Warner Bros. and Village pursuant to the applicable QCSA or MPRPA, are fully

integrated with the Derivative Rights Agreements and (ii) accordingly, any joint Derivative Rights

"ownership" rights Village asserts Warner Bros. conveyed to it were ***always*** subject to the

limitations of the applicable MPRPA/QCSA, Co-Ownership Agreement, and Rights Purchase Agreement ("RPA") or picture and/or purchase agreement for each picture. This matters because contrary to any assertions otherwise, the Debtors **never** owned an unfettered joint interest in the Derivative Rights themselves. *See, e.g.*, Suppl. Smith Decl. App'x, Ex. 45 (Practical Magic Assignment of Rights from Warner Bros. to WV Films LLC) ¶ 2, (2009 and 2012 MPRPAs) Ex. B, ¶ 2; *see* Smith Decl. Exs. 2, 3 (2014 and 2020 MPRPA) Ex. F ¶ 2.1 Instead, Village's interest in the Derivative Rights was always limited by contract and by the initial grant of such rights by Warner Bros. as set forth in the Assignments.

66.    It is for this reason that, as Warner Bros. has previously asserted,  Warner Bros. is the primary copyright owner of the Derivative Rights. *See* Omnibus Obj. ¶ 53; *see also In re Golden Books Family Entm't*, 269 B.R. 300, 310 (Bankr. D. Del. 2001) ("[I]t is clear that these two licenses do not confer exclusive rights to [the debtor]. Both licenses are therefore nonexclusive . . . ."). It is Warner Bros. that has the **exclusive** and **unilateral** right to exploit a derivative work and exercise upon the Derivative Rights.  *See supra*, ¶ 63.  This matters because under applicable copyright law and guiding bankruptcy decisions, holders of nonexclusive intellectual property interests cannot freely transfer such rights absent the counter-party's consent. Omnibus Obj. ¶ 68 (citing cases). Here, the anti-assignment provision of the Derivative Rights Agreements— specifically, Omnibus Amendment No. 2—makes this all the more clear.[28]   While Warner Bros.

███████████████████████████████████████████████████████████████████████████████

Village is instead limited in its ability to transfer or license its interests in the Derivative Rights *only* to ████████████████████████████████████████████████████████████████

---

[28] *See* Smith Decl., Ex. 6 (Omnibus Amendment No. 2 § 2(f)(i) (amending ¶ 2(c) of the Co-Ownership Agreement) (restricting the Debtors ████████████████████████████████████████████████████████████████████████████████████ (emphasis added).

████████████████ *Id.*

67.     As discussed *supra*, the Derivative Rights Agreements include agreements that purport to convey or address the Debtors' interests in the Derivative Rights. While the core of those agreements may have been previously identified to include the Co-Ownership Agreements, as amended, it is the Assignments that provide Warner Bros. and Village, respectively, with the original grant of rights (including Warner Bros.' and Village's respective rights in the Derivative Rights) pursuant to their terms. Because these agreements are fully integrated, and provide Warner Bros. with exclusive rights, the Debtors cannot now use the present sale to Alcon to circumvent the carefully bargained-for consent rights that Warner Bros. and Village previously negotiated. Instead, Warner Bros.' exclusive intellectual property rights under the Derivative Rights Agreements must be protected absent Warner Bros.' consent in accordance with section 365 of the Bankruptcy Code. And because Warner Bros. does not consent, the sale to Alcon must be denied.

