**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>VILLAGE ROADSHOW ENTERTAINMENT<br>GROUP USA INC., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-10475 (TMH)<br><br>(Jointly Administered) |

### SUPPLEMENTAL DECLARATION OF WAYNE M. SMITH IN SUPPORT OF WARNER BROS. ENTERTAINMENT INC.'S SUPPLEMENTAL OBJECTION TO (I) THE DEBTORS' MOTION FOR AN ORDER APPROVING THE SALE OF THE DEBTORS' ASSETS AND (II) THE DEBTORS' ASSUMPTION AND ASSIGNMENT OF CERTAIN WARNER BROS. AGREEMENTS

I, Wayne M. Smith, declare the following pursuant to 28 U.S.C. § 1746:

1.      I am an attorney at law, licensed to practice in the State of California.  I am employed by WarnerMedia Services LLC, a subsidiary of Warner Bros. Discovery, Inc., as Executive Vice President, Legal, Warner Bros. Studios, where I act as the head of legal with oversight over various business units including HBO, Warner Bros. Television, DC Studios and the Warner Bros. Motion Picture Group  (together with Warner Bros. Entertainment Inc. and its affiliates, "Warner Bros.").  I have been employed by Warner Bros. or its predecessors and affiliates in various legal capacities for over 25 years, since January 2000.  Prior to, and briefly overlapping with, my current role, from 2020 through May 2025, I was Head of Legal Affairs for Warner Bros. Motion Picture Group, adding DC Studios in 2022.  In that role, I supervised a group of attorneys and other legal professionals who were responsible for negotiating agreements relating

---

[1] The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343. The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

to the development, production, and financing of feature-length motion pictures developed, financed, produced and distributed by Warner Bros. Since 2020, I have been the attorney at Warner Bros. who has been chiefly responsible for all legal issues regarding Village.[2] During that same period, I have also been involved in a number of legal matters involving Alcon Entertainment (including its affiliates, *e.g.*, Alcon Media Group, LLC, collectively "Alcon"), as explained in more detail below. Prior to my role as Head of Legal Affairs, from 2000 to 2020, I held various roles in the Corporate Legal department of Warner Bros., including supervising the handling of litigation and claims in which Warner Bros. was involved.

2.      I submit this declaration in support of *Warner Bros. Entertainment Inc.'s Supplemental Objection to (I) the Debtors' Motion For an Order Approving the Sale Of the Debtors' Assets and (II) the Debtors' Assumption and Assignment of Certain Warner Bros. Agreements* (the "Supplemental Objection"), filed contemporaneously herewith.[3] Except as otherwise indicated, all facts set forth in this declaration are based on my personal knowledge, my review of the relevant documents, my discussions with the Warner Bros. team and its advisors, and my views based on personal experience and knowledge. I am above 18 years of age, am competent to testify, and, if called as a witness, could and would testify competently to the facts set forth in this declaration on that basis.

## I.      WARNER BROS.' REVISED BID FOR THE DERIVATIVE RIGHTS

3.      Following the Auction on May 28, 2025, it is my understanding that Village

---

[2] "Village" refers to Village Roadshow Pictures North America Inc. ("VRPNA"), Village Roadshow Films North America Inc. ("VRFNA"), Village Roadshow Films (BVI) Limited ("VRF-BVI"), Village Roadshow Distribution USA Inc. ("VRD-USA"), Village Roadshow Distribution (BVI) Ltd. ("VRD-BVI") and/or VREG Wonka IP Global, LLC, as applicable.

[3] Capitalized terms used but not otherwise defined or described in this declaration shall have the meanings ascribed to them in the Supplemental Objection. As set forth in the Appendix filed contemporaneously herewith, the Exhibit numbering herein continues from the Smith Declaration.

designated Warner Bros. as the "Back-Up Bidder" for Debtors' interests in the Derivative Rights pursuant to Warner Bros. initial $17.5 million bid. On September 8, 2025, Warner Bros. sent a confidential offer to Village's counsel (the "Revised Warner Bros. Bid"). The Revised Warner Bros. Bid provides, among other things, "$18.5 million for the Debtors' interests in the Derivative Rights under the same terms as Warner Bros.' designated Back-Up Bid of $17.5 million," in addition to "the Warner Bros. Reserve [] be[ing] reduced by $10 million," subject to additional terms as set forth therein. A true and correct copy of the Revised Warner Bros. Bid is attached to the Appendix filed contemporaneously herewith as **Exhibit 26.**

4.      Although that revised bid expired by its terms on September 16, 2025, Warner Bros. informed Village through a letter sent by Warner Bros.' outside counsel, O'Melveny & Myers, LLP, that the Revised Warner Bros. Bid was extended "through and including the October 20, 2025 hearing on the Debtors' proposal to sell their interests in the Derivative Rights," and that such revised bid would "no longer be treated as confidential." A true and correct copy of the September 26, 2025 Warner Bros. letter is attached to the Appendix filed contemporaneously herewith as **Exhibit 27.**

5.      To date, the Debtors have not selected Warner Bros. as the designated Successful Bidder for the Debtors' interests in the Derivative Rights.

## II.    THE CONNECTION BETWEEN ALCON AND WARNER BROS.

### A.  Overview

6.      Warner Bros. and Alcon had, for many years, a productive and non-combative working relationship.  Beginning in or around 2000, Warner Bros. and Alcon entered into a series of distribution agreements pursuant to which Warner Bros. distributed feature films produced by Alcon, for a limited term, for a fee.  Some of the more notable films distributed by Warner Bros.

under this arrangement, and which Warner Bros. continues to distribute, are *The Blind Side*, *Sisterhood of the Traveling Pants*, and *Blade Runner 2049*. The distribution arrangement between Alcon and Warner Bros. with respect to new projects, however, concluded at the end of 2019, and Alcon has subsequently partnered with other studios for distribution of any new films.

