# Exhibit 33

ANDERSON YEH PC
 Edward M. Anderson (STATE BAR NO. 198183)
edward@andersonyehlaw.com
 Regina Yeh (STATE BAR NO. 266019)
regina@andersonyehlaw.com
1055 E. Colorado Blvd. Ste 500
Pasadena, California 91106
Telephone: (626) 204-4092  Facsimile: (888) 744-0317

Attorneys for Plaintiff
ALCON ENTERTAINMENT, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| ALCON ENTERTAINMENT, LLC, a Delaware Limited Liability Company,<br><br>        Plaintiff,<br><br>        v.<br><br>TESLA, INC., a Texas Corporation; ELON MUSK, an individual; WARNER BROS. DISCOVERY, INC., a Delaware Corporation;<br><br>        Defendants. | CASE NO. 2;24-CV-09033-GW-RAO<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**1) DIRECT COPYRIGHT INFRINGEMENT [17 U.S.C. § 501]**<br><br>**2) VICARIOUS COPYRIGHT INFRINGEMENT [17 U.S.C. § 501]**<br><br>**3) CONTRIBUTORY COPYRIGHT INFRINGEMENT [17 U.S.C. § 501]**<br><br>**4) FALSE AFFILIATION AND/OR FALSE ENDORSEMENT [15 U.S.C. § 1125(a)(1)(A)]**<br><br>**DEMAND FOR JURY TRIAL** |

FIRST AMENDED COMPLAINT

WB_0000943

1    Plaintiff Alcon Entertainment, LLC ("Plaintiff" or "Alcon"), through its

2  attorneys, hereby alleges its First Amended Complaint ("FAC") against defendants

3  Tesla, Inc. ("Tesla"), Elon Musk ("Musk"), and Warner Bros. Discovery, Inc.

4  ("WBDI") (collectively, "Defendants" and each separately a "Defendant"):

5                    **SUBJECT MATTER JURISDICTION**

6    1.    The Court has federal question subject matter jurisdiction per 15

7  U.S.C. § 1121(a), 28 U.S.C. §§ 1331 and 1338(a) and (b), and on the grounds that

8  this is a civil action arising under the laws of the United States.  Plaintiff seeks

9  relief under the Copyright Act of 1976, as amended, 17 U.S.C. §§ 101, *et al.*, and

10  the Lanham Act, 15 U.S.C. §§ 1125(a)(1)(A), in interstate commerce.

11                    **SUMMARY OF DISPUTE**

12    2.    This is a case about a car maker improperly borrowing the storytelling

13  power of a Hollywood movie for a car advertisement.  That is an old, long-

14  prohibited kind of scheme.  In a sorcerer's apprentice kind of way, Musk and Tesla

15  opened their artificial intelligence spell book to do it faster and more cheaply than

16  perhaps any car maker had before them.  However, the fact that artificial

17  intelligence ("AI"), in its ubiquity, now makes it so much faster and easier for

18  scurrilous actors to violate creator rights often simply means old wrongs are just

19  dressed up in new twenty-first century clothes.  Such is the case here.

20    3.    Defendants requested permission to use an iconic still image (Exhibit

21  A) from Alcon's "Blade Runner 2049" motion picture ("BR2049" or the "Picture")

22  to promote Tesla's new fully autonomous cybercab in an October 10, 2024 event

23  titled "We Robot."  The event was to be, and was in fact, livestreamed worldwide

24  from WBDI's Burbank, California studio lot.  When Alcon was informed just

25  hours prior to the commencement of the event that Defendants wanted BR2049 to

26  somehow be wrapped into it, Alcon refused all permissions.  More than that, Alcon

27  adamantly objected to Defendants suggesting any affiliation whatsoever between

28  BR2049 or Alcon on the one hand, and Tesla, Musk or any Musk-owned company,

- 1 -
DEMAND FOR JURY TRIAL

WB_0000944

1   on the other.  Musk and Tesla used an admittedly AI-generated image to do it
2   anyway, and WBDI facilitated or ratified the bad conduct.

3          4.      Musk and Tesla wanted to leverage BR2049 to advertise cars,
4   specifically including BR2049's main character and the Picture's iconic "Las
5   Vegas Sequence."  In the sequence, the artificially intelligent android main
6   character K (played by Ryan Gosling) explores the irradiated, orange-lit ruins of a
7   post-apocalyptic Las Vegas, seeking answers to existential questions about his own
8   past.  He also seeks the truth about the human-AI social compact in the Picture's
9   story: a human-as-god-like-master/AI android-as-slave compact which the Picture
10  both presents and calls into question.  In Las Vegas, K hopes to find and confront
11  the long-lost Deckard -- the lead character from the original 1982 "Blade Runner"
12  motion picture ("1982 Picture"), played in both works by Harrison Ford.  Exhibit B
13  shows sample still images from BR2049's Las Vegas Sequence.

14         5.      After Alcon refused permission to use the Exhibit A still image, Musk
15  and Tesla used an AI image generator to create their own near-photo-realistic
16  illustration of K exploring the ruined Las Vegas.  (Exhibit C.)  Musk put Exhibit C
17  into his presentation as the second slide, and displayed it full screen for 11 seconds
18  on the global livestream feed as his presentation opener.  Lest anyone in the live or
19  livestream audience not understand what Exhibit C was a picture of, Musk in his
20  opening voiceover clearly identifies the image as an illustration of the "Blade
21  Runner" movie set in a world which has suffered a "bleak apocalypse," where "he"
22  (meaning the particular blade runner in question) is wearing a "duster" (trench
23  coat) while he surveys the distinctly orange-lit ruins of a city in the apocalyptic
24  space.  That description, especially in connection with the visual elements present
25  in Exhibit C, only matches a single motion picture in all of Hollywood, or
26  anywhere else: BR2049.  There is also only one blade runner character that fits that
27  description: K.
28  ///

FIRST AMENDED COMPLAINT

WB_0000945

6.     Musk tried awkwardly to explain why he was showing the audience a picture of BR2049 and K and talking about them, when he was supposed to be talking about his new product.  He really had no credible reason, or none that doesn't come back to wanting to borrow the storytelling power and expression of that particular Hollywood motion picture to sell cars and the car company.  Musk ostensibly invited the global audience to think about the cybercab's possibilities in juxtaposition to BR2049's fictional future.  But it all exuded an odor of thinly contrived excuse to link Tesla's cybercab to strong Hollywood brands at a time when Tesla and Musk are on the outs with Hollywood.[1]  Which of course is exactly what it was.

7.     It was hardly coincidental that the specific Hollywood film which Musk actually discussed to pitch his new, fully autonomous, AI-driven cybercab was BR2049 – a film which just happens to feature a strikingly-designed, artificially intelligent, fully autonomous car throughout the story.  Especially where Defendants had asked Alcon's permission to use BR2049 and been so firmly refused, this was clearly all a bad faith and intentionally malicious gambit by at least Musk and Tesla to misappropriate BR2049's storytelling power and BR2049 and Alcon's brand goodwill to advertise, market and sell Tesla's automobiles and Tesla as a company.  Indeed, the rest of the opening was stilted and stiff.

8.     Musk and Tesla's idea to borrow from or link to Hollywood motion pictures to advertise cars is far from new.  The motivations behind it, and why the law does not allow even seemingly short or limited references to famous motion pictures in car ads without permission, have to do with the especially powerful

---

[1] *See, e.g.,* Brett Berk, "Hollywood Can't Ditch Its Tesla's Fast Enough: 'They're Destroying Their Leases and Walking Away,'" *The Hollywood Reporter*, September 20, 2024, https://www.hollywoodreporter.com/lifestyle/lifestyle-news/tesla-robotaxi-warner-bros-reveal-hollywood-rejection-elon-musk-1236007945/.

FIRST AMENDED COMPLAINT

WB_0000946

1  nature of Hollywood movies, and how easy it can be to evoke the full influencing

2  power of a famous movie with even just one reference.

3        9.    Historian Yuval Noah Harari[2] teaches that, more than using tools or

4  harnessing fire, humanity's transcending evolutionary superpower is the ability to

5  engage in persistent exercises of shared imagination. Through the power of stories,

6  transmitted first by oral tradition, and later by technologies like books and movies

7  that tangibly capture expression, humans have the unique ability to build and

8  maintain worlds and constructs that may not exist in the physical universe. Yet,

9  these worlds and constructs nonetheless can endure as powerful intersubjective

10  realities in the shared consciousness of millions or even billions of individual

11  human beings.

