128.   The rights acquired by Alcon included, and Alcon still owns, a perpetual non-exclusive, irrevocable license to the word mark "BLADE RUNNER."  Warner Bros. Pictures also has non-exclusive, irrevocable rights to the word mark "BLADE RUNNER."

129.   After the 2011 rights acquisition by Alcon, if not before, the essence of Warner Bros. Pictures exclusive rights in the 1982 Picture was and is that Warner Bros. Pictures continues to own the exclusive right to exploit the 1982 Picture as is (with no rights to make meaningful derivative, or new, works). Warner Bros. Pictures as a successor to The Blade Runner Partnership also owns and controls many or even most physical elements of the 1982 Picture (*e.g.*, physical prints of the 1982 Picture, old costumes, props, and the like), including car props (although Warner Bros. Pictures may from time to time sell these props to private parties).  Meaningful rights to make fresh content based on the 1982 Picture belong to Alcon, by virtue of Alcon's sweeping exclusive derivative work rights.

130.   Additional facts about the 1982 Picture are alleged in Appendix 1, including a story overview.

## BR2049

131.   <u>BR2049 Is The Copyright Infringed Work</u>.  Alcon produced BR2049 as a sequel to the 1982 Picture, pursuant to Alcon's derivative work rights.  Alcon is the owner and, as to all rights at issue herein, the exclusive copyright holder, of BR2049.  In copyright terms of art, BR2049 is both a "motion picture" and the "infringed work" in this action.  BR2049 has been registered with the United States Copyright Office under registration number PA0002056792 since October 6, 2017.

132.   Warner Bros. Pictures is the original and current (but not perpetual) distributor for BR2049 in the domestic territory (U.S. and Canada), pursuant to a license from Alcon.  SPE is the distributor for BR2049 for the rest of the world, also pursuant to a rights grant from Alcon.

WB_0001196

133.  <u>Exhibits A and B Relative to the Infringed Work</u>.  The images in Exhibits A and B are not themselves the Copyright Office-registered "infringed work" claimed.  In the terminology of the United States Copyright Act of 1976, as amended, 17 U.S.C. § 101, *et seq.*, the images in Exhibits A and B are examples of "still images" from BR2049 – in particular from the core dramatic sequence that appears in BR2049 at runtime 1:36:28-1:37:59, and continuing at 1:40:48-2:01:50 ("Las Vegas Sequence").  The Exhibit A image appears in BR2049 at about 1:37:55 in BR2049's run time.  The Exhibit B images are from run times between 1:36:28-1:37:59, 1:40:48-1:43:35, and 1:51:30-2:01:50.[17]

134.  <u>Exhibit A Image in Story Context</u>.  The Exhibit A image is from shortly after K's arrival in Las Vegas with his spinner, a fully autonomous flying car.  (*See* BR2049 story overview in Appendix 2.).  It is an image positioned from behind K, with his close-cropped hair, garbed in his distinctive trench coat or "duster," as he stands next to his spinner, facing away from the camera lens and audience to survey the devastated orange-light-bathed Las Vegas cityscape.  In the Exhibit A image, K is surveying the ruins as he prepares to set out on the walk through them that will lead him to the long-lost and mysterious Deckard – the most highly anticipated encounter in BR2049.

135.  <u>Exhibit B Image in Story Context</u>.  The Exhibit B images are samples of other still images from the Las Vegas Sequence.  They include images from K's walk through the ruins to encounter Deckard, and from when K is in Deckard's aerie looking out the picture windows at the ruined city.  (*See* BR2049 story overview in Appendix 2.)

///

---

[17] Alcon has noted the respective run time references next to each image, directly on Exhibits A and B.

SECOND AMENDED COMPLAINT

WB_0001197

1    136.   Additional facts about BR2049 are alleged in Appendix 2, including a

2  story overview and list of claimed protected elements.

3                    **ALCON MARKS AND TRADE DRESS**

4    137.   "BLADE RUNNER" Word Mark.  In actual usage, the words

5  "BLADE RUNNER" can refer to the 1982 Picture, BR2049, or both (as opposed to

6  the words "BLADE RUNNER 2049," which only refer to BR2049).  (*See, e.g.*,

7  Exhibit E at E-3 [use of "BLADE RUNNER" mark on back cover of the Alcon-

8  licensed coffee table art book *The Art and Soul of Blade Runner 2049*]; Exhibit H

9  at H-22 and H-23 [Space.com news article referencing cybertruck as "straight out

10  of Blade Runner" and making clear in body of article that writer is referring to both

11  the 1982 Picture and BR2049 by the headline]; Exhibit J and recorded video

12  interview of Event invitee recorded referenced therein,

13  https://www.youtube.com/watch?v=KyBFlYFIXcg [invitee answers journalist's

14  question of what invitee expects from the Event by explicitly referencing "Blade

15  Runner 2049," and by the end of the invitee's answer to the journalist has

16  shortened their usage to just "Blade Runner," even though the invitee appears to be

17  talking about BR2049 in the entire answer, transcribed *supra*, ¶ 69].)

