## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | CHAPTER 11 |
|  | ) |  |
| VILLAGE ROADSHOW | ) | Case No. 25-10475 (TMH) |
| ENTERTAINMENT GROUP USA INC., *et* | ) |  |
| *al.,* [1] | ) | (Jointly Administered) |
|  | ) |  |
| Debtors. | ) | Re:  Dkt Nos. 11, 197, 276, 297 |
|  | ) |  |
|  | ) | Hearing Date: |
|  | ) | October 20, 2025 at 10:00 a.m. |
|  | ) |  |

### AMENDED DECLARATION OF DAVID C. FRIEDMAN
### IN SUPPORT OF OBJECTIONS BY REGENCY ENTERTAINMENT (USA), INC.
### TO SALE OF DEBTORS' ASSETS AND
### ASSUMPTION AND ASSIGNMENT OF CO-OWNERSHIP AGREEMENT

I, David C. Friedman, hereby state and declare the following under penalty of perjury:

1.      I am the Executive Vice President and General Counsel of New Regency Productions, Inc. ("**NRP**"), a wholly owned subsidiary of Regency Entertainment (USA), Inc. ("**REUSA**"). In such capacity, I am familiar with REUSA's books and business records, including contracts to which REUSA is a party.

2.      I submit this declaration in support of the *Objection by Regency Entertainment (USA), Inc. to Sale of Debtor's Assets* and the *Objection by Regency Entertainment (USA), Inc. to Assumption and Assignment of Co-Ownership Agreement* ("**Objections**").[2]

---

[1] The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343. The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information is available on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg. REUSA can make a copy of the Co-Ownership Agreement available for *in camera* review by the Court if necessary.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Objections.

3.      I have reviewed REUSA's books and records and have personal knowledge of the matters set forth herein. All facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of REUSA's senior management team, my review of relevant documents, and/or my opinions based on my experience and knowledge of REUSA's business and legal affairs. If called to testify as a witness in this matter, I could and would testify competently to the facts set forth herein.

4.      On or about December 14, 2001, REUSA and VRF entered into that certain *"Don't Say a Word" Co-Ownership Agreement* (**"Co-Ownership Agreement"**).[3] At the time, they were each obtaining, through a series of assignments, an undivided one-half interest in the Derivative Rights in the Picture "Don't Say a Word." As part of those assignments, the rights of VRF and REUSA to further assign the Derivative Rights in the Picture were limited by a contractual provision which required any assignee to agree to be bound by the terms of the Co-Ownership Agreement. REUSA and VRF entered into the Co-Ownership Agreement because

REDACTED

.

5.      The language of the Co-Ownership Agreement is intended to protect the value of the Derivative Rights in the Picture. This is because the development of the Derivative Rights in the Picture, whether through one or more subsequent theatrical pictures, television projects, or other projects, requires a degree of trust and confidence between the co-owners of those rights,

---

[3] The Co-Ownership Agreement contains a confidentiality provision that generally restricts the parties from disclosing its material terms, including the existence of the Agreement, without the consent of the other party. Because the Debtors have already disclosed the existence of the Co-Ownership Agreement in the Supplemental Assumption Notice, REUSA's Objections only refer to the relevant terms of that Agreement to the extent necessary to enforce the Agreement and to explain why it cannot be assumed and assigned by the Debtors.

particularly with respect to the personal character and skills of the individuals who will ultimately be developing those rights.

6.     In accordance with the terms of the Co-Ownership Agreement, the parties each have the ability to propose a Derivative Rights project that may or may not include the other party. If the parties elect to develop a Derivative Rights project together, they are entitled to trust that they will be able to work cooperatively with the other party, who will bring the necessary experience, skill, and creative input to the project. Should one co-owner elect not to participate in a proposed Derivative Rights project, it remains entitled to trust that its co-owner will not single-handedly develop the Derivative Rights in the Picture in such a way as to devalue them and/or preclude the other party from any future projects that it may wish to pursue.

7.     The production of a movie or television show is an inherently artistic endeavor, dependent on the particular character, reputation, and skill of the parties involved. The language of the Co-Ownership Agreement is intended to protect the value of the Derivative Rights in the Picture, which is one of the primary purposes underlying the Co-Ownership Agreement.

8.     When REUSA entered into the Co-Ownership Agreement, VRF was an active co-financier, producer, and distributor of feature films, having both the personnel and the experience to deal with such matters. In addition to its producing and financing skills, VRF was a significant film distributor in particular international territories, and as a result of such skills and experience, VRF was granted the distribution rights to the Picture REDACTED

REDACTED . The Co-Ownership Agreement further contemplated that

REDACTED

REDACTED.

3

9.      At the time of entering into the Co-Ownership Agreement, Bruce Berman, Greg Basser, and Graham Burke were principals of VRF and REUSA had a particularly good working relationship with these individuals. A comprehensive set of business terms with respect to the Picture, including, but not limited to, Derivative Rights, was negotiated by the principals of REUSA and VRF and there was a high level of trust between the companies to develop the Picture into a commercially successful project. This is evidenced in part by the fact that, unlike the dispute resolution mechanism found in most agreements and due to the good working relationship between the parties, the parties believed that any disputes relative to the Co-Ownership Agreement should and could be resolved by the principals of the companies.

10.      Specifically,                    REDACTED

REDACTED

REDACTED          . These provisions are not customary, and their inclusion highlights the personal nature of the Co-Ownership Agreement, the intention of specific individuals at each company to work together with respect to the Picture, and the confidence of the contracting parties that they, through their principals, would be able to work cooperatively through any disputes.

11.      If a Derivative Rights project had been developed for the Picture while Mesrs. Berman, Basser, and Burke were with the Debtors, REUSA would have worked with those individuals. Additionally, because of REUSA's close relationship with Louis Santor, a former CFO for NRP and current COO for the Debtors,          REDACTED

REDACTED          . Each of these principals of the Debtor has the personal character and skills to oversee the development and exploitation of the Derivative Rights in the Picture in a manner acceptable to REUSA.

4

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.

Dated: September 24, 2025

_____
David C. Friedman