## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC., *et al.*,[1] | Case No. 25-10475 (TMH) |
| Debtors. | (Jointly Administered) |

### DECLARATION OF WAYNE M. SMITH IN SUPPORT OF WARNER BROS. ENTERTAINMENT INC.'S INITIAL OMNIBUS OBJECTION AND SUPPLEMENTAL OBJECTION TO (I) THE DEBTORS' MOTION FOR AN ORDER APPROVING THE SALE OF THE DEBTORS' ASSETS AND (II) THE DEBTORS' ASSUMPTION AND ASSIGNMENT OF CERTAIN WARNER BROS. AGREEMENTS

I, Wayne M. Smith, declare the following pursuant to 28 U.S.C. § 1746:

1.      I am an attorney at law, licensed to practice in the State of California.  I am employed by WarnerMedia Services LLC, a subsidiary of Warner Bros. Discovery, Inc., as Executive Vice President, Legal, Warner Bros. Studios, where I act as the head of legal with oversight over various business units including HBO, Warner Bros. Television, DC Studios and the Warner Bros. Motion Picture Group  (together with Warner Bros. Entertainment Inc. and its affiliates, "Warner Bros.").  I have been employed by Warner Bros. or its predecessors and affiliates in various legal capacities for over 25 years, since January 2000.  Prior to, and briefly overlapping with, my current role, from 2020 through May 2025, I was Head of Legal Affairs for Warner Bros. Motion Picture Group, adding DC Studios in 2022.  In that role, I supervised a group of attorneys and other legal professionals who were responsible for negotiating agreements relating

---

[1] The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343. The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

to the development, production, and financing of feature-length motion pictures developed, financed, produced, and distributed by Warner Bros. Since 2020, I have been the attorney at Warner Bros. who has been chiefly responsible for all legal issues regarding Village.[2] During that same period, I have also been involved in a number of legal matters involving Alcon Entertainment (including its affiliates, *e.g.*, Alcon Media Group, LLC, collectively "Alcon"), as explained in more detail below. Prior to my role as Head of Legal Affairs, from 2000 to 2020, I held various roles in the Corporate Legal department of Warner Bros., including supervising the handling of litigation and claims in which Warner Bros. was involved.

2. I submit this declaration as my written direct examination in support of *Warner Bros. Entertainment Inc.'s Omnibus Objection to (I) the Debtors' Motion For an Order Approving the Sale Of the Debtors' Assets, (II) the Debtors' Sale Supplement With Respect Thereto and (III) the Debtors' Assumption and Assignment of Certain Warner Bros. Agreements* (the "Omnibus Objection") and *Warner Bros. Entertainment Inc.'s Supplemental Objection to (I) the Debtors' Motion For an Order Approving the Sale Of the Debtors' Assets and (II) the Debtors' Assumption and Assignment of Certain Warner Bros. Agreements* (the "Supplemental Objection"), filed under seal at docket numbers 518 and 908, respectively.[3] Except as otherwise indicated, all facts set forth in this declaration are based on my personal knowledge, my review of the relevant documents, my discussions with the Warner Bros. team and its advisors, and my views based on personal

---

[2] "Village" refers to Village Roadshow Pictures North America Inc. ("VRPNA"), Village Roadshow Films North America Inc. ("VRFNA"), Village Roadshow Films (BVI) Limited ("VRF-BVI"), Village Roadshow Distribution USA Inc. ("VRD-USA"), Village Roadshow Distribution (BVI) Ltd. ("VRD-BVI") and/or VREG Wonka IP Global, LLC, as applicable.

[3] Capitalized terms used but not otherwise defined or described in this declaration shall have the meanings ascribed to them in the Omnibus Objection and Supplemental Objection, as applicable. References to **Exhibits** herein are references to those Exhibits affixed to the Smith Declaration (the "Initial Smith Declaration"), and the Appendix in support of the Supplemental Objection and Supplemental Smith Declaration (described herein as in support of the Supplemental Smith Declaration), as applicable.

experience and knowledge.  I am above 18 years of age, am competent to testify, and, if called as a witness, could and would testify competently to the facts set forth in this declaration on that basis.

## I. OVERVIEW OF WARNER BROS.' FILM CO-FINANCING AND DISTRIBUTION DEALS

### A. Film Co-Financing

3.      Warner Bros.—a studio that, among other things, produces its own motion pictures—finances many of those pictures itself.  However, Warner Bros. also co-finances a number of pictures with other studios and specialized film-financing investors, the latter of which will sometimes invest in a "slate" of films. Over the past 25 years, third parties that have co-financed motion pictures with Warner Bros. include Village; Legendary Entertainment; Ratpac Entertainment, LLC/Dune Entertainment; Domain Capital; Bron Creative; Universal Pictures, Paramount Pictures, DreamWorks, and Touchstone Pictures.  As discussed in more detail below, a film co-financing relationship requires a high degree of trust and cooperation.  Among other things, and as later described in connection with Warner Bros.' agreements with Village, Warner Bros. shares with its co-financier confidential information about its upcoming film projects and plans.  Those parties share credits on the resulting films and participate in media events and communications.

4.      In addition and in my experience, many commercial motion-picture production agreements require co-financiers like Village to pay their share of film co-financing as costs are incurred, ███████████████████████████████████████████████████████████████████ ████████████████████████████  Warner Bros.' film co-financing contractual relationship with Village in connection with certain derivative works is unique in that although Village becomes obligated to pay its co-financing share once a Warner Bros. motion picture is greenlit (assuming

3

Village accepts a Project Notice pursuant to the terms of the parties' agreements as set forth below), Village does not pay its co-financing share until just before the film is released, which sometimes may be years after Warner Bros. advances the initial funds to produce the picture.

### B. Film Distribution

5.      Separate and apart from film production and film co-financing, Warner Bros. also maintains a widespread domestic and international film distribution business. Warner Bros. has partnered with other film studios to distribute their films even when Warner Bros. has not produced or co-financed any of those pictures. A recent example of this is Warner Bros.' distribution of Apple's *F1*. Such an arrangement was also in place for Alcon's own films produced between 1999 to 2018 (except for the Alcon film, *Sisterhood of the Traveling Pants* 2, as discussed below). As compared to a co-financing relationship, a film-distribution relationship generally carries much less risk for the party that is merely distributing the film as there is no investment in the cost of the picture and marketing expenditures are almost always subject to a repayment guarantee. Accordingly, a film-distribution relationship pursuant to which Warner Bros. is only distributing pictures produced by a third-party studio—unlike a film co-financing relationship like the one Warner Bros. shares with Village in connection with the Derivative Rights—does not involve the sharing of the same level of risk or volume of sensitive information that film co-financing requires, and correspondingly, is not as dependent upon the particular character, reputation, skill and trust of the parties involved. Warner Bros., unlike Alcon, maintains widespread film distribution capabilities.

### C. Film Advances

6.      In certain instances, Warner Bros. provides advances against films it either distributes or co-finances. Like film-distribution relationships (and unlike a 50/50 film co-

financing relationship analogous to the one Warner Bros. shares with Village in connection with the Derivative Rights), film advances carry much less risk for the counter-party who provides the advance. This is because, in general, film advances are collateralized against revenues guaranteed back to the advancing party. Thus, such advances are recouped in a priority position after marketing, advertising and distribution expenses (typically referred to as "P&A") for a film are paid.

7.      As a result, a studio's provision of film advances does not require the same degree of trust and confidence as film co-financing. Warner Bros., on occasion, has provided P&A advances to certain studios with whom it has primarily shared a distribution relationship with, including Alcon.

## II.    WARNER BROS.' FILM CO-FINANCING AND DISTRIBUTION CONTRACTUAL RELATIONSHIP WITH VILLAGE

### A.    The Close Nature of the Parties' Relationship When Village was a Family-Owned Business

8.      Since 1998, back when Village was a family-owned business, Warner Bros. and Village have entered into numerous agreements setting forth their respective rights and obligations with regard to the co-financing and co-ownership of motion-picture properties. During this period, up until 2019, Warner Bros. had an established relationship with Bruce Berman, who served as an executive at Warner Bros. before joining Village. In addition, Warner Bros. had a close business relationship with both Greg Basser (until 2019) and Graham Burke (until 2017) given that they worked together for a long time.

9.      Warner Bros. and Village have co-financed over 90 theatrical motion pictures under those arrangements, beginning with the 1998 film *Practical Magic.*  Pursuant to the parties' agreements, Village is entitled to a contractually defined share of the proceeds from Warner Bros.'

exploitation of the co-financed films.  After a film is released, Warner Bros. continues to pay Village its contractually defined share of proceeds in accordance with the terms of Warner Bros.' film rights and distribution agreements with Village.

### B.  Village is Acquired by Vine, and the Parties' Relationship Becomes More Limited: Co-Financing Derivative Works Under the Parties' Agreements

10.     The nature of Warner Bros.' and Village's co-financing relationship, and their respective rights as contracting parties, has evolved over the years.  Since December 31, 2020, which was just several years after Village was acquired by a hedge fund (*e.g.*, Vine Alternative Investments Group, LLC), Warner Bros. elected to not extend its prior deal with Village and as a result, the parties are no longer engaged in co-financing any projects other than those that are derivative works (*e.g.*, remakes, sequels, prequels) of the motion pictures co-financed prior to 2021.  That is, since December 31, 2020, Village's only co-financing rights are in certain derivative works based on motion pictures that the parties co-own and previously co-financed; there is no existing agreement that contemplates Village co-financing new motion picture projects—*i.e.*, other than derivative works of prior projects.  Further, and as set forth below, Village's right to co-finance derivative works is limited by contract to those derivative works that meet certain requirements.

