## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VILLAGE ROADSHOW ENTERTAINMENT | ) Case No. 25-10475 (TMH) |
| GROUP USA INC., *et al.*,[1] | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) **Ref. Docket Nos. 276, 446, 518, 908, 915** |
| | ) |

## DEBTORS' REPLY IN SUPPORT OF THE DERIVATIVE RIGHTS SALE

The above-captioned debtors and debtors in possession (collectively, the "Debtors" or

"Village"),[2] hereby submit their reply (this "Reply"): (i) in support of the sale (the "Sale") of

their derivative rights assets (the "Derivative Rights Assets") to Alcon Media Group, LLC

("Alcon"); and (ii) in response to the objections thereto filed by (a) Warner Bros. Entertainment

Inc. and its affiliates (collectively, "Warner") [Docket No. 518] (the "Omnibus Warner

Objection") [Docket No. 908] (the "Supplemental Warner Objection," together with the

Omnibus Warner Objection, the "Warner Objections"), and (b) Regency Entertainment (USA),

Inc. ("Regency") [Docket Nos. 478, 482, and 915] (collectively, the "Regency Objections," and

together with the Warner Objections, the "Objections").  In support of the Sale and this Reply,

the Debtors rely on the  declarations of Kevin Berg (the "Berg Declaration"), Keith Maib

(the "Maib Declaration"), and Reid Snellenbarger (the "Snellenbarger Declaration"), each filed

---

[1]  The last four digits of the Debtors Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343.  The mailing address for the Debtors Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069.  Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

[2]  Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Objections or the Bid Procedures Order [Docket No. 276], as applicable.

contemporaneously herewith. In further support of the Sale and this Reply, the Debtors respectfully state as follows:

## I.   PRELIMINARY STATEMENT

1.       Warner raises numerous objections, but none satisfy the requisite legal standard to prevent the sale of the Derivative Rights Assets to Alcon. Indeed, as demonstrated below, Warner's objections are based on misunderstandings of the applicable law and mischaracterizations of both the context and meaning of various contracts between the parties, the vast majority of which have no relevance to this Sale. To understand the Sale, it is critical to appreciate the distinction between the Derivative Rights and the Derivative Rights Agreements (each as defined below, and together, the "Derivative Rights Assets"), as well as their respective substance. Put simply, the Debtors are seeking to sell and assign: (i) their copyright ownership interests (i.e. the Derivative Rights); and (ii) the contracts with the co-owner of the Derivative Rights (Warner) that govern the use and exploitation of the co-owned copyright (i.e. the Derivative Rights Agreements).

2.       The Derivative Rights Agreements allow Warner to exploit any Derivative Work at its discretion, but give the Debtors a guaranteed *option* to invest in Derivative Works that Warner elects to produce, thereby sharing in both the upfront risk and the potential profits if the project is ultimately successful. Under federal copyright law, a co-owner of a copyright interest can freely transfer such interest without consent from its co-owner. Under the Bankruptcy Code, a debtor can assume and assign an executory contract even when such contract prohibits assignment, subject only to certain limited and narrow exceptions. Despite Warner's assertions to the contrary, the Derivative Rights Agreements fit no exception.

3.       Warner, as the co-owner of the Derivative Rights, derives no benefit from being assigned the Derivative Rights Agreements, which it is already party to, other than securing the

ability to terminate them.   Thus, it stands to reason that Warner's bid consideration for the Derivative Rights Assets is limited to: (i) the Debtors' intellectual property interest; and (ii) ensuring that the Derivative Rights Agreements are not assigned to a third party—which would eliminate Warner's obligation under the agreements to offer participation in the Derivative Works to a third party.   Warner's corporate representatives have admitted as much—

███████████████████████████████████████████████████████████████

██████████████████████████████████████████.[3] ███████████████████████

██████████████████████████████████████████████████████████████████

████████████████.

4.      Prior to the Auction, the Debtors selected Warner's bid as the Baseline Bid for the Derivative Rights.   At the Auction, Warner participated in ten rounds of competitive bidding. The Debtors accepted each bid that Warner submitted.   At the beginning of the eleventh round, Warner declined to submit a further overbid and—for the first time—asserted that its $17.5 million bid should be deemed highest and best for the sole reason that Warner would force the Debtors to incur over $1 million in litigation costs if they chose to proceed with Alcon's facially higher bid.   New testimony has evidenced an additional fact: ██████████████████████

████████████████████████████████████████████████.[4] ███████

████████████████████████████████████████████.

---

[3]   *See* Deposition of Steve Spira (October 6, 2025) [112:1–12] ("████████████████████████

███████████████████████████████████████ █████████████████

██████████████████████████); [99:2–8] (████████████████████████

███████████████).

[4]   *See* Deposition of Wayne Smith (October 8, 2025) [151:] ("████████ ███████████████

████████████████████████████████████.").

5.      Three months after the Auction concluded, Warner requested a status conference and raised a new argument with this Court: the Debtors allegedly violated their business judgment in selecting Alcon's $18.5 million bid as the highest and best.  Warner did not (and does not) raise any objection to the integrity of the Auction or the Debtors' marketing and sale process for the Derivative Rights more broadly.  Warner set its sights *solely* on the Debtors' determination as to the identity of the highest and best bid, and seeks to force the Debtors to consider Warner's late bid, which the Debtors do not value as meeting the minimum overbidding increment.  But the record of the Auction, and the testimony adduced during the depositions since demonstrate that the Debtors exercised sound business judgment in selecting Alcon as the Successful Bidder.

6.      After this Court rejected Warner's request for a bifurcated hearing on the issue of business judgment, Warner took an additional step to bolster its argument—submitting a settlement offer (the "Warner Settlement Offer") which, among other things, purported to exceed Alcon's bid of $18.5 million.  But the Debtors do not value the Warner Settlement Offer as exceeding Alcon's offer.  On the contrary, the Warner Settlement Offer is riddled with infirmities and illusory consideration, including $10 million released from the Warner Bros. Reserve—without any corresponding cap on Warner's claim in connection with the ongoing Matrix Arbitration (the "Matrix Claim")—and a "settlement" of the Wonka Arbitration, which would deprive the Debtors of valuable claims against Warner rather than eliminate any estate liabilities.  The Debtors, in their business judgment, did not ascribe any additional value to these terms.

7.      With respect to the merits of the Warner Objections, Warner's core assumption and assignment arguments are logically inconsistent: the Derivative Rights Agreements are

financial accommodations—yet highly personal in nature; and the Debtors' intellectual property interests in the Derivative Rights—that Warner submitted multiple bids for—are not ownership interests, but are licenses or some lesser contract right.  Warner's arguments fail under applicable law and rely on misinterpretations of the facts.

8.      Relevant case law holds that, when courts evaluate arguments concerning either financial accommodations or personal services contracts, the focus should be on the "true legal nature" and "essence" of the agreement.[5]  Courts consistently hold that both exceptions are to be construed narrowly.  For financial accommodation contracts, the ***primary purpose*** of the contract must be to provide a loan or other traditional debt financing.  For personal services contracts, courts determine whether the provided services are so unique that ***only the debtor*** is capable of fulfilling the specific obligations.  Warner cannot satisfy either exception and its arguments do not overcome the fundamental premise in bankruptcy that a debtor may assume and assign executory contracts notwithstanding restrictions set forth therein.  Indeed, the Court will not find any provisions related to lending or obligations that require unique performance in the Derivative Rights Agreements.  That is because their primary purpose is to govern the use and exploitation of the parties' co-owned intellectual property—not to provide financing or personal services.

9.      Similarly, Warner's attempt to downplay the Debtors' intellectual property ***ownership*** interests in the Derivative Rights—in order to recharacterize them as nonexclusive licenses, strictly contractual rights, or some other interest lesser than true ownership—is

---

[5]    *See*, *e.g.*, *Citizens & Southern Nat'l Bank v. Thomas B. Hamilton Co., Inc. (In re Thomas B. Hamilton Co., Inc.)*, 969 F.2d 1013, 1020 (11th Cir. 1992) (in determining whether a contract is a financial accommodation, courts must analyze the "true legal nature" of the agreement) (citation omitted); *In re Vice Group Holding Inc.*, 652 B.R. 423, 431 (S.D.N.Y. 2023) (an agreement is not a personal services contract where its "essence" is not sufficiently personal and an assignee would be able to perform the assignor's obligations).

untenable.  Warner's framing is at odds with the record in these cases and records at the U.S. Copyright Office, which indisputably establish the Debtors' ownership interests.

10.     Additionally, Warner contends that Alcon—a party with whom Warner has had a longstanding and productive partnership on numerous projects—cannot provide adequate assurance of future performance, relying primarily on the existence of ongoing litigation between the parties—litigation that is wholly unrelated to the Derivative Rights Assets.  Section 365 of the Bankruptcy Code provides that an assignee must provide adequate assurance of performance under the transferred agreements, not adequate assurance of a desirable counterparty.  Warner cites no supporting authorities showing that its subjective determination as to the "suitability" of an assignee is relevant to whether adequate assurance has been provided.  In truth, permitting corporate entities' general disapproval of a counterparty—especially when unrelated to the agreements and obligations at issue—would directly contravene the standard for adequate assurance established by courts in this District.

11.     As detailed below, the Derivative Rights Assets consist of the Derivative Rights and the Derivative Rights Agreements, which govern the use and exploitation of those rights. Despite Warner's (and Regency's) assertions, none of the provisions in these agreements (i) require Warner to extend credit; (ii) include non-exclusive intellectual property licenses; or (iii) are "personal" such that an adequately capitalized corporate counterparty could not reasonably assure future performance as required under Section 365.  Ultimately, Warner's arguments that the Derivative Rights Agreements cannot be assumed and assigned to Alcon in accordance with Section 365 collapse under scrutiny.

12.     Accordingly, the Debtors request this Court approve the Sale of the Derivative Rights Assets to Alcon.

## II.  REPLY

### A.  The Debtors' Interests in the Derivative Rights and the Derivative Rights Agreements.

13.     The Derivative Rights Assets comprise two related but distinct categories of property interests: (i) the Debtors' specific ownership share of the exclusive intellectual property right (arising under federal copyright law) to create and exploit derivative works based on the Pictures (the "Derivative Rights"); and (ii) the Debtors' contractual rights arising under the Derivative Rights Agreements (as defined below) with respect to governance and exploitation of the Derivative Rights.  *See* Berg Decl. ¶ 4.

14.     The Debtors' interests in the Derivative Rights and Derivative Rights Agreements are property of the Debtors' bankruptcy estate, and the extent of those interests is determined by reference to applicable nonbankruptcy law. [6]  Accordingly, the Debtors' interests in the Derivative Rights are determined by the Copyright Act.[7]  The Debtors' interests in the Derivative Rights Agreements are governed by California contract law.[8]

### i.     The Debtors' Co-Ownership of the Derivative Rights Under Copyright Law.

15.     The term "copyright owner" is defined in the Copyright Act as the owner of "any one of the exclusive rights comprised in a copyright."  17 U.S.C. § 101.  The bundle of "exclusive rights" comprised in a copyright includes the rights to reproduce, distribute, adapt, perform, and display the work, as well as the right to prepare derivative works.  *See id.* § 106.  In

---

[6]    *See* 11 U.S.C. § 541(a); *Butner v. U.S.*, 440 U.S. 48, 55 (1979).

[7]    *See, e.g., In re Simplified Information Systems, Inc.*, 89 B.R. 538, 541 (W.D. Pa. 1988) (applying Copyright Act to determine estate's interest in a copyrighted software design); *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1143–44 (9th Cir. 2008) ("Copyright is wholly a 'creature of statute, and the only rights that exist under copyright law are those granted by statute.'") (quoting *Silvers v. Sony Pictures Entm't*, 402 F.3d 881, 883–84 (9th Cir. 2005)).

[8]    *See, e.g., In re Modular Structures, Inc.*, 27 F.3d 72, (3d Cir. 1994) (applying state law to determine estate's interest arising under a contract).

addition, "[a]ny of the exclusive rights comprised in a copyright, including any subdivision [thereof] . . . may be transferred . . . and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protections and remedies accorded to the copyright owner." *Id.* § 201(d)(2). For a transfer of copyright ownership to be valid, it must be effectuated in a written "***instrument of conveyance***" that is "***signed by the owner of the rights conveyed.***" *See id.* § 204(a) (emphasis added). Transfers of copyright ownership may be recorded with the United States Copyright Office and the order of recordation generally governs priorities among conflicting transfers. *See id.* §§ 205(a), (d).

