**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VILLAGE ROADSHOW ENTERTAINMENT | ) Case No. 25-10475 (TMH) |
| GROUP USA INC., *et al.*,[1] | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) **Ref. Docket Nos. 276 & 824** |
| | ) |

**NOTICE OF FILING OF REVISED**
**ASSET PURCHASE AGREEMENT FOR THE DERIVATIVE RIGHTS**

     **PLEASE TAKE NOTICE** that, on April 24, 2025, the United States Bankruptcy Court for the District of Delaware (the "Court") entered the *Amended Order (I) Approving Bid Procedures for the Sale of the Debtors' Assets, (II) Authorizing the Debtors' Entry Into the Stalking Horse APA and Approving Bid Protections There under, (III) Scheduling an Auction for, and Hearing to Approve, Sale of the Debtors' Assets, (IV) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (V) Approving Assumption and Assignment Procedures, and (VI) Granting Related Relief* [D.I. 276] (the "Bid Procedures Order").[2]  The Bidding Procedures Order established Bidding Procedures to govern the Sale and Auction of all or substantially all of the Debtors' assets.

     **PLEASE TAKE FURTHER NOTICE** that, on September 15, 2025, the Debtors filed the *Notice of Filing of Revised Proposed Sale Order and Asset Purchase Agreement for the Derivative Rights* [Docket No. 824], which attached as Exhibit B a form of asset purchase agreement (the "APA") for the Sale of the Derivative Rights.

     **PLEASE TAKE FURTHER NOTICE** attached hereto as **Exhibit A** is a revised form of asset purchase agreement (the "Revised APA") for the Sale of the Derivative Rights Assets.  For the convenience of the Court and all parties in interest, a blackline comparing the APA and the Revised APA is attached hereto as **Exhibit B**.

---

[1]    The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343.  The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069.  Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bid Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that a hearing (the "Sale Hearing") to consider the sale of the Derivative Rights Assets is scheduled to be held on **October 20, 2025, at 10:00 a.m. (ET)** before the Honorable Thomas M. Horan, United States Bankruptcy Judge.

**PLEASE TAKE FURTHER NOTICE** that the Revised APA remains subject to ongoing review and revision in all respects. The Debtors reserve all rights to further revise the Revised APA at or prior to the Sale Hearing.

Dated: October 17, 2025
Wilmington, Delaware

/s/ Benjamin C. Carver

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joseph M. Mulvihill (Del. Bar No. 6061)
Benjamin C. Carver (Del. Bar No. 7176)
Brynna M. Gaffney (Del. Bar No. 7402)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:     (302) 571-6600
Facsimile:     (302) 571-1253
Email:         jmulvihill@ycst.com
               bcarver@ycst.com
               bgaffney@ycst.com

*Co-Counsel for the Debtors and Debtors in Possession*

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
Justin R. Bernbrock (admitted *pro hac vice*)
Matthew T. Benz (admitted *pro hac vice*)
321 North Clark Street, 32nd Floor
Chicago, IL 60654
Telephone:     (312) 499-6300
Facsimile:     (312) 499-6301
Email:         jbernbrock@sheppardmullin.com
               mbenz@sheppardmullin.com

-and-

Jennifer L. Nassiri (admitted *pro hac vice*)
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
Telephone:     (310) 228-3700
Facsimile:     (310) 228-3701
Email:         jnassiri@sheppardmullin.com

-and-

Alyssa Paddock (admitted *pro hac vice*)
30 Rockefeller Plaza, 39th Floor
New York, NY 10112
Telephone:     (212) 653-8700
Facsimile:     (212) 653-8701
Email:         apaddock@sheppardmullin.com

*Co-Counsel for the Debtors and Debtors in Possession*

## EXHIBIT A

**Revised APA**

# PURCHASE AGREEMENT (DERIVATIVE RIGHTS)

THIS PURCHASE AGREEMENT (DERIVATIVE RIGHTS) (as amended, restated, supplemented, or otherwise modified pursuant to the terms hereof from time to time, this "**Agreement**"), is made and entered into as of October 17, 2025 (the "**Effective Date**"), by and among the Persons identified on Annex I hereto (each, a "**Seller**", and collectively, the "**Sellers**"), Alcon Media Group, LLC ("**Buyer**"), and Kevin Berg in his capacity as the representative of the Sellers pursuant to Section 10.15 (the "**Seller Representative**").

## RECITALS

A.      The Parties desire to set forth the terms pursuant to which Buyer will, subject to the entry of a Sale Order (as defined below), purchase from the Sellers, the Purchased Assets.

B.      The Sellers and certain of their Affiliates have commenced voluntary petitions for relief under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "**Bankruptcy Code**") on March 17, 2025 (the "**Petition Date**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") (such cases, collectively, the "**Bankruptcy Cases**").

C.      On the terms and subject to the conditions hereof, the Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to purchase, acquire and assume from the Sellers, the Purchased Assets, subject to the terms and conditions set forth in this Agreement, the Bid Procedures (as defined below) and Bid Procedures Order (as defined below), and in accordance with sections 105, 363, 365, 1123, as applicable, and other applicable provisions of the Bankruptcy Code. The Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the receipt and sufficiency of which is hereby acknowledged, it is hereby agreed among the Parties as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01      **Defined Terms**. Except as otherwise specified in this Agreement or as the context may otherwise require, the following terms shall have the respective meanings set forth below for all purposes of this Agreement:

"**ABS Obligations**" means all Liabilities of the Sellers and their Affiliates under the ABS Transaction Documents, including, without limitation, all fees, costs, expenses and indemnity obligations, and, in each case, any interest accrued thereon.

"**ABS Transaction Documents**" means all "Transaction Documents" under (and as defined in) the Indenture.

"**Adverse Claim**" means an interest, lien (statutory or otherwise), security interest, attachment, Claim (excluding Claims arising in connection with the Wonka Dispute and the PM2 Dispute), any claim asserted or that could have been asserted by WBEI or and/or its Affiliates in the Other Warner Disputes, Avoidance Action, Liability, Indebtedness, offset, deduction, restriction, mortgage, pledge or other charge or

Encumbrance, or other type of preferential arrangement having the practical effect of any of the foregoing, or other claim or interest of any kind in, of or on any Person's assets or properties in favor of any other Person.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such Person. The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and/or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise provided, however, that, notwithstanding anything herein to the contrary, other than for the purposes of Section 6.01 and Section 10.03, in no event shall Buyer be considered to be an Affiliate of any other investment fund or investment vehicle controlled or managed by Buyer or any of its Affiliates, any limited or general partner of such fund (or any Affiliate of such limited or general partners), or any portfolio company of any investment fund or investment vehicle controlled or managed by Buyer or any of its Affiliates.

"**Agreement**" has the meaning set forth in the preamble.

"**Alternative Transaction**" means any agreement (binding or nonbinding), relating to any direct or indirect acquisition, financing or purchase of all or any portion of the Purchased Assets or any other similar transaction involving all or any portion of the Purchased Assets, whether effected by sale of assets, sale of equity, merger, joint venture, recapitalization, loan, financing arrangement or otherwise, but excluding any financing provided by any holder of Parent's existing notes and any debtor-in-possession financing.

"**Ancillary Rights**" means any and all ancillary, subsidiary or allied rights now known and unknown, including, without limitation, publishing, novelization, music publishing, soundtrack recording, screenplay, publication, sponsorship, commercial tie-up, character, live stage, radio, interactive, Internet, theme park and merchandising rights of every kind and nature whatsoever derived from, appurtenant to or related to a Picture, the underlying material relating thereto, the title or titles of such Picture, the characters appearing in such Picture or said underlying material and/or the names or characteristics of said characters.

"**Applicable Percentage**" means, with respect to each Picture, the percentage of the Derivative Rights in and to such Picture that are owned by the Sellers. The Applicable Percentage for the Derivative Rights in each Picture is set forth on <u>Annex III</u> hereto.

"**Assignment Agreements of Derivative Rights**" means collectively, that certain Assignment (Derivative Rights) (VRF/VREG IP Global LLC), dated as of November 28, 2023, by and between VRF and VREG IP, that certain Assignment (Derivative Rights) (VRF/VREG J2 Global LLC), dated as of November 28, 2023, by and between VRF and VREG J2, that certain Assignment (Derivative Rights) (VRF/VREG OP Global LLC), dated as of November 28, 2023, by and between VRF and VREG OP, that certain Assignment (Derivative Rights) (VRF/VREG WW IP Global LLC), dated as of November 28, 2023, by and between VRF and VREG WW, that certain Assignment (Derivative Rights) (VRFNA/VREG IP Global LLC), dated as of November 28, 2023, by and between VRFNA and VREG IP, that certain Assignment (Derivative Rights) (VRFNA/VREG J2 Global LLC), dated as of November 28, 2023, by and between VRFNA and VREG J2, that certain Assignment (Derivative Rights) (VRFNA/VREG OP Global LLC), dated as of November 28, 2023, by and between VRFNA and VREG OP, that certain Assignment (Derivative Rights) (VRFNA/VREG WW IP Global LLC), dated as of November 28, 2023, by and between VRFNA and VREG WW, and that certain Assignment (Derivative Rights) (VRPNA/VREG MM2 IP Global LLC), dated as of November 28, 2023, by and between VRPNA and VREG MM2.

"**Assumed Contracts**" means those Contracts that are set forth on Annex <u>II</u> attached hereto, which schedule Buyer may update at any time and from time to time prior to the Closing Effective Date.

"**Assumed Liabilities**" has the meaning set forth in Section 2.02.

"**Assumption and Assignment Agreement**" means an Assignment and Assumption Agreement effecting the assignment of the Assumed Contracts and Assumed Liabilities from Sellers to Buyer, in form and substance satisfactory to the Parties.

"**Auction**" means the auction for the sale of the Sellers' assets conducted on May 28, 2025 pursuant to the terms and conditions of the Bid Procedures Order.

"**Avoidance Actions**" means all rights, lawsuits, claims, rights of recovery, objections, causes of action, avoidance actions and other similar rights of any Seller or other appropriate party in interest arising under Chapter 5 of the Bankruptcy Code or applicable state law (whether or not asserted as of the Closing Effective Date) and all proceeds thereof.

"**Backup Bidder**" means the party that is the next highest or otherwise best bidder at the Auction after the Successful Bidder.

"**Bankruptcy Cases**" has the meaning set forth in the recitals.

"**Bankruptcy Code**" has the meaning set forth in the recitals.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bid Procedures**" means the bid procedures approved by the Bankruptcy Court pursuant to the Bid Procedures Order.

"**Bid Procedures and Sale Motion**" means the motions filed in the Bankruptcy Cases (i) seeking approval of (A) the transactions contemplated hereby and (B) the Bid Procedures and scheduling certain dates, deadlines and forms of notice in connection therewith, and (ii) granting other related relief.

"**Bid Procedures Order**" means the order of the Bankruptcy Court approving the Bid Procedures and Sale Motion and the Bid Procedures, and granting the relief requested therein, entered on April 24, 2025 [ECF # 276].

"**Books and Records**" means all principal and/or material business records, tangible data, documents, management information systems (including related computer software), files, participant lists, vendor lists, statements, invoices, all work papers, notes, files or documents related thereto, and all other principal and/or material books and records received and/or maintained by Sellers or their Affiliates (excluding personnel records) related to the Derivative Rights in the Pictures and Assumed Contracts (but excluding all Tax records and Tax Returns (including working papers)).

"**business day**" means any day other than a Saturday, Sunday, legal holiday in the United States or any day on which banks in the City of New York, New York are authorized or required by applicable Law to close.

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer Closing Deliverables**" has the meaning set forth in Section 2.10.

"**Buyer Deposit**" has the meaning set forth in Section 2.06(b).

"**Claim**" means all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"**Closing**" means the consummation of the purchase by Buyer from Sellers of the Purchased Assets pursuant to this Agreement.

"**Closing Effective Date**" means the date on which the Closing occurs.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

"**Collective Bargaining Agreement**" means any agreement, contract or arrangement with any union or guild or similarly constituted or substitute organization regarding any rights and/or services and/or personnel utilized in connection with the production and/or distribution and/or Exploitation of a Picture.

"**Constitutive Documents**" means, as to any Person, such Person's certificate of incorporation or registration (including, if relevant, certificates of change of name), memorandum of association, articles of association or incorporation, charter, by-laws, trust deed, partnership, limited liability company, joint venture or shareholders' agreement or equivalent documents constituting the organization or forming of such Person, in each case as the same may from time to time be amended, restated, supplemented or otherwise modified from time to time.

"**Contract**" means any contract, agreement, lease, license, or other legally binding commitment, agreement or instrument, whether or not in writing, including all amendments and modifications thereto.

"**Copyright**" means, with respect to a Picture, all common law and statutory copyrights, rights in copyrights (including the right to make publication thereof for copyright purposes, to register claims under copyright, the right to renew and extend such copyrights and the right to sue for past, present and future infringements of copyright), interests in copyrights, all applications for copyrights, registrations of copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained upon such project, the underlying material relating thereto or any part thereof.

"**Cure Amounts**" means all amounts, costs and expenses to cure defaults (including any amounts owed by the Sellers relating to the Other Warner Disputes), if any, under the Assumed Contracts so that such Assumed Contracts may be assumed and assigned to Buyer pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code.

"**Cure Notice**" has the meaning set forth in Section 7.01.

"**Dataroom**" means that certain virtual data room hosted by Ansarada titled "Project Rabbit".

"**Debtor Relief Laws**" means the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, suspension of payments or similar debtor relief Laws from time to time in effect affecting the rights of creditors generally.

"**Derivative Rights**" means, with respect to a motion picture, any and all rights throughout the world to produce remakes, sequels and prequels of such motion picture and other derivative works based thereon and to distribute and otherwise Exploit such remakes, sequels or prequels for viewing in any medium or

media now known or hereafter devised, whether in theatres or home video or on television, and to produce, distribute and otherwise Exploit as a television program, movie of the week, television series or a television spinoff any audiovisual work based on such motion picture, its story line, or any one or more of its characters. Without limiting the foregoing, the Derivative Rights with respect to *Saving Silverman* shall include all rights throughout the world to produce Derivative Productions (as defined in that certain Co-Ownership Agreement with respect to "Saving Silverman", dated as of March 5, 2001, between Columbia Pictures, a division of Columbia Pictures Industries, Inc. and VRF, as it may be amended, restated, supplemented, extended or otherwise modified from time to time) and to distribute and otherwise exploit such Derivative Productions in any and all media now known or hereafter devised, including without limitation, theatres, home video and/or television.

"**DIP Obligations**" has the meaning set forth in the DIP Order.

"**DIP Order**" means that certain Final Order (i) Authorizing the Debtors to Obtain Post-Petition Secured Financing, (ii) Authorizing the Use of Cash Collateral, (iii) Granting Liens and Superpriority Administrative Expense Status, (iv) Granting Adequate Protection, (v) Modifying the Automatic Stay, and (vi) Granting Related Relief, entered in the Bankruptcy Cases on April 24, 2025 [ECF No. 280].

"**Disclosure Schedules**" has the meaning set forth in Section 4.01.

"**Effective Date**" has the meaning set forth in the preamble.

"**Encumbrance**" means any defect or imperfection in title, charge, deed of trust, security interest, pledge, hypothecation, mortgage, encumbrance, Lien (as such term is defined in the Bankruptcy Code), lease, license grant by any Seller, sublease, option, right of first refusal, easement, right of way, servitude, covenant, condition, proxy, voting trust or agreement or transfer restriction under any equity holder or similar Contract.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**Escrow Account**" has the meaning set forth in Section 2.06(b).

"**Escrow Holder**" means Verita Global.

"**Excluded Assets**" has the meaning set forth in Section 2.03.

"**Excluded Liabilities**" has the meaning set forth in Section 2.04.

"**Excluded Taxes**" means any liabilities of any Seller for any period, or otherwise imposed on the Purchased Assets with respect to any Pre-Closing Tax Period (as apportioned in the manner provided by Section 6.06(e) for Taxes relating to any Straddle Period), in respect of any Tax, including without limitation (a) any Liability of any Seller for the Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law), as a transferee or successor, or by Contract (other than any Contracts entered into in the ordinary course of business not primarily related to Taxes), and (b) any Taxes that will arise as a result of the purchase and sale of the Purchased Assets, but excluding any Property Taxes to the extent specifically allocated to Buyer pursuant to Section 6.05.

"**Exploit**" means the manufacture, distribution, licensing, exhibition, marketing, promotion, reissuance, and other exploitation of a motion picture or applicable rights thereto, in any and all languages, by any and all means and devices now known or hereafter devised, and howsoever accessed by the viewer,

and to otherwise exploit the foregoing in any and all media, whether now known or hereafter existing and howsoever accessed, including, without limitation, theatrical, home video, pay, cable and free television, computers, hand held devices, cell phones and other accessing devices. The meaning of the term "**Exploitation**" shall be correlative to the foregoing.

"**Government Approval**" means any (a) necessary filings, notifications, registrations, applications, declarations, waiting period expiration or termination, and submissions in connection with the Transactions, as required under any applicable Law and (b) consents, certifications, grants, confirmation, permits or Orders from a Governmental Authority required to be obtained or made by any Seller or Buyer or any of their respective Affiliates to execute, deliver and perform their respective obligations under this Agreement or the other Transaction Documents and consummate the Transactions.

"**Governmental Authority**" means any court, tribunal, arbitrator, authority, agency, commission, bureau, board, department, legislature, official, body or other instrumentality of the United States (whether federal, state, municipal or local), any foreign country, or any domestic or foreign state, province, county, city, other political subdivision or any other similar body or organization exercising governmental or quasi-governmental power or authority.

"**IFRS**" means the International Financial Reporting Standards issued from time to time by the International Financial Reporting Standards Foundation and the International Accounting Standards Board.

"**Indebtedness**" of any Person as of any date of determination means, without duplication, (a) the principal amount of all indebtedness of such Person for borrowed money and any accrued and unpaid interest thereon, (b) the principal amount of any other indebtedness of such Person which is evidenced by a note, bond, debenture or similar instrument or debt security and any accrued and unpaid interest thereon, including, without limitation, the obligations of the Sellers under all notes issued pursuant to the Indenture, (c) all capital lease obligations of such Person as of such date, in each case determined in accordance with IFRS, (d) indebtedness secured by an Adverse Claim on assets of any Seller, (e) obligations under any drawn letters of credit (excluding reimbursement obligations in respect of undrawn letters of credit), (f) all interest rate or non-U.S. currency swaps, caps, collars, hedges or insurance agreements, or options or forwards on such agreements, or other similar agreements for the purpose of managing the interest rate or non-U.S. exchange risk, (g) all financing fees and costs related to the indebtedness described in foregoing clauses (a) through (f), and (h) all guaranties of such Person in respect of any of the foregoing.

"**Indenture**" means (a) that certain Base Indenture dated as of November 10, 2020 among VR Funding and VRF Holdings, as issuers, and U.S. Bank National Association, as trustee, as supplemented by (b) that certain Group A Supplement dated as of November 10, 2020 among VR Funding, VRF Holdings, VRF, VRFNA, VRFG and VRVS, as Group A Co-Issuers, and U.S. Bank National Association, as trustee, as supplemented by (c) that certain Series 2020-1 Supplement dated as of November 10, 2020 among the Group A Co-Issuers and U.S. Bank National Association, as trustee in each case, as supplemented, amended, restated, extended or otherwise modified from time to time.

"**Insider**" shall have the meaning set forth in section 101(31) of the Bankruptcy Code.

"**Insider Causes of Action**" means any Claims or causes of action against any Insider of the Sellers.

"**IP Assignment Agreement**" means the assignment agreement to assign and transfer the Sellers' rights in the Transferred Rights to Buyer, to be entered into at Closing, in form and substance mutually acceptable to each of the Parties.

"**Knowledge**" means, when referring to the "knowledge" of the Sellers, or any similar phrase or qualification based on knowledge of any Seller, (a) the actual knowledge of James Moore, Louis Santor, Kevin Berg, Keith Maib, and/or Glenn Taylor and (b) the knowledge that any such person referenced in clause (a) above, as a prudent business person, would have obtained after making due inquiry with respect to the particular matter in question.

"**Law**" or "**law**" means and includes any provision or requirement of any present or future statute, rule, regulation, code, code of practice, ordinance, standard, statutory guidance, decree, rule of common law or principle of equity, or other decision of any court, tribunal or Governmental Authority or by-law of any foreign, multinational, regional, federal, state, county, municipal or local jurisdiction.

"**Liability**" means, with respect to any Person, any liability or obligation (including with respect to Taxes) of such Person of any kind, character or description, whether known or unknown, disclosed or undisclosed, absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, direct or indirect, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person or is discharged, stayed or otherwise affected by any proceeding under any Debtor Relief Laws.

"**Loompala Option Agreement**" means the Option Agreement, dated as of December 6, 2023, by and between VREG Wonka IP Global LLC, VREG MM2 IP Global LLC and VREG J2 Global LLC, on the one hand, and Loompala Pictures, LLC, on the other hand.

"**Loss**" or "**Losses**" means any Liability, loss, damage, claim, demand, obligation, charge, deficiency, settlement payment, Tax, expense, interest, award, judgment, penalty, assessment, disbursement, fine, fee or amount paid in settlement or cost or expense related to any of the foregoing (including reasonable and documented out-of-pocket legal fees and expenses), but shall not include any exemplary or punitive damages.

"**Lot 1 Assets**" means the "Purchased Assets," as defined in the Lot 1 Purchase Agreement (including, without limitation, all Exploitation rights with respect to the Pictures (including all Ancillary Rights)).

"**Lot 1 Purchase Agreement**" means that certain Purchase Agreement (Library), dated as of July 1, 2025, by and among certain sellers identified therein and the Seller Representative, on the one hand, and Buyer, on the other hand, pursuant to which Buyer has purchased, acquired and assumed the sellers' interest (excluding the Purchased Assets hereunder) in a library of 108 feature films, among other assets and liabilities.

"**Lot 3 Assets**" means the "Purchased Assets," as defined in the Lot 3 Purchase Agreement.

"**Lot 3 Purchase Agreement**" means a Purchase Agreement (Studio Business) by and among certain sellers identified therein and the Seller Representative, on the one hand, and Buyer, on the other hand, pursuant to which Buyer is purchasing, acquiring and assuming the sellers' interest in certain assets and liabilities with respect to the development, production and other Exploitation of certain television, motion picture and/or other audiovisual projects, among other assets and liabilities.

"**Magnum**" means Magnum Films SPC, a segregated portfolio company incorporated under the laws of the Cayman Islands.

"**Material Adverse Effect**" means any change, event, circumstance, effect, state of facts, occurrence, development or other matter (any such item, an "**Effect**") that, individually or in the aggregate, (a) prevents

or would reasonably be expected to prevent or impair the ability of any Seller to consummate the Transactions under the Transaction Documents or (b) is or would reasonably be expected to be materially adverse to (i) the benefits, interests, rights or remedies of Buyer under any of the Transaction Documents or the rights to, timing of, or the amount of, payments thereunder, (ii) the Purchased Assets, (iii) the ability of any Seller to timely perform or comply with its covenants, agreements or obligations under any Transaction Document, or (iv) the legality, validity or enforceability of any Transaction Document; but, with respect to clauses (a) and (b), excluding any change or effect to the extent that it results from or arises out of the commencement of the Bankruptcy Cases.

"**Matrix 4**" means the Picture entitled *The Matrix Resurrections*.

"**MPRPA**" means (a) that certain Amended and Restated Motion Picture Rights Purchase Agreement dated as of November 21, 2012, between WV Films IV LLC and WV Film Partners IV L.P., as amended, restated, supplemented or otherwise modified from time to time; (b) that certain Amended and Restated Motion Picture Rights Purchase Agreement dated as of November 10, 2020, between VRPNA and WBEI, as amended, restated, supplemented or otherwise modified from time to time;  and (c) that certain Amended and Restated Motion Picture Rights Purchase Agreement dated as of October 30, 2015, between VRPNA and Sony, as amended, restated, supplemented or otherwise modified from time to time.

"**Order**" means any order, judgment, ruling, injunction, award, stipulation, assessment, decree or writ, whether preliminary or final, issued, promulgated or entered by or with any Governmental Authority.

"**Other Warner Disputes**" means, excluding the Wonka Dispute and PM2 Dispute, any and all other claims (whether being argued, disputed or litigated in arbitration, court or otherwise) brought or asserted at any time by WBEI and/or its Affiliates against any Seller and/or any of its Affiliates, and any and all claims brought or asserted at any time by any Seller and/or any of its Affiliates against WBEI and/or its Affiliates, including, but not limited to, each of the Proceedings set forth in items (1) and (2) of Annex V, and any other related or similar Proceedings (excluding the Wonka Dispute and the PM2 Dispute), in each case involving any Seller and/or its Affiliates, on the one hand, and WBEI and/or its Affiliates, on the other hand.

"**Outside Date**" has the meaning set forth in Section 8.01(c).

"**Parent**" means Village Roadshow Entertainment Group (BVI) Limited, a BVI business company incorporated under the laws of the British Virgin Islands.

"**Party**" or "**Parties**" means any party or parties to this Agreement.

"**Person**" means any individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company, Governmental Authority, or other entity.

"**Pictures**" means the motion pictures set forth in Annex III.

"**PM2 Dispute**" means the Proceedings described in item (5) of Annex V.

"**Post-Closing Tax Period**" means (x) any Tax period beginning after the Closing Effective Date and (y) with respect to a Straddle Period, that portion of such Straddle Period beginning after the Closing Effective Date and continuing for the remainder of such Straddle Period.

"**Pre-Closing Period**" means the period from the Effective Date until the earlier of (i) the Closing Effective Date, or (ii) the date this Agreement is validly terminated in accordance with its terms.

"**Pre-Closing Tax Period**" means (a) any Tax period ending on or before the Closing Effective Date and (b) with respect to a Straddle Period, that portion of such Straddle Period ending on (and including) the Closing Effective Date.

"**Prepetition Secured Notes Obligations**" has the meaning set forth in the DIP Order.

"**Proceeding**" means any suit, action, cause of action, litigation, hearing, inquiry, examination, demand, proceeding, controversy, complaint, appeal, notice of violation, citation, summons, subpoena, arbitration, mediation, dispute, claim, allegation, investigation or audit of any nature whether civil, criminal, quasi criminal, indictment, administrative, regulatory or otherwise and whether at Law or in equity.

"**Proceeds**" means, with respect to any property, (a) whatever is acquired upon the sale, lease, license, exchange, or other disposition of such property; (b) whatever is collected on, or distributed on account of, such property; (c) rights arising out of such property; (d) to the extent of the value of such property, claims arising out of the Loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, such property; or (e) to the extent of the value of such property and to the extent payable to the owner of such property, insurance payable by reason of the Loss or nonconformity of, defects or infringement of rights in, or damage to, such property.

"**Property Taxes**" means all real property Taxes, personal property Taxes and similar ad valorem

Taxes.

"**Purchase Price**" has the meaning set forth in Section 2.06(a).

"**Purchased Assets**" means, collectively, (i) the Purchased Wonka Naked Copyrights, (ii) the Purchased Unfunded Pictures Derivative Rights, if any, and (iii) the Purchased Derivative Rights (except to the extent constituting the Excluded Assets); provided, for clarity, that the Purchased Assets shall include the following:

(a)    the Assumed Contracts;

(b)    all Books and Records; and

(c)    other than with respect to the Other Warner Disputes, the Insider Causes of Action and the Avoidance Actions, all of the Sellers' claims or causes of action, choses in action, rights of recovery and rights of set-off of any kind and indemnities against other Persons (regardless of whether or not such claims and causes of action have been asserted) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery (regardless of whether such rights are currently exercisable) relating to the Purchased Assets, including any of the foregoing relating to and/or arising in connection with the Wonka Dispute and/or the PM2 Dispute; provided, that, for the avoidance of doubt, (i) Sellers agree that Buyer is not acquiring the obligations or Liabilities relating to any claim (A) asserted against any Seller (or its Affiliates) in the Other Warner Disputes or (B) asserted by any Seller (or its Affiliates) in the Other Warner Disputes and (ii) if Sellers acquire any Purchased Unfunded Pictures Derivative Rights as a result of the settlement or other disposition of the Other Warner Disputes (including, without limitation, pursuant to the Sale Order), such Purchased Unfunded Pictures Derivative Rights shall constitute Purchased Assets hereunder.  However, nothing herein shall affect Buyer's (or any of its Affiliate's) rights with respect to any all claims or causes of action, choses in action, rights of recovery and rights of set-off of any kind and indemnities made on its own behalf against other Persons (regardless of

whether or not such claims and causes of action have been asserted) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery (regardless of whether such rights are currently exercisable) to which Buyer (or its Affiliates) may be entitled in the Other Warner Disputes.

"**Purchased Derivative Rights**" means all of each Seller's entire worldwide right, title and interest in and to the Derivative Rights in each of the Pictures, together with any and all of the assets, properties and rights of each Seller of any kind, whether tangible or intangible, used in, held for use in, relating to or arising from the financing, development, production or Exploitation of any Seller's Derivative Rights in each of the Pictures, and includes the entire worldwide right, title and interest of each Seller (if any) in and to, for each of the Pictures, an undivided interest equal to the Applicable Percentage for such Picture in the Derivative Rights (including, without limitation, the results and proceeds of any development activity relating to such Derivative Rights) in and to such Picture for the entire world.

"**Purchased Unfunded Pictures Derivative Rights**" means all of each Seller's entire worldwide right title and interest in and to the Derivative Rights in and to each of the Unfunded Pictures.

"**Purchased Wonka Naked Copyrights**" means all of each Seller's right, title and interest in the "naked" worldwide copyright of Wonka and the underlying material for Wonka (which "naked" copyright excludes, for the avoidance of doubt, all Exploitation rights with respect to Wonka (including, without limitation, the Ancillary Rights with respect to Wonka)).

"**QCSA**" means (a) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of February 22, 2006, between WV Films LLC and WV Film Partners L.P., as amended, restated, supplemented or otherwise modified from time to time; (b) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of February 22, 2006, between WV Films II LLC and WV Film Partners II L.P., as amended, restated, supplemented or otherwise modified from time to time; (c) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of April 10, 2008, between WV Films III LLC and WV Film Partners III L.P., as amended, restated, supplemented or otherwise modified from time to time; (d) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of December 15, 2017, between WV Films IV LLC and WV Film Partners IV L.P., as amended, restated, supplemented or otherwise modified from time to time; (e) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of December 14, 2021, between Evil Woman Films LLC and Evil Woman Film Partners LP, as amended, restated, supplemented or otherwise modified from time to time; (f) that certain Qualified Cost Sharing Agreement dated as of August 11, 2000, between Zoo Films LLC and Zoo Film Partners LP, as amended, restated, supplemented or otherwise modified from time to time; (g) that certain Qualified Cost Sharing Agreement dated as of August 11, 2000, between DTE Films LLC and DTE Film Partners LP, as amended, restated, supplemented or otherwise modified from time to time; and (h) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of December 19, 2019, between DSAW Films LLC and DSAW Film Partners L.P., as amended, restated, supplemented or otherwise modified from time to time.

"**Required Consent**" has the meaning set forth in Section 2.05(a).

"**Sale Order**" means an order entered by the Bankruptcy Court, in form and substance acceptable to Buyer and the Sellers, approving this Agreement and all of the terms and conditions hereof and approving and authorizing the Sellers to consummate the transactions contemplated hereby. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, (i) the execution, delivery and performance by the Sellers of this Agreement, (ii) the sale of the Purchased Assets to Buyer on the terms set forth herein and free and clear of all Adverse Claims (other than those included in the Assumed Liabilities) pursuant to section 363(f) of the Bankruptcy Code and find that Buyer is not a successor of any of the Sellers and determine that none of the transactions herein is avoidable for any

reason, and (iii) the performance by the Sellers of their respective obligations under this Agreement, including the full satisfaction of Cure Amounts for all Assumed Contracts, (b) authorize and empower the Sellers to transfer to Buyer the Assumed Contracts as set forth in this Agreement pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, (c) find that Buyer is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code and grant Buyer the protections of section 363(m) of the Bankruptcy Code, (d) find that Buyer has provided adequate assurance of future performance necessary to effect the assumption and assignment of the Assumed Contracts, (e) enjoin any and all holders of Adverse Claims from asserting such Adverse Claim against the Buyer, its Affiliates or the Purchased Assets and (f) provide that any Debtor or subsidiary thereof that presently owns or hereafter acquires any asset that would constitute a Purchased Asset shall be deemed to be a Seller under this Agreement and the other Transaction Documents and subject to all of the terms and provisions hereof and thereof).

"**Seller Closing Deliverables**" has the meaning set forth in Section 2.09.

"**Sellers**" has the meaning set forth in the preamble.

"**Service Provider**" means, with respect to any Person, each director, officer, employee, manager, independent contractor, consultant, leased employee or other service provider of such Person.

"**Sony**" means Sony Pictures Entertainment Inc., a Delaware corporation.

"**Source**" has the meaning set forth in Section 4.02(e).

"**Straddle Period**" means any Tax period beginning before or on, and ending after, the Closing Effective Date.

"**Successful Bidder**" means the prevailing party with respect to the Purchased Assets at the conclusion of the Auction.

"**Tax**" or "**Taxes**" means any U.S. federal, state, local or non-U.S. income, gross receipts, branch profits, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, escheat, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, escheat and unclaimed property, sales, use, transfer, registration, ad valorem, value added, alternative or add-on minimum or estimated tax or other tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or not, whether payable directly or by withholding, and whether or not requiring the filing of a Tax Return.

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Transaction Documents**" means this Agreement, the Assumption and Assignment Agreement, the IP Assignment Agreement, any pleadings related to this Agreement filed with the Bankruptcy Court, and all other instruments, exhibits, documents and agreements executed or delivered from time to time in connection with the foregoing.

"**Transactions**" means the transactions contemplated by the Transaction Documents.

"**Transferred Rights**" means, collectively, the Purchased Derivative Rights, the Purchased Unfunded Pictures Derivative Rights and the Purchased Wonka Naked Copyrights.

"**Transfer Taxes**" means all transfer, stamp, documentary, sales, use, registration, value-added and other similar Taxes (including all applicable real estate transfer Taxes) incurred in connection with any Transaction Document and the Transactions.

"**Unfunded Pictures**" means the Pictures entitled *Furiosa: A Mad Max Saga*, *Joker: Folie à Deux*, and *The Matrix Resurrections*.

"**VR Funding**" means VR Funding LLC, a Delaware limited liability company.

"**VREG Wonka**" means VREG Wonka IP Global LLC, a Delaware limited liability company.

"**VRF**" means Village Roadshow Films (BVI) Limited, a BVI business company incorporated in the British Virgin Islands.

"**VRF Holdings** means VR Films Holdings (BVI) Limited, a BVI business company incorporated under the laws of the British Virgin Islands.

"**VRFG**" means Village Roadshow Films Global Inc., a Delaware corporation.

"**VRFNA**" means Village Roadshow Films North America Inc., a Delaware corporation.

"**VRPNA**" means Village Roadshow Pictures North America Inc., a Delaware corporation.

"**VRVS**" means Village Roadshow VS Films LLC, a Delaware limited liability company.

"**WBEI**" means Warner Bros. Entertainment Inc., a Delaware corporation.

"**Wonka**" means the Picture entitled *Wonka*.

"**Wonka Dispute**" means the Proceedings described in item (3) of Annex V.

Section 1.02    **References to Agreements**. References to an agreement or document shall include all schedules, annexes, exhibits, appendices and other attachments to such agreement or document, and unless otherwise stated, are to such agreement or document (including all such attachments) as amended, restated, replaced, supplemented or otherwise modified from time to time in a manner not inconsistent with the terms hereof and thereof.

## ARTICLE II
## SALE AND PURCHASE; CLOSING

Section 2.01    **Sale and Purchase of Purchased Assets**. Pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Buyer shall purchase, acquire and accept from the Sellers, and the Sellers shall irrevocably sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, all of the Sellers' right, title and interest, in, to and under the Purchased Assets, on an "as is" and "where is" basis (except as otherwise provided herein), but free and clear of Adverse Claims (except for the Assumed Liabilities) or other interests in such Purchased Assets to the full extent provided by section 363(f) of the Bankruptcy Code.

Section 2.02    **Assumed Liabilities**. Upon the terms and subject to the conditions of this Agreement, and explicitly excluding the Excluded Liabilities described below in Section 2.04, Buyer agrees,

effective as of the time of the Closing, that it shall assume the sole responsibility for paying, performing and discharging when due, all Liabilities (a) arising solely from the ownership and Exploitation of the Purchased Assets by or on behalf of Buyer after the Closing Effective Date, and/or (b) relating to any claim asserted against any Seller (or its Affiliates) in the Wonka Dispute or the PM2 Dispute (the "**Assumed Liabilities**").

Section 2.03    **Excluded Assets**. Notwithstanding any provision in this Agreement to the contrary, the Sellers shall not be deemed to sell, transfer, assign, convey or deliver, and the Sellers will retain, all right, title and interest to, in and under, (a) any Contract that is not an Assumed Contract, (b) Avoidance Actions, (c) Insider Causes of Action, (d) Lot 1 Assets, (e) Lot 3 Assets and/or (f) the rights, obligations, or Liabilities relating to any claim asserted against any Seller (or its Affiliates) in the Other Warner Disputes (other than Purchased Unfunded Pictures Derivative Rights, if any, resulting from resolution of the Other Warner Disputes in accordance with clause (c) of the definition of Purchased Assets) or asserted by any Seller (or its Affiliates) in the Other Warner Disputes (collectively, the "**Excluded Assets**"); provided that the foregoing limitations shall not exclude from the Purchased Assets any Derivative Rights owned by the Sellers related to any Picture (unless such Derivative Rights are separately conveyed to Buyer pursuant to the Lot 1 Purchase Agreement).

