**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC., *et al.*[1] | Case No. 25-10475 (TMH) |
| | (Jointly Administered) |
| Debtors. | |

**MEMORANDUM OPINION**

This is the opinion regarding the Debtors' motion to approve the sale and assumption and assignment of certain derivative rights to Alcon Media Group, LLC under sections 363 and 365 of the Bankruptcy Code. Warner Brothers Entertainment Inc. and Regency Entertainment (USA), Inc., who are counterparties to various derivative rights agreements, have objected to the sale. For the reasons set forth below, those objections are overruled and the sale to Alcon is approved.

I. Background

On March 17, 2025, Village Roadshow Entertainment Group USA Inc. and certain of its affiliates (collectively the "Debtors") filed petitions under chapter 11 of the Bankruptcy Code. The Debtors are seeking to sell the rights to participate in

---

[1] The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343. The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

motion picture projects that are derivative of certain films (the "Derivative Rights"), including those that the Debtors co-produced with Warner Bros. Entertainment Inc. and its affiliates (collectively, "Warner Bros.") and Regency Entertainment (USA), Inc. ("Regency").[2] The Derivative Right for each film is governed by its own co-ownership agreement, as such agreement may have been amended (collectively the "DRAs").

On April 22, 2025, this court approved bidding procedures for the sale of the Debtors' assets.[3] The bidding procedures order established ground rules for the sale of three types of assets – the Library Assets, the Studio Business, and the Derivative Rights.

---

[2] See Debtors' Motion for Entry of Orders (I)(A) Approving Bid Procedures for the Sale of the Debtors' Assets, (B) Authorizing the Debtors' Entry Into the Stalking Horse APA and Approving Bid Protections Thereunder, (C) Scheduling an Auction for, and Hearing to Approve, Sale of the Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (E) Approving Assumption and Assignment Procedures; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of all Liens, Claims, Interests, and Encumbrances, and (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief [D.I. 11]

[3] Order (I) Approving Bid Procedures for the Sale of the Debtors' Assets, (II) Authorizing the Debtors' Entry Into the Stalking Horse, APA and Approving Bid Protections Thereunder, (III) Scheduling an Auction for, and Hearing to Approve, Sale of the Debtors' Assets, (IV) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, (V) Approving Assumption and Assignment Procedures, and (VI) Granting Related Relief [D.I. 240].

In accordance with the bidding procedures order, on May 22, 2025, the Debtors filed notice that Alcon Media Group, LLC ("Alcon") was the successful bidder for the Library Assets.[4]

On May 28, 2025, the Debtors conducted an auction for the Derivative Rights and the Studio Business. After spirited bidding for the Derivative Rights, the Debtors designated Alcon as the successful bidder with a bid of $18.5 million, and Warner Bros. as the backup bidder with a bid of $17.5 million.[5] Alcon made the lone conforming bid for Studio Assets and was designated as the successful bidder for those assets. On August 26, 2025, this court entered an order approving the sale of the Studio Assets to Alcon.[6]

Warner Bros. and Regency objected to the sale of Derivative Rights. The sale of the Derivative Assets proceeded on a separate track because the sale of those assets raised issues not pertinent to the sale of the Library Assets and Studio Assets, requiring substantial discovery and further briefing. The court scheduled a hearing on the Derivative Rights for October 20, 2025.

---

[4] Notice of Successful Bidder for Library Assets [D.I. 396]. On June 20, 2025, the court entered its Order (I) Approving the Sale of Library Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief [D.I. 562], Ex. 78.

[5] Notice of (I) Successful Bidder for Derivative Rights and Studio Business and (II) Back-Up Bidder for Derivative Rights [D.I. 446], Ex. 81, at 1–2.

[6] Order (I) Approving the Sale of the Studio Business Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases In Connection Therewith, and (III) Granting Related Relief [D.I. 782].

On August 22, 2025, this court held a status conference where counsel for the Debtors stated "[w]e would be more than happy to welcome a bid in amount greater than $18.5 million. I think that we would have an obligation to consider any such bid."[7]

Warner Bros. then submitted a revised bid to the Debtors for $18.5 million plus additional consideration in the form of releasing $10 million from the Warner Bros. Reserve,[8] and dismissing and releasing claims for certain disputes.[9] The Debtors declined this offer and, instead, submitted a counteroffer to Warner Bros. for a purchase price of $30 million, along with the settlement of claims for certain disputes, including the ones for which cash is being held in the Warner Bros. Reserve.[10] On October 19, 2025, the day before the Derivative Rights sale hearing, Warner Bros. added $1 million to its revised offer, making the cash component of its offer $19.5 million.[11] The Debtors did not accept this offer and are seeking approval of the sale of the Derivative Rights to Alcon.

