**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC., *et al.*,[1] | Case No. 25-10475 (TMH) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. 1048** |

**DEBTORS' OBJECTION TO WARNER'S MOTION FOR A STAY
OF THE DERIVATIVE RIGHTS SALE ORDER PENDING APPEAL**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>" or

"<u>Village</u>"), [2] file this objection (this "<u>Objection</u>") to *Warner Bros. Entertainment Inc.'s*

*Emergency Motion to Stay Pending Appeal* [Docket No. 1048] (the "<u>Motion</u>") filed by Warner

Bros. Entertainment Inc. and its affiliates (collectively, "<u>Warner</u>").  In support of this Objection,

the Debtors respectfully state as follows:

## I.   PRELIMINARY STATEMENT

1.      Having failed to persuade this Court to deny entry of the Sale Order, Warner has

doubled down on its misguided attempts to derail the Debtors' successful sale of the Derivative

Rights Assets by simply reasserting many of the same arguments that this Court already rejected

in its written ruling after full briefing and an extensive evidentiary hearing.  Warner has not

---

[1]    The last four digits of the Debtors Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343.  The mailing address for the Debtors Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069.  Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the *Debtors' Reply in Support of the Derivative Rights Sale* [Docket No. 934] (the "<u>Derivative Rights Sale Reply</u>"), as applicable.

come close to demonstrating that a stay is proper under the four factors considered in the Third Circuit to justify a stay pending appeal and the Motion should be denied in its entirety.

2.    ***First***, Warner has not made a "strong showing" that it has a reasonable likelihood of success on the merits of its appeal—the gating issue for the relief it seeks.  Rather, Warner merely recycles the same arguments the Court previously considered and properly rejected in its Memorandum Opinion [Docket No. 1027] (the "Opinion").  The Motion references case law in support of this factor where the law is "somewhat unclear" or there is "genuine doubt as to the correct legal standard."  As demonstrated below, those authorities are inapposite here.  The applicable legal standards are clear, and their proper application forecloses the success of Warner's arguments.

3.    As this Court has decided, the Derivative Rights Agreements are not financial accommodations because "the 'nature of the entire transaction' is not one of financial accommodation" for the Debtors' benefit.  *See* Op., at 11.  The Court correctly concluded that the Derivative Rights Agreements primarily operate to govern the exploitation of the Derivative Rights and allow for "the Debtors to provide financing to [Warner] to mitigate the risk (or share in the profit) of the project."  *Id*.  The Court's analysis is correct.  As is clear from the record, the entire purpose of Warner partnering with co-investors (including the Debtors) is to ***mitigate its own risk*** on film production costs.[3]  Warner ignores this evidence and claims that the upfront payment feature, whereby Warner "commit[s] hundreds of millions of dollars" to fund initial production costs—money that Warner spends ***by choice*** and ***regardless of whether the Debtors elect to participate***—is the "textbook risk" that the "financial accommodation" exception is intended to protect against.  *See* Mot., ¶¶ 2-3.  In reality, the purpose of Section 365(c)(2) is to

---

[3]    *See*, *e.g.*, Deposition of Steve Spira (October 6, 2025) (61:9-13; 83:10-17).

prevent a debtor in possession from requiring new money from a lender—not, as Warner contends, to avoid any risk of contract breach relating to payment obligations.

4.      Further, Warner's reference to the Matrix Arbitration undermines its own argument.  Warner has not, and will not, advance millions of dollars "with only a promise of repayment" (Mot., ¶ 3)—rather, Alcon will be contractually obligated to pay the purchase price of any derivative work it accepts from Warner.  If Alcon ever did default under any applicable contracts, Warner could pursue claims for breach of contract through arbitration or litigation— not, for the avoidance of doubt—through a loan foreclosure or other similar creditor remedy.

5.      This Court also found that the Derivative Rights Agreements are not personal services contracts.  Without a shred of new support, Warner argues that this decision could be reasonably overturned because such agreements were "founded on trust and confidence."  *See* Mot., ¶¶ 51-53.  As the Court held in weighing the testimony during the extensive evidentiary hearing, "a close personal working relationship" between individuals at each contract counterparty does not equate to "personal services as defined by law.'"  Op., at 14 (quoting *Husain v. McDonald's Corp.*, 205 Cal. App. 4th 860, 870 (2012)).  Indeed, while the Debtors and Warner may have entered into the Derivative Rights Agreements at a time when they had "a close relationship built on trust . . . over the years both companies have been bought and sold and have experienced a large amount of turnover in personnel that has affected the manner in which they have conducted business together."  Op., at 13.  Despite the fact that "[b]oth parties have changed significantly" since then, "the [Derivative Rights Agreements] are still in effect between the parties," which represents "strong evidence that [they] are not based on any personal services or attributes of either party."  *Id.*  Contrary to Warner's arguments, there is no likelihood of

success here, either—a reversal on this point would surely destabilize the applicable standard altogether.

6.     As to adequate assurance, the record speaks for itself—Alcon has a significant and meaningful track record in the entertainment industry and has sufficiently evidenced capital to close the Sale of the Derivative Rights Assets and fund *Practical Magic 2*. However, the Derivative Rights Agreements do not obligate Alcon to fund projects, and Alcon would not participate in a project unless it has the ability to fund. *Id*. at 16. Warner's reproduction of its tired arguments fails to support its assertion that it has a likelihood of success on the merits.

7.     *Second*, Warner has not identified any imminent and irreparable harm that would justify a stay. Warner argues that it would suffer irreparable harm because (i) it would be required to comply with its obligations under the Derivative Rights Agreements, and (ii) consummation of the Sale would moot its appeal. Of course, the requirement to comply with contractual obligations cannot ostensibly evidence irreparable harm. Further, Third Circuit precedent is clear—the potential that section 363(m) could moot an appeal absent a stay similarly cannot constitute irreparable harm.

8.     As accurately set forth in the Motion, it is only upon satisfaction of the first two factors that courts assess the third and fourth factor. Here, the Debtors submit that this Court need not address harm to other parties or weigh the public interest. However, even if the Court did consider these factors, neither support granting a stay of the Sale Order pending appeal.

