> **THIS PROPOSED DISCLOSURE STATEMENT IS NOT A SOLICITATION OF VOTES ON THE PLAN. ACCEPTANCES AND REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT FOR SOLICITATION. THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE DEBTORS RESERVE THE RIGHT TO AMEND, SUPPLEMENT, OR OTHERWISE MODIFY THIS DISCLOSURE STATEMENT PRIOR AND UP TO THE DISCLOSURE STATEMENT HEARING.**

> **PLEASE NOTE THAT A HOLDER OF A CLAIM WHO VOTES TO ACCEPT THE PLAN AND WHO DOES NOT TIMELY SUBMIT A RELEASE OPT-OUT IN ACCORDANCE WITH THE BALLOT TO VOTE TO ACCEPT OR REJECT THE PLAN WILL BE DEEMED TO <u>CONSENT TO THE RELEASES CONTAINED IN ARTICLE X OF THE PLAN</u>, WHICH RELEASES ARE ALSO DISCUSSED IN ARTICLE XI OF THIS DISCLOSURE STATEMENT. PLEASE CAREFULLY REVIEW SUCH RELEASES.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC., *et al.*,[1] | ) Case No. 25-10475 (TMH) |
| | ) |
| | ) (Jointly Administered) |
| Debtors. | ) |
| | ) |

## DISCLOSURE STATEMENT FOR THE
## JOINT CHAPTER 11 PLAN OF LIQUIDATION FOR VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC. AND ITS DEBTOR AFFILIATES

---

[1] The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343. The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

**YOUNG CONAWAY
STARGATT & TAYLOR, LLP**
Joseph M. Mulvihill (Del. Bar No. 6061)
Brynna M. Gaffney (Del. Bar No. 7402)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:        jmulvihill@ycst.com
              bgaffney@ycst.com

*Co-Counsel for Debtors and Debtors in
Possession*

Dated: January 29, 2026

**SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP**
Justin R. Bernbrock (admitted *pro hac vice*)
Matthew T. Benz (admitted *pro hac vice*)
321 North Clark Street, 32nd Floor
Chicago, Illinois 60654
Telephone:    (312) 499-6300
Facsimile:    (312) 499-6301
Email:        jbernbrock@sheppardmullin.com
              mbenz@sheppardmullin.com

-and-

Jennifer L. Nassiri (admitted *pro hac vice*)
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
Telephone:    (310) 228-3700
Facsimile:    (310) 228-3701
Email:        jnassiri@sheppardmullin.com

-and-

Alyssa Paddock (admitted *pro hac vice*)
30 Rockefeller Plaza, 39th Floor
New York, NY 10112
Telephone:    (212) 653-8700
Facsimile:    (212) 653-8701
Email:        apaddock@sheppardmullin.com

*Co-Counsel for the Debtors and
Debtors in Possession*

## DISCLOSURE STATEMENT DATED January 29, 2026[2]

\*     \*     \*

**All creditors are encouraged to read and carefully consider this Disclosure Statement, including the Plan, and the matters described under "Risk Factors" in Article XV prior to submitting ballots in response to this solicitation.  This Disclosure Statement is being delivered to you because you are the holder of, or have otherwise asserted, a Claim or Claims against: Village Roadshow Entertainment Group USA Inc.; Crescent Film Holdings Limited; Village Roadshow Distribution (BVI) Limited; Village Roadshow Distribution Pty Ltd; Village Roadshow Distribution UK Limited; Village Roadshow Distribution USA Inc.; Village Roadshow Entertainment Group (BVI) Limited; Village Roadshow Entertainment Group Asia Limited; Village Roadshow Film Administration Management Pty Ltd; Village Roadshow Films (BVI) Limited; Village Roadshow Films Global Inc.; Village Roadshow Films North America Inc.; Village Roadshow Holdings USA Inc.; Village Roadshow Pictures Entertainment Inc.; Village Roadshow Pictures North America Inc.; Village Roadshow Productions (BVI) Ltd; Village Roadshow Productions Inc.; Village Roadshow VS Films LLC; VR DTE Distribution USA Inc.; VR DTE Productions Limited; VR Films Holdings (BVI) Limited; VR Funding LLC; VR Zoo Distribution USA Inc.; VR Zoo Productions Ltd; VREG Films Ltd; VREG Funding LLC; VREG IP Global LLC; VREG J2 Global LLC; VREG MM2 IP Global LLC; VREG OP Global LLC; VREG Production Services Inc.; VREG Television Inc.; VREG Wonka IP Global LLC; and VREG WW IP Global LLC (collectively, the "_Company_," "_Village_," or the "_Debtors_").**

\*     \*     \*

**The Debtors and the Committee believe that the Plan is in the best interests of creditors and other stakeholders.  All claimants entitled to vote thereon are urged to vote in favor of the Plan.  A summary of the voting instructions is set forth in Article I.F.2.  More detailed instructions are included in the ballots distributed to the creditors entitled to vote on the Plan.  To be counted, your ballot must be duly completed, executed, and received by the Debtors' voting agent by 4:00 p.m., prevailing Eastern Time, on March 24, 2026 (the "_Voting Deadline_"), unless extended.**

\*     \*     \*

**All of the projected Recoveries (defined below) to creditors are based upon the analysis performed by the Debtors and their professionals.  Although the Debtors have made every effort to verify the accuracy of the information presented herein and in the exhibits attached hereto, the Debtors cannot make any representations or warranties regarding the accuracy of the information.**

\*     \*     \*

---

[2]  Capitalized terms used herein and not otherwise defined have the meanings ascribed to them in the _Joint Chapter 11 Plan of Liquidation for Village Roadshow Entertainment Group USA Inc. and its Debtor Affiliates_ (the "_Plan_").

**Although the Debtors have made every effort to ensure that this summary provides adequate information with respect to the Plan, it does not purport to be complete and is qualified to the extent it does not set forth the entire text of the Plan. The summaries of the Plan and other documents contained in this Disclosure Statement are qualified by reference to the Plan itself, the exhibits thereto, and documents described therein. If there is any inconsistency between the Plan and the summary of the Plan contained in this Disclosure Statement, the Plan shall control. Accordingly, each Holder of a Claim should review the Plan in its entirety.**

\*      \*      \*

**The Effective Date of the Plan is subject to material conditions precedent. *See* Article X. There is no assurance that these conditions will be satisfied or waived.**

\*      \*      \*

**The Plan provides that (i) Holders of Claims that vote to accept the Plan and do not "opt out" of the Third-Party Releases and (ii) Holders of Claims that vote to reject or abstain from voting and "opt-in" to the Third-Party Releases will be bound by the Third-Party Releases.**

\*      \*      \*

No person is authorized by the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation other than as contained in this Disclosure Statement and the exhibits attached hereto or incorporated by reference or referred to herein. If such information or representation is given or made, it may not be relied upon as having been authorized by the Debtors. The Debtors will make available to creditors entitled to vote on the Plan such additional information as may be required by applicable law prior to the Voting Deadline.

\*      \*      \*

The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors, the historical and projected financial information regarding the Debtors, and the liquidation analysis relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as admissions or stipulations, but rather as statements made in settlement negotiations.

\*      \*      \*

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors. The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect," and similar expressions identify these forward-looking statements. These forward-looking statements are subject to a number of risks, uncertainties, and assumptions, including those described below under the caption "Risk Factors"

in Article XV.    In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements.    The Debtors do not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events, or otherwise.

**TABLE OF CONTENTS**

I.      OVERVIEW OF THE PLAN ................................................................................ 1

  A.  Introduction ........................................................................................................ 1

  B.  The Plan ............................................................................................................. 1

  C.  The Adequacy of This Disclosure Statement .................................................... 2

  D.  Summary of Classes and Treatment of Claims or Interests ............................... 3

  E.  Solicitation Package .......................................................................................... 5

  F.  Voting and Confirmation of the Plan ................................................................. 5

      1.  Certain Factors to be Considered Prior to Voting ..................................... 5

      2.  Voting Procedures and Requirements ........................................................ 6

      3.  Plan Objection Deadline ............................................................................ 6

      4.  Combined Hearing ..................................................................................... 7

      5.  Confirmation .............................................................................................. 7

      6.  Acceptance ................................................................................................. 8

      7.  Feasibility .................................................................................................. 8

      8.  Best Interests Test; Liquidation Analysis .................................................. 8

      9.  Compliance with Applicable Provisions of the Bankruptcy Code ............ 9

     10.  Alternatives to Confirmation and Consummation of the Plan ................... 9

  G.  Releases by the Debtors Set Forth in the Plan .................................................. 9

II.     HISTORY OF THE DEBTORS ...................................................................... 11

  A.  The Debtors' Corporate Structure and Ownership .......................................... 11

  B.  Debtors' Prepetition Business Operations ....................................................... 12

      1.  The Library Assets ................................................................................... 12

      2.  The Derivative Rights Assets ................................................................... 12

      3.  The Studio Business ................................................................................. 13

  C.  The Debtors' Prepetition Capital Structure ..................................................... 13

      1.  The Senior Secured Notes ........................................................................ 13

      2.  The ABS Facility ..................................................................................... 14

  D.  Events Leading to these Chapter 11 Cases ...................................................... 15

      1.  The Warner Bros. Arbitration .................................................................. 15

      2.  The Studio Business ................................................................................. 16

      3.  Prepetition Restructuring Efforts ............................................................. 16

III.    EVENTS DURING CHAPTER 11 CASE ...................................................... 17

vi

A.   First Day Motions ................................................................................... 17

B.   Second Day Motions ............................................................................... 18

C.   Committee Appointment .......................................................................... 19

D.   Approval of the DIP ................................................................................ 19

E.   Approval of the Bid Procedures and the Stalking Horse Bidder ..................... 19

F.   The Library Assets Sale ........................................................................... 21

G.   The Remaining Sale Transactions. ............................................................ 21

    1.   Sale of the Studio Business ................................................................ 22

    2.   Sale of the Derivative Rights Assets .................................................... 22

H.   Bar Dates .............................................................................................. 23

IV.   TREATMENT OF CLAIMS AND INTERESTS ............................................ 24

A.   Unclassified Claims ................................................................................ 24

    1.   Administrative Claims ....................................................................... 24

    2.   DIP Claims ...................................................................................... 25

    3.   ABS Claims ..................................................................................... 25

    4.   Professional Fee Claims ..................................................................... 25

    5.   Priority Tax Claims ........................................................................... 26

    6.   U.S. Trustee Statutory Fees ............................................................... 26

B.   Classified Claims .................................................................................... 27

    1.   Class 1 – Other Secured Claims .......................................................... 27

    2.   Class 2 – Other Priority Claims ........................................................... 27

    3.   Class 3A – Library Debtors General Unsecured Claims ............................ 27

    4.   Class 3B – Non-Library Debtors General Unsecured Claims ..................... 28

    5.   Class 4 – Senior Secured Notes Claims ................................................ 29

    6.   Class 5 – Intercompany Claims ........................................................... 29

    7.   Class 6 – Existing Equity Interests ...................................................... 30

    8.   Class 7 – Intercompany Interests ........................................................ 30

C.   Special Provisions Governing Unimpaired Claims ....................................... 30

D.   Elimination of Vacant Classes .................................................................. 30

E.   Voting Classes; Presumed Acceptance by Non-Voting Classes ...................... 31

F.   Controversy Concerning Impairment ......................................................... 31

G.   Subordination of Claims .......................................................................... 31

H.   Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ... 31

I.   Insurance ............................................................................................... 31

V.      MEANS FOR IMPLEMENTATION OF THE PLAN ................................................. 31

   A.   General Settlement of Claims and Interests ................................................... 31

   B.   Liquidation Transactions ............................................................................... 32

   C.   Sale Transactions .......................................................................................... 32

   D.   The Liquidation Trust .................................................................................... 32

   E.   The Committee Settlement ............................................................................ 33

   F.   The GUC Trust .............................................................................................. 34

   G.   Sources of Consideration for Plan Distributions .......................................... 35

   H.   Dissolution of the Debtors ............................................................................ 35

   I.    Preservation of Causes of Action .................................................................. 35

   J.    Corporate Action ........................................................................................... 35

   K.   Cancellation of Existing Securities and Agreements .................................... 36

   L.   Effectuating Documents; Further Transactions ............................................ 36

   M.   Section 1146 Exemption from Certain Taxes and Fees ................................ 37

   N.   Sale Orders .................................................................................................... 37

   O.   Authority to Act ............................................................................................ 37

   P.   Transfer of Privilege/No Waiver ................................................................... 37

   Q.   Final Decree .................................................................................................. 37

VI.     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...... 38

   A.   Assumption and Rejection of Executory Contracts and Unexpired Leases ..... 38

   B.   Claims Based on Rejection of Executory Contracts or Unexpired Leases ..... 38

   C.   Reservation of Rights .................................................................................... 39

   D.   Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases 39

   E.   D&O Liability Insurance Policies .................................................................. 39

   F.   Modifications, Amendments, Supplements, Restatements, or Other Agreements ........... 40

   G.   Nonoccurrence of the Effective Date ............................................................ 40

VII.    PROVISIONS GOVERNING DISTRIBUTIONS ................................................ 40

   A.   Distributions on Account of Claims Allowed as of the Effective Date ........... 40

   B.   Compliance with Tax Requirements .............................................................. 40

   C.   Date of Distributions ..................................................................................... 41

   D.   Disbursing Agent .......................................................................................... 41

   E.   Rights and Powers of Disbursing Agent ....................................................... 42

   F.   Surrender of Instruments ............................................................................... 42

   G.   Delivery of Distributions and Undeliverable or Unclaimed Distributions ....... 42

H.  Manner of Payment .................................................................................... 43

I.  Foreign Currency Exchange Rate .......................................................... 43

J.  Minimum Distribution ........................................................................... 43

K.  Allocations .............................................................................................. 43

L.  Distributions Free and Clear ................................................................. 44

M.  Claims Paid or Payable by Third Parties ............................................. 44

   1.  Claims Paid by Third Parties ............................................................ 44

   2.  Claims Payable by Third Parties ...................................................... 44

   3.  Applicability of Insurance Policies ................................................... 44

N.  No Postpetition Interest on Claims ....................................................... 45

VIII.    PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS ...................................................................................................... 45

A.  Allowance of Claims .............................................................................. 45

B.  Claims Administration Responsibilities ............................................... 45

C.  Estimation of Claims and Interests ...................................................... 45

D.  Adjustment to Claims or Interests Without Objection ........................ 46

E.  Time to File Objections to Claims ........................................................ 46

F.  Disallowance of Claims or Interests ..................................................... 46

G.  Disputed Claims Process ....................................................................... 46

H.  No Distributions Pending Allowance .................................................... 46

I.  Distributions After Allowance .............................................................. 46

IX.    LIQUIDATION TRUST AND LIQUIDATION TRUSTEE ........................ 47

A.  **Liquidation Trust Creation** ............................................................... 47

B.  Purpose of the Liquidation Trust .......................................................... 47

C.  Transfer of Assets to the Liquidation Trust ........................................ 48

D.  Tax Treatment of the Liquidation Trust ............................................... 48

E.  Exculpation, Indemnification, Insurance and Liability Limitation ...... 49

F.  Securities Exemption ............................................................................. 50

G.  Termination of the Liquidation Trustee ................................................ 50

X.    GUC TRUST AND GUC TRUSTEE ........................................................... 50

A.  GUC Trust Creation ............................................................................... 50

B.  Purpose of the GUC Trust ..................................................................... 51

C.  Transfer of Assets to the GUC Trust .................................................... 51

D.  Tax Treatment of the GUC Trust .......................................................... 51

E.  Exculpation, Indemnification, Insurance and Liability Limitation ...... 52

F.    Securities Exemption .................................................................................. 53

G.    Termination of the GUC Trustee .............................................................. 53

XI.        CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ....................... 53

A.    Conditions to Effective Date...................................................................... 53

B.    Waiver of Conditions ................................................................................. 54

XII.       SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS .......... 54

A.    Releases by the Debtors ............................................................................. 54

B.    Releases by Holders of Claims and Interests ............................................ 55

C.    Exculpation ................................................................................................ 56

D.    Injunction .................................................................................................. 57

E.    Setoffs ....................................................................................................... 57

F.    Release of Liens ......................................................................................... 58

G.    Recoupment ............................................................................................... 58

XIII.      BINDING NATURE OF PLAN ................................................................ 58

XIV.      RETENTION OF JURISDICTION ............................................................ 59

XV.       MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ............. 61

A.    Modification and Amendment .................................................................... 61

B.    Effect of Confirmation on Modifications ................................................... 61

C.    Revocation or Withdrawal of the Plan ...................................................... 61

XVI.      MISCELLANEOUS PROVISIONS ........................................................... 62

A.    Immediate Binding Effect .......................................................................... 62

B.    Additional Documents ............................................................................... 62

C.    Substantial Consummation ......................................................................... 62

D.    Reservation of Rights................................................................................. 62

E.    Successors and Assigns.............................................................................. 63

F.    Determination of Tax Liabilities ............................................................... 63

G.    Dissolution of the Committee .................................................................... 63

H.    Notices ...................................................................................................... 63

I.    Term of Injunction or Stays ...................................................................... 64

J.    Entire Agreement ...................................................................................... 65

K.    Plan Supplement ....................................................................................... 65

L.    Governing Law .......................................................................................... 65

M.    Nonseverability of Plan Provisions............................................................ 65

N.    Closing of the Chapter 11 Cases ............................................................... 66

XVII.    RISK FACTORS ........................................................................................... 66

A.    Bankruptcy Law Considerations ............................................................ 66

    1.    Risk of Non-Approval of the Disclosure Statement as Containing Adequate Information 66

    2.    The Debtors May Fail to Satisfy the Vote Requirements ............................. 67

    3.    The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired, Non-Accepting Classes ........................................ 67

    4.    Confirmation Could Be Delayed ............................................................. 67

    5.    Parties in Interest May Object to Provisions of the Plan ............................ 67

    6.    Risk of Non-Confirmation of Plan ......................................................... 67

    7.    The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code ............................................................................ 68

    8.    The Debtors May Object to the Amount or Classification of a Claim .......... 68

    9.    Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.. 68

    10.    The Conditions Precedent to the Effective Date May Not Occur................. 69

B.    Allowance of Claims.............................................................................. 69

    1.    The Amounts of Allowed Claims May Adversely Affect the Recovery of Some Holders of Allowed Claims ...................................................... 69

    2.    Any Valuation of Any Assets to be Distributed Under the Plan is Speculative ........... 69

    3.    The Debtors Cannot Guarantee the Timing of Distributions......................... 69

    4.    Certain Tax Implications of the Debtors' Bankruptcy................................. 70

C.    Disclosure Statement Disclaimers ......................................................... 70

    1.    The Financial Information Contained in This Disclosure Statement Has Not Been Audited............................................................................ 70

    2.    Information Contained in This Disclosure Statement Is For Soliciting Votes ............. 70

    3.    This Disclosure Statement Was Not Reviewed or Approved by the SEC.................... 70

    4.    This Disclosure Statement May Contain Forward Looking Statements....................... 70

    5.    No Legal or Tax Advice Is Provided to You by This Disclosure Statement................. 70

    6.    No Admissions Made................................................................................ 71

    7.    Failure to Identify Potential Objections ...................................................... 71

    8.    No Waiver of Right to Object or Right to Recover Transfers and Assets ..................... 71

    9.    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors ...................................................................... 71

    10.    Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update............... 71

    11.    No Representations Outside This Disclosure Statement are Authorized..................... 72

XVIII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF
CONSUMMATION OF THE PLAN .......................................................................... 72

    A.    Certain U.S. Federal Income Tax Consequences to the Debtors ...................................... 74

      1.    The Sale Transactions ................................................................................................. 74

      2.    Transfer of Assets to the Liquidation Trust and the GUC Trust.................................. 74

      3.    Cancellation of Debt .................................................................................................. 74

    B.    Liquidation Trust ............................................................................................................. 74

    C.    GUC Trust........................................................................................................................ 75

    D.    Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims ............ 77

      1.    Recognition of Gain or Loss ...................................................................................... 77

      2.    Allocation of Consideration to Interest...................................................................... 78

      3.    Information Reporting and Backup Withholding ........................................................ 78

    E.    Backup Withholding and Information Reporting .............................................................. 79

    F.    Importance of Obtaining Professional Tax Assistance .................................................... 79

XIX.    ADDITIONAL INFORMATION........................................................................................ 79

XX.    RECOMMENDATION AND CONCLUSION............................................................. 80

## EXHIBITS

**Exhibit A**    *Joint Chapter 11 Plan of Liquidation for Village Roadshow Entertainment Group USA Inc. and its Debtor Affiliates*

**Exhibit B**    Liquidation Analysis

## I.    OVERVIEW OF THE PLAN

<div style="border:1px solid black">

### RECOMMENDATION BY THE DEBTORS

It is the Debtors' opinion that confirmation and implementation of the Plan is in the best interests of the Debtors' Estates and their creditors.  Therefore, the Debtors recommend that all creditors whose votes are being solicited submit a ballot to **accept** the Plan.

</div>

### A.    Introduction

The following is a brief overview of certain material provisions of the Plan.  This overview is qualified by reference to the provisions of the Plan, which is attached hereto as **Exhibit A**, and the exhibits hereto, as amended from time to time.  In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control.  The requirements for confirmation, including the vote of creditors entitled to vote on the Plan and certain of the statutory findings that must be made by the Bankruptcy Court for a plan to be confirmed, are set forth in Article I.F.  Confirmation of the Plan and the occurrence of the Effective Date are subject to certain conditions, which are summarized in Article X.  There is no assurance that these conditions will be satisfied or waived.  At the Combined Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a chapter 11 plan are that the plan: (1) is accepted by the requisite holders of claims or interests in impaired classes under the plan; (2) is in the "best interests" of each holder of a claim or interest in each impaired class under the plan; (3) is feasible; and (4) complies with the applicable provisions of the Bankruptcy Code.  In this instance, only Holders of Claims in Classes 3B and 4 are entitled to vote to accept or reject the Plan.  Because Classes 5, 6, and 7 will receive no distributions under the Plan, those Classes are deemed to reject the Plan.  Because Classes 1, 2, and 3A are unimpaired, they are deemed to vote to accept the Plan.  *See* Article I.F.5 for a discussion of the Bankruptcy Code's requirements for Plan confirmation.

### B.    The Plan

The Debtors filed for chapter 11 bankruptcy protection on March 17, 2025 (the "Petition Date").  Since the Petition Date, the Debtors have sold substantially all of their assets pursuant to section 363(b) and (f) of the Bankruptcy Code.  The following phase of these Chapter 11 Cases is the confirmation and Consummation of the Plan, pursuant to which the Debtors will (1) wind-down the Debtors; (2) liquidate the Debtors' remaining assets after the consummation of the Sale Transactions, if any; and (3) make distributions to Holders of Allowed Claims as set forth in the Plan.

A chapter 11 bankruptcy case permits a debtor to resolve its affairs and distribute the proceeds of its estate pursuant to a confirmed chapter 11 plan.  To that end, the Debtors filed the Plan, the terms of which are more fully described herein, contemporaneously with the filing of this Disclosure Statement.  Because the Debtors have sold substantially all of their assets, and now seek to distribute the proceeds from those sales, the Plan is referred to as a "plan of liquidation." The primary objective of the Plan is to maximize the value of recoveries to Holders of Allowed Claims and to distribute all property of the Debtors' Estates that is or becomes available for

1

distribution in accordance with the Bankruptcy Code and the Plan.  The Debtors assert that the Plan accomplishes this objective and is in the best interests of their Estates, and therefore seek to confirm the Plan.  The Plan classifies Holders of Claims or Interests according to the type and nature of the Holder's Claim or Interest, as more fully described below.

The Plan designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (a) Impaired or Unimpaired by the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; or (c) deemed to accept or reject the Plan.  Claims against the Debtors and Interests in the Debtors are classified in ten separate Classes, as described herein.

### C.      The Adequacy of This Disclosure Statement

Before soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a plan proponent to prepare a written disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the plan.  The Debtors are providing this Disclosure Statement in accordance with those requirements.  This Disclosure Statement includes, without limitation, information about:

- the Plan, including a summary, the procedures for voting on the Plan and projected recoveries thereunder (Article I hereof);

- the statutory requirements for confirming the Plan (Article I.F hereof);

- the Debtors' organizational structure, business operations, and financial obligations (Article II hereof);

- the events leading to the filing of the Chapter 11 Cases (Article II.D hereof);

- the major events during these Chapter 11 Cases, including (i) significant pleadings filed in the Chapter 11 Cases, (ii) the Committee Settlement, and (iii) certain relief granted by the Bankruptcy Court (Article III hereof);

- certain risk factors that Holders of Claims should consider before voting to accept or reject the Plan (Article XV hereof);

- the classification and treatment of Claims or Interests under the Plan, including identification of the Holders of Claims entitled to vote on the Plan (Article IV hereof);

- the means for implementation of the Plan, the provisions governing distributions to certain Holders of Claims pursuant to the Plan, the procedures for resolving Disputed Claims and other significant aspects of the Plan (Articles V, VII, and VIII hereof);

- the releases contemplated by the Plan that are integral to the overall settlement of Claims pursuant to the Plan (Article XI hereof); and

- certain United States federal income tax consequences of the Plan (Article XVI hereof).

2

### D.    Summary of Classes and Treatment of Claims or Interests

The classification of Claims or Interests, the estimated aggregate amount of Claims in each Class, and the amount and nature of distributions to holders of Claims or Interests in each Class are summarized in the table below.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified.  For a discussion of certain additional matters related to Administrative Claims and Priority Tax Claims, see Article II.A of the Plan.

Each amount designated in the table below as "Estimated Percentage Recovery" for each Class is the quotient of the estimated Cash or other assets to be distributed to holders of Allowed Claims in that Class, divided by the estimated aggregate amount of Allowed Claims in that Class. In determining those amounts, the Debtors have assumed that the Plan is consummated as described herein.

For a discussion of various factors that could materially affect the amount of assets to be distributed pursuant to the Plan, see Article XV of this Disclosure Statement.

| CLASS | CLAIM OR INTEREST | STATUS/ ENTITLED TO VOTE | ESTIMATED ALLOWED CLAIMS | ESTIMATED RECOVERY (%) |
|---|---|---|---|---|
| **Class 1** | Other Secured Claims | **Unimpaired**<br><br>Deemed to Accept the Plan.<br><br>Not Entitled to Vote. | $452,131 | 100% |
| **Class 2** | Other Priority Claims | **Unimpaired**<br><br>Deemed to Accept the Plan.<br><br>Not Entitled to Vote. | N/A | 100% |

| Class 3A | Library Debtors General Unsecured Claims | **Unimpaired**<br><br>Deemed to Accept the Plan.<br><br>Not Entitled to Vote. | $119,292,360[3] | 100% |
|---|---|---|---|---|
| **Class 3B** | Non-Library Debtors General Unsecured Claims | **Impaired**<br><br>Entitled to Vote. | $8,579,606 | 85% |
| **Class 4** | Senior Secured Notes Claims | **Impaired**<br><br>Entitled to Vote. | $157,288,992 | 3% – 72%[4] |
| **Class 5** | Intercompany Claims | **Impaired**<br><br>Deemed to Reject the Plan.<br><br>Not Entitled to Vote. | N/A | 0.0% |
| **Class 6** | Existing Equity Interests | **Impaired**<br><br>Deemed to Reject the Plan.<br><br>Not Entitled to Vote. | N/A | 0.0% |
| **Class 7** | Intercompany Interests | **Impaired**<br><br>Deemed to Reject the Plan.<br><br>Not Entitled to Vote. | N/A | 0.0% |

---

[3]    The estimated amount of Allowed Library Debtors Unsecured Claims assumes that the Warner Bros. Claims are Allowed in full.

[4]    The low end of the estimated recovery for Holders of Allowed Senior Secured Notes Claims assumes that the Warner Bros. Claims are Allowed in full.  The high end of the estimated recovery for Holders of Allowed Senior Secured Notes Claims assumes that the Warner Bros. Claims are $0.

### E.   Solicitation Package

The package of materials (the "<u>Solicitation Package</u>") to be sent to Holders of Claims on the Plan will contain:

- a notice of the Combined Hearing;

- for Holders of Claims in the Classes eligible to vote (the "<u>Voting Classes</u>"), an appropriate form of Ballot, instructions on how to complete the Ballot, a pre-paid, preaddressed Ballot return envelope, and such other materials as the Bankruptcy Court may direct;

- for Holders of Claims or Interests in Classes 1, 2, 3A, 5, and 7, the form of Notice of Non-Voting Package;

- Committee Letter; and

- any other documents that the Bankruptcy Court directs to be included in the Solicitation Package.

The Debtors will cause the Notice and Claims Agent to complete the distribution of the Solicitation Packages to Holders of Claims in the Voting Classes within two (2) Business Days after entry of the Disclosure Statement Order.

The Solicitation Package may also be obtained free of charge from the Notice and Claims Agent by: (1) visiting https://www.veritaglobal.net/vreg; (2) emailing the Notice and Claims Agent at vreginfo@veritaglobal.com; or (3) calling (866) 526-6865 (U.S./Canada) or (781) 575-2076 (International).

### F.   Voting and Confirmation of the Plan

The Disclosure Statement Order, among other things, (1) conditionally approved this Disclosure Statement pursuant to section 1125 of the Bankruptcy Code for solicitation purposes, and (2) established Plan voting tabulation procedures, which include certain vote tabulation rules that temporarily allow or disallow Claims for voting purposes pursuant to section 502 of the Bankruptcy Code and Bankruptcy Rule 3018.

#### 1.   Certain Factors to be Considered Prior to Voting

There are a variety of factors that all Holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan, including:

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors assert that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan; and

- any delays of either the Confirmation Date or Consummation could result in, among other things, increased Administrative Claims or Professional Fee Claims that would likely reduce the recoveries to the Holders of Claims and Interests, if any.

2.    Voting Procedures and Requirements

Pursuant to the Bankruptcy Code, only classes of claims against or equity interests in a debtor that are "impaired" under the terms of a plan of liquidation or reorganization are entitled to vote to accept or reject a plan. A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or interests of that class are modified, other than by curing defaults and reinstating maturity. Classes of Claims or Interests that are not impaired are not entitled to vote on the Plan and are conclusively presumed to have accepted the Plan. In addition, Classes of Claims or Interests that do not receive distributions under the Plan are not entitled to vote on the Plan and are deemed to have rejected the Plan. The classification of Claims or Interests is summarized, together with an indication of whether each Class of Claims or Interests is impaired or unimpaired, in Article I.D. February 18, 2026 is the voting record date (the "Voting Record Date") for purposes of determining which Holders of Filed or scheduled Claims in Classes 3B and 4 are entitled to receive a Solicitation Package.

**Voting on the Plan by each Holder of a Claim in Classes 3B and 4 is important. Please carefully follow all of the instructions contained on the Ballot(s) provided to you. All Ballots must be completed and returned in accordance with the instructions provided. To be counted, your Ballot or Ballots must be received by the Voting Deadline at the address set forth on the preaddressed envelope provided to you.**

**If you are entitled to vote and you did not receive a Ballot, received a damaged Ballot or lost your Ballot, please call or email the Debtors' voting agent, Kurtzman Carson Consultants, LLC dba Verita Global (the "Voting Agent"), at (866) 526-6865 (U.S./Canada) or (781) 575-2076 (International) or vreginfo@veritaglobal.com. Also, this Disclosure Statement, the Plan and all of the related exhibits and schedules are available, without charge, to any party in interest at https://www.veritaglobal.net/vreg.**

**Ballots cannot be transmitted orally, by email or by facsimile. Accordingly, you are urged to return your signed and completed Ballot, by hand delivery, overnight service, regular U.S. mail, or electronically via the Voting Agent's e-Ballot portal (vreginfo@veritaglobal.com) promptly, so that it is received by the Voting Agent before the Voting Deadline.**

3.    Plan Objection Deadline

The deadline to file objections to the confirmation of the Plan (the "Confirmation Objections") is March 24, 2026 at 4:00 p.m. (prevailing Eastern Time) (the "Objection Deadline"). All Confirmation Objections must be in writing and must specify in detail the name and address

of the objector, all grounds for the objection, and the amount of the Claim or Interest held by the objector.  Any Confirmation Objection must be filed with the Bankruptcy Court and served on the Debtors, the official committee of unsecured creditors appointed in these Chapter 11 Cases (the "Committee") and the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), and certain other parties in interest in accordance with the Disclosure Statement Order on or before the Objection Deadline.

####    4.    Combined Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan.  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.  On January 29, 2026, the Debtors filed a motion requesting that the Bankruptcy Court conditionally approve this Disclosure Statement for purposes of solicitation, and set the Combined Hearing to approve this Disclosure Statement on a final basis and confirm the Plan.  The Bankruptcy Court has set the Combined Hearing on April 7, 2026, at a time to be determined, before the Honorable Thomas M. Horan, United States Bankruptcy Judge, at the United States Bankruptcy Court for the District of Delaware, 824 Market ST N, 3rd Floor, Wilmington, Delaware 19801.

The Combined Hearing may be conducted virtually, with access instructions filed on the Bankruptcy Court's docket in these Chapter 11 Cases, or in-person.  The Combined Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the Entities who have filed Confirmation Objections, without further notice to other parties in interest.  The Bankruptcy Court, in its discretion and before the Confirmation Hearing, may put in place additional procedures governing the Combined Hearing.  The Plan may be modified in accordance with its terms, if necessary, before, during or as a result of the Combined Hearing, without further notice to parties in interest.

####    5.    Confirmation

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including that:[5]

- the Plan has classified Claims and Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtors have complied with the applicable provisions of the Bankruptcy Code;

- the Debtors, as proponents of the Plan, have proposed the Plan in good faith and not by any means forbidden by law;

---

[5]    The descriptions contained herein are only a summary of certain confirmation requirements; they are not exhaustive of all confirmation requirements and should not be construed as such.

- the disclosure required by section 1125 of the Bankruptcy Code has been made;

- the Plan has been accepted by the requisite votes, except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code, of creditors and equity interest holders;

- the Plan is feasible;

- all Statutory Fees due and owing have been paid or the Plan provides for the payment thereof on the Effective Date; and

- the Plan is in the "best interests" of all Holders of Claims or Interests in an impaired Class by providing to those Holders on account of their Claims or Interests property of a value, as of the Effective Date, that is not less than the amount that each Holder would receive or retain in a chapter 7 liquidation, unless each Holder of a Claim or Interest in that Class has accepted the Plan.

6.    Acceptance

A Plan is accepted by an impaired class of Claims if Holders of at least two-thirds in dollar amount and a majority in number of Claims of that Class vote to accept the Plan. Only those Holders of Claims who actually vote (and are entitled to vote) to accept or to reject a Plan count in this tabulation.

7.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan will not likely be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor (unless liquidation or reorganization is proposed in the Plan). Because the Plan proposes a liquidation of all of the Debtors' assets, for purposes of this test the Debtors have analyzed the ability of the Liquidation Trustee to meet its obligations under the Plan. Based on the Debtors' analysis, regarding recoveries available to Holders of Allowed Claims under the Plan, the Liquidation Trustee is expected to have sufficient assets to accomplish its tasks under the Plan. Therefore, the Debtors have determined that their liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

8.    Best Interests Test; Liquidation Analysis

Notwithstanding acceptance of the Plan by each impaired Class, to confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of each Holder of a Claim or Interest in any impaired Class who has not voted to accept the Plan. Accordingly, if an impaired Class does not unanimously accept the Plan, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of that impaired Class a recovery on account of the Holder's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that the Holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date.

Because the Plan proposes a liquidation of all the Debtors' assets, the Debtors have analyzed factors that will impact recoveries (the "Recoveries") available to creditors in each scenario. These factors include professionals' fees and expenses, asset disposition expenses, applicable taxes, potential Claims arising during the pendency of the Plan or chapter 7 case and trustee fees and expenses. In addition, the Committee Settlement, which guarantees an 85% recovery on account of Allowed Class 3B Claims, would not be available to Holders of such Claims in a chapter 7 case.

In summary, the Debtors have determined that a chapter 7 liquidation would result in diminution in the Recoveries to be realized by Holders of Allowed Claims, as compared to the proposed distributions under the Plan. Consequently, the Debtors have determined that the Plan will provide a greater ultimate return to Holders of Allowed Claims than would a chapter 7 liquidation of the Debtors.

