**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC., *et al.*,[1] | ) ) ) ) | Case No. 25-10475 (TMH) |
|  | ) | (Jointly Administered) |
| Debtors. | ) ) |  |

**AFFIDAVIT OF PUBLICATION OF THE COMBINED HEARING NOTICE
IN THE WALL STREET JOURNAL AND LOS ANGELES TIMES**

  This Affidavit of Publication includes the sworn statements verifying that the *Notice of (I) Conditional Approval of Disclosure Statement and (II) the Hearing to Consider (A) Final Approval of the Disclosure Statement as Containing Adequate Information, (B) Confirmation of the Joint Plan of Village Roadshow Entertainment Group USA Inc. and its Debtor Affiliates, and (C) Related Voting and Objection Deadlines* was published and incorporated by reference herein as follows:

1. In *The Wall Street Journal* on February 26, 2026, attached hereto as **Exhibit A**.

2. In *Los Angeles Times* on February 26, 2026, attached hereto as **Exhibit B**.

---

[1] The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343. The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

# Exhibit A

# AFFIDAVIT

**STATE OF NEW JERSEY** )
                                    ) ss:
**CITY OF MONMOUTH JUNCTION, in the COUNTY OF MIDDLESEX** )

I, Wayne Sidor, being duly sworn, depose and say that I am the Advertising Clerk of the Publisher of THE WALL STREET JOURNAL, a daily national newspaper of general circulation throughout the United States, and that the notice attached to this Affidavit has been regularly published in THE WALL STREET JOURNAL for National distribution for

1 insertion(s) on the following date(s): 02/26/2026

ADVERTISER: VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC.

and that the foregoing statements are true and correct to the best of my knowledge.

Sworn to before me this 2nd day of March 2026

_Wayne Sidor_

_____
Notary Public



IAN C. MARTIN
NOTARY PUBLIC
ID # 50086494
COMMISSION EXPIRES
07/18/2028
STATE OF NEW JERSEY

# New Galaxy Phone Boosts AI Features

Samsung's latest S26 flagship will hit shelves in U.S. and elsewhere March 11

By Jiyoung Sohn

SEOUL—**Samsung Electronics** said the artificial-intelligence features on its latest flagship Galaxy smartphones unveiled Wednesday were designed to work effortlessly without the user needing to figure out the technology.

"AI provides exactly what you need, exactly when you need it, without you having to go looking for it," said Kang Min-seok, a Samsung executive vice president who leads smartphone product planning.

In one example, users of the new phones can press the side button to call up an Uber ride, entering the destination by voice or text. In partnership with Google's Gemini AI, the phone will take care of opening the Uber app, inputting the address and finding a driver.


The price of the new base model will rise $40 to about $900. HAVEN DALEY/AP

The Galaxy S26 phones, the company's flagship lineup, will hit the shelves in the U.S. and other markets on March 11.

Reflecting higher memory-chip prices, the price of the base model will rise $40 from the prior generation to about $900. The larger-screen Galaxy S26 Plus costs about $1,100, an increase of $100. The top-line Galaxy S26 Ultra is priced at $1,300, the same as the prior year's model.

Samsung says it has the most AI-enabled mobile devices of any company. It said roughly 800 million of its mobile devices—including smartphones, tablets, wearables and laptops—would be AI-enabled by the end of this year.

The South Korean company has often been ahead of Apple in bringing generative AI features to smartphones, such as the "circle-to-search" feature offered with Google that lets users search an image on the screen by circling it.

Samsung's internal research has found more than 80% of consumers think AI will be useful or necessary but the same proportion feel actually using it is hard. The Galaxy S26 phones deploy AI "without you even having to think about it," Kang said.

He said he expected the smartphone to be the main vehicle through which people make use of AI because its tools and hardware such as the screen make it hard to be fully replaced by AI-dedicated devices such as AI glasses.

With the Galaxy S26, photos can be edited directly in the gallery app by entering a prompt, such as a command to make a rainy day look sunny. If someone asks in a message about making lunch plans on a certain date, the user's schedule for the date will automatically appear on the side. Some AI features are offered by connecting to outside services via the cloud, while others run locally on the device using Samsung's proprietary generative AI model called Gauss, Kang said.



**A Photo Essay: Inside Apple's U.S. Chip Supply Chain**

CHRISTOPHER PAYNE FOR WSJ

 **Scan this code** to see photos from WSJ reporter Rolfe Winkler's look inside Apple's U.S. supply chain as the iPhone maker develops its U.S. manufacturing capabilities for semiconductors.

---

# Salesforce Sees Stable Growth Despite AI Fears

By Katherine Hamilton

**Salesforce** expects revenue to grow in the current fiscal year at about the same rate as it did the year before, as investors worry about AI's threat to software.

The customer-relationship-management company on Wednesday posted a profit of $1.87 billion, or $2.07 a share, in the quarter ended Jan. 31, compared with $1.82 billion, or $1.75 a share, a year earlier.

Stripping out certain one-time items, adjusted per-share earnings were $3.81, ahead of the $3.05 anticipated by analysts, according to FactSet.

Revenue rose 12% to $11.20 billion. Analysts surveyed by FactSet forecast revenue of $11.19 billion.

Salesforce also authorized a $50 billion share buyback program, replacing all previously unused authorizations.

Salesforce is among many companies that investors have focused on in recent weeks amid concerns that artificial-intelligence models will eventually replace software companies. Salesforce's stock shed 16% in the past month.

Annual recurring revenue from Salesforce's AI product Agentforce reached $800 million in the quarter, up from $540 million the quarter before. Salesforce said it closed 29,000 deals during the quarter, a 50% jump from the third quarter. Agentforce made its debut in the fall of 2024.

In the new fiscal year, Salesforce expects annual revenue to be $45.8 billion to $46.2 billion, while analysts were projecting $46.11 billion. The company expects adjusted earnings per share to be $13.11 to $13.19, while the consensus estimate from Wall Street was $13.15.

At the mid-point, the full-year revenue guidance would represent roughly 10% growth, in line with the 10% sales increase Salesforce logged in the just-ended fiscal year.

About 3 percentage points of the projected growth range will come from contributions from Informatica, which Salesforce acquired in November 2025.

In the current quarter, Salesforce anticipates revenue of $11.03 billion to $11.08 billion, ahead of the $11.0 billion analysts expected. Adjusted earnings per share are set to be $3.11 to $3.13, also ahead of Street estimates of $3.01.

