**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>VILLAGE ROADSHOW ENTERTAINMENT<br>GROUP USA INC., et al.,<br><br>Debtors. | Chapter 11<br><br>Case No. 25-10475 (TMH)<br><br>(Jointly Administered)<br><br>Ref. Docket Nos. 1317, 1357, 1359, 1372,<br>1507, 1516, & 1519 |

**SUPPLEMENTAL STATEMENT IN SUPPORT OF CLAIM TREATMENT,**
**RECORD COMPLETENESS, AND PLAN CONFIRMATION**

THE G.O.A.T. MEDIA, LLC ("Claimant"), together with its manager and sole economic stakeholder—who originated, developed, financed, and transmitted all underlying materials and performed the associated services—submits this Supplemental Statement in connection with Plan confirmation to ensure claim treatment and creditor rights are determined on a complete and reliable record.

This Statement supplements Claimant's prior filings dated February 17, 2026 (Docket No. 1357) and March 26, 2026 (Docket No. 1507) and addresses issues bearing directly on claim treatment, record completeness, and Plan confirmation.

The Plan, as proposed, does not satisfy 11 U.S.C. §1129 because it relies on a claim evaluation framework dependent on Debtor-controlled records that the Debtors have not produced, tested, or reconciled against conflicting positions taken throughout this case.

The record establishes a pattern of non-responsiveness, selective disclosure, and inconsistent representations concerning authority, submission handling, development activity, and claim-relevant information. These inconsistencies go to the core of how claims are evaluated, quantified, and resolved.

Despite repeated requests, the Debtors have not produced the records required to determine:

• whether individuals acting through Debtor systems had actual or apparent authority to receive, evaluate, and act on submitted materials and services

• how submitted materials were received, tracked, routed, evaluated, and used or otherwise commercialized

• whether those materials were retained, rejected, repurposed, or remain active

• whether those materials informed internal development, packaging, or external transactions

• how those materials were handled and processed during restructuring discussions, the period leading into bankruptcy and throughout the claims administration process; and

• how governing policies and decision-making frameworks applied to those materials carried into the bankruptcy process, including the handling of intellectual property, strategic initiatives, related rights, and associated market activity within the claims administration and Plan.

Instead, the claims process has replicated the underlying conduct reflected in the record— reliance on selective statements and limited record excerpts, failure to respond to requests for clarification, and continued withholding of material information exclusively within Debtor control—thereby shifting the burden of incomplete information onto the Claimant while maintaining Debtor control over the information necessary to evaluate claim outcomes. A confirmation process that relies on Debtor-controlled information while withholding that information from claim evaluation does not satisfy 11 U.S.C. §1129(a)(3).

## I. CONTINUITY OF CONDUCT — PRE- AND POST-PETITION

The same core issues present during the pre-petition period continue through the bankruptcy process, including claim administration and Plan development.

The record reflects that the Debtors' agent—whom the Debtors inconsistently describe as a

first-look producer through February 2022 on the record, as a consultant through at least late 2022 in direct communications to Claimant as reflected in the evidentiary record, and as a former representative—operated within Debtor-sanctioned systems in connection with the solicitation, receipt, development, and handling of Claimant's materials authored and originated by its sole manager and economic stakeholder. The agent separately represented himself as an in-house producer in public-facing materials and private communications, as reflected in the evidentiary record. The Debtors have not reconciled these differing descriptions or explained how any transition or exit affected authority, scope of engagement, or responsibility for the receipt, handling, and use of Claimant's materials and services.

The Debtors do not identify any governing agreements, internal controls, or documented limitations defining or restricting that authority, and do not produce records reflecting how Claimant's submissions were received, routed, evaluated, or dispositioned within Debtor systems.

The record further reflects contemporaneous awareness by that agent of a potential VREG sale and bankruptcy in early 2023, as reflected in communications in the evidentiary record, yet the Debtors do not explain how that knowledge bears on authority, oversight, or the handling and exploitation of Claimant's materials, the services provided, or the use of its author and originator's work during the relevant period and leading into this case.