### c.     The Derivative Rights Agreements are personal in nature and cannot be assigned absent Warner Bros.' consent.

68.     Section 365(c)(1) also prohibits the Debtors' assumption and assignment of the Derivative Rights Agreements because the contracts are personal to Village as it was previously constituted. The personal-contract exception under section 365(c)(1) applies equally to bar assignments where the contracting party is a corporation. *See In re Planet Hollywood Int'l, Inc.*, 2000 WL 36118317, at *1 (D. Del. Nov. 21, 2000) (unpublished). There, the Delaware District Court explained that "whether a contract is a personal service contract" or a contract "involving relationships of personal confidence and trust" that would bar its assignment absent the counterparty's consent under section 365(c)(1) of the Code and California law "depends upon the nature and circumstances of the contract, its provisions, and the intent of the parties," and "whether the contract involves such qualities as character, reputation, taste, skill or discretion of the party

that is to render performance." *Id*. at \*15, 24-25, 36. *See also EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 380 B.R. 348, 363 (Bankr. D. Del. 2008) (*aff'd*, 382 F. App'x 135 (3d Cir. 2010)) (Under Virginia law, contract was not assignable where the identity of the contracting parties was material to the ongoing performance of the contract, where such materiality existed if the contract "is founded on one of the parties maintaining trust of confidence in the ability to perform, judgment or business experience of the other party.").

69.    As Warner Bros. set forth in its prior objection and supporting declarations, the majority of the Derivative Rights Agreements are the vestiges of Warner Bros.' close personal relationship with Village under its former ownership structure. *See generally* Smith Decl. ¶¶ 4-5. During Warner Bros.' deposition of Kevin Berg, Village's general counsel and Secretary, Mr. Berg ███████████████████████████████████████████████████████████████████████ ████████ [29] To be sure, the very nature of a co-financing arrangement like the one specific to Warner Bros. and Village, as opposed to a more general arms'-length film distribution arrangement (which Warner Bros. has historically shared with Alcon, *see* Suppl. Smith Decl. ¶¶ 6-7) is one that is necessarily dependent on personal confidence and trust. *See* Smith Decl. ¶¶ 43, 45. ████████ ███████████████████████████████████████████████████████████████████████ ████████████████████ [30] This makes sense, given the sensitive information that the parties share when Village commits to co-financing a Warner Bros. derivative work pursuant to the terms of the parties' agreements, including ████████████████████████    *See* Smith Decl. ¶ 18. ████████

---

[29] *See* App'x, Ex. 58 (Sept. 30, 2025 Deposition of K. Berg) ████████████████████████ ███████████████████████████████████████████████

[30] *See* App'x, Ex. 58 (Sept. 30, 2025 Deposition of K. Berg) ████████████████████████ ████████████████████

31

70.     Here, as in *Planet Hollywood* and *EBC I*, the testimony will show that the parties intended the Derivative Rights Agreements to be of a personal nature and the relationship was founded based on trust and confidence. *Cf.* 2000 WL 36118317, at *36; *see also EBC I*, 380 B.R. at 363 ("The AOL-eToys business relationship ***was founded on*** AOL's trust and confidence in eToys' unique attributes, as well as its experience, all of which were relevant to eToys' ability to serve AOL Members and protect their privacy interests as set forth in the 1999 Agreement.") (emphasis added). Indeed, "the very nature and essence" of these agreements "involves the unique skill, character and reputation" of Warner Bros. as well as the reputation and character of Village. *Cf.* 2000 WL 36118317, at *36-37.  This is evidenced by, among other things, the logos and production credits that both Warner Bros. and Village display in tandem in connection with certain co-financed works subject to the terms of the parties' agreements, Smith Decl. ¶ 13, and certain consultation rights that Village maintains. *Id*. ¶ 27.

71.     For these reasons, and the additional reasons why Alcon is an ill-suited counterparty to usurp that role discussed below, the Sale Motion to Alcon must be denied.