7.      In addition to the limited distribution agreements, Warner Bros. has co-financed one Alcon produced film (*Sisterhood of the Traveling Pants 2*). To my knowledge, Alcon, however, has not directly co-financed any films produced by Warner Bros. Warner Bros. is aware of a transaction pursuant to which I understand Village sold its share of participation revenues in *Wonka* to Alcon on or about December 6, 2023 in exchange for Alcon financing Village's acquisition of a 50% interest in the film. Warner Bros.' only (and limited) involvement in that transaction was its execution of the Wonka Intercreditor Agreement that establishes the priority of Warner Bros.' liens in, among other things, picture rights. Also relevant here, Recitals Section F of the Wonka Intercreditor Agreement provides that, ███████████████████████████

████████████████████████████████████████████████████████████████

██████████████████    Village asked that Warner Bros. consent to Alcon being its direct co-financing partner for *Wonka*, but Warner Bros. refused and remained in contractual privity with Village—not Alcon.

8.      Since 2019, and particularly following the closing of the merger with Discovery Communications in 2022, the Alcon/Warner Bros. relationship has been characterized by increasing disagreements, one of which has resulted in fractious litigation that remains pending. Specifically, since early 2024, Warner Bros. has had three disputes with Alcon, all of which I have been personally involved in, and which illustrate why Warner Bros. views Alcon as an unacceptable candidate to acquire the Derivative Rights and enter into partnership with Warner

Bros., as set forth further below.

9.     In addition, Warner Bros. objected to the Debtors' sale of Library Assets to Alcon in these cases but that objection was subsequently resolved upon the Court's entry of the Library Sale Order. Importantly, the Debtors' sale of Library Assets to Alcon does not present the same types of issues as the Debtors' proposed sale of their interests in the Derivative Rights. Warner Bros.' engagement with Alcon in connection with their now-acquired interests in the Library Assets is generally limited to Warner Bros.' collection and remitting of Alcon's (formerly Village's) share of participation revenues related to the Pictures to Alcon, along with certain audit rights. That type of relationship is more transactional, in contrast to the high degree of trust and cooperation that is required in film co-financing, including under the Derivative Rights Agreements, as discussed my initial Smith Declaration and described further below. Warner Bros.' relationship with Alcon as the purchaser of the Debtors' interests in the Library Assets does not require Warner Bros. to make advances or other accommodations on behalf of Alcon, nor does it grant Alcon with access to extremely confidential information about forthcoming Warner Bros. motion pictures, nor does it require Warner Bros. to work closely with Alcon on marketing and distribution plans for those films, and nor is it a public-facing partnership with shared logo and production credits on tentpole films with budgets in the hundreds of millions of dollars.

**B. The Alcon Disputes**

i. <u>The Alcon Lawsuit</u>

10.     In October 2024, without any prior notice or discussion with Warner Bros., Alcon filed a lawsuit against Warner Bros. relating to Telsa's rental of the Warner Bros. studio lot to stage a October 10, 2024 event regarding self-driving taxis. On October 7, 2024, three days before the event was scheduled to occur, Tesla asked Warner Bros. if it could license a still from the

motion picture *Blade Runner 2049* (the "Still") for what was understood to be a display limited to the event location, *i.e.*, not part of a live broadcast that was planned.  The matter was referred to me internally and I passed it on to Warner Bros.' Clips and Stills Licensing Department.  Warner Bros. only holds domestic (United States and Canada) clips and stills licensing rights in *Blade Runner 2049* and as such, Warner Bros. sent Tesla a proposed still license agreement that limited the use of the Still to the United States and Canada.  On the morning of October 10, 2024, Tesla advised Warner Bros. that it intended to include the *Blade Runner 2049* Still in its live broadcast, which would require worldwide rights.  This was directed to my attention, and at 11:25 a.m. I sent an email to Warner Bros. Event Specialist, Joesci McIntosh, stating:

> I thought that we had made it clear to Tesla that this still could not be part of a broadcast.  We do not have worldwide rights in the film.  Our rights are U.S./Canada only and expire in 2029.  If Tesla intends to broadcast anything containing this still outside the U.S./Canada it needs to obtain a license from Alcon.  Please advise – thanks.

11.     At 11:53 a.m., Ms. McIntosh forwarded my email to David Adametz at Tesla, advising that the image was not approved for worldwide broadcast and that "[i]f Tesla intends to broadcast anything containing this still outside the U.S./Canada it needs additional licensing through another company."  A true and correct copy of this email exchange is attached to the Appendix filed contemporaneously herewith as **Exhibit 28.**  At 12:54 p.m., the Warner Bros. Clips and Stills Licensing Department contacted Jeannette Hill, Executive Vice President, Business and Legal Affairs at Alcon, and asked whether Alcon was willing to license its rights in the Still to Tesla.   At 1:20 p.m., Ms. Hill advised that it did not approve of the use and, as a result, no license was granted to Tesla. A true and correct copy of this email exchange is attached to the Appendix filed contemporaneously herewith as **Exhibit 29**.   At the time, I considered this to be the end of Warner Bros.' involvement in the matter.  But it was not.