12        10.    Powerful stories can organize, inspire, manipulate or even control

13  huge numbers of people, sometimes separated by vast distances of space or even

14  time. Through the power of stories captured in printed materials, or transmitted

15  over radio, or broadcast over television, or carried by innumerable other media, the

16  work of talented creators has been used for thousands of years to build global

17  empires, maintain religious institutions, and send people to the moon.

18        11.    For at least several decades, salesmen have specifically used the

19  storytelling power of popular Hollywood motion pictures to sell cars, including

20  through product placement, where a car makes a branded appearance within a

21  motion picture. Carmakers also do the inverse, borrowing story elements from

22  Hollywood movies and incorporating them into car commercials through

23  agreements with motion picture rights owners:

24        The car commercial used to be a pretty predictable affair: a shiny new

25        sedan driving through a downtown Los Angeles tunnel or across Big

26  _____

27  [2] Yuval Noah Harari, *Sapiens: A Brief History of Humankind* (HarperCollins 2015) and *Nexus: A Brief History of Information Networks From the Stone Age to AI* (HarperCollins 2015).

28

FIRST AMENDED COMPLAINT

WB_0000947

1   Sur's Bixby Bridge, unencumbered by traffic, or a celebrity espousing
2   the gadget-laden features of an SUV or minivan. … [¶] Many tried
    product placement deals, but such deals don't guarantee prime
3   exposure for a company's product. … [¶] [I]n the latest series of
4   campaigns, a variety of carmakers have put a twist on the typical
    product placement deal.  They've appropriated hit films and popular
5   film characters, making them the focus of the spots.

6   M. Graser, "Car Commercials Borrow From Movies to Make Their Own Stories,"

7   *Variety*, March 31, 2014 https://variety.com/2014/film/features/1201150512-

8   1201150512/

9       12.    Mr. Graser's *Variety* piece is from 2014, but the practice of

10  automakers evoking famous Hollywood motion picture properties in their car ads

11  started at least nineteen years earlier.  Automakers tried to do it without permission

12  from, or any payment to, the motion picture creators, but the judiciary quickly shut

13  that down.  *See, e.g.*, *Metro-Goldwyn-Mayer, Inc. v. American Honda Motor Co.,*

14  *Inc.*, 900 F.Supp. 1287 (C.D. Cal. 1995) (granting injunction against Honda and its

15  ad agency for evoking MGM's James Bond motion pictures in television

16  advertisements for the then-new Honda Del Sol).

17      13.    Responsible car makers and ad agencies now ask permission from

18  studios first, and, if permission is granted, negotiate and pay meaningful

19  compensation.  Because Hollywood motion picture storytelling power is so strong

20  not just in the United States but globally, responsible car makers still covet it for

21  their advertising campaigns even though they have to pay (a lot) for it:

22      "You can't underestimate how the entertainment community
23      influences audiences around the world." says Audi of America
        president Scott Keogh.  Connecting with entertainment keeps Audi "in
24      the conversation," he says.

25  M. Graser, *supra*, *Variety*, March 31, 2014.

26      14.    The financial magnitude of the misappropriation by Defendants here

27  was substantial.  Alcon has spent decades and hundreds of millions of dollars

28

---

FIRST AMENDED COMPLAINT

1  building the BR2049 brand into the famous mark that it now is.  The words "Blade
2  Runner 2049," the words "Blade Runner" used in contexts that specifically evoke
3  BR2049 distinct from the original 1982 "Blade Runner" motion picture, visual
4  images or audiovisual presentations which evoke BR2049's main character "K,"
5  and/or which evoke iconic sequences and settings from BR2049, are all protected
6  marks and trade dress with secondary meaning.  All of these marks and trade dress
7  connote BR2049 and its producer as the source of goods and services, or that there
8  is an affiliation of the advertiser with BR2049 and the Picture's producer.

9      15.    Alcon's BR2049 marks and trade dress clearly have secondary
10  meaning in the automotive market space.  Alcon has an established record of doing
11  business with major automotive brands to affiliate themselves and their car
12  products with Alcon and BR2049.  These deals have had total dollar price tags well
13  into the eight figures, including at least one contract for direct cash payments to
14  Alcon in the six figures (hundreds of thousands of dollars), plus guaranteed media
15  spends for Alcon's benefit in the eight figures (tens of millions of dollars).[3]

16      16.    The financial stakes and complexity of BR2049 automotive brand
17  affiliations were especially high at the time of the "We Robot" event.  As of
18  October 10, 2024, Alcon was in talks with at least one automotive brand for
19  partnerships on Alcon's BR2049-based *Blade Runner 2099* television series
20  currently in production, and Alcon intends to try to resume such talks.  Defendants'
21  conduct is likely to cause confusion among Alcon's potential brand partner
22  customers, and may have already caused actual confusion with potential *Blade*
23  *Runner 2099* car partners.

24

25  _____

26  [3] The referenced contract was for an aggregate of ten (10) seconds of on-screen time
    in the relevant context there, and not a consecutive ten seconds, either.  Eleven
27  consecutive seconds of on-screen time tying a car brand to a movie is a marketing
    and advertising eternity.
28

---

FIRST AMENDED COMPLAINT

WB_0000949

17.    Beyond these more ordinary commercial issues, there is the problematic Musk himself. The unauthorized and unwanted association of Musk with BR2049 and Alcon is its own commercial problem. Any prudent brand considering any Tesla partnership has to take Musk's massively amplified, highly politicized, capricious and arbitrary behavior, which sometimes veers into hate speech, into account. If, as here, a company or its principals do not actually agree with Musk's extreme political and social views, then a potential brand affiliation with Tesla is even more issue-fraught. Alcon did not want to be affiliated with Musk, Tesla, or any Musk company, for all of these reasons.

18.    All of this happened because WBDI contracted with Tesla, essentially loaning Tesla the studio lot for the "We Robot" event for what Plaintiff alleges was a highly lucrative deal. That made it difficult and problematic for WBDI to keep Musk bounded by well-established rules of the business. WBDI ultimately failed to do so when it could have, to Alcon's significant damage.

19.    Now BR2049 and Alcon unfortunately and falsely are so affiliated, and far beyond the 11 seconds of presentation time at the cybercab "We Robot" live event. The event's worldwide livestream X feed, including Musk's BR2049-infused opening, was re-posted by Tesla, Musk, X and others thousands of times, with millions of total views. The false affiliation between BR2049 and Alcon on the one hand, and Tesla and Musk on the other hand, is irreparably entangled in the global media tapestry, all as Defendants knew would inevitably happen.

20.    This was and is all highly offensive to Alcon's right to commercial and cultural self-determination. It is also directly financial damaging to Alcon. The fair market value of the brand affiliation goodwill that Defendants stole -- and the damage to Alcon's BR2049 brand and goodwill -- is at least in the six figures and possibly much higher. Defendants have also muddied the waters for Alcon's in-progress exploration of automotive brand partnerships for the upcoming BR2049-based *Blade Runner 2099* television series.

---

FIRST AMENDED COMPLAINT

WB_0000950

21.    Alcon now seeks relief under the United States Copyright Act and the Lanham Act, for damages and to pry Musk and his co-Defendants away from Alcon's BR2049 brand and goodwill.

## **PERSONAL JURISDICTION OVER DEFENDANTS**

22.    Per Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure, this Court has personal jurisdiction over any defendant who is subject to the jurisdiction of any California court of general jurisdiction. California's long arm statute, *Cal. Code Civ. Pro.* § 410.10, allows courts in the state to exercise personal jurisdiction over parties to the full extent permissible under the United States Constitution. Personal jurisdiction over the Defendants here is thus proper if it comports with due process. It does, including for the following reasons.

### *Personal Jurisdiction Over Tesla*

23.    <u>General Personal Jurisdiction</u>: The Court has general or unlimited personal jurisdiction over Tesla. Tesla is currently incorporated under the laws of the State of Texas and its principal corporate office or headquarters is in Austin, Texas and has been since about December 2021. However, California was Tesla's original principal corporate office home state, from Tesla's inception in about 2003 until the December 2021 move to Texas. Tesla still maintains continuous and systematic contacts with California, including continuing to operate at least two major manufacturing plants in the state.