18    138.   "BLADE RUNNER 2049" Word Mark.  Alcon exclusively owns, and

19  has continuously exclusively owned since prior to 2024, the unregistered trademark

20  word mark "BLADE RUNNER 2049."  The words "Blade Runner 2049" are

21  fanciful, arbitrary or suggestive and thus inherently distinctive.  Even if only

22  descriptive, they have nonetheless achieved secondary meaning through years of

23  continuous use in commerce by Alcon, beginning no later than 2017.

24    139.   Alcon's uses of BLADE RUNNER 2049 include without limitation

25  uses in connection with and to market, promote and advertise motion pictures,

26  DVDs, comic books, video games, and other merchandise items.  As a result, the

27  BLADE RUNNER 2049 mark is widely recognized by the general consuming

28

WB_0001198

public of the United States and the rest of the world as a designation of source of the goods and services of Alcon (or of a single source). As detailed further below, the BLADE RUNNER 2049 mark is also recognized by both the general consuming public and by major car manufacturers and car brands as connoting affiliation with or sponsorship by Alcon when used in connection with automobiles and automobile brands (including both real automobiles and concept automobiles).

140. <u>BR2049's Main Character K.</u> The character K, including descriptions of K, and visuals images that look like or evoke the character K and/or that are held out to be the character K, either explicitly or implicitly, are unregistered marks and/or protectable trade dress of Alcon. They also have achieved secondary meaning as trade dress widely recognized by the general consuming public of the United States and the rest of the world as a designation of source as to the goods and services of Alcon (or a single source) in all categories identified for the BLADE RUNNER 2049 mark.

141. Including because of the close connection between K and his flying fully autonomous spinner in BR2049, Alcon's K marks and trade dress are especially recognized by both the general consuming public and by major car manufacturers and car brands as having secondary meaning connoting affiliation with or sponsorship by Alcon (or a single source) when used in connection with automobiles and automobile brands (including both real automobiles and concept automobiles). Sample visual images of K as he appears onscreen in BR2049 can be seen in Exhibits A and B. Sample visual images of K as he appears in marketing and commercial uses by Alcon appear in Exhibit E.

142. Uses of K in the above contexts are non-functional. That an automobile is associated with an image of K has no actual bearing on the function of the automobile, but rather serves only as a source-identifying or source-affiliation function.

WB_0001199

143.  <u>Alcon Marketing Uses of Exhibit A</u>.  The Exhibit A image was the lead visual image used for numerous marketing, promotional and publicity press pieces about BR2049 preceding BR2049's October 2017 initial theatrical release. The Exhibit A image, including in the context of these marketing uses, is both inherently distinctive and also has secondary meaning, including by virtue of the extensive marketing spend and resulting widespread publicity and association with BR2049 that the Exhibit A image achieved with the 2017 global release of BR2049 and subsequent uses.  In the context of marketing, promotional and publicity identification of BR2049, the Exhibit A image is non-functional; for instance, on the YouTube trailer and other sites, the trailer and sites would still play and operate without the Exhibit A image.  The Exhibit A image is still to this day the image that appears as the cover image to the official BR2049 marketing and promotional trailer as that trailer appears on YouTube and other sites:



(Exhibit E at E-1.)

144.  A slightly modified version of Exhibit A (removing the K character from the image) is the back cover image for *The Art and Soul of Blade Runner 2049*, the coffee table book celebrating BR2049's visual design elements (K appears on the back cover image below in banner montage, fourth image from left, just above the main image of the spinner, and also appears on the front cover of the same book, as shown further below):

51

SECOND AMENDED COMPLAINT

WB_0001200



(Exhibit E at E-3.)  The modified image as used in this context is non-functional
and only serves as source identification.  The image does not help bind the pages or
make the book cover more durable or more utilitarian in any respect.

145.  The Exhibit A image is thus one of the most iconic images from
BR2049, and also one of the most commercially significant in a marketing sense.
It immediately evokes BR2049 and K by itself, and is strongly associated with both
of them in commercial marketing uses.