11.     There is nothing in any of the Warner Bros. agreements with Village that requires Warner Bros. to develop and produce any derivative works.  Rather, and as set forth further below, the agreements expressly provide Warner Bros. with the "unilateral right" and "sole discretion" over the development of such projects, and contain specific requirements on when Warner Bros. is required to offer Village a co-financing opportunity, should Warner Bros. elect to produce any derivative works.  For any derivative works that Warner Bros. does develop and plans to exploit, and that Warner Bros. and Village agree to co-finance, the agreements make clear that Warner

6

Bros. has broad and exclusive control over the distribution of such projects, and that Warner Bros. will front all production costs if Village commits to co-finance a derivative work.

### C. The Motion Picture Rights Purchase Agreements, the Earlier Qualified Cost Sharing Agreements, and Related Security Interests

12.    The last agreement that contemplated that Village might co-finance new, non-derivative motion picture projects was the 2014 *Motion Picture Rights Purchase Agreement* ("2014 MPRPA"), which was amended and restated in 2020 (the "2020 MPRPA") shortly prior to its expiration on December 31, 2020. Prior to the 2014 MPRPA, Warner Bros. and Village had entered into a similar dated as of October 14, 2009 ("2009 MPRPA"), which was amended and restated on November 12, 2012 ("2012 MPRPA" and together with the 2009 MPRPA, 2014 MPRPA and 2020 MPRPA, the "MPRPAs").  Prior to the 2009 MPRPA, Warner Bros. and Village entered into a series of four *Qualified Cost Sharing Agreements* (the "QCSAs"), as amended and restated, which similarly defined the terms on which Village might co-finance certain motion pictures and the parties' rights and obligations with respect to such pictures. Attached to the Initial Smith Declaration as **Exhibits 2 and 3**, and attached to the Appendix in support of the Supplemental Smith Declaration as **Exhibits 46 and 47**, are true and correct copies of the 2014 MPRPA, 2020 MPRPA, and 2009 MPRPA and 2012 MPRPA, respectively.

13.    The MPRPAs (as with the earlier QCSAs), among other things, are "master" agreements that set out the terms on which Village could co-finance new projects, and how Warner Bros. will finance projects that Village elects to co-finance. They also include the form Co-Ownership Agreements, form Rights Purchase Agreements (the "RPAs," or as analogous under the QCSAs, the Picture Agreements), and form of Assignments that the parties execute in connection with each Warner Bros. motion picture that is greenlit (assuming Village has agreed to co-finance such picture pursuant to the terms of the parties' agreements). While I understand the

Co-Ownership Agreements, as amended by the 2017 Omnibus Amendment and Omnibus Amendment No. 2, which are all further described and defined, constitute at least part of the "Derivative Rights Agreements," other of Warner Bros.' contracts with Village are relevant to the Debtors' proposed sale of the Derivative Rights to Alcon, including the MPRPAs, the QCSAs, and the Assignments (also as later described) for each Picture.

14.     Notably, Section 8.1 of the 2014 and 2020 MPRPAs refers to Warner Bros. (or a Warner Bros. affiliate) as the "Production Lender" and provides that Warner Bros. █████████ ████████████████████████████████████████████████████████████████████████ (emphasis added). That section further provides, in relevant part, that the funding provided by Warner Bros. includes ███████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████ and that ██████████████████████████████████████████████████ ████████████████████████████████████████████████ Section 8.2 of the 2014 and 2020 MPRPAs, in turn, define the ██████████████████████████████████████ subject to the terms set forth therein.

15.     The MPRPAs and QCSAs also grant Warner Bros. certain exclusive rights, including consent rights and intellectual property protections. The 2014 MPRPA and the 2020 MPRPA, for example, provide that for each co-financed picture, Warner Bros. and Village would enter into an RPA specific to that picture, which specified each party's rights and payment obligations in connection with such co-financed picture, among other things. Relevant here, Section 2(a) of the form RPA affixed as Exhibit F to the 2014 and 2020 MPRPA provides, in part, that █████████████████████████████████████████████ and that ████████ ████████████████████████████████████████████████████████████████████████

██████████████████████████████████████ In addition, Section 2(b) of that same form

RPA provides, in relevant part, that ███████████████████████████████████████

███████████████████████████████████████

16.    The 2014 MPRPA and 2020 MPRPA also provide for the execution of security

agreements and copyright mortgages and assignments in favor of Warner Bros. with respect to

certain picture rights.   Warner Bros.' liens and security interests maintain their priority over

Village's interests in any co-financed pictures, as set forth in the agreements.  For example, Section

2.1 of the 2014 and 2020 MPRPAs provide that ██████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████ (emphasis added).

Further, Section 3.5(a) provides that ███████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████ (emphasis added).  Finally, Section 6.1 provides that ████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████ (emphasis added).

9

17.    Additionally, and as relevant here, Section 13.5 of the 2014 MPRPA and 2020 MPRPA (entitled "Assignments") provides that, █████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ (emphasis added).

18.    Also relevant here, the 2014 and 2020 MPRPAs show how the relationship between Warner Bros. and Village is public facing.  Sections 9.1 and 9.2, for example, provides that ███ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ In addition, Section 9.4 of the 2014 and 2020 MPRPAs provide that ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████

19.    In addition to advancing all production costs of the pictures it co-financed with Village, beginning with the 2012 MPRPA, Warner Bros. ████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████ This ███████████████████████████████████████ ██████████████ and is defined in Article 1 of the 2020 MPRPA, for example, as ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ As described by Village

10

in ██████████████████████████ it provided to Warner Bros. in July 2020, a true and correct copy of which is attached to the Appendix in support of the Supplemental Smith Declaration as **Exhibit 54**, ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████ This is further reflected in Article 1 and Section 5.6(b) of the 2020 MPRPA. Village ████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

### D. The Co-Ownership Agreements and Amendments Thereto

20.     For nearly all co-financed pictures, Warner Bros. and Village also entered into a Co-Ownership Agreement.  The Co-Ownership Agreements generally set forth the parties' rights to produce, distribute, and otherwise exploit remakes, sequels, prequels, and other derivative works that Warner Bros. may create for the 91 films in the Film Library[4] that Warner Bros. co-financed with Village (the "Derivative Rights").  For example, Warner Bros. and Village entered into a *Co-Ownership Agreement with Respect to Remakes and Sequels of the Matrix* (the "Matrix Co-Ownership Agreement") dated as of October 30, 2003, which, among other things, sets forth Warner Bros.' and Village's rights with respect to future derivative works based on the first three *Matrix* films.  Attached to the Initial Smith Declaration **Exhibit 4** is a true and correct copy of the

---

[4] I understand that Village claims to have certain derivative rights with respect to up to 108 feature films (the "Film Library").  As set forth above, 91 of these 108 films are films that Village co-financed with Warner Bros.

Matrix Co-Ownership Agreement. Warner Bros. also entered into Co-Ownership Agreements with Village for 86 of the other Warner Bros. films in the Film Library.

21.     Over the years, Warner Bros. and Village have amended the Co-Ownership Agreements through certain Omnibus Amendments.  For instance, Warner Bros. and Village entered into an *Omnibus Amendment to Co-Ownership Agreements* as of August 29, 2017 (the "2017 Omnibus Amendment").  As set forth in Recital K thereto, Warner Bros.' and Village's mutually stated intent in entering the 2017 Omnibus Amendment was to "restructure the arrangements for exploiting the Derivative Rights under the various Co-Ownership Agreements so that the treatment of the ownership and exploitation of the Derivative Rights will be the same *for all Pictures*."  (Emphasis added).  This included the Matrix Co-Ownership Agreement, as well as all other Co-Ownership Agreements between Warner Bros. and Village that predated the 2017 Omnibus Amendment.  Attached to the Initial Smith Declaration as **Exhibit 5** is a true and correct copy of the 2017 Omnibus Amendment.

22.     Pursuant to Attachment 1 to the 2017 Omnibus Amendment, Warner Bros. and Village agreed to amend paragraph 4 in the Co-Ownership Agreements to confirm, among other things, that Warner Bros. has the "unilateral right" and "sole discretion" over whether to initiate any exploitation of Derivative Rights: "[Village] shall have the right to *propose* Sequel or Remake Projects or Television Projects for consideration by [Warner Bros.], provided that [Warner Bros.] *shall have __no__ obligation to agree to any such proposal* and [Warner Bros.]' decision to agree or not to agree to a proposal *is within its **sole discretion**, and neither VRF nor VRFNA [i.e., Village] shall have any right*, as a consequence, to exploit any of the Derivative Rights, nor shall VRF or VRFNA have any right to produce, license or exploit any of the Derivative Rights without [Warner Bros.]' written consent, it being understood that *only [Warner Bros.] shall have the **unilateral**

*right in its **sole discretion** to initiate any exploitation of the Derivative Rights*." (Emphases added.)

23.     Warner Bros. and Village also amended paragraph 4 in the Co-Ownership Agreements to confirm the derivative works for which Warner Bros. was required to offer Village a co-financing opportunity should Warner Bros. elect to produce such projects, and the process for doing so.  Specifically, Attachment 1 to the 2017 Omnibus Amendment amended paragraph 4 in the Co-Ownership Agreements to state that if a proposed "Sequel or Remake Project" or "Television Project" is based on a "Non-Library Film" or is a "Qualifying Derivative Work" (as those terms are defined in the agreements), Warner Bros. is required to provide Village with a "Project Notice" or "Television Project Notice," as applicable.  Such "Project Notice" includes

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████     and such "Television Project Notice" includes ████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████     This information,

particularly ████████████████████████████████ and ██████████████████████

████████████     is highly confidential and extremely sensitive information.  And this sensitive information is provided to Village, subject to the terms of, and as set forth in, the 2017 Omnibus Amendment and applicable Warner Bros.' agreements, regardless of whether Village elects to co-finance a project.  Based on my experience, the disclosure of (i) the contents of the screenplay of a film in advance of its release can seriously damage the film's commercial prospects, such as by revealing "spoilers"; and (ii) a film's Projected Budget (as defined in the 2017 Omnibus Amendment) would reveal extremely sensitive and private information to the public, including compensation paid to a number of individuals who can be identified by their unique roles (such as

the film's director).    In recognition of these highly sensitive matters, the Co-Ownership Agreements contain confidentially clauses, as found in the Matrix Co-Ownership Agreement, for example, which expressly provides that a party shall not disclose ███████████████████ ███████████████████████████████ subject only to certain narrow exceptions.