16.    Under well-established copyright law, copyright co-owners each hold broad default rights with respect to the copyright that may be exercised unilaterally. For example, each co-owner has an independent right to exploit the copyright.[9] In addition, ***a co-owner may transfer its own interest in the copyright to a third party (whether through assignment or a nonexclusive license), without the consent of the other co-owner(s)***, subject only to the general requirements of a valid transfer of copyright.[10]

17.    Here, the Debtors are co-owners of the Derivative Rights in substantially all of the 91 theatrical motion-picture properties (collectively, the "Pictures") that they co-invested in with Warner over the course of the parties' relationship since 1998.[11] *See* Berg Decl. ¶ 5. For each

---

[9]    *See Brownstein v. Lindsay*, 742 F.3d 55, 68 (3d Cir. 2014) (citing 1 NIMMER ON COPYRIGHT § 6.10); *Sybersound Records, Inc.*, 517 F.3d at 1145 (citing H.R. Rep. No. 94-1476, at 121 (1976)) (stating that co-owners of a copyright are "treated generally as tenants in common, with each co-owner having an independent right to use or license the use of the work, subject to a duty of accounting to the other co-owners for any profits"); *Oddo v. Ries*, 743 F.2d 630, 632–33 (9th Cir. 1984); *Corbello v. DeVito*, 777 F.3d 1058, 1064–66 (9th Cir. 2015).

[10]    *See Warrick v. Roberts*, 34 F. Supp. 3d 913, 919 (N.D. Ill. 2014) (citing 1 NIMMER ON COPYRIGHT § 6.10(A)(3)(a) (a co-owner "may always transfer his interest in the joint work to a third party")); *see also Brownstein*, 742 F.3d at 68 ("[E]ach co-author is entitled to convey non-exclusive rights to the joint work without the consent of his co-author.").

[11]    The only Pictures for which the Debtors did not purchase an ownership interest in the applicable Derivative Rights are *The Lego Movie* and *Sex and the City 2*. *See* Berg Decl. ¶ 5.

Picture, the Debtors agreed to purchase a defined percentage (the "Applicable Percentage") of the copyright—including the Derivative Rights—from Warner. *See id.*, ¶ 6.  On the closing date for each purchase (the "Pick-Up Date"), which was generally around the time the applicable Picture was released, the Debtors paid a purchase price to Warner and Warner contemporaneously conveyed the ownership rights to the Debtors through one or more separate copyright assignment agreements (the "Assignment Agreements"), thereby making the Debtors co-owners of the copyright—including the Derivative Rights—in accordance with the Copyright Act.  *See id.*  In order to put third parties on notice of both the Debtors' and Warner's ownership interests, the copyright in each Picture was generally registered with the U.S. Copyright Office (in the names of the applicable Debtor and Warner entities) and the copyright notices in the end credits of each Picture listed both the Debtors and Warner as the copyright owners.  *See id.*

18.     Historically, the process by which the Debtors purchased and were assigned their Applicable Percentage ownership in the Pictures was set forth in a series of structured film investment arrangements—initially, a series of Qualified Cost Sharing Agreements ("QCSA"), and subsequently, a series of Motion Picture Rights Purchase Agreements ("MPRPA"), the last of which expired on December 31, 2020.[12]  *See id.*, ¶ 7.  While certain provisions in the QCSAs and MPRPAs have continuing effect with respect to existing Pictures, their terms have expired and no new films can be included thereunder—including any future Derivative Works.  *See id.*  For the avoidance of doubt, the Debtors are not seeking to assume and assign the QCSAs, MPRPAs, and various other Picture-specific transaction documents pursuant to this Sale.  In fact,

---

[12]   Under the QCSAs, the Debtors' purchase was documented in Picture-specific picture agreements (each, a "Picture Agreement").  Under the MPRPAs, the Debtors' purchase was documented in a Rights Purchase Agreement for each Picture (each, a "RPA").

such agreements were already assigned to Alcon pursuant to the Debtors' sale of the Library Assets.

19.     As co-owners of the Derivative Rights in the Pictures, the Debtors and Warner agreed to a ***contractual*** framework with respect to the parties' exercise of their default rights under copyright law.  Accordingly, the Debtors and Warner also entered into film-specific co-ownership agreements governing the parties' rights and obligations with respect to the Derivative Rights in such Picture (collectively, the "Co-Ownership Agreements").  *See id.*  The Debtors and Warner have since amended certain provisions of the Co-Ownership Agreements, first through that certain *Omnibus Amendment to Co-Ownership Agreements* dated as of August 29, 2017 ("Omnibus Amendment No. 1"),[13] and next through that certain *Omnibus Amendment No. 2* dated as of November 10, 2020 ("Omnibus Amendment No. 2").  Critically, and notwithstanding Warner's suggestions otherwise, the only contracts with Warner that the Debtors seek to assume and assign to Alcon in connection with the Sale are the Co-Ownership Agreements, Omnibus Amendment No. 1, and Omnibus Amendment No. 2 (collectively, the "Derivative Rights Agreements").[14]

---

[13]   Pursuant to Omnibus Amendment No. 1, the Debtors and Warner restructured the arrangements for exploiting the Derivative Rights under the various Co-Ownership Agreements so that the treatment of the ownership and exploitation of the Derivative Rights is the same for all Pictures.  *See* Berg Decl. ¶ 8.  Omnibus Amendment No. 1 applied retroactively and its terms were incorporated into subsequent Co-Ownership Agreements.  *See id.*

[14]   For clarity, the Debtors are also seeking to assume and assign four additional agreements with Warner identified in the *Supplemental Notice of Possible Assumption and Assignment of Certain Executory Contracts with Warner Bros.* [Docket No. 904] (the "Supplemental Warner Assumption Notice").  These additional Warner agreements memorialize the Debtors' decision not to participate in certain Derivative Works previously produced by Warner.  In addition, the Debtors are also seeking to assume and assign the following co-ownership agreements with non-Warner counterparties: (i) Co-Ownership Agreement with Columbia Pictures Industries, Inc. re "Saving Silverman," (ii) Co-Ownership Agreement with Paramount Pictures Corporation with respect to "Down to Earth," (iii) Co-Ownership Agreement with Paramount Pictures Corporation with respect to "Zoolander," (iv) Co-Ownership Agreement with Regency Entertainment (USA), Inc. with respect to "Don't Say a Word," and (iv) Quitclaim Agreement with Paramount Pictures Corporation with respect to "Zoolander 2."  *See* Annex II of Exhibit B to the Notice of Filing of Revised Proposed Sale Order and Asset Purchase Agreement for the Derivative Rights [Docket No. 824] (the "Assumed Contracts List").

20.     While the Debtors' ownership interests in the Derivative Rights are confirmed and further memorialized in the Derivative Rights Agreements,[15] ***they do not arise from the Derivative Rights Agreements***.  As detailed above, the Debtors purchased their ownership interests in the Derivative Rights pursuant to the Picture Agreements and RPAs, as applicable, and those ownership interests were formally conveyed to the Debtors via the Assignment Agreements.

> ii.     **The Derivative Rights Agreements.**

21.     The Derivative Rights Agreements are separate and distinct assets that govern the parties' ***contractual*** rights and obligations with respect to exploitation of the Derivative Rights through the production and distribution of audio-visual works based on the Pictures or any of the characters therein, including remakes, sequels, prequels, series, or spin-offs ("Derivative Works").  Broadly, the Derivative Rights Agreements provide (i) Warner with the sole contractual right to initiate exploitation of the Derivative Rights through the production and distribution of Derivative Works and (ii) the Debtors with a contractual right of first refusal to purchase the Applicable Percentage interest in such Derivative Works.  Other executory obligations under the Derivative Rights Agreements require each party to abide by confidentiality provisions and share in the costs of protecting the Derivative Rights from infringement by third parties.

22.     Under the Derivative Rights Agreements, Warner has no obligation to develop or produce Derivative Works or otherwise exploit the Derivative Rights.  *See id.*, ¶ 9.  If Warner, in

---

[15]    *See*, *e.g.*, Practical Magic Co-Ownership Agreement, Recital E ("██████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████").

its sole discretion, does propose to exploit the Derivative Rights through production of a Derivative Work, Warner must provide the Debtors with a written notice (a "Project Notice"),[16] which constitutes an **offer** to the Debtors to acquire the interest in such Derivative Work. *See* Omnibus Amendment No. 1, § 4; Berg Decl. ¶ 9. If the Debtors wish to accept, they must provide a written notice of acceptance (a "Project Notice Acceptance") to Warner within 15 business days after receiving the Project Notice. *See* Berg Decl. ¶ 10. Even after the Debtors provide a Project Notice Acceptance, Warner has full discretion regarding whether to proceed with production of the Derivative Work. *See* Omnibus Amendment No. 1, §§ 4(b)(i), (f);[17] Berg Decl. ¶ 10. The Derivative Rights Agreements therefore **never require** Warner to produce Derivative Works.

23.     When the Debtors exercise their option right, and Warner chooses to proceed with production, the Derivative Rights Agreements provide that ████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████. *See* Omnibus Amendment No. 1, § 4(b)(ii). However, the Derivative Rights Agreements do not themselves effectuate the transaction or otherwise govern the economic terms pursuant to which the Debtors purchase their percentage of a Derivative Work. Instead, the Derivative Rights Agreements provide that the Debtors' purchase will be documented in a separate "████████████████████████████████████████████████████████████████ ████████████████████████████████████." *See id.*, § 4(d).

---

[16]   A Project Notice must delineate the "Proposed Picture Elements" for the Derivative Work, ████████ ████████████████████████. *See* Omnibus Amendment No. 1, § 4(a).

[17]   Section 4(b)(i) provides that, if the Debtors timely provide a Project Notice Acceptance, "████████ ████████████████████████████" (emphasis added).

**B.**     **The Debtors Have Exercised Sound Business Judgment Throughout the Sale Process for the Derivative Rights.**

24.     In renewing its challenge to the Debtors' selection of Alcon as the Successful Bidder for the Derivative Rights Assets, and perhaps as a concession regarding the weakness of its own arguments, Warner now instructs the Court that it need not consider the merits of Warner's substantive objections, nor any of the events leading up to, at, or during the three months after the Auction.  Rather, according to Warner, the Court should focus solely on the Warner Settlement Offer, summarily rule that it is the highest and best bid for the Derivative Rights, and force the Debtors to accept it.  Such a result would strip the Debtors of their fundamental duty as fiduciaries to administer their assets in a manner that maximizes value for the benefit of their estates as a whole.  Warner fails to provide any supporting authority or factual predicate to justify the drastic relief it seeks.  And Warner ignores the impact that such a ruling would have on future sale processes in this District and across the country.

25.     The valuation of bids is a responsibility that falls to the Debtors—not Warner. That fact remains as true today as it was at the Auction.  As the record in these cases makes clear, the Debtors have exercised sound business judgment throughout the extensive sale process for the Derivative Rights Assets.  Warner does not present any evidence to the contrary or raise any objection to the integrity of the sale process or the Auction.  Instead, Warner presents to the Court the Warner Settlement Offer in a vacuum and expects its own self-serving analysis of the value offered thereby to override Debtors' own business judgment.  The Court should not permit Warner to substitute its subjective preferences for the Debtors' business judgment to the detriment of the Debtors and their estates.

i.      **The Debtors' Exercised Sound Business Judgment in Selecting Alcon as the Successful Bidder at the Auction.**

26.     Courts approve asset sales under section 363(b) where the sale "constitutes a reasonable and sound exercise of the Debtor's business judgment." *In re Dura Automotive Sys., Inc.*, 2007 WL 7728109, at *7 (Bankr. D. Del. Aug. 15, 2007).  A debtor's business judgment is entitled to substantial deference.  *See*, *e.g.*, *Stanizale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 234 (3d Cir. 2005); *Official Comm. of Subordinated Bondholders v. In re Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) ("Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence."); *In re Royal Palm, LLC*, 600 B.R. 119, 126 (Bankr. S.D. Fla. 2019) ("A debtor's business decision should be approved by the court unless it is shown to be so manifestly unreasonable that it could not be based upon sound business judgment, but only on bad faith, or whim or caprice.") (internal quotations omitted).  "Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." *In re Genco Shipping & Trading Limited*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014) (quoting *In re Integrated Resources, Inc.*, 147 B.R. at 656).