Section 2.04    **Excluded Liabilities**. Notwithstanding any provision in this Agreement to the contrary, (i) Buyer is assuming only the Assumed Liabilities, (ii) Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any manner be liable or responsible for any other Liabilities of the Sellers or relating to the Purchased Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Effective Date or arising thereafter, other than the Assumed Liabilities and (iii) as between Buyer and the Sellers, the Excluded Liabilities shall remain the sole obligation and responsibility of the Sellers. As used in this Agreement, "**Excluded Liabilities**" includes, without limitation:

(a)    all Liabilities of the Sellers not arising out of, in respect of or relating to the Purchased Assets;

(b)    all Liabilities of the Sellers arising out of, in respect of or relating to the Purchased Assets;

(c)    all Liabilities accruing or arising prior to the Closing Effective Date (including, for the avoidance of doubt, Avoidance Actions and other Liabilities accruing or arising out of or in connection with the Assignment Agreements of Derivative Rights);

(d)    all Liabilities arising out of, in respect of or relating to the Purchased Assets to the extent resulting from or relating to actions, omissions or circumstances taking place prior to the Closing Effective Date, including all Liabilities arising out of, in respect of or relating to (1) any actual or threatened Proceedings or legal claims (including but not limited to the Other Warner Disputes, but excluding the Wonka Dispute and the PM2 Dispute) arising from or relating to Sellers' production, financing, ownership or Exploitation of the Pictures or the Purchased Assets or any other aspect of Sellers' business prior to the Closing Effective Date, (2) any Seller at any time in its capacity as a producer, financier, owner, licensor, distributor or in any other capacity at or prior to the Closing Effective Date, (3) the failure of Sellers to comply with any Laws or any of their obligations prior to the Closing Effective Date (whether contractual or otherwise, including, without limitation, any Participation or Residual obligations that are contractually required to be paid on or prior to the Closing Effective Date), and (4) the obligation to indemnify, reimburse or advance amounts to any present or former officer, director, employee, owner, manager, Affiliate or agent of Sellers or their Affiliates or any participant, producer, financier, owner, distributor, talent or other Person in connection with any Picture or otherwise prior to the Closing Effective Date;

(e)     all Liabilities of the Sellers pursuant to any QCSA or MPRPA;

(f)     all Liabilities arising out of, in respect of, or relating to the Excluded Assets;

(g)     Excluded Taxes;

(h)     all Indebtedness of the Sellers and all Indebtedness arising before the Closing Effective Date that is otherwise secured by any of the Purchased Assets which in either case remains outstanding following the Closing Effective Date;

(i)     the ABS Obligations;

(j)     the Prepetition Secured Notes Obligations;

(k)     the DIP Obligations;

(l)     all Liabilities assumed by, retained by or agreed to be performed by Sellers pursuant to the Transaction Documents; and

(m)     all Liabilities arising out of, in respect of, or relating to Cure Amounts under the Assumed Contracts.

Section 2.05     **Assumption and Assignment of Contracts**.

(a)     <u>Assignment of Contracts</u>. To the maximum extent permitted by law, at the Closing, and pursuant to the Sale Order, the Sellers shall transfer to Buyer the Assumed Contracts pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to transfer any Purchased Asset or any right thereunder if an attempted transfer, without the consent of a third party, would not be permissible under section 365 of the Bankruptcy Code; provided, that the Sellers shall use their commercially reasonable efforts to obtain all necessary consents (each, a "**Required Consent**") to the assignment and/or transfer thereof.

(b)     <u>Sellers Commitment to Cure Payments</u>. On the Closing Effective Date, the Sellers will pay all Cure Amounts in connection with the assumption and assignment of Assumed Contracts for which all Required Consents (as necessary) and Bankruptcy Court approval to transfer have been obtained. The Sellers have provided to Buyer a schedule set forth on Annex <u>II</u> setting forth a good faith estimate of all Cure Amounts for all Assumed Contracts ("**Cure Schedule**"), which schedule the Sellers may update with appropriate Cure Amounts from time to time prior to the date that is three (3) business days prior to the Closing Effective Date.

(c)     <u>Adequate Assurance</u>. Buyer shall use commercially reasonable efforts to provide the Bankruptcy Court and non-debtor contract counterparties any evidence reasonably necessary to prove adequate assurance of future performance necessary to effect the assumption and assignment of the Assumed Contracts.

Section 2.06     **Purchase Price and Buyer Deposit**.

(a)     On the terms and subject to the conditions contained herein, the aggregate purchase price to be paid by Buyer for the Purchased Assets (the "**Purchase Price**") shall consist of an amount of cash equal to Eighteen Million Five Hundred Thousand Dollars ($18,500,000).

(b)      Buyer has made a deposit in the amount of Four Hundred Thousand Dollars ($400,000) (the "**Buyer Deposit**") with the Escrow Holder by wire transfer of immediately available funds. The Escrow Holder will hold the Buyer Deposit until the Closing Effective Date or earlier termination of this Agreement pursuant to Article VIII in a segregated account (the "**Escrow Account**") pursuant to the terms below. The Buyer Deposit shall become payable, and shall be paid, to the Sellers at the Closing. At the Closing, Buyer and Sellers shall instruct the Escrow Holder to deliver the Buyer Deposit to Sellers by wire transfer of immediately available funds into an account designated by the Sellers. Without limiting the foregoing, the Parties acknowledge and agree that in the event that this Agreement is terminated by the Sellers in accordance with Section 8.01(c), the Sellers shall be entitled to retain the Buyer Deposit. If this Agreement is validly terminated prior to the Closing pursuant to Article VIII, the Buyer Deposit shall be released and distributed to Buyer or Sellers, as applicable, in accordance with the terms of this Agreement and the Parties shall jointly instruct the Escrow Holder with respect thereto. If there is a dispute concerning the reason for termination of this Agreement, the disputing Party shall provide notice of same to Escrow Holder and the Buyer's Deposit shall be distributed pursuant to an Order of the Bankruptcy Court unless such dispute is consensually resolved by the Parties. In the event of any termination of this Agreement then each Party covenants and agrees that such Party shall promptly provide Escrow Holder with such instructions as may be reasonable and necessary to cause Escrow Holder to release the Buyer's Deposit to the Party entitled thereto.

Section 2.07    **Closing**. The Closing shall be effected by exchanging true, complete and accurate copies of executed originals via electronic mail at a time and on a date specified by the Sellers and Buyer that is no later than the fifth (5th) business day following the date on which the last of the conditions set forth in Article III has been satisfied or expressly waived (other than those conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of any such condition), or at such other time and place as the Sellers and Buyer may agree in writing.

Section 2.08    **Post-Closing Transfer of Contracts to Buyer**. At any time after the Closing Effective Date, the Sellers and Buyer may (but shall have no obligation to) mutually agree to seek authorization from the Bankruptcy Court, pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, to transfer a contract that was not identified as an Assumed Contract as of Closing (which contract shall become an Assumed Contract upon such transfer); provided that the Sellers will be solely responsible for paying the Cure Amount required (if applicable) to transfer such contract.

Section 2.09    **Seller Closing Deliverables**. In addition to the other requirements set forth in this Agreement, as of the Closing, the Sellers shall deliver or cause to be delivered to Buyer each of the following documents and instruments (the "**Seller Closing Deliverables**"):

(a)      a counterpart of each Transaction Document to which any Seller or the Seller Representative is a party, duly executed by each applicable Seller and/or the Seller Representative, as applicable;

(b)      an IRS Form W-9 or applicable IRS Form W-8 for each of the Sellers, duly executed by such Seller;

(c)      a certificate in form and substance reasonably acceptable to Buyer dated as of the Closing Effective Date and duly executed by the secretary, director or other authorized officer of each Seller, certifying (i) that attached thereto are copies of each such Person's certificate of formation or certificate of incorporation, as the case may be (and any amendments thereto), certified as of a recent date by the Secretary of State of the State of Delaware or the Registrar of Corporate Affairs in the British Virgin Islands, and limited liability company agreement, bylaws or memorandum and articles of association, as the case may be (and any amendments thereto), (ii) that attached thereto are resolutions adopted by the Board of Directors (or equivalent body) and/or equity holders or members of such Person (as applicable) authorizing the execution, delivery and performance in accordance with their respective terms of the Transaction Documents to which

each of such Persons is a party, (iii) attached thereto are incumbency and specimen signatures of each authorized signatory of such Person executing the Transaction Documents, and (iv) as to the Sellers' satisfaction of the conditions set forth in Sections 3.01(a) and 3.01(b);

(d)     the IP Assignment Agreement; and

(e)     all other instruments and documents reasonably requested by Buyer.

Section 2.10    **Buyer Closing Deliverables**. In addition to the other requirements set forth in this Agreement, as of the Closing, Buyer shall deliver or cause to be delivered to the Seller Representative each of the following documents and instruments (the "**Buyer Closing Deliverables**"):

(a)     a counterpart of each Transaction Document to which Buyer is a party, duly executed by Buyer; and

(b)     a certificate in form and substance reasonably acceptable to the Sellers dated as of the Closing Effective Date and duly executed by the secretary or other authorized officer of Buyer, certifying as to Buyer's satisfaction of the conditions set forth in Sections 3.02(a), and 3.02(b).

Section 2.11    **Payments at Closing**. At the Closing, Buyer shall pay or cause to be paid to each Seller, by wire transfer of immediately available funds to the account or accounts designated in writing by the Sellers not less than two (2) days prior to the Closing Effective Date, its share as designated on Annex IV hereto of an amount equal to (i) the Purchase Price, *less* (ii) the Buyer Deposit.

Section 2.12    **Withholding**. Notwithstanding anything to the contrary in this Agreement, Buyer, the Sellers, and their designees will be entitled to deduct and withhold from any amounts payable pursuant to this Agreement any amounts required to be deducted or withheld under applicable Law. To the extent that any such amounts are so deducted or withheld, such amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction or withholding was made. Upon Closing (and thereafter as required by applicable Law or as requested by Buyer), each person entitled to payment under this Agreement shall provide a duly executed IRS Form W-9 or applicable IRS Form W- 8.

## ARTICLE III
## CONDITIONS PRECEDENT TO CLOSING

Section 3.01    **Conditions Precedent to Purchase by Buyer**. The obligations of Buyer to consummate the Transactions at Closing are subject to the fulfillment or, to the extent permitted by applicable Law, written waiver by Buyer, as of the Closing Effective Date, of each of the following conditions:

(a)     Representations and Warranties. Each of the representations and warranties of the Sellers contained in this Agreement or any other Transaction Document (i) that are qualified as to Material Adverse Effect, shall be true and correct in all respects as of the Effective Date and as of the Closing Effective Date as though made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects on and as of such date) and (ii) that are not qualified as to Material Adverse Effect, shall be true and correct in all respects as of the Effective Date and as of the Closing Effective Date as if made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects as of such date), except for breaches and inaccuracies the

effect of which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)    <u>Performance of Covenants</u>. Each Seller shall have performed in all material respects all of the covenants and obligations required to be performed by it under this Agreement or any other Transaction Document prior to or at the Closing.

(c)    <u>Government Approvals.</u> All Government Approvals required in connection with the Sellers' execution, delivery and performance of this Agreement or any other Transaction Document or consummation of the Transactions shall have been obtained or made and shall be in full force and effect.

(d)    <u>Seller Closing Deliverables</u>. Buyer shall have received each Seller Closing Deliverable.

(e)    <u>Assumed Contracts</u>. Sellers shall have obtained and delivered to Buyer the Sale Order approving the transfer to Buyer of each Assumed Contract.

Section 3.02    **Conditions Precedent to Sale by Sellers**. The obligations of the Sellers to consummate the Transactions at Closing are subject to the fulfillment or written waiver by the Sellers, as of the Closing Effective Date, of each of the following conditions:

(a)    <u>Representations and Warranties</u>. Each of the representations and warranties of Buyer contained in this Agreement (i) that are qualified as to Material Adverse Effect, shall be true and correct in all respects as of the Effective Date and as of the Closing Effective Date as though made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects on and as of such date) and (ii) that are not qualified as to Material Adverse Effect shall be true and correct in all respects as of the Effective Date and as of the Closing Effective Date as if made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects as of such date), except for breaches and inaccuracies the effect of which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)    <u>Performance of Covenants</u>. Buyer shall have performed in all material respects all of the covenants and obligations required to be performed by it under this Agreement or any other Transaction Document prior to or at the Closing.

(c)    <u>Government Approvals</u>. All Government Approvals required in connection with execution, delivery and performance of this Agreement or any other Transaction Document or consummation of the Transactions shall have been obtained or made and shall be in full force and effect.

Section 3.03    **Conditions Precedent to Obligations of Buyer and the Sellers**. The obligations of the Buyer and the Sellers to consummate the Transactions at Closing are subject to the fulfillment or written waiver by each of the Buyer and the Sellers, as of the Closing Effective Date, of the following condition:

(a)    <u>Bankruptcy Court Order</u>. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be unstayed and in full force and effect.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

Section 4.01 **Representations and Warranties of Sellers**. Except as set forth in the corresponding sections or subsections of the Disclosure Schedules attached hereto (collectively, the "**Disclosure Schedules**"), each Seller hereby jointly and severally represents and warrants to Buyer, unless another date is expressly noted below, as of the Effective Date and as of the Closing Effective Date as follows:

(a) <u>Organization and Qualification</u>. Such Seller is a limited liability company or corporation duly incorporated, formed, validly existing and in good standing under the laws of (x) the State of Delaware or, in the case of the Sellers incorporated in the British Virgin Islands, the laws of the British Virgin Islands and (y) all other jurisdictions where the business conducted by such Seller requires it be qualified to do business. None of the Sellers incorporated in the British Virgin Islands conducts business outside of the British Virgin Islands. No Seller other than the Sellers incorporated in the British Virgin Islands conducts business outside of the United States.

(b) <u>Authorization; No Violation</u>.

(i) The execution and delivery by such Seller of, and the performance by such Seller of its obligations under, the Transaction Documents to which it is or is to be a party, and the consummation of the Transactions, are within such Person's powers and have been duly authorized by all necessary action.

(ii) Except to the extent that a violation, contravention, breach or default is rendered unenforceable pursuant to Section 363 or 365 of the Bankruptcy Code or other applicable Law, the execution and delivery by such Seller of, and the performance by such Seller of its obligations under, the Transaction Documents to which it is or is to be a party, and the consummation of the Transactions, do not and will not (w) contravene, conflict with or violate its Constitutive Documents, (x) contravene, conflict with or violate any applicable Law or Order, including, in the case of the Sellers incorporated in the British Virgin Islands, the Economic Substance (Companies and Limited Partnerships) Act (As Revised) of the British Virgin Islands, (y) require any consent, approval, waiver, authorization or notice under, conflict with or result in the material breach of, or constitute a material default (or an event that, with the giving of notice or lapse of time, or both, would become a material default) under, or give rise to any rights of termination, amendment, modification, acceleration, creation or increase in any material payment obligation or forfeiture, suspension, limitation, cancellation, impairment or Loss of any right or benefit of the Sellers (and, after the Closing, Buyer) to own or Exploit or otherwise exercise any rights that the Sellers currently have with respect to the Purchased Assets under, any loan agreement, indenture, mortgage, deed of trust, lease or other instrument or Contract binding on or affecting such Person or any of its assets or properties, including the Purchased Assets, or (z) except as set forth on <u>Section 4.01(b)(ii)(z)</u> of the Disclosure Schedules, result in or require the creation or imposition of any Adverse Claim upon or with respect to any of the assets or properties of such Person, including the Purchased Assets.

(c) <u>Consents and Approvals</u>. All authorizations or approvals of and other actions by, and all notices to and filings with, any Governmental Authority or regulatory body or any other Person that are required to be obtained, taken, given or made by any Seller (i) for the due execution and delivery by such Person of, and the performance by such Person of its obligations under, any of the Transaction Documents to which it is or is to be a party, or (ii) for the exercise by Buyer of its rights under such Transaction Documents, as applicable, have been (or, in the case of the purchase and sale of the Purchased Assets hereunder, shall have been as of the Closing Effective Date) duly obtained, taken, given or made and are (or,

in the case of the purchase and sale of the Purchased Assets hereunder, shall have been as of the Closing Effective Date) in full force and effect.

(d)     Enforceability. This Agreement has been, and each other Transaction Document to which any Seller is or is to be a party is, or when delivered will have been, duly executed by such Person, and is, or when delivered will be, the legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium and other similar laws affecting the rights of creditors and to general principles of equity (whether considered in a suit at law or in equity or pursuant to arbitration).

(e)     Litigation. Except as set forth on Section 4.01(e) of the Disclosure Schedules, there is no pending or, to the Sellers' Knowledge, threatened Proceeding (i) that questions the legality or propriety of the Transactions or that if adversely determined could reasonably be expected to adversely impact any Seller's ability to comply with the terms of the Transaction Documents and/or adversely impact Buyer's rights under the Transaction Documents, (ii) against or affecting any Seller or its Affiliates, or any of its or their current or former officers, directors, members, employees or representatives in their capacities as such, in each case relating to or arising out of the Purchased Assets or any Picture, or (iii) that requires any future payment by any Seller or its Affiliates to any Person in connection with any Picture. None of the Purchased Assets is subject to any Order. In connection with the Wonka Dispute, the PM2 Dispute and the Other Warner Disputes, there have been no, nor does any Seller have Knowledge of any, threatened, adverse interim or final Orders by a court or arbitrator against any Seller or any of its Affiliates that could reasonably be expected to adversely impact such Seller's ability to comply with the terms of the Transaction Documents and/or Buyer's rights under the Transaction Documents, other than in connection with Matrix 4.

(f)     Absence of Certain Changes or Events.  Except as set forth on Section 4.01(f) of the Disclosure Schedules, since December 6, 2023, none of the Sellers has:

(i)     sold, transferred, leased, subleased, licensed or otherwise disposed of, or imposed or suffered to be imposed any Adverse Claim on, the Purchased Assets;

(ii)     accelerated or delayed collection of any material notes or material accounts receivable, advances, cash flows or other income or revenues of whatever kind or nature arising out of or related to the Purchased Assets;

(iii)     delayed or accelerated payment of any material account payable or other material Liability arising out of or related to the Purchased Assets;

(iv)     paid any material amount in respect of the Purchased Assets as a result of awards or settlements in connection with any Proceeding (including any audit);

(v)     (1) cancelled, compromised, waived or released any material right in Sellers' favor or claim of such Seller with respect to any Purchased Assets or (2) settled or compromised any Proceeding (including any audit) with respect to any Purchased Assets;

(vi)     entered into, amended, modified or terminated any Assumed Contract, or cancelled, modified or waived any debts or claims or waived any rights held by it thereunder;

(vii)     entered into any contract or transaction with any Affiliate pertaining to or affecting the Purchased Assets;

(viii)   (1) made, changed or revoked any Tax election, (2) changed an annual accounting period, (3) adopted or changed any accounting method with respect to Taxes, (4) filed any amended Tax Return, (5) entered into any closing agreement, (6) settled or compromised any Tax claim or assessment, or (7) consented to any extension or waiver of the limitation period applicable to any claim or assessment with respect to Taxes; in each case, to the extent such action would adversely affect the Purchased Assets in a Post-Closing Tax Period; or

(ix)   agreed, whether in writing or otherwise, to take any of the actions specified in this Section 4.01(f).

(g)   Pictures.

(i)   Ownership of Derivative Rights.   Annex III hereto sets forth a true, correct and complete list of each Picture, including, for each such Picture, the percentage and nature of the Derivative Rights for such Picture owned by Sellers. Other than pursuant to the Loompala Option Agreement, no party (including, without limitation, Magnum and its Affiliates) owns or has any right to purchase any Derivative Rights owned by the Sellers' in any Pictures.

(ii)   Picture Information.  All written information (excluding any estimates, projections, forecasts, opinions with respect to future events or library valuations prepared by third party non-affiliated appraisers, as to which the Sellers make no representation other than that none of them altered the contents thereof) heretofore furnished by any Seller or any of their Affiliates in writing to Buyer for purposes of or in connection with this Agreement or the Transactions is, and all such written information hereafter furnished by or on behalf of the Sellers or any of their Affiliates to Buyer will be, true, complete and accurate in all material respects, on the date such information is furnished, stated or certified, and all expressions of expectation, intention, belief and opinion contained in that information were given (or when hereafter given, shall be given) honestly and on reasonable grounds after due and careful inquiry.

(h)   Assumed Contracts.

(i)   Section 4.01(h)(i) of the Disclosure Schedules sets forth a true, correct and complete list of all the Assumed Contracts.  True, complete and accurate copies of each Assumed Contract, together with all modifications and amendments thereto, have previously been made available to Buyer.  Each Assumed Contract is valid, binding, and in full force and effect and is enforceable by the applicable Seller party thereto (or to whom the rights therein were assigned) in accordance with its terms and is not subject to any material claims, charges, set-offs or defenses.

(ii)   Except as set forth in Section 4.01(h)(ii) of the Disclosure Schedules, each Seller has performed the material obligations required to be performed by it to date under the Assumed Contracts and no Seller is (with or without the lapse of time or the giving of notice, or both) in material breach or default thereunder, nor has any event occurred that would give rise to any right of notice, modification, acceleration, payment, cancellation or termination of or by another party under, or in any manner release any party thereto from any material obligation under, any such Assumed Contract and, to the Knowledge of the Sellers, no other party to the Assumed Contract is (with or without the lapse of time or the giving of notice, or both) in material breach or default thereunder and no event has occurred that with the giving of notice or the passage of time or both would constitute a material breach or default by any other party, or that would give rise to any right of notice, modification, acceleration, payment, cancellation or termination of or by any Seller under, or in any manner release any party thereto from any material obligation under, any such Assumed Contract.

(iii)    Except as set forth in <u>Section 4.01(h)(iii)</u> of the Disclosure Schedules, no Seller has received any notice of the intention of any third party to terminate, cancel or rescind any Assumed Contract.

(iv)    As of immediately prior to the Closing, excluding certain assignment agreements pursuant to which the Sellers (or their predecessors in interest) were assigned certain Assumed Contracts and Derivative Rights being acquired by Buyer hereunder, the Assumed Contracts are all of the agreements to which any Seller or any of their affiliates is party with respect to the Purchased Assets.

(v)    Except as set forth in Section 4.01(h)<u>(v)</u> of the Disclosure Schedules, there are no amounts owed, accrued or due or payable by any Seller pursuant to any Assumed Contract, including any shortfall payments, advances or similar payments.

(vi)    No Assumed Contract has been altered, amended or modified in any manner by any Seller (or to such Seller's Knowledge by any other party to such agreements) since the date of execution except (y) as specified in the applicable document or (z) as such documentation has been previously provided to Buyer.

(i)    <u>Derivative Rights</u>.  Except (i) as set forth on <u>Section 4.01(i)</u> of the Disclosure Schedules and/or (b) with respect to Derivative Rights that are being purchased by Buyer pursuant to the Lot 3 Asset Purchase Agreement, to the Knowledge of the Sellers, no Seller owns, controls or otherwise holds any Derivative Rights.

(j)    <u>First/Last Opportunity Rights</u>.  No Person has any first/last opportunity rights (including, without limitation, rights of first refusal, rights of first negotiation, rights of last refusal, rights of first offer, or other rights of similar nature) or any "call" or "put" right with respect to any Purchased Assets that have not expired or terminated.

(k)    <u>Copyrights and Copyright Registrations</u>.  <u>Section 4.01(k)</u> of the Disclosure Schedules sets forth a true, correct and complete list of all registered Copyrights with respect to Wonka that are owned by or currently licensed to, or purported to be owned by or currently licensed to, a Seller, which schedule shall include, with respect to all such Copyrights, (1) the name of the registrant (as applicable) and each Seller that currently owns any portion of such Copyright (including the ownership share of each such Seller), (2) the registration number (as applicable), (3) the status of the registration (as applicable), and (4) the jurisdiction where the registration is located.  Wonka has, as of the date hereof, been registered in the U.S. Copyright Office. No Seller owns or is currently licensed any Trademarks with respect to Wonka.

(l)    <u>Intellectual Property Protection</u>.  The Purchased Wonka Naked Copyrights that are protectable under Applicable Copyright Law are registered, recorded, applied for or otherwise protected and validly subsisting under all Applicable Copyright Laws, and, to the Knowledge of the Sellers, no material protectable portion of any of the foregoing is in the public domain in the United States.  Each Seller uses and has used commercially reasonable efforts to protect, confirm, register (to the extent such registration is or was, as the case may be, customary industry practice at the time the rights were created), maintain, police and enforce all Purchased Wonka Naked Copyrights, including making all filings, paying all fees and executing all appropriate written agreements in connection therewith, in each case to the extent any of the Sellers has the right to protect, confirm, register, maintain, police or enforce its rights in the applicable Picture.  No Seller or any of its Affiliates (nor, to the Knowledge of the Sellers, any other Person) has received any written notice from a third Person that such third Person has exercised or intends to exercise any Copyright Termination with respect to Wonka.

(m)     <u>Title to Purchased Assets</u>. Except as set forth on <u>Section 4.01(m)</u> of the Disclosure Schedules, Sellers have and will convey to Buyer (and upon consummation of the Transactions, Buyer will acquire) good, valid and marketable title to, and sole and exclusive legal and beneficial ownership of, the Purchased Assets, free and clear of any Adverse Claim (other than the Assumed Liabilities).

(n)     <u>No Brokers or Finders</u>. Except as set forth on Section 4.01(n) of the Disclosure Schedules, none of the Sellers nor any Affiliate thereof has retained any broker or finder, agreed to pay or made any statement or representation to any Person that would entitle such Person to, any broker's, finder's or similar fees or commissions in connection with the Transactions.

Section 4.02     <u>**Representations and Warranties of Buyer**</u>.  Buyer hereby represents and warrants to the Sellers as of the Effective Date and the Closing Effective Date as follows:

(a)     <u>Organization</u>. Buyer is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of Delaware.

(b)     <u>Authorization</u>. Buyer has full power and authority to enter into this Agreement.

(c)     <u>Enforceability</u>. Upon entry of the Sale Order, this Agreement, and each other Transaction Document to which Buyer is or is to be a party is, or when delivered will have been, duly executed and delivered by Buyer and is, or when delivered will be, the valid and binding agreement of Buyer, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium and other similar laws affecting the rights of creditors and to general principles of equity (whether considered in a suit at law or in equity or pursuant to arbitration).

(d)     <u>No Violation</u>. The execution and delivery by Buyer, and the performance by Buyer of its obligations under, the Transaction Documents to which it is or is to be a party, and the Transactions, do not (i) contravene, conflict with or violate its Constitutive Documents or (ii) contravene, conflict with or violate any material applicable Law or Order.

(e)     <u>Source of Funds</u>. Buyer represents that the following statement is an accurate representation as to each source of funds (a "**Source**") to be used by Buyer to pay the Purchase Price for the Purchased Assets: The Source does not include assets of any employee benefit plan, other than a plan exempt from the coverage of ERISA. As used in this Section 4.02(e), the term "**employee benefit plan**" shall have the meaning assigned to such term in Section 3 of ERISA.

(f)     <u>Investment Representations</u>. Buyer is sophisticated with respect to decisions to acquire assets of the type represented by the Purchased Assets and either it, or the Person exercising discretion in making its decision to acquire the Purchased Assets, is experienced in acquiring assets of such type.

(g)     <u>Acknowledgement</u>. Except for the representations and warranties made by the Sellers in Section 4.01 of this Agreement, Buyer hereby acknowledges that (i) none of the Sellers nor any of their Affiliates has made, or has agreed to make, any express or implied representation, warranty, guarantee or agreement with respect to the film industry as a whole or the business and financial risks associated with the film industry as a whole, (ii) it has made its own inquiry and investigation into, and based thereon has formed an independent judgment concerning, the film industry as a whole and the business and financial risks associated with the film industry as a whole, and (iii) there are uncertainties inherent in making any estimates, projections, forecasts or opinions with respect to future events and that any such estimates, projections, forecasts or opinions delivered by the Sellers or any of their Affiliates pursuant to the Transaction Documents shall be subject to such uncertainties.

(h)     No Brokers or Finders. None of Buyer nor any Affiliate thereof has retained any broker or finder, agreed to pay or made any statement or representation to any Person that would entitle such Person to, any broker's, finder's or similar fees or commissions in connection with the Transactions.

## ARTICLE V
## DEPOSITS; NO SETOFF; NO SURVIVAL

Section 5.01     **Deposits to Buyer's Account**. In the event that any amounts that are required under any Transaction Document to be paid directly to Buyer or otherwise constitute Purchased Assets are received by any Seller or any of their respective Affiliates after the Closing Effective Date, such Person shall, and each Seller shall cause such Person to, as applicable, hold such amounts in trust, and deposit such amounts in the form received, immediately, but in any event not later than two (2) business days of its receipt thereof, in an account designated in writing by Buyer.

Section 5.02     **No Setoff**. Each payment of any amounts included in the Purchased Assets required under Section 5.01 shall not be reduced by any setoff or deduction on account of any claim or other charge other than with respect to any tax withholding or similar governmental charge or as expressly permitted or required under this Agreement.

Section 5.03     **No Survival**. The respective representations and warranties of the Parties hereto hereunder shall not survive the Closing. The respective covenants of the Parties hereto required to be performed on or prior to the Closing Effective Date shall not survive the Closing.

## ARTICLE VI
## COVENANTS

Section 6.01     **Conduct of the Sellers Prior to Closing**.

(a)     During the period from the Effective Date until the earlier of (i) the Closing Effective Date, or (ii) the date this Agreement is validly terminated in accordance with its terms (such period, the "**Pre-Closing Period**"), unless otherwise consented to in writing by Buyer, the Sellers shall (A) operate their businesses and the Purchased Assets only in the ordinary course of business as debtors in possession, (B) preserve and maintain their business organization and assets (including the Purchased Assets), (C) keep available the services of the current Service Providers of the Sellers or any of their Affiliates. During the Pre-Closing Period, Sellers shall not commence or settle any Proceeding relating to the Purchased Assets or the Pictures (including any audit or the Wonka Dispute, the PM2 Dispute or Other Warner Disputes) if such commencement or settlement could reasonably be expected to adversely affect, in any material respect, the Purchased Assets (including, without limitation, the Post-Cutoff Cash Flows) or the Pictures, unless otherwise authorized by a finding of the Bankruptcy Court.

(b)     Without limiting the generality of the foregoing, except as consented to in writing by Buyer or as required by Law or directed by the Bankruptcy Court, during the Pre Closing Period, the Sellers shall not, except as set forth in Section 6.01(b) of the Disclosure Schedules:

(i)     issue, sell, transfer, lease, license, convey, assign, abandon, cancel, pledge, dispose of, or otherwise subject to any Adverse Claim, any Purchased Assets;

(ii)     incur any Indebtedness or issue any debt securities or assume, guarantee or endorse, or otherwise become responsible for, the obligations of any Person, or make any loans or advances, in each case affecting the Purchased Assets;

(iii)    amend, waive, modify, terminate or give any consent or approval under the Assumed Contracts, or amend, waive, modify, terminate or give any consent or approval regarding any Seller's rights thereunder, or enter into any Contract in connection with the Purchased Assets;

(iv)    pay, discharge or satisfy any Liability relating to the Purchased Assets;

(v)    cancel, compromise, waive or release any right or claim or Proceeding (including any audit) relating to the Purchased Assets;

(vi)    permit the lapse of any existing policy of insurance relating to the Purchased Assets;

(vii)    commence or settle any Proceeding relating to the Purchased Assets or the Pictures (including any audit or the Wonka Dispute, the PM2 Dispute or any Other Warner Disputes) if such commencement or settlement could reasonably be expected to adversely affect, in any material respect, the Purchased Assets, unless otherwise authorized by a finding of the Bankruptcy Court;

(viii)    fail to comply in all material respects with all applicable Laws in any manner that could reasonably be expected to adversely affect, in any material respect, the Purchased Assets or the rights or remedies of Buyer under the Transaction Documents;

(ix)    fail to maintain their existence as a limited liability company or corporation, as the case may be, validly existing and in good standing under the laws of its jurisdiction of organization and obtain and preserve its qualification to do business in each jurisdiction in which the failure to so could reasonably be expected to adversely affect, in any material respect, the Purchased Assets or the rights or remedies of Buyer under the Transaction Documents;

(x)    (A) fail to maintain all organizational formalities, (B) fail to comply with the provisions of its Constitutive Documents (including with respect to Separateness or independent directors) in all material respects at all times, (C) amend any provisions of their Constitutive Documents in any manner that could reasonably be expected to adversely affect, in any material respect, the Purchased Assets or the rights or remedies of Buyer under the Transaction Documents, (D) permit any Affiliate to assume or guarantee any of the Liabilities of any Seller other than as required by this Agreement or documents governing any Seller's Indebtedness or ABS Obligations that are in effect as of the Effective Date, (E) fail to make all decisions regarding any Seller's organization and operation independently, or allow such decisions to be dictated by any other Person, (F) fail to take such other actions as are necessary on a Seller's part to ensure that all corporate procedures required by their Constitutive Documents are duly and validly taken, and (G) act in any manner that would foreseeably mislead others with respect to its separate identity from any Affiliate;

(xi)    fail to pay and discharge and fully perform, at or before maturity, all of their respective material obligations and Liabilities, including, without limitation, Tax liabilities and other governmental claims levied or imposed upon such Seller or upon the income, properties or operations of such Seller, judgments, settlement agreements and all obligations of such Seller under the Transaction Documents, except where the same may be contested in good faith by appropriate proceedings, and will maintain, in accordance with IFRS, reserves as appropriate for the accrual of any of the same;

(xii)    engage in any dealings or transactions with any Person described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or in Section 1 of the Anti-Terrorism Order;

(xiii)    take any action, or intentionally fail to take any action, that would cause any representation or warranty made by the Sellers in this Agreement or any other Transaction Document to be untrue or result in a breach of any covenant made by the Sellers in this Agreement or any other Transaction Document, or that has or would reasonably be expected to have a Material Adverse Effect;

(xiv)    enter into any transaction or Contract between any Seller, on the one hand, and any Affiliate of such Seller, on the other hand, with respect to the Purchased Assets;

(xv)    (A) make, change or revoke any Tax election, (B) change an annual accounting period, (C) adopt or change any accounting method with respect to Taxes, (D) file any amended Tax Return, (E) enter into any closing agreement, (F) settle or compromise any Tax claim or assessment, or (G) consent to any extension or waiver of the limitation period applicable to any claim or assessment with respect to Taxes; in each case, to the extent such action would adversely affect the Purchased Assets in a Post-Closing Tax Period; or

(xvi)    announce an intention, enter into any formal or informal agreement, or otherwise make a commitment to do any of the foregoing.

Section 6.02    **Access**. During the Pre-Closing Period, except to the extent prohibited by applicable Law, the Sellers shall provide, and cause their Service Providers, attorneys, accountants, advisors, consultants and other agents to provide, to Buyer and its accounting, legal and other representatives, as well as their respective Service Providers, affiliates and other agents, access at all reasonable times and during normal business hours, upon reasonable notice, to the Sellers' personnel and to business, financial, legal, tax, compensation and other data and information concerning the Purchased Assets as Buyer deems reasonably necessary or advisable; provided, however, that, for avoidance of doubt, the foregoing shall not require the Sellers to waive, or take any action with the effect of waiving, their attorney-client privilege or any confidentiality obligation to which they are bound with respect thereto. After the Closing, upon reasonable advance written request by Sellers or their Service Providers, except to the extent prohibited by applicable Law, the Buyer shall provide, and cause its Service Providers, attorneys, accountants, advisors, consultants and other agents to provide, to each Seller and its accounting, legal and other representatives, as well as their respective Service Providers, affiliates and other agents, access at all reasonable times and during normal business hours, upon reasonable notice, access to business, financial, legal, tax, compensation and other data and information included in the Purchased Assets prior to Closing to the extent such access is necessary in order for Sellers (as applicable) to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality; provided, however, that, for avoidance of doubt, the foregoing shall not require the Sellers to waive, or take any action with the effect of waiving, their attorney- client privilege or any confidentiality obligation to which they are bound with respect thereto.

Section 6.03    **Notification of Certain Matters**.

(a)    During the Pre-Closing Period, Sellers shall give prompt written notice to Buyer of (i) the occurrence or non-occurrence of any event, the occurrence or non-occurrence of which would render any representation or warranty of the Sellers contained in this Agreement or any other Transaction Document, if made on or immediately following the date of such event, untrue, inaccurate or misleading, (ii) the occurrence of any event that, individually or in combination with any other events, has had or could reasonably be expected to have a Material Adverse Effect, (iii) any failure of the Sellers, or any Affiliate of the Sellers to comply with or satisfy any covenant or agreement to be complied with or satisfied by it under the Transaction Documents or any event that would otherwise result in the nonfulfillment of any of the conditions to Buyer's obligations hereunder, (iv) any notice or other communication from any Person

alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions, (v) any notice or other communication from any Governmental Authority in connection with the Transactions, (vi) any material and adverse change to the Purchased Assets, (vii) any notice of any material breach, default or termination of any Assumed Contract, (viii) the occurrence of any event which would or would reasonably be likely to (A) prevent or materially delay the consummation of the Transactions or (B) result in the failure of any condition to Closing set forth in this Agreement to be satisfied, or (ix) any Proceeding pending or, to the Knowledge of the Sellers, threatened against a Party or the Parties relating to the Transactions or otherwise affecting the Purchased Assets.