---

[7] Tr. of Status Conference 08/22/25 [D.I. 910-42], Ex. 61, at 12:3–5.
[8] The Warner Bros. Reserve was established under the final DIP order and refers to the Debtors' obligation to maintain a reserve in the amount of $110 million from the sale of assets to ensure they have sufficient proceeds to satisfy potential claims of Warner Bros. based on alleged prepetition contract breaches. Final Order (I) Authorizing the Debtors to Obtain Post-Petition Secured Financing, (II) Authorizing the use of Cash Collateral, (III) Granting Liens and Superpriority Administrative expense Status, (IV) Granting Adequate Protection, and (VI) Granting Related Relief [D.I. 280], Ex. 76, at 61.
[9] Sept. 8, 2025 Revised Warner Bros. Bid Ex. 26.
[10] Village Sept. 16, 2025, Resp. and Counteroffer to Warner's Revised Bid Ex. 360.
[11] See Oct. 19, 2025 Email Re: Warner Bros. Offer Ex. 403.

Warner Bros. objects to the sale of the Derivative Rights to Alcon on the grounds that (i) Alcon did not make the highest and best offer, (ii) the DRAs are non-assignable financial accommodations, (iii) the DRAs are non-assignable personal service contracts, and (iv) Alcon has not provided adequate assurance of future performance. Warner Bros. asks this court to find that its bid is the highest and best bid, and to approve the sale to Warner Bros. in its capacity as the backup bidder for the Derivative Rights.

Regency objects on the grounds that the DRA between the Debtors and Regency is a non-assignable personal service contract.

## II. Discussion

### A. Warner Bros.

#### 1. The Debtors have exercised their business judgment appropriately in selecting Alcon's bid as the highest and best bid.

Bankruptcy Code section 363(b)(1) provides that a debtor may sell property of the estate outside the ordinary course of business after notice and a hearing. In determining whether to approve such a sale, courts consider broad range of factors to demonstrate "that a sound business purpose justifies" the sale under the "business judgment test."[12] The business judgment test is deferential to debtors and courts will not "'substitute [their] views for those of the [debtor] if the latter's decision can be attributed to any rational business purpose.'"[13]

---

[12] In re Montgomery Ward Holding Corp., 242 B.R. 147, 153 (D. Del. 1999).
[13] In re Glob. Crossing Ltd., 295 B.R. 726, 744 (Bankr. S.D.N.Y. 2003) (quoting Paramount Communications Inc. v. QVC Network Inc., 637 A.2d 34, 45 n.17 (Del.1994).

The auction here was conducted according to court-approved bidding procedures, and Warner Bros. actively participated in the auction. It made the baseline bid for the Derivative Assets.[14] It bid through round ten of the auction,[15] and its representatives bid up to the amount they were authorized to bid.[16] After round ten, the Debtors determined that Alcon's $18.5 million bid (the "Alcon Bid") was the highest and best offer after primarily considering the bids' cash value[17] and Warner Bros. declined to submit a higher bid in the next round.[18]

Warner Bros. has no objection to the integrity or procedures of the auction.[19] Months after the auction,[20] Warner Bros. submitted two additional bids, including one for $19.5 million and additional consideration which it submitted the night