9.     *Third*, Warner has not demonstrated that the Debtors and other parties would suffer substantial harm as a result of the stay. On the contrary, a stay threatens to derail the Debtors' efforts to effectuate a sale of their assets and harms the Debtors and their stakeholders by materially delaying the consummation of a plan of liquidation and ultimately distributions to

creditors.  Warner claims that an appeal would not meaningfully harm other creditors and "[a]t most, they would face a delay of distribution on appeal—a minor inconvenience." Mot., ¶ 7. Other creditors most certainly disagree.  Warner's status as the Debtors' "largest asserted unsecured creditor" does not entitle it to dictate the amount of risk and delay the Debtors and their other creditors must tolerate while Warner pursues a meritless appeal—particularly given that Warner enjoys a fully protected recovery.  *Id.*  Further, a stay would impose substantial additional operating costs, professional fees, and administrative expenses while the Debtors remain in bankruptcy.

10.    ***Fourth***, Warner has not shown that any public interest favors a stay.  Public interest favors the expedient administration of bankruptcy proceedings and finality in bankruptcy court decisions—goals directly furthered by the Sale of the Derivative Rights Assets closing quickly, which paves the way for stakeholder distributions in these cases.

11.    Although no stay is warranted for the reasons set forth herein, if the Court were to impose a stay, the Court should require Warner to post a bond commensurate with the potential harm a stay may cause.  Despite Warner's contention that its Back-Up Bid deposit is sufficient (*see* Mot., ¶ 63, n. 17), $600,000 is woefully insufficient to protect the Debtors and their estates against the harms that would result from a stay.  To protect the Debtors' interests, the Court should (as is the default when granting a stay pending appeal) require ***at least*** a $18.5 million bond in an amount reflecting the impact of jeopardizing approximately $18.5 million in value and other resulting harms to the Debtors' estates

## II.  **OBJECTION**

A.    **Warner Fails to Establish Any of the Four Factors Necessary to Obtain a Stay Pending Appeal.**

12.     A stay pending appeal is an "extraordinary remedy" that is rarely issued.  *El v. Marino*, 722 F. App'x 262, 267 (3d Cir. 2018).  The movant bears the "burden of establishing that imposition of a stay is warranted."  *David v. Weinstein Co. Holdings (In re Weinstein Co. Holdings LLC)*, Civ No. 21-171 (MN), 2021 WL 979603 (D. Del. Mar. 16, 2021) (citing *In re W.R. Grace & Co.*, 475 B.R. 34, 205 (D. Del. 2012)).  The Third Circuit requires four factors in assessing whether to grant a stay pending appeal:

> (1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether the issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*In re MTE Holdings, LLC*, No. 19-12269 (CTG), 2021 WL 4203339, at *3 (Bankr. D. Del. Sept. 15, 2021) (citing *Revel AC, Inc. v. IDEA Boardwalk LLC (In re Revel AC, Inc.)*, 802 F.3d 558, 568 (3d Cir. 2015)).

13.     These four factors are "similar to those considered in ruling on applications for preliminary injunctions."  *S.S. Body Armor I., Inc. v. Carter Ledyard & Milburn LLP*, 927 F.3d 763, 771 (3d Cir. 2019); *see also Nken v. Holder*, 556 U.S. 418, 434 (2009) (noting that there is substantial overlap between the factors assessed in motions for stays and preliminary injunctions because "similar concerns arise whenever a court order may allow or disallow anticipated action before the legality of that action has been conclusively determined").  Each factor is important, and a court is required to "'balance[] them all' and 'consider the[ir] relative strength . . . .'"  *S.S. Body Armor I, Inc.*, 927 F.3d at 772 (citations omitted) (alteration in original).

-6-

14. However, the "most critical" factors are the first two—likelihood of success on appeal and irreparable harm absent the stay. *Id.* Furthermore, although both of these factors are necessary, of the two, "the former is arguably the more important piece of the stay analysis." *Id.* (citations omitted). The first factor requires the movant to demonstrate "a reasonable chance, or probability, of winning," *id.* (internal citations and quotations omitted), *i.e.*, "significantly better than negligible but not greater than 50%." *MTE Holdings, LLC*, 2021 WL 4203339, at *3 (internal citations and quotations omitted). The second factor requires the movant to "demonstrate that irreparable injury is 'likely [not merely possible] in the absence of a stay,'" meaning "more apt to occur than not." *S.S. Body Armor I., Inc.*, 927 F.3d at 772 (internal citations and quotations omitted) (alteration and emphasis in original). If the movant does not make the requisite showings on both of these first two factors, there is no need to examine the remaining factors and the request for a stay should be denied. *See id.* Only if the movant establishes the first two factors must a court proceed to "balance the relative harms considering all four factors using a 'sliding scale' approach." *MTE Holdings, LLC*, 2021 WL 4203339, at *3 (internal citations and quotations omitted).

15. As the Third Circuit has explained, under the "sliding scale" analysis, "[t]he more likely the [movant] is to win, the less heavily need the balance of harms weigh in [its] favor; the less likely [the movant] is to win, the more [heavily] need [the balance of harms] weigh in [its] favor." *S.S. Body Armor I., Inc.*, 927 F.3d at 772 (internal citations and quotations omitted) (alterations in original).

> [A]ll four stay factors are interconnected and the analysis proceeds as follows:
>
> 'Did the applicant make a sufficient showing that [(1)] it can win on the merits[—]significantly better than negligible but not greater than 50%[—]and [(2)] will suffer irreparable harm absent a stay?

> If it has, we 'balance the relative harms considering all four factors using a 'sliding[-]scale' approach. However, if the movant does not make the requisite showings on either of these [first] two factors, the[ ] inquiry into the balance of harms [and the public interest] is unnecessary, and the stay should be denied without further analysis.'

*Id.* (internal citations omitted) (alterations in original).