9.    Compliance with Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that the Plan comply with the applicable provisions of the Bankruptcy Code. The Debtors considered each of these issues in the development of the Plan and have determined that the Plan complies with all provisions of the Bankruptcy Code.

10.    Alternatives to Confirmation and Consummation of the Plan

The Debtors evaluated alternatives to the Plan, including alternative structures and terms of the Plan. While the Debtors concluded that the Plan is the best alternative and will maximize recoveries by Holders of Allowed Claims, if the Plan is not confirmed, the Debtors, or (subject to the Debtors' exclusive periods under the Bankruptcy Code to file and solicit acceptances of a plan or plans) any other party in interest in these Chapter 11 Cases could attempt to formulate and propose a different plan. Further, if no plan under chapter 11 of the Bankruptcy Code can be confirmed, these Chapter 11 Cases may be converted to chapter 7 cases. In liquidation cases under chapter 7 of the Bankruptcy Code, a trustee would be appointed to liquidate the remaining assets of the Debtors and distribute proceeds to creditors. The proceeds of the liquidation would be distributed to the respective creditors of the Debtors in accordance with the priorities established by the Bankruptcy Code. For further discussion of the potential impact on the Debtors of the conversion of these Chapter 11 Cases to chapter 7 liquidation, see Article XV.A of this Disclosure Statement. The Debtors have determined that confirmation and Consummation of the Plan is preferable to the available alternatives.

G.    Releases by the Debtors Set Forth in the Plan

Article XI.B of the Plan provides that each Released Party is deemed released by the Debtors and their Estates from any and all claims and Causes of Action except as set forth therein. The Debtors have determined that applicable law and the facts support those releases and that the Bankruptcy Court can and should approve them. **The Plan provides (i) Holders of Claims that vote to accept the Plan and do not "opt out" of the Third-Party Releases and (ii) Holders of Claims that vote to reject or abstain from voting and "opt-in" to the Third-Party Releases will be bound by the Third-Party Releases.**

9

\*        \*        \*

## II.    HISTORY OF THE DEBTORS

### A.    The Debtors' Corporate Structure and Ownership

Debtor Village Roadshow Entertainment Group (BVI) Limited ("VREG-BVI") is the parent holding company and the direct or indirect controlling member and/or shareholder of its Debtor subsidiaries.  An organizational chart of the Company is set forth below.



VREG-BVI is a limited liability company incorporated in the British Virgin Islands and has 60,000,000 shares of common stock issued and outstanding as of the Petition Date.  The stockholders in VREG-BVI are Vine Media Opportunities – Fund III, LP, Vine Media Opportunities – Fund III-A, LP, Vine Media Opportunities – Fund III-B, LP, Vine Westcon SPV, LP, 1397225 Ontario Limited, Falcon Strategic Partners IV LP, and Village Roadshow Pictures International Pty Ltd.

### B.    Debtors' Prepetition Business Operations

The Company is a leading independent producer and financier of major Hollywood motion pictures, having produced and released over 100 films since its inception in 1997.  The Company has had worldwide blockbusters such as *Joker*, *The Great Gatsby*, the *Ocean's* franchise, *Sully*, *The LEGO Movie*, and the original *Matrix* trilogy, to name a few.  The Company's numerous critically acclaimed and commercially successful films have garnered significant income and recognition, including over $19 billion worldwide box office receipts, 34 #1 U.S. box office openings, 19 Academy Awards, and 6 Golden Globes.

As detailed more fully in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs; and (II) Granting Related Relief* [Docket No. 8], as of the Petition Date, the Debtors employed two executives and three at-will administrative professionals in the United States, and six financial professionals in Australia.

As a market-leading entertainment organization, the Company's affairs are complex.  As of the Petition Date, the Debtors operated several different entities that were attached to two separate debt structures. The Company's primary assets are contractual rights and intellectual property related to motion picture films and television series.

### 1.    The Library Assets

Prior to a change in ownership structure in 2017, the Company was almost exclusively engaged in the co-financing and co-production of studio motion pictures.  Since its establishment in 1998, the Company co-financed and co-produced a library of 108 motion picture films (collectively, the "Pictures").  This business was incredibly profitable and allowed the Company to achieve commercial success on a consistent basis.  The Company co-financed and co-produced the Pictures with various studio partners, including Sony and Paramount, but the majority of the Pictures (91) were developed through co-financing and co-production agreements between the Company and Warner Bros.  The Company's interests in the Pictures were the Company's primary assets, which included an undivided interest in the relevant percentage of the intellectual property, including an undivided interest in the relevant percentage in domestic distribution rights, foreign distribution rights, and global distribution rights (together, the "Distribution Rights"), cash flows, and other property related to the Pictures (collectively, the "Library Assets").  As of the Petition Date, the Library Assets generated revenue of approximately $50 million per year.

### 2.    The Derivative Rights Assets

For a substantial majority of the Pictures, the Company also owns a specific ownership share of the exclusive intellectual property right to create and exploit remakes, sequels, prequels, series, spin-offs, and other derivative works based on the Pictures and the characters therein (the "Derivative Rights").  The Company co-owns the Derivative Rights with the applicable studio partners that the Company co-financed the underlying Picture with.  For each Picture in which the Company owns a share of the Derivative Rights, the Company and the applicable studio partner entered into film-specific "co-ownership" agreements governing the parties' respective rights and obligations with respect to the co-ownership and exploitation of the Derivative Rights in the

relevant Pictures (collectively, the "Derivative Rights Agreements," and together with the Derivative Rights, the "Derivative Rights Assets"). Historically, the Derivative Rights Assets brought significant value to the Company and strengthened lucrative business relationships with studio partners.

3.     The Studio Business

From 2018 to 2020, following a shift in the Company's ownership structure and management, the Company expanded its business model and dedicated a meaningful portion of its resources to the development and production of independent films and scripted and television series (the "Studio Business"). The goal of the Studio Business was for the Company to create content independently and without the need for studio partners, including films, scripted television series, and unscripted television programs (including documentaries and game shows). The Company sought to establish itself in the market as a full service shop, offering idea creation through development partnership with certain labels, writers, and talent, and a support staff that included various professionals, from business administration to marketing and distribution. To build the Studio Business, the Company invested significant capital into talent deals and writing contracts, hired additional employees and creative teams, and directly funded the development and production of new projects.

From 2018 to the Petition Date, the Company invested in the development of 99 feature films, 67 unscripted television series, and 166 scripted television series in connection with the Studio Business. Of those projects, six feature films, five unscripted television series, and two scripted television series proceeded to the production phase. While the Studio Business did not result in the production of any profitable projects, it did generate certain valuable intellectual property and contractual rights.

**C.    The Debtors' Prepetition Capital Structure**

As of the Petition Date, the Debtors had an aggregate principal amount of approximately $386,895,702.13 in funded debt obligations, consisting of the ABS Facility and the Senior Secured Notes (each as defined below and, together, the "Prepetition Secured Debt Facilities"), as summarized below:

| Funded Debt Facility | Approximate Principal Amount Outstanding as of the Petition Date |
|---|---|
| **Senior Secured Notes** | $163,075,096.60 |
| **ABS Facility** | $223,820,605.53 |
| **TOTAL:** | **$386,895,702.13** |

1.     The Senior Secured Notes

As of the Petition Date, certain of the Debtors had outstanding secured debt obligations in the aggregate outstanding principal amount of approximately $163,075,096.60 arising under

senior secured notes (the "Senior Secured Notes") issued pursuant to that certain *Fifth Amended and Restated Note Purchase Agreement* dated as of January 21, 2025 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "Prepetition Senior Secured Notes Agreement"), by and among VREG-BVI, as borrower, the subsidiary guarantors referred to therein[6] (the "Subsidiary Guarantors," and together with VREG-BVI, the "Notes Debtors"), the noteholders listed therein (the "Prepetition Senior Secured Noteholders"), and Wilmington Savings Fund Society, FSB, as collateral agent (the "Prepetition Senior Secured Notes Collateral Agent," and together with the Prepetition Senior Secured Noteholders, the "Prepetition Senior Secured Notes Parties").

Pursuant to the Prepetition Senior Secured Notes Agreement and the other security and credit documents related thereto (collectively, the "Prepetition Senior Secured Notes Credit Documents"), the obligations of the Notes Debtors under the Senior Secured Notes (the "Prepetition Senior Secured Notes Obligations") are secured on first-priority basis by liens (the "Prepetition Senior Secured Notes Liens") on substantially all of the assets of the Notes Debtors (the "Senior Notes Collateral"). The Senior Notes Collateral includes the Debtors' Derivative Rights Assets and Studio Business assets. The Senior Secured Notes are further secured by a senior pledge of the equity interests of each of (a) the Subsidiary Guarantors, (b) Village Roadshow Distribution (BVI) Limited ("VRD-BVI"), (c) Village Roadshow Productions (BVI) Limited ("VRP-BVI"), (d) Village Roadshow Film Management Pty Ltd ("VRFAM"), and (e) Village Roadshow Distribution USA Inc. ("VRD-USA").

The most recent amendment and restatement of the Prepetition Senior Secured Notes Agreement, which was entered into on January 21, 2025, extended certain maturity dates under that certain *Fourth Amended and Restated Note Purchase Agreement* and allowed the Notes Debtors to issue additional Senior Secured Notes in the aggregate principal amount of approximately $5,786,104.96 (the "Bridge Notes"). The aggregate principal amount outstanding on account of the Senior Secured Notes as of the Petition Date—$163,075,096.60—was inclusive of the $5,786,104.96 amount on account of the Bridge Notes.

2.    The ABS Facility

As of the Petition Date, certain of the Debtors had outstanding secured debt obligations in the aggregate outstanding principal amount of approximately $223,820,605.53 arising under asset-backed secured notes (the "ABS Facility") issued pursuant to that certain *Base Indenture*, dated as of November 10, 2020 (the "Base Indenture"), by and among Debtors VR Funding LLC ("VR Funding") and VR Films Holdings (BVI) Limited ("VRFH-BVI"), as parent co-issuers (together, the "Parent Co-Issuers") and U.S. Bank National Association, as trustee (the "ABS Trustee," and together with the Prepetition Senior Secured Notes Collateral Agent, the "Prepetition Agents"), as supplemented by that certain Group A Supplement, dated as of November 10, 2020 (the "Group A Supplement"), among the Parent Co-Issuers, Debtor Village Roadshow Films (BVI) Limited ("VRF-BVI", Debtor Village Roadshow Films North America Inc. ("VRFNA"), Debtor Village

---

[6]    The Subsidiary Guarantors under the Senior Secured Notes are Crescent Film Holdings Limited, Village Roadshow Entertainment Group USA Inc., Village Roadshow Pictures Entertainment Inc., Village Roadshow Holdings USA Inc., VREG IP Global LLC, VREG WW IP Global LLC, VREG MM2 IP Global LLC, VREG J2 Global LLC, and VREG OP Global LLC.

Roadshow Films Global Inc. ("VRFG"), and Debtor Village Roadshow VS Films LLC ("VRVS Films"), as subsidiary co-issuers (collectively, the "Group A Subsidiary Co-Issuers," and together with the Parent Co-Issuers, the "ABS Co-Issuers") and the ABS Trustee, as further supplemented by the Series 2020-1 Supplement, dated as of November 10, 2020 (the "Series Supplement," together with the Base Indenture and the Group A Supplement, and as amended, supplemented, or otherwise modified from time to time, the "Prepetition ABS Agreement"), among the ABS Co-Issuers and the ABS Trustee.

Pursuant to the Prepetition ABS Agreement and the other security and credit documents related thereto (collectively, the "Prepetition ABS Credit Documents," and together with the Prepetition Senior Secured Notes Credit Documents, the "Prepetition Credit Documents"), the obligations of the ABS Co-Issuers under the ABS Facility (the "Prepetition ABS Obligations," and together with the Prepetition Senior Secured Notes Obligations, the "Prepetition Obligations") were secured on a first-priority basis by liens (the "Prepetition ABS Liens," and together with the Prepetition Senior Secured Notes Liens, the "Prepetition Liens"), in favor of the ABS Trustee and for the benefit of the noteholders under the Prepetition ABS Agreement (the "ABS Noteholders," together with the ABS Trustee, the "Prepetition ABS Secured Parties," and the Prepetition ABS Secured Parties and the Prepetition Senior Secured Notes Parties, collectively, the "Prepetition Secured Parties") on substantially all of the assets of the ABS Co-Issuers (the "ABS Collateral," and together with the Senior Secured Notes Collateral, the "Prepetition Collateral"), including the Debtors' Library Assets.

### D.    Events Leading to these Chapter 11 Cases

In the years leading up to the Petition Date, a confluence of macro-economic factors weighed heavily on the Company's balance sheet, including: the COVID pandemic disrupting the entertainment industry at large; the 2023 writers' and actors' strikes delaying production and increasing cost; and "streaming wars" and alternate viewing methods challenging business models across the board.  The bulk of the Company's liquidity crisis, however, stemmed from costly litigation with the Company's most significant business partner and the lack of return on the Company's significant investment in the Studio Business.

As set forth in more detail below, these circumstances required the Company to begin exploring strategic alternatives to address its go-forward liquidity position.  The Company also engaged advisors to assist with these efforts.  After exploring various potential pathways, the Company, with the assistance of its advisors, ultimately determined to file these Chapter 11 Cases in an effort to maximize the value of its assets and operations for the benefit of its creditors and all parties in interest.

### 1.    The Warner Bros. Arbitration

The Company historically enjoyed a prolific business relationship with Warner Bros. Entertainment Inc. and its affiliates (collectively, "Warner Bros."), which included the co-production, co-financing, and co-ownership of 91 motion picture properties, including the original *Matrix* trilogy.  In February 2022, Warner Bros. initiated arbitration proceedings against the Company, asserting breach of contract claims alleging that the Company was contractually obligated to pay its co-financing share of *The Matrix Resurrections* (the "Matrix Arbitration").

The Company filed counterclaims against Warner in the Matrix Arbitration related to Warner Bros.' decision to release *The Matrix Resurrections* day-and-date on HBO Max.  Also in February 2022, Warner Bros. filed a separate arbitration demand seeking a declaratory judgment that Warner Bros. was not required to offer the Company the opportunity to participate in co-financing a separate film project, *Wonka*, and that the Company's right to participate in derivative works of certain other Pictures was subject to the same limitations (the "Wonka Arbitration").  The Company filed counterclaims against Warner in the Wonka Arbitration seeking a declaratory judgment that the Company was entitled to participate in co-financing *Wonka* and that the limitations alleged by Warner did not apply to certain other Pictures.

## 2. The Studio Business

In 2018, the Company's management began focusing the majority of its working capital on the development of the Studio Business, with the goals of creating independently developed and owned films, scripted television series and unscripted television programs (including documentaries and game shows).  The Company spent approximately $47.5 million on development expenses for projects that either were developed and never producer or if produced, never became profitable.

While the Company did achieve certain creative success and independently produced some media content, including six full-length movies, five unscripted television programs (including two seasons of a game show), and two scripted television series, no production from the Studio Business resulted in profits needed to make the venture sustainable.  Though the Company's investment in the Studio Business did generate certain valuable intellectual property and contractual rights, significant liability attached due to unpaid contracts, such as those with writers and consultants.  Without net positive results, the Company was unable to raise additional capital to continue to fund the Studio Business.  The Company's inability to satisfy obligations in connection with certain Studio Business projects had a detrimental impact on its reputation in the entertainment industry and led to the Company being placed on the Writers' Guild strike list.

## 3. Prepetition Restructuring Efforts

In early 2024, the Company's board of directors (the "Board") recognized that the Company's financial condition was untenable and engaged Goldman Sachs Group, Inc. ("Goldman") as investment banker to run an out-of-court marketing and sale process for substantially all of the Company's assets.  In February 2024, the Company also engaged Accordion Partners, LLC ("Accordion") as restructuring advisor to advise the Company on cost reduction efforts and various strategic alternatives.  Immediately following its engagement, Accordion advised the Company to take several proactive steps to mitigate the stress on its balance sheet, including pausing all Studio Business development efforts, discontinuing discretionary spending, and streamlining the Company's workforce to reduce overhead costs on a go-forward basis.

During the first half of 2024, Goldman marketed a sale of the equity in the Company, seeking to sell the business as a going concern.  While the Company received meaningful interest and entered exclusivity with a potential purchaser, uncertainty surrounding the arbitration with Warner Bros. ultimately stifled the Company's ability to close the transaction.  Thereafter, Goldman continued to market the Company and its assets to a broad array of potential purchasers.

Following negotiations with potential purchasers, it became evident that the Company would likely receive the highest value for its assets by separating them into three business segments: the Library Assets, the Derivative Rights, and the Studio Business.

Despite significant efforts, the Company was unable to close a sale transaction before the financial distress it faced became dire.  On December 10, 2024, the Company engaged Sheppard, Mullin, Richter & Hampton LLP ("Sheppard Mullin") as legal counsel to advise on potential out-of-court and in-court restructuring options.  On February 3, 2025, the Company engaged Solic Capital Advisors, LLC ("Solic") to replace Goldman as investment banker and continue the Company's marketing and sale efforts through a potential chapter 11 process.  The Board also appointed a special committee on January 20, 2025 to determine additional cost-cutting measures, hire professionals, negotiate any future financing proposals, and approve any sale transactions. The Company negotiated with certain of its existing Prepetition Senior Secured Noteholders and obtained the Bridge Facility on January 21, 2025, which provided a cash runway for the Company to further pursue a potential sale transaction.

In February 2025, it became clear that two purchasers were at the forefront of a potential deal for the sale of the Library Assets.  During this period, the Company introduced a dual track approach to both transactions: out-of-court, or through a chapter 11 process, which the Company could pursue at its sole discretion after evaluating the best path forward.  Ultimately, the Company decided that a sale (or sales) pursuant to Section 363 of the Bankruptcy Code would maximize the value of the Library Assets as well as the Derivative Rights Assets and the Studio Business.  On March 14, 2025, following extensive good-faith negotiations with the potential purchasers, the Company determined, in the exercise of its business judgment, to execute a stalking horse asset purchase agreement (the "CP Stalking Horse APA") with CP Ventura LLC ("CP"), which provided for a base purchase price in the amount of $365 million for the Library Assets.

## III.    EVENTS DURING CHAPTER 11 CASE

### A.    First Day Motions

On the Petition Date, the Debtors filed various first-day motions (the "First Day Motions") for the purpose of stabilizing the Debtors' business operations as they transitioned into chapter 11. These First Day Motions requested, among other things, authority to:

- jointly administer the Chapter 11 Cases for procedural purposes only;

- redact certain personally identifiable information of individuals from the consolidated list of creditors and certain other filings;

- continue to operate the Debtors' existing cash management system and continue the use of existing bank accounts and business forms;

- pay prepetition compensation to employees and continue employee benefits programs;

- pay certain taxes that the Debtors are required to collect and remit to appropriate taxing authorities;

- appoint a claims and noticing agent; and

- obtain postpetition financing.

The relief sought in the First Day Motions was granted on an interim or final basis, as applicable, on March 18, 2025, March 19, 2025, April 9, 2025, April 15, 2025, April 22, 2025, and April 24, 2025.

B.    **Second Day Motions**

On or around March 28, 2025, March 31, 2025, April 4, 2025, and April 10, 2025, as applicable, the Debtors filed a number of motions and other pleadings (collectively the "Second Day Motions") to ensure the preservation of value of the Debtors' assets through the Chapter 11 Cases.  These Second Day Motions requested, among other things, authority to:

- establish procedures for interim compensation of professionals;

- retain and compensate professionals utilized in the ordinary course of business;

- extend the time to file schedules and statements of financial affairs;

- assume certain executory contracts with Green Hasson & Janks LLP;

- retain Sheppard Mullin as co-counsel to the Debtors;

- retain Young Conaway Stargatt & Taylor, LLP ("Young Conaway") as co-counsel to the Debtors;

- retain Kurtzman Carson Consultants, LLC dba Verita Global ("Verita") as administrative advisor to the Debtors;

- retain Accordion as restructuring advisor to the Debtors and designate Keith Maib as Chief Restructuring Officer;

- retain Solic as investment banker to the Debtors; and

- retain Kirkland & Ellis LLP ("Kirkland") as special litigation counsel to the Debtors.

The relief sought in the Second Day Motions was granted on a final basis, as applicable, on April 15, 2025, April 16, 2025, April 17, 2025, April 28, 2025, and April 29, 2025.

C.      **Committee Appointment**

On March 27, 2025, the U.S. Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 103] (the "Committee Appointment Notice"), appointing 10100 Santa Monica, Inc. and McGuffin Entertainment Media, Inc. to the Committee pursuant to 11 U.S.C. § 1102(a)(1).  On April 1, 2025, the U.S. Trustee filed the *Amended Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 123], which amended the Committee Appointment Notice to include Vanessa McCarthy as an additional member of the Committee.

On April 3, 2025, counsel for the Committee, Pachulski Stang Ziehl & Jones LLP ("Pachulski"), filed a notice of appearance and request for notices [Docket No. 128] on behalf of the Committee.  The Bankruptcy Court approved the Committee's retention of Pachulski on May 22, 2025 [Docket No. 392].  The Bankruptcy Court also approved the Committee's retention of its financial adviser, Dundon Advisers LLC, on May 22, 2025 [Docket No. 395].

D.      **Approval of the DIP**

On the Petition Date, the Debtors executed a debtor-in-possession financing facility with the DIP Lenders, which the Bankruptcy Court approved on an interim basis on March 19, 2025 and on a final basis on April 24, 2025.  *See* Docket Nos. 69 and 280.  Pursuant to the DIP Facility, the DIP Lenders agreed to provide additional liquidity to the Debtors, to, among other things, conduct and complete the prepetition marketing process.  The Debtors and their advisors actively negotiated the terms and provisions of the DIP Facility leading up to the Petition Date and pushed back on the material terms of the proposed financing, including the economics and covenants.  In addition, the Debtors and their advisors assessed the market to determine whether any alternative financing would be available on better terms that that offered by the DIP Lenders.  No better financing presented itself.

The DIP Facility was comprised of, among other things, (a) a new money commitment in the amount of $7,000,000, of which $500,000 was made available upon entry of the Interim DIP Order and an additional $6,500,000 was made available upon entry of the Final DIP Order, and (b) pursuant to the Final DIP Order, a "roll-up" component in the amount of $5,786,104.96, on a cashless, dollar-for-dollar basis, of the Debtors' outstanding obligations with respect to the Bridge Notes.  The DIP Facility was secured by liens on the DIP Collateral in favor of the DIP Secured Parties.

As part of a resolution reached with Warner Bros. with respect to Warner Bros.' objection to the DIP Facility, the Debtors and Warner Bros. stipulated to a modification of the automatic stay to allow Warner Bros. to proceed with the Matrix Arbitration.  The Court approved this stipulation on June 18, 2025.  *See* Docket No. 545.

E.      **Approval of the Bid Procedures and the Stalking Horse Bidder**

On the Petition Date, the Debtors filed a motion [Docket No. 11] (the "Bid Procedures and Sale Motion") seeking entry of (a) an order, (the "Bid Procedures Order"), (i) authorizing and approving bid procedures (the "Bid Procedures"), in connection with one or more sales or dispositions (collectively, the "Sale") of the Debtors' Assets, (ii) authorizing and approving the Debtors' entry into and performance under the CP Stalking Horse APA, subject to higher or

otherwise better bids submitted in accordance with the Bid Procedures, (iii) authorizing and approving certain stalking horse bid protections provided to CP in accordance with the terms and conditions set forth in the CP Stalking Horse APA and the Bid Procedures, (iv) establishing certain dates and deadlines in connection with the sale process for the Assets, including scheduling an auction (the "Auction"), if necessary, in accordance with the Bid Procedures, and the hearing with respect to the approval of the Sale (the "Sale Hearing"), (v) approving the form and manner of notice of the Auction, if any, the Sale, and the Sale Hearing, (vi) approving procedures for the assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale (the "Assumption and Assignment Procedures") and solely with respect to Warner Bros., the Warner Bros. Assumption and Assignment Procedures, and approving the form and manner of notice thereof, and (vii) granting related relief; and (b) one or more orders (each, a "Sale Order"), (i) authorizing and approving the Sale of the Debtors' Assets to the Stalking Horse Bidder or otherwise Successful Bidder(s), as applicable, free and clear of all liens, claims, interests, and encumbrances to the extent set forth in the Stalking Horse APA or the asset purchase agreement with the otherwise Successful Bidder, as applicable (the "APA"), (ii) the assumption and assignment of the Assumed Contracts as set forth in the applicable APA, and (iii) granting related relief.

Shortly after commencing these Chapter 11 Cases, Solic launched the postpetition marketing process. This process was designed to build upon the prepetition efforts by marketing the Debtors' assets to an even broader group of potential buyers, which included the parties who were contacted prepetition and additional parties identified by the Debtors and their advisors. The expanded process included strategic and financial parties as well as distress-oriented investors who may be interested in the Debtors' intellectual property and fixed assets. As a result, the Debtors and their advisors increased the total pool of potential purchasers and the information available to such potential purchasers postpetition, all in an effort to maximize value for the Debtors' estates.

On April 3, 2025, the Debtors received a letter proposal from Alcon Media Group, LLC ("Alcon") setting forth a bid for the Library Assets, contingent upon being the new stalking horse bidder. While the Debtors were not previously soliciting bids for a replacement stalking horse bidder for the Library Assets, the Debtors and Alcon engaged in good-faith, arms-length negotiations, which resulted in Alcon submitting an asset purchase agreement to the Debtors on April 7, 2025, on terms very similar to the initial CP Stalking Horse APA, but with an increased purchase price, no break-up fee, and an identical expense reimbursement of $2 million. The Debtors, prepared to accept the bid from Alcon in the exercise of their business judgment and following Board approval, notified CP of Alcon's bid. On April 11, 2025, CP raised their bid for the Library Assets, topping Alcon's bid. The Debtors sought further approval from the Board to accept CP's revised stalking horse bid on April 12, 2025, and notified Alcon of the same. On April 13, 2025, Alcon submitted a further stalking horse bid for the Library Assets, topping CP's bid received on April 11, 2025. Following this development, the Debtors brought both bids to the Board, and the Board directed the Debtors to request best and final bids from both Alcon and CP by 5:00 p.m. ET on April 14, 2025. After the deadline passed, the highest and best bid for the Library Assets was offered by Alcon, with a purchase price of $417.5 million (the "Alcon Stalking Horse Bid").

As a result of the extensive good-faith negotiations, and in consultation with their other advisors, the Debtors determined that the Alcon Stalking Horse Bid for the Library Assets was the

highest and best proposal received. On April 16, 2025, the Debtors filed a motion [Docket No. 197] (the "Stalking Horse Supplement") seeking entry of an order (a) modifying the relief requested in the Bid Procedures and Sale Motion, (b) approving (i) the designation of Alcon as the new stalking horse bidder for the Debtors' Library Assets, (ii) the Debtors' entry into an asset purchase agreement with Alcon setting forth the terms of the Alcon Stalking Horse Bid for the Library Assets ("Alcon Stalking Horse APA"), and (iii) an expense reimbursement provided to Alcon pursuant to the terms of the Alcon Stalking Horse APA, and (c) granting related relief.

On April 24, 2025, the Bankruptcy Court entered the Bid Procedures Order [Docket No. 276], approving, among other things, the Bid Procedures, which established key dates and times relating to the Sale and the Auction, and granting the relief requested in the Stalking Horse Supplement. The Bid Procedures Order provided the Debtors broad discretion to modify the timeline and other procedures set forth in the Bid Procedures, in consultation with the Consultation Parties (as defined in the Bidding Procedures Order), in order to maximize value.

Following entry of the Bid Procedures Order, the Debtors served the Sale Notice on the Sale Notice Parties and published the Sale Notice in the national edition of the *The Wall Street Journal* and *The Los Angeles Times*.

F.    **The Library Assets Sale**

Other than the Alcon Stalking Horse APA, the Debtors did not receive any Qualified Bids for the Library Assets. Accordingly, on May 22, 2025, the Debtors filed the *Notice of Successful Bidder for Library Assets* [Docket No. 396], which named Alcon as the Successful Bidder for the Library Assets. On June 20, 2025, the Bankruptcy Court entered the *Order (I) Approving the Sale of Library Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* [Docket No. 562] (the "Library Assets Sale Order") approving the sale of the sale of the Library Assets to Alcon pursuant to the terms of the Alcon Stalking Horse APA.

On July 23, 2025, the sale of the Library Assets to Alcon closed, and the Debtors filed the *Notice of Library Assets Sale Closing* [Docket No. 689]. Pursuant to the Library Assets Sale Order, the Debtors applied the proceeds of the Library Assets sale: (a) first to the ABS Trustee for the indefeasible payment in full of the outstanding Prepetition ABS Obligations in accordance with the Prepetition ABS Agreements; (b) second, to each of the DIP Secured Parties, amounts necessary to indefeasibly satisfy all of the Debtors' obligations owed to such DIP Secured Party in full in accordance with the DIP Documents and the Final DIP Order; (c) third, to fund the Warner Bros. Reserve; (d) fourth, to fund the Library Reserve; and (e) fifth, to the Sellers.

G.    **The Remaining Sale Transactions.**

In accordance with the Bid Procedures Order, the Debtors, in consultation with their advisors and the Consultation Parties, evaluated the Qualified Bids submitted for the Derivative Rights Assets and the Studio Business and conducted the Auction. The Auction commenced and concluded on May 28, 2025. Participants, including principals and advisors of the Debtors, the Consultation Parties, and each of the Qualified Bidders, attended both in-person and virtually.

1.      *Sale of the Studio Business*

Prior to the Auction, the Debtors received two Qualified Bids for the Studio Business assets, one of which was limited to a single Studio Business project, and the other for the entirety of the Studio Business.  At the conclusion of the Auction, the Debtors selected Alcon as the Successful Bidder for the Studio Business, with a purchase price comprised of cash in the amount of $4.25 million plus the assumption of certain liabilities.  On August 26, 2025, the Bankruptcy Court entered the *Order (I) Approving the Sale of the Studio Business Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* [Docket No. 782] (the "Studio Business Sale Order") approving the sale to Alcon.

On December 30, 2025, the Debtors filed the *Notice of Studio Business Sale Closing* [Docket No. 1224], which provided notice to all parties in interest that the sale of the Studio Business to Alcon closed on December 29, 2025.  Pursuant to the Studio Business Sale Order, the Debtors applied the proceeds of the Studio Business sale: (a) first, to each of the DIP Secured Parties, amounts necessary to indefeasibly satisfy all of the Debtors' obligations owed to such DIP Secured Party in full in accordance with the DIP Documents and the Final DIP Order, which includes payments to the Union Entities as senior secured parties in certain assets; and (b) second, to the Sellers.

2.      *Sale of the Derivative Rights Assets*

Prior to the Auction, the Debtors received four Qualified Bids for the Derivative Rights Assets.  At the conclusion of the Auction, the Debtors selected (i) Alcon as the Successful Bidder for the Derivative Rights Assets, with a cash purchase price in the amount of $18.5 million, and (ii) Warner Bros. as the Back-Up Bidder for the Derivative Rights Assets, with a cash purchase price in the amount of $17.5 million.

After the conclusion of the Auction, Warner Bros. and Regency Entertainment (USA), Inc. ("Regency") each filed objections to the Debtors' proposed sale of the Derivative Rights Assets to Alcon.  *See* Docket Nos. 477, 478, and 518.  On September 2, 2025, following extensive discussions and good faith negotiations between the Debtors, Alcon, Warner Bros., and Regency, the Court entered the *Agreed Scheduling Order For the Pending Contested Matter Regarding the Sale of the Debtors' Derivative Rights Assets* [Docket No. 800] (the "Scheduling Order"), which established an agreed discovery, supplemental briefing, and hearing schedule with respect to the sale of the Derivative Rights Assets.  In accordance with the Scheduling Order, Warner Bros. and Regency each filed supplemental objections on October 6, 2025.  On October 15, 2025, the Debtors filed their reply and Alcon filed a joinder thereto.  On October 20–21, 2025, the Court held a contested hearing regarding with Debtors' proposed sale of the Derivative Rights Assets to Alcon and the related objections of Warner Bros. and Regency.

On November 5, 2025, the Bankruptcy Court issued a *Memorandum Opinion* [Docket No. 1027] approving the sale of the Derivative Rights Assets to Alcon and overruling the objections filed by Warner Bros. and Regency.  On November 12, 2025, the Bankruptcy Court entered the *Order (I) Approving the Sale of the Derivative Rights Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Approving the Assumption and Assignment of Certain Executory*

*Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* [Docket No. 1043] (the "Derivative Rights Sale Order").

On November 18, 2025, Warner Bros. filed a Notice of Appeal of the Derivative Rights Sale Order with the United States District Court for the District of Delaware (the "District Court"), Case No. 1:25-01405 (the "District Court Appeal"). Warner concurrently sought relief from the Bankruptcy Court to stay the Sale Order and on November 25, 2025, this Court entered an *Order Denying Warner Bros. Entertainment Inc.'s Emergency Motion to Stay Pending Appeal* [Docket No. 1118] (the "Stay Denial Order"). After entry of the Stay Denial Order, Warner filed *Warner Bros. Entertainment Inc.'s Emergency Motion for a Stay Pending Appeal* in the District Court Appeal [Dist. Ct. Docket No. 6] (the "District Court Stay Motion"). On December 23, 2025, the District Court issued a Memorandum Opinion and corresponding Order denying the District Court Stay Motion. *See* Dist. Ct. Docket Nos. 56 & 57. Also on December 23, 2025, Warner filed a notice of appeal of the District Court's Order denying the District Court Stay Motion with the United States Court of Appeals for the Third Circuit (the "Third Circuit"), Case No. 25-3555 (the "Third Circuit Appeal"). Warner contemporaneously filed the *Emergency Motion of Warner Bros. Entertainment Inc. for a Stay Pending Appeal* with the Third Circuit [Third Cir. Docket No. 4] (the "Third Circuit Stay Motion"). On December 24, 2025, the Third Circuit entered an Order [Third Cir. Docket No. 23] denying the Third Circuit Stay Motion. On December 31, 2025, *Warner filed Warner Bros. Entertainment Inc.'s Unopposed Motion for Voluntary Dismissal of Appeal* in the Third Circuit Appeal [Third Cir. Docket No. 26] and the Third Circuit entered an Order dismissing the Third Circuit Appeal [Third Cir. Docket No. 27].

On December 30, 2025, the Debtors filed the *Notice of Derivative Rights Assets Sale Closing* [Docket No. 1223], which provided notice to all parties in interest that the sale of the Debtors' Derivative Rights Assets to Alcon closed on December 29, 2025.

### H.     Bar Dates

On May 29, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Claims Arising Under Section 503(b)(9) of the Bankruptcy Code) and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 445] (the "Bar Date Motion"). On June 13, 2025, the Bankruptcy Court entered the *Order (I) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Claims Arising Under Section 503(b)(9) of the Bankruptcy Code) and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 514] (the "Bar Date Order") approving the Bar Date Motion.

The Bar Date Order provides, among other things, that each person or entity (excluding governmental units) that asserts a claim against the Debtors that arose (or is deemed to have arisen) before the Petition Date was required to file an original written Proof of Claim so that such Proof of Claim was actually received on or before July 18, 2025, at 5:00 p.m. (prevailing Eastern Time) (the "General Claims Bar Date"). All governmental units holding claims that arose (or is deemed to have arisen) before the Petition Date were required to file an original written Proof of Claim so that such Proof of Claim was actually received on or before September 15, 2025, at 5:00 p.m. (prevailing Eastern Time) (the "Government Claims Bar Date").

The Debtors have commenced the process of reviewing Proofs of Claim and may file one or more claims objections prior to the Effective Date. The Liquidation Trustee will continue the claims reconciliation process after the Effective Date as set forth in the Plan. Consequently, the Debtors anticipate that the figures set forth above in Article I.D, which reflect estimates of Allowed Claims, may change significantly following the claims reconciliation process.