**$3.81**
Salesforce's adjusted earnings per share, beating analyst views of $3.05


Salesforce CEO Marc Benioff at a conference in October. MICHAEL SHORT/BLOOMBERG NEWS

---

# Telecom Italia to Launch $471 Million Share Buyback

By Najat Kantouar

**Telecom Italia** said it planned to launch a share buyback of up to €400 million, or $470.9 million, after reporting preliminary 2025 results that showed revenue growth in its domestic market and in Brazil.

The Italian telecommunications company—also known as TIM—said late Tuesday that like-for-like revenue rose to €13.73 billion from €13.37 billion.

Meanwhile, like-for-like service revenue—a closely watched metric in the industry—increased 3.5% to €12.86 billion.

Like-for-like earnings before interest, taxes, depreciation and amortization after leases climbed to €3.69 billion from €3.46 billion.

The board will propose the share buyback plan at the next shareholders' meeting, subject to the sale of the Sparkle business closing and a reverse stock split, it said.

For the year ahead, TIM expects group capital expenditure below 14% of revenue and equity free cash flow after lease equal to around €1.8 billion.

---

ADVERTISEMENT

## The Marketplace
To advertise: 800-366-3975 or WSJ.com/classifieds

### COMMERCIAL REAL ESTATE

**UCC PUBLIC SALE NOTICE**

PLEASE TAKE NOTICE THAT, pursuant to the Uniform Commercial Code, Silver Hill Capital, LLC (f/k/a Community Loan Servicing, LLC) (together with its successors and assigns, the "Secured Party") will offer for sale at public auction to be held at 3:00 p.m. (prevailing Eastern Time) on May 14, 2026, and conducted both via Zoom (or similar online platform) and in-person at the offices of Hunton Andrews Kurth LLP, located at 200 Park Avenue, New York, NY 10166, all right, title and interest of each of 68-70 Spring Street Holdings 1, LLC; 73-75 Sullivan Holdings 1, LLC; 241 Mulberry Holdings LLC; and 1-3 Mott and 218 Lafayette Street Holdings, LLC, each a Delaware limited liability company (each a "Debtor" and collectively, the "Debtors"), respectively, to: (i) all limited liability company interests in 68-70 Spring Partners 1, LLC, a Delaware limited liability company, and all other collateral pledged by Debtor 68-70 Spring Street Holdings 1, LLC under that certain Mezzanine Pledge and Security Agreement, dated as of November 12, 2024, made by Debtors in favor of Secured Party (the "Pledge Agreement"); (ii) all limited liability company interests in 73-75 Sullivan Partners-1, LLC, a Delaware limited liability company, and all other collateral pledged by Debtor 73-75 Sullivan Holdings 1, LLC under the Pledge Agreement; (iii) all limited liability company interests in 241 Mulberry Partners, LLC, a Delaware limited liability company, and all other collateral pledged by Debtor 241 Mulberry Holdings LLC under the Pledge Agreement; and (iv) all limited liability company interests in 1-3 Mott and 218 Lafayette Street Partners, LLC, a Delaware limited liability company, and all other collateral pledged by Debtor 1-3 Mott and 218 Lafayette Street Holdings, LLC under the Pledge Agreement; (items (i), (ii), (iii), and (iv), each an "Individual Collateral", and collectively, the "Collateral"). The Collateral will first be offered as a collective whole and then each Individual Collateral will be offered independently. Whichever method of sale results in the highest aggregate bid from qualified bidder(s) (as determined by Secured Party) will be utilized. Copies of the Pledge Agreement are available for inspection as hereinafter described. The Secured Party was granted a security interest in the Collateral to secure certain indebtedness (the "Indebtedness") of the Debtors. All interested prospective purchasers that meet the qualifications for bidding are invited to attend and bid at the auction and will have the option to attend either via Zoom (or similar online platform) or in-person.

PLEASE TAKE FURTHER NOTICE THAT, based upon information known to Secured Party or involving the by Debtors, and/or certain other persons and entities affiliated therewith, it is the understanding of the Secured Party (but without any warranty or representation by the Secured Party as to the accuracy or completeness of the following matters) that: (i) Debtor 68-70 Spring Street Holdings 1, LLC owns all limited liability company interests in 68-70 Spring Partners 1, LLC; Debtor 73-75 Sullivan Holdings 1, LLC owns all limited liability company interests in 73-75 Sullivan Partners-1, LLC; Debtor 241 Mulberry Holdings LLC owns all limited liability company interests in 241 Mulberry Partners, LLC; and Debtor 1-3 Mott and 218 Lafayette Street Holdings, LLC owns all limited liability company interests in 1-3 Mott and 218 Lafayette Street Partners, LLC; (ii) 68-70 Spring Partners 1, LLC owns the real property commonly known as 68-70 Spring Street, New York, NY 10012 (the "Spring Street Property"); 73-75 Sullivan Partners-1, LLC owns the real property commonly known as 73-75 Sullivan Street, New York, NY 10012 (the "Sullivan Street Property"); 241 Mulberry Partners, LLC owns the real property commonly known as 241 Mulberry Street, New York, NY 10012 (the "Mulberry Street Property"); and 1-3 Mott and 218 Lafayette Street Partners, LLC owns the real property commonly known as 1-3 Mott Street a/k/a 201/205 Worth Street, New York, NY 10012, and 218 Lafayette Street, New York, NY 10012 (the "Mott Street and Lafayette Street Property," together with the Spring Street Property, the Sullivan Street Property, and the Mulberry Street Property, the "Properties"); and (iii) the Properties are subject to a first priority mortgage loan securing indebtedness in the original principal amount of $76,641,500.00, which may be in default.

PLEASE TAKE FURTHER NOTICE THAT the Secured Party reserves the right to accept or reject any bid and shall not be obligated to make any sale pursuant to this notice. The Secured Party reserves the right to bid and to become a purchaser at the sale to be made pursuant to this notice and to credit against the purchase price of the Collateral any and all of the Indebtedness.

PLEASE TAKE FURTHER NOTICE THAT the Collateral will be sold pursuant to appropriate transfer documents on an "AS IS, WHERE IS" basis, with all faults, and without any guarantees, representations or warranties of any kind or nature whatsoever.