Claimant's materials and services were solicited, transmitted, and received through Debtor-controlled systems and communication channels under representations of authority and active engagement, including company and market approval language as shown in the record.

The Debtors' inconsistent characterization of that agent leaves the scope of authority, responsibility, and involvement unresolved on the present record.

The Debtors control the records governing receipt, routing, review, analysis, and use of those materials and have not produced them.

Specifically:

• Requests for clarification regarding authority, submission handling, and project status have gone unanswered or received incomplete responses

• The Debtors have advanced differing and conflicting characterizations of authority and engagement scope without reconciling those positions against the record

• The status, disposition, and internal handling of submitted materials and services remain undefined both pre-petition and during the claims process

• Communications and records relevant to submission tracking, evaluation, internal routing, and downstream activity have not been produced despite their central relevance to claim determination

• Representations regarding market viability, project positioning, and disposition have shifted over time without supporting documentation

This continuity reflects sustained reliance on Debtor-controlled information without corresponding disclosure before and after the petition date. The same unresolved issues that gave rise to the claim continue within the Plan framework.

The Debtors assert no records of the submitted projects, while Claimant filed with the Court a complete, verifiable record of communications, transmitted works, and submissions that directly contradicts that position.

A process that permits the Debtors to rely on information within their control while withholding that information from the record does not satisfy 11 U.S.C. § 1129(a)(3)'s requirement that the Plan be proposed in good faith.

## II. ECONOMIC CONTEXT AND UNDISCLOSED VALUE

The Debtors attribute their restructuring to external market conditions. At the same time, the record reflects that during the period in which Claimant's services, materials, strategies, and project frameworks were submitted through Debtor-sanctioned channels, significant media rights activity, development output, and downstream commercial projects occurred across the market. The relationship between those outcomes and materials and services submitted through Debtor-controlled processes remain undisclosed, even as the Debtors seek approval of broad third-party releases.

To the extent the Debtors' internal development, packaging, or strategic positioning incorporated or was informed by Claimant services or materials authored and originated by its sole manager and economic stakeholder, that information remains uniquely within Debtor control and bears directly on claim evaluation, valuation, and participation rights.

Yet the Plan proceeds without requiring disclosure of:

• whether submitted materials were retained, circulated, or integrated into development pipelines

• whether such materials informed transactions, partnerships, or rights positioning

• whether any economic benefit was realized in connection with those materials prior to or during the bankruptcy period or continues to be realized

• whether any internal or external parties participated in or benefited from such activity

This is not a neutral evidentiary gap. It is a structural information asymmetry in which the Debtors control the records that define value while advancing a Plan that fixes that value without producing them.

Where a Plan seeks to resolve claims under those conditions, it fixes outcomes on an incomplete record, shifts the consequence of non-disclosure onto the Claimant, and preserves Debtor control over both the information and the result.

A Plan that fixes claim outcomes while the Debtors retain exclusive control over the information necessary to determine those outcomes does not satisfy 11 U.S.C. §1129(a)(3).

### III. ONGOING VALUATION AND ESTIMATION UNDER §502(c)

The claim cannot be fixed to a static point in time where the value of submitted materials, formats, development frameworks, and strategic services continues to manifest and be realized in the marketplace.

The materials submitted through Debtor-sanctioned channels were structured to generate ongoing commercial output across multiple projects, timelines, and distribution pathways. That value continues to materialize post-petition and during the pendency of this case. Following the claim hearing on January 30, 2026, market activity reflects materially similar project outputs within categories, structures, and development pathways aligned with Claimant's submissions and the evidentiary record, the full scope of which remains within Debtor control.

For example, "GOAT," released February 13, 2026, generated approximately $182 million in reported box office performance. That outcome materialized after the claim was evaluated on a limited record assembled by Claimant's manager—the author, originator, and sole economic stakeholder—without access to Debtor-controlled systems and records required to complete the evidentiary record. It reflects value realized outside the record before the Court.