## C.     The Debtors and Alcon Cannot Provide Adequate Assurance of Future Performance.

72.     The proposed sale of the Derivative Rights and transfer of the Derivative Rights Agreements to Alcon must also be rejected because neither the Debtors nor Alcon can provide Warner Bros. with adequate assurance of future performance. *See* 11 U.S.C. § 365(b)(1).  Although an assignee's financial performance and industry experience may be cited in support of "adequate assurance of future performance," Third Circuit law is clear that the meaning of "adequate

---

[31] *See* App'x, Ex. 58 (Sept. 30, 2025 Deposition of K. Berg)

assurance of future performance" hinges on "the facts and circumstances of each case." *See* Reply ¶ 35 (citing *In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988)). Such facts and circumstances include a purchaser's ability to maintain a healthy relationship with a primary contract counter-party. *See generally, e.g., In re Texas Health Enters., Inc.*, 246 B.R. 832, 836 (Bankr. E.D. Tex. 2000) (holding that the debtor failed to provide adequate assurance of future performance, emphasizing the parties' historical relationship and the adverse impact of their "poor" relationship on operations under the agreement at issue). That is particularly relevant to the facts and circumstances of this case because based on the facts set forth above, Alcon cannot do so given the status of its relationship with Warner Bros.

73.     Where, as here, the Debtors' interests in the Derivative Rights are tied to the Derivative Rights Agreements, and those agreements contain financial accommodations and consent rights in favor of Warner Bros. that the Debtors cannot assume and assign through a sale to a non-Warner Bros. third party, the Debtors' sale to Alcon must be denied. Indeed, the consents for transferring the Derivative Rights were put in place precisely to avoid the situation here: Requiring Warner Bros. to be forced into an ongoing third-party relationship with an entity other than Village to produce a motion picture in which Warner Bros. is investing and fronting tens if not hundreds of millions of dollars. *See* Suppl. Smith Decl. ¶ 35. And this is especially true when that third-party is one that has recently initiated frivolous litigation against Warner Bros., asserted other bad faith positions that will make any working relationship untenable, and has conceded that the parties' relationship is characterized by "significant friction." *See* Suppl. Smith Decl. ¶¶ 10-30.

74.     Allowing the sale and assignment of the Derivative Rights to Alcon seems destined to ensure that Warner Bros. will be consigned to repeat a disastrous experience like it had with

Village in the *Matrix IV* dispute.  Warner Bros. does not trust Alcon, and it is clear that Alcon does not trust Warner Bros. given the false allegations it recently leveled in pending litigation.  *See id*. ¶¶ 15, 16, 19, 26.   Mutual distrust cannot be the basis of a co-financing arrangement under which Warner Bros. will advance all of the costs of covered films in the expectation of repayment from Alcon years later and with significantly more information about the likely success or failure of the picture.  *See generally id*. ¶¶ 35, 50.

75.    What is more, discovery in this contested matter has raised questions about ██████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████[32]  ████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████[33]  ████████████████████████████████

76.    ████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████  As such, Alcon is unable to

---

[32] *See* App'x, Ex. 63 VREG-WB-004778-80 ██████████████████████

[33] *See supra*, ¶ 14, n.16.

give Warner Bros. sufficient adequate assurance of ▮▮▮▮▮▮ Because the Debtors cannot

provide Warner Bros. with adequate assurance of Alcon's future performance, and the parties have

stipulated and agreed that any sale of the Derivative Rights is tied to the Debtors' proposed

assignment of the Derivative Rights Agreements, the Debtors' proposed sale of the Derivative

Rights to Alcon must be rejected.

**D.      The Debtors' Proposed Derivative Rights APA With Alcon Suffers From Additional Infirmities That Bar Approval of That Sale.**

77.      In addition to all of the incurable legal defects the Debtors' proposed sale to Alcon

raises, the Debtors' proposed APA with Alcon in connection with their sale of the Derivative

Rights contains fatal defects that were only recently disclosed to Warner Bros. Among other

things, the Alcon Derivative Rights APA fails to satisfy the requirements of the Agreed Scheduling

Order[34] and otherwise proposes to (i) sell the Debtors' purported Derivative Rights interests in

three "Purchased ***Unfunded*** Pictures," *i.e.*, *Furiosa: A Mad Max Saga* ("*Furiosa*"), *Joker: Folie à