6

12.     On the morning of October 21, 2024, I learned from a story published by *The Hollywood Reporter* that Alcon had filed a lawsuit earlier that same day against Warner Bros., Tesla, Inc. ("Tesla"), Elon Musk ("Musk"), alleging, among other things, that after Tesla was unable to license an image from *Blade Runner 2049*, Tesla used AI to generate a "faked" *Blade Runner 2049* image (the "Alcon Complaint"). Although there was no evidence of any Warner Bros. involvement in the "faked" *Blade Runner* 2049 image, the Alcon Complaint nonetheless directly implicated Warner Bros. in its creation, asserting, on "information and belief," factually unsupported claims against Warner Bros. for (1) direct copyright infringement, (2) vicarious copyright infringement, (3) contributory copyright infringement, and (4) false endorsement in violation of 15 U.S.C. § 1125(a)(1)(A) [*i.e.*, the Lanham Act].  Attached to the Appendix filed contemporaneously herewith as **Exhibit 30** is a true and correct copy of the Alcon Complaint.

13.     Late in the afternoon on October 21, 2024, the same day the Alcon Complaint was filed, I sent an email to Alcon COO Scott Parish, with whom I had been in communications with regarding an amendment Alcon had requested to the *Wonka* interparty agreement mentioned above.  That email, which was sent by me in an attempt to engage constructively with Alcon on the issues raised by the numerous false allegations in the Alcon Complaint, stated:

> Hi Scott:
>
> Sorry for the delays on the financing matter.  A complicating factor has now arisen in that I am advised that WBD was named in a lawsuit filed by Alcon today with respect to an event that was held by Tesla on the WB lot on 10/10.  I've attached the complaint, which based on a complete distortion of the facts and unfounded assumptions based on "information and belief," makes the irresponsible and patently false accusation that WBD infringed the copyright in *Blade Runner: 2049* – something that Alcon knows, or at the least should know, is untrue.  I know this to be the case as I was personally involved in the matter.  The actual facts are the [sic] Tesla approached us at the last minute for a still license.  We requested information about the intended use and did not learn until the morning of the event on 10/10 that Tesla wanted to use the still in a live broadcast.  At that point, we advised Tesla (via an email that I wrote) that they would need to get permission

from Alcon since we did not hold sufficient rights for such a license, and provided Tesla with contact information.

Clearly, based on the actual facts, Alcon had no legitimate basis to file a lawsuit against WBD, which is likely why the charging allegations of the complaint predictably and weakly rely on "information and belief."  If it would help resolve the matter I could share with you, under appropriate conditions, my email that was sent to Tesla late in the morning of 10/10 that specifically advised that Tesla would need to obtain rights from Alcon.  Let me know.

A true and correct copy of that October 21, 2024 email communication (excepting its attachment, *i.e.*, the Alcon Complaint, which is already affixed separately hereto) is attached to the Appendix filed contemporaneously herewith as **Exhibit 31.**[4] Mr. Parish never responded to my email.

14.     On February 4, 2025, Warner Bros. (and separately, Tesla and Musk) filed motions to dismiss the Alcon Complaint (the "Initial MTDs"). On February 13, 2025, Alcon filed its opposition brief to those motions to dismiss ("Alcon's Response to Initial MTDs") alongside its *First Amended Complaint* against Tesla, Musk and Warner Bros. (the "Alcon Amended Complaint"), alleging (1) direct copyright infringement, (2) vicarious copyright infringement, (3) contributory copyright infringement, and (4) false affiliation and/or false endorsement in violation of 15 U.S.C. § 1125(a)(1)(A) [*i.e.*, the Lanham Act] related to the same event. Attached to the Appendix filed contemporaneously herewith as **Exhibits 32 and 33** are true and correct copies of Alcon's Response to Initial MTDs and the Alcon Amended Complaint, respectively.

15.     Among other things, Alcon asserted in the Alcon Complaint that Warner Bros. had "conspired" with Tesla and Elon Musk to infringe upon Alcon's copyright in the film.  But, as Alcon itself conceded in the Alcon Complaint, these allegations were not based on any actual information, only Alcon's purported suspicions.  *See* **Exhibit 30** (stating that "[s]ome of what

---

[4] ████████████████████████████████████████████████████████████████

happened among the Defendants is not yet known to Plaintiff, and likely will not be known until and unless Plaintiff is allowed discovery"). Yet that conceded lack of knowledge did not stop Alcon from proceeding to make a series of false and defamatory allegations against Warner Bros, its now would-be co-finance partner, all premised on assertions of "information and belief." The following excerpts, none of which are true, are taken directly from the Alcon Complaint and the Alcon Amended Complaint:

- "Plaintiff is <u>informed and believes</u> [that] . . . [Warner Bros.] had a financial incentive to avoid any claims of breach of contract or adjustment of the contract price, and one way to do that was essentially to allow the fudging (questionable manipulation) of the situation by either suggesting, encouraging, or knowingly allowing Tesla and Musk's generation of and use of the infringing Presentation Slide 2 Image." (Alcon Compl. ¶ 94).

- "Plaintiff is <u>informed and believes</u> and on that basis and subject to the need for discovery alleges that if [Warner Bros.] or its personnel were not Direct Infringers, WBDI's [clip licensing] department was at least being shown image options, including viewing the proposed Presentation Slide 2 Image in advance of the event, and thus knew about the infringement." (Alcon Compl. ¶ 109).

- "Plaintiff is <u>informed and believes</u> and on that basis, and subject to the need for discovery, alleges that [Warner Bros.] induced the infringement by convincing or encouraging the Direct Infringers and Tesla and Musk that Alcon's denial of any BR2049 permissions could be circumvented by generation and use of an AI-generated copy of iconic BR2049 imagery, as Alcon alleges the Presentation Slide 2 Image to be." (Alcon Compl. ¶ 110).

- "Alcon is further <u>informed and believes</u> that the issue was then raised to a very high level within the [Warner Bros.] organization, essentially to the effect that Musk and Tesla were not getting something that they want, and [Warner Bros.] either effectively blessed Musk and Tesla to incorporate BR2049 in the event anyway, and/or failed to take meaningful action to stop them, although such action was available." (Alcon Am. Compl. at ¶ 96).