24.    <u>Specific Personal Jurisdiction</u>: Additionally and/or in the alternative, the Court has specific or limited personal jurisdiction over Tesla. Alcon's claims arise out of Tesla's purposeful availment of the rights, privileges, and protections of doing business in California, and also arise out of Tesla's commission of tortious activity in California and purposeful direction of tortious conduct toward the forum state. Tesla committed the acts of infringement alleged herein, or substantial portions of them, in preparation for and during the course of the October 10, 2024 cybercab product reveal event at WBDI's Burbank, California studio lot. The

WB_0000951

1  event was personally conducted by Musk who is Tesla's founder, principal and
2  Chief Executive Officer. Tesla's acts of copyright infringement and violations of
3  the Lanham Act all constituted torts directed toward Alcon, a forum resident, and
4  relate to the motion picture industry, which is of compelling interest to the forum
5  state. Exercise of personal jurisdiction over Tesla also is reasonable and fair.

6  ***Personal Jurisdiction Over Musk***

7       25.    The Court has at least specific or limited personal jurisdiction over
8  Musk as an individual. Plaintiff's claims against him arise out of his acts of
9  purposeful availment of the benefits and privileges of conducting activities in
10  California, including where he personally conducted the event from the WBDI lot
11  in Burbank, California. Plaintiff's claims also arise out of Musk's commission of
12  tortious acts while physically present in the forum state. His acts also constituted
13  purposeful direction of tortious conduct to the forum, all for the same specific facts
14  and reasons as described above regarding Tesla personal jurisdiction. Exercise of
15  personal jurisdiction over Musk as an individual also is reasonable and fair. At any
16  given time depending on stock market fluctuations, Musk is reportedly the richest
17  man in the world and has ample resources to defend himself in California court.

18  ***Personal Jurisdiction Over WBDI***

19       26.    The Court has general or unlimited personal jurisdiction over WBDI.
20  WBDI is incorporated under the laws of the State of Delaware and its principal
21  corporate office or headquarters is in New York. However, WBDI has continuous
22  and systematic contacts with California, including owning and operating one of
23  Hollywood's oldest major motion picture and television studios including the
24  Warner Bros. Studios lot in Burbank, California.

25       27.    Additionally and/or in the alternative, the Court has specific or limited
26  personal jurisdiction over WBDI. Alcon's claims arise out of WBDI's purposeful
27  availment of the rights, privileges, and protections of doing business in California.
28  They also arise out of WBDI's commission of tortious activity in California and

---

FIRST AMENDED COMPLAINT

WB_0000952

1  purposeful direction of tortious conduct toward the forum state. WBDI's

2  involvement in acts of copyright infringement and violations of the Lanham Act all

3  constituted torts directed toward Alcon, a forum resident. They all relate to the

4  motion picture industry, an industry in which the forum state has a compelling

5  interest. Exercise of personal jurisdiction over WBDI also is reasonable and fair.

### VENUE

6

7  *28 U.S.C. § 1391(b)(2) Venue as to all Defendants*

8  28.    Venue is proper as to all Defendants pursuant to 28 U.S.C. §

9  1391(b)(2), because a substantial part of the events or omissions giving rise to

10  Alcon's claims occurred, or a substantial part of the property that is the subject of

11  the action is situated, within this judicial district. The infringed property in

12  question includes Alcon's copyright in BR2049 and ownership of BR2049 marks

13  and goodwill, which property is all located within this district for venue purposes,

14  where Alcon has its corporate headquarters in Los Angeles, California.

15  *Additional Venue Bases*

16  29.    Venue also is proper as to WBDI and Tesla pursuant to 28 U.S.C. §§

17  1400(a) and 1391(d). For venue purposes, Tesla and WBDI each reside in or may

18  be found within this district. Tesla and WBDI each have continuous and

19  systematic contacts with the forum state and this district specifically, including

20  sufficient contacts with this district to establish personal jurisdiction in this district,

21  if this district were treated as a separate state.

### PARTIES

22

23  *Plaintiff*

24  30.    Alcon is an independent motion picture and television studio whose

25  products are distributed worldwide. Alcon is a limited liability company organized

26  under the laws of the State of Delaware, with its principal place of business at

27  10390 Santa Monica Blvd., #250, Los Angeles, California 90025.

28  ///

---

FIRST AMENDED COMPLAINT

WB_0000953

31.     Alcon produced BR2049 and owns the BR2049 copyright and the BR2049 marks and brand at issue in this action.  Alcon has produced more than thirty other major motion pictures, including "The Blind Side" (which won the 2009 Academy Award for Best Actress), the "Dolphin Tale" series, the "Sisterhood of the Traveling Pants" series, "Book of Eli," "P.S. I Love You," "My Dog Skip," "Prisoners," and "The Garfield Movie."  Alcon also produces television, including the critically acclaimed television series *The Expanse*.  Alcon is currently in production on a "Blade Runner 2049" sequel or spinoff television series entitled *Blade Runner 2099*.

### *Defendants*

32.     Tesla: Tesla is a well-known developer and manufacturer of electric automobiles.  Some of Tesla's automobile products are marketed as partially or fully autonomous.  The idea of AI-controlled or otherwise autonomous automobiles is a Tesla brand focus.

33.     Musk: Musk is Tesla's founder, largest shareholder and Chief Executive Officer.  In addition to owning and operating Tesla, he also owns and operates the social media platform X (formerly Twitter) and the rocket and satellite company SpaceX, among other ventures.  Musk has become an increasingly vocal, overtly political, highly polarizing figure globally, specifically including U.S. consumers, and especially in Hollywood.

34.     WBDI: WBDI is one of the largest entertainment conglomerates in the world.  Plaintiff is informed and believes that WBDI is the specific corporate entity within the WBDI conglomerate which actually owns the Warner Bros. Studios lot in Burbank, California, including substantially all real property and improvements thereon, including without limitation telecommunications infrastructure and systems over which the October 10, 2024 We Robot presentation was transmitted.  WBDI is currently run by its Chief Executive Officer, David Zaslav, a man who is both friendly with Musk and controversial in Hollywood in his own right.  Plaintiff

---

FIRST AMENDED COMPLAINT

1   is informed and believes that the business relationship with Musk and Tesla and the

2   October 10, 2024 We Robot events and related business arrangements were

3   significant enough to the overall WBDI conglomerate, that even with respect to

4   matters usually or sometimes left to WBDI subsidiaries and the employees of same,

5   the event, at the very least as to the disputed matters that are the subject of this

6   FAC, was actively monitored by, supervised by, and ultimately controlled by and

7   directed by executives at the WBDI level, and not at a lower level of the WBDI

8   conglomerate, such as lower level executives at Warner Bros. Pictures.

9                  **FACTS COMMON TO ALL CAUSES OF ACTION**

10                      **The Infringed Work for Copyright**

11          35.    Copyright Infringed Work. Alcon is the owner and, as to all rights at

12   issue herein, the exclusive copyright holder, of the BR2049 motion picture. In

13   copyright terms of art, BR2049 is both a "motion picture" and the "infringed

14   work." The Picture is registered with the United States Copyright Office under

15   registration number PA0002056792 and has been since October 6, 2017.

16          36.    BR2049 is itself a "derivative work" in copyright terms. It is a sequel

17   to the 1982 Picture starring Harrison Ford as the lead character, Deckard, a

18   professional "blade runner" -- a government sanctioned hunter and killer of

19   replicants, or synthetic, artificially intelligent humans. In or about 2011 (with some

20   supplemental rights acquisitions after, but all completed years before the issues

21   arising now), Alcon acquired a broad set of rights in the 1982 Picture and

22   underlying properties. Alcon's rights include substantially all rights to make any

23   derivative works of the 1982 Picture in any manner or medium that appears

24   relevant to the action.