146.  Alcon Marketing and Commercial Uses of Exhibit B Images and
Similar Images.  Images from BR2049's same Las Vegas Sequence as the Exhibit
A image also have been, and still are, used by Alcon for marketing, promotion and
publicity for BR2049.  Exhibit B images that prominently feature a male figure in a
trenchcoat or duster moving through a distinctly orange-lit empty wasteland, or
wasteland with post-apocalyptic appearing urban ruins, are inherently distinctive,
and have also established secondary meaning.  Indeed, when fans want to create
fan art images of BR2049, images meeting the foregoing description are one of the
most common forms of image they create.  As just one example of an Alcon-
licensed use of such an image, the front cover of the same *The Art and Soul of
Blade Runner 2049* coffee table book referenced above is from the Exhibit B
///

SECOND AMENDED COMPLAINT

WB_0001201

1  images set (K's duster-garbed silhouette moving alone through misty orange-lit

2  desert landscape):



11  (Exhibit E at E-2.)  The image as used in this context is non-functional and only

12  serves as source identification.  The image does not help bind the pages or make

13  the book cover more durable or more utilitarian in any respect.  However, it is very

14  distinctive and has acquired secondary meaning, such that on the book cover image

15  above, if the word mark "Blade Runner 2049" were removed from the cover,

16  consumers would still instantly recognize the book as pertaining to B2049, from

17  the K image alone.

18      147.      Additional Examples of marketing and commercial uses of Exhibit B

19  images and those like them from BR2049's Las Vegas Sequence are in Exhibit E.

20  Exhibit E at E-5 is an art poster created by artist Pablo Olivera pursuant to a license

21  from Alcon, and which art poster was offered for sale and sold commercially:



53
SECOND AMENDED COMPLAINT

WB_0001202

(Exhibit E at E-5.)

148.   Exhibit E at E-4 is an image of a one sheet (marketing promotional poster) used by Alcon for the global theatrical release of BR2049:



(Exhibit E at E-4.)

149.   Exhibit B images and those like them from the Las Vegas Sequence -- of a silhouetted trench coat-garbed (or duster-garbed) man moving through a misty orange-colored ruinous urban desert landscape -- are immediately evocative of BR2049 and K, without any other cues or references required.  They are thus inherently distinctive, and have secondary meaning, including through the consumer association between BR2049 and the images built up by extensive Alcon marketing and publicity efforts using the images.

150.   <u>Combinations of Elements Evocative of BR2049</u>.  Alcon also has a protectable Lanham Act interest (mark, brand or trade dress) in combinations of elements which evoke or tend to evoke BR2049 in the eyes of the ordinary consumer, in relevant markets in which Alcon does business or intends to do business, including without limitation licensing affiliation rights or advertising rights to car companies and car brands.  Pertinent here, Alcon's protectable rights in this regard extend to showing images that look like K moving through or

54
SECOND AMENDED COMPLAINT

1   surveying an orange-lit post-apocalyptic ruin, and that are being present in the

2   context of science fiction movies, including the context of autonomous cars. That

3   combination of elements evokes BR2049 under the "total effect of [the infringer's]

4   product and package on the eye of the ordinary purchaser test" applied

5   in cases such as *Warner Bros. Entertainment v. Global Asylum, Inc.*, 107

6   U.S.P.Q.2d 1910, 2012 WL 6951315 at *8 (C.D. Cal. 2012).

7        151.   Beginning in or about 2011 and on a continuing basis ever since,

8   Alcon expended and continues to expend vast resources to develop, produce and

9   maintain BR2049 and BR2049-associated goodwill. Alcon has expended in excess

10  of $200 million on such efforts to date, from original acquisition of the relevant

11  underlying rights, to development, production, marketing, and distribution of

12  BR2049, to ongoing brand development and active policing of infringements, to

13  development, production and distribution of numerous derivative works, including

14  without limitation television series, comic books, and video games.

15       152.   Alcon theatrically released BR2049 globally on a day-and-date basis

16  in October 2017. BR2049 received and still has both popular and critical acclaim.

17  BR2049 received an 89% positive audience reaction on well-known film review

18  site Rotten Tomatoes. Among numerous other awards, BR2049 was nominated for

19  five Academy Awards, and it won two: Best Cinematography and Best Visual

20  Effects. IGN gaming website named BR2049 the Best Movie of the Year for 2017,

21  the Golden Tomato Awards named it the Best Sci-Fi/Fantasy Movie of 2017, and

22  the 2018 Saturn Awards named it the Best Science Fiction film. BR2049 is

23  regularly identified as one of the best science fiction movies of all time on lists of

24  such movies generated by journalists, critics, and consumers.

25       153.   BR2049 and its brand (including specifically the words "Blade

26  Runner" even without the year "2049," when used in contexts that evoke BR2049

27  distinct from the 1982 Picture, and specifically including the Exhibit A image and

28

WB_0001204

1  Exhibit B images) all have especially high resonance as to artificial intelligence,

2  fully autonomous automotive technology, and the combination of the two.

3  Especially in these contexts, the Exhibit A image and Exhibit B images are entirely

4  non-functional – they do nothing to make any autonomous automotive technology

5  or artificial intelligence function any better.