24.    The amended paragraph 4 of the 2017 Omnibus Amendment also states that the "Project Notice" or "Television Project Notice" constitutes an offer to Village to acquire an interest in the project and participate in the financing and co-ownership of the project.  Village has 15 business days to accept the offer, otherwise Warner Bros. may proceed with the production and exploitation of the "Sequel or Remake Project" or "Television Project" free and clear of any right or interest of Village.  However, if a "Sequel or Remake Project" or "Television Project" is based on a "Library Film"[5] and is not a "Qualifying Derivative Work," Village's derivative rights with respect to such Sequel or Remake Project or Television Project shall automatically revert, be reassigned, and be fully transferred to Warner Bros. at such time as such Sequel or Remake Project or Television Project is determined not to be a Qualifying Derivative Work.  In other words, Village has no right to co-finance such projects.

25.    In the event Village timely accepts the offer to co-finance a derivative work, Warner Bros. produces the derivative work and fronts all production costs.  Paragraph 4(b) of Attachment 1 to the 2017 Omnibus Amendment provides that ███████████████████

---

[5] The Library Films include, without limitation, (i) *Ocean's Eleven,* (ii) *Catwoman,* (iii) *Constantine,* (iv) *Charlie & the Chocolate Factory,* (v) *The Dukes of Hazzard,* (vi) *Ocean's Twelve,* (vii) *House of Wax,* (viii) *The Invasion,* (ix) *I Am Legend,* (x) *Get Smart,* (xi) *Ocean's 13,* (xii) *Speed Racer,* (xiii) *Sherlock Holmes,* (xiv) *Sherlock Holmes 2,* (xv) *Dark Shadows,* (xvi) *The Great Gatsby,* (xvii) *The Legend of Tarzan,* (xviii) *King Arthur: Legend of the Sword,* (xix) *Going In Style,* (xx) *Ocean's 8, and* (xxi) *Wonka.*   For clarity, Village has no co-ownership rights in derivative productions of *The Lego Movie* and *Sex and the City 2,* and very limited co-ownership rights in *Joker* (only in productions where Joaquin Phoenix plays the role "Joker").   In addition, Warner Bros.' underlying rights in the property on which the film *Edge of Tomorrow* was based have lapsed and, accordingly, any Derivative Rights have similarly lapsed.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████████████████████████████████ (Emphasis added).

26.     Paragraph 4(d) of Attachment 1 to the 2017 Omnibus Amendment further provides

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████ (Emphasis added).

27.     Warner Bros. and Village also entered into an *Omnibus Amendment No. 2* to Co-Ownership Agreements as of November 10, 2020 ("Omnibus Amendment No. 2"), which, among other things, also amended the language of paragraph 2 of the Co-Ownership Agreements to confirm that, ████████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████    (Emphases added).   Attached to the Initial Smith Declaration as

**Exhibit 6** is a true and correct copy of Omnibus Amendment No. 2.

28.    In the event that Village does not timely accept the offer to co-finance a derivative

work as set forth in the 2017 Omnibus Amendment, or to the extent a "Sequel or Remake Project"

or "Television Project" is based on a "Library Film" and is not a "Qualifying Derivative Work,"

and Warner Bros. chooses, in its discretion, to seek other co-financiers for future films, it is Warner

Bros.' desire to only partner with parties it can trust and with which it anticipates having a positive

working relationship with going forward.   These protections safeguarding with whom Warner

Bros. must conduct business, especially the sensitive and highly confidential business involved in

co-financing a film, are important to Warner Bros., and hence one sees them across various

agreements with Village.

29.    Based on the foregoing, for any derivative works that Warner Bros. develops and

intends to exploit and Village agrees to co-finance pursuant to the terms of the parties' agreements,

Warner Bros. is responsible for advancing all production costs, including Village's share.   This

advancement of production costs commences upon Village accepting a Project Notice and

continues until at least shortly before the initial theatrical release date, which may span several years, during which time Warner Bros. is entitled to charge interest on Village's co-financing share.  By way of example, Village's share of the production costs for a single film can exceed $100,000,000, as was the case with *Matrix IV*.  In some instances, this advance funding period has been extended further if Village requests and Warner Bros. grants Village additional time to pay its co-financing share, with extended notes issued as appropriate.

### E. The Assignments of Derivative Rights, as Limited by the Co-Ownership Agreements

30.     As previously discussed, the MPRPAs by and between Warner Bros. and Village contain corresponding form assignments of certain picture rights from Warner Bros. to Village (or, in the case of pre-2014 MPRPA pictures that Village co-financed with Warner Bros., to certain limited partnership entities), of Village's  respective interests therein, including Village's ultimate respective interests in the Derivative Rights (the "Assignments"). The parties' earlier QCSAs also contain forms of Assignment for each Warner Bros. motion picture.

31.     The specific language of these Assignments has varied slightly over the years.  For example, paragraph 2 of the *Assignment* of "All Rights" made by and between Warner Bros. in favor of WV Films LLC dated October 15, 1998 in connection with the motion picture *Practical Magic* (the "Practical Magic Assignment"), provides in part that ███████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ Paragraph 2 of the form *Assignment* found as Exhibit B to the 2009 and 2012 MPRPAs in turn provides, in relevant part, that ████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ A true and correct copy of the Practical Magic Assignment is attached to the Appendix filed in

support of the Supplemental Smith Declaration as **Exhibit 45**. And paragraph 2.1 of the form

*Assignment* marked as Exhibit F to the 2014 and 2020 MPRPAs provides, in part, that ███

████████████████████████████████████████████████████████████████

████████████████████

32.     Each of the QCSAs, and MPRPAs, in turn (and as later amended), generally

provide that the respective Warner Bros. and Village entities are required to execute a Co-

Ownership Agreement, substantially in the form affixed to each QCSA or MPRPA, and are

otherwise bound by their terms.  For example, Section 6.4 of that certain *Qualified Cost Sharing*

*Agreement* dated January 15, 1998, by and between WV Films LLC and WV Film Partners, L.P.

(the "1998 QCSA"), provides, in relevant part, that ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██   A true and correct copy of the 1998 QCSA is attached to the Appendix filed in support of the

Supplemental Smith Declaration as **Exhibit 48.**   Section 6.4 of all of the MPRPAs similarly

provide that ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████

33.     Before the Co-Ownership Agreements were amended by the 2017 Omnibus

Amendment and the Omnibus Amendment No. 2, in general, the Co-Ownership Agreements

similarly restricted Village's right to produce derivative works pursuant to their terms.  For

example, paragraph 2(a) of Exhibit D to the 1998 QSCA, which is titled the "*Form of Co-*

*Ownership Agreement With Respect to Remakes and Sequels of Warner-Developed Pictures,*"

provides that ████████████████████████████████████████████████████████

██████████████████████████████████████████████████ and paragraph 3 of that same exhibit provides that ████████████████████████████████████████████ ██████████████████████████████████████ (emphases added). Paragraph 4(a)-(d) of that same form Co-Ownership Agreement, titled ████████████ generally provides for Warner Bros.' unilateral right to exploit the Derivative Rights, subject to certain co-financing rights provided to Village as set forth therein. For instance, paragraph 4(a) provides in relevant part that, ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Notably, paragraph 4(e) of the form Co-Ownership Agreement to the 1998 QCSA provides that while ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ That same paragraph further provides that ██████████████████████████████████████████ ██████████████████████████ (emphasis added).

34.     In addition and in general, the Assignments of Derivative Rights to Village for Warner Bros.' earlier QCSA co-financed pictures with Village specifically acknowledge that Village's asserted one-half interest in the Derivative Rights remain subject to contractual restrictions as set forth in the Co-Ownership Agreements.  For instance, paragraph 3.1 of that certain *Assignment* of "Derivative Rights – WVFP" dated October 15, 1998, by and between WVFP and Village for the motion picture "Practical Magic" (the "<u>Practical Magic Derivative Rights Assignment</u>"), provides in pertinent part that ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████ Paragraph 3.2

of the Practical Magic Derivative Rights Assignment also provides that ██████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████ A true and correct copy of the Practical

Magic Derivative Rights Assignment is attached to the Appendix filed in support of the

Supplemental Smith Declaration as **Exhibit 49.**

35.     Similarly, paragraph 3.1 of that certain *Assignment* of "Derivative Rights – LP to

VRP" dated May 9, 2013, by and between WV Film Partners IV L.P. and Village for the motion

picture "The Great Gatsby" (the "Great Gatsby Derivative Rights Assignment") provides that ███

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████ Paragraph 3.2 of the Great Gatsby Derivative Rights Assignment

also provides in relevant part that █████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████ A true and correct copy of the Great Gatsby Derivative Rights

Assignment is attached to the Appendix filed in support of the Supplemental Smith Declaration as

**Exhibit 50.**

36.     Many (if not all) of the Assignments related to the 2014 MPRPA and later pictures

also contain specific language that Warner Bros.' assignment to Village of its share of the

Derivative Rights are limited by the Co-Ownership Agreement.  Paragraph 2.2 of that certain

*Assignment* dated October 1, 2019 for the motion picture "Joker," by and between Warner Bros.

and Village (the "Joker Assignment"), for example, provides in relevant part that ████████████

█████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████ A true and correct copy of

the Joker Assignment is attached to the Appendix filed in support of the Supplemental Smith

Declaration as **Exhibit 51.**

### F.  The Promissory Notes and Loan Agreement Related to Certain Pictures

37.    Separate and apart from the Assignments, the QCSAs, the MPRPAs, and the RPAs,

on a number of occasions Village, or entities associated with Village, did not pay its co-finance

share prior to release of the picture.  Instead of making payment, Village executed promissory

notes in favor of Warner Bros., ████████████████████████████████

████████████████████████████████████ Pictures for which Village

executed promissory notes and paid its co-finance share after the picture's release include █████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████ A true and correct copy of the December 19,