27.     The Debtors conducted a fair, transparent, and robust marketing process for the Derivative Rights with the advice of experienced legal, financial, and restructuring professionals, which resulted in the submission of four qualified bids in advance of the Auction. *See* Snellenbarger Decl. ¶ 7.  Prior to the commencement of the Auction, the Debtors announced to each qualified bidder that the initial $6 million bid submitted by Warner was the Baseline Bid for the Derivative Rights Assets.  *See id*., ¶ 8.  The Auction itself generated **ten full rounds** of competitive bidding.  At the end of round 10, only two bidders remained—Alcon, with a bid of $18.5 million, and Warner, with a bid of $17.5 million.  *See* Maib Decl. ¶ 6.  Rather than submit

-14-

a further overbid, Warner asserted that its bid, despite being $1 million less than Alcon's, should be deemed higher and better for the sole reason that Warner would vigorously object to any proposed sale to Alcon and force the Debtors to incur litigation costs in excess of the million dollar delta. *See id.*

28.     Notwithstanding Warner's asserted objections, the Debtors believe they have the right, in accordance with applicable law, to sell the Derivative Rights to Alcon without Warner's consent.  In the Debtors' view, Warner's threat of litigation did not add value to Warner's bid sufficient to overcome the purchase price deficit.  Indeed, selecting Warner's lower bid would likely have resulted in extensive and costly litigation with Alcon.  The Debtors further consulted diligently with counsel to the Committee and the DIP Lenders, who were active participants at the Auction, in analyzing the competing bids.  *See id.*  After carefully considering all relevant factors and discussing with the Consultation Parties, including the Committee, the Debtors determined that Alcon's bid, which was ***$1 million higher than Warner's and on the exact same terms***, represented the highest and best value for the Derivative Rights.  *See id.*  On this factual record, the Debtors clearly exercised sound business judgment in naming Alcon as the Successful Bidder and Warner as the Back-Up Bidder at the Auction.

     **ii.**     **The Debtors Prudently Determined Not to Exercise Their Fiduciary Out in Response to the Warner Settlement Offer.**

29.     Generally, courts reopen bidding under a "narrow range" of circumstances—none of which apply here—such as where the initial sale price was "so grossly inadequate as to shock the conscience of the court" or where the original auction was "tainted by fraud, mistake, or some comparable defect."  *Corporate Assets Inc. v. Paloian*, 368 F.3d 761, 768 (7th Cir. 2004) ("Accepting a late bid may mean more money for creditors in the short run, but by upsetting the expectations of those who thought the bidding was at an end, it may in the long term undermine

confidence in judicial sales and discourage prospective purchasers from making their best offers in a timely manner."); *see also In re Food Barn Stores Inc.*, 107 F.3d 558, 564 (8th Cir. 1997). The integrity and finality of the auction process is an important consideration. *See In re Bigler, LP*, 443 B.R. 101, 115 (Bankr. S.D. Tex. 2010) ("Reneging on clearly established and properly conducted procedures in order to generate some additional dollars for the estate undermines the integrity of the judicial process; indeed, it can undermine the integrity and reputations of the individual litigants and lawyers.  The public in general, and all participants at auctions in particular, need to have confidence in the judicial system.").  Reopening bidding or reneging on a publicly announced winning bidder undermines the confidence of market participants and makes it more difficult to maximize value to the bankrupt estate. *See In re Edwards*, 228 B.R. 552, 562 (Bankr. E.D. Pa. 1998) ("[W]e think that the important notions of finality and regularity in judicial auctions are appeased if the court acts consistently with the rules by which the particular sale is conducted and in compliance with the bidders' reasonable expectations.").

30.     Here, the Warner Settlement Offer does not offer value sufficient for the Debtors to change course, undermine the integrity of the Auction, and upend their sale process more broadly.  *See* Maib Decl. ¶ 9.   Indeed, Warner's claim that the Warner Settlement Offer "amounts to upward of $28.5 million in aggregate additional value to the Debtors' estates" is false.  *See* Supp. Warner Obj. ¶ 49 (emphasis omitted); Maib Decl. ¶ 9.  In reality, the only cash consideration contemplated by the Warner Settlement Offer is the $18.5 million purchase price offered for the Derivative Rights Assets, which merely matches the amount offered by Alcon at the Auction. *See id.*  The remainder of Warner's offer is nothing more than manufactured settlement consideration to which the Debtors, in the sound exercise of their business judgment, do not attribute any additional value.

31.     Most notably, Warner consenting to the release of $10 million from the Warner Bros. Reserve would not provide any additional value to the Debtors' estates.  *See id.*  As the Court is aware, the Warner Bros. Reserve was established to ensure that Warner's Matrix Claim, once liquidated, can be paid in full.  While Warner has offered to consent to the release of $10 million from the Warner Bros. Reserve, ***Warner has not agreed to any cap on its Matrix Claim***. *See id.*  On the contrary, the Warner Settlement Offer explicitly provides that Warner's offer would "only reduce[] the amount of the Warner Bros. Reserve, but shall not impact Warner Bros.' ability to seek its full damages, ***including in an amount in excess of $100 million***, in the Matrix Arbitration."  *See* Docket No. 910, Ex. 26 (emphasis added).  Merely releasing $10 million from the Warner Bros. Reserve (which is already property of the Debtors' estates), without any corresponding cap on Warner's Matrix Claim, would not infuse any additional cash into the estates or reduce any of the estates' liabilities.  *See* Maib Decl. ¶ 9.  Even if Warner did agree to a cap on its Matrix Claim, Warner's statement that the $10 million released from the Warner Bros. Reserve could be used to pay other general unsecured claims reveals a fundamental misunderstanding of the Debtors' corporate and capital structure. [18]  Warner consenting to $10 million being distributed to general unsecured creditors does not permit the Debtors to bypass the Bankruptcy Code's priority scheme in order to do so.  The Debtors determined in their business judgment that this was not entitled to any additional value.

32.     Moreover, while Warner also offers to release various purportedly "valuable claims," Warner fails to acknowledge that its offer would also require ***the Debtors to dismiss***

---

[18]   The so-called "Village holding companies" that own 100% of equity in the Library Debtors are subject to all-asset liens in favor of the Senior Secured Noteholders.  *See generally* DIP Motion, Docket No. 9, ¶¶ 15–17.

*their claims against Warner* in the Wonka Arbitration.[19]  Pursuant to the transaction documents executed in connection with *Wonka*, Warner must assign the Derivative Rights in *Wonka* to the Debtors **only if the Debtors prevail** in the Wonka Arbitration.[20]  The Derivative Rights in *Wonka* have material value—likely millions of dollars—and the Debtors' claims to those rights are therefore valuable assets of their estates.[21]  The Warner Settlement Offer would require the Debtors to release those claims, which would have a detrimental impact on the Debtors' estates.[22]  Again, the Debtors, in their business judgment, determined that this was not entitled to any additional value.

33.      Finally, Warner "believes" that the Warner Settlement Offer would also resolve the Regency Objection.  *See* Docket No. 910, Ex. 26.  However, Warner conveniently omits that

███████████████████████████████████████████████████████

███████████████████████████████████████████

---

[19]  *See* Docket No. 910, Ex. 26 ("In addition, upon the closing of the Warner Bros. Sale, Warner Bros. will enter into a stipulation with the Debtors to dismiss all claims and counterclaims in the Wonka Arbitration (with each party to bear its own fees and costs).").

[20]  *See* Wonka RPA, Ex. 1 (Assignment Agreement) ████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████").

[21]  Indeed, during Alcon's 30(b)(6) deposition, Alcon's corporate representative testified that Alcon believed the Derivative Rights in Wonka had significant value.  *See* Deposition of Broderick Johnson (October 7, 2025) [74:16–19] (█████████████████████████████████ ███████████████"); [76:6–10] ("█████████████████ ████████████████████████████ █████████"); █████").

[22]  Additionally, Warner offers to (i) not seek standing to assert estate claims in connection with the Challenge Period, and (ii) release any claim it may have against the Debtors regarding payment of the Roll-Up Obligations.  *See* Docket No. 910, Ex. 26.  Warner has no basis to seek standing to bring any claim on behalf of the estates, nor does Warner have any claim arising from the Debtors' payment of the Roll-Up Obligations. Consistent with its strategy at the Auction, Warner only threatens these claims as a means of engineering value without having to increase the cash component of its purchase price.

█████████████████████████████████████████████████████████████████.[23]

███████████████████████████████████████████████████████████████

█████████.[24] ████████████████████████████████████████████████████.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████.  █████████████████

█████████████████████████████████████████████████████.

      34.     Beyond the economics alone, Warner's letter to the Debtors on September 8 stated that the Warner Settlement Offer was subject to material contingencies.  Specifically, Warner's offer was expressly subject to the Debtors' agreement to keep the terms of Warner's offer confidential, not seek any further overbids, and promptly pursue Court approval.[25]  These conditions are antithetical to the principles of transparency and competitive bidding that are fundamental to asset sales under Section 363 and that the Debtors abided by throughout the sale process in an effort to maximize the value of the Derivative Rights Assets.

      35.     Nevertheless, the Debtors did not reject Warner's offer out of hand.  *See* Maib Decl. ¶ 10.  The Debtors and their advisors formulated a counteroffer, which included terms that the Debtors considered to be higher and better than Alcon's bid and that would warrant exercising the fiduciary out that the Debtors reserved in the Bid Procedures Order.[26]  In response, Warner declined to raise its bid and instead elected to restate the exact same terms of its prior

---

[23] *See* Deposition of Wayne Smith (October 6, 2025), Ex. 7 (████████████████████████
████████).

[24] *See id.*

[25] *See* Docket No. 910, Ex. 26 ("The terms of the proposed Warner Bros. Settlement are subject to the Debtors promptly accepting the Warner Bros. Settlement described herein, and promptly seeking and obtaining Court approval of both the Warner Bros. Settlement and the Warner Bros. Sale.  There shall be ***no further bidding for the Derivative Rights*** upon acceptance by the Debtors of this settlement offer, ***which is confidential and not to be shared*** with any parties other than the Consultation Parties.") (emphasis added).

[26] *See* Bid Procedures, § 13 [Docket No. 276, Ex. 1].

offer, inform the Debtors that the offer was no longer confidential (but remained subject to no further bidding), and make one last thinly veiled threat—*i.e.*, that "Warner Bros. intends to inform the Court of its willingness to move forward under the terms of the Warner Bros. Offer."[27]  Even if the Debtors were to accept an alternate offer from Warner, it would require the reopening of the Auction and subjecting the offer to higher and better bids, in accordance with the terms of the Bid Procedures Order.

36.     The Supplemental Warner Objection ignores all of these infirmities and summarily asserts that the Warner Settlement Offer is the highest and best bid for the Derivative Rights.  The Debtors carefully considered the terms of the Warner Settlement Offer, conferred with their professional advisors and the Consultation Parties, and ultimately determined that it would not be in the best interests of their estates to exercise their fiduciary out.

### iii.    Warner's Attempts to Disrupt the Integrity of the Debtors' Sale Process Should Not Be Rewarded.

37.     The deference that must be afforded to the Debtors' business judgment under these circumstances is designed to protect the interests of the broader estates—not those of an unsuccessful bidder who owes no duties to other interested parties.  *See*, *e.g.*, *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("[A] bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike."); *In re GSC, Inc.*, 453 B.R. 132, 170 (Bankr. S.D.N.Y. 2011) ("[T]he duty is an obligation to the estate as a whole, not to individual creditors."); *In re MTE Holdings LLC*, 2021 WL 3743201, at \*8 (Bankr. D. Del. Aug. 17, 2021).  This doctrine must

---

[27]    Docket No. 910, Ex. 27.

hold particularly true here, in light of Warner's attempts to disrupt the Debtors' sale process and acquire the Derivative Rights Assets for the lowest possible amount—a goal that is directly adverse to the interests of the broader estates.

38.     At every available opportunity, Warner has asserted its objections to the proposed sale of the Derivative Rights Assets (and the Debtors' other assets, as well).  Warner has also incorrectly described the Debtors' interests in the Derivative Rights Assets, which undoubtedly had the effect of discouraging potential bids for these assets, now shrouded in litigation.  At the Auction itself, Warner waited until the beginning of round 11 to assert its position that its bid, despite being $1 million less than Alcon's, should be deemed higher and better for the sole reason that Warner would vigorously object to any proposed sale to Alcon and force the Debtors to incur litigation costs in excess of the million dollar delta.  During the deposition of Warner's 30(b)(6) witness, ███████████████████████████████████████████████████████████ ████████████████████████████████████████████████████.  *See supra* ¶ 4.  Thus, the rationale behind Warner's conduct at the Auction is clear—█████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████.

39.     When the Debtors did not give in to Warner's tactics at the Auction, Warner sought to have the Court force the Debtors to do so through its request for bifurcation of the Sale Hearing.  When that strategy failed, Warner submitted the Warner Settlement Offer, which was conditioned on the Debtors agreeing to stop any further bidding for the Derivative Rights Assets, which would violate requirements in the Bid Procedures Order that all bids be subject to higher and better offers, as well as the core principles of value maximization under section 363.