(b)     Without limiting anything set forth in Section 6.03(a), during the Pre-Closing Period, to the fullest extent permitted or consistent with any applicable Order of any court, tribunal or arbitrator in the Wonka Dispute, the PM2 Dispute or the Other Warner Disputes, Sellers and their Affiliates will (and will cause their litigation counsel to) furnish Buyer with the material details respecting any offer of settlement or other resolution either proposed by Sellers or its Affiliates or by WBEI or its Affiliates that could reasonably be expected to adversely affect the Purchased Assets (and at Buyer's request, Sellers shall take all reasonable steps to obtain any necessary consent Sellers reasonably believe is required in order to furnish Buyer with such offer of settlement or other resolution or any information related thereto); provided, nothing in this Section 6.03(b) shall restrict Sellers or their Affiliates from entering into any settlement or other resolution of the Other Warner Disputes in its sole discretion, subject to Buyer's consent rights pursuant to Section 6.01(b)(vii). To the extent that any Order of any Governmental Authority does not permit Sellers or their Affiliates from furnishing information as described in this Section 6.03(b), upon reasonable request from Buyer, Sellers and/or their Affiliates shall seek modification or relief from such Order such that Buyer shall be permitted to receive such information. Sellers shall be solely responsible for the payment of all arbitration fees, attorneys' fees, costs, experts, or any other fees and costs in connection with the Other Warner Disputes.

(c)     From and after the Closing Effective Date through a period that is the earlier of (a) the closing of the Bankruptcy Cases; or (b) the third (3rd) anniversary thereof, subject to any confidentiality obligations applicable to the Sellers or their Affiliates, if any Seller or its Affiliates receives notice of a pending or threatened Proceeding against, relating to or affecting the Purchased Assets (including, without limitation, any claimed breach by any Seller or its Affiliates under any Picture Agreement), then such Person will (i) promptly notify Buyer of same; and (ii) give Buyer copies of all notices and other writings relating to it received by such Person promptly after their receipt.

Section 6.04     **Efforts to Close**. Each Party shall, and Sellers shall cause their Affiliates to, use commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the Transactions as promptly as practicable. In furtherance and not in limitation of the foregoing, the Sellers shall permit Buyer reasonably to participate in the defense and settlement of any claim, suit or cause of action relating to this Agreement or the Transactions, and the Sellers shall not settle or compromise any such claim, suit or cause of action without Buyer's written consent.

Section 6.05     **Tax Matters**.

(a)     Buyer and the Sellers agree to furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets, including, without limitation, access to Books and Records, as is reasonably necessary for the filing of all Tax Returns by Buyer or the Sellers, the making of any election relating to Taxes, the preparation for any audit with respect to Taxes by any Governmental Authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Buyer and the Sellers shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least seven (7) years following the Closing Effective Date. Buyer

and the Sellers shall cooperate fully with each other in the conduct of any audit, litigation or other proceeding relating to Taxes involving the Purchased Assets.

(b)      To the extent not otherwise provided in this Agreement, the Sellers shall be responsible for and shall promptly pay when due all Property Taxes levied with respect to the Purchased Assets attributable to the Pre-Closing Tax Period. All Property Taxes levied with respect to the Purchased Assets for the Straddle Period shall be apportioned between Buyer and the Sellers in the manner provided in Section 6.06(e)(ii). The Sellers shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period. Upon receipt of any bill for such Property Taxes by Buyer or any Seller, Buyer or the Sellers as applicable, shall present a statement to the other setting forth the amount of reimbursement to which Buyer or the Sellers, as applicable, are entitled under this Section 6.06(b) together with such supporting evidence as is reasonably necessary to calculate the proration amount. The proration amount shall be paid by the Party or Parties owing it to the other(s) within ten (10) days after delivery of such statement. In the event that Buyer or any Seller makes any payment for which it is entitled to reimbursement under this Section 6.06, Buyer or the Sellers shall make such reimbursement promptly but in no event later than ten (10) days after the presentation of a statement setting forth the amount of reimbursement to which the presenting Party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement.

(c)      All Transfer Taxes will be borne one hundred percent (100%) by Buyer. The Buyer shall duly prepare any Tax Return or other document with respect to such Transfer Taxes (and Sellers shall cooperate with respect thereto as necessary) and Buyer shall pay such Transfer Taxes when due.

(d)      The Sellers shall promptly notify Buyer in writing upon receipt by any Seller of written notice of any pending or threatened Tax audits or assessments relating to the income, properties or operations of such Seller that may reasonably be expected to relate to or give rise to an Excluded Tax or an Adverse Claim on the Purchased Assets.

(e)      The portion of any Taxes payable with respect to a Straddle Period that, for the purposes of this Agreement, shall be allocated to Pre-Closing Tax Period are:

(i)      in the case of Taxes that are either (A) based upon or related to income or receipts or (B) imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible), other than conveyances pursuant to this Agreement, deemed equal to the amount which would be payable if the taxable year ended on the Closing Date; and

(ii)      in the case of Property Taxes or other Taxes imposed on a periodic basis with respect to the assets shall be the product of (A) the amount of such Taxes for the entire period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period), and (B) a fraction, the numerator of which is the number of calendar days in the portion of the Straddle Period ending on the Closing Date and the denominator of which is the number of calendar days in the entire Straddle Period.

(f)      To the extent required to comply with any applicable Law relating to Tax, Buyer and the Sellers shall consult with each other to reasonably determine that portion of the Purchase Price that is properly attributable to any Purchased Assets sold by VRF to Buyer hereunder; provided, that the Parties agree that not more than one percent (1%) of the Purchase Price shall be considered as so attributable to any such Purchased Assets.

Section 6.06    **Further Assurances**. Subject to the terms of this Agreement, from and after the date hereof, each Party hereto agrees to, and to cause their Affiliates to, as applicable, to use commercially reasonable efforts to (a) furnish upon request to each other Party such further information in connection with the Transaction, (b) execute and deliver to each other Party such other documents consistent herewith (after a reasonable period to review and discuss such documents) and (c) do such other acts and things consistent herewith, in each case as another Party may reasonably request for the purpose of carrying out the intent of this Agreement, the other Transaction Documents to which it is a party and the Transactions. To the extent any Purchased Assets are in the name of an Affiliate of a Seller, the Sellers shall cause such Affiliate to sell, assign, transfer, convey and deliver to Buyer the applicable Purchased Assets and further cause their respective Affiliates to comply with the terms of this Agreement and the other Transaction Documents to the extent such terms purport to bind such Affiliate. Following the Closing, each Seller shall take any actions and execute any documents as reasonably requested by Buyer in furtherance of this Section 6.06 relating to the Purchased Assets. In the event that such Seller does not take such actions or deliver such executed documents to Buyer within five (5) business days following Buyer's request therefor, Buyer shall have the authority as such Seller's true and lawful attorney-in-fact to take any such actions and execute any such documents on behalf of such Seller relating to the Purchased Assets. In such event, Buyer shall provide such Seller with a copy of any document so executed; provided, that the inadvertent failure to do so shall not be deemed a breach hereof.

Section 6.07    **Books and Records**. Promptly following the Closing Effective Date, and in no event later than ten (10) business days thereafter (with respect to any Books and Records provided to Buyer in the Dataroom as of the Closing Effective Date) or sixty (60) days thereafter (with respect to all other Books and Records), Sellers shall use commercially reasonable efforts to deliver to Buyer, via a cloud- based server or another electronic format reasonably acceptable to Buyer, copies of all Books and Records, in the Sellers' possession in an electronic format. No later than sixty (60) days following the Closing Effective Date, Sellers shall use commercially reasonable efforts to deliver to Buyer, or otherwise make accessible to Buyer via a cloud-based server or another electronic format reasonably acceptable to Buyer, copies of all Books and Records, in the Sellers' possession in a physical format. From and after the Closing Effective Date through the third (3rd) anniversary thereof, each Seller will hold, and will cause its Affiliates and Representatives to hold, in confidence from any other Person, all confidential information, documents, materials and other information related to the Books and Records.

Section 6.08    **Wonka Dispute and PM2 Dispute**. From and after the Closing Effective Date, the Sellers shall, in coordination with Buyer, use commercially reasonable efforts to (a) facilitate the substitution of Buyer (or its designated Affiliate) in place of VRF, VRFNA and VRPNA (as respondents and counter-claimants), as the real party in interest in connection with the Wonka Dispute and the PM2 Dispute, including without limitation, taking all actions and executing all documents necessary to remove all bars, restrictions, or impediments that may prevent Buyer from viewing or obtaining any pleadings, filings, served documents, correspondence with third parties and/or opposing counsel, research memos or other summaries, deposition transcripts, deposition summaries or witness interview notes/summaries, expert reports or summaries, discovery requests, discovery responses, orders, or any other documents produced or provided in the Wonka Dispute or the PM2 Dispute (this includes assisting in making Buyer or its designated Affiliate a party to any protective order), (b) facilitate the substitution of Buyer's designated counsel in place of VRF, VRFNA and VRPNA's current counsel of record in the Wonka Dispute and the PM2 Dispute, (c) provide introductions to relevant third parties (such as experts, witnesses, consultants, or external counsel previously engaged by Sellers), (d) provide to Buyer any documents, information and/or other materials in Seller's possession or control reasonably necessary to support such substitutions or otherwise facilitate Buyer's assumption and continued defense, prosecution and/or resolution of the Wonka Dispute and the PM2 Dispute, which, for the avoidance of doubt, shall be at Buyer's cost and expense, (e) facilitate the transfer, to the extent necessary and permissible, of access credentials, login information, or any other tools required for Buyer to fully participate in the Wonka Dispute and the PM2 Dispute, (f) upon the substitution of Buyer (or

its designated Affiliate) in place of VRF, VRFNA and VRPNA as the real party in interest in connection with the Wonka Dispute and the PM2 Dispute, and subject to Buyer or its designated Affiliate becoming a party to any protective order, facilitate the transfer to Buyer of Seller's entire client litigation file in customary form, including without limitation, unredacted documents produced or provided by any party in the Wonka Dispute or the PM2 Dispute, unredacted copies of pleadings, filings, served documents, discovery requests, discovery responses, orders, correspondence with third parties and/or opposing counsel, research memos or other summaries, deposition transcripts, deposition summaries or witness interview notes/summaries, expert reports or summaries, or any other document produced or provided to Seller in the Wonka Dispute or the PM2 Dispute, (g) make reasonably available to Buyer, during normal business hours, any employees or personnel of VRF, VRFNA, and VRPNA for purposes of information interviews and testimony (including preparation for the same), and for signing declarations, affirmations, affidavits, or similar statements as Buyer may reasonably request from time to time or provide Buyer with such employee's or personnel's last known contact information; (h) make prior counsel for Sellers reasonably available to assist with the transition to Buyer's counsel and cooperate with any requests from Buyer or its counsel, which, for the avoidance of doubt, shall be subject to counsel's availability and at Buyer's cost and expense; and (i) for any insurance policies that may provide coverage for any claims made against Sellers, provide such policies to Buyer along with all communications with any such insurance companies and take all necessary steps to ensure continuity of coverage.  For the avoidance of doubt, from and after the Closing Effective Date, Buyer shall have sole and exclusive control over, and shall be entitled to assert or waive, any and all client privileges or legal doctrines that permit the withholding of documents or information in connection with the Wonka Dispute or the PM2 Dispute, including, without limitation, the attorney-client privilege.  Sellers shall preserve and not destroy, delete, or alter any documents, files, or evidence related to the Wonka Dispute or the PM2 Dispute until Buyer confirms in writing that such materials may be released or destroyed.  Sellers confirm that all appropriate "litigation hold" notices have been circulated and implemented.

## ARTICLE VII
## BANKRUPTCY COURT MATTERS

Section 7.01      **Sale Motion, Bankruptcy Procedures Hearing, Bid Procedures and Sale Order**. The Sellers shall use their reasonable best efforts to seek entry of the Sale Order, and appropriate supporting declarations, in form and substance acceptable to the Sellers and Buyer, on or prior to December 15, 2025. The Sellers shall affix a true and complete copy of this Agreement to the Sale Motion filed with the Bankruptcy Court. The Sellers shall comply with all notice requirements (a) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedures and/or (b) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith. In the event the entry of the Sale Order is appealed, the Sellers shall use commercially reasonable efforts to defend such appeal.  Sellers shall have timely served a cure notice (the "**Cure Notice**") by first class mail on all non-debtor counterparties to Contracts. The Cure Notice shall inform each recipient that its respective Contract may be designated as either assumed or rejected, and the timing and procedures relating to such designations, and, to the extent applicable (i) the title of the Contract, (ii) the name of the counterparty to the Contract, (iii) the Sellers' good faith estimates of the cure amounts required in connection with such Contract, (iv) the identity of Buyer, (v) the deadline by which any such Contract counterparty may file an objection to the proposed assumption and assignment and/or cure, and the procedures relating thereto, and (vi) that such Contract counterparty's failure to object timely to the proposed assumption or cure amount will be deemed to be consent to such assumption to cure amount.

Section 7.02      **Auction**. The Parties acknowledge and agree that (a) the Auction for the Purchased Assets was conducted on May 28, 2025 in accordance with the Bidding Procedures Order, and (b) at such Auction, the Debtors selected (i) Buyer as the Successful Bidder with respect to the Purchased Assets and (ii)

-29-

WBEI as the Backup Bidder with respect to the Purchased Assets, in each case, in accordance with the Bidding Procedures Order.

Section 7.03    **Bankruptcy Filings**.   From and after the Effective Date and until the Closing Effective Date, to the extent reasonably practicable, the Sellers shall deliver to Buyer drafts of any material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement and the operation of the Sellers for Buyer's prior review and comment at least two (2) business days prior to the filing or submission thereof, and such filings shall be acceptable to Buyer to the extent they relate to the Purchased Assets, the Assumed Liabilities, or any of Buyer's obligations hereunder. Each of the Sellers and Buyer shall appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other Party with copies of notices or other communications received by such Party from the Bankruptcy Court or any third party or any Governmental Authority with respect to the transactions contemplated by this Agreement. Buyer agrees that it will use its commercially reasonable efforts to assist the Sellers in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, and (y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

Section 7.04    **Sale Free and Clear**. The Sellers acknowledge and agree, and the Sale Order shall provide that, on the Closing Effective Date and concurrently with the Closing, all then existing or thereafter arising obligations, Adverse Claims (other than the Assumed Liabilities) of, against or created by the Sellers or their bankruptcy estate, pursuant to section 363(f) of the Bankruptcy Code, shall be fully released from, and with respect to, the Purchased Assets and may not be asserted against Buyer after the Closing Effective Date. On the Closing Effective Date, the Purchased Assets shall be transferred to Buyer free and clear of all Adverse Claims (other than the Assumed Liabilities), pursuant to section 363 of the Bankruptcy Code. Sellers shall ensure that the Sale Order becomes effective immediately upon entry thereof and that the provisions of Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall be waived for cause.

Section 7.05    **Excluded Assets**. For the avoidance of doubt, nothing in this Agreement will restrict Sellers or their Affiliates from selling, disposing of or otherwise transferring any Excluded Assets, or from settling, delegating or otherwise transferring any Excluded Liabilities, in each case, with the approval of the Bankruptcy Court, or from entering into discussions or agreements with respect to the foregoing.

**ARTICLE VIII**
**TERMINATION**

Section 8.01    **Termination**. This Agreement and the obligations of the Parties to consummate the Transactions may, by written notice given on or prior to the Closing Effective Date, in the manner provided in this Section 8.01, be terminated at any time prior to the Closing only as follows:

(a)    by mutual written consent of Buyer and the Seller Representative, at which point the Buyer Deposit shall be returned to Buyer;

(b)    by Buyer if at any time (i) any of the representations or warranties of any Seller in Section 4.01 is or becomes untrue or inaccurate such that the condition set forth in Section 3.01(a) would not be satisfied (treating such time as if it were the Closing for purposes of this Section 8.01(b)), (ii) the condition set forth in Section 3.01(e) cannot be satisfied (treating such time as if it were the Closing for purposes of

this Section 8.01(b)) or (iii) there has been a breach on the part of any Seller or Parent of any of its covenants or agreements contained in this Agreement such that the condition set forth in Section 3.01(b) would not be satisfied (treating such time as if it were the Closing for purposes of this Section 8.01(b)), and in the case of (i) through (iii) above, such breach or failure to satisfy such condition cannot be cured by the Sellers or Parent or, if capable of being cured, has not been cured by the applicable Sellers or Parent by the date that is three (3) business days prior to the Outside Date, at which point the Buyer Deposit shall be returned to Buyer; provided that Buyer shall not be entitled to terminate pursuant to this Section 8.01(b) if the consummation of the Transactions is then being prevented by the willful and material breach by Buyer of any of its representations, warranties or covenants contained in the Agreement;

(c)      by the Sellers if at any time (i) any of the representations or warranties of Buyer in Section 4.02 is or becomes untrue or inaccurate such that the condition set forth in Section 3.02(a) would not be satisfied (treating such time as if it were the Closing for purposes of this Section 8.01(c)), or (ii) there has been a breach on the part of Buyer of any of its covenants or agreements contained in this Agreement such that the condition set forth in Section 3.02(b) would not be satisfied (treating such time as if it were the Closing for purposes of this Section 8.01(c)), and in the case of both (i) and (ii) above, such breach cannot be cured by Buyer or, if capable of being cured, has not been cured by Buyer by the date that is three (3) business days prior to the Outside Date, at which point the Buyer Deposit shall be retained by the Sellers; provided that the Sellers shall not be entitled to terminate pursuant to this Section 8.01(c) if the consummation of the Transactions is then being prevented by the willful and material breach by Sellers or Parent of any of their representations, warranties or covenants contained in the Agreement;

(d)      by Buyer if the Closing has not occurred on or before December 31, 2025, or such later date, if any, as Buyer may agree upon in writing (as such date may be extended by the written consent of Buyer, the "**Outside Date**"), at which point the Buyer Deposit shall be returned to Buyer; provided that Buyer shall not be entitled to terminate pursuant to this Section 8.01(c) if the failure to consummate the Transactions by the Outside Date was primarily caused by the willful and material breach by Buyer of any of Buyer's representations, warranties or covenants contained in the Agreement;

(e)      by either Buyer or the Sellers if consummation of the Transactions is enjoined or prohibited by the terms of any Law or a final, non-appealable Order of any Governmental Authority having competent jurisdiction, at which point the Buyer Deposit shall be returned to Buyer; provided, however, that the party seeking to terminate shall not be entitled to terminate pursuant to this Section 8.01(e) if the imposition of such Order or the failure of such Order to be resisted, resolved or lifted, as applicable, was proximately caused by a breach of a representation, warranty, covenant or agreement on the part of Buyer (if it is seeking to terminate) or any Seller (if the Sellers are seeking to terminate);

(f)      by Buyer if any of the Bankruptcy Cases of a Seller are dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of the Sellers is appointed in the Bankruptcy Case of a Seller, at which point the Buyer Deposit shall be returned to Buyer;

(g)      Buyer, if (i) the Sale Order acceptable to Buyer shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York Time) on or before December 15, 2025, or (ii) following the entry of the Sale Order, the Sale Order shall (A) fail to be in full force and effect, (B) have been reversed, (C) have been stayed and such stay shall continue to be in effect for more than fourteen (14) days or (D) have been modified or amended in any manner adverse to Buyer without the prior written consent of Buyer. Under any such circumstance, the Buyer Deposit shall be returned to Buyer; or

-31-

(h)     by Buyer or Sellers upon the consummation of an Alternative Transaction, at which point the Buyer Deposit shall be returned to Buyer.

The Party seeking to terminate this Agreement pursuant to this Section 8.01 (other than pursuant to Section 8.01(a)) shall give prompt written notice of such termination to the other Parties hereto.

Section 8.02     **Effect of Termination**. In the event of termination of this Agreement as provided above, this Agreement shall immediately terminate and have no further force and effect and there shall be no Liability on the part of any Party to any other Party under this Agreement, except that (a) the covenants and agreements set forth in this Section 8.02 and Article IX and all definitions herein necessary to interpret any of the foregoing provisions shall remain in full force and effect and survive such termination indefinitely, (b) if applicable, the Buyer Deposit shall be released or retained in accordance with the terms of <u>Section 8.01</u>, and (c) nothing in this Section 8.02 shall release any Party from any Liability for any breach by such Party of this Agreement before the effective date of such termination, or otherwise affect any of the rights or remedies (whether under this Agreement, or at Law, in equity or otherwise) available to any Party with respect to the breach of this Agreement by any Party before the effective date of such termination.

Section 8.03     [Reserved].

## ARTICLE IX
## REMEDIES

Section 9.01     **Remedies**. Except as contemplated by Section 2.06(b) or as otherwise provided in Section 9.02, the Parties agree that the remedies and/or the termination of this Agreement in accordance with the provisions of Article VIII shall be the sole and exclusive remedy of the Sellers (if the breaching party is Buyer) or Buyer (if the breaching party is a Seller) under this Agreement for any breach of representation and warranty made or any covenant or agreement to be performed on or prior to Closing.

Section 9.02     **Specific Performance**. The parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that any party does not perform the provisions of this Agreement (including failing to take such actions as are required of it hereunder to consummate the Transaction) in accordance with its specified terms or otherwise breaches such provisions. It is accordingly agreed that Buyer shall be entitled to an injunction or other equitable relief to prevent breaches of this Agreement by the Sellers and to enforce specifically the terms and provisions hereof, and the Sellers shall be entitled to an injunction or other equitable relief to prevent breaches of this Agreement by Buyer and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which a non-breaching party is entitled at Law or in equity.

## ARTICLE X
## MISCELLANEOUS

Section 10.01    **Assignments**. This Agreement shall be binding upon the Parties and their respective successors and permitted assigns except to the extent that it is hereafter superseded or modified by subsequent written agreements between the Parties. This Agreement may not be assigned or otherwise transferred (including by operation of Law) by Buyer, without the prior written consent of the Seller Representative, or by any Seller or Seller Representative, without the prior written consent of Buyer; <u>provided</u>, <u>however</u>, that nothing in this Agreement or any other Transaction Document shall or is intended to limit the ability of Buyer to assign (a) its right, title and interest in and to this Agreement and/or the Purchased Assets to any Affiliate of Buyer or to any entity acquiring or succeeding to all or substantially all of the assets of Buyer or into which Buyer is merged; (b) this Agreement and Buyer's rights hereunder to one or more financiers (or a collateral agent or security trustee for and on behalf of any such financiers) for

security purposes; and (c) all or any portion of the Purchased Assets to any Person after the Closing Effective Date; provided, further, no assignment or delegation shall relieve the assigning or delegating party of any of its obligations hereunder without the prior written consent of the other Parties. Any attempted assignment in violation of this Section 10.01 is void *ab initio*.

Section 10.02   **Notices**. All notices and other communications provided for or required hereunder shall be in writing (including e-mail communication) and e-mailed or delivered at each party's address set forth below, or at such other address as shall be designated by such party in a written notice to the other parties. All such notices and communications shall be effective two (2) business days after delivery to a recognized overnight courier service, or when delivered, if sent by other means.

<u>If to Buyer</u>:

Alcon Media Group, LLC
10390 Santa Monica Boulevard Suite 250
Los Angeles, CA 90025
Attention: Scott Parish
E-mail: sparish@alconent.com

<u>With a copy (which shall not constitute notice) to</u>:

Loeb & Loeb LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Attention: Scott Edel
E-mail: sedel@loeb.com

Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
Attention: Vadim J. Rubinstein
E-mail: vrubinstein@loeb.com

<u>If to Sellers</u>:

c/o Village Roadshow Entertainment Group USA Inc

 1750 N. San Vicente Blvd, Suite 800 West
West Hollywood, California 90069
Attention: Louis Santor and Kevin Berg
E-mail: louis.santor@vreg.com and kevin.berg@vreg.com

<u>With copies (which shall not constitute notice) to</u>:

Sheppard Mullin Richter & Hampton LLP
350 South Grand Ave., 40th Floor
Los Angeles, California 90071-3460
Attention: Stacey Rosenberg, Esq.
E-mail: srosenberg@sheppardmullin.com

321 North Clark Street, 32nd Floor
Chicago, IL 60654

SMRH:4927-5764-9012.1
101725

76KN-409057

Attention: Justin R. Bernbrock
E-mail: jbernbrock@sheppardmullin.com

Section 10.03    **Confidentiality**. Following the Closing, the Parties shall, and shall cause their respective Affiliates and representatives to, treat all non public information and trade secrets relating to the other Parties, their respective Affiliates, the terms of this Agreement and the other Transaction Documents, as confidential, preserve the confidentiality thereof, and not use such information and trade secrets for any reason or purpose whatsoever (other than any purposes permitted under this Agreement) or disclose to any Person such information or trade secrets unless such information or trade secret is (a) now or hereafter disclosed, through no act or omission of the applicable Party or its Affiliates or their respective representatives in breach of this Agreement, in a manner making it available to the general public, (b) required by Law to be disclosed, (c) received by any Party or its representatives after the Closing Effective Date from a third party who is not, to the knowledge of such Party, its Affiliates or their respective representatives, known to be under an obligation of nondisclosure or in breach of an obligation of confidentiality, in each case, to the other Party, (d) independently developed by any Party or its representatives after the Closing Effective Date without the use of or reference to any such information or trade secret, (e) reasonably necessary to defend or prosecute a Proceeding, or (f) approved in advance for use or disclosure via written authorization of the applicable Party. If the disclosure of such information or trade secrets is required by Law or is reasonably necessary to defend or prosecute a Proceeding, the Parties, their Affiliates and their respective representatives shall (i) cooperate with and provide the other Party an opportunity to object to the disclosure and shall, to the extent legally permissible, give the other Party as much prior written notice as is practicable under the circumstances, (ii) only disclose such information or trade secrets to the minimum extent required by Law to be disclosed or reasonably necessary to defend or prosecute such Proceeding, and (iii) use reasonable efforts to procure that confidential treatment will be accorded to any such information or trade secrets so disclosed. Notwithstanding the foregoing, (x) each Party shall have the right to communicate and discuss with, and provide to, its Affiliates and its and their legal advisors, financial or accounting advisors, representatives, officers or employees, directors, consultants and agents, any information regarding the terms and status of this Agreement and the other Transaction Documents and the Transactions who are under professional duty or contractual obligation to maintain the confidentiality of such information, and (y) Buyer and its Affiliates may make customary disclosures (which are made subject to customary confidentiality obligations), including the key economic terms of the Transactions and the return realized as a result thereof, to its current or prospective investors or lenders in connection with its fundraising and reporting activities.

Section 10.04    **Amendment; Waiver**. This Agreement shall not be amended, modified or waived in any manner except by an agreement in writing duly executed and delivered by each of Buyer and the Sellers. No failure or delay of any Party to exercise any right or remedy given to such Party under this Agreement or any other Transaction Document or otherwise available to such Party, or to insist upon strict compliance by any other Party with its or his obligations hereunder, no single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, and no custom or practice of the Parties in variance with the terms hereof, shall constitute a waiver of any Party's right to demand exact compliance with the terms hereof. Any written waiver shall be limited to those items specifically waived therein and shall not be deemed to waive any future breaches or violations or other non- specified breaches or violations unless, and to the extent, expressly set forth therein.

Section 10.05    **Binding Effect; No Third-Party Beneficiaries**. Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors, transferees and assigns. Nothing in this Agreement, express or implied, is intended to confer on any Person (other than the Parties or their respective successors and permitted assigns) any rights, remedies, obligations or liabilities under or by reason of this

Agreement. For the avoidance of doubt, the Sellers' permitted successors include, without limitation, any trustee appointed in the Bankruptcy Cases and the Sellers' other successors in the Bankruptcy Cases.

Section 10.06  **Rules of Construction**. The following rules of construction shall govern the interpretation of this Agreement:

(a)     all references to Articles, Sections, Exhibits or Schedules are to Articles, Sections, Exhibits or Schedules in this Agreement;

(b)     unless the context otherwise requires, words in the singular or plural include the singular and plural, and pronouns stated in either the masculine, the feminine or neuter gender shall include the masculine, feminine and neuter;

(c)     whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "but not limited to";

(d)     the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not simply mean "if";

(e)     references to a Person herein are also to its permitted successors and permitted assigns;

(f)     references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(g)     in computing any period of time pursuant to this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included, but the time shall begin to run on the next succeeding day. The last day of the period so computed shall be included, unless it is not a business day, in which event the period shall run until the end of the next business day;

(h)     time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement;

(i)     Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof;

(j)     (i) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits hereto, (ii) the term "any" means "any and all," and (iii) the term "or" shall not be exclusive and shall mean "and/or";

(k)     the phrases "provided" or "made available to Buyer" mean that the information referred to has been made available in the Dataroom at least two (2) business days prior to the Effective Date;

(l)     (i) references to "days" means calendar days unless business days are expressly specified and (ii) references to "$" mean U.S. dollars, provided that if there is a need to convert U.S. dollars into any foreign currency, or vice versa, the exchange rate shall be that published by The Wall Street Journal three (3) business days before the date on which the obligation is paid (or if The Wall Street Journal is not published on such date, the first date thereafter on which The Wall Street Journal is published), except as otherwise

required by applicable Law (in which case, the exchange rate shall be determined in accordance with such Law);

(m)    the Parties intend that each representation, warranty, covenant and agreement contained herein shall have independent significance, and if any Party has breached any representation, warranty, covenant or agreement contained herein in any respect, the fact that there exists another representation, warranty, covenant or agreement relating to the same or similar subject matter that the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, covenant or agreement;

(n)    any drafts of this Agreement or any other Transaction Document circulated by or among the Parties prior to the final fully executed drafts shall not be used for purposes of interpreting any provision of this Agreement or any other Transaction Document, and each of the Parties agrees that no Party shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any dispute or Proceeding among any of the foregoing or for any other purpose; and

(o)    the Parties have participated jointly in the negotiation and drafting of this Agreement and the other Transaction Documents; in the event an ambiguity or question of intent or interpretation arises, this Agreement and the other Transaction Documents shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement or any other Transaction Document and the language used in it will be deemed to be the language chosen by the Parties to express their mutual intent.

Section 10.07    **Severability**. Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement. The preceding sentence of this Section shall be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause any Party to lose the material benefit of its economic bargain.

Section 10.08    **Incorporation by Reference**. Every Exhibit, annex and schedule (including the Disclosure Schedules) attached to this Agreement and referred to herein is incorporated fully into this Agreement by reference.

Section 10.09    **Governing Law; Submission to Jurisdiction**.

(a)    THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

(b)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY ANCILLARY AGREEMENT; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN NEW YORK WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR

IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

Section 10.10   **Waiver of Jury Trial**. EACH OF THE PARTIES IRREVOCABLY WAIVES TO THE EXTENT PERMITTED BY LAW ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT, STATUTE OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF. EACH PARTY FURTHER WAIVES ANY RIGHT TO SEEK TO CONSOLIDATE ANY PROCEEDING IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER PROCEEDING IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (a) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED OR WARRANTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (c) EACH PARTY MAKES THIS WAIVER VOLUNTARILY AND (d) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.10.

Section 10.11   **Expenses**. Except as otherwise expressly stated herein, each Party shall be responsible for the payment of its own fees and expenses (including legal, accounting and investment banking fees and expenses) incurred in connection with the Transaction Documents and in the negotiation and preparation for and consummation of the Transactions.

Section 10.12   **Counterpart Execution**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and when taken together shall constitute one and the same instrument. The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.13   **Entire Agreement**. This Agreement (including all annexes, schedules (including the Disclosure Schedules) and the Exhibits attached hereto) and the other Transaction Documents constitute the entire agreement and understanding between the Parties in respect of the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

Section 10.14   **Relationship of the Parties**. Nothing in this Agreement creates any partnership, employment, joint venture, franchise or agency relationship between the parties; rather, the parties acknowledge that their relationship under this Agreement is one of independent contracting parties.

Section 10.15   **Seller Representative**.

(a)      For purposes of this Agreement, each Seller hereby irrevocably appoints and designates Seller Representative to serve as such Seller's true and lawful representative, agent, and attorney-in-fact, with full power of substitution and re-substitution, to act for and on behalf of such Seller for the purpose of taking any and all actions by such Seller specified in or contemplated by this Agreement or the other Transaction

Documents; provided, that if Kevin Berg at any time is unable, due to incapacity or otherwise, to serve as Seller Representative or resigns as Seller Representative, then the Sellers shall designate a successor Seller Representative in writing. Each successor Seller Representative, if required to serve, shall sign an acknowledgment in writing agreeing to perform and be bound by all of the provisions of this Agreement and the other Transaction Documents applicable to Seller Representative. Each successor Seller Representative shall have all of the power, authority, rights and privileges conferred by this Agreement upon the original Seller Representative, and the term "Seller Representative" as used herein shall be deemed to include any successor Seller Representative.

(b)     Seller Representative is hereby constituted and appointed as agent and attorney-in-fact for and on behalf of each Seller with respect to the performance of its duties as Seller Representative as set forth herein. This power of attorney and all authority hereby conferred is coupled with an interest and is irrevocable and shall not terminate or otherwise be affected by the death, disability, incompetence, bankruptcy or insolvency of any Seller and shall be binding upon the successors, assigns, heirs, executors, administrators, legal representatives, and beneficiaries, as applicable, of each Seller. Seller Representative shall promptly deliver to each Seller any notice received by Seller Representative concerning this Agreement that Seller Representative deems is material.

(c)     Without limiting the generality of the foregoing, Seller Representative has full power and authority, on behalf of each Seller and such Seller's successors and assigns, to: (i) interpret the terms and provisions of this Agreement and the other Transaction Documents to be executed and delivered by the Sellers in connection herewith, (ii) execute and deliver and receive deliveries of all agreements, certificates, statements, notices, approvals, extensions, waivers, undertakings, amendments, and other documents required or permitted to be given in connection with the consummation of the Transactions, (iii) receive service of process in connection with any claims under this Agreement or the other Transaction Documents, (iv) agree to, negotiate, enter into settlements and compromises of, assume the defense of claims, and demand arbitration and comply with orders of courts and awards of arbitrators with respect to such claims, and to take all actions necessary or appropriate in the judgment of Seller Representative for the accomplishment of the foregoing, (v) give and receive notices and communications, (vi) authorize delivery to Buyer of the Buyer Deposit, (vii) object to such delivery, (viii) distribute the Buyer Deposit to which Sellers are entitled, and any earnings and proceeds thereon, (ix) to assert the attorney-client privilege on behalf of the Sellers with respect to any communications that relate in any way to the transactions contemplated hereby, (x) deliver to Buyer any and all Transaction Documents to which any Seller is a party executed by such Seller and deposited with Seller Representative, upon Seller Representative's determination that the conditions to Closing have been satisfied or waived, (xi) grant any consent, approval or waiver under this Agreement or any other Transaction Document and (xii) take all actions necessary or appropriate in the sole judgment of Seller Representative on behalf of the Sellers for the accomplishment of the foregoing or otherwise specifically required or in connection with this Agreement or the other Transaction Documents. Notwithstanding anything to the contrary herein, in the event of a claim hereunder against a single Seller, and not any other Seller, such affected Seller shall be entitled to control the defense of such claim.

(d)     Service by Seller Representative shall be without compensation except for the reimbursement by the Sellers of out-of-pocket expenses and indemnification specifically provided herein.

(e)     Seller Representative shall have no duties or responsibilities except those expressly set forth herein, and no implied covenants, functions, responsibilities, duties, obligations or liabilities on behalf of any Seller shall otherwise exist against Seller Representative. Seller Representative shall not be liable to any Seller relating to the performance of Seller Representative's duties or exercise of any rights under this Agreement for any errors in judgment, negligence, oversight, breach of duty or otherwise except to the extent it is finally determined in a court of competent jurisdiction by clear and convincing evidence that the actions taken or not taken by Seller Representative constituted actual fraud or were taken or not taken, as applicable,

SMRH:4927-5764-9012.1
101725

in bad faith. Seller Representative shall be protected in acting upon any notice, statement or certificate believed by Seller Representative to be genuine and to have been furnished by the appropriate Person and in acting or refusing to act in good faith on any matter. Seller Representative shall not be liable to Buyer or any Affiliate of Buyer by reason of this Agreement or the performance of Seller Representative's duties hereunder or otherwise.

(f)      The Sellers shall indemnify and hold harmless Seller Representative against all losses, including costs of defense, paid or incurred in connection with any action, suit, proceeding or claim to which Seller Representative is made a party by reason of the fact that Seller Representative was acting as Seller Representative pursuant to this Agreement; provided, that Seller Representative shall not be entitled to indemnification hereunder to the extent it is finally determined in a court of competent jurisdiction by clear and convincing evidence that the actions taken or not taken by Seller Representative constituted actual fraud or were taken or not taken, as applicable, in bad faith.

(g)      Buyer shall be entitled to rely conclusively without inquiry upon any decision, action, consent or instruction of Seller Representative as the duly authorized decision, action, consent or instruction of Seller Representative on behalf of each Seller with respect to any matters set forth in this Agreement or any other Transaction Document and Buyer is hereby relieved from any liability to any Person for any acts done by it in accordance with any such decision, action, consent or instruction.

(h)      The provisions of this Section 10.15 will survive the Closing, the resignation or removal of Seller Representative or the termination of this Agreement.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties have executed and entered into this Purchase Agreement (Derivative Rights) on the date first set forth above.

**SELLERS:**

VILLAGE ROADSHOW FILMS (BVI) LIMITED

By: _____
Name:
Title:

VILLAGE ROADSHOW FILMS NORTH AMERICA INC.

By: _____
Name: Kevin P. Berg
Title:    General Counsel and Secretary

VREG IP GLOBAL LLC

By: _____
Name:
Title:

VREG WW IP GLOBAL LLC

By: _____
Name:
Title:

VREG MM2 IP GLOBAL LLC

By: _____
Name:
Title:

VREG J2 GLOBAL LLC

By: _____
Name:
Title:

SMRH:4927-5764-9012.1
101725

76KN-409057

VREG OP GLOBAL LLC

By: _____
Name:
Title:


VREG WONKA IP GLOBAL LLC

By: _____
Name:
Title:

VILLAGE ROADSHOW PICTURES NORTH AMERICA
INC.


By: _____
Name:
Title:
VILLAGE ROADSHOW ENTERTAINMENT GROUP
USA INC.