---

[14] May 28, 2025 Auction Tr. Ex. 93, at 15:7–9 (hereinafter Auction Tr.); Tr. Regarding Hr'g held Oct. 20, 2025, at 76:16–17 [D.I. 971] (hereinafter Oct. 20, 2025 Hr'g Tr.).
[15] See Auction Tr. 37:2–8; Oct. 20, 2025 Hr'g Tr. 88:25–89:2.
[16] Oct. 20, 2025 Hr'g Tr. 185:22–23.
[17] See Auction Tr. 40:1–6; Decl. of Keith Maib Supp. Debtors' Reply Supp. Debtors' Derivative Rights Sale Ex. 356, at 2–3 (hereinafter Maib Decl. Supp. Derivative Rights Sale); Oct. 20, 2025 Hr'g Tr. 78:14–19. While the evidence shows that the Debtors primarily considered the cash value of the offers, Mr. Maib, the Debtor's Chief Restructuring Officer, testified that the Debtors also considered other relevant factors such as the buyers' ability to close and the reputation of the parties. Maib Decl. Supp. Derivative Rights Sale 3; Hr'g Tr. 91:3–15.
[18] Auction Tr. 40:9–10; Oct. 20, 2025 Hr'g Tr. 78:17–18.
[19] Auction Tr. 43:23–44:2; Oct. 20, 2025 Hr'g Tr. 207:25–208:5.
[20] Warner Bros. contends that a statement by the Debtors' counsel during a status conference to the effect of welcoming higher offers and believing the Debtors would have an obligation to consider any offers reopened bidding, but the Court finds that the statement was consistent with the Debtors' fiduciary duties and did not reopen the bidding procedures. See Tr. of Status Conference 08/22/25 Ex. 61, at 12:3–5; Oct. 20, 2025 Hr'g Tr. 211:4–15.

before the Derivative Rights sale hearing.[21] The Debtors considered these bids, but determined that the first bid was not higher or better than the Alcon bid, and that the second was insufficient to exercise their fiduciary out.[22] After Warner Bros.' first post-auction bid, the Debtors submitted a counteroffer asking for $30 million along with additional consideration, reflecting their judgment on what would be sufficient to justify the exercise of their fiduciary out.[23]

The Debtors have determined that the Alcon Bid is the highest and best offer considering the cash value of the competing bids and balancing their obligation to maximize the value to the estate with the Debtors' obligation to comply with the bidding procedures and honor the bid chosen at the auction. The evidence supports that the Debtors exercised appropriate business judgment in selecting the Alcon Bid for the sale of the Derivative Rights and that there are no exceptional circumstances here that would warrant the extraordinary act of this court substituting its judgment for that of the Debtors.

To maintain the integrity of the auction process, the finality of an auction should only be undone in exceptional circumstances.[24] There are numerous reasons

---

[21] See September 8, 2025 Revised Warner Bros. Bid Ex. 26; October 19, 2025 Bid Email Ex. 403.
[22] Maib Decl. Supp. Derivative Rights Sale 3–5; Oct. 20, 2025 Hr'g Tr. 9:21–10:9.
[23] Village September 16, 2025, Response and Counteroffer to Warner's Revised Bid Ex. 360; Oct. 20, 2025 Hr'g Tr. 109:19–110:14.
[24] See In re Stanley Eng'g Corp., 164 F.2d 316, 318–20 (3d Cir. 1947) (holding that the court abused its discretion by failing to confirm the sale to the highest bidder at the auction in favor of a higher post-auction bid without a "finding of inadequacy of price . . . [or] unfairness, fraud or mistake in the conduct of the public sale"); In re Gil-Bern Indus., Inc., 526 F.2d 627, 629 (1st Cir. 1975) ("If there is no local custom

why this is so. The auction process here was established by an order of this court. Not only are the parties bound to respect that order, but bidders acknowledge they are bound by it when they undertake to participate. An orderly bidding process and auction has the effect of getting all qualified bidders in one room with the debtor and any consultation parties and encourages the parties to lay their cards on the table.

There may be reasons why a debtor might determine it is an appropriate exercise of its business judgment to exercise a fiduciary out after the close of an auction. However, Warner Bros. waited until the evening before the Derivative Rights sale hearing to enhance its offer in any meaningful respect. Such a course of conduct not only leaves a debtor and its consultation parties with inadequate opportunity to assess a late bid, but it also appears engineered to run down the clock by effectively preventing a debtor from counteroffering or going back to its designated successful bidder to see if there is yet a better deal to be had.

This court will not substitute its judgment for that of the Debtors. There is no basis upon which this court can find that the Alcon bid was inadequate or that there was any infirmity in the sale process, much less one amounting to unfairness, fraud,

---

to the contrary, we are in accord with the established rule that it is an abuse of discretion for a bankruptcy court to refuse to confirm an adequate bid received in a properly and fairly conducted sale merely because a slightly higher offer has been received after the bidding is closed."); In re Bigler, LP, 443 B.R. 101, 115 (Bankr. S.D. Tex. 2010) ("A court order reopening the auction process when procedures were clearly established, when the auction was conducted without fraud or collusion and in compliance with the procedures, and when an adequate bid was accepted, will undercut such confidence and faith in the system.").

or mistake. The Debtors have established that it properly used its business judgment in selecting Alcon as the successful bidder and in going forward at the October 20, 2025 hearing to seek approval of the sale to Alcon.