16.     Here, Warner has not made a sufficient showing with respect to ***any*** of the four factors and the Motion should therefore be denied.

### i.     *Warner Is Unlikely to Succeed on Appeal.*

17.     To satisfy the first factor—likelihood of success on the merits—Warner must make a "strong showing" that it has "a reasonable chance, or probability, of winning" on appeal—meaning a "significantly better than negligible" chance of success.  *S.S. Body Armor I., Inc.*, 927 F.3d at 772–73 (internal citations omitted).  Warner argues that it has a "more than a likelihood of success on the merits because it has three strong arguments," (Mot., ¶ 39), specifically, that (i) the Derivative Rights Agreements constitute un-assumable financial accommodations, (ii) the Derivative Rights Agreements constitute un-assignable personal services contracts, and (iii) Alcon has not provided adequate assurance of future performance under the Derivative Rights Agreements.

18.     Warner makes no meaningful effort to meet its burden beyond repeating the same failed arguments previously raised and rejected by the Court after analyzing dozens of pages of briefing, hundreds of exhibits, and holding a two-day evidentiary hearing with seven witnesses. As the Court held in its 19-page Opinion, the Derivative Rights Agreements are neither un-assumable financial accommodations under section 365(c)(2), nor un-assignable absent Warner's consent under section 365(c)(1) and applicable non-bankruptcy law.  Moreover, the Court held that Alcon has provided adequate assurance of its future performance under the Derivative

Rights Agreements. The Court correctly ruled on all of these issues based on the ample evidentiary record, plain language of the Derivative Rights Agreements, and overwhelming body of case law supporting the Debtors' arguments. By merely relying on the same arguments the Court previously rejected, Warner falls woefully short of satisfying its critical burden to make a strong showing that it has a reasonable likelihood of success on appeal. Accordingly, the Motion should be denied.

a.   <u>The Derivative Rights Agreements Are Not Financial Accommodations</u>.

19.  The Court's ruling that the Derivative Rights Agreements do not constitute financial accommodations under section 365(c)(2) is squarely in line with the well-established case law holding that the term "financial accommodation" must be construed narrowly. Warner has failed to identify any analogous case law and cannot otherwise salvage an argument to support its conclusory view that an appellate court would likely find that the Derivative Rights Agreements constitute financial accommodations.

20.  First, Warner claims that the Court failed to "address[] the Derivative Rights Agreements' plain and unambiguous text" (*see* Mot., ¶ 40) and misapplied *In re United Airlines, Inc.*, 368 F.3d 720, 724 (7th Cir 2004) in ruling that the Derivative Rights Agreements are not financial accommodations (*see* Mot., ¶¶ 41-46). On the contrary, the Court conducted a thorough analysis of the terms of the Derivative Rights Agreements and the process they establish for the exploitation of derivative works. *See* Op., at 10-11. The Court based its conclusion on the objective terms of the Derivative Rights Agreements and the nature of the overall transaction, not what the negotiators of the Derivative Rights Agreements subjectively intended their purpose to be—precisely the analysis *United Airlines* prescribes. *See id.* The Court's findings that the Derivative Rights Agreements "primarily involve the underlying intellectual property rights and a structure, including a financial structure, for the counterparties

to exploit the derivative rights together" and that "the 'nature of the entire transaction' is not one

of a financial accommodation" are entirely consistent with the plain and unambiguous language

of the Derivative Rights Agreements.  *See id.* at 11 (quoting *United Airlines*, 368 F.3d at 724).

21.     Second, Warner incorrectly states that *In re Sportsman's Warehouse, Inc.*, 457

B.R. 372 (Bankr. D. Del. 2011) supports its argument.  *See Mot.*, ¶¶ 47-48.  In *Sportsman's

Warehouse*, the court found that a lease was a non-assumable "debt financing" or "financial

accommodation" contract **to the extent applicable state law provided for the lease to be**

**reclassified as a financing arrangement** due to a mandatory obligation for the lessee to purchase

the subject property at the end of the lease.[4]  Warner does not argue that the Derivative Rights

Agreements constitute financing arrangements under applicable state law, nor does Warner

identify any specific factual similarities between the lease at issue in *Sportsman's Warehouse*

and the Derivative Rights Agreements.  The holding in *Sportsman's Warehouse* had nothing to

do with the general "amount of financial risk" borne by the lessor.  *See Mot.*, ¶ 48.

22.     Finally, Warner argues that the Court "fail[ed] to consider the persuasiveness of"

*Svenhard's Swedish Bakery v. Bakery & Confectionary Union & Indus. Int'l Pension Fund (In re*

*Svenhard's Swedish Bakery)*, 154 F.4th 1100 (9th Cir. 2025).  *See Mot.*, ¶¶ 49-50.  As the

Debtors have clearly established, the facts of *Svenhard's* are readily distinguishable and the

Ninth Circuit's ruling—even if it was controlling (it is not)—provides no support for Warner's

---

[4]     *Id.* at 393–94 (stating that "[u]nder the Uniform Commercial Code, as adopted in Montana, [a] transaction in the form of a lease creates a security interest if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee and . . . the lessee is bound to . . . become the owner of the goods" and that "[t]he official comments to this provision clarify that [a] security interest is created only if the option price is nominal and the conditions stated in the introduction to the second paragraph of this subsection are met").  The *Sportsman's Warehouse* court also emphasized that Third Circuit law "suggests that a lessee's contractual obligation to purchase the leased property at the end of the term operates to convert what is normally a lease into what is really a loan transaction, with the lessor providing property of a certain value in exchange for the repayment of that value plus a fixed yield."  *Id.* at 393 (internal quotation marks omitted).

argument.  *See* Derivative Rights Sale Reply, ¶¶ 50-51.[5]  There is no evidence whatsoever to support Warner's claims that the Derivative Rights Agreements are "financial favors" or "indispensable means of financing the debtor's business."  Mot., ¶¶ 49-50.  Warner's reliance on *Svenhard's*—which is wholly inapposite—underscores the lack of support for Warner's argument on the merits.