I.      **The Warner Bros. Standing Motion**

On October 31, 2025, *Warner Bros. filed Warner Bros. Motion for an Order Granting Standing and Authorizing the Prosecution of Challenge Claims Against the Prepetition Senior Secured Notes Parties, and Certain Notes Debtors: the Derivative Rights Transferees* [Docket No. 1018] (the "Standing Motion"). The Standing Motion sought, among other things, to grant Warner Bros. authority to commence and prosecute certain claims and causes of action on behalf of the Debtors' Estates. On November 19, 2025, the Debtors filed the *Debtors' Objection to Warner's Motion for an Order Granting Standing and Authorizing the Prosecution of Challenge Claims* [Docket No. 1060], and the Senior Secured Notes Parties filed the *Noteholder Parties' Objection to Warner Bros.' Standing Motion* [Docket No. 1062]. On January 12, 2026, Warner Bros. voluntarily withdrew the Standing Motion. *See* Docket No. 1245.

IV.     **TREATMENT OF CLAIMS AND INTERESTS**

A.      **Unclassified Claims**

1.      Administrative Claims

Except to the extent that a Holder of an Allowed Administrative Claim agrees to a different treatment, each Holder of an Allowed Administrative Claim (other than a Professional Fee Claim) shall receive, in full and final satisfaction of such Claim, (1) Cash in an amount equal to such Allowed Administrative Claim in accordance with the following: (i) if Allowed on or prior to the Effective Date, then on the Effective Date or as soon as reasonably practicable thereafter, (ii) if not Allowed as of the Effective Date, then no later than forty-five (45) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or (iii) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; or (2) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

Except for Professional Fee Claims, and notwithstanding any prior Filing or Proof of Claim, Proofs of Claim seeking the allowance and payment of Administrative Claims must be Filed and served on the Debtors or the Liquidation Trustee (as applicable) and their counsel by no later than the Administrative Claims Bar Date pursuant to the procedures set forth in the Confirmation Order and the notice of the occurrence of the Effective Date. The burden of proof for the allowance of Administrative Claims remains on the Holder of the Administrative Claims.

**Except as otherwise provided in Articles II.B, II.C, or II.D of the Plan, holders of Administrative Claims that do not File and serve a Proof of Claim or application for payment of administrative expenses requesting the allowance of an Administrative Claim by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting Administrative Claims against the Debtors or the Liquidation Trustee, the Estates,**

**or the Debtors' assets and properties, and any Administrative Claims shall be deemed disallowed as of the Effective Date unless otherwise ordered by the Bankruptcy Court.**

### 2.    DIP Claims

Each Holder of a DIP Claim previously received payment in full and final satisfaction of such Claim.  As a result, all DIP Claims have been indefeasibly paid in full and shall not be entitled to any Plan Distributions, *provided* that any indemnification or other obligations existing following payoff of the DIP Facility pursuant to the documents governing payoff of the DIP Facility shall survive following the Effective Date, constitute Allowed Claims against the Debtors' estates, and, if applicable, be payable from the Liquidation Trust.

### 3.    ABS Claims

Each Holder of an ABS Claim previously received payment in full and final satisfaction of such Claim.  As a result, all ABS Claims have been indefeasibly paid in full and shall not be entitled to any Plan Distributions.

### 4.    Professional Fee Claims

#### a.    *Final Fee Applications and Payment of Professional Fee Claims*

All Professional Persons (other than OCPs) seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (1) file, on or before the date that is forty-five (45) days after the Confirmation Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred; and (2) be paid in full, in Cash, from the Professional Fee Reserve Account in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Professional Fee Claim. Objections to Professional Fee Claims must be Filed and served no later than twenty-one (21) days after the Filing of the Professional Fee Claim.

#### b.    *Administrative Claims of OCPs*

All requests for payment of Professional Fee Claims of OCPs shall be made pursuant to the OCP Order.  To the extent any Professional Fee Claims of the OCPs have not been Allowed pursuant to the OCP Order on or before the Effective Date, the amount of Professional Fee Claims owing to the OCPs shall be paid in Cash to such OCPs by the Debtor or the Liquidation Trustee (as applicable) from the Professional Fee Reserve Account as soon as reasonably practicable after such Professional Fee Claims are Allowed pursuant to the OCP Order.

#### c.    *Post-Confirmation Date Fees and Expenses*

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors, the Liquidation Trustee, or the GUC Trustee (as applicable) shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees

and expenses incurred by the Debtors or the Liquidation Trust (as applicable). Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or Liquidation Trust (as applicable) may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

d.    *Professional Fee Reserve Account*

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors or the Committee, as applicable, before and as of the Effective Date, and shall deliver such estimate to the Debtors no later than two (2) Business Days before the Effective Date; *provided*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professionals' final request for payment of Filed Professional Fee Claims. If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The Debtors shall fund and reserve the Professional Fee Reserve Account until payment in full of all Allowed Professional Fee Claims. If the Professional Fee Reserve Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, the remaining unpaid Allowed Professional Fee Claims shall be paid by the Liquidation Trust as Allowed Administrative Claims. For the avoidance of doubt, the Professional Fee Reserve Account cannot be used to pay any Secured, Priority, or Administrative Claims until all Professional Fee Claims are satisfied or otherwise reserved for.

5.    Priority Tax Claims

On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed Priority Tax Claim and the Debtors agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed Priority Tax Claim, each Holder thereof will be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

6.    U.S. Trustee Statutory Fees

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Liquidation Trust shall be liable to pay any and all Quarterly Fees when due and payable. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Liquidation Trustee shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. The Liquidation Trust shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee on account of each Debtor's Chapter 11 Case, and such fees shall be paid exclusively from the Liquidation Trust Assets, until the earliest of that Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Proof of Claim for an Administrative Claim in the Chapter 11 Cases, and shall not be treated as providing any release under the Plan.

26

**B.**     **Classified Claims**

    1.    <u>Class 1 – Other Secured Claims</u>

        a.    *Classification*:  Class 1 consists of all Other Secured Claims against the Debtors.

        b.    *Treatment*:   On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Other Secured Claim and the Debtors or the Liquidation Trustee, as applicable, agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed Other Secured Claim, each Holder thereof will receive: (a) payment in full in Cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; (c) reinstatement of such Claim; or (d) such other treatment rendering such Claim Unimpaired.

        c.    *Voting*:  Class 1 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Other Secured Claims are not entitled to vote to accept or reject the Plan.

    2.    <u>Class 2 – Other Priority Claims</u>

        a.    *Classification*:  Class 2 consists of all Other Priority Claims against the Debtors.

        b.    *Treatment*:   On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Other Priority Claim and the Debtors or the Liquidation Trustee, as applicable, agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed Other Priority Claim, each Holder thereof will receive: (a) payment in full in Cash; or (b) such other treatment rendering such Claim Unimpaired.

        c.    *Voting*:  Class 2 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

    3.    <u>Class 3A – Library Debtors General Unsecured Claims</u>

        a.    *Classification*:  Class 3 consists of Library Debtors General Unsecured Claims against the Library Debtors.

b.    *Treatment*:   On the Effective Date, or as soon as reasonably practicable thereafter, all Allowed Library Debtors General Unsecured Claims, other than the Warner Bros. Claims, will be paid in full from the Library Reserve, unless the Holder of an Allowed Library Debtors General Unsecured Claim and the Debtors or the Liquidation Trustee, as applicable, agree to less favorable treatment for such Holder, in full and final satisfaction of its Allowed Library Debtors General Unsecured Claim.  Once the Warner Bros. Claims have been determined by Final Order or by agreement of the parties and become Allowed (if at all, or in whole or in part), the Warner Bros. Claims will be paid in full in the Allowed amount, first from the Warner Bros. Reserve, and second, to the extent that the Warner Bros. Reserve is insufficient to satisfy the Warner Bros. Claims, from the Library Reserve.

c.    *Voting*: Class 3A is Unimpaired, and Holders of Library Debtors General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.   Therefore, Holders of Class 3 Library Debtors General Unsecured Claims are not entitled to vote to accept or reject the Plan.

4.    <u>Class 3B – Non-Library Debtors General Unsecured Claims</u>

a.    *Classification*:   Class 3B consists of the Non-Library Debtors General Unsecured Claims against the Non-Library Debtors.

b.    *Treatment*:  On or prior to the Effective Date, the Debtors will fund the GUC Trust with the GUC Trust Amount and the GUC Trust Initial Funding Amount.  Except to the extent that a Holder of an Allowed Non-Library Debtors General Unsecured Claim and the Debtors or the Liquidation Trustee, as applicable, agree to less favorable treatment for such Holder, in full and final satisfaction of its Allowed Non-Library Debtors General Unsecured Claim, each Holder thereof will receive 85% of its Allowed Claim from the GUC Trust Net Amount; *provided*, for the avoidance of doubt, that if the value of the GUC Trust Net Amount exceeds the GUC Recovery, such excess amount shall be distributed to the Liquidation Trust for the sole and exclusive benefit of Holders of Senior Secured Notes Claims; *provided further*, that if the value of the GUC Trust Net Amount is less than the GUC Recovery, the Debtors or the Liquidation Trust, as applicable, shall fund the shortfall to the GUC Trust immediately upon request solely to the extent of available Liquidation Trust Assets.  The GUC Trust Fees and Expenses shall not exceed the GUC Trust Initial Funding Amount in the aggregate from any funding source.

28

c.    *Voting*:  Class 3B is Impaired, and Holders of Non-Library Debtors General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.    <u>Class 4 – Senior Secured Notes Claims</u>

a.    *Classification*:  Class 4 consists of all Senior Secured Notes Claims.

b.    *Allowance*: Senior Secured Notes Claims shall be deemed Allowed in the principal amount of $157,288,992.00, plus all accrued and unpaid interest as of the Petition Date, and reasonable and documented fees, expenses, and other amounts arising and payable under and in accordance with the Senior Secured Notes Credit Documents.

c.    *Treatment*:  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of a Senior Secured Notes Claim and the Debtors agree to less favorable treatment for such Holder, in full and final satisfaction of the Senior Secured Notes Claims, shall receive distributions from the Liquidation Trust in accordance with the waterfall set forth in Section 12.5 Application of Proceeds in the Senior Secured Notes Agreement, as amended by the Senior Secured Notes Prepetition Amendment, as more fully set forth in the Liquidation Trust Agreement.

d.    *Voting*:  Class 4 is Impaired, and Holders of Senior Secured Notes Claims are entitled to vote to accept or reject the Plan.

6.    <u>Class 5 – Intercompany Claims</u>

a.    *Classification*:  Class 5 consists of Intercompany Claims between and among the Debtors.

b.    *Treatment*:  On the Effective Date, all Intercompany Claims shall either be settled, discharged, canceled, or released without any distribution, on account of such Intercompany Claims, and be of no further force or effect.

c.    *Voting*:  Class 5 is Impaired, and Holders of Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 5 Intercompany Claims are not entitled to vote to accept or reject the Plan.

7.      <u>Class 6 – Existing Equity Interests</u>

        a.     *Classification*:  Class 6 consists of all Existing Equity Interests in the Debtors.

        b.     *Treatment*:  On the Effective Date, all Existing Equity Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Existing Equity Interests shall not receive any distribution, property or other value under the Plan on account of such Interest.

        c.     *Voting*:  Class 6 is Impaired, and Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 6 Existing Equity Interests are not entitled to vote to accept or reject the Plan.

8.      <u>Class 7 – Intercompany Interests</u>

        a.     *Classification*:  Class 7 consists of all Intercompany Interests in the Debtors.

        b.     *Treatment*:  On the Effective Date, all Intercompany Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Intercompany Interests shall not receive any distribution, property, or other value under the Plan on account of such Interest.

        c.     *Voting*:  Class 7 is Impaired, and Holders of Intercompany Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 7 Intercompany Interests are not entitled to vote to accept or reject the Plan.

**C.      Special Provisions Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Liquidation Trustee with respect to any Unimpaired Claims, including all legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**D.      Elimination of Vacant Classes**

Any Class that, as of the commencement of the Combined Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

E.    **Voting Classes; Presumed Acceptance by Non-Voting Classes**

With respect to each Debtor, if a Class contains Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

F.    **Controversy Concerning Impairment**

If a controversy arises as to whether any Claim or any Class of Claims is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the date of the Combined Hearing.

G.    **Subordination of Claims**

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, contract (including, without limitation, under the Senior Secured Notes Credit Documents), section 510(b) of the Bankruptcy Code, or otherwise.

H.    **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to this Article III of the Plan.  The Debtors request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Class that is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  The Debtors reserve the right to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any voting Class that votes to reject the Plan.

I.    **Insurance**

Notwithstanding anything to the contrary in the Plan, if any Claim is subject to coverage under an Insurance Policy, payments on account of such Claim will first be made from proceeds of such Insurance Policy in accordance with the terms thereof, with the balance of such Claim, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

V.    **MEANS FOR IMPLEMENTATION OF THE PLAN**

A.    **General Settlement of Claims and Interests**

To the extent provided by the Bankruptcy Code, and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such

Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

### B.    Liquidation Transactions

On the Effective Date, or as soon as reasonably practicable thereafter, the Liquidation Trustee shall take all actions as may be necessary or appropriate to effectuate the Liquidation Transactions, including, without limitation: (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) such other transactions that are required to effectuate the Liquidation Transactions; (e) all transactions necessary to provide for the purchase of some or all of the assets of, or Interests in, any of the Debtors which purchase may be structured as a taxable transaction for United States federal income tax purposes; and (f) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

### C.    Sale Transactions

On or after the Confirmation Date, the Debtors shall be authorized to take all actions as may be deemed necessary or appropriate to consummate any Sale Transactions pursuant to the terms of the Plan, the Sale Orders, any Sale Documents, and the Confirmation Order, and any such Sale Transactions shall be free and clear of any Liens, Claims, Interests, and encumbrances pursuant to sections 363 and 1123 of the Bankruptcy Code as of the earlier of (i) the closing date of such Sale Transaction and (ii) the Effective Date.

### D.    The Liquidation Trust

On the Effective Date, the Debtors, on their own behalf and on behalf of the Liquidation Trust Beneficiaries, and the Liquidation Trustee shall execute the Liquidation Trust Agreement and take all other steps necessary to establish the Liquidation Trust pursuant to the Liquidation Trust Agreement and Article VIII of the Plan.  On the Effective Date, and in accordance with and pursuant to the terms of the Plan, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Liquidation Trust all of their rights, title, and interests in all of the Liquidation Trust Assets and, in accordance with Section 1141 of the Bankruptcy Code, the Liquidation Trust Assets shall automatically vest in the Liquidation Trust free and clear of all Claims, Liens, encumbrances or interests, subject to the terms of the Liquidation Trust Agreement.

To the extent that any conflict or inconsistency arises between the terms of the Plan or the Confirmation Order and the Liquidation Trust Agreement concerning the governance, administration, operation, or management of the Liquidation Trust or the rights and duties of the Liquidation Trustee, the terms of the Plan and the Confirmation Order shall govern and control in all respects.

### E.    The Committee Settlement

The Debtors, the Committee, and the Senior Secured Noteholders engaged in extensive and good faith negotiations, which culminated in an agreement to the terms of the Committee Settlement which shall be effectuated pursuant to the Plan.  The Committee Settlement provides for the following, in summary:

1.    The Debtors and the Committee shall form the GUC Trust, to be administered by the GUC Trustee for the benefit of Holders of Allowed Non-Library Debtors General Unsecured Claims.

2.    Each Holder of Allowed Non-Library Debtors General Unsecured Claims shall receive a recovery of 85% of its Allowed Claims.

3.    The Debtors shall pay (i) the GUC Trust Amount and (ii) the GUC Trust Initial Funding Amount to the GUC Trust on the Effective Date.

4.    If the GUC Trust Net Amount exceeds the GUC Recovery, such excess amount shall be distributed to the Liquidation Trust solely and exclusively for the benefit of Holders of Allowed Senior Secured Notes Claims.  If the GUC Trust Net Amount is less than the GUC Recovery, the shortfall will be funded to the GUC Trust by the Debtors or the Liquidation Trust solely to the extent of available Liquidation Trust Assets.

5.    The reconciliation process for Non-Library Debtors General Unsecured Claims shall take no more than 60 days after the Effective Date, subject to reasonable requests for extension by the Liquidation Trustee with the written consent of the Senior Secured Notes Parties.  The Debtors agree to begin the claims reconciliation process for the Non-Library Debtors General Unsecured Claims as soon as practicable, including promptly after the Bar Date.

6.    The Debtors shall waive all preference claims against Holders of Allowed Non-Library Debtors General Unsecured Claims and, for the avoidance of doubt, such claims shall not be Retained Causes of Action.

7.    The Committee shall fully release the Debtors and each of the Senior Secured Notes Parties, and the Debtors and the Committee shall be afforded maximum exculpation allowed under law.

Section 105(a) provides, in relevant part, that "[t]he court may issue any order . . . necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).  In turn,

Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The compromise or settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged and "generally favored in bankruptcy." *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006).

The Third Circuit has enumerated four factors that should be considered in determining whether a settlement should be approved. The four enumerated factors are "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

"[T]he decision whether to approve a compromise under [Bankruptcy] Rule 9019 is committed to the sound discretion of the Court, which must determine if the compromise is fair, reasonable, and in the interest of the estate." *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997). Courts should not, however, substitute their judgment for that of the debtor, but instead should canvas the issues to see whether the compromise falls below the lowest point in the range of reasonableness. *See In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986); *In re W.T. Grant and Co.*, 699 F.2d 599, 608 (2d Cir. 1983); *see also In re World Health*, 344 B.R. at 296 ("[T]he court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is 'within the reasonable range of litigation possibilities.'") (internal citations and quotations omitted).

In the Debtors' judgment—with which the Committee and the Senior Secured Noteholders agree—the Committee Settlement is reasonable and in the best interest of the Debtors, their estates, creditors and all parties in interest. The Committee Settlement was the product of good-faith and arm's-length negotiations between the parties. The Committee Settlement resolves once and for all the disputes regarding potential outstanding objections to the Senior Secured Notes Claims and a possible standing litigation in an efficient, consensual, and cost-effective manner that will avoid litigation and the uncertainty it involves. As a result of the Committee Settlement, each Holder of an Allowed Non-Library Debtors General Unsecured Claim will receive an assured recovery in Class 3B that would either be unlikely or the result of substantial, costly and time-consuming litigation, absent the Committee Settlement. The Debtors have reasonably determined that entry into the Committee Settlement is in the best interests of the estates and reflects a fair and reasonable compromise. Furthermore, the Committee and the Senior Secured Noteholders support the Committee Settlement. Accordingly, the *Martin* factors are met, the Committee Settlement falls well within the lowest "range of reasonableness" and, therefore, the Committee Settlement should be approved pursuant to Bankruptcy Rule 9019.

## F.    The GUC Trust

On the Effective Date, the Debtors and the GUC Trustee shall execute the GUC Trust Agreement and take all other steps necessary to establish the GUC Trust pursuant to the GUC Trust Agreement and Article IX of the Plan. On the Effective Date, and in accordance with and pursuant to the terms of the Plan, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the GUC Trust all of their rights, title, and interests in the GUC Trust Amount and GUC Trust Initial Funding Amount, in accordance with Section 1141 of the

Bankruptcy Code, the GUC Trust Amount and GUC Trust Initial Funding Amount shall automatically vest in the GUC Trust free and clear of all Claims, Liens, encumbrances or interests, subject to the terms of the GUC Trust Agreement.

To the extent that any conflict or inconsistency arises between the terms of the Plan or the Confirmation Order and the GUC Trust Agreement concerning the governance, administration, operation, or management of the GUC Trust or the rights and duties of the GUC Trustee, the terms of the GUC Trust Agreement shall govern and control in all respects; *provided, however*, that nothing in this provision shall alter or impair any substantive rights or treatment provided for under the Plan to any creditor or party in interest.

### G.    Sources of Consideration for Plan Distributions

Subject to the provisions of the Plan concerning the Professional Fee Reserve Account, the Debtors, the Liquidation Trustee or the GUC Trustee, as applicable, shall fund distributions under the Plan with Cash on hand on the Effective Date and the Debtors' other assets.

### H.    Dissolution of the Debtors

On or as soon as reasonably practicable after the Effective Date and after transfer of all Liquidation Trust Assets to the Liquidation Trust, the Liquidation Trustee shall ensure that the Debtors shall be disposed of, dissolved, wound down, or liquidated under applicable Law, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, and neither the Liquidation Trustee nor the Debtors shall be required to pay any taxes or fees to cause such dissolutions.

### I.    Preservation of Causes of Action

Except as otherwise provided in any contract, instrument, release, or agreement entered into in connection with the Plan or the Sale, in accordance with section 1123(b) of the Bankruptcy Code, all Retained Causes of Action are preserved and shall vest in the Liquidation Trust on the Effective Date; *provided*, *however*, that no Causes of Action shall be retained or preserved against the Released Parties.  No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Liquidation Trust will not pursue any and all available Causes of Action of the Debtors against it.

### J.    Corporate Action

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Liquidation Transactions; (2) the establishment of the Liquidation Trust and execution of the Liquidation Trust Agreement; (3) the establishment of the GUC Trust and execution of the GUC Trust Agreement; (4) the funding of all applicable escrows and accounts; and (5) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date); *provided* that, with respect to any Sale Transactions consummated prior to the Effective Date, all actions necessary to consummate such Sale Transaction in accordance

with the terms of the applicable Sale Order shall be deemed authorized and approved by the Bankruptcy Court as of the closing date applicable to such Sale Transaction.

K.    **Cancellation of Existing Securities and Agreements**

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, securities and other documents evidencing any Claim or Interest, and any rights of any Holder in respect thereof, shall be deemed cancelled and of no further force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged and, as applicable, shall be deemed to have been surrendered to the Liquidation Trust.  The holders of or parties to such cancelled instruments, securities, and other documentation shall have no rights arising from or related to such instruments, securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan; *provided*, *however*, that notwithstanding the occurrence of the Effective Date, the Senior Secured Notes Credit Documents shall continue in effect solely for the purposes of, (a) to the extent not previously paid in full, allowing holders of Senior Secured Notes Claims to receive and accept their respective distributions under the Plan on account of such Senior Secured Notes Claims; and (b) allowing and preserving the rights of the Senior Secured Notes Parties to (1) assert or maintain any rights such parties may have against any money or property distributable or allocable to holders of Senior Secured Notes Claims, including, without limitation, any intercreditor rights; (2) receive compensation or reimbursement for any reasonable and documented fees and expenses incurred in connection with the implementation, consummation, and defense of the Plan, the Plan Supplement, or Confirmation Order; (3) preserve, maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or subrogation, or any other claim or entitlement that the Senior Secured Notes Parties may have under the Plan, the Plan Supplement, the Confirmation Order, the Senior Secured Notes Credit Documents, or any other related agreement; (4) preserve the rights of the Senior Secured Notes Parties to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including, without limitation, to enforce any right or obligation owed to the Senior Secured Notes Parties under the Plan, the Plan Supplement, the Confirmation Order, or other documents incorporated therein; and (5) execute documents pursuant to the Plan.

L.    **Effectuating Documents; Further Transactions**

Upon entry of the Confirmation Order, the Debtors or the Liquidation Trustee (as applicable) shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, consents, certificates, resolutions, programs, and other agreements or documents, and take such acts and actions as may be reasonable, necessary, or appropriate to effectuate, implement, consummate, and/or further evidence the terms and conditions of the Plan and any transactions described in or contemplated by the Plan.  The Debtors or the Liquidation Trustee (as applicable), all Holders of Claims receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

**M.      Section 1146 Exemption from Certain Taxes and Fees**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan or the Sale Transactions shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall comply with the requirements of section 1146(a) of the Bankruptcy Code and forgo the collection of any such tax, recordation fee, or governmental assessment and accept for filing and recordation all such instruments or other documents governing or evidencing such transfers without the payment of any such tax, recordation fee, or governmental assessment.

**N.      Sale Orders**

Notwithstanding anything to the contrary in the Plan, nothing in the Plan shall affect, impair or supersede the Sale Orders, each of which remains in full force and effect and governs in the event of any inconsistency with the Plan.

**O.      Authority to Act**

Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under the Plan that would otherwise require approval of the stockholders, security holders, officers, directors, or other owners of the Debtors shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as applicable) pursuant to the applicable law of the state(s) in which the Debtors are formed, without any further vote, consent, approval, authorization, or other action by such stockholders, security holders, officers, directors, or other owners of the Debtor or notice to, order of, or hearing before, the Bankruptcy Court.

**P.      Transfer of Privilege/No Waiver**

On the Effective Date, the Debtors' evidentiary privileges, including but not limited to the attorney/client privilege, relating to (i) the amount, validity, or allowability of any Disputed Claim; and (ii) the Liquidation Trust Assets, shall be deemed transferred to the Liquidation Trustee and the Liquidation Trust; *provided, however*, counsel to the Debtors that are Retained Professionals shall not be required to turn over work product existing as of the Effective Date.  The Plan shall be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief.  Upon such transfer, the Debtors and the Estates shall have no other further rights or obligations with respect thereto.  Nothing in the Plan nor any actions taken by the Debtors or the Liquidation Trustee pursuant hereto shall be deemed a waiver of any privilege or immunity of the Debtors or the Liquidation Trustee and the Liquidation Trust, including any attorney-client privilege, joint interest privilege, or work product privilege attaching to any documents or communications (whether written or oral).

**Q.      Final Decree**

At any time following the Effective Date, the Liquidation Trustee shall have the power and authority to file a motion with the Bankruptcy Court seeking the entry of a Final Decree closing

any of the Chapter 11 Cases in accordance with section 350(a) of the Bankruptcy Code, Bankruptcy Rule 3022, and Local Rule 3022-1(a).

## VI.    TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided in the Plan (which exclusion includes the Indemnification Obligations and the D&O Liability Insurance Policies), all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court or not included on the Schedule of Assumed Executory Contracts and Unexpired Leases, will be deemed rejected, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code other than those Executory Contracts or Unexpired Leases that are the subject of a motion to assume that is pending on the Confirmation Date, or are subject to an unresolved cure dispute as of the Effective Date (and shall be assumed, assumed and assigned, or rejected, as applicable, upon the resolution of such cure dispute in accordance with the Sale Documents).

Assumption of any Executory Contract or Unexpired Lease pursuant to the Sale Documents or the Plan, and payment of any cure amounts relating thereto, shall, upon satisfaction of the applicable requirements of section 365 of the Bankruptcy Code, result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults or provisions restricting the change in control of ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

### B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order results in a Claim, then, unless otherwise ordered by the Court, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Estates, the Liquidation Trust or the GUC Trust, or any of their respective assets and properties unless a Proof of Claim is Filed with the Notice and Claims Agent and served upon counsel to the Liquidation Trustee and the GUC Trustee within thirty (30) days of the Effective Date.

The foregoing applies only to Claims arising from the rejection of an Executory Contract or Unexpired Lease under the Plan and Confirmation Order; any other Claims held by a party to a rejected Executory Contract or Unexpired Lease shall have been evidenced by a Proof of Claim Filed by the applicable Bar Date or shall be barred and unenforceable. Claims arising from the rejection of Executory Contracts or Unexpired Leases under the Plan and Confirmation Order shall be classified as General Unsecured Claims and shall, if Allowed, be treated in accordance with the provisions in the Plan.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order that are not timely Filed within thirty (30) days of the Effective Date will be disallowed automatically, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Estates, the Liquidation Trust, the GUC Trust, or any of their respective assets and properties.

A Proof Claim with respect to any Claim arising from the rejection of an Executory Contract where any Debtor is a licensor of intellectual property must identify whether the Claimant (i) elects to treat the Executory Contract as terminated by virtue of the rejection, or (ii) elects to assert its Elected Section 365(n) Rights. If a Claimant who is a counterparty to a rejected Executory Contract where any Debtor was a licensor of intellectual property either (i) fails to timely file a Proof of Claim within thirty (30) days of the Effective Date, or (ii) fails to specify that such Claimant has elected to assert its Elected Section 365(n) Rights, such Claimant shall be deemed to have elected to treat such Executory Contract as terminated pursuant to section 365(n)(1)(A) of the Bankruptcy Code.

### C.  Reservation of Rights

Neither the exclusion or inclusion of any contract or lease in the Schedules or in any Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors have any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Liquidation Trustee (as applicable) may elect within thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease under the Plan by filing a notice of such election on the docket of these Chapter 11 Cases.

### D.  Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or Liquidation Trust (as applicable) under such Executory Contracts or Unexpired Leases.  In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors and the Liquidation Trustee (as applicable) expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties, indemnity or continued maintenance obligations.  The Debtors also expressly reserve any and all rights with respect to the applicability (or non-applicability) of any non-bankruptcy laws to the contrary.

### E.  D&O Liability Insurance Policies

Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) shall be treated as an Executory Contract under the Plan and shall be assumed, in its entirety, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 105, 365, and 1123 of the Bankruptcy Code.  For the avoidance of doubt, coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in the D&O Liability Insurance Policies.  In addition, after the Effective Date, all officers, directors, agents, or employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies (including any "tail" policy) in effect or purchased as of the Effective Date for the full term of such policy regardless of whether such officers, directors, agents, and/or

39

employees remain in such positions after the Effective Date, in each case, to the extent set forth in the D&O Liability Insurance Policies.

The Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date and shall continue such policies and satisfy their obligations thereunder in full in the ordinary course of business.

### F.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Modifications, amendments, supplements, and restatements to a prepetition Executory Contract and/or Unexpired Lease that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease.

### G.    Nonoccurrence of the Effective Date

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

## VII.    PROVISIONS GOVERNING DISTRIBUTIONS

### A.    Plan Distributions on Account of Claims Allowed as of the Effective Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests.  The Disbursing Agent shall have no obligation to recognize any ownership transfer of the Claims or Interests occurring on or after the Confirmation Date.  The Disbursing Agent shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

Except as otherwise provided in the Plan, the Disbursing Agent shall make distributions to Holders of Allowed Claims or as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, that the manner of such distributions shall be determined at the discretion of the Debtors, the Liquidation Trustee or the GUC Trustee (as applicable); *provided further*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder or, if no Proof of Claim was Filed, the address set forth in the Debtors' books and records on the Distribution Record Date.

### B.    Compliance with Tax Requirements

In connection with the Plan, any Person issuing any instrument or making any distribution or payment in connection therewith, shall comply with all applicable withholding and reporting

requirements imposed by any federal, state, provincial, local, or foreign taxing authority. In the case of a non-Cash distribution that is subject to withholding, the distributing party may require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution or withhold an appropriate portion of such distributed property and either (1) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax) or (2) pay the withholding tax using its own funds and retain such withheld property. The distributing party shall have the right not to make a distribution under the Plan until its withholding or reporting obligation is satisfied pursuant to the preceding sentences. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipients for all purposes of the Plan.

Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the withholding agent or such other Person designated by the Liquidation Trustee the appropriate IRS Form or other tax forms or documentation requested by the Liquidation Trustee to reduce or eliminate any required federal, state, or local withholding. If the party entitled to receive such property as an issuance or distribution fails to comply with any such request for a 90 day period beginning on the date after the date such request is made, the amount of such issuance or distribution shall irrevocably revert to the Liquidation Trustee and any Claim in respect of such distribution under the Plan shall be discharged and forever barred from assertion against such Debtor, the Liquidation Trustee, or their respective property.

Notwithstanding the above, each Holder of an Allowed Claim or Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Plan Distribution, and further including, in the case of a Holder of a Disputed Claim that has become an Allowed Claim, any tax obligation that would be imposed on the Liquidation Trust Assets or the Liquidation Trust, in connection with such Plan Distribution.

### C.    Date of Plan Distributions

Plan Distributions made after the Effective Date to Holders of Allowed Claims shall be deemed to have been made on the Effective Date and no interest shall accrue or be payable with respect to such Claims or any distribution related thereto. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### D.    Disbursing Agent

Except as otherwise provided in the Plan, all distributions under the Plan shall be made by the Disbursing Agent on or after the Effective Date. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. If the Disbursing Agent is otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Liquidation Trust.

### E.    Rights and Powers of Disbursing Agent

The Disbursing Agent may (1) effect all actions and execute all agreements, instruments, and other documents necessary to carry out the provisions of the Plan; (2) make all distributions contemplated by the Plan; and (3) perform such other duties as may be required of the Disbursing Agent pursuant to the Plan.

### F.    Surrender of Instruments

As of the Effective Date, and subject to Article IV.K. of the Plan, each Holder of a certificated instrument or note related to the Debtors shall be deemed to have surrendered such instrument or note held by it to the Liquidation Trustee or its designee, as applicable.

### G.    Delivery of Plan Distributions and Undeliverable or Unclaimed Plan Distributions

Subject to applicable Bankruptcy Rules, all distributions to Holders of Allowed Claims shall be made by the Disbursing Agent, who shall transmit such distributions to the applicable Holders of Allowed Claims or their designees.

The Liquidation Trustee and the GUC Trustee shall each only be required to act and make Plan Distributions in accordance with the terms of the Plan.  Except on account of gross negligence, fraud, illegality or willful misconduct, the Liquidation Trustee has no (i) liability to any party for actions taken in accordance with the Plan or in reasonable reliance upon information provided to it in accordance with the Plan, or (ii) obligation or liability for Plan Distributions to any party who does not hold a Claim against one or more of the Debtors as of the Distribution Record Date or any other date on which a Plan Distribution is made or who does not otherwise comply with the terms of the Plan.

Except as otherwise provided in a Final Order or as agreed by the relevant parties, Plan Distributions on account of Disputed Claims, if any, that become Allowed, shall be made, as applicable (i) by the Liquidation Trustee at such periodic intervals as the Liquidation Trustee determines to be reasonably prudent, or (ii) by the GUC Trustee at such periodic intervals as the GUC Trustee determines to be reasonably prudent.

Notwithstanding anything in the Plan to the contrary: (a) no Plan Distribution shall be made with respect to any Disputed Claim until and only to the extent such Claim becomes an Allowed Claim (as applicable), and (b) unless agreed otherwise by the Liquidation Trustee, no Plan Distribution shall be made to any Person that holds both an Allowed Claim and a Disputed Claim until such Person's Disputed Claims have been resolved by settlement or Final Order.

Any Entity which fails to claim any Cash within 90 days from the date upon which a Plan Distribution is first made to such entity shall forfeit all rights to such Plan Distribution, and the Liquidation Trustee shall be authorized to cancel any Plan Distribution that is not timely claimed. Pursuant to section 347(b) of the Bankruptcy Code, upon forfeiture, such Cash (including interest thereon, if any) shall revert to the Liquidation Trust or GUC Trust, as applicable, free of any restrictions under the Plan, the Bankruptcy Code or the Bankruptcy Rules.  Upon forfeiture, the claim of any Creditor or Interest Holder with respect to such funds shall be irrevocably waived

and forever barred against the Debtors, their Estates, the Liquidation Trust, the Liquidation Trustee, the GUC Trust, and the GUC Trustee, notwithstanding any federal or state escheat laws to the contrary, and such Creditor or Interest Holder shall have no claim whatsoever against any of the foregoing or against any Holder of a Claim to whom Plan Distributions are made.

The Liquidation Trustee or the GUC Trustee, as applicable, shall make one attempt to make the Plan Distributions contemplated hereunder in accordance with the procedures set forth in the Plan. The Liquidation Trustee or the GUC Trustee, as applicable, in its sole discretion may, but shall have no obligation to, attempt to locate Holders of undeliverable Plan Distributions. Any Plan Distributions returned to the Liquidation Trustee or the GUC Trustee, as applicable, as undeliverable or otherwise shall remain in the possession of the Liquidation Trust or the GUC Trust, as applicable, until such time as a Plan Distribution becomes deliverable, and no further Plan Distributions shall be made to such Holder unless such Holder notifies the Liquidation Trustee or GUC Trustee, as applicable, of its then current address. Any Holder of an Allowed Claim entitled to a Plan Distribution that does not assert a claim pursuant to the Plan for an undeliverable Plan Distribution, or notify the Liquidation Trustee or the GUC Trustee, as applicable, of such Holder's then current address, within 30 days of such Plan Distribution shall have its claim for such undeliverable Plan Distribution irrevocably waived and shall be forever barred from asserting any such claim against the Debtors, their Estates, the Liquidation Trust, the Liquidation Trustee, the GUC Trust, and/or the GUC Trustee or their respective property, and such Plan Distribution shall be deemed unclaimed property.

## H.    Manner of Payment

Except as specifically provided in the Plan, at the option of the Debtors, the Liquidation Trustee or the GUC Trustee as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

## I.    Foreign Currency Exchange Rate

As of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal*, on the Petition Date.