PLEASE TAKE FURTHER NOTICE THAT the limited liability company interests being sold may be considered unregistered securities under the Securities Act of 1933, as amended (the "Securities Act"). The purchaser of the Collateral will be required to represent in writing to the Secured Party (the "Bidding Certificate") that such purchaser (i) is acquiring the Collateral for investment purposes, solely for the purchaser's own account and not with a view to distribution or resale of the Collateral within the meaning of Section 2(a)(11) of the Securities Act; (ii) is an accredited investor within the meaning of the applicable securities laws; (iii) has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of investment and has sufficient financial means to afford the risk of investment in the Collateral; (iv) will not resell or otherwise hypothecate the Collateral without a valid registration under applicable federal or state laws, including, without limitation, the Securities Act, or an available exemption therefrom; (v) will purchase the Collateral in compliance with all applicable federal and state laws, and (vi) will be able to satisfy all of the requirements set forth in the Intercreditor Agreement (copies of which are available for inspection as hereinafter described). Additionally, the Bidding Certificate shall provide the prospective bidder's agreement to indemnify the Secured Party with respect to any claim based on any misrepresentation or inaccuracy contained in such Bidding Certificate. **Meeting any requirements of the foregoing shall be at the sole risk, cost and expense of a prospective bidder.**

PLEASE TAKE FURTHER NOTICE that the following will apply with respect to the sale herein described. The Collateral will be sold for cash at such price and on such other commercially reasonable terms as the Secured Party may determine. In order for a prospective bidder (other than the Secured Party or its designee) to be a "qualified bidder" and eligible to bid at the public auction, each such prospective bidder must, unless otherwise agreed in writing by the Secured Party: (a) register with Newmark & Company Real Estate, Inc. (the "Broker") and execute and deliver to the Broker a Bidding Certificate, an Internal Revenue Service form W-9, and a KYC Letter (i) by email to brock.cannon@nmrk.com provided receipt is confirmed by response email, or (ii) by hand, certified mail (return receipt requested), or overnight delivery by a nationally recognized courier service, with a courtesy copy sent by email to brock.cannon@nmrk.com, so as to be actually received on or prior to 5:00 p.m. (prevailing Eastern Time) on May 7, 2026; (b) demonstrate to the Secured Party's satisfaction in advance of bidding its financial ability to tender payment for the Collateral; (c) demonstrate, to the Secured Party's satisfaction, that the certifications set forth in its Bidding Certificate are true and correct; and (d) at least two (2) business days prior to the start of the auction, provide an initial deposit to the escrow agent designated by the Secured Party (the "Designated Agent"), by wire transfer of immediately available funds from a U.S. commercial bank that is a member of the Federal Reserve System, in an amount equal to $50,000. **Prospective bidders are encouraged to perform such due diligence as they deem necessary.**

PLEASE TAKE FURTHER NOTICE that the full terms and conditions of the sale, copies of the relevant agreements, information for attending the auction, and other information may be obtained by contacting Brock Cannon of Newmark & Company Real Estate, Inc., 125 Park Avenue, New York, NY 10017, Telephone No.: (646) 315-4785; Email: brock.cannon@nmrk.com. In the event of any conflict between the terms set forth herein and the full terms of public sale, the full terms of public sale shall govern. For further information please visit the following website: https://tinyurl.com/3amx4z8h.

### NOTICE OF SALE

Notice is hereby given that, in accordance with applicable provisions of the Uniform Commercial Code (the "UCC"), by virtue of default under a pledge agreement dated November 27, 2024 executed by AYA Service 1 LLC ("Pledgor") and 47 West LLC, a Delaware limited liability company, authorized to do business in New York ("Secured Party"), the Secured Party, will offer for sale, at public auction, the right, title, and interest of AYA Service 1, LLC ("Pledgor") in and to one hundred percent (100%) of the membership interests and other equity interests, including, but not limited to, all economic rights and governance rights associated therewith, in and to 321-323-325 West 42nd Street LLC (the "Issuer") which owns the real property known as 321, 323 and 325 West 42nd Street, New York, New York ("Property") (collectively, the "Collateral").

The rights secured by the Secured Party are subject to a senior loan (the "Senior Loan") and first-priority mortgage on the Property and the obligations and liabilities set forth in the Senior Loan documents.

In order to satisfy the amounts due to the Secured Party in the amount of $3,648,639.28, plus accrued interest and fees, including default interest at the rate of 24% per annum from November 19, 2025, plus costs and disbursements and less any credits being held by the lender, if any, and less a $100,000 payment received on January 15, 2026 to reduce the principal, the public auction will be held on **March 16, 2026 at 3:30pm. (EST),** and will be conducted by Matthew D. Mannion of Mannion Auctions, LLC, virtually via the following Zoom meeting link:
https://us06web.zoom.us/j/83931696258?pwd=Bgrvaf2lJoygzuoFUuAHuQFPAFI72.1
Meeting ID: 839 3169 6258
Passcode: 582050
or by phone at +1 (646) 931-3860.

The Secured Party Reserves the right to credit bid. Any individual or entity interested in bidding on the Collateral must contact, Matthew D. Mannion at mdmannion@jpandr.com or by phone at +1 (212) 267-6698, to obtain a copy of the Terms of Sale and information regarding bidding instructions. Upon execution of a confidentiality and non-disclosure agreement, additional documentation and information will be made available.

The relevant UCC was filed on November 27, 2024 and refiled on November 19, 2025, in the State of Delaware, whereby AYA Service 1 LLC, as pledgor, pledged its 100% interest in 321-323-325 West 42nd Street LLC, as the sole member, to the Secured Party.

Evan M. Newman, Esq.
Attorneys for Secured Party
Jacobowitz Newman Tversky LLP
377 Pearsall Ave, Suite C, Cedarhurst, NY 11516
T: (516) 545-0996 | F: (212) 671 1883

### BANKRUPTCIES

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**

In re: VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC., et al.,[1] Debtors.