This sequence establishes a valuation dislocation: the claim was evaluated on a paper record without access to internal development evidence, despite proof of claim and claimant narrative supported by an evidence record demonstrating documented access, transmission of services and

intellectual property architecture and development frameworks, traceable alignment to subsequent market outputs, prior notice and requests for clarification from Claimant to the Debtors, and Debtor control over the records required to confirm authority, handling, and exploitation.

At the claim objection hearing, the Debtors relied on Claimant's evidence—specifically their "former" agent's email communications—to assert authority as of March 2023, despite contending the relationship had ended, then used that asserted authority to disallow the claim while advancing inconsistent positions as to its scope and duration. This raises a direct question as to who controlled Debtor infrastructure and decision-making regarding the handling of submitted materials and services and the use of Claimant's work and the underlying materials authored and originated by its sole manager and economic stakeholder across known franchises, original content, and live events, including resulting media rights, and establishes a reasonable basis to examine the operative conduct during the relevant period and its impact on these proceedings.

At the claim objection hearing, the Debtors made clear they would not produce internal records or present evidence sufficient to permit testing of disputed facts as required under Bankruptcy Rule 9014(d), and instead relied on selective, unverified, and contradictory excerpts from their agent, drawn from Claimant's evidentiary record. That approach prevented Claimant from testing the evidentiary basis of the Debtors' positions, demonstrates that the claim was evaluated on a record shaped by Debtor-controlled selection rather than full disclosure, and establishes that the absence of those records is a consequence of Debtor control, not Claimant omission. Additional Claimant projects reflect similar structural alignment across scripted, unscripted, and live formats, confirming that the value associated with submitted materials is not confined to a

discrete project or pre-petition snapshot but reflects a broader development architecture capable of delayed and repeated commercial realization.

Under these conditions, any attempt to fix, cap, reserve, or disallow the claim on an incomplete evidentiary record necessarily understates or excludes ongoing and subsequently realized value. Without access to internal records regarding authority, policy, development timelines, incubation processes, packaging cycles, internal routing, and communications bearing on submitted materials, strategic services, and the use—the full scope, trajectory, and realization of value cannot be determined.

This evidentiary gap is structural. The Debtors control the records required to evaluate the claim, have not produced those records, and nonetheless seek to fix or disallow claim value through Plan confirmation. That framework cannot support a reliable or legally sufficient valuation. Under these conditions, estimation under §502(c) is required, and a Plan confirmed on an evidentiary record shaped by unresolved conduct cannot lawfully fix or discharge claims dependent on that record. Any valuation or disposition of the claim under these conditions would rest on an incomplete evidentiary record controlled by the Debtors and cannot support a fair or legally sufficient determination of claim value.

### III-A. ESTIMATION REQUIRED UNDER 11 U.S.C. §502(c)

Section 502(c) requires estimation of any claim where liquidation would unduly delay the administration of the case.

Here, liquidation of the claim depends on access to Debtor-controlled records that have not been produced, including internal development materials, communications, project tracking data, and information concerning downstream commercial activity.

Absent those records, full liquidation cannot occur within the timeframe imposed by Plan confirmation.

That delay is the direct result of Debtor control over undisclosed records required to determine value.

At the same time, the record reflects that value associated with the claim continues to manifest post-petition, including measurable commercial outcomes aligned with the submitted materials and arising during and after the claim evaluation process.

This creates an active valuation gap that cannot be resolved through delay and cannot be resolved through disallowance or artificial limitation.

Under these conditions, §502(c) is triggered and estimation is required.

Estimation must account for:

• the structural capacity of the submitted materials to generate multiple commercial outputs

• the demonstrated alignment between submitted materials and subsequent market activity

• the timing gap between claim evaluation and value realization

• the absence of Debtor-produced records necessary to quantify development pathways and resulting outcomes

• the likelihood of continued realization of value across additional projects derived from the same underlying frameworks

Any estimation that excludes post-evaluation outcomes, disregards ongoing value realization, or relies solely on the incomplete record previously presented fails to approximate the claim's actual economic value.