Deux* ("*Joker 2*"), *The Matrix Resurrections* ("*Matrix IV*")—which were not noticed in connection

with the Sale Motion—without curing the Debtors' obligations thereunder (to the extent such

rights even exist),[35] (ii) sell the Debtors' interests in the Derivative Rights relating to the 1998

Warner Bros. theatrical motion picture *Practical Magic*, without assigning or providing adequate

assurances in connection with the Debtors' recent purported project notice acceptance to co-

---

[34] The Agreed Scheduling Order provides, in relevant part, that the Alcon Derivative Rights APA be ***executed*** and filed by September 15, 2025, along with "***all*** schedules and exhibits with respect to the Derivative Rights Sale." Agreed Scheduling Order ¶ 10 (emphasis added). Notwithstanding that the Alcon Derivative Rights APA on file is unexecuted, the Debtors failed to attach a proposed IP assignment agreement, which otherwise needs to be acceptable to the seller and purported purchaser, and should be disclosed and subject to the review of the parties, including Warner Bros., upon proper notice.

[35] (Emphasis added). Though the Debtors' obligation to cure Warner Bros.' *Matrix IV* arbitration claim is required in order for the sale of the Derivative Rights to be approved, the Library Sale Order provides for the Warner Bros. Reserve in connection with that claim.  *See* Library Sale Order ¶ 37(e). Warner Bros. reserves all rights in connection therewith.

finance the upcoming film, *Practical Magic 2* in connection with that picture (all of Warner Bros.' rights in, and objections to which, must be preserved), (iii) sell the Debtors' interests in the "Purchased Assets" to Alcon, which otherwise must provide adequate assurance of sufficient capital or a guaranty, particularly to the extent that Alcon can designate a buyer designee, (iv) contravene the express language of the Library Sale Order in providing that "Excluded Assets" include any Derivative Rights "separately conveyed to Buyer pursuant to the Lot 1 Purchase Agreement,"[36] and (v) add agreements to the Assumed Contract list notwithstanding the Warner Bros. Assumption and Assignment Procedures as set forth in the Bid Procedures Order, and the Debtors' proposal to sell its interests in the Derivative Rights in the Film Library.[37]

78.     The majority of these terms were added to the Alcon Derivative Rights APA, which were not part of the form Derivative Rights purchase agreement in connection with the Debtors' proposed sale. Nor were they timely provided to Warner Bros. despite Warner Bros.' repeated requests following the Auction and Warner Bros.' entitlement to access such information under the Bid Procedures Order. They also violate Warner Bros.' rights under the Bid Procedures Order and potentially expose the estate (and Alcon) to damages in the form of cure and adequate assurance obligations that dwarf Alcon's $18.5 million purchase price for the Debtors' interests in the Derivative Rights, as set forth below.[38] For these reasons, the proposed sale to Alcon must be denied.

---

[36] Alcon Derivative Rights APA § 2.03.

[37] The Alcon Derivative Rights APA carves out the "Wonka Dispute" and provides that Alcon "will replace Village as the real party in interest in the Wonka Dispute." Alcon DR APA § 6.08. Yet the Debtors' effort to include the "Purchased Unfunded Pictures" and *Practical Magic 2* in their sale to Alcon, as set forth below, raises another problem with that proposed sale.  While the definitions seem to preserve Warner Bros. disputes with Village over the potential rights to the *Wonka* franchise, they ignore the fact that Warner Bros. also disputes Village's alleged rights to participate in *Joker 2*, *Furiosa* and *Practical Magic 2*.  Like *Wonka*, those disputes must be preserved.

[38] The below is not an exhaustive list of issues Warner Bros. has with respect to the Alcon Derivative Rights APA and accordingly, reserves all rights.