- "Plaintiff is <u>specifically informed and believes</u> . . . that the issue of whether or not Musk and Tesla should be allowed to use any aspect of the [Blade Runner] 2049 property in the event and whether [Warner Bros.] should do anything to stop them from doing so was raised internally at [Warner Bros.] to a very high level [Warner Bros.] executive, such that [Warner Bros.] was actively aware of the issue, and did nothing to stop it." (Alcon Am. Compl.

¶ 96).

(Emphases added.)

16.     Alcon did not limit its defamatory assertions against Warner Bros. to the Alcon Complaint.  After Warner Bros. filed its Initial MTD on the ground that Alcon's claims against it lacked any basis in fact and could not be overcome by "information and belief" pleadings, Alcon proceeded to double down on its false theories as reflected at pages 5 and 6 of Alcon's Response to Initial MTD:

> Alcon's vicarious copyright infringement liability theory at core is along the lines that Musk and Tesla agreed to enter into an event arrangement with [Warner Bros.] that was highly lucrative for [Warner Bros.], and that, either as a formal term or as an informal back-scratching or customer courtesy, Musk and Tesla expected [Warner Bros.] to throw in some motion picture brand affiliations for their car advertisement, and the one that they wanted most was [*Blade Runner 2049*]; when Alcon told Musk and Tesla 'no way,' [Warner Bros.] did not have the corporate fortitude to stand up fully to Musk and Tesla, given the financial stakes.

The actual facts are that it was Warner Bros., not Alcon, that initially advised Tesla that it was unable to grant the rights that Tesla sought and, similarly, it was Warner Bros. that communicated to Tesla that Alcon was unwilling to grant those rights and therefore the Still could not be licensed. This was the information I had offered to share with Alcon's COO Scott Parish on the same day the complaint was filed, and would have, had he bothered to respond to my email.

17.     On March 6, 2025, Warner Bros., Tesla, and Musk filed motions to dismiss the Alcon Amended Complaint (the "Motions to Dismiss").

18.     On April 4, 2025, the United States District Court for the Central District of California (the "District Court") issued a tentative ruling ("Alcon Lawsuit Initial Tentative Ruling") which granted (1) Warner Bros.' motion with respect to Alcon's first cause of action, (2) both Motions to Dismiss with respect to Alcon's second cause of action, and (3) both Motions to Dismiss with respect to Alcon's fourth cause of action.  In the Alcon Lawsuit Tentative Ruling,

the District Court pointed out, among other things, that "[Alcon] alleges that, after last-minute attempts to secure rights through [Alcon] failed, Warner [Bros.] essentially 'stood by' and did nothing, with [Alcon] asserting that Warner [Bros.] 'either effectively blessed Musk and Tesla to incorporate BR2049 in the event anyway, and/or failed to take meaningful action to stop them, although such action was available,' 'empower[ing]' Musk 'to do it anyway,'" was "made on information and belief," and that "on [that] particular point [Alcon] [did] not have sufficient facts surrounding the allegation to make it in this manner."

19.    As to certain of Alcon's other theories of liability against Warner Bros. in the Alcon Complaint, the District Court noted in the Alcon Lawsuit Initial Tentative Ruling:

> Instead, Plaintiff has alleged here[] that Warner [Bros.] took certain steps in advance of the 'We Robot' event in an attempt to obtain proper clearance of BR2049, but that those efforts failed. Beyond that, Plaintiff simply asserts – without citation to any facts supporting the assertion, making it an improper/insufficient information-and-belief allegation – that Warner [Bros.] 'blessed Musk and Tesla to incorporate BR2049 in the event anyway, and/or failed to take meaningful action to stop them, although such action was available,' leaving Musk to feel 'empowered' to use BR2049 anyway. FAC ¶¶ 96-97, 142. Plaintiff has made no effort to explain what 'such action was available' means factually. *See also id.* ¶ 18 (alleging that Warner [Bros.] 'ultimately failed' 'to keep Musk bounded by well-established rules of the business' 'when it could have'); *id.* ¶ 142 (alleging on information and belief that 'the issue of whether or not Musk and Tesla should be allowed to use any aspect of the BR2049 property in the event and whether [Warner [Bros.]] should do anything to stop them from doing so was raised internally at [Warner Bros.] to a very high level [Warner [Bros.]] executive, such that [Warner [Bros.]] was actively aware of the issue, and did nothing to stop it'). The other allegations on this topic are entirely conclusory, meaning that the Court need not accept them as true. *See id.* ¶ 34 (alleging that the 'We Robot' event 'was actively monitored by, supervised by, and ultimately controlled by and directed by executives at' Warner [Bros.]'); *id.* ¶ 142. Even if the Court were to accept as true Plaintiff's summary assertion that, because of its pre-clearance role/efforts, Warner [Bros.] must have had the right and ability to tell Tesla/Musk that their infringing conduct was not acceptable and could not be part of the presentation, *see id.*, Ninth Circuit authority indicates that being in that position is insufficient for purposes of this element.

These were precisely the infirmities that I had pointed out to Alcon COO Scott Parish in my

11

unanswered email to him on October 21, 2024, the same day Alcon's lawsuit was filed.