25          37.    Exhibits A and B Relative to the Infringed Work. The images in

26   Exhibits A and B to this FAC are not themselves the copyright office-registered

27   "infringed work" claimed, nor are they "photographs" or "pictorial, graphic, and

28   sculptural works" in the copyright term of art context here. It is true that some or

_____

FIRST AMENDED COMPLAINT

1  all of them properly qualify as "derivative works" in their own right, if taken on a

2  standalone basis. An action theoretically could be pursued with some or all of

3  them as themselves the "infringed work," separated from BR2049, and subject to

4  perfection of the appropriate derivative work registrations. But that is not this

5  action, at least not at present. Rather, as presently alleged, in the terminology of

6  the United States Copyright Act of 1976, as amended, 17 U.S.C. § 101, *et seq.*, the

7  images in Exhibits A and B are examples of "still images" from the Picture – in

8  particular from the core dramatic sequence that appears in BR2049 at runtime

9  1:36:28-1:37:59, and continuing at 1:40:48-2:01:50 ("Las Vegas Sequence"). The

10  Exhibit A image appears in BR2049 at about 1:37:55 in the Picture's run time. The

11  Exhibit B images are from points in the run time between 1:36:28-1:37:59,

12  1:40:48-1:43:35, and 1:51:30-2:01:50.[4]

13      38.    Exhibit A is the specific still image from BR2049 in which

14  Defendants expressed licensing interest for the "We Robot" event.

15      39.    The Exhibit B images are examples of other actual still images from

16  the Las Vegas Sequence referenced above, but only a tiny fraction of the still

17  images actually in it. Motion pictures like BR2049 create the impression of motion

18  through the persistence of vision principle. Still images are displayed rapidly in

19  sequence, typically at the rate of 24 frames per second, which human vision

20  perceives as an uninterrupted continuously moving image. BR2049's Las Vegas

21  Sequence runs for about 1,414 seconds or about 33,936 frames. This makes it not

22  practically feasible to attach captured still images of every one of the frames in the

23  Las Vegas Sequence to the FAC, or even a quantitatively significant fraction.

24      40.    Proper Analytic Framework For Identifying Protected Elements

25  Where The Infringed Work Is A Motion Picture. The distinction between "motion

26  _____

27  [4] Alcon has noted the respective run time references next to each image, directly on

28  Exhibits A and B.

FIRST AMENDED COMPLAINT

WB_0000956

1  picture still images" and "photographs" is more than a mere statutory technicality.
2  The two types of tangible expression operate differently expressively in the real
3  world, and they are treated differently analytically under copyright law.

4      41.     Still images recognizably from BR2049, especially if from
5  qualitatively important scenes or sequences, are themselves protected elements of
6  the Picture.  If one or more actual still images is literally copied (by, for instance,
7  putting it into an AI image generator), the test for whether that is unlawful
8  appropriation does not involve any extrinsic/intrinsic analysis of the infringed work
9  (but testing unlawful appropriation in such a circumstance, and whether there is
10 any fair use defense, may involve the "heart of the work" test).

11     42.     Still images recognizably from BR2049, especially if from
12 qualitatively important scenes or sequences, are also <u>more</u> than just protected
13 elements of the Picture that can be looked at alone: they are effective vehicles for
14 quickly evoking <u>other</u> protected elements of the Picture.  As is true with many
15 famous motion pictures, the display of a single image from, for example, BR2049's
16 Las Vegas Sequence, can immediately evoke protectable elements of the Picture to
17 the audience -- like the Picture's plot, theme, dialogue, mood, setting, pace,
18 characters, and sequence of events – even if those elements cannot be visually
19 identified directly in the still image in question.  An infringing work that <u>looks like</u>
20 it is or might be a still image from BR2049, can powerfully evoke some or all of
21 the entire Picture's plot, theme, dialogue, mood, setting, pace, characters and
22 sequence of events in this same way -- especially if such an emulated image is
23 openly characterized by the presenter as meant to be a still from or illustration of
24 BR2049 or protected elements of its story (as happened here).

25     43.     That is a kind of expressive superpower that ordinary standalone
26 photographs do not have.  Copyright explicitly recognizes that photographs and
27 still images of motion pictures are not the same thing, in the Copyright Act's
28 different statutory treatment of "motion picture still images" relative to the

---

FIRST AMENDED COMPLAINT

WB_0000957

1  statutorily separate category of "photographs." *See, e.g.,* 17 U.S.C. §§ 101, 106.

2  This distinction tracks to differences in their expressive power.

3      44.    Standalone photographs can be very powerful to evoke ideas,

4  concepts, feelings and even whole social movements or histories, well beyond the

5  shapes and colors within the four corners of the image – *see, e.g.,* Jeff Widener's

6  1989 photograph of Tiananmen Square's "Tank Man"; Alfred Eisenstadt's 1945

7  photograph "V-J Day Kiss in Times Square"; or the crew of Apollo 8's December

8  1968 "Earthrise."

9      45.    Still images from motion pictures (or emulations of such images,

10  especially if held out by the infringer to the audience to be such) can do such

11  things, too, but they can also do something else. Even a single still image from a

12  motion picture can evoke the motion picture's entire more specific set of

13  expressive elements in the mind of the audience. Consider for example a still

14  image of a rumpled young Dustin Hoffman bisected by the nylon-stockinged leg of

15  a woman who's face isn't shown: if it's the right one, we all know from just that

16  one shot that the movie is 1968's "The Graduate," and that the woman is Ann

17  Bancroft's Mrs. Robinson. Or, of more recent vintage, a still image of a tension-

18  wrought Zendaya in a blue dress, eyes masked by sunglasses, as she sits in a larger

19  audience watching a contest or spectacle not shown: to anyone who has seen the

20  movie, and perhaps even to many who only have familiarity that the movie exists,

21  the recognition that the image is from 2024's "Challengers" is easy and immediate.

22      46.    This phenomenon of human perception goes beyond the audience just

23  being able to identify which movie it is from a single still image. A sufficiently

24  recognizable motion picture still image goes further and evokes in the audience's

25  mind some or all of the larger motion picture's story elements, like plot, themes,

26  dialogue, mood, setting, pace, characters and sequence of events. This is because

27  tremendous creative resources were previously expended to have the movie come

28  ///

FIRST AMENDED COMPLAINT

WB_0000958

1 | into tangible existence, as a powerful vehicle to move (and maintain) those
2 | elements in the audience's shared imagination.

3 |     47.    As Harari might put it if he were a copyright lawyer, both a standalone
4 | photograph and a single still image from a motion picture can transport the
5 | audience to a specifically shared intersubjective reality, bringing them together or
6 | otherwise influencing them (a kind of "gating," one might say).  From a copyright
7 | law perspective though, the way the gating occurs is very different as between the
8 | two types of works (photographs and motion picture still images).  The photograph
9 | gates to ideas, concepts, feelings, social movements or histories that may exist in a
10 | human shared imagination at some level (and probably do), but not as specifically
11 | as with a motion picture still image, and also, extremely relevant to copyright law,
12 | not preserved in a specifically copyright-protected space.  In contrast, a still image
13 | from a motion picture gates to a shared imagination that is more specifically
14 | delineated (by the motion picture and its elements), and that also actually exists
15 | captured in a tangible form of expression which copyright law <u>does</u> protect (a
16 | "motion picture").

17 |     48.    Existing copyright law as literally applied already dictates that motion
18 | picture still images are to be treated analytically differently than photographs.  The
19 | two were consciously placed by Congress in different statutory categories: in
20 | section 101 of the Copyright Act, movie still images are defined as and treated as
21 | parts of "audiovisual works," rather than as "pictorial, graphic and sculptural
22 | works," where "photographs" in contrast specifically are "pictorial, graphic and
23 | sculptural works."

24 |     49.    Substantiality similarity comparison case law similarly makes clear
25 | that the elements of a work to look at analytically to determine what is protected
26 | and what is not, depend on what kind of "work" the "infring<u>ed</u> work" statutorily is.
27 | For example, under the Ninth Circuit's extrinsic/intrinsic analytical test, if the
28 | infring<u>ed</u> work is a "motion picture," the extrinsic test must be analyzed in the

---

FIRST AMENDED COMPLAINT

WB_0000959

1  context of elements like plot, themes, dialogue, mood, setting, pace, characters, and
2  sequence of events.  In contrast, if the infringed work is a "photograph," the
3  extrinsic test is analyzed under a different set of elements: subject matter, pose,
4  lighting, camera angle, depth of field, and others (and the outcome for
5  photographer plaintiffs in copyright infringement cases tends to be more
6  Draconian).

7      50.    Alcon respectfully submits that Congress meant what it said, and so
8  does existing case law: motion pictures (and still images from them) and
9  photographs are two different categories of works, and they must be treated
10  analytically differently, including as to identification of protectable elements.
11  Alcon also respectfully submits that makes sense, too, because of the difference in
12  storytelling gating power that the different types of images have in the real world,
13  as discussed above.

14      51.    For these reasons, for instances of copying that go beyond literal
15  copying or bodily appropriation of protected elements, identification of protected
16  elements of BR2049 has to involve some level of consideration of the entire
17  Picture, including its plot, themes, dialogue, mood, setting, pace, characters, and
18  sequence of events.  To facilitate that, it helps to summarize or discuss the story of
19  work and its overall elements in the pleading, as below.

20      52.    <u>BR2049 Story Summary Overview</u>.  BR2049 is a sequel to the 1982
21  Picture, and specifically a post-apocalyptic one (to the original's mere dystopia).
22  An overview of BR2049's elements is first helpfully informed by discussion of the
23  1982 Picture.