6      154.  K's spinner has been recognized culturally as one of the most famous

7  vehicles in motion picture history.  For example, the Petersen Automotive Museum

8  in Los Angeles featured one of the full-scale prop models of K's spinner

9  prominently in the museum's extended run of its "Hollywood Dream Machines:

10  Vehicles of Science Fiction and Fantasy" special exhibit which ran from 2019 to

11  2020.  The BR2049 K spinner was one of three vehicles selected to be on the

12  marketing one-sheet poster for the exhibit, along with the time-traveling DeLorean

13  from the "Back to the Future" movies and a light cycle from "Tron: Legacy."  The

14  poster was created pursuant to a license from Alcon:



26  (Petersen Automotive Museum One Sheet Poster (2019-2020).)

27  ///

SECOND AMENDED COMPLAINT

WB_0001205

## WBDI HAD THE CONTRACTUAL RIGHT AND ACTUAL ABILITY TO POLICE MUSK AND TESLA'S INFRINGING CONDUCT BUT INTENTIONALLY OR NEGLIGENTLY FAILED TO EXERCISE IT

155.   As referenced in prior paragraphs, Alcon's understanding is that there is no dispute that, even after the Alcon Event Directions to WBDI, WBDI did not actively police Musk's and Tesla's Event conduct against uses of BR2049 or any other property exclusively owned by Alcon.  By Alcon's understanding, WBDI's excuse and justification for not having done so is WBDI's contention that WBDI had no contractual right to police Musk and Tesla's Event conduct with respect to IP laws, and that WBDI also had no actual or practical ability to do so, either. (Musk's and Tesla's positions on both of these issues is silence.)

156.   Alcon disputes WBDI's excuse and justification in both respects.

***Alcon's Sources and Bases for Information and Belief Pleading on WBDI's Contractual Rights to Police IP Law Violations and Actual Ability to Do So***

157.   Plaintiff's sources for its information and belief pleading on WBDI contractual policing rights and actual ability to police include:

    a. Expert Consultation: Plaintiff's counsel hired and consulted with expert professionals in the studio lot event business and live event telecasting and livestreaming business.  These expert consultants reviewed available materials, including Defendants' Exhibits 1 (public redacted version only) and 2 (Event Recording), and applied their own experience and knowledge to assist pleading of the SAC.

    b. Custom and Practice and Industry Standards: The business of studios licensing their lot space and resources and potentially their IP for private events is a regular line of business for studios.  It has recognized customs and practices and industry standards, although the specific policies and practices of each studio can vary to some extent.

WB_0001206

The live event telecasting and livestreaming business similarly has its own customs, practices, and industry standards. The expert consultants provided Plaintiff's counsel with this information. Plaintiff's counsel is also an experienced content clearance and entertainment industry profit participation attorney.

c. <u>Defendants' Exhibit 2 (Event Recording) and Other Recordings of the Event</u>: This partial documentation of what happened at the Event and how it was conducted is a reasonable source, and one of the best sources, of what the agreed terms of the Event relationship between WBDI and Tesla must have been or likely were. In addition to the Event Recording, Plaintiff has located other recordings, including Event attendees who posted documentation of what occurred at the Event (videos, photographs, social media text posts) on social media and similar public facing sources.

d. <u>Information from Individual Percipient Witnesses</u>: Individuals with some percipient knowledge of what happened as to Event negotiations, the Event preparations process, and agreed terms and documentation of same are one of Plaintiff's sources of information. This includes WBDI shared services licensing executive Heath, who provided Alcon with information about Event matters prior to the filing of the action, both telephonically, and in communications like email records.

e. <u>Defendants' Exhibit 1</u>: This is an important source, and how Plaintiff applies it is discussed in detail in the sections below.

f. <u>Common Knowledge and Plaintiff's Counsel's Own Actual Knowledge of Certain Matters</u>: This includes subjects like the nature and significance of particular pieces of IP.

SECOND AMENDED COMPLAINT

WB_0001207

g. <u>Independent Factual Research</u>: This includes research on such matters
as present ownership and location of the 1982 Picture "56 Sedan," and
various other matters

158.   Some overarching principles and observations from the above sources
guide Plaintiff's information and belief reasoning for its pleading on the WBDI-
Tesla relevant contract terms and WBDI's actual IP policing abilities:

a. <u>Livestreaming Rights Industry Standards and Customs and Practices</u>:
In the studio lot event business, livestreaming rights do not necessarily
go along with the right to use the physical event space.  If
livestreaming rights are granted, they are virtually always
documented, including usually with special additional types of
insurance the licensee must have (*e.g.,* media liability insurance).
They are usually for an additional fee, over and above the live event
space fee.  Where they are granted, there will be clearance protocols
established.  There will be a production truck or video village set up
somewhere on the lot near the event, where a production and direction
team will produce and direct the livestream in real time, with ability to
make clearance decisions and effect them (*e.g.,* cutting the sound of
the livestream, switching off of a camera showing problematic
material, replacing the livestream feed with a test pattern if a
significant clearance problem arises).  If the production and direction
team does not include an embedded clearance professional (from the
studio or otherwise), the production and direction team will likely rely
on a clearance sheet or other typically written directions or guidance.
If they are conducting a livestream from a studio, they will as a
practical matter at a minimum be very deferential to and take note of
studio clearance instructions and guidance, even if not strictly

59
SECOND AMENDED COMPLAINT

1    contractually required to do so.  (It is a relatively small world and

2    making oneself unwelcome at a studio lot is not necessarily good

3    business practice).