2014 Promissory Note Village executed in connection with the Warner Bros. motion picture

████████████, for example, is attached to the Appendix filed in support of the Supplemental

Smith Declaration as **Exhibit 52.**

38.    In addition, Warner Bros. has provided other financial accommodations to Village

in the past.  For example, Warner Bros. and Village entered into a *Loan Agreement* dated as of

May 26, 2010 by and between Village, as borrower, and Warner Bros., as lender, in the principal

amount of ████████, a true and correct copy of which is attached to the Appendix filed in support

of the Supplemental Smith Declaration as **Exhibit 53.**

### G. The Distribution Agreements and Related Security Interests

39.     In November 2020, Village and Warner Bros. also entered into a *Second Amended and Restated Output Distribution Agreement (Domestic)* (the "2020 Domestic Distribution Agreement"), which amended and followed the *Amended and Restated Output Distribution Agreement (Domestic)*, dated October 30, 2015 between Warner Bros. and Village (the "2015 Domestic Distribution Agreement"); a *Second Amended and Restated Output Distribution Agreement (Foreign)* (the "2020 Warner Foreign Distribution (F-D) Agreement"), which amended and followed the *Amended and Restated Output Distribution Agreement (Foreign)* dated as of October 30, 2015 between WBPL and Village (the "2015 Warner Foreign Distribution (F-D) Agreement"); and an *Amended and Restated Consolidated Output Distribution Agreement (Foreign)* (the "2020 Warner Foreign Agreement" and collectively with the 2020 and 2015 Domestic Distribution Agreements and the 2020 and 2015 Warner Foreign Distribution (F-D) Agreements, the "Distribution Agreements"). The Distribution Agreements, among other things, yet again confirm Warner Bros.' broad discretion and control over distribution of any co-financed motion pictures and set forth terms pursuant to which Warner Bros. would account to Village for receipts received from Warner Bros.' exploitation of the motion pictures distributed thereunder. Attached to the Initial Smith Declaration as **Exhibits 7, 8, 9, 10, and 11** are true and correct copies of the 2020 Domestic Distribution Agreement, 2015 Domestic Distribution Agreement, 2020 Warner Foreign Distribution (F-D) Agreement, 2015 Warner Foreign Distribution (F-D) Agreement, and the 2020 Warner Foreign Agreement, respectively.

40.     Under the 2015 and 2020 Domestic Distribution Agreements, Warner Bros. and Village agreed that Warner Bros. would have the right to "exploit or distribute directly, or license

to, or subdistribute through, a third party (whether or not affiliated with [Warner Bros.]) any of the Exploitation Rights determined by [Warner Bros.] in its sole discretion, without any consultation with [Village]." The 2015 and 2020 Domestic Distribution Agreements also contain other provisions setting forth Warner Bros.' broad control and discretion over distribution decisions. For example, Paragraph 6(e) provides that Warner Bros. "shall have the broadest possible latitude in exercising its rights under this Agreement and in exploiting its distribution rights in the Pictures" and that Warner Bros.' "judgment and decision in all matters pertaining to the distribution of any Picture shall be binding and conclusive upon [Village]."

41.     The Distribution Agreements also provide for the creation of certain security interests by Village in favor of Warner Bros. for picture rights, among other things. For example, the 2020 and 2015 Domestic Distribution Agreements require Village to execute certain security agreements, copyright mortgages, and assignments of copyrights in favor of WAV Distribution LLC ("WAV," a Warner Bros. affiliate), to secure WAV's security interests in each picture. Similarly, the 2020 and 2015 Warner Foreign (F-D) Agreements require Village to execute certain security interests, copyright mortgages, and assignments in favor of Warner Bros. Productions Ltd. ("WBPL").

42.     In addition, in the event that Village elects to co-finance a Derivative Rights work subject to the terms of the 2017 Omnibus Amendment as described above, Warner Bros.' relationship of trust with Village expands significantly. This is because Warner Bros.' agreements with Village require Warner Bros. to consult and work closely with Village on a wide range of extremely sensitive and confidential matters. For example, paragraph 2 of Exhibit G to the 2020 Domestic Distribution Agreement and 2020 Warner Foreign Distribution (F-D) Agreement each provide that Warner Bros. ███████████████████████████

████████████████████████████████████ Further, paragraph 3 of Exhibit G to those

agreements provide that Warner Bros. ██████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████ and in connection with that obligation,

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ And as

set forth in paragraph 4 of Exhibit G to those agreements, Warner Bros. is also required to ████

█████████████████████████████

## III.   ARBITRATION DISPUTES BETWEEN WARNER BROS. AND VILLAGE CONCERNING *MATRIX IV* AND *WONKA*

### A.  Overview of *Matrix IV* and *Wonka* Disputes

43.     For many years, Warner Bros. enjoyed a productive and beneficial relationship with Village.  However, after the following disputes between Village and Warner Bros. arose—both of which occurred after Village was acquired by Vine Alternative Investments Group, LLC, that relationship quickly deteriorated.

44.     On August 13, 2019, Warner Bros. sent Village a Project Notice in connection with the fourth Matrix film, *The Matrix Resurrections* ("*Matrix IV*"), pursuant to the Matrix Co-Ownership Agreement, as amended by the 2017 Omnibus Amendment.  Village sent Warner Bros. an acceptance of the Project Notice on August 21, 2019, and agreed to participate in the financing and co-ownership of *Matrix IV*.  In reliance on Village's agreement to co-finance the picture, Warner Bros. thereafter spent more than $200 million to produce *Matrix IV* and committed another $100 million more to market it.

45.     On December 3, 2020, in the heart of the Covid-19 crisis, Warner Bros. announced

its decision to release each of its 2021 theatrical motion pictures, including *Matrix IV*, simultaneously in theaters and on HBO Max—*i.e.*, a *"day-and-date"* release.

46.  On December 10, 2021—over a year after Warner Bros. announced its release plans for *Matrix IV*, and less than a week before the film was to be initially released on December 16, 2021—I received a letter from Village's counsel, which asserted that Warner Bros.' day-and-date release plan for *Matrix IV* breached the 2020 Domestic Distribution Agreement and that Village was invoking the dispute-resolution provisions under the parties' agreements, which required a period of time for the parties to attempt informal resolution before either party could initiate an arbitration.  Not until the eve of the movie's release (when publicly available tracking indicated that it would not perform as hoped) did Village refuse to pay its co-financing share.

47.  In February 2022, two months after *Matrix IV* was released and informal attempts at resolution with Village had failed, Warner Bros. initiated arbitration proceedings against Village, asserting that Village had breached its agreement to co-finance *Matrix IV* and seeking to collect Village's more than $100 million co-financing share (the "Matrix Arbitration").

48.  At the same time, and in connection with a separate dispute that had arisen with Village during 2021, Warner Bros. filed a separate arbitration demand seeking a declaratory judgment that Warner Bros. was not required to offer Village the opportunity to participate in co-financing a separate film project, *Wonka*, because it was based on a "Library Film" (*Charlie and the Chocolate Factory*) and is not a "Qualifying Derivative Work," and that Village's right to participate in derivative works of a number of other co-financed pictures based on "Library Films" was subject to the same limitations (the "Wonka Arbitration").

49.  After Warner Bros. filed its confidential *Matrix IV* and *Wonka* arbitration demands, and in violation of its agreements to arbitrate all disputes, Village filed a public complaint and

motion for a preliminary injunction in California state court in connection with both the *Matrix* and *Wonka* disputes, as well as a separate issue related to another potential derivative television project based on the motion picture *Edge of Tomorrow*.  Village also shared pre-filing versions of its complaint with the press, leaked confidential plot information about the forthcoming *Wonka* film, and its agents disparaged Warner Bros. and its executive team. Warner Bros. moved to compel arbitration of Village's lawsuit.  On May 27, 2022, the court denied Village's request for a preliminary injunction and granted Warner Bros.' motion to compel arbitration.  Attached to the Initial Smith Declaration as **Exhibit 21** is a true and correct copy of the Superior Court's May 27, 2022 Minute Order, and subsequent Nunc Pro Tunc Order entered that same day.

### B.  The Arbitrator Finds Village Liable to Warner Bros. and ██████████

50.     In July 2023, following more than a year of discovery and motion practice and a ████████████████, the Hon. Terry Friedman (Ret.) of JAMS (the "<u>Arbitrator</u>") issued an award in the Matrix Arbitration (the "<u>Final Award</u>"), finding that Village breached its contractual obligations to Warner Bros. by failing to pay its co-financing share for *Matrix IV* ███████ ████  Judge  Friedman ████████████████████████████ ████████████████████████████████████████ ████████  Judge Friedman ████████████████████████ ████████████████████████████████████████ ████████████████████████████  Judge  Friedman ██████████ ████████████████████████████████████████ █████████████████████████████████████  Attached to the Initial Smith Declaration as **Exhibits 22 and 23** are true and correct copies of the Arbitrator's July 21, 2023 Final Award and Order Granting Post-Hearing Relief.

### C.  Village Transfers the Derivative Rights for $1 per Transfer

51.    On November 28, 2023, four months after Judge Friedman issued his Final Award in the Matrix Arbitration, I received an email from counsel for Village notifying Warner Bros. that Village had assigned the Derivative Rights to approximately 90 films it had previously co-financed with Warner Bros. to other Village entities not named as respondents in the Matrix Arbitration for a consideration of $1 per transfer.  Attached to the Initial Smith Declaration as **Exhibit 24** are true and correct copies of the Assignments of Derivative Rights.  In March and April 2024, Warner Bros. objected that Village's transfers of these Derivative Rights to entities that were not respondents in the Matrix Arbitration for a total of $9 in consideration, was improper.