Through its latest challenge to the Debtors' business judgment, Warner makes one final attempt to disrupt the integrity of the Debtors' sale process. Warner's repeated efforts to disrupt the integrity of the bidding process and discourage competitive interest for the Derivative Rights Assets simply cannot be permitted to undermine the Debtors' efforts to maximize the value of their assets.

**C.     The Derivative Rights Agreements Are Not Financial Accommodations Under Section 365(c)(2) of the Bankruptcy Code.**

> **i.     "Financial Accommodations" Has a Discrete and Limited Meaning Under the Bankruptcy Code.**

40.     Section 365(c)(2) of the Bankruptcy Code prohibits a debtor from assuming contracts to "make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor." 11 U.S.C. § 365(c)(2). "[C]ourts are instructed to 'strictly construe the terms 'loan,' 'debt financing,' and 'financial accommodation' narrowly.'" *In re Sportsman's Warehouse, Inc.*, 457 B.R. 372, 392 (Bankr. D. Del. 2011) (citing *In re Emerald Forest Constr.*, 226 B.R. 659, 664 (Bankr. D. Mont. 1998); *Chase Manhattan Bank v. Iridium Africa Corp.*, No. Civ. A. 00–546, 2004 WL 323178, at *4 (D. Del. Feb. 13, 2004).).[28] The legislative history confirms this narrow interpretation.[29]

41.     Courts and commentators uniformly agree that section 365(c)(2) "does **not** apply to all contracts that involve the extension of credit; rather, it applies to 'contracts to make loans and **other traditional kinds of debt financing arrangements**.'" *Citizens & Southern Nat'l Bank*

---

[28]     *See also* 3 COLLIER ON BANKRUPTCY ¶ 365.07[2] (16th ed.) ("The scope of [section 365(c)(2)] is limited, however, and applies only to extensions of credit that are "loans," "debt financing" or "financial accommodations," and not to all contracts to extend credit. These terms are strictly construed and do not extend to an ordinary contract to provide goods or services that has incidental financial accommodations or extensions of credit.").

[29]     *See* H.R. Rep. No. 95-595, at 549 (1978) ("Characterization of contracts to make a loan, or extend other debt financing or financial accommodations, is limited to the extension of cash or a line of credit and is not intended to embrace ordinary leases or contracts to provide goods or services with payment to be made over time.").

*v. Thomas B. Hamilton Co., Inc. (In re Thomas B. Hamilton Co., Inc.)*, 969 F.2d 1013, 1018–19 (11th Cir. 1992) (emphasis added) (quoting *Wegner Farms Co. v. Merchants Bonding Co. (In re Wegner Farms Co.)*, 49 B.R. 440, 444 (Bankr. N.D. Iowa 1985)). To determine whether an executory contract is a financial accommodation, courts must examine the "true legal nature of the agreement" and not "hunt for features that look like loans or guarantees." *In re Ernie Haire Ford, Inc.*, 403 B.R. 750, 756 (Bankr. M.D. Fla. 2009) (citations omitted); *see also In re United Airlines, Inc.*, 368 F.3d 720, 725 (7th Cir. 2004) ("[Section] 365(c)(2) speaks of a contract that *is* a financial accommodation, not one that has economic effects for one party similar to a financial accommodation.") (emphasis in original).

42.     "Courts also distinguish between contracts for which the extension of credit is the **primary purpose**, that is, a primary contractual **obligation**, and contracts in which the extension of credit is only incidental to or a part of a larger arrangement involving the debtor; the former constitute contracts to extend financial accommodations while the latter do not." *In re Thomas B. Hamilton Co., Inc.*, 969 F.2d at 1019 (emphasis added). In evaluating whether a contract constitutes a financial accommodation, courts also consider the purpose of section 365(c)(2), which "is to prevent the trustee from **requiring** new advances of money or other property." *In re Jonesboro Tractor Sales, Inc.*, 619 B.R. 223, 232 (Bankr. E.D. Ark. 2020) (emphasis added) (quoting *In re Twin City Power Equip., Inc.*, 308 B.R. 898, 900 (Bankr. C.D. Ill. 2004)). Thus, section 365(c)(2) only applies to contracts that have the primary purpose of obligating a party to provide financing to a debtor. *See In re Ernie Haire Ford, Inc.*, 403 B.R. at 755 ("[O]nly when the 'principal purpose' of a contract is 'to extend financing to or guarantee the financial obligations of the debtor' is the contract a non-assumable contract to extend financial accommodations . . . .") (quoting *In re Thomas B. Hamilton Co., Inc.*, 969 F.2d at 1018)).

43.     Here, the Derivative Rights Agreements are not financial accommodations because they are not agreements to provide financing—they simply govern the parties' respective rights and obligations related to their co-ownership of the Derivative Rights. However, Warner asks the Court to disregard the body of well-established precedent and apply a far broader standard. Specifically, Warner asserts that section 365(c)(2) applies to contracts "relating to the extension of money or credit," or where the extension of money or credit "is not incidental to the overall agreement between these parties." Om. Warner Obj., ¶ 36 (internal quotations and citations omitted). Warner's attempted recharacterization of the applicable standard is mistaken and contrary to the purpose of section 365(c)(2).

44.     As a threshold matter, the Derivative Rights Agreements would not constitute financial accommodations even under Warner's framing of the standard because they do not provide for **any** financing or lending whatsoever. Indeed, the record makes clear that Warner itself does not consider the Project Notice and acceptance process to be a loan or other type of financing transaction.[30]  For example, Warner argues that the Debtors' issuance of a Project Notice Acceptance is what triggers the "financing obligations" that allegedly render the Derivative Rights Agreements financial accommodations. Om. Warner Obj., ¶ 48. However, for the vast majority of the parties' relationship, Warner did not abide by the contractual Project Notice and acceptance process. In fact, ███████████████████████████████

████████████████████████████████████████████████████████████████

---

[30]  *See* Deposition of Steve Spira (October 6, 2025) [61:9–13] ("██████████████████████████
████████████████████   ██████████████████████████████████
█████████████████████████████████████████████████ ").

██████████████████████████████████████████████.[31]  If the primary purpose of

the Derivative Rights Agreements was to provide financial accommodations to the Debtors, and

the formal Project Notice and acceptance process was what triggered those financial

accommodations, ████████████████████████████████████████████████████████████

████████████████████.  Indeed, ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████.  *See* Supp.

Warner Obj. ¶¶ 12, 73.

     45.    And even if the process by which the parties historically co-financed Pictures

were viewed as involving some sort of extension of credit from Warner to the Debtors, it would

be at best ***incidental*** to the parties' broader business relationship and not a contractual

requirement set forth in the Derivative Rights Agreements themselves.  *See In re Thomas B.*

*Hamilton Co., Inc.*, 969 F.2d at 1020 ("[T]he purpose of the Agreement is to establish a

relationship that will permit [the debtor] to accept the use by customers of credit cards instead of

cash in the course of its business and permit [counterparty] to purchase the sales drafts arising

from the resulting credit card transactions.  Its purpose is not to provide financing. . . .  [Any]

extension of credit can only be viewed as incidental to the overall relationship . . . ."); *In re*

*Neuhoff Farms, Inc.*, 258 B.R. 343, 348 (Bankr. E.D.N.C. 2000) (for a contract under which "the

extension of credit is only incidental to or a part of a larger arrangement involving the debtor, [it]

cannot be classified as a financial accommodation").  The record is clear—the Derivative Rights

---

[31]   *See* Deposition of Wayne Smith (October 8, 2025) [60:18–25] ("█████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████").

Agreements are in furtherance of a risk *sharing* relationship between the Debtors and Warner, not one whereby Warner bears all the risk for the Debtors' benefit.[32]

46.     Most critically, Warner's proposed standard would materially expand the scope of section 365(c)(2) and sweep countless agreements into the definition of "financial accommodations" that Congress specifically intended to exclude.  Warner provides no principled way to distinguish contracts like the Derivative Rights Agreements from any contract to provide goods or services with payment to be made over time.  *See In re Neuhoff Farms, Inc.*, 258 B.R. at 348 ("Were the movant's arguments accepted, then nearly every supply of goods contract that did not require contemporaneous exchange could fall within the ambit of § 365(c)(2).").  It is for this reason that courts have settled on a far stricter standard—section 365(c)(2) applies *only* where the *primary purpose* of a contract is to *require* a party to extend money, credit, or other financial accommodations to a debtor.  The Derivative Rights Agreements clearly do not fit within this narrow exception.  Accordingly, the Court should overrule Warner's objection.

> **ii.     The Derivative Rights Agreements Do Not Require Warner to Extend Credit or Other Financial Accommodations to the Debtors.**

47.     One key fallacy underlies Warner's entire argument: the claim that somehow, under the terms of the Derivative Rights Agreements, Warner has "a yet-unperformed lending commitment" to the Debtors.  Om. Warner Obj., ¶ 37.  Based on their plain language, nothing in

---

[32]     *See* Deposition of Steve Spira (October 6, 2025) [110:19–111:11] ("████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████").

the Derivative Rights Agreements obligates Warner to lend, extend credit, or provide any other type of financial accommodations to the Debtors.

48.     Under the Derivative Rights Agreements, ████████████████████████████ ████████████████████████████████████████████.”  Omnibus Amendment No. 1, § 4(f).  As a result, Warner has no obligation to initiate any exploitation of the Derivative Rights and the Debtors have no ability to compel Warner to initiate an exploitation of the Derivative Rights.[33]  Even after the Debtors provide a Project Notice Acceptance to Warner with respect to a particular Derivative Work, Warner has full discretion in deciding whether to proceed with producing the project.[34]  Warner also has full discretion to modify the Proposed Picture Elements for a Derivative Work at any time.[35]  While Warner alleges that that new "financing obligations" are created each time the Debtors issue a Project Notice Acceptance, Warner fails to specify what provisions of the Derivative Rights Agreements place such financing obligations *on Warner*.  This is because no such provision exists.  At no point before, during, or after the Project Notice and acceptance process do the Derivative Rights Agreements require Warner to produce Derivative Works, make any related capital expenditures, or extend any credit specifically for the benefit of or to the Debtors.  To the extent Warner chooses to proceed with production of a Derivative Work and "takes on Village as a credit risk" (Om. Warner Obj., ¶ 43), Warner does so willingly.

---

[33]    *See* Smith Declaration [Docket No. 519], at ¶ 6 ("There is nothing in any of the Warner Bros. agreements with Village that requires Warner Bros. to develop and produce any derivative works.").

[34]    *See* Deposition of Wayne Smith (October 8, 2025) [67:3–9] ("█████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████████").

[35]    *See* Omnibus Amendment No. 1, § 4(a) ("██████████████████████████████████ ████████████████████████████████████").

49.    Courts consistently hold that, where a contract does not affirmatively **obligate** the non-debtor party to provide financial accommodations, the contract is not subject to section 365(c)(2).  *See, e.g.*, *In re Jonesboro Tractor Sales, Inc.*, 619 B.R. at 232 (dealership agreement was a not a financial accommodation because dealer was not obligated to provide financing to debtor, but had sole discretion whether to sell its equipment to debtor for cash, on open account, collect on delivery, by electronic funds transfer, or pursuant to financing arrangements); *In re UAL Corp.*, 293 B.R. 183, 189 (Bankr. N.D. Ill. 2003) (credit card processing agreement was not financial accommodation because "[t]here is no requirement under the agreement that [the counterparty] advance funds to [the debtor]"); *In re Ernie Haire Ford, Inc.*, 403 B.R. at 754–55 (auto financing agreements not financial accommodations where counterparties "[had] discretion as to whether to enter into each individual transaction").

50.    In its Supplemental Objection, Warner cites extensively to the Ninth Circuit's recent decision in *Svenhard's Swedish Bakery v. Bakery & Confectionary Union & Indus. Int'l Pension Fund (In re Svenhard's Swedish Bakery)*, No. 23-60045, 2025 WL 2627837 (9th Cir. Sep. 12, 2025) (hereinafter, "*Svenhard's*") for the proposition that the Derivative Rights Agreements constitute financial accommodations.  However, Warner does not explain how the contract at issue in *Svenhard's* is in any manner analogous to the Derivative Rights Agreements or how the Ninth's Circuit's analysis is applicable.  This is because the facts and holding from *Svenhard's* are readily distinguishable.[36]  Indeed, the Ninth Circuit's core holding—that "the

---

[36]    In *Svenhard's*, the debtor ("Svenhard"), a commercial bakery, was obligated to make contributions to an industry pension fund (the "Pension Fund") for covered employees prepetition.  *Id.* at *2.  In 2014, Svenhard sold its business and stopped making contributions to the Pension Fund.  *Id.*  The Pension Fund asserted that Svenhard had withdrawn and owed over $39 million in ERISA withdrawal liability.  *Id.*  The parties ultimately entered into a Settlement Agreement, whereby Svenhard agreed to make reduced monthly payments totaling $3 million over 20 years.  *Id.*  The Settlement Agreement expressly indicated that the Pension Fund agreed to this arrangement as a result of Svenhard's "limited assets" and strained financial situation.  *Id.*  After defaulting on

ordinary and common meaning of 'financial accommodations' at the time of enactment included contracts to **forebear** or **reduce** payments **to which one was otherwise entitled**, if those contracts were agreed upon **to aid a debtor's poor financial condition**"—further underscores the fatal flaws in Warner's argument.  *Id.* at *4 (emphasis added).