By: _____
Name:
Title:

**BUYER:**

ALCON MEDIA GROUP, LLC

By: _____
Name:    *Scott Parish*
Title:    *COO*


**SELLER REPRESENTATIVE:**


_____

Kevin Berg

## Annex I

### Sellers

1. Village Roadshow Films (BVI) Limited, a BVI business company incorporated in the British Virgin Islands ("**VRF**")

2. Village Roadshow Films North America Inc., a Delaware corporation ("**VRFNA**")

3. VREG IP Global LLC, a Delaware limited liability company ("**VREG IP**")

4. VREG WW IP Global LLC, a Delaware limited liability company ("**VREG WW**")

5. VREG MM2 IP Global LLC, a Delaware limited liability company ("**VREG MM2**")

6. VREG J2 Global LLC, a Delaware limited liability company ("**VREG J2**")

7. VREG OP Global LLC, a Delaware limited liability company ("**VREG OP**")

8. VREG Wonka IP Global LLC, a Delaware limited liability company ("**VREG Wonka**")

9. Village Roadshow Pictures North America Inc., a Delaware corporation ("**VRPNA**")

10. Village Roadshow Entertainment Group USA Inc. ("**VREG USA**")

If and to the extent that any other Debtor has or hereafter acquires any asset that would constitute a Purchased Asset if such Debtor were a party hereto, it shall be deemed to be a Seller for all purposes as if listed herein.

**Annex II**

**Assumed Contracts and Cure Amounts**

| | Assumed Contract | Cure Amount |
|---|---|---|
| 1. | Co-Ownership Agreement With Respect To Remakes and Sequels of "Practical Magic", dated as of June 26, 2000, by and between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by that certain Omnibus Amendment dated as of August 29, 2017 among Warner Bros. Entertainment Inc., Village Roadshow Films (BVI) Limited, Village Roadshow Films North America Inc., and Village Roadshow Pictures North America Inc. (the "2017 Omnibus Amendment"), as further amended by that certain Omnibus Amendment No. 2 dated as of November 10, 2020 among Village Roadshow Distribution USA Inc., Village Roadshow Distribution (BVI) Limited, Village Roadshow Films (BVI) Limited, Village Roadshow Films North America Inc., Warner Bros. Entertainment Inc., Warner Bros. Productions Limited, and WAV Distribution LLC (the "Second Omnibus Amendment"), and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 2. | Co-Ownership Agreement With Respect To Remakes and Sequels of "Analyze This", dated as of June 26, 2000, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 3. | Co-Ownership Agreement With Respect to Remakes and Sequels of "Deep Blue Sea", dated as of June 26, 2000, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 4. | Co-Ownership Agreement with respect to Remakes and Sequels of "Three Kings", dated as of June 26, 2000, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 5. | Co-Ownership Agreement with respect to Remakes and Sequels of "Three To Tango", dated as of June 26, 2000, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 6. | Co-Ownership Agreement with respect to Remakes and Sequels of "Gossip", dated as of June 26, 2000, between Warner Bros., a division of Time Warner | $0.00 |

| | Assumed Contract | Cure Amount |
|---|---|---|
| | Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | |
| 7. | Co-Ownership Agreement with respect to Remakes and Sequels of "Space Cowboys", dated as of August 3, 2000, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 8. | Co-Ownership Agreement with respect to "Red Planet", dated as of November 8, 2000, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 9. | Co-Ownership Agreement with respect to Remakes and Sequels of "Miss Congeniality", dated as of March 22, 2005, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time.. | $0.00 |
| 10. | Co-Ownership Agreement with respect to "Valentine", dated as of April 4, 2001, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 11. | Co-Ownership Agreement with respect to "Saving Silverman", dated as of March 5, 2001, between Columbia Pictures, a division of Columbia Pictures Industries, Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as it may be amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 12. | Co-Ownership Agreement with respect to "Down To Earth", dated as of August 11, 2000, between Paramount Pictures Corporation and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as it may be amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 13. | Co-Ownership Agreement with respect to "See Spot Run", dated as of April 4, 2001, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to | $0.00 |

SMRH:4927-5764-9012.1
101725

76KN-409057

| | Assumed Contract | Cure Amount |
|---|---|---|
| | time. | |
| 14. | Co-Ownership Agreement with respect to "Exit Wounds", dated as of April 4, 2001, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 15. | Co-Ownership Agreement with respect to "Swordfish", dated as of June 6, 2001, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 16. | Co-Ownership Agreement with respect to "Cats and Dogs", dated as of July 9, 2001, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 17. | Co-Ownership Agreement with respect to "Zoolander", dated as of August 11, 2000, between Paramount Pictures Corporation and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as it may be amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 18. | Co-Ownership Agreement with respect to "Hearts in Atlantis", dated as of January 10, 2002, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 19. | Co-Ownership Agreement with respect to "Don't Say a Word", dated as of December 14, 2001, between Regency Entertainment (USA), Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as it may be amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 20. | Co-Ownership Agreement with respect to "Training Day", dated as of October 2, 2001, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 21. | Co-Ownership Agreement "Ocean's Eleven" dated as of January 10, 2002 by and between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG OP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus | $0.00 |

| | Assumed Contract | Cure Amount |
|---|---|---|
| | Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | |
| 22. | Co-Ownership Agreement with respect to "The Majestic", dated as of January 10, 2002, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 23. | Co-Ownership Agreement with respect to "Queen of the Damned", dated as of February 27, 2002, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 24. | Co-Ownership Agreement with respect to "Showtime", dated as of March 26, 2002, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 25. | Co-Ownership Agreement with respect to "Eight Legged Freaks", dated as of July 18, 2002, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 26. | Co-Ownership Agreement with respect to "Pluto Nash", dated as of August 20, 2002, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 27. | Co-Ownership Agreement with respect to "Ghost Ship", dated as of February 11, 2003, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 28. | Co-Ownership Agreement with respect to "Analyze That", dated as of February 11, 2003, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus | $0.00 |

SMRH:4927-5764-9012.1
101725

| | Assumed Contract | Cure Amount |
|---|---|---|
| | Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | |
| 29. | Co-Ownership Agreement with respect to "Two Weeks Notice", dated as of February 11, 2003, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 30. | Co-Ownership Agreement with respect to "Dreamcatcher", dated as of April 1, 2003, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 31. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Mystic River", dated as of October 7, 2003, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 32. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Torque", dated as of January 15, 2004, between Warner Bros. Entertainment Inc. and Village Roadshow Films (BVI) Limited, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 33. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Taking Lives", dated as of March 18, 2004, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 34. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Catwoman", dated as of July 22, 2004, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 35. | Co-Ownership Agreement With Respect to Remakes and Sequels Of Warner-Developed Pictures with respect to "Ocean's Twelve", dated as of December 9, 2004, Warner Bros. Entertainment Inc. and VREG OP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from | $0.00 |

| | Assumed Contract | Cure Amount |
|---|---|---|
| | time to time. | |
| 36. | Co-Ownership Agreement With Respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Constantine", dated as of February 7, 2005, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 37. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "House of Wax", dated as of May 5, 2005, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 38. | Co-Ownership Agreement With Respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Charlie and the Chocolate Factory", dated as of July 12, 2005, between Warner Bros. Entertainment Inc. and VREG WW IP Global (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 39. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Dukes of Hazzard", dated as of August 4, 2005, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 40. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Rumor Has It", dated as of December 15, 2005, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 41. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Firewall" (f/k/a "The Wrong Element"), dated as of February 7, 2006, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 42. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "The Lake House" (f/k/a "Il Mare"), dated as of June 13, 2006, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, | $0.00 |

| | Assumed Contract | Cure Amount |
|---|---|---|
| | extended or otherwise modified from time to time. | |
| 43. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Happy Feet", dated as of November 15, 2006, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 44. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Unaccompanied Minors", dated as of November 29, 2006, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 45. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Music and Lyrics" (aka "Music and Lyrics By…"), dated as of February 8, 2007, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 46. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "The Reaping", dated as of April 3, 2007, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 47. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Lucky You", dated as of May 3, 2007, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 48. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Ocean's Thirteen", dated as of June 5, 2007, between Warner Bros. Entertainment Inc. and VREG OP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 49. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "License to Wed", dated as of July 2, 2007, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from | $0.00 |

| | Assumed Contract | Cure Amount |
|---|---|---|
| | time to time. | |
| 50. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "No Reservations" (a/k/a "Mostly Martha"), dated as of July 26, 2007, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 51. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "The Invasion" (a/k/a "The Visiting"), dated as of August 14, 2007, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 52. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "The Brave One", dated as of September 10, 2007, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 53. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "I Am Legend", dated as of December 11, 2007, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 54. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Speed Racer", dated as of May 6, 2008, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 55. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Get Smart", dated as of May 8, 2009, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 56. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Nights in Rodanthe", dated as of May 8, 2009, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise | $0.00 |

| | Assumed Contract | Cure Amount |
|---|---|---|
| | modified from time to time. | |
| 57. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Yes Man", dated as of May 8, 2009, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 58. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Gran Torino", dated as of May 8, 2009, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 59. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Where The Wild Things Are", dated as of October 15, 2009, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 60. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Sherlock Holmes", dated as of December 18, 2009, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 61. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Cats & Dogs: The Revenge of Kitty Galore", dated as of July 27, 2010, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 62. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Legend of the Guardians: The Owls of Ga'Hoole", dated as of December 17, 2010, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 63. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Life As We Know It", dated as of October 7, 2010, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to | $0.00 |

SMRH:4927-5764-9012.1
101725

| | Assumed Contract | Cure Amount |
|---|---|---|
| | time. | |
| 64. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Happy Feet 2", dated as of November 3, 2011, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 65. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Sherlock Holmes: A Game of Shadows" (a/k/a "Sherlock Holmes 2"), dated as of February 14, 2012, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 66. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "The Lucky One", dated as of April 18, 2012, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 67. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Dark Shadows", dated as of June 29, 2012, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 68. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Gangster Squad", dated as of January 10, 2013, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 69. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "The Great Gatsby", dated as of May 9, 2013, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 70. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Winter's Tale", dated as of February 12, 2014, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |

| | Assumed Contract | Cure Amount |
|---|---|---|
| 71. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Edge of Tomorrow", dated as of May 23, 2014, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 72. | Amended and Restated Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Into the Storm", dated as of December 4, 2014, by and among Warner Bros. Entertainment Inc., on the one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.), on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 73. | Amended and Restated Co-Ownership Agreement with respect to Remakes and Sequels with respect to "The Judge", dated as of December 4, 2014, by and among Warner Bros. Entertainment Inc., on the one hand, and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 74. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "American Sniper", dated as of February 27, 2015, by and among Warner Bros. Entertainment Inc.,, on the one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 75. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Jupiter Ascending", dated as of May 5, 2015, by and among Warner Bros. Entertainment Inc., on one hand, and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 76. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "San Andreas", dated as of July 31, 2015, by and among Warner Bros. Entertainment Inc., on one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 77. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "In The Heart of the Sea", dated as of December 2, 2015, by and among | $0.00 |

SMRH:4927-5764-9012.1
101725

76KN-409057

| | Assumed Contract | Cure Amount |
|---|---|---|
| | Warner Bros. Entertainment Inc., on one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | |
| 78. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "The Legend of Tarzan", dated as of April 28, 2017, by and among Warner Bros. Entertainment Inc., on one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 79. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Sully", dated as of October 31, 2016, by and among Warner Bros. Entertainment Inc., on one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 80. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Collateral Beauty", dated as of April 28, 2017, by and among Warner Bros. Entertainment Inc., on one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 81. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Fist Fight", dated as of April 28, 2017, by and among Warner Bros. Entertainment Inc., on one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 82. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Going In Style", dated as of April 28, 2017, by and among Warner Bros. Entertainment Inc., on one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 83. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "King Arthur: Legend of the Sword", dated as of October 31, 2017, by and among Warner Bros. Entertainment Inc., on one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and | $0.00 |

| | Assumed Contract | Cure Amount |
|---|---|---|
| | Village Roadshow Films North America Inc.) on the other hand, as amended by the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | |
| 84. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "The House", dated as of August 24, 2017, by and among Warner Bros. Entertainment Inc., on one hand, and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 85. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "The 15:17 to Paris", dated as of May 15, 2018, by and among Warner Bros. Entertainment Inc., on one hand, and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 86. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Ready Player One", dated as of May 15, 2018, by and among Warner Bros. Entertainment Inc., on one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 87. | Co-Ownership Agreement With Respect To Remakes and Sequels with respect to "Ocean's Eight", dated July 31, 2018, by and among Warner Bros. Entertainment Inc., VREG OP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.), as it may be amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 88. | Co-Ownership Agreement With Respect To Remakes and Sequels of "The Matrix" dated as of October 30, 2003, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and Village Roadshow Films (BVI) Limited, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 89. | "Mad Max: Fury Road" Co-Ownership Agreement dated as of January 26, 2015, by and between Warner Bros. Entertainment Inc., and VREG MM2 IP Global LLC (successor in interest to Village Roadshow Pictures North America Inc.), as it may be amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 90. | Co-Ownership Agreement With Respect To Remakes and Sequels with respect to "Joker", dated November 22, 2019, by and between by and among Warner Bros. Entertainment Inc., VREG J2 Global, LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.), as it may be amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 91. | Co-Ownership Agreement With Respect To Remakes and Sequels with respect | $0.00 |

SMRH:4927-5764-9012.1
101725

76KN-409057

| | Assumed Contract | Cure Amount |
|---|---|---|
| | to "Wonka", dated as of December 6, 2023, by and between Warner Bros. Entertainment Inc., and VREG Wonka IP Global LLC, as it may be amended, restated, supplemented, extended or otherwise modified from time to time (the "Wonka Co-Ownership Agreement"). | |
| 92. | Quitclaim Agreement, dated as of February 18, 2015, by and between Paramount Pictures Corporation and Village Roadshow Films (BVI) Limited, with respect to "Zoolander 2". | $0.00 |
| 93. | Amendment to QCSA / Co-Ownership Agreements "Training Day Prequel," dated as of February 23, 2021, by and between Warner Brothers Entertainment Inc., on the one hand, and Village Roadshow Films (BVI) Limited, Village Roadshow Films North America Inc. and Village Roadshow Pictures North America, Inc., on the other hand, with respect to a feature length motion picture prequel to "Training Day". | $0.00 |
| 94. | Option and Assignment Agreement, dated as of April 17, 2017, by and between Village Roadshow Entertainment Group USA Inc. (as successor-in-interest to Village Roadshow Films (BVI) Limited) and Warner Specialty Films, Inc. with respect to the project entitled "Deep Blue Sea 2 DTV" (the "Deep Blue Sea Option Agreement"). | $0.00 |
| 95. | Short Form Option/Purchase Agreement, dated as of March 20, 2023, by and between Warner Bros. (F.E.), Inc., on the one hand, and Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc., on the other hand, with respect to the Chinese language motion picture tentatively called "Undercover Netcaster" based on "Miss Congeniality". | $0.00 |
| 96. | Acknowledgement and Consent, dated as of June 19, 2019, by and among Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc., on the one hand and Warner Bros. Entertainment Inc. on the other hand, with respect to the project entitled "Happy Feet China." | $0.00 |
| 97. | Option Agreement, dated as of December 6, 2023, by and among VREG Wonka IP Global LLC, VREG MM2 IP Global LLC, VREG J2 Global LLC, and Loompala Pictures, LLC. | $0.00 |

SMRH:4927-5764-9012.1
101725

76KN-409057

**Annex III**

**Derivative Rights Pictures**

| # | Picture | Percentage of Derivative Rights Owned By Sellers |
|---|---------|--------------------------------------------------|
| 1. | American Sniper | 33.3% |
| 2. | Analyze That | 50% |
| 3. | Analyze This | 50% |
| 4. | Catwoman | 50% (limited to theatrical motion pictures) |
| 5. | Cats & Dogs | 50% |
| 6. | Cats & Dogs: The Revenge of Kitty Galore | 50% |
| 7. | Charlie and the Chocolate Factory | 50% |
| 8. | Collateral Beauty | 25% |
| 9. | Constantine | 50% (limited to theatrical motion pictures) |
| 10. | Dark Shadows | 50% |
| 11. | Deep Blue Sea | 50% |
| 12. | Don't Say A Word | 50% |
| 13. | Down to Earth | 50% |
| 14. | Dreamcatcher | 50% |
| 15. | Dukes of Hazzard | 50% |
| 16. | Edge of Tomorrow | 33.3% |
| 17. | Eight Legged Freaks | 50% |
| 18. | Exit Wounds | 50% |
| 19. | Fist Fight | 25% |
| 20. | Firewall | 50% |
| 21. | Gangster Squad | 50% |
| 22. | Get Smart | 50% (limited to theatrical motion pictures) |
| 23. | Ghost Ship | 50% |
| 24. | Going in Style | 25% |
| 25. | Gossip | 50% |

| 26. | Gran Torino | 50% |
|---|---|---|
| 27. | Happy Feet | 50% |
| 28. | Happy Feet Two | 50% |
| 29. | Hearts in Atlantis | 50% |
| 30. | House of Wax | 50% |
| 31. | I Am Legend | 50% |
| 32. | In the Heart of the Sea | 25% |
| 33. | Into the Storm | 37.5% |
| 34. | Joker | 25% (limited to derivative productions where Joaquin Phoenix performs in a starring role in the exact same role and character as the "Joker" as he does in the original Picture) |
| 35. | Jupiter Ascending | 33.3% |
| 36. | King Arthur | 15% |
| 37. | Legend of the Guardians | 50% |
| 38. | License to Wed | 50% |
| 39. | Life As We Know It | 50% |
| 40. | Lucky You | 50% |
| 41. | Mad Max: Fury Road | Pursuant to the Co-Ownership Agreement with respect to Mad Max: Fury Road, VRPNA is entitled to an undivided 50% ownership interest in the Derivative Rights in Mad Max: Fury Road, subject to certain conditions set forth in such Co-Ownership Agreement. However, to date, no Derivative Rights in Mad Max: Fury Road have been assigned to the Sellers. |
| 42. | Miss Congeniality | 50% |
| 43. | Miss Congeniality 2: Armed & Fabulous | 50% |
| 44. | Music and Lyrics | 50% |
| 45. | Mystic River | 50% |
| 46. | Nights in Rodanthe | 50% |
| 47. | No Reservations | 50% |
| 48. | Ocean's 8 | 50% |

-58-

| 49. | Ocean's Eleven | 50% |
|---|---|---|
| 50. | Ocean's Thirteen | 50% |
| 51. | Ocean's Twelve | 50% |
| 52. | Pluto Nash | 50% |
| 53. | Practical Magic | 50% |
| 54. | Queen of the Damned | 50% |
| 55. | Ready Player One | 33.3% |
| 56. | Red Planet | 50% |
| 57. | Rumor Has It… | 50% |
| 58. | San Andreas | 25% |
| 59. | Saving Silverman | 50% |
| 60. | See Spot Run | 50% |
| 61. | Sherlock Holmes | 50% |
| 62. | Sherlock Holmes: A Game of Shadows | 50% |
| 63. | Showtime | 50% |
| 64. | Space Cowboys | 50% |
| 65. | Speed Racer | 50% (excludes rights to television series being developed by J.J. Abrams) |
| 66. | Sully | 25% |
| 67. | Swordfish | 50% |
| 68. | Taking Lives | 50% |
| 69. | The 15:17 to Paris | 33.3% |
| 70. | The Brave One | 50% |
| 71. | The Great Gatsby | 50% |
| 72. | The House | 25% |
| 73. | The Invasion | 50% |

SMRH:4927-5764-9012.1
101725

76KN-409057

| 74. | The Judge | 25% |
|---|---|---|
| 75. | The Lake House | 50% |
| 76. | The Legend of Tarzan | 33.3% (Warner Bros. only licensed live action theatrical motion picture rights from the Burroughs Estate. The live action remake and sequel rights reverted back to the Burroughs Estate as Warner Bros. did not theatrically release a remake or sequel within 4 years of the start of principal of photography of The Legend of Tarzan.) |
| 77. | The Lucky One | 50% |
| 78. | The Majestic | 50% |
| 79. | The Matrix | 50% |
| 80. | The Matrix Reloaded (together with The Animatrix) | 50% |
| 81. | The Matrix Revolutions | 50% |
| 82. | The Reaping | 50% |
| 83. | Three Kings | 50% |
| 84. | Three to Tango | 50% |
| 85. | Torque | 50% |
| 86. | Training Day | 50% |
| 87. | Two Weeks Notice | 50% |
| 88. | Unaccompanied Minors | 50% |
| 89. | Valentine | 50% |
| 90. | Where the Wild Things Are | 50% |
| 91. | Winter's Tale | 25% |
| 92. | Wonka | 50%, subject to the conditions set forth in the Wonka Co-Ownership Agreement |
| 93. | Yes Man | 50% |
| 94. | Zoolander | 50% |

SMRH:4927-5764-9012.1
101725

**Annex IV**

**Purchase Price Schedule**

[To come]

## Annex V

## Derivative Rights Disputes

1.      *Village Roadshow Films (BVI) Limited, et al. v. Warner Bros. Entertainment Inc., et al. (Los Angeles Superior Court Case No. 22STCV04606)*. VRF, VRFNA, VRPNA. VRD and VRD-USA filed their verified Complaint for declaratory and injunctive relief in Los Angeles Superior Court on February 7, 2022, and their verified First Amended Complaint adding a claim under California's Unfair Competition Law and adding WarnerMedia as a defendant on March 25, 2022 in connection with WBEI's release of Matrix 4 aka The Matrix Resurrections day-and-date on HBO Max and disputed contractual rights of Village Roadshow's right to co-finance derivative works based on WBEI/VR co-financed library titles. On May 27, 2022, the state court action was compelled to arbitration, and the state court case has been stayed pending resolutions of the ongoing arbitration.

2.      *Warner Bros. Entertainment Inc., et al. v. Village Roadshow Films North America, et al. (JAMS Confidential Arbitration before Judge Friedman -- Matrix 4 aka The Matrix Resurrections Arbitration) ("Matrix Arbitration")*. WBEI filed its arbitration demand related to Village Roadshow's alleged failure to pay its co-financing share of Matrix 4 aka The Matrix Resurrections on February 2, 2022. This arbitration remains active and has not yet reached a final resolution.

3.      *Warner Bros. Entertainment Inc., et al. v. Village Roadshow Films (BVI) Limited, et al. (JAMS Confidential Arbitration before Judge Otero – Wonka/Derivative Rights Arbitration)*. WBEI filed its arbitration demand in respect of Wonka in connection with Village Roadshow's rights to co-finance the motion picture Wonka and the parties' rights and obligations with respect to derivative works based on WBEI/VR co-financed library titles on February 2, 2022. WBEI relinquished its challenge to Village Roadshow's right to co-finance Wonka and issued a project notice to Village Roadshow on June 17, 2022, and Village Roadshow accepted WBEI's project notice. However, WBEI maintained its claims that could significantly restrict Village Roadshow's derivative rights. The parties have ongoing disputes with respect to future, slated derivative works and the parties' rights and obligations. This arbitration has been effectively "paused" until resolution of the Matrix Arbitration is first achieved.

4.      *Fraudulent Conveyance Claim (All Pictures)*.  In a series of letters in early 2024, Warner Bros. Entertainment Inc. has alleged that assignments of certain of the Derivative Rights with respect to the Pictures from Village Roadshow Films (BVI) Limited and ("VRF") Village Roadshow Films North America Inc. ("VRFNA") to certain of their affiliates constituted fraudulent conveyances and a breach of VREG's Amended and Restated Consolidated Undertaking and Indemnity dated as of November 10, 2020.

5.      *Practical Magic 2 Dispute*. On September 4, 2025, VREG IP Global LLC ("VREG IP Global"), as successor-in-interest to VRF and VRFNA, delivered to WBEI written notice (the "Project Acceptance Notice") of its acceptance of the opportunity to participate in the motion picture titled "Practical Magic 2" ("PM2"), a derivative work based on the Picture titled "Practical Magic", subject and pursuant to the Co-Ownership Agreement with Respect to Remakes and Sequels of "Practical Magic" (the "PM2 Co-Ownership Agreement"), dated as of June 26, 2000, by and between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VRF, as amended. The Project Acceptance Notice was expressly subject to entry by the Bankruptcy Court in the Bankruptcy Cases of (a) an order approving the Project Acceptance Notice and (b) the Sale Order. In a letter dated September 8, 2025, WBEI disputed the validity of the Project Acceptance Notice on various grounds. In such letter, WBEI expressly reserved all rights in connection with the Project Acceptance Notice, including the right to seek affirmative relief from the Bankruptcy Court presiding over the Bankruptcy Cases.

SMRH:4927-5764-9012.1
101725

76KN-409057

*Execution Version*

## DISCLOSURE SCHEDULES

These Disclosure Schedules and all attachments hereto (each of which is incorporated herein by reference) constitute the "Disclosure Schedules" and are being delivered by Sellers (as defined below) in connection with that certain Asset Purchase Agreement (the "Agreement"), dated as of October 17, 2025, by and among the Persons identified on Annex I of the Agreement (each, a "Seller", and collectively, the "Sellers"), and the Seller Representative (as defined in the Agreement), on the one hand, and Alcon Media Group, LLC ("Buyer"), on the other hand. Unless the context otherwise requires, or as otherwise defined in these Disclosure Schedules, all capitalized terms used in these Disclosure Schedules shall have the respective meanings assigned to them in the Agreement.

The information in these Disclosure Schedules constitutes exceptions or qualifications to certain representations and warranties of each Seller as set forth in the Agreement and specified herein. Disclosure of any information contained in these Disclosure Schedules is not intended as, and shall not be deemed to be, an acknowledgement or admission that any such information is required to be disclosed, except to the extent provided in the Agreement. Such information is included solely for informational purposes, and disclosure of such information shall not be deemed to enlarge or enhance any of the representations or warranties in the Agreement or otherwise alter in any way the terms of the Agreement, except to the extent provided in the Agreement. These Disclosure Schedules do not necessarily include other information of a similar nature. Disclosure of any item in any section hereof shall not constitute an admission or indication that such item or matter is material, except to the extent provided in the Agreement.

The references and headings in these Disclosure Schedules are inserted for convenience only and shall not have the effect of amending or changing the information presented. The section numbers herein correspond to the section and subsection numbers of the representations and warranties in the Agreement that are modified or supplemented by the disclosures hereinafter. Any disclosure made in these Disclosure Schedules shall be deemed to be disclosures made with respect to the applicable representations and warranties contained in the Agreement to the extent reasonably apparent on the face of such disclosure, regardless of whether or not a specific cross-reference is made thereto.

In disclosing the information in these Disclosure Schedules, Sellers do not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any matters disclosed or discussed herein. Inclusion of any item in these Disclosure Schedules shall not constitute, or be deemed to be, an admission to any third party concerning such item. No disclosure in any section hereof relating to a possible breach or violation of any contract or applicable law shall be construed as an admission or indication that a breach or violation exists or has actually occurred. Except as set forth in the Agreement, none of the parties to the Agreement assume any responsibility to any Person that is not a party to the Agreement for the accuracy of any information contained herein. Subject to applicable legal requirements, this information is disclosed in confidence for the purposes contemplated in the Agreement and is subject to any confidentiality agreement or other confidentiality obligations between or among any of the parties to the Agreement. For the avoidance of doubt, these Disclosure Schedules are dated as of the date hereof and cannot be

amended or modified without the mutual agreement of Buyer and Seller Representative.

SMRH:4933-0756-1844.1
101725

76KN-409057

## SECTION 4.01(b)

## AUTHORIZATION; NO VIOLATION

(ii)(z) <u>Annex V</u> of the Agreement is hereby incorporated herein by reference.

**SECTION 4.01(c)**

**CONSENTS AND APPROVALS**

Except as otherwise set forth in the Sale Order, entry of the Sale Order shall satisfy any consent, approval, or notice that each Seller may have been required to obtain in order to execute and deliver the Transaction Documents and perform the requisite obligations thereunder, with respect to the documents listed in <u>Annex II</u> Assumed Contracts & Cure Amounts of the Agreement.

**SECTION 4.01(e)**

**LITIGATION**

<u>Annex V</u> of the Agreement (*Derivative Rights Disputes*) is hereby incorporated herein by reference.

## SECTION 4.01(f)

## ABSENCE OF CERTAIN CHANGES OR EVENTS

1. Pursuant to (a) the "2017 Omnibus Amendment" (as defined in <u>Annex II</u> to the Agreement) and (b) the Co-Ownership Agreement for each Picture co-financed by a Seller pursuant to that certain Amended and Restated Motion Picture Rights Purchase Agreement (the "Warner MPRPA"), dated as of November 10, 2020, by and between Village Roadshow Pictures North America Inc. and Warner Bros. Entertainment Inc. ("WBEI"), in the event a Derivative Work based on a "Library Film" (as defined in the Warner MPRPA) does not qualify as a "Qualifying Derivative Work" (as defined in the Warner MPRPA), the Sellers' Derivative Rights in the applicable Picture shall automatically revert to WBEI, but solely with respect to such non-Qualifying Derivative Work. This reversion does not affect the Sellers' retained Derivative Rights in connection with any other Derivative Work – based on the same Library Film – that does qualify as a Qualifying Derivative Work.

2. The filing of the Bankruptcy Cases on March 16, 2025.

3. All Proceedings disclosed under <u>Annex V</u> of the Agreement remain active and are subject to final adjudication.

## SECTION 4.01(h)

## ASSUMED CONTRACTS

(i)       <u>Annex II</u> of the Agreement is hereby incorporated herein by reference.

(ii)      Items 1 and 2 of <u>Annex V</u> are hereby incorporated herein by reference.

(iii)     On April 1, 2025, Regency Entertainment (USA), Inc. ("**Regency**") delivered a notice to VRF wherein Regency (a) alleged that any sale or transfer of the Sellers' Derivative Rights in and to the Picture in connection with the Bankruptcy Cases without Regency's express consent would constitute a breach of that certain Co-Ownership Agreement, dated as of December 14, 2001,by and between VRF and Regency ("Regency Co-Ownership Agreement"), and (b) purported to terminate the Sellers' right, title, and interest in and to such Derivative Rights, citing the bankruptcy filing of the Sellers' and certain of their Affiliates as the basis for termination. On April 2, 2025, the Sellers responded with a formal notice asserting that terminating the Regency Co-Ownership Agreement would constitute a violation of the automatic stay imposed under section 362(a) of the Bankruptcy Code. The Sellers demanded that Regency immediately cease and desist from any further efforts to unilaterally terminate or modify the Agreement and/or interfere with the Sellers' Derivative Rights in and to "Don't Say a Word."

(v)       Item 2 of <u>Annex V</u> is hereby incorporated herein by reference.

SMRH:4933-0756-1844.1
101725

76KN-409057

## SECTION 4.01(i)

## DERIVATIVE RIGHTS

The Derivative Rights in the Pictures listed on Annex III, subject to the following limitations:

1. Section 4.01(f) of these Disclosures Schedules is hereby incorporated by reference.
2. With respect to "Catwoman," "Constantine" and "Get Smart," the Sellers' Derivative Rights are limited to theatrical motion picture derivative productions based on such Pictures.
3. With respect to "Speed Racer", the Sellers' Derivative Rights exclude any rights respecting a television series based on such Picture being developed by J.J. Abrams.
4. With respect to "The Legend of Tarzan", Warner Bros. only licensed live action theatrical motion picture Derivative Rights from the Burroughs Estate. Such Derivative Rights reverted to the Burroughs Estate as Warner Bros. did not theatrically release a remake or sequel within 4 years of the start of principal of photography of "The Legend of Tarzan." As a result, the Sellers' Derivative Rights in "The Legend of Tarzan" are conditioned upon Warner Bros. reacquiring Derivative Rights in the picture.
5. With respect to "Joker", the Derivative Rights are limited to audiovisual derivative productions where the actor Joaquin Phoenix himself performs in a starring role in the exact same role and character as the "Joker" as he does in the original Picture.

6. Pursuant to that certain "Mad Max: Fury Road" Co-Ownership Agreement ("Mad Max Co-Ownership Agreement"), dated as of June 26, 2015, between WBEI and VRPNA, VRPNA is entitled to an undivided 50% ownership interest in the Derivative Rights in "Mad Max: Fury Road," subject to certain conditions set forth in the Mad Max Co-Ownership Agreement. However, to date, no copyright interest in the Derivative Rights in "Mad Max: Fury Road" have been assigned to the Sellers.

7. Pursuant to the following agreements, one or more Sellers quitclaimed, assigned, conveyed or otherwise transferred all of their rights, title and interest in and to certain Derivative Works based on a Picture, as follows:[1]

   a.  Pursuant to that certain Quitclaim Agreement, dated as of February 18, 2015, by and between Paramount Pictures Corporation ("Paramount") and Village Roadshow Films (BVI) Limited ("VRF"), with respect to the project entitled "Zoolander 2", VRF quitclaimed to Paramount, all of its right, title, and interest in and to "Zoolander 2", the results and proceeds of any development activity in connection with "Zoolander 2" and the Underlying Picture Materials (as defined thereunder).

   b.  Pursuant to that certain Option and Assignment Agreement, dated as of April 17, 2017, by and between Village Roadshow Films (BVI) Limited and Warner Specialty Films, Inc. ("Warner Specialty") with respect to the project entitled "Deep Blue Sea 2 DTV" ("Deep Blue Sea 2 Option Agreement"), VRF granted Warner Specialty the

---

[1] Note to Seller: Please confirm whether Buyer wishes to assume these contracts.

option to acquire the right to produce one live action direct-to-DVD motion picture based on "Deep Blue Sea."

c.  Pursuant to that certain Short Form Assignment Agreement dated as of November 30, 2022, by and between VRF and Village Roadshow Entertainment Group USA Inc. ("VREG"), VRF assigned to VREG all its right, title, and interest in and to the Deep Blue Sea 2 Option Agreement.

d.  Pursuant to that certain Acknowledgement and Consent, dated as of June 19, 2019, by VRF and VRFNA with respect to the project entitled "Happy Feet China", VRF and VRFNA waived all rights granted to VRF and VRFNA in connection with the Remake under that certain Co-Ownership Agreement, dated as of November 15, 2006, between Warner Bros. and VRF, as amended by the 2017 Omnibus Amendment (as defined in Annex II of the Agreement).

e.  Pursuant to that certain Short Form Option/Purchase Agreement, dated as of March 20, 2023, by and among Warner Bros. (F.E.), Inc. VRF and VRFNA, with respect to the project entitled "Miss Congeniality", VRF and VRFNA grant to Warner Bros. (F.E.) Inc. the option to acquire the right to produce one Chinese language motion picture throughout the universe tentatively called "Undercover Netcaster" based on "Miss Congeniality."

f.  Pursuant to that certain Amendment to QCSA / Co-Ownership Agreements "Training Day Sequel," dated as of February 23, 2021, by and between WBEI, on the one hand, and VRF, VRFNA and VRPNA, on the other hand, VRF, VRFNA and VRPNA quitclaimed to WBEI all of their rights, title and interest in and to a feature length motion picture prequel based on the Picture entitled "Training Day."

SMRH:4933-0756-1844.1
101725

76KN-409057

SMRH:4933-0756-1844.1
101725

76KN-409057

## SECTION 4.01(k)

## WONKA COPYRIGHT

| Picture & Title | Claimants | Application/ Registration Number | Date of Registration | Sellers' Ownership Share in the Domestic Territory | Sellers' Ownership Share in the Foreign Territory | Jurisdiction | Assignment Number(s) | Recordation |
|---|---|---|---|---|---|---|---|---|
| "WONKA." Title with respect to screenplay registration: "Wonka" Title with respect to motion picture registration: "WONKA (Draft 14.4 - September 29, 2023)" | *Screenplay*: Warner Bros. Entertainment Inc.; Village Roadshow Films North America, Inc. *Motion Picture Registrant:* Warner Bros. Entertainment Inc.; VREG Wonka IP Global LLC; Domain Pictures, LLC | *Screenplay*: PAU004199849 *Motion Picture*: PA0002443871 (supplemented by PA0002506060) | *Screenplay*: October 31, 2023 *Motion Picture*: December 6, 2023 | 50% of bare copyright | 50% of bare copyright | US Copyright Office | V15021D105; V15020D683 | V15020D684; |

SMRH:4933-0756-1844.1
101725

76KN-409057

### SECTION 4.01(m)

### TITLE TO PURCHASED ASSETS

<u>Annex V</u> of the Agreement (*Derivative Rights Disputes*) is hereby incorporated herein by reference.

SMRH:4933-0756-1844.1
101725

76KN-409057

**SECTION 4.01(n)**

**NO BROKERS OR FINDERS**

1.    Solic Capital LLC

2.    Virtu Global Advisors, LLC

SMRH:4933-0756-1844.1
101725

## EXHIBIT B

**Blackline**

## PURCHASE AGREEMENT (DERIVATIVE RIGHTS)

THIS PURCHASE AGREEMENT (DERIVATIVE RIGHTS) (as amended, restated, supplemented, or otherwise modified pursuant to the terms hereof from time to time, this "**Agreement**"), is made and entered into as of [●]October 17, 2025 (the "**Effective Date**"), by and among the Persons identified on Annex I hereto (each, a "**Seller**", and collectively, the "**Sellers**"), Alcon Media Group, LLC ("**Buyer**"), and Kevin Berg in his capacity as the representative of the Sellers pursuant to Section 10.15 (the "**Seller Representative**").

## RECITALS

A.      The Parties desire to set forth the terms pursuant to which Buyer will, subject to the entry of a Sale Order (as defined below), purchase from the Sellers, the Purchased Assets.

B.      The Sellers and certain of their Affiliates have commenced voluntary petitions for relief under Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (as amended, the "**Bankruptcy Code**") on March 17, 2025 (the "**Petition Date**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") (such cases, collectively, the "**Bankruptcy Cases**").