2. The DRAs are assignable under 11 U.S.C. § 365.

The Bankruptcy Code allows for debtors to accept and assign executory contracts, subject to some exceptions, under Bankruptcy Code section 365.[25] "[E]xceptions to assignability are narrowly construed" in favor of free assignability.[26] Warner Bros. argues that the DRAs are unassignable under section 365 because they are financial accommodations, personal service contracts, and because Alcon has not provided adequate assurance of future performance.

a. The Derivative Rights Agreements are not financial accommodations, and therefore are assignable, under 11 U.S.C. § 365(c)(2).

Section 365(c)(2) prohibits a debtor from assuming or assigning an executory contract or lease if "such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor . . . ." The statute prevents a debtor from assuming financing agreements and "thus compel[ling] its lender to continue to advance funds during reorganization" or liquidation.[27] In determining whether a contract is one to extend financial

---

[25] The parties do not dispute that the DRAs are executive contracts.
[26] In re Health Plan of Redwoods, 286 B.R. 407, 409 (Bankr. N.D. Cal. 2002); see also In re IT Grp., Inc., 350 B.R. 166, 177 (Bankr. D. Del. 2006) ("The Code generally favors free assignability . . . .").
[27] Watts v. Pennsylvania Hous. Fin. Co., 876 F.2d 1090, 1095 (3d Cir. 1989) (quoting Louis W. Levit, Use and Disposition of Property Under Chapter 11 of the Bankruptcy Code: Some Practical Concerns, 53 Am. Bankr. L.J. 275, 276 (1979)).

9

accommodations, the whole contract must be considered because "[a] contract is not a 'financial accommodations' contract if the extension of credit is merely incidental to the broader contractual arrangement involving the debtor."[28] Additionally, courts have found that the term "financial accommodations" is to be interpreted narrowly to mean "the extension of money or credit to accommodate another."[29]

The DRAs between the Debtors and Warner Bros. are components of a set of contracts outlining the rights and responsibilities of each party and incorporated through the DRAs. For example, the terms of Amendment I to the 2017 Omnibus Amendment to the Co-Ownership Agreements[30] incorporate the terms of the 2014 Motion Picture Rights Purchase Agreement (the "2014 MPRPA")[31] for derivative projects while giving the parties freedom to adopt other agreements.[32] In broad strokes, the structure of the agreements, taken together, provides that if Warner Bros. decides to exploit a derivative right, it must provide the Debtors with notice of the project (a "Project Notice"), which includes information about the project such as the script, director, confirmed cast, and a proposed budged, which the Debtors then have fifteen days to accept.[33] If the Debtors accept within the fifteen-day timetable,

---

[28] In re Sportsman's Warehouse, Inc., 457 B.R. 372, 392–93 (Bankr. D. Del. 2011) (citing Nat'l Bank v. Thomas B. Hamilton Co. (In re Thomas B. Hamilton Co.), 969 F.2d 1013, 1019 (11th Cir.1992)).
[29] Id. 457 at 392 (quoting Nat'l Bank, 969 F.2d at 1019).
[30] Ex. 5.
[31] Ex. 2.
[32] See 2017 Omnibus Amendment to the Co-Ownership Agreements Ex. 5, at 15, 17.
[33] Initial Smith Decl. Ex. 66, at 9–10; Oct. 20, 2025 Hr'g Tr. 48:5–23; see also, e.g., 2017 Omnibus Amendment to the Co-Ownership Agreements Ex. 5, at 14.

they become co-producers and are obligated to pay for their share of the project.[34] Warner Bros. pays all the costs related to the project as they come due, and the Debtors pay Warner Bros. their percentage, plus interest, shortly before the movie is distributed, on the "pickup date."[35] While there is no set length of time, the pickup date is often one to two years after the Project Notice was sent out.[36]