23.     Unsurprisingly, Warner cherry-picks various snippets of testimony adduced during depositions and at the sale hearing in an effort to prop up its weak legal argument.  *See* Mot., ¶ 25-28.  Of course, Warner loses the forest for the trees, focusing exclusively on the fact that Warner funds production costs upfront and ignoring the mountain of contradictory evidence demonstrating that the Derivative Rights Agreements provide for a co-investment and risk-sharing relationship, not financial accommodations all for the Debtors' benefit.[6]  The Court properly analyzed all evidence presented at the sale hearing—including that which Warner cites

---

[5]     As set forth in the Derivative Rights Sale Reply, no provision of the Derivative Rights Agreements obligates Warner to make any payments, or to reduce or forbear from collecting any payments owed by the Debtors.  In addition, the record is undisputed that Warner chose to contract with the Debtors as a co-investment partner ***because of their own financial wherewithal and access to capital***.  *See* Deposition of Steve Spira (October 6, 2025) [107:4–13] ("Q: What did you mean by Village bringing capital to the co-production arrangement? A: They bring money. . . . I'll use an example. We have a $100 million movie. If we're putting up 50 and we have 50 from someone else, be it Village or someone else, that's capital that we can then put in our other businesses.").

[6]     *See, e.g.*, Oct. 20 H'rg Tr., at 64:10-12 ("[Debtors' Counsel] Q: Did Village ever view the relationship with Warner [] as one of a lending relationship?  [Mr. Berg] A: No."); Deposition of Steve Spira (October 6, 2025) [110:19–111:11] ("Q: Let me ask a little bit about risk mitigation that you talked about. What did you mean by that? A: Well, again, just to make up round numbers, we have a $100 million film. We each have $50 million in it. We put up our marketing costs. We put up our $100 million together. We collect all the money. And if . . . [$50] million come in, we both lost $25 million. So they mitigate the risk on the film. If the film underperforms and does not recoup all of its money, then they helped us defer some of that loss. Q: Right. So it's – you're saying it's a way for Warner to mitigate some of its risk by giving up an equity stake to a partner because then they would share some of the losses as well? A: Exactly."); *id.* [107:4–13] ("Q: What did you mean by Village bringing capital to the co-production arrangement? A: They bring money. . . . I'll use an example. We have a $100 million movie. If we're putting up 50 and we have 50 from someone else, be it Village or someone else, that's capital that we can then put in our other businesses."); *id.* [83:7–17] ("Q: In the context of the relationship between Warner and Village, are you aware of what an MPRPA is? A: A little bit. Q: What is your understanding? A: In an overly simplistic way, it is one of the incarnations of how we memorialized their investment in a film. Q: And by 'their investment' you're talking about Village's investment? A: Yes. I'm sorry. Village's investment of the film.").

-11-

to in the Motion—in reaching its conclusion that the Derivative Rights Agreements do not constitute financial accommodations.

24.     Despite Warner's attempts to contort the plain language of the Derivative Rights Agreements and the relevant case law, the Court reached the only reasonable conclusion: the Derivative Rights Agreements are not financial accommodations under section 365(c)(2). Warner has failed to present any plausible reason why an appellate court would come to a different conclusion.

        b.      <u>The Derivative Rights Agreements Are Not Personal Services Contracts</u>.

25.     Warner's alternative argument under Section 365(c)(1) is that the Derivative Rights Agreements qualify as personal services contracts under California contract law.  Once again, Warner mischaracterizes the law, equating agreements that were entered into at a time when parties were engaged in a close working relationship to those contracts that are actually for personal services.  *See* Mot., ¶ 52.  As the Debtors reiterated through pleadings and substantial testimony, there is no dispute that Warner and the Debtors previously enjoyed a collaborative working relationship.

26.     However, the prior cooperative relationship between Warner and the Debtors is not relevant to determining whether the Derivative Rights Agreements involve personal services. The only pertinent consideration is the specific requirements of the Derivative Rights Agreements.  Warner's reference to testimony from its own representative that explained how the exchange of "sensitive commercial information" requires "the parties to trust each other" is both not commercially reasonable in the context of large corporations, and not relevant to a determination of whether or not a contract is for personal services.  *See* Mot., ¶ 52.  The Derivative Rights Agreements have confidentiality provisions that will bind Alcon as the assignee.

27.     To support its position, Warner again cites *In re Planet Hollywood Int'l, Inc.*, 2000 WL 36118317, at *1 (D. Del. Nov. 21, 2000), and *EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 380 B.R. 348, 363 (Bankr. D. Del. 2008) (aff'd, 382 F. App'x 135 (3d Cir. 2010). However, neither case is analogous to the fact pattern here.  The proper framework under California law is: "to be considered a personal services contract, there must be a special relationship between the parties or the party to perform must possess special knowledge or a unique skill, such that no performance save that of the contracting party could meet the obligations of the contract." *In re Health Plan of the Redwoods*, 286 B.R. 407, 409 (Bankr. N.D. Cal. 2002).  A more comparable fact pattern is found (and conveniently ignored by Warner) in *In re Vice Group Holding Inc.*, 652 B.R. 423 (S.D.N.Y. 2023), where the court determined that a production contract between two corporations did not constitute a personal services contract under California law. *Id.* at 432. There, as here, the court found that an assignee could fulfill the contractual obligations, and even approval rights and control over key personnel—factors not present here—were insufficiently specific to render the agreements personal.  *Id.*

28.     Even still, Warner asserts that the case law "provides [it] with a likelihood of success on appeal, or at least a substantial case on the merits, ***that the Agreements are unassignable personal trust and confidence contracts***."  Mot., ¶ 52.  However, there is no exception under Section 365 for "personal trust and confidence contracts".  And, as this Court found, no obligations under the Derivative Rights Agreements are non-delegable personal services; the nature and obligations of the contracts here are not those of personal service contracts; and the contracts are assignable under Section 365(c)(1).  Op., at 14.

        c.     <u>Alcon Has Provided Adequate Assurance of Future Performance</u>.