## J.    Minimum Plan Distribution

No payment of Cash in an amount of less than one hundred U.S. dollars ($100.00) shall be required to be made on account of any Allowed Claim. Such undistributed amount may instead be used in accordance with the Plan. If the Cash available for the final distribution is less than the cost to distribute such funds, the Liquidation Trustee may donate such funds to the unaffiliated charity of its choice.

## K.    Allocations

Except as otherwise provided in the Plan or as otherwise required by law, distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim

43

(as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

**L.    Plan Distributions Free and Clear**

Except as otherwise provided in the Plan, any distribution or transfer made under the Plan, including distributions to any Holder of an Allowed Claim, shall be free and clear of any Liens, Claims, encumbrances, charges, and other interests, and no other entity shall have any interest, whether legal, beneficial, or otherwise, in property distributed or transferred pursuant to the Plan.

**M.    Claims Paid or Payable by Third Parties**

1.    <u>Claims Paid by Third Parties</u>

If a Holder of a Claim receives a payment or other satisfaction of its Claim other than through the Debtors, the Liquidation Trustee and/or the GUC Trustee (as applicable) on account of such Claim, such Claim shall be reduced by the amount of such payment or satisfaction without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, and if the Claim was paid or satisfied in full other than through the Debtors the Liquidation Trustee and/or the GUC Trustee (as applicable), then such Claim shall be disallowed and any recovery in excess of a single recovery in full shall be paid over to the Liquidation Trust without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment or satisfaction from a party that is not the Debtors and/or the Liquidation Trustee (as applicable) on account of such Claim, such Holder shall, within fourteen (14) Business Days of receipt thereof, repay or return the distribution to the Debtors or Liquidation Trust (as applicable), to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

2.    <u>Claims Payable by Third Parties</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy.  Except as set forth in Article X in the Plan, nothing in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity, including the Liquidation Trust, may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained in the Plan

constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### N.      No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

## VIII.   PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

### A.      Allowance of Claims

After the Effective Date, the Liquidation Trustee shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date.

### B.      Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Effective Date, pursuant to the Liquidation Trust Agreement, the Liquidation Trustee shall have the sole authority to: (1) File, withdraw, or litigate to judgment, objections to all Claims or Interests; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. The Liquidation Trustee shall succeed to any pending objections to Claims filed by the Debtors prior to the Effective Date, and shall have and retain any and all rights and defenses the Debtors had immediately prior to the Effective Date with respect to any Disputed Claim. The Liquidation Trustee shall provide status reports to the GUC Trustee upon reasonable request with respect to the status of resolution of Class 3 Claims, but not less than quarterly.

### C.      Estimation of Claims and Interests

Before or after the Effective Date, the Debtors or the Liquidation Trust (as applicable) may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.

Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged or disallowed from the claims register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero U.S. dollars ($0.00) unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim

for all purposes under the Plan (including for purposes of distributions), and the Debtors or the Liquidation Trustee (as applicable) may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

### D.    Adjustment to Claims or Interests Without Objection

Any Claim that has been paid, satisfied, or assumed by a Purchaser in the respective Sale, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or the Liquidation Trustee (as applicable) without an objection to such Claim having to be Filed following notice filed on the docket in the Bankruptcy Court of such adjustment or expungement.

### E.    Time to File Objections to Claims

Except as otherwise provided in the Plan, any objections to Claims shall be Filed on or before the Claims Objection Bar Date (as such date may be extended upon presentment of an order to the Bankruptcy Court by the Liquidation Trustee).

### F.    Disallowance of Claims or Interests

Except as provided in the Plan or otherwise agreed to by the Debtors or the Liquidation Trustee (as applicable), any Holder of a Claim Filed, via Proof of Claim, after the Bar Date shall not be treated as a creditor for purposes of Plan Distributions pursuant to Bankruptcy Rule 3003(c)(2) or otherwise receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

### G.    Disputed Claims Process

All Claims held by Persons or Entities against whom or which the Debtors have commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549, or 550 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 548, 549 or 724(a) of the Bankruptcy Code shall be deemed Disputed Claims pursuant to section 502(d) of the Bankruptcy Code and Holders of such Claims shall not be entitled to vote to accept or reject the Plan.  A Claim deemed Disputed pursuant to this Article VII.G shall continue to be Disputed for all purposes until the relevant proceeding against the Holder of such Claim has been settled or resolved by a Final Order and any sums due to the Debtors or the Liquidation Trustee from such Holder have been paid.

### H.    No Plan Distributions Pending Allowance

If an objection to a Claim, Proof of Claim, or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim, Proof of Claim, or portion thereof unless and until the Disputed Claim becomes an Allowed Claim.

### I.    Plan Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of

the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim.  No interest shall accrue or be paid on any Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Claim.

### J.    Amendments to Claims

On or after the Effective Date, a Claim may not be Filed or amended to increase liability or to assert new liabilities without the prior authorization of the Bankruptcy Court or the Liquidation Trustee.

## IX.    LIQUIDATION TRUST AND LIQUIDATION TRUSTEE

### A.    Liquidation Trust Creation

On the Effective Date, a Liquidation Trust shall be established and become effective for the benefit of the Liquidation Trust Beneficiaries.  The Liquidation Trust Agreement shall contain customary provisions for trust agreements utilized in comparable circumstances, including any and all provisions necessary to ensure continued treatment of the Liquidation Trust as a grantor trust and the Liquidation Trust Beneficiaries as the grantors and owners thereof for federal income tax purposes.  On the Effective Date, the Liquidation Trustee will be designated by the Debtors and appointed in accordance with the terms of the Plan and the Liquidation Trust Agreement.  The rights, responsibilities, and duties of the Liquidation Trustee are set forth in the Liquidation Trust Agreement.  Notwithstanding anything contained in the Plan or the Liquidation Trust Agreement, the Liquidation Trustee shall always act consistently with, and not contrary to, the purpose of the Liquidation Trust as set forth in the Plan.

All relevant parties (including the Debtors, the Liquidation Trustee, and the Liquidation Trust Beneficiaries) will take all actions necessary to cause title to the Liquidation Trust Assets to be transferred to the Liquidation Trust.  The powers, authority, responsibilities, and duties of the Liquidation Trust and the Liquidation Trustee are set forth in and will be governed by the Liquidation Trust Agreement, the Plan, and the Confirmation Order.

### B.    Purpose of the Liquidation Trust

The Liquidation Trust will be established, as a liquidating trust in accordance with Treasury Regulation Section 301.7701-4(d), for the primary purposes of maximizing the value of its assets and making distributions in accordance with the Plan, Confirmation Order, and the Liquidation Trust Agreement, including resolving any Disputed Claims not to be resolved by the Debtors prior to the Effective Date and winding down the Debtors.  The Liquidation Trust will have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust.

### C.   Transfer of Assets to the Liquidation Trust

The Debtors and the Liquidation Trustee will establish the Liquidation Trust on behalf of the Liquidation Trust Beneficiaries pursuant to the Liquidation Trust Agreement, with the Liquidation Trust Beneficiaries to be treated as the grantors and deemed owners of the Liquidation Trust Assets.  The Debtors will irrevocably transfer, assign, and deliver to the Liquidation Trust, on behalf of the Liquidation Trust Beneficiaries, all of their rights, title, and interests in the Liquidation Trust Assets.  The Liquidation Trust will accept and hold the Liquidation Trust Assets in the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries, subject to the Plan and the Liquidation Trust Agreement.

On the Effective Date, all Liquidation Trust Assets will vest and be deemed to vest in the Liquidation Trust in accordance with section 1141 of the Bankruptcy Code or as otherwise set forth in the Liquidation Trust Agreement; *provided, however*, that the Liquidation Trustee may abandon or otherwise not accept any Liquidation Trust Assets that the Liquidation Trustee believes, in good faith, have no value to the Liquidation Trust.  Any assets the Liquidation Trust so abandons or otherwise does not accept shall not vest in the Liquidation Trust.  As of the Effective Date, all Liquidation Trust Assets vested in the Liquidation Trust shall be free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in the Plan or in the Confirmation Order.  Upon the transfer by the Debtors of the Liquidation Trust Assets to the Liquidation Trust or abandonment of Liquidation Trust Assets by the Liquidation Trust, the Debtors will have no reversionary or further interest in or with respect to any Liquidation Trust Assets or the Liquidation Trust.  Notwithstanding anything in the Plan to the contrary, the Liquidation Trust and the Liquidation Trustee shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

In furtherance of, and consistent with, the purposes of the Liquidation Trust and the Plan, the Liquidation Trustee shall, as more fully set forth in the Liquidation Trust Agreement, among other things, (a) have the power and authority to hold, manage, sell, invest, and distribute to the Holders of Senior Secured Notes Claims, the Liquidation Trust Net Assets, including any proceeds thereof, (b) hold the Liquidation Trust Net Assets for the benefit of the Holders of Senior Secured Notes Claims, (c) have the power and authority to prosecute and resolve objections to Disputed General Unsecured Claims, and (d) have the power and authority to perform such other functions as are provided for in the Plan and the Liquidation Trust Agreement.  For the avoidance of doubt, notwithstanding anything to the contrary in the Plan or the Liquidation Trust Agreement, the Liquidation Trustee shall not pursue any Claims or Causes of Action against any Released Party (if any).

As further set forth in the Liquidation Trust Agreement, the Liquidation Trustee shall have sole responsibility for reconciling all Claims.

### D.   Tax Treatment of the Liquidation Trust

It is intended that the Liquidation Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Section 671 through 677 of the Internal Revenue Code.  In furtherance of this objective, the Liquidation Trust shall, in its business judgment, make continuing

best efforts not to unduly prolong the duration of the Liquidation Trust.  The Liquidation Trust Assets shall be deemed for U.S. federal income tax purposes to have been transferred by the Debtors to the Liquidation Trust Beneficiaries, and then contributed by the Liquidation Trust Beneficiaries to the Liquidation Trust in exchange for their respective Liquidation Trust Interests. The Liquidation Trust Beneficiaries of the Liquidation Trust (or their direct or indirect owners, as required under applicable tax law) will be treated as the grantors and deemed owners of their respective shares of Liquidation Trust Assets in the Liquidation Trust.  As grantors and deemed owners of the Liquidation Trust Assets, the Liquidation Trust Beneficiaries will be required to include in income their respective shares of income, gains, losses, or deductions attributable to the Liquidation Trust Assets. All Holders shall use the valuation of the Liquidation Trust Assets transferred to the Liquidation Trust as established by the Liquidation Trust for all federal income tax purposes (including the recognition of income, gain, loss or deduction with respect to their Allowed Claims), which determination shall be made as soon as reasonably practicable following the Effective Date.  The Liquidation Trust will be responsible for filing information on behalf of the Liquidation Trust as grantor trust pursuant to Treasury Regulation Section 1.671-4(a).  The foregoing treatment shall also apply, to the extent permitted by applicable law, for all state, local, and non-U.S. tax purposes.  Further, the Liquidation Trust is intended to comply with the conditions and the requirements set forth in Rev. Proc. 94-45, 1994-2 C.B. 684.

To the extent the Liquidation Trust is determined to incur any tax liability (including any withholding for any reason), it shall be entitled to liquidate the Liquidation Trust Assets to satisfy such tax liability.

The Liquidation Trust will not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the Liquidation Trust Agreement.  In addition, the Liquidation Trust may request an expedited determination of Taxes of the Debtors or of the Liquidation Trust under Bankruptcy Code section 505(b) for all returns filed for, or on behalf of, the Debtors and the Liquidation Trust for all taxable periods through the dissolution of the Liquidation Trust.

With respect to any of the assets of the Liquidation Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Liquidation Trust, the Debtors or the Liquidation Trustee may, in its sole discretion, determine the best way to report for tax purposes with respect to the portion of the Liquidation Trust Assets subject to the disputed claims, including, but not limited to, filing a tax election to treat such assets as subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations.  Under such treatment, a separate federal income tax return must be filed with the IRS for, and a separate entity-level tax will be imposed on, any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

### E.    Exculpation, Indemnification, Insurance and Liability Limitation

The Liquidation Trustee and all professionals retained by the Liquidation Trustee, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful

misconduct, or gross negligence, in all respects by the Liquidation Trust. The Liquidation Trustee may obtain and maintain, at the expense of the Liquidation Trust, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Liquidation Trust, including customary insurance coverage for the protection of Entities serving as administrators and overseers of the Liquidation Trust on and after the Effective Date, including for the avoidance of doubt, the Liquidation Trustee. The Liquidation Trustee may rely upon written information previously generated by the Debtors.

### F.    Securities Exemption

The Liquidation Trust Interests to be distributed to the Liquidation Trust Beneficiaries pursuant to the Plan shall not constitute "securities" under applicable law. The Liquidation Trust Interests shall not be transferrable (except under limited circumstances set forth in the Liquidation Trust Agreement) and shall not have consent or voting rights or otherwise confer on the Liquidation Trust Beneficiaries any rights similar to the rights of stockholders of a corporation in respect of actions to be taken by the Liquidation Trustee in connection with the Liquidation Trust (except as otherwise provided in the Liquidation Trust Agreement). To the extent the Liquidation Trust Interests are considered "securities" under applicable law, the issuance of such interests satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act and any state or local law requiring registration. To the extent any "offer or sale" of Liquidation Trust Interests may be deemed to have occurred, such offer or sale is under the Plan and in exchange for Claims against or Interests in one or more of the Debtors, or principally in exchange for such Claims or Interests and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code.

### G.    Termination of the Liquidation Trustee

The duties, responsibilities, and powers of the Liquidation Trustee will terminate in accordance with the terms of the Liquidation Trust Agreement.

## X.    GUC TRUST AND GUC TRUSTEE

### A.    GUC Trust Creation

On the Effective Date, GUC Trust shall be established and become effective for the benefit of the GUC Trust Beneficiaries. The GUC Trust Agreement shall contain customary provisions for trust agreements utilized in comparable circumstances, including (i) any and all provisions necessary to ensure continued treatment of the GUC Trust as a grantor trust and the GUC Trust Beneficiaries as the grantors and owners thereof for federal income tax purposes, and (ii) indemnification of the GUC Trustee and its professionals. On the Effective Date, the GUC Trustee will be designated by the Committee and appointed in accordance with the terms of the Plan and the GUC Trust Agreement. The rights, responsibilities, and duties of the GUC Trustee are set forth in the GUC Trust Agreement. Notwithstanding anything contained in the Plan or the GUC Trust Agreement, the GUC Trustee shall always act consistently with, and not contrary to, the purpose of the GUC Trust as set forth in the Plan.

All relevant parties (including the Debtors and the GUC Trustee) will take all actions necessary to cause title to the GUC Trust Assets to be transferred to the GUC Trust. The powers,

authority, responsibilities, and duties of the GUC Trust and the GUC Trustee are set forth in and will be governed by the GUC Trust Agreement, the Plan, and the Confirmation Order.

### B.    Purpose of the GUC Trust

The GUC Trust will be established, as a liquidating trust in accordance with Treasury Regulation Section 301.7701-4(d), for the primary purposes of maximizing the value of its assets and making distributions to the Holders of Allowed Non-Library Debtors General Unsecured Claims in accordance with the Plan, Confirmation Order, and the GUC Trust Agreement.  The GUC Trust will have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the GUC Trust.

### C.    Transfer of Assets to the GUC Trust

The Debtors and the GUC Trustee will establish the GUC Trust on behalf of the GUC Trust Beneficiaries pursuant to the GUC Trust Agreement, with the GUC Trust Beneficiaries to be treated as the grantors and deemed owners of the GUC Trust Assets, to the extent such assets do not exceed the GUC Recovery.  The Debtors will transfer, assign, and deliver to the GUC Trust, on behalf of the GUC Trust Beneficiaries, all of their rights, title, and interests in the GUC Trust Assets.  The GUC Trust will accept and hold the GUC Trust Assets in the GUC Trust for the benefit of the GUC Trust Beneficiaries, subject to the Plan and the GUC Trust Agreement.

On the Effective Date, all GUC Trust Assets will vest and be deemed to vest in the GUC Trust in accordance with section 1141 of the Bankruptcy Code or as otherwise set forth in the GUC Trust Agreement.  As of the Effective Date, all GUC Trust Assets vested in the GUC Trust shall be free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in the Plan or in the Confirmation Order.

In furtherance of, and consistent with, the purposes of the GUC Trust and the Plan, the GUC Trustee shall, as more fully set forth in the GUC Trust Agreement, have the power to distribute the GUC Trust Net Assets to the Holders of Allowed Non-Library Debtors General Unsecured Claims.

### D.    Tax Treatment of the GUC Trust

It is intended that the GUC Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Section 671 through 677 of the Internal Revenue Code.  In furtherance of this objective, the GUC Trustee shall, in its business judgment, make continuing best efforts not to unduly prolong the duration of the GUC Trust.  The GUC Trust Assets shall be deemed for U.S. federal income tax purposes to have been transferred by the Debtors to the GUC Trust Beneficiaries, and then contributed by the GUC Trust Beneficiaries to the GUC Trust in exchange for their respective GUC Trust Interests.  The GUC Trust Beneficiaries of the GUC Trust (or their direct or indirect owners, as required under applicable tax law) will be treated as the grantors and deemed owners of their respective shares of GUC Trust Assets in the GUC Trust.  As grantors and deemed owners of the GUC Trust Assets, the GUC Trust Beneficiaries will be required to include in income their respective shares of income, gains, losses, or deductions

attributable to the GUC Trust Assets. All Holders shall use the valuation of the GUC Trust Assets transferred to the GUC Trust as established by the GUC Trust for all federal income tax purposes (including the recognition of income, gain, loss or deduction with respect to their Allowed Claims), which determination shall be made as soon as reasonably practicable following the Effective Date. The GUC Trust will be responsible for filing information on behalf of the GUC Trust as grantor trust pursuant to Treasury Regulation Section 1.671-4(a). The foregoing treatment shall also apply, to the extent permitted by applicable law, for all state, local, and non-U.S. tax purposes. Further, the GUC Trust is intended to comply with the conditions and the requirements set forth in Rev. Proc. 94-45, 1994-2 C.B. 684.

To the extent the GUC Trust is determined to incur any tax liability (including any withholding for any reason), it shall be entitled to liquidate the GUC Trust Assets to satisfy such tax liability.

The GUC Trust will not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth in the Plan or in the GUC Trust Agreement. In addition, the GUC Trust may request an expedited determination of taxes of the Debtors or of the GUC Trust under Bankruptcy Code section 505(b) for all returns filed for, or on behalf of, the Debtors and the GUC Trust for all taxable periods through the dissolution of the GUC Trust.

With respect to any of the assets of the GUC Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the GUC Trust, the Debtors or the GUC Trustee may, in its sole discretion, determine the best way to report for tax purposes with respect to the portion of the GUC Trust Assets subject to the disputed claims, including, but not limited to, filing a tax election to treat such assets as subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations. Under such treatment, a separate federal income tax return must be filed with the IRS for, and a separate entity-level tax will be imposed on, any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

E.    Exculpation, Indemnification, Insurance and Liability Limitation

The GUC Trustee and all professionals retained by the GUC Trustee, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the GUC Trust. The GUC Trustee may obtain and maintain, at the expense of the GUC Trust, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the GUC Trust, including customary insurance coverage for the protection of Entities serving as administrators and overseers of the GUC Trust on and after the Effective Date, including for the avoidance of doubt, the GUC Trustee. The GUC Trustee may rely upon written information previously generated by the Debtors.

### F.    Securities Exemption

The GUC Trust Interests to be distributed to the GUC Trust Beneficiaries pursuant to the Plan shall not constitute "securities" under applicable law.  The GUC Trust Interests shall not be transferrable (except under limited circumstances set forth in the GUC Trust Agreement) and shall not have consent or voting rights or otherwise confer on the GUC Trust Beneficiaries any rights similar to the rights of stockholders of a corporation in respect of actions to be taken by the GUC Trustee in connection with the GUC Trust (except as otherwise provided in the GUC Trust Agreement).  To the extent the GUC Trust Interests are considered "securities" under applicable law, the issuance of such interests satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act and any state or local law requiring registration.  To the extent any "offer or sale" of GUC Trust Interests may be deemed to have occurred, such offer or sale is under the Plan and in exchange for Claims against or Interests in one or more of the Debtors, or principally in exchange for such Claims or Interests and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code.

### G.    Termination of the GUC Trustee

The duties, responsibilities, and powers of the GUC Trustee will terminate in accordance with the terms of the GUC Trust Agreement.

## XI.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### A.    Conditions to Effective Date

The occurrence of the Effective Date of the Plan is subject to each of the following conditions precedent.

1.    The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

2.    The Confirmation Order shall have been entered and shall be in full force and effect.

3.    There shall have been no modification or stay of the Confirmation Order or entry of any other order prohibiting the material transactions contemplated by the Plan from being consummated.

4.    The Professional Fee Reserve Account shall have been fully funded pursuant to the terms of the Plan.

5.    Any adequate protection payments due and owing to the Senior Secured Notes Parties under paragraph 8(g) of the DIP Order shall have been paid or reserved for in full, as applicable.

6.      All actions, documents and agreements necessary to implement the Plan shall have been effected, executed and/or tendered for delivery. All conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (or will be satisfied and waived substantially concurrently with the occurrence of the Effective Date).

7.      The Liquidation Trustee and GUC Trustee shall have been appointed and prepared to assume its rights and responsibilities under the Plan or Confirmation Order.

8.      The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents necessary to implement the Plan and any transaction contemplated by the Plan that are required by law, regulation, or order.

9.      The Debtors shall have sufficient Cash such that the Debtors are not administratively insolvent.

10.     The GUC Trustee shall have been appointed and prepared to assume its rights and responsibilities under the Plan or Confirmation Order.

11.     The GUC Trust Agreement shall have been executed and the GUC Trust Amount and the GUC Trust Initial Funding Amount shall have been transferred to the GUC Trust.

12.     The Liquidation Trust Agreement shall been executed and the Liquidation Trust Cash shall been transferred to the Liquidation Trust as set forth in the Plan.

**B.      Waiver of Conditions**

Unless otherwise specifically provided for in the Plan, and except for the condition set forth in Article X.A.8, Article X.A.9, Article X.A.10, and Article X.A.11 (each of which may not be waived without the consent of the affected parties), the conditions set forth in Article X.A. may be waived, in whole or in part, in writing by each of the Debtors, the Committee, and the Senior Secured Notes Parties without notice to any other parties in interest or the Bankruptcy Court and without a hearing.

**XII.    SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

**A.     Releases by the Debtors**

**Effective as of the Effective Date, pursuant to Section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which shall be confirmed by the Plan, to the fullest extent allowed by applicable law, each Released Party is shall be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates, in each case on behalf of themselves and**

their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims and Causes of Action, and liabilities whatsoever, including any derivative claims, asserted by or assertable on behalf of any of the Debtors or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, in law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, or otherwise, that the Debtors or their Estates, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtor-Related Matters.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any obligations of a Purchaser arising under the applicable Asset Purchase Agreement and Sale Order, or (c) any Retained Causes of Action.

Upon the Effective Date, the Debtors shall be deemed to have released all Claims, Causes of Action, or remedies arising under section 547 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including voidable transfer laws against holders of Allowed Non-Library Debtors General Unsecured Claims.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is:  (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims or Causes of Action released by the Debtor Release; (c) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after reasonable investigation by the Debtors and after due notice and opportunity for hearing; and (f) a bar to any of the Debtors or their Estates, asserting any claim or Cause of Action released pursuant to the Debtor Release.

B.      Releases by Holders of Claims and Interests

Effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which shall be confirmed by the Plan, to the fullest extent allowed by applicable law, each of the Releasing Parties shall be deemed to have to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each of the Released Parties and the other Releasing Parties from any and all claims, Causes of Action, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or

derivatively, in law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or otherwise based on or relating to, or in any manner arising from, in whole or in part, the Debtor-Related Matters. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (b) any Retained Causes of Action; (c) actual fraud, willful misconduct, or gross negligence as determined by a Final Order or (d) any right to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement that the Senior Secured Notes Collateral Agent may have against the Senior Secured Noteholders under the Senior Secured Notes Agreement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is:  (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (d) a good faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

C.     Exculpation

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party shall be exculpated from any claim or Cause of Action related to, any act or omission in connection with, relating to, or arising out of the negotiation, solicitation, confirmation, execution, or implementation (to the extent on or prior to the Effective Date) of, as applicable, the Debtor Related Matters except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted bad faith, fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, an Exculpated Party shall be entitled to exculpation from the Petition Date through the Effective Date, and the exculpation set forth above does not exculpate (a) any obligations arising after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (b) any Retained Causes of Action.

## D.    Injunction

**Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims, Interests, Causes of Action, or liabilities that: (1) are subject to compromise and settlement pursuant to the terms of the Plan; (2) have been released pursuant to the Plan; (3) were purchased and released by a Purchaser in connection with the respective Sale; (4) are subject to exculpation pursuant to the Plan; or (5) are otherwise satisfied, stayed, released, or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from commencing or continuing in any manner, any action or other proceeding, including on account of any Claims, Interests, Causes of Action, or liabilities that have been compromised or settled against the Debtors or any Entity so released or exculpated (or the property or estate of any Entity, directly or indirectly, so released or exculpated) on account of, or in connection with or with respect to, any released, settled, compromised, or exculpated claims, Interests, Causes of Action, or liabilities, including being permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Liquidation Trustee, the Released Parties, or Exculpated Parties (as applicable): (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or Interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estate of such Entities on account of or in connection with or with respect to any such claims or Interests; (4) asserting any right of setoff or subrogation of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or Interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding any other indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or Interests released or settled pursuant to the Plan.**

**Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan by the Debtors, the Liquidation Trustee, and their respective affiliates, employees, advisors, officers and directors, or agents.**

## E.    Setoffs

Except as otherwise expressly provided for in the Plan, each Debtor and the Liquidation Trustee (as applicable), pursuant to the Bankruptcy Code (including section 552 of the Bankruptcy Code), applicable non-bankruptcy law or as may be agreed to by the Holder of a Claim or an Interest, may set off against any Allowed Claim or Allowed Interest and the distributions to be

made pursuant to the Plan on account of such Allowed Claim or Allowed Interest (before any distribution is made on account of such Allowed Claim or Allowed Interest), any claims, rights and Causes of Action of any nature that such Debtor or the Liquidation Trustee, as applicable, may hold against the Holder of such Allowed Claim or Allowed Interest, to the extent such claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Debtor or the Liquidation Trustee, as applicable, of any such claims, rights and Causes of Action that such Debtor or the Liquidation Trustee, as applicable, may possess against such Holder.  In no event shall any Holder of Claims or Interests be entitled to set off any Claim or Interest against any claim, right or Cause of Action of the applicable Debtor or the Liquidation Trustee, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date.

F.    **Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtors and their successors and assigns.

If any Holder of a Secured Claim or any agent for such Holder has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps reasonably requested by the Liquidation Trustee, at the sole cost of the Liquidation Trust, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Liquidation Trustee shall be entitled to make any such filings or recordings on such Holder's behalf.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

G.    **Recoupment**

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date.

## XIII.    BINDING NATURE OF PLAN

THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR

RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES, OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

## XIV.    RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, these Chapter 11 Cases, the Sale, the Sale Documents, the Confirmation Order, and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to each of the following:

1. Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests.

2. Resolve any cases, controversies, suits, or disputes that may arise in connection with Claims, including Claim objections, allowance, disallowance, subordination, estimation and distribution.

3. Decide and resolve all matters related to the granting and denying, in whole or in part of, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan.

4. Resolve any matters related to: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which the Debtors are a party or with respect to which the Debtors may be liable and to hear, determine, and, if necessary, liquidate, any cure amount arising therefrom; and/or (b) any dispute regarding whether a contract or lease is or was executory or expired.

5. Adjudicate, decide or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date.

6. Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code.

7. Adjudicate, decide or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters relating to the Retained Causes of Action, if any.

8. Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement.

59

9.     Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan.

10.    Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan.

11.    Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions.

12.    Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated.

13.    Determine any other matters that may arise in connection with or related to the Sale Documents, the Disclosure Statement, the Plan, and the Confirmation Order.

14.    Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan.

15.    Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by any Holder for amounts not timely repaid.

16.    Adjudicate any and all disputes arising from or relating to distributions under the Plan.

17.    Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order.

18.    Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order.

19.    Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

20.    To recover all assets of the Debtors and property of the Debtors' Estates, wherever located.

21.    To hear and determine any Causes of Action that may be brought by the Liquidation Trustee.

22.     To hear and determine any other rights, claims, or Causes of Action held by or accruing to the Debtors or the Liquidation Trustee pursuant to the Bankruptcy Code or any applicable state or federal statute or legal theory.

23.     To hear and determine any dispute with respect to the GUC Trust, the GUC Trust Agreements, or the GUC Trust Assets.

24.     Enter an order or final decree concluding or closing these Chapter 11 Cases.

25.     Enforce all orders previously entered by the Bankruptcy Court.

26.     Hear any other matter over which the Bankruptcy Court has jurisdiction.

## XV.     MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### A.     Modification and Amendment

Subject to the limitations contained in the Plan, the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules (1) to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129 of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. Notwithstanding the foregoing, the Debtors may not make any modifications to the Plan as it pertains to the Committee Settlement absent written agreement of the Committee.  Any amendment, alteration, modification or technical modification that affects the treatment of the Holders of Senior Secured Notes (including any release granted to or by such Holder) shall be reasonably acceptable to the Senior Secured Noteholders.

The Debtors may make appropriate non-material, technical adjustments and modifications to the Plan or the Plan Supplement prior to the Effective Date without further order or approval of the Bankruptcy Court.

### B.     Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

### C.     Revocation or Withdrawal of the Plan

Subject to the conditions to the Effective Date, the Debtors, reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to File subsequent plans of reorganization or liquidation.  If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement

executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan, the Confirmation Order, or the Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of the Debtors or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.  For the avoidance of doubt, the revocation or withdrawal of the Plan shall have no effect on the validity, enforceability, or finality of the Sale Orders, nor shall it impair or invalidate any distributions made in accordance therewith.

## XVI.   MISCELLANEOUS PROVISIONS

### A.    Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the documents and instruments contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Liquidation Trustee, all Holders of Claims against and Interests in the Debtors (regardless of whether any such Holder has voted or failed to vote to accept or reject the Plan and regardless of whether any such Holder is entitled to receive any distribution under the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, any and all non-Debtor parties to Executory Contracts and Unexpired Leases, and all parties in interest.

### B.    Additional Documents

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors, the Liquidation Trustee, or the GUC Trustee (as applicable), all Holders of Claims or Interests receiving distributions pursuant to the Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may reasonably be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### C.    Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated (within the meaning set forth in section 1101 of the Bankruptcy Code) pursuant to section 1127(b) of the Bankruptcy Code.

### D.    Reservation of Rights

The Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

### E.    Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, beneficiaries or guardian, if any, of each Entity.

### F.    Determination of Tax Liabilities

As of the Effective Date, the Liquidation Trustee will be responsible for preparing and filing any tax forms or returns on behalf of the Debtors' Estates (to the extent not the responsibility of a Purchaser); *provided* that the Liquidation Trustee shall not be responsible for preparing or filing any tax forms for Holders of Interests in the Debtors (which Interests shall be cancelled pursuant to the Plan), but shall provide such Holders with any information reasonably required to prepare such forms.  The Debtors and the Liquidation Trustee (as applicable) shall have the right to request an expedited determination of any tax liability pursuant to section 505 of the Bankruptcy Code, including on any unpaid liability of the Debtors' Estate for any tax incurred during the administration of these Chapter 11 Cases.

### G.    Dissolution of the Committee

The Committee shall dissolve on the Effective Date and the members of such Committee shall be released and discharged from all further rights and duties arising from or related to the Chapter 11 Cases, except with respect to, and to the extent of any applications for Professional Fee Claims or expense reimbursements for members of such Committee.  The Committee and its retained Professionals may also participate in any appeal pending as of the Effective Date or filed thereafter, the outcome of which could affect the treatment of prepetition creditors (including Holders of Allowed Priority Claims and 503(b)(9) Claims), including, but not limited to, any cases, controversies, suits or disputes arising in connection with the Consummation, interpretation, implementation or enforcement of the Plan or the Confirmation Order. The Professionals retained by the Committee shall not be entitled to assert any Administrative Claims nor shall they have an Allowed Administrative Claims for any services rendered or expenses incurred after the Effective Date except in respect of the preparation and prosecution of or any objection to any Filed fee application and participation in any appeals.

### H.    Notices

In order for all notices, requests, and demands to or upon the Debtors or the Liquidation Trustee, as the case may be, to be effective such notices, requests and demands shall be in writing (including by electronic mail) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by email, when received, and served on or delivered to the following parties:

| Debtors | Counsel to the Debtors |
|---|---|
| Village Roadshow Entertainment Group USA Inc. 750 N. San Vicente Blvd., Suite 800 West West Hollywood, CA 90069 | Sheppard, Mullin, Richter & Hampton LLP 321 North Clark Street, 32nd Floor Chicago, Illinois 60654 |

| Attn: Kevin Berg | Attn:   Justin R. Bernbrock<br>         Matthew T. Benz<br>Email: jbernbrock@sheppardmullin.com<br>         mbenz@sheppardmullin.com<br><br>-and-<br><br>Young Conaway Stargatt & Taylor LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE 19801<br>Attn:   Joseph M. Mulvihill<br>         Benjamin C. Carver<br>Email: jmulvihill@ycst.com<br>         bcarver@ycst.com |
|---|---|
| **Liquidation Trustee** ||
| To be included in the Plan Supplement. ||
| **GUC Trustee** ||
| To be included in the Plan Supplement. ||

After the Effective Date, Persons or Entities that wish to continue to receive documents Bankruptcy Rule 2002 shall, within thirty (30) days of the Effective Date, file a renewed request for receipt of notices and serve copies of such request by mail upon the Notice and Claims Agent and, as applicable, the Liquidation Trust, the Liquidation Trustee, and the Debtors. After the Effective Date, the Liquidation Trustee is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that Filed such renewed requests, provided, however, the Office of the United States Trustee for the District of Delaware shall remain on the 2002 List without the need to file a renewed request for receipt of notices.

## I.     Term of Injunction or Stays

Except as otherwise provided in the Plan, to the maximum extent permitted by applicable law and subject to the Bankruptcy Court's post-confirmation jurisdiction to modify the injunctions and stays under the Plan (1) all injunctions with respect to or stays against an action against property of the Debtors or the Debtors' Estates arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, and in existence on the date the Confirmation Order is entered, shall remain in full force and effect until such property is no longer property of the Debtors or the Debtors' Estates; and (2) all other injunctions and stays arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code shall remain in full force and effect until the earliest of (i) the date that the Chapter 11 Cases are closed pursuant to a final order of the Bankruptcy Court, or (ii) the date that the Chapter 11 Cases are

dismissed pursuant to a final order of the Bankruptcy Court. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect indefinitely.

**J.      Entire Agreement**

On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**K.      Plan Supplement**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. Copies of such exhibits and documents shall be made available upon written request to Debtors' counsel or Liquidation Trustee's counsel (as applicable) at the address above or by downloading such exhibits and documents free of charge from the Notice and Claims Agent's website.

Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of the Plan, the Plan shall control. Notwithstanding the foregoing, to the extent that any conflict or inconsistency arises between the terms of the Plan or the Confirmation Order and the Liquidation Trust Agreement concerning the governance, administration, operation, or management of the Liquidation Trust or the rights and duties of the Liquidation Trustee, the terms of the Liquidation Trust Agreement shall govern and control in all respects; *provided, however*, that nothing in this provision shall alter or impair any substantive rights or treatment provided for under the Plan to any creditor or party in interest.

The documents in the Plan Supplement are considered an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

**L.      Governing Law**

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters.

**M.      Nonseverability of Plan Provisions**

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in

full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is the following: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Liquidation Trustee (as applicable); and (3) nonseverable and mutually dependent.

**N.      Closing of the Chapter 11 Cases**

After the full administration of the Chapter 11 Cases, the Liquidation Trustee shall promptly File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022, a motion pursuant to Local Rule 3022-1(a), and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

**O.      Agent Expenses**

The fees, costs, and expenses of the Senior Secured Notes Collateral Agent (including the fees, costs and expenses of the professionals retained by the Senior Secured Notes Collateral Agent) incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) without the requirement to file a fee application with the Bankruptcy Court and will not be subject to any requirement that (i) the Senior Secured Notes Collateral Agent file any application with the Bankruptcy Court or (ii) the Bankruptcy Court enters any further orders.