Chapter 11
Case No. 25-10475 (TMH)
(Jointly Administered)

**NOTICE OF (I) CONDITIONAL APPROVAL OF DISCLOSURE STATEMENT AND (II) THE HEARING TO CONSIDER (A) FINAL APPROVAL OF THE DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, (B) CONFIRMATION OF THE JOINT PLAN OF VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC. AND ITS DEBTOR AFFILIATES, AND (C) RELATED VOTING AND OBJECTION DEADLINES**

PLEASE TAKE NOTICE that on February 20, 2026, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order [Docket No. 1376] (the "Disclosure Statement Order"): (a) conditionally approving the Disclosure Statement for Joint Plan of Liquidation of Village Roadshow Entertainment Group USA Inc. and its Debtor Affiliates [Docket No. 1318] (including all exhibits thereto and as may be amended, supplemented, or modified from time to time, the "Disclosure Statement") for solicitation purposes only; (b) approving the solicitation and voting procedures with respect to the proposed Joint Plan of Liquidation of Village Roadshow Entertainment Group USA Inc. and its Debtor Affiliates [Docket No. 1317] (as may be amended, modified, or supplemented from time to time, the "Plan"); (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Package"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

PLEASE TAKE FURTHER NOTICE that the hearing at which the Court will consider (a) final approval of the Disclosure Statement as containing adequate information with the meaning of section 1125 of the Bankruptcy Code and (b) confirmation of the Plan (the "Combined Hearing") will commence on **April 16, 2026 at 10:00 a.m., prevailing Eastern Time**, before the Honorable Thomas M. Horan, United States Bankruptcy Judge, via Zoom or at the Court, 824 North Market Street, 3rd Floor, Courtroom No. 7, Wilmington, Delaware 19801.

PLEASE BE ADVISED THE COMBINED HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

**CRITICAL INFORMATION REGARDING VOTING ON THE PLAN**

**Voting Record Date**. The voting record date is February 18, 2026, except as otherwise provided in the Disclosure Statement (the "Voting Record Date"), which is the date for determining which Holders of Claims in Classes 3B and 4 are entitled to vote on the Plan.

**Voting Deadline**. The deadline for voting on the Plan is on **March 27, 2026 at 4:00 p.m. prevailing Eastern Time** (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot, and intend to vote on the Plan, you **must**: (a) follow the instructions carefully; (b) complete **all** of the required information on the Ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is **actually received** by the Debtors' voting and solicitation agent, Kurtzman Carson Consultants, LLC (KCC) dba Verita Global ("Verita" or the "Voting Agent"), on or before the Voting Deadline. **A failure to follow such instructions may disqualify your vote.**

**CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN OR ADEQUACY OF THE DISCLOSURE STATEMENT**

**ARTICLE XI** OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**Objection Deadline.** The deadline for filing objections to the Plan and any objection to the adequacy of the disclosures in the Disclosure Statement, if any, is **March 27, 2026 at 4:00 p.m. prevailing Eastern Time** (the "Confirmation Objection Deadline"). All objections to the relief sought at the Combined Hearing **must**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state with particularity the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; **and** (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be **actually received** on or before the Confirmation Objection Deadline: **(a) the Debtors**, Village Roadshow Entertainment Group USA Inc., 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA (Attn: Kevin Berg (kevin.berg@vreg.com) and Keith Maib (kmaib@accordeon.com); **(b) counsel to the Debtors,** (i) Sheppard, Mullin, Richter & Hampton LLP, 321 North Clark Street, 32nd Floor, Chicago, IL 60654 (Attn.: Justin R. Bernbrock (jbernbrock@sheppardmullin.com) and Jennifer L. Nassiri (jnassiri@sheppardmullin.com), Alyssa Paddock (apaddock@sheppardmullin.com), and Matthew T. Benz (mbenz@sheppardmullin.com), and (ii) Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Rodney Square, Wilmington, DE 19801, Joseph M. Mulvihill (jmulvihill@ycst.com); **(c)** the Office of the United States Trustee for the District of Delaware, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Wilmington, DE 19801 (Attn.: Timothy Fox (timothy.fox@usdoj.gov); and **(d) counsel to the Official Committee of Unsecured Creditors**, Pachulski Stang Ziehl & Jones LLP, 1700 Broadway, 36th Floor, New York, NY 10019 (Attn.: Robert Feinstein (rfeinstein@pszjlaw.com) and Bradford Sandler (bsandler@pszjlaw.com).

**ADDITIONAL INFORMATION**

**Obtaining Solicitation Materials.** The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received electronic access to the solicitation materials), please feel free to contact the Debtors' Voting Agent by: (a) writing to Village Roadshow Entertainment Ballot Processing Center, c/o KCC dba Verita, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; (b) calling the Debtors' restructuring hotline at (866) 526-6865 (Toll-Free) or (781) 575-2076 (International); or (c) visiting the Debtors' restructuring website at https://veritaglobal.net/vreg/epiq. For additional information or to send an email inquiry. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: https://www.deb.uscourts.gov/. Please be advised that the Voting Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may **not** advise you as to whether you should vote to accept or reject the Plan.

**Notice of Assumption or Rejection of Executory Contracts.** Under the terms of Article V of the Plan, on the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors not otherwise assumed or rejected will be deemed rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code (the "Rejection Notice"). Executory Contracts or Unexpired Leases that are the subject of a motion to assume that is pending on the Confirmation Date. Assumption of any Executory Contract or Unexpired Lease pursuant to the Sale Documents or the Plan, and payment of any cure amounts relating thereto, shall, upon satisfaction of the applicable requirements of section 365 of the Bankruptcy Code, result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults or provisions restricting the change in control of ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

**BINDING NATURE OF THE PLAN: IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THESE CHAPTER 11 CASES OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

Dated: February 20, 2026, Wilmington, Delaware, /s/ Joseph M. Mulvihill, **YOUNG CONAWAY STARGATT & TAYLOR, LLP**, Joseph M. Mulvihill (Del. Bar No. 6061), Brynna M. Gaffney (Del. Bar No. 7402), Rodney Square, 1000 North King Street, Wilmington, DE 19801, Telephone: (302) 571-6600, Facsimile: (302) 571-1253, Email: jmulvihill@ycst.com, bgaffney@ycst.com, Co-Counsel for the Debtors and Debtors in Possession -and- **SHEPPARD, MULLIN, RICHTER & HAMPTON LLP**, Justin R. Bernbrock (admitted pro hac vice), Matthew T. Benz (admitted pro hac vice), 321 North Clark Street, 32nd Floor, Chicago, IL 60654, Telephone: (312) 499-6300, Facsimile: (312) 499-6301, Email: jbernbrock@sheppardmullin.com, mbenz@sheppardmullin.com -and- Jennifer L. Nassiri (admitted pro hac vice), 1901 Avenue of the Stars, Suite 1600, Los Angeles, CA 90067, Telephone: (310) 228-3700, Facsimile: (310) 228-3701, Email: jnassiri@sheppardmullin.com -and- Alyssa Paddock (admitted pro hac vice), 30 Rockefeller Plaza, 39th Floor, New York, NY 10112, Telephone: (212) 653-8700, Facsimile: (212) 653-8701, Email: apaddock@sheppardmullin.com, Co-Counsel for the Debtors and Debtors in Possession

[1] The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343. The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan or the Disclosure Statement, as applicable, or as context otherwise requires.