Estimation that incorporates these factors provides the only basis to approximate value while avoiding material prejudice to Claimant and permitting the case to proceed.

### III-B. CONNECTION TO PLAN CONFIRMATION

The Plan cannot be confirmed while simultaneously:

• relying on an incomplete Debtor-controlled evidentiary record

• fixing claim value at a pre-realization point in time

• declining to estimate the claim despite the impossibility of full liquidation within the Plan timeline.

Proceeding under that framework:

• shifts the economic consequence of missing records onto the Claimant

• excludes demonstrable post-evaluation value

• resolves the claim on a basis incapable of reflecting its actual scope.

A valuation process that excludes post-evaluation outcomes arising within the same development architecture is not a valuation; it is a limitation imposed by non-disclosure.

A Plan predicated on that framework cannot satisfy the requirements of 11 U.S.C. §1129.

### III-C. PRESERVATION OF RECONSIDERATION

The post-evaluation emergence of materially aligned commercial outputs, together with the continued absence of Debtor-controlled records necessary to evaluate exploitation pathways and value realization, establishes that the claim was assessed on an incomplete record.

To the extent the Court's prior evaluation relied on a limited evidentiary presentation, these developments and the continued withholding of Debtor-controlled information require further review to ensure claim treatment reflects the full scope of relevant facts.

Where resolution of the claim depends on disputed facts exclusively within Debtor control, adjudication without evidentiary development contravenes Bankruptcy Rule 9014(d), which requires evidentiary development where material facts are disputed.

The Plan provides no mechanism to address this deficiency.

Proceeding to confirmation under these conditions would fix claim outcomes while material information remains unproduced and while value associated with the claim continues to manifest outside the record before the Court.

Reconsideration must remain preserved and available under the Court's discretion to prevent claim treatment from being fixed on an incomplete and evolving record.

### III-D. RELIEF

Confirmation cannot be granted unless the Plan is modified to:

• require disclosure of records necessary to evaluate claims dependent on Debtor-controlled information

• provide a mechanism for estimation under §502(c) that incorporates ongoing and post-petition value realization

• preserve a procedural mechanism for further review of claim treatment where prior evaluation occurred on an incomplete evidentiary record, and subsequent developments reflect material value realized outside the record before the Court.

Absent these modifications, the Plan fixes claim outcomes on an incomplete record, excludes ongoing and post-petition value, and does not provide a fair and lawful basis for claim treatment. Accordingly, the Plan does not satisfy 11 U.S.C. §1129 and cannot be confirmed.

### IV. UNRESOLVED ALTERNATIVES AND RESULTING EXPOSURE

The record presents unresolved and conflicting accounts regarding the Debtors' conduct and their treatment of Claimant's materials and services and its author, originator, and sole economic stakeholder.

If the Debtors contend their restructuring is unrelated to the conduct shown in Claimant's filings, the Plan nonetheless fails to account for whether submitted materials were extracted, retained, circulated, or used to inform development, packaging, or transactions without participation, attribution, or compensation.

If, alternatively, the conduct reflected in the record is connected to the Debtors' internal operations or strategic posture during the relevant period, those issues bear directly on asset treatment, claim exposure, and the integrity of the claims process.

In either case, the Plan seeks finality without providing the information necessary to determine:

• whether submitted materials were used or influenced downstream outcomes

• whether value was generated in connection with those materials

• whether Claimant or its manager's rights were affected through Debtor-controlled processes

Each alternative results in unresolved exposure. The Plan resolves neither.

A Plan that seeks finality while leaving these alternatives unresolved cannot satisfy the requirements of 11 U.S.C. §1129.

## V. AUTHORITY

A parallel, unresolved issue concerns authority.

The Debtors have advanced shifting, irreconcilable characterizations of the role, scope, and authority of the individual through whom Claimant's materials and services were submitted. The claims arise from conduct, apparent authority, and reliance—not solely contract—and cannot be extinguished through characterization that collapses those doctrines into a contractual framework.