### a.      The Debtors cannot sell any purported rights in Furiosa or Joker 2.

79.     <u>As an initial matter</u>, **nowhere** in the Sale Motion do the Debtors identify *Matrix IV*, *Furiosa,* or *Joker 2* as pictures in the Debtors' Film Library that are subject to the proposed Derivative Rights sale. Nor do the Debtors identify those Co-Ownership Agreements and associated contracts in the Warner Bros. Contract Notice. This makes sense as Village breached its obligations in connection with paying its co-financing share for *Matrix IV*, Warner Bros.' damages for which remain unpaid but reserved for until the Matrix Arbitration concludes. Although Warner Bros. sent Village a Project Notice in connection with *Furiosa* and *Joker 2* that Village purported to accept, Village ultimately did not co-finance those films and lost all rights to do so. Thus, the Debtors have **no rights** in either of those two pictures.

80.     Yet *Furiosa* and *Joker 2*, alongside *Matrix IV*, are ironically defined in the Alcon Derivative Rights APA as "Purchased Unfunded Pictures," presumably because the Debtors have paid Warner Bros. nothing for those already completed films.[39]  As the Court is well aware, *Matrix IV* is the subject of the pending Matrix Arbitration for which the estate was required to establish the $110 million Warner Bros. Reserve to pay the unfunded amount.  But the other two "[] Unfunded Pictures" were films for which Warner Bros. contested the Debtors' right to co-finance under the parties' agreements due to pending defaults.  The Debtors have no rights to *Furiosa* or *Joker 2*, which are otherwise not properly identified as subject to this sale, and cannot be assigned without Warner Bros.' consent.

81.     But even if the Debtors had any rights in connection with *Furiosa* and *Joker 2*, and

---

[39] In addition, in the Debtors' proposed form purchase agreement for the Derivative Rights sale, the "Purchased Unfunded Pictures" were listed as ███████████████████████████████████████████████ *See* App'x Ex. 64, (Redline of form Derivative Rights Purchase Agreement & Alcon Derivative Rights APA), pp. 4, 5, and § 2.01. The Alcon Derivative Rights APA deviates from this form ███████████████████, which results in current claims by Warner Bros. that must be protected.

to the extent the Debtors propose to sell their rights in the "Purchased Unfunded Pictures," (which Warner Bros. disputes Debtors can do), the Debtors would have to first cure their defaults in connection with their obligations for those films—an estimated ███████—before any such rights could be purchased or assigned. Suppl. Smith Decl. ¶ 52.  *See Stanley Jacobs Prod., Ltd. v. 9472541 Can. Inc. (In re Thane Int'l, Inc.)*, 586 B.R. 540, 546 (Bankr. D. Del. 2018) ("Assumption requires the trustee to cure all defaults or to provide 'adequate assurance' that such defaults will be promptly cured.").  That is, the presently unfunded amount would need to be reserved for in full (as was the case for *Matrix IV*) if the Derivative Rights to those pictures are to be sold over Warner Bros.' objections.  Such cure and adequate assurance payment exceeds the entire value of the Debtors' estates.

> **b.      The Debtors' Purported Project Notice Acceptance for Practical Magic 2 is Invalid, and Cannot be Approved.**

82.      On ███████████ the Debtors' purported to accept Warner Bros.' ████████ ████ PM2 Project Notice (which remained at all times subject to Warner Bros.' broad reservation of rights) in connection with the upcoming film, *Practical Magic 2*. Suppl. Smith Decl. ¶¶ 46-47. In that letter, the Debtors indicated that they ████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████. Suppl. Smith Decl. ¶ 47, App'x, Ex. 56.  Notably, however, the Debtors have neither sought nor obtained separate Court approval for their proposed outside-the-ordinary-course proposal to co-finance *Practical Magic 2*. *See* 11 U.S.C. § 363(b) (requiring "notice and hearing" before a debtor may engage in transactions outside of the ordinary course of business).