20.     In addition, the District Court noted in the Alcon Lawsuit Initial Tentative Ruling

that "[t]o the extent the Court will grant one or both motions, it is unlikely that the Court will do

so with leave to amend and, with respect to the Lanham Act claim, the claim will almost certainly

be dismissed with prejudice."  Attached to the Appendix filed contemporaneously herewith as

**Exhibit 34** is a true and correct copy of the Alcon Lawsuit Tentative Ruling.

21.     On April 7, 2025, the District Court entered a subsequent minute order (the "Alcon

Lawsuit Minute Order"), granting the Motions to Dismiss with leave to amend and giving the

parties 21 days from the date of the Alcon Lawsuit Minute Order to mediate the case.  The District

Court also noted that "if settlement is not reached, the Second Amended Complaint will be filed

21 days after the mediation deadline."  Attached to the Appendix filed contemporaneously

herewith as **Exhibit 35** is a true and correct copy of the Alcon Lawsuit Minute Order.

22.     On June 16, 2025, Alcon filed its *Second Amended Complaint* (the "Alcon Second

Amended Complaint") against Warner Bros., Musk and Tesla related to the same October 10, 2024

Tesla event, alleging claims of (1) direct copyright infringement, (2) vicarious copyright

infringement, and (3) contributory copyright infringement against Tesla, Musk and Warner Bros.,

and alleging its fourth claim for false affiliation and/or false endorsement in violation of 15 U.S.C.

§ 1125(a)(1)(A) [*i.e.*, the Lanham Act], only as against Tesla and Musk. Attached to the Appendix

filed contemporaneously herewith as **Exhibit 36** is a true and correct copy of the Alcon Second

Amended Complaint (without any of its attachments). Through the Alcon Second Amended

Complaint, Alcon continued to assert a false narrative that Warner Bros. wrongly "spen[t] time on

the 'clip license' plan rather than immediately informing Alcon of Musk and Tesla's specific

expression of interest in using protected elements of BR2049 for the Event." Alcon does so despite

admitting that Warner Bros.' "shared services licensing department told Tesla that Warner Bros. was now—very close to the scheduled start of the Event—not going to be able to license the Exhibit A image to Tesla for Musk's keynote speech as planned." Alcon also further contends that, notwithstanding Warner Bros.' aforementioned actions, Warner Bros. "intentionally or negligently failed actively to police Musk and Tesla's conduct during the Event."

23.     On July 30, 2025, Warner Bros., and separately Musk and Tesla, once again moved to dismiss the Alcon Second Amended Complaint (the "Second MTD"). A true and correct copy of Warner Bros.' Second MTD is attached to the Appendix filed contemporaneously herewith as **Exhibit 37.**

24.     On August 21, 2025, Alcon filed is opposition to the Second MTD. A true and correct copy of Alcon's objection to the Second MTD is attached to the Appendix filed contemporaneously herewith as **Exhibit 38.**

25.     On August 28, 2025, Warner Bros., Musk and Tesla filed a reply in support of their Second MTD. A true and correct copy of that reply is attached to the Appendix filed contemporaneously herewith as **Exhibit 39.**

26.     On September 9, 2025, the District Court issued a tentative ruling on the Second MTD (the "Alcon Lawsuit Second Tentative Ruling"). A true and correct copy of the Alcon Lawsuit Second Tentative Ruling is attached to the Appendix filed contemporaneously herewith as **Exhibit 40**. In that ruling, the District Court once again granted Warner Bros.' Second MTD with respect to Alcon's first and third causes of action, with Alcon's Lanham Act claim already having been dropped as against Warner Bros. In doing so, the District Court emphasized the deficiencies in Alcon's "information and belief" allegations as to Warner Bros.:

> None of the "sources" Plaintiff identifies for its "information and belief" allegations about Warner [Bros.]'s right and ability to "police" Tesla's/Musk's alleged

intellectual property violations, *see* SAC ¶¶ 157(a)-157(g), actually have anything to say about Warner [Bros.]'s abilities/power here vis a vis Plaintiff's content. There is no Warner [Bros.] employees or agents. That Warner may have licensed certain of its properties to Tesla, *see id.* ¶¶ 158(c)(i)-158(c)(iv), does not mean that its failure to stop Tesla and/or Musk from inappropriately using Plaintiff's properties was in violation of any Warner [Bros.] right/responsibility to control. As a result, Plaintiff's "information and belief" allegations relating to this topic are little more than educated guesswork. *See id.* ¶¶ 160-185; *see also Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1161 (9th Cir. 2022) ("[A] plaintiff may plead facts on information and belief 'where the belief is based on *factual information* that makes the inference of culpability plausible.'") (emphasis added) (quoting *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017)). To be clear here, Plaintiff has obviously attempted to have "information and belief" allegations carry much of its water in getting across the pleading line in this case. Muddying the waters at this stage by such practice is unnecessary, and certainly unhelpful. . . . . Speculative "information and belief" allegations on this point at this juncture are unnecessary, in that light.

27.    On September 11, 2025, the District Court entered a minute order, granting the Second MTD for the reasons stated in the Alcon Lawsuit Second Tentative Ruling and allowing Alcon leave to amend its complaint no later than October 2, 2025. A true and correct copy of that order is attached to the Appendix filed contemporaneously herewith as **Exhibit 41.** The Alcon Lawsuit Second Tentative Ruling noted Alcon should limit its next complaint to 20 pages.