24      53.    <u>1982 Picture - Story Overview</u>.  The 1982 Picture is set in a fictional
25  2019 Los Angeles.  Artificially intelligent androids or replicants exist, but only
26  essentially as slaves who must stay away from Earth, in off-world colonies, on
27  penalty of death.  The 1982 Picture's story opens in a Los Angeles saturated by
28  constant advertising, shrouded in perpetual darkness and light rain, and with the

---

FIRST AMENDED COMPLAINT

WB_0000960

1  city being stalked by four rogue replicants who escaped to Earth in search of their
2  human maker.  Blade runners are tasked with finding the rogue replicants and
3  "retiring" (killing) them.

4      54.    In the 1982 Picture, after the blade runner initially assigned to the case
5  is hospitalized by one of the rogue replicants, Deckard is conscripted from an
6  ambiguous state of retirement or inactive duty by his former superiors in the Los
7  Angeles Police Department to find the rogue replicants and retire them.  To aid his
8  search by better familiarity with current replicant technology, Deckard is sent to the
9  corporate headquarters of the replicant maker (Tyrell) and introduced to Rachel.

10      55.    Rachel is a new replicant model – one even more difficult to
11  distinguish from humans than earlier models, and implanted with a full set of false
12  human memories.  The illusion is so effective that Rachel is herself unaware she is
13  a replicant, until Deckard's testing of her empathy responses reveals the truth to
14  her.  Rachel becomes a fugitive replicant, whom Deckard's superiors add to his
15  target list.  Deckard and Rachel become lovers.  The 1982 Picture is famously
16  ambiguous about whether Deckard is or is not himself a replicant.  If Deckard is a
17  replicant, he is unaware of it; however, the possibility gnaws at him at varying
18  levels depending on the particular cut of the film (there are several).  After the
19  original four rogue replicants are all terminated, the 1982 Picture ends with
20  Deckard and Rachel fleeing as fugitive lovers, leaving their future undetermined.

21      56.    The initial theatrical version of the 1982 Picture sets the mood of
22  Rachel and Deckard's future as sunny and hopeful.  However, in Ridley Scott's
23  director's cut, Rachel and Deckard's future is left ominously ambiguous.  The
24  different versions of the 1982 Picture's ending amplified the tension and
25  anticipation attached to the cliffhanger question it posed: what happens to Deckard
26  and Rachel?  The 1982 Picture's fanbase had to wait an unusual thirty-five real-
27  world years for the answer.
28  ///

FIRST AMENDED COMPLAINT

57.    BR2049 – Story Overview.  Released in October 2017, BR2049 is the
first, and so far only, motion picture sequel to the 1982 Picture.  BR2049 is set in a
fictional 2049, thirty years after the 1982 Picture's fictional 2019.  BR2049 tells the
story of the main character "K" (played by Ryan Gosling).  Like the 1982 Picture's
Deckard, K is a professional blade runner.  Unlike Deckard, K from the beginning
of BR2049 clearly understands himself to be an artificially intelligent android or
replicant (though he becomes unsure in the middle act of the Picture).  K's human
superiors put him on the track of pursuing the possible existence of a wholly or
partially replicant child conceived by, and born to, a replicant mother (revealed
ultimately to be Rachel).  If true, the phenomenon would re-order the entire societal
relationship between humans and their artificially intelligent replicant creations.
K's trench coat or "duster" is the dominant feature of his wardrobe or costume.
Throughout the Picture, K travels in, and is assisted by, his artificially intelligent,
quasi-sentient flying car, or "spinner," which is capable of autonomous action.

58.    K's love interest in BR2049 is Joi (played by Ana de Armas).  Joi is
K's personal version of an apparently mass-produced and mass-advertised
holographic, artificially intelligent, virtual home companion.  K buys an expensive
emulator accessory to allow Joi to accompany him beyond her usual domestic
boundaries.  Together, K, Joi and the artificially intelligent spinner travel to various
locations in search of the seemingly miraculous replicant child, eventually leading
them to a post-apocalyptic Las Vegas.

59.    By that point in the Picture, K has come to suspect that he might be
the lost miracle child, now grown, and that, in searching for Rachel and Deckard,
he might be searching for his own parents, a thing he previously thought
impossible and only for humans.  Also by that point in the Picture, unknown to K, a
corporate female replicant assassin ("Luv", the antagonist in the Picture, played by
Sylvia Hoeks) has been tasked by her human superiors (Tyrell, the replicant maker)
///

---

FIRST AMENDED COMPLAINT

WB_0000962

1  with finding the missing child before K does.  Luv has been stalking K's progress,

2  knowing he has better information than she does about the child's location.

3      60.    BR2049 Las Vegas Sequence.  The Picture's Las Vegas Sequence

4  shows K's arrival in, and exploration of, the orange-colored ruins of the Picture's

5  abandoned Las Vegas, rendered uninhabitable by a dirty nuclear device many years

6  prior to the story's timeframe.  The sequence follows K as he leaves the spinner

7  (with Joi's genie-bottle like emulator in his pocket) and walks in his duster toward

8  and through the misty orange urban desert ruins, often viewed by the camera from

9  behind or in silhouette.  The sequence includes K's walk through the Las Vegas

10 ruins, leading up to and foreboding the Picture's dramatic apogee: K's encounter

11 with his predecessor Deckard (reprised by Harrison Ford) from the 1982 Picture.

12     61.    K follows signs of life (an apiary) to a ruined casino hotel.  K enters

13 the building and finds an unfriendly Deckard, who tries to kill K.  Throughout the

14 Las Vegas Sequence to this point, the lighting is distinctly orange, so that

15 everything appears filtered through a kind of sweetened or radioactive sepia.

16     62.    The Las Vegas Sequence's lighting only changes when K's and

17 Deckard's physical conflict takes them into the building's abandoned lounge or

18 theater, where they have a one-sided fist-fight.  Initially pitch black, the lounge

19 becomes partially lit by an apparently malfunctioning holographic entertainment

20 system, which intermittently displays stuttering holograms of 1960s- and 1970s-era

21 entertainers, including Marilyn Monroe, chorus line dancers, Liberace, and, most

22 prominently, Elvis Presley.  As the holograms move in and out behind and among

23 the combatants, Deckard tries vainly to knock out the inhumanly durable K with

24 haymakers.  K refuses to fight back, letting Deckard exhaust himself.  As Elvis

25 appears again singing "Can't Help Falling In Love," Deckard finally relents and

26 invites K to have a drink instead.  K accepts.

27     63.    The distinctive orange lighting then resumes as K and Deckard retire

28 to a private bar on an upper floor of the building -- Deckard's private nest or aerie.

---

FIRST AMENDED COMPLAINT

WB_0000963

1    Its exterior walls are floor-to-ceiling windows overlooking the Las Vegas ruins. In

2    Deckard's aerie, both before and after K and Deckard talk about Rachel and the

3    missing child, the screen image is K in his duster, viewed from behind or in three-

4    quarter view, in dark silhouette, taking in the ruined Las Vegas through the picture

5    windows, all of it bathed in orange light. (*See, e.g.,* Exhibit B, final four images.)

6        64.    After Deckard makes emotional revelations about Rachel and the

7    missing child, he retires to a room off-screen. K explores more of the room and its

8    contents. He causes a jukebox to display a miniature, holographic Frank Sinatra

9    who performs "One More for My Baby (And One More For the Road)," while

10   trapped in a glass bottle or dome. The genie-Sinatra is distinctly gray, black and

11   white, not orange or orange-lit like the rest of the scene. As the genie-Sinatra

12   sings, K wistfully examines small animal wood carvings clearly made by Deckard.

13   They match a small wood carving of a horse which K carries and which ties to an

14   implanted memory he has. K has come to suspect the memory might actually be an

15   impossible-yet-real memory of his own childhood. The presence of the carvings in

16   the aerie bolster K's suspicion that he is the miracle child and that Deckard is his

17   father and Rachel his mother. As the genie-Sinatra continues to sing, K picks up a

18   framed photographic portrait of Rachel and looks at it longingly.