4    b.  <u>Interaction Between Livestream Rights and Music</u>: One of the biggest

5    concerns and reasons strong clearance protocols are required if a lot

6    event is livestreamed is proper clearance of music rights and vigilance

7    against unauthorized uses of popular music in particular.  If an event is

8    only live (in-person, no livestream), rights to use songs and sound

9    recordings of songs can usually be handled efficiently and

10    economically, including through blanket licensing societies, like

11    ASCAP.  Livestream music rights, on the other hand, generally

12    require obtaining often very expensive synchronization licenses, and

13    often have to be negotiated work-by-work with particular rights

14    holder(s).

15    c.  <u>Valuable Studio IP Customs and Practices and Industry Standards</u>.

16    Studios are in the business of monetizing their IP content.  Among

17    other concerns, studios have to guard against third party infringement,

18    and also potentially have to answer to profit participants on accounting

19    for money that comes into the studio that might be attributable a

20    particular use.  The Event Recording and social media posts and other

21    public online posts by Event attendees show the following valuable

22    pieces of IP content known to be owned by one or more of WBDI's

23    subsidiaries (the "Valuable WBDI IP In The Event"), and all of which

24    would almost certainly have been done pursuant to a documented

25    license agreement, and on a case-by-case basis (*i.e.,* separate licenses

26    for "Westworld" and for the Batmobile), each with their own attached

27    specific monetary fee:

28

60<br>SECOND AMENDED COMPLAINT

1        (i)    "Westworld" motion picture and television property

2              elements. (*See, e.g.,* Event Recording at 0:42:49-

3              42:51; 0:43:24; 0:47:19-0:47:31.) The uses appear to

4              include the "Westworld" name and brand, in the live

5              portion of the Event, including on large digital map

6              displays prominent to in-person attendees (although

7              not prominent on the livestream). On social media

8              posts by Event attendees, "Westworld" branding is

9              also visible on the digital display screens inside the

10             Tesla vehicles at the Event.

11      (ii)    The Batmobile: (*See* Event Recording at 1:15:47-

12            1:15:43.) The Batmobile is one of the most diligently

13            guarded specific pieces of IP content in the WBDI

14            conglomerate IP library. It is visible on the lot for in

15            the Event space for the Event. That is almost certainly

16            not coincidental, and WBDI's decisions about it

17            would have been careful and documented.

18     (iii)    "Mad Max" derivative work poster: This work is not

19            visible on the Event Recording, but it is clearly visible

20            on social media posts of one more Event attendees

21            who took photos or video on their phones at the Event.

22            One visible use from such sources is a copy of one of

23            the iconic one sheets for the original 1979 "Mad Max"

24            motion picture featuring the Mad Max character in a

25            face shielded helmet clad in a black leather racing or

26            motorcycle suit and stepping forward on his right leg

27            away from a vehicle while brandishing a gun, all on a

28

WB_0001210

yellow background with red lettering, but in an altered version to make the vehicle behind the lead figure a cybertruck, and changing the one sheet title words from "Mad Max" to "Mad Musk."

(iv) 1982 Picture "56 Sedan": This is the orange (when shown in clear lighting) futuristic car driven by Deckard in the 1982 Picture. (Exhibit G at G-2.) It can be seen clearly at the Event in an attendee's social media post (Exhibit K at K-2), and also obliquely in the background of the Event Recording at 1:05:33-1:05:49 and 1:07:03-10.

***WBDI Had the Contractual Right to Police Musk's and Tesla's IP Law Compliance and Contractual Compliance During the Event, or, to the Extent It Failed to Secure Such Contractual Rights, That Was a Departure From and in Violation of WBDI's Own Standard Practices and Policies***

159. The allegations in paragraphs 160 to 177 below are **WBDI Contractual IP Policing Rights Alternative Theory 1.**

160. Plaintiff alleges on information and belief, subject to need for discovery, that WBDI in fact did have more than adequate contractual rights to police Musk and Tesla's compliance with IP laws in the course of the Event.

161. Relevant Definition of Event Contract for Analysis of WBDI Policing Rights and Policing Ability Issues. As a threshold matter, Plaintiff alleges and contends that, for purposes of issues that depend in whole or in part on what the contractual rights and abilities of WBDI to supervise or police Musk and Tesla were or were not, the "contract" that matter for analyzing such issues is not whatever contract terms may or may not have existed between WBDI and Tesla at some earlier date than the date of the actual Event (as WBDI appears to suggest).