### D.  The Arbitration Appeal Panel Affirms Liability in Favor of Warner Bros. but Reverses and Orders Further Proceedings on the Amount of Warner Bros.' Damages

52.    Village appealed Judge Friedman's Final Award in the Matrix Arbitration. Following lengthy appellate proceedings, the arbitration appeal panel (the "Appeal Panel") issued an Interim Decision and Award on September 19, 2024, affirming Judge Friedman's liability ruling, finding that the ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ Judge Friedman ███████████████████████████████████████████████ Judge Friedman ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████    In its Interim Decision and Award, the Appeal Panel also noted, ███████████

██████████████████████████████████████████████

█ The Appeal Panel ███████████████████████████████████████

████████████████   In March 2025, Village filed these Chapter 11 cases and invoked the automatic stay to stay the August 2025 hearing before the Appeal Panel. The parties subsequently agreed to lift the stay and are scheduled for ████████████████████ to determine the amount of Warner Bros.' damages. Attached to the Initial Smith Declaration as **Exhibit 25** is a true and correct copy of the September 19, 2024 Appeal Panel Interim Decision and Award.

## IV.  THE CONNECTION BETWEEN ALCON AND WARNER BROS.

### A. Overview of Parties' Distribution Relationship That is Winding Down

53.    Warner Bros. and Alcon had, for many years, a productive and non-combative working relationship. Beginning in or around 2000, Warner Bros. and Alcon entered into a series of distribution agreements pursuant to which Warner Bros. distributed feature films produced by Alcon, for a limited term, for a fee. Some of the more notable films distributed by Warner Bros. under this arrangement, and which Warner Bros. continues to distribute, are *The Blind Side*, *Sisterhood of the Traveling Pants*, and *Blade Runner 2049*. The distribution arrangement between Alcon and Warner Bros. with respect to new projects, however, concluded at the end of 2019, and Alcon has subsequently partnered with other studios for distribution of any new films going forward.

### B. Warner Bros. Has Not Formally Invited Alcon to Co-Finance a Warner Bros. Motion Picture

54.    In addition to the limited distribution agreements, Warner Bros. has co-financed one Alcon produced film (*Sisterhood of the Traveling Pants 2*), which was based on literary rights owned by Warner Bros.' Alloy Entertainment. To my knowledge, Alcon, however, has not directly co-financed any films produced by Warner Bros. Warner Bros. is aware of a transaction

pursuant to which I understand Village sold its share of participation revenues in *Wonka* to Alcon on or about December 6, 2023 in exchange for Alcon financing Village's acquisition of a 50% interest in the film. Warner Bros.' only (and limited) involvement in that transaction was its execution of the Wonka Intercreditor Agreement and resulting security agreement that establishes the priority of Warner Bros.' liens in, among other things, picture rights. Also relevant here, Recitals Section F of the Wonka Intercreditor Agreement provides that, ███████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████ Village asked that Warner Bros. consent to Alcon being its direct co-financing partner for *Wonka*, but Warner Bros. refused that request and remained in contractual privity with Village—not Alcon.

55.     Though Warner Bros. and Village executed a Co-Ownership Agreement for *Wonka*, that agreement expressly provides, in relevant part, that ██████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████ The term ███████████████ █████ is defined in the *Motion Picture Rights Purchase Agreement* by and between Warner Bros. and Debtor VREG Wonka IP Global LLC (the "Wonka MPRPA"), and is in reference to the Wonka Arbitration.

56.     In addition, Warner Bros. objected to the Debtors' sale of Library Assets to Alcon in these cases but I understand that objection was subsequently resolved upon the Court's entry of the Library Sale Order.  Importantly, the Debtors' sale of Library Assets to Alcon does not present the same types of issues as the Debtors' proposed sale of their interests in the Derivative Rights.

Warner Bros.' engagement with Alcon in connection with their now-acquired interests in the Library Assets is generally limited to Warner Bros.' accounting for Alcon's (formerly Village's) share of contractually defined receipts related to the Pictures to Alcon, along with certain limited audit rights.  That type of relationship, where Warner Bros. is merely accounting to Alcon, is more transactional in nature, in contrast to the high degree of trust and cooperation that is required in a film co-financing relationship, including under the Derivative Rights Agreements, as discussed in my Initial Smith Declaration and described further below.  For example, Warner Bros.' relationship with Alcon as the purchaser of the Debtors' interests in the Library Assets does not require Warner Bros. to make advances or other accommodations on behalf of Alcon, does not grant Alcon with access to extremely confidential information about forthcoming Warner Bros. motion pictures, does not require Warner Bros. to work closely with Alcon on marketing and distribution plans for those films, and is not a public-facing partnership with shared logo and production credits on tentpole films with budgets in the hundreds of millions of dollars.

57.    Since 2019, and particularly following the closing of the merger with Discovery Communications in 2022, the Alcon/Warner Bros. relationship has been characterized by increasing disagreements, one of which has resulted in fractious litigation that remains pending. Specifically, since early 2024, Warner Bros. has had three separate disputes with Alcon, all of which I have been personally involved in, and which further illustrate why Warner Bros. views Alcon as an unacceptable candidate to acquire the Derivative Rights and enter into a partnership with Warner Bros., as set forth further below.

**C.  The Recent Alcon Disputes with Warner Bros.**

i.  The Alcon Lawsuit

58.    In October 2024, without any prior notice or discussion with Warner Bros., Alcon

filed a lawsuit against Warner Bros. relating to Telsa's rental of the Warner Bros. studio lot to

stage a October 10, 2024 event regarding self-driving taxis.  On October 7, 2024, three days before

the event was scheduled to occur, Tesla asked Warner Bros. if it could license a still from the

motion picture *Blade Runner 2049* (the "Still") for what was understood to be a display limited to

the event location, *i.e.*, not part of a live broadcast that was also planned.  The matter was referred

to me internally and I passed it on to Warner Bros.' Clips and Stills Licensing Department.  Warner

Bros. only holds domestic (United States and Canada) clips and stills licensing rights in *Blade*

*Runner 2049* and as such, Warner Bros. sent Tesla a proposed still license agreement that limited

the use of the Still to the United States and Canada.  On the morning of October 10, 2024, Tesla

advised Warner Bros. that it intended to include the *Blade Runner 2049* Still in its live broadcast,

which would require worldwide rights.  This was directed to my attention, and at 11:25 a.m. I sent

an email to Warner Bros. Event Specialist, Joesci McIntosh, stating:

> I thought that we had made it clear to Tesla that this still could not be part of a
> broadcast.  We do not have worldwide rights in the film.  Our rights are
> U.S./Canada only and expire in 2029.  If Tesla intends to broadcast anything
> containing this still outside the U.S./Canada it needs to obtain a license from Alcon.
> Please advise – thanks.

59.     At 11:53 a.m., Ms. McIntosh forwarded my email to David Adametz at Tesla,

advising that the image was not approved for worldwide broadcast and that "[i]f Tesla intends to

broadcast anything containing this still outside the U.S./Canada it needs additional licensing

through another company."  A true and correct copy of this email exchange is attached to the

Appendix filed in support of the Supplemental Smith Declaration as **Exhibit 28.**  At 12:54 p.m.,

the Warner Bros. Clips and Stills Licensing Department contacted Jeannette Hill, Executive Vice

President, Business and Legal Affairs at Alcon, and asked whether Alcon was willing to license

its rights in the Still to Tesla.   At 1:20 p.m., Ms. Hill advised that it did not approve of the use

and, as a result, no license was granted to Tesla. A true and correct copy of this email exchange is attached to the Appendix filed in support of the Supplemental Smith Declaration as **Exhibit 29**. At the time, I considered this to be the end of Warner Bros.' involvement in the matter. But it was not.

60.     On the morning of October 21, 2024, I learned from a story published by *The Hollywood Reporter* that Alcon had filed a lawsuit earlier that same day against Warner Bros., Tesla, Inc. ("Tesla"), Elon Musk ("Musk"), alleging, among other things, that after Tesla was unable to license an image from *Blade Runner 2049*, Tesla used AI to generate a "faked" *Blade Runner 2049* image (the "Alcon Complaint"). Although there was no evidence of any Warner Bros. involvement in the alleged "faked" *Blade Runner* 2049 image, the Alcon Complaint nonetheless directly implicated Warner Bros. in its creation, asserting, on "information and belief," factually unsupported claims against Warner Bros. for (1) direct copyright infringement, (2) vicarious copyright infringement, (3) contributory copyright infringement, and (4) false endorsement in violation of 15 U.S.C. § 1125(a)(1)(A) [*i.e.*, the Lanham Act]. Attached to the Appendix filed in support of the Supplemental Smith Declaration as **Exhibit 30** is a true and correct copy of the Alcon Complaint.

61.     Late in the afternoon on October 21, 2024, the same day the Alcon Complaint was filed, I sent an email to Alcon COO Scott Parish, with whom I had been in communications with regarding an amendment Alcon had requested to the *Wonka* interparty agreement mentioned above. That email, which was sent by me in an attempt to engage constructively with Alcon on the issues raised by the numerous false allegations in the Alcon Complaint, stated:

Hi Scott:

Sorry for the delays on the financing matter. A complicating factor has now arisen in that I am advised that WBD was named in a lawsuit filed by Alcon today with

respect to an event that was held by Tesla on the WB lot on 10/10. I've attached the complaint, which based on a complete distortion of the facts and unfounded assumptions based on "information and belief," makes the irresponsible and patently false accusation that WBD infringed the copyright in *Blade Runner: 2049* – something that Alcon knows, or at the least should know, is untrue. I know this to be the case as I was personally involved in the matter. The actual facts are the [sic] Tesla approached us at the last minute for a still license. We requested information about the intended use and did not learn until the morning of the event on 10/10 that Tesla wanted to use the still in a live broadcast. At that point, we advised Tesla (via an email that I wrote) that they would need to get permission from Alcon since we did not hold sufficient rights for such a license, and provided Tesla with contact information.