51.     As detailed above, no provision of the Derivative Rights Agreements obligates Warner to make any payments, or to reduce or forbear from collecting any payments owed by the Debtors.  In addition, the record is undisputed that Warner chose to contract with the Debtors as a co-investment partner **because of their own financial wherewithal and access to capital**.[37] Warner is no charity—it is a publicly traded company with duties to maximize profits for its shareholders.  The notion that Warner entered into the Derivative Rights Agreements to aid the Debtors' allegedly poor financial condition is absurd on its face.  Moreover, Warner's statement that it "executed the 2017 Omnibus Amendment at a time when Village's financial position was strained" is false and unsupported by any evidence whatsoever.  Supp. Warner Obj. ¶ 55. Warner also fails to acknowledge that the parties entered into the Derivative Rights Agreements not just in 2017, but throughout the course of their relationship since 1998.  The Ninth Circuit's reasoning in *Svenhard's* provides no support for Warner's position.

52.     Every other case Warner relies upon (aside from those where the courts found that section 365(c)(2) did **not** apply to the contracts at issue) involved an affirmative obligation by the non-debtor to lend or provide other financial accommodations.  *See In re Sun Runner Marine, Inc.*, 945 F.2d 1089 (9th Cir. 1991) (financing agreement whereby counterparty agreed

---

the Settlement Agreement, Svenhard filed for chapter 11 and sought to assume and assign the Settlement Agreement under section 365.  *Id.*

[37]   *See* Deposition of Steve Spira (October 6, 2025) [107:4–13] ("███████████████████████ ████████████████████ ████████ █████████ ██████████ ██████████████████████ █████").

to lend money to retail boat dealers so they could buy boats from the debtor was a financial accommodation); *Watts v. Pa. Hous. Fin. Co.*, 876 F.2d 1090 (3d Cir. 1989) (commitment to provide mortgage assistance financing was a financial accommodation); *In re Taggatz*, 106 B.R. 983, 993 (Bankr. W.D. Wis. 1989) (agreement obligating bank to fund unfunded portion of promissory note was a financial accommodation); *In re Wegner Farms*, 49 B.R. 440, 444 (Bankr. Iowa 1985) (surety agreements are a financial accommodation because they are "the obligation to pay money on the obligation of another"); *In re Whiteprize, LLC*, 275 B.R. 868, 874 (Bankr. D. Ariz. 2002) (agreements providing debt financing for the purchase of property are financial accommodations); *In re Placid Oil Co.*, 72 B.R. 135, 139 (Bankr. N.D. Tex. 1987) (insurance premium agreement requiring the insurer to extend credit to the debtor was a financial accommodation).  There are no such provisions in the Derivative Rights Agreements.

53.    The Derivative Rights Agreements simply do not obligate Warner to lend, extend credit, or provide any other type of financial accommodations to the Debtors.  If the Derivative Rights Agreements are assumed, Warner would remain free of any obligation to lend, extend credit, or provide any other financial accommodations to the Debtors or their assignee.  The stark contrast between the cases where courts have barred assumption of an executory contract under section 365(c)(2) and the situation at bar reveals that the Derivative Rights Agreements are not a financial accommodation and do not fall under the narrow subset of contracts that section 365(c)(2) is intended to prevent a debtor from assuming.

iii.    **Any "Credit" That Warner Has Historically Extended Was Governed by Separate Agreements That Were Already Assumed and Assigned to Alcon in Connection with the Library Sale.**

54.    That Warner has in the past provided the initial production funding for co-financed motion pictures simply does not mean Warner is *required* to do so *under the Derivative Rights Agreements*.  The only economic term set forth in the Derivative Rights Agreements is

that ███████████████████████████████████████████████████████████████

███████████████████████████████████████████████. Omnibus Amendment No.

1, § 4(b)(ii).  The specific terms pursuant to which the production of a Derivative Work is funded

and the Debtors purchase an Applicable Percentage interest are instead dictated by separate

agreements—*i.e.*, a███████████████████████████████████████████████████

████████████████████████████████████████ *See id.*, § 4(d).[38]

     55.     Rather than ground its argument in the terms of the Derivative Rights Agreements

themselves (which Warner cannot do), Warner relies on a variety of cherry-picked provisions

contained in certain "ancillary agreements" in an attempt to bury the lede under a mountain of

irrelevant contractual provisions.  To be clear: ***none of the ancillary agreements that Warner***

***refers to are being assumed and assigned in connection with the sale of the Derivative Rights***

***Assets***.  Warner's claim that those agreements are somehow fully "integrated" with the

Derivative Rights Agreements is directly contradicted by the fact that the terms of those ancillary

agreements have expired and no new films can be produced thereunder.  And to the extent they

were not expired, those agreements were ***already assigned to Alcon*** in connection with the

Library Sale.[39]  Nevertheless, the Debtors must respond to Warner's inaccurate characterizations

of those agreements to correct the record:

---

[38]  When the Debtors timely provide a Project Notice Acceptance and Warner elects to proceed with production, the Derivative Rights Agreements provide flexibility with respect to the documents that the parties subsequently execute to effectuate the transaction.  Specifically, ████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████"  These provisions reveal that the Derivative Rights Agreements are effectively agnostic to the terms by which the parties actually effectuate the transaction.

[39]  The 2020 MPRPA, *i.e.*, the parties' most recent overall co-investment deal, expired on December 31, 2020.  See While certain provisions in the QCSAs, MPRPAs, and related picture and purchase agreements have continuing effect with respect to existing Pictures, they were assumed and assigned to Alcon in connection with the Library

- **Commitment to Fund Production Costs.** Warner references Article 8 of the 2020 MPRPA, which provides that ████████████████████████████████ ███████████████" 2020 MPRPA, § 8.1 (emphasis added); Om. Warner Obj., ¶ 47.

  o As is apparent from the text of this provision, ███████████████ ████████████████████████████████████████████ ██████████. Indeed, nothing in the Derivative Rights Agreements affirmatively commits Warner to fund any production costs.

- **Production Interest.** Warner repeatedly claims that it charges "interest" on production costs "all for Village's benefit." Om. Warner Obj., ¶ 47.

  o However, the "interest" that Warner refers to is "Production Interest" as defined in the 2020 MPRPA. ████████████████████████ ████████████████████████████████████████████ ████████████████████     █████████████████████ █████████████████████████████████[40]██.

- **Security Agreements and Copyright Mortgages.** Warner claims the form security agreements and copyright mortgages attached as exhibits to the 2020 MPRPA are "yet another immutable characteristic of a financial accommodation." Om. Warner Obj., ¶¶ 6, 47.

  o ████████████████████████████████████████ ████████████████████████████████████████ ████████████.[41]████████████████████

---

Sale. As a result, the parties would need to negotiate and execute new transaction documents for any future Derivative Works. *See* Deposition of Wayne Smith (October 8, 2025) [34:9–17] ("█████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████"). To provide a concrete example, for the 2023 motion picture *Wonka*, the Debtors and Warner negotiated and entered into an entirely new film-specific set of agreements. *See, e.g.*, Wonka MPRPA and Wonka RPA.

[40] Under the 2020 MPRPA, ████████████████████████████████ ████████████████████████████████████████████ █████████████     █████████████████████████████ ████████████████     ███████████████████████ ████████████████████. *See* 2020 MPRPA, §§ 5.1–5.4.

[41] *See* 2020 MPRPA, Ex. C-1.

███████████████████████████████████████.⁴² Warner
transparently references these documents because they sound financial in nature,
but in reality they are irrelevant to the Derivative Rights Agreements.

- **Promissory Notes.** Warner asserts that certain Promissory Notes "further evidence
  Village's commitment to repay with interest."  Supp. Warner Obj. ¶ 57.

  o ████████████████████████████████████████
    ████████████████████████████████████████
    ████████████████████████████████████████
    ████████████████████████████████████████
    ████████████████████████████████████████
    ████████████████████████████████████████
    █████████████████ █████████████████████
    ████████████████████████████████████████
    ███████████████████████

- **Assigned Offset.** Warner disingenuously states that it "extends other significant
  financial accommodations to Village" through "Assigned Offsets."  Supp. Warner
  Obj. ¶ 58.

  o  Under the 2020 MPRPA, ███████████████████████████
     ████████████████████████████████████████
     ████████████████████████████████████████
     ███████████████████████████ █████████████
     ████████████████████████████████████████
     ████ ██ ██ █████ ██████ ███ ███ ██████ █ ████
     █████████████

56.    In addition to mischaracterizing the aforementioned provisions, Warner also
ignores various other terms of the 2020 MPRPA that demonstrate it did not require Warner to
provide financial accommodations to the Debtors.  For example, ████████████████
███████████████████████████████████████████████

---

⁴² *See* Deposition of Wayne Smith (October 8, 2025) [95:25–96:3] (████████ █
██████████████████████████ ").

███████████████████████████████████████.[43]  In addition, ██████████████

████████████████████████████████████████████████████████████████████████

████.[44]  These provisions make clear that the MPRPAs and RPAs were intended to facilitate

Warner's **sale** of specified interests in a ***finished product*** to the Debtors—not a financial

accommodation for the Debtors' benefit.[45]

57.     Warner's claim that the MPRPAs and other ancillary agreements somehow

"confirm the executory and financial-accommodation nature" of the Derivative Rights

Agreements is simply a red herring.  And regardless of whether the MPRPAs or other ancillary

agreements have historically involved some sort of temporary extension of credit from Warner to

the Debtors, it would be ***at best*** incidental to the parties' broader business relationship and not a

contractual requirement set forth in the Derivative Rights Agreements themselves.  Courts

consistently hold that contracts involving incidental extensions of credit do not constitute

financial accommodations within the meaning of section 365(c)(2).[46]

---

[43]   *See* 2020 MPRPA, § 3.3 ("████████████████████████████████████████████████
████████████████████████████████████████████████████████████.").

[44]   *See*, *e.g.*, 2020 MPRPA § 3.2 ("█████████████████████████████████████████████
██████████████████████████████████████"); § 8.5 ("██████████████████████████████████
███████████████████████████████████████").

[45]   *See* Deposition of Steve Spira (October 6, 2025) [83:7–17] ("██████████████████████
███████████████████████████████████████████████████████████████████████████████
████████████████████████████████████     ██████████████████████████████
████████████████████████").

[46]   *See*, *e.g.*, *In re Thomas B. Hamilton Co. Inc.*, 969 F.2d at 1020–21 (if an "[a]greement establishes a contractual business relationship and any financing that is part of this relationship is only incidental to the relationship, then the [a]greement does not fall within the ambit of [section] 365(c)(2)"); *Phillips v. McLane Co. (In re Fast Mart Convenience Stores, Inc.)*, 296 B.R. 414, 420 (Bankr. E.D. Va. 2002) (finding inventory financing provision was only part of a larger agreement, the primary purpose of which was to govern the sale of goods between parties); *In re Neuhoff Farms, Inc.*, 258 B.R. at 347–48 (temporary extension of credit as between parties to a supply agreement does not render such an agreement a financial accommodation); *In re Braniff*, 118 B.R. 819, 845 (Bankr. M.D. Fla. 1989) (the financing aspects of contracts involving option rights to purchase aircraft were incidental to the purpose of the overall agreement and therefore not financial accommodations); *In re Emerald*

---

**iv.  The Purpose of the Derivative Rights Agreements is to Govern the Parties Rights and Obligations as Co-Owners of the Derivative Rights—Not to Provide Financial Accommodations to the Debtors.**

58.  The lack of any provision obligating Warner to lend, extend credit, or provide any other type of financial accommodations to the Debtors is not surprising because that was not the purpose of the Derivative Rights Agreements.  Warner may claim that "the Derivative Rights Agreements are built entirely around [Warner]'s extension of credit to Village" (Om. Warner Obj. ¶ 45), but the Derivative Rights Agreements do not contain any provision that mentions lending, borrowing, or extending credit—explicitly or implicitly—and Warner cannot credibly dispute this fact.[47]

59.  On the contrary, as the title "Co-Ownership Agreement" makes clear, the purpose is to set forth the parties' respective rights and obligations as co-owners of the Derivative Rights. The recitals in each Co-Ownership Agreement underscore that the agreements are intended to govern the parties' broader relationship as co-owners of the Derivative Rights, not provide terms for the financing of future films.[48]

60.  The purpose of the Derivative Rights Agreements is further demonstrated by considering what the parties' respective rights and obligations would be in their absence.