C.      On the terms and subject to the conditions hereof, the Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to purchase, acquire and assume from the Sellers, the Purchased Assets, subject to the terms and conditions set forth in this Agreement, the Bid Procedures (as defined below) and Bid Procedures Order (as defined below), and in accordance with sections 105, 363, 365, 1123, as applicable, and other applicable provisions of the Bankruptcy Code. The Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, entry of the Sale Order by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, the receipt and sufficiency of which is hereby acknowledged, it is hereby agreed among the Parties as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01      **Defined Terms**. Except as otherwise specified in this Agreement or as the context may otherwise require, the following terms shall have the respective meanings set forth below for all purposes of this Agreement:

"**ABS Obligations**" means all Liabilities of the Sellers and their Affiliates under the ABS Transaction Documents, including, without limitation, all fees, costs, expenses and indemnity obligations, and, in each case, any interest accrued thereon.

"**ABS Transaction Documents**" means all "Transaction Documents" under (and as defined in) the Indenture.

"**Adverse Claim**" means an interest, lien (statutory or otherwise), security interest, attachment, Claim (excluding Claims arising in connection with the Wonka Dispute and the PM2 Dispute), any claim asserted or that could have been asserted by WBEI or and/or its Affiliates in the Other Warner Disputes, Avoidance Action, Liability, Indebtedness, offset, deduction, restriction, mortgage, pledge or other charge or

Encumbrance, or other type of preferential arrangement having the practical effect of any of the foregoing, or other claim or interest of any kind in, of or on any Person's assets or properties in favor of any other Person.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such Person. The term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and/or policies of a Person, whether through the ownership of voting securities, by contract, or otherwise provided, however, that, notwithstanding anything herein to the contrary, other than for the purposes of Section 6.01 and Section 10.03, in no event shall Buyer be considered to be an Affiliate of any other investment fund or investment vehicle controlled or managed by Buyer or any of its Affiliates, any limited or general partner of such fund (or any Affiliate of such limited or general partners), or any portfolio company of any investment fund or investment vehicle controlled or managed by Buyer or any of its Affiliates.

"**Agreement**" has the meaning set forth in the preamble.

"**Alternative Transaction**" means any agreement (binding or nonbinding), relating to any direct or indirect acquisition, financing or purchase of all or any portion of the Purchased Assets or any other similar transaction involving all or any portion of the Purchased Assets, whether effected by sale of assets, sale of equity, merger, joint venture, recapitalization, loan, financing arrangement or otherwise, but excluding any financing provided by any holder of Parent's existing notes and any debtor-in-possession financing.

"**Ancillary Rights**" means any and all ancillary, subsidiary or allied rights now known and unknown, including, without limitation, publishing, novelization, music publishing, soundtrack recording, screenplay, publication, sponsorship, commercial tie-up, character, live stage, radio, interactive, Internet, theme park and merchandising rights of every kind and nature whatsoever derived from, appurtenant to or related to a Picture, the underlying material relating thereto, the title or titles of such Picture, the characters appearing in such Picture or said underlying material and/or the names or characteristics of said characters.

"**Applicable Percentage**" means, with respect to each Picture, the percentage of the Derivative Rights in and to such Picture that are owned by the Sellers. The Applicable Percentage for the Derivative Rights in each Picture is set forth on Annex III hereto.

"**Assignment Agreements of Derivative Rights**" means collectively, that certain Assignment (Derivative Rights) (VRF/VREG IP Global LLC), dated as of November 28, 2023, by and between VRF and VREG IP, that certain Assignment (Derivative Rights) (VRF/VREG J2 Global LLC), dated as of November 28, 2023, by and between VRF and VREG J2, that certain Assignment (Derivative Rights) (VRF/VREG OP Global LLC), dated as of November 28, 2023, by and between VRF and VREG OP, that certain Assignment (Derivative Rights) (VRF/VREG WW IP Global LLC), dated as of November 28, 2023, by and between VRF and VREG WW, that certain Assignment (Derivative Rights) (VRFNA/VREG IP Global LLC), dated as of November 28, 2023, by and between VRFNA and VREG IP, that certain Assignment (Derivative Rights) (VRFNA/VREG J2 Global LLC), dated as of November 28, 2023, by and between VRFNA and VREG J2, that certain Assignment (Derivative Rights) (VRFNA/VREG OP Global LLC), dated as of November 28, 2023, by and between VRFNA and VREG OP, that certain Assignment (Derivative Rights) (VRFNA/VREG WW IP Global LLC), dated as of November 28, 2023, by and between VRFNA and VREG WW, and that certain Assignment (Derivative Rights) (VRPNA/VREG MM2 IP Global LLC), dated as of November 28, 2023, by and between VRPNA and VREG MM2.

"**Assumed Contracts**" means those Contracts that are set forth on Annex II attached hereto, which schedule Buyer may update at any time and from time to time prior to the Closing Effective Date.

"**Assumed Liabilities**" has the meaning set forth in Section 2.02.

"**Assumption and Assignment Agreement**" means an Assignment and Assumption Agreement effecting the assignment of the Assumed Contracts and Assumed Liabilities from Sellers to Buyer, in form and substance satisfactory to the Parties.

"**Auction**" means the auction for the sale of the Sellers' assets conducted on May 28, 2025 pursuant to the terms and conditions of the Bid Procedures Order.

"**Avoidance Actions**" means all rights, lawsuits, claims, rights of recovery, objections, causes of action, avoidance actions and other similar rights of any Seller or other appropriate party in interest arising under Chapter 5 of the Bankruptcy Code or applicable state law (whether or not asserted as of the Closing Effective Date) and all proceeds thereof.

"**Backup Bidder**" means the party that is the next highest or otherwise best bidder at the Auction after the Successful Bidder.

"**Bankruptcy Cases**" has the meaning set forth in the recitals.

"**Bankruptcy Code**" has the meaning set forth in the recitals.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bid Procedures**" means the bid procedures approved by the Bankruptcy Court pursuant to the Bid Procedures Order.

"**Bid Procedures and Sale Motion**" means the motions filed in the Bankruptcy Cases (i) seeking approval of (A) the transactions contemplated hereby and (B) the Bid Procedures and scheduling certain dates, deadlines and forms of notice in connection therewith, and (ii) granting other related relief.

"**Bid Procedures Order**" means the order of the Bankruptcy Court approving the Bid Procedures and Sale Motion and the Bid Procedures, and granting the relief requested therein, entered on April 24, 2025 [ECF # 276].

"**Books and Records**" means all principal and/or material business records, tangible data, documents, management information systems (including related computer software), files, participant lists, vendor lists, statements, invoices, all work papers, notes, files or documents related thereto, and all other principal and/or material books and records received and/or maintained by Sellers or their Affiliates (excluding personnel records) related to the Derivative Rights in the Pictures and Assumed Contracts (but excluding all Tax records and Tax Returns (including working papers)).

"**business day**" means any day other than a Saturday, Sunday, legal holiday in the United States or any day on which banks in the City of New York, New York are authorized or required by applicable Law to close.

"**Buyer**" has the meaning set forth in the preamble.

"**Buyer Closing Deliverables**" has the meaning set forth in Section 2.10.

"**Buyer Deposit**" has the meaning set forth in Section 2.06(b).

"**Claim**" means all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment rights, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

"**Closing**" means the consummation of the purchase by Buyer from Sellers of the Purchased Assets pursuant to this Agreement.

"**Closing Effective Date**" means the date on which the Closing occurs.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

"**Collective Bargaining Agreement**" means any agreement, contract or arrangement with any union or guild or similarly constituted or substitute organization regarding any rights and/or services and/or personnel utilized in connection with the production and/or distribution and/or Exploitation of a Picture.

"**Constitutive Documents**" means, as to any Person, such Person's certificate of incorporation or registration (including, if relevant, certificates of change of name), memorandum of association, articles of association or incorporation, charter, by-laws, trust deed, partnership, limited liability company, joint venture or shareholders' agreement or equivalent documents constituting the organization or forming of such Person, in each case as the same may from time to time be amended, restated, supplemented or otherwise modified from time to time.

"**Contract**" means any contract, agreement, lease, license, or other legally binding commitment, agreement or instrument, whether or not in writing, including all amendments and modifications thereto.

"**Copyright**" means, with respect to a Picture, all common law and statutory copyrights, rights in copyrights (including the right to make publication thereof for copyright purposes, to register claims under copyright, the right to renew and extend such copyrights and the right to sue for past, present and future infringements of copyright), interests in copyrights, all applications for copyrights, registrations of copyrights and renewals and extensions of copyrights, domestic and foreign, heretofore or hereafter obtained upon such project, the underlying material relating thereto or any part thereof.

"**Cure Amounts**" means all amounts, costs and expenses to cure defaults (including any amounts owed by the Sellers relating to the Other Warner Disputes), if any, under the Assumed Contracts so that such Assumed Contracts may be assumed and assigned to Buyer pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code.

"**Cure Notice**" has the meaning set forth in Section 7.01.

"**Dataroom**" means that certain virtual data room hosted by Ansarada titled "Project Rabbit".

"**Debtor Relief Laws**" means the Bankruptcy Code and all other applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, receivership, insolvency, reorganization, suspension of payments or similar debtor relief Laws from time to time in effect affecting the rights of creditors generally.

"**Derivative Rights**" means, with respect to a motion picture, any and all rights throughout the world to produce remakes, sequels and prequels of such motion picture and other derivative works based thereon and to distribute and otherwise Exploit such remakes, sequels or prequels for viewing in any medium or

media now known or hereafter devised, whether in theatres or home video or on television, and to produce, distribute and otherwise Exploit as a television program, movie of the week, television series or a television spinoff any audiovisual work based on such motion picture, its story line, or any one or more of its characters. Without limiting the foregoing, the Derivative Rights with respect to *Saving Silverman* shall include all rights throughout the world to produce Derivative Productions (as defined in that certain Co-Ownership Agreement with respect to "Saving Silverman", dated as of March 5, 2001, between Columbia Pictures, a division of Columbia Pictures Industries, Inc. and VRF, as it may be amended, restated, supplemented, extended or otherwise modified from time to time) and to distribute and otherwise exploit such Derivative Productions in any and all media now known or hereafter devised, including without limitation, theatres, home video and/or television.

"**DIP Obligations**" has the meaning set forth in the DIP Order.

"**DIP Order**" means that certain Final Order (i) Authorizing the Debtors to Obtain Post-Petition Secured Financing, (ii) Authorizing the Use of Cash Collateral, (iii) Granting Liens and Superpriority Administrative Expense Status, (iv) Granting Adequate Protection, (v) Modifying the Automatic Stay, and (vi) Granting Related Relief, entered in the Bankruptcy Cases on April 24, 2025 [ECF No. 280].

"**Disclosure Schedules**" has the meaning set forth in Section 4.01.

"**Effective Date**" has the meaning set forth in the preamble.

"**Encumbrance**" means any defect or imperfection in title, charge, deed of trust, security interest, pledge, hypothecation, mortgage, encumbrance, Lien (as such term is defined in the Bankruptcy Code), lease, license grant by any Seller, sublease, option, right of first refusal, easement, right of way, servitude, covenant, condition, proxy, voting trust or agreement or transfer restriction under any equity holder or similar Contract.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder from time to time in effect.

"**Escrow Account**" has the meaning set forth in Section 2.06(b).

"**Escrow Holder**" means Verita Global.

"**Excluded Assets**" has the meaning set forth in Section 2.03.

"**Excluded Liabilities**" has the meaning set forth in Section 2.04.

"**Excluded Taxes**" means any liabilities of any Seller for any period, or otherwise imposed on the Purchased Assets with respect to any Pre-Closing Tax Period (as apportioned in the manner provided by Section 6.06(e) for Taxes relating to any Straddle Period), in respect of any Tax, including without limitation (a) any Liability of any Seller for the Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or non-U.S. Law), as a transferee or successor, or by Contract (other than any Contracts entered into in the ordinary course of business not primarily related to Taxes), and (b) any Taxes that will arise as a result of the purchase and sale of the Purchased Assets, but excluding any Property Taxes to the extent specifically allocated to Buyer pursuant to Section 6.05.

"**Exploit**" means the manufacture, distribution, licensing, exhibition, marketing, promotion, reissuance, and other exploitation of a motion picture or applicable rights thereto, in any and all languages, by any and all means and devices now known or hereafter devised, and howsoever accessed by the viewer,

and to otherwise exploit the foregoing in any and all media, whether now known or hereafter existing and howsoever accessed, including, without limitation, theatrical, home video, pay, cable and free television, computers, hand held devices, cell phones and other accessing devices. The meaning of the term "**Exploitation**" shall be correlative to the foregoing.

"**Government Approval**" means any (a) necessary filings, notifications, registrations, applications, declarations, waiting period expiration or termination, and submissions in connection with the Transactions, as required under any applicable Law and (b) consents, certifications, grants, confirmation, permits or Orders from a Governmental Authority required to be obtained or made by any Seller or Buyer or any of their respective Affiliates to execute, deliver and perform their respective obligations under this Agreement or the other Transaction Documents and consummate the Transactions.

"**Governmental Authority**" means any court, tribunal, arbitrator, authority, agency, commission, bureau, board, department, legislature, official, body or other instrumentality of the United States (whether federal, state, municipal or local), any foreign country, or any domestic or foreign state, province, county, city, other political subdivision or any other similar body or organization exercising governmental or quasi-governmental power or authority.

"**IFRS**" means the International Financial Reporting Standards issued from time to time by the International Financial Reporting Standards Foundation and the International Accounting Standards Board.

"**Indebtedness**" of any Person as of any date of determination means, without duplication, (a) the principal amount of all indebtedness of such Person for borrowed money and any accrued and unpaid interest thereon, (b) the principal amount of any other indebtedness of such Person which is evidenced by a note, bond, debenture or similar instrument or debt security and any accrued and unpaid interest thereon, including, without limitation, the obligations of the Sellers under all notes issued pursuant to the Indenture, (c) all capital lease obligations of such Person as of such date, in each case determined in accordance with IFRS, (d) indebtedness secured by an Adverse Claim on assets of any Seller, (e) obligations under any drawn letters of credit (excluding reimbursement obligations in respect of undrawn letters of credit), (f) all interest rate or non-U.S. currency swaps, caps, collars, hedges or insurance agreements, or options or forwards on such agreements, or other similar agreements for the purpose of managing the interest rate or non-U.S. exchange risk, (g) all financing fees and costs related to the indebtedness described in foregoing clauses (a) through (f), and (h) all guaranties of such Person in respect of any of the foregoing.

"**Indenture**" means (a) that certain Base Indenture dated as of November 10, 2020 among VR Funding and VRF Holdings, as issuers, and U.S. Bank National Association, as trustee, as supplemented by (b) that certain Group A Supplement dated as of November 10, 2020 among VR Funding, VRF Holdings, VRF, VRFNA, VRFG and VRVS, as Group A Co-Issuers, and U.S. Bank National Association, as trustee, as supplemented by (c) that certain Series 2020-1 Supplement dated as of November 10, 2020 among the Group A Co-Issuers and U.S. Bank National Association, as trustee in each case, as supplemented, amended, restated, extended or otherwise modified from time to time.

"**Insider**" shall have the meaning set forth in section 101(31) of the Bankruptcy Code.

"**Insider Causes of Action**" means any Claims or causes of action against any Insider of the Sellers.

"**IP Assignment Agreement**" means the assignment agreement to assign and transfer the Sellers' rights in the Transferred Rights to Buyer, to be entered into at Closing, in form and substance mutually acceptable to each of the Parties.

"**Knowledge**" means, when referring to the "knowledge" of the Sellers, or any similar phrase or qualification based on knowledge of any Seller, (a) the actual knowledge of James Moore, Louis Santor, Kevin Berg, Keith Maib, and/or Glenn Taylor and (b) the knowledge that any such person referenced in clause (a) above, as a prudent business person, would have obtained after making due inquiry with respect to the particular matter in question.

"**Law**" or "**law**" means and includes any provision or requirement of any present or future statute, rule, regulation, code, code of practice, ordinance, standard, statutory guidance, decree, rule of common law or principle of equity, or other decision of any court, tribunal or Governmental Authority or by-law of any foreign, multinational, regional, federal, state, county, municipal or local jurisdiction.

"**Liability**" means, with respect to any Person, any liability or obligation (including with respect to Taxes) of such Person of any kind, character or description, whether known or unknown, disclosed or undisclosed, absolute or contingent, matured or unmatured, accrued or unaccrued, asserted or unasserted, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, direct or indirect, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person or is discharged, stayed or otherwise affected by any proceeding under any Debtor Relief Laws.

"**Loompala Option Agreement**" means the Option Agreement, dated as of December 6, 2023, by and between VREG Wonka IP Global LLC, VREG MM2 IP Global LLC and VREG J2 Global LLC, on the one hand, and Loompala Pictures, LLC, on the other hand.

"**Loss**" or "**Losses**" means any Liability, loss, damage, claim, demand, obligation, charge, deficiency, settlement payment, Tax, expense, interest, award, judgment, penalty, assessment, disbursement, fine, fee or amount paid in settlement or cost or expense related to any of the foregoing (including reasonable and documented out-of-pocket legal fees and expenses), but shall not include any exemplary or punitive damages.

"**Lot 1 Assets**" means the "Purchased Assets," as defined in the Lot 1 Purchase Agreement (including, without limitation, all Exploitation rights with respect to the Pictures (including all Ancillary Rights)).

"**Lot 1 Purchase Agreement**" means that certain Purchase Agreement (Library), dated as of July 1, 2025, by and among ~~the Sellers,~~ certain sellers identified therein and the Seller Representative, on the one hand, and Buyer, on the other hand, pursuant to which Buyer ~~is purchasing, acquiring and assuming~~ has purchased, acquired and assumed the sellers' interest (excluding the Purchased Assets hereunder) in a library of 108 feature films, among other assets and liabilities.

"**Lot 3 Assets**" means the "Purchased Assets," as defined in the Lot 3 Purchase Agreement.

"**Lot 3 Purchase Agreement**" means ~~that certain~~ a Purchase Agreement (Studio Business)~~, dated as of ____,~~ by and among certain sellers identified therein and the Seller Representative, on the one hand, and Buyer, on the other hand, pursuant to which Buyer is purchasing, acquiring and assuming the sellers' interest in certain assets and liabilities with respect to the development, production and other Exploitation of certain television, motion picture and/or other audiovisual projects, among other assets and liabilities.

"**Magnum**" means Magnum Films SPC, a segregated portfolio company incorporated under the laws of the Cayman Islands.

"**Material Adverse Effect**" means any change, event, circumstance, effect, state of facts, occurrence, development or other matter (any such item, an "**Effect**") that, individually or in the aggregate, (a) prevents

or would reasonably be expected to prevent or impair the ability of any Seller to consummate the Transactions under the Transaction Documents or (b) is or would reasonably be expected to be materially adverse to (i) the benefits, interests, rights or remedies of Buyer under any of the Transaction Documents or the rights to, timing of, or the amount of, payments thereunder, (ii) the Purchased Assets, (iii) the ability of any Seller to timely perform or comply with its covenants, agreements or obligations under any Transaction Document, or (iv) the legality, validity or enforceability of any Transaction Document; but, with respect to clauses (a) and (b), excluding any change or effect to the extent that it results from or arises out of the commencement of the Bankruptcy Cases.

"**Matrix 4**" means the Picture entitled *The Matrix Resurrections*.

"**MPRPA**" means (a) that certain Amended and Restated Motion Picture Rights Purchase Agreement dated as of November 21, 2012, between WV Films IV LLC and WV Film Partners IV L.P., as amended, restated, supplemented or otherwise modified from time to time; (b) that certain Amended and Restated Motion Picture Rights Purchase Agreement dated as of November 10, 2020, between VRPNA and WBEI, as amended, restated, supplemented or otherwise modified from time to time;  and (c) that certain Amended and Restated Motion Picture Rights Purchase Agreement dated as of October 30, 2015, between VRPNA and Sony, as amended, restated, supplemented or otherwise modified from time to time.

"**Order**" means any order, judgment, ruling, injunction, award, stipulation, assessment, decree or writ, whether preliminary or final, issued, promulgated or entered by or with any Governmental Authority.

"**Other Warner Disputes**" means, excluding the Wonka Dispute and PM2 Dispute, any and all other claims (whether being argued, disputed or litigated in arbitration, court or otherwise) brought or asserted at any time by WBEI and/or its Affiliates against any Seller and/or any of its Affiliates, and any and all claims brought or asserted at any time by any Seller and/or any of its Affiliates against WBEI and/or its Affiliates, including, but not limited to, each of the Proceedings set forth in items (1) and (2) of Annex V, and any other related or similar Proceedings (excluding the Wonka Dispute and the PM2 Dispute), in each case involving any Seller and/or its Affiliates, on the one hand, and WBEI and/or its Affiliates, on the other hand.

"**Outside Date**" has the meaning set forth in Section 8.01(c).

"**Parent**" means Village Roadshow Entertainment Group (BVI) Limited, a BVI business company incorporated under the laws of the British Virgin Islands.

"**Party**" or "**Parties**" means any party or parties to this Agreement.

"**Person**" means any individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company, Governmental Authority, or other entity.

"**Pictures**" means the motion pictures set forth in Annex III.

"**PM2 Dispute**" means the Proceedings described in item (5) of Annex V.

"**Post-Closing Tax Period**" means (x) any Tax period beginning after the Closing Effective Date and (y) with respect to a Straddle Period, that portion of such Straddle Period beginning after the Closing Effective Date and continuing for the remainder of such Straddle Period.

-8-

"**Pre-Closing Period**" means the period from the Effective Date until the earlier of (i) the Closing Effective Date, or (ii) the date this Agreement is validly terminated in accordance with its terms.

"**Pre-Closing Tax Period**" means (a) any Tax period ending on or before the Closing Effective Date and (b) with respect to a Straddle Period, that portion of such Straddle Period ending on (and including) the Closing Effective Date.

"**Prepetition Secured Notes Obligations**" has the meaning set forth in the DIP Order.

"**Proceeding**" means any suit, action, cause of action, litigation, hearing, inquiry, examination, demand, proceeding, controversy, complaint, appeal, notice of violation, citation, summons, subpoena, arbitration, mediation, dispute, claim, allegation, investigation or audit of any nature whether civil, criminal, quasi criminal, indictment, administrative, regulatory or otherwise and whether at Law or in equity.

"**Proceeds**" means, with respect to any property, (a) whatever is acquired upon the sale, lease, license, exchange, or other disposition of such property; (b) whatever is collected on, or distributed on account of, such property; (c) rights arising out of such property; (d) to the extent of the value of such property, claims arising out of the Loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, such property; or (e) to the extent of the value of such property and to the extent payable to the owner of such property, insurance payable by reason of the Loss or nonconformity of, defects or infringement of rights in, or damage to, such property.

"**Property Taxes**" means all real property Taxes, personal property Taxes and similar ad valorem Taxes.

"**Purchase Price**" has the meaning set forth in Section 2.06(a).

"**Purchased Assets**" means, collectively, (i) the Purchased Wonka Naked Copyrights, (ii) the Purchased Unfunded Pictures Derivative Rights, if any, and (~~ii~~iii) the Purchased Derivative Rights (except to the extent constituting the Excluded Assets); provided, for clarity, that the Purchased Assets shall include the following:

(a)    the Assumed Contracts;

(b)    all Books and Records; and

(c)    other than with respect to the Other Warner Disputes, the Insider Causes of Action and the Avoidance Actions, all of the Sellers' claims or causes of action, choses in action, rights of recovery and rights of set-off of any kind and indemnities against other Persons (regardless of whether or not such claims and causes of action have been asserted) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery (regardless of whether such rights are currently exercisable) relating to the Purchased Assets, including any of the foregoing relating to and/or arising in connection with the Wonka Dispute and/or the PM2 Dispute; provided, that, for the avoidance of doubt, (i) Sellers agree that Buyer is not acquiring the obligations or Liabilities relating to any claim (A) asserted against any Seller (or its Affiliates) in the Other Warner Disputes or (B) asserted by any Seller (or its Affiliates) in the Other Warner Disputes and (ii) if Sellers acquire any Purchased Unfunded Pictures Derivative Rights as a result of the settlement or other disposition of the Other Warner Disputes (including, without limitation, pursuant to the Sale Order), such Purchased Unfunded Pictures Derivative Rights shall constitute Purchased Assets hereunder.  However, nothing herein shall affect Buyer's (or any of its Affiliate's) rights with respect to any all claims or causes of action, choses in action, rights of recovery and rights of set-off of any kind and indemnities made on its own behalf against other Persons (regardless of

-9-

whether or not such claims and causes of action have been asserted) and all rights of indemnity, warranty rights, rights of contribution, rights to refunds, rights of reimbursement and other rights of recovery (regardless of whether such rights are currently exercisable) to which Buyer (or its Affiliates) may be entitled in the Other Warner Disputes.

"**Purchased Derivative Rights**" means all of each Seller's entire worldwide right, title and interest in and to the Derivative Rights in each of the Pictures, together with any and all of the assets, properties and rights of each Seller of any kind, whether tangible or intangible, used in, held for use in, relating to or arising from the financing, development, production or Exploitation of any Seller's Derivative Rights in each of the Pictures, and includes the entire worldwide right, title and interest of each Seller (if any) in and to, for each of the Pictures, an undivided interest equal to the Applicable Percentage for such Picture in the Derivative Rights (including, without limitation, the results and proceeds of any development activity relating to such Derivative Rights) in and to such Picture for the entire world.

"**Purchased Unfunded Pictures Derivative Rights**" means all of each Seller's entire worldwide right title and interest in and to the Derivative Rights in and to each of the Unfunded Pictures.

"**Purchased Wonka Naked Copyrights**" means all of each Seller's right, title and interest in the "naked" worldwide copyright of Wonka and the underlying material for Wonka (which "naked" copyright excludes, for the avoidance of doubt, all Exploitation rights with respect to Wonka (including, without limitation, the Ancillary Rights with respect to Wonka)).

"**QCSA**" means (a) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of February 22, 2006, between WV Films LLC and WV Film Partners L.P., as amended, restated, supplemented or otherwise modified from time to time; (b) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of February 22, 2006, between WV Films II LLC and WV Film Partners II L.P., as amended, restated, supplemented or otherwise modified from time to time; (c) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of April 10, 2008, between WV Films III LLC and WV Film Partners III L.P., as amended, restated, supplemented or otherwise modified from time to time; (d) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of December 15, 2017, between WV Films IV LLC and WV Film Partners IV L.P., as amended, restated, supplemented or otherwise modified from time to time; (e) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of December 14, 2021, between Evil Woman Films LLC and Evil Woman Film Partners LP, as amended, restated, supplemented or otherwise modified from time to time; (f) that certain Qualified Cost Sharing Agreement dated as of August 11, 2000, between Zoo Films LLC and Zoo Film Partners LP, as amended, restated, supplemented or otherwise modified from time to time; (g) that certain Qualified Cost Sharing Agreement dated as of August 11, 2000, between DTE Films LLC and DTE Film Partners LP, as amended, restated, supplemented or otherwise modified from time to time; and (h) that certain Amended and Restated Qualified Cost Sharing Agreement dated as of December 19, 2019, between DSAW Films LLC and DSAW Film Partners L.P., as amended, restated, supplemented or otherwise modified from time to time.

"**Required Consent**" has the meaning set forth in Section 2.05(a).

"**Sale Order**" means an order entered by the Bankruptcy Court, in form and substance acceptable to Buyer and the Sellers, approving this Agreement and all of the terms and conditions hereof and approving and authorizing the Sellers to consummate the transactions contemplated hereby. The Sale Order shall, among other things, (a) approve, pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, (i) the execution, delivery and performance by the Sellers of this Agreement, (ii) the sale of the Purchased Assets to Buyer on the terms set forth herein and free and clear of all Adverse Claims (other than those included in the Assumed Liabilities) pursuant to section 363(f) of the Bankruptcy Code and find that Buyer is not a successor of any of the Sellers and determine that none of the transactions herein is avoidable for any

reason, and (iii) the performance by the Sellers of their respective obligations under this Agreement, including the full satisfaction of Cure Amounts for all Assumed Contracts, (b) authorize and empower the Sellers to transfer to Buyer the Assumed Contracts as set forth in this Agreement pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, (c) find that Buyer is a "good faith" buyer within the meaning of section 363(m) of the Bankruptcy Code and grant Buyer the protections of section 363(m) of the Bankruptcy Code, (d) find that Buyer has provided adequate assurance of future performance necessary to effect the assumption and assignment of the Assumed Contracts, (e) enjoin any and all holders of Adverse Claims from asserting such Adverse Claim against the Buyer, its Affiliates or the Purchased Assets and (f) provide that any Debtor or subsidiary thereof that presently owns or hereafter acquires any asset that would constitute a Purchased Asset shall be deemed to be a Seller under this Agreement and the other Transaction Documents and subject to all of the terms and provisions hereof and thereof).

"**Seller Closing Deliverables**" has the meaning set forth in Section 2.09.

"**Sellers**" has the meaning set forth in the preamble.

"**Service Provider**" means, with respect to any Person, each director, officer, employee, manager, independent contractor, consultant, leased employee or other service provider of such Person.

"**Sony**" means Sony Pictures Entertainment Inc., a Delaware corporation.

"**Source**" has the meaning set forth in Section 4.02(e).

"**Straddle Period**" means any Tax period beginning before or on, and ending after, the Closing Effective Date.

"**Successful Bidder**" means the prevailing party with respect to the Purchased Assets at the conclusion of the Auction.

"**Tax**" or "**Taxes**" means any U.S. federal, state, local or non-U.S. income, gross receipts, branch profits, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, escheat, environmental, customs duties, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, real and unclaimed property, sales, use, transfer, registration, ad valorem, value added, alternative or add-on minimum or estimated tax or other tax of any kind whatsoever, including any interest, penalty or addition thereto, whether disputed or not, whether payable directly or by withholding, and whether or not requiring the filing of a Tax Return.

"**Tax Return**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"**Transaction Documents**" means this Agreement, the Assumption and Assignment Agreement, the IP Assignment Agreement, any pleadings related to this Agreement filed with the Bankruptcy Court, and all other instruments, exhibits, documents and agreements executed or delivered from time to time in connection with the foregoing.

"**Transactions**" means the transactions contemplated by the Transaction Documents.

"**Transferred Rights**" means, collectively, the Purchased Derivative Rights and, the Purchased Unfunded Pictures Derivative Rights and the Purchased Wonka Naked Copyrights.

"**Transfer Taxes**" means all transfer, stamp, documentary, sales, use, registration, value-added and other similar Taxes (including all applicable real estate transfer Taxes) incurred in connection with any Transaction Document and the Transactions.

"**Unfunded Pictures**" means the Pictures entitled *Furiosa: A Mad Max Saga*, *Joker: Folie à Deux*, and *The Matrix Resurrections*.

"**VR Funding**" means VR Funding LLC, a Delaware limited liability company.

"**VREG Wonka**" means VREG Wonka IP Global LLC, a Delaware limited liability company.

"**VRF**" means Village Roadshow Films (BVI) Limited, a BVI business company incorporated in the British Virgin Islands.

"**VRF Holdings** means VR Films Holdings (BVI) Limited, a BVI business company incorporated under the laws of the British Virgin Islands.

"**VRFG**" means Village Roadshow Films Global Inc., a Delaware corporation.

"**VRFNA**" means Village Roadshow Films North America Inc., a Delaware corporation.

"**VRPNA**" means Village Roadshow Pictures North America Inc., a Delaware corporation.

"**VRVS**" means Village Roadshow VS Films LLC, a Delaware limited liability company.

"**WBEI**" means Warner Bros. Entertainment Inc., a Delaware corporation.

"**Wonka**" means the Picture entitled *Wonka*.

"**Wonka Dispute**" means the Proceedings described in item (3) of Annex V.

Section 1.02    **References to Agreements**. References to an agreement or document shall include all schedules, annexes, exhibits, appendices and other attachments to such agreement or document, and unless otherwise stated, are to such agreement or document (including all such attachments) as amended, restated, replaced, supplemented or otherwise modified from time to time in a manner not inconsistent with the terms hereof and thereof.

## ARTICLE II
## SALE AND PURCHASE; CLOSING

Section 2.01    **Sale and Purchase of Purchased Assets**. Pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Buyer shall purchase, acquire and accept from the Sellers, and the Sellers shall irrevocably sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, all of the Sellers' right, title and interest, in, to and under the Purchased Assets, on an "as is" and "where is" basis (except as otherwise provided herein), but free and clear of Adverse Claims (except for the Assumed Liabilities) or other interests in such Purchased Assets to the full extent provided by section 363(f) of the Bankruptcy Code.

Section 2.02    **Assumed Liabilities**. Upon the terms and subject to the conditions of this Agreement, and explicitly excluding the Excluded Liabilities described below in Section 2.04, Buyer agrees,

effective as of the time of the Closing, that it shall assume the sole responsibility for paying, performing and discharging when due, all Liabilities (a) arising solely from the ownership and Exploitation of the Purchased Assets by or on behalf of Buyer after the Closing Effective Date, and/or (b) relating to any claim asserted against any Seller (or its Affiliates) in the Wonka Dispute or the PM2 Dispute (the "**Assumed Liabilities**").

Section 2.03    **Excluded Assets**. Notwithstanding any provision in this Agreement to the contrary, the Sellers shall not be deemed to sell, transfer, assign, convey or deliver, and the Sellers will retain, all right, title and interest to, in and under, (a) any Contract that is not an Assumed Contract, (b) Avoidance Actions, (c) Insider Causes of Action, (d) Lot 1 Assets, (e) Lot 3 Assets and/or (f) the rights, obligations, or Liabilities relating to any claim asserted against any Seller (or its Affiliates) in the Other Warner Disputes (other than Purchased Unfunded Pictures Derivative Rights, if any, resulting from resolution of the Other Warner Disputes in accordance with clause (c) of the definition of Purchased Assets) or asserted by any Seller (or its Affiliates) in the Other Warner Disputes (collectively, the "**Excluded Assets**"); provided that the foregoing limitations shall not exclude from the Purchased Assets any Derivative Rights owned by the Sellers related to any Picture (unless such Derivative Rights are separately conveyed to Buyer pursuant to the Lot 1 Purchase Agreement).

Section 2.04    **Excluded Liabilities**. Notwithstanding any provision in this Agreement to the contrary, (i) Buyer is assuming only the Assumed Liabilities, (ii) Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any manner be liable or responsible for any other Liabilities of the Sellers or relating to the Purchased Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Effective Date or arising thereafter, other than the Assumed Liabilities and (iii) as between Buyer and the Sellers, the Excluded Liabilities shall remain the sole obligation and responsibility of the Sellers. As used in this Agreement, "**Excluded Liabilities**" includes, without limitation:

(a)    all Liabilities of the Sellers not arising out of, in respect of or relating to the Purchased Assets;

(b)    all Liabilities of the Sellers arising out of, in respect of or relating to the Purchased Assets;

(c)    all Liabilities accruing or arising prior to the Closing Effective Date (including, for the avoidance of doubt, Avoidance Actions and other Liabilities accruing or arising out of or in connection with the Assignment Agreements of Derivative Rights);

(d)    all Liabilities arising out of, in respect of or relating to the Purchased Assets to the extent resulting from or relating to actions, omissions or circumstances taking place prior to the Closing Effective Date, including all Liabilities arising out of, in respect of or relating to (1) any actual or threatened Proceedings or legal claims (including but not limited to the Other Warner Disputes, but excluding the Wonka Dispute and the PM2 Dispute) arising from or relating to Sellers' production, financing, ownership or Exploitation of the Pictures or the Purchased Assets or any other aspect of Sellers' business prior to the Closing Effective Date, (2) any Seller at any time in its capacity as a producer, financier, owner, licensor, distributor or in any other capacity at or prior to the Closing Effective Date, (3) the failure of Sellers to comply with any Laws or any of their obligations prior to the Closing Effective Date (whether contractual or otherwise, including, without limitation, any Participation or Residual obligations that are contractually required to be paid on or prior to the Closing Effective Date), and (4) the obligation to indemnify, reimburse or advance amounts to any present or former officer, director, employee, owner, manager, Affiliate or agent of Sellers or their Affiliates or any participant, producer, financier, owner, distributor, talent or other Person in connection with any Picture or otherwise prior to the Closing Effective Date;

(e)      all Liabilities of the Sellers pursuant to any QCSA or MPRPA;

(f)      all Liabilities arising out of, in respect of, or relating to the Excluded Assets;

(g)      Excluded Taxes;

(h)      all Indebtedness of the Sellers and all Indebtedness arising before the Closing Effective Date that is otherwise secured by any of the Purchased Assets which in either case remains outstanding following the Closing Effective Date;

(i)      the ABS Obligations;

(j)      the Prepetition Secured Notes Obligations;

(k)      the DIP Obligations;

(l)      all Liabilities assumed by, retained by or agreed to be performed by Sellers pursuant to the Transaction Documents; and

(m)      all Liabilities arising out of, in respect of, or relating to Cure Amounts under the Assumed Contracts.

Section 2.05      **Assumption and Assignment of Contracts**.

(a)      <u>Assignment of Contracts</u>. To the maximum extent permitted by law, at the Closing, and pursuant to the Sale Order, the Sellers shall transfer to Buyer the Assumed Contracts pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to transfer any Purchased Asset or any right thereunder if an attempted transfer, without the consent of a third party, would not be permissible under section 365 of the Bankruptcy Code; provided, that the Sellers shall use their commercially reasonable efforts to obtain all necessary consents (each, a "**Required Consent**") to the assignment and/or transfer thereof.

(b)      <u>Sellers Commitment to Cure Payments</u>. On the Closing Effective Date, the Sellers will pay all Cure Amounts in connection with the assumption and assignment of Assumed Contracts for which all Required Consents (as necessary) and Bankruptcy Court approval to transfer have been obtained. The Sellers have provided to Buyer a schedule set forth on ~~Annex II~~<u>Annex II</u> setting forth a good faith estimate of all Cure Amounts for all Assumed Contracts ("**Cure Schedule**"), which schedule the Sellers may update with appropriate Cure Amounts from time to time prior to the date that is three (3) business days prior to the Closing Effective Date.

(c)      <u>Adequate Assurance</u>. Buyer shall use commercially reasonable efforts to provide the Bankruptcy Court and non-debtor contract counterparties any evidence reasonably necessary to prove adequate assurance of future performance necessary to effect the assumption and assignment of the Assumed Contracts.