      Warner Bros. contends that this structure, which requires that they pay all costs up front and are repaid with interest later, is a financial accommodation under section 365(c)(2). It is unnecessary to decide whether the up-front payment term of the agreement is a financial accommodation, because even if it is, the "'nature of the entire transaction" is not one of financial accommodation.[37] The DRAs primarily involve the underlying intellectual property rights and a structure, including a financial structure, for the counterparties to exploit the derivative rights together. The purpose is not for Warner Bros. to provide financing to the Debtors, but for the Debtors to provide financing to Warner Bros. to mitigate the risk (or share in the profit) of the project. Essentially, they are an investment for the Debtors.[38] While the terms of this investment do not require that the Debtors pay their share until later into the development of the project, that does not change that this overall agreement is not one intended to financially accommodate the

---

[34] Oct. 20, 2025 Hr'g Tr. 49:3–6.
[35] Initial Smith Decl. Ex. 66, at 10–11; Oct. 20, 2025 Hr'g Tr. 44:7-14.
[36] See Oct. 20, 2025 Hr'g Tr. 46:6–47:4.
[37] See In re United Airlines, Inc., 368 F.3d 720, 724 (7th Cir. 2004).
[38] See Deposition of Steve Spira 61:9–13, 83:10–17 (hereinafter Spira Deposition); 2014 MPRPA Ex. 2, at 9 (describing the purpose as being for a purchase of rights).

11

Debtors so much as to provide funding to Warner Bros. for the project. Because the DRAs are not contract for financial accommodations, they are assignable under section 365(c)(2).

### b. The DRAs are not contracts for personal services.

Under section 365(c)(1), when an executory contract cannot be assigned under applicable non-bankruptcy law, it may not be assumed or assigned in bankruptcy without permission of the other contracting party.[39] Under California law, which the parties agree is the applicable nonbankruptcy law, "contracts involving relationships of personal confidence and trust or personal services are not assignable by either party without the consent of the other party."[40] Such a contract would consequently be non-assignable without consent in bankruptcy under section 365(c)(1). The test for whether a contract is such a personal service contract is "whether the contract involves a personal relation of confidence between the parties or relies on the character and personal ability of a party."[41] Additionally, "there must be a special relationship between the parties or the party to perform must possess special knowledge or a unique skill, such that no performance save that of the contracting party could be meet the obligations of the contract."[42]

---

[39] In re Golden Books Fam. Ent., Inc., 269 B.R. 300, 308 (Bankr. D. Del. 2001); see also 11 U.S.C. § 365(c)(1).
[40] In re Planet Hollywood Int'l, Inc., No. 99-3612 (JJF), 2000 WL 36118317, at *4 (D. Del. Nov. 21, 2000) (unpublished).
[41] In re Health Plan of Redwoods, 286 B.R. 407, 409 (Bankr. N.D. Cal. 2002).
[42] Id.

"Courts applying California law have found the fact that a party contracted with a corporation as evidence that a contract is not for personal services."[43] The situation between the Debtors and Warner Bros. highlights why this is true, especially in cases like this where the agreements are contemplated to be ongoing over years. The parties originally began working together in 1998 when they had what has been characterized as a close relationship built on trust, but over the years both companies have been bought and sold and have experienced a large amount of turnover in personnel that has affected the manner in which they have conducted business together.[44] Both parties have changed significantly from when the DRAs were entered into but, as contemplated at the time, the DRAs are still in effect between the parties. This is strong evidence that the DRAs are not based on any personal services or attributes of either party.[45]

The contracts being between corporate entities is a strong indication that the contracts are not personal service contracts, but it is not conclusive. However, the assignability of the DRAs is further supported because they also do not contain

---

[43] In re Vice Grp. Holding Inc., 652 B.R. 423, 429 (Bankr. S.D.N.Y. 2023) (first citing Lauter v. Rosenblatt, 2020 WL 3545733, at *3 (C.D. Cal. June 30, 2020); and then citing Haldor, Inc. v. Beebe, 164 P.2d 568, 572–73 (Cal. Ct. App. 1945)); see also Tran v. Intern. Buddhist Cultural Heritage Found., No. 30201500787567CUMCCJ, 2015 WL 13081192, at *4 (Cal. Super. Oct. 30, 2015).
[44] See Spira Deposition 44:16–45:21, 47:6–22, 48:2–11; Oct. 20, 2025 Hr'g Tr. 199:15–20, 220:4–13.
[45] See Haldor, Inc., 164 P.2d at 572 (1945) ("In this case the agreement was made with a corporation which, in the nature of things, cannot perform personal functions. . . . [I]t must have been in contemplation of the parties when the contract was signed that the services bargained for would be rendered by a human representative delegated to perform that duty by the corporation and subject to being succeeded, if occasion should arise, by one with proper qualifications.")