29.     Warner simply restates its original argument, which this Court rejected,  that the Debtors and Alcon have failed to provide adequate assurance of future performance.  Section

365(b)(1)(C) of the Bankruptcy Code provides that a debtor seeking to assume an executory contract must provide "adequate assurance of future performance under such contract." 11 U.S.C. § 365(b)(1)(C).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).  Adequate assurance does not require a debtor to guarantee the success of the proposed assignee, or that the debtor must select an assignee that is subjectively suitable to the applicable counterparty.  *See In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."); *Cinicola v. Scharffenberger*, 248 F.3d 110, 120 n.10 (3d Cir. 2001) ("What constitutes 'adequate assurance' is to be determined by factual conditions; the seller must exercise good faith and observe commercial standards; his satisfaction must be based upon reason and must not be arbitrary and capricious. . . . The phrase 'adequate assurance of future performance' . . . is to be given a practical, pragmatic construction based upon the facts and circumstances of each case.  Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.") (citations omitted).

30.    In the Motion, Warner reiterates that this standard cannot be satisfied because there is "doubt" with respect to Alcon's ability to continuously perform co-financing obligations, and because Warner and Alcon are engaged in litigation entirely unrelated to the Derivative Rights Agreements.  *See* Mot., ¶¶ 54-55.  This Court considered these arguments and found that Alcon both has the funds to close the Sale of the Derivative Rights and has provided sufficient assurance to fund *Practical Magic 2*.  Op., at 15.  Beyond the current, actual obligations, this

Court correctly noted that "the [Derivative Rights Agreements] do not obligate Alcon to fund other projects unless they accept a Project Notice, and Alcon has indicated it will not accept Project Notices unless it has the ability to fund them." *Id*. at 16. Moreover, as the Debtors previously argued, this Court found that the litigation between Warner and Alcon is unrelated to the Derivative Rights Agreements, and "the Court is satisfied that it will have no bearing on Alcon's ability to perform under the [Derivative Rights Agreements]." *Id*.

31.    The Debtors submit that there is no dispute the assurance provided by Alcon is adequate as required under applicable law, and Warner has not provided any evidence that it has a likelihood of success with respect to this argument.

### ii.    *Warner Will Not Suffer Irreparable Harm Absent a Stay Pending Appeal.*

32.    Although Warner's failure to demonstrate a likelihood of success on appeal is reason enough to deny the Motion, it falls short on the other factors as well. Warner does not articulate any actual irreparable harm that it would suffer without a stay. Warner attempts to argue that it will be irreparably harmed if a stay is not granted because (i) absent a stay, Warner will be required to comply with immediate obligations under the Derivative Rights Agreements; and (ii) consummation of the Sale would foreclose Warner's ability for an effective remedy on appeal under Section 363(m) of the Bankruptcy Code. *See* Mot., ¶ 56. Neither of these arguments has merit.

33.    *First*, Warner cannot seriously contend that compliance with its own obligations under the Derivative Rights Agreements constitutes harm, irreparable or otherwise. Courts consistently hold that irreparable harm cannot result from a party being required to abide by obligations that it agreed to undertake. *See Ashker v. Newsom*, No. 09-CV-05796 CW, 2019 WL 11880374, at *12 (N.D. Cal. June 26, 2019) ("Further, the sources of irreparable harm that Defendants have identified . . . arise out of contractual obligations to which Defendants agreed. .

. . Irreparable harm cannot result from obligations that Defendants agreed to undertake."); *Abdou v. DaVita Inc.,* No. 216-CV-02597 APGCWH, 2017 WL 7036659, at *3 (D. Nev. Nov 17, 2017), aff'd 734 F. App'x 506 (9th Cir. 2018) ("[P]arties 'will not suffer irreparable harm in being forced to comply with their contractual obligations.'"); *Commuter Rail Div. of Reg'l Transportation Auth. v. Union Pac. R.R. Co.*, No. 1:25-CV-02439, 2025 WL 1787514, at *6 (N.D. Ill. June 27, 2025) (same); *Willis Towers Watson Se., Inc. v. Alliant Ins. Servs., Inc.*, No. 322CV00277FDWDCK, 2022 WL 2555108, at *9 (W.D.N.C. July 7, 2022) ("By contrast, the Individual Defendants would not suffer irreparable harm if the injunction is granted. The Individual Defendants will be required to maintain the status quo, abide by existing valid contractual obligations, and cease all unlawful conduct.").

34.     In particular, Warner claims that, absent a stay, it may be required to share sensitive information regarding derivative works in development with the counterparty to the Derivative Rights Agreements.  *See* Mot., ¶ 57.  These are obligations that ***Warner agreed to undertake*** pursuant to the Derivative Rights Agreements, which are executory contracts that are freely assumable and assignable.  Warner will be required to comply with its obligations under the Derivative Rights Agreements ***regardless of whether a stay is granted***.  The only difference a stay would make is whether Warner's contractual duties are owed to the Debtors or Alcon. And as the Debtors and Alcon have comprehensively demonstrated, Alcon has the requisite industry experience and access to capital to step seamlessly into the Debtors' shoes.  Of course, this reveals the crux of Warner's argument (and the motive behind its appeal)—Warner desires to relieve itself of its contractual obligations under the Derivative Rights Agreements ***altogether***. Warner's inability to do so simply does not constitute irreparable harm.

35.     Further, Alcon will be contractually bound by confidentiality obligations and thus be prohibited from improperly disclosing any sensitive information regarding derivative works in development.  Any prospective harm to Warner would only materialize upon the occurrence of a highly speculative sequence of events culminating in Alcon's breach of its confidentiality obligations under the Derivative Rights Agreements.  *See In re Tribune Co.*, 477 B.R. 465, 476 (Bankr. D. Del. 2012) ("[T]o establish irreparable harm, a movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent.").  Even in the unlikely event Alcon breached these obligations, Warner could pursue breach of contract claims and would have adequate legal and equitable remedies available.  *See W.R. Grace & Co.*, 475 B.R. at 34 ("Irreparable harm, however, is an injury that cannot be redressed by a legal or equitable remedy.") (internal quotations and citations omitted); *In re BGI, Inc.*, 504 B.R. 754, 762 (S.D.N.Y. 2014) ("Injuries fully remedied by monetary damages do not constitute irreparable harm.") (citations omitted).