**XVII.  RISK FACTORS**

Holders of Claims and Interests, especially prior to voting on the Plan, if applicable, should consider carefully the risk factors described below, as well as all of the information contained in this Disclosure Statement, including the Exhibits hereto. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation. See Article XVIII for a discussion of tax law considerations.

**A.      Bankruptcy Law Considerations**

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims and Interests under the Plan but will not necessarily affect the validity of the vote of the Voting Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Voting Classes.

1.      <u>Risk of Non-Approval of the Disclosure Statement as Containing Adequate Information</u>

This Disclosure Statement has not, as of the date hereof, been approved by the Bankruptcy Court as containing "adequate information" within the meaning of Section 1125(a) of the Bankruptcy Code. While the Debtors believe that this Disclosure Statement provides "adequate

information" within the meaning of Section 1125(a), there can be no assurance that the Bankruptcy Court will reach the same conclusion.

2.     The Debtors May Fail to Satisfy the Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may need to seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Interests and Allowed Claims as those proposed in the Plan, and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

3.     The Debtors May Not Be Able to Secure Nonconsensual Confirmation Over Certain Impaired, Non-Accepting Classes

In the event that any Impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Debtors' request if at least one Impaired Class has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each Impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting Impaired Class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

4.     Confirmation Could Be Delayed

Any material delay in the confirmation of the Plan, the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court would add substantial expense and uncertainty to the process, which would have a negative impact on creditor recoveries.

5.     Parties in Interest May Object to Provisions of the Plan

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

6.     Risk of Non-Confirmation of Plan

Even if the Holders of Claims who are entitled to vote accept the Plan, the Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  For example, Section 1129 of the Bankruptcy Code requires, among other things, that the value of distributions to dissenting Holders of Claims or Interests may not be less than the value such

Holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe the Plan meets such requirement, there can be no assurance the Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes. In the event that the Debtors are unable to get sufficient votes from the Holders of Claims who are entitled to vote to accept the Plan, the Debtors may seek to accomplish an alternative chapter 11 plan or seek to cram down the Plan on non-accepting classes. If the Plan is not confirmed, it is unclear what distributions Holders of Claims and Interests ultimately would receive with respect to their Claim and Interests in an alternative plan.

7.    The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (b) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation.

8.    The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

9.    Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may

materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

10.     The Conditions Precedent to the Effective Date May Not Occur

The Plan provides that there are conditions precedent to the occurrence of the Effective Date. There is no guarantee as to the timing of the Effective Date. Additionally, if the conditions precedent to the Effective Date are not satisfied or waived, the Bankruptcy Court may vacate the Confirmation Order. In that event, the Plan would be deemed null and void, and the Debtors or any other party may propose or solicit votes on an alternative plan of liquidation that may not be as favorable to parties in interest as the Plan.

**B.      Allowance of Claims**

This Disclosure Statement has been prepared based on preliminary information concerning filed Claims and the Debtors' books and records. The actual amount of Allowed Claims may differ from the Debtors' current estimates.

1.     The Amounts of Allowed Claims May Adversely Affect the Recovery of Some Holders of Allowed Claims

The distributions available to Holders of Allowed Claims and Interests, if any, under the Plan can be affected by a variety of contingencies, including, without limitation, the amount of Allowed Administrative Claims, Priority Tax Claims, Class 1 Claims, Class 2 Claims, Class 3A Claims, Class 3B Claims, and Class 4 Claims, thereby reducing the amount of distributions available for other Holders of Allowed Claims. The Debtors cannot determine with any certainty at this time the number or amount of such Claims that will ultimately be Allowed. Thus, the projected recoveries for Holders of Allowed Claims and Interests disclosed in this Disclosure Statement are highly speculative.

2.     Any Valuation of Any Assets to be Distributed Under the Plan is Speculative

Any valuation of any of the assets to be distributed under the Plan is necessarily speculative, including but not limited to the potential recoveries, if any, in respect of any Retained Causes of Action. Accordingly, the ultimate value, if any, of these assets could materially affect, among other things, recoveries to the Holders of Allowed Claims and Interests.

3.     The Debtors Cannot Guarantee the Timing of Distributions

The timing of actual distributions to Holders of Allowed Claims and Interests, if any, may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guarantee the timing of any Distribution.

4.      Certain Tax Implications of the Debtors' Bankruptcy

Holders of Allowed Claims should carefully review Article XVIII of this Disclosure Statement, "Certain U.S. Federal Income Tax Consequences of Consummation of the Plan," for a description of certain tax implications of the Plan and the Debtors' Chapter 11 Cases.

### C.      Disclosure Statement Disclaimers

1.      The Financial Information Contained in This Disclosure Statement Has Not Been Audited

In preparing this Disclosure Statement, the Debtors and their advisors relied on financial data derived from the Debtors' books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information, and any conclusions or estimates drawn from that financial information, provided in this Disclosure Statement, and although the Debtors believe that the financial information herein fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant that the financial information contained herein, or any conclusions or estimates drawn therefrom, is without inaccuracies.

2.      Information Contained in This Disclosure Statement Is For Soliciting Votes

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

3.      This Disclosure Statement Was Not Reviewed or Approved by the SEC

This Disclosure Statement was not filed with the Securities and Exchange Commission ("SEC") under the Securities Act or applicable state securities laws. Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement or the exhibits or the statements contained in this Disclosure Statement.

4.      This Disclosure Statement May Contain Forward Looking Statements

This Disclosure Statement may contain "forward looking statements" within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, as amended. Statements containing words such as "may," "believe," "anticipate," "expect," "intend," "plan," "project," "projections," "business outlook," "estimate," or similar expressions constitute forward-looking statements and may include, without limitations, information regarding the Debtors' expectations with respect to future events. These forward looking statements are subject to a number of risks, uncertainties and assumptions, including those risks described in this Article.

5.      No Legal or Tax Advice Is Provided to You by This Disclosure Statement

This Disclosure Statement is not legal advice to you. The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each Holder of a Claim or an Interest should consult his or her own legal counsel, accountant or other applicable advisor with regard to any legal, tax and other matters concerning his, her or its Claim or Interest. This

Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

6.     No Admissions Made

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, Holders of Claims or Interests, or any other parties in interest.

7.     Failure to Identify Potential Objections

No reliance should be placed on the fact that a particular Retained Cause of Action or potential objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Liquidation Trustee may, pursuant to the Plan, object to applicable Claims or Interests after the Effective Date of the Plan irrespective of whether this Disclosure Statement identifies a particular Retained Cause of Action or objection to a Claim.

8.     No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or recover any preferential, fraudulent or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their Estates are specifically or generally identified in this Disclosure Statement.

9.     Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

10.     Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date of this Disclosure Statement, unless otherwise specified in this Disclosure Statement, and the delivery of this Disclosure Statement after the date of this Disclosure Statement does not imply that there has not been a change in the information set forth in this Disclosure Statement since that date. While the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in

this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

11.    No Representations Outside This Disclosure Statement are Authorized

No representations concerning or relating to the Debtors, these Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.  You should promptly report unauthorized representations or inducements to counsel to the Debtors and the U.S. Trustee.

## XVIII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and certain Holders of Allowed Claims.  The following summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated thereunder, judicial decisions, administrative rules, and pronouncements as in effect on the date hereof.  Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the U.S. federal income tax consequences described herein.  This summary addresses certain U.S. federal income tax consequences only to Holders of Claims that are entitled to vote (i.e., Holders of Claims in Classes 3B and 4) and it does not address the U.S. federal income tax consequences to Holders of Interests or to Holders of Claims that are not entitled to vote on the Plan.  The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties.

This discussion does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder of an Allowed Claim in light of such Holder's particular facts and circumstances.  In addition, this summary addresses only U.S. federal income taxes.  Thus, the following discussion does not address foreign, state, or local tax consequences, or any estate, gift, or other non-income tax consequences, of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to Holders of Allowed Claims that are subject to special treatment under the IRC (including, but not limited to, Persons who are related to the Debtors within the meaning of the IRC, Holders liable for the alternative minimum tax, Holders whose functional currency is not the U.S. dollar, Holders that received their Claims as compensation, broker dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental entities, pass-through entities such as partnerships or S corporations and investors therein, and Holders of Claims who are themselves in bankruptcy).  Accordingly, this summary should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim.

If a partnership (including any entity or arrangement treated as a partnership for U.S. federal income tax purposes) holds an Allowed Claim, the tax treatment of a partner or other investor in such partnership will generally depend upon the status of the partner or investor and

the activities of the partnership.  If you are a partner or other investor in a partnership holding an Allowed Claim, you should consult your tax advisors.

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of Allowed Class 3B or 4 Claims that is: (A) an individual citizen or resident of the United States for U.S. federal income tax purposes; (B) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (C) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (D) a trust (1) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (2) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (as defined in the IRC), and a "Non-U.S. Holder" is a Holder (other than an entity treated as a partnership for U.S. federal income tax purposes) that is not a U.S. Holder.

The following discussion assumes that the Plan will be implemented as described herein and does not address the tax consequences if the Plan is not carried out.  Furthermore, this discussion assumes that Holders of Allowed Claims only hold Claims in a single Class.  This discussion further assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.  In addition, a substantial amount of time may elapse between the confirmation date and the receipt of a final distribution under the Plan.  Events subsequent to the date of this Disclosure Statement, such as additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder.

This summary of the U.S. federal income tax consequences of the Plan is not binding on the Internal Revenue Service ("IRS"), and no ruling will be sought or has been sought from the IRS with respect to any of the tax aspects of the Plan, no opinion of counsel has been obtained or will be obtained by the Debtors with respect thereto, and no tax opinion is given by this Disclosure Statement.  The U.S. federal income tax consequences of certain aspects of the Plan may therefore be uncertain due to the lack of applicable legal authority and may be subject to administrative or judicial interpretations that differ from the discussion below.

The following discussion is not exhaustive and the U.S. federal income tax consequences to each Holder of an Allowed Claim will differ and will depend on factors specific to each such Holder, including (A) whether the Holder's Allowed Claim (or portion thereof) constitutes a claim for principal or interest; (B) the origin of the Holder's Allowed Claim; (C) whether the Holder reports income using the accrual or cash basis method; (D) whether the Holder receives distributions under the Plan in more than one taxable year; (E) whether the Holder has previously included in income any accrued but unpaid interest with respect to the Allowed Claim; and (F) whether the Holder has previously taken a bad debt deduction or otherwise recognized a loss with respect to the Allowed Claim.  The discussion is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each Holder of an Allowed Claim.  Accordingly, each Holder of an Allowed Claim is strongly urged to consult with its own tax advisor regarding the U.S. federal, state, local, and foreign income and other tax consequences of the Plan.

A.    **Certain U.S. Federal Income Tax Consequences to the Debtors**

1.    The Sale Transactions

The Sale Transactions contemplated by the Plan are expected to be treated as a taxable sale of the Debtors' assets for U.S. federal income tax purposes.  Taxable gain or loss will be recognized in an amount equal to the amount realized on the Sale Transactions, less the aggregate adjusted basis in the assets that are subject to the Sale Transactions.  The amount realized on the Sale Transactions will generally be equal to the cash proceeds from the Sale Transactions or, in the case of a credit bid, the fair market value of the assets transferred in the credit bid.

2.    Transfer of Assets to the Liquidation Trust and the GUC Trust

Pursuant to the Plan, (a) the Liquidation Trust will be established and receive the Liquidation Trust Assets and (b) the GUC Trust will be established and receive the GUC Trust Assets.  For U.S. federal income tax purposes, the transfer of the Liquidation Trust Assets and the GUC Trust Assets generally is treated as equivalent to a sale of such assets at their then fair market value.  Taxable gain or loss will be recognized in an amount equal to the amount realized on the transfer, less the aggregate adjusted basis in the assets that are subject to the transfer.  The amount realized on the transfer will generally be equal to the fair market value of the assets transferred.

3.    Cancellation of Debt

The cancellation of Claims against the Debtors may give rise to cancellation of indebtedness income ("COD Income").

B.    **Liquidation Trust**

The Liquidation Trust will be organized for the primary purpose of maximizing the value of its assets and making distributions in accordance with the Plan with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust.  It is intended that the Liquidation Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Sections 671 through 677 of the IRC.  In furtherance of this objective, the Liquidation Trust shall, in its business judgment, make continuing best efforts not to unduly prolong the duration of the Liquidation Trust.  The Liquidation Trust Assets shall be deemed for U.S. federal income tax purposes to have been transferred by the Debtors to the Liquidation Trust Beneficiaries, and then contributed by the Liquidation Trust Beneficiaries to the Liquidation Trust in exchange for their respective Liquidation Trust Interests.  The Liquidation Trust Beneficiaries of the Liquidation Trust (or their direct or indirect owners, as required under applicable tax law) will be treated as the grantors and deemed owners of their respective shares of Liquidation Trust Assets in the Liquidation Trust.

U.S. Holders of Claims that receive a Liquidation Trust Interest will be required to report on their U.S. federal income tax returns their share of the Liquidation Trust's items of income gain, loss, deduction and credit in the year recognized by the Liquidation Trust.  This requirement may result in U.S. Holders being subject to tax on their allocable share of a portion of the Liquidation

74

Trust's taxable income prior to receiving any cash distributions from the Liquidation Trust. On the other hand, a distribution of cash by the Liquidation Trust will not be separately taxable to a U.S. Holder of Liquidation Trust Interests because the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Liquidation Trust).

All parties shall report consistently with the valuation of the Liquidation Trust Assets transferred to the Liquidation Trust as established by the Liquidation Trustee for all federal income tax purposes (including the recognition of income, gain, loss or deduction with respect to their Allowed Claims), which determination shall be made as soon as reasonably practicable following the Effective Date. The Liquidation Trust will be responsible for filing information on behalf of the Liquidation Trust as grantor trust pursuant to Treasury Regulations Section 1.671-4(a). The foregoing treatment shall also apply, to the extent permitted by applicable law, for all state, local, and non-U.S. tax purposes. Further, the Liquidation Trust is intended to comply with the conditions and the requirements set forth in Rev. Proc. 94-45, 1994-2 C.B. 684.

To the extent the Liquidation Trust is determined to incur any tax liability (including any withholding for any reason), it shall be entitled to liquidate the Liquidation Trust Assets to satisfy such tax liability.

With respect to any of the assets of the Liquidation Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Liquidation Trust, the Debtors or the Liquidation Trustee may, in its sole discretion, determine the best way to report for tax purposes with respect to the portion of the Liquidation Trust Assets subject to the disputed claims, including, but not limited to, filing a tax election to treat such assets as subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations. Under such treatment, a separate federal income tax return must be filed with the IRS for, and a separate entity-level tax will be imposed on, any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

No request for a ruling from the IRS will be sought on the classification of the Liquidation Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidation Trust. If the IRS were to successfully challenge the classification of the Liquidation Trust as a grantor trust, the federal income tax consequences to the Liquidation Trust and the Holders of Claims could vary from those discussed herein (including the potential for an entity-level tax).

C.    **GUC Trust**

The GUC Trust will be organized for the primary purpose of maximizing the value of its assets and making distributions in accordance with the Plan with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the GUC Trust. It is intended that the GUC Trust be classified for U.S. federal income tax purposes as a "liquidating trust" within the meaning of Treasury

Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Sections 671 through 677 of the IRC. In furtherance of this objective, the GUC Trust shall, in its business judgment, make continuing best efforts not to unduly prolong the duration of the GUC Trust. The GUC Trust Assets shall be deemed for U.S. federal income tax purposes to have been transferred by the Debtors to the GUC Trust Beneficiaries, and then contributed by the GUC Trust Beneficiaries to the GUC Trust in exchange for their respective GUC Trust Interests. The GUC Trust Beneficiaries of the GUC Trust (or their direct or indirect owners, as required under applicable tax law) will be treated as the grantors and deemed owners of their respective shares of GUC Trust Assets in the GUC Trust.

U.S. Holders of Claims that receive a GUC Trust Interest will be required to report on their U.S. federal income tax returns their share of the GUC Trust's items of income gain, loss, deduction and credit in the year recognized by the GUC Trust. This requirement may result in U.S. Holders being subject to tax on their allocable share of a portion of the GUC Trust's taxable income prior to receiving any cash distributions from the GUC Trust. On the other hand, a distribution of cash by the GUC Trust will not be separately taxable to a U.S. Holder of GUC Trust Interests because the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the GUC Trust).

All parties shall report consistently with the valuation of the GUC Trust Assets transferred to the GUC Trust as established by the GUC Trustee for all federal income tax purposes (including the recognition of income, gain, loss or deduction with respect to their Allowed Claims), which determination shall be made as soon as reasonably practicable following the Effective Date. The GUC Trust will be responsible for filing information on behalf of the GUC Trust as grantor trust pursuant to Treasury Regulations Section 1.671-4(a). The foregoing treatment shall also apply, to the extent permitted by applicable law, for all state, local, and non-U.S. tax purposes. Further, the GUC Trust is intended to comply with the conditions and the requirements set forth in Rev. Proc. 94-45, 1994-2 C.B. 684.

To the extent the GUC Trust is determined to incur any tax liability (including any withholding for any reason), it shall be entitled to liquidate the GUC Trust Assets to satisfy such tax liability.

With respect to any of the assets of the GUC Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the GUC Trust, the Debtors or the GUC Trustee may, in its sole discretion, determine the best way to report for tax purposes with respect to the portion of the GUC Trust Assets subject to the disputed claims, including, but not limited to, filing a tax election to treat such assets as subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations. Under such treatment, a separate federal income tax return must be filed with the IRS for, and a separate entity-level tax will be imposed on, any such account. Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

No request for a ruling from the IRS will be sought on the classification of the GUC Trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the GUC Trust. If the IRS were to successfully challenge the classification of the GUC Trust as a grantor trust, the federal income tax consequences to the GUC Trust and the Holders of Claims could vary from those discussed herein (including the potential for an entity-level tax).

**D.    Certain U.S. Federal Income Tax Consequences to Holders of Allowed Claims**

This summary discusses the U.S. federal income tax consequences to holders of Claims who are U.S. Holders and does not discuss tax consequences for those who are not U.S. Holders. As used herein, the term "U.S. Holder" means a beneficial owner of Claims that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Claims, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  If you are a partner in such a partnership holding any of such instruments, you should consult your own tax advisor.

1.    Recognition of Gain or Loss

The U.S. federal income tax consequences of the implementation of the Plan to a U.S. Holder of a Claim will depend, among other things, upon the origin of the U.S. Holder's Claim, when the U.S. Holder receives payment in respect of such Claim, whether the U.S. Holder reports income using the accrual or cash method of tax accounting, whether the U.S. Holder acquired its Claim at a discount, whether the U.S. Holder has taken a bad debt deduction or worthless security deduction with respect to such Claim, and whether (as intended and herein assumed) the Plan is treated as a plan of liquidation for U.S. federal income tax purposes.

Generally, a U.S. Holder of a Claim will recognize gain or loss with respect to its Claim in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value of any other property (including the Liquidation Trust Interests or the GUC Trust Interests) received by the U.S. Holder (other than any consideration attributable to accrued but unpaid interest) and (ii) the adjusted tax basis of the Claim exchanged therefor (other than basis

attributable to accrued but unpaid interest previously included in the U.S. Holder's taxable income). As discussed below, the amount of Cash or other property received in respect of accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a U.S. Holder under its method of accounting. *See* <u>Section XVIII.D.2.</u>— "Allocation of Consideration to Interest." Consistent with the intended treatment of the Plan as a plan of liquidation for U.S. federal income tax purposes, any loss realized by a U.S. Holder of a Claim may not be recognizable until all of the distributions to such U.S. Holder are received.

When gain or loss is recognized, such gain or loss may be long-term capital gain or loss if the Claim disposed of is a capital asset in the hands of the U.S. Holder and has been held for more than one year. Each holder of a Claim should consult its tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such holder.

2.    <u>Allocation of Consideration to Interest</u>

Pursuant to Section VI.L of the Plan, all distributions in respect of Claims will be allocated first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. In general, to the extent any amount received (whether cash or other property) by a holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as ordinary interest income (if not previously included in the holder's gross income under the holder's normal method of accounting). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each holder of a Claim is urged to consult its own tax advisors regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

3.    <u>Information Reporting and Backup Withholding</u>

Payments of interest and any other reportable payments, possibly including amounts received pursuant to the Plan, may be subject to "backup withholding" if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. You should consult your own tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

E.    **Backup Withholding and Information Reporting**

Generally, information reporting requirements will apply to all payments or distributions under the Plan, unless you are an exempt recipient. Additionally, a U.S. Holder may be subject to backup withholding at applicable rates, unless the U.S. Holder (1) is a person exempt from backup withholding and, when required, demonstrates this or (2) provides a correct taxpayer identification number ("TIN") on IRS Form W-9 (or a suitable substitute form) and timely provides the other information, makes the representations required by such form and complies with the other requirements of the backup withholding rules. A U.S. Holder may become subject to backup withholding if, among other things, the U.S. Holder (1) fails to properly report interest and dividends for U.S. federal income tax purposes or (2) in certain circumstances, fails to certify, under penalty of perjury, that it has furnished a correct TIN. A U.S. Holder that does not timely provide a correct TIN also may be subject to penalties imposed by the IRS. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a refund or a credit against your U.S. federal income tax liability provided the required information is properly furnished to the IRS.

Under the Foreign Account Tax Compliance Act ("FATCA"), unless otherwise subject to an exception, foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income (including interest). FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of these rules, including the availability of an exemption on such Non-U.S. Holder's ownership of the consideration being received under the Plan.

F.    **Importance of Obtaining Professional Tax Assistance**

**The foregoing is intended to be only a summary of certain U.S. federal income tax consequences of the Plan and is not a substitute for careful tax planning with a tax professional. The U.S. federal, state, local, and foreign income and other tax consequences of the Plan are complex and in some cases uncertain. Such consequences may also vary based on the individual circumstances of each Holder of an Allowed Claim. Accordingly, each Holder of an Allowed Claim is strongly urged to consult with his, her, or its own tax advisor regarding the U.S. federal, state, local, and foreign income and other tax consequences of the Plan.**

## XIX.    ADDITIONAL INFORMATION

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof. Certain documents described or referred to in this Disclosure Statement have not been attached as exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement. The Debtors will file all supplements to the Plan with the Bankruptcy Court and make them available for review on https://www.veritaglobal.net/vreg.

79

## XX.    RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the confirmation and Consummation of the Plan is preferable to all other alternatives.  Consequently, the Debtors urge all Holders of Claims in Voting Classes, to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline.

[*Remainder of Page Intentionally Left Blank*]

Dated: January 29, 2026

Respectfully submitted,

_/s/_____

By:

**<u>Exhibit A</u>**

**Joint Chapter 11 Plan of Liquidation for**
**Village Roadshow Entertainment Group USA Inc. and its Debtor Affiliates**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>VILLAGE ROADSHOW<br>ENTERTAINMENT GROUP USA INC., *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 25-10475 (TMH)<br><br>(Jointly Administered) |

## JOINT PLAN OF LIQUIDATION OF VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC. AND ITS DEBTOR AFFILIATES

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Joseph M. Mulvihill (Del. Bar No. 6061)
Brynna M. Gaffney (Del. Bar No. 7402)
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone:    (302) 571-6600
Facsimile:    (302) 571-1253
Email:        jmulvihill@ycst.com
              bgaffney@ycst.com


*Co-Counsel to the Debtors and Debtors in Possession*

**SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**
Justin R. Bernbrock (admitted *pro hac vice*)
Matthew Benz (admitted *pro hac vice*)
321 North Clark Street, 32nd Floor
Chicago, Illinois 60654
Telephone:    (312) 499-6300
Facsimile:    (312) 499-6301
Email:        jbernbrock@sheppardmullin.com
              mbenz@sheppardmullin.com

-and-

Jennifer L. Nassiri (admitted *pro hac vice*)
1901 Avenue of the Stars, Suite 1600
Los Angeles, CA 90067
Telephone:    (310) 228-3700
Facsimile:    (310) 228-3701
Email:        jnassiri@sheppardmullin.com

-and-

Alyssa Paddock (admitted pro hac vice)
30 Rockefeller Plaza

---

[1] The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343.  The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069.  Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

New York, NY 10112
Telephone:      (212) 653-8700
Facsimile:      (212) 653-8701
Email:          apaddock@sheppardmullin.com

*Counsel to the Debtors and Debtors in
Possession*

**TABLE OF CONTENTS**

ARTICLE I.  DEFINED TERMS AND RULES OF INTERPRETATION ................................. 1

   A.  Defined Terms. ............................................................................................... 1

   B.  Rules of Interpretation. ................................................................................. 14

   C.  Computation of Time. ................................................................................... 14

   D.  Controlling Document. ................................................................................. 15

ARTICLE II.  ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND STATUTORY
FEES ............................................................................................................................... 15

   A.  Administrative Claims. ................................................................................. 15

   B.  DIP Claim. .................................................................................................... 15

   C.  ABS Claim. ................................................................................................... 16

   D.  Professional Fee Claims. .............................................................................. 16

      1.  Final Fee Applications and Payment of Professional Fee Claims. .............. 16

      2.  Administrative Claims of OCPs. ................................................................ 16

      3.  Post-Confirmation Date Fees and Expenses. ............................................. 16

      4.  Professional Fee Reserve Account. ............................................................ 16

   E.  Priority Tax Claims. ...................................................................................... 17

   F.  U.S. Trustee Statutory Fees. ........................................................................ 17

ARTICLE III.  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .... 17

   A.  Classification of Claims and Interests. ......................................................... 17

   B.  Treatment of Claims and Interests. .............................................................. 18

      1.  Class 1 – Other Secured Claims. ............................................................... 18

      2.  Class 2 – Other Priority Claims. ............................................................... 19

      3.  Class 3A – Library Debtors General Unsecured Claims. ........................... 19

      4.  Class 3B – Non-Library Debtors General Unsecured Claims. ................... 20

      5.  Class 4 – Senior Secured Notes Claims. ................................................... 20

      6.  Class 5 – Intercompany Claims. ............................................................... 20

      7.  Class 6 – Existing Equity Claims. ............................................................. 21

      8.  Class 7 – Intercompany Interests. ............................................................. 21

   C.  Special Provision Governing Unimpaired Claims. ....................................... 21

   D.  Elimination of Vacant Classes. .................................................................... 21

   E.  Voting Classes, Presumed Acceptance by Non-Voting Classes. ................... 22

   F.  Controversy Concerning Impairment. .......................................................... 22

G.    Subordination of Claims. ........................................................................... 22

H.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .. 22

I.    Insurance. ................................................................................................... 22

ARTICLE IV.   MEANS FOR IMPLEMENTATION OF THE PLAN ....................................... 23

A.    General Settlement of Claims and Interests. ............................................... 23

B.    Liquidation Transactions. ........................................................................... 23

C.    Sale Transactions. ...................................................................................... 23

D.    The Liquidation Trust. ................................................................................ 24

E.    The Committee Settlement. ........................................................................ 24

F.    The GUC Trust. .......................................................................................... 25

G.    Sources of Consideration for Plan Distributions. ...................................... 26

H.    Dissolution of the Debtors. ........................................................................ 26

I.    Preservation of Causes of Action. ............................................................. 26

J.    Corporate Action. ....................................................................................... 26

K.    Cancellation of Existing Securities and Agreements. ................................ 27

L.    Effectuating Documents; Further Transactions. ........................................ 27

M.    Section 1146 Exemption from Certain Taxes and Fees. ............................ 27

N.    Sale Orders. ................................................................................................ 27

O.    Authority to Act. ........................................................................................ 28

P.    Transfer of Privilege/No Waiver. .............................................................. 28

Q.    Final Decree. .............................................................................................. 28

ARTICLE V.   TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES
............................................................................................................................. 28

A.    Assumption and Rejection of Executory Contracts and Unexpired Leases. ................... 28

B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases. ..................... 29

C.    Reservation of Rights. ................................................................................ 29

D.    Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.
............................................................................................................................. 29

E.    D&O Liability Insurance Policies. ............................................................. 30

F.    Modifications, Amendments, Supplements, Restatements, or Other Agreements. .......... 30

G.    Nonoccurrence of Effective Date. ............................................................. 30

ARTICLE VI.   PROVISIONS GOVERNING DISTRIBUTIONS ............................................. 31

A.    Distributions on Account of Claims Allowed as of the Effective Date. ........................... 31

B.    Compliance with Tax Requirements. .......................................................... 31

C.    Date of Distributions. ................................................................................. 32

D.  Disbursing Agent. ........................................................................................... 32

E.  Rights and Powers of Disbursing Agent. ........................................................ 32

F.  Surrender of Instruments. ................................................................................ 32

G.  Delivery of Distributions and Undeliverable or Unclaimed Distributions. ...... 32

H.  Manner of Payment. ........................................................................................ 34

I.  Foreign Currency Exchange Rate. .................................................................. 34

J.  Minimum Distribution. .................................................................................... 34

K.  Allocations. ...................................................................................................... 34

L.  Distributions Free and Clear. .......................................................................... 34

M.  Claims Paid or Payable by Third Parties. ........................................................ 34

  1.  Claims Paid by Third Parties. ..................................................................... 34

  2.  Claims Payable by Third Parties. ................................................................ 35

  3.  Applicability of Insurance Policies. ............................................................ 35

N.  No Postpetition Interest on Claims. ................................................................ 35

ARTICLE VII.  PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS ................................................................................................. 35

A.  Allowance of Claims. ...................................................................................... 35

B.  Claims Administration Responsibilities. ......................................................... 35

C.  Estimation of Claims and Interests. ................................................................ 36

D.  Adjustment to Claims or Interests Without Objection. .................................... 36

E.  Time to File Objections to Claims. ................................................................. 36

F.  Disallowance of Claims or Interests. .............................................................. 36

G.  Disputed Claims Process. ............................................................................... 37

H.  No Distributions Pending Allowance. ............................................................ 37

I.  Distributions After Allowance. ....................................................................... 37

ARTICLE VIII. ........................................................................................................... 37

LIQUIDATION TRUST AND LIQUIDATION TRUSTEE ...................................... 37

A.  Liquidation Trust Creation. ............................................................................. 37

B.  Purpose of the Liquidation Trust. ................................................................... 38

C.  Transfer of Assets to the Liquidation Trust. ................................................... 38

D.  Tax Treatment of the Liquidation Trust. ......................................................... 39

E.  Exculpation, Indemnification, Insurance and Liability Limitation. .................. 40

F.  Securities Exemption. ...................................................................................... 40

G.  Termination of the Liquidation Trustee. .......................................................... 41

ARTICLE IX. .................................................................................................................. 41

GUC TRUST AND GUC TRUSTEE......................................................................................... 41

   A.   GUC Trust Creation........................................................................................ 41

   B.   Purpose of the GUC Trust............................................................................... 41

   C.   Transfer of Assets to the GUC Trust. ............................................................ 41

   D.   Tax Treatment of the GUC Trust.................................................................... 42

   E.   Exculpation, Indemnification, Insurance and Liability Limitation.................. 43

   F.   Securities Exemption. .................................................................................... 43

   G.   Termination of the GUC Trustee. .................................................................. 43

ARTICLE X. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ............................. 44

   A.   Conditions Precedent to the Effective Date. ................................................. 44

   B.   Waiver of Conditions..................................................................................... 44

ARTICLE XI.  SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS 45

   A.   Releases by the Debtors. ................................................................................ 45

   B.   Releases by Holders of Claims and Interests................................................. 46

   C.   Exculpation. ................................................................................................... 46

   D.   Injunction. ..................................................................................................... 47

   E.   Setoffs. .......................................................................................................... 48

   F.   Release of Liens............................................................................................. 48

   G.   Recoupment. .................................................................................................. 48

ARTICLE XII BINDING NATURE OF PLAN .......................................................................... 49

ARTICLE XIII RETENTION OF JURISDICTION .................................................................... 49

ARTICLE XIV. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ... 51

   A.   Modification and Amendment. ...................................................................... 51

   B.   Effect of Confirmation on Modifications. ..................................................... 51

   C.   Revocation or Withdrawal of Plan................................................................. 51

ARTICLE XV................................................................................................................... 52

MISCELLANEOUS PROVISIONS............................................................................................ 52

   A.   Immediate Binding Effect.............................................................................. 52

   B.   Additional Documents. .................................................................................. 52

   C.   Substantial Consummation. ........................................................................... 52

   D.   Reservation of Rights..................................................................................... 52

   E.   Successors and Assigns.................................................................................. 52

   F.   Determination of Tax Liabilities.................................................................... 53

G.    Dissolution of the Committee. ........................................................................................ 53

H.    Notices. ........................................................................................................................... 53

I.    Term of Injunctions or Stays............................................................................................ 54

J.    Entire Agreement. ............................................................................................................ 54

K.    Plan Supplement. ............................................................................................................. 54

L.    Governing Law. ............................................................................................................... 55

M.    Nonseverability of Plan Provisions................................................................................. 55

N.    Closing of the Chapter 11 Cases. .................................................................................... 55

## INTRODUCTION

Village Roadshow Entertainment Group USA Inc., along with its Debtor affiliates (collectively, the "Debtors") propose this liquidating chapter 11 plan (the "Plan")[1] under section 1121 of the Bankruptcy Code. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Supplemental agreements and documents referenced in this Plan and the Disclosure Statement are available for review on both the Bankruptcy Court's docket and on the Debtors' case information website: https://www.veritaglobal.net/vreg.

Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims and Interests pursuant to the Bankruptcy Code. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

Reference is made to the Disclosure Statement filed contemporaneously with this Plan for a discussion of the Debtors' history, business, capital structure, marketing and sale process, and liquidation analysis, as well as a summary and analysis of the Plan and certain related matters, including distributions to be made under this Plan.

**ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

## ARTICLE I.
## DEFINED TERMS AND RULES OF INTERPRETATION

### A.    Defined Terms.

"*ABS Claim*" means a claim under the ABS Facility.

"*ABS Facility*" has the meaning ascribed to the term in the DIP Order.

"*Administrative Claim*" means a Claim incurred by the Debtors on or after the Petition Date and before the Effective Date for costs and expenses of administration of the Chapter 11 Cases entitled to priority pursuant to sections 503(b), 507(a), or 507(b) of the Bankruptcy Code, including: (1) the actual and necessary costs and expenses of preserving the Estates and operating the businesses of the Debtors incurred on or after the Petition Date and through the Effective Date; (2) Allowed Professional Fee Claims; and (3) all fees and charges assessed against the Estates under 28 U.S. Code Chapter 123.

"*Administrative Claims Bar Date*" means the deadline for Filing all requests for allowance and payment of Administrative Claims, which, except in the case of Professional Fee Claims and Section 503(b)(9) Claims, shall be thirty (30) days after the Effective Date. Professional Fee

---

[1] Capitalized terms used but not immediately defined herein have the meaning ascribed to such terms as set forth below.

Claims shall be filed in accordance with the provisions of Article II.C. herein.  The Bar Date for Section 503(b)(9) Claims is as set forth in the Bar Date Order.

"*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code as if such entity was a debtor in a case under the Bankruptcy Code.

"*Allowed*" means, with respect to any Claim, except as otherwise provided in the Plan: (1) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been Filed; or (2) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clause (1) above, such Claim shall be considered Allowed only if, and to the extent that, with respect to such Claim, no objection to the allowance thereof has been Filed by the Debtors, the Liquidation Trustee, or any other party in interest within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection was so Filed and the Claim shall have been Allowed by a Final Order of the Bankruptcy Court. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is Filed by the Bar Date, is not considered Allowed and shall be expunged without further action by the Debtors or the Liquidation Trust (as applicable) and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes the Debtors or the Liquidation Trust, as applicable.  "*Allow*" and "*Allowing*" shall have correlative meanings.  A Proof of Claim Filed after the Bar Date shall not be Allowed for any purposes whatsoever absent (i) entry of a Final Order allowing such late Filed Claim, or (ii) written consent of the Debtors or the Liquidation Trustee, as applicable, to the allowance of such Claim.

"*Asset Purchase Agreements*" means each of the asset purchase agreements, other agreements, instruments, pleadings, orders and related documents entered into in connection with the Library Assets Sale Order, the Studio Business Sale Order, and the Derivative Rights Sale Order.

"*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including fraudulent and voidable transfer laws.