---

### NOTICE OF SALE

**Notice of Disposition of Collateral Public Auction – UCC Sale**

Notice is hereby given that, in accordance with applicable provisions of the Uniform Commercial Code as enacted in Nevada, Allied Affiliated Funding, a Division of Axiom Bank, N.A. (the "Agent") under that certain (i) that certain Loan and Security Agreement with Art Lending, Inc. (the "Grantor"), dated as of June 18, 2021, as amended by that certain First Amendment to Loan and Security Agreement, dated as of October 3, 2022, as further amended by that certain Limited Waiver and Second Amendment to Loan and Security Agreement, dated as of July 3, 2024 (as the same may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Loan Agreement**"), will offer for sale, at public auction, certain Collateral (as defined below) pledged to it by the Grantor. The public auction (the "**Auction**") will be held by Mannion Auctions, LLC, as auctioneer for the Agent for the benefit of itself and the Lenders (the "**Auctioneer**"), and held virtually at **2:00 p.m. (Prevailing Eastern Time) on March 12, 2026** (the "**Auction Date**") and towards that end, the Agent is now soliciting opening bids from qualified bidders which must be submitted on or before **12:00 noon (Prevailing Eastern Time) on March 10, 2026** (the "**Bid Deadline**"). The Collateral will be sold to the to the highest qualified bidder at the Auction; provided, however, that Lender reserves the right to cancel the Auction in its entirety, or to adjourn the Auction to a future date.

The Collateral will be sold in six (6) lots (described below), and there is no warranty or representations relating to title, possession, quiet enjoyment, merchantability, fitness, or the like in this disposition. The Agent for the benefit of itself and the Lenders reserves the right for itself and any assignee to bid (whether by cash and/or crediting some or all of the secured obligations) and to become the purchaser at the sale. Parties interested in bidding on the Collateral must contact the Auctioneer, Mannion Auctions, LLC, Attn: Matthew D. Mannion, 299 Broadway, Suite 1601, New York, NY 10007, Tel.: (212) 267-6698, mdmannion@jpandr.com. The Terms of Sale, bidding instructions and additional documentation will be made available by contacting the Auctioneer. Interested parties who do not contact the Auctioneer prior to the sale and submit an opening bid and required deposit on or before the Bid Deadline will not be permitted to bid at the auction.

The Collateral to be sold consists of six separate notes each of which is secured by various artworks, including Borrower's title and interest in the notes as well, all supporting obligations related thereto, including without limitation all guaranties, letters of credit, letter-of-credit rights, indemnities, security agreements, mortgages, deeds of trust, pledges, assignments, subordination agreements, intercreditor agreements, collateral agency or participation agreements, and any other collateral documents or credit support securing or supporting such Notes or any obligations of the underlying obligors as well as any proceeds or offspring thereof: **(1)** The Secured Grid Promissory Note dated as of November 2, 2020 by and between The Art Guarantee Fund, LLC as borrower and Art Funding (VIII) LLC as lender in the original principal sum of the lesser of (A) Two Million Two Hundred Fifty Thousand Dollars ($2,250,000.00) or (B) the principal amount of the loan. This note is secured by Monumental Marble Vase by Paul Howard Manship; **(2)** The Secured Grid Promissory Note dated as of June 26, 2019 by and between Art Investment Fund (VIII) LLC as borrower and Art Funding (VI) LLC as well as any successors and participants dated as of June 26, 2019 in the original principal amount of the lesser of (A) One Million Dollars ($1,000,000.00) or (B) or the principal amount of the loans, as amended from time to time. This note is secured by In the Teton Range by Thomas Moran; **(3)** The Secured Grid Promissory Note dated as of August __, 2017 by and between Madison Avenue, LLC as borrower and Art Finance Funding (VI) LLC as well as any successors and participants as lender in the original principal amount of the lesser of (A) One Million Five Hundred Thousand Dollars ($1,500,000.00) or (B) the principal amount of the loan. This note is secured by Oval Form by Barbara Hepworth; **(4)** The Secured Grid Promissory Note dated as of March 31, 2019 by and between Procacini S.L. and Florencio Nicolas Cortes Barrios jointly and severally as borrowers and AF Funding (VIII) LLC as well as any successors and participants as lender in the original principal amount of the lesser of (A) Five Million Dollars ($5,000,000.00) or (B) the principal amount of the loan. This note is secured by Saint Lois of France by Georgia O'Keefe; **(5)** The Secured Grid Promissory Noted dated as of April 30, 2021 by and between Carlton C. Rochell, Jr. as borrower and Art Finance Funding (VI), LLC as well as its assignees and participants as lender in the original principal amount of the lesser of (A) Two Million Five Hundred Thousand Dollars ($2,500,000.00) or (B) the principal amount of the loan. This note is secured by Juan de Mesa; and **(6)** The Secured Grid Promissory Noted dated as of December 23, 2020 by and between W&P Galleries, Inc. as borrower and Art Funding (X), LLC as well as its assignees and participants as lender in the original principal amount of the lesser of (A) Six Million Five Hundred Thousand Dollars ($6,500,000.00) or (B) the principal amount of the loan. This note is secured by various Himalayan Antiquities.

Bids may be submitted either on a single Note or all the Notes. More information on each of Notes and artworks securing each of the Notes can be obtained by contacting the Auctioneer prior to the Bid Deadline.

---



**THE WALL STREET JOURNAL**
**THE MARKETPLACE**
© 2026 Dow Jones & Company, Inc. All Rights Reserved.

ADVERTISE TODAY
**(800) 366-3975**
wsj.com/classifieds
DJ | DOW JONES

# Exhibit B

# Los Angeles Times
## MEDIA GROUP

**PROOF OF PUBLICATION**
**(2015.5 C.C.P.)**

**STATE OF CALIFORNIA**
**County of Los Angeles**

I am a citizen of the United States and a resident of the County aforesaid; I am over the age of eighteen years, and not a party to or interested in the action for which the attached notice was published. I am a principal clerk of the Los Angeles Times, which was adjudged a newspaper of general circulation on May 21, 1952, Cases 598599 for the City of Los Angeles, County of Los Angeles, and State of California. Attached to this Affidavit is a true and complete copy as was printed and published on the following date(s):
February 26, 2026

I certify (or declare) under penalty of perjury
under the laws of the State of California that the foregoing is true and correct.