If that individual acted with authority—actual, apparent, or exercised through Debtor-sanctioned infrastructure—then the Debtors are accountable for the handling, use, and disposition of materials and services submitted through that channel.

If that individual lacked authority, then the Debtors must account for the use of Debtor-branded systems and personnel, the absence of internal controls, the failure to intervene or correct, and any resulting handling, transmission, or use of submitted materials within or beyond the organization—particularly where the Debtors were on notice of that individual's history and were expressly flagged by the Claimant—as shown in the record.

Either path establishes Debtor accountability.

The Plan does not reconcile these positions, does not resolve the underlying conduct, and does not provide a lawful basis to fix claim treatment while the authority framework remains undefined.

## VI. RESERVE AND CLAIM TREATMENT

The Plan contemplates treatment of disputed claims through a reserve mechanism.

No methodology is disclosed for:

• how approved and disputed claims are evaluated

• how reserve amounts are determined

• how claims dependent on Debtor-controlled, withheld records are assessed

• whether claimants or creditors can access or test the information required for valuation

• whether the reserve captures all claims against the estate or trust arising from the conduct reflected in the record, including those pending, contingent, or subject to further review

Absent that transparency, the reserve risks functioning as a procedural endpoint rather than a good-faith mechanism for claim resolution.

If distributions proceed and releases become effective while claims remain subject to this undisclosed framework, the resulting prejudice is irreversible.

A reserve that fixes outcomes without disclosing the methodology or permitting access to the underlying information does not provide a fair or reliable basis for claim treatment.

On that basis, the Plan does not satisfy 11 U.S.C. §1129.

## VII. BASIS OF CLAIMS AND IMPACT OF THIRD-PARTY RELEASES

The claims arise from intellectual property, proprietary materials, strategic frameworks, and related services solicited by the Debtors and transmitted through Debtor-controlled systems and channels by its sole manager and economic stakeholder, as author and originator.

The record reflects the submission, handling, and development context of those materials, including associated talent, project structuring, and related services, as well as unresolved issues regarding authority, engagement scope, verified submission status, and internal handling within Debtor-controlled systems.

At the same time, materially similar projects, formats, and outputs have appeared in the marketplace through third parties and affiliated participants operating within the same industry channels reflected in Claimant's submissions and the evidentiary record.

The Plan contemplates releases in favor of third parties, including parties that may have participated in, received, evaluated, or commercially advanced or distributed materials, concepts, or strategies derived from or aligned with those submissions.

Absent disclosure of Debtor-controlled records sufficient to determine how Claimant's materials and services were handled, routed, evaluated, or, if applicable, shared or used, the scope and effect of such releases cannot be assessed.

Proceeding with third-party releases under these conditions risks extinguishing claims and related rights before the facts necessary to evaluate those claims have been produced or tested. Without access to the underlying information required to evaluate receipt, use, and resulting benefit, any purported consent to such releases cannot be informed.

Under these conditions, disclosure of Debtor-controlled records and a defined process for claim evaluation are required to ensure releases do not impair claims dependent on information uniquely within Debtor control.

Releases cannot extend to conduct or parties where the factual record necessary to determine involvement, use, or benefit remains unproduced and exclusively within Debtor control.

A Plan that grants third-party releases on that record does not satisfy 11 U.S.C. §1129.

## VIII. GOOD FAITH — §1129(a)(3)

Good faith requires a process that permits fair and informed evaluation of claims.

Here, the Debtors seek confirmation of a Plan that centralizes control over the records required to evaluate claims including disputed claims, declines to produce those records, advances conflicting positions regarding authority and submission handling, and proceeds to fix claim outcomes without providing the information necessary to test those positions.

A process that prevents access to and testing of the information required to evaluate claims cannot satisfy the requirements of good faith.

Where a Plan depends on undisclosed, Debtor-controlled information while resolving claims that require that information, the process fails to provide a fair and informed basis for adjudication.

Where the Debtors control the information required to evaluate claims and decline to produce it, confirmation cannot rest on that same information.