83.      More importantly, the Purported Project Notice Acceptance is facially invalid. Nowhere do the Derivative Rights Agreements permit Village ████████████████████

██████████  *See* App'x, Ex. 57; Smith Decl. Ex. 5.  This is particularly the case where, as here,

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████  What is more, that Village entity did not do so timely. Indeed, given the Debtors'

failure to ***timely*** seek Court approval of its Purported Project Notice Acceptance in the 15 business

day window provided under the applicable Derivative Rights Agreements, no rights, including

Derivative Rights, in *Practical Magic 2* can be transferred in connection with the Debtors'

proposed sale. *See also* App'x, Ex. 57.  *See generally Moody v. Amoco Oil Co.*, 734 F.2d 1200,

1213 (7th Cir. 1984) ("The automatic stay does not toll the mere running of time under a contract

. . . [and] does not give a debtor greater rights in a contract.").

84.    Further, the Derivative Rights Agreements do not permit a  ██████████

██████████████████  Suppl. Smith Decl., App'x, Ex. 57. Thus, the Debtors' efforts

to do so here must be rejected. Under applicable California law, a party's conditional acceptance

of an offer constitutes a counteroffer.  *See Ajir v. Exxon Corp.*, 855 F. Supp. 294, 298 (N.D. Cal.

1994) ("A conditional 'acceptance' is a rejection and counter-offer which the offeror can then

accept or reject."); *see also Kambiz Ajir v. Exxon Corp.*, Nos. 97-17032, 97-17134, 1999 U.S. App.

LEXIS 11046, at *30 (9th Cir. May 26, 1999) (citing California Civil Code § 1585) (same).  For

this additional reason, the Purported Project Notice Acceptance is invalid, and to the extent it

constitutes a counteroffer, is rejected, and should not be approved in connection with the Sale

Motion.

85.    To be sure, the effect of a  ██████████████████  of a Project Notice would render

Village's performance optional. This was made clear in Warner Bros.' arbitration proceeding with

Village over Village's failure to co-finance the *Matrix IV* motion picture. *See* Smith Decl., Ex. 25

(Appeal Panel's Interim Decision and Award) at 17 █████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ ; *see also* App'x, Ex. 58

(Sept. 30, 2025 Deposition of K. Berg) [91:9-13]. Indeed, as Village, the Court, and parties-in-

interest are well aware, after contractually committing itself to co-financing *Matrix IV*, Village

defaulted by ████████████████████████████████ and then failing to pay its $100

million+ co-financing share. After Warner Bros. initiated arbitration proceedings against Village,

Village ██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████ Pursuing these sorts of arguments has cost Village almost $20

million in legal fees, to no end other than contributing to the demise and bankruptcy of what was

once a venerable company.

86.     Despite this, Warner Bros. has learned through discovery that ██████████████

████████████████████████████████████████[40]████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

███████████████████████████.[41] Because, however, the Debtors did not timely accept the

PM2 Project Notice and have failed to seek Court approval blessing that transaction, no sale of the

Debtors' interests in the Derivative Rights to Alcon can be approved to the extent that sale purports

---

[40] *See* App'x, Ex. 63 VREG-WB-004778-80 █████████████████████████████

[41] *See supra*, ¶ 14, n. 16.

to include and approve of the Debtors' purported PM2 Project Notice Acceptance and assign those rights to Alcon.[42]

### c. *Additional issues prevent approval of the Sale Motion to Alcon.*

87.     Alcon seeks to acquire all right, title, and interest in the "Purchased Assets." Though Alcon cannot provide adequate assurance of future performance to Warner Bros. for the reasons set forth above, any buyer designee—to the extent permitted—would need to provide adequate assurance of future performance, including a guaranty, solely in the event the Court overrules Warner Bros.' arguments in connection with the Debtors' proposed sale.