28.    On October 2, 2025 Alcon filed its *Third Amended Complaint*, attached to the Appendix filed contemporaneously herewith as **Exhibit 42.** In its Third Amended Complaint, Alcon asserts a claim for direct copyright infringement against Tesla and Musk, and a contributory copyright claim against Warner Bros. Like its three prior complaints, Alcon once again showed little regard for the actual facts, much less any consideration for the relationship it claims to desire with Warner Bros. as a film production partner, proceeding to plead all manner of conspiracy theories against Warner Bros. and its parent company "on information and belief" or under various "alternative theor[ies]."  In contrast to these allegations, the Third Amended Complaint does get one fact correct, observing that in the months prior to the October 2024 event, "significant friction

had developed in the WBDI-Alcon relationship." *Id.* ¶ 32.

        ii.  ██████████

29.    In addition to the Alcon Lawsuit, Warner Bros. is engaged in another dispute with

Alcon over ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

A true and correct copy of that January 19, 2024 and February 1, 2024 email exchange between

myself and Alcon's lawyers is attached to the Appendix filed contemporaneously herewith  as

**Exhibit 43.**

        iii.  █████████████████████

30.    ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████    A true and correct copy of the May 29, 2025 email exchange is attached to the Appendix filed contemporaneously herewith as **Exhibit 44.**

## III.    WARNER BROS.' DERIVATIVE RIGHTS AGREEMENTS WITH VILLAGE

31.    For nearly all co-financed pictures between Warner Bros. and Village, the parties also entered into a Co-Ownership Agreement.  The Co-Ownership Agreements set forth the parties' rights to produce, distribute, and otherwise exploit remakes, sequels, prequels, and other derivative works that Warner Bros. may create for the 91 films in the Film Library that Warner Bros. co-financed with Village (the "Derivative Rights").

32.     Over the years, Warner Bros. and Village have amended the Co-Ownership Agreements through certain Omnibus Amendments.  For instance, Warner Bros. and Village entered into an *Omnibus Amendment to Co-Ownership Agreements* as of August 29, 2017 (the "2017 Omnibus Amendment").  As set forth in Recital K thereto, Warner Bros.' and Village's mutually stated intent in entering the 2017 Omnibus Amendment was to "restructure the arrangements for exploiting the Derivative Rights under the various Co-Ownership Agreements so that the treatment of the ownership and exploitation of the Derivative Rights will be the same *for all Pictures*." (Emphasis added).  Attached to the Smith Declaration as **Exhibit 5** is a true and correct copy of the 2017 Omnibus Amendment.

33.     In the event Village timely accepts the offer to co-finance a derivative work, Warner Bros. produces the derivative work and fronts all production costs, paragraph 4(b) of Attachment 1 to the 2017 Omnibus Amendment provides that ███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████ (Emphasis added).

34.     Paragraph 4(d) of Attachment 1 to the 2017 Omnibus Amendment further provides

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ (Emphasis added).

35.     Based on the foregoing, for any derivative works that Warner Bros. develops and intends to exploit and Village agrees to co-finance pursuant to the terms of the parties' agreements, Warner Bros. is responsible for advancing all production costs, including Village's share.  This advancement of production costs commences upon the film being greenlit (assuming Village accepts a Project Notice) and continues until at least shortly before the initial theatrical release date, which may span several years, during which time Warner Bros. is entitled to charge interest. In some instances, this advance funding period may be extended further if Village requires additional time, with extended notes issued as appropriate.  By way of example, the production costs for a single film can exceed $100,000,000, as was the case with *Matrix IV*.

36.     In addition to the Co-Ownership Agreements, as amended by the 2017 Omnibus Amendment and Omnibus Amendment No. 2, by and between Warner Bros. and Village (which constitute at least part of the "Derivative Rights Agreements"), other of Warner Bros.' contracts with Village are relevant to the Debtors' proposed sale of the Derivative Rights to any third party, including Alcon.

37.     Specifically, the Motion Rights Picture Agreements ("MPRPAs") for 2020, 2014, 2012, and 2009 by and between Warner Bros. and Village, contain form Rights Purchase Agreements for each Warner Bros. motion picture, and corresponding form assignments of certain

picture rights from Warner Bros. to Village (or, in the case of pre-2014 MPRPA pictures that Village co-financed with Warner Bros., to certain limited partnership entities), of Village's respective interests therein, including Village's ultimate respective interests in the Derivative Rights (the "Assignments"). The parties' earlier Qualified Cost Sharing Agreements ("QCSAs") also contain form picture agreements and forms of Assignment for each Warner Bros. motion picture.

38.      The specific language of these Assignments have varied slightly over the years. For example, paragraph 2 of the *Assignment* of "All Rights" made by and between Warner Bros. in favor of WV Films LLC dated October 15, 1998 in connection with the motion picture *Practical Magic* (the "Practical Magic Assignment"), provides in part that ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ Paragraph 2 of the form *Assignment* found as Exhibit B to the 2009 and 2012 MPRPAs in turn provides, in relevant part, that ██████████████████████████████████████████████ ████████████████████████████████████████████████

True and correct copies of the Practical Magic Assignment, 2009 MPRPA, and 2012 MPRPA are attached to the Appendix filed contemporaneously herewith as **Exhibits 45, 46, and 47**, respectively. And paragraph 2.1 of the form *Assignment* marked as Exhibit F to the 2014 and 2020 MPRPAs provides, in part, that █████████████████████████████████████ ████████████████████████████

39.      Each of the QCSAs, and MPRPAs, in turn (and as later amended), generally provide that the respective Warner Bros. and Village entities are required to execute a Co-Ownership Agreement, substantially in the form affixed to each QCSA or MPRPA, and are

otherwise bound by their terms. For example, Section 6.4 of that certain *Qualified Cost Sharing Agreement* dated January 15, 1998, by and between WV Films LLC and WV Film Partners, L.P. (the "1998 QCSA"), provides, in relevant part, that ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

.""). A true and correct copy of the 1998 QCSA is attached to the Appendix filed contemporaneously herewith as **Exhibit 48.** Section 6.4 of all of the MPRPAs similarly provide that ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████