19       65.    The Las Vegas Sequence concludes with the antagonist Luv catching

20   up to K, assaulting Deckard's aerie with a mercenary force of flying cars, drones,

21   and combat replicants. K wakes up from a dream or sleep, briefly to see Joi

22   captivated by Deckard's colorful hydroponic garden, which again stands out from

23   the other visual elements in the scene as not being orange-lit, while everything else

24   is. Deckard returns from some other room and raises the alarm that there are

25   incoming hostile forces. The lighting turns even more deeply orange as Luv's

26   forces violently assault the Deckard aerie. In the assault, Deckard tries to reach his

27   old 1982 Picture spinner where he has it parked in another room of the building. K

28   follows him, but Luv arrives too soon. She and her forces destroy Deckard's

FIRST AMENDED COMPLAINT

WB_0000964

1  original 1982 Picture spinner and kidnap Deckard.  Luv defeats K in hand-to-hand

2  combat. She then smashes the Joi emulator, effectively killing Joi, while K has to

3  watch helplessly.  Right before being killed, Joi tells K that she loves him.  Luv and

4  her forces leave K lying defeated in the rubble, ending the Las Vegas Sequence.

5      66.    <u>BR2049 Third Act</u>.  The third act of the Picture plays out broadly as

6  follows: A joint human/replicant resistance movement (seeking to topple the

7  current replicants-as-slaves social regime) rescues K.  They reveal to him that they

8  know who the miracle child is, and that K is not the child (disappointingly re-

9  establishing to K that he is a replicant and not human).  The resistance asks K to

10  help them by going after the captive Deckard and killing him, so that the

11  information he has about the child cannot be used against the resistance.  After K

12  leaves the resistance hideaway and ponders the choice, K interacts with a giant

13  holographic advertisement of the Joi virtual companion product.  The giant Joi

14  hologram tries to sell itself to him again – presenting K with the choice of going

15  back to his old life status quo, in the form of literally replacing Joi.  In parallel,

16  Luv's master (Tyrell, the head of the corporate replicant maker) makes the captive

17  Deckard a similar offer – Tyrell presents Deckard with a rebuilt Rachel, and offers

18  her to Deckard if Deckard will voluntarily help Tyrell find the child, for the

19  purpose of improving Tyrell's replicant technology to further entrench the human-

20  as-god-like-master/AI-replicants-as-slaves status quo.

21      67.    K and Deckard both reject the respective temptation offers.  Tyrell

22  directs Luv to take Deckard off-world where Tyrell has better tools for torturing

23  Deckard into cooperation, and she commences to do so.  K chases them down in

24  his own flying spinner, shoots their spinner out of the sky, and rescues Deckard

25  after a battle with Luv in the crashing surf where the ocean meets a giant retaining

26  wall built against rising sea levels.  K kills Luv, but is severely wounded himself,

27  possibly fatally.  Deckard rescues K from drowning, and Deckard expresses

28  readiness to die (implicitly for the same reasons given by the resistance).  Instead

---

FIRST AMENDED COMPLAINT

WB_0000965

1  of K killing Deckard per the resistance plan, K suggests that they both agree to the

2  fiction that Deckard died in the surf, and that Deckard actually instead live secretly

3  and meet his missing child (a daughter, a memory maker character whom K

4  encountered earlier in his quest).

5       68.    K takes Deckard in K's flying spinner to Deckard's daughter's

6  location, as snow falls.  Before Deckard goes inside alone to meet his daughter, he

7  asks K for an explanation as to why K is helping Deckard.  K gives no answer, but

8  does say "your daughter makes the best memories."  In the penultimate scene, K is

9  left alone with the spinner, laying on a set of stairs looking skyward, as snow falls

10 down on him.  The scene is ambiguous about whether K survives his injury from

11 the battle with Luv or dies.  In the final scene, Deckard and his daughter see each

12 other for the first time, and the movie ends with them reaching out to touch hands.

13      69.    <u>Exhibit A Image in Story Context</u>.  The Exhibit A image is from

14 shortly after K's, Joi's and the Spinner's arrival in Las Vegas.  It is an image

15 positioned from behind K, with his close-cropped hair, garbed in his distinctive

16 trench coat or "duster," as he stands next to his spinner, facing away from the

17 camera to survey the devastated orange-light-bathed Las Vegas cityscape.  In the

18 Exhibit A Image, K is surveying the ruins as he prepares to set out on the walk

19 through them that will lead him to the long-lost and mysterious Deckard – the most

20 highly anticipated encounter in the Picture.

21      70.    <u>Exhibit B Image in Story Context</u>.  The Exhibit B images attached

22 hereto and incorporated herein by reference are samples of still images from the

23 Las Vegas Sequence.  They include images from K's walk through the ruins to

24 encounter Deckard, and from when K is in Deckard's aerie looking out the picture

25 windows at the ruined city.

26      71.    <u>Non-Exhaustive List of Protected Elements of BR2049</u>: Original

27 protected elements of BR2049 include, but are not limited to:

28      a.  Still images from the Picture which are iconic or sufficiently

---

FIRST AMENDED COMPLAINT

recognizable to by themselves be identifiable as a still image from BR2049 versus any other motion picture, and especially such still images which evoke one or more of the other protected elements below.

b. The character K. Especially under storytelling theory where a "story" tracks the emotional development of a character through challenging periods of transition, K is the "story being told" in BR2049. K is also distinctively delineated, including visually. Indeed, he is at his most visually distinctive (iconically so) when depicted as a duster-clad man with close-cropped hair viewed in silhouette or near-silhouette, surveying or exploring a post-apocalyptic ruined cityscape bathed in orange light. K is also the only character in all of motion pictures to Plaintiff's knowledge who can be described as a duster-clad blade runner who surveys or explores an orange-lit post-apocalyptic ruined city.

c. Urgent Human-AI Decision Point Theme. Science fiction is always about the present in its themes and messages, and BR2049 is no exception. One of BR2049's main themes is that of society being at a critical decision point as to how humans and artificial intelligence relate to each other, and specifically that there are extremely consequential choices about that which must be made with urgency. Part of the theme is specifically that the wrong decisions will lead to apocalyptic ruin. BR2049's specific expression of the theme uses a visual relationship of signaling with orange lighting in ruins, and from K's perspective. For instance, in the Las Vegas Sequence, positive elements of a more happy and hopeful past or future (especially with an element of nostalgia) stand out from the rest of the sequence lighting in that the orange lighting is absent, either from a fragment of

FIRST AMENDED COMPLAINT

WB_0000967

1    the rest of a scene (genie-Sinatra, Deckard's hydroponic garden), or

2    for a full fight scene (K's non-fight with Deckard in the

3    malfunctioning hotel casino holo lounge).  In contrast, the

4    consequences of bad decisions or pressures of the human-AI

5    relationship question going unresolved driving the characters and

6    society to ruin is expressed in the orange lighting of the ruin setting,

7    with the orange lighting becoming darker and more intense as the

8    pressure and urgency of the human-AI relationship question

9    intensifies.  Autonomously capable artificially intelligent cars vehicles

10    taking the characters (us) alternatively toward and away from right or

11    wrong answers to the question is also part of the expression of the

12    theme.

13    d. Mood of Anxiety, Fear and Urgency, and specifically about the

14    Human-AI Decision Point: BR2049 uses story elements of apocalyptic

15    event back story, combined with specific visual elements such as

16    orange lighting, urban ruin, and the K figure in silhouette or near-

17    silhouette surveying or exploring the ruined post-apocalyptic

18    landscape (especially with the sense that, even in the ruin, there are

19    still worse things that could or might happen), all to create a mood of

20    anxiety, fear and urgency, specifically around the gravity of the

21    Human-AI Decision Point question, and the importance of making the

22    right decisions about it.

23    e. Setting: The setting of a post-apocalyptic urban ruin, specifically as a

24    place that holds answers or important information about the Human-

25    AI Relationship Question, bathed in orange light, and especially one

26    that is about to be explored by a blade runner in a duster shown in

27    silhouette or near-silhouette.