WB_0001211

1   Instead, the relevant "contract" is: the "Event Contract," defined as whatever full

2   set of agreed contractual terms existed between WBDI and Tesla, however

3   manifested, as of the point in time when WBDI had received the Alcon Event

4   Directions to WBDI, or, if better for Alcon, as of the actual commencement of the

5   Event at about 8:00 p.m. PDT on October 10, 2024.

6        162.   The Event Contract as so defined is not necessarily set forth in any

7   one single written contract document, nor were the full overall contract terms in the

8   Event Contract necessarily reached between WBDI and Tesla all at once, but rather

9   likely at different times, in a kind of progression.  The Event Contract likely looks

10  something like one or more main contractual agreement documents, with multiple

11  addendums and/or additional, but clearly related, side agreements, or supplemental

12  or ancillary agreements.  The Event Contract could also include (and Alcon alleges

13  does include) understandings reached informally between WBDI and Tesla in such

14  communications as emails, or even oral or implied-in-fact understandings between

15  WBDI's and Tesla's respective representatives with authority.

16       163.   By the Event Contract as used here in the SAC, Alcon means that

17  whole set of agreed terms, however they are manifested, as WBDI and Tesla had

18  agreed to them by about 2:00 p.m. PDT on October 10, 2024 (about the point in

19  time when Alcon communicated the Alcon Event Directions to WBDI), or, if better

20  for Alcon, by about 8:00 p.m. PDT on October 10, 2024 when the Event actually

21  commenced.  Further, in the discussion of Event Contract terms and performances

22  here, unless otherwise noted, "WBDI" means "WBDI or a WBDI subsidiary as the

23  nominal contracting party, but which subsidiary for all issues relevant herein Alcon

24  alleges on information and belief, subject to the need for discovery, was acting at

25  the direction and under the control of WBDI."

26       164.   <u>The Event Contract Provided WBDI with More Than Adequate

27  <u>Contractual Rights to Police Musk and Tesla Against Violations of Alcon's</u>

28
SECOND AMENDED COMPLAINT

WB_0001212

1  Copyright and Lanham Act Rights in the Course of the Event.  Plaintiff makes the
2  allegation of the foregoing underlined heading sentence, and the allegations of
3  paragraphs 164-177 below, on information and belief, subject to need for
4  discovery, including under the following reasoning.

5        165.  Part of Plaintiff's support for this contention is the language of
6  Defendants' Exhibit 1. (Dkt. No. 32-1 [publicly redacted version]; both the
7  publicly redacted and sealed complete versions are referred to in the SAC as
8  "Defendants' Exhibit 1" or "Exhibit 1.")

9        166.  Defendants' Exhibit 1 on its face is a letter agreement on "Warner
10  Bros. Studio Operations" letterhead, with attachments, transmitted on September 4,
11  2024 by an executive at "Warner Bros. Special Events" to an executive at Tesla,
12  for a "Tesla Event" to take place on October 10, 2024 from 7:00 p.m. to 12:00
13  a.m., with a countersignature by Tesla on September 6, 2024.  WBDI has
14  represented to Plaintiff and the Court that this Exhibit 1 document is a genuine
15  document in WBDI's corporate records.  Further, as Plaintiff understands WBDI's
16  position, WBDI asserts that Defendants' Exhibit 1 is the one and only contractual
17  document between WBDI (or a WBDI subsidiary contracting on WBDI's behalf)
18  and Tesla regarding the Event, and contains all of the contractual terms between
19  WBDI and Tesla about the Event.

20        167.  Plaintiff was not involved with creating Defendants' Exhibit 1, and
21  has had no opportunity to take discovery about it or anything else.  As a result,
22  Plaintiff pleads two alternative theories about Defendants' Exhibit 1, both of them
23  on an information and belief basis, subject to need for discovery, as follows:

24        a.  **Nature and Authenticity of Exhibit 1 Alternative Theory 1:**
25            Defendants' Exhibit 1 is a genuine document from WBDI's corporate
26            records, and is or was an actual contracting document between WBDI
27            and Tesla regarding the Event.  However, including because Exhibit 1

28

WB_0001213

is dated several weeks before the Event actually occurred, and because its written terms on their face do not fully match, and sometimes flatly contradict, the observable evidence about what occurred with the Event itself, Exhibit 1 is part of, but <u>only</u> part of, the Event Contract. By the October 10, 2024 date of the actual Event, Exhibit 1 had been amended, modified, and/or supplemented by other communications and negotiations between WBDI and Tesla, such that Exhibit 1 only provides at most partial information about the Event Contract, and later agreed terms of the Event Contract almost certainly contradict some of the written terms of Exhibit 1. However, on terms like rights to police Tesla compliance with IP laws or other contractual or legal compliance, whatever the full set of Event Contract terms actually were between WBDI and Tesla regarding the Event, those policing and compliance terms of the Event Contract were at least as strongly in favor of WBDI having such rights against Tesla, and Tesla's employees, agents, contractors and representatives, as appear on the face of Exhibit 1.