Clearly, based on the actual facts, Alcon had no legitimate basis to file a lawsuit against WBD, which is likely why the charging allegations of the complaint predictably and weakly rely on "information and belief." If it would help resolve the matter I could share with you, under appropriate conditions, my email that was sent to Tesla late in the morning of 10/10 that specifically advised that Tesla would need to obtain rights from Alcon. Let me know.

A true and correct copy of that October 21, 2024 email communication (excepting its attachment, *i.e.*, the Alcon Complaint, which is already affixed separately hereto) is attached to the Appendix filed in support of the Supplemental Smith Declaration as **Exhibit 31.**[6] Mr. Parish never responded to my email.

62.    On February 4, 2025, Warner Bros. (and separately, Tesla and Musk) filed motions to dismiss the Alcon Complaint (the "Initial MTDs"). On February 13, 2025, Alcon filed its opposition brief to those motions to dismiss ("Alcon's Response to Initial MTDs") alongside its *First Amended Complaint* against Tesla, Musk and Warner Bros. (the "Alcon Amended Complaint"), alleging (1) direct copyright infringement, (2) vicarious copyright infringement, (3) contributory copyright infringement, and (4) false affiliation and/or false endorsement in violation of 15 U.S.C. § 1125(a)(1)(A) [*i.e.*, the Lanham Act] related to the same event. Attached to the

---

[6] ████████████████████████████████████████████████████████

Appendix filed in support of the Supplemental Smith Declaration as **Exhibits 32 and 33** are true and correct copies of Alcon's Response to Initial MTDs and the Alcon Amended Complaint, respectively.

63.     Among other things, Alcon asserted in the Alcon Complaint that Warner Bros. had "conspired" with Tesla and Elon Musk to infringe upon Alcon's copyright in the film.  But, as Alcon itself conceded in the Alcon Complaint, these allegations were not based on any actual information, only Alcon's purported suspicions.  *See* **Exhibit 30** to the Appendix filed in support of the Supplemental Smith Declaration (stating that "[s]ome of what happened among the Defendants is not yet known to Plaintiff, and likely will not be known until and unless Plaintiff is allowed discovery"). Yet that conceded lack of knowledge did not stop Alcon from proceeding to make a series of false and defamatory allegations against Warner Bros, its now would-be co-finance partner, all premised on assertions of "information and belief."  The following excerpts, none of which are true, are taken directly from the Alcon Complaint and the Alcon Amended Complaint:

- "Plaintiff is <u>informed and believes</u> [that] . . . [Warner Bros.] had a financial incentive to avoid any claims of breach of contract or adjustment of the contract price, and one way to do that was essentially to allow the fudging (questionable manipulation) of the situation by either suggesting, encouraging, or knowingly allowing Tesla and Musk's generation of and use of the infringing Presentation Slide 2 Image." (Alcon Compl. ¶ 94).

- "Plaintiff is <u>informed and believes</u> and on that basis and subject to the need for discovery alleges that if [Warner Bros.] or its personnel were not Direct Infringers, WBDI's [clip licensing] department was at least being shown image options, including viewing the proposed Presentation Slide 2 Image in advance of the event, and thus knew about the infringement." (Alcon Compl. ¶ 109).

- "Plaintiff is <u>informed and believes</u> and on that basis, and subject to the need for discovery, alleges that [Warner Bros.] induced the infringement by convincing or encouraging the Direct Infringers and Tesla and Musk that Alcon's denial of any BR2049 permissions could be circumvented by

generation and use of an AI-generated copy of iconic BR2049 imagery, as Alcon alleges the Presentation Slide 2 Image to be." (Alcon Compl. ¶ 110).

- "Alcon is further <u>informed and believes</u> that the issue was then raised to a very high level within the [Warner Bros.] organization, essentially to the effect that Musk and Tesla were not getting something that they want, and [Warner Bros.] either effectively blessed Musk and Tesla to incorporate BR2049 in the event anyway, and/or failed to take meaningful action to stop them, although such action was available." (Alcon Am. Compl. at ¶ 96).

- "Plaintiff is <u>specifically informed and believes</u> . . . that the issue of whether or not Musk and Tesla should be allowed to use any aspect of the [Blade Runner] 2049 property in the event and whether [Warner Bros.] should do anything to stop them from doing so was raised internally at [Warner Bros.] to a very high level [Warner Bros.] executive, such that [Warner Bros.] was actively aware of the issue, and did nothing to stop it." (Alcon Am. Compl. ¶ 96).

(Emphases added.)

64.    Alcon did not limit its defamatory assertions against Warner Bros. to the Alcon Complaint. After Warner Bros. filed its Initial MTD on the ground that Alcon's claims against it lacked any basis in fact and could not be overcome by "information and belief" pleadings, Alcon proceeded to double down on its false theories as reflected at pages 5 and 6 of Alcon's Response to Initial MTD:

> Alcon's vicarious copyright infringement liability theory at core is along the lines that Musk and Tesla agreed to enter into an event arrangement with [Warner Bros.] that was highly lucrative for [Warner Bros.], and that, either as a formal term or as an informal back-scratching or customer courtesy, Musk and Tesla expected [Warner Bros.] to throw in some motion picture brand affiliations for their car advertisement, and the one that they wanted most was [*Blade Runner 2049*]; when Alcon told Musk and Tesla 'no way,' [Warner Bros.] did not have the corporate fortitude to stand up fully to Musk and Tesla, given the financial stakes.

The actual facts are that it was Warner Bros., not Alcon, that initially advised Tesla that it was unable to grant the rights that Tesla sought and, similarly, it was Warner Bros. that communicated to Tesla that Alcon was unwilling to grant those rights and therefore the Still could not be licensed.

This was the information I had offered to share with Alcon's COO Scott Parish on the same day the complaint was filed, and would have, had he bothered to respond to my email.

65.     On March 6, 2025, Warner Bros., Tesla, and Musk filed motions to dismiss the Alcon Amended Complaint (the "Motions to Dismiss").

66.     On April 4, 2025, the United States District Court for the Central District of California (the "District Court") issued a tentative ruling ("Alcon Lawsuit Initial Tentative Ruling") which granted (1) Warner Bros.' motion with respect to Alcon's first cause of action, (2) both Motions to Dismiss with respect to Alcon's second cause of action, and (3) both Motions to Dismiss with respect to Alcon's fourth cause of action.  In the Alcon Lawsuit Tentative Ruling, the District Court pointed out, among other things, that "[Alcon] alleges that, after last-minute attempts to secure rights through [Alcon] failed, Warner [Bros.] essentially 'stood by' and did nothing, with [Alcon] asserting that Warner [Bros.] 'either effectively blessed Musk and Tesla to incorporate BR2049 in the event anyway, and/or failed to take meaningful action to stop them, although such action was available,' 'empower[ing]' Musk 'to do it anyway,'" was "made on information and belief," and that "on [that] particular point [Alcon] [did] not have sufficient facts surrounding the allegation to make it in this manner."

67.     As to certain of Alcon's other theories of liability against Warner Bros. in the Alcon Complaint, the District Court noted in the Alcon Lawsuit Initial Tentative Ruling:

> Instead, Plaintiff has alleged here[] that Warner [Bros.] took certain steps in advance of the 'We Robot' event in an attempt to obtain proper clearance of BR2049, but that those efforts failed. Beyond that, Plaintiff simply asserts – without citation to any facts supporting the assertion, making it an improper/insufficient information-and-belief allegation – that Warner [Bros.] 'blessed Musk and Tesla to incorporate BR2049 in the event anyway, and/or failed to take meaningful action to stop them, although such action was available,' leaving Musk to feel 'empowered' to use BR2049 anyway. FAC ¶¶ 96-97, 142. Plaintiff has made no effort to explain what 'such action was available' means factually. *See also id.* ¶ 18 (alleging that Warner [Bros.] 'ultimately failed' 'to keep Musk bounded by well-

established rules of the business' 'when it could have'); *id.* ¶ 142 (alleging on information and belief that 'the issue of whether or not Musk and Tesla should be allowed to use any aspect of the BR2049 property in the event and whether [Warner [Bros.]] should do anything to stop them from doing so was raised internally at [Warner Bros.] to a very high level [Warner Bros.]] executive, such that [Warner [Bros.]] was actively aware of the issue, and did nothing to stop it'). The other allegations on this topic are entirely conclusory, meaning that the Court need not accept them as true. *See id.* ¶ 34 (alleging that the 'We Robot' event 'was actively monitored by, supervised by, and ultimately controlled by and directed by executives at' Warner [Bros.]'); *id.* ¶ 142. Even if the Court were to accept as true Plaintiff's summary assertion that, because of its pre-clearance role/efforts, Warner [Bros.] must have had the right and ability to tell Tesla/Musk that their infringing conduct was not acceptable and could not be part of the presentation, *see id.*, Ninth Circuit authority indicates that being in that position is insufficient for purposes of this element.

These were precisely the infirmities that I had pointed out to Alcon COO Scott Parish in my unanswered email to him on October 21, 2024, the same day Alcon's lawsuit was filed.

68.     In addition, the District Court noted in the Alcon Lawsuit Initial Tentative Ruling that "[t]o the extent the Court will grant one or both motions, it is unlikely that the Court will do so with leave to amend and, with respect to the Lanham Act claim, the claim will almost certainly be dismissed with prejudice."   Attached to the Appendix filed in support of the Supplemental Smith Declaration as **Exhibit 34** is a true and correct copy of the Alcon Lawsuit Tentative Ruling.

69.     On April 7, 2025, the District Court entered a subsequent minute order (the "Alcon Lawsuit Minute Order"), granting the Motions to Dismiss with leave to amend and giving the parties 21 days from the date of the Alcon Lawsuit Minute Order to mediate the case.  The District Court also noted that "if settlement is not reached, the Second Amended Complaint will be filed 21 days after the mediation deadline."   Attached to the Appendix filed in support of the Supplemental Smith Declaration as **Exhibit 35** is a true and correct copy of the Alcon Lawsuit Minute Order.