---

*Forest Const., Inc.*, 226 B.R. 659, 664 (Bankr. D. Mont. 1998) (an equipment lease containing a purchase option was not a financial accommodation despite that it contained incidental financial accommodations); *In re United Press Intern., Inc.*, 55 B.R. 63, 66 (Bankr. D.C. 1985) ("That [lessor] is obligated to spend money under the lease to make it suitable for the Debtor does not mean the Debtor is being financed.").

[47]  *See supra* ¶¶ 47–53.

[48]  *See*, *e.g.*, Recital E to Wonka Co-Ownership Agreement ("████████████████████████████████████████████████ ██████████████████████████████"); *see also In re Thomas B. Hamilton Co., Inc.*, 969 F.2d at 1020 (referring to the purpose of the agreement set forth in the recitals in concluding that "[i]ts purpose is not to provide financing"); *In re Ambassador Travel, Inc.*, 98 B.R. 1018, 1020–21 (Bankr. S.D. Fla. 1989) (agreement "is not a contract for financial accommodations since the subject of the contract is the sale of airline tickets/goods, not financing"); *In re The Travel Shoppe, Inc.*, 88 B.R. 466, 470 (Bankr. N.D. Ga. 1988) (similar agreement not financial accommodation because "[t]he stated purpose of the contract is to facilitate the issuance of airline tickets to the public, not to extend credit").

Without the Derivative Rights Agreements, the Debtors and Warner would each be able to freely and unilaterally exploit the Derivative Rights and exercise their other broad default rights as co-owners.  *See Brownstein*, 742 F.3d at 68 (3d Cir. 2014) (citing 1 NIMMER ON COPYRIGHT § 6.10); *Sybersound Records, Inc.*, 517 F.3d at 1145 (citing H.R. Rep. No. 94-1476, at 121 (1976)).  In addition, each party would have a duty to account to the other for any profits generated from their unilateral exploitation of the Derivative Rights, even if the other party did not co-finance or otherwise contribute to the exploitation.  *See id.*  In practice, this would discourage either party from investing in Derivative Works as it would mean bearing all of the risk and only benefiting from half of the potential profit upside.  The primary objective of the Derivative Rights Agreements is to remedy this by allowing Warner to control exploitation of the Derivative Rights, while still recognizing the Debtors' standing as a co-owner and preserving the Debtors' ability to invest in potential profits generated from Derivative Works.  This further underscores that the parties' relationship is one of risk *sharing*—not Warner bearing all the risk for the Debtors' benefit.  This was the parties' intent when they entered into the Derivative Rights Agreements.[49]

61.    Warner's broad interpretation of "financial accommodations" not only defies every case on point, it materially expands the scope of section 365(c)(2) beyond its natural reading in a way that would potentially upend commercial bankruptcies nationwide.[50]  The plain

---

[49]  *See supra* ¶ 45.

[50]  *See In re Thomas B. Hamilton Co., Inc.*, 969 F.2d at 1019 (a broad interpretation of "financial accommodations" could "turn every contract where the debtor owed money into a contract for financial accommodations and would allow the exception to swallow the rule") (quoting *In re The Travel Shoppe, Inc.*, 88 B.R. at 470)); *In re Ernie Haire Ford, Inc.*, 403 B.R. at 755 ("A broad interpretation of [section 365(c)(2)] would lead to absurd results."); *In re United Airlines, Inc.*, 368 F.3d at 724 ("[A]lmost every lease and other executory contract has some provision that could be characterized as a short-term loan to one side or the other. . . . Doubtless this is why no one (to our knowledge) has argued that debtors cannot assume leases and sales contracts.").

language and effect of the Derivative Rights Agreements, as well as the circumstances giving rise to their execution, make clear that their primary purpose is to govern the parties' rights and obligations as co-owners of the Derivative Rights—not to provide financial accommodations to the Debtors.

D.   **The Debtors Can Assign the Derivative Rights Agreements in Accordance with the Bankruptcy Code, and Warner Provides No Legal Basis to Support a Contrary Position.**

62.   Section 365(f)(1) of the Bankruptcy Code provides that, subject to limited exceptions, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease." 11 U.S.C. § 365(f)(1); *see also In re Fleming Companies, Inc.,* 499 F.3d 300, 307 (3d. Cir. 2007) ("The Bankruptcy Code expressly permits assignment of executory contracts even when contracts prohibit such assignment.").

63.   The relevant exceptions to this rule that Warner relies on stem from Section 365(c)(1) of the Bankruptcy Code, which provides that "[t]he trustee may not assume or assign any executory contract" if (i) "applicable law" excuses the contract counterparty from accepting performance from or rendering performance to an entity other than the debtor, and (ii) such counterparty does not consent. 11 U.S.C. § 365(c)(1). Specifically, Warner claims two well-established exceptions can be applicable here: (y) licenses for non-exclusive intellectual property in accordance with federal copyright law; and (z) contracts for personal services under prevailing state law. As detailed above, the Debtors' ownership of the Derivative Rights is subject to federal copyright law, and the Debtors' interests in the Derivative Rights Agreements are governed by California contract law. *See supra*, ¶ 14. Despite Warner's claims to the contrary, the Derivative Rights Assets do not fit into either of these exceptions.

i.     **The Debtors' Intellectual Property Interests are Freely Assignable Pursuant to Section 365(f)(1) of the Bankruptcy Code and Federal Copyright Law.**

64.    Warner contends that they are the "primary" copyright owner of the Derivative Rights and on that basis: (i) such primary position relegates the Debtors to a diminished interest, tantamount to a non-exclusive licensee; and (ii) their consent rights under the Derivative Rights Agreements must be respected.  *See* Supp. Warner Obj., ¶¶ 53, 68.  Despite its repeated efforts to muddy the waters, Warner cannot—and in fact does not—dispute that the Debtors co-own the Derivative Rights.[51]

65.    As more fully detailed above, the Debtors co-own the Derivative Rights.  *See Supra*, ¶¶ 15-20.  In connection with closing of the co-investment transactions for each Picture, the Debtors purchased a percentage ownership interest (usually 50%) in the Derivative Rights and Warner formally conveyed that ownership interest to the Debtors through the Assignment Agreements.[52]  As Warner notes, the Assignment Agreements typically reference being made "pursuant" to terms of various ancillary agreements.  This is accurate, given the parties' other agreements required that the relevant ownership interest in the Derivative Rights be assigned to the Debtors, but holds no bearing on the legal analysis here.  These assignments, which Warner does not contest, and in fact, append to their pleadings as evidence, create valid copyright

---

[51]    *See* Deposition of Wayne Smith (October 8, 2025) [43:12–19] ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮"); *see also* Supp. Warner Obj., ¶ 63 "all other Derivative Rights shall remain *jointly owned*. . ." (emphasis added).  Warner's desire to purchase the Derivative Rights Assets further reveal Warner's acknowledgement that the Derivative Rights are distinct intellectual property assets.  The Derivative Rights Agreements, to which Warner is the counterparty, are terminable if Warner appears on both sides of the agreement.  As a result, Warner's purchase price consideration not only includes the Debtors ownership interest in the intellectual property—*i.e.*, the Derivative Rights—but is limited to that distinct asset, given Warner would derive no contractual benefit from possessing both sides of the Derivative Rights Agreements.

[52]    *See, e.g.*, Suppl. Smith Decl., ¶¶ 37-38, App'x. Ex. 45 (Practical Magic Assignment of Rights from Warner Bros. to WV Films LLC).

ownership interests and are governed, outside of the Bankruptcy Code, by federal copyright law rather than contract law.[53]  *See id.*

66.     In an attempt to argue for an exception related to intellectual property under Section 365(c)(1) of the Bankruptcy Code, Warner asserts that the Assignment Agreements are integrated with the Derivative Rights Agreements, and that references to the Co-Ownership Agreements therein somehow transform Warner into an undefined "primary copyright owner" whose consent is required under Section 365(c) of the Bankruptcy Code, but provide no case law that substantiates this exception.  *See* Objection, ¶¶ 65-67.  Instead, Warner cites *to Golden Books*, and incorporates by reference to the Omnibus Warner Objection, *Patient Education* and *Nike*.[54]  Unlike the debtors in *Golden Books*, *Patient Education*, and *Nike*, who were licensees of the subject copyright, the Debtors ***own*** their copyright interests in the Derivative Rights that they are seeking to assign.  And, under well-established federal copyright law, a co-owner may transfer its own interest in a copyright to a third party without the consent of the other co-owner(s), subject only to the general requirements of a valid transfer of copyright.[55]  Warner has provided no evidence that the Derivative Rights Assets include ***any*** non-exclusive licenses (or any type of license whatsoever), and the related case law Warner relies on is inapposite.

---

[53]   Copyright ownership initially vests in the author(s) of the work and subsequently "may be transferred in whole or in part by any means of conveyance or by operation of law."  *Id.* §§ 201(a), (d)(1); *see also Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1003 (9th Cir. 2015) (an assignment of a copyright transfers legal title to the transferee).  In addition, "[a]ny of the exclusive rights comprised in a copyright, ***including any subdivision*** [thereof] . . . may be transferred . . . and owned separately.  The owner of any particular right is entitled, to the extent of that right, to all of the protections and remedies accorded to the copyright owner."  *Id.* § 201(d)(2) (emphasis added).  For a transfer of copyright ownership to be valid, it must be effectuated in a written instrument of conveyance that is signed by the owner of the rights conveyed.  *See id.* § 204(a).

[54]   *See In re Golden Books Family Entm't*, 269 B.R. 300 (Bankr. D. Del. 2001); *In re Patient Educ. Media, Inc.*, 210 B.R. 237 (Bankr. S.D.N.Y. 1997); *Gardner v. Nike, Inc.*, 279 F.3d 774, 781 (9th Cir. 2002).

[55]   *See Warrick v. Roberts*, 34 F. Supp. 3d 913, 919 (N.D. Ill. 2014) (citing 1 NIMMER ON COPYRIGHT § 6.10(A)(3)(a) (a co-owner "may always transfer his interest in the joint work to a third party")); *see also Brownstein*, 742 F.3d at 68 ("[E]ach co-author is entitled to convey non-exclusive rights to the joint work without the consent of his co-author.").

67.     Further, five pages in the Supplemental Warner Objection are dedicated to explanations regarding the contractual restrictions on the Debtors' intellectual property interest in the Derivative Rights Agreements—specifically, (i) that Warner has the sole right to exploit Derivative Works under the Derivative Rights Agreements, which the Debtors do not contest, and (ii) that Warner has "consent rights" that bar assignment of the Derivative Rights Agreements, which would be relevant—if the Debtors were not seeking to assign such agreements pursuant to Section 365 of the Bankruptcy Code.

68.     To apply the restrictions set forth under copyright law to the assignability of a non-exclusive licensee to the Debtors, who are *bona fide* copyright owners, would have the effect of a partial forfeiture of the Debtors' property interests.  Further, it would contravene well established federal copyright law, which allows for owners to freely transfer their interest in a copyright without their co-owners' consent, and bankruptcy law, which allows for assignment of agreements notwithstanding consent provisions to the contrary.  *See In re Fleming Companies, Inc.,* 499 F.3d at 307; *see also Supra*, ¶¶ 15-20, 66.

### ii.      The Derivative Rights Agreements Are Not Personal Services Contracts

69.     Warner's alternative argument under Section 365(c)(1) is that the Derivative Rights Agreements qualify as personal services contracts under California contract law.  Warner emphasizes that they historically enjoyed a good business relationship with the Debtors, one that was characterized by "trust and cooperation."  *See* Supp. Warner Obj., ¶ 69.  The Debtors agree. The Debtors and Warner previously enjoyed a collaborative working relationship, with their respective representatives acting cooperatively and upholding confidentiality agreements, as Warner has done with Alcon,[56] and similar to many other companies engaged in joint ventures

---

[56]     *See, e.g.*, Johnson Decl. ¶ 15.

within the film industry.  However, the prior cooperative relationship between Warner and the Debtors is not relevant to determining whether the Derivative Rights Agreements involve personal services—in theory, the Debtors and Warner's joint repertoire of past agreements could include a multitude of both personal and non-personal contracts. The only pertinent consideration is the specific requirements of the Derivative Rights Agreements themselves, which are the sole agreements being transferred as part of this Sale.