Section 2.06      **Purchase Price and Buyer Deposit**.

(a)      On the terms and subject to the conditions contained herein, the aggregate purchase price to be paid by Buyer for the Purchased Assets (the "**Purchase Price**") shall consist of an amount of cash equal to Eighteen Million Five Hundred Thousand Dollars ($18,500,000).

SMRH:~~4908-5037-9589.9~~4927-5764-9012.1
101725

76KN-409057

(b)      Buyer has made a deposit in the amount of Four Hundred Thousand Dollars ($400,000) (the "**Buyer Deposit**") with the Escrow Holder by wire transfer of immediately available funds. The Escrow Holder will hold the Buyer Deposit until the Closing Effective Date or earlier termination of this Agreement pursuant to Article VIII in a segregated account (the "**Escrow Account**") pursuant to the terms below. The Buyer Deposit shall become payable, and shall be paid, to the Sellers at the Closing. At the Closing, Buyer and Sellers shall instruct the Escrow Holder to deliver the Buyer Deposit to Sellers by wire transfer of immediately available funds into an account designated by the Sellers. Without limiting the foregoing, the Parties acknowledge and agree that in the event that this Agreement is terminated by the Sellers in accordance with Section 8.01(c), the Sellers shall be entitled to retain the Buyer Deposit. If this Agreement is validly terminated prior to the Closing pursuant to Article VIII, the Buyer Deposit shall be released and distributed to Buyer or Sellers, as applicable, in accordance with the terms of this Agreement and the Parties shall jointly instruct the Escrow Holder with respect thereto. If there is a dispute concerning the reason for termination of this Agreement, the disputing Party shall provide notice of same to Escrow Holder and the Buyer's Deposit shall be distributed pursuant to an Order of the Bankruptcy Court unless such dispute is consensually resolved by the Parties. In the event of any termination of this Agreement then each Party covenants and agrees that such Party shall promptly provide Escrow Holder with such instructions as may be reasonable and necessary to cause Escrow Holder to release the Buyer's Deposit to the Party entitled thereto.

Section 2.07      **Closing**. The Closing shall be effected by exchanging true, complete and accurate copies of executed originals via electronic mail at a time and on a date specified by the Sellers and Buyer that is no later than the fifth (5th) business day following the date on which the last of the conditions set forth in Article III has been satisfied or expressly waived (other than those conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of any such condition), or at such other time and place as the Sellers and Buyer may agree in writing.

Section 2.08      **Post-Closing Transfer of Contracts to Buyer**. At any time after the Closing Effective Date, the Sellers and Buyer may (but shall have no obligation to) mutually agree to seek authorization from the Bankruptcy Court, pursuant to sections 105, 363, 365, and/or 1123 of the Bankruptcy Code, to transfer a contract that was not identified as an Assumed Contract as of Closing (which contract shall become an Assumed Contract upon such transfer); provided that the Sellers will be solely responsible for paying the Cure Amount required (if applicable) to transfer such contract.

Section 2.09      **Seller Closing Deliverables**. In addition to the other requirements set forth in this Agreement, as of the Closing, the Sellers shall deliver or cause to be delivered to Buyer each of the following documents and instruments (the "**Seller Closing Deliverables**"):

(a)      a counterpart of each Transaction Document to which any Seller or the Seller Representative is a party, duly executed by each applicable Seller and/or the Seller Representative, as applicable;

(b)      an IRS Form W-9 or applicable IRS Form W-8 for each of the Sellers, duly executed by such Seller;

(c)      a certificate in form and substance reasonably acceptable to Buyer dated as of the Closing Effective Date and duly executed by the secretary, director or other authorized officer of each Seller, certifying (i) that attached thereto are copies of each such Person's certificate of formation or certificate of incorporation, as the case may be (and any amendments thereto), certified as of a recent date by the Secretary of State of the State of Delaware or the Registrar of Corporate Affairs in the British Virgin Islands, and limited liability company agreement, bylaws or memorandum and articles of association, as the case may be (and any amendments thereto), (ii) that attached thereto are resolutions adopted by the Board of Directors (or equivalent body) and/or equity holders or members of such Person (as applicable) authorizing the execution, delivery and performance in accordance with their respective terms of the Transaction Documents to which

each of such Persons is a party, (iii) attached thereto are incumbency and specimen signatures of each authorized signatory of such Person executing the Transaction Documents, and (iv) as to the Sellers' satisfaction of the conditions set forth in Sections 3.01(a) and 3.01(b);

(d)    the IP Assignment Agreement; and

(e)    all other instruments and documents reasonably requested by Buyer.

Section 2.10    **Buyer Closing Deliverables**. In addition to the other requirements set forth in this Agreement, as of the Closing, Buyer shall deliver or cause to be delivered to the Seller Representative each of the following documents and instruments (the "**Buyer Closing Deliverables**"):

(a)    a counterpart of each Transaction Document to which Buyer is a party, duly executed by Buyer; and

(b)    a certificate in form and substance reasonably acceptable to the Sellers dated as of the Closing Effective Date and duly executed by the secretary or other authorized officer of Buyer, certifying as to Buyer's satisfaction of the conditions set forth in Sections 3.02(a), and 3.02(b).

Section 2.11    **Payments at Closing**. At the Closing, Buyer shall pay or cause to be paid to each Seller, by wire transfer of immediately available funds to the account or accounts designated in writing by the Sellers not less than two (2) days prior to the Closing Effective Date, its share as designated on Annex IV hereto of an amount equal to (i) the Purchase Price, *less* (ii) the Buyer Deposit.

Section 2.12    **Withholding**. Notwithstanding anything to the contrary in this Agreement, Buyer, the Sellers, and their designees will be entitled to deduct and withhold from any amounts payable pursuant to this Agreement any amounts required to be deducted or withheld under applicable Law. To the extent that any such amounts are so deducted or withheld, such amounts will be treated for all purposes of this Agreement as having been paid to the Person in respect of whom such deduction or withholding was made. Upon Closing (and thereafter as required by applicable Law or as requested by Buyer), each person entitled to payment under this Agreement shall provide a duly executed IRS Form W-9 or applicable IRS Form W- 8.

**ARTICLE III**
**CONDITIONS PRECEDENT TO CLOSING**

Section 3.01    **Conditions Precedent to Purchase by Buyer**. The obligations of Buyer to consummate the Transactions at Closing are subject to the fulfillment or, to the extent permitted by applicable Law, written waiver by Buyer, as of the Closing Effective Date, of each of the following conditions:

(a)    Representations and Warranties. Each of the representations and warranties of the Sellers contained in this Agreement or any other Transaction Document (i) that are qualified as to Material Adverse Effect, shall be true and correct in all respects as of the Effective Date and as of the Closing Effective Date as though made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects on and as of such date) and (ii) that are not qualified as to Material Adverse Effect, shall be true and correct in all respects as of the Effective Date and as of the Closing Effective Date as if made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects as of such date), except for breaches and inaccuracies the

effect of which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)    <u>Performance of Covenants</u>. Each Seller shall have performed in all material respects all of the covenants and obligations required to be performed by it under this Agreement or any other Transaction Document prior to or at the Closing.

(c)    <u>Government Approvals.</u> All Government Approvals required in connection with the Sellers' execution, delivery and performance of this Agreement or any other Transaction Document or consummation of the Transactions shall have been obtained or made and shall be in full force and effect.

(d)    <u>Seller Closing Deliverables</u>. Buyer shall have received each Seller Closing Deliverable.

(e)    <u>Assumed Contracts</u>. Sellers shall have obtained and delivered to Buyer the Sale Order approving the transfer to Buyer of each Assumed Contract.

Section 3.02    **Conditions Precedent to Sale by Sellers**. The obligations of the Sellers to consummate the Transactions at Closing are subject to the fulfillment or written waiver by the Sellers, as of the Closing Effective Date, of each of the following conditions:

(a)    <u>Representations and Warranties</u>. Each of the representations and warranties of Buyer contained in this Agreement (i) that are qualified as to Material Adverse Effect, shall be true and correct in all respects as of the Effective Date and as of the Closing Effective Date as though made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects on and as of such date) and (ii) that are not qualified as to Material Adverse Effect shall be true and correct in all respects as of the Effective Date and as of the Closing Effective Date as if made on and as of the Effective Date and as of the Closing Effective Date (other than such representations and warranties that are made as of a specified date, which representations and warranties shall be true and correct in all respects as of such date), except for breaches and inaccuracies the effect of which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

(b)    <u>Performance of Covenants</u>. Buyer shall have performed in all material respects all of the covenants and obligations required to be performed by it under this Agreement or any other Transaction Document prior to or at the Closing.

(c)    <u>Government Approvals</u>. All Government Approvals required in connection with execution, delivery and performance of this Agreement or any other Transaction Document or consummation of the Transactions shall have been obtained or made and shall be in full force and effect.

Section 3.03    **Conditions Precedent to Obligations of Buyer and the Sellers**. The obligations of the Buyer and the Sellers to consummate the Transactions at Closing are subject to the fulfillment or written waiver by each of the Buyer and the Sellers, as of the Closing Effective Date, of the following condition:

(a)    <u>Bankruptcy Court Order</u>. The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be unstayed and in full force and effect.

SMRH:4908-5037-9589.94927-5764-9012.1
101725

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES**

Section 4.01    **Representations and Warranties of Sellers**. Except as set forth in the corresponding sections or subsections of the Disclosure Schedules attached hereto (collectively, the "**Disclosure Schedules**"), each Seller hereby jointly and severally represents and warrants to Buyer, unless another date is expressly noted below, as of the Effective Date and as of the Closing Effective Date as follows:

(a)    <u>Organization and Qualification</u>. Such Seller is a limited liability company or corporation duly incorporated, formed, validly existing and in good standing under the laws of (x) the State of Delaware or, in the case of the Sellers incorporated in the British Virgin Islands, the laws of the British Virgin Islands and (y) all other jurisdictions where the business conducted by such Seller requires it be qualified to do business. None of the Sellers incorporated in the British Virgin Islands conducts business outside of the British Virgin Islands. No Seller other than the Sellers incorporated in the British Virgin Islands conducts business outside of the United States.

(b)    <u>Authorization; No Violation</u>.

(i)    The execution and delivery by such Seller of, and the performance by such Seller of its obligations under, the Transaction Documents to which it is or is to be a party, and the consummation of the Transactions, are within such Person's powers and have been duly authorized by all necessary action.

(ii)    Except to the extent that a violation, contravention, breach or default is rendered unenforceable pursuant to Section 363 or 365 of the Bankruptcy Code or other applicable Law, the execution and delivery by such Seller of, and the performance by such Seller of its obligations under, the Transaction Documents to which it is or is to be a party, and the consummation of the Transactions, do not and will not (w) contravene, conflict with or violate its Constitutive Documents, (x) contravene, conflict with or violate any applicable Law or Order, including, in the case of the Sellers incorporated in the British Virgin Islands, the Economic Substance (Companies and Limited Partnerships) Act (As Revised) of the British Virgin Islands, (y) require any consent, approval, waiver, authorization or notice under, conflict with or result in the material breach of, or constitute a material default (or an event that, with the giving of notice or lapse of time, or both, would become a material default) under, or give rise to any rights of termination, amendment, modification, acceleration, creation or increase in any material payment obligation or forfeiture, suspension, limitation, cancellation, impairment or Loss of any right or benefit of the Sellers (and, after the Closing, Buyer) to own or Exploit or otherwise exercise any rights that the Sellers currently have with respect to the Purchased Assets under, any loan agreement, indenture, mortgage, deed of trust, lease or other instrument or Contract binding on or affecting such Person or any of its assets or properties, including the Purchased Assets, or (z) except as set forth on <u>Section 4.01(b)(ii)(z)</u> of the Disclosure Schedules, result in or require the creation or imposition of any Adverse Claim upon or with respect to any of the assets or properties of such Person, including the Purchased Assets.

(c)    <u>Consents and Approvals</u>. All authorizations or approvals of and other actions by, and all notices to and filings with, any Governmental Authority or regulatory body or any other Person that are required to be obtained, taken, given or made by any Seller (i) for the due execution and delivery by such Person of, and the performance by such Person of its obligations under, any of the Transaction Documents to which it is or is to be a party, or (ii) for the exercise by Buyer of its rights under such Transaction Documents, as applicable, have been (or, in the case of the purchase and sale of the Purchased Assets hereunder, shall have been as of the Closing Effective Date) duly obtained, taken, given or made and are (or,

-18-

in the case of the purchase and sale of the Purchased Assets hereunder, shall have been as of the Closing Effective Date) in full force and effect.

(d)    Enforceability. This Agreement has been, and each other Transaction Document to which any Seller is or is to be a party is, or when delivered will have been, duly executed by such Person, and is, or when delivered will be, the legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium and other similar laws affecting the rights of creditors and to general principles of equity (whether considered in a suit at law or in equity or pursuant to arbitration).

(e)    Litigation. Except as set forth on Section 4.01(e) of the Disclosure Schedules, there is no pending or, to the Sellers' Knowledge, threatened Proceeding (i) that questions the legality or propriety of the Transactions or that if adversely determined could reasonably be expected to adversely impact any Seller's ability to comply with the terms of the Transaction Documents and/or adversely impact Buyer's rights under the Transaction Documents, (ii) against or affecting any Seller or its Affiliates, or any of its or their current or former officers, directors, members, employees or representatives in their capacities as such, in each case relating to or arising out of the Purchased Assets or any Picture, or (iii) that requires any future payment by any Seller or its Affiliates to any Person in connection with any Picture. None of the Purchased Assets is subject to any Order. In connection with the Wonka Dispute, the PM2 Dispute and the Other Warner Disputes, there have been no, nor does any Seller have Knowledge of any, threatened, adverse interim or final Orders by a court or arbitrator against any Seller or any of its Affiliates that could reasonably be expected to adversely impact such Seller's ability to comply with the terms of the Transaction Documents and/or Buyer's rights under the Transaction Documents, other than in connection with Matrix 4.

(f)    Absence of Certain Changes or Events.  Except as set forth on Section 4.01(f) of the Disclosure Schedules, since December 6, 2023, none of the Sellers has:

(i)    sold, transferred, leased, subleased, licensed or otherwise disposed of, or imposed or suffered to be imposed any Adverse Claim on, the Purchased Assets;

(ii)    accelerated or delayed collection of any material notes or material accounts receivable, advances, cash flows or other income or revenues of whatever kind or nature arising out of or related to the Purchased Assets;

(iii)    delayed or accelerated payment of any material account payable or other material Liability arising out of or related to the Purchased Assets;

(iv)    paid any material amount in respect of the Purchased Assets as a result of awards or settlements in connection with any Proceeding (including any audit);

(v)    (1) cancelled, compromised, waived or released any material right in Sellers' favor or claim of such Seller with respect to any Purchased Assets or (2) settled or compromised any Proceeding (including any audit) with respect to any Purchased Assets;

(vi)    entered into, amended, modified or terminated any Assumed Contract, or cancelled, modified or waived any debts or claims or waived any rights held by it thereunder;

(vii)    entered into any contract or transaction with any Affiliate pertaining to or affecting the Purchased Assets;

(viii)    (1) made, changed or revoked any Tax election, (2) changed an annual accounting period, (3) adopted or changed any accounting method with respect to Taxes, (4) filed any amended Tax Return, (5) entered into any closing agreement, (6) settled or compromised any Tax claim or assessment, or (7) consented to any extension or waiver of the limitation period applicable to any claim or assessment with respect to Taxes; in each case, to the extent such action would adversely affect the Purchased Assets in a Post-Closing Tax Period; or

(ix)    agreed, whether in writing or otherwise, to take any of the actions specified in this Section 4.01(f).

(g)    Pictures.

(i)    Ownership of Derivative Rights.  Annex III hereto sets forth a true, correct and complete list of each Picture, including, for each such Picture, the percentage and nature of the Derivative Rights for such Picture owned by Sellers.  No Other than pursuant to the Loompala Option Agreement, no party (including, without limitation, Magnum and its Affiliates) owns or has any right to purchase any Derivative Rights owned by the Sellers' in any Pictures.

(ii)    Picture Information.  All written information (excluding any estimates, projections, forecasts, opinions with respect to future events or library valuations prepared by third party non-affiliated non-affiliated appraisers, as to which the Sellers make no representation other than that none of them altered the contents thereof) heretofore furnished by any Seller or any of their Affiliates in writing to Buyer for purposes of or in connection with this Agreement or the Transactions is, and all such written information hereafter furnished by or on behalf of the Sellers or any of their Affiliates to Buyer will be, true, complete and accurate in all material respects, on the date such information is furnished, stated or certified, and all expressions of expectation, intention, belief and opinion contained in that information were given (or when hereafter given, shall be given) honestly and on reasonable grounds after due and careful inquiry.

(h)    Assumed Contracts.

(i)    (h) Assumed Contracts.  Section 4.01(h)(i) of the Disclosure Schedules sets forth a true, correct and complete list of all the Assumed Contracts.  True, complete and accurate copies of each Assumed Contract, together with all modifications and amendments thereto, have previously been made available to Buyer.  Except as set forth on Section 4.01(h) of the Disclosure Schedules, each Each Assumed Contract is valid, binding, and in full force and effect and is enforceable by the applicable Seller party thereto (or to whom the rights therein were assigned) in accordance with its terms and is not subject to any material claims, charges, set-offs or defenses.  Each

(ii)    Except as set forth in Section 4.01(h)(ii) of the Disclosure Schedules, each Seller has performed the material obligations required to be performed by it to date under the Assumed Contracts and no Seller is (with or without the lapse of time or the giving of notice, or both) in material breach or default thereunder, nor has any event occurred that would give rise to any right of notice, modification, acceleration, payment, cancellation or termination of or by another party under, or in any manner release any party thereto from any material obligation under, any such Assumed Contract and, to the Knowledge of the Sellers, no other party to the Assumed Contract is (with or without the lapse of time or the giving of notice, or both) in material breach or default thereunder and no event has occurred that with the giving of notice or the passage of time or both would constitute a material breach or default by any other party, or that would give rise to any right of notice,

modification, acceleration, payment, cancellation or termination of or by any Seller under, or in any manner release any party thereto from any material obligation under, any such Assumed Contract. ~~No~~

(iii)     Except as set forth in Section 4.01(h)(iii) of the Disclosure Schedules, no Seller has received any notice of the intention of any third party to terminate, cancel or rescind any Assumed Contract. ~~As of immediately prior to the Closing, the Assumed Contracts are all of the agreements to which any Seller or any of their affiliates is party with respect to the Purchased Assets.~~

(iv)     As of immediately prior to the Closing, excluding certain assignment agreements pursuant to which the Sellers (or their predecessors in interest) were assigned certain Assumed Contracts and Derivative Rights being acquired by Buyer hereunder, the Assumed Contracts are all of the agreements to which any Seller or any of their affiliates is party with respect to the Purchased Assets.

(v)     Except as set forth in Section 4.01(h)(v) of the Disclosure Schedules, there are no amounts owed, accrued or due or payable by any Seller pursuant to any Assumed Contract, including any shortfall payments, advances or similar payments.

(vi)     No Assumed Contract has been altered, amended or modified in any manner by any Seller (or to such Seller's Knowledge by any other party to such agreements) since the date of execution except (y) as specified in the applicable document or (z) as such documentation has been previously provided to Buyer.

(i)     Derivative Rights.  Except (i) as set forth on Section 4.01(i) of the Disclosure Schedules and/or (b) with respect to Derivative Rights that are being purchased by Buyer pursuant to the Lot 3 Asset Purchase Agreement, to the Knowledge of the Sellers, no Seller owns, controls or otherwise holds any Derivative Rights.

(j)     First/Last Opportunity Rights.  No Person has any first/last opportunity rights (including, without limitation, rights of first refusal, rights of first negotiation, rights of last refusal, rights of first offer, or other rights of similar nature) or any "call" or "put" right with respect to any Purchased Assets that have not expired or terminated.

~~(k) Assumed Contracts.  Each Assumed Contract is valid, binding, and in full force and effect and is enforceable by the applicable Seller party thereto (or to whom the rights therein were assigned) in accordance with its terms and is not subject to any material claims, charges, set-offs or defenses.  Each Seller has performed the material obligations required to be performed by it to date under the Assumed Contracts and no Seller is (with or without the lapse of time or the giving of notice, or both) in material breach or default thereunder, nor has any event occurred that would give rise to any right of notice, modification, acceleration, payment, cancellation or termination of or by another party under, or in any manner release any party thereto from any material obligation under, any such Assumed Contract and, to the Knowledge of the Sellers, no other party to the Assumed Contract is (with or without the lapse of time or the giving of notice, or both) in material breach or default thereunder and no event has occurred that with the giving of notice or the passage of time or both would constitute a material breach or default by any other party, or that would give rise to any right of notice, modification, acceleration, payment, cancellation or termination of or by any Seller under, or in any manner release any party thereto from any material obligation under, any such Assumed Contract.  No Seller has received any notice of the intention of any third party to terminate, cancel or rescind any Assumed Contract.  Except as set forth in Section 4.01(k) of the Disclosure Schedules, there are no amounts owed, accrued or due or payable by any Seller pursuant to any Assumed Contract, including any shortfall payments, advances or similar payments.  No Assumed Contract has been altered, amended or modified in any manner by any Seller (or to such Seller's Knowledge by any other party to such agreements) since the date of~~

execution except (y) as specified in the applicable document or (z) as such documentation has been previously provided to Buyer.

(k)     Copyrights and Copyright Registrations.  Section 4.01(k) of the Disclosure Schedules sets forth a true, correct and complete list of all registered Copyrights with respect to Wonka that are owned by or currently licensed to, or purported to be owned by or currently licensed to, a Seller, which schedule shall include, with respect to all such Copyrights, (1) the name of the registrant (as applicable) and each Seller that currently owns any portion of such Copyright (including the ownership share of each such Seller), (2) the registration number (as applicable), (3) the status of the registration (as applicable), and (4) the jurisdiction where the registration is located.  Wonka has, as of the date hereof, been registered in the U.S. Copyright Office. No Seller owns or is currently licensed any Trademarks with respect to Wonka.

(l)     Intellectual Property Protection.  The Purchased Wonka Naked Copyrights that are protectable under Applicable Copyright Law are registered, recorded, applied for or otherwise protected and validly subsisting under all Applicable Copyright Laws, and, to the Knowledge of the Sellers, no material protectable portion of any of the foregoing is in the public domain in the United States.  Each Seller uses and has used commercially reasonable efforts to protect, confirm, register (to the extent such registration is or was, as the case may be, customary industry practice at the time the rights were created), maintain, police and enforce all Purchased Wonka Naked Copyrights, including making all filings, paying all fees and executing all appropriate written agreements in connection therewith, in each case to the extent any of the Sellers has the right to protect, confirm, register, maintain, police or enforce its rights in the applicable Picture.  No Seller or any of its Affiliates (nor, to the Knowledge of the Sellers, any other Person) has received any written notice from a third Person that such third Person has exercised or intends to exercise any Copyright Termination with respect to Wonka.

(m)     (l)  Title to Purchased Assets. Except as set forth on Section 4.01(lm) of the Disclosure Schedules, Sellers have and will convey to Buyer (and upon consummation of the Transactions, Buyer will acquire) good, valid and marketable title to, and sole and exclusive legal and beneficial ownership of, the Purchased Assets, free and clear of any Adverse Claim (other than the Assumed Liabilities).

(n)     (m)  No Brokers or Finders. Except as set forth on Section 4.01(m)Section 4.01(n) of the Disclosure Schedules, none of the Sellers nor any Affiliate thereof has retained any broker or finder, agreed to pay or made any statement or representation to any Person that would entitle such Person to, any broker's, finder's or similar fees or commissions in connection with the Transactions.

Section 4.02     **Representations and Warranties of Buyer**.  Buyer hereby represents and warrants to the Sellers as of the Effective Date and the Closing Effective Date as follows:

(a)     Organization. Buyer is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of Delaware.

(b)     Authorization. Buyer has full power and authority to enter into this Agreement.

(c)     Enforceability. Upon entry of the Sale Order, this Agreement, and each other Transaction Document to which Buyer is or is to be a party is, or when delivered will have been, duly executed and delivered by Buyer and is, or when delivered will be, the valid and binding agreement of Buyer, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, moratorium and other similar laws affecting the rights of creditors and to general principles of equity (whether considered in a suit at law or in equity or pursuant to arbitration).

(d)     No Violation. The execution and delivery by Buyer, and the performance by Buyer of its obligations under, the Transaction Documents to which it is or is to be a party, and the Transactions, do not (i) contravene, conflict with or violate its Constitutive Documents or (ii) contravene, conflict with or violate any material applicable Law or Order.

(e)     Source of Funds. Buyer represents that the following statement is an accurate representation as to each source of funds (a "**Source**") to be used by Buyer to pay the Purchase Price for the Purchased Assets: The Source does not include assets of any employee benefit plan, other than a plan exempt from the coverage of ERISA. As used in this Section 4.02(e), the term "**employee benefit plan**" shall have the meaning assigned to such term in Section 3 of ERISA.

(f)     Investment Representations. Buyer is sophisticated with respect to decisions to acquire assets of the type represented by the Purchased Assets and either it, or the Person exercising discretion in making its decision to acquire the Purchased Assets, is experienced in acquiring assets of such type.

(g)     Acknowledgement. Except for the representations and warranties made by the Sellers in Section 4.01 of this Agreement, Buyer hereby acknowledges that (i) none of the Sellers nor any of their Affiliates has made, or has agreed to make, any express or implied representation, warranty, guarantee or agreement with respect to the film industry as a whole or the business and financial risks associated with the film industry as a whole, (ii) it has made its own inquiry and investigation into, and based thereon has formed an independent judgment concerning, the film industry as a whole and the business and financial risks associated with the film industry as a whole, and (iii) there are uncertainties inherent in making any estimates, projections, forecasts or opinions with respect to future events and that any such estimates, projections, forecasts or opinions delivered by the Sellers or any of their Affiliates pursuant to the Transaction Documents shall be subject to such uncertainties.

(h)     No Brokers or Finders. None of Buyer nor any Affiliate thereof has retained any broker or finder, agreed to pay or made any statement or representation to any Person that would entitle such Person to, any broker's, finder's or similar fees or commissions in connection with the Transactions.

## ARTICLE V
## DEPOSITS; NO SETOFF; NO SURVIVAL

**Section 5.01     Deposits to Buyer's Account**. In the event that any amounts that are required under any Transaction Document to be paid directly to Buyer or otherwise constitute Purchased Assets are received by any Seller or any of their respective Affiliates after the Closing Effective Date, such Person shall, and each Seller shall cause such Person to, as applicable, hold such amounts in trust, and deposit such amounts in the form received, immediately, but in any event not later than two (2) business days of its receipt thereof, in an account designated in writing by Buyer.

**Section 5.02     No Setoff**. Each payment of any amounts included in the Purchased Assets required under Section 5.01 shall not be reduced by any setoff or deduction on account of any claim or other charge other than with respect to any tax withholding or similar governmental charge or as expressly permitted or required under this Agreement.

**Section 5.03     No Survival**. The respective representations and warranties of the Parties hereto hereunder shall not survive the Closing. The respective covenants of the Parties hereto required to be performed on or prior to the Closing Effective Date shall not survive the Closing.

## ARTICLE VI
## COVENANTS

Section 6.01    **Conduct of the Sellers Prior to Closing**.

(a)    During the period from the Effective Date until the earlier of (i) the Closing Effective Date, or (ii) the date this Agreement is validly terminated in accordance with its terms (such period, the "**Pre-Closing Period**"), unless otherwise consented to in writing by Buyer, the Sellers shall (A) operate their businesses and the Purchased Assets only in the ordinary course of business as debtors in possession, (B) preserve and maintain their business organization and assets (including the Purchased Assets), (C) keep available the services of the current Service Providers of the Sellers or any of their Affiliates. During the Pre-Closing Period, Sellers shall not commence or settle any Proceeding relating to the Purchased Assets or the Pictures (including any audit or the Wonka Dispute, the PM2 Dispute or Other Warner Disputes) if such commencement or settlement could reasonably be expected to adversely affect, in any material respect, the Purchased Assets (including, without limitation, the Post-Cutoff Cash Flows) or the Pictures, unless otherwise authorized by a finding of the Bankruptcy Court.

(b)    Without limiting the generality of the foregoing, except as consented to in writing by Buyer or as required by Law or directed by the Bankruptcy Court, during the Pre Closing Period, the Sellers shall not, except as set forth in Section 6.01(b) of the Disclosure Schedules:

(i)    issue, sell, transfer, lease, license, convey, assign, abandon, cancel, pledge, dispose of, or otherwise subject to any Adverse Claim, any Purchased Assets;

(ii)    incur any Indebtedness or issue any debt securities or assume, guarantee or endorse, or otherwise become responsible for, the obligations of any Person, or make any loans or advances, in each case affecting the Purchased Assets;

(iii)    amend, waive, modify, terminate or give any consent or approval under the Assumed Contracts, or amend, waive, modify, terminate or give any consent or approval regarding any Seller's rights thereunder, or enter into any Contract in connection with the Purchased Assets;

(iv)    pay, discharge or satisfy any Liability relating to the Purchased Assets;

(v)    cancel, compromise, waive or release any right or claim or Proceeding (including any audit) relating to the Purchased Assets;

(vi)    permit the lapse of any existing policy of insurance relating to the Purchased Assets;

(vii)    commence or settle any Proceeding relating to the Purchased Assets or the Pictures (including any audit or the Wonka Dispute, the PM2 Dispute or any Other Warner Disputes) if such commencement or settlement could reasonably be expected to adversely affect, in any material respect, the Purchased Assets, unless otherwise authorized by a finding of the Bankruptcy Court;

(viii)    fail to comply in all material respects with all applicable Laws in any manner that could reasonably be expected to adversely affect, in any material respect, the Purchased Assets or the rights or remedies of Buyer under the Transaction Documents;

(ix)    fail to maintain their existence as a limited liability company or corporation, as the case may be, validly existing and in good standing under the laws of its jurisdiction of organization and obtain and preserve its qualification to do business in each jurisdiction in which the failure to so

could reasonably be expected to adversely affect, in any material respect, the Purchased Assets or the rights or remedies of Buyer under the Transaction Documents;

(x)      (A) fail to maintain all organizational formalities, (B) fail to comply with the provisions of its Constitutive Documents (including with respect to Separateness or independent directors) in all material respects at all times, (C) amend any provisions of their Constitutive Documents in any manner that could reasonably be expected to adversely affect, in any material respect, the Purchased Assets or the rights or remedies of Buyer under the Transaction Documents, (D) permit any Affiliate to assume or guarantee any of the Liabilities of any Seller other than as required by this Agreement or documents governing any Seller's Indebtedness or ABS Obligations that are in effect as of the Effective Date, (E) fail to make all decisions regarding any Seller's organization and operation independently, or allow such decisions to be dictated by any other Person, (F) fail to take such other actions as are necessary on a Seller's part to ensure that all corporate procedures required by their Constitutive Documents are duly and validly taken, and (G) act in any manner that would foreseeably mislead others with respect to its separate identity from any Affiliate;

(xi)     fail to pay and discharge and fully perform, at or before maturity, all of their respective material obligations and Liabilities, including, without limitation, Tax liabilities and other governmental claims levied or imposed upon such Seller or upon the income, properties or operations of such Seller, judgments, settlement agreements and all obligations of such Seller under the Transaction Documents, except where the same may be contested in good faith by appropriate proceedings, and will maintain, in accordance with IFRS, reserves as appropriate for the accrual of any of the same;

(xii)    engage in any dealings or transactions with any Person described or designated in the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control or in Section 1 of the ~~Anti Terrorism~~Anti-Terrorism Order;

(xiii)   take any action, or intentionally fail to take any action, that would cause any representation or warranty made by the Sellers in this Agreement or any other Transaction Document to be untrue or result in a breach of any covenant made by the Sellers in this Agreement or any other Transaction Document, or that has or would reasonably be expected to have a Material Adverse Effect;

(xiv)    enter into any transaction or Contract between any Seller, on the one hand, and any Affiliate of such Seller, on the other hand, with respect to the Purchased Assets;

(xv)     (A) make, change or revoke any Tax election, (B) change an annual accounting period, (C) adopt or change any accounting method with respect to Taxes, (D) file any amended Tax Return, (E) enter into any closing agreement, (F) settle or compromise any Tax claim or assessment, or (G) consent to any extension or waiver of the limitation period applicable to any claim or assessment with respect to Taxes; in each case, to the extent such action would adversely affect the Purchased Assets in a Post-Closing Tax Period; or

(xvi)    announce an intention, enter into any formal or informal agreement, or otherwise make a commitment to do any of the foregoing.

Section 6.02      **Access**. During the Pre-Closing Period, except to the extent prohibited by applicable Law, the Sellers shall provide, and cause their Service Providers, attorneys, accountants, advisors, consultants and other agents to provide, to Buyer and its accounting, legal and other representatives, as well as their respective Service Providers, affiliates and other agents, access at all reasonable times and during

normal business hours, upon reasonable notice, to the Sellers' personnel and to business, financial, legal, tax, compensation and other data and information concerning the Purchased Assets as Buyer deems reasonably necessary or advisable; provided, however, that, for avoidance of doubt, the foregoing shall not require the Sellers to waive, or take any action with the effect of waiving, their attorney-client privilege or any confidentiality obligation to which they are bound with respect thereto. After the Closing, upon reasonable advance written request by Sellers or their Service Providers, except to the extent prohibited by applicable Law, the Buyer shall provide, and cause its Service Providers, attorneys, accountants, advisors, consultants and other agents to provide, to each Seller and its accounting, legal and other representatives, as well as their respective Service Providers, affiliates and other agents, access at all reasonable times and during normal business hours, upon reasonable notice, access to business, financial, legal, tax, compensation and other data included in the Purchased Assets prior to Closing to the extent such access is necessary in order for Sellers (as applicable) to comply with applicable Law or any contract to which it is a party, for liquidation, winding up, Tax reporting or other proper purposes and so long as such access is subject to an obligation of confidentiality; provided, however, that, for avoidance of doubt, the foregoing shall not require the Sellers to waive, or take any action with the effect of waiving, their attorney- client privilege or any confidentiality obligation to which they are bound with respect thereto.

Section 6.03    **Notification of Certain Matters**.

(a)    During the Pre-Closing Period, Sellers shall give prompt written notice to Buyer of (i) the occurrence or non-occurrence of any event, the occurrence or non-occurrence of which would render any representation or warranty of the Sellers contained in this Agreement or any other Transaction Document, if made on or immediately following the date of such event, untrue, inaccurate or misleading, (ii) the occurrence of any event that, individually or in combination with any other events, has had or could reasonably be expected to have a Material Adverse Effect, (iii) any failure of the Sellers, or any Affiliate of the Sellers to comply with or satisfy any covenant or agreement to be complied with or satisfied by it under the Transaction Documents or any event that would otherwise result in the nonfulfillment of any of the conditions to Buyer's obligations hereunder, (iv) any notice or other communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions, (v) any notice or other communication from any Governmental Authority in connection with the Transactions, (vi) any material and adverse change to the Purchased Assets, (vii) any notice of any material breach, default or termination of any Assumed Contract, (viii) the occurrence of any event which would or would reasonably be likely to (A) prevent or materially delay the consummation of the Transactions or (B) result in the failure of any condition to Closing set forth in this Agreement to be satisfied, or (ix) any Proceeding pending or, to the Knowledge of the Sellers, threatened against a Party or the Parties relating to the Transactions or otherwise affecting the Purchased Assets.

(b)    Without limiting anything set forth in Section 6.03(a), during the Pre-Closing Period, to the fullest extent permitted or consistent with any applicable Order of any court, tribunal or arbitrator in the Wonka Dispute, the PM2 Dispute or the Other Warner Disputes, Sellers and their Affiliates will (and will cause their litigation counsel to) furnish Buyer with the material details respecting any offer of settlement or other resolution either proposed by Sellers or its Affiliates or by WBEI or its Affiliates that could reasonably be expected to adversely affect the Purchased Assets (and at Buyer's request, Sellers shall take all reasonable steps to obtain any necessary consent Sellers reasonably believe is required in order to furnish Buyer with such offer of settlement or other resolution or any information related thereto); provided, nothing in this Section 6.03(b) shall restrict Sellers or their Affiliates from entering into any settlement or other resolution of the Other Warner Disputes in its sole discretion, subject to Buyer's consent rights pursuant to Section 6.01(b)(vii). To the extent that any Order of any Governmental Authority does not permit Sellers or their Affiliates from furnishing information as described in this Section 6.03(b), upon reasonable request from Buyer, Sellers and/or their Affiliates shall seek modification or relief from such Order such that Buyer shall be permitted to receive such information. Sellers shall be solely responsible for the payment of all arbitration

fees, attorneys' fees, costs, experts, or any other fees and costs in connection with the Other Warner Disputes.

(c)    From and after the Closing Effective Date through a period that is the earlier of (a) the closing of the Bankruptcy Cases; or (b) the third (3rd) anniversary thereof, subject to any confidentiality obligations applicable to the Sellers or their Affiliates, if any Seller or its Affiliates receives notice of a pending or threatened Proceeding against, relating to or affecting the Purchased Assets (including, without limitation, any claimed breach by any Seller or its Affiliates under any Picture Agreement), then such Person will (i) promptly notify Buyer of same; and (ii) give Buyer copies of all notices and other writings relating to it received by such Person promptly after their receipt.

Section 6.04    **Efforts to Close**. Each Party shall, and Sellers shall cause their Affiliates to, use commercially reasonable efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the Transactions as promptly as practicable. In furtherance and not in limitation of the foregoing, the Sellers shall permit Buyer reasonably to participate in the defense and settlement of any claim, suit or cause of action relating to this Agreement or the Transactions, and the Sellers shall not settle or compromise any such claim, suit or cause of action without Buyer's written consent.

Section 6.05    **Tax Matters**.