nondelegable obligations for either party. The Debtors' primary obligation under the contract is to co-finance the derivative projects for which they have accepted a Project Notice. The Debtors may also give input into the projects, but nothing in the DRAs obligates Warner Bros. to accept any of the Debtors' suggestions.[46] Conversely, Warner Bros.' primary duty under the DRAs is to give the Debtors the opportunity to co-finance derivative projects that it chooses to undertake. None of these obligations is a non-delegable personal service.[47]

While Warner Bros. describes the relationship, or at least the earlier years of the relationship, as being close and built on trust, "[a] 'close personal working relationship' does not automatically equate to personal services as defined by law."[48] The nature and obligations of the underlying contracts here are not those of personal service contracts, and the contracts are assignable under section 365(c)(1).

### c. Alcon has provided adequate assurance of future performance.

11 U.S.C. § 365(f)(2)(B) provides that a debtor seeking to assign an executory contract must provide "adequate assurance of future performance by the assignee of such contract."[49] The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical,

---

[46] Oct. 20, 2025 Hr'g Tr. 65:5–8, 188:4–19.
[47] See SMC Specialty Fin., LLC v. Zhengfu Pictures Ltd., No. B314024, 2022 WL 2255230, at *7 (Cal. Ct. App. June 23, 2022) (finding that a contract to cofinance and distribute a film was not a personal services contract).
[48] Husain v. McDonald's Corp., 205 Cal. App. 4th 860, 870 (2012).
[49] 11 U.S.C. § 365(f)(2)(B); see also Cinicola v. Scharffenberger, 248 F.3d 110, 120 (3d Cir. 2001).

14

pragmatic construction."⁵⁰ The primary focus of determining whether an assignee has given adequate assurance of future performance is "the assignee's ability to satisfy the financial obligations imposed by the [contract]."⁵¹ However the non-financial obligations, while "less significant," may also be considered.⁵²

Here, Alcon has shown that it can satisfy the financial obligations of the DRAs. Alcon has shown that it has the funds to close on the sale and, while Debtors have not yet sought to assign their purported acceptance of the Project Notice for Practical Magic 2 so Alcon's obligations as to this project are uncertain, Alcon has also given sufficient assurance that it will be able to raise the money to fund the project if and when the amount comes due.

Alcon has $39.6 million available to it under its credit facility with Bank of America and $15.39 million available to it under its credit facility with JPMorgan Chase Bank, N.A.⁵³ Broderick Johnson, the co-founder and co-CEO of Alcon testified that, in the past, Alcon has been able to increase the size of these credit facilities and in the past that he reasonably anticipates being able to do so in the future if the need arises.⁵⁴ He also testified as to Alcon's relationship with the Smith family, the majority owners of Alcon, which has previously helped Alcon fund projects, and has

---

⁵⁰ In re Carlisle Homes, Inc., 103 B.R. 524, 538 (Bankr. D.N.J. 1988).
⁵¹ In re Evelyn Byrnes, Inc., 32 B.R. 825, 829 (Bankr. S.D.N.Y. 1983).
⁵² Id.
⁵³ Bank of America Letter 09/24/25, Ex. 63; JPMorgan Letter 09/25/25; see also Oct. 20, 2025 Hr'g Tr. 162:8–13.
⁵⁴ Oct. 20, 2025 Hr'g Tr. 125:9–18.

committed to continue funding projects, including Practical Magic II, for Alcon.[55] The Smith family is not obligated to provide this funding, but Molly Smith, a member of the Smith family and an Alcon board member, offered uncontroverted testimony as to the family's support of Alcon's purchase of the Derivative Rights and commitment to continue funding projects for Alcon.[56]

Beyond the expenses to close the sale and co-finance Practical Magic 2, the DRAs do not obligate Alcon to fund other projects unless they accept a Project Notice, and Alcon has indicated it will not accept Project Notices unless it has the ability to fund them.[57] There is no evidence that Alcon has ever defaulted on any contract with Warner Bros. or with any other party.[58]

Warner Bros. has also discussed non-financial concerns in relation to separate litigation Alcon has initiated against Warner Bros. This litigation is unrelated to the DRAs, and the Court is satisfied that it will have no bearing on Alcon's ability to perform under the DRA contracts.