36.     ***Second***, the argument that section 363(m) of the Bankruptcy Code may moot Warner's appeal has been repeatedly rejected by the Third Circuit and courts in this District (and elsewhere) as insufficient to establish irreparable harm.   "[I]t is well established that the possibility that an appeal may become moot does not constitute irreparable harm for purposes of obtaining a stay."  *In re Swift Energy Co.*, Civ. No. 16-404 (GMS), 2016 WL 3566962, at *7 (D. Del. 2016); *see also Winters Bursery LLC v. Color Spot Holdings, Inc. (In re Color Spot Holdings, Inc.)*, Civ. No. 18-1246 (RGA), 2018 WL 3996938, at *3 (D. Del. Aug. 21, 2018) (holding that the possibility that an appeal would become statutorily moot "does not alone constitute irreparable harm for purposes of obtaining a stay"); *Regal Ware, Inc. v. Global Home Prods., LLC (In re Global Home Products, LLC)*, Civ. No. 06-508 (JJF), 2006 WL 2381918, at

*1 (D. Del. Aug. 17, 2006) (holding that the possibility that an appeal could be rendered moot absent a stay "does not in and of itself constitute irreparable harm"); *W.R. Grace & Co.*, 475 B.R. at 207 ("The Third Circuit and courts within its appellate jurisdiction have previously recognized, however, that the risk of equitable mootness by itself is insufficient to demonstrate irreparable injury for purposes of a stay.").  Indeed, "if equitable mootness alone could serve as the basis of irreparable injury, a stay would be issued in every case of this nature pending appeal." *W.R. Grace & Co.*, 475 B.R. at 207 (internal citations omitted). *See also In re Trans World Airlines, Inc.*, No. 01-0056 (PJW), 2001 WL 1829325, at *10 (Bankr. D. Del. March 27, 2001), *aff'd*, 322 F.3d 283 (3d Cir. 2003) ("Even if § 363(m) adversely impacts the [creditor's] objection, [i]t is well settled that an appeal being rendered moot does not itself constitute irreparable harm."); *In re 203 North LaSalle Street Ptship*, 190 B.R. 595, 598 (N.D. Ill. 1995); *In re Kent*, 145 B.R. 843, 844 (Bankr.E.D.Va.1991); *In re Charter Co.*, 72 B.R. 70, 72 (Bankr.M.D.Fla.1987).

37.    While Warner acknowledges this case law to some extent, it argues that one Delaware bankruptcy court found otherwise in an "analogous statutory context." *See* Mot., ¶ 59; *Bayside Cap. Inc. v. TPC Grp. Inc.*, No. 22-50372, 2022 Bankr. LEXIS 1901 (CTG) (Bankr. D. Del. July 11, 2022).  That case—which did also deny the stay—found that a ***lender may have an argument*** of irreparable harm without the stay in place ***in the context of a contested order that approved debtor in possession financing***. *Id.* at *18.  Here, Warner is a counterparty to contracts being sold and assigned, and an aggrieved back-up bidder.  The Sale of the Derivative Rights Assets was the product of an orderly and fair court-supervised process, not a structural financing affecting creditor priorities or the estate's ability to operate within a chapter 11 proceeding.  The consequence of closing the Sale will not result in the kind of irreversible

-18-

changes to creditor recoveries at issue in the *Bayside* case, and the facts at issue here fall squarely within the voluminous case law that finds the potential for mootness of an appeal cannot amount to irreparable harm.

38.     Warner admits that its goal in filing the Motion is to avoid being prejudiced by the operation of Section 363(m) of the Bankruptcy Code while Warner pursues its appeal rights. *See* Mot., ¶¶ 58-60.  This is not an appropriate basis to stay the effectiveness of the Sale Order, and Warner's arguments are otherwise facially inadequate.

### iii.    *A Stay Pending Appeal Would Substantially Harm the Debtors and Other Interested Parties.*

39.     As a preliminary matter, the Court need not reach this factor because Warner has failed to show (a) a reasonable likelihood of success on the merits or (b) that it will suffer irreparable harm if a stay pending appeal is not granted.  If the Court does consider this factor, however, a stay pending appeal would substantially harm the Debtors and other parties in interest in these cases.

40.     First, a stay of the Sale Order pending Warner's appeal would delay confirmation of a chapter 11 plan for months, if not over a year.  *See In re ANC Rental Corp.*, No. 01-11220 (MFW), 2002 WL 1058196, at *3 (D. Del. May 22, 2002) ("[I]t is clear that granting a stay would have a substantial and detrimental effect on the debtor's plan of reorganization.").   In addition, a stay would result in a corresponding delay in any distributions to creditors.  Warner recognizes this reality, but states that a delay of distributions to creditors would be only "a minor inconvenience" to the Debtors' creditors.  Mot., ¶ 7.  Far from a minor inconvenience, "a delay in distributions is a tangible and substantial harm."  *In re Boy Scouts of Am. & Delaware BSA, LLC*, No. 20-10343-LSS, 2023 WL 6442586, at *9 (D. Del. Oct. 3, 2023); *see also In re BlockFi, Inc.,* 2024 WL 358112, at *9 (Bankr. D.N.J. Jan. 30, 2024); *In re Scrub Island Dev. Grp. Ltd.*,

523 B.R. 862, 878–79 (Bankr. M.D. Fla. 2015) ("And a delay in administering an estate surely harms the Debtors' creditors. . . [D]elaying distributions to creditors under a chapter 11 plan is a substantial harm that warrants denial of a stay pending appeal."); *In re Dernick*, 2019 WL 236999, at \*4 (Bankr. S.D. Tex. 2019) ("[C]ourts have generally found that a significant delay in the administration of an estate, or a delay in the distribution to creditors under a plan generally satisfies the criterion of harm to other parties."); *In re Salvo*, No. 07-11829, 2008 WL 938585, at \*4 (Bankr. N.D. Ohio Apr. 4, 2008) (holding that a stay could injure all creditors by delaying their potential payments through a confirmed plan); *In re The Charter Co.*, 72 B.R. 70, 72 (Bankr. M.D. Fla. 1987) (holding that claimants will suffer substantial harm as a result of a stay because of the resulting delay in their receipt of settlement funds).