"*Ballots*" means ballots provided to each of the Holders of Claims entitled to vote to accept or reject the Plan in accordance with the procedures governing the solicitation process as set forth in this Plan and the Disclosure Statement.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended from time to time.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the United States Code and the general, local, and chambers rules of the Bankruptcy Court, each, as amended from time to time.

"*Bar Date*" means, as applicable, the Administrative Claims Bar Date, and any other date or dates established by an order of the Bankruptcy Court by which Proofs of Claim must be Filed, including the general bar date and bar date for Governmental Units, each as determined by the Bar Date Order. Notwithstanding the foregoing, the Professional Fee Claims shall be Filed in accordance with Article II.C. herein.

"*Bar Date Order*" means the *Order (I) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim (Including for Claims Arising Under Section 503(b)(9) of the Bankruptcy Code) and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 130].

"*Bid Procedures and Sale Motion*" means the *Debtors' Motion for Entry of Orders (I)(A) Approving Bid Procedures for the Sale of the Debtors' Assets, (B) Authorizing the Debtors' Entry into the Stalking Horse APA and Approving Bid Protections Thereunder, (C) Scheduling an Auction for, and Hearing to Approve, Sale of the Debtors' Assets, (D) Approving Form and Manner of Notices of Sale, Auction, and Sale Hearing, and (E) Approving Assumption and Assignment Procedures, (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of All Liens, Claims, Interests, and Encumbrances, and (B) Approving Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 11].

"*Business Day*" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the laws of, or are in fact closed in, the State of New York.

"*Cash*" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

"*Causes of Action*" means any claims, interests, damages, remedies, causes of action, demands, rights, actions, controversies, proceedings, agreements, suits, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties, and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, whether arising before, on, or after the Petition Date, in contract, tort, law, equity, or otherwise. Causes of Action also include: (1) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (2) claims pursuant to federal securities law; (3) the right to object to or otherwise contest Claims or Interests and any Claims Objections; (4) claims pursuant to section 362 or chapter 5 of the Bankruptcy Code; (5) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; (6) any avoidance actions arising under chapter 5 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and

-3-

common law, including fraudulent transfer laws; and (7) claims pursuant to section 505 of the Bankruptcy Code.

"*Chapter 11 Cases*" means these chapter 11 cases Filed by the Debtors on the Petition Date in the Bankruptcy Court.

"*Claim*" means any "claim," as defined in section 101(5) of the Bankruptcy Code, against any of the Debtors or the Estates.

"*Claims Objection*" means an objection to the allowance of a Claim as set forth in section 502 of the Bankruptcy Code, Bankruptcy Rule 3007, and/or any Bankruptcy Court order regarding omnibus claims objections.

"*Claims Objection Bar Date*" means the date that is ninety (90) days after the Effective Date, which date may be extended upon presentment of an order to the Bankruptcy Court by the Liquidation Trustee.

"*Claims Register*" means the official register managed by the Notice and Claims Agent reflecting Claims against and Interests in the Debtors.

"*Class*" means a category of Claims or Interests as established by and set forth in Article III herein pursuant to section 1122(a) of the Bankruptcy Code.

"*Combined Hearing*" means the hearing(s) conducted by the Bankruptcy Court to consider (1) final approval of the adequacy of the Disclosure Statement under section 1125 of the Bankruptcy Code and (2) confirmation of the proposed Plan under section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

"*Committee*" means the official committee of unsecured creditors appointed by the U.S. Trustee under section 1102(b) of the Bankruptcy Code in these Chapter 11 Cases as it may be reconstituted from time to time [Docket Nos. 103, 123].

"*Committee Professionals*" means Pachulski Stang Ziehl & Jones LLP, as counsel, and Dundon Advisors LLC, as financial advisor, in each case retained by or representing the Committee in connection with the Chapter 11 Cases.

"*Committee Settlement*" means the comprehensive settlement among the Debtors, the Committee, and the Senior Secured Notes Parties as set forth in Article IV.E of the Plan.

"*Confirmation Date*" means the date upon which the Bankruptcy Code enters the Confirmation Order on the docket in these Chapter 11 Cases.

"*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

"*Consummation*" means the occurrence of the Effective Date.

-4-

"*Cure*" means all amounts, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) that is to be assumed or assumed and assigned by the Debtors pursuant to this Plan.

"*D&O Liability Insurance Policies*" means all directors', managers', and officers' liability insurance policies (including any "tail policy") that have been issued to provide coverage at any time to current and/or former directors, managers, officers and employees of the Debtors to which the Debtors are a party as of the Effective Date.

"*Debtors*" means Village Roadshow Entertainment Group USA Inc.; Crescent Film Holdings Limited; Village Roadshow Distribution (BVI) Limited; Village Roadshow Distribution Pty Ltd; Village Roadshow Distribution UK Limited; Village Roadshow Distribution USA Inc.; Village Roadshow Entertainment Group (BVI) Limited; Village Roadshow Entertainment Group Asia Limited; Village Roadshow Film Administration Management Pty Ltd; Village Roadshow Films (BVI) Limited; Village Roadshow Films Global Inc.; Village Roadshow Films North America Inc.; Village Roadshow Holdings USA Inc.; Village Roadshow Pictures Entertainment Inc.; Village Roadshow Pictures North America Inc.; Village Roadshow Productions (BVI) Ltd; Village Roadshow Productions Inc.; Village Roadshow VS Films LLC; VR DTE Distribution USA Inc.; VR DTE Productions Limited; VR Films Holdings (BVI) Limited; VR Funding LLC; VR Zoo Distribution USA Inc.; VR Zoo Productions Ltd; VREG Films Ltd; VREG Funding LLC; VREG IP Global LLC; VREG J2 Global LLC; VREG MM2 IP Global LLC; VREG OP Global LLC; VREG Production Services Inc.; VREG Television Inc.; VREG Wonka IP Global LLC; and VREG WW IP Global LLC, each as a debtor and debtor in possession.

"*Debtor-Related Matters*" means any matter arising from, in whole or in part, the Debtors, as such Entities existed prior to or after the Petition Date (including the management, ownership, or operation thereof or otherwise), the Debtors' Estates, any restructuring transactions contemplated by this Plan or otherwise, these Chapter 11 Cases, the Debtors' in- or out-of-court restructuring efforts, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in this Plan, the business or contractual arrangements or interaction between or among any Debtor and any Released Party, the distribution of any Cash or other property of the Debtors to any Released Party, the assertion of enforcement of rights or remedies against the Debtors, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, intercompany transactions between or among the Debtors or between the Debtors and their affiliates, the DIP Facility, the DIP Credit Documents (as defined in the DIP Order), any order approving the Disclosure Statement, the Confirmation Order, any "first day" or "second day" pleadings filed in these Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, administration, or filing of the Disclosure Statement, this Plan, the Plan Supplement or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the DIP Facility, this Plan, or the Plan Supplement, the filing of the Chapter 11 Cases, the pursuit of confirmation of this Plan, the pursuit of Consummation, the administration and implementation of this Plan, including the issuance or distribution of securities pursuant to this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.

"*Debtor Releases*" means the releases set forth in Article IX herein.

"*Derivative Rights*" has the meaning ascribed to such term in the Bid Procedures and Sale Motion.

"*Derivative Rights Sale*" means the sale of the Derivative Rights pursuant to the Derivative Rights Sale Order.

"*Derivative Rights Sale Order*" means the *Order (I) Approving the Sale of the Derivative Rights Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* [Docket No. 1043].

"*DIP Claim*" means a Claim arising from, under, or in connection with the DIP Facility.

"*DIP Facility*" has the meaning ascribed to such term in the DIP Order.

"*DIP Order*" means the *Final Order (I) Authorizing the Debtors to Obtain Post-Petition Secured Financing, (II) Authorizing the use of Cash Collateral, (III) Granting Liens and Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, and (VI) Granting Related Relief* [Docket No. 280].

"*Disbursing Agent*" means the Debtors, the Liquidation Trustee, the GUC Trust, or the Person or Entit(ies) selected by the Liquidation Trustee or GUC Trustee, as applicable, to make or to facilitate the Plan Distributions, or to make any disbursements on behalf of any Debtor or on account of an obligation of any Debtor.

"*Disclosure Statement*" means the *Disclosure Statement Relating to the Joint Chapter 11 Plan of Liquidation of Village Roadshow Entertainment Group USA Inc. and its Debtor Affiliates*, dated January 29, 2026 (as such may be amended, supplemented, or modified from time to time thereafter), including all exhibits and schedules thereto.

"*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest:  (1) listed on the Schedules as unliquidated, disputed or contingent, unless a Proof of Claim has been Filed in a liquidated and non-contingent amount and no objection to such Proof of Claim has been timely filed; (2) included in a Proof of Claim as to which an objection or request for estimation has been timely filed, or as to which the Debtor, the Liquidation Trustee, or other parties in interest retain the ability to interpose a timely objection or request for estimation; or (3) which is otherwise disputed by the Debtor or the Liquidation Trustee in accordance with applicable law and for which the objection, request for estimation, or dispute has not been withdrawn or determined by a Final Order.  Claims that are Allowed by the Plan or that have been Allowed by a Final Order shall not be Disputed Claims.

"*Distribution Record Date*" means the date for determining which Holders of Allowed Claims are eligible to receive Plan Distributions under the Plan, which date shall be the Confirmation Date, or such other date as announced by the Debtors with the consent of the Senior Secured Notes Parties or as designated in a Final Order of the Bankruptcy Court.

"*Effective Date*" means the date that is the first calendar Day after the Confirmation Date on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions precedent to the occurrence of the Effective Date have been satisfied or waived in accordance with the Plan. Any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable thereafter.

"*Elected Section 365(n) Rights*" means the valid rights, if any, of any licensee who elected in writing to retain its right to licensed intellectual property of any Debtor pursuant to section 365(n) of the Bankruptcy Code following rejection of such licensee's license by such Debtor, but only to the extent that such rights following rejection exist under the Bankruptcy Code.

"*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

"*Exculpated Party*" means collectively, and in each case, in its capacity as such: (a) the Debtors; (b) the Debtors' directors and officers who served at any time between the Petition Date and the Effective Date; (c) the Debtors' managers during these Chapter 11 Cases; (d) such Released Parties that are fiduciaries to the Debtors' Estates; (e) the Committee; (f) the members of the Committee in their capacity as such; and (g) all Professionals retained by the Debtors and the Committee in these Chapter 11 Cases in their respective capacities as Professionals to the Debtors or Committee.

"*Exculpation*" means the exculpation granted to each of the Exculpated Parties as set forth herein.

"*Executory Contract*" means a contract to which any of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Existing Equity Interests*" means the existing Interests in Village Roadshow Entertainment Group (BVI) Limited.

"*File*," "*Filed*," or "*Filing*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases, or in the case of a Proof of Claim, the Notice and Claims Agent.

"*Final Order*" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek leave to appeal, seek reconsideration under Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure, seek a new trial, reargument, or rehearing and, where applicable, petition for certiorari has expired and no appeal, motion for leave to appeal, motion for reconsideration under Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure, motion for a new trial, reargument or rehearing or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, or as to which any motion for reconsideration that has been filed pursuant to Rule 59(b) or 59(e) of the Federal Rules of Civil Procedure or any

-7-

motion for a new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided* that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024, or any analogous rule, may be filed relating to such order or judgment shall not cause such order or judgment not to be a Final Order.

"*Governmental Unit(s)*" means a "governmental unit," as defined in section 101(27) of the Bankruptcy Code.

"*GUC Recovery*" means 85% of the total Allowed Non-Library Debtors General Unsecured Claims.

"*GUC Trust*" means the trust established for the benefit of Holders of Allowed Non-Library Debtors General Unsecured Claims, which will be funded on the Effective Date and administered by a trustee appointed by the Committee.

"*GUC Trust Agreement*" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the Liquidation Trust.

"*GUC Trust Amount*" means $7,225,000.

"*GUC Trust Assets*" means (i) the GUC Trust Amount, (ii) the GUC Trust Initial Funding Amount, and (iii) any shortfall amounts funded to the GUC Trust by the Debtors or the Liquidation Trust pursuant to the terms of the Committee Settlement, subject to the terms of this Plan.

"*GUC Trust Beneficiaries*" means all Holders of Allowed Non-Library Debtors General Unsecured Claims against the Non-Library Debtors.

"*GUC Trust Fees and Expenses*" means all reasonable and documented fees, expenses, and costs (including any taxes imposed on or payable by the GUC Trust or in respect of the GUC Trust Assets) incurred by the GUC Trust, any professionals retained by the GUC Trust, and any additional amount determined necessary by the GUC Trustee to adequately reserve for the operating expenses of the GUC Trust, which may be paid first from the GUC Trust Initial Funding Amount and then by the GUC Trust Amount.  For the avoidance of doubt, GUC Trust Fees and Expenses shall not exceed the GUC Trust Initial Funding Amount in the aggregate from any funding source.

"*GUC Trust Initial Funding Amount*" means $500,000.

"*GUC Trust Interests*" means the non-transferable interests in the GUC Trust that are issued to the GUC Trust Beneficiaries pursuant to this Plan.

"*GUC Trustee*" means the Person appointed by the Committee to administer the GUC Trust.

"*GUC Trust Net Amount*" means the GUC Trust Amount less the GUC Trust Fees and Expenses.

-8-

"*Holder*" means a Person or Entity, as applicable, holding a Claim against or an Interest in any of the Debtors.

"*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is "impaired" within the meaning of section 1124 of the Bankruptcy Code.

"*Indemnification Obligations*" means, collectively, each of the Debtors' indemnification obligations (whether in charters, bylaws, limited liability company agreements, or other organizational documents) in place as of the Effective Date to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors.

"*Insider*" has the meaning set forth in section 101(31) of the Bankruptcy Code.

"*Insurance Policies*" means all insurance policies that have been issued at any time to provide coverage to the Debtors and all agreements, documents, or instruments relating thereto, *provided* that it does not include any such policies that are, or have been, assumed and assigned to the Purchaser(s) on or before the Effective Date pursuant to the Asset Purchase Agreement(s), the Sale Orders, and section 365 of the Bankruptcy Code.

"*Intercompany Claim*" means any Claim held by a Debtor or an Affiliate against a Debtor or an Affiliate of a Debtor; provided, for the avoidance of doubt, that the term Intercompany Claim shall not include the Senior Secured Notes Claims.

"*Intercompany Interest*" means an Interest in a Debtor that is held by another Debtor or an Affiliate of a Debtor.

"*Interest(s)*" means an equity security (as defined in section 101(16) of the Bankruptcy Code) of the Debtors, including all shares, common stock, preferred stock, or other instrument evidencing any fixed or contingent ownership interest in the Debtors, whether or not transferable, and any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, whether fully vested or vesting in the future, including without limitation, equity or equity-based incentives, grants, or other instruments issued, granted, or promised to be granted to current or former employees, directors, officers, or contractors of the Debtors, to acquire any such interest in the Debtors.

"*IRS Form*" means IRS Form W-9, W-8BEN, any acceptable substitute, or any other tax information form that the Liquidation Trustee may require from a holder of a Claim for a distribution under the Plan.

"*Library Assets*" has the meaning ascribed to such term in the Bid Procedures and Sale Motion.

"*Library Assets Sale*" means the sale of the Library Assets pursuant to the Library Assets Sale Order.

"*Library Assets Sale Order*" means the *Order (I) Approving the Sale of Library Assets Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* [Docket No. 562].

"*Lien*" means a "lien," as defined in section 101(37) of the Bankruptcy Code.

"*Library Debtors*" means Village Roadshow Films (BVI) Limited; Village Roadshow Films North America Inc.; Village Roadshow Pictures North America Inc.; Village Roadshow Distribution (BVI) Limited; Village Roadshow Films Global Inc.; Village Roadshow VS Films LLC; VR Films Holdings (BVI) Limited; and VR Funding LLC.

"*Library Debtors General Unsecured Claims*" means any unsecured Claim that is held against the Library Debtors, including the Warner Bros. Claims.

"*Library Reserve*" shall have the meaning ascribed to such term in the DIP Order.

"*Library Reserve Distributable Proceeds*" means the amount remaining in the Library Reserve, if any, available for distribution following payment of the Library Debtors General Unsecured Claims.

"*Liquidation Analysis*" means the analysis of a liquidation scenario under chapter 7 of the Bankruptcy Code for the Debtors, to be filed with the Disclosure Statement filed concurrently with the Plan or part of any Plan Supplement or other filing or notice Filed and noticed prior to or concurrently with distribution of the Ballots and Notice of Non-Voting Status Package.

"*Liquidation Transaction*" means, collectively, those mergers, amalgamations, consolidations, arrangements, continuances, restructurings, transfers, conversions, dispositions, liquidations, dissolutions, or other corporate transactions, that the Debtors or the Liquidation Trustee reasonably determine to be necessary to implement the Plan.

"*Liquidation Trust*" means the trust established for the benefit of the Liquidation Trust Beneficiaries on the Effective Date in accordance with the terms of this Plan and the Liquidation Trust Agreement, which shall be structured to qualify as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d) and in compliance with Revenue Procedure 94-45, 1994 2 C.B. 684, and thus, as a "grantor trust" within the meaning of Sections 671 through 679 of the Internal Revenue Code.

"*Liquidation Trust Agreement*" means the trust agreement establishing and delineating the terms and conditions for the creation and operation of the Liquidation Trust.

"*Liquidation Trust Assets*" means (a) the Liquidation Trust Cash; (b) the Warner Bros. Reserve Distributable Proceeds; (c) the Library Reserve Distributable Proceeds; (d) the Retained Causes of Action; (e) the Intercompany Interests, if applicable; (f) any of the Debtors' rights and proceeds under the Sale Transactions; (g) all bank accounts of the Debtors; and (h) all documents, communications, and information protected by attorney-client privilege, the work-product privilege, and any other applicable evidentiary privileges.  For the avoidance of doubt, the Liquidation Trust Assets shall not include (x) any Claims and Causes of Action that have been

-10-

released pursuant to the Plan or transferred pursuant to the Sale Transactions; and (y) any GUC Trust Assets, if applicable.

"*Liquidation Trust Beneficiaries*" means a Holder of a Liquidation Trust Interest, whether individually or as agent.  To the extent Holders of Allowed Claims are entitled to a distribution from the Liquidation Trust pursuant to the terms of this Plan, such Holders are each a Liquidation Trust Beneficiary.

"*Liquidation Trust Cash*" means all Cash excluding the GUC Trust Amount and the GUC Trust Initial Funding Amount.

"*Liquidation Trust Fees and Expenses*" means all reasonable and documented fees, expenses, and costs (including any taxes imposed on or payable by the Liquidation Trust or in respect of the Liquidation Trust Assets) incurred by the Liquidation Trust, any professionals retained by the Liquidation Trust, and any additional amount determined necessary by the Liquidation Trustee to adequately reserve for the operating expenses of the Liquidation Trust.

"*Liquidation Trust Interests*" means the non-transferable interests in the Liquidation Trust that are issued to the Liquidation Trust Beneficiaries pursuant to this Plan.

"*Liquidation Trust Net Assets*" means the Liquidation Trust Assets less the Liquidation Trust Fees and Expenses.

"*Liquidation Trustee*" means the Person appointed by the Debtors to administer the Liquidation Trust.

"*Non-Library Debtors General Unsecured Claims*" means any Claim other than a(n): (a) Administrative Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) DIP Claim; (e) Other Secured Claim; (f) Other Priority Claim; (g) Senior Secured Notes Claim; (h) Library Debtors General Unsecured Claim; or (i) Intercompany Claim.

"*Non-Library Debtors*" means any Debtor that is not a Library Debtor.

"*Notice and Claims Agent*" means Kurtzman Carson Consultants LLC, DBA Verita Global, in its capacity as noticing, claims, and solicitation agent for the Debtors.

"*Notice of Non-Voting Status Package*" means the materials sent to Holders of Claims and Interests not entitled to vote to accept or reject the Plan in accordance with the procedures governing the solicitation process as set forth in this Plan and the Disclosure Statement.

"*OCP*" means an ordinary course professional whose retention and compensation has been authorized by the Bankruptcy Court by entry of the OCP Order.

"*OCP Order*" means the *Order (I) Authorizing the Debtors to Retain and Compensate Professionals Utilized in the Ordinary Course of Business and (II) Granting Related Relief* [Docket No. 192].

"*Other Priority Claim*" means a Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"*Other Secured Claim*" means any Secured Claim against the Debtors, other than a Senior Secured Notes Claim, ABS Claim, or a DIP Claim.

"*Person*" means a "person" as defined in section 101(41) of the Bankruptcy Code.

"*Petition Date*" means the date on which each of the Debtors Filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code, thereby commencing these Chapter 11 Cases.

"*Plan*" means this joint plan of liquidation under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified, or supplemented from time to time, including all exhibits and schedules hereto.

"*Plan Distribution*" means a payment or distribution to holders of Allowed Claims or other eligible Entities under this Plan.

"*Plan Supplement*" means a supplemental appendix to the Plan consisting of documents and forms of documents, agreements, schedules, and exhibits to the Plan (in each case, as may be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and Bankruptcy Rules), which shall be Filed by the Debtors no later than seven (7) days before the Voting Deadline to accept or reject the Plan or such later date that may be approved by the Bankruptcy Court. The Plan Supplement shall include, as applicable, (1) the identity of the Liquidation Trustee and the compensation of the Liquidation Trustee; (2) the Liquidation Trust Agreement; (3) the identity of the GUC Trustee and the compensation of the GUC Trustee; (4) the GUC Trust Agreement; (5) solely to the extent required under section 1129(a)(5) of the Bankruptcy Code and to the extent known, the identity of any insider that will be employed or retained by the Liquidation Trust, and the nature of any compensation for such insider; (4) the list of Retained Causes of Action, if any; and (6) other documentation necessary to effectuate the Plan or that is contemplated by the Plan. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement through the Effective Date.

"*Priority Tax Claim*" means a Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"*Professional*" means a Person or Entity: (1) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (2) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

"*Professional Fee Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred after the Petition Date and on or before the Effective Date under sections 328, 330, 331, or 503(b)(2) of the Bankruptcy Code, as applicable.

"*Professional Fee Reserve Account*" means the reserve account established and funded by the Debtors prior to the Effective Date to satisfy the accrued but unpaid Professional Fee Claims of the Professionals.

"*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in these Chapter 11 Cases.

"*Related Party*" means each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of an entity), accountants, investment bankers, consultants, representatives, and other professionals and advisors and any such person's or entity's respective heirs, executors, estates, and nominees.

"*Release Opt-Out Election*" means the timely election to "opt out" of being a Releasing Party by (a) submitting a Ballot by the Voting Deadline that (i) does not vote to accept the Plan and (ii) selects the option set forth on the Ballot or the Notice of Non-Voting Status Package, as applicable to not grant the releases set forth in Article XI of this Plan, or (b) Filing a written objection to the releases set forth in Article XI of this Plan by the Confirmation Objection Deadline.

"*Released Party*" means each of the following and in each case in its capacity as such: (a) the Debtors; (b) each of the Senior Secured Notes Parties; (c) the Holders of DIP Claims; (d) the Liquidation Trustee; (e) the Committee and its members, each in their capacities as such; (f) the Holders of Existing Equity Interests and (g) each Related Party of each Entity in clause (a) through this clause (f); *provided* that, a Released Party shall only be a Released Party if it is also a Releasing Party.

"*Releasing Party*" means (a) the Released Parties; (b) all Holders of Claims or Interests that are Unimpaired; (c) all Holders of Claims or Interests that (i) vote to accept the Plan or (ii) do not vote on the Plan, and for each of the foregoing, do not make a Release Opt-Out Election; (d) all Holders of Claims or Interests who receive a Notice of Non-Voting Status Package and do not make a Release Opt-Out Election; and (e) each Related Party of each Entity in the foregoing clauses (a) through (d), solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through (d); *provided, however*, the Debtors shall not be a Releasing Party to the extent being a Releasing Party is duplicative or inconsistent with the Debtor Releases provided in Article X.A herein or any Retained Cause of Action; and *provided further* that Releasing Parties shall exclude any of the foregoing parties that makes a Release Opt-Out Election.

"*Retained Causes of Action*" means the list of Claims and Causes of Action of the Debtors filed with the Plan Supplement; *provided, however*, the Retained Causes of Action shall not

include (x) any Claims or Causes of Action against any Released Party or (y) transferred pursuant to the Sale Transactions.

"*Sale Documents*" means, collectively, the Asset Purchase Agreements and all agreements, documents, and instruments related thereto, including the Sale Orders.

"*Sale Orders*" means, collectively, the Library Assets Sale Order, the Studio Business Sale Order, and the Derivative Rights Sale Order.

"*Sale Transactions*" means, collectively, the (a) Library Assets Sale; (b) the Studio Business Sale; and (c) the Derivative Rights Sale.

"*Schedules*" means, collectively, the schedule of assets and liabilities and statement of financial affairs Filed by the Debtor pursuant to section 521 of the Bankruptcy Code, the Bankruptcy Rules, and the official bankruptcy forms, as the same may be amended, modified, or supplemented from time to time.

"*Section 503(b)(9) Claims*" means a Claim entitled to administrative expense status arising under section 503(b)(9) of the Bankruptcy Code.

"*Secured*" means when referring to a Claim: (a) secured by a Lien on collateral in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such collateral or to the extent of the amount subject to setoff, as applicable, determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

"*Senior Secured Noteholders*" means "Holders" as defined in the Senior Secured Notes Agreement.

"*Senior Secured Notes*" means, collectively, "Notes" as defined in the Senior Secured Notes Agreement.

"*Senior Secured Notes Agreement*" means that certain Fifth Amended and Restated Note Purchase Agreement dated as of January 21, 2025 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time).

"*Senior Secured Notes Prepetition Amendment*" means that certain amendment to the Senior Secured Notes Agreement dated as of March 16, 2025.

"*Senior Secured Notes Claims*" means any Claim arising under, derived from, secured by, based on, or related to the Senior Secured Notes.

"*Senior Secured Notes Collateral Agent*" means Wilmington Savings Fund Society, FSB, in its capacity as collateral agent under the Senior Secured Notes Agreement, and any successor thereto.

-14-

"*Senior Secured Notes Credit Documents*" means the Senior Secured Notes Agreement and the other security and credit documents related thereto (including, without limitation, the Senior Secured Notes Prepetition Amendment).

"*Senior Secured Notes Parties*" means the Senior Secured Noteholders and the Senior Secured Notes Collateral Agent.

"*Senior Secured Notes Recovery*" means (i) any amounts in the GUC Trust that exceeds the value of the GUC Recovery, if applicable; and (ii) all other available Cash, after the allocation of sufficient Cash to (a) fund the GUC Trust, (b) pay Allowed Administrative Claims, Priority Tax Claims, Other Secured Claims and Other Priority Claims in an amount up to the Priority Claims Amount Cap, and (c) fund the Professional Fee Reserve Account.

"*Studio Business"* has the meaning ascribed to such term in the Bid Procedures and Sale Motion.

"*Studio Business Sale*" means the sale of the Studio Business pursuant to the Studio Business Sale Order

"*Studio Business Sale Order*" means the *Order (I) Approving the Sale of the Studio Business Free and Clear of Liens, Claims, Interests, and Encumbrances, (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (III) Granting Related Relief* [Docket No. 782].

"*Third-Party Release*" means the release given by each of the Releasing Parties to the Released Parties as set forth in Article XI.B herein.

"*U.S. Trustee*" means the United States Trustee for the District of Delaware.

"*Unimpaired*" means, with respect to a Claim or Class of Claims, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

"*Voting Deadline*" means the date and time by which all ballots to accept or reject the Plan must be received to be counted.

"*Warner Bros.*" means Warner Bros. Entertainment Inc., WAV Distribution LLC and their affiliates.

"*Warner Bros. Claims*" means any amounts due to Warner Bros. on account of alleged prepetition breaches of any agreement between Warner Bros. and any of the Debtors.

"*Warner Bros. Reserve*" has the meaning ascribed to such term in the DIP Order.

"*Warner Bros. Reserve Distributable Proceeds*" means the amount remaining in the Warner Bros. Reserve, if any, available for distribution following payment of the Warner Bros. Claims.

"*Wind-Down*" means the post-Effective Date wind-down process by which the Liquidation Trust shall seek to (a) liquidate any remaining assets of the Debtors and make distributions relating to the same; (b) complete any tasks required to wind-down the affairs of the Debtors; and (c) otherwise close these Chapter 11 Cases, as described in more detail in Article IV herein.

## B.    Rules of Interpretation.

For the purposes of the Plan, and except as otherwise provided herein, the following rules of interpretation shall apply:  (1) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, will include both the singular and the plural; (2) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document will be substantially in such form or substantially on such terms and conditions; (3) any reference in the Plan to an existing document or exhibit Filed or to be Filed means such document or exhibit, as it may have been or may be amended, modified or supplemented pursuant to the Plan or Confirmation Order; (4) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (5) all references in the Plan to "Articles" and "Exhibits" are references to the articles and exhibits of or to the Plan unless otherwise noted; (6) the words "herein," "hereunder," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (7) the words "includes" or "including" are not limiting; (8) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (9) unless otherwise specified, references in the Plan to "Docket No." refer to entries on these Chapter 11 Cases' docket; (10) subject to the provisions of any contract, certificate of incorporation, by-laws, or similar constituent document, instrument, release, or other agreement or document entered into or delivered in connection with the Plan, the rights and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and the Bankruptcy Rules, and, to the extent applicable, the laws of the State of Delaware; (11) the rules of construction set forth in section 102 of the Bankruptcy Code will apply; and (12) all references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

## C.    Computation of Time.

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) will apply. Any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter unless otherwise specified herein.

## D.    Controlling Document.

In the event of an inconsistency between the Plan and the Disclosure Statement or the Plan and the Plan Supplement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Confirmation Order, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS, PRIORITY TAX CLAIMS, AND STATUTORY FEES

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims (including Professional Fee Claims) and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

### A.    Administrative Claims.

Except to the extent that a Holder of an Allowed Administrative Claim agrees to a different treatment, each Holder of an Allowed Administrative Claim (other than a Professional Fee Claim) shall receive, in full and final satisfaction of such Claim, (1) Cash in an amount equal to such Allowed Administrative Claim in accordance with the following: (i) if Allowed on or prior to the Effective Date, then on the Effective Date or as soon as reasonably practicable thereafter, (ii) if not Allowed as of the Effective Date, then no later than forty-five (45) days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or (iii) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court; or (2) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

Except for Professional Fee Claims, and notwithstanding any prior Filing or Proof of Claim, Proofs of Claim seeking the allowance and payment of Administrative Claims must be Filed and served on the Debtors or the Liquidation Trustee  (as applicable) and their counsel by no later than the Administrative Claims Bar Date pursuant to the procedures set forth in the Confirmation Order and the notice of the occurrence of the Effective Date.  The burden of proof for the allowance of Administrative Claims remains on the Holder of the Administrative Claims.

**Except as otherwise provided in Articles II.B, II.C, or II.D herein, holders of Administrative Claims that do not File and serve a Proof of Claim or application for payment of administrative expenses requesting the allowance of an Administrative Claim by the Administrative Claims Bar Date shall be forever barred, estopped, and enjoined from asserting Administrative Claims against the Debtors or the Liquidation Trustee, the Estates, or the Debtors' assets and properties, and any Administrative Claims shall be deemed disallowed as of the Effective Date unless otherwise ordered by the Bankruptcy Court.**

### B.    DIP Claim.

Each Holder of a DIP Claim previously received payment in full and final satisfaction of such Claim.  As a result, all DIP Claims have been indefeasibly paid in full and shall not be entitled to any Plan Distributions, *provided* that any indemnification or other obligations existing following payoff of the DIP Facility pursuant to the documents governing payoff of the DIP Facility shall survive following the Effective Date, constitute Allowed Claims against the Debtors' estates, and, if applicable, be payable from the Liquidation Trust.

C.    **ABS Claim.**

Each Holder of an ABS Claim previously received payment in full and final satisfaction of such Claim.  As a result, all ABS Claims have been indefeasibly paid in full and shall not be entitled to any Plan Distributions.

D.    **Professional Fee Claims.**

1.    Final Fee Applications and Payment of Professional Fee Claims.

All Professional Persons (other than OCPs) seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (1) file, on or before the date that is forty-five (45) days after the Confirmation Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred; and (2) be paid in full, in Cash, from the Professional Fee Reserve Account in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Professional Fee Claim. Objections to Professional Fee Claims must be Filed and served no later than twenty-one (21) days after the Filing of the Professional Fee Claim.

2.    Administrative Claims of OCPs.

All requests for payment of Professional Fee Claims of OCPs shall be made pursuant to the OCP Order.  To the extent any Professional Fee Claims of the OCPs have not been Allowed pursuant to the OCP Order on or before the Effective Date, the amount of Professional Fee Claims owing to the OCPs shall be paid in Cash to such OCPs by the Debtor or the Liquidation Trustee (as applicable) from the Professional Fee Reserve Account as soon as reasonably practicable after such Professional Fee Claims are Allowed pursuant to the OCP Order.

3.    Post-Confirmation Date Fees and Expenses.

Except as otherwise specifically provided in the Plan, from and after the Confirmation Date, the Debtors, the Liquidation Trustee, or the GUC Trustee (as applicable) shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses incurred by the Debtors or the Liquidation Trust (as applicable).  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors or Liquidation Trust (as applicable) may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

4.    Professional Fee Reserve Account.

Professionals shall reasonably estimate their unpaid Professional Fee Claims and other unpaid fees and expenses incurred in rendering services to the Debtors or the Committee, as applicable, before and as of the Effective Date, and shall deliver such estimate to the Debtors no

later than two (2) Business Days before the Effective Date; *provided*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professionals' final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional. The Debtors shall fund and reserve the Professional Fee Reserve Account until payment in full of all Allowed Professional Fee Claims.  If the Professional Fee Reserve Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, the remaining unpaid Allowed Professional Fee Claims shall be paid by the Liquidation Trust as Allowed Administrative Claims. For the avoidance of doubt, the Professional Fee Reserve Account cannot be used to pay any Secured, Priority, or Administrative Claims until all Professional Fee Claims are satisfied or otherwise reserved for.

### E.    Priority Tax Claims.

On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent a Holder of an Allowed Priority Tax Claim and the Debtors agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed Priority Tax Claim, each Holder thereof will be paid in full in Cash or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

### F.    U.S. Trustee Statutory Fees.

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Liquidation Trust shall be liable to pay any and all Quarterly Fees when due and payable.  The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Liquidation Trustee shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  The Liquidation Trust shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee on account of each Debtor's Chapter 11 Case, and such fees shall be paid exclusively from the Liquidation Trust Assets, until the earliest of that Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.  The U.S. Trustee shall not be required to file any Proof of Claim for an Administrative Claim in the Chapter 11 Cases, and shall not be treated as providing any release under the Plan.

### ARTICLE III.
### CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A.    Classification of Claims and Interests.

Except for the Claims addressed in Article II herein, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Class(es) to the extent that any portion of the Claim or Interest qualifies within the description of such other Class(es).  A Claim also is classified in a particular Class for the purpose of receiving

-19-

distributions under the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been otherwise paid, released, or satisfied at any time.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3A | Library Debtors General Unsecured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3B | Non-Library Debtors General Unsecured Claims | Impaired | Entitled to Vote |
| Class 4 | Senior Secured Notes Claims | Impaired | Entitled to Vote |
| Class 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Existing Equity Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 7 | Intercompany Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**B.    Treatment of Claims and Interests.**

1.    <u>Class 1 – Other Secured Claims</u>.

i.    *Classification*:  Class 1 consists of all Other Secured Claims against the Debtors.

ii.    *Treatment*:  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Other Secured Claim and the Debtors or the Liquidation Trustee, as applicable, agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed Other Secured Claim, each Holder thereof will receive: (a) payment in full in Cash; (b) delivery of the collateral securing any such Claim and payment of any interest required under section 506(b) of the

-20-

Bankruptcy Code; (c) reinstatement of such Claim; or (d) such other treatment rendering such Claim Unimpaired.

    iii.   *Voting*:  Class 1 is Unimpaired, and Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1 Other Secured Claims are not entitled to vote to accept or reject the Plan.