Dated at El Segundo, California on
this 3nd day of March, 2026

_____KB_____
*Katherine G. Gundell*
[signature]

2300 E. Imperial Hwy.
El Segundo, CA 90245

Ad#8015624 - Los Angeles Times
Page 1 of 2

Los Angeles Times
MEDIA GROUP

# IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC., et al.,[1] | ) Chapter 11<br>) Case No. 25-10475 (TMH)<br>) (Jointly Administered) |
| Debtors. | |

## NOTICE OF (I) CONDITIONAL APPROVAL OF DISCLOSURE STATEMENT AND (II) THE HEARING TO CONSIDER (A) FINAL APPROVAL OF THE DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, (B) CONFIRMATION OF THE JOINT PLAN OF VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC. AND ITS DEBTOR AFFILIATES, AND (C) RELATED VOTING AND OBJECTION DEADLINES

**PLEASE TAKE NOTICE** that on February 20, 2026, the United States Bankruptcy Court for the District of Delaware (the "Court") entered an order [Docket No. 1376] (the "Disclosure Statement Order"): (a) conditionally approving the *Disclosure Statement for Joint Plan of Liquidation of Village Roadshow Entertainment Group USA Inc. and its Debtor Affiliates* [Docket No. 1318] (including all exhibits thereto and as may be amended, supplemented, or modified from time to time, the "Disclosure Statement") for solicitation purposes only; (b) approving the solicitation and voting procedures with respect to the proposed *Joint Plan of Liquidation of Village Roadshow Entertainment Group USA Inc. and its Debtor Affiliates* [Docket No. 1317] (as may be amended, modified, or supplemented from time to time, the "Plan")[2]; (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Package"); and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE** that the hearing at which the Court will consider (a) final approval of the Disclosure Statement as containing adequate information within the meaning of section 1125 of the Bankruptcy Code and (b) confirmation of the Plan (the "Combined Hearing") will commence on **April 16, 2026 at 10:00 a.m., prevailing Eastern Time**, before the Honorable Thomas M. Horan, United States Bankruptcy Judge, via Zoom or at the Court, 824 North Market Street, 3rd Floor, Courtroom No. 7, Wilmington, Delaware 19801.

**PLEASE BE ADVISED**: THE COMBINED HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

### CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

**Voting Record Date**. The voting record date is February 18, 2026, except as otherwise provided in the Disclosure Statement (the "Voting Record Date"), which is the date for determining which Holders of Claims in Classes 3B and 4 are entitled to vote on the Plan.

**Voting Deadline**. The deadline for voting on the Plan is on **March 27, 2026 at 4:00 p.m. prevailing Eastern Time** (the "Voting Deadline"). If you received a Solicitation Package, including a Ballot, and intend to vote on the Plan, you **must**: (a) follow the instructions carefully; (b) complete **all** of the required information on the Ballot; and (c) execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is **actually received** by the Debtors' voting and solicitation agent, Kurtzman Carson Consultants, LLC (KCC) dba Verita Global ("Verita" or the "Voting Agent"), on or before the Voting Deadline. **A failure to follow such instructions may disqualify your vote.**

### CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN OR ADEQUACY OF THE DISCLOSURES IN THE DISCLOSURE STATEMENT

**ARTICLE XI** OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS. THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**Objection Deadline**. The deadline for filing objections to the Plan and any objection to the adequacy of the disclosures in the Disclosure Statement, if any, is **March 27, 2026 at 4:00 p.m. prevailing Eastern Time** (the "Confirmation Objection Deadline"). All objections to the relief sought at the Combined Hearing **must**: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Rules, and any orders of the Court; (c) state with particularity the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection; **and** (d) be filed with the Court (contemporaneously with a proof of service) and served upon the following parties so as to be **actually received** on or before the Confirmation Objection Deadline: **(a) the Debtors**, Village Roadshow Entertainment Group USA Inc., 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA (Attn: Kevin Berg (kevin.berg@vreg.com) and Keith Maib (kmaib@accordion.com)); **(b) counsel to the Debtors**, (i) Sheppard, Mullin, Richter & Hampton LLP, 321 North Clark Street, 32nd Floor, Chicago, IL 60654 (Attn.: Justin R. Bernbrock (jbernbrock@sheppardmullin.com), Jennifer L. Nassiri (jnassiri@sheppardmullin.com), Alyssa Paddock (apaddock@sheppardmullin.com), and Matthew T. Benz (mbenz@sheppardmullin.com)), and (ii) Young Conaway Stargatt & Taylor, LLP, 1000 N. King Street, Rodney Square, Wilmington, DE 19801, Joseph M. Mulvihill (jmulvihill@ycst.com); **(c) the Office of the United States Trustee for the District of Delaware**, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Wilmington, DE 19801 (Attn.: Timothy Fox (timothy.fox@usdoj.gov)); and **(d) counsel to the Official Committee of Unsecured Creditors**, Pachulski Stang Ziehl & Jones LLP, 1700 Broadway, 36th Floor, New York, NY 10019 (Attn.: Robert Feinstein (rfeinstein@pszjlaw.com) and Bradford Sandler (bsandler@pszjlaw.com).

### ADDITIONAL INFORMATION

**Obtaining Solicitation Materials**. The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received electronic access to the solicitation materials), please feel free to contact the Debtors' Voting Agent by: (a) writing to Village Roadshow Entertainment Ballot Processing Center, c/o KCC dba Verita, 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; (b) calling the Debtors' restructuring hotline at (866) 526-6865 (Toll-Free) or (781) 575-2076 (International); or (c) visiting the Debtors' restructuring website at https://veritaglobal.net/vreg/inquiry for additional information or to send an email inquiry. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at: https://www.deb.uscourts.gov/. Please be advised that the Voting Agent is authorized to answer any questions about, and provide additional copies of, solicitation materials, but may **not** advise you as to whether you should vote to accept or reject the Plan.

**Notice of the Assumption or Rejection of Executory Contracts**. Under the terms of Article V of the Plan, on the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors not otherwise assumed or rejected will be deemed rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that are the subject of a motion to assume that is pending on the Confirmation Date. Assumption of any Executory Contract or Unexpired Lease pursuant to the Sale Documents or the Plan, and payment of any cure amounts relating thereto, shall, upon satisfaction of the applicable requirements of section 365 of the Bankruptcy Code, result in the full, final, and complete release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults or provisions restricting the change in control of ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

**BINDING NATURE OF THE PLAN**: IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THESE CHAPTER 11 CASES OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.