Proceeding to confirmation under these conditions fixes outcomes while the facts necessary to determine responsibility, value, and entitlement remain exclusively within Debtor control and withheld.

To the extent value attributable to estate assets or creditor-linked materials was diverted, displaced, or positioned outside the estate through the conduct of executives, financial participants, agents, producers, or third parties, the resulting framework shifts that loss onto creditors while insulating the underlying conduct from review.

A Plan advanced under these conditions is not proposed in good faith and does not satisfy 11 U.S.C. §1129(a)(3).

## IX. STRUCTURAL DEFICIENCY

The claim arises from multi-year services and project submissions originated, authored, developed, financed, and transmitted by Claimant's sole manager and economic stakeholder through Debtor-controlled channels under representations of authority that remain unresolved, inconsistently described, and contradicted by the evidentiary record.

Evaluation of this claim depends on access to internal records, communications, and Debtor-side evaluation, development, and disposition—including records governing routing, review, analysis, internal notes, and use following confirmed receipt—which have not been produced.

The result is a structural imbalance: the Debtors control the evidence, define the narrative, seek finality through Plan confirmation, and simultaneously implement releases for themselves and third parties exposed to potential liability arising from the same underlying conduct reflected in the record, occurring pre-petition and carried into the bankruptcy, while withholding information exclusively within their control necessary to evaluate and test those claims.

That structure mirrors the evidentiary failure identified on appeal: the Debtors rely on debtor-controlled records to defeat the claim while producing none of those records.

This same underlying conduct spans the full lifecycle of Claimant's submissions: project, talent, and strategy statuses pre-petition; internal handling, routing, and evaluation during the claims process; and continued non-disclosure and release implementation at confirmation, with the operative records remaining exclusively within Debtor control at each stage—now positioned for final resolution through Plan confirmation on that same undeveloped, Debtor-controlled record. Under that structure, accurate claim evaluation is not possible.

These deficiencies are embedded in the Plan.

A Plan that embeds this imbalance—control of the record coupled with non-disclosure and liability insulation—cannot provide a fair or reliable basis for claim or creditor treatment. On that basis, the Plan does not satisfy 11 U.S.C. §1129.

## X. CONCLUSION

Claimant does not seek to delay administration of the estate.

Claimant seeks a process that permits claims dependent on Debtor-controlled information to be evaluated and tested on a complete and reliable record.

Claimant requested fair treatment, guidance, and clarification in the claim narrative submitted July 14, 2025. The Debtors had the opportunity to address and resolve those issues and did not. The same underlying conduct has continued through the claims process and into Plan confirmation, including the pursuit of releases that would fix claim outcomes while the operative record remains incomplete and withheld.

Absent disclosure of the materials necessary to evaluate and test such claims, confirmation fixes claim outcomes on an incomplete and selectively presented record.

A Plan that fixes claim outcomes while withholding the information required to evaluate and test those claims, and seeks to extend releases on that basis, cannot support confirmation.

That result does not satisfy the requirements of 11 U.S.C. §1129.

Confirmation must be denied unless the Plan is modified to require disclosure, provide for estimation under §502(c), and preserve mechanisms for review sufficient to ensure fair, transparent, and complete evaluation and resolution of affected claims.

Nothing herein constitutes consent to any third-party release, and all rights of Claimant and its sole manager and economic stakeholder are expressly preserved, including all rights arising from its role as originator, author, and rights holder of the underlying materials and from the development, submission, and provision of related services.

Dated: April 6, 2026

Respectfully submitted,

/s/ John T. Pautsch

John T. Pautsch
Manager
THE G.O.A.T. MEDIA, LLC
9903 Santa Monica Blvd. #169
Beverly Hills, CA 90212
Telephone: (310) 745-0257
Email: legal@thegoat.com

## CERTIFICATE OF SERVICE

I, John T. Pautsch, certify that on April 6, 2026, I caused a copy of this Supplemental Statement to be filed with the Court and served by electronic mail on parties in interest.

Dated: April 6, 2026

/s/ John T. Pautsch

John T. Pautsch