88.     In addition, various provisions of the Alcon Derivative Rights APA contravene (a) the express language of the Library Sale Order (*see, e.g.*, § 2.03), or (b) this Court's prior orders (including but not limited to the Bid Procedures Order). This Court's prior orders must be respected, and any sale order regarding the Derivative Rights notwithstanding Warner Bros.' objections must ensure the Court's prior language reserving for Warner Bros.' Assumption and Assignment Procedures and protection of its property interests is not disturbed. For instance, the Debtors seek to include several "Assumed Contracts" that were only just identified on the Suppl. Warner Contract Notice. *See* App'x, Ex. 64 (Redline of Alcon Derivative Rights APA), Annex II ¶¶ 93-96 (listing agreements for purported agreements in connection with "Training Day Prequel," "Deep Blue Sea 2," "Undercover Netcaster," "Happy Feet China" and "Zhong Kui: Snow Girl and the Dark Crystal"). Warner Bros. reserves all rights in connection with these agreements pursuant to the Warner Bros. Assumption and Assignment Procedures as set forth in the Bid Procedures Order, and objects to their assignment to the extent any relate to films or projects that are not part

---

[42] As discussed, *supra*, Warner Bros. reserves all rights that the Debtors' flawed project notice acceptance constitutes a post-petition breach that entitles Warner Bros. to an administrative expense claim for damages.

of the Debtors' Derivative Rights interests in the Film Library that are subject to the Sale Motion. Bid Proc. Order ¶ 32.

89.     For all of these reasons, and the additional reasons set forth herein, the Sale Motion as to Alcon must be denied.

**E.     The Value of the Derivative Rights Should be Allocated to the Applicable Library Debtors as the Rightful Owners of the Derivative Rights.**

90.     As the Debtors, the Court, and parties-in-interest have been made well aware, Village transferred and assigned the Derivative Rights to approximately 90 films that it had previously co-financed with Warner Bros. to other Village entities not named in the Matrix Arbitration shortly after Judge Friedman issued his final Matrix Arbitration award. Omnibus Obj. ¶ 22. Those transfers—for a mere, total consideration of $9—were fraudulent and in breach of certain of Warner Bros.' agreements with Village, including Omnibus Amendment No. 2.  *See id.*

91.     On July 18, 2025, Warner Bros. timely filed proofs of claim against certain of the Debtors.[43] In its Proofs of Claim, Warner Bros. reserved any and all rights in connection with the foregoing claims against the Debtor-Derivative Rights transferees. *See* Claim No. 30. In light of Warner Bros.' objections to the Debtors' proposed sale of Derivative Rights to Alcon, and for the reasons and colorable allegations set forth in its Proofs of Claim, Warner Bros. contends that the value of the Derivative Rights should be allocated to VRF, VRFNA and VRPNA (certain Library Debtors and the Derivative Rights transferors, VRF and VRFNA of which are also named defendants in the Matrix Arbitration), as the rightful owners of the Derivative Rights. *See* Smith Decl., Ex. 24. *Miller v. Fallas (In re J & M Sales, Inc.)*, Nos. 18-11801 (JTD), 20-50775, 2021

---

[43] Pursuant to the *Order Approving Stipulation Between Warner Bros. and the Debtors Permitting Warner Bros. to File One or More Consolidated Proofs of Claim Under One Case Number* [Dkt. No. 632], Warner Bros. filed a consolidated proof of claim for procedural purposes and administrative convenience only (the "Proofs of Claim").

Bankr. LEXIS 2268, at *77 (Bankr. D. Del. Aug. 20, 2021) ("Delaware courts have recognized the right of a creditor to bring a direct claim for fraudulent transfer outside the bankruptcy context."). *AstroPower Liquidating Tr. v. Xantrex Tech., Inc. (In re AstroPower Liquidating Tr.)*, 335 B.R. 309, 328 (Bankr. D. Del. 2005) (while "fraudulent transfer actions are derivative in nature; the transferor's creditors are the real parties in interest"). *See also* 11 U.S.C. § 550 ("[T]o the extent that a transfer is avoided under section 544, 545, 547, 548, 549 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from the initial transferee of such transfer . . . .").