40.      Before the Co-Ownership Agreements were amended by the 2017 Omnibus Amendment and the Omnibus Amendment No. 2, in general, the Co-Ownership Agreements similarly restricted Village's right to produce derivative works pursuant to their terms. For example, paragraph 2(a) of Exhibit D to the 1998 QSCA, which is titled the "*Form of Co-Ownership Agreement With Respect to Remakes and Sequels of Warner-Developed Pictures*," provides that ████████████████████████████████████████████████████

██████████████████████████████ and paragraph 3 of that same exhibit provides that ████████████████████████████████████████████████████

████████████████████████████████ (emphases added). Paragraph 4(a)-(d) of that same form Co-Ownership Agreement, titled █████████ generally provides for Warner Bros.' unilateral right to exploit the Derivative Rights, subject to certain co-financing rights provided to Village as set forth therein. For instance, paragraph 4(a) provides in relevant part that, ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Notably, paragraph 4(e) of the form Co-Ownership Agreement to the 1998 QCSA provides that

while ███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████ That

same paragraph further provides that ████████████████████████████

██████████████████████ (emphasis added).

41.     In addition and in general, the Assignments of Derivative Rights to Village for Warner Bros.' earlier QCSA co-financed pictures with Village specifically acknowledge that Village's asserted one-half interest in the Derivative Rights remain subject to contractual restrictions as set forth in the Co-Ownership Agreements. For instance, paragraph 3.1 of that certain *Assignment* of "Derivative Rights – WVFP" dated October 15, 1998, by and between WVFP and Village for the motion picture "Practical Magic" (the "<u>Practical Magic Derivative Rights Assignment</u>"), provides in pertinent part that ███████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ Paragraph 3.2 of the Practical Magic Derivative Rights Assignment also provides that ███████████████

████████████████████████████████████████████████████

████████████████████████████ A true and correct copy of the Practical Magic Derivative Rights Assignment is attached to the Appendix filed contemporaneously herewith as <u>**Exhibit 49.**</u>

42.     Similarly, paragraph 3.1 of that certain *Assignment* of "Derivative Rights – LP to

VRP" dated May 9, 2013, by and between WV Film Partners IV L.P. and Village for the motion picture "The Great Gatsby" (the "Great Gatsby Derivative Rights Assignment") provides that ███

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████ Paragraph 3.2 of the Great Gatsby Derivative Rights Assignment also provides in relevant part that ██████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████ A true and correct copy of the Great Gatsby Derivative Rights Assignment is attached to the Appendix filed contemporaneously herewith as **Exhibit 50.**

43.     Many (if not all) of the Assignments related to the 2014 MPRPA and later pictures also contain specific language that Warner Bros.' assignment to Village of its share of the Derivative Rights are limited by the Co-Ownership Agreement. Paragraph 2.2 of that certain *Assignment* dated October 1, 2019 for the motion picture "Joker," by and between Warner Bros. and Village (the "Joker Assignment"), for example, provides in relevant part that █████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████. A true and correct copy of the Joker Assignment is attached to the Appendix filed contemporaneously herewith as **Exhibit 51.**

44.     Separate and apart from the Assignments, the QCSAs, the MPRPAs, and the RPAs, on a number of occasions Village, or entities associated with Village, did not pay its co-finance share prior to release of the picture. Instead of making payment, Village executed promissory notes

in favor of Warner Bros., ███████████████████████████████████████

████████████████████████████████████████ Pictures for which Village executed

promissory notes and paid its co-finance share after the picture's release include ████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████ A true and correct copy of the December 19,

2014 Promissory Note Village executed in connection with the Warner Bros. motion picture

████████████ for example, is attached to the Appendix filed contemporaneously herewith as

**Exhibit 52.** In addition, Warner Bros. and Village entered into a Loan Agreement dated as of May

26, 2010 by and between Village, as borrower, and Warner Bros., as lender, a true and correct

copy of which is attached to the Appendix filed contemporaneously herewith as **Exhibit 53.**

45.    In addition to advancing all production costs of the pictures it co-financed with

Village, beginning with the 2012 MPRPA, Warner Bros. ██████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████ This ████████████████████████████████████

████████████ and is defined in Article 1 of the 2020 MPRPA, for example, as ████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████ A true and correct

copy of the 2020 MPRPA is attached to the Smith Declaration as **Exhibit 3**.    As described by

Village in ████████████████████████████████ it provided to Warner Bros. in July 2020, a true

and correct copy of which is attached to the Appendix as **Exhibit 54,** ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████ This is further reflected in Article 1 and Section 5.6(b) of the 2020

MPRPA. Village ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████

## IV.    VILLAGE PURPORTS TO ACCEPT WARNER BROS.' PROJECT NOTICE FOR *PRACTICAL MAGIC 2*

46.     While Village remains in bankruptcy, Warner Bros.' creation and financing of

theatrical motion pictures and other audio visual works remains ongoing. Warner Bros. recently

greenlit the production of *Practical Magic 2.* ██████████████ subject to reservations, ██████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████ (the "PM2 Project Notice"). A true and correct copy

of the PM2 Project Notice is attached to the Appendix filed contemporaneously herewith as

**Exhibit 55.**

47.     ██████████████████ Village purported to accept the PM2 Project Notice ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████ A true and correct copy of Village's ██████████

██████ purported Project Notice Acceptance for *Practical Magic 2* is attached to the Appendix filed

contemporaneously herewith as **Exhibit 56.**

48.    On September 8, 2025, outside counsel for Warner Bros. sent a letter to Village's

bankruptcy counsel which, *inter alia*, ████████████████████████████

████████*2*. A true and correct copy of that September 8, 2025 letter is attached to the

Appendix filed contemporaneously herewith as **Exhibit 57.**

## V.    THE DEBTORS' PROPOSED SALE OF DERIVATIVE RIGHTS ASSETS AND PROPOSED ASSUMPTION AND ASSIGNMENT OF WARNER BROS.' AGREEMENTS TO ALCON THREATENS AND IMPAIRS WARNER BROS.' RIGHTS

49.    The Debtors have neither sought nor obtained Warner Bros.' consent to any sale of

the Derivative Rights, including the assumption or assignment of the Derivative Rights

Agreements in connection with a sale of the Derivative Rights, much less consent to sell and assign

any such rights to Alcon. While Warner Bros. believes that no currently identified third party

would be a suitable Village assignee for the Derivative Rights Agreements (including Village's

limited interests in the Derivative Rights therein), Alcon is a particularly unsuitable candidate.