28    f. Combination of Elements: Even if one or more aspects of the above

FIRST AMENDED COMPLAINT

WB_0000968

1          protected elements list is unprotected, their use in combination,

2          especially in the context of urgent human-AI relationship questions, is

3          protectable, especially if openly labeled or presented as "Blade

4          Runner"-related by the infringer.

5      72.    Protected elements identification is discussed further herein in this

6 FAC in the context of Defendants' acts of infringement.

7                  **Infringed Property for Lanham Act Context:**

8               **Alcon's BR2049 Marks, Brand and Trade Dress**

9      73.    Alcon's "Blade Runner 2049" Mark.  Alcon owns, and has

10 continuously owned since prior to 2024, an unregistered trademark in the words

11 "Blade Runner 2049."  The claimed mark is broad enough to include the words

12 "Blade Runner" in contexts that refer to or include BR2049 (such as, for example,

13 the words "Blade Runner" not followed by the number "2049," but alongside

14 iconic images from BR2049, or other callouts to specific scenes or elements of

15 BR2049).  The words "Blade Runner 2049" are fanciful or arbitrary or suggestive

16 and thus inherently distinctive.  Even if only descriptive, they have nonetheless

17 achieved secondary meaning through years of continuous use in commerce by

18 Alcon, beginning no later than 2017.  This includes without limitation uses in

19 motion pictures, DVDs, comic books, video games, and other merchandise items,

20 all such that the BLADE RUNNER 2049 mark is widely recognized by the general

21 consuming public of the United States as a designation of source of the goods and

22 services of Alcon (or of a single source).  As detailed further below, the BLADE

23 RUNNER 2049 mark is also recognized by both the general consuming public and

24 by major car manufacturers and car brands as connoting affiliation with or

25 sponsorship by Alcon when used in connection with automobiles and automobile

26 brands (including both real automobiles, and concept automobiles).

27      74.    Alcon's "Blade Runner 2049" Brand and Trade Dress.  Still images

28 from iconic scenes in BR2049, and audiovisual clips of iconic scenes from BR2049

---

FIRST AMENDED COMPLAINT

WB_0000969

1  have also achieved secondary meaning as trade dress widely recognized by the

2  general consuming public of the United States as a designation of source as to the

3  goods and services of Alcon (or a single source) in all of the categories identified

4  above for the BLADE RUNNER 2049 mark.  As detailed further below, BR2049

5  itself, and still images from iconic scenes from it and audiovisual clips of iconic

6  scenes, are also specifically recognized by both the general consuming public and

7  by major car manufacturers and car brands as having secondary meaning connoting

8  affiliation with or sponsorship by Alcon (or a single source) when used in

9  connection with automobiles and automobile brands (including both real

10  automobiles, and concept automobiles).

11       75.   Alcon's Mark or Protectable Brand Good Will in the Character "K".

12  The character "K," including descriptions of K, and visuals images that look like or

13  evoke the character K, and/or that are held out to be the character K, either

14  explicitly or implicitly, are unregistered marks and/or protectable trade dress of

15  Alcon.  They have also achieved secondary meaning as trade dress widely

16  recognized by the general consuming public of the United States as a designation

17  of source as to the goods and services of Alcon (or a single source) in all of the

18  categories identified above for the BLADE RUNNER 2049 mark.  Including

19  because of the close connection between K and his flying spinner in the BR2049

20  Picture, Alcon's K marks and trade dress are especially recognized by both the

21  general consuming public and by major car manufacturers and car brands as having

22  secondary meaning connoting affiliation with or sponsorship by Alcon (or a single

23  source) when used in connection with automobiles and automobile brands

24  (including both real automobiles, and concept automobiles).  Sample visual images

25  of K can be seen in Exhibits A and B.

26       76.   Alcon's Protectable Lanham Act Interest in Combinations of Elements

27  Evocative of BR2049.  Alcon also has a protectable Lanham Act interest (mark,

28  brand or trade dress) in combinations of elements which evoke or tend to evoke

FIRST AMENDED COMPLAINT

1   BR2049 in the eyes of the ordinary consumer, in relevant markets in which Alcon

2   does business or intends to do business, including without limitation in the sense of

3   licensing affiliation rights or advertising rights to car companies and car brands.

4   Pertinent here, Alcon's protectable rights in this regard extend to showing an image

5   like Exhibit C with an accompanying voiceover discussing a "post-apocalyptic"

6   "Blade Runner" movie, especially in an overall context of robots (replicants are

7   sometimes recognized as a variation of robots) and artificially intelligent, semi-

8   autonomous or wholly autonomous cars. That combination of elements evokes

9   BR2049 under the "total effect of [the infringer's] product and package on the eye

10   of the ordinary purchaser test" applied in cases such as *Warner Bros.*

11   *Entertainment v. Global Asylum, Inc.*, 107 U.S.P.Q.2d 1910, 2012 WL 6951315 at

12   *8 (C.D. Cal. 2012).

13         77.   <u>Alcon's Development of the Marks and Trade Dress</u>. The above

14   marks and trade dress and other identified protectable Lanham Act interests of

15   Alcon have achieved at least secondary meaning, and in some cases famous mark

16   status, not merely accidentally, but because of Alcon's extensive and expensive

17   efforts. Beginning no later than 2011 and on a continuing basis ever since, Alcon

18   expended and continues to expend vast resources, in excess of $200 million to date,

19   from original acquisition of relevant underlying rights, to development, production,

20   marketing, and distribution of BR2049, to ongoing brand development and active

21   policing of infringements, to development, production and distribution of numerous

22   derivative works, including without limitation television series, comic books, and

23   video games. Alcon also specifically has been in the business of engaging in

24   license agreements where car companies and brands license rights to affiliate their

25   car brand with BR2049's marks and brands, since no later than 2016.

26         78.   The Picture was theatrically released globally on a day-and-date basis

27   in October 2017. It received an 89% positive audience reaction on well-known

28   film review site Rotten Tomatoes. Among numerous other awards, BR2049 was

FIRST AMENDED COMPLAINT

WB_0000971

1    nominated for five Academy Awards, and it won two: Best Cinematography and
2    Best Visual Effects. IGN gaming website named BR2049 the Best Movie of the
3    Year for 2017, the Golden Tomato Awards named it the Best Sci-Fi/Fantasy Movie
4    of 2017, and the 2018 Saturn Awards named it the Best Science Fiction film.
5    BR2049 is regularly identified as one of the best science fiction movies of all time
6    on lists of such movies generated by journalists, critics, and consumers.

7         79.    Alcon's efforts thus have generated robust consumer goodwill and
8    brand recognition for BR2049 and its elements, specifically including the Exhibit
9    A Image and the Exhibit B Images in the Lanham Act context, and the other marks,
10   trade dress and Lanham Act protectable elements identified in foregoing
11   paragraphs. Both the Exhibit A Image and some of the Exhibit B Images, have
12   been, and still are, prominently used by Alcon in the marketing, promotion and
13   publicity of BR2049.

14        80.    The Exhibit A Image was the image used as the lead visual image for
15   numerous marketing, promotional and publicity press pieces about the Picture
16   preceding the Picture's October 2017 initial theatrical release. It is still to this day
17   the image that appears as the cover image to the official BR2049 marketing and
18   promotional trailer as that trailer appears on YouTube. It is the back cover image
19   for *The Art and Soul of Blade Runner 2049*, the coffee table book celebrating the
20   Picture's visual design elements. It thus is one of the most iconic images from the
21   Picture, and also one of the most commercially significant in a marketing sense. It
22   immediately evokes BR2049 and everything the Picture stands for, without any
23   words or other references. It is the image which Defendants specifically requested
24   to use (and were refused by Alcon).

25        81.    Images from BR2049's same Las Vegas Sequence also have been, and
26   still are, used by Alcon for marketing, promotion and publicity for the Picture. As
27   just one example, the front cover of the same *The Art and Soul of Blade Runner
28   2049* coffee table book about the Picture is from the Exhibit B Images set (K's

---

FIRST AMENDED COMPLAINT

1  duster-garbed silhouette moving alone through misty orange-lit emptiness).

2  Exhibit B Images and similar images from the same sequence in the Picture

3  consistently appear at, or near, the top of search engine queries about the Picture.

4  Exhibit B Images and those like them from the Las Vegas sequence -- of a

5  silhouetted trench coat-garbed (or duster-garbed) man moving through a misty

6  orange-colored ruinous urban desert landscape -- are immediately evocative of

7  BR2049, without any other cues or references required.

8       82.    The Picture and its brand (including specifically the words "Blade

9  Runner" even without the year "2049," when used in contexts that evoke BR2049

10  distinct from the 1982 Picture, and specifically including the Exhibit A Image and

11  Exhibit B Images) all have especially high resonance as to artificial intelligence,

12  advanced automotive technology, and the combination of the two.  K's spinner has

13  been recognized culturally as one of the most famous vehicles in motion picture

14  history.  For example, the Petersen Automotive Museum in Los Angeles featured

15  one of the full-scale prop models of K's spinner prominently in the museum's

16  extended run of its "Hollywood Dream Machines: Vehicles of Science Fiction and

17  Fantasy" special exhibit which ran from 2019 to 2020.  The BR2049 K spinner was

18  one of only three vehicles selected to be on the marketing one-sheet poster for the

19  Petersen exhibit, along with the time-traveling DeLorean from the "Back to the

20  Future" movies and a light cycle from "Tron: Legacy."

21       83.    Numerous major automotive brands expressed substantial interest in a

22  co-promotion brand partnership with Alcon on BR2049 prior to the Picture's initial

23  theatrical release.  K's spinner as it appears in BR2049 is in fact visibly branded

24  under a major global automotive brand.  The contract price for that theatrical

25  release co-promotion was well into the eight figures (broken up into hundreds of

26  thousands of dollars in direct cash payments to Alcon, and tens of millions of

27  dollars in guaranteed co-promotional media spend for Alcon and the Picture's

28  ///

FIRST AMENDED COMPLAINT

1  benefit), with the length of on-screen visible branding involved being only ten (10)

2  non-consecutive seconds.