b. ***Nature and Authenticity of Exhibit 1 Alternative Theory 2:***
*Defendants' Exhibit 1 is not a genuine document, including in the sense of not being any part of the actual contract terms between WBDI and Tesla regarding the Event. Exhibit 1 either is not actually what it appears to be on its face, or, even if it is, or once was, it was subsequently entirely superseded by other contracting documents, at the level of a novation or equivalent, such that it is not any part of the Event Contract. Even to the extent any of that is true, however, Plaintiff alleges on information and belief, subject to the need for discovery, that on all terms in the Event Contract regarding or related*

WB_0001214

1    *to WBDI's contractual rights to police Tesla compliance with IP laws*

2    *or other contractual or legal compliance, those terms were at least as*

3    *strongly in favor of WBDI having such rights against Tesla, and*

4    *Tesla's employees, agents, contractors, and representatives, as appear*

5    *on the face of Exhibit 1.*

6    168.   Pursuant to both Nature and Authenticity of Defendants' Exhibit 1

7    Alternative Theories 1 and 2, the Event Contract provided WBDI with at least the

8    level of contractual policing rights and compliance enforcement rights against

9    Tesla regarding compliance with IP laws and contractual obligations as appear on

10   the face of Exhibit 1.

11   169.   Exhibit 1 on its face has an extremely broad compliance with laws

12   clause, obligating Tesla, as the defined "Client" under Exhibit 1, as follows:

13       **9.  Compliance with Laws, Rules and Regulations:**

14       **9.1**        Client's and Client's Visitors' actions and conduct,

15       as well as equipment furnished by Client, will conform to all
         applicable Federal, State, and City statutes, ordinances,

16       regulations and laws, including, but not limited to, all
         applicable Occupational Safety and Health Acts.  Such

17       compliance will include the acquisition by Client of all
         necessary licenses and permits at its own expense.  Studio

18       agrees that its actions and conduct will conform to all
         applicable Federal, State and City statutes and ordinances,

19       regulations and laws.

20

21   (Defendants' Exhibit 1 at page 4, section 9, subsection 9.1, bold in original.)

22   170.   On its face, this term requires Tesla to comply with all Federal laws,

23   without any exception for copyright law or the Lanham Act, and further requires

24   Tesla to comply with such laws by "the acquisition by [Tesla] of all necessary

25   licenses … at its own expense."

26   171.   A Tesla failure to comply with these terms by, for instance, Musk or

27   Tesla committing copyright infringement or violating the Lanham Act, would be a

28

66
SECOND AMENDED COMPLAINT

1  violation of Federal law and thus a contractual breach by Tesla of Exhibit 1.

2      172.   Defendants' Exhibit 1 on its face gives WBDI extremely broad rights

3  to enforce WBDI's contractual rights against (*i.e.,* police against) breach by Tesla

4  of its legal compliance obligations or any contractual breach by Tesla. Those

5  rights in WBDI are in section 6.2 of Exhibit 1, which reads:

6          6.2  In the event Client breaches any of the terms or conditions of
7          the Event Letter or these Terms and Conditions, Studio may, in
           addition to any other rights and remedies available to Studio
8          hereunder or at law or in equity, immediately (i) suspend or cancel
           activities at the Event, or (ii) cancel the Event in its entirety and
9          these Terms and Conditions at any time thereafter, provided that
10         such breach is material. In such event, the entire License Fee shall
           be due and payable by Client to Studio.
11

12  (Defendants' Exhibit 1 at page 3, paragraph 6.2.)

13      173.   On the face of Exhibit 1, then WBDI had the right to "suspend or

14  cancel activities at the Event," including Musk's keynote speech and the livestream

15  of it, for <u>any</u> breach (material or non-material) of the compliance with laws clause,

16  and could cancel the entire Event altogether for a material breach of the clause.

17      174.   The Event Recording and other available sources about what actually

18  occurred at the Event show that the Event Contract necessarily included livestream

19  rights.

20      175.   The Event Recording and other available sources located by Plaintiff

21  show the Valuable WBDI IP in the Event, as discussed above. No responsible

22  Hollywood studio with sophisticated and experienced legal licensing professionals

23  at its disposal would ever agree to a contract for an event that included both of

24  those foregoing types of terms (valuable studio IP rights and actual content,

25  coupled with worldwide livestream rights), and which event contract did not also

26  include a contractual policing right in favor of the studio to make sure that,

27  whatever specific rights had been granted or not granted to the licensee with

28

WB_0001216

1 respect to the interaction of those two types of terms, the licensee would not engage

2 in any usage beyond the specific scope of the rights granted.