70.     On June 16, 2025, Alcon filed its *Second Amended Complaint* (the "Alcon Second

<u>Amended Complaint</u>") against Warner Bros., Musk and Tesla related to the same October 10, 2024 Tesla event, alleging claims of (1) direct copyright infringement, (2) vicarious copyright infringement, and (3) contributory copyright infringement against Tesla, Musk and Warner Bros., and alleging its fourth claim for false affiliation and/or false endorsement in violation of 15 U.S.C. § 1125(a)(1)(A) [*i.e.*, the Lanham Act], only as against Tesla and Musk. Attached to the Appendix filed in support of the Supplemental Smith Declaration as **<u>Exhibit 36</u>** is a true and correct copy of the Alcon Second Amended Complaint (without any of its attachments). Through the Alcon Second Amended Complaint, Alcon continued to assert a false narrative that Warner Bros. wrongly "spen[t] time on the 'clip license' plan rather than immediately informing Alcon of Musk and Tesla's specific expression of interest in using protected elements of BR2049 for the Event." Alcon does so despite admitting that Warner Bros.' "shared services licensing department told Tesla that Warner Bros. was now—very close to the scheduled start of the Event—not going to be able to license the Exhibit A image to Tesla for Musk's keynote speech as planned." Alcon also further contends that, notwithstanding Warner Bros.' aforementioned actions, Warner Bros. "intentionally or negligently failed actively to police Musk and Tesla's conduct during the Event."

71.      On July 30, 2025, Warner Bros., and separately Musk and Tesla, once again moved to dismiss the Alcon Second Amended Complaint (the "<u>Second MTD</u>"). A true and correct copy of Warner Bros.' Second MTD is attached to the Appendix filed in support of the Supplemental Smith Declaration as **<u>Exhibit 37.</u>**

72.      On August 21, 2025, Alcon filed is opposition to the Second MTD. A true and correct copy of Alcon's objection to the Second MTD is attached to the Appendix filed in support of the Supplemental Smith Declaration as **<u>Exhibit 38.</u>**

73.      On August 28, 2025, Warner Bros., Musk and Tesla filed a reply in support of their

Second MTD. A true and correct copy of that reply is attached to the Appendix filed in support of the Supplemental Smith Declaration as **Exhibit 39.**

74.    On September 9, 2025, the District Court issued a tentative ruling on the Second MTD (the "Alcon Lawsuit Second Tentative Ruling"). A true and correct copy of the Alcon Lawsuit Second Tentative Ruling is attached to the Appendix filed in support of the Supplemental Smith Declaration as **Exhibit 40**. In that ruling, the District Court once again granted Warner Bros.' Second MTD with respect to Alcon's first and third causes of action, with Alcon's Lanham Act claim already having been dropped as against Warner Bros. In doing so, the District Court emphasized the deficiencies in Alcon's "information and belief" allegations as to Warner Bros.:

> None of the "sources" Plaintiff identifies for its "information and belief" allegations about Warner [Bros.]'s right and ability to "police" Tesla's/Musk's alleged intellectual property violations, *see* SAC ¶¶ 157(a)-157(g), actually have anything to say about Warner [Bros.']'s abilities/power here vis a vis Plaintiff's content. There is no Warner [Bros.] employees or agents. That Warner may have licensed certain of its properties to Tesla, *see id.* ¶¶ 158(c)(i)-158(c)(iv), does not mean that its failure to stop Tesla and/or Musk from inappropriately using Plaintiff's properties was in violation of any Warner [Bros.] right/responsibility to control. As a result, Plaintiff's "information and belief" allegations relating to this topic are little more than educated guesswork. *See id.* ¶¶ 160-185; *see also Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1161 (9th Cir. 2022) ("[A] plaintiff may plead facts on information and belief 'where the belief is based on *factual information* that makes the inference of culpability plausible.'") (emphasis added) (quoting *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017)). To be clear here, Plaintiff has obviously attempted to have "information and belief" allegations carry much of its water in getting across the pleading line in this case. Muddying the waters at this stage by such practice is unnecessary, and certainly unhelpful. . . . . Speculative "information and belief" allegations on this point at this juncture are unnecessary, in that light.

75.    On September 11, 2025, the District Court entered a minute order, granting the Second MTD for the reasons stated in the Alcon Lawsuit Second Tentative Ruling and allowing Alcon leave to amend its complaint no later than October 2, 2025. A true and correct copy of that order is attached to the Appendix filed in support of the Supplemental Smith Declaration as

**Exhibit 41.**

76.    On October 2, 2025 Alcon filed its *Third Amended Complaint*, attached to the Appendix filed in support of the Supplemental Smith Declaration as **Exhibit 42.** In its Third Amended Complaint, Alcon asserts a claim for direct copyright infringement against Tesla and Musk, and a contributory copyright claim against Warner Bros. Like its three prior complaints, Alcon once again showed little regard for the actual facts, much less any consideration for the relationship it claims to desire with Warner Bros. as a film production partner, proceeding to plead all manner of conspiracy theories against Warner Bros. and its parent company "on information and belief" or under various "alternative theor[ies]."  In contrast to these allegations, the Third Amended Complaint does get one fact correct, observing that in the months prior to the October 2024 event, "significant friction had developed in the WBDI-Alcon relationship." *Id.* ¶ 32.

███████████████

77.    In addition to the Alcon Lawsuit, Warner Bros. is engaged in another dispute with Alcon over ████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████ A true and correct copy of that January 19, 2024

and February 1, 2024 email exchange between myself and Alcon's lawyers is attached to the Appendix filed in support of the Supplemental Smith Declaration as **Exhibit 43.**

████████████████████

78.    ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████    A true and correct copy of the May 29, 2025 email exchange

is attached to the Appendix filed in support of the Supplemental Smith Declaration as **Exhibit 44.**

I did not understand why Mr. Kosove reacted in the manner he did to something which Warner

Bros. was not organizing.  Nor, in any event, should this have led to the type of he email he sent.

## V.    VILLAGE'S SALE PROCESS IN THESE CASES

### A.    Village Selects Alcon as the Successful Bidder for its Interests in the Library Assets, Derivative Rights and Studio Business, and Warner Bros. as the Back-Up Bidder for the Derivative Rights

79.    Although I understand the Debtors initially designated CP Ventura—an affiliate of

Content Partners—as the Stalking Horse Bidder in connection with their proposed sale of Village's

interests in the Library Assets in these cases, on or about April 16, 2025, I understand that the

Debtors pivoted and sought approval of Alcon as the Stalking Horse Bidder for the Library Assets

instead.

80.    On May 16, 2025, Warner Bros. submitted a bid package in connection with the

Debtors' interests in the Derivative Rights. As part of that bid package, Warner Bros. submitted

an asset purchase agreement in connection with its proposal to acquire Village's interests in the

Derivative Rights, along with a commitment to close on that transaction. In addition, Warner

Bros.' offer letter in connection with its bid package specifically provided, among other things,

that:



81.     I attended the Auction on behalf of Warner Bros. on May 28, 2025, where prior to Warner Bros. bidding on the Derivative Rights, outside Warner Bros. counsel reiterated our position on the non-assignability of the assets. At the conclusion of the Auction, the Debtors' designated Alcon as the Successful Bidder in connection with the Debtors' interests in the Library Assets, Derivative Rights and Studio Business. Outside counsel for Warner Bros., O'Melveny & Myers, LLP, objected to the Debtors' designation of Alcon as the Successful Bidder for the Derivative Rights at that time.

### B. Warner Bros. Objects to the Library Asset Sale and Village Studio Business Sale to Protect its Interests in the Derivative Rights, Which are Later Resolved

82.     On June 13, 2025, Warner Bros. filed its Omnibus Objection in connection with the Debtors' proposed sale of its interests in the Library Assets, Studio Business, and Derivative Rights to Alcon.  Although the Derivative Rights hearing was ultimately continued shortly prior to Warner Bros.' filing of that Omnibus Objection, along with Warner Bros.' ability to further object to that sale, Warner Bros. lodged its initial objections to the Debtors' proposal to sell the Derivative Rights in order to protect its interests and voice its concerns in connection with the Derivative Rights sale.

83.     Warner Bros. also lodged several objections to the Debtors' proposed Library Asset sale to Alcon, along with its proposal to sell its interests in the Studio Business to Alcon, in its Omnibus Objection. In connection with Village's Studio Business, Warner Bros. was licensed by Village to exploit certain rights for the motion picture *December Boys*.  Attached to the Initial Smith Declaration as **Exhibit 1** is a true and correct copy of the *December Boys Purchase and Distribution Agreement (US/Canada)* dated February 9, 2007, by and between Warner Independent Pictures, Inc. and VRPG-DB Pty. Ltd. (as set forth therein). Ultimately, I understand Warner Bros.' objections to the Library Asset and Studio Business sales were resolved upon the

Court's entry of orders approving those sales. Both the Library Sale Order and order approving the Studio Business sale to Alcon include language ensuring that no Derivative Rights in connection with any Warner Bros. motion picture or other Warner Bros. audio visual project were transferred to Alcon.

### C.  Warner Bros. Submits a Revised Bid for the Derivative Rights

84.     Following the Auction on May 28, 2025, it is my understanding that Village designated Warner Bros. as the "Back-Up Bidder" for Debtors' interests in the Derivative Rights pursuant to Warner Bros. initial $17.5 million bid.  During a hearing on August 22, 2025 that I virtually attended, I heard Village's bankruptcy counsel state that the Debtors "would be more than happy to welcome a bid in an amount greater than $18.5 million," in connection with the Debtors' interests in the Derivative Rights.