70.     Under California law, which governs the Derivative Rights Agreements, "[i]n order to be considered a personal services contract, there must be a special relationship between the parties or the party to perform must possess special knowledge or a unique skill, *such that no performance save that of the contracting party could be meet the obligations of the contract*." *In re Health Plan of the Redwoods*, 286 B.R. 407, 409 (Bankr. N.D. Cal. 2002).

71.     Further, Courts applying California law have found that a contract with a corporation, as opposed to an individual, is clear evidence that the contract is not for personal services, as a corporation cannot perform personal functions.  *See, e.g., Tran v. Intern. Buddhist Cultural Heritage Foundation*, No. 30201500787567CUMCCJ, 2015 WL 13081192, at *4 (Cal. Super. Oct. 30, 2015) ("[T]he agreement was made with a corporation which, in the nature of things, cannot perform personal functions . . . it must have been in contemplation of the parties when the contract was signed that the services bargained for would be rendered by a human representative delegated to perform that duty by the corporation and subject to being succeeded, if occasion should arise, by one with proper qualifications.") (citing *Haldor, Inc. v. Beebe*, 164 P.2d 568, 572 (1945)); *Farmland Irr. Co. v. Dopplmaier*, 308 P.2d 732, 741 (1957) ("The contract was made, however, with a corporation, and a corporation by nature may change in ownership and the agents through whom it acts."); *see also Lauter v. Rosenblatt*, 2020 WL

3545733, at *3 (C.D. Cal. June 30, 2020) ("Although Plaintiff asserts that substitution of any assignee in place of [Defendant's] materially changed his own duties, increased the risk to him, impaired his chance of obtaining return performance, and materially reduced the value of the contracts to Plaintiff, he provides no explanation of how this was so, let alone evidence to support his assertions.").

72.     To support their position, Warner Bros. cites to *Planet Hollywood* and *EBC I. In re Planet Hollywood Int'l, Inc*., 2000 WL 36118317, at *1 (D. Del. Nov. 21, 2000); *EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 380 B.R. 348, 363 (Bankr. D. Del. 2008) (*aff'd*, 382 F. App'x 135 (3d Cir. 2010)).   In *Planet Hollywood,* the contracts at issue involved celebrity endorsement contracts where the essence of each deal was the integration of the personal image and reputation of individual athletes.  *Planet Hollywood,* at *5.   In that case, each athlete was required to personally sign a "Confirmation and Agreement" attesting to the athlete's individual responsibility for performing all the obligations of the endorsement contract, confirming the servicing company's authority, and personally binding themselves to the contract's terms. *Id* at *2.

73.     In sharp contrast, the Derivative Rights Agreements are contracts between sophisticated ***corporate entities***, not individuals, as Warner freely admitted during its depositions in this matter.[57]  These agreements do not name or require any individual to perform or guarantee performance—they are strictly business-to-business arrangements that govern the parties' use of the co-owned Derivative Rights.   There are no attestation clauses, no direct personal obligations, and no contractual mechanisms calling for the exercise of unique reputation, judgment, or

---

[57]   *See* Deposition of Steve Spira (October 6, 2025) [97:16–19] (████████████████████████████████ ████████████████████████████████████████████████████████████ ").

artistry by an individual.  Further, there are no individuals named in the Derivative Rights Agreements, and no obligations that even arguably require unique skill, trust, or artistic discretion personal to the Debtors or their management.  Unlike *Planet Hollywood*, where the court emphasized the "close association" of the athlete's persona and performance with contractual obligations, here, the substance of the parties' arrangements are strictly corporate and, as such, freely assignable and not subject to the personal contract exception of section 365(c)(1).  Indeed, following assignment, Alcon's primary obligations under the Derivative Rights Agreements would be to fund its co-investment share for Derivative Works that Warner chooses to produce and that Alcon elects to participate in.

74.     *EBC I* similarly addresses agreements and relevant law that are inapposite to the Derivative Rights Agreements for several reasons.  Most notably, the court was addressing whether proceeds from an assignment agreement could be voided as a fraudulent transfer, and its analysis was rooted in Virginia law, which is not controlling or reflective of the facts or law governing the Derivative Rights Agreements.

75.     Conversely, in *Vice Group*, the court found that a production contract between two corporations did not constitute personal services under California law.  *See In re Vice Group Holding Inc.*, 652 B.R. 423 (S.D.N.Y. 2023).  There, Showtime, as objecting counterparty, argued that its contract with the debtors constituted personal services, where such contract was for the production and licensing of a television documentary series.  *See id.*, at 427-428.  The agreement at issue required the debtors to produce (including writing and developing ideas and concepts), deliver, and license a documentary series to Showtime for exhibition on Showtime's premium television network, and gave Showtime approval rights over creative elements and key personnel involved in creating the series.  *Id.*  Showtime argued the contract involved "a personal

relation of confidence that [was] reliant on [debtor's] specialized skill and knowledge"; that "timely delivery" and "first-class technical quality" were the "essence" of the contract; and that Showtime should be afforded the benefit of its bargained for counterparty. *Id*. at 430-431. The *Vice Group* court found that such requirements were not sufficiently specific to qualify as personal services, and such benefit could be received from the purchaser. *Id* at 431. Further, the court held that while Showtime did have approval rights and control over key personnel, the nature of the contract did not require sufficiently close cooperation, did not constitute personal services, and could be assigned over Showtime's objection. *Id* at 432.

76.     Here, Warner contends that the Derivative Rights Agreements constitute personal services because (i) Warner shares sensitive information related to Derivative Works; (ii) the "logos and production credits" are displayed in tandem in connection with certain co-financed works; and (iii) certain consultation rights exist in the Derivative Rights Agreements. *See* Supp. Warner Obj., ¶¶ 69-70.

77.     First, many contract counterparties across all industries share sensitive and confidential information, and Warner provides no legal support for this being a factor in a personal services analysis. The Derivative Rights Agreements have confidentiality provisions that will bind Alcon as the assignee. Second, Warner's claim that the "logos and production credits that both Warner and [the Debtors] display in tandem" support their assertion that the Derivative Rights Agreements constitute personal services is unfounded. The paragraph immediately preceding this statement in Warner's Supplemental Objection explicitly distinguishes Warner's "very personal" co-financing relationship with the Debtors from Warner's "impersonal" film distribution arrangement with Alcon. *See* Om. Warner Obj., ¶ 69. But, a review of the opening credits of any Alcon film distributed by Warner confirms that their

logos are also displayed in tandem—thus indicating tandem logos do not in fact evidence close personal relationships.[58]   Third, similar to Showtime's approval rights in *Vice Group*, the Debtors consultation rights are not significantly personal in nature.  During deposition testimony, when asked whether Warner was obligated to accept any of the Debtors' input, Warner's 30(b)(6) witness responded "███████████████████████████████"[59]

78.     In reality, the Derivative Rights Agreements are focused on the co-ownership of Derivative Works and governance of the related rights.  While they do impose obligations, including those referenced above, as in *Vice Group*, these provisions do not demand close collaboration.  Nor are they sufficiently specific to demonstrate a personal service that only the Debtors can provide—particularly given the agreements are between two corporate entities under California law.  *See, e.g., In re Health Plan of the Redwoods*, 286 B.R. at 409.

**E.     The Debtors and Alcon Have Provided Adequate Assurance of Future Performance**

79.     Section 365(b)(1)(C) of the Bankruptcy Code provides that a debtor seeking to assume an executory contract must provide "adequate assurance of future performance under such contract." 11 U.S.C. § 365(b)(1)(C).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).  Adequate assurance does not require a debtor to guarantee the success of the proposed assignee, or that the debtor must select an assignee that is subjectively suitable to the applicable counterparty.  *See In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will

---

[58]    *See, e.g.*, The Blind Side (Alcon Entertainment, 2009) (opening credits).

[59]    *See* Deposition of Wayne Smith (October 7, 2025) [184:1-10].

fall considerably short of an absolute guarantee of performance."); *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n.10 (3d Cir. 2001) ("What constitutes 'adequate assurance' is to be determined by factual conditions; the seller must exercise good faith and observe commercial standards; his satisfaction must be based upon reason and must not be arbitrary and capricious. . . . The phrase 'adequate assurance of future performance' . . . is to be given a practical, pragmatic construction based upon the facts and circumstances of each case.  Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.") (citations omitted); *In re Fleming Co*., 499 F.3d 300, 305 (3d Cir. 2007) (discussing Cinicola's definition of adequate assurance of future performance and subsequently noting that "[i]t is clear that adequate assurances need not be given for every term of an executory contract").

80.     Adequate assurance may be established by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance of future performance is present when prospective assignee of a lease from debtor has financial resources and has expressed a willingness to devote sufficient funding to business to give it strong likelihood of succeeding).   Further, when evaluating a potential assignee, the primary determinant of adequate assurance of future performance is whether the assignee will be able to satisfy ***any monetary obligations*** arising under the assigned contracts.  *Id*. at 605 (*citing In re Natco Indus., Inc*., 54 B.R. 436, 440-441 (Bankr. S.D.N.Y. 1985)).

81.     Warner asserts that Alcon cannot provide adequate assurance of future performance "given the status of its relationship with [Warner]".  *See* Supp. Warner Obj. ¶ 72. Warner cites to *Texas Health* for its misleading claim that "a purchaser's ability to maintain a

healthy relationship with a primary contract counter-party" is considered as part of an adequate assurance analysis.  *See id.*[60]

82.     In *Texas Health*, the court held that the debtor could not assume its sublease with a counterparty for lack of adequate assurance from the debtor due to significant pre- and post-petition monetary and non-monetary breaches ***that were not cured***.  *In re Texas Health Enters., Inc.*, 246 B.R. 832, 836 (Bankr. E.D. Tex. 2000).[61]  There, the debtor and objecting counterparty did not just fail to maintain "a healthy relationship"—the debtor breached the contract it was seeking to assume in both monetary and non-monetary ways and did not remedy the breach or offer to cure.  *Id.* at 836-837.  The court ultimately found that, given the uncured breaches, the counterparty would have grounds to terminate the contract outside of bankruptcy.  *Id.* ("Although at the hearing [debtor] offered to cure any monetary default, no offer to cure the non-monetary defaults were extended. . . There was ample evidence of non-performance of duties pre- and post-petition.  It is clear to this Court that under non-bankruptcy law, [counterparty] would have substantial grounds for terminating its relationship with [debtor]." *Id.*

83.     Unlike the uncured breaches in *Texas Health*, the Derivative Rights Agreements have no outstanding cure obligations.  While Warner claims it does not have a sufficiently cooperative relationship with Alcon, any dispute between Warner and Alcon is unrelated to the Derivative Rights Agreements and further, Warner has presented no evidence that such conflict impacts Alcon's ability to access capital, perform financial obligations, maintain confidential

---

[60]     *In re Texas Health Enters., Inc.*, 246 B.R. 832, 836 (Bankr. E.D. Tex. 200).

[61]     These breaches in *Texas Health* included the debtor's failure to make payments to the operator under the management agreement, as well as non-monetary defaults such as credible and unrefuted evidence of Medicare and Medicaid regulation violations and licensing irregularities.  *Id.*  The court further found evidence that the debtor made certain physical changes to two of the operator's nursing home facilities against the operator's direct instructions, which the debtor "never corrected . . . or offered to cure," and also failed to comply with notice provisions in the management agreement relating to a lawsuit where the debtor and operator were co-defendants.  *Id.*

information, or comply with any other obligation that could be triggered under the Derivative Rights Agreements.[62]  *See* Johnson Decl. ¶¶ 8-20.[63]

84.    Alcon is extremely well-capitalized—generating close to $4 billion in revenue since its inception—and will have the requisite corporate backing to fund any Derivative Work it may elect to participate in. *See* Johnson Decl., ¶¶ 6, 22-31.  Further, the Derivative Rights Agreements would provide Alcon with an ***option*** to participate in the financing of a film, but would not require them to do so, meaning Alcon would have the ability to analyze whether they had the capital to adequately perform pursuant to any Project Notice if and when they were presented with one. *See supra* ¶ 22.