(a)    Buyer and the Sellers agree to furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Purchased Assets, including, without limitation, access to Books and Records, as is reasonably necessary for the filing of all Tax Returns by Buyer or the Sellers, the making of any election relating to Taxes, the preparation for any audit with respect to Taxes by any Governmental Authority and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Buyer and the Sellers shall retain all books and records with respect to Taxes pertaining to the Purchased Assets for a period of at least seven (7) years following the Closing Effective Date. Buyer and the Sellers shall cooperate fully with each other in the conduct of any audit, litigation or other proceeding relating to Taxes involving the Purchased Assets.

(b)    To the extent not otherwise provided in this Agreement, the Sellers shall be responsible for and shall promptly pay when due all Property Taxes levied with respect to the Purchased Assets attributable to the Pre-Closing Tax Period. All Property Taxes levied with respect to the Purchased Assets for the Straddle Period shall be apportioned between Buyer and the Sellers in the manner provided in Section 6.06(e)(ii). The Sellers shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period. Upon receipt of any bill for such Property Taxes by Buyer or any Seller, Buyer or the Sellers as applicable, shall present a statement to the other setting forth the amount of reimbursement to which Buyer or the Sellers, as applicable, are entitled under this Section 6.06(b) together with such supporting evidence as is reasonably necessary to calculate the proration amount. The proration amount shall be paid by the Party or Parties owing it to the other(s) within ten (10) days after delivery of such statement. In the event that Buyer or any Seller makes any payment for which it is entitled to reimbursement under this Section 6.06, Buyer or the Sellers shall make such reimbursement promptly but in no event later than ten (10) days after the presentation of a statement setting forth the amount of reimbursement to which the presenting Party is entitled along with such supporting evidence as is reasonably necessary to calculate the amount of reimbursement.

SMRH:4908-5037-9589.94927-5764-9012.1
101725

76KN-409057

(c)     All Transfer Taxes will be borne one hundred percent (100%) by Buyer. The Buyer shall duly prepare any Tax Return or other document with respect to such Transfer Taxes (and Sellers shall cooperate with respect thereto as necessary) and Buyer shall pay such Transfer Taxes when due.

(d)     The Sellers shall promptly notify Buyer in writing upon receipt by any Seller of written notice of any pending or threatened Tax audits or assessments relating to the income, properties or operations of such Seller that may reasonably be expected to relate to or give rise to an Excluded Tax or an Adverse Claim on the Purchased Assets.

(e)     The portion of any Taxes payable with respect to a Straddle Period that, for the purposes of this Agreement, shall be allocated to Pre-Closing Tax Period are:

(i)     in the case of Taxes that are either (A) based upon or related to income or receipts or (B) imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible), other than conveyances pursuant to this Agreement, deemed equal to the amount which would be payable if the taxable year ended on the Closing Date; and

(ii)     in the case of Property Taxes or other Taxes imposed on a periodic basis with respect to the assets shall be the product of (A) the amount of such Taxes for the entire period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period), and (B) a fraction, the numerator of which is the number of calendar days in the portion of the Straddle Period ending on the Closing Date and the denominator of which is the number of calendar days in the entire Straddle Period.

(f)     To the extent required to comply with any applicable Law relating to Tax, Buyer and the Sellers shall consult with each other to reasonably determine that portion of the Purchase Price that is properly attributable to any Purchased Assets sold by VRF to Buyer hereunder; provided, that the Parties agree that not more than [●]one percent ([●]1%) of the Purchase Price shall be considered as so attributable to any such Purchased Assets.

Section 6.06     **Further Assurances**. Subject to the terms of this Agreement, from and after the date hereof, each Party hereto agrees to, and to cause their Affiliates to, as applicable, to use commercially reasonable efforts to (a) furnish upon request to each other Party such further information in connection with the Transaction, (b) execute and deliver to each other Party such other documents consistent herewith (after a reasonable period to review and discuss such documents) and (c) do such other acts and things consistent herewith, in each case as another Party may reasonably request for the purpose of carrying out the intent of this Agreement, the other Transaction Documents to which it is a party and the Transactions. To the extent any Purchased Assets are in the name of an Affiliate of a Seller, the Sellers shall cause such Affiliate to sell, assign, transfer, convey and deliver to Buyer the applicable Purchased Assets and further cause their respective Affiliates to comply with the terms of this Agreement and the other Transaction Documents to the extent such terms purport to bind such Affiliate. Following the Closing, each Seller shall take any actions and execute any documents as reasonably requested by Buyer in furtherance of this Section 6.06 relating to the Purchased Assets. In the event that such Seller does not take such actions or deliver such executed documents to Buyer within five (5) business days following Buyer's request therefor, Buyer shall have the authority as such Seller's true and lawful attorney-in-fact to take any such actions and execute any such documents on behalf of such Seller relating to the Purchased Assets. In such event, Buyer shall provide such Seller with a copy of any document so executed; provided, that the inadvertent failure to do so shall not be deemed a breach hereof.

Section 6.07     **Books and Records**. Promptly following the Closing Effective Date, and in no event later than ten (10) business days thereafter (with respect to any Books and Records provided to Buyer in the

Dataroom as of the Closing Effective Date) or sixty (60) days thereafter (with respect to all other Books and Records), Sellers shall use commercially reasonable efforts to deliver to Buyer, via a cloud- based server or another electronic format reasonably acceptable to Buyer, copies of all Books and Records, in the Sellers' possession in an electronic format. No later than sixty (60) days following the Closing Effective Date, Sellers shall use commercially reasonable efforts to deliver to Buyer, or otherwise make accessible to Buyer via a cloud-based server or another electronic format reasonably acceptable to Buyer, copies of all Books and Records, in the Sellers' possession in a physical format. From and after the Closing Effective Date through the third (3rd) anniversary thereof, each Seller will hold, and will cause its Affiliates and Representatives to hold, in confidence from any other Person, all confidential information, documents, materials and other information related to the Books and Records.

Section 6.08    **Wonka Dispute and PM2 Dispute**. From and after the Closing Effective Date, the Sellers shall, in coordination with Buyer, use commercially reasonable efforts to (a) facilitate the substitution of Buyer (or its designated Affiliate) in place of VRF, VRFNA and VRPNA (as respondents and counter-claimants), as the real party in interest in connection with the Wonka Dispute and the PM2 Dispute, including without limitation, taking all actions and executing all documents necessary to remove all bars, restrictions, or impediments that may prevent Buyer from viewing or obtaining any pleadings, filings, served documents, correspondence with third parties and/or opposing counsel, research memos or other summaries, deposition transcripts, deposition summaries or witness interview notes/summaries, expert reports or summaries, discovery requests, discovery responses, orders, or any other documents produced or provided in the Wonka Dispute or the PM2 Dispute (this includes assisting in making Buyer or its designated Affiliate a party to any protective order), (b) facilitate the substitution of Buyer's designated counsel in place of VRF, VRFNA and VRPNA's current counsel of record in the Wonka Dispute, and the PM2 Dispute, (c) provide introductions to relevant third parties (such as experts, witnesses, consultants, or external counsel previously engaged by Sellers), (d) provide to Buyer any documents, information and/or other materials in Seller's possession or control reasonably necessary to support such substitutions or otherwise facilitate Buyer's assumption and continued defense, prosecution and/or resolution of the Wonka Dispute and the PM2 Dispute, which, for the avoidance of doubt, shall be at Buyer's cost and expense, (e) facilitate the transfer, to the extent necessary and permissible, of access credentials, login information, or any other tools required for Buyer to fully participate in the Wonka Dispute and the PM2 Dispute, (f) upon the substitution of Buyer (or its designated Affiliate) in place of VRF, VRFNA and VRPNA as the real party in interest in connection with the Wonka Dispute and the PM2 Dispute, and subject to Buyer or its designated Affiliate becoming a party to any protective order, facilitate the transfer to Buyer of Seller's entire client litigation file in customary form, including without limitation, unredacted documents produced or provided by any party in the Wonka Dispute or the PM2 Dispute, unredacted copies of pleadings, filings, served documents, discovery requests, discovery responses, orders, correspondence with third parties and/or opposing counsel, research memos or other summaries, deposition transcripts, deposition summaries or witness interview notes/summaries, expert reports or summaries, or any other document produced or provided to Seller in the Wonka Dispute or the PM2 Dispute, (g) make reasonably available to Buyer, during normal business hours, any employees or personnel of VRF, VRFNA, and VRPNA for purposes of information interviews and testimony (including preparation for the same), and for signing declarations, affirmations, affidavits, or similar statements as Buyer may reasonably request from time to time or provide Buyer with such employee's or personnel's last known contact information; (h) make prior counsel for Sellers reasonably available to assist with the transition to Buyer's counsel and cooperate with any requests from Buyer or its counsel, which, for the avoidance of doubt, shall be subject to counsel's availability and at Buyer's cost and expense; and (i) for any insurance policies that may provide coverage for any claims made against Sellers, provide such policies to Buyer along with all communications with any such insurance companies and take all necessary steps to ensure continuity of coverage.  For the avoidance of doubt, from and after the Closing Effective Date, Buyer shall have sole and exclusive control over, and shall be entitled to assert or waive, any and all client privileges or legal doctrines that permit the withholding of documents or information in connection with the Wonka Dispute or the PM2 Dispute, including, without limitation, the attorney-client privilege.  Sellers shall

preserve and not destroy, delete, or alter any documents, files, or evidence related to the Wonka Dispute or the PM2 Dispute until Buyer confirms in writing that such materials may be released or destroyed. Sellers confirm that all appropriate "litigation hold" notices have been circulated and implemented.

# ARTICLE VII
# BANKRUPTCY COURT MATTERS

Section 7.01 **Sale Motion, Bankruptcy Procedures Hearing, Bid Procedures and Sale Order**. The Sellers shall use their reasonable best efforts to seek entry of the Sale Order, and appropriate supporting declarations, in form and substance acceptable to the Sellers and Buyer, on or prior to ~~June 18~~December 15, 2025. The Sellers shall affix a true and complete copy of this Agreement to the Sale Motion filed with the Bankruptcy Court. The Sellers shall comply with all notice requirements (a) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedures and/or (b) imposed by the Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith. In the event the entry of the Sale Order is appealed, the Sellers shall use commercially reasonable efforts to defend such appeal. Sellers shall have timely served a cure notice (the "**Cure Notice**") by first class mail on all non-debtor counterparties to Contracts. The Cure Notice shall inform each recipient that its respective Contract may be designated as either assumed or rejected, and the timing and procedures relating to such designations, and, to the extent applicable (i) the title of the Contract, (ii) the name of the counterparty to the Contract, (iii) the Sellers' good faith estimates of the cure amounts required in connection with such Contract, (iv) the identity of Buyer, (v) the deadline by which any such Contract counterparty may file an objection to the proposed assumption and assignment and/or cure, and the procedures relating thereto, and (vi) that such Contract counterparty's failure to object timely to the proposed assumption or cure amount will be deemed to be consent to such assumption to cure amount.

Section 7.02 **Auction**. The Parties acknowledge and agree that (a) the Auction for the Purchased Assets was conducted on May 28, 2025 in accordance with the Bidding Procedures Order, and (b) at such Auction, the Debtors selected (i) Buyer as the Successful Bidder with respect to the Purchased Assets and (ii) WBEI as the Backup Bidder with respect to the Purchased Assets, in each case, in accordance with the Bidding Procedures Order.

Section 7.03 **Bankruptcy Filings**. From and after the Effective Date and until the Closing Effective Date, to the extent reasonably practicable, the Sellers shall deliver to Buyer drafts of any material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement and the operation of the Sellers for Buyer's prior review and comment at least two (2) business days prior to the filing or submission thereof, and such filings shall be acceptable to Buyer to the extent they relate to the Purchased Assets, the Assumed Liabilities, or any of Buyer's obligations hereunder. Each of the Sellers and Buyer shall appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement and keep the other Party reasonably apprised of the status of material matters related to this Agreement, including, upon reasonable request promptly furnishing the other Party with copies of notices or other communications received by such Party from the Bankruptcy Court or any third party or any Governmental Authority with respect to the transactions contemplated by this Agreement. Buyer agrees that it will use its commercially reasonable efforts to assist the Sellers in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, and (y) establishing adequate assurance of future performance within the meaning of section 365 of the Bankruptcy Code.

Section 7.04    **Sale Free and Clear**. The Sellers acknowledge and agree, and the Sale Order shall provide that, on the Closing Effective Date and concurrently with the Closing, all then existing or thereafter arising obligations, Adverse Claims (other than the Assumed Liabilities) of, against or created by the Sellers or their bankruptcy estate, pursuant to section 363(f) of the Bankruptcy Code, shall be fully released from, and with respect to, the Purchased Assets and may not be asserted against Buyer after the Closing Effective Date. On the Closing Effective Date, the Purchased Assets shall be transferred to Buyer free and clear of all Adverse Claims (other than the Assumed Liabilities), pursuant to section 363 of the Bankruptcy Code. Sellers shall ensure that the Sale Order becomes effective immediately upon entry thereof and that the provisions of Federal Rules of Bankruptcy Procedure 6004(g) and 6006(d) shall be waived for cause.

Section 7.05    **Excluded Assets**. For the avoidance of doubt, nothing in this Agreement will restrict Sellers or their Affiliates from selling, disposing of or otherwise transferring any Excluded Assets, or from settling, delegating or otherwise transferring any Excluded Liabilities, in each case, with the approval of the Bankruptcy Court, or from entering into discussions or agreements with respect to the foregoing.

### ARTICLE VIII
### TERMINATION

Section 8.01    **Termination**. This Agreement and the obligations of the Parties to consummate the Transactions may, by written notice given on or prior to the Closing Effective Date, in the manner provided in this Section 8.01, be terminated at any time prior to the Closing only as follows:

(a)    by mutual written consent of Buyer and the Seller Representative, at which point the Buyer Deposit shall be returned to Buyer;

(b)    by Buyer if at any time (i) any of the representations or warranties of any Seller in Section 4.01 is or becomes untrue or inaccurate such that the condition set forth in Section 3.01(a) would not be satisfied (treating such time as if it were the Closing for purposes of this Section 8.01(b)), (ii) the condition set forth in Section 3.01(e) cannot be satisfied (treating such time as if it were the Closing for purposes of this Section 8.01(b)) or (iii) there has been a breach on the part of any Seller or Parent of any of its covenants or agreements contained in this Agreement such that the condition set forth in Section 3.01(b) would not be satisfied (treating such time as if it were the Closing for purposes of this Section 8.01(b)), and in the case of (i) through (iii) above, such breach or failure to satisfy such condition cannot be cured by the Sellers or Parent or, if capable of being cured, has not been cured by the applicable Sellers or Parent by the date that is three (3) business days prior to the Outside Date, at which point the Buyer Deposit shall be returned to Buyer; provided that Buyer shall not be entitled to terminate pursuant to this Section 8.01(b) if the consummation of the Transactions is then being prevented by the willful and material breach by Buyer of any of its representations, warranties or covenants contained in the Agreement;

(c)    by the Sellers if at any time (i) any of the representations or warranties of Buyer in Section 4.02 is or becomes untrue or inaccurate such that the condition set forth in Section 3.02(a) would not be satisfied (treating such time as if it were the Closing for purposes of this Section 8.01(c)), or (ii) there has been a breach on the part of Buyer of any of its covenants or agreements contained in this Agreement such that the condition set forth in Section 3.02(b) would not be satisfied (treating such time as if it were the Closing for purposes of this Section 8.01(c)), and in the case of both (i) and (ii) above, such breach cannot be cured by Buyer or, if capable of being cured, has not been cured by Buyer by the date that is three (3) business days prior to the Outside Date, at which point the Buyer Deposit shall be retained by the Sellers; provided that the Sellers shall not be entitled to terminate pursuant to this Section 8.01(c) if the consummation of the Transactions is then being prevented by the willful and material breach by Sellers or Parent of any of their representations, warranties or covenants contained in the Agreement;

(d)      by Buyer if the Closing has not occurred on or before ~~July 7~~December 31, 2025, or such later date, if any, as Buyer may agree upon in writing (as such date may be extended by the written consent of Buyer, the "**Outside Date**"), at which point the Buyer Deposit shall be returned to Buyer; provided that Buyer shall not be entitled to terminate pursuant to this Section 8.01(c) if the failure to consummate the Transactions by the Outside Date was primarily caused by the willful and material breach by Buyer of any of Buyer's representations, warranties or covenants contained in the Agreement;

(e)      by either Buyer or the Sellers if consummation of the Transactions is enjoined or prohibited by the terms of any Law or a final, non-appealable Order of any Governmental Authority having competent jurisdiction, at which point the Buyer Deposit shall be returned to Buyer; provided, however, that the party seeking to terminate shall not be entitled to terminate pursuant to this Section 8.01(e) if the imposition of such Order or the failure of such Order to be resisted, resolved or lifted, as applicable, was proximately caused by a breach of a representation, warranty, covenant or agreement on the part of Buyer (if it is seeking to terminate) or any Seller (if the Sellers are seeking to terminate);

(f)      by Buyer if any of the Bankruptcy Cases of a Seller are dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of the Sellers is appointed in the Bankruptcy Case of a Seller, at which point the Buyer Deposit shall be returned to Buyer;

(g)      Buyer, if (i) the Sale Order acceptable to Buyer shall not have been entered by the Bankruptcy Court by 11:59 p.m. (New York Time) on or before ~~June 18~~December 15, 2025, or (ii) following the entry of the Sale Order, the Sale Order shall (A) fail to be in full force and effect, (B) have been reversed, (C) have been stayed and such stay shall continue to be in effect for more than fourteen (14) days or (D) have been modified or amended in any manner adverse to Buyer without the prior written consent of Buyer. Under any such circumstance, the Buyer Deposit shall be returned to Buyer; or

(h)      by Buyer or Sellers upon the consummation of an Alternative Transaction, at which point the Buyer Deposit shall be returned to Buyer.

The Party seeking to terminate this Agreement pursuant to this Section 8.01 (other than pursuant to Section 8.01(a)) shall give prompt written notice of such termination to the other Parties hereto.

Section 8.02      **Effect of Termination**. In the event of termination of this Agreement as provided above, this Agreement shall immediately terminate and have no further force and effect and there shall be no Liability on the part of any Party to any other Party under this Agreement, except that (a) the covenants and agreements set forth in this Section 8.02 and Article IX and all definitions herein necessary to interpret any of the foregoing provisions shall remain in full force and effect and survive such termination indefinitely, (b) if applicable, the Buyer Deposit shall be released or retained in accordance with the terms of Section 8.01, and (c) nothing in this Section 8.02 shall release any Party from any Liability for any breach by such Party of this Agreement before the effective date of such termination, or otherwise affect any of the rights or remedies (whether under this Agreement, or at Law, in equity or otherwise) available to any Party with respect to the breach of this Agreement by any Party before the effective date of such termination.

Section 8.03      [Reserved].

# ARTICLE IX
# REMEDIES

Section 9.01      **Remedies**. Except as contemplated by Section 2.06(b) or as otherwise provided in Section 9.02, the Parties agree that the remedies and/or the termination of this Agreement in accordance with

the provisions of Article VIII shall be the sole and exclusive remedy of the Sellers (if the breaching party is Buyer) or Buyer (if the breaching party is a Seller) under this Agreement for any breach of representation and warranty made or any covenant or agreement to be performed on or prior to Closing.

Section 9.02    **Specific Performance**. The parties agree that irreparable damage for which monetary damages, even if available, would not be an adequate remedy, would occur in the event that any party does not perform the provisions of this Agreement (including failing to take such actions as are required of it hereunder to consummate the Transaction) in accordance with its specified terms or otherwise breaches such provisions. It is accordingly agreed that Buyer shall be entitled to an injunction or other equitable relief to prevent breaches of this Agreement by the Sellers and to enforce specifically the terms and provisions hereof, and the Sellers shall be entitled to an injunction or other equitable relief to prevent breaches of this Agreement by Buyer and to enforce specifically the terms and provisions hereof, this being in addition to any other remedy to which a non-breaching party is entitled at Law or in equity.

## ARTICLE X
## MISCELLANEOUS

Section 10.01    **Assignments**. This Agreement shall be binding upon the Parties and their respective successors and permitted assigns except to the extent that it is hereafter superseded or modified by subsequent written agreements between the Parties. This Agreement may not be assigned or otherwise transferred (including by operation of Law) by Buyer, without the prior written consent of the Seller Representative, or by any Seller or Seller Representative, without the prior written consent of Buyer; provided, however, that nothing in this Agreement or any other Transaction Document shall or is intended to limit the ability of Buyer to assign (a) its right, title and interest in and to this Agreement and/or the Purchased Assets to any Affiliate of Buyer or to any entity acquiring or succeeding to all or substantially all of the assets of Buyer or into which Buyer is merged; (b) this Agreement and Buyer's rights hereunder to one or more financiers (or a collateral agent or security trustee for and on behalf of any such financiers) for security purposes; and (c) all or any portion of the Purchased Assets to any Person after the Closing Effective Date; provided, further, no assignment or delegation shall relieve the assigning or delegating party of any of its obligations hereunder without the prior written consent of the other Parties. Any attempted assignment in violation of this Section 10.01 is void *ab initio*.

Section 10.02    **Notices**. All notices and other communications provided for or required hereunder shall be in writing (including e-mail communication) and e-mailed or delivered at each party's address set forth below, or at such other address as shall be designated by such party in a written notice to the other parties. All such notices and communications shall be effective two (2) business days after delivery to a recognized overnight courier service, or when delivered, if sent by other means.

<u>If to Buyer:</u>

Alcon Media Group, LLC
10390 Santa Monica Boulevard Suite 250
Los Angeles, CA 90025
Attention: Scott Parish
E-mail: sparish@alconent.com

<u>With a copy (which shall not constitute notice) to:</u>

Loeb & Loeb LLP
10100 Santa Monica Blvd., Suite 2200
Los Angeles, CA 90067
Attention: Scott Edel

E-mail: sedel@loeb.com

Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154
Attention: Vadim J. Rubinstein
E-mail: vrubinstein@loeb.com

If to Sellers:

c/o Village Roadshow Entertainment Group USA Inc.

 1750 N. San Vicente Blvd, Suite 800 West
West Hollywood, California 90069
Attention: Louis Santor and Kevin Berg
E-mail: louis.santor@vreg.com and kevin.berg@vreg.com

With copies (which shall not constitute notice) to:

Sheppard Mullin Richter & Hampton LLP
350 South Grand Ave., 40th Floor
Los Angeles, California 90071-3460
Attention: Stacey Rosenberg, Esq.
E-mail: srosenberg@sheppardmullin.com

321 North Clark Street, 32nd Floor
Chicago, IL 60654
Attention: Justin R. Bernbrock
E-mail: jbernbrock@sheppardmullin.com

Section 10.03  **Confidentiality**. Following the Closing, the Parties shall, and shall cause their respective Affiliates and representatives to, treat all non public information and trade secrets relating to the other Parties, their respective Affiliates, the terms of this Agreement and the other Transaction Documents, as confidential, preserve the confidentiality thereof, and not use such information and trade secrets for any reason or purpose whatsoever (other than any purposes permitted under this Agreement) or disclose to any Person such information or trade secrets unless such information or trade secret is (a) now or hereafter disclosed, through no act or omission of the applicable Party or its Affiliates or their respective representatives in breach of this Agreement, in a manner making it available to the general public, (b) required by Law to be disclosed, (c) received by any Party or its representatives after the Closing Effective Date from a third party who is not, to the knowledge of such Party, its Affiliates or their respective representatives, known to be under an obligation of nondisclosure or in breach of an obligation of confidentiality, in each case, to the other Party, (d) independently developed by any Party or its representatives after the Closing Effective Date without the use of or reference to any such information or trade secret, (e) reasonably necessary to defend or prosecute a Proceeding, or (f) approved in advance for use or disclosure via written authorization of the applicable Party. If the disclosure of such information or trade secrets is required by Law or is reasonably necessary to defend or prosecute a Proceeding, the Parties, their Affiliates and their respective representatives shall (i) cooperate with and provide the other Party an opportunity to object to the disclosure and shall, to the extent legally permissible, give the other Party as much prior written notice as is practicable under the circumstances, (ii) only disclose such information or trade secrets to the minimum extent required by Law to be disclosed or reasonably necessary to defend or prosecute such Proceeding, and (iii) use reasonable efforts to procure that confidential treatment will be accorded to any such information or trade secrets so disclosed. Notwithstanding the foregoing, (x) each Party

shall have the right to communicate and discuss with, and provide to, its Affiliates and its and their legal advisors, financial or accounting advisors, representatives, officers or employees, directors, consultants and agents, any information regarding the terms and status of this Agreement and the other Transaction Documents and the Transactions who are under professional duty or contractual obligation to maintain the confidentiality of such information, and (y) Buyer and its Affiliates may make customary disclosures (which are made subject to customary confidentiality obligations), including the key economic terms of the Transactions and the return realized as a result thereof, to its current or prospective investors or lenders in connection with its fundraising and reporting activities.

Section 10.04    **Amendment; Waiver**. This Agreement shall not be amended, modified or waived in any manner except by an agreement in writing duly executed and delivered by each of Buyer and the Sellers. No failure or delay of any Party to exercise any right or remedy given to such Party under this Agreement or any other Transaction Document or otherwise available to such Party, or to insist upon strict compliance by any other Party with its or his obligations hereunder, no single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, and no custom or practice of the Parties in variance with the terms hereof, shall constitute a waiver of any Party's right to demand exact compliance with the terms hereof. Any written waiver shall be limited to those items specifically waived therein and shall not be deemed to waive any future breaches or violations or other non- specified breaches or violations unless, and to the extent, expressly set forth therein.

Section 10.05    **Binding Effect; No Third-Party Beneficiaries**. Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors, transferees and assigns. Nothing in this Agreement, express or implied, is intended to confer on any Person (other than the Parties or their respective successors and permitted assigns) any rights, remedies, obligations or liabilities under or by reason of this Agreement. For the avoidance of doubt, the Sellers' permitted successors include, without limitation, any trustee appointed in the Bankruptcy Cases and the Sellers' other successors in the Bankruptcy Cases.

Section 10.06    **Rules of Construction**. The following rules of construction shall govern the interpretation of this Agreement:

(a)    all references to Articles, Sections, Exhibits or Schedules are to Articles, Sections, Exhibits or Schedules in this Agreement;

(b)    unless the context otherwise requires, words in the singular or plural include the singular and plural, and pronouns stated in either the masculine, the feminine or neuter gender shall include the masculine, feminine and neuter;

(c)    whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "but not limited to";

(d)    the word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and such phrase shall not simply mean "if";

(e)    references to a Person herein are also to its permitted successors and permitted assigns;

(f)    references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated

under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(g)      in computing any period of time pursuant to this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included, but the time shall begin to run on the next succeeding day. The last day of the period so computed shall be included, unless it is not a business day, in which event the period shall run until the end of the next business day;

(h)      time is of the essence with regard to all dates and time periods set forth or referred to in this Agreement;

(i)      Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision hereof;

(j)      (i) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits hereto, (ii) the term "any" means "any and all," and (iii) the term "or" shall not be exclusive and shall mean "and/or";

(k)      the phrases "provided" or "made available to Buyer" mean that the information referred to has been made available in the Dataroom at least two (2) business days prior to the Effective Date;

(l)      (i) references to "days" means calendar days unless business days are expressly specified and (ii) references to "$" mean U.S. dollars, provided that if there is a need to convert U.S. dollars into any foreign currency, or vice versa, the exchange rate shall be that published by The Wall Street Journal three (3) business days before the date on which the obligation is paid (or if The Wall Street Journal is not published on such date, the first date thereafter on which The Wall Street Journal is published), except as otherwise required by applicable Law (in which case, the exchange rate shall be determined in accordance with such Law);

(m)      the Parties intend that each representation, warranty, covenant and agreement contained herein shall have independent significance, and if any Party has breached any representation, warranty, covenant or agreement contained herein in any respect, the fact that there exists another representation, warranty, covenant or agreement relating to the same or similar subject matter that the Party has not breached shall not detract from or mitigate the fact that the Party is in breach of the first representation, warranty, covenant or agreement;

(n)      any drafts of this Agreement or any other Transaction Document circulated by or among the Parties prior to the final fully executed drafts shall not be used for purposes of interpreting any provision of this Agreement or any other Transaction Document, and each of the Parties agrees that no Party shall make any claim, assert any defense or otherwise take any position inconsistent with the foregoing in connection with any dispute or Proceeding among any of the foregoing or for any other purpose; and

(o)      the Parties have participated jointly in the negotiation and drafting of this Agreement and the other Transaction Documents; in the event an ambiguity or question of intent or interpretation arises, this Agreement and the other Transaction Documents shall be construed as if drafted jointly by the Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement or any other Transaction Document and the language used in it will be deemed to be the language chosen by the Parties to express their mutual intent.

Section 10.07  **Severability**. Except as otherwise provided in the succeeding sentence, every provision of this Agreement is intended to be severable, and, if any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement. The preceding sentence of this Section shall be of no force or effect if the consequence of enforcing the remainder of this Agreement without such illegal or invalid term or provision would be to cause any Party to lose the material benefit of its economic bargain.

Section 10.08  **Incorporation by Reference**. Every Exhibit, annex and schedule (including the Disclosure Schedules) attached to this Agreement and referred to herein is incorporated fully into this Agreement by reference.

Section 10.09  **Governing Law; Submission to Jurisdiction**.

(a)    THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

(b)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY ANCILLARY AGREEMENT; PROVIDED, HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN NEW YORK WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

Section 10.10  **Waiver of Jury Trial**. EACH OF THE PARTIES IRREVOCABLY WAIVES TO THE EXTENT PERMITTED BY LAW ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT, STATUTE OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE TRANSACTIONS OR THE ACTIONS OF SUCH PARTY IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE AND ENFORCEMENT HEREOF. EACH PARTY FURTHER WAIVES ANY RIGHT TO SEEK TO CONSOLIDATE ANY PROCEEDING IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER PROCEEDING IN WHICH A JURY TRIAL CANNOT OR HAS NOT BEEN WAIVED. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (a) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED OR WARRANTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) EACH PARTY UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (c) EACH PARTY MAKES THIS WAIVER VOLUNTARILY AND (d) EACH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.10.

Section 10.11  **Expenses**. Except as otherwise expressly stated herein, each Party shall be responsible for the payment of its own fees and expenses (including legal, accounting and investment banking fees and expenses) incurred in connection with the Transaction Documents and in the negotiation and preparation for and consummation of the Transactions.

Section 10.12   **Counterpart Execution**. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and when taken together shall constitute one and the same instrument. The words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.13   **Entire Agreement**. This Agreement (including all annexes, schedules (including the Disclosure Schedules) and the Exhibits attached hereto) and the other Transaction Documents constitute the entire agreement and understanding between the Parties in respect of the subject matter hereof and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

Section 10.14   **Relationship of the Parties**. Nothing in this Agreement creates any partnership, employment, joint venture, franchise or agency relationship between the parties; rather, the parties acknowledge that their relationship under this Agreement is one of independent contracting parties.

Section 10.15   **Seller Representative**.

(a)      For purposes of this Agreement, each Seller hereby irrevocably appoints and designates Seller Representative to serve as such Seller's true and lawful representative, agent, and attorney-in-fact, with full power of substitution and re-substitution, to act for and on behalf of such Seller for the purpose of taking any and all actions by such Seller specified in or contemplated by this Agreement or the other Transaction Documents; provided, that if Kevin Berg at any time is unable, due to incapacity or otherwise, to serve as Seller Representative or resigns as Seller Representative, then the Sellers shall designate a successor Seller Representative in writing. Each successor Seller Representative, if required to serve, shall sign an acknowledgment in writing agreeing to perform and be bound by all of the provisions of this Agreement and the other Transaction Documents applicable to Seller Representative. Each successor Seller Representative shall have all of the power, authority, rights and privileges conferred by this Agreement upon the original Seller Representative, and the term "Seller Representative" as used herein shall be deemed to include any successor Seller Representative.

(b)      Seller Representative is hereby constituted and appointed as agent and attorney-in-fact for and on behalf of each Seller with respect to the performance of its duties as Seller Representative as set forth herein. This power of attorney and all authority hereby conferred is coupled with an interest and is irrevocable and shall not terminate or otherwise be affected by the death, disability, incompetence, bankruptcy or insolvency of any Seller and shall be binding upon the successors, assigns, heirs, executors, administrators, legal representatives, and beneficiaries, as applicable, of each Seller. Seller Representative shall promptly deliver to each Seller any notice received by Seller Representative concerning this Agreement that Seller Representative deems is material.

(c)      Without limiting the generality of the foregoing, Seller Representative has full power and authority, on behalf of each Seller and such Seller's successors and assigns, to: (i) interpret the terms and provisions of this Agreement and the other Transaction Documents to be executed and delivered by the Sellers in connection herewith, (ii) execute and deliver and receive deliveries of all agreements, certificates, statements, notices, approvals, extensions, waivers, undertakings, amendments, and other documents required or permitted to be given in connection with the consummation of the Transactions, (iii) receive service of process in connection with any claims under this Agreement or the other Transaction Documents, (iv) agree

to, negotiate, enter into settlements and compromises of, assume the defense of claims, and demand arbitration and comply with orders of courts and awards of arbitrators with respect to such claims, and to take all actions necessary or appropriate in the judgment of Seller Representative for the accomplishment of the foregoing, (v) give and receive notices and communications, (vi) authorize delivery to Buyer of the Buyer Deposit, (vii) object to such delivery, (viii) distribute the Buyer Deposit to which Sellers are entitled, and any earnings and proceeds thereon, (ix) to assert the attorney-client privilege on behalf of the Sellers with respect to any communications that relate in any way to the transactions contemplated hereby, (x) deliver to Buyer any and all Transaction Documents to which any Seller is a party executed by such Seller and deposited with Seller Representative, upon Seller Representative's determination that the conditions to Closing have been satisfied or waived, (xi) grant any consent, approval or waiver under this Agreement or any other Transaction Document and (xii) take all actions necessary or appropriate in the sole judgment of Seller Representative on behalf of the Sellers for the accomplishment of the foregoing or otherwise specifically required or in connection with this Agreement or the other Transaction Documents. Notwithstanding anything to the contrary herein, in the event of a claim hereunder against a single Seller, and not any other Seller, such affected Seller shall be entitled to control the defense of such claim.

(d)    Service by Seller Representative shall be without compensation except for the reimbursement by the Sellers of out-of-pocket expenses and indemnification specifically provided herein.

(e)    Seller Representative shall have no duties or responsibilities except those expressly set forth herein, and no implied covenants, functions, responsibilities, duties, obligations or liabilities on behalf of any Seller shall otherwise exist against Seller Representative. Seller Representative shall not be liable to any Seller relating to the performance of Seller Representative's duties or exercise of any rights under this Agreement for any errors in judgment, negligence, oversight, breach of duty or otherwise except to the extent it is finally determined in a court of competent jurisdiction by clear and convincing evidence that the actions taken or not taken by Seller Representative constituted actual fraud or were taken or not taken, as applicable, in bad faith. Seller Representative shall be protected in acting upon any notice, statement or certificate believed by Seller Representative to be genuine and to have been furnished by the appropriate Person and in acting or refusing to act in good faith on any matter. Seller Representative shall not be liable to Buyer or any Affiliate of Buyer by reason of this Agreement or the performance of Seller Representative's duties hereunder or otherwise.

(f)    The Sellers shall indemnify and hold harmless Seller Representative against all losses, including costs of defense, paid or incurred in connection with any action, suit, proceeding or claim to which Seller Representative is made a party by reason of the fact that Seller Representative was acting as Seller Representative pursuant to this Agreement; provided, that Seller Representative shall not be entitled to indemnification hereunder to the extent it is finally determined in a court of competent jurisdiction by clear and convincing evidence that the actions taken or not taken by Seller Representative constituted actual fraud or were taken or not taken, as applicable, in bad faith.

(g)    Buyer shall be entitled to rely conclusively without inquiry upon any decision, action, consent or instruction of Seller Representative as the duly authorized decision, action, consent or instruction of Seller Representative on behalf of each Seller with respect to any matters set forth in this Agreement or any other Transaction Document and Buyer is hereby relieved from any liability to any Person for any acts done by it in accordance with any such decision, action, consent or instruction.

(h)    The provisions of this Section 10.15 will survive the Closing, the resignation or removal of Seller Representative or the termination of this Agreement.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties have executed and entered into this Purchase Agreement (Derivative Rights) on the date first set forth above.

<b>SELLERS:</b>

VILLAGE ROADSHOW FILMS (BVI) LIMITED


By: _____
Name:
Title:

VILLAGE ROADSHOW FILMS NORTH AMERICA INC.


By: _____
Name: Kevin P. Berg
Title:    General Counsel and Secretary


VREG IP GLOBAL LLC


By: _____
Name:
Title:


VREG WW IP GLOBAL LLC


By: _____
Name:
Title:


VREG MM2 IP GLOBAL LLC

By: _____
Name:
Title:


VREG J2 GLOBAL LLC

By: _____
Name:
Title:

SMRH:~~4908-5037-9589.9~~4927-5764-9012.1
101725

76KN-409057

VREG OP GLOBAL LLC

By: _____
Name:
Title:


VREG WONKA IP GLOBAL LLC

By: _____
Name:
Title:

VILLAGE ROADSHOW PICTURES NORTH AMERICA
INC.


By: _____
Name:
Title:
VILLAGE ROADSHOW ENTERTAINMENT GROUP
USA INC.