    B.    <u>Regency</u>

        1.    <u>The DRA is not a contract for personal services and is otherwise freely assignable under 11 U.S.C. § 365.</u>

Regency has one DRA with the Debtors. It has notable differences from the Warner Bros. DRAs. Unlike the Warner Bros. agreements, under which only

---

[55] Id. at 166:3–167:7; see also Sept. 25, 2025 Letter from Black Label Media re financial and other support to Alcon Media Group Ex. 369 (referencing the Smith family's "recent decision to invest over $40 million to co-finance Practical Magic 2).
[56] Oct. 20, 2025 Hr'g Tr. 180:11–16.
[57] Decl. of Broderick Johnson Ex. 402, at 7; see also Oct. 20, 2025 Hr'g Tr. 223:10–22.
[58] Oct. 20, 2025 Hr'g Tr. 224:22–25, 225:1–25.

Warner Bros. can initiate exploitation of a Derivative Right, under the Regency DRA, either party is able to initiate such an exploitation. Also, the Regency DRA identifies certain individuals (or their successors in their respective roles) employed by Regency and the Debtors who must work together to settle disputes. Regency argues that these differences present a stronger case that its DRA is a personal services contract.

Because either party can initiate exploitation of the Derivative Rights and subsequently develop a derivative project on their own if the other party does not accept a Project Notice, Regency argues that its DRAs are built on trust in one another's skills and abilities such that neither party would devalue the Derivative Rights of the other through the development of a project.[59] Regency claims that this trust along with provisions of the Co-ownership Agreement that names employees for each company that must negotiate with one another in the event of a dispute are evidence that this DRA is a non-assignable personal services contract.

Neither feature creates a personal services contract. The terms that name specific employees also allow for their successors to negotiate in place of the named employees. In fact, David Friedman, the Executive Vice President and General Counsel of Regency, testified that only one of the four named individuals still works at their respective companies, and he does so in a more limited capacity.[60]

---

[59] See Am. Decl. David C. Friedman Supp. Obj. Regency Ent., Inc. to Sale of Debtors' Assets and Assumption and Assignment of Co-Ownership Agreement Ex. 89, at 3 (hereinafter Am. Friedman Decl.); Oct. 20, 2025 Hr'g Tr. 242:13–243:8.
[60] Oct. 20, 2025 Hr'g Tr. 249:12–250:4, 250:24–251:5.

Moreover, the contract only names individuals for dispute resolution clauses, not for any of the central roles or responsibilities of either party under the contract.[61] The contract was entered into between two corporations and was intended to continue into the future, beyond when any individual would be working at either party.

The fact that the Debtors may initiate an exploitation of derivative rights and engage in that exploitation alone if the other declines to participate[62] similarly does not create a personal services contract. This clause provides an extra right in comparison to the Warner Bros. DRAs, not an obligation to Regency that could be found to be a personal service.[63] While the Debtor's or assignee's exercise of this right could affect the value of Regency's Derivative Rights, this does not create a personal services contract.

### III. Conclusion

The Debtors have sustained their burden of showing that it is an appropriate exercise of their business judgment to convey the DRAs to Alcon. The DRAs can be assumed and assigned to Alcon under Bankruptcy Code section 365 because they are executory contracts that are not financial accommodations or contracts for personal services and because Alcon has given adequate assurance of future performance. The Derivative Rights sale is therefore approved. The parties are

---

[61] See generally Co-Ownership Agreement Dec. 14, 2001, between Regency Ent., Inc. and Village Roadshow Films Ltd. re: "Don't Say a Word" Ex. 395 (hereinafter Don't Say a Word Co-Ownership Agreement).
[62] See id. at 5–6, 9.
[63] See, e.g., Husain v. McDonald's Corp., 205 Cal. App. 4th 860, 870 (2012).

directed to settle an appropriate form of order and submit it under certification of counsel.

Dated: November 5, 2025  
Wilmington, Delaware

_____  
Thomas M. Horan  
United States Bankruptcy Judge