41.    Moreover, a stay would also force the Debtors to incur substantial administrative expenses during the pendency of the appeal.  These substantial harms that the Debtors and their estates would suffer if a stay were granted, especially when weighed against the complete lack of cognizable harm that would befall Warner, mandate denial of the Motion.

     **iv.**    ***A Stay Would Not Be in the Public Interest.***

42.    Warner has also failed to meet its burden of showing that a stay would serve the public interest.  Warner asserts that there is a public interest in permitting it to repeat the same arguments on appeal that this Court previously rejected, without modification.  This justification is nothing more than a repackaging of Warner's argument that it will experience irreparable harm if a stay is not granted because their appeal may become statutorily moot, but, as explained above, the "risk of . . . mootness by itself is insufficient" to impose a stay.  *W.R. Grace & Co.*, 475 B.R. at 206.  Further, because Warner cannot demonstrate a reasonable likelihood of success on the merits, its arguments as to why a stay is in the public interest fail.

43.     Specifically, Warner first argues that the public has an interest in the correct application of the law.  *See* Mot., ¶ 69.  The Debtors agree—this interest has been served through entry of the Opinion and Sale Order.  Despite Warner's claim that there is "limited Third Circuit case law regarding financial accommodations" (*see id.*), there is no dispute among courts in the Third Circuit (or in other jurisdictions) regarding the correct application of section 365(c)(2) and the Court correctly applied the undisputed legal framework in analyzing the Derivative Rights Agreements.  Next, Warner contends that there is a strong federal interest in "protecting creators and owners of copyrighted material."  *Id.* at ¶ 70.  The Debtors agree with this general position, but it is not relevant in here.  Indeed, Warner did not raise any argument relating to intellectual property on appeal, and the Debtors believe the record and Sale Order evidence that all of Warner's intellectual property interests, including co-ownership of the Derivative Rights, remain uninterrupted and fully protected.  Further, Warner's argument that the public interest favors the ability to seek meaningful appellate review is without merit in light of the depth of case law finding the mootness of an appeal does not constitute harm.  *See supra*, ¶ 33.  Warner is well within its rights to continue seeking appellate review, but case law, and the public interest, is better served by the Sale of the Derivative Rights closing before such appeal is heard.

44.     Indeed, denial of the stay would serve the public interest.  It is well recognized that there is a "strong public 'need for finality of decisions, especially in bankruptcy proceedings.'"  *See In re Calpine Corp.*, No. 05-60200 (BRL), 2008 WL 207841, at *7 (Bankr. S.D.N.Y. Jan. 24, 2008) (citations omitted); *see also W.R. Grace & Co.*, 475 B.R. at 208 ("In the bankruptcy context, there is a general public policy weighing in favor of affording finality to bankruptcy judgments.").  Similarly, courts recognize that the public interest requires prompt and efficient resolution of bankruptcy cases.  *See, e.g., id.* ("Public policy weighs in favor of

-21-

facilitating quick and successful reorganizations of financially troubled companies.") (internal citations omitted); *U.S. v. LCI Holding Co. (In re LCI Holding Co.)*, 519 B.R. 461, 466 (D. Del. 2014), *aff'd sub nom. In re ICL Holding Co.*, 802 F.3d 547 (3d Cir. 2015) (denying motion to stay sale order in part because "[t]he public interest is better served by allowing the estates to be administered swiftly and efficiently and with the sale remaining in effect"); *ePlus, Inc. v. Katz (In re Metiom, Inc.)*, 318 B.R. 263, 272 (S.D.N.Y. 2004) (noting that the public interest generally favors "the expeditious administration of bankruptcy cases as well as . . . the preservation of the bankrupt's assets for purposes of paying creditors, rather than litigation of claims lacking a substantial possibility of success."); *see also Bullard v. Blue Hills Bank*, 135 S. Ct. 1686, 1694 (2015) ("[E]xpedition is always an important consideration in bankruptcy.").

45.    A stay would only disrupt the administration of these cases, create uncertainty that will harm the Debtors and their creditors, and delay the Debtors' successful emergence from chapter 11.  Accordingly, a stay is unsupported by fact or law and the public interest is best served by denying the stay.

**B.    If a Stay Is Granted, Warner Should Be Required to Post a Substantial Bond.**

46.    As demonstrated above, no stay is warranted.  However, if a stay is nevertheless granted, Warner should be required to post a substantial bond.

47.    The Third Circuit has recognized that courts may condition a stay pending appeal on the posting of a supersedeas bond.  *Tribune Media Co. v. Aurelius Capital Mgmt., L.P.*, 799 F.3d 272, 287 (3d Cir. 2015) (explaining that such a bond serves to "indemnify the party prevailing in the original action against loss caused by an unsuccessful attempt to reverse the holding of the bankruptcy court") (quoting *In re Theatre Corp.*, 22 B.R. 884, 885 (Bankr. S.D.N.Y. 1982)).  Consistent with this principle, bankruptcy courts routinely require appellants to post a bond as a condition of any stay pending appeal absent "exceptional circumstances."

*Adelphia Comm. Corp. (In re Adelphia Comm. Corp.)*, 361 B.R. 337, 350–51 (S.D.N.Y. 2007).[7]

It is the movant's burden to demonstrate why a bond is not necessary. *See, e.g., W.R. Grace &*

*Co.*, 475 B.R. at 209 ("It has been recognized that if the movant seeks the imposition of a stay

without a bond, the applicant has the burden of demonstrating why the court should deviate from

the ordinary full security requirement.") (internal quotation marks omitted); *De La Fuente v. DCI*

*Telecommc'ns, Inc.*, 269 F. Supp. 2d 237, 240 (S.D.N.Y. 2004).