    2.      <u>Class 2 – Other Priority Claims</u>.

    i.   *Classification*:  Class 2 consists of all Other Priority Claims against the Debtors.

    ii.   *Treatment*:  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of an Allowed Other Priority Claim and the Debtors or the Liquidation Trustee, as applicable, agree to less favorable treatment for such Holder, in full and final satisfaction of the Allowed Other Priority Claim, each Holder thereof will receive: (a) payment in full in Cash; or (b) such other treatment rendering such Claim Unimpaired.

    iii.   *Voting*:  Class 2 is Unimpaired, and Holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2 Other Priority Claims are not entitled to vote to accept or reject the Plan.

    3.      <u>Class 3A – Library Debtors General Unsecured Claims.</u>

    i.   *Classification*: Class 3 consists of Library Debtors General Unsecured Claims against the Library Debtors.

    ii.   *Treatment*:  On the Effective Date, or as soon as reasonably practicable thereafter, all Allowed Library Debtors General Unsecured Claims, other than the Warner Bros. Claims, will be paid in full from the Library Reserve, unless the Holder of an Allowed Library Debtors General Unsecured Claim and the Debtors or the Liquidation Trustee, as applicable, agree to less favorable treatment for such Holder, in full and final satisfaction of its Allowed Library Debtors General Unsecured Claim.  Once the Warner Bros. Claims have been determined by Final Order or by agreement of the parties and become Allowed (if at all, or in whole or in part), the Warner Bros. Claims will be paid in full in the Allowed amount, first from the Warner Bros. Reserve, and second, to the extent that the Warner Bros. Reserve is insufficient to satisfy the Warner Bros. Claims, from the Library Reserve.

    iii.   *Voting*: Class 3A is Unimpaired, and Holders of Library Debtors General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of

Class 3 Library Debtors General Unsecured Claims are not entitled to vote to accept or reject the Plan.

4.    Class 3B – Non-Library Debtors General Unsecured Claims.

i.    *Classification*:  Class 3B consists of the Non-Library Debtors General Unsecured Claims against the Non-Library Debtors.

ii.    *Treatment*:  On or prior to the Effective Date, the Debtors will fund the GUC Trust with the GUC Trust Amount and the GUC Trust Initial Funding Amount.  Except to the extent that a Holder of an Allowed Non-Library Debtors General Unsecured Claim and the Debtors or the Liquidation Trustee, as applicable, agree to less favorable treatment for such Holder, in full and final satisfaction of its Allowed Non-Library Debtors General Unsecured Claim, each Holder thereof will receive 85% of its Allowed Claim from the GUC Trust Net Amount; *provided*, for the avoidance of doubt, that if the value of the GUC Trust Net Amount exceeds the GUC Recovery, such excess amount shall be distributed to the Liquidation Trust for the sole and exclusive benefit of Holders of Senior Secured Notes Claims; *provided further*, that if the value of the GUC Trust Net Amount is less than the GUC Recovery, the Debtors or the Liquidation Trust, as applicable, shall fund the shortfall to the GUC Trust immediately upon request solely to the extent of available Liquidation Trust Assets.  The GUC Trust Fees and Expenses shall not exceed the GUC Trust Initial Funding Amount in the aggregate from any funding source.

iii.    *Voting*:  Class 3B is Impaired, and Holders of Non-Library Debtors General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.    Class 4 – Senior Secured Notes Claims.

i.    *Classification*:  Class 4 consists of all Senior Secured Notes Claims.

ii.    *Allowance*:  Senior Secured Notes Claims shall be deemed Allowed in the principal amount of $157,288,992.00, plus all accrued and unpaid interest as of the Petition Date, and reasonable and documented fees, expenses, and other amounts arising and payable under and in accordance with the Senior Secured Notes Credit Documents.

iii.    *Treatment*:  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that a Holder of a Senior Secured Notes Claim and the Debtors agree to less favorable treatment for such Holder, in full and final satisfaction of the Senior Secured Notes Claims, shall receive distributions from the Liquidation Trust in accordance with the waterfall set forth in Section 12.5 Application of Proceeds in the Senior Secured Notes Agreement, as amended by the Senior Secured Notes Prepetition Amendment, as more fully set forth in the Liquidation Trust Agreement.

iv. *Voting*:  Class 4 is Impaired, and Holders of Senior Secured Notes Claims are entitled to vote to accept or reject the Plan.

6.    Class 5 – Intercompany Claims.

i. *Classification*:   Class 5 consists of Intercompany Claims between and among the Debtors.

ii. *Treatment*:  On the Effective Date, all Intercompany Claims shall either be settled, discharged, canceled, or released without any distribution, on account of such Intercompany Claims, and be of no further force or effect.

iii. *Voting*:   Class 5 is Impaired, and Holders of Intercompany Claims are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 5 Intercompany Claims are not entitled to vote to accept or reject the Plan.

7.    Class 6 – Existing Equity Claims.

i. *Classification*:   Class 6 consists of all Existing Equity Interests in the Debtors.

ii. *Treatment*:  On the Effective Date, all Existing Equity Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Existing Equity Interests shall not receive any distribution, property or other value under the Plan on account of such Interest.

iii. *Voting*:  Class 6 is Impaired, and Holders of Existing Equity Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 6 Existing Equity Interests are not entitled to vote to accept or reject the Plan.

8.    Class 7 – Intercompany Interests.

i. *Classification*:  Class 7 consists of all Intercompany Interests in the Debtors.

ii. *Treatment*:   On the Effective Date, all Intercompany Interests shall be canceled, released, and extinguished, and will be of no further force or effect, and Holders of such Intercompany Interests shall not receive any distribution, property, or other value under the Plan on account of such Interest.

iii. *Voting*:  Class 7 is Impaired, and Holders of Intercompany Interests are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 7 Intercompany Interests are not entitled to vote to accept or reject the Plan.

C.    **Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in this Plan, nothing under this Plan shall affect the rights of the Debtors or the Liquidation Trustee with respect to any Unimpaired Claims, including all legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

D.    **Elimination of Vacant Classes.**

Any Class that, as of the commencement of the Combined Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of voting to accept or reject this Plan, and disregarded for purposes of determining whether this Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

E.    **Voting Classes, Presumed Acceptance by Non-Voting Classes.**

With respect to each Debtor, if a Class contains Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject this Plan, this Plan shall be presumed accepted by the holders of such Claims in such Class.

F.    **Controversy Concerning Impairment.**

If a controversy arises as to whether any Claim or any Class of Claims is Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the date of the Combined Hearing.

G.    **Subordination of Claims.**

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, contract (including, without limitation, under the Senior Secured Notes Credit Documents), section 510(b) of the Bankruptcy Code, or otherwise.

H.    **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to this Article III of the Plan. The Debtors hereby request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Class that is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. The Debtors reserve the right to request confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any voting Class that votes to reject the Plan.

-24-

I.    **Insurance.**

Notwithstanding anything to the contrary in the Plan, if any Claim is subject to coverage under an Insurance Policy, payments on account of such Claim will first be made from proceeds of such Insurance Policy in accordance with the terms thereof, with the balance of such Claim, if any, treated in accordance with the provisions of the Plan governing the Class applicable to such Claim.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    **General Settlement of Claims and Interests.**

To the extent provided by the Bankruptcy Code, and in consideration for the distributions, releases, and other benefits provided pursuant to this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Claims and Interests, and is fair, equitable, and reasonable.

B.    **Liquidation Transactions.**

On the Effective Date, or as soon as reasonably practicable thereafter, the Liquidation Trustee shall take all actions as may be necessary or appropriate to effectuate the Liquidation Transactions, including, without limitation: (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (d) such other transactions that are required to effectuate the Liquidation Transactions; (e) all transactions necessary to provide for the purchase of some or all of the assets of, or Interests in, any of the Debtors which purchase may be structured as a taxable transaction for United States federal income tax purposes; and (f) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

C.    **Sale Transactions.**

On or after the Confirmation Date, the Debtors shall be authorized to take all actions as may be deemed necessary or appropriate to consummate any Sale Transactions pursuant to the

terms of the Plan, the Sale Orders, any Sale Documents, and the Confirmation Order, and any such Sale Transactions shall be free and clear of any Liens, Claims, Interests, and encumbrances pursuant to sections 363 and 1123 of the Bankruptcy Code as of the earlier of (i) the closing date of such Sale Transaction and (ii) the Effective Date.

**D.     The Liquidation Trust.**

On the Effective Date, the Debtors, on their own behalf and on behalf of the Liquidation Trust Beneficiaries, and the Liquidation Trustee shall execute the Liquidation Trust Agreement and take all other steps necessary to establish the Liquidation Trust pursuant to the Liquidation Trust Agreement and Article VIII of this Plan.  On the Effective Date, and in accordance with and pursuant to the terms of the Plan, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Liquidation Trust all of their rights, title, and interests in all of the Liquidation Trust Assets and, in accordance with Section 1141 of the Bankruptcy Code, the Liquidation Trust Assets shall automatically vest in the Liquidation Trust free and clear of all Claims, Liens, encumbrances or interests, subject to the terms of the Liquidation Trust Agreement.

To the extent that any conflict or inconsistency arises between the terms of this Plan or the Confirmation Order and the Liquidation Trust Agreement concerning the governance, administration, operation, or management of the Liquidation Trust or the rights and duties of the Liquidation Trustee, the terms of the Plan and the Confirmation Order shall govern and control in all respects.

**E.     The Committee Settlement.**

The Debtors, the Committee, and the Senior Secured Noteholders engaged in extensive and good faith negotiations, which culminated in an agreement to the terms of the Committee Settlement which shall be effectuated pursuant to the Plan.  The Committee Settlement provides for the following, in summary:

1.  The Debtors and the Committee shall form the GUC Trust, to be administered by the GUC Trustee for the benefit of Holders of Allowed Non-Library Debtors General Unsecured Claims.

2.  Each Holder of Allowed Non-Library Debtors General Unsecured Claims shall receive a recovery of 85% of its Allowed Claims.

3.  The Debtors shall pay (i) the GUC Trust Amount and (ii) the GUC Trust Initial Funding Amount to the GUC Trust on the Effective Date.

4.  If the GUC Trust Net Amount exceeds the GUC Recovery, such excess amount shall be distributed to the Liquidation Trust solely and exclusively for the benefit of Holders of Allowed Senior Secured Notes Claims.  If the GUC Trust Net Amount is less than the GUC Recovery, the shortfall will be funded to the GUC Trust by the Debtors or the Liquidation Trust solely to the extent of available Liquidation Trust Assets.

-26-

5. The reconciliation process for Non-Library Debtors General Unsecured Claims shall take no more than 60 days after the Effective Date, subject to reasonable requests for extension by the Liquidation Trustee with the written consent of the Senior Secured Notes Parties. The Debtors agree to begin the claims reconciliation process for the Non-Library Debtors General Unsecured Claims as soon as practicable, including promptly after the Bar Date.

6. The Debtors shall waive all preference claims against Holders of Allowed Non-Library Debtors General Unsecured Claims and, for the avoidance of doubt, such claims shall not be Retained Causes of Action.

7. The Committee shall fully release the Debtors and each of the Senior Secured Notes Parties, and the Debtors and the Committee shall be afforded maximum exculpation allowed under law.

Section 105(a) provides, in relevant part, that "[t]he court may issue any order . . . necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). In turn, Bankruptcy Rule 9019(a) provides, in relevant part, that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The compromise or settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged and "generally favored in bankruptcy." *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006).

The Third Circuit has enumerated four factors that should be considered in determining whether a settlement should be approved. The four enumerated factors are "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).

"[T]he decision whether to approve a compromise under [Bankruptcy] Rule 9019 is committed to the sound discretion of the Court, which must determine if the compromise is fair, reasonable, and in the interest of the estate." *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997). Courts should not, however, substitute their judgment for that of the debtor, but instead should canvas the issues to see whether the compromise falls below the lowest point in the range of reasonableness. *See In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986); *In re W.T. Grant and Co.*, 699 F.2d 599, 608 (2d Cir. 1983); *see also In re World Healt*h, 344 B.R. at 296 ("[T]he court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is 'within the reasonable range of litigation possibilities.'") (internal citations and quotations omitted).

In the Debtors' judgment—with which the Committee and the Senior Secured Noteholders agree—the Committee Settlement is reasonable and in the best interest of the Debtors, their estates, creditors and all parties in interest. The Committee Settlement was the product of good-faith and arm's-length negotiations between the parties. The Committee Settlement resolves once and for all the disputes regarding potential outstanding objections to the Senior Secured Notes Claims and a possible standing litigation in an efficient, consensual, and cost-effective manner that will avoid litigation and the uncertainty it involves. As a result of the Committee Settlement, each Holder of

-27-

an Allowed Non-Library Debtors General Unsecured Claim will receive an assured recovery in Class 3B that would either be unlikely or the result of substantial, costly and time-consuming litigation, absent the Committee Settlement.  The Debtors have reasonably determined that entry into the Committee Settlement is in the best interests of the estates and reflects a fair and reasonable compromise.  Furthermore, the Committee and the Senior Secured Noteholders support the Committee Settlement.  Accordingly, the *Martin* factors are met, the Committee Settlement falls well within the lowest "range of reasonableness" and, therefore, the Committee Settlement should be approved pursuant to Bankruptcy Rule 9019.

F.      **The GUC Trust.**

On the Effective Date, the Debtors and the GUC Trustee shall execute the GUC Trust Agreement and take all other steps necessary to establish the GUC Trust pursuant to the GUC Trust Agreement and Article IX of this Plan.  On the Effective Date, and in accordance with and pursuant to the terms of the Plan, the Debtors shall irrevocably transfer and shall be deemed to have irrevocably transferred to the GUC Trust all of their rights, title, and interests in the GUC Trust Amount and GUC Trust Initial Funding Amount, in accordance with Section 1141 of the Bankruptcy Code, the GUC Trust Amount and GUC Trust Initial Funding Amount shall automatically vest in the GUC Trust free and clear of all Claims, Liens, encumbrances or interests, subject to the terms of the GUC Trust Agreement.

To the extent that any conflict or inconsistency arises between the terms of this Plan or the Confirmation Order and the GUC Trust Agreement concerning the governance, administration, operation, or management of the GUC Trust or the rights and duties of the GUC Trustee, the terms of the GUC Trust Agreement shall govern and control in all respects; *provided, however,* that nothing in this provision shall alter or impair any substantive rights or treatment provided for under this Plan to any creditor or party in interest.

G.      **Sources of Consideration for Plan Distributions.**

Subject to the provisions of the Plan concerning the Professional Fee Reserve Account, the Debtors, the Liquidation Trustee or the GUC Trustee, as applicable, shall fund distributions under the Plan with Cash on hand on the Effective Date and the Debtors' other assets.

H.      **Dissolution of the Debtors.**

On or as soon as reasonably practicable after the Effective Date and after transfer of all Liquidation Trust Assets to the Liquidation Trust, the Liquidation Trustee shall ensure that the Debtors shall be disposed of, dissolved, wound down, or liquidated under applicable Law, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, and neither the Liquidation Trustee nor the Debtors shall be required to pay any taxes or fees to cause such dissolutions.

I.      **Preservation of Causes of Action.**

Except as otherwise provided in any contract, instrument, release, or agreement entered into in connection with the Plan or the Sale, in accordance with section 1123(b) of the Bankruptcy

-28-

Code, all Retained Causes of Action are preserved and shall vest in the Liquidation Trust on the Effective Date; *provided*, *however*, that no Causes of Action shall be retained or preserved against the Released Parties.  No Entity (other than the Released Parties) may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Liquidation Trust will not pursue any and all available Causes of Action of the Debtors against it.

### J.    Corporate Action.

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan, regardless of whether taken before, on, or after the Effective Date, shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the implementation of the Liquidation Transactions; (2) the establishment of the Liquidation Trust and execution of the Liquidation Trust Agreement; (3) the establishment of the GUC Trust and execution of the GUC Trust Agreement; (4) the funding of all applicable escrows and accounts; and (5) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date); *provided* that, with respect to any Sale Transactions consummated prior to the Effective Date, all actions necessary to consummate such Sale Transaction in accordance with the terms of the applicable Sale Order shall be deemed authorized and approved by the Bankruptcy Court as of the closing date applicable to such Sale Transaction.

### K.    Cancellation of Existing Securities and Agreements.

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, securities and other documents evidencing any Claim or Interest, and any rights of any Holder in respect thereof, shall be deemed cancelled and of no further force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged and, as applicable, shall be deemed to have been surrendered to the Liquidation Trust.  The holders of or parties to such cancelled instruments, securities, and other documentation shall have no rights arising from or related to such instruments, securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to this Plan; *provided*, *however*, that notwithstanding the occurrence of the Effective Date, the Senior Secured Notes Credit Documents shall continue in effect solely for the purposes of, (a) to the extent not previously paid in full, allowing holders of Senior Secured Notes Claims to receive and accept their respective distributions under the Plan on account of such Senior Secured Notes Claims; and (b) allowing and preserving the rights of the Senior Secured Notes Parties to (1) assert or maintain any rights such parties may have against any money or property distributable or allocable to holders of Senior Secured Notes Claims, including, without limitation, any intercreditor rights; (2) receive compensation or reimbursement for any reasonable and documented fees and expenses incurred in connection with the implementation, consummation, and defense of this Plan, the Plan Supplement, or Confirmation Order; (3) preserve, maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or subrogation, or any other claim or entitlement that the Senior Secured Notes Parties may have under this Plan, the Plan Supplement, the Confirmation Order, the Senior Secured Notes Credit Documents, or any other related agreement; (4) preserve the rights of the Senior Secured Notes Parties to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy

Court or any other court, including, without limitation, to enforce any right or obligation owed to the Senior Secured Notes Parties under the Plan, the Plan Supplement, the Confirmation Order, or other documents incorporated therein; and (5) execute documents pursuant to the Plan.

**L.      Effectuating Documents; Further Transactions.**

Upon entry of the Confirmation Order, the Debtors or the Liquidation Trustee (as applicable) shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, consents, certificates, resolutions, programs, and other agreements or documents, and take such acts and actions as may be reasonable, necessary, or appropriate to effectuate, implement, consummate, and/or further evidence the terms and conditions of this Plan and any transactions described in or contemplated by this Plan.  The Debtors or the Liquidation Trustee (as applicable), all Holders of Claims receiving distributions pursuant to this Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents, and take any other actions as may be necessary or advisable to effectuate the provisions and intent of this Plan.

**M.      Section 1146 Exemption from Certain Taxes and Fees.**

To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers of property pursuant to the Plan or the Sale Transactions shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall comply with the requirements of section 1146(a) of the Bankruptcy Code and forgo the collection of any such tax, recordation fee, or governmental assessment and accept for filing and recordation all such instruments or other documents governing or evidencing such transfers without the payment of any such tax, recordation fee, or governmental assessment.

**N.      Sale Orders.**

Notwithstanding anything to the contrary herein, nothing in this Plan shall affect, impair or supersede the Sale Orders, each of which remains in full force and effect and governs in the event of any inconsistency with the Plan.

**O.      Authority to Act.**

Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under this Plan that would otherwise require approval of the stockholders, security holders, officers, directors, or other owners of the Debtors shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as applicable) pursuant to the applicable law of the state(s) in which the Debtors are formed, without any further vote, consent, approval, authorization, or other action by such stockholders, security holders, officers, directors, or other owners of the Debtor or notice to, order of, or hearing before, the Bankruptcy Court.

**P.      Transfer of Privilege/No Waiver.**

On the Effective Date, the Debtors' evidentiary privileges, including but not limited to the attorney/client privilege, relating to (i) the amount, validity, or allowability of any Disputed Claim;

-30-

and (ii) the Liquidation Trust Assets, shall be deemed transferred to the Liquidation Trustee and the Liquidation Trust; *provided, however*, counsel to the Debtors that are Retained Professionals shall not be required to turn over work product existing as of the Effective Date. The Plan shall be considered a motion pursuant to sections 105, 363 and 365 of the Bankruptcy Code for such relief. Upon such transfer, the Debtors and the Estates shall have no other further rights or obligations with respect thereto. Nothing herein nor any actions taken by the Debtors or the Liquidation Trustee pursuant hereto shall be deemed a waiver of any privilege or immunity of the Debtors or the Liquidation Trustee and the Liquidation Trust, including any attorney-client privilege, joint interest privilege, or work product privilege attaching to any documents or communications (whether written or oral).

> Q. **Final Decree.**

At any time following the Effective Date, the Liquidation Trustee shall have the power and authority to file a motion with the Bankruptcy Court seeking the entry of a Final Decree closing any of the Chapter 11 Cases in accordance with section 350(a) of the Bankruptcy Code, Bankruptcy Rule 3022, and Local Rule 3022-1(a).

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

> A. **Assumption and Rejection of Executory Contracts and Unexpired Leases.**

On the Effective Date, except as otherwise provided herein (which exclusion includes the Indemnification Obligations and the D&O Liability Insurance Policies), all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court or not included on the Schedule of Assumed Executory Contracts and Unexpired Leases, will be deemed rejected, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code other than those Executory Contracts or Unexpired Leases that are the subject of a motion to assume that is pending on the Confirmation Date, or are subject to an unresolved cure dispute as of the Effective Date (and shall be assumed, assumed and assigned, or rejected, as applicable, upon the resolution of such cure dispute in accordance with the Sale Documents).

Assumption of any Executory Contract or Unexpired Lease pursuant to the Sale Documents or this Plan, and payment of any cure amounts relating thereto, shall, upon satisfaction of the applicable requirements of section 365 of the Bankruptcy Code, result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults or provisions restricting the change in control of ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

> B. **Claims Based on Rejection of Executory Contracts or Unexpired Leases.**

If the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order results in a Claim, then, unless otherwise ordered by the Court, such Claim shall be forever barred and shall not be enforceable against the Debtors, the Estates, the Liquidation

Trust or the GUC Trust, or any of their respective assets and properties unless a Proof of Claim is Filed with the Notice and Claims Agent and served upon counsel to the Liquidation Trustee and the GUC Trustee within thirty (30) days of the Effective Date.

The foregoing applies only to Claims arising from the rejection of an Executory Contract or Unexpired Lease under the Plan and Confirmation Order; any other Claims held by a party to a rejected Executory Contract or Unexpired Lease shall have been evidenced by a Proof of Claim Filed by the applicable Bar Date or shall be barred and unenforceable. Claims arising from the rejection of Executory Contracts or Unexpired Leases under the Plan and Confirmation Order shall be classified as General Unsecured Claims and shall, if Allowed, be treated in accordance with the provisions herein.

Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan and Confirmation Order that are not timely Filed within thirty (30) days of the Effective Date will be disallowed automatically, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Estates, the Liquidation Trust, the GUC Trust, or any of their respective assets and properties.

A Proof Claim with respect to any Claim arising from the rejection of an Executory Contract where any Debtor is a licensor of intellectual property must identify whether the Claimant (i) elects to treat the Executory Contract as terminated by virtue of the rejection, or (ii) elects to assert its Elected Section 365(n) Rights. If a Claimant who is a counterparty to a rejected Executory Contract where any Debtor was a licensor of intellectual property either (i) fails to timely file a Proof of Claim within thirty (30) days of the Effective Date, or (ii) fails to specify that such Claimant has elected to assert its Elected Section 365(n) Rights, such Claimant shall be deemed to have elected to treat such Executory Contract as terminated pursuant to section 365(n)(1)(A) of the Bankruptcy Code.

      **C.**      **Reservation of Rights.**

Neither the exclusion or inclusion of any contract or lease in the Schedules or in any Plan Supplement, nor anything contained in this Plan, shall constitute an admission by the Debtors that such contract or lease is in fact an Executory Contract or Unexpired Lease or that the Debtors have any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Liquidation Trustee (as applicable) may elect within thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease under the Plan by filing a notice of such election on the docket of these Chapter 11 Cases.

      **D.**      **Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors or Liquidation Trust (as applicable) under such Executory Contracts or Unexpired Leases. In particular, notwithstanding any non-bankruptcy law to the contrary, the Debtors and the Liquidation Trustee (as applicable) expressly reserve and do not waive any right to receive, or any continuing

obligation of a counterparty to provide, warranties, indemnity or continued maintenance obligations.  The Debtors also expressly reserve any and all rights with respect to the applicability (or non-applicability) of any non-bankruptcy laws to the contrary.

### E.     D&O Liability Insurance Policies.

Each D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) shall be treated as an Executory Contract under the Plan and shall be assumed, in its entirety, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to sections 105, 365, and 1123 of the Bankruptcy Code.  For the avoidance of doubt, coverage for defense and indemnity under the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in the D&O Liability Insurance Policies.  In addition, after the Effective Date, all officers, directors, agents, or employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Liability Insurance Policies (including any "tail" policy) in effect or purchased as of the Effective Date for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in the D&O Liability Insurance Policies.

The Debtors shall not terminate or otherwise reduce the coverage under any D&O Liability Insurance Policy (including, without limitation, any "tail policy" and all agreements, documents, or instruments related thereto) in effect prior to the Effective Date and shall continue such policies and satisfy their obligations thereunder in full in the ordinary course of business.

### F.     Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Modifications, amendments, supplements, and restatements to a prepetition Executory Contract and/or Unexpired Lease that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease.

### G.     Nonoccurrence of Effective Date.

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### ARTICLE VI.
### PROVISIONS GOVERNING DISTRIBUTIONS

### A.     Plan Distributions on Account of Claims Allowed as of the Effective Date.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests.  The Disbursing Agent shall have no obligation to recognize any

-33-

ownership transfer of the Claims or Interests occurring on or after the Confirmation Date. The Disbursing Agent shall be entitled to recognize and deal for all purposes hereunder only with those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date, to the extent applicable.

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims or as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, that the manner of such distributions shall be determined at the discretion of the Debtors, the Liquidation Trustee or the GUC Trustee (as applicable); *provided further*, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder or, if no Proof of Claim was Filed, the address set forth in the Debtors' books and records on the Distribution Record Date.

### B.    Compliance with Tax Requirements.

In connection with this Plan, any Person issuing any instrument or making any distribution or payment in connection therewith, shall comply with all applicable withholding and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority. In the case of a non-Cash distribution that is subject to withholding, the distributing party may require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution or withhold an appropriate portion of such distributed property and either (1) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advance payment of the withholding tax) or (2) pay the withholding tax using its own funds and retain such withheld property. The distributing party shall have the right not to make a distribution under this Plan until its withholding or reporting obligation is satisfied pursuant to the preceding sentences. Any amounts withheld pursuant to this Plan shall be deemed to have been distributed to and received by the applicable recipients for all purposes of this Plan.

Any party entitled to receive any property as an issuance or distribution under this Plan shall, upon request, deliver to the withholding agent or such other Person designated by the Liquidation Trustee the appropriate IRS Form or other tax forms or documentation requested by the Liquidation Trustee to reduce or eliminate any required federal, state, or local withholding. If the party entitled to receive such property as an issuance or distribution fails to comply with any such request for a 90 day period beginning on the date after the date such request is made, the amount of such issuance or distribution shall irrevocably revert to the Liquidation Trustee and any Claim in respect of such distribution under this Plan shall be discharged and forever barred from assertion against such Debtor, the Liquidation Trustee, or their respective property.

Notwithstanding the above, each Holder of an Allowed Claim or Interest that is to receive a distribution under this Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such Plan Distribution, and further including, in the case of a Holder of a Disputed Claim that has become an Allowed Claim, any tax obligation that would be imposed on the Liquidation Trust Assets or the Liquidation Trust, in connection with such Plan Distribution.

C.      **Date of Plan Distributions.**

Plan Distributions made after the Effective Date to Holders of Allowed Claims shall be deemed to have been made on the Effective Date and no interest shall accrue or be payable with respect to such Claims or any distribution related thereto. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

D.      **Disbursing Agent.**

Except as otherwise provided herein, all distributions under the Plan shall be made by the Disbursing Agent on or after the Effective Date. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties. If the Disbursing Agent is otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Liquidation Trust.

E.      **Rights and Powers of Disbursing Agent.**

The Disbursing Agent may (1) effect all actions and execute all agreements, instruments, and other documents necessary to carry out the provisions of this Plan; (2) make all distributions contemplated hereby; and (3) perform such other duties as may be required of the Disbursing Agent pursuant to this Plan.

F.      **Surrender of Instruments.**

As of the Effective Date, and subject to Article IV.K. hereof, each Holder of a certificated instrument or note related to the Debtors shall be deemed to have surrendered such instrument or note held by it to the Liquidation Trustee or its designee, as applicable.

G.      **Delivery of Plan Distributions and Undeliverable or Unclaimed Plan Distributions.**

Subject to applicable Bankruptcy Rules, all distributions to Holders of Allowed Claims shall be made by the Disbursing Agent, who shall transmit such distributions to the applicable Holders of Allowed Claims or their designees.

The Liquidation Trustee and the GUC Trustee shall each only be required to act and make Plan Distributions in accordance with the terms of the Plan. Except on account of gross negligence, fraud, illegality or willful misconduct, the Liquidation Trustee has no (i) liability to any party for actions taken in accordance with the Plan or in reasonable reliance upon information provided to it in accordance with the Plan, or (ii) obligation or liability for Plan Distributions to any party who does not hold a Claim against one or more of the Debtors as of the Distribution Record Date or any other date on which a Plan Distribution is made or who does not otherwise comply with the terms of the Plan.

-35-

Except as otherwise provided in a Final Order or as agreed by the relevant parties, Plan Distributions on account of Disputed Claims, if any, that become Allowed, shall be made, as applicable (i) by the Liquidation Trustee at such periodic intervals as the Liquidation Trustee determines to be reasonably prudent, or (ii) by the GUC Trustee at such periodic intervals as the GUC Trustee determines to be reasonably prudent.

Notwithstanding anything herein to the contrary: (a) no Plan Distribution shall be made with respect to any Disputed Claim until and only to the extent such Claim becomes an Allowed Claim (as applicable), and (b) unless agreed otherwise by the Liquidation Trustee, no Plan Distribution shall be made to any Person that holds both an Allowed Claim and a Disputed Claim until such Person's Disputed Claims have been resolved by settlement or Final Order.

Any Entity which fails to claim any Cash within 90 days from the date upon which a Plan Distribution is first made to such entity shall forfeit all rights to such Plan Distribution, and the Liquidation Trustee shall be authorized to cancel any Plan Distribution that is not timely claimed. Pursuant to section 347(b) of the Bankruptcy Code, upon forfeiture, such Cash (including interest thereon, if any) shall revert to the Liquidation Trust or GUC Trust, as applicable, free of any restrictions under the Plan, the Bankruptcy Code or the Bankruptcy Rules. Upon forfeiture, the claim of any Creditor or Interest Holder with respect to such funds shall be irrevocably waived and forever barred against the Debtors, their Estates, the Liquidation Trust, the Liquidation Trustee, the GUC Trust, and the GUC Trustee, notwithstanding any federal or state escheat laws to the contrary, and such Creditor or Interest Holder shall have no claim whatsoever against any of the foregoing or against any Holder of a Claim to whom Plan Distributions are made.

The Liquidation Trustee or the GUC Trustee, as applicable, shall make one attempt to make the Plan Distributions contemplated hereunder in accordance with the procedures set forth herein. The Liquidation Trustee or the GUC Trustee, as applicable, in its sole discretion may, but shall have no obligation to, attempt to locate Holders of undeliverable Plan Distributions. Any Plan Distributions returned to the Liquidation Trustee or the GUC Trustee, as applicable, as undeliverable or otherwise shall remain in the possession of the Liquidation Trust or the GUC Trust, as applicable, until such time as a Plan Distribution becomes deliverable, and no further Plan Distributions shall be made to such Holder unless such Holder notifies the Liquidation Trustee or GUC Trustee, as applicable, of its then current address. Any Holder of an Allowed Claim entitled to a Plan Distribution that does not assert a claim pursuant to the Plan for an undeliverable Plan Distribution, or notify the Liquidation Trustee or the GUC Trustee, as applicable, of such Holder's then current address, within 30 days of such Plan Distribution shall have its claim for such undeliverable Plan Distribution irrevocably waived and shall be forever barred from asserting any such claim against the Debtors, their Estates, the Liquidation Trust, the Liquidation Trustee, the GUC Trust, and/or the GUC Trustee or their respective property, and such Plan Distribution shall be deemed unclaimed property.

**H.**     **Manner of Payment.**

Except as specifically provided herein, at the option of the Debtors, the Liquidation Trustee or the GUC Trustee as applicable, any Cash payment to be made under this Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

I.      **Foreign Currency Exchange Rate.**

As of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal*, on the Petition Date.

J.      **Minimum Plan Distribution.**

No payment of Cash in an amount of less than one hundred U.S. dollars ($100.00) shall be required to be made on account of any Allowed Claim.  Such undistributed amount may instead be used in accordance with the Plan.  If the Cash available for the final distribution is less than the cost to distribute such funds, the Liquidation Trustee may donate such funds to the unaffiliated charity of its choice.

K.      **Allocations.**

Except as otherwise provided in this Plan or as otherwise required by law, distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

L.      **Plan Distributions Free and Clear.**

Except as otherwise provided in this Plan, any distribution or transfer made under this Plan, including distributions to any Holder of an Allowed Claim, shall be free and clear of any Liens, Claims, encumbrances, charges, and other interests, and no other entity shall have any interest, whether legal, beneficial, or otherwise, in property distributed or transferred pursuant to this Plan.

M.      **Claims Paid or Payable by Third Parties.**

1.      <u>Claims Paid by Third Parties.</u>

If a Holder of a Claim receives a payment or other satisfaction of its Claim other than through the Debtors, the Liquidation Trustee and/or the GUC Trustee (as applicable) on account of such Claim, such Claim shall be reduced by the amount of such payment or satisfaction without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, and if the Claim was paid or satisfied in full other than through the Debtors the Liquidation Trustee and/or the GUC Trustee (as applicable), then such Claim shall be disallowed and any recovery in excess of a single recovery in full shall be paid over to the Liquidation Trust without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment or satisfaction from a party that is not the Debtors and/or the Liquidation Trustee (as applicable) on account of such Claim, such Holder shall, within fourteen (14) Business Days of receipt thereof, repay or return the distribution to the Debtors or Liquidation Trust (as applicable), to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.

2.      Claims Payable by Third Parties.

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' Insurance Policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection to such Claim having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Policies.

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy. Except as set forth in Article X herein, nothing in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity, including the Liquidation Trust, may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**N.      No Postpetition Interest on Claims.**

Unless otherwise specifically provided for in the Plan, or the Confirmation Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue or be paid on any prepetition Claims, and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on such Claim.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS**

**A.      Allowance of Claims.**

After the Effective Date, the Liquidation Trustee shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim or Interest immediately prior to the Effective Date.

**B.      Claims Administration Responsibilities.**

Except as otherwise specifically provided in the Plan, after the Effective Date, pursuant to the Liquidation Trust Agreement, the Liquidation Trustee shall have the sole authority to: (1) File, withdraw, or litigate to judgment, objections to all Claims or Interests; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. The Liquidation Trustee shall succeed to any pending objections to Claims filed by the Debtors prior to the Effective Date, and shall have and retain any and all rights and defenses the Debtors had immediately prior to the Effective Date with respect to any Disputed Claim. The Liquidation

Trustee shall provide status reports to the GUC Trustee upon reasonable request with respect to the status of resolution of Class 3 Claims, but not less than quarterly.

### C.    Estimation of Claims and Interests.

Before or after the Effective Date, the Debtors or the Liquidation Trust (as applicable) may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection.

Notwithstanding any provision otherwise herein, a Claim that has been expunged or disallowed from the claims register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero U.S. dollars ($0.00) unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors or the Liquidation Trustee (as applicable) may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.

### D.    Adjustment to Claims or Interests Without Objection.

Any Claim that has been paid, satisfied, or assumed by a Purchaser in the respective Sale, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or the Liquidation Trustee (as applicable) without an objection to such Claim having to be Filed following notice filed on the docket in the Bankruptcy Court of such adjustment or expungement.

### E.    Time to File Objections to Claims.

Except as otherwise provided herein, any objections to Claims shall be Filed on or before the Claims Objection Bar Date (as such date may be extended upon presentment of an order to the Bankruptcy Court by the Liquidation Trustee).

### F.    Disallowance of Claims or Interests.

Except as provided herein or otherwise agreed to by the Debtors or the Liquidation Trustee (as applicable), any Holder of a Claim Filed, via Proof of Claim, after the Bar Date shall not be treated as a creditor for purposes of Plan Distributions pursuant to Bankruptcy Rule 3003(c)(2) or otherwise receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely Filed by a Final Order.