Dated: February 20, 2026, Wilmington, Delaware, /s/ Joseph M. Mulvihill, **YOUNG CONAWAY STARGATT & TAYLOR, LLP,** Joseph M. Mulvihill (Del. Bar No. 6061), Brynna M. Gaffney (Del. Bar No. 7402), Rodney Square, 1000 North King Street, Wilmington, DE 19801, Telephone: (302) 571-6600, Facsimile: (302) 571-1253, Email: jmulvihill@ycst.com, bgaffney@ycst.com, *Co-Counsel for the Debtors and Debtors in Possession* -and- **SHEPPARD, MULLIN, RICHTER & HAMPTON LLP,** Justin R. Bernbrock (admitted pro hac vice), Matthew T. Benz (admitted pro hac vice), 321 North Clark Street, 32nd Floor, Chicago, IL 60654, Telephone: (312) 499-6300, Facsimile: (312) 499-6301, Email: jbernbrock@sheppardmullin.com, mbenz@sheppardmullin.com -and- Jennifer L. Nassiri (admitted pro hac vice), 1901 Avenue of the Stars, Suite 1600, Los Angeles, CA 90067, Telephone: (310) 228-3700, Facsimile: (310) 228-3701, Email: jnassiri@sheppardmullin.com -and- Alyssa Paddock (admitted pro hac vice), 30 Rockefeller Plaza, 39th Floor, New York, NY 10112, Telephone: (212) 653-8700, Facsimile: (212) 653-8701, Email: apaddock@sheppardmullin.com, *Co-Counsel for the Debtors and Debtors in Possession*

[1] The last four digits of Village Roadshow Entertainment Group USA Inc.'s federal tax identification number are 0343. The mailing address for Village Roadshow Entertainment Group USA Inc. is 750 N. San Vicente Blvd., Suite 800 West, West Hollywood, CA 90069. Due to the large number of debtors in these cases, which are being jointly administered for procedural purposes only, a complete list of the Debtors and the last four digits of their federal tax identification is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/vreg.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan or the Disclosure Statement, as applicable, or as context otherwise requires.

Ad #8015624 - Los Angeles Times

Page 2 of 2

## Voices  MICHAEL HILTZIK  COLUMNIST

# Waiting for your tariff refund check? Dream on

Treasury Secretary Scott Bessent, who has a way of saying the quiet parts out loud in defending President Trump's economic policies, told the truth again Friday, during a public appearance a few hours after the Supreme Court threw out most of Trump's tariffs.

Asked about the prospects that Americans would be receiving refunds of the illegal tariffs paid since Trump imposed them in April, Bessent replied with a condescending smirk: "I get a feeling the American people won't see it."

A couple of things about that. One is that there doesn't seem to be any legal question that those who paid the tariffs are entitled to refunds. In his 6-3 ruling invalidating levies imposed on imports under the International Emergency Economic Powers Act of 1977, or IEEPA, Chief Justice John G. Roberts Jr. made clear that those tariffs were unconstitutional and illegal from their inception.

Therefore, there's no excuse for the government to hold on to the money it has collected — estimated at somewhere between $135 billion and $170 billion. But Roberts didn't state whether refunds are warranted or, if so, how they should be calculated and distributed.

Trump has dangled the prospect of tariff refunds — actually, tariff "dividend" checks of $2,000 — in front of taxpayers for months. In effect, that would mean returning to taxpayers the money that his tariffs have cost them. Bessent's comments put paid to that promise.

Today, no one is arguing seriously that checks should be cut for taxpayers — except Illinois Gov. J.B. Pritzker, who demanded refund checks totaling $8.7 billion for his constituents. But that has the aroma of a campaign stunt for Pritzker, who is running for a third term and may be positioning himself for a presidential run.

By not specifying a refund process, the Supreme Court decision left a vacuum that Bessent tried to fill. In his comments, he explained why refunds will be nothing but a dream for the average American — and those comments were chilling.

First, he said, Trump has the authority to reimpose the same tariffs under different laws. Indeed, Trump has already announced that he will be imposing 15% tariffs across the board.

He also signaled that although Roberts pushed refund decisions down to the Court of International Trade, the government is poised to challenge importers' applications for reimbursement, generating litigation that "can be dragged out for weeks, months, years."

In other words, Bessent implied that, far from resolving the economic confusion Trump has generated through his on-again-off-again tariff policies during 2025, the court's decision provoked Trump to inject even more uncertainty into U.S. trade relations and domestic business decisions.

That dime appeared to drop for stock market investors Monday. The markets rose modestly in a relief rally Friday after the Supreme Court released its decision, but tumbled Monday as Trump doubled down on tariffs. At the close, the Dow Jones industrial average was down by 821.91 points, or nearly 1.7%, and the Nasdaq and Standard & Poor's 500 indices both fell by more than 1%.

Bessent didn't mention the most important reason why American consumers are unlikely to see anything resembling a tariff refund.

Tariffs on imported products are, by any measure, a tax on domestic consumers. Economic opinion is virtually unanimous on that point. As I reported in January, the Kiel Institute for the World Economy, a German think tank, concluded that 96% of the 2025 Trump tariffs were paid by American importers and their domestic clients.

"The tariffs are, in the most literal sense, an own goal," Kiel's researchers wrote. "Americans are footing the bill." Their conclusion was largely echoed earlier this month by the Federal Reserve Bank of New York, which placed the burden on American importers and consumers at "nearly 90%."

That said, the specifics of tariff payments are in the hands of importers and retailers, which keep records of how much they've paid and on what products or parts. Consumers don't normally know the numbers. (I actually received an invoice last year breaking out the tariffs charged by a Japanese retailer on a set of pens I had bought for a birthday present, but since the sum came to $12 I'm not sure that demanding a refund from the government would be worth it.)

So far, about 1,500 businesses have filed claims for refunds through the Court of International Trade. Most filed these claims to secure for themselves a position in the scrum for refunds, like music fans lining up overnight for tickets to a star's upcoming concert.

Many of these businesses may not actually have put a number on their claim. Costco, perhaps the biggest retailer to file with the CIT, didn't say in its Nov. 28 filing how much it thought it was owed, possibly because it was still bound to pay the tariffs until the Supreme Court issued a final decision.

U.S. Customs and Border Protection, which actually computes and collects the tariffs, says it will cease collecting the invalidated levies when the clock strikes 12:01 a.m. Tuesday morning.

What consumers don't know is how much of the tariffs have been passed down to them. Some sellers decided to eat some or all of the tariffs to keep consumer prices steady. Some may have stocked up on tariff-eligible products ahead of the formal imposition of the levies.

Will retailers seek out customers who paid higher prices on products that were tariffed to hand them refunds? None has said that such an eventuality is in the cards, though it might not be surprising to see some businesses use the end of tariffs as a marketing device — you know, "We're cutting prices on Toyotas during 'tariff freedom month!'" etc., etc.

It's also conceivable that retailers passed *imaginary* tariff costs on to their customers, putting through price increases that had nothing to do with the levies but could be blamed on them anyway.

That's what happened after Trump imposed tariffs on washing machines, which were almost all foreign-made, in 2018. According to a 2020 survey by Federal Reserve and University of Chicago economists, the tariffs forced washing machine prices up by nearly 12%, or about $86 each. The researchers discovered, however, that prices on clothes dryers increased by about the same amount, even though they weren't subject to the tariffs at all.

What happened? The researchers conjectured that because washers and dryers are typically sold as pairs, retailers may have simply spread the washing machine cost increase between the two products to keep their prices similar. It's also possible that retailers, figuring that consumers would expect to pay more for tariffed washing machines and would assume the same effect held for dryers, charged more for the latter to fatten their profits. One wouldn't expect consumer refunds in those cases.

Another imponderable is the effect of Trump's tariffs on the U.S. consumer economy generally. The Trump tariffs cost the average American household the equivalent of a tax increase of about $1,000, the Tax Foundation has calculated. About $600 of that sum was due to the IEEPA tariffs now struck down. But the new tariffs Trump announced after the Supreme Court ruling will raise the tariff tax for American families by $300 to $700, the Foundation reported — potentially a greater total burden than existed before the court's action.

All of Trump's tariffs increased the average tariff rate to 13.8%, the Foundation reckoned. The Supreme Court's ruling reduced that to about 6% — still the highest U.S. tariff rate since 1971 — but the new 15% tariff Trump announced would raise the applied rate back to 12.1%. By law, the new tariff can remain in effect for only five months unless it's extended by Congress. In 2022, America's applied tariff rate was 1.5%.

Perhaps the most immediate question facing businesses is how refund claims will be administered. In his dissent to Roberts' IEEPA decision, Justice Brett M. Kavanaugh wrote that "the refund process is likely to be a 'mess.'"

Possibly Kavanaugh's concern was that the Court of International Trade will have to adjudicate 1,500 claims one by one. But it need not be so.

In 1998, the Supreme Court declared a Harbor Maintenance Tax on exports, based on the constitutional provision that exports can't be taxed. Responsibility for those refunds also fell to the Court of International Trade, which established a standardized procedure for claims. Even under the streamlined system, however, the resolution of all those claims took until 2005, or seven years. And that involved only about $1 billion in claims, not the more than $130 billion at stake today.

What remains unexplained in the miasma created by Trump's tariff policies is why he is doing this. None of his rationales has been borne out. The tariffs haven't restored manufacturing employment in the U.S., which have fallen throughout Trump's current term. They haven't eliminated America's trade deficit with the rest of the world, which has persisted since 1975 and — despite Trump's assertions — isn't anywhere close to an economic crisis.

As it happens, while the overall trade deficit fell modestly last year by less than $3 billion, or about one-third of 1%, most of the reduction was in services; the deficit in goods rose by $25.5 billion to a record $1.24 trillion.

All that's left is Trump's inclination to wield tariffs as tools of geopolitical bullying. He has raised or threatened to raise tariffs on Brazil because of that country's criminal pursuit of former President Jair Bolsonaro for leading a coup attempt; on Switzerland because he felt dissed by a Swiss government leader; and on several European countries for thwarting his effort to annex Greenland.

None of those actions bore fruit (Bolsonaro was convicted and is currently serving a 27-year prison sentence). America's trading partners plainly recognize that the new tariffs must expire within 150 days and can't be renewed without action by a Congress plainly queasy about giving Trump his tariffs back after the Supreme Court took them away. They don't seem to be taking Trump seriously.

They can tell that on tariffs, as on many other things, Trump is increasingly behaving like a lame duck, albeit one with a whim of iron. But as the stock market seemed to be telling us Monday, even a whim of iron can be very, very costly.



ALLEN J. SCHABEN Los Angeles Times

**THE SUPREME COURT** ruled that President Trump's sweeping emergency tariffs were illegal. Above, a container ship is unloaded at the Port of Los Angeles.

IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE

In re: VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC., *et al.*,¹  Chapter 11  Case No. 25-10475 (TMH)  (Jointly Administered)

Debtors.

NOTICE OF (I) CONDITIONAL APPROVAL OF DISCLOSURE STATEMENT AND (II) THE HEARING TO CONSIDER (A) FINAL APPROVAL OF THE DISCLOSURE STATEMENT AS CONTAINING ADEQUATE INFORMATION, (B) CONFIRMATION OF THE JOINT PLAN OF VILLAGE ROADSHOW ENTERTAINMENT GROUP USA INC. AND ITS DEBTOR AFFILIATES, AND (C) RELATED VOTING AND OBJECTION DEADLINES

[Legal notice continues with details about bankruptcy proceedings, voting deadlines, and contact information for counsel including Sheppard Mullin, Young Conaway Stargatt & Taylor, Pachulski Stang Ziehl & Jones, and Robert Feinstein.]



POPPY BANK

3.50% APY*

Poppy Premier Savings

Pasadena Branch
36 Sierra Madre Villa Avenue, Unit 101
(626) 507-9889

Visit one of our many branch locations and grow your future today!
poppy.bank/locations

*The promotional Annual Percentage Yield (APY) is accurate as of January 5, 2026 and is subject to change without notice. A minimum balance of $1,000 must be maintained to obtain the advertised Annual Percentage Yield. Electronic statements must be activated, and enrollment maintained, to avoid a monthly $5.00 paper statement fee. Refer to the Terms and Conditions of Your Account and the Personal Schedule of Fees & Charges disclosures for additional details pertaining to your account. Fees and withdrawals of principal or interest could reduce earnings. Offer available for a limited time and only at participating branches.

Member FDIC