92.    The Bid Procedures Order and Library Sale Order preserve Warner Bros.' rights as to allocation of any sale proceeds from the sales of Debtors' assets in these cases. Library Sale Order ¶ 37 ("Warner Bros. reserves all rights concerning (i) the appropriate allocation of any asset sales proceeds as among the Debtors' estates . . . ."); Bid Proc. Order ¶ 11 ("For the avoidance of doubt, the rights of all parties in interest to address (i) the distribution and allocation of proceeds in connection with any Sale(s) . . . are fully reserved."). And to the extent Warner Bros. and/or the Committee seek standing to pursue estate (and not direct) claims for fraudulent transfers, the Committee and Warner Bros. have reserved their rights to pursue such actions. *See Fifth Stipulation With Prepetition Senior Secured Noteholders Extending Committee and Warner Bros. Challenge Rights Pursuant to Final DIP Financing Order* [Dkt. No. 895-1] (extending the Challenge Period with respect to Warner Bros. and the Committee as it relates to the Prepetition Lien and Claim Stipulations by the Debtors in favor of the Prepetition Senior Secured Notes Parties, as defined therein, until October 31, 2025).   Accordingly, the value of the Derivative Rights must be preserved in favor of VRF, VRFNA and VRPNA particularly where, as here, Warner Bros. has potential additional damages in connection with the Debtors' proposed

Derivative Rights sale that must be preserved in favor of Warner Bros. until its claims are paid in full.

## IV.    <u>RESERVATION OF RIGHTS</u>

93.    Warner Bros. expressly reserves all rights to amend and/or supplement this Supplemental Objection, and any arguments advanced herein, at any time prior to, or during, the Court's hearing to consider final approval of the Debtors' proposed sale of Derivative Rights to Alcon or any other non-Warner Bros. third party.

94.    Warner Bros. further reserves all rights, solely to the extent the Debtors later seek to reject any of Warner Bros.' agreements notwithstanding the stipulations in the Scheduling Order, to assert an election under 11 U.S.C. § 365(n), whether as to all or a portion of the Derivative Rights Agreements, on a picture-by-picture basis.

95.    In addition, nothing contained herein is intended to be or shall be deemed a waiver of Warner Bros.' rights under the Bankruptcy Code or any other applicable non-bankruptcy law, including its rights to (a) move to withdraw the reference from this Court; (b) contest the jurisdiction of this Court; (c) contest whether any matter constitutes a core proceeding; (d) contest the entry of final orders or judgments by this Court; or (e) demand arbitration or a trial by jury.

## V.    <u>CONCLUSION</u>

**WHEREFORE**, Warner Bros. respectfully requests that this Court (i) deny the Sale Motion as to the Debtors' proposed sale of the Derivative Rights to Alcon on a final basis, (ii) approve the sale of the Derivative Rights to Warner Bros. instead, and (iii) grant such other and further relief as the Court deems just and proper.

*[Remainder of page intentionally left blank.]*

Dated: October 6, 2025
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Curtis S. Miller*

Curtis S. Miller (No. 4583)
Matthew B. Harvey (No. 5186)
1201 North Market Street, 16th Floor
Wilmington, DE 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: cmiller@morrisnichols.com
        mharvey@morrisnichols.com

*- and –*

**O'MELVENY & MYERS LLP**
Steve Warren (*Admitted pro hac vice*)
400 South Hope Street, Suite 1900
Los Angeles, CA 90071
Telephone: (213) 430-6000
Email: swarren@omm.com

Dan Petrocelli (*Admitted pro hac vice*)
Matt Kline (*Admitted pro hac vice*)
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Telephone: (310) 553-6700
Email: dpetrocelli@omm.com
Email: mkline@omm.com

Scott Drake (*Admitted pro hac vice*)
Emma Jones (*Admitted pro hac vice*)
2801 North Hardwood Street, Suite 1600
Dallas, Texas 75201
Telephone: (972) 360-1900
Email: sdrake@omm.com
Email: eljones@omm.com

*Counsel to Warner Bros. Entertainment Inc., and its Affiliates*