50.    Alcon filed the highly inflammatory and unsupported Alcon Complaint without

even first reaching out to Warner Bros. for an explanation regarding its alleged claims, nor did

Alcon provide any warning or prior notice to Warner Bros.  Immediately thereafter, Alcon rebuffed

Warner Bros.' offer to share information about what had *actually* occurred, choosing to believe its

own conspiracy theories rather than be confronted with the truth.  The Alcon Amended Complaint,

Alcon Second Amended Complaint and Alcon Third Amended Complaint, which by their own

admission are based almost entirely upon speculation, and the majority of claims in which were

dismissed as against Warner Bros., assumes the worst of its now-desired partner Warner Bros.,

publicly accusing Warner Bros. of acting tortiously and with malicious intent, alleging that Warner

Bros. had a motive to allow the alleged infringement, and further characterizing Warner Bros. and

its personnel as "disingenuous" and its CEO of being "controversial" within the industry.  *See* **Exhibit 30** to the Appendix filed contemporaneously herewith.  Indeed, Warner Bros. learned of the Alcon Lawsuit through the press (initially via *The Hollywood Reporter* and subsequently *Deadline* and *Variety*) after Alcon filed the Alcon Complaint (and well before it was served with the Alcon Complaint), as each of those publications published stories of the lawsuit in quick succession beginning with *The Hollywood Reporter* at 10:10 a.m.[5]  The release of these articles immediately upon the filing of the Alcon Complaint suggests a coordinated and calculated media campaign orchestrated by Alcon to publicly discredit Warner Bros.  The Alcon Complaint, its preemptory filing, the Alcon media campaign, and Alcon's persistence in repeating defamatory allegations against Warner Bros. notwithstanding repeated admonitions from the federal court that they lack any basis in fact, have severely damaged whatever remaining trust Warner Bros.' had in Alcon, and for that reason, Warner Bros. considers Alcon to be a completely unacceptable partner to be forced to work closely with in connection with the Derivative Rights, including the Derivative Rights Agreements, much less to share a logo and production credits on a Warner Bros. theatrical feature film.

51.    An assignment of the Derivative Rights to a prospective "partner" such as Alcon, which has recently demonstrated animus and open hostility toward Warner Bros., is precisely what the rights of consent were intended to prevent. The relationship between Warner Bros. and Alcon

---

[5] *See* "'Blade Runner 2049' Producer Sues Elon Musk's Tesla, Warner Bros. Discovery Over AI Images," *The Hollywood Reporter*, https://www.hollywoodreporter.com/business/business-news/blade-runner-2049-producer-sues-elon-musk-tesla-warner-bros-discovery-1236040228/ (last visited 6.10.25); *see* "'Blade Runner 2049' Producers Sue Elon Musk, Tesla and Warner Bros. Discovery, Alleging Copyright Infringement," *Variety*, https://variety.com/2024/biz/news/blade-runner-2049-lawsuit-elon-musk-tesla-warner-bros-discovery-1236184961/ (last visited 6.10.25); *see* "'Blade Runner 2049' Producers Sue 'Problematic' Elon Musk & Warner Bros. Discovery Over 'Highly Offensive' AI Imagery Used in Tesla Pitch," *Deadline*, https://deadline.com/2024/10/elon-musk-lawsuit-blade-runner-2049-ai-warner-bros-discovery-1236122044/ (last visited 6.10.25).

has, as Alcon concedes, deteriorated and shows no signs of improvement.  This has not been Warner Bros.' doing.  Time and again, Alcon has proven itself to be an unsuitable partner for Warner Bros., particularly in a venture where the parties must work closely together in a relationship of trust.  By way of example only, under the Derivative Rights Agreements, Warner Bros. currently shares highly confidential and proprietary information with Village concerning unreleased films.  Village is further entitled to certain consultation rights regarding the marketing and distribution and of the films, and is entitled to have to have its logo and certain credits on the film, among other things.

52.     Moreover, I understand that the Debtors seek to sell to Alcon the "Purchased Unfunded Pictures," as defined and set forth in the Alcon Derivative Rights APA. Those include purported rights with respect to Warner Bros.' theatrical motion pictures, *Furiosa*, *Joker 2,* and *Matrix IV*. To date, the Debtors have not provided financing in connection with, nor paid any production costs for, *Furiosa* and *Joker 2*.  In addition, all amounts Warner Bros. is currently owed in connection with certain of the Debtors' breaches regarding its failure to co-finance *Matrix IV* remain owed and unpaid.

53.     Although Warner Bros. maintains that Village lost any and all rights to co-finance *Furiosa* and *Joker 2*, to the extent the Debtors seek to assume or assign any such rights to Alcon, any and all amounts that would have been owed and payable by Village in connection with those films would need to be paid by Alcon. Had Village participated in those films, which Warner Bros. believes it did not have the right to do, Village would have been required to pay in the range of

27

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: October 6, 2025
Burbank, California

By:

Wayne M. Smith
Executive Vice President, Legal
Warner Bros. Studios