3      84.    BR2049 is a commercially living property, with an ongoing active

4  market for automotive brand partnerships in particular.  For instance, as already

5  mentioned, Alcon is currently in production on *Blade Runner 2099*, a BR2049-

6  derived sequel or spin-off television series.  At the time of the "We Robot" event,

7  Alcon was actively in the process of engaging with automotive brands for brand

8  partnerships on that project, and intends to resume such efforts if possible.

9      ***The October 10, 2024 Tesla Marketing Event and Alcon's Express Denial of***

10     ***Defendants' License Requests and Clear Objections to Any Affiliation***

11     85.    Some of what happened among the Defendants is not yet known to

12 Plaintiff, and likely will not be known until and unless Plaintiff is allowed

13 discovery.  Based on news reports, the nature of the event, and industry custom and

14 practice with respect to studio lot events, and partial information provided by

15 WBDI agents or representatives, Plaintiff makes the allegations in this paragraph

16 85 on information and belief and subject to the need for discovery: At some point

17 prior to October 10, 2024, Tesla and WBDI (or a WBDI subsidiary as the nominal

18 contracting party, but with WBDI in fact actively supervising and directing

19 decision making about the relevant facts alleged herein) entered into a contractual

20 agreement, the details of which are unknown to Alcon, but the essence of which

21 necessarily included that WBDI (or nominally a WBDI subsidiary being actively

22 directed and supervised by WBDI) would lease or license or otherwise provide

23 studio lot space, lot access, infrastructure support and other resources to Tesla for

24 the October 10, 2024 cybercab event and preparations leading up to it.  The event

25 involved substantial WBDI resources and lot access, and regardless of who the

26 nominal WBDI contracting entity was, the business and contractual relationship

27 with Musk and Tesla was important enough that it was actively supervised and

28 managed by WBDI.  Pre-event preparations were significant and started weeks or

---

FIRST AMENDED COMPLAINT

months prior, including Tesla vehicles repeatedly driving the studio lot to map it
beforehand, so that about fifty fully autonomous Tesla cars could navigate the lot
carrying Musk and event attendees on fully driverless rides as part of the event.
The contract necessarily would have required substantial financial compensation to
be paid by Tesla to WBDI (or a WBDI subsidiary, but flowing directly into
WBDI's consolidated financial statements), in at least the high six figures and
possibly in seven figures.

86.   Based on what actually happened at the event and the communications
from WBDI agents and representatives to Alcon on the day of the event, as well as
the absence of any substantial brand affiliation negotiation communications to
Alcon at earlier dates or at all, Alcon is informed and believes and subject to the
need for discovery thereon makes the allegations in this paragraph 86: The Tesla-
WBDI event contract (or another associated contract or set of understandings)
included a promotional element or elements, whereby Musk and Tesla expected to
be able to affiliate the cybercab with one or more motion pictures from WBDI's
motion picture library, or the motion picture library of WBDI's subsidiary Warner
Bros. Pictures, a division of WB Studio Enterprises Inc. ("Warner Bros. Pictures").

87.   Warner Bros. Pictures was Alcon's domestic distributor for the 2017
theatrical release of BR2049 and still has some domestic distribution rights, but not
without limitations and restrictions.  Warner Bros. Pictures has some limited and
ongoing "clip licensing" rights in the domestic market only, and not at all for a
livestream television feed.  Moreover, neither Warner Bros. Pictures nor any other
WBDI entity owns the copyright in BR2049 or any of the Picture's marks or
goodwill.  No WBDI entity has or ever had any non-domestic rights or permissions
for the Picture.  Thus, neither Warner Bros. Pictures nor any other WBDI entity has
or ever had sufficient rights to allow Tesla to exploit BR2049 or any of its
elements, or any of Alcon's marks or goodwill in connection with the globally
livestreamed cybercab reveal event.

---

FIRST AMENDED COMPLAINT

WB_0000975

88.     Warner Bros. Pictures has a longstanding course of dealing with Alcon generally and on BR2049 specifically.  Pursuant at least to that course of dealing, and custom and practice in the industry, Warner Bros. Pictures is required to, expected by Alcon to, and in fact actually does consult with Alcon and seek Alcon's approval prior to brand affiliation licensing of any BR2049 elements for, *inter alia*, a substantial, high-profile, and highly commercial brand affiliation, especially if the affiliation is potentially controversial or politically charged, and even if for only the domestic market.

89.     Neither Warner Bros. Pictures nor any other WBDI entity or representative ever communicated with Alcon at all about any potentially contemplated BR2049 brand affiliation with the Tesla cybercab or the event. (Even the communications that occurred from WBDI's representative to Alcon on the day of the event were disingenuously in the context of a purported relatively routine "clip license" request, never as the much more significant brand affiliation really at issue.)  That failure is inconsistent with the above long-standing course of dealing, and with custom and practice in the industry.

90.     Based on what actually happened at the event and the communications to Alcon from WBDI representatives on the day of the event and since, as well as the absence of certain communications to Alcon at earlier dates or at all, Alcon is informed and believes and, subject to the need for discovery, makes the allegations in this paragraph 90: Musk communicated to WBDI, either before Tesla entered into a contract or contracts about the event, or at some point in the event planning process, that Musk specifically wanted to associate the cybercab and Tesla with BR2049.  Musk believed (incorrectly) that in connection with the event, WBDI or Warner Bros. Pictures was going to be able to authorize Musk and Tesla's exploitation of BR2049 in connection with the event, or otherwise that WBDI or Warner Bros. Pictures could and would grant Tesla worldwide BR2049 exploitation rights to affiliate BR2049 with the cybercab during the event.  Among

---

FIRST AMENDED COMPLAINT

1   other BR2049 brand affiliation rights, Tesla and Musk asked WBDI (or one or

2   more Warner Bros. Pictures employees who were being actively managed and

3   directed by WBDI on event issues) for specific permission and rights to use the

4   Exhibit A Image.  The specific Tesla employees, contractors or agents tasked with

5   executing on these issues included David Adametz ("Adametz") (a video

6   production marketing executive at Tesla) and Shara Lili ("Lili"), a Manager of

7   Video Content for Tesla (also a video production marketing executive at Tesla).

8   One or both of Adametz and Lili were in direct contact with the WBDI executives

9   (or Warner Bros. executives acting under the direction of WBDI about event

10   issues) about the BR2049 brand affiliation, and one or both of Adametz and Lili

11   were also in direct or indirect contact with Musk about it, too.

12       91.    Based on similarly-founded information and belief, and subject to the

13   need for discovery, Alcon further makes the allegations in this paragraph 91: At the

14   request of one or all of the Defendants (possibly made by Adametz or Lili on

15   behalf of Tesla and Musk), WBDI's shared services rights clearance department

16   commenced clearance checks on the planned BR2049 brand inclusion in the

17   October 10, 2024 cybercab event.[5]  For reasons not yet fully known to Alcon,

18   WBDI's shared services rights clearance department commenced (incorrectly) to

19   clear the use as only involving a need for a "clip license" (typically a relatively

20

21

_____

22  [5] Shared services departments at Hollywood studios and their affiliated larger
corporate conglomerates have personnel (often legal, financial, accounting, or
23  human resources professionals) who may be ostensibly employed by, receive their
paychecks from, and have titles only with, a single corporate entity in the larger
24  conglomerate, but who in fact render services upon request or direction to a range of
entities within the conglomerate.  Here, Plaintiff is informed and believes and on
25  that basis alleges that the WBDI shared services licensing department personnel
26  involved in this matter included an individual executive who is based in Burbank,
California and ostensibly an employee of Warner Bros. Pictures, but who on request
27  or direction renders licensing and clearance services to WBDI or on its behalf.
28

_____

FIRST AMENDED COMPLAINT