3       176.  WBDI at least sees itself as a responsible Hollywood studio and it has

4 sophisticated and experienced legal licensing professionals.  It would not have and

5 did not agree to the inclusion of the Valuable WBDI IP Provided to Tesla and the

6 worldwide livestream rights, without WBDI giving itself and requiring Tesla to

7 agree to, policing rights for the Event livestream, including the livestream of

8 Musk's keynote speech, that were at least as strong in favor of WBDI as the

9 policing rights visible on the face of Exhibit 1.

10       177.  Pursuant to the reasoning and allegations above, Plaintiff alleges on

11 information and belief, subject to need for discovery, that the Event Contract

12 provided WBDI with sufficient contractual rights to supervise, control and

13 otherwise police Musk and Tesla against actual or potential violation of Alcon's

14 rights exclusive rights under at least the Copyright Act in the course of the Event.

15       178.  ***WBDI Contractual IP Policing Rights Alternative Theory 2:*** *Plaintiff*

16 *alleges on information and belief, subject to the need for discovery, as an*

17 *alternative theory, that, to the extent that WBDI failed to secure contractual rights*

18 *against Tesla to police Musk and Tesla's conduct during the Event against*

19 *violations of IP law and against Musk and Tesla's breach of contractual*

20 *obligations, including during the live and livestream of Musk's keynote speech*

21 *during the Event, that failure was a material departure from and violation of*

22 *WBDI's own standard practices and policies, to Alcon's reasonably foreseeable*

23 *and actual prejudice.*

24 ///

25 ///

26 ///

27 ///

28

WB_0001217

*WBDI Had the Practical Ability to Police Musk's and Tesla's IP Law Compliance and Contractual Compliance During the Event And Actually Exercised It, Just Not With Respect to Alcon's Exclusive Property*

179.   For live studio lot events that will include a livestream element, and especially if valuable IP of the studio or a third party is also involved in or connected to the event, then all responsible studios as a matter of entertainment industry standards, custom and practice, and the studios' own practices and policies, implement at least one of the following three protocols for policing or "clearing" livestream content so that the livestream does not result in violations of the studios' or any third party's IP rights in valuable IP content:

a. Advance Livestream Script Provision by the Event Licensee.  This is a requirement that the licensee provide a script of the planned livestream content reasonably in advance of the commencement of the Event livestream, so that qualified studio professionals can conduct a policing or "clearance" review, without having such policing or clearance review occur in real time.

b. Clearance Sheet and Advance Communication of and Instructions Regarding Same to Production Truck or Video Village Livestream Production and Direction Team.  This is information, usually written, setting out the rules of what can and cannot be shown on the publicly performed or public displayed livestream feed, prepared by the studio and provided to the production and direction team who will staff the livestream production truck or video village, along with additional guidance and instruction those teams from the studio on actual implementation of the clearance rules for the livestream.  This is all for the purpose of the livestream production and direction team in the production truck or video village being able to engage in real time

WB_0001218

1   policing or clearance of actual or potential clearance rule violations

2   during the livestream.

3       c.   In-person or Virtual Placement of Studio Clearance Professional(s)

4            with the Livestream Production and Direction Team During the Actual

5            Livestream.  By this protocol, a studio clearance attorney, or other

6            experienced clearance professional from the studio, works in real time

7            with the production and direction team in the production truck or

8            video village, to give clearance advice and directions in real time.

9       180.   There is an additional entertainment industry standard custom and

10  practice and policy of responsible studios to the effect that, if a specific higher risk

11  of infringement of specific piece of IP content is identified prior to the livestream,

12  or if a specific expression of concern and/or request for extra vigilance has been

13  communicated about or received from a particular IP rights holder, that identified

14  higher risk, expression of concern or request for extra vigilance will result in the

15  studio implementing extra precautions to guard against the issue, over and above

16  the three protocols above, or as an enhanced implementation of all of them.  The

17  extra precautions often take the form of instilling heightened awareness of the issue

18  in expected actual or potential performers on the livestream (e.g., people expected

19  to give keynote speeches) and in the production and direction team in the

20  production team or video village.  In essence, the special risk gets "flagged" for

21  attention or put on a "watch list."

22      181.   Plaintiff alleges on information and belief, subject to the need for

23  discovery, that WBDI's standard practices and policies are consistent with

24  entertainment industry standards and customs and practices as described above.

25      182.   The Event Recording, and other sources found and reviewed by

26  Plaintiff as to what actually occurred at the Event, show all of the following:

27      a.   All of the Valuable WBDI IP in the Event was used in the live (in-

28

70
SECOND AMENDED COMPLAINT

WB_0001219