85.     On September 8, 2025, Warner Bros. sent a confidential offer to Village's counsel (the "Revised Warner Bros. Bid"). The Revised Warner Bros. Bid provides, among other things, "$18.5 million for the Debtors' interests in the Derivative Rights under the same terms as Warner Bros.' designated Back-Up Bid of $17.5 million," in addition to "the Warner Bros. Reserve [] be[ing] reduced by $10 million," subject to additional terms as set forth therein. A true and correct copy of the Revised Warner Bros. Bid is attached to the Appendix filed in support of the Supplemental Smith Declaration as **Exhibit 26.**

86.     Although that revised bid expired by its terms on September 16, 2025, Warner Bros. informed Village through a letter sent by Warner Bros.' outside counsel, O'Melveny & Myers, LLP, that the Revised Warner Bros. Bid was extended "through and including the October 20, 2025 hearing on the Debtors' proposal to sell their interests in the Derivative Rights," and that such revised bid would "no longer be treated as confidential." A true and correct copy of the

September 26, 2025 Warner Bros. letter is attached to the Appendix filed in support of the Supplemental Smith Declaration as **Exhibit 27.**

87.     To date, the Debtors have not selected Warner Bros. as the designated Successful Bidder for the Debtors' interests in the Derivative Rights. Warner Bros. remains ready, willing, and able to close on the terms set forth in the Revised Warner Bros. Bid.

## VI.   VILLAGE PURPORTS TO ACCEPT WARNER BROS.' PROJECT NOTICE FOR *PRACTICAL MAGIC 2* ON BEHALF OF ALCON

88.     While Village remains in bankruptcy, Warner Bros.' creation and financing of theatrical motion pictures and other audio visual works remains ongoing. Warner Bros. recently greenlit the production of *Practical Magic 2*. ████████████████, subject to numerous reservations, ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ (the "PM2 Project Notice"). A true and correct copy of the PM2 Project Notice is attached to the Appendix filed in support of the Supplemental Smith Declaration as **Exhibit 55.**

89.     ████████████████ Village purported to accept the PM2 Project Notice ██ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████ A true and correct copy of Village's ████████ ██ purported Project Notice Acceptance for *Practical Magic 2* is attached to the Appendix filed in support of the Supplemental Smith Declaration as **Exhibit 56.**

90.     On September 8, 2025, outside counsel for Warner Bros. sent a letter to Village's bankruptcy counsel which, *inter alia*, ████████████████████████████████████████ ████████████ A true and correct copy of that September 8, 2025 letter is attached to the

Appendix filed in support of the Supplemental Smith Declaration as **Exhibit 57.**

91.    Upon review of certain documents Alcon has produced in discovery in connection with the Derivative Rights sale hearing, I understand that ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████    Had Village sought Warner Bros. consent to share such sensitive materials with Alcon, Warner Bros. would have refused.

## VII.    THE DEBTORS' PROPOSED SALE OF DERIVATIVE RIGHTS ASSETS AND PROPOSED ASSUMPTION AND ASSIGNMENT OF WARNER BROS.' AGREEMENTS TO ALCON THREATENS AND IMPAIRS WARNER BROS.' RIGHTS

### A. Warner Bros. Does Not Consent to a Forced Partnership With Alcon in Connection With the Derivative Rights

92.    The Debtors' proposed sale of their interests in the Derivative Rights to Alcon as their designated Successful Bidder for those assets involves the Debtors' proposed assumption and assignment of the Derivative Rights Agreements with Warner Bros. to Alcon. Those Derivative Rights Agreements contain certain financial accommodations that Warner Bros. extended and continues to extend to Village and certain exclusive rights, including consent requirements, anti-assignment provisions, and intellectual property protections, all for Warner Bros.' benefit.  The Debtors have neither sought nor obtained Warner Bros.' consent to any assumption or assignment of the Derivative Rights Agreements in connection with a sale of the Derivative Rights to Alcon or any other third party. While Warner Bros. believes that no currently identified third party would be a suitable Village assignee for the Derivative Rights Agreements (including Village's limited interests in the Derivative Rights therein), Alcon is a particularly unsuitable candidate.

93.    Alcon filed the highly inflammatory and unsupported Alcon Complaint without

even first reaching out to Warner Bros. for an explanation regarding its alleged claims, nor did Alcon provide any warning or prior notice to Warner Bros. before filing the Alcon Complaint and leaking it to the trade press.  Immediately thereafter, Alcon rebuffed Warner Bros.' offer to share information about what had *actually* occurred.  The Alcon Amended Complaint, Alcon Second Amended Complaint, and Alcon Third Amended Complaint, which by their own admission, at least with respect to the claims against Warner Bros. are based almost entirely upon speculation, and the majority of claims in which were dismissed as against Warner Bros., assumes the worst of its now-desired partner Warner Bros., publicly accusing Warner Bros. of acting tortiously and with malicious intent, alleging that Warner Bros. had a motive to allow the alleged infringement, and further characterizing Warner Bros. and its personnel as "disingenuous" and its CEO of being "controversial" within the industry.  *See* **Exhibit 30** to the Appendix filed in support of the Supplemental Smith Declaration.

94.    Indeed, Warner Bros. learned of the Alcon Lawsuit through the press (initially via *The Hollywood Reporter* and subsequently *Deadline* and *Variety*) after Alcon filed the Alcon Complaint (and well before it was served with the Alcon Complaint), as each of those publications published stories of the lawsuit in quick succession beginning with *The Hollywood Reporter* at 10:10 a.m.[7]  The release of these articles immediately upon the filing of the Alcon Complaint suggests a coordinated and calculated media campaign orchestrated by Alcon to publicly discredit

---

[7] *See* "'Blade Runner 2049' Producer Sues Elon Musk's Tesla, Warner Bros. Discovery Over AI Images," *The Hollywood Reporter*,  https://www.hollywoodreporter.com/business/business-news/blade-runner-2049-producer-sues-elon-musk-tesla-warner-bros-discovery-1236040228/ (last visited 6.10.25); *see* "'Blade Runner 2049' Producers Sue Elon Musk, Tesla and Warner Bros. Discovery, Alleging Copyright Infringement," *Variety*, https://variety.com/2024/biz/news/blade-runner-2049-lawsuit-elon-musk-tesla-warner-bros-discovery-1236184961/ (last visited 6.10.25); *see* "'Blade Runner 2049' Producers Sue 'Problematic' Elon Musk & Warner Bros. Discovery Over 'Highly Offensive' AI Imagery Used in Tesla Pitch," *Deadline*, https://deadline.com/2024/10/elon-musk-lawsuit-blade-runner-2049-ai-warner-bros-discovery-1236122044/ (last visited 6.10.25).

Warner Bros. The Alcon Complaint, its preemptory filing, the Alcon media campaign, and Alcon's persistence in repeating defamatory allegations against Warner Bros. notwithstanding repeated admonitions from the federal court that they lack any basis in fact, have severely damaged whatever remaining trust Warner Bros.' had in Alcon. For these reasons (and others), Warner Bros. considers Alcon to be an unacceptable partner to be forced to work closely with in connection with the Derivative Rights, including the Derivative Rights Agreements, much less to share a logo and production credits on a Warner Bros. theatrical feature film.

95. An assignment of the Derivative Rights to a prospective "partner" such as Alcon, which has recently demonstrated animus and open hostility toward Warner Bros., is precisely what the rights of consent were intended to prevent. The relationship between Warner Bros. and Alcon has, as Alcon concedes, deteriorated and shows no signs of improvement. This has not been Warner Bros.' doing. Time and again, Alcon has proven itself to be an unsuitable partner for Warner Bros., particularly in a venture where the parties must work closely together in a relationship of trust, as set forth herein.

96. Warner Bros. does not want to face the same issues it is now enduring with Village for *Matrix IV* and other derivative works if it is forced to partner with Alcon over the Debtors' interests in the Derivative Rights. Warner Bros.' pre-existing relationship with Village was and remains a primary consideration for Warner Bros. entering into the Derivative Rights Agreements that Village now seeks to assume and assign to Alcon. Permitting Village to assume and assign the Derivative Rights Agreements to a third party without Warner Bros.' consent would force Warner Bros. into a commercial relationship with an entity that Warner Bros. never agreed to partner with in connection with co-financing films. That is something that Warner Bros. specifically wanted to prevent when it negotiated and entered into the Derivative Rights

Agreements, as evidenced by the consent rights Warner Bros. expressly negotiated therein.

97.     Indeed, for the reasons described above, Warner Bros.' co-financing relationship with Village is more than just a publicly-facing collaboration, it provides that the parties are to work closely together in a relationship of partnership and trust.  That arrangement was a special negotiated deal between Warner Bros. and Village founded on trust and confidence in the parties' ability to perform. Because of this close working relationship, the highly confidential matters involved, and the necessity of a high degree of trust and personal confidence, the Derivative Rights Agreements cannot be transferred to just anyone. In view of the foregoing, Warner Bros.' rights of consent are of vital importance to Warner Bros. as they dictate who Warner Bros. will be working closely with on future derivative works.

### B. Village Has No Rights in the Purchased Unfunded Pictures to Sell to Alcon

98.     Moreover, I understand that the Debtors seek to sell to Alcon the "Purchased Unfunded Pictures," as defined and set forth in the Alcon Derivative Rights APA. Those include purported rights with respect to Warner Bros.' theatrical motion pictures, *Furiosa*, *Joker 2,* and *Matrix IV*. To date, the Debtors have not provided financing in connection with, nor paid any portion of the production costs for, *Furiosa* and *Joker 2*.  In addition, all amounts Warner Bros. is currently owed in connection with certain of the Debtors' breaches regarding its failure to co-finance *Matrix IV* remain owed and unpaid.

99.     Although Warner Bros. maintains that Village lost any and all rights to co-finance *Furiosa* and *Joker 2*, to the extent the Debtors seek to assume or assign any such rights to Alcon, any and all amounts that would have been owed and payable by Village in connection with those films would need to be paid by Alcon. Had Village participated in those films, which Warner Bros. believes it did not have the right to do, Village would have been required to pay in the range of

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: October 15, 2025
Burbank, California

By: _____
Wayne M. Smith
Executive Vice President, Legal
Warner Bros. Studios