85.    Case law provides that assurance of performance—while not a guarantee—can be adequately demonstrated by financial health and if practical, relevant experience. *See Supra* 75-76.  In *Vice Group*, the court found that adequate assurance had been provided over Showtime's objection, and included in its reasoning that "***the Purchaser [was] in a stronger financial position than the Debtors***." *See In re Vice Group*, 652 B.R. at 432.  Alcon is undoubtedly in a stronger position to perform under the Derivative Rights Agreements than the Debtors—a fact convincingly demonstrated by Alcon's over $95 million purchase of the Debtors' interests in *Wonka* and ███████████████████, both obligations that arise, upon election, under the Derivative Rights Agreements.  *See* Johnson Decl. ¶ 35.  This court cannot countenance an adequate assurance analysis that considers whether a contract

---

[62]   *See* Deposition of Wayne Smith (October 8, 2025) [115:3–11] ("███████████████████████ ████████████ ████████████████████████████████").

[63]   *See Declaration of Broderick Johnson in Support of Alcon Media Group, LLC's (I) Joinder to the Debtors' Reply in Support of Derivative Rights Sale and (II) Response to Warner Bros. Entertainment Inc.'s and Regency Entertainment (USA), Inc.'s Objection* filed contemporaneously herewith (the "Johnson Declaration").

counterparty finds an assignee subjectively suitable, a consideration which would surely thwart the purpose of Section 365(f)(1) of the Bankruptcy Code.

F.  **Warner's Objections to Certain Terms in the Alcon Derivative Rights APA Are Not Grounds to Prevent the Sale.**

86.  Warner objects to several allegedly "fatal defects" in the Alcon Derivative Rights APA, including: (i) the inclusion of the Purchased Unfunded Pictures Derivative Rights as Purchased Assets; (ii) any assignment to Alcon of ███████████████████████████ ████████████████████████; (iii) the sale of the Purchased Assets to Alcon without sufficient adequate assurance; (iv) the inclusion of any Derivative Rights "separately conveyed to Buyer pursuant to the Lot 1 Purchase Agreement" as Excluded Assets; and (v) the addition of certain agreements with Warner on the Assumed Contracts List.  As set forth below, Warner's objections are based on a misinterpretation of the applicable provisions in the Alcon Derivative Rights APA and do not constitute grounds to prevent the Sale to Alcon.

i.  **The Debtors Are Not Proposing to Sell Any Derivative Rights or Other Interest That They Do Not Own.**

87.  As defined in the Alcon Derivative Rights APA, the Purchased Unfunded Pictures Derivative Rights refer to any interest the Sellers **may** hold in the Derivative Rights to *Furiosa: A Mad Max Saga*, *Joker: Folie à Deux* and *The Matrix Resurrections*—regardless of whether the Debtors co-invested in those titles.  These rights are expressly included in the definition of Purchased Assets **only to the extent such rights exist and are transferable**.  The Alcon Derivative Rights APA does not purport to convey rights the Debtors do not own or cannot lawfully assign.  Further, the Debtors make no representations in the Alcon Derivative Rights APA regarding whether and to what extent they own rights in the Purchased Unfunded Pictures Derivative Rights.  To the extent the Debtors do not own any rights in these titles or the Debtors' rights in these titles are not transferable, they are excluded from the Purchased Assets.  In any

event, the Alcon Derivative Rights APA does not include any agreements related to *Furiosa: A Mad Max Saga*, *Joker: Folie à Deux* or *The Matrix Resurrections* on the Assumed Contracts List.  Warner's claim that the Debtors are somehow liable for cure costs in associated with the Purchased Unfunded Pictures Derivative Rights lacks both factual and legal foundation.

88.    Warner's objection suggests that the Alcon Derivative Rights APA improperly deviates from the bid draft form of the Derivative Rights purchase agreement by eliminating certain conditions precedent to the transfer of the Purchased Unfunded Pictures Derivative Rights.  While the Alcon Derivative Rights APA does not replicate the exact language in the bid draft, it expressly conditions the inclusion of the Purchased Unfunded Pictures Derivative Rights on the Debtors' actual ownership and ability to transfer such rights.   No Purchased Unfunded Pictures Derivative Rights will transfer unless they exist, are owned by the Debtors, and are capable of assignment.   Thus, while the structural mechanics of the Alcon Derivative Rights APA may differ from the bid draft of the Derivative Rights purchase agreement, the practical effect is the same.

ii.    **The Validity of** ████████████████████████████████ ████████████████████ **Is Not Before the Court in Connection with this Sale.**

89.    Warner states that █████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████ Supp. Warner Obj.

¶ 86.  For the avoidance of doubt, ██████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████ .

90.     As is clear from its explicit language, ███████████████████████████
████████████████████████████████████████████████. Warner will have a
full and fair opportunity to object and be heard on any arguments it may have with respect to ███
████████████████████████████████████. Accordingly, Warner's objection
on this basis does not constitute grounds to prevent the Sale to Alcon.

### iii.    Warner's Other Objections to the Alcon Derivative Rights APA Cannot Prevent the Sale.

91.     None of Warner's remaining objections to the Alcon Derivative Rights APA
constitute grounds to prevent the Sale to Alcon.  First, as set forth herein, the Debtors and Alcon
have provided comprehensive evidence of adequate assurance and Alcon's ability to perform
under the Derivative Rights Agreements.  *See supra* II(E).  Second, Warner provides no evidence
or explanation to support its claims that the Alcon Derivative Rights APA in any way violates
the Library Sale Order, the Bid Procedures Order, or any other order entered by the Court in
these cases.  Finally, Warner incorrectly asserts that the Debtors improperly included additional
contracts with Warner on the Assumed Contracts List to the Alcon Derivative Rights APA.  The
Debtors properly provided notice that these additional agreements may be assumed and assigned
pursuant to the Sale in accordance with the requirements of the Bid Procedures Order.[64]  To the
extent Warner objects to the assumption and assignment of these agreements, it has every
opportunity to file an objection by the applicable deadline and to be heard on any such objections
before the Court at the Sale Hearing.

---

[64]  *See* Bid Procedures Order, ¶ 32(c) ("In the event that the Debtors seek to add any contract or lease to the Warner Bros. Contract Schedule or any previously-stated Cure Costs are modified, in accordance with the applicable APA, the Debtors will promptly serve a supplemental cure notice (each, a "Warner Bros. Supplemental Cure Notice") on Warner Bros. Each Warner Bros. Supplemental Cure Notice will include the same information with respect to the applicable contract or lease as is required to be included in the Cure Notice."); *see also Supplemental Notice of Possible Assumption and Assignment of Certain Executory Contracts with Warner Bros.* [Docket No. 904].

**G.**  **Warner Has No Basis to Dictate How the Value of the Derivative Rights Assets Are Allocated.**

92.    Through its contention that the value of the Derivative Rights should be allocated to certain of the Library Debtors (Supp. Warner Obj. ¶¶ 90–92), Warner seeks a preliminary ruling from this Court as to the merits of its alleged fraudulent transfer claim, which Warner has repeatedly referred to in various filings but thus far taken no action to pursue.  As the Debtors have previously explained,[65] the transfers Warner refers to were expressly permitted by Omnibus Amendment No. 2 and in no way constituted fraudulent transfers.  But it is not the Debtors' burden to rebut a claim which Warner has not properly brought before this Court.  Whether and to what extent Warner has reserved the right to pursue claims related to these transfers is not relevant to whether the Debtors may sell and assign the Derivative Rights Assets to Alcon in accordance with applicable law.  Accordingly, Warner's objection on this basis is improper and should be overruled.

**H.**  **The Debtors May Assume and Assign the Regency Co-Ownership Agreement Under Section 365 and the Regency Objection Should Be Overruled.**

93.    Regency objects to the Sale on the grounds that (i) the Regency Co-Ownership Agreement is a personal services contract and therefore un-assignable under section 365(c)(1) without Regency's consent, (ii) the Regency Co-Ownership Agreement cannot be separated from the underlying Derivative Rights in *Don't Say a Word*, and (iii) the Sale of the Derivative Rights in *Don't Say a Word* without Regency's consent would result in a breach of the Regency Co-Ownership Agreement that is incapable of being cured by payment of monetary damages, and must instead be enjoined.  Each of Regency's arguments is unsupported by applicable law and should be rejected.

---

[65]    *See Debtors' Reply in Support of the DIP Motion* [Docket No. 219], at ¶¶ 23–24.

94.     First, the Regency Co-Ownership Agreement is not a personal services contract for the same reasons that the Derivative Rights Agreements with Warner are not personal services contracts. *See supra* ¶¶ 69-78. The Regency Co-Ownership Agreement is a contract between sophisticated corporate entities and does not require any individual to perform or guarantee performance—it is a business-to-business arrangement that establishes a framework for participation in potential derivative works based on *Don't Say a Word*. There are no attestation clauses, no direct personal obligations, and no contractual mechanisms calling for the exercise of unique reputation, judgment, or artistry by an individual. While Sections 4.7 and 5.7 of the Regency Co-Ownership Agreement require that the parties' respective officers engage in negotiations in certain limited circumstances, those provisions explicitly contemplate successors for the identified individuals.[66] Regency's 30(b)(6) witness further testified that the Debtors' performance under the Regency Co-Ownership Agreement did not require any participation by specific individuals.[67] Notably, the Regency Co-Ownership Agreement ***was executed in 2001*** and has not been amended since. The parties clearly contemplated that the Regency Co-Ownership Agreement would remain in effect indefinitely, regardless of any changes in their respective ownership or the agents through whom they act. There are simply no obligations that even arguably require unique skill, trust, reputation, or artistic discretion personal to the Debtors or their management such that no other parties would be able to perform them.

95.     In addition, Regency's extensive discussions with both Alcon and Warner regarding the terms by which Regency would provide its consent to the Sale reveal that Regency

---

[66]   *See* Regency Co-Ownership Agreement, § 4.7 (█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████") (emphasis added).

[67]   *See* Deposition of David Friedman (September 30, 2025) [25:15-26:9; 28:11-16; 29:19-30:23].

does not truly believe that no party other than the Debtors is able to perform under the Derivative Rights Agreements.  Indeed, Regency's conduct reveals that its primary motive is to secure the exclusive rights to propose derivative works based on Don't Say a Word.[68]

96.    Regency's remaining arguments similarly fall flat.  The Debtors are not seeking to separate the Regency Co-Ownership Agreement from the underlying Derivative Rights in *Don't Say a Word*—quite the opposite, the Debtors are seeking both to sell their share of the Derivative Rights and assign the Regency Co-Ownership Agreement to Alcon.  Finally, Regency provides no explanation for why—even if a sale of the Derivative Rights in *Don't Say a Word* without Regency's consent would result in a non-monetary breach of the Regency Co-Ownership Agreement—this would constitute grounds to block the Sale.  As set forth above, Section 365(f)(1) of the Bankruptcy Code expressly overrides anti-assignment clauses such as that contained in the Regency Co-Ownership Agreement.

97.    In sum, the Regency Objections lack merit and cannot overcome the Debtors' proposed Sale to Alcon.  Accordingly, the Court should overrule the Regency Objections and approve the Sale.

## III.  CONCLUSION

98.    For the reasons set forth above, the Debtors respectfully request this Court overrule the Objections, enter the Sale Order, and grant such other and further relief as is just and proper.

---

[68]  *See Amended Declaration of David C. Friedman in Support of Objections by Regency Entertainment (USA), Inc. to Sale of Debtors' Assets and Assumption and Assignment of Co-Ownership Agreement* [Docket No. 917], ¶¶ 11–15.

Dated: October 15, 2025
Wilmington, Delaware

*/s/ Joseph M. Mulvihill*
**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**
Joseph M. Mulvihill (Del. Bar No. 6061)
Benjamin C. Carver (Del. Bar No. 7176)
Brynna M. Gaffney (Del. Bar. No. 7402)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:         jmulvihill@ycst.com
               cthompson@ycst.com
               bcarver@ycst.com
               bgaffney@ycst.com

*Co-Counsel for the Debtors and
Debtors in Possession*

**SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP**
Justin R. Bernbrock (admitted *pro hac vice*)
Matthew T. Benz (admitted *pro hac vice*)
321 North Clark Street, 32nd Floor
Chicago, Illinois 60654
Telephone:    (312) 499-6300
Facsimile:    (312) 499-6301
Email:         jbernbrock@sheppardmullin.com
               mbenz@sheppardmullin.com

-and-

Jennifer L. Nassiri (admitted *pro hac vice*)
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
Telephone:    (310) 228-3700
Facsimile:    (310) 228-3701
Email:         jnassiri@sheppardmullin.com

-and-

Alyssa Paddock (admitted *pro hac vice*)
30 Rockefeller Plaza, 39th Floor
New York, NY 10112
Telephone:    (212) 653-8700
Facsimile:    (212) 653-8701
Email:         apaddock@sheppardmullin.com

*Co-Counsel for the Debtors and
Debtors in Possession*