By: _____
Name:
Title:

**BUYER:**

ALCON MEDIA GROUP, LLC

By: _____
Name:
Title:


**SELLER REPRESENTATIVE:**


_____
Kevin Berg

## Annex I

## Sellers

1.     Village Roadshow Films (BVI) Limited, a BVI business company incorporated in the British Virgin Islands ("**VRF**")

2.     Village Roadshow Films North America Inc., a Delaware corporation ("**VRFNA**")

3.     VREG IP Global LLC, a Delaware limited liability company ("**VREG IP**")

4.     VREG WW IP Global LLC, a Delaware limited liability company ("**VREG WW**")

5.     VREG MM2 IP Global LLC, a Delaware limited liability company ("**VREG MM2**")

6.     VREG J2 Global LLC, a Delaware limited liability company ("**VREG J2**")

7.     VREG OP Global LLC, a Delaware limited liability company ("**VREG OP**")

8.     VREG Wonka IP Global LLC, a Delaware limited liability company ("**VREG Wonka**")

9.     Village Roadshow Pictures North America Inc., a Delaware corporation ("**VRPNA**")

10.    Village Roadshow Entertainment Group USA Inc. ("**VREG USA**")


If and to the extent that any other Debtor has or hereafter acquires any asset that would constitute a Purchased Asset if such Debtor were a party hereto, it shall be deemed to be a Seller for all purposes as if listed herein.

**Annex II**

**Assumed ~~Derivative Rights~~ Contracts and Cure Amounts**

| | Assumed Contract | Cure Amount |
|---|---|---|
| 1. | Co-Ownership Agreement With Respect To Remakes and Sequels of "Practical Magic", dated as of June 26, 2000, by and between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by that certain Omnibus Amendment dated as of August 29, 2017 among Warner Bros. Entertainment Inc., Village Roadshow Films (BVI) Limited, Village Roadshow Films North America Inc., and Village Roadshow Pictures North America Inc. (the "2017 Omnibus Amendment"), as further amended by that certain Omnibus Amendment No. 2 dated as of November 10, 2020 among Village Roadshow Distribution USA Inc., Village Roadshow Distribution (BVI) Limited, Village Roadshow Films (BVI) Limited, Village Roadshow Films North America Inc., Warner Bros. Entertainment Inc., Warner Bros. Productions Limited, and WAV Distribution LLC (the "Second Omnibus Amendment"), and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 2. | Co-Ownership Agreement With Respect To Remakes and Sequels of "Analyze This", dated as of June 26, 2000, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 3. | Co-Ownership Agreement With Respect to Remakes and Sequels of "Deep Blue Sea", dated as of June 26, 2000, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 4. | Co-Ownership Agreement with respect to Remakes and Sequels of "Three Kings", dated as of June 26, 2000, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 5. | Co-Ownership Agreement with respect to Remakes and Sequels of "Three To Tango", dated as of June 26, 2000, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 6. | Co-Ownership Agreement with respect to Remakes and Sequels of "Gossip", dated as of June 26, 2000, between Warner Bros., a division of Time Warner | $0.00 |

| | Assumed Contract | Cure Amount |
|---|---|---|
| | Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | |
| 7. | Co-Ownership Agreement with respect to Remakes and Sequels of "Space Cowboys", dated as of August 3, 2000, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 8. | Co-Ownership Agreement with respect to "Red Planet", dated as of November 8, 2000, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 9. | Co-Ownership Agreement with respect to Remakes and Sequels of "Miss Congeniality", dated as of March 22, 2005, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time.. | $0.00 |
| 10. | Co-Ownership Agreement with respect to "Valentine", dated as of April 4, 2001, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 11. | Co-Ownership Agreement with respect to "Saving Silverman", dated as of March 5, 2001, between Columbia Pictures, a division of Columbia Pictures Industries, Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as it may be amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 12. | Co-Ownership Agreement with respect to "Down To Earth", dated as of August 11, 2000, between Paramount Pictures Corporation and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as it may be amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 13. | Co-Ownership Agreement with respect to "See Spot Run", dated as of April 4, 2001, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to | $0.00 |

| | Assumed Contract | Cure Amount |
|---|---|---|
| | time. | |
| 14. | Co-Ownership Agreement with respect to "Exit Wounds", dated as of April 4, 2001, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 15. | Co-Ownership Agreement with respect to "Swordfish", dated as of June 6, 2001, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 16. | Co-Ownership Agreement with respect to "Cats and Dogs", dated as of July 9, 2001, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 17. | Co-Ownership Agreement with respect to "Zoolander", dated as of August 11, 2000, between Paramount Pictures Corporation and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as it may be amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 18. | Co-Ownership Agreement with respect to "Hearts in Atlantis", dated as of January 10, 2002, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 19. | Co-Ownership Agreement with respect to "Don't Say a Word", dated as of December 14, 2001, between Regency Entertainment (USA), Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as it may be amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 20. | Co-Ownership Agreement with respect to "Training Day", dated as of October 2, 2001, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 21. | Co-Ownership Agreement "Ocean's Eleven" dated as of January 10, 2002 by and between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG OP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus | $0.00 |

| | Assumed Contract | Cure Amount |
|---|---|---|
| | Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | |
| 22. | Co-Ownership Agreement with respect to "The Majestic", dated as of January 10, 2002, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 23. | Co-Ownership Agreement with respect to "Queen of the Damned", dated as of February 27, 2002, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 24. | Co-Ownership Agreement with respect to "Showtime", dated as of March 26, 2002, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 25. | Co-Ownership Agreement with respect to "Eight Legged Freaks", dated as of July 18, 2002, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 26. | Co-Ownership Agreement with respect to "Pluto Nash", dated as of August 20, 2002, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 27. | Co-Ownership Agreement with respect to "Ghost Ship", dated as of February 11, 2003, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 28. | Co-Ownership Agreement with respect to "Analyze That", dated as of February 11, 2003, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus | $0.00 |

SMRH:4908-5037-9589.94927-5764-9012.1
101725

76KN-409057

| | Assumed Contract | Cure Amount |
|---|---|---|
| | Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | |
| 29. | Co-Ownership Agreement with respect to "Two Weeks Notice", dated as of February 11, 2003, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 30. | Co-Ownership Agreement with respect to "Dreamcatcher", dated as of April 1, 2003, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 31. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Mystic River", dated as of October 7, 2003, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 32. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Torque", dated as of January 15, 2004, between Warner Bros. Entertainment Inc. and Village Roadshow Films (BVI) Limited, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 33. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Taking Lives", dated as of March 18, 2004, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 34. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Catwoman", dated as of July 22, 2004, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 35. | Co-Ownership Agreement With Respect to Remakes and Sequels Of Warner-Developed Pictures with respect to "Ocean's Twelve", dated as of December 9, 2004, Warner Bros. Entertainment Inc. and VREG OP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from | $0.00 |

SMRH:4908-5037-9589.94927-5764-9012.1
101725

76KN-409057

| | Assumed Contract | Cure Amount |
|---|---|---|
| | time to time. | |
| 36. | Co-Ownership Agreement With Respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Constantine", dated as of February 7, 2005, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 37. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "House of Wax", dated as of May 5, 2005, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 38. | Co-Ownership Agreement With Respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Charlie and the Chocolate Factory", dated as of July 12, 2005, between Warner Bros. Entertainment Inc. and VREG WW IP Global (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 39. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Dukes of Hazzard", dated as of August 4, 2005, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 40. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Rumor Has It", dated as of December 15, 2005, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 41. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Firewall" (f/k/a "The Wrong Element"), dated as of February 7, 2006, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 42. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "The Lake House" (f/k/a "Il Mare"), dated as of June 13, 2006, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, | $0.00 |

SMRH:4908-5037-9589.94927-5764-9012.1
101725

76KN-409057

| | Assumed Contract | Cure Amount |
|---|---|---|
| | extended or otherwise modified from time to time. | |
| 43. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Happy Feet", dated as of November 15, 2006, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 44. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Unaccompanied Minors", dated as of November 29, 2006, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 45. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Music and Lyrics" (aka "Music and Lyrics By…"), dated as of February 8, 2007, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 46. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "The Reaping", dated as of April 3, 2007, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 47. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Lucky You", dated as of May 3, 2007, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 48. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Ocean's Thirteen", dated as of June 5, 2007, between Warner Bros. Entertainment Inc. and VREG OP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 49. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "License to Wed", dated as of July 2, 2007, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from | $0.00 |

SMRH:4908-5037-9589.94927-5764-9012.1
101725

76KN-409057

| | Assumed Contract | Cure Amount |
|---|---|---|
| | time to time. | |
| 50. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "No Reservations" (a/k/a "Mostly Martha"), dated as of July 26, 2007, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 51. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "The Invasion" (a/k/a "The Visiting"), dated as of August 14, 2007, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 52. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "The Brave One", dated as of September 10, 2007, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 53. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "I Am Legend", dated as of December 11, 2007, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 54. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Speed Racer", dated as of May 6, 2008, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 55. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Get Smart", dated as of May 8, 2009, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 56. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Nights in Rodanthe", dated as of May 8, 2009, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be | $0.00 |

| | Assumed Contract | Cure Amount |
|---|---|---|
| | further amended, restated, supplemented, extended or otherwise modified from time to time. | |
| 57. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Yes Man", dated as of May 8, 2009, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 58. | Co-Ownership Agreement with respect to Remakes and Sequels of Warner-Developed Pictures with respect to "Gran Torino", dated as of May 8, 2009, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 59. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Where The Wild Things Are", dated as of October 15, 2009, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 60. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Sherlock Holmes", dated as of December 18, 2009, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 61. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Cats & Dogs: The Revenge of Kitty Galore", dated as of July 27, 2010, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 62. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Legend of the Guardians: The Owls of Ga'Hoole", dated as of December 17, 2010, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 63. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Life As We Know It", dated as of October 7, 2010, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further | $0.00 |

SMRH:4908-5037-9589.94927-5764-9012.1
101725

| | Assumed Contract | Cure Amount |
|---|---|---|
| | amended, restated, supplemented, extended or otherwise modified from time to time. | |
| 64. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Happy Feet 2", dated as of November 3, 2011, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 65. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Sherlock Holmes: A Game of Shadows" (a/k/a "Sherlock Holmes 2"), dated as of February 14, 2012, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 66. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "The Lucky One", dated as of April 18, 2012, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 67. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Dark Shadows", dated as of June 29, 2012, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 68. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Gangster Squad", dated as of January 10, 2013, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 69. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "The Great Gatsby", dated as of May 9, 2013, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 70. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Winter's Tale", dated as of February 12, 2014, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time | $0.00 |

SMRH:4908-5037-9589.94927-5764-9012.1
101725

76KN-409057

| Assumed Contract | Cure Amount |
|---|---|
| | time. | |
| 71. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Edge of Tomorrow", dated as of May 23, 2014, between Warner Bros. Entertainment Inc. and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited), as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 72. | Amended and Restated Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Into the Storm", dated as of December 4, 2014, by and among Warner Bros. Entertainment Inc., on the one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.), on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 73. | Amended and Restated Co-Ownership Agreement with respect to Remakes and Sequels with respect to "The Judge", dated as of December 4, 2014, by and among Warner Bros. Entertainment Inc., on the one hand, and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 74. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "American Sniper", dated as of February 27, 2015, by and among Warner Bros. Entertainment Inc.,, on the one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 75. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Jupiter Ascending", dated as of May 5, 2015, by and among Warner Bros. Entertainment Inc., on one hand, and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 76. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "San Andreas", dated as of July 31, 2015, by and among Warner Bros. Entertainment Inc., on one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 77. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to | $0.00 |

SMRH:4908-5037-9589.94927-5764-9012.1
101725

76KN-409057

| | Assumed Contract | Cure Amount |
|---|---|---|
| | "In The Heart of the Sea", dated as of December 2, 2015, by and among Warner Bros. Entertainment Inc., on one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | |
| 78. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "The Legend of Tarzan", dated as of April 28, 2017, by and among Warner Bros. Entertainment Inc., on one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 79. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Sully", dated as of October 31, 2016, by and among Warner Bros. Entertainment Inc., on one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 80. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Collateral Beauty", dated as of April 28, 2017, by and among Warner Bros. Entertainment Inc., on one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 81. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Fist Fight", dated as of April 28, 2017, by and among Warner Bros. Entertainment Inc., on one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 82. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Going In Style", dated as of April 28, 2017, by and among Warner Bros. Entertainment Inc., on one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 83. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "King Arthur: Legend of the Sword", dated as of October 31, 2017, by and among Warner Bros. Entertainment Inc., on one hand and VREG IP Global | $0.00 |

| | Assumed Contract | Cure Amount |
|---|---|---|
| | LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | |
| 84. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "The House", dated as of August 24, 2017, by and among Warner Bros. Entertainment Inc., on one hand, and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 85. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "The 15:17 to Paris", dated as of May 15, 2018, by and among Warner Bros. Entertainment Inc., on one hand, and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 86. | Co-Ownership Agreement with respect to Remakes and Sequels with respect to "Ready Player One", dated as of May 15, 2018, by and among Warner Bros. Entertainment Inc., on one hand and VREG IP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.) on the other hand, as amended by the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 87. | Co-Ownership Agreement With Respect To Remakes and Sequels with respect to "Ocean's Eight", dated July 31, 2018, by and between by and among Warner Bros. Entertainment Inc., VREG OP Global LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.), as it may be amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 88. | Co-Ownership Agreement With Respect To Remakes and Sequels of "The Matrix" dated as of October 30, 2003, between Warner Bros., a division of Time Warner Entertainment Company, L.P., and Village Roadshow Films (BVI) Limited, as amended by the 2017 Omnibus Amendment and the Second Omnibus Amendment, and as it may be further amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 89. | "Mad Max: Fury Road" Co-Ownership Agreement dated as of January 26, 2015, by and between Warner Bros. Entertainment Inc., and VREG MM2 IP Global LLC (successor in interest to Village Roadshow Pictures North America Inc.), as it may be amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |
| 90. | Co-Ownership Agreement With Respect To Remakes and Sequels with respect to "Joker", dated November 22, 2019, by and between by and among Warner Bros. Entertainment Inc., VREG J2 Global, LLC (successor in interest to Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc.), as it may be amended, restated, supplemented, extended or otherwise modified from time to time. | $0.00 |

| | Assumed Contract | Cure Amount |
|---|---|---|
| 91. | Co-Ownership Agreement With Respect To Remakes and Sequels with respect to "Wonka", dated as of December 6, 2023, by and between Warner Bros. Entertainment Inc., and VREG Wonka IP Global LLC, as it may be amended, restated, supplemented, extended or otherwise modified from time to time (the "Wonka Co-Ownership Agreement"). | $0.00 |
| 92. | Quitclaim Agreement, dated as of February 18, 2015, by and between Paramount Pictures Corporation and Village Roadshow Films (BVI) Limited, with respect to "Zoolander 2". | $0.00 |
| 93. | Amendment to QCSA / Co-Ownership Agreements "Training Day Prequel," dated as of February 23, 2021, by and between Warner Brothers Entertainment Inc., on the one hand, and Village Roadshow Films (BVI) Limited, Village Roadshow Films North America Inc. and Village Roadshow Pictures North America, Inc., on the other hand, with respect to a feature length motion picture prequel to "Training Day". | $0.00 |
| 94. | Option and Assignment Agreement, dated as of April 17, 2017, by and between Village Roadshow Entertainment Group USA Inc. (as successor-in-interest to Village Roadshow Films (BVI) Limited) and Warner Specialty Films, Inc. with respect to the project entitled "Deep Blue Sea 2 DTV" (the "Deep Blue ~~See~~Sea Option Agreement"). | $0.00 |
| 95. | Short Form Option/Purchase Agreement, dated as of March 20, 2023, by and between Warner Bros. (F.E.), Inc., on the one hand, and Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc., on the other hand, with respect to the Chinese language motion picture tentatively called "Undercover Netcaster" based on "Miss Congeniality". | $0.00 |
| 96. | Acknowledgement and Consent, dated as of June 19, 2019, by and among Village Roadshow Films (BVI) Limited and Village Roadshow Films North America Inc., on the one hand and Warner Bros. Entertainment Inc. on the other hand, with respect to the project entitled "Happy Feet China." | $0.00 |
| 97. | Option Agreement, dated as of December 6, 2023, by and among VREG Wonka IP Global LLC, VREG MM2 IP Global LLC, VREG J2 Global LLC, and Loompala Pictures, LLC. | $0.00 |

SMRH:~~4908-5037-9589.9~~4927-5764-9012.1
101725

76KN-409057

**Annex III**

**Derivative Rights Pictures**

| # | Picture | Percentage of Derivative Rights Owned By Sellers |
|---|---------|--------------------------------------------------|
| 1. | American Sniper | 33.3% |
| 2. | Analyze That | 50% |
| 3. | Analyze This | 50% |
| 4. | Catwoman | 50% (limited to theatrical motion pictures) |
| 5. | Cats & Dogs | 50% |
| 6. | Cats & Dogs: The Revenge of Kitty Galore | 50% |
| 7. | Charlie and the Chocolate Factory | 50% |
| 8. | Collateral Beauty | 25% |
| 9. | Constantine | 50% (limited to theatrical motion pictures) |
| 10. | Dark Shadows | 50% |
| 11. | Deep Blue Sea | 50% |
| 12. | Don't Say A Word | 50% |
| 13. | Down to Earth | 50% |
| 14. | Dreamcatcher | 50% |
| 15. | Dukes of Hazzard | 50% |
| 16. | Edge of Tomorrow | 33.3% |
| 17. | Eight Legged Freaks | 50% |
| 18. | Exit Wounds | 50% |
| 19. | Fist Fight | 25% |
| 20. | Firewall | 50% |
| 21. | Gangster Squad | 50% |
| 22. | Get Smart | 50% (limited to theatrical motion pictures) |
| 23. | Ghost Ship | 50% |
| 24. | Going in Style | 25% |
| 25. | Gossip | 50% |

SMRH:4908-5037-9589.94927-5764-9012.1
101725

76KN-409057

| 26. | Gran Torino | 50% |
|-----|-------------|-----|
| 27. | Happy Feet | 50% |
| 28. | Happy Feet Two | 50% |
| 29. | Hearts in Atlantis | 50% |
| 30. | House of Wax | 50% |
| 31. | I Am Legend | 50% |
| 32. | In the Heart of the Sea | 25% |
| 33. | Into the Storm | 37.5% |
| 34. | Joker | 25% (limited to derivative productions where Joaquin Phoenix performs in a starring role in the exact same role and character as the "Joker" as he does in the original Picture) |
| 35. | Jupiter Ascending | 33.3% |
| 36. | King Arthur | 15% |
| 37. | Legend of the Guardians | 50% |
| 38. | License to Wed | 50% |
| 39. | Life As We Know It | 50% |
| 40. | Lucky You | 50% |
| 41. | Mad Max: Fury Road | [50%Pursuant to the Co-Ownership Agreement with respect to Mad Max: Fury Road, VRPNA is entitled to an undivided 50% ownership interest in the Derivative Rights in Mad Max: Fury Road, subject to thecertain conditions set forth in the applicablesuch Co-Ownership Agreement]. However, to date, no Derivative Rights in Mad Max: Fury Road have been assigned to the Sellers. |
| 42. | Miss Congeniality | 50% |
| 43. | Miss Congeniality 2: Armed & Fabulous | 50% |
| 44. | Music and Lyrics | 50% |
| 45. | Mystic River | 50% |
| 46. | Nights in Rodanthe | 50% |
| 47. | No Reservations | 50% |

SMRH:4908-5037-9589.94927-5764-9012.1
101725

| 48. | Ocean's 8 | 50% |
|---|---|---|
| 49. | Ocean's Eleven | 50% |
| 50. | Ocean's Thirteen | 50% |
| 51. | Ocean's Twelve | 50% |
| 52. | Pluto Nash | 50% |
| 53. | Practical Magic | 50% |
| 54. | Queen of the Damned | 50% |
| 55. | Ready Player One | 33.3% |
| 56. | Red Planet | 50% |
| 57. | Rumor Has It… | 50% |
| 58. | San Andreas | 25% |
| 59. | Saving Silverman | 50% |
| 60. | See Spot Run | 50% |
| 61. | Sherlock Holmes | 50% |
| 62. | Sherlock Holmes: A Game of Shadows | 50% |
| 63. | Showtime | 50% |
| 64. | Space Cowboys | 50% |
| 65. | Speed Racer | 50% (excludes rights to television series being developed by J.J. Abrams) |
| 66. | Sully | 25% |
| 67. | Swordfish | 50% |
| 68. | Taking Lives | 50% |
| 69. | The 15:17 to Paris | 33.3% |
| 70. | The Brave One | 50% |
| 71. | The Great Gatsby | 50% |
| 72. | The House | 25% |

SMRH:4908-5037-9589.94927-5764-9012.1
101725

76KN-409057

| 73. | The Invasion | 50% |
|---|---|---|
| 74. | The Judge | 25% |
| 75. | The Lake House | 50% |
| 76. | The Legend of Tarzan | 33.3% (Warner Bros. only licensed live action theatrical motion picture rights from the Burroughs Estate. The live action remake and sequel rights reverted back to the Burroughs Estate as Warner Bros. did not theatrically release a remake or sequel within 4 years of the start of principal of photography of The Legend of Tarzan.) |
| 77. | The Lucky One | 50% |
| 78. | The Majestic | 50% |
| 79. | The Matrix | 50% |
| 80. | The Matrix Reloaded (together with The Animatrix) | 50% |
| 81. | The Matrix Revolutions | 50% |
| 82. | The Reaping | 50% |
| 83. | Three Kings | 50% |
| 84. | Three to Tango | 50% |
| 85. | Torque | 50% |
| 86. | Training Day | 50% |
| 87. | Two Weeks Notice | 50% |
| 88. | Unaccompanied Minors | 50% |
| 89. | Valentine | 50% |
| 90. | Where the Wild Things Are | 50% |
| 91. | Winter's Tale | 25% |
| 92. | Wonka | 50%, subject to the conditions set forth in the Wonka Co-Ownership Agreement |
| 93. | Yes Man | 50% |
| 94. | Zoolander | 50% |

SMRH:4908-5037-9589.94927-5764-9012.1
101725

76KN-409057

**Annex IV**

**Purchase Price Schedule**

[To come]

**Annex V**

**Derivative Rights Disputes**

1.      *Village Roadshow Films (BVI) Limited, et al. v. Warner Bros. Entertainment Inc., et al. (Los Angeles Superior Court Case No. 22STCV04606)*. VRF, VRFNA, VRPNA. VRD and VRD-USA filed their verified Complaint for declaratory and injunctive relief in Los Angeles Superior Court on February 7, 2022, and their verified First Amended Complaint adding a claim under California's Unfair Competition Law and adding WarnerMedia as a defendant on March 25, 2022 ~~with respect to an Excluded Asset~~ in connection with WBEI's release of Matrix 4 aka The Matrix Resurrections day-and-date on HBO Max and disputed contractual rights of Village Roadshow's right to co-finance derivative works based on WBEI/VR co-financed library titles. On May 27, 2022, the state court action was compelled to arbitration, and the state court case has been stayed pending resolutions of the ongoing arbitration.

2.      *Warner Bros. Entertainment Inc., et al. v. Village Roadshow Films North America, et al. (JAMS Confidential Arbitration before Judge Friedman -- Matrix 4 aka The Matrix Resurrections Arbitration) ("Matrix Arbitration")*. WBEI filed its arbitration demand related to Village Roadshow's alleged failure to pay its co-financing share of ~~an Excluded Asset, being~~ Matrix 4 aka The Matrix Resurrections on February 2, 2022. This arbitration remains active and has not yet reached a final resolution.

3.      *Warner Bros. Entertainment Inc., et al. v. Village Roadshow Films (BVI) Limited, et al. (JAMS Confidential Arbitration before Judge Otero – Wonka/Derivative Rights Arbitration)*. WBEI filed its arbitration demand in respect of ~~an Excluded Asset~~Wonka in connection with Village Roadshow's rights to co-finance the motion picture Wonka and the parties' rights and obligations with respect to derivative works based on WBEI/VR co-financed library titles on February 2, 2022. WBEI relinquished its challenge to Village Roadshow's right to co-finance Wonka and issued a project notice to Village Roadshow on June 17, 2022, and Village Roadshow accepted WBEI's project notice. However, WBEI maintained its claims that could significantly restrict Village Roadshow's derivative rights. The parties have ongoing disputes with respect to future, slated derivative works and the parties' rights and obligations. This arbitration has been effectively "paused" until resolution of the Matrix Arbitration is first achieved.

4.      *Fraudulent Conveyance Claim (All Pictures)*.  In a series of letters in early 2024, Warner Bros. Entertainment Inc. has alleged that assignments of certain of the Derivative Rights with respect to the Pictures from Village Roadshow Films (BVI) Limited and ("VRF") Village Roadshow Films North America Inc. ("VRFNA") to certain of their affiliates constituted fraudulent conveyances and a breach of VREG's Amended and Restated Consolidated Undertaking and Indemnity dated as of November 10, 2020.

5.      *Practical Magic 2 Dispute*. On September 4, 2025, VREG IP Global LLC ("VREG IP Global"), as successor-in-interest to VRF and VRFNA, delivered to WBEI written notice (the "Project Acceptance Notice") of its acceptance of the opportunity to participate in the motion picture titled "Practical Magic 2" ("PM2"), a derivative work based on the Picture titled "Practical Magic", subject and pursuant to the Co-Ownership Agreement with Respect to Remakes and Sequels of "Practical Magic" (the "PM2 Co-Ownership Agreement"), dated as of June 26, 2000, by and between Warner Bros., a division of Time Warner Entertainment Company, L.P., and VRF, as amended. The Project Acceptance Notice was expressly subject to entry by the Bankruptcy Court in the Bankruptcy Cases of (a) an order approving the Project Acceptance Notice and (b) the Sale Order. In a letter dated September 8, 2025, WBEI disputed the validity of the Project Acceptance Notice on various grounds. In such letter, WBEI expressly reserved all rights in connection with the Project Acceptance Notice, including the right to seek affirmative relief from the Bankruptcy Court presiding over the Bankruptcy Cases.

SMRH:~~4908-5037-9589.9~~4927-5764-9012.1
101725

76KN-409057

SMRH:4908-5037-9589.94927-5764-9012.1
101725

76KN-409057

*SMRH Draft 9/9/2025*Execution Version

# DISCLOSURE SCHEDULES

These Disclosure Schedules and all attachments hereto (each of which is incorporated herein by reference) constitute the "Disclosure Schedules" and are being delivered by Sellers (as defined below) in connection with that certain Asset Purchase Agreement (the "Agreement"), dated as of ~~_____~~October 17, 2025, by and among the Persons identified on Annex I of the Agreement (each, a "Seller", and collectively, the "Sellers"), and the Seller Representative (as defined in the Agreement), on the one hand,  and Alcon Media Group, LLC ("Buyer"), on the other hand.  Unless the context otherwise requires, or as otherwise defined in these Disclosure Schedules, all capitalized terms used in these Disclosure Schedules shall have the respective meanings assigned to them in the Agreement.

The information in these Disclosure Schedules constitutes exceptions or qualifications to certain representations and warranties of each Seller as set forth in the Agreement and specified herein.  Disclosure of any information contained in these Disclosure Schedules is not intended as, and shall not be deemed to be, an acknowledgement or admission that any such information is required to be disclosed, except to the extent provided in the Agreement. Such information is included solely for informational purposes, and disclosure of such information shall not be deemed to enlarge or enhance any of the representations or warranties in the Agreement or otherwise alter in any way the terms of the Agreement, except to the extent provided in the Agreement. These Disclosure Schedules do not necessarily include other information of a similar nature. Disclosure of any item in any section hereof shall not constitute an admission or indication that such item or matter is material, except to the extent provided in the Agreement.

The references and headings in these Disclosure Schedules are inserted for convenience only and shall not have the effect of amending or changing the information presented. The section numbers herein correspond to the section and subsection numbers of the representations and warranties in the Agreement that are modified or supplemented by the disclosures hereinafter. Any disclosure made in these Disclosure Schedules shall be deemed to be disclosures made with respect to the applicable representations and warranties contained in the Agreement to the extent reasonably apparent on the face of such disclosure, regardless of whether or not a specific cross-reference is made thereto.

In disclosing the information in these Disclosure Schedules, Sellers do not waive any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any matters disclosed or discussed herein. Inclusion of any item in these Disclosure Schedules shall not constitute, or be deemed to be, an admission to any third party concerning such item. No disclosure in any section hereof relating to a possible breach or violation of any contract or applicable law shall be construed as an admission or indication that a breach or violation exists or has actually occurred. Except as set forth in the Agreement, none of the parties to the Agreement assume any responsibility to any Person that is not a party to the Agreement for the accuracy of any information contained herein. Subject to applicable legal requirements, this information is disclosed in confidence for the purposes contemplated in the Agreement and is subject to any confidentiality agreement or other confidentiality obligations between or among any of the parties to the Agreement.  For the avoidance of doubt, these Disclosure Schedules are dated as of the date hereof and cannot be

amended or modified without the mutual agreement of Buyer and Seller Representative.

**SECTION 4.01(b)**

**AUTHORIZATION; NO VIOLATION**

(ii)(z) Annex V of the Agreement is hereby incorporated herein by reference.

**SECTION 4.01(c)**

**CONSENTS AND APPROVALS**

(ii) Except as otherwise set forth in the Sale Order, entry of the Sale Order shall satisfy any consent, approval, or notice that each Seller may have been required to obtain in order to execute and deliver the Transaction Documents and perform the requisite obligations thereunder, with respect to the documents listed in <u>Annex II</u> Assumed Contracts & Cure Amounts of the Agreement.

(ii)(z) <u>Annex V</u> of the Agreement is hereby incorporated herein by reference.

**SECTION 4.01(e)**

**CONSENTS AND APPROVALS**

Section 4.01(b)(ii) *(Authorization; No Violation)* is hereby incorporated herein by reference.

**SECTION 4.01(e)**

**LITIGATION**

<u>Annex V</u> of the Agreement (*Derivative Rights Disputes*) is hereby incorporated herein by reference.

## SECTION 4.01(f)

## ABSENCE OF CERTAIN CHANGES OR EVENTS

1. Pursuant to (a) the "2017 Omnibus Amendment" (as defined in <u>Annex II</u> to the Agreement) and (b) the Co-Ownership Agreement for each Picture co-financed by a Seller pursuant to that certain Amended and Restated Motion Picture Rights Purchase Agreement (the "Warner MPRPA"), dated as of November 10, 2020, by and between Village Roadshow Pictures North America Inc. and Warner Bros. Entertainment Inc. ("WBEI"), in the event a Derivative Work based on a "Library Film" (as defined in the Warner MPRPA) does not qualify as a "Qualifying Derivative Work" (as defined in the Warner MPRPA), the Sellers' Derivative Rights in the applicable Picture shall automatically revert to WBEI, but solely with respect to such non-Qualifying Derivative Work. This reversion does not affect the Sellers' retained Derivative Rights in connection with any other Derivative Work – based on the same Library Film – that does qualify as a Qualifying Derivative Work.

2. The filing of the Bankruptcy Cases on March 16, 2025.

3. All Proceedings disclosed under <u>Annex V</u> of the Agreement remain active and are subject to final adjudication.

## SECTION 4.01(h)

## ASSUMED CONTRACTS

(i)       Annex II ~~and Annex V~~ of the Agreement ~~are~~is hereby incorporated herein by reference.

(ii)      Items 1 and 2 of Annex V are hereby incorporated herein by reference.

(iii)     On April 1, 2025, Regency Entertainment (USA), Inc. ("**Regency**") delivered a notice to VRF wherein Regency (a) alleged that any sale or transfer of the Sellers' Derivative Rights in and to the Picture in connection with the Bankruptcy Cases without Regency's express consent would constitute a breach of that certain Co-Ownership Agreement, dated as of December 14, 2001,by and between VRF and Regency ("Regency Co-Ownership Agreement"), and (b) purported to terminate the Sellers' right, title, and interest in and to such Derivative Rights, citing the bankruptcy filing of the Sellers' and certain of their Affiliates as the basis for termination. On April 2, 2025, the Sellers responded with a formal notice asserting that terminating the Regency Co-Ownership Agreement would constitute a violation of the automatic stay imposed under section 362(a) of the Bankruptcy Code. The Sellers demanded that Regency immediately cease and desist from any further efforts to unilaterally terminate or modify the Agreement and/or interfere with the Sellers' Derivative Rights in and to "Don't Say a Word."

(v)       Item 2 of Annex V is hereby incorporated herein by reference.

## SECTION 4.01(i)

## DERIVATIVE RIGHTS

The Derivative Rights in the Pictures listed on Annex III ~~are~~, subject to the following limitations:

1. Section 4.01(f) of these Disclosures Schedules is hereby incorporated by reference.
2. With respect to "Catwoman," "Constantine" and "Get Smart," the Sellers' Derivative Rights are limited to theatrical motion picture derivative productions based on such Pictures.
3. With respect to "Speed Racer", the Sellers' Derivative Rights exclude any rights respecting a television series based on such Picture being developed by J.J. Abrams.
4. With respect to "The Legend of Tarzan", Warner Bros. only licensed live action theatrical motion picture Derivative Rights from the Burroughs Estate. Such Derivative Rights reverted to the Burroughs Estate as Warner Bros. did not theatrically release a remake or sequel within 4 years of the start of principal of photography of "The Legend of Tarzan." As a result, the Sellers' Derivative Rights in "The Legend of Tarzan" are conditioned upon Warner Bros. reacquiring Derivative Rights in the picture.
5. With respect to "Joker", the Derivative Rights are limited to audiovisual derivative productions where the actor Joaquin Phoenix himself performs in a starring role in the exact same role and character as the "Joker" as he does in the original Picture.

6. Pursuant to that certain "Mad Max: Fury Road" Co-Ownership Agreement ("Mad Max Co-Ownership Agreement"), dated as of June 26, 2015, between WBEI and VRPNA, VRPNA is entitled to an undivided 50% ownership interest in the Derivative Rights in "Mad Max: Fury Road," subject to certain conditions set forth in the Mad Max Co-Ownership Agreement. However, to date, no copyright interest in the Derivative Rights in "Mad Max: Fury Road" have been assigned to the Sellers.

7. Pursuant to the following ~~Assumed Contracts~~agreements, one or more Sellers quitclaimed, assigned, conveyed or otherwise transferred all of their rights, title and interest in and to certain Derivative Works based on a Picture, as follows:[1]

    a.  Pursuant to that certain Quitclaim Agreement, dated as of February 18, 2015, by and between Paramount Pictures Corporation ("Paramount") and Village Roadshow Films (BVI) Limited ("VRF"), with respect to the project entitled "Zoolander 2", VRF quitclaimed to Paramount, all of its right, title, and interest in and to "Zoolander 2", the results and proceeds of any development activity in connection with "Zoolander 2" and the Underlying Picture Materials (as defined thereunder).

    b.  Pursuant to that certain Option and Assignment Agreement, dated as of April 17, 2017, by and between Village Roadshow Films (BVI) Limited and Warner Specialty Films, Inc. ("Warner Specialty") with respect to the project entitled "Deep Blue Sea 2 DTV" ("Deep Blue Sea 2 Option Agreement"), VRF granted Warner Specialty the

---

[1] Note to Seller: Please confirm whether Buyer wishes to assume these contracts.

option to acquire the right to produce one live action direct-to-DVD motion picture based on "Deep Blue Sea."

c.  Pursuant to that certain Short Form Assignment Agreement dated as of November 30, 2022, by and between VRF and Village Roadshow Entertainment Group USA Inc. ("VREG"), VRF assigned to VREG all its right, title, and interest in and to the Deep Blue Sea 2 Option Agreement.

d.  Pursuant to that certain Acknowledgement and Consent, dated as of June 19, 2019, by VRF and VRFNA with respect to the project entitled "Happy Feet China", VRF and VRFNA waived all rights granted to VRF and VRFNA in connection with the Remake under that certain Co-Ownership Agreement, dated as of November 15, 2006, between Warner Bros. and VRF, as amended by the 2017 Omnibus Amendment (as defined in Annex II of the Agreement).

e.  Pursuant to that certain Short Form Option/Purchase Agreement, dated as of March 20, 2023, by and among Warner Bros. (F.E.), Inc. VRF and VRFNA, with respect to the project entitled "Miss Congeniality", VRF and VRFNA grant to Warner Bros. (F.E.) Inc. the option to acquire the right to produce one Chinese language motion picture throughout the universe tentatively called "Undercover Netcaster" based on "Miss Congeniality."

f.  Pursuant to that certain Amendment to QCSA / Co-Ownership Agreements "Training Day Sequel," dated as of February 23, 2021, by and between WBEI, on the one hand, and VRF, VRFNA and VRPNA, on the other hand, VRF, VRFNA and VRPNA quitclaimed to WBEI all of their rights, title and interest in and to a feature length motion picture prequel based on the Picture entitled "Training Day."

## SECTION 4.01(k)

## WONKA COPYRIGHT

| Picture & Title | Claimants | Application/ Registration Number | Date of Registration | Sellers' Ownership Share in the Domestic Territory | Sellers' Ownership Share in the Foreign Territory | Jurisdiction | Assignment Recordation Number(s) |
|---|---|---|---|---|---|---|---|
| "WONKA." <br><br> Title with respect to screenplay registration: "Wonka" <br><br> Title with respect to motion picture registration: "WONKA (Draft 14.4 - September 29, 2023)" | *Screenplay*: Warner Bros. Entertainment Inc.; Village Roadshow Films North America, Inc. <br><br> *Motion Picture Registrant*: Warner Bros. Entertainment Inc.; VREG Wonka IP Global LLC; Domain Pictures, LLC | *Screenplay*: PAU004199849 *Motion Picture*: PA0002443871 (supplemented by PA0002506060) | *Screenplay*: October 31, 2023 <br><br> *Motion Picture*: December 6, 2023 | 50% of bare copyright | 50% of bare copyright | US Copyright Office | V15021D105; V15020D684; V15020D683 |

SMRH:4933-0756-1844.1 101725

76KN-409057

**SECTION 4.01(l̶m)**

**TITLE TO PURCHASED ASSETS**

Annex V of the Agreement (*Derivative Rights Disputes*) is hereby incorporated herein by reference.

## SECTION 4.01(mn)

## NO BROKERS OR FINDERS

1.    Solic Capital LLC.

2.    Virtu Global Advisors, LLC.