48.    Warner does not even attempt to address its burden with respect to posting a

bond.  Instead, in a single conclusory footnote, Warner states that its $600,000 deposit being held

by the Debtors on account of Warner's Back-Up Bid "constitutes a sufficient bond, should the

Court require one."  Mot., ¶ 63, n. 17.  As set forth above, the requested stay risks jeopardizing

the sale of the Derivative Rights asset, denying the Debtors access to funds necessary to

administer their estates, and delaying and interfering with the confirmation process that is well

underway, resulting in a substantial continued drain on the Debtors' estates and a delay in

distributions to creditors.  Warner's $600,000 Back-Up Bid deposit is woefully insufficient to

"indemnify" the Debtors against the harms that would result from a stay.

---

[7]    *See also In re HNRC Dissolution Co.*, No. 04-158 (HRW), 2005 WL 1972592, at *4 & n.6 (Bankr. E.D. Ky. Aug. 16, 2005) (noting that union challenging sale of debtors' assets under 11 U.S.C. § 363 was required to post a bond of at least $500 million to obtain stay pending appeal); *ACC Bondholder Grp. v. Adelphia Comm. Corp. (In re Adelphia Comm. Corp.)*, 361 B.R. 337, 368 (S.D.N.Y. 2007) (requiring appellants to post a bond in the amount of $1.3 billion, based upon estimation of potential harms that the confirmed plan would fall apart); *In re Calpine Corp.*, 2008 WL 207841, at *7 (noting that if the motion to stay were granted—which it was not—the court would require a bond "in the range of $900 million to $1 billion" to compensate for aggregate additional interest the debtors would incur if they were unable to close on their existing exit financing); *In re Scotia Dev. LLC*, No. 07-20027-C-11 (RSS), 2008 Bankr. LEXIS 5127, at *26 (Bankr. S.D. Tex. July 15, 2008) ("A bond must be set at or near the full potential harm to other parties in interest."); *Tribune Co.*, 477 B.R. at 469 (granting the stay motions, "condition[ed] upon the posting of a supersedeas bond in the amount of $1.5 billion"); *In re Grubb & Ellis Co.*, No. 12-10685 (MG), 2012 Bankr. LEXIS 1279, 2012 WL 1036071, at *34-35 (Bankr. S.D.N.Y. Mar. 27, 2012) ("[P]ursuant to Bankruptcy Rule 8005, if a party seeks a stay pending appeal, it is normally required to file a bond in a sum sufficient to protect the rights of the party who prevailed in the bankruptcy court.").

49.     As for the appropriate bond amount, courts in similar circumstances have required that an appellant seeking appeal of a sale order post a bond equal to the aggregate purchase price and applicable damages.  *See, e.g.*, *In re Am. Commer., Inc.*, No. 09-35359-NLW, 2009 WL 8189222, at *6 (Bankr. D.N.J. Nov. 10, 2009) ("Any appeal seeking to enjoin or stay consummation of the Sale . . . shall be subject to the appellant depositing or posting a bond in an amount equal to the then aggregate purchase price, and applicable damages, pending the outcome of the Appeal."); *In re Norview Builders, Inc.*, No. 19 C 2884, 2019 WL 2297466, at *3 (N.D. Ill. May 29, 2019) (requiring appellant, who unsuccessfully sought to purchase the debtor's assets, to post a bond equal to the $950,000 proposed purchase price so that "the process does not start at square one if [appellant] fails to follow through with the purchase"); *Ratcliff v. Rancher's Legacy Meat Co.*, No. 20-CV-834 NEB, 2020 WL 4048509, at *14–15 (D. Minn. July 20, 2020) (requiring bond of $6 million where proposed purchase price was $5 million).

50.     Here, while the appropriate bond amount would have to be at least the value of Alcon's purchase price under the Derivative Rights APA (*i.e.*, $18.5 million) and likely higher considering the additional expense to the Debtors' estates as a result of a stay, the Debtors respectfully suggest that this issue be deferred until after the Court decides whether a stay is warranted.  Unless the Court prefers a different approach, the parties can file supplemental submissions to address the bond amount if that proves necessary.

## III.  <u>CONCLUSION</u>

51.     For the reasons set forth above, the Debtors respectfully request that the Court (a) deny the Motion in its entirety, (b) if applicable, require Warner to post a bond, and (c) grant such further relief as is necessary and appropriate under the circumstances.

Dated: November 21, 2025
Wilmington, Delaware

/s/ Joseph M. Mulvihill

**YOUNG CONAWAY STARGATT &
TAYLOR, LLP**
Joseph M. Mulvihill (Del. Bar No. 6061)
Benjamin C. Carver (Del. Bar No. 7176)
Brynna M. Gaffney (Del. Bar. No. 7402)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:    jmulvihill@ycst.com
          cthompson@ycst.com
          bcarver@ycst.com
          bgaffney@ycst.com

*Co-Counsel for the Debtors and
Debtors in Possession*

**SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP**
Justin R. Bernbrock (admitted *pro hac vice*)
Matthew T. Benz (admitted *pro hac vice*)
321 North Clark Street, 32nd Floor
Chicago, Illinois 60654
Telephone:    (312) 499-6300
Facsimile:    (312) 499-6301
Email:    jbernbrock@sheppardmullin.com
          mbenz@sheppardmullin.com

-and-

Jennifer L. Nassiri (admitted *pro hac vice*)
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
Telephone:    (310) 228-3700
Facsimile:    (310) 228-3701
Email:    jnassiri@sheppardmullin.com

-and-

Alyssa Paddock (admitted *pro hac vice*)
30 Rockefeller Plaza, 39th Floor
New York, NY 10112
Telephone:    (212) 653-8700
Facsimile:    (212) 653-8701
Email:    apaddock@sheppardmullin.com

*Co-Counsel for the Debtors and
Debtors in Possession*