### G.    Disputed Claims Process.

All Claims held by Persons or Entities against whom or which the Debtors have commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548,

549, or 550 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 548, 549 or 724(a) of the Bankruptcy Code shall be deemed Disputed Claims pursuant to section 502(d) of the Bankruptcy Code and Holders of such Claims shall not be entitled to vote to accept or reject this Plan.  A Claim deemed Disputed pursuant to this Article VII.G shall continue to be Disputed for all purposes until the relevant proceeding against the Holder of such Claim has been settled or resolved by a Final Order and any sums due to the Debtors or the Liquidation Trustee from such Holder have been paid.

### H.      No Plan Distributions Pending Allowance.

If an objection to a Claim, Proof of Claim, or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim, Proof of Claim, or portion thereof unless and until the Disputed Claim becomes an Allowed Claim.

### I.      Plan Distributions After Allowance.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim.  No interest shall accrue or be paid on any Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Claim.

### J.      Amendments to Claims

On or after the Effective Date, a Claim may not be Filed or amended to increase liability or to assert new liabilities without the prior authorization of the Bankruptcy Court or the Liquidation Trustee.

<div align="center">

**ARTICLE VIII.**
**LIQUIDATION TRUST AND LIQUIDATION TRUSTEE**

</div>

### A.      Liquidation Trust Creation.

On the Effective Date, a Liquidation Trust shall be established and become effective for the benefit of the Liquidation Trust Beneficiaries.  The Liquidation Trust Agreement shall contain customary provisions for trust agreements utilized in comparable circumstances, including any and all provisions necessary to ensure continued treatment of the Liquidation Trust as a grantor trust and the Liquidation Trust Beneficiaries as the grantors and owners thereof for federal income tax purposes.  On the Effective Date, the Liquidation Trustee will be designated by the Debtors and appointed in accordance with the terms of this Plan and the Liquidation Trust Agreement.  The rights, responsibilities, and duties of the Liquidation Trustee are set forth in the Liquidation Trust Agreement.  Notwithstanding anything contained in the Plan or the Liquidation Trust Agreement, the Liquidation Trustee shall always act consistently with, and not contrary to, the purpose of the Liquidation Trust as set forth in the Plan.

All relevant parties (including the Debtors, the Liquidation Trustee, and the Liquidation Trust Beneficiaries) will take all actions necessary to cause title to the Liquidation Trust Assets to be transferred to the Liquidation Trust.  The powers, authority, responsibilities, and duties of the Liquidation Trust and the Liquidation Trustee are set forth in and will be governed by the Liquidation Trust Agreement, the Plan, and the Confirmation Order.

### B.      Purpose of the Liquidation Trust.

The Liquidation Trust will be established, as a liquidating trust in accordance with Treasury Regulation Section 301.7701-4(d), for the primary purposes of maximizing the value of its assets and making distributions in accordance with the Plan, Confirmation Order, and the Liquidation Trust Agreement, including resolving any Disputed Claims not to be resolved by the Debtors prior to the Effective Date and winding down the Debtors.  The Liquidation Trust will have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust.

### C.      Transfer of Assets to the Liquidation Trust.

The Debtors and the Liquidation Trustee will establish the Liquidation Trust on behalf of the Liquidation Trust Beneficiaries pursuant to the Liquidation Trust Agreement, with the Liquidation Trust Beneficiaries to be treated as the grantors and deemed owners of the Liquidation Trust Assets.  The Debtors will irrevocably transfer, assign, and deliver to the Liquidation Trust, on behalf of the Liquidation Trust Beneficiaries, all of their rights, title, and interests in the Liquidation Trust Assets.  The Liquidation Trust will accept and hold the Liquidation Trust Assets in the Liquidation Trust for the benefit of the Liquidation Trust Beneficiaries, subject to the Plan and the Liquidation Trust Agreement.

On the Effective Date, all Liquidation Trust Assets will vest and be deemed to vest in the Liquidation Trust in accordance with section 1141 of the Bankruptcy Code or as otherwise set forth in the Liquidation Trust Agreement; *provided, however*, that the Liquidation Trustee may abandon or otherwise not accept any Liquidation Trust Assets that the Liquidation Trustee believes, in good faith, have no value to the Liquidation Trust.  Any assets the Liquidation Trust so abandons or otherwise does not accept shall not vest in the Liquidation Trust.  As of the Effective Date, all Liquidation Trust Assets vested in the Liquidation Trust shall be free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in the Plan or in the Confirmation Order.  Upon the transfer by the Debtors of the Liquidation Trust Assets to the Liquidation Trust or abandonment of Liquidation Trust Assets by the Liquidation Trust, the Debtors will have no reversionary or further interest in or with respect to any Liquidation Trust Assets or the Liquidation Trust.  Notwithstanding anything herein to the contrary, the Liquidation Trust and the Liquidation Trustee shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

In furtherance of, and consistent with, the purposes of the Liquidation Trust and the Plan, the Liquidation Trustee shall, as more fully set forth in the Liquidation Trust Agreement, among other things, (a) have the power and authority to hold, manage, sell, invest, and distribute to the Holders of Senior Secured Notes Claims, the Liquidation Trust Net Assets, including any proceeds thereof, (b) hold the Liquidation Trust Net Assets for the benefit of the Holders of Senior Secured

Notes Claims, (c) have the power and authority to prosecute and resolve objections to Disputed General Unsecured Claims, and (d) have the power and authority to perform such other functions as are provided for herein and the Liquidation Trust Agreement.  For the avoidance of doubt, notwithstanding anything to the contrary in the Plan or the Liquidation Trust Agreement, the Liquidation Trustee shall not pursue any Claims or Causes of Action against any Released Party (if any).

As further set forth in the Liquidation Trust Agreement, the Liquidation Trustee shall have sole responsibility for reconciling all Claims.

### D.    Tax Treatment of the Liquidation Trust.

It is intended that the Liquidation Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Section 671 through 677 of the Internal Revenue Code.  In furtherance of this objective, the Liquidation Trust shall, in its business judgment, make continuing best efforts not to unduly prolong the duration of the Liquidation Trust.  The Liquidation Trust Assets shall be deemed for U.S. federal income tax purposes to have been transferred by the Debtors to the Liquidation Trust Beneficiaries, and then contributed by the Liquidation Trust Beneficiaries to the Liquidation Trust in exchange for their respective Liquidation Trust Interests. The Liquidation Trust Beneficiaries of the Liquidation Trust (or their direct or indirect owners, as required under applicable tax law) will be treated as the grantors and deemed owners of their respective shares of Liquidation Trust Assets in the Liquidation Trust.  As grantors and deemed owners of the Liquidation Trust Assets, the Liquidation Trust Beneficiaries will be required to include in income their respective shares of income, gains, losses, or deductions attributable to the Liquidation Trust Assets. All Holders shall use the valuation of the Liquidation Trust Assets transferred to the Liquidation Trust as established by the Liquidation Trust for all federal income tax purposes (including the recognition of income, gain, loss or deduction with respect to their Allowed Claims), which determination shall be made as soon as reasonably practicable following the Effective Date.  The Liquidation Trust will be responsible for filing information on behalf of the Liquidation Trust as grantor trust pursuant to Treasury Regulation Section 1.671-4(a).  The foregoing treatment shall also apply, to the extent permitted by applicable law, for all state, local, and non-U.S. tax purposes.   Further, the Liquidation Trust is intended to comply with the conditions and the requirements set forth in Rev. Proc. 94-45, 1994-2 C.B. 684.

To the extent the Liquidation Trust is determined to incur any tax liability (including any withholding for any reason), it shall be entitled to liquidate the Liquidation Trust Assets to satisfy such tax liability.

The Liquidation Trust will not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Liquidation Trust Agreement.  In addition, the Liquidation Trust may request an expedited determination of Taxes of the Debtors or of the Liquidation Trust under Bankruptcy Code section 505(b) for all returns filed for, or on behalf of, the Debtors and the Liquidation Trust for all taxable periods through the dissolution of the Liquidation Trust.

With respect to any of the assets of the Liquidation Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the Liquidation Trust, the Debtors or the Liquidation Trustee may, in its sole discretion, determine the best way to report for tax purposes with respect to the portion of the Liquidation Trust Assets subject to the disputed claims, including, but not limited to, filing a tax election to treat such assets as subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations.  Under such treatment, a separate federal income tax return must be filed with the IRS for, and a separate entity-level tax will be imposed on, any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

### E.    Exculpation, Indemnification, Insurance and Liability Limitation.

The Liquidation Trustee and all professionals retained by the Liquidation Trustee, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the Liquidation Trust.  The Liquidation Trustee may obtain and maintain, at the expense of the Liquidation Trust, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the Liquidation Trust, including customary insurance coverage for the protection of Entities serving as administrators and overseers of the Liquidation Trust on and after the Effective Date, including for the avoidance of doubt, the Liquidation Trustee.  The Liquidation Trustee may rely upon written information previously generated by the Debtors.

### F.    Securities Exemption.

The Liquidation Trust Interests to be distributed to the Liquidation Trust Beneficiaries pursuant to the Plan shall not constitute "securities" under applicable law.  The Liquidation Trust Interests shall not be transferrable (except under limited circumstances set forth in the Liquidation Trust Agreement) and shall not have consent or voting rights or otherwise confer on the Liquidation Trust Beneficiaries any rights similar to the rights of stockholders of a corporation in respect of actions to be taken by the Liquidation Trustee in connection with the Liquidation Trust (except as otherwise provided in the Liquidation Trust Agreement).  To the extent the Liquidation Trust Interests are considered "securities" under applicable law, the issuance of such interests satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act and any state or local law requiring registration.  To the extent any "offer or sale" of Liquidation Trust Interests may be deemed to have occurred, such offer or sale is under the Plan and in exchange for Claims against or Interests in one or more of the Debtors, or principally in exchange for such Claims or Interests and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code.

### G.    Termination of the Liquidation Trustee.

The duties, responsibilities, and powers of the Liquidation Trustee will terminate in accordance with the terms of the Liquidation Trust Agreement.

## ARTICLE IX.
## GUC TRUST AND GUC TRUSTEE

### A.    GUC Trust Creation.

On the Effective Date, GUC Trust shall be established and become effective for the benefit of the GUC Trust Beneficiaries.  The GUC Trust Agreement shall contain customary provisions for trust agreements utilized in comparable circumstances, including (i) any and all provisions necessary to ensure continued treatment of the GUC Trust as a grantor trust and the GUC Trust Beneficiaries as the grantors and owners thereof for federal income tax purposes, and (ii) indemnification of the GUC Trustee and its professionals.  On the Effective Date, the GUC Trustee will be designated by the Committee and appointed in accordance with the terms of this Plan and the GUC Trust Agreement.  The rights, responsibilities, and duties of the GUC Trustee are set forth in the GUC Trust Agreement.  Notwithstanding anything contained in the Plan or the GUC Trust Agreement, the GUC Trustee shall always act consistently with, and not contrary to, the purpose of the GUC Trust as set forth in the Plan.

All relevant parties (including the Debtors and the GUC Trustee) will take all actions necessary to cause title to the GUC Trust Assets to be transferred to the GUC Trust.  The powers, authority, responsibilities, and duties of the GUC Trust and the GUC Trustee are set forth in and will be governed by the GUC Trust Agreement, the Plan, and the Confirmation Order.

### B.    Purpose of the GUC Trust.

The GUC Trust will be established, as a liquidating trust in accordance with Treasury Regulation Section 301.7701-4(d), for the primary purposes of maximizing the value of its assets and making distributions to the Holders of Allowed Non-Library Debtors General Unsecured Claims in accordance with the Plan, Confirmation Order, and the GUC Trust Agreement.  The GUC Trust will have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the GUC Trust.

### C.    Transfer of Assets to the GUC Trust.

The Debtors and the GUC Trustee will establish the GUC Trust on behalf of the GUC Trust Beneficiaries pursuant to the GUC Trust Agreement, with the GUC Trust Beneficiaries to be treated as the grantors and deemed owners of the GUC Trust Assets, to the extent such assets do not exceed the GUC Recovery.  The Debtors will transfer, assign, and deliver to the GUC Trust, on behalf of the GUC Trust Beneficiaries, all of their rights, title, and interests in the GUC Trust Assets.  The GUC Trust will accept and hold the GUC Trust Assets in the GUC Trust for the benefit of the GUC Trust Beneficiaries, subject to the Plan and the GUC Trust Agreement.

On the Effective Date, all GUC Trust Assets will vest and be deemed to vest in the GUC Trust in accordance with section 1141 of the Bankruptcy Code or as otherwise set forth in the GUC Trust Agreement.  As of the Effective Date, all GUC Trust Assets vested in the GUC Trust shall be free and clear of all Liens, Claims, and Interests except as otherwise specifically provided in the Plan or in the Confirmation Order.

In furtherance of, and consistent with, the purposes of the GUC Trust and the Plan, the GUC Trustee shall, as more fully set forth in the GUC Trust Agreement, have the power to distribute the GUC Trust Net Assets to the Holders of Allowed Non-Library Debtors General Unsecured Claims.

### D.    Tax Treatment of the GUC Trust.

It is intended that the GUC Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of Treasury Regulations Section 301.7701-4(d) and as a "grantor trust" within the meaning of Section 671 through 677 of the Internal Revenue Code.  In furtherance of this objective, the GUC Trustee shall, in its business judgment, make continuing best efforts not to unduly prolong the duration of the GUC Trust.  The GUC Trust Assets shall be deemed for U.S. federal income tax purposes to have been transferred by the Debtors to the GUC Trust Beneficiaries, and then contributed by the GUC Trust Beneficiaries to the GUC Trust in exchange for their respective GUC Trust Interests.  The GUC Trust Beneficiaries of the GUC Trust (or their direct or indirect owners, as required under applicable tax law) will be treated as the grantors and deemed owners of their respective shares of GUC Trust Assets in the GUC Trust.  As grantors and deemed owners of the GUC Trust Assets, the GUC Trust Beneficiaries will be required to include in income their respective shares of income, gains, losses, or deductions attributable to the GUC Trust Assets. All Holders shall use the valuation of the GUC Trust Assets transferred to the GUC Trust as established by the GUC Trust for all federal income tax purposes (including the recognition of income, gain, loss or deduction with respect to their Allowed Claims), which determination shall be made as soon as reasonably practicable following the Effective Date. The GUC Trust will be responsible for filing information on behalf of the GUC Trust as grantor trust pursuant to Treasury Regulation Section 1.671-4(a).  The foregoing treatment shall also apply, to the extent permitted by applicable law, for all state, local, and non-U.S. tax purposes. Further, the GUC Trust is intended to comply with the conditions and the requirements set forth in Rev. Proc. 94-45, 1994-2 C.B. 684.

To the extent the GUC Trust is determined to incur any tax liability (including any withholding for any reason), it shall be entitled to liquidate the GUC Trust Assets to satisfy such tax liability.

The GUC Trust will not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the GUC Trust Agreement.  In addition, the GUC Trust may request an expedited determination of taxes of the Debtors or of the GUC Trust under Bankruptcy Code section 505(b) for all returns filed for, or on behalf of, the Debtors and the GUC Trust for all taxable periods through the dissolution of the GUC Trust.

With respect to any of the assets of the GUC Trust that are subject to potential disputed claims of ownership or uncertain distributions, or to the extent "liquidating trust" treatment is otherwise unavailable or not elected to be applied with respect to the GUC Trust, the Debtors or the GUC Trustee may, in its sole discretion, determine the best way to report for tax purposes with respect to the portion of the GUC Trust Assets subject to the disputed claims, including, but not limited to, filing a tax election to treat such assets as subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations.  Under such treatment, a separate federal income tax return must be filed with the IRS for, and a separate entity-level tax will be imposed

on, any such account.  Any taxes (including with respect to interest, if any, earned in the account) imposed on such account shall be paid out of the assets of the respective account (and reductions shall be made to amounts disbursed from the account to account for the need to pay such taxes).

### E.    Exculpation, Indemnification, Insurance and Liability Limitation.

The GUC Trustee and all professionals retained by the GUC Trustee, each in their capacities as such, shall be deemed exculpated and indemnified, except for fraud, willful misconduct, or gross negligence, in all respects by the GUC Trust.  The GUC Trustee may obtain and maintain, at the expense of the GUC Trust, commercially reasonable liability or other appropriate insurance with respect to the indemnification obligations of the GUC Trust, including customary insurance coverage for the protection of Entities serving as administrators and overseers of the GUC Trust on and after the Effective Date, including for the avoidance of doubt, the GUC Trustee.  The GUC Trustee may rely upon written information previously generated by the Debtors.

### F.    Securities Exemption.

The GUC Trust Interests to be distributed to the GUC Trust Beneficiaries pursuant to the Plan shall not constitute "securities" under applicable law.  The GUC Trust Interests shall not be transferrable (except under limited circumstances set forth in the GUC Trust Agreement) and shall not have consent or voting rights or otherwise confer on the GUC Trust Beneficiaries any rights similar to the rights of stockholders of a corporation in respect of actions to be taken by the GUC Trustee in connection with the GUC Trust (except as otherwise provided in the GUC Trust Agreement).  To the extent the GUC Trust Interests are considered "securities" under applicable law, the issuance of such interests satisfies the requirements of section 1145 of the Bankruptcy Code and, therefore, such issuance is exempt from registration under the Securities Act and any state or local law requiring registration.  To the extent any "offer or sale" of GUC Trust Interests may be deemed to have occurred, such offer or sale is under the Plan and in exchange for Claims against or Interests in one or more of the Debtors, or principally in exchange for such Claims or Interests and partly for cash or property, within the meaning of section 1145(a)(1) of the Bankruptcy Code.

### G.    Termination of the GUC Trustee.

The duties, responsibilities, and powers of the GUC Trustee will terminate in accordance with the terms of the GUC Trust Agreement.

## ARTICLE X.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### A.    Conditions Precedent to the Effective Date.

The occurrence of the Effective Date of this Plan is subject to each of the following conditions precedent.

1. The Bankruptcy Court shall have approved the Disclosure Statement as containing adequate information with respect to the Plan within the meaning of section 1125 of the Bankruptcy Code.

2. The Confirmation Order shall have been entered and shall be in full force and effect.

3. There shall have been no modification or stay of the Confirmation Order or entry of any other order prohibiting the material transactions contemplated by this Plan from being consummated.

4. The Professional Fee Reserve Account shall have been fully funded pursuant to the terms of this Plan.

5. Any adequate protection payments due and owing to the Senior Secured Notes Parties under paragraph 8(g) of the DIP Order shall have been paid or reserved for in full, as applicable.

6. All actions, documents and agreements necessary to implement the Plan shall have been effected, executed and/or tendered for delivery. All conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof (or will be satisfied and waived substantially concurrently with the occurrence of the Effective Date).

7. The Liquidation Trustee and GUC Trustee shall have been appointed and prepared to assume its rights and responsibilities under the Plan or Confirmation Order.

8. The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, or documents necessary to implement this Plan and any transaction contemplated hereby that are required by law, regulation, or order.

9. The Debtors shall have sufficient Cash such that the Debtors are not administratively insolvent.

10. The GUC Trustee shall have been appointed and prepared to assume its rights and responsibilities under the Plan or Confirmation Order.

11. The GUC Trust Agreement shall have been executed and the GUC Trust Amount and the GUC Trust Initial Funding Amount shall have been transferred to the GUC Trust.

12. The Liquidation Trust Agreement shall been executed and the Liquidation Trust Cash shall been transferred to the Liquidation Trust as set forth in this Plan.

B.      **Waiver of Conditions.**

Unless otherwise specifically provided for in this Plan, and except for the condition set forth in Article X.A.8, Article X.A.9, Article X.A.10, and Article X.A.11 (each of which may not be waived without the consent of the affected parties), the conditions set forth in Article X.A. may be waived, in whole or in part, in writing by each of the Debtors, the Committee, and the Senior Secured Notes Parties without notice to any other parties in interest or the Bankruptcy Court and without a hearing.

**ARTICLE XI.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

A.      **Releases by the Debtors.**

**Effective as of the Effective Date, pursuant to Section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all claims and Causes of Action, and liabilities whatsoever, including any derivative claims, asserted by or assertable on behalf of any of the Debtors or their Estates, as applicable, whether known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, in law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, or otherwise, that the Debtors or their Estates, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, or that any Holder of any Claim against, or Interest in, a Debtor or other Entity could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part, the Debtor-Related Matters.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, (b) any obligations of a Purchaser arising under the applicable Asset Purchase Agreement and Sale Order, or (c) any Retained Causes of Action.**

**Upon the Effective Date, the Debtors shall be deemed to have released all Claims, Causes of Action, or remedies arising under section 547 of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law, including voidable transfer laws against holders of Allowed Non-Library Debtors General Unsecured Claims.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtor Release, which includes by reference each of the related provisions and**

-48-

definitions contained in the Plan and, further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the claims or Causes of Action released by the Debtor Release; (c) in the best interests of the Debtors, the Estates, and all Holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after reasonable investigation by the Debtors and after due notice and opportunity for hearing; and (f) a bar to any of the Debtors or their Estates, asserting any claim or Cause of Action released pursuant to the Debtor Release.

**B.      Releases by Holders of Claims and Interests.**

Effective as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, to the fullest extent allowed by applicable law, each of the Releasing Parties shall be deemed to have to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged each of the Released Parties and the other Releasing Parties from any and all claims, Causes of Action, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, matured or unmatured, suspected or unsuspected, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, in law (or any applicable rule, statute, regulation, treaty, right, duty or requirement), equity, contract, tort, or otherwise, that such Releasing Party would have been legally entitled to assert in its own right (whether individually or collectively) or otherwise based on or relating to, or in any manner arising from, in whole or in part, the Debtor-Related Matters. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any obligations arising pursuant to or after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (b) any Retained Causes of Action; (c) actual fraud, willful misconduct, or gross negligence as determined by a Final Order or (d) any right to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement that the Senior Secured Notes Collateral Agent may have against the Senior Secured Noteholders under the Senior Secured Notes Agreement.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (a) consensual; (b) essential to the Confirmation of the Plan; (c) given in exchange for the good and valuable consideration provided by the Released Parties, including the Released Parties' contributions to facilitating the restructuring and implementing the Plan; (d) a good faith settlement and compromise of the claims or Causes of Action released by the Third-Party Release; (e) in the best interests of the Debtors and their Estates; (f) fair, equitable, and reasonable; (g) given and made after due notice and opportunity for hearing; and (h) a bar to any of the Releasing Parties asserting any claim or Cause of Action released pursuant to the Third-Party Release.

C.      **Exculpation.**

Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor Release or the Third-Party Release, and except as otherwise specifically provided in the Plan or the Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party hereby is exculpated from any claim or Cause of Action related to, any act or omission in connection with, relating to, or arising out of the negotiation, solicitation, confirmation, execution, or implementation (to the extent on or prior to the Effective Date) of, as applicable, the Debtor Related Matters except for claims related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted bad faith, fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, an Exculpated Party shall be entitled to exculpation from the Petition Date through the Effective Date, and the exculpation set forth above does not exculpate (a) any obligations arising after the Effective Date of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (b) any Retained Causes of Action.

D.      **Injunction.**

Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold, or may hold claims, Interests, Causes of Action, or liabilities that: (1) are subject to compromise and settlement pursuant to the terms of the Plan; (2) have been released pursuant to the Plan; (3) were purchased and released by a Purchaser in connection with the respective Sale; (4) are subject to exculpation pursuant to the Plan; or (5) are otherwise satisfied, stayed, released, or terminated pursuant to the terms of the Plan, are permanently enjoined and precluded, from and after the Effective Date, from commencing or continuing in any manner, any action or other proceeding, including on account of any Claims, Interests, Causes of Action, or liabilities that have been compromised or settled against the Debtors or any Entity so released or exculpated (or the property or estate of any Entity, directly or indirectly, so released or exculpated) on account of, or in connection with or with respect to, any released, settled, compromised, or exculpated claims, Interests, Causes of Action, or liabilities, including being permanently enjoined and precluded, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Liquidation Trustee, the Released Parties, or Exculpated Parties (as applicable): (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or Interests; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estate of such Entities on account of or in connection with or with respect to any such claims or Interests; (4) asserting any right of setoff or subrogation of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or Interests unless such Entity has timely asserted such setoff right

**in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding any other indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or Interests released or settled pursuant to the Plan.**

**Upon the Bankruptcy Court's entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of this Plan by the Debtors, the Liquidation Trustee, and their respective affiliates, employees, advisors, officers and directors, or agents.**

E.      **Setoffs.**

Except as otherwise expressly provided for in the Plan, each Debtor and the Liquidation Trustee (as applicable), pursuant to the Bankruptcy Code (including section 552 of the Bankruptcy Code), applicable non-bankruptcy law or as may be agreed to by the Holder of a Claim or an Interest, may set off against any Allowed Claim or Allowed Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Allowed Interest (before any distribution is made on account of such Allowed Claim or Allowed Interest), any claims, rights and Causes of Action of any nature that such Debtor or the Liquidation Trustee, as applicable, may hold against the Holder of such Allowed Claim or Allowed Interest, to the extent such claims, rights or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); *provided*, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Debtor or the Liquidation Trustee, as applicable, of any such claims, rights and Causes of Action that such Debtor or the Liquidation Trustee, as applicable, may possess against such Holder.  In no event shall any Holder of Claims or Interests be entitled to set off any Claim or Interest against any claim, right or Cause of Action of the applicable Debtor or the Liquidation Trustee, as applicable, unless such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date.

F.      **Release of Liens.**

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Debtors and their successors and assigns.

If any Holder of a Secured Claim or any agent for such Holder has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take

any and all steps reasonably requested by the Liquidation Trustee, at the sole cost of the Liquidation Trust, that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Liquidation Trustee shall be entitled to make any such filings or recordings on such Holder's behalf. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.

### G.    Recoupment.

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any claim, right, or Cause of Action of the Debtors, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date.

## ARTICLE XII
## BINDING NATURE OF PLAN

THIS PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (I) WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, (II) HAS FILED A PROOF OF CLAIM OR INTEREST IN THE CHAPTER 11 CASES, OR (III) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

## ARTICLE XIII
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, these Chapter 11 Cases, the Sale, the Sale Documents, the Confirmation Order, and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to each of the following:

1.      Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests.

2.      Resolve any cases, controversies, suits, or disputes that may arise in connection with Claims, including Claim objections, allowance, disallowance, subordination, estimation and distribution.

3.      Decide and resolve all matters related to the granting and denying, in whole or in part of, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan.

4.      Resolve any matters related to: (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which the Debtors are a party or with respect to which the Debtors may be liable and to hear, determine, and, if necessary, liquidate, any cure amount arising therefrom; and/or (b) any dispute regarding whether a contract or lease is or was executory or expired.

5.      Adjudicate, decide or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date.

6.      Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code.

7.      Adjudicate, decide or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters relating to the Retained Causes of Action, if any.

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan or the Disclosure Statement.

9.      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan.

10.      Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan.

11.      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions.

12.      Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated.

13.      Determine any other matters that may arise in connection with or related to the Sale Documents, the Disclosure Statement, the Plan, and the Confirmation Order.

14.      Ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan.

15.      Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by any Holder for amounts not timely repaid.

16.      Adjudicate any and all disputes arising from or relating to distributions under the Plan.

17.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order.

18.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order.

19.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code.

20.     To recover all assets of the Debtors and property of the Debtors' Estates, wherever located.

21.     To hear and determine any Causes of Action that may be brought by the Liquidation Trustee.

22.     To hear and determine any other rights, claims, or Causes of Action held by or accruing to the Debtors or the Liquidation Trustee pursuant to the Bankruptcy Code or any applicable state or federal statute or legal theory.

23.     To hear and determine any dispute with respect to the GUC Trust, the GUC Trust Agreements, or the GUC Trust Assets.

24.     Enter an order or final decree concluding or closing these Chapter 11 Cases.

25.     Enforce all orders previously entered by the Bankruptcy Court.

26.     Hear any other matter over which the Bankruptcy Court has jurisdiction.

## ARTICLE XIV.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

### A.     Modification and Amendment.

Subject to the limitations contained in the Plan, the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules (1) to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129 of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan. Notwithstanding the foregoing, the Debtors may not make any modifications to the Plan as it pertains to the Committee Settlement absent written agreement of the Committee. Any amendment, alteration, modification or technical modification that affects the treatment of the Holders of Senior Secured Notes (including any release granted to or by such Holder) shall be reasonably acceptable to the Senior Secured Noteholders.

The Debtors may make appropriate non-material, technical adjustments and modifications to this Plan or the Plan Supplement prior to the Effective Date without further order or approval of the Bankruptcy Court.

**B.      Effect of Confirmation on Modifications.**

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation under Bankruptcy Rule 3019.

**C.      Revocation or Withdrawal of Plan.**

Subject to the conditions to the Effective Date, the Debtors, reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to File subsequent plans of reorganization or liquidation. If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan, the Confirmation Order, or the Disclosure Statement shall (a) constitute a waiver or release of any Claims, Interests, or Causes of Action, (b) prejudice in any manner the rights of the Debtors or any other Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity. For the avoidance of doubt, the revocation or withdrawal of the Plan shall have no effect on the validity, enforceability, or finality of the Sale Orders, nor shall it impair or invalidate any distributions made in accordance therewith.

# ARTICLE XV.
# MISCELLANEOUS PROVISIONS

**A.      Immediate Binding Effect.**

Notwithstanding Bankruptcy Rules 3020(e) or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the documents and instruments contained in the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Liquidation Trustee, all Holders of Claims against and Interests in the Debtors (regardless of whether any such Holder has voted or failed to vote to accept or reject this Plan and regardless of whether any such Holder is entitled to receive any distribution under this Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan, any and all non-Debtor parties to Executory Contracts and Unexpired Leases, and all parties in interest.

**B.      Additional Documents.**

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Liquidation Trustee, or the GUC Trustee (as applicable), all Holders of Claims or Interests receiving distributions pursuant to the

Plan, and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may reasonably be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

### C.     Substantial Consummation.

On the Effective Date, this Plan shall be deemed to be substantially consummated (within the meaning set forth in section 1101 of the Bankruptcy Code) pursuant to section 1127(b) of the Bankruptcy Code.

### D.     Reservation of Rights.

The Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the Holders of Claims or Interests prior to the Effective Date.

### E.     Successors and Assigns.

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, beneficiaries or guardian, if any, of each Entity.

### F.     Determination of Tax Liabilities.

As of the Effective Date, the Liquidation Trustee will be responsible for preparing and filing any tax forms or returns on behalf of the Debtors' Estates (to the extent not the responsibility of a Purchaser); *provided* that the Liquidation Trustee shall not be responsible for preparing or filing any tax forms for Holders of Interests in the Debtors (which Interests shall be cancelled pursuant to this Plan), but shall provide such Holders with any information reasonably required to prepare such forms.  The Debtors and the Liquidation Trustee (as applicable) shall have the right to request an expedited determination of any tax liability pursuant to section 505 of the Bankruptcy Code, including on any unpaid liability of the Debtors' Estate for any tax incurred during the administration of these Chapter 11 Cases.

### G.     Dissolution of the Committee.

The Committee shall dissolve on the Effective Date and the members of such Committee shall be released and discharged from all further rights and duties arising from or related to the Chapter 11 Cases, except with respect to, and to the extent of any applications for Professional Fee Claims or expense reimbursements for members of such Committee.  The Committee and its retained Professionals may also participate in any appeal pending as of the Effective Date or filed thereafter, the outcome of which could affect the treatment of prepetition creditors (including Holders of Allowed Priority Claims and 503(b)(9) Claims), including, but not limited to, any cases, controversies, suits or disputes arising in connection with the Consummation, interpretation, implementation or enforcement of the Plan or the Confirmation Order. The Professionals retained by the Committee shall not be entitled to assert any Administrative Claims nor shall they have an

Allowed Administrative Claims for any services rendered or expenses incurred after the Effective Date except in respect of the preparation and prosecution of or any objection to any Filed fee application and participation in any appeals.

### H.    Notices.

In order for all notices, requests, and demands to or upon the Debtors or the Liquidation Trustee, as the case may be, to be effective such notices, requests and demands shall be in writing (including by electronic mail) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by email, when received, and served on or delivered to the following parties:

| Debtors | Counsel to the Debtors |
|---|---|
| Village Roadshow Entertainment Group USA Inc.<br>750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069<br>Attn: Kevin Berg | Sheppard, Mullin, Richter & Hampton LLP<br>321 North Clark Street, 32nd Floor<br>Chicago, Illinois 60654<br>Attn: Justin R. Bernbrock, Matthew T. Benz<br>Email: jbernbrock@sheppardmullin.com<br>mbenz@sheppardmullin.com<br><br>Young Conaway Stargatt & Taylor LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE 19801<br>Attn: Joseph M. Mulvihill, Benjamin C. Carver<br>Email: jmulvihill@ycst.com,<br>bcarver@ycst.com |
| **Liquidation Trustee** ||
| To be included in the Plan Supplement. ||
| **GUC Trustee** ||
| To be included in the Plan Supplement. ||

After the Effective Date, Persons or Entities that wish to continue to receive documents Bankruptcy Rule 2002 shall, within thirty (30) days of the Effective Date, file a renewed request for receipt of notices and serve copies of such request by mail upon the Notice and Claims Agent and, as applicable, the Liquidation Trust, the Liquidation Trustee, and the Debtors. After the Effective Date, the Liquidation Trustee is authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that Filed such renewed requests, provided, however, the Office of the United States Trustee for the District of Delaware shall remain on the 2002 List without the need to file a renewed request for receipt of notices.

### I.        Term of Injunctions or Stays.

Except as otherwise provided in this Plan, to the maximum extent permitted by applicable law and subject to the Bankruptcy Court's post-confirmation jurisdiction to modify the injunctions and stays under this Plan (1) all injunctions with respect to or stays against an action against property of the Debtors or the Debtors' Estates arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, and in existence on the date the Confirmation Order is entered, shall remain in full force and effect until such property is no longer property of the Debtors or the Debtors' Estates; and (2) all other injunctions and stays arising under or entered during the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code shall remain in full force and effect until the earliest of (i) the date that the Chapter 11 Cases are closed pursuant to a final order of the Bankruptcy Court, or (ii) the date that the Chapter 11 Cases are dismissed pursuant to a final order of the Bankruptcy Court.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect indefinitely.

### J.        Entire Agreement.

On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### K.        Plan Supplement.

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Copies of such exhibits and documents shall be made available upon written request to Debtors' counsel or Liquidation Trustee's counsel (as applicable) at the address above or by downloading such exhibits and documents free of charge from the Notice and Claims Agent's website.

Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of the Plan, the Plan shall control. Notwithstanding the foregoing, to the extent that any conflict or inconsistency arises between the terms of this Plan or the Confirmation Order and the Liquidation Trust Agreement concerning the governance, administration, operation, or management of the Liquidation Trust or the rights and duties of the Liquidation Trustee, the terms of the Liquidation Trust Agreement shall govern and control in all respects; *provided, however*, that nothing in this provision shall alter or impair any substantive rights or treatment provided for under this Plan to any creditor or party in interest.

The documents in the Plan Supplement are considered an integral part of the Plan and shall be deemed approved by the Bankruptcy Court pursuant to the Confirmation Order.

### L.        Governing Law.

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of Delaware, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise

set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters.

**M.      Nonseverability of Plan Provisions.**

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is the following: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Liquidation Trustee (as applicable); and (3) nonseverable and mutually dependent.

**N.      Closing of the Chapter 11 Cases.**

After the full administration of the Chapter 11 Cases, the Liquidation Trustee shall promptly File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022, a motion pursuant to Local Rule 3022-1(a), and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

**O.      Agent Expenses**

The fees, costs, and expenses of the Senior Secured Notes Collateral Agent (including the fees, costs and expenses of the professionals retained by the Senior Secured Notes Collateral Agent) incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) without the requirement to file a fee application with the Bankruptcy Court and will not be subject to any requirement that (i) the Senior Secured Notes Collateral Agent file any application with the Bankruptcy Court or (ii) the Bankruptcy Court enters any further orders.

*[Remainder of page intentionally left blank.]*

Dated: January 29, 2026

Respectfully submitted,

_/s/_____

By:

## Exhibit B

**Liquidation Analysis**

